**[ORAL ARGUMENT SCHEDULED FOR AUGUST 21, 2024]**

**Nos. 24-3089, 24-3094**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

_____

STATE OF ALASKA, et al.,

        Plaintiffs-Appellees / Cross-Appellants,

v.

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

        Defendants-Appellants / Cross-Appellees.

_____

On Appeal from the United States District Court for the District of Kansas
District Court Case No. 6:24-CV-01057-DDC-ADM (Judge Daniel D. Crabtree)

_____

## RESPONSE AND REPLY BRIEF
## FOR APPELLANTS / CROSS-APPELLEES

_____

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*
MICHAEL S. RAAB
THOMAS PULHAM
SIMON C. BREWER
SARAH N. SMITH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7529*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5367*

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED APPEALS

GLOSSARY

INTRODUCTION ..................................................................................................... 1

STATEMENT OF THE ISSUE ............................................................................... 2

STATEMENT OF THE CASE ................................................................................ 3

SUMMARY OF ARGUMENT ................................................................................ 3

STANDARD OF REVIEW ...................................................................................... 6

ARGUMENT ............................................................................................................. 6

I.     The government correctly construed the preliminary injunction. ....................... 6

II.    The government is likely to prevail on the merits. ................................................. 8

    A.    The States lack Article III standing. ............................................................. 8

        1.    FFEL consolidation does not give rise to an injury in fact traceable to the Department's actions. .............................................. 8

        2.    Plaintiffs' tax-revenue and recruiting theories fail to demonstrate standing ....................................................................... 14

    B.    The Department has clear statutory authority to promulgate the Final Rule ......................................................................................... 20

        1.    The major-questions doctrine does not apply ............................... 21

        2.    Even if the major-questions doctrine applied, the HEA clearly authorizes the Final Rule. ..................................................... 26

    C.    Plaintiffs are not likely to succeed on their other APA claims. ............... 34

        1.    The Final Rule is not arbitrary or capricious. ................................. 34

2.      The Department complied with the APA's procedural
        requirements. ..................................................................................... 39

III.    The remaining equitable factors favor the government. ..................................... 41

        A.      Plaintiffs will not suffer irreparable harm if the preliminary
                injunction is reversed. ................................................................. 41

        B.      Plaintiffs fail to show irreparable harm from the provisions of the
                Final Rule that the district court did not enjoin. ....................................... 42

        C.      The balance of the equities and the public interest favor the
                government. ................................................................................. 44

IV.     At a minimum, the overbroad injunction should be narrowed, not
        expanded. ......................................................................................... 46

        A.      The injunction is overbroad. .......................................................... 46

        B.      The injunction should not be broadened. ................................................. 48

CONCLUSION ............................................................................................. 52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                                                    **Page(s)**

*Acosta v. Foreclosure Connection, Inc.*,
   903 F.3d 1132 (10th Cir. 2018) ........................................................... 51

*Air Transp. Ass'n of Am. v. FAA*,
   169 F.3d 1 (D.C. Cir. 1999) .................................................................. 35

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
   458 U.S. 592 (1982) ............................................................................. 20

*American Textile Mfrs. Inst., Inc. v. Donovan*,
   452 U.S. 490 (1981) ............................................................................. 37

*Arbaugh v. Y&H Corp.*,
   546 U.S. 500 (2006) ............................................................................. 10

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*,
   576 U.S. 787 (2015) ............................................................................. 20

*Bar MK Ranches v. Yuetter*,
   994 F.2d 735 (10th Cir. 1993) ........................................................... 40

*Becerra v. Empire Health Found.*,
   597 U.S. 424 (2022) ............................................................................. 24

*Biden v. Nebraska*,
   600 U.S. 477 (2023) ......................................... 2, 24, 25, 33-34, 47

*Biden v. Texas*,
   597 U.S. 785 (2022) ............................................................................. 46

*Bradford v. U.S. Dep't of Labor*,
   101 F.4th 707 (10th Cir. 2024) ............................................ 21, 22, 23

*California v. Texas*,
   593 U.S. 659 (2021) .................................................................... 12, 15

*CFPB v. Community Fin. Servs. Ass'n of Am.*,
   601 U.S. 416 (2024) ............................................................................. 33

*Citizens United v. Gessler*,
   773 F.3d 200 (10th Cir. 2014) ............................................................. 6

*Collins v. Daniels*,
916 F.3d 1302 (10th Cir. 2019) ...................................................................... 8

*Colorado v. U.S. EPA*,
989 F.3d 874 (10th Cir. 2021) ............................................... 15, 42, 44, 48

*Combat Veterans for Cong. Political Action Comm. v. FEC*,
795 F.3d 151 (D.C. Cir. 2015) ..................................................................... 38

*Conkright v. Frommert*,
559 U.S. 506 (2010) ...................................................................................... 10

*Connecticut Light & Power Co. v. NRC*,
673 F.2d 525 (D.C. Cir. 1982) ..................................................................... 40

*Davilla v. Enable Midstream Partners L.P.*,
913 F.3d 959 (10th Cir. 2019) ..................................................................... 34

*Delaware State Sportsmen's Ass'n v. Delaware Dep't of Safety & Homeland Sec.*,
--- F.4th ---, 2024 WL 3406290 (3d Cir. July 15, 2024) ........................... 45

*Department of Commerce v. New York*,
588 U.S. 752 (2019) ...................................................................................... 12

*Department of Educ. v. Brown*,
600 U.S. 551 (2023) ......................................................................... 13, 14, 24

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .......................................................................................... 36

*Entergy Corp. v. Riverkeeper Inc.*,
556 U.S. 208 (2009) ...................................................................................... 37

*FDA v. Alliance for Hippocratic Med.*,
602 U.S. 367 (2024) ...................................................................... 8, 10, 11, 18

*FEC v. Cruz*,
596 U.S. 289 (2022) ...................................................................................... 16

*Florida v. Mellon*,
273 U.S. 12 (1927) ........................................................................................ 17

*Gill v. Whitford*,
585 U.S. 48 (2018) .................................................................................. 46, 47

iv

*GTE Corp. v. Williams,*
731 F.2d 676 (10th Cir. 1984) ........................................ 43

*Gundy v. United States,*
588 U.S. 128 (2019) ........................................ 33

*Habitat Educ. Ctr. v. U.S. Forest Serv.,*
607 F.3d 453 (7th Cir. 2010) ........................................ 10

*Labrador v. Poe ex rel. Poe,*
144 S. Ct. 921 (2024) ........................................ 45, 46, 47

*Larson v. Valente,*
456 U.S. 228 (1982) ........................................ 13

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
591 U.S. 657 (2020) ........................................ 33, 38, 39, 40

*Lomax v. Ortiz-Marquez,*
590 U.S. 595 (2020) ........................................ 27

*Loper Bright Enters. v. Raimondo,*
144 S. Ct. 2244 (2024) ........................................ 23, 33

*Louisiana ex rel. Landry v. Biden,*
2022 WL 866282 (5th Cir. Mar. 16, 2022) ........................................ 49

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ........................................ 9, 14

*Mackinac Ctr. for Pub. Pol'y v. Cardona,*
102 F.4th 343 (6th Cir. 2024), *reh'g denied* (July 23, 2024) ........................................ 19

*Maine Cmty. Health Options v. United States,*
140 S. Ct. 1308 (2020) ........................................ 29

*Marx v. General Revenue Corp.,*
568 U.S. 371 (2013) ........................................ 30

*Massachusetts v. EPA,*
549 U.S. 497 (2007) ........................................ 14

*Michigan v. EPA,*
576 U.S. 743 (2015) ........................................ 37

*Missouri v. Biden,*
2024 WL 3462265 (8th Cir. July 18, 2024) ...................................... 44

*Missouri v. Biden,*
2024 WL 3104514 (E.D. Mo. June 24, 2024) ............................... 39

*Murthy v. Missouri,*
144 S. Ct. 1972 (2024) ................................................. 12, 13, 18, 19

*National Truck Equip. Ass'n v. NHTSA,*
711 F.3d 662 (6th Cir. 2013) .......................................... 35

*Nebraska v. Biden,*
52 F.4th 1044 (8th Cir. 2022) ......................................... 47

*New Mexico Health Connections v. HHS,*
946 F.3d 1138 (10th Cir. 2019) ..................................... 36

*NFIB v. OSHA,*
595 U.S. 109 (2022) ...................................................... 45

*Ohio v. EPA,*
144 S. Ct. 2040 (2024) ................................................. 36

*OPM v. Richmond,*
496 U.S. 414 (1990) ...................................................... 33

*Outdoor Amusement Bus. Ass'n, Inc. v. DHS,*
983 F.3d 671 (4th Cir. 2020) ........................................ 29

*Pennsylvania v. New Jersey,*
426 U.S. 660 (1976) ...................................................... 15

*Phillips Petroleum Co. v. U.S. EPA,*
803 F.2d 545 (10th Cir. 1986) ..................................... 40

*Prairie Band Pottawatomie Nation v. Federal Highway Admin.,*
684 F.3d 1002 (10th Cir. 2012) .................................... 38

*Rimbert v. Eli Lilly & Co.,*
647 F.3d 1247 (10th Cir. 2011) .................................... 34

*RoDa Drilling Co. v. Siegal,*
552 F.3d 1203 (10th Cir. 2009) ................................. 43, 49

*Ron Peterson Firearms, LLC v. Jones,*
  760 F.3d 1147 (10th Cir. 2014) ............................................................ 29, 31

*Shields Law Grp. v. Stueve Siegel Hanson LLP,*
  95 F.4th 1251 (10th Cir. 2024) ............................................................... 9

*Simon v. Eastern Ky. Welfare Rights Org.,*
  426 U.S. 26 (1976) ................................................................................. 13

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ............................................................................. 8, 9

*St. Anthony Hosp. v. U.S. Dep't of Health & Human Servs.,*
  309 F.3d 680 (10th Cir. 2002) ............................................................... 38

*Stillman v. Teachers Ins. & Annuity Ass'n Coll. Ret. Equities Fund,*
  343 F.3d 1311 (10th Cir. 2003) ............................................................. 34

*Tesone v. Empire Mktg. Strategies,*
  942 F.3d 979 (10th Cir. 2019) ............................................................... 22

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.,*
  576 U.S. 519 (2015) ............................................................................... 28

*Tompkins v. U.S. Dep't of Veterans Affairs,*
  16 F.4th 733 (10th Cir. 2021) ............................................................... 11

*Trump v. International Refugee Assistance Project,*
  582 U.S. 571 (2017) ........................................................................... 50, 51

*University of Tex. v. Camenisch,*
  451 U.S. 390 (1981) ............................................................................. 7, 50

*United States v. Texas,*
  599 U.S. 670 (2023) ..................................................................... 14, 16, 46

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,*
  435 U.S. 519 (1978) ............................................................................... 39

*West Virginia v. EPA,*
  597 U.S. 697 (2022) ............................................................................... 24

*Whitman v. American Trucking Ass'ns,*
  531 U.S. 457 (2001) ............................................................................... 37

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ............................................................... 43, 45, 48, 50

*Wyoming v. Oklahoma,*
  502 U.S. 437 (1992) ..................................................................... 17

*Wyoming v. U.S. Dep't of Interior,*
  674 F.3d 1220 (10th Cir. 2012) ...................................... 16, 17, 20

*Wyoming v. USDA,*
  661 F.3d 1209 (10th Cir. 2011) .............................................. 40

**Statutes:**

Administrative Procedure Act (APA):
  5 U.S.C. § 553(b) ........................................................................ 39
  5 U.S.C. § 553(c) ........................................................................ 39
  5 U.S.C. § 706 ............................................................................ 38

Pub. L. No. 110-84, § 205, 121 Stat. 784, 795-96 (2007) ................................ 28

20 U.S.C. § 1070a ........................................................................ 30

20 U.S.C. § 1071 ......................................................................... 11

20 U.S.C. § 1071(d) ..................................................................... 11

20 U.S.C. § 1078(b)(1)(D) ............................................................... 9

20 U.S.C. § 1078(b)(1)(G) .............................................................. 10

20 U.S.C. § 1078-3(b)(1)(D) ............................................................. 9

20 U.S.C. § 1087a(a) .................................................................... 33

20 U.S.C. § 1087e(d)(1)(D) ............................................ 4, 22, 23, 26, 30, 32

20 U.S.C. § 1087e(d)(1)(E) .............................................................. 30

20 U.S.C. § 1087e(e) .................................................................... 37

20 U.S.C. § 1087e(e)(1) ................................................................. 26

20 U.S.C. § 1087e(e)(4) .................................... 21, 22, 23, 25, 26, 32

20 U.S.C. § 1087e(e)(7) ................................................................ 27

20 U.S.C. § 1087e(e)(7)(B)(i) ...................................................... 28

20 U.S.C. § 1087e(m)(1) .............................................................. 31

20 U.S.C. § 1098e(a)(3) ................................................................ 28

20 U.S.C. § 1098e(b)(7) ................................................................ 29

20 U.S.C. § 1098e(b)(7)(B)(iv) .................................................... 30

20 U.S.C. § 1098e(e)(1) ................................................................ 28

26 U.S.C. § 61(a)(11)-(12) ............................................................ 14

26 U.S.C. § 108(f)(5) ..................................................................... 14

31 U.S.C. § 3711(a) ....................................................................... 31

**Regulatory Materials:**

34 C.F.R. § 682.209(b)(2) ............................................................... 9

34 C.F.R. § 685.220(f)(1)-(2) ......................................................... 9

59 Fed. Reg. 61,664 (Dec. 1, 1994) .......................................... 27

77 Fed. Reg. 66,088 (Nov. 1, 2012) .......................................... 27

80 Fed. Reg. 67,204 (Oct. 30, 2015) .......................................... 27

88 Fed. Reg. 43,820 (July 10, 2023) .................... 2-3, 6, 18, 25, 26, 30,
                                                        31, 32, 35, 37, 38, 41, 51

88 Fed. Reg. 72,686 (Oct. 23, 2023) .......................................... 51

89 Fed. Reg. 2489 (Jan. 16, 2024) ............................................... 6

Exec. Order No. 12,866
     58 Fed. Reg. 51,735 (Oct. 4, 1993):
          § 1(a) ................................................................................ 35
          § 3(b) ................................................................................ 35
          § 3(f) ................................................................................. 35

§ 6(a)(3) ....................................................................................... 35

**Rule:**

Fed. R. Civ. P. 65(d)(1) ...................................................................... 7

**Legislative Material:**

H.R. Rep. 110-210 (2007) ................................................................... 29

**Other Authorities:**

NASDAQ, *Certainty Equivalent*, https://perma.cc/ZLJ6-2BGQ ................................. 10

Press Release, *White House, Fact Sheet: President Biden Announces
   Student Loan Relief for Borrowers Who Need It Most* (Aug. 24, 2022),
   https://perma.cc/R2ND-6RQJ ............................................................ 38

Tax Policy Ctr., *How Do State Individual Income Taxes Conform with
   Federal Income Taxes?*, https://perma.cc/Y5WS-W524 .................................... 15

**STATEMENT OF RELATED APPEALS**
**PURSUANT TO CIRCUIT RULE 28.2(C)(3)**

Counsel for appellants are aware of the following prior or related appeals:

*Alaska et al. v. Department of Education et al.*, No. 24A11 (U.S.)

*Kansas et al. v. Biden et al.*, No. 24-3093 (10th Cir.)

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| EPA | Environmental Protection Agency |
| FFEL | Federal Family Education Loan |
| HEA | Higher Education Act |
| IBR | Income-Based Repayment |
| ICR | Income Contingent Repayment |
| PSLF | Public Service Loan Forgiveness |
| REPAYE | Revised Pay As You Earn |
| SAVE | Saving on a Valuable Education |

## INTRODUCTION

For more than 30 years, the Department of Education (Department) has implemented Congress's direction to offer student loan borrowers an income contingent repayment (ICR) plan in a consistent fashion. Every ICR plan ever offered has required borrowers to pay a defined percentage of their discretionary income for a fixed term of years, after which they receive forgiveness of any outstanding balance that remains. The Department adopted a rule in 2023 that made changes to one such plan, including by reducing the amount of income upon which payment amounts would be based and shortening the repayment period for a subset of loans. The rule preserved the essential features that had long been understood to characterize ICR plans.

A group of States now claims that the shared understanding of every Secretary of Education to exercise this congressional authority was wrong. The district court agreed with the Department that the plain statutory text authorized these amendments, but nonetheless concluded that the plaintiff States were likely to succeed on their challenge and preliminarily enjoined all provisions of the rule that had not yet taken effect.

The Department's opening brief explained why the district court's preliminary injunction was improper, and plaintiffs have failed to mount a convincing defense. Their response brief reprises theories of injury that the district court properly rejected. And plaintiffs continue to insist that they are somehow harmed when loans they hold

are repaid in full in accordance with the terms of the loan. On the merits, plaintiffs contend that the rule exceeds the Department's authority, but their arguments ignore clear statutory text requiring the Department to establish the details for an ICR plan of limited duration with "repayment amounts" "based on the [borrower's] income." Plaintiffs seek to bolster their standing and merits arguments by repeatedly invoking *Biden v. Nebraska*, 600 U.S. 477 (2023). But as the district court recognized, their "theory of standing is more attenuated—and therefore weaker" than the one the Supreme Court accepted. App. Vol. II, at 469. And on the merits, the rule relies on a different statute with different language to provide a different set of borrowers with different relief from the program the Supreme Court held invalid. Finally, the remaining equitable factors weigh strongly against the injunctive relief ordered by the district court, as this Court necessarily recognized in granting a stay.

Plaintiffs also cross-appeal to enjoin parts of the rule that have already been implemented. But their brief fails to engage with the district court's reasons for limiting the injunction. Worse yet, plaintiffs would have this Court enjoin provisions of the rule that have never been specifically challenged in this litigation. This Court should deny that request and reverse the district court's preliminary injunction.

## STATEMENT OF THE ISSUE

The question presented by plaintiffs' cross-appeal is whether the district court abused its discretion by declining to enjoin provisions of the Final Rule (88 Fed. Reg.

43,820 (July 10, 2023)), that had already gone into effect based on its conclusion that the equities of this case did not support broader relief.

## STATEMENT OF THE CASE

The relevant legal and factual background is set out in the government's opening brief (at 4-12).

## SUMMARY OF ARGUMENT

This Court should reverse the district court's preliminary injunction and deny plaintiffs' request for expanded injunctive relief.

I.     The government correctly construed the district court's injunction, which enjoined provisions of the Final Rule scheduled to take effect on July 1, 2024. Plaintiffs' argument that the district court enjoined other provisions that were already in effect cannot be reconciled with the court's order or with plaintiffs' conduct in this litigation.

II.     The government is likely to succeed on the merits, as plaintiffs have not established standing to challenge the Final Rule, nor have they shown that the Rule exceeds the Department's statutory authority or otherwise violates the Administrative Procedure Act (APA).

A.     Plaintiffs lack Article III standing.  As explained in the government's opening brief, plaintiffs do not suffer an injury traceable to the Final Rule when borrowers consolidate Federal Family Education Loans (FFELs) held by plaintiffs' instrumentalities, because consolidation makes those instrumentalities whole and the

decision to consolidate is made by third-party borrowers exercising independent judgment. Plaintiffs' other standing theories were properly rejected by the district court. Any loss in state tax revenue would result from South Carolina's decision to tie its definition of taxable income to the federal definition and would therefore be self-inflicted. And plaintiffs' claim that the Final Rule will hamper their ability to recruit and retain employees because it makes the Public Service Loan Forgiveness (PSLF) program less appealing is too speculative to support standing.

**B.** The Higher Education Act (HEA) provides clear authorization for the Saving on a Valuable Education (SAVE) plan. The major questions doctrine does not apply here, but even if it did, the HEA's plain text authorizes the Secretary to set repayment schedules so long as borrowers pay "over an extended period of time . . . not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D). The Secretary's consistent use of that authority, over more than 30 years, to set the terms of ICR plans supports the Final Rule's legality.

**C.** Because plaintiffs have not shown any prejudice, they cannot prevail on their other APA claims, which, in any case, lack merit. The inclusion of a cost estimate that was affected by subsequent events does not render the Final Rule arbitrary and capricious where the cost analysis was created pursuant to Executive Order and was not relied upon as a basis for the Department's action. And defendants did not violate the APA's procedural requirements by providing interested

parties 30 days to comment on its proposed rule, because the APA sets no minimum period and 30 days was adequate to air the pertinent issues.

      **III.**    Even if plaintiffs could show a likelihood of success on the merits, the equitable factors clearly favor the government. Plaintiffs have not shown any injury— let alone irreparable injury—traceable to the Final Rule. And, on the other side of the ledger, enjoining the Rule would impose certain and serious harms on the Department, borrowers, and the public.

      **IV.**    At a minimum, this Court should narrow the district court's preliminary injunction, which is overbroad both because it is universal in scope and because it enjoined provisions of the Final Rule not challenged by plaintiffs as contrary to the HEA. Assuming some relief was proper, the district court should have tailored its remedy to address the only injury it determined plaintiffs had suffered: lost interest following borrowers' consolidation of FFELs.

      Plaintiffs have not shown that the district court abused its discretion by declining to enjoin the entire Rule. Their brief fails to meaningfully engage with the district court's analysis of the equities. Instead, plaintiffs restate their arguments on the merits, ignoring the other factors a movant must show to obtain injunctive relief. Plaintiffs fail to carry their burden, and the Court should deny their request for expanded relief.

## STANDARD OF REVIEW

This Court reviews for abuse of discretion an order granting or denying a preliminary injunction. *Citizens United v. Gessler*, 773 F.3d 200, 209 (10th Cir. 2014). The district court's legal conclusions are reviewed de novo and its factual findings are reviewed for clear error. *Id.*

## ARGUMENT

## I.    The government correctly construed the preliminary injunction.

The district court issued a preliminary injunction prohibiting the Department from "implementing or acting pursuant to the parts of [the] Final Rule . . . set to become effective on July 1, 2024." App. Vol. II, at 544. The scope of this order is clear, covering only provisions of the Final Rule that had not yet become effective and leaving in place provisions of the Rule that had already become effective. *See* App. Vol. I, at 020 (confirming that "the preliminary injunction doesn't touch any aspect of the SAVE Plan that already has taken effect"). It is also clear which parts of the Final Rule fall into each category. The Department provided public notice that the Secretary was exercising his statutory authority to designate specific provisions for early implementation, including the increased income exemption, *see* 88 Fed. Reg. 43,820, 43,820-21 (July 10, 2023), and the shortened timeline to forgiveness, *see* 89 Fed. Reg. 2489 (Jan. 16, 2024). Provisions that were not so designated would become effective on July 1. 88 Fed. Reg. at 43,821.

The district court's opinion confirmed that understanding. The court noted that, of the three main provisions challenged by plaintiffs, "two . . . already are in effect: (i) the increase in the discretionary income line from 150% to 225% of the federal poverty line and (ii) the shorter path to forgiveness for borrowers who took out small loans." App. Vol. II, at 527. The court expressly stated that it "decline[d] to enjoin the parts of the SAVE plan defendants already have implemented" because "[t]he equities of this case" did not support such relief. App. Vol. II, at 540; *see infra* pp. 48-51. Instead, the court "enter[ed] a preliminary injunction that forbids defendants from implementing the parts of the Final Rule set to take effect on July 1, 2024." App. Vol. II, at 541. Such circumscribed relief would "preserve the relative positions of the parties until a trial on the merits can be held." *Id.* (quoting *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

Ignoring the text of the district court's order, plaintiffs insist that the district court enjoined all "three 'key' provisions" of the Rule on a prospective basis. Second Br. 15. This attempt fails on its own terms—the pages of the opinion that plaintiffs cite distinguish between "parts" of the Rule already in effect and those not yet in effect. App. Vol. II, at 530 n.9, 541. But more fundamentally, it is inconsistent with Federal Rule of Civil Procedure 65(d)(1), which establishes that acts "restrained or required" must be identified in the "order granting an injunction" itself and not in some "other document." *See* App. Vol. II, at 533 (acknowledging this requirement).

Plaintiffs' argument is also inconsistent with their own conduct in this litigation. The Department laid out its understanding of the injunction in a stay motion filed a month ago. Dkt. 81, at 3-4. Plaintiffs did not raise any objection before the district court—the proper forum for a dispute about the meaning of that court's own order—in a motion for clarification or similar filing. And in a previous filing in this Court, they similarly described the district court's order as enjoining "parts" of the Final Rule and agreed that "[t]he only provision genuinely at issue" was the one "capping payments at 5%-vs-10% of discretionary income." Stay Opp'n 1, 20-21.

## II.    The government is likely to prevail on the merits.

The government is likely to prevail in this suit. Accordingly, the preliminary injunction should be reversed—not expanded, as plaintiffs request.

### A.    The States lack Article III standing.

#### 1.    FFEL consolidation does not give rise to an injury in fact traceable to the Department's actions.

As the government's opening brief explained (at 15-22), plaintiffs do not suffer a judicially cognizable injury arising from FFEL consolidation traceable to the challenged provisions of the Final Rule. The existence of each element of standing is a question of law reviewed de novo. *See Collins v. Daniels*, 916 F.3d 1302, 1311 (10th Cir. 2019); *see also, e.g.*, *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 390 (2024) (reviewing causation as a matter of law); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)

(reviewing injury in fact as a matter of law). Plaintiffs' argument (at 17) that the district court's standing analysis is subject to "the clear-error standard of review" therefore misses the mark. And the fact that defendants did not submit evidence with their motion to dismiss for lack of standing is irrelevant, as "[t]he party invoking federal jurisdiction bears the burden of establishing" each element. *Shields Law Grp. v. Stueve Siegel Hanson LLP*, 95 F.4th 1251, 1280 (10th Cir. 2024). Plaintiffs have not met that burden.

    **a.** An asserted injury "must actually exist" to satisfy Article III. *Spokeo*, 578 U.S. at 340. As the government's opening brief explained (at 16-19), consolidation does not entail any financial injury to the State instrumentalities. Plaintiffs do not dispute that FFEL consolidation results in full repayment for the State instrumentalities. *See* 20 U.S.C. § 1078-3(b)(1)(D); 34 C.F.R. § 685.220(f)(1)-(2). Nor do they dispute that the FFEL program's terms give borrowers the right to "accelerate" their loans at any time (without penalty). *See* 20 U.S.C. § 1078(b)(1)(D)(i); 34 C.F.R. § 682.209(b)(2). Plaintiffs therefore have no legal entitlement to future payments from FFEL borrowers following loan consolidation. And without any "invasion of a legally protected interest," they have not established an injury in fact. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

    Plaintiffs' principal response is that the Court should not weigh "offsetting benefits" from early repayment against lost interest income. Second Br. 19. But as our opening brief explained (at 19), "[t]he value of early repayment goes to whether

the States would suffer any pocketbook injury in the first place."  Full repayment of

FFELs is the economic equivalent of future interest payments, as the lender both

recoups the time value of money, *see Conkright v. Frommert*, 559 U.S. 506, 519 (2010),

and avoids the risk of default, *see* 20 U.S.C. § 1078(b)(1)(G).[1]  Those are not unrelated,

offsetting benefits; they are the very reasons why a lender is not entitled to interest

after a loan is repaid.  *See Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th

Cir. 2010).

The implications of plaintiffs' theory are remarkable.  *Cf. Alliance for Hippocratic

Med.*, 602 U.S. at 391-92.  Under their logic, any lender would be harmed any time a

borrower repays a loan earlier than expected, whether because the borrower found a

new source of income or received proceeds from a gift, a bonus, a different loan at a

lower interest rate, or anything else.  But events that improve a borrower's ability to

repay outstanding debt do not injure a lender; quite the contrary.  There is no Article

III injury when a lender receives full satisfaction of a debt in accordance with the

terms of the loan.

---

[1] Plaintiffs suggest that the Department failed to present this argument to the district court.  Second Br. 19.  That is inconsistent with the record, *see* Dkt. 65, at 10, but in any event, objections to subject-matter jurisdiction cannot be waived or forfeited.  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).  Moreover, plaintiffs' newfound reliance (at 19) on other economic concepts is unavailing.  Because borrowers may accelerate their FFELs at any time without penalty, lenders must and do accept payment of the outstanding principal and interest in lieu of the chance to receive future payments.  *Cf.* NASDAQ, *Certainty Equivalent*, https://perma.cc/ZLJ6-2BGQ.  Plaintiffs' citation to a journal article about firms' demand for liquidity in the face of financial constraints is even further afield.

As a fallback, plaintiffs assert (at 20) that "the SAVE Plan's incentives for borrowers to consolidate" effectively make the Department "a competitor for offering student loans to these state instrumentali[ties]." This argument was never offered below and is therefore forfeited. *See Tompkins v. U.S. Dep't of Veterans Affairs*, 16 F.4th 733, 735 n.1 (10th Cir. 2021). In any event, it fails on its own terms. No new FFELs have been issued since 2010, *see* 20 U.S.C. § 1071(d), so the federal government does not "compete" with these State instrumentalities for student-loan originations. That aside, the FFEL program was itself a student-loan program administered by the Department, which guaranteed and subsidized loans made by lenders to borrowers to help them pay for the cost of higher education. *See generally id.* § 1071. Plaintiffs' continued holding of loans issued through that federal program hardly establishes that they are in competition with a different federal student-loan program that largely replaced the FFEL program starting in 2010.

**b.** Plaintiffs also fail to establish that any such injury is fairly traceable to any challenged portion of the Final Rule rather than the independent decisions of third-party borrowers. As the government's opening brief showed (at 19-21), plaintiffs' theory of causation rests "on speculation about the unfettered choices made by independent actors not before the courts." *Alliance for Hippocratic Med.*, 602 U.S. at 383. Indeed, plaintiffs concede that "borrowers might also consolidate loans for *other* reasons" besides the Final Rule's challenged provisions. Second Br. 22. Accordingly,

plaintiffs must show "*why* [borrowers] might" consolidate to establish traceability. *California v. Texas*, 593 U.S. 659, 678 (2021).

Plaintiffs have not met that burden. As the district court explained, they did not "adduce[] any evidence that purports to suss out the amount of consolidation caused by . . . the SAVE plan[] and general market forces individually." App. Vol. II, at 474. Plaintiffs rely (at 21) nearly exclusively on the Alaska declaration,[2] but that declaration suffers the flaws identified in the government's opening brief (at 20-21). Given the evidence that borrowers had "independent incentives" to consolidate long before the SAVE plan "entered the picture," plaintiffs' "murky" evidence fails to clearly show traceability. *Murthy v. Missouri*, 144 S. Ct. 1972, 1992 n.8 (2024).

That is the critical distinction between this case and *Department of Commerce v. New York*, 588 U.S. 752 (2019), on which plaintiffs principally rely. *See* Second Br. 20-22. In *Department of Commerce*, the district court concluded that the plaintiffs had standing to challenge the addition of a citizenship question to the census because the "evidence made clear that the *citizenship question* drove" the injury-causing third-party decisions. *Murthy*, 144 S. Ct. at 1992 n.8. Plaintiffs' evidence here is nothing like that; they never dispute that borrowers have many "independent incentives" driving their

---

[2] Plaintiffs also mention (at 21) "the evidence submitted by Texas." That evidence did not purport to establish causation. *See* App. Vol. II, at 410 ("*To the extent that federal policy results in borrowers consolidating their loans . . .* [t]he SAVE Plan could cause pecuniary harm . . . ." (emphasis added)); *see also* App. Vol. II, at 476 (concluding that the Texas "declaration doesn't help plaintiffs shoulder their burden to show that borrowers will consolidate their FFEL loans into direct loans").

consolidation decisions, both before and after the Final Rule's various provisions took effect, and they make no effort to parse out the effect of those incentives. *Id.* Accordingly, they have offered "only speculat[ion] about the decisions of third parties," which does not carry their burden. *Id.* at 1994 (quotation marks omitted).

Plaintiffs disclaim (at 22) the need to establish why borrowers consolidate, citing *Larson v. Valente*, 456 U.S. 228 (1982). But that case did not involve a situation in which standing depended on the actions of independent third parties. *See id.* at 242-43. In the relevant line of cases, the Supreme Court has made clear that plaintiffs must demonstrate that the purportedly injurious third-party actions will occur "in response to the actions of at least one Government defendant." *Murthy*, 144 S. Ct. at 1986; *see also Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 42-43 (1976).

Plaintiffs mistakenly suggest that the traceability requirement is "relaxed" here because one of their claims involves procedural rights. Second Br. 22. A plaintiff asserting a procedural right must still show that "it has a 'concrete interest that is affected by the deprivation' of the claimed right," and that its "ostensible injury" "fairly can be traced to" the defendant's conduct. *Department of Educ. v. Brown*, 600 U.S. 551, 562, 567 (2023) (citations omitted). Procedural-rights cases are different only in that "the fact that the defendant might well come to the same decision after abiding by the contested procedural requirement does not deprive a plaintiff of standing." *Id.* at 561-62. But that is not the defect in plaintiffs' standing theory.

Similarly, plaintiffs' invocation (at 22) of "special solicitude" for State litigants under *Massachusetts v. EPA*, 549 U.S. 497 (2007), is misplaced. *Massachusetts*'s holding is limited: that case "involved a challenge to the denial of a statutorily authorized petition for rulemaking," so it "does not control this case" where there are no analogous statutory procedures at issue. *United States v. Texas*, 599 U.S. 670, 685 n.6 (2023); *see also id.* at 688-89 (Gorsuch, J., concurring in the judgment) ("Nor has 'special solicitude' played a meaningful role in this Court's decisions in the years since [*Massachusetts*]. . . . [I]t's hard not to think, too, that lower courts should just leave that idea on the shelf . . . ."). Accordingly, plaintiffs' consolidation theory fails to demonstrate the "irreducible constitutional minimum of standing." *Brown*, 600 U.S. at 561 (quoting *Lujan*, 504 U.S. at 560).

### 2. Plaintiffs' tax-revenue and recruiting theories fail to demonstrate standing.

**a.** South Carolina asserts (at 23-24) standing based on the loss of income-tax revenue.[3] The Internal Revenue Code normally treats "discharge of indebtedness" as a form of "gross income," 26 U.S.C. § 61(a)(11)-(12), but a temporary provision excludes discharges of student loans prior to January 1, 2026, *see id.* § 108(f)(5). South Carolina argues that because it has tied its own definition of taxable income to the federal definition, *see* App. Vol II, at 486, the Final Rule's provision "accelerat[ing] the

---

[3] This theory does not apply to Alaska and Texas, which "have no state income tax." App. Vol. II, at 486 n.11.

timeline for cancelation on income-driven repayment plans" will result in less taxable student-debt forgiveness. App. Vol. II, at 487; *see also* Second Br. 23. That theory does not help South Carolina for several reasons.

First, as the district court recognized, the tax-revenue theory has "a traceability problem." App. Vol. II, at 490. A plaintiff has standing only if its injury is "fairly traceable to *the defendant's* allegedly unlawful conduct." *California*, 593 U.S. at 669 (emphasis added). But under *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) (per curiam), South Carolina's injury is self-inflicted.[4] There, Pennsylvania sought to establish standing to challenge a New Jersey tax by arguing that, because Pennsylvania provided a credit for taxes paid to other States, a tax increase in New Jersey could lead to a loss of tax revenue in Pennsylvania. *Id.* at 664-65. The Court rejected that theory, explaining that nothing required Pennsylvania to extend the credit, that any harm to Pennsylvania was thus "self-inflicted," and that "[n]o State can be heard to complain about damage inflicted by its own hand." *Id.* at 664. So too, here. States have no obligation to track the federal definition of gross income; indeed, many do not. *See* Tax Policy Ctr., *How Do State Individual Income Taxes Conform with Federal Income Taxes?*, https://perma.cc/Y5WS-W524; *see also supra* note 3. Regardless of the Final Rule, South Carolina remains free to treat student-loan discharges prior to 2026 as

---

[4] *Pennsylvania*'s holding on this point "is not limited to the original jurisdiction context." *Colorado v. U.S. EPA*, 989 F.3d 874, 888 & n.2 (10th Cir. 2021).

taxable income under state law.  If it chooses not to, any resulting reduction in its tax revenues is fairly traceable only to its own choices about how to structure its tax laws.

Plaintiffs' passing reference (at 24) to *FEC v. Cruz*, 596 U.S. 289 (2022), does not alter that conclusion.  There, the Supreme Court held that "an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred."  *Id.* at 297.  The Court expressly distinguished that scenario, which establishes an Article III injury, from the one in *Pennsylvania*, where "the unilateral decisions by a group of States" to set their tax policies in a certain way meant that "the financial injury those States suffered was due to their own independent" choices.  *Id.*  As explained above, "[n]othing in the challenged [policy] require[s]" South Carolina to exclude student-loan discharges from its definition of taxable income, so any injury resulting from that decision is "not a basis to attack the legality" of the Final Rule.  *Id.*  Thus, a State suffers no cognizable injury when adherence to its prior tax policy choices yields less revenue than expected.  Nor is a State injured if it makes a "choice" to amend its tax code to make up for the shortfall. Second Br. 24.

Second, even apart from the self-inflicted nature of the asserted harm, any "indirect effects on state revenues" are too "attenuated" to establish standing.  *United States v. Texas*, 599 U.S. at 680 n.3; *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012) ("[T]he unavoidable economic repercussions of virtually all federal

16

policies . . . suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury-in-fact to support state standing."). This principle dates to *Florida v. Mellon*, 273 U.S. 12 (1927). There, Florida sought to challenge a federal inheritance tax, arguing that the tax would prompt the "withdrawal of property" from the State, diminishing its tax base. *Id.* at 18. The Court explained that Florida failed to show a "direct injury"; any harm caused by the federal tax was, "at most, only remote and indirect" and likely could be "made up by an increased rate of taxation." *Id.* (emphasis omitted). The same holds true here.

Plaintiffs' reliance (at 23-24) on *Wyoming v. Oklahoma*, 502 U.S. 437 (1992), is misplaced. There, Oklahoma adopted discriminatory regulations with the avowed purpose of reducing purchases of coal from Wyoming. *Id.* at 443. The Supreme Court held that Wyoming had standing to challenge the Oklahoma laws under the Commerce Clause because it had suffered "a direct injury in the form of a loss of specific [coal] tax revenues." *Id.* at 448. Thus, the Supreme Court "found a direct injury in the form of a loss of *specific* tax revenues." *Wyoming v. U.S. Dep't of Interior*, 674 F.3d at 1234. That is unlike the present case, where plaintiffs do not claim that the Department targeted or discriminated against them. App. Vol. II, at 489 ("The SAVE Plan doesn't target plaintiffs or their tax policies."). They allege, at most, that the plan will have incidental effects on their general tax revenues, which are not Article III injuries.

Finally, even if South Carolina's tax-revenue theory were valid, it would support standing to challenge only the Rule's shortened timelines to forgiveness for borrowers with smaller original loan balances. South Carolina has not claimed that any other part of the Final Rule would cause it to lose income-tax revenue. *See* Second Br. 23. And "standing is not dispensed in gross." *Murthy*, 144 S. Ct. at 1988.

**b.** Plaintiffs' final standing argument centers on an alleged harm to their "ability to recruit and retain employees." Second Br. 24. Plaintiffs submit that they use the opportunity to obtain PSLF as a recruiting tool, and that the Final Rule reduces the incentives to work for State employers by "reducing or eliminating student debt." *Id.* Plaintiffs offer a hypothetical (and unlikely) example of a PSLF participant who would qualify for the shortened timeline to loan forgiveness and would therefore leave public-sector employment. *See id.* at 25-26. *But see* 88 Fed. Reg. at 43,880 ("[T]ypical balances forgiven in PSLF are significantly higher than the amounts that would be subject to the early forgiveness provision in this rule.").[5]

As that example suggests, this theory fails because it requires unadorned speculation about third parties' employment decisions. *See Alliance for Hippocratic Med.*, 602 U.S. at 383. Indeed, the Sixth Circuit recently rejected substantially the same

---

[5] Like the tax-reduction theory, plaintiffs' recruiting theory appears to relate solely to the shortened timeline to forgiveness. That makes sense, as the SAVE plan's reduced payment amounts "would also be available to those seeking PSLF." 88 Fed. Reg. at 43,880. If anything, those lower payments "will make careers in non-profit and public service industries more appealing to borrowers who are seeking PSLF." *Id.* at 43,884.

theory in a case challenging a different Departmental action. *Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343 (6th Cir. 2024), *reh'g denied* (July 23, 2024). Relying on competitor-standing cases, the plaintiffs there contended that the challenged action would hurt "their ability to recruit and retain college-educated employees" by reducing the "financial incentive under PSLF to seek and maintain employment with public service employers." *Id.* at 353 (quotation marks omitted). The court rejected that argument, holding that the plaintiffs must adduce "facts showing how the [challenged policy] affects their ability to recruit and retain college-educated employees." *Id.* (quotation marks omitted). Such facts include "how many of [the p]laintiffs' employees will be impacted" and "how many individuals may make employment decisions based on the" challenged policy, rather than "for any number of reasons unrelated to the [challenged provision], such as pay, location, work-life balance, or any combination of factors." *Id.* at 355-56.

The record here is similarly devoid of evidence that the Final Rule has caused or will cause any borrower's decision to forgo employment with any plaintiff. *See* App. Vol. I, at 108-10 (Texas declaration); App. Vol. II, at 394-95 (Alaska declaration). And once again, plaintiffs' standing theory finds no support in *Department of Commerce*, *see* Second Br. 25-26, where the record "evidence made clear" that the challenged action "drove" third-party decisions. *Murthy*, 144 S. Ct. at 1992 n.8.

Nor is plaintiffs' invocation (at 26) of "special solicitude" any more successful this time around. *See supra* p. 14. As the district court recognized, plaintiffs do not assert a "quasi-sovereign" interest of the type involved in *Massachusetts*. App. Vol. II, at 499. Historically, quasi-sovereign interests have "fall[en] into two general categories": an "interest in the health and well-being" of a State's residents, and an interest "in not being discriminatorily denied" a State's "rightful status within the federal system." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982). By contrast, plaintiffs here are "suing on [their] own behalf" to assert a purported injury in their capacity as employers. *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 802 n.10 (2015). Further, whatever "special solicitude" means, it "does *not* eliminate the state [plaintiffs'] obligation to establish a concrete injury." *Wyoming v. U.S. Dep't of Interior*, 674 F.3d at 1238. As plaintiffs have failed to demonstrate any non-speculative injury, their reliance on "special solicitude" is inapt. *See id.*; App. Vol. II, at 498.

**B. The Department has clear statutory authority to promulgate the Final Rule.**

Even if plaintiffs had established standing, the government likely will prevail on the merits. As noted, plaintiffs specifically challenged three aspects of the SAVE plan. Two provisions adjust borrowers' payment amounts by increasing the protected-income threshold to 225% of the federal poverty line and by setting payments for undergraduate loans at 5% of the borrower's discretionary income. Those two

provisions are an exercise of the Department's clear authority to set "payments that vary in relation to the appropriate portion of the annual income of the borrower . . . as determined by the Secretary," 20 U.S.C. § 1087e(e)(4), as plaintiffs now appear to acknowledge. *See* Second Br. 33 (the Department's statutory authority permits it to "vary[] the payment amounts that are due if a requisite reduction in a borrower's income occurs"). As a borrower's income fluctuates, her payments will change according to the formula prescribed by the regulations. To the extent plaintiffs do not contest the Department's clear authority to set ICR payment amounts, the government will succeed in its appeal, as the 5% payment cap was the only provision challenged as contrary to the HEA and enjoined by the district court. But even if all three key provisions of the Final Rule remain in dispute, plaintiffs are unlikely to succeed on the merits of their claim that the Department lacked statutory authority to adopt the Rule.

### 1. The major-questions doctrine does not apply.

This Court has articulated a four-factor test to determine whether the major-questions doctrine applies to an agency action. *See Bradford v. U.S. Dep't of Labor*, 101 F.4th 707, 725-28 (10th Cir. 2024); Opening Br. 23-24, 24 n.5. Those factors militate

against applying the major-questions doctrine to the Final Rule's modification of a longstanding program.[6]

As the district court noted, App. Vol. II, at 524, two factors plainly favor the Department. For more than 30 years, the Department has used its ICR authority to create repayment plans based on the borrower's income, require payment in accordance with those income-based plans over an extended period of time, and then forgive any balance left at the end of the repayment term. It therefore is not "'claim[ing] to discover' regulatory authority for the first time 'in a long-extant statute.'" *Bradford*, 101 F.4th at 726-27. Indeed, plaintiffs acknowledge that those prior ICR plans were authorized by statute. *See* Second Br. 5-6 ("None of these programs went outside the text of what Congress authorized . . . ."); *id.* at 36 ("Earlier rules establishing [ICR] plans . . . were consistent with the repayment mandate."). And the Department plainly has "expertise" in administering the federal student loan portfolio, *Bradford*, 101 F.4th at 728—including because Congress expressly delegated it the power to set the terms of ICR plans. *See* 20 U.S.C. § 1087e(d)(1)(D), (e)(4). Plaintiffs do not dispute that prior ICR plans reflected the application of such expertise. *See* Second Br. 31.

---

[6] This argument is not "forfeit[ed]." Second Br. 27. The question whether the major-questions doctrine applies is properly presented to this Court, as the district court "explicitly consider[ed] and resolve[d]" the issue. *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 991 (10th Cir. 2019); *see* App. Vol. II, at 511-14, 518-25.

The other *Bradford* factors do not suggest a different conclusion. The Department has not attempted an "enormous and transformative expansion in regulatory authority without clear congressional authority." *Bradford*, 101 F.4th at 726 (alteration omitted). Rather, the challenged provisions of the Final Rule modify the payment amounts and terms of an existing ICR plan, under a statute that expressly authorizes the Secretary to set payment amounts based on "the appropriate portion" of a borrower's income and payment duration over an "extended" period of repayment "not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D), (e)(4). Nor has the Department relied on "'modest words,' 'vague terms or ancillary provisions.'" *Bradford*, 101 F.4th at 725. Rather, the statutory text "empower[s]" the Secretary to "fill up the details" of ICR plans using language that "leaves [him] with flexibility." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024).

In contending otherwise, plaintiffs repeatedly invoke an estimate of the SAVE plan's cost. *See generally* Second Br. 28-31. Even if one of the various (and divergent) cost estimates cited by plaintiffs were accurate, *see* Opening Br. 26 n.7, it would not be dispositive. Plaintiffs' singular focus on cost cannot be reconciled with *Bradford*'s reasoning. *See* 101 F.4th at 725 (rejecting a sole "focus on the economic effects" of the policy). The Supreme Court has never considered only the "economic and political significance" of an agency action, as that would transform the mine run of statutory-interpretation cases involving large government programs, such as Medicare, into "major questions" cases. Plaintiffs embrace this implication of their theory.

Second Br. 28. But that is inconsistent with how the Supreme Court has decided such cases. *See, e.g., Becerra v. Empire Health Found.*, 597 U.S. 424 (2022). The doctrine is reserved for "extraordinary cases," *West Virginia v. EPA*, 597 U.S. 697, 723 (2022); not every dispute about the interpretation of a statute connected to economically substantial federal programs gives rise to a "major question."

Plaintiffs also repeatedly invoke *Biden v. Nebraska*, 600 U.S. 477 (2023), which held that a one-time action designed to cancel student-loan principal implicated a major question. That decision does not resolve the question here, as it concerned a different kind of agency action (waivers and modifications of existing statutory and regulatory provisions to cancel student-loan principal) under a different statutory authority (the HEROES Act) to create a "novel" program. *Nebraska*, 600 U.S. at 494-96. In a companion case, the Supreme Court made clear that "HEROES Act loan relief and HEA loan relief function independently of each other." *Brown*, 600 U.S. at 567. *Nebraska* cannot be read to suggest that every amendment to an ICR plan that includes a loan-forgiveness component is also a major question. After all, the Supreme Court reached its conclusion in *Nebraska* after extensively considering multiple factors, including the Department's "past practice under *the statute*." 600 U.S. at 501 (emphasis added); *see also id.* (contrasting loan cancellation with "past waivers and modifications issued under the [HEROES] Act").

Like every other ICR plan, the SAVE plan bases a borrower's payment amount on a percentage of the borrower's discretionary income and then forgives the

outstanding principal and interest due at the end of the borrower's repayment term. Plaintiffs contend that the SAVE plan's lower payment amounts—particularly for borrowers "who have lifetime income in the bottom quintile"—are "transformative." Second Br. 30 (quoting 88 Fed. Reg. at 43,881). But while the end result may have a significant effect on a particular borrower's financial condition, it is hard to see how adjusting the protected income-threshold from 150% of the federal poverty line to 225% and the share of discretionary income subject to payment from 10% to 5% (for undergraduate loans) is an "expansion of regulatory authority." In each case, the same regulatory authority to set "payments that vary in relation to the appropriate portion of the annual income of the borrower" is being exercised. 20 U.S.C. § 1087e(e)(4). The Department has simply made a different discretionary judgment about what is "appropriate." Moreover, it is unsurprising that borrowers with lower lifetime incomes would pay less under an "[i]ncome contingent" repayment plan. *Id.* Such lower payment amounts do not transform the loans into a grant, *contra* Second Br. 30, but rather are the quintessential feature of an ICR plan. *See infra* p. 30.

Similarly, some borrowers will achieve forgiveness more quickly than they otherwise would have under preexisting regulations. But this is not transformative either. Approximately 70% of borrowers remain on the same timeline they were on before. 88 Fed. Reg. at 43,891. Thus, unlike in *Nebraska*, the challenged action has not "created a novel and fundamentally different loan forgiveness program." 600 U.S. at 496. Rather, the Department modified the parameters (but not the fundamental

features) of an existing ICR plan. *See* 88 Fed. Reg. at 43,822 (explaining that the Department "decided to reform" a current ICR plan). Plaintiffs do not acknowledge that meaningful difference. And for the reasons given above, there is no other reason to be skeptical of the Department's exercise of authority here.

### 2. Even if the major-questions doctrine applied, the HEA clearly authorizes the Final Rule.

**a.** Congress instructed the Department to offer "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D). The Secretary has explicit authority to set "repayment schedules" for such a plan "that vary in relation to the appropriate portion of the annual income of the borrower . . . as determined by the Secretary." *Id.* § 1087e(e)(4). The Secretary also must "establish procedures for determining the borrower's repayment obligation . . . and such other procedures as are necessary to implement effectively income contingent repayment." *Id.* § 1087e(e)(1).

Those express delegations authorize the Department to set borrowers' payment amounts and the term of repayment. *See* Opening Br. 29. For some borrowers, compliance with the established payment schedules may not be sufficient to cover the full amount of the loan, and some balance will therefore remain. *See* App. Vol. II, at 517. Congress's explicit decision to impose an upper bound on the repayment period necessitates a disposition of the remaining balance. Recognizing this, the district

court concluded that the HEA's "plain text" "imagines repayment for less than 25 years, with forgiveness at the end." App. Vol. II, at 518. Plaintiffs have offered no alternative for what should happen in that scenario, and there is no plausible one—particularly in light of plaintiffs' recognition that previous ICR plans "were consistent with the repayment mandate," Second Br. 36, even though they too offered forgiveness of both principal and interest. *See* 80 Fed. Reg. 67,204, 67,209 (Oct. 30, 2015); 77 Fed. Reg. 66,088, 66,114 (Nov. 1, 2012); 59 Fed. Reg. 61,664, 61,666 (Dec. 1, 1994).

Plaintiffs' contrary argument hinges on the word "repayment," which they understand to convey Congress's "intent that borrowers repay the principal of the loan and at least some amount of interest." Second Br. 32-33. As the district court explained, this "interpretation inserts the word 'full' in the statute, rendering it to require 'full repayment' of the loan's principal and some interest. But that's just not what the statute says." App. Vol. II, at 517-18. Courts "may not narrow a provision's reach by inserting words Congress chose to omit." *Lomax v. Ortiz-Marquez*, 590 U.S. 595, 600 (2020).

Other provisions reinforce the Department's longstanding interpretation, shared by "every Secretary of Education since" Congress authorized ICR. App. Vol. II, at 517. Consider the subsection governing the maximum repayment period for ICR plans, codified at 20 U.S.C. § 1087e(e)(7). Congress instructed the Department to credit certain time periods (such as periods of deferment due to economic

hardship) toward a borrower's repayment period. *See id.* § 1087e(e)(7)(B)(i). That makes sense only if Congress intended the loans to be forgiven at the end of the repayment period; otherwise, counting these time periods would make it more difficult for a borrower to repay the loan in full (by reducing the time permitted for repayment). Moreover, Congress added this statutory language in 2007, *see* Pub. L. No. 110-84, § 205, 121 Stat. 784, 795-96 (2007), against the backdrop of the Department's consistent view, dating to 1994, that the loan is forgiven at the end of the repayment period. Rather than rejecting that understanding, Congress enacted new provisions that assume that loans would be forgiven at the end of the repayment period. *Cf. Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 537-38 (2015) (counseling against interpreting a statute in a manner where "none of these [subsequent] amendments would make sense").

**b.** Plaintiffs suggest that statutory context undermines the Department's plain-text reading of the statute. But their various arguments only confirm the Department's authority.

First, plaintiffs compare the Department's ICR authority to the terms of income-based repayment (IBR) plans set by Congress. Second Br. 33-34. Since 2014, the IBR statute caps payments at 10% of a borrower's discretionary income above 150% of the poverty line. *See* 20 U.S.C. § 1098e(a)(3), (e)(1). The adoption by Congress of the particular parameters for a plan it created does not implicitly limit the authority Congress had previously granted to the Department to create a different

type of plan. *See Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020) (noting that "repeals by implication are not favored"). On the contrary, the IBR provision demonstrates that Congress knows how to specify the terms of a repayment plan when it wants to. *See id.* (presuming that Congress "intend[s] a difference in meaning" when it uses "particular language in one section of a statute" but not in another).

Nor does the requirement for loan forgiveness in IBR, 20 U.S.C. § 1098e(b)(7), indicate congressional intent to "den[y] Defendants authority" to forgive loans through ICR. Second Br. 34. *Cf. Ron Peterson Firearms, LLC v. Jones*, 760 F.3d 1147, 1158 (10th Cir. 2014) (Congress's decision to make an action mandatory in one circumstance did not foreclose agency's authority to require that action in a different circumstance); *Outdoor Amusement Bus. Ass'n, Inc. v. DHS*, 983 F.3d 671, 686 (4th Cir. 2020) ("[T]he contrast between Congress's mandate in one context with its silence in another suggests not a prohibition but simply a decision not to mandate any solution in the second context, i.e., to leave the question to agency discretion."). Congress viewed IBR as "build[ing] on the existing Income Contingent Repayment Program offered in the Direct Loan program and extend[ing] this option to individuals participating in the FFEL loan program." H.R. Rep. 110-210, at 44 (2007); *see also id.* at 71 (Congressional Budget Office estimate describing IBR as providing "similar relief" as "the current ICR plan"). In that vein, Congress decided to credit ICR

payments toward loan forgiveness under the IBR program.  *See* 20 U.S.C.
§ 1098e(b)(7)(B)(iv).

Moreover, the IBR statute's hardship provision underscores the fundamental
weakness in plaintiffs' textual argument.  The HEA describes IBR as a "repayment
plan" as well, 20 U.S.C. § 1087e(d)(1)(E), but borrowers whose incomes are
consistently near or below 150% of the federal poverty line will *not* repay their loans'
entire principal and some interest under IBR.  So plaintiffs' understanding of the term
"repayment" is incorrect.

Next, plaintiffs suggest that the SAVE plan's forgiveness provisions transform
loans into grants.  Second Br. 34-35.  This argument repeats the mistaken assumption
that a loan cannot have principal forgiven.  By authorizing repayment plans with
"varying annual repayment amounts based on the income of the borrower," 20 U.S.C.
§ 1087e(d)(1)(D), Congress allowed some borrowers to make payments that would
not cover the entire principal and interest on the loan.  "[M]any" other borrowers
"will repay their balances with interest" under the SAVE plan.  88 Fed. Reg. at 43,826.
That stands in stark contrast to grants, where repayment is not required *regardless* of
the borrower's income.  *See generally* 20 U.S.C. § 1070a (authorizing Pell Grants).

Third, plaintiffs invoke the *expressio unius* canon, contending that because other
portions of the HEA explicitly mention loan forgiveness, the ICR authority must not
permit forgiveness.  Second Br. 35.  That is not a sensible inference to draw from the
statutory context.  *See Marx v. General Revenue Corp.*, 568 U.S. 371, 381 (2013) ("The

force of any negative implication, however, depends on context.").  The HEA

expressly *requires* loan forgiveness in certain circumstances, such as through the PSLF

program.  *See* 20 U.S.C. § 1087e(m)(1) ("The Secretary shall cancel the balance of

interest and principal due . . . for a borrower who . . . [meets the requirements].").

That does not call into question the Department's ability to offer forgiveness in

others, such as under the shortened timeline to forgiveness established in the Final

Rule.  *Cf. Ron Peterson Firearms*, 760 F.3d at 1158.  And in any event, plaintiffs'

argument here cannot be reconciled with their own submission that earlier "income-

contingent repayment plans . . . were consistent with the repayment mandate," Second

Br. 36, notwithstanding their forgiveness provisions.

Fourth, plaintiffs submit that the SAVE plan's forgiveness provision is

inconsistent with the Federal Claims Collection Act.  Second Br. 35-36.  That statute,

as a general matter, provides that all federal agencies "[s]hall try to collect a claim of

the United States Government," though it also acknowledges circumstances in which

an agency "may compromise" such a claim.  31 U.S.C. § 3711(a).  But the SAVE plan

"is not the implementation of the Department's authority to compromise claims[;] it is

an implementation of the Department's authority to prescribe income-contingent

repayment plans," 88 Fed. Reg. at 43,834, which is governed by different statutory

language.

Finally, plaintiffs observe that the SAVE plan offers lower payments for the

average borrower than previous ICR plans.  Second Br. 36-38.  While true, that

provides no reason to doubt the legality of the SAVE plan's forgiveness provision. Under the SAVE plan—as under all other ICR plans—borrowers make payments based on a percentage of their discretionary income and, at the end of their repayment term, have any remaining balance forgiven. *See* Opening Br. 5-6. Under each plan, borrowers with lower incomes could pay less than their initial loan balance. The HEA authorizes that consistent approach, and there is nothing categorically different about the SAVE plan.

c. Plaintiffs mistakenly suggest that the Department's interpretation "has no limiting principle." Second Br. 38; *see also id.* at 30-31. The statute contains several. First, the Secretary must establish an "extended" repayment period, "not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D). As the Final Rule explains, for borrowers with initial loan balances of $12,000 or less, "10 years of monthly payments represents an extended period of time." 88 Fed. Reg. at 43,833. These borrowers "are most commonly those who enrolled in postsecondary education for one academic year or less," so the SAVE plan's repayment period "can be 10 times longer than the duration of their enrollment in postsecondary education." *Id.* Plaintiffs offer no argument as to why that timeline would not qualify as "an extended period of time prescribed by the Secretary." 20 U.S.C. § 1087e(d)(1)(D). Second, payments must "*vary* in relation to the *appropriate* portion of the annual income of the borrower." *Id.* § 1087e(e)(4) (emphases added). A hypothetical repayment plan that "set[] payments at 0.1% of

discretionary income, defined as 3000% federal poverty, for two months" would not fall within those limits. Second Br. 38.

Accordingly, plaintiffs' "constitutional doubts" (at 38) are beside the point. They are also insubstantial. Even assuming the Appropriations Clause governs forgiveness of student debt, *but see OPM v. Richmond*, 496 U.S. 414, 424 (1990) ("[The Appropriations Clause] means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."), Congress has provided "an identified source" of public funds for Direct Loans "and [a] purpose" for their expenditure, *CFPB v. Community Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 427 (2024); *see* 20 U.S.C. § 1087a(a). And the nondelegation doctrine does not forbid the Department from setting "appropriate" payment amounts over an "extended" period of time. *See Loper Bright*, 144 S. Ct. at 2263 (citing with approval statutes that provide agencies "a degree of discretion" by using terms such as "appropriate"); *see also Gundy v. United States*, 588 U.S. 128, 146 (2019) (plurality opinion) ("[W]e have over and over upheld even very broad delegations.").

Ultimately, plaintiffs' statutory interpretation arguments attempt to impose atextual limitations on the Department's authority to offer ICR plans that include debt forgiveness. Whether or not the major questions doctrine applies, that is not a proper interpretation of the HEA. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020) (courts may not "impos[e] limits on an agency's discretion that are not supported by the text"); *Nebraska*, 600 U.S. at 516 (Barrett, J.,

concurring) (major-questions doctrine "does not mean that courts have an obligation (or even permission) to choose an inferior-but-tenable alternative that curbs the agency's authority").

## C. Plaintiffs are not likely to succeed on their other APA claims.

Plaintiffs argue that, if their statutory authority argument should fail, this Court should nevertheless affirm the district court's preliminary injunction on grounds that "the district court did not reach." Second Br. 40. This Court has made clear that "affirming on legal grounds not considered by the trial court is disfavored." *Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1256-57 (10th Cir. 2011) (collecting cases). This rule applies with special force on appeals from orders granting a preliminary injunction, *see Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 974 (10th Cir. 2019), and when relevant facts are not "sufficiently clear," *Stillman v. Teachers Ins. & Annuity Ass'n Coll. Ret. Equities Fund*, 343 F.3d 1311, 1323 (10th Cir. 2003). Both conditions apply here. *See infra* pp. 38-39, 40-41 (plaintiffs failed to establish prejudice from the claimed APA violations).

### 1. The Final Rule is not arbitrary or capricious.

Plaintiffs contend that the Final Rule is arbitrary and capricious because the Department's cost estimate assumed the success of the loan forgiveness program the Supreme Court subsequently held unlawful in *Nebraska*. This claim is unreviewable and lacks merit.

**a.**  Executive Order 12,866 requires federal agencies (other than independent agencies) to assess costs and benefits before proposing "[s]ignificant" regulatory actions, as part of the Executive Branch's centralized process for regulatory review. Exec. Order No. 12,866, §§ 1(a), 3(b), 3(f), 6(a)(3), 58 Fed. Reg. 51,735, 51,735 (Oct. 4, 1993).  In accordance with this requirement, the Department conducted a cost-benefit analysis of the Final Rule and published the results in the accompanying "Regulatory Impact Analysis."  *See* 88 Fed. Reg. at 43,867.  But a cost-benefit analysis created for this purpose and not relied upon as the basis for agency action has no legal effect and is not subject to judicial review.  *See National Truck Equip. Ass'n v. NHTSA*, 711 F.3d 662, 670 (6th Cir. 2013) ("Executive Order 12,866 does not create judicially enforceable rights, nor does it provide a basis for rejecting final agency action."); *Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 8-9 (D.C. Cir. 1999) (rejecting an attempt to rely on an erroneous cost-benefit analysis as "evidence of the arbitrary and capricious nature of the FAA's decision" as an "indirect—and impermissible—attempt to enforce private rights" under Executive Order 12,866).

Even if it were reviewable, plaintiffs' claim would fail.  They contend (at 40) that the Final Rule is arbitrary and capricious because "it rests on a foundation that was false when the rule was published."  But the Final Rule does not rely on the cost estimate to justify any changes to Department regulations.  Regardless, the Final Rule was signed and sent to the Federal Register on June 14, 2023, App. Vol. II, at 345,

two weeks *before* the Supreme Court's decision in *Nebraska*.[7]  "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'"  *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020); *see also New Mexico Health Connections v. HHS*, 946 F.3d 1138, 1161-62 (10th Cir. 2019).  Subsequent factual developments cannot retroactively make a rule arbitrary and capricious, even if the promulgating agency could amend its rule.

Plaintiffs' reliance on *Ohio v. EPA*, 144 S. Ct. 2040 (2024), is misplaced.  That case concerned the severability of a Federal Implementation Plan issued by the Environmental Protection Agency (EPA) that bound 23 States.  *Id.* at 2051.  The Supreme Court held that when commenters expressed concern about "an important aspect of the problem"—whether EPA's chosen methodology might require changes if fewer States remained in the Plan—"EPA offered no reasoned response."  *Id.* at 2053-54.  Here, in contrast, the Department did not rely on the cost estimate in establishing the contours of the Final Rule, so it was not an important aspect of the problem in the first place.  And when a commenter suggested that an alternative cost estimate be prepared, the Department offered a reasoned response, explaining that its

---

[7] Plaintiffs note (at 41) that a press statement imprecisely referred to the Rule as "finalized" on June 30, the day the *Nebraska* opinion was issued.  But the undisputed fact remains that the Rule had been signed and transmitted previously.

"cost estimate[] account[ed] for [its] current and anticipated programs and policies."

88 Fed. Reg. at 43,875.

Plaintiffs further err in arguing that costs are always an "'important aspect of the problem' for agencies to consider." Second Br. 43 (quoting *Michigan v. EPA*, 576 U.S. 743, 752 (2015)). Administrative agencies often choose to weigh costs and benefits when deciding whether and how to regulate. *See, e.g.*, *Entergy Corp. v. Riverkeeper Inc.*, 556 U.S. 208, 226 (2009). But whether an agency *must* do so depends on the underlying statute that governs the agency's action. For example, in *Michigan*, the Court held that a specific provision of the Clean Air Act—not the APA—required EPA to consider costs when deciding whether to regulate power plant emissions. *See* 576 U.S. at 760 (holding that "EPA interpreted § 7412(n)(1)(A) unreasonably"). And in *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 486 (2001), the Court held that a different provision of the Clean Air Act—again, not the APA—prevented EPA from "consider[ing] implementation costs" when setting particular air standards.

"When Congress has intended that an agency engage in cost-benefit analysis, it has [generally] clearly indicated such intent on the face of the statute." *American Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 510 (1981). The HEA imposes no such requirement here. *See* 20 U.S.C. § 1087e(e). Plaintiffs do not contend otherwise. Instead, they urge the Court to ignore the HEA's text because "it was never offered in the Rule as a basis for rejecting the commenter's request." Second Br. 43. This argument makes little sense. The Department cannot "waive[]," *id.*, a legal argument

regarding the requirements of its organic statute in responding to a comment about the accuracy of a cost estimate required by Executive Order.

**b.** Most importantly, any error in not producing an alternative cost estimate was harmless. *See* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); *Little Sisters of the Poor*, 591 U.S. at 684 ("[T]he rule of prejudicial error is treated as an 'administrative law harmless error rule[.]'" (alteration omitted)). "[T]he party challenging the action below bears the burden of establishing that the error prejudiced that party." *St. Anthony Hosp. v. U.S. Dep't of Health & Human Servs.*, 309 F.3d 680, 691 (10th Cir. 2002). But plaintiffs offer no argument that the Department's cost estimate harmed them in any way. That is fatal to their claim. *Prairie Band Pottawatomie Nation v. Federal Highway Admin.*, 684 F.3d 1002, 1008 (10th Cir. 2012).

While "the agency need not prove [the] absence" of harm, *Combat Veterans for Cong. Political Action Comm. v. FEC*, 795 F.3d 151, 157 (D.C. Cir. 2015), here it is clear that a second cost estimate would not have changed anything. For both the President and the Secretary, reducing the crushing burdens of student-loan debt is an important priority, and both this rulemaking and the prior action under the HEROES Act were taken to advance that goal. 88 Fed. Reg. at 43,810; Press Release, *White House, Fact Sheet: President Biden Announces Student Loan Relief for Borrowers Who Need It Most* (Aug. 24, 2022), https://perma.cc/R2ND-6RQJ. There is no evidence or reason to believe that the Secretary's decision to sign the Final Rule turned on "whether costs were to

occur under the Final Rule or would be spread between the Final Rule and the

HEROES Act forgiveness plan." *Missouri v. Biden*, 2024 WL 3104514, at *25 (E.D.

Mo. June 24, 2024).

> ## 2. The Department complied with the APA's procedural requirements.

Plaintiffs next argue that the Department violated the APA by providing

interested parties 30 days, instead of 60, to comment on its notice of proposed

rulemaking. This claim also fails.

**a.** The APA requires an agency engaged in notice-and-comment rulemaking to

(1) issue a "[g]eneral notice" of the proposed rule in the Federal Register; (2) "give

interested persons an opportunity to participate"; and (3) "[a]fter consideration of the

relevant matter presented," to include in the rule "a concise general statement of [its]

basis and purpose." 5 U.S.C. § 553(b), (c). "[T]his section of the [APA] established

the maximum procedural requirements which Congress was willing to have the courts

impose upon agencies in conducting rulemaking procedures." *Vermont Yankee Nuclear*

*Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978). Although

"[a]gencies are free to grant additional procedural rights in the exercise of their

discretion," "reviewing courts are generally not free to impose them." *Id.*; *see also Little*

*Sisters of the Poor*, 591 U.S. at 685.

*Vermont Yankee* forecloses plaintiffs' procedural claim. The APA requires some

"opportunity to participate" but contains "no requirement concerning how many

days" an agency must provide for comment on a proposed rule. *Phillips Petroleum Co.*
*v. U.S. EPA*, 803 F.2d 545, 559 (10th Cir. 1986). Therefore, courts generally lack the
authority to impose a minimum required comment-period length. *See id.*; *Connecticut*
*Light & Power Co. v. NRC*, 673 F.2d 525, 534 (D.C. Cir. 1982) (rejecting a challenge to
a 30-day comment period); *see also Wyoming v. USDA*, 661 F.3d 1209, 1239 (10th Cir.
2011) (a court-ordered extension of a time period "would violate the well-settled
principle articulated by the Supreme Court in *Vermont Yankee* 'that the formulation of
procedure is to be basically left within the discretion of the agencies'" (quoting *Phillips*,
803 F.2d at 559)).

Plaintiffs rely on out-of-circuit cases (involving comment periods shorter than
30 days) and other authorities they recognize are "not binding on courts" for the
proposition that an agency should provide "at least 60 days of comments for major
rules." Second Br. 44. They do not even cite, much less attempt to distinguish, this
Court's decision upholding a 45-day comment period and citing with approval the
D.C. Circuit's decision in *Connecticut Light & Power*. *Phillips*, 803 F.2d at 559.

**b.** Even if the Department erred in offering insufficient time for comments,
any error was harmless. *See Little Sisters of the Poor*, 591 U.S. at 684. Once again,
plaintiffs have made no effort to demonstrate prejudice. *See Bar MK Ranches v. Yuetter*,
994 F.2d 735, 740 (10th Cir. 1993) (an allegation of procedural error "does not in
itself sufficiently allege prejudice").

Nor is any prejudice apparent. The Department received 13,621 comments during the comment period, 88 Fed. Reg. at 43,821, including comments regarding issues that are now the subject of this litigation. That is on top of the "5,300 public comments" that the agency received "as part of the public hearing process" required by the HEA's negotiated-rulemaking provisions. *Id.* Plaintiffs identify no new issues or concerns that they (or anyone else) would have raised during a longer comment period.

## III. The remaining equitable factors favor the government.

Even if plaintiffs could show a likelihood of success on the merits, the other equitable factors weigh strongly in favor of reversing, not expanding, the preliminary injunction.

### A. Plaintiffs will not suffer irreparable harm if the preliminary injunction is reversed.

As the government previously explained, plaintiffs have not shown that they would suffer irreparable injury if the preliminary injunction were reversed. *See* Opening Br. 32-34. Indeed, they make no mention at all of the enjoined provisions in their discussion of irreparable harm. *See* Second Br. 45-46. Instead, they assert only that "'loan forgiveness' creates 'irreparable harm.'" Second Br. 45. Even if that were true, the district court's injunction does not prohibit any loan forgiveness. *See supra* pp. 6-8. Thus, the preliminary injunction would not forestall the only irreparable

harm plaintiffs invoke. That alone requires reversal. *See Colorado v. U.S. EPA*, 989

F.3d 874, 884 (10th Cir. 2021).

**B.** **Plaintiffs fail to show irreparable harm from the provisions of the Final Rule that the district court did not enjoin.**

Plaintiffs fare no better as to the remaining portions of the Final Rule. They

reason that, because the Eighth Circuit determined that loan forgiveness gave rise to

irreparable harm in the *Nebraska* litigation, "it follows here" that plaintiffs must also

suffer irreparable harm "if the SAVE Plan is allowed to take full effect." Second Br.

45 (quotation marks omitted). But as the district court observed, the financial injury

invoked by plaintiffs here "is different—and weaker—than the . . . harm that

prevailed in *Biden v. Nebraska*." App. Vol. II, at 468. Because plaintiffs do not service

any loans that would be forgiven under the Final Rule (or under any ICR plan for that

matter), they cannot rely on the loss of servicing revenue to establish harm. And as

shown above, they have not shown that they would suffer some other injury—let

alone irreparable injury—traceable to the Final Rule. *See supra* pp. 8-20.

Plaintiffs do not even acknowledge, let alone dispute, the district court's

conclusion that "plaintiffs haven't demonstrated irreparable harm attributable to the

parts of the SAVE Plan already in effect," including the shortened timeline to

forgiveness. App. Vol. II, at 529. *Contra* Second Br. 45. The district court

documented plaintiffs' delay in bringing this suit and their subsequent "fail[ure] to

proffer a reasonable explanation for the delay." App. Vol. II, at 529. That

unexplained and unreasonable delay forecloses their assertions of irreparable harm. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009) ("[D]elay in seeking preliminary relief cuts against finding irreparable injury." (quotation marks omitted)).

All plaintiffs can muster is the assertion that their suit was timely under the statute of limitations. Second Br. 46. The statute of limitations is beside the point. Of course, plaintiffs must bring a timely claim to have any likelihood of success on the merits. But the mere ability to proceed on a legal claim does not establish entitlement to the "extraordinary remedy of injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Even in timely brought actions, "delay is an important consideration in the assessment of irreparable harm for purposes of a preliminary injunction." *GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984).

Nor is plaintiffs' delay excused by the fact that their suit was brought before the Rule went into full effect. As the district court recognized, the government "published advance warning" that certain provisions of the Final Rule—including the increase in protected income and shortened timeline to forgiveness—would be implemented early. App. Vol. II, at 527. And plaintiffs do not contest the Department's use of its early-implementation authority. App. Vol. II, at 527. Nothing prevented plaintiffs from challenging the early-implemented provisions sooner, and their (now abandoned) explanations for that delay were properly considered and rejected by the district court. *Id.* at 528 (declining to "credit"

plaintiffs' assertions about the need to develop their standing theories before bringing suit).

Finally, plaintiffs err in suggesting that a "meager harm," App. Vol. II, at 532, is sufficient to obtain a preliminary injunction. Second Br. 46. A party seeking a preliminary injunction must show a harm that is "both certain and great, not merely serious or substantial." *Colorado*, 989 F.3d at 884 (quotation marks omitted). Plaintiffs have not done so.

## C. The balance of the equities and the public interest favor the government.

On the other side of the balance, enjoining the Final Rule would cause irreparable harm to the government, its loan servicers, borrowers, and the public at large. The government's opening brief laid out the extensive harms that an injunction would cause. These include reprogramming government and private systems, retraining servicer staff, and recalculating payments for millions of borrowers, all at the expense of other critical priorities; placing borrowers into forbearance for months while those processes play out; and then surprising borrowers with bills requiring payments much higher than they previously expected. *See* Opening Br. 35-36. This Court recognized the gravity of those harms in granting a stay pending appeal.[8]

---

[8] In another case involving similar claims, the Eighth Circuit has administratively stayed the Final Rule pending its disposition of a motion for an injunction pending appeal. *See Missouri v. Biden*, 2024 WL 3462265 (8th Cir. July 18, 2024).

Plaintiffs' principal response is to insist that it is never in the public interest "for federal agencies to exceed their statutory authority," and otherwise argue that neither the government nor borrowers are harmed by the enjoining of an "illegal rule." Second Br. 47-49. Such an approach "collapses the four factors into one," "forcing judges to grant preliminary equitable relief based on only a likelihood of success on the merits." *Delaware State Sportsmen's Ass'n v. Delaware Dep't of Safety & Homeland Sec.*, --- F.4th ---, 2024 WL 3406290, at *5 (3d Cir. July 15, 2024). But as the Supreme Court has made clear, a preliminary injunction is "a matter of equitable discretion"—it is "never awarded as of right" and "does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. at 24, 32. *NFIB v. OSHA*, 595 U.S. 109 (2022) (per curiam), *cited at* Second Br. 47, does not hold otherwise. As explained in the government's opening brief (at 36), *NFIB* stands only for the proposition that, where the "harms and equities are very weighty on both sides," an assessment of "likelihood of success on the merits" may well be dispositive. *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 929 (2024) (Kavanaugh, J., concurring in the grant of stay). The equities here, however, tip decisively in favor of the government.

Plaintiffs also criticize the Secretary's public communications regarding the litigation challenging the SAVE plan. Second Br. 2-3, 47. But the cited statements by the Secretary have no bearing on the equities here, as they disclose nothing about the harms to governmental and the public interest caused by the injunction. To the extent plaintiffs' underlying concern is that the Secretary's policy decision was

45

"partisan," Second Br. 47, that critique fundamentally misunderstands the relevant legal standard. Agencies are permitted to make decisions "in light of the philosophy of the administration." *Biden v. Texas*, 597 U.S. 785, 812 (2022).

## IV. At a minimum, the overbroad injunction should be narrowed, not expanded.

### A. The injunction is overbroad.

The injunction entered by the district court is overbroad both because of its universal scope and because it enjoined parts of the Rule that "no party has shown, and no court has held, likely offensive to federal law." *Poe*, 144 S. Ct. at 923 (Gorsuch, J., concurring in the grant of stay). Article III and traditional equitable principles require that injunctive relief be "limited to the inadequacy that produced [the plaintiff's] injury." *Gill v. Whitford*, 585 U.S. 48, 66 (2018). Accordingly, to the extent any injunctive relief in this case is warranted, the district court should have tailored relief to address the only injury it found plaintiffs had suffered: consolidation of FFELs held by plaintiffs' instrumentalities.

Instead, the district court entered a universal injunction preventing the application of many of the Rule's provisions to millions of borrowers throughout the country—the vast majority of whom do not have any connection with plaintiffs' instrumentalities. App. Vol. II, at 534. That was error. *United States v. Texas*, 599 U.S. at 703 (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment) (if "party-specific relief can adequately protect the plaintiff's interests," then "an

appellate court should not hesitate to hold that broader relief is an abuse of discretion").

Plaintiffs (at 50) endorse the district court's reasoning that a universal injunction is necessary to ensure "nationwide uniformity." But that argument disregards the principles requiring a court to tailor its remedy "to redress the plaintiff's particular injury." *Gill*, 585 U.S. at 73; *accord id.* at 72 ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."). Here, the only theory of injury accepted by the district court was lost interest revenue caused by consolidation of FFELs. At the very least, the injunction should have been tailored to address that harm alone.

Plaintiffs also contend (at 49) that because the universal injunction entered by the Eighth Circuit in *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (per curiam), was neither stayed nor reversed by the Supreme Court, the district court could not have abused its discretion by issuing a nationwide injunction here. But the Supreme Court did not approve that injunction or address the proper scope of interim relief in that case. *See* 600 U.S. at 507 (reversing the district court's judgment and denying the government's application to vacate the Eighth Circuit's injunction as moot). The Court has since stayed the universal aspect of a district court's injunction based on five Justices' explicit conclusion that universal injunctions are likely impermissible. *See Poe*, 144 S. Ct. at 923 (Gorsuch, J., concurring in the grant of stay); *id.* at 933 n.4 (Kavanaugh, J., concurring in the grant of stay).

Plaintiffs' arguments (at 50-51) regarding severability fare no better. To start, the government did not waive the issue of severability—plaintiffs did. *See* App. Vol. II, at 527 n.8 (observing that "[d]efendants argue[d] that the SAVE Plan is severable," but "[p]laintiffs' brief never respond[ed] to this argument" and thus holding that plaintiffs waived the issue). In response, plaintiffs cite the district court's order denying a stay pending appeal, which declined to "narrow the injunction to certain aspects of the SAVE Plan" even though "[t]here's something to be said for this approach." App. Vol. I, at 020. The district court's statement that this approach "surfaces in this Kansas case just now, for the first time," *id.*, is difficult to reconcile with its earlier recognition that only the Department made severability arguments.

Plaintiffs also insist that "severability is irrelevant" because its arbitrary-and-capricious and major-questions doctrine arguments "implicate the entire rule." Second Br. 50-51. Plaintiffs confuse their merits arguments with what they must show to obtain the "extraordinary remedy" of a preliminary injunction, *Winter*, 555 U.S. at 24: a certainly impending injury "of such imminence that there is a clear and present need for equitable relief," *Colorado*, 989 F.3d at 884. The district court abused its discretion by failing to sever provisions of the Final Rule that plaintiffs did not argue—much less clearly show—harm them.

### B.   The injunction should not be broadened.

Finally, plaintiffs' invitation to broaden the preliminary injunction should be declined. The district court offered several independent reasons for limiting its

injunction to the portions of the Final Rule that had not yet taken effect. First, as explained above, the court found that plaintiffs had "failed to show an irreparable harm from . . . provisions already in effect." App. Vol. II, at 526, 529 (formatting and capitalization adjusted). Second, the court observed that enjoining the entire Final Rule would "modify[] the status quo" because at the time of its ruling, portions of the Final Rule had been "in effect for months." App. Vol. II, at 539; *see Louisiana ex rel. Landry v. Biden*, 2022 WL 866282, at *3 (5th Cir. Mar. 16, 2022) (per curiam) (staying an injunction directed at a challenged action that was already in place). Injunctions that "alter the status quo" are "disfavored." *RoDa Drilling*, 552 F.3d at 1208 n.3. And third, the court noted that "plaintiffs ha[d] failed to present the court with any meaningful direction" about "what a preliminary injunction undoing the already-active parts of the SAVE Plan would look like." App. Vol. II, at 539. The court thus explained that, "[e]ven without the delay," plaintiffs' "fail[ure] to present a workable injunction" separately precluded an injunction aimed at "the entire SAVE plan." App. Vol. II, at 540.

Plaintiffs fail to demonstrate that the district court abused its discretion in concluding that "[t]he equities of this case simply don't favor unwinding the parts of the SAVE Plan that defendants already have implemented." App. Vol. II, at 540. Their cross-appeal briefing does not even attempt to engage with the district court's first two justifications. That failure alone provides sufficient grounds to deny a broader injunction. As for the third justification, plaintiffs suggest that they did not

need to assist the district court in crafting a workable injunction because it was obvious that the Department could "simply revert to the [Revised Pay As You Earn (REPAYE)] parameters in place for nearly a decade." Second Br. 54. As the Department's stay motion explained, however, there is nothing simple about such a process. The development and testing of the necessary code would take several months at least, during which time borrowers would be placed in forbearance (which would generate significant confusion and strain on governmental and servicer resources). *See* Stay Mot. 17-19. The imposition of such burdens is flatly inconsistent with "[t]he purpose of a preliminary injunction"—to "preserve the relative positions of the parties until a trial on the merits can be held." *Camenisch*, 451 U.S. at 395.

Instead of addressing the district court's analysis of the equities, plaintiffs contend (at 52-53) that their legal arguments undermine all of the Final Rule, not just parts. But as discussed, even where a plaintiff shows likelihood of success on the merits, a preliminary injunction "does not follow . . . as a matter of course." *Winter*, 555 U.S. at 32 ("the balance of equities and consideration of the public interest" are always "pertinent in assessing the propriety of any injunctive relief, preliminary or permanent"). Further, "a court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." *Trump v. International Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (per curiam) (quotation marks omitted). "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of

the legal issues it presents." *Id.* at 579. Plaintiffs have not carried their burden of establishing that the district court abused its discretion in concluding that the equities of this case did not warrant the full relief they request here.

This failing is especially clear with respect to the numerous parts of the Final Rule designated for early implementation that plaintiffs never specifically challenged. These include, for example, provisions "[a]djusting the treatment of spousal income in the REPAYE plan for married borrowers who file separately"; "[n]ot charging accrued interest to the borrower after the borrower's payment on REPAYE is applied"; providing "that REPAYE may also be referred to as the [SAVE] plan"; and changing "the definition of family size for Direct Loan borrowers in IBR, ICR, PAYE, and REPAYE . . . to exclude the spouse when a borrower is married and files a separate tax return." 88 Fed. Reg. at 43,821. Another regulatory change effective since October 2023 "eliminates the requirement for borrowers returning to SAVE after having previously been on REPAYE to provide prior years' income." 88 Fed. Reg. 72,686, 72,686 (Oct. 23, 2023). Plaintiffs do not establish entitlement to relief regarding these other provisions simply by making a general request to "enjoin[] the SAVE plan in its entirety," Second Br. 51 (formatting and capitalization adjusted); *see Acosta v. Foreclosure Connection, Inc.*, 903 F.3d 1132, 1136 (10th Cir. 2018) (explaining that "arguments are waived if they are presented in a perfunctory and conclusory fashion" (quotation marks omitted)).

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be reversed, not expanded.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

MICHAEL S. RAAB
THOMAS PULHAM
 *s/ Simon C. Brewer*
SIMON C. BREWER
SARAH N. SMITH
*Attorneys, Appellate Staff*
*Civil Division, Room 7529*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5367*
*Simon.C.Brewer@usdoj.gov*

July 2024

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 28.1(e)(2)(A)(i) because it contains 12,993 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Simon C. Brewer*
Simon C. Brewer

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Simon C. Brewer*
Simon C. Brewer