No. 24-3089

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

————————————

STATE OF ALASKA, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

Defendants-Appellants.

————————————

On Appeal from the United States District Court
for the District of Kansas
District Court Case No. 6:24-CV-01057-DDC-ADM (Judge Daniel D. Crabtree)

————————————

## EMERGENCY MOTION FOR AN IMMEDIATE ADMINISTRATIVE STAY AND A STAY PENDING APPEAL

————————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*
MICHAEL S. RAAB
SIMON C. BREWER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7529*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5367*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF NEED FOR EMERGENCY RELIEF .................................... C-1

INTRODUCTION .................................................................................................... 1

BASIS FOR JURISDICTION ................................................................................. 3

STATEMENT ........................................................................................................... 3

    A.    Statutory and Regulatory Background ......................................................... 3

    B.    Prior Proceedings ......................................................................................... 6

ARGUMENT ............................................................................................................ 8

I.    The government is likely to succeed on the merits.................................... 9

    A.    Plaintiffs lack Article III standing................................................................ 9

    B.    The Higher Education Act clearly authorizes the SAVE plan. ............... 11

II.    The remaining equitable factors strongly favor the government....................... 17

    A.    A stay is necessary to prevent irreparable harm to the government
         and the public interest.................................................................................. 17

    B.    The balance of the equities favors the government. ................................. 19

III.    Any preliminary injunction must be narrowly tailored........................................ 20

CONCLUSION ...................................................................................................... 22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                  **Page(s)**

*Becerra v. Empire Health Found.*,
    142 S. Ct. 2354 (2022) ................................................................ 14

*Benisek v. Lamone*,
    585 U.S. 155 (2018) .................................................................. 19

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023) ..................................................... 14-15, 15

*Bradford v. U.S. Dep't of Labor*,
    101 F.4th 707 (10th Cir. 2024) ............................................... 13

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) .................................................................. 20

*Colorado v. Griswold*,
    99 F.4th 1234 (10th Cir. 2024) ................................................ 8

*DHS v. New York*,
    140 S. Ct. 599 (2020) ............................................................... 21

*FDA v. Alliance for Hippocratic Med.*,
    2024 WL 2964140 (U.S. June 13, 2024) ..................................... 9

*Gill v. Whitford*,
    585 U.S. 48 (2018) .................................................................... 20

*Habitat Educ. Ctr. v. U.S. Forest Serv.*,
    607 F.3d 453 (7th Cir. 2010) ................................................... 10

*Labrador v. Poe ex rel. Poe*,
    144 S. Ct. 921 (2024) ............................................................... 21

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020) .................................................................. 15

*Missouri v. Biden*,
    2024 WL 3104514 (E.D. Mo. June 24, 2024) ............................. 8

*Murthy v. Missouri*,
    2024 WL 3165801 (U.S. June 26, 2024) ................................. 9, 10

*National Fed'n of Indep. Bus. v. OSHA*,
595 U.S. 109 (2022) ................................................................ 20

*Nken v. Holder*,
556 U.S. 418 (2009) .............................................................. 8, 17

*Simon v. Eastern Ky. Welfare Rights Org.*,
426 U.S. 26 (1976) ................................................................. 10

*Trump v. International Refugee Assistance Project*,
582 U.S. 571 (2017) ................................................................ 20

*Utility Air Regulatory Grp. v. EPA*,
573 U.S. 302 (2014) ................................................................ 16

*Walker v. UPS, Inc.*,
240 F.3d 1268 (10th Cir. 2001) ............................................... 17

*West Virginia v. EPA*,
597 U.S. 697 (2022) ................................................................ 14

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ............................................................ 9, 19, 20

**Statutes:**

20 U.S.C. § 1078-3(b)(1)(D) ......................................................... 9

20 U.S.C. § 1087e(d)(1) ............................................................... 3

20 U.S.C. § 1087e(d)(1)(D) ......................................... 3, 5, 11, 12, 16

20 U.S.C. § 1087e(e)(1) ............................................................... 12

20 U.S.C. § 1087e(e)(4) ........................................................... 12, 16

20 U.S.C. § 1089(c)(1) ................................................................. 5

20 U.S.C. § 1089(c)(2) ................................................................. 5

20 U.S.C. § 1098e(e) .................................................................. 16

28 U.S.C. § 1292(a)(1) ................................................................. 3

28 U.S.C. § 1331 ........................................................................ 3

28 U.S.C. § 1361 ................................................................ 3

**Regulation:**

34 C.F.R. § 685.220(f)(1)-(2) .......................................... 9

**Other Authorities:**

59 Fed. Reg. 61,664 (Dec. 1, 1994) ............................... 3, 4

77 Fed. Reg. 66,088 (Nov. 1, 2012) ............................ 3-4, 4

80 Fed. Reg. 67,204 (Oct. 30, 2015) ................................ 4

88 Fed. Reg. 1894 (Jan. 11, 2023) ................................... 4

88 Fed. Reg. 43,820 (July 10, 2023) ............. 4, 5, 7, 8, 14, 16, 17

88 Fed. Reg. 72,685 (Oct. 23, 2023) ................................ 7

Fed. Student Aid, *Consolidating Student Loans*, https://studentaid.gov/
    manage-loans/consolidation ...................................................10-11

## CERTIFICATE OF NEED FOR EMERGENCY RELIEF

Pursuant to Circuit Rule 8.2(A), undersigned counsel certifies as follows:

There is an immediate need for emergency relief. The government respectfully requests that this Court (i) immediately enter an administrative stay pending its consideration of this motion and (ii) issue a stay pending appeal of the preliminary injunction. If the Court declines to grant a longer stay, it should at a minimum stay the injunction for ten days to permit the Supreme Court to consider an application for a stay, should the Solicitor General elect to file one.

The district court's order granting in part plaintiffs' motion for a preliminary injunction was entered on June 24, 2024. The preliminary injunction is temporarily stayed only until 10:00 PM CDT on Sunday, June 30, 2024. The government filed this motion as expeditiously as possible after the district court ruled.

Pursuant to Federal Rule of Appellate Procedure 8(a)(1)(A), (C), defendants-appellants requested that the district court grant a stay pending the government's appeal. Dkts. 80-81 (filed June 27, 2024). The district court denied that motion earlier today. Dkt. 84.

Contact information for all counsel of record is as follows:

- For the U.S. Department of Education and U.S. Secretary of Education Miguel A. Cardona:

  - Michael S. Raab, U.S. Department of Justice, Civil Division, Appellate Staff, michael.raab@usdoj.gov, (202) 514-4053

- o Simon C. Brewer, U.S. Department of Justice, Civil Division, Appellate Staff, simon.c.brewer@usdoj.gov, (202) 616-5367

- For the States of Alaska, South Carolina, and Texas:

  - o Abhishek Kambli, Office of the Kansas Attorney General, Abhishek.Kambli@ag.ks.gov, (785) 296-6109

  - o Erin Gaide, Office of the Kansas Attorney General, Erin.Gaide@ag.ks.gov, (785) 296-7109

  - o William E. Milks, Alaska Department of Law, Bill.Milks@alaska.gov, (907) 465-3600

  - o Joseph David Spate, Office of the Attorney General for the State of South Carolina, josephspate@scag.gov, (803) 734-3970

  - o Charles K. Eldred, Office of the Texas Attorney General, charles.eldred@oag.texas.gov, (512) 463-2085

Counsel for the government informed counsel for plaintiffs that the government intended to seek an administrative stay and a stay pending appeal.

Plaintiffs oppose the relief sought in this motion and plan to file an opposition.

*/s/ Simon C. Brewer*
Simon C. Brewer

# INTRODUCTION

The district court entered a profoundly inequitable injunction requiring the Department of Education to unwind an improved repayment plan for millions of borrowers that took more than a year to build. An immediate stay is necessary to prevent that result. The repayment plan, known as Saving on a Valuable Education (SAVE), is set to go into full effect on July 1. The Department and its student-loan servicers have been preparing for months to make the transition, including by updating their computer systems and notifying borrowers of their new payment amounts. Now, those processes will be thrown into disarray—and millions of borrowers plunged into uncertainty about their payment obligations—absent a stay pending appeal.

The district court should never have entered an injunction. As an initial matter, no plaintiff has standing to maintain this action—let alone made the clear showing necessary to obtain a preliminary injunction. No State is harmed when student loan borrowers consolidate loans held by the States' instrumentalities into Federal Direct loans, as the States' loans are repaid in full. Even if they were harmed, the independent decisions of third-party borrowers provide no basis to enjoin the Department. And even if the States could make that showing, the SAVE plan is plainly lawful under the Higher Education Act (HEA). The HEA requires the Department to offer income-driven repayment (IDR) plans, such as SAVE. The district court recognized that a plain-text reading of the statute authorizes the SAVE

plan. That should have been dispositive, even assuming that the major-questions doctrine applies to this case. But the district court went on to impose atextual limits on the agency's authority based on an incorrect understanding of this Court's major-questions precedent.

Turning to the equities, plaintiffs have shown, in the district court's words, a "relatively meager harm," while an injunction would withhold critical payment protections from "millions of student loan borrowers." And if the injunction goes into effect, administrative chaos and widespread borrower confusion will ensue. Many borrowers will be placed into forbearance, which could impede their progress towards loan forgiveness under IDR and other programs. The lopsided balance of those equities alone necessitates a stay pending appeal.

Finally, even if some relief were warranted, the district court vastly exceeded the scope of its jurisdiction and its equitable powers by issuing universal, nationwide relief. Nationwide relief cannot be squared with a minimal showing by just three States that they stand to suffer modest monetary harm. This Court should, at a minimum, stay the injunction to the extent that it exceeds what is necessary to provide those three plaintiffs with relief.

# BASIS FOR JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1361. A123.[1] As explained below, however, the district court lacked jurisdiction because no plaintiff has standing. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

# STATEMENT

## A.    Statutory and Regulatory Background

**1.** For student loans issued directly by the Department of Education, the Secretary "shall offer a borrower" five different types of repayment plans from which "[t]he borrower may choose." 20 U.S.C. § 1087e(d)(1). As particularly relevant here, those plans include "an income contingent repayment plan," *id.* § 1087e(d)(1)(D). The statute provides for:

> an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years, except that the plan described in this subparagraph shall not be available to the borrower of a Federal Direct PLUS loan made on behalf of a dependent student.

*Id.*

Before the agency action at issue here, the Secretary had used this authority three times: (1) to create the first income-contingent repayment plan in 1994, *see* 59 Fed. Reg. 61,664 (Dec. 1, 1994); (2) to create the PAYE plan in 2012, *see* 77 Fed. Reg.

---

[1] Citations in this format refer to the addendum.

66,088 (Nov. 1, 2012); and (3) to create the REPAYE plan in 2015, *see* 80 Fed. Reg. 67,204 (Oct. 30, 2015). The parameters varied, but each involved determinations by the Secretary about the "amount of income protected from payments, the amount of income above the income protection threshold that goes toward loan payments, and the amount of time borrowers must pay before repayment ends." 88 Fed. Reg. 43,820, 43,827 (July 10, 2023). And each included significant loan forgiveness at the end of the plan, as long as a borrower completed a specified period of time making payments. *See* 59 Fed. Reg. at 61,666; 77 Fed. Reg. at 66,114; 80 Fed. Reg. at 67,209.

**2.** In January 2023, the Department  solicited comments on proposed changes to IDR plans. 88 Fed. Reg. 1894 (Jan. 11, 2023). Among the anticipated changes, relevant here were several alterations to the REPAYE plan: an increase in the amount of income exempt from the calculation of monthly payments; a decrease in the share of discretionary income borrowers must pay monthly on undergraduate loans; a shorter maximum repayment window for borrowers with low original balances (to be followed by discharge of remaining balances); the cessation of accrued interest charges in certain circumstances; and modifications to make it easier for borrowers to navigate repayment and make progress toward forgiveness. *Id.* at 1895.

**3.** In July 2023, nine months before this lawsuit was filed, the Department published a final rule creating the SAVE plan (the Final Rule or Rule). 88 Fed. Reg. at 43,820. The Rule's operative provisions broadly track the proposed rule. In particular, the Rule decreases monthly payments for REPAYE (now SAVE) borrowers and

limits the repayment window to 10 years (from 20 or 25) of qualifying payments for loans with original balances of $12,000 or less[2]; decreases the percentage of discretionary income available for repayment (from 10% to as little as 5% for certain borrowers); and increases an exemption for borrower income from 150% to 225% of the federal poverty line.

The HEA generally requires that final regulations for the federal student-financial-aid programs go into effect the following July 1. 20 U.S.C. § 1089(c)(1). The HEA also confers on the Secretary discretion to designate certain provisions for early implementation. *Id.* § 1089(c)(2). As announced in the Final Rule and several Federal Register notices, the Secretary has exercised early implementation authority with respect to several provisions in the Rule, including the changed provision governing credit toward loan forgiveness eligibility. 88 Fed. Reg. at 43,820-21. The result is that repayment plans have been modified and borrowers have had their loan balances forgiven under the SAVE plan as early as February 23, well before this lawsuit was filed.

---

[2] The Rule provides for forgiveness after one additional year for each additional $1,000 in original loan balance above $12,000, up to the statutory 25-year maximum. 88 Fed. Reg. at 43,903; 20 U.S.C. § 1087e(d)(1)(D). A REPAYE borrower whose original balance was $14,000, for example, would be eligible for forgiveness after 12 years of qualifying payments.

## B.    Prior Proceedings

**1.** In March 2024, plaintiffs brought this suit challenging the validity of the SAVE plan under the Administrative Procedure Act. Dkt. 1; *see also* A119-159 (operative complaint). Attempting to establish standing, plaintiffs asserted three types of harms: "(1) reduced revenue for the [S]tates' public instrumentalities who own student loans, (2) reduced tax revenue, and (3) a competitive harm to their ability to recruit and retain employees to state public service employment." A45.

The district court granted in part the government's motion to dismiss, holding that only the first theory established standing for three plaintiff States. *See* A45-46. Alaska, South Carolina, and Texas "just barely," A45, met their burden to show standing based on alleged harms to State instrumentalities that hold Federal Family Education Loans (FFELs). "FFEL[s] are student loans held by private corporations and guaranteed by the federal government." A55. Borrowers with FFELs can "consolidate" those loans into Direct Consolidation Loans held by the Department of Education, which are repaid under the Department's available repayment plans, including the SAVE plan. The district court held that the three States with instrumentalities that hold FFELs showed that "the SAVE Plan will cause FFEL borrowers to consolidate their loans into direct loans" and that such consolidation will reduce the interest income accruing to the State instrumentalities that hold FFELs. A66. The court rejected plaintiffs' remaining standing arguments, including that the States would experience decreased tax revenue due to the SAVE plan, A74-

80, and that they would experience harms in recruiting and retaining public employees, A80-88.

**2.** On June 24, the district court granted a nationwide preliminary injunction preventing the Department "from implementing or acting pursuant to the parts of [the] Final Rule ... set to become effective on July 1, 2024." A1. The court reasoned that the major-questions doctrine applies here, and that the Department lacked clear statutory authorization to adopt the Final Rule. A14-25. The court concluded that the provisions shortening the timeline to forgiveness and reducing the percentage of a borrower's discretionary income used to calculate her monthly payment were likely unlawful. A23.

The court held that plaintiffs failed to show irreparable harm from those provisions already in effect (*i.e.*, subject to early implementation), A26-29, and therefore declined to enjoin them, A39-41.[3] But the court held that the remaining

---

[3] The court noted two such provisions: "(i) the increase in the discretionary income line from 150% to 225% of the federal poverty line and (ii) the shorter path to forgiveness for borrowers who took out small loans—*i.e.*, ten years of payments for a borrower who took out $12,000 or less." Op. 26. Other provisions subject to early implementation, and therefore not enjoined, include those adjusting the treatment of certain spousal income in the REPAYE plan; not charging accrued interest to the borrower after the borrower's payment is applied; designating that REPAYE may be called SAVE; and awarding credit toward forgiveness for certain periods of loan deferment. 88 Fed. Reg. at 43,821. The Department also designated for early implementation a change to the process for a borrower re-enrolling in REPAYE/SAVE after previously being enrolled in a different plan. 88 Fed. Reg. 72,685 (Oct. 23, 2023).

*Continued on next page.*

provisions[4] would cause plaintiffs irreparable injury if allowed to take full effect on July 1, A30-31. Despite recognizing that plaintiffs' asserted injuries were "meager," it declined to weigh the equities, apparently because of its view that the Department lacked the authority to adopt the SAVE plan. A32. And it entered nationwide relief, despite having held that only three States have standing. A38.

The court *sua sponte* stayed its injunction until 10:00 PM CDT on Sunday, June 30, 2024, to allow the government to seek further relief. A42.

## ARGUMENT

The traditional four-factor test governs a motion for a stay pending appeal. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). Because plaintiffs sought the "extraordinary remedy" of preliminary injunctive relief, they were required to "make a clear and unequivocal showing [they were] entitled to such relief." *Colorado v. Griswold*, 99 F.4th 1234, 1240 (10th Cir. 2024) (quotation marks omitted).

---

Separately, a Missouri district court has enjoined "any further loan forgiveness for borrowers under the Final Rule's SAVE plan." *Missouri v. Biden*, 2024 WL 3104514, at *30 (E.D. Mo. June 24, 2024), *appeal filed* (June 27, 2024). The government does not intend to seek a stay pending appeal of the *Missouri* injunction's prohibition on the SAVE Plan's shorter path to forgiveness of small loans.

[4] The enjoined provisions include, but are not limited to, those changing the percentage of discretionary income available for repayment; counting the deferment of monthly payments for cancer patients or borrowers engaged in military service toward forgiveness; allowing borrowers in default to access an IDR plan; and automatically enrolling delinquent borrowers in an IDR plan if they have provided approval for the disclosure of their Federal tax information, 88 Fed. Reg. at 43,903.

# I.    The government is likely to succeed on the merits.

## A.    Plaintiffs lack Article III standing.

To obtain a preliminary injunction, "the plaintiff must make a 'clear showing' that [it] is 'likely' to establish each element of standing." *Murthy v. Missouri*, 2024 WL 3165801, at *8 (U.S. June 26, 2024) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U. S. 7, 22 (2008)). That requires the plaintiff to "demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. Alliance for Hippocratic Med.*, 2024 WL 2964140, at *6 (U.S. June 13, 2024). Plaintiffs cannot do so.

The district court determined that three plaintiffs (Alaska, South Carolina, and Texas) will experience diminished interest revenue from FFELs (which are held by State instrumentalities) because borrowers will consolidate those loans into Direct Consolidation Loans (held by the Department). But plaintiffs have not shown that consolidation represents a financial injury. And even if they could, any resulting harm is attributable to the independent decisions of borrowers.

The States assert that when FFEL loans are consolidated, their instrumentalities lose out on interest revenue. A56. But when borrowers consolidate FFEL loans, the existing loans are repaid in full, including the principal and outstanding interest. 20 U.S.C. § 1078-3(b)(1)(D); 34 C.F.R. § 685.220(f)(1)-(2). It is counterintuitive to describe full repayment of an outstanding loan in accordance with

its terms as a financial injury. *See Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010) (explaining the value of "having cash now rather than a promise, however reliable, of cash later"). It is certainly not self-evident that full repayment results in any financial harm to a lender. Early repayment lets the lender recoup the time-value of money—the economic equivalent of the interest payments the holder would otherwise collect. *See id.* ("If you part with money, you lose liquidity (the instant ability to deploy cash) and in addition incur a risk of never getting your money back. So you demand compensation for parting with money, and that compensation normally takes the form of interest at a specified rate ... ."). And given changes in prevailing interest rates, any reinvestment of the repaid principal may well produce *more* interest income for the States.

All that aside, the States fail to show that any injury is fairly traceable to the Final Rule. "[I]t is a bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" *Murthy*, 2024 WL 3165801, at *8; *see also id.* at *13 n.8. The States cannot make the necessary showing. It is "purely speculative" whether borrowers' consolidation decisions are attributable to the SAVE plan or are instead "made by the [borrowers] without regard to" the SAVE plan. *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 42-43 (1976). Consolidation entails various considerations that vary among borrowers. *See* Fed. Student Aid, *Consolidating Student Loans*, https://studentaid.gov/manage-

loans/consolidation (listing possible benefits and disadvantages). Those individual trade-offs will vary regardless of the SAVE plan's availability.

Plaintiffs have not established that any FFEL consolidation is attributable to the SAVE plan. Indeed, what the district court called plaintiffs' "best evidence," A66—a declaration from the Alaska instrumentality—merely asserts in conclusory fashion that certain benefits offered by the SAVE plan are driving consolidation and that Alaska will lose $100,000 in interest payments over ten years. A172. No cogent analysis supports that conclusion. Indeed, plaintiffs' own evidence shows that consolidation payments vary greatly from year to year without a discernible pattern. *See* A167. Absent some method of discerning *why* borrowers consolidate—entirely absent from the declaration—there is no basis for attributing their decisions to the SAVE plan. *Cf.* A62 (recognizing this problem).

## B. The Higher Education Act clearly authorizes the SAVE plan.

Even if the district court had jurisdiction, the government is likely to succeed on the merits. The HEA's plain text authorizes the SAVE plan.

**1.** The Department must offer "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D). The Secretary has explicit authority to set the "repayment schedules" for such a plan: "repayment schedules shall be established by regulations

promulgated by the Secretary and shall require payments that vary in relation to the appropriate portion of the annual income of the borrower ... as determined by the Secretary." *Id.* § 1087e(e)(4). The Secretary also must "establish procedures for determining the borrower's repayment obligation ... and such other procedures as are necessary to implement effectively income contingent repayment." *Id.* § 1087e(e)(1).

The SAVE plan fits comfortably within the statute. It sets "[i]ncome contingent repayment schedules" via "regulations." 20 U.S.C. § 1087e(e)(4). The regulations "require payments that vary in relation to the appropriate portion of the annual income of the borrower ... as determined by the Secretary." *Id.* Those "varying annual repayment amounts" are "paid over an extended period of time prescribed by the Secretary," which does not "exceed 25 years." *Id.* § 1087e(d)(1)(D). And "the borrower's repayment obligation" is "determin[ed]" by "procedures" established by the Secretary. *Id.* § 1087e(e)(1).

The district court correctly concluded that the statute's "plain text" confirms "the Secretary's longstanding interpretation of the statute." A15-18. In accordance with the statutory language, the SAVE plan requires "repayment for less than 25 years, with forgiveness at the end." A18. Accordingly, the SAVE plan lawfully authorizes loan forgiveness of any remaining balance at the end of a borrower's repayment term (as every other IDR plan has) and adjusts the percentage of a borrower's discretionary income used to calculate monthly payment amounts.

**2.** Despite its correct understanding of the clear statutory text, the district court held that the major-questions doctrine applies, A11-14, and that the statutory "context" is not sufficiently clear to authorize the SAVE plan, A18-25. That was error.

**a.** As an initial matter, the major-questions doctrine is not implicated here, where the relevant program is longstanding and the agency has adjusted some of the policy's parameters. This Court has recognized four hallmarks of "extraordinary cases" involving the major-questions doctrine: (1) when "the executive branch seeks to locate expansive authority in modest words, vague terms or ancillary provisions"; (2) when an action involves an "enormous and transformative expansion in regulatory authority without clear congressional authorization"; (3) when "an agency [has] claimed to discover regulatory authority for the first time in a long-extant statute"; and (4) when "the agency ... lacks expertise in the relevant area of policymaking." *Bradford v. U.S. Dep't of Labor*, 101 F.4th 707, 725-26, 728 (10th Cir. 2024) (alterations and quotation marks omitted).[5] As the district court recognized, the latter two factors clearly favor the Department. A24.

---

[5] The district court distilled these factors, A19, but it conflated the question whether the major-questions doctrine applies with the question whether the statute clearly authorizes the challenged agency action. After considering these factors, *Bradford* "decline[d] to apply" the major-questions doctrine because that case "differ[ed] markedly from those in which the Supreme Court" had applied it. 101 F.4th at 728. The district court's statement that *Bradford* "assumed without deciding

*Continued on next page.*

Nonetheless, the court concluded that the second factor "overpowers" the others, principally because of the SAVE plan's estimated cost. A24-25. The SAVE plan is economically substantial.[6] But that does not make this an "extraordinary case" involving a major question. Given the size of the Department's student-loan portfolio—approximately $1.6 trillion, 88 Fed. Reg. at 43,872—many potential agency actions could have many billions of dollars in economic impact. The same is true of the Medicare program, and the Supreme Court has not treated that as a reason to apply the major-questions doctrine. *See, e.g., Becerra v. Empire Health Found.*, 142 S. Ct. 2354 (2022). The same holds for various agency actions implicating billions of dollars in costs to other industries. *See, e.g., EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489 (2014).

One key aspect of a major-questions case is that the agency's invocation of authority was "unprecedented" or "effected a 'fundamental revision of the statute.'" *West Virginia v. EPA*, 597 U.S. 697, 728 (2022); *see also Biden v. Nebraska*, 143 S. Ct.

---

that the [major-questions doctrine] applied" was therefore mistaken. A19; *see also* A14 n.3.

[6] The district court stated that the SAVE plan "forgives nearly one-third of all student loan debt" based on a comparison of an estimated budgetary impact ($475 billion over 10 years) to the current balance of all federal student loans ($1.6 trillion). A24. Even assuming the accuracy of that cost estimate, the comparison is apples-to-oranges: it fails to account for the approximately "$872 billion [that] will be lent over the coming decade." 88 Fed. Reg. at 43,872.

2355, 2372-73 (2023).[7] That is not the case here. The Final Rule incrementally changed aspects of the REPAYE plan, including the percentage of a borrower's discretionary income available for student-loan payments and the number of monthly payments required for some borrowers. Consequently, it is *plaintiffs'* interpretation of the statute that would "effect[] a fundamental revision of the statute" by dramatically curtailing the Department's authority to offer IDR plans.

**b.** Even if the major-questions doctrine applied, the HEA clearly grants the Department the authority to adopt the SAVE plan. As noted above, the plain text of the HEA authorizes the SAVE plan. But despite agreeing with that interpretation, the district court held that the statutory "context," A18, was insufficiently clear to uphold the Rule under the major-questions doctrine, *see* A25. That holding flouts the Supreme Court's admonition against "introducing a limitation not found in the statute" on an agency's authority. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020); *see also Nebraska*, 143 S. Ct. at 2381 (Barrett, J., concurring) (the major-questions doctrine "does not mean that courts have an obligation (or even

---

[7] Citing *Nebraska*, the district court also appeared to assume that any agency action involving substantial debt forgiveness would be a "major question[]." A14. But *Nebraska* involved a different kind of agency action (one-time debt cancellation rather than adjustments to statutorily required repayment plan) under a different statutory authority, with different political and economic significance. *See* 143 S. Ct. at 2372-73. It does not follow that whether the SAVE plan is a proper invocation of the Department's authority to establish an IDR plan is a major question.

permission) to choose an inferior-but-tenable alternative that curbs the agency's authority").

In all events, considering the HEA's terms "in their context and with a view to their place in the overall statutory scheme," *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 320 (2014) (quotation marks omitted), only confirms the Department's authority. For example, the district court faulted the SAVE plan for deviating from the repayment formula for a *different* type of plan, where payments are calculated based on 10% of the borrower's available income over 20 years. *See* A23 (citing 20 U.S.C. § 1098e(e)). But Congress did not prescribe the same terms for plans under the provision invoked by the Department. Instead, it granted the Department broad authority to set terms so long as the payments "vary in relation to the appropriate portion of the annual income of the borrower ... as determined by the Secretary" and are "paid over an extended period of time prescribed by the Secretary," not to "exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D), (e)(4).

Historical context also supports the agency's interpretation. While the Department has created and amended IDR plans in various ways over the years, "Congress has made minimal changes to the Department's authority relating to [income-contingent repayment]." 88 Fed. Reg. at 43,827. In making those changes, Congress has never limited or repudiated the agency's consistent approach, which

supports that interpretation. *See Walker v. UPS, Inc.*, 240 F.3d 1268, 1276 (10th Cir. 2001).[8]

## II. The remaining equitable factors strongly favor the government.

### A. A stay is necessary to prevent irreparable harm to the government and the public interest.

If the injunction goes into effect on June 30, the Department and the public will suffer irreparable harm. *See Nken*, 556 U.S. at 435 (the government's interest and the public interest "merge"). Although the preliminary injunction is technically prospective, it upsets months of preparation by the Department and its servicers to implement the outstanding provisions of the Final Rule, preparation that cannot be undone in a matter of days. The resulting chaos, confusion, and unrecoverable cost should be avoided.

To calculate monthly amounts due for the millions of SAVE-enrolled borrowers, prepare timely billing notices, and process payments, the Department and its federally contracted loan servicers have undertaken a lengthy process of reprogramming complex software in the servicers' systems with custom SAVE-specific code. A93-94. Development and testing of that code is extraordinarily resource- and time-intensive. A91, 93-94. To revert back to the pre-SAVE approach,

_____

[8] In 2007, Congress "provided more specificity over the periods that can be counted toward the maximum repayment period. Even then, it did not adjust language related to how much borrowers would pay each month." 88 Fed. Reg. at 43,830.

17

both the Department and the servicers will be required to recode their systems to recalculate monthly payments. A95. Absent judicial relief, during that process, which will take at least several months, A91, 95, the Department will have no choice but to place many SAVE borrowers into forbearance until its servicers' systems can service loans with a correct calculation of payments due. A96. The Department will spend considerable resources supervising and implementing the technical changes required for those systems, which will detract from other important priorities. A95-97.

Borrowers also stand to suffer significant and unrecoverable harm. Despite the seeming benefit of a temporary reprieve from the obligation to make loan payments (during which interest will not accrue), forbearance also comes with significant costs. Most notably, this period of forbearance-related nonpayment will not be counted toward forgiveness under IDR plans or the public service loan forgiveness program, thus delaying any eventual loan forgiveness under those programs. A97. And when forbearance ends and recalculated payments resume, SAVE enrollees will be obligated to pay up to double what they expected under the Final Rule. A97.

Alongside these pocketbook harms, borrowers will face widespread uncertainty and confusion. Approximately 124,000 borrowers have received billing notices calculated with the soon-to-be-enjoined income percentage cap. A97. And given the public prominence of the SAVE plan, many borrowers—whether enrolled in SAVE or another repayment plan—likely will seek clarification of their obligations from their servicers. A111-113. Historically, such a large and sudden increase in volume has

overwhelmed servicers, leading to high call wait times, provision of inaccurate information, and dropped calls. A111-112, 116. And when borrowers are unable to receive accurate, timely information about their loans, they risk missing payments and suffering adverse impacts on their credit. A116-117.

## B.     The balance of the equities favors the government.

The balance of the equities favors the government. As plaintiffs have not shown any Article III injury, they necessarily have not shown irreparable harm. *See supra*. But even if Alaska, South Carolina, and Texas would (barely) suffer cognizable harm from loan consolidation, their interests are plainly outweighed by certainly impending harms arising from the preliminary injunction. *See supra*. As the district court specifically noted, "plaintiffs' theories of irreparable harm aren't all that substantial," A26, and they made only a showing of a "relatively meager harm," A32. That comes nowhere close to justifying the burdensome preliminary injunction. *See Winter*, 555 U.S. at 26 (even "serious[]" irreparable harms do not justify a preliminary injunction when outweighed by other equities).

The district court declined to balance the equities, seemingly because of its merits holding that Congress "didn't delegate to the Secretary clear power to enact the SAVE Plan." *See* A32 ("The equities thus favor a preliminary injunction of some sort."). That was incorrect. Even if a plaintiff has shown a likelihood of success on the merits, "a preliminary injunction does not follow as a matter of course." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018). Indeed, the equities—standing alone—can suffice

19

to deny a preliminary injunction regardless of the likelihood of success on the merits. *See Winter*, 555 U.S. at 23 (holding that any irreparable injury shown by the plaintiffs "is outweighed by the public interest and the Navy's interest" and that "consideration of these factors alone requires denial of the requested injunctive relief").

The district court viewed *National Federation of Independent Business v. OSHA* (*NFIB*), 595 U.S. 109 (2022) (per curiam), as precluding it from balancing the parties' harms. *See* A32. But the Supreme Court did not silently overturn decades of precedent that require weighing the equities before issuing a preliminary injunction. Though the equities may not have "justif[ied] withholding interim relief" in *NFIB*, 595 U.S. at 120, that opinion does not license the preliminary injunction here.

## III.    Any preliminary injunction must be narrowly tailored.

Assuming that some relief was proper, this Court should at least grant a partial stay to narrow the injunction. *See Trump v. International Refugee Assistance Project*, 582 U.S. 571, 580 (2017). Consistent with Article III, federal courts may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (citation omitted). Principles of equity reinforce those limitations. Injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

The district court acknowledged those principles. *See* A34-35. And it noted that plaintiffs offered no evidence that the purportedly harmed public instrumentalities

have an "important national role" that requires nationwide relief. A38. But the court disregarded these principles in granting a nationwide injunction. It premised that universal relief on a desire for "nationwide uniformity," discerning "no good reason why student debtors in 47 states should do better than those in the three plaintiff states with standing." A38. That ignores both fundamental jurisdictional limitations and the myriad practical problems associated with such injunctions. *See DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring). Accordingly, this Court should at a minimum narrow the injunction to prohibit only the Department's processing any further consolidation of FFELs held by the three relevant State instrumentalities.

Putting aside its universal scope, the injunction also improperly covers provisions not shown to affect plaintiffs. *See Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring). Enjoined portions of the Final Rule include a statutorily-mandated provision to allow automatic recertification of borrower income on multiple repayment plans and a provision that allows borrowers with cancer to receive credit towards forgiveness on all IDR plans. *See supra* note 4. There is no indication that plaintiffs experience any harm from provisions, let alone that they are unlawful. Thus, if the Court declines to enter broader relief, it should narrow the injunction to apply only to the Final Rule's provision adjusting the percentage of a borrower's discretionary income used to calculate monthly payments—the only

provision set to go into effect on July 1 that plaintiffs attempted to link to their asserted injury.

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be stayed pending appeal. The Court should grant an immediate administrative stay while it considers this motion.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

MICHAEL S. RAAB
 *s/ Simon C. Brewer*
SIMON C. BREWER
*Attorneys, Appellate Staff*
*Civil Division, Room 7529*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5367*
*Simon.C.Brewer@usdoj.gov*

June 2024

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5200 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Simon C. Brewer*
Simon C. Brewer

**CERTIFICATE OF SERVICE**

I hereby certify that on June 28, 2024, I electronically filed the foregoing

motion with the Clerk of the Court for the United States Court of Appeals for the

Tenth Circuit by using the appellate CM/ECF system. Service will be accomplished

by the appellate CM/ECF system.


*s/ Simon C. Brewer*
Simon C. Brewer

# ADDENDUM

# TABLE OF CONTENTS

Preliminary Injunction (June 24, 2024), Dkt. 77............................................................ A1

Memorandum and Order Granting in Part and Denying in Part Plaintiffs'
      Motion for Preliminary Injunction (June 24, 2024), Dkt. 76............................. A2

Memorandum and Order Granting in Part and Denying in Part Defendants'
      Motion to Dismiss for Lack of Jurisdiction (June 7, 2024), Dkt. 68............... A44

Exhibits in Support of Defendants' Motion for a Stay Pending Appeal (June 27,
      2024), Dkts. 81-1, 81-2 ........................................................................................ A90

First Amended Complaint (May 16, 2024), Dkt. 57................................................... A119

Exhibits E, F, and G in Support of Plaintiffs' Reply in Support of Their
      Motion for a Preliminary Injunction and Response in Opposition to
      Defendants' Motion to Dismiss (May 10, 2024), Dkts. 53-6 to 53-8 ........... A160

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **STATE OF ALASKA, et al.,** | |
| **Plaintiffs,** | **Case No. 24-1057-DDC-ADM** |
| **v.** | |
| **UNITED STATES DEPARTMENT OF EDUCATION, et al.,** | |
| **Defendants.** | |

<u>**PRELIMINARY INJUNCTION**</u>

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants United States

Department of Education and United States Secretary of Education Miguel Cardona, and their

agents, employees, and attorneys, are enjoined from implementing or acting pursuant to the parts

of Final Rule—promulgated by the Department of Education titled "Improving Income Driven

Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family

Education Loan (FFEL) Program," 88 Fed. Reg. 43,820—set to become effective on July 1,

2024.

**IT IS SO ORDERED.**

**Dated this 24th day of June, 2024, at Kansas City, Kansas.**

<u>s/ Daniel D. Crabtree</u>
**Daniel D. Crabtree
United States District Judge**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
| --- | --- |
| **STATE OF ALASKA, et al.,** | |
| **Plaintiffs,** | **Case No. 24-1057-DDC-ADM** |
| **v.** | |
| **UNITED STATES DEPARTMENT OF EDUCATION, et al.,** | |
| **Defendants.** | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiffs have moved the court for a preliminary injunction that would prevent defendants from implementing their student loan regulations, known as the SAVE Plan. Doc. 23. The SAVE Plan lowers monthly payments for eligible borrowers and reduces the maximum repayment period for eligible borrowers who took out loans with low original balances. To resolve plaintiffs' motion, the court must answer three questions.

*First*: does defendants' SAVE Plan present a "major question"—one of such economic and political significance that defendants must show that Congress clearly authorized the SAVE Plan? In *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), the Supreme Court answered this question. This recent, binding Supreme Court decision holds "that the basic and consequential tradeoffs inherent in a mass debt cancellation program are ones that Congress would likely have intended for itself." *Id.* at 2375 (quotation cleaned up). So, this is an easy yes.

*Second*, given that the case presents a major question, have defendants shown that the Higher Education Act clearly authorizes their SAVE Plan? *Biden v. Nebraska* doesn't answer

this question because that case addressed a different statute with a different regulatory history. While it's a close and difficult question, the court answers this second question no. Defendants have offered colorable, plausible interpretations of the Higher Education Act that could authorize the SAVE Plan, but those interpretations fall short of *clear* congressional authorization.

*Last*, the court must decide whether the preliminary injunction should apply nationwide. Scope aside, part of plaintiffs' requested injunction is unworkable, and so the court denies it. But, for the workable part of plaintiffs' injunction, the court reluctantly answers yes—it should apply nationwide. Nationwide injunctions are the subject of much controversy, and this court is less than enthusiastic about entering one.

With these three answers, the court grants in part and denies in part plaintiffs' Motion for Preliminary Injunction (Doc. 23). The court enjoins the SAVE Plan—in part—nationwide. It declines, however, to unwind the parts of the SAVE Plan already in effect because plaintiffs have failed to demonstrate those provisions caused irreparable harm. Plaintiffs brought this lawsuit long after defendants already had implemented those aspects of the SAVE Plan, so the court doesn't see how plaintiffs can complain of irreparable harm from them. Nor have plaintiffs explained how a preliminary injunction could unwind the parts of the SAVE Plan already in effect. But the court grants plaintiffs' request to enjoin those aspects of the SAVE Plan not yet implemented.

The court emphasizes one more thing about its decision. This Order does not decide whether student loan forgiveness is good policy or bad policy. The popularly elected branches of our government—the President and the Congress—properly control that decision. Thus, no one should read this Order to take a position on that question because our Constitution doesn't assign any part of it to the federal courts.

The court explains each one of its decisions, below, beginning with the relevant background.

## I.        Background

The court begins with a fly-over of student loan repayment legislation and the Secretary of Education's role in it.

Congress enacted the Higher Education Act (HEA) in 1965 to "strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education."  Pub. L. No. 89-329, 79 Stat. 1219 (1965).  Twenty-eight years later, Congress passed the "Student Loan Reform Act," and allowed the Secretary of Education to issue federal student loans directly from the Department.  Pub. L. No. 103-66, § 4011–21, 107 Stat. 312 (1993).  The Student Loan Reform Act also created income-contingent repayment plans—the repayment plans at issue here.  *Id.* at § 4021 (codified at 20 U.S.C. § 1087e(d)(1)(D)).

Here's the statutory provision establishing income-contingent repayment plans, which serves as this case's axis:

> Consistent with criteria established by the Secretary, the Secretary shall offer a borrower of a loan made under this part a variety of plans for repayment of such loan, including principal and interest on the loan.  The borrower shall be entitled to accelerate, without penalty, repayment on the borrower's loans under this part.  The borrower may choose . . . an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years[.]

20 U.S.C. § 1087e(d)(1)(D).

Before the action challenged here, the Secretary of Education—"the Secretary" in the remainder of this Order—has invoked this statutory authority three times:

1. In 1994, the Secretary created the first income-contingent repayment plan.  William D. Ford Federal Direct Loan Program, 59 Fed. Reg. 61,664 (Dec. 1, 1994) (codified at 34 C.F.R. pt. 685).

2. In 2012, the Secretary created the PAYE Plan.  Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 77 Fed. Reg. 66,088 (Nov. 1, 2012) (codified at 34 C.F.R. pts. 674, 682, 685).

3. In 2015, the Secretary created the REPAYE Plan.  Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 80 Fed. Reg. 67,204 (Oct. 30, 2015) (codified at 34 C.F.R. pts. 668, 682, 685).

Each time, the Secretary imagined forgiving the remaining loan balance after a borrower had made payments for a specific period of time.  *See* 59 Fed. Reg. at 61,666 ("Some borrowers in the [income-contingent repayment] plan may not earn sufficient income to fully repay their loans within the statutory 25-year time period.  In this event, the Secretary will forgive any outstanding loan balance (principal plus interest) that is unpaid after 25 years."); 77 Fed. Reg. at 66,114 ("The revisions offer eligible borrowers lower payments and loan forgiveness after 20 years of qualifying payments."); 80 Fed. Reg. 67,209 ("We agree that borrowers are responsible for repaying their student loans, and we believe that most borrowers repaying their loans under the REPAYE plan will be successful in repaying their loans, in many cases before the end of the 20- or 25-year repayment period.  However, we also believe the REPAYE plan will provide relief to struggling borrowers who experience financial difficulties that prevent them from repaying their loans.  We note that the REPAYE plan requires 20 or 25 years of qualifying payments before a loan is forgiven.").

With this background about income-driven repayment plans, the court next explains relevant details about a different kind of repayment plan:  income-*based* repayment plans.

### *Income-Based Repayment (IBR) Plans*

In 2007, Congress amended the HEA and created income-based repayment plans for borrowers with "partial financial hardship."  Pub. L. No. 110-84, 121 Stat. 784 (2007).  The statute defines "partial financial hardship" to mean the borrower's annual total loan payment,

based on a 10-year repayment period, exceeds 15% of the amount by which "the borrower's and the borrower's spouse's . . . adjusted gross income[] exceeds" 150% of the applicable poverty line. 20 U.S.C. § 1098e(a)(3). And the statute explicitly authorized the Secretary to "repay or cancel any outstanding balance of principal and interest due on all loans made" under certain conditions after "a period time prescribed the Secretary, not to exceed 25 years[.]" *Id.* § 1098e(b)(7).

In 2010, Congress amended the IBR statute. Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 2213, 124 Stat. 1029, 1081 (2010) (codified at 20 U.S.C. § 1098e(e)). For borrowers taking out a loan on or after July 1, 2014, Congress lowered the cap on payments for IBR plans to 10%—down from 15%. 20 U.S.C. § 1098e(e)(1). And for those same borrowers, Congress reduced the maximum payment time window to 20 years—down from 25 years. *Id.* § 1098e(e)(2). The Secretary then applied these IBR updates to all student loans.

Five years later, in 2015, the Secretary created the REPAYE Plan by rulemaking and applied the 10% payment cap to all borrowers, regardless of when they took out loans. 80 Fed. Reg. 67,204. The REPAYE Plan also lowered the repayment window for borrowers with undergraduate debt from 25 years to 20 years. *Id.* at 67,205 ("For a borrower who only has loans received to pay for undergraduate study, provide that the remaining balance of the borrower's loans that have been repaid under the REPAYE plan is forgiven after 20 years of qualifying payments."). The REPAYE Plan set the repayment window for borrowers with graduate debt at 25 years. *Id.* ("For a borrower who has at least one loan received to pay for graduate study, provide that the remaining balance of the borrower's loans that have been repaid under the REPAYE plan is forgiven after 25 years of qualifying payments.").

A6

### *The SAVE Plan*

In 2023, the Secretary issued regulations creating the SAVE Plan—the plan challenged here.  Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43,820 (July 10, 2023) (to be codified at 34 C.F.R. pts. 682, 685).  First, a few notes about the SAVE Plan's terminology.  The SAVE Plan seeks to combine income-contingent repayment plans and income-based repayment plans under one umbrella term:  income-driven repayment plans.  *Id.* at 43,820.  And the SAVE Plan is the new name for the REPAYE plan.  *Id.*

The SAVE Plan first emerged in January 2023, when the Department issued a Notice of Proposed Rulemaking (NPRM).  Doc. 57 at 12 (1st Am. Compl. ¶ 57).  The NPRM "propose[d] to amend the regulations governing income-contingent repayment plans[.]"  Improving Income-Driven Repayment for the William D. Ford Federal Direct Loan Program, 88 Fed. Reg. 1894 (Jan. 11, 2023) (to be codified at 34 C.F.R. pt. 685).  After the NPRM and the corresponding comment period, the Department published the "Final Rule" in July 2023.  Doc. 57 at 14 (1st Am. Compl. ¶ 68); *see also* Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43,820 (July 10, 2023) (to be codified at 34 C.F.R. pts. 682, 685).

Here, plaintiffs attack several pieces of the Final Rule.[1]  Specifically, they challenge the following changes to income contingent repayment plans:

- those changes defining discretionary income as income above 225% of the applicable federal poverty guideline;

- those changes setting a borrower's monthly payment amount to $0 if the borrower's income falls below 225% of the applicable federal poverty guideline;

---

[1]    This Memorandum and Order uses the terms "Final Rule" and "SAVE Plan" interchangeably.

- those changes capping, for undergraduate loans, a borrower's monthly payment amount at 5% of the borrower's income above 225% of the applicable federal poverty guideline; and

- those changes cancelling, for borrowers whose original principal balance was $12,000 or less, the remaining balance after the borrower has made 120 monthly payments or the equivalent.

Doc. 57 at 14 (1st Am. Compl. ¶ 70).  So, summarizing, the Final Rule raises the floor of discretionary income, decreases borrowers' monthly payments, and, for loans with original balances of $12,000 or less, limits a borrower's repayment window to 10 years (from 20 or 25) of qualifying payments.

### *This Lawsuit*

According to plaintiffs, the Final Rule is "plainly unlawful" under the Constitution and the Administrative Procedures Act (APA).  They bring four claims targeting this purportedly unlawful conduct:  (1) agency action in excess of statutory jurisdiction and in violation of separation of powers, violating Article I of the Constitution; (2) agency action in excess of statutory authority, violating the Administrative Procedures Act; (3) arbitration and capricious agency action, violating the APA; and (4) agency action in violation of APA procedures.  Doc. 57 at 25–38 (1st Am. Compl. ¶¶ 133–227).  Relying on these legal theories, plaintiffs ask the court to enjoin defendants "from implementing or acting pursuant to the" SAVE Plan.  Doc. 23.

## II.     Legal Standard

Federal Rule of Civil Procedure 65(a) authorizes federal courts to issue preliminary injunctions.  The courts enjoy broad discretion when deciding whether to grant a preliminary injunction.  *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (citations omitted).

The relief afforded under Rule 65 embraces a limited purpose—a preliminary injunction serves "merely to preserve the relative positions of the parties until a trial on the merits can be

held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  The Tenth Circuit instructs that the moving party—here plaintiffs—must satisfy four factors to deserve a preliminary injunction: "'(1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest.'" *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (quoting *Republican Party of N.M. v. King*, 741 F.3d 1089, 1092 (10th Cir. 2013)).  When the government is the party opposing the preliminary injunction— as here—the third and fourth factors merge.  *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)), *abrogated on other grounds*, *Garland v. Cargill*, No. 22-976, 2024 WL 2981505 (U.S. 2024).

"A preliminary injunction is an extraordinary remedy[.]" *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  So, the moving party must demonstrate a "'clear and unequivocal'" right to such relief.  *Petrella v. Brownback*, 787 F.3d 1242, 1256 (10th Cir. 2015) (quoting *Beltronics*, 562 F.3d at 1070).  "In general, 'a preliminary injunction . . . is the exception rather than the rule.'" *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007) (quoting *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984)).

## III.        Analysis

The court's analysis of plaintiffs' Motion for Preliminary Injunction unfolds in this fashion:  it evaluates the three preliminary injunction factors, in turn.  Then, after concluding that all three factors favor entry of a preliminary injunction, the court considers the scope of the relief warranted.  The court begins with the first preliminary injunction factor:  plaintiffs' likelihood of success on the merits.

A.      **Likelihood of Success on the Merits**

Plaintiffs assert they are likely to succeed on their statutory-based claims and their APA claims.  "Where a plaintiff seeks a preliminary injunction and asserts multiple claims upon which the relief may be granted, the plaintiff need only establish a likelihood of success on the merits of one of the claims."  *George v. Davis Sch. Dist.*, No. 23-cv-00139, 2023 WL 5000989, at *6 (D. Utah Aug. 4, 2023) (citation and internal quotation marks omitted).  The court's analysis of this factor begins and ends with plaintiffs' statutory claims[2]—ones asserting that the SAVE Plan exceeds defendants' authority under the HEA.  To show that their claims are likely to succeed, plaintiffs argue the SAVE Plan violates the "Major Questions Doctrine."

To apply the Major Questions Doctrine (MQD), the court must engage in a two-step analysis.  *First*, the court must determine whether this case presents a major question.  *Second*, if it does, the court must determine whether the statute the agency invokes provides clear congressional authorization for the challenged agency action.  The court takes up each question, in turn, below.

---

[2]      There's a slight discrepancy between plaintiffs' Motion for Preliminary Injunction and their First Amended Complaint.

Plaintiffs' First Amended Complaint asserts four claims for relief.  In Count I, plaintiffs assert defendants violated Article I of the Constitution by taking an agency action in excess of statutory jurisdiction and in violation of the separation of powers.  Doc. 57 at 25–28 (1st Am. Compl. ¶¶ 133–54).  In Count II, plaintiffs assert defendants took an agency action in excess of their statutory authority, violating the APA.  *Id.* at 28–30 (1st Am. Compl. ¶¶ 155–73).  Count III asserts defendants took an arbitrary and capricious agency action, violating the APA.  *Id.* at 30–36 (1st Am. Compl. ¶¶ 174–215).  And in Count IV, plaintiffs assert defendants violated APA procedures.  *Id.* at 36–38 (1st Am. Compl. ¶¶ 216–27).

In contrast, plaintiffs' brief asserts plaintiffs are likely to succeed on the merits of *three* claims: "(1) the final rule exceeds Defendants' authority under the HEA, (2) the final rule is arbitrary and capricious, and (3) the rule's thirty-day comment period violated the APA."  Doc. 24 at 10.  The court assumes that this first "statutory" claim mentioned in plaintiffs' brief supporting their Motion for Preliminary Injunction includes Count I and Count II from the First Amended Complaint.

1.    **The MQD Applies Because the SAVE Plan has Vast Economic and Political Significance.**

The "so-called Major Questions Doctrine applies where 'an agency claims to discover in a long-extant statute an unheralded power to regulate "a significant portion of the American economy"' or make 'decisions of vast "economic and political significance."'" *Bradford v. U.S. Dep't of Labor*, 101 F.4th 707, 725 (10th Cir. 2024) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S 120, 159–60 (2000))).  "Although courts generally enforce plain and unambiguous statutory language according to its terms, where the statute at issue is one that confers authority upon an administrative agency, there are certain extraordinary cases that provide a reason to hesitate before concluding that Congress meant to confer such authority."  *Id.* at 726 (quotation cleaned up).  If the case is an "extraordinary" one, then "the agency must point to clear congressional authorization for the proposed regulation."  *Id.* (internal quotation marks, citation, and ellipsis omitted).  In *West Virginia v. EPA*, the Supreme Court labelled several of its prior decisions as Major Question cases.  597 U.S. 697, 721 (2022).  The court reviews some of these examples, below, to demonstrate how the MQD works.

In *Brown & Williamson*, the Supreme Court rejected the FDA's attempt to regulate tobacco products under its authority to regulate "drugs" and "devices."  529 U.S. at 159–60.  It did so because the Court was "confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion."  *Id.* at 160.

In *Alabama Association of Realtors v. Department of Health & Human Services*, the Court rejected the CDC's authority to issue a nationwide eviction moratorium in response to the COVID-19 pandemic.  594 U.S. 758, 759–60 (2021).  The CDC had claimed this kind of

authority under a provision of the Public Health Service Act because it allowed the CDC to

"'make and enforce . . . regulations'" that it deemed "'necessary to prevent the introduction,

transmission, or spread of communicable diseases[.]'" *Id.* at 760–61 (quoting 42 U.S.C.

§ 264(a)).  The Court called the CDC's "claim of expansive authority" under this statute

"unprecedented" and found the statute "a wafer-thin reed on which to rest such sweeping

power." *Id.* at 765.  The Court emphasized that the eviction moratorium covered millions at risk

for eviction and likely had an economic impact around $50 billion.  *Id.* at 764.

 In *Utility Air Regulatory Group v. EPA*, the Court rejected the agency's attempt to

include greenhouse gases under the Clean Air Act's definition of "air pollutant."  573 U.S. at

321.  The Court concluded EPA's interpretation "would be incompatible with the substance of

Congress' regulatory scheme," *id.* at 322 (quotation cleaned up), because EPA's interpretation

relied on "ambiguous statutory text[,]" *id.* at 324.  And, the Court emphasized, EPA's claimed

authority would give it "unheralded power to regulate 'a significant portion of the American

economy[.]'" *Id.* (quoting *Brown & Williamson*, 529 U.S. at 159).  Against this broader

backdrop, the court turns to an MQD case involving student loans:  *Biden v. Nebraska*.

 *Biden v. Nebraska* involved student loan forgiveness under the Higher Education Relief

Opportunities for Students Act (HEROES Act) of 2003, a law enacted out of Congress's concern

for student loan borrowers in the wake of the September 11 terrorist attacks.  143 S. Ct. at 2363.

The HEROES Act allows the Secretary to "waive or modify any statutory or regulatory

provision applicable to the student financial assistance programs" during a "national

emergency[.]" 20 U.S.C. § 1098bb(a)(1).  In August 2022, the Secretary cancelled student loan

debt under the HEROES Act to address financial harm stemming from the COVID-19 pandemic.

*Biden v. Nebraska*, 143 S. Ct. at 2364.  This plan sought "to reduce and eliminate student debts directly."  *Id.*  Here's how that batch of loan forgiveness worked:

> For borrowers with an adjusted gross income below $125,000 in either 2020 or 2021 who have eligible federal loans, the Department of Education will discharge the balance of those loans in an amount up to $10,000 per borrower.  Borrowers who previously received Pell Grants qualify for up to $20,000 in loan cancellation.

*Id.* at 2364–65 (citations omitted).

Six states challenged this student loan forgiveness plan based on the HEROES Act.  *Id.* at 2365.  The Supreme Court—after determining that at least one state had standing—then applied the MQD.  That is, the Court concluded the "economic and political significance of the [HEROES Act plan was] staggering by any measure."  *Id.* at 2373 (citation and internal quotation marks omitted).  Given the significance of the Secretary's HEROES Act loan forgiveness, the Court found a "reason to hesitate before concluding that Congress meant to confer such authority."  *Id.* at 2372 (citation and internal quotation marks omitted).  The Court thus searched—in vain, as it turned out—for "clear congressional authorization for such a program."  *Id.* at 2375 (internal quotation marks omitted).  And the Court concluded with this: "[T]he basic and consequential tradeoffs inherent in a mass debt cancellation program are ones that Congress would likely have intended for itself."  *Id.* (citation and internal quotation marks omitted).

Here, defendants correctly point out that this case differs from *Biden v. Nebraska*.  As the Supreme Court already has noted, "HEROES Act loan relief and HEA loan relief function independently of each other."  *Dep't of Educ. v. Brown*, 600 U.S. 551, 567 (2023).  Indeed, the Supreme Court specified that its HEROES Act decision did "not opine on the substantive lawfulness of any action the Department might take under the HEA[.]"  *Id.* at 565 n.2.  This difference notwithstanding, *Biden v. Nebraska* definitively answers the question:  is the SAVE

12

Plan a major question?  The SAVE Plan, like the HEROES Act loan forgiveness, has "staggering" "'economic and political significance[.]'"  *Biden v. Nebraska*, 143 S. Ct. at 2373 (quoting *West Virginia v. EPA*, 597 U.S. at 721).  And so, the answer must be yes.

The Supreme Court has determined that student loan debt cancellation plans that forgive enormous amounts of debt are major questions.  *Id.* at 2375 ("[T]he basic and consequential tradeoffs inherent in a mass debt cancellation program are ones that Congress would likely have intended for itself." (citation and internal quotation marks omitted)).  Defendants estimate the net federal budget effect of the SAVE Plan at $156 billion.  88 Fed. Reg. at 43,886.  Recall that the $50 billion cost of the CDC's eviction moratorium triggered the MQD in *Alabama Association of Realtors*, 594 U.S. at 764.  The court thus easily concludes that the SAVE Plan—with a price tag three times as high—is a "decision[] of vast economic and political significance."  *Bradford*, 101 F.4th at 725 (citation and internal quotation marks omitted).  And so, the court must proceed to step two of the MQD, scouring the HEA for clear congressional authorization.

## 2. The Statute Doesn't Provide Clear Congressional Authorization for the SAVE Plan.

Step two is where things get tricky.  So, what, exactly, does "clear congressional authorization" mean?  The Supreme Court has dedicated much of its MQD analysis to defining what doesn't qualify as clear congressional authorization.[3]  But the Supreme Court's decisions to date have used a two-part approach.  First, the cases evaluate the statute's plain text.  Second, they consider the statute's context.  *See West Virginia v. EPA*, 597 U.S. at 721–23.  The court's analysis here, below, uses the same approach.

---

[3]  The court is not aware of, nor have the parties cited any MQD case where the Supreme Court has found clear congressional authorization.  Does this absence suggest that the Supreme Court views the MQD as the equivalent of strict scrutiny for regulations?  Our Circuit has answered no.  In *Bradford*, our Circuit assumed without deciding that the MQD applied and found clear congressional authorization for the challenged regulation.  101 F.4th at 725–28.  More on *Bradford* later.

13

### a.    The HEA's Plain Text Authorizes the SAVE Plan.

*Biden v. Nebraska* doesn't answer this case's statutory interpretation question—at least not directly—because that case involved an entirely different statute.  But it nonetheless illustrates the kind of routine textual analysis the Supreme Court directs district courts to conduct when applying the MQD.  For example, the HEROES Act authorizes the Secretary to "waive or modify" student loan programs in connection with a national emergency.  20 U.S.C. § 1098bb(a)(1).  The *Biden v. Nebraska* Court carefully considered the meaning of both words. 143 S. Ct. at 2368–69.

*First*, the Court held that the word "modify" "does not authorize basic and fundamental changes[.]"  *Id.* at 2368 (citation and internal quotation marks omitted).  Instead, the Court explained, modify "carries a connotation of increment or limitation, and must be read to mean to change moderately or in minor fashion."  *Id.* (citation and internal quotation marks omitted). The Court rejected the change imposed under the HEROES Act loan forgiveness as a modification.  It "modified the cited provisions only in the same sense that the French Revolution modified the status of the French nobility—it has abolished them and supplanted them with a new regime entirely."  *Id.* at 2369 (citation and internal quotation marks omitted).

*Second*, the Court rejected the Secretary's reliance on the word "waiver" in the statute. Previously, the Secretary had used his waiver power to identify particular legal requirements— *i.e.*, "the requirement that a student provide a written request for a leave of absence"—and waive such requirements.  *Id.* at 2370.  But, under the HEROES Act loan forgiveness, the Secretary never identified a particular legal requirement he had waived.  *Id.*  Ultimately, the Court held that what the Secretary had "actually done [was] draft a new section of the Education Act from scratch by 'waiving' provisions root and branch and then filling the empty space with radically new text."  *Id.* at 2371.  The Court thus invalidated the HEROES Act plan because the HEROES

Act text—allowing the Secretary to "waive or modify"—didn't clearly authorize student loan

forgiveness.  *Id.* at 2375.  So, step two of the MQD analysis begins like any other statutory

interpretation exercise:  with the statute's text.

In the HEA, Congress gave the Secretary the following authority to set income-

contingent repayment plans:

> Consistent with criteria established by the Secretary, the Secretary shall offer a
> borrower of a loan made under this part a variety of plans for repayment of such
> loan, including principal and interest on the loan.  The borrower shall be entitled to
> accelerate, without penalty, repayment on the borrower's loans under this part.  The
> borrower may choose . . . an income contingent repayment plan, with varying
> annual repayment amounts based on the income of the borrower, paid over an
> extended period of time prescribed by the Secretary, not to exceed 25 years[.]

20 U.S.C. § 1087e(d)(1)(D).  Plaintiffs argue this statute doesn't clearly authorize the SAVE

Plan because it consistently uses the word "repayment."  Doc. 24 at 14.  According to plaintiffs,

the statute's operative term—"repayment"—"*affirmatively precludes* massive debt forgiveness."

*Id.* (emphasis in original).

Plaintiffs argue that repay means "to pay back."  Doc. 24 at 14 (citing Repay, *American*

*Heritage Dictionary* (4th ed. 2001)); *see also Repay*, *Black's Law Dictionary* (6th ed. 1990)

(defining repay first as "[t]o pay back"); Antonin Scalia & Bryan A. Garner, *A Note on the Use*

*of Dictionaries*, 16 Green Bag 2d 419, 428 (2013) (approving use of *Black's Law Dictionary*

sixth edition for legal terms from 1951–2000).  Taking one more step, plaintiffs argue that repay

means to pay back the entirety of the principal borrowed, with some interest.  Doc. 24 at 14–15.

Plaintiffs also point out that the statute requires "repayment . . . including principal and interest

on the loan."  20 U.S.C. § 1087e(d)(1).  Plaintiffs see the statutory terms "principal" and

"interest" as signals that Congress intended for borrowers to repay the entire principal and at

least some interest.  But plaintiffs' argument ignores the rest of the statute.

15

The statute also requires annual payments "paid over an extended period of time prescribed by the Secretary, not to exceed 25 years[.]" 20 U.S.C. § 1087e(d)(1)(D).  What happens when 25 years' worth of payments doesn't "repay[]" a loan?  Loan forgiveness.  Indeed, every Secretary of Education since the HEA's enactment has interpreted this provision to mean that the Secretary must forgive the remaining balance of the loan after 25 years.  59 Fed. Reg. at 61,666 ("Some borrowers in the [income-contingent repayment] plan may not earn sufficient income to fully repay their loans within the statutory 25-year time period.  In this event, the Secretary will forgive any outstanding loan balance (principal plus interest) that is unpaid after 25 years."); 77 Fed. Reg. at 66,114 ("The revisions offer eligible borrowers lower payments and loan forgiveness after 20 years of qualifying payments."); 80 Fed. Reg. 67,209 ("We agree that borrowers are responsible for repaying their student loans, and we believe that most borrowers repaying their loans under the REPAYE plan will be successful in repaying their loans, in many cases before the end of the 20- or 25-year repayment period.  However, we also believe the REPAYE plan will provide relief to struggling borrowers who experience financial difficulties that prevent them from repaying their loans.  We note that the REPAYE plan requires 20 or 25 years of qualifying payments before a loan is forgiven.").

In the court's view, the Secretary's longstanding interpretation of the statute is the correct one.  The statute sets an upper limit for repayments.  Congress wanted borrowers on income-contingent repayment plans to make payments for no more than 25 years.  As defendants aptly put it, "a plan for *partial* repayment of a loan or *slower* repayment of a loan are both still 'plans for repayment of such loan, including principal and interest on the loan.'" Doc. 47 at 34 (emphases in original) (quoting 20 U.S.C. § 1087e(d)(1)).  Plaintiffs' interpretation inserts the word "full" in the statute, rendering it to require "full repayment" of the loan's principal and

some interest.  But that's just not what the statute says.  The court thus agrees with the Secretary's time-honored interpretation that the statute imagines repayment for less than 25 years, with forgiveness at the end.  *See Walker v. United Parcel Serv., Inc.*, 240 F.3d 1268, 1276 (10th Cir. 2001) ("'Where an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.'" (quoting *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982))).

The court doesn't buy plaintiffs' argument about the HEA's plain text.  It next addresses plaintiffs' arguments about the statute's context.

### b. The HEA's Context Does Not Provide Clear Congressional Authorization for the SAVE Plan.

The Justices have emphasized that a statute's context plays an important role in the MQD analysis.  *See West Virginia v. EPA*, 597 U.S. at 721 (emphasizing that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme" and, in ordinary cases, "context has no great effect on the appropriate analysis" but "there are 'extraordinary cases' that call for a different approach" (quotation cleaned up)); *see also Biden v. Nebraska*, 143 S. Ct. at 2376 (Barrett, J., concurring) (responding to "the charge that the [Major Questions] doctrine is inconsistent with textualism" by "understand[ing] it to emphasize the importance of *context* when a court interprets a delegation to an administrative agency" (emphasis in original) (citation omitted)).  To that end, a statute's context can tell the court a lot about Congress's authorization in an MQD case.  As avid footnote readers already know, our Circuit addressed this very issue in *Bradford*, 101 F.4th at 725–28.[4]

---

[4]      None of the parties here cited *Bradford* in its papers.  *See* Doc. 24; Doc. 47; Doc. 50.  The court's analysis nonetheless uses *Bradford* because it's binding Circuit precedent and it provides a helpful framework for a developing doctrine.  As the court already mentioned, the Supreme Court has directed

In *Bradford*, the Tenth Circuit assumed without deciding that the MQD applied to a Department of Labor rule requiring recreational service outfitters operating on federal land to pay their employees a $15 minimum wage, rescinding an exemption the outfitters previously enjoyed.  *Id.* at 713.  After assuming the MQD applied, the Circuit asked whether the Congress clearly had authorized the Department of Labor's rule.  In its clear congressional authorization analysis, the Circuit identified four touchstones:  (1) whether the agency "seeks to locate expansive authority in modest words, vague terms or ancillary provisions[;]" (2) whether the rule is "an enormous and transformative expansion in regulatory authority without clear congressional authorization[;]" (3) whether the agency is "claim[ing] to discover regulatory authority for the first time in a long-extant statute[;]" and (4) whether "the agency issuing the . . . rule lacks expertise in the relevant area of policymaking."[5]  *Id.* at 725–28 (quotation cleaned

---

most of its MQD efforts to deciding what is *not* clear congressional authorization.  *Bradford*, on the other hand, demonstrates what *is* clear congressional authorization.  And, in any event, the parties' papers make arguments that fall well within *Bradford*, though they don't structure them in *Bradford*'s style.

[5]     The court recognizes that our Circuit didn't explicitly name these four touchstones as considerations for the clear congressional authorization analysis.  The court nonetheless interprets *Bradford* this way because these four touchstones resemble Justice Gorsuch's four "clues" for a clear congressional authorization analysis, as laid out in his *West Virginia v. EPA* concurrence.  *West Virginia v. EPA*, 597 U.S. at 746–49 (Gorsuch, J., concurring).  There, Justice Gorsuch identified four "telling clues" for a court's clear congressional authorization inquiry:  (1) whether the agency relies on "[o]blique or elliptical language" or "seek[s] to hide elephants in mouseholes[;]" (2) "the age and focus of the statute the agency invokes in relation to the problem the agency seeks to address[;]" (3) "the agency's past interpretations of the relevant statute[;]" and (4) whether "there is a mismatch between an agency's challenged action and its congressionally assigned mission and expertise."  *Id.* at 746–48 (Gorsuch, J., concurring) (citations and internal quotation marks omitted).

Justice Gorsuch's four "clues" don't match our Circuit's four *Bradford* touchstones perfectly, but they're awfully close:

up).  The court applies each of these touchstones, below, to discern whether the Congress clearly

has authorized the measures adopted in the SAVE Plan.

*First*, the court considers whether the Department of Education's SAVE Plan "seeks to

locate expansive authority in 'modest words,' 'vague terms or ancillary provisions.'"  *Id.* at 725

(citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)).  Even if a regulation has "a

colorable textual basis[,]" a statute's context can make "it very unlikely that Congress" delegated

such expansive power to the agency.  *West Virginia v. EPA*, 597 U.S. at 722–23.  "Extraordinary

grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or

'subtle devices.'"  *Id.* at 723 (brackets omitted) (quoting *Whitman*, 531 U.S. at 468).  To survive

MQD scrutiny, the Secretary must show "something more than a merely plausible textual basis

for the agency action[.]"  *Id.*

Here, defendants haven't shown that something more.  As demonstrated above,

defendants have identified a colorable, even plausible textual basis for the SAVE Plan.  The

| | **Touchstones from _Bradford v. U.S. Dep't of Labor_, 101 F.4th at 725–28.** | **"Clues" in _West Virginia v. EPA_, 597 U.S. at 746–49 (Gorsuch, J., concurring).** |
|---|---|---|
| 1 | Whether the agency "seeks **to locate expansive authority in modest words**, vague terms or ancillary provisions." | Whether the agency relies on "[o]**blique or elliptical language**[.]" |
| 2 | Whether the challenged rule is "an **enormous and transformative expansion in regulatory authority** without clear congressional authorization." | "[E]xamine **the age and focus of the statute** the agency invokes in relation to the problem the agency seeks to address. . . .  [I]t is unlikely that Congress will make **extraordinary grants of regulatory authority** through vague language in a long-extant statute." |
| 3 | Whether the agency is "claim[ing] **to discover regulatory authority for the first time** in a long-extant statute." | "[C]ourts may examine the agency's **past interpretations** of the relevant statute." |
| 4 | Whether "the agency issuing the . . . rule **lacks expertise** in the relevant area of policymaking." | "[S]kepticism may be merited where there is **a mismatch** between an agency's challenged action and its congressionally assigned **mission** and **expertise**." |

The court thus applies these four touchstones in its clear congressional authority analysis.

SAVE Plan creates "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years[.]"  20 U.S.C. § 1087e(d)(1)(D).  While it's plausible to interpret the SAVE Plan to comply with the statute, plausibility won't suffice.  Take, for example, "not to exceed 25 years[.]"  *Id.*  Recall that the SAVE Plan limits some borrowers' repayment window to 10 years.  To be sure, 10 years of repayments doesn't exceed 25.  And the Secretary's discretion to set a repayment time window is constrained by the phrase "*extended period of time*[.]"  20 U.S.C. § 1087e(d)(1)(D) (emphasis added).  But defendants' plausible textual basis doesn't rise to the level of "clear."  The statute sets a clear ceiling, but not a clear floor.  That is why the statute's language is, at most, a "subtle device[]" and so, it can't support an "[e]xtraordinary grant[] of regulatory authority[.]"  *West Virginia v. EPA*, 597 U.S. at 723 (internal quotation marks and citation omitted).  Without a clear floor—only a plausible floor and a "subtle device"—the court can't find clear congressional authorization for the SAVE Plan.

*Second*, the court asks whether the SAVE Plan is "an 'enormous and transformative expansion in regulatory authority without clear congressional authorization.'"  *Bradford*, 101 F.4th at 726 (ellipsis omitted) (quoting *Utility Air*, 573 U.S. at 324).  In *Utility Air*, summarized above, the Supreme Court struck down the EPA's interpretation of the term "air pollutant" because—though plausible—the interpretation gave the EPA "unheralded power to regulate a significant portion of the American economy[.]"  573 U.S. at 324 (citation and internal quotation marks omitted).

Here, defendants estimate the SAVE Plan will cost $156 billion over 10 years.  88 Fed. Reg. at 43,820.  But, when defendants calculated that number, they assumed the Supreme Court would uphold the HEROES Act loan forgiveness.  The Supreme Court invalidated the HEROES

Act loan forgiveness in *Biden v. Nebraska*, and none of those loans were cancelled.  And that has

significant implications for the SAVE Plan's cost.  Plaintiffs proffer a new SAVE Plan cost

estimate that accounts for *Biden v. Nebraska*, and that cost is $475 billion over ten years.  Doc.

24 at 23 (citing Penn Wharton, *Biden's New Income-Driven Repayment ("SAVE") Plan:*

*Budgetary Cost Estimate Update*, University of Pennsylvania (July 17, 2023),

https://budgetmodel.wharton.upenn.edu/issues/2023/7/17/biden-income-driven-repayment-

budget-update).  As points of reference, the REPAYE Plan cost an estimated $15.4 billion.  80

Fed. Reg. at 67,225.  This difference—$475 billion versus $15.4 billion—expands agency

authority to such an extent that it alters it.[6]  So, the court concludes that the SAVE Plan

represents "an 'enormous and transformative expansion in regulatory authority without clear

congressional authorization.'"  *Bradford*, 101 F.4th at 726 (ellipsis omitted) (quoting *Utility Air*,

573 U.S. at 324).

---

[6]     The court recognizes that this second *Bradford* touchstone seems to overlap with step one of the
MQD analysis.  The court differentiates between the two this way:  step one of the MQD analysis asks
about the sheer size of the regulatory action—*i.e.*, is it one of huge economic and political significance?
The second *Bradford* touchstone asks, in contrast, not only whether the regulatory action is enormous but,
crucially, whether the regulatory action is *transformative*.  This requires the court's context analysis to
look back at the agency's previous actions and compare them to the challenged action.

Justice Barrett provided a helpful example in her *Biden v. Nebraska* concurrence, where she
explained the importance of context:

> [I]magine a grocer instructs a clerk to "go to the orchard and buy apples for the store."
> Though this grant of apple-purchasing authority sounds unqualified, a reasonable clerk
> would know that there are limits.  For example, if the grocer usually keeps 200 apples on
> hand, the clerk does not have actual authority to buy 1,000—the grocer would have spoken
> more directly if she meant to authorize such an out-of-the-ordinary purchase.

143 S. Ct. at 513 (Barrett, J., concurring).  So, comparing prior apple orders to the existing apple orders
provided important context.  And the court must look for "out-of-the-ordinary" grants of authority.  All
this is to say:  the sheer cost of the SAVE Plan is relevant to MQD step one; the cost of the SAVE Plan
compared to the cost of the REPAYE Plan is relevant to *Bradford*'s second touchstone.

Beyond cost, the SAVE Plan is a transformative expansion in regulatory authority in another important way:  it represents the first time the Secretary has gone beyond the number set by Congress.  Recall that Congress modified the laws for income-based repayment programs in 2010.  Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 2213, 124 Stat. 1029, 1081 (2010) (codified at 20 U.S.C. § 1098e(e)).  For borrowers who had taken out a loan on or after July 1, 2014, Congress lowered the cap on payments for IBR plans to 10%—down from 15%.  20 U.S.C. § 1098e(e)(1).  And for those same borrowers, Congress reduced the maximum repayment window to 20 years—down from 25 years.  *Id.* § 1098e(e)(2).  In 2015, the REPAYE Plan took these numbers—10% instead of 15% and 20 years instead of 25 years—and applied them to eligible loans taken out before July 2014.[7]  Putting it another way, the REPAYE Plan took Congress's generosity with income-based repayment plans from § 1098e(e) and applied that generosity to some income-driven repayment plans.  So, the REPAYE Plan took Congressionally-blessed numbers and applied them more broadly.

Not so here.  Both the monthly payment cap and the payment period limitation overreach any generosity Congress has authorized before.  Here, the SAVE Plan caps a borrower's monthly payment amount at 5% of the borrower's income above 225% of the applicable federal poverty guideline.  Congress has gone as low as 10%, but it's never gone as low as 5%.  The SAVE Plan also cancels the remaining balance after the borrower has made 120 monthly payments for borrowers whose original principal balance was $12,000 or less.  Congress has gone as low as 20 years, but it's never gone as low as 10 years.  Because the Final Rule goes beyond Congress's limits—for the first time—the SAVE Plan is a "'transformative expansion in regulatory authority

---

[7]     Borrowers with graduate debt were excepted.  The REPAYE Plan still required those borrowers to pay for 25 years.

without clear congressional authorization.'" *Bradford*, 101 F.4th at 726 (ellipsis omitted)

(quoting *Utility Air*, 573 U.S. at 324).

*Third*, the court asks whether the Secretary is "claim[ing] to discover regulatory authority

for the first time in a long-extant statute." *Id.* at 726–27 (citation and internal quotation marks

omitted).  This *Bradford* touchstone favors defendants.  The Secretary has used its HEA

authority three times before:  to create the first income-contingent repayment plan, to create the

PAYE Plan, and to create the REPAYE Plan.

*Last*, the court considers whether the Department of Education "lacks 'expertise' in the

relevant area of policymaking." *Id.* at 728.  That is not the case here.  The current record

demonstrates that the Department of Education has a great deal of expertise in the area of student

loans.  This final touchstone also favors defendants.

In sum, two of the touchstones guiding the MQD favor plaintiffs.  Two favor defendants.

But this calculus doesn't produce a dead heat.  That's so because one of the touchstones favors

plaintiffs so compellingly that it overpowers the others.  It's the second factor:  whether the

SAVE Plan represents "an enormous and transformative expansion in statutory authority without

clear congressional authorization." *Bradford*, 101 F.4th at 726 (quotation cleaned up).

Unquestionably it does.

The record here contains just one estimate of the price tag for the SAVE Plan's

forgiveness:  $475 billion, over ten years. *Biden v. Nebraska* reported the total value of all

outstanding federal student loans at $1.6 trillion.  143 S. Ct. at 2362.  So, the SAVE Plan

forgives nearly one-third of all student loan debt.  And while this $1.6 trillion figure is a 2022

number—the record here doesn't contain a current figure—the court has no doubt that $475

billion in forgiveness qualifies as "enormous" and a "transformative expansion." *Bradford*, 101

F.4th at 726 (quotation cleaned up).  Indeed, the SAVE Plan's forgiveness towers over earlier iterations.  For instance, the REPAYE Plan cost $15.4 billion.

This unprecedented and dramatic expansion shifts the overall balance of *Bradford*'s four touchstones in favor of plaintiffs.  The court finds that plaintiffs are likely to prevail on the first of their statutory claims, *i.e.*, that the SAVE Plan exceeds the Secretary's authority under the HEA.  The court so finds even though defendants have mustered a plausible construction suggesting that Congress conferred such authority.  But they haven't assembled what *Biden v. Nebraska* and the MQD require:  a clear showing of such authority.  The court thus concludes that plaintiffs are likely to prevail on the merits of their bellwether claim.

Next, the court analyzes the second preliminary injunction factor.

### B.        Irreparable Harm

At the hearing on this motion, plaintiffs emphasized that the SAVE Plan will cause irreparable harm to their public instrumentalities.  A "plaintiff satisfies the irreparable harm requirement by demonstrating 'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'"  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)).  According to plaintiffs, their public instrumentalities hold FFEL loans, and the SAVE Plan incentivizes student loan borrowers to consolidate their loans away from FFEL loans.  And, according to plaintiffs, borrowers already have consolidated their loans, seeking to reap the benefits of the SAVE Plan.  Once a borrower consolidates an FFEL loan, that loan is gone, depriving the public instrumentalities of interest income.  And plaintiffs can't recover money damages from defendants due to sovereign immunity.  So, plaintiffs argue, they've suffered an irreparable harm.

As an initial matter, the court must reiterate its concerns about plaintiffs' evidence of the harms to their public instrumentalities.  As mentioned in the Memorandum and Order deciding defendants' Motion to Dismiss, South Carolina's evidence about its public instrumentality doesn't demonstrate that the SAVE Plan is leading to FFEL loan consolidation, nor does it show that FFEL loan consolidation leads to decreased interest revenue.  Doc. 68 at 18–20.  And Texas's evidence merely shows that—*assuming* borrowers consolidate their loans—loan consolidation will cause revenue loss to Texas's public instrumentality *in the future*.  *See* Doc. 53-7 at 2 (Keyton Decl. ¶ 4) ("*To the extent that* federal policy results in borrowers consolidating their loans out of FFELP into the Direct Loan Program, those consolidations will cause the State of Texas to lose revenue." (emphasis added)).  Only Alaska's evidence adduces evidence of a *current* harm to its public instrumentality.  *See* Doc. 53-8 at 3 (Efird Decl. ¶ 9) ("[T]he enticed consolidation has already harmed and will continue to harm ASLC[.]").  So, plaintiffs' theories of irreparable harm aren't all that substantial.

Defendants argue that plaintiffs' delay in seeking a preliminary injunction further undermines their claims of irreparable harm.  To evaluate this argument, the court divides its analysis of plaintiffs' irreparable harm in two:  (i) irreparable harm from the SAVE Plan provisions already in effect and (ii) irreparable harm from the SAVE Plan provisions set to go into effect on July 1.

### 1.      Plaintiffs Have Failed to Show an Irreparable Harm from SAVE Plan Provisions Already in Effect.

Defendants point out that the Secretary published the Final Rule in July 2023—nine months before plaintiffs filed suit in March 2024.  A party's "delay in seeking preliminary relief cuts against finding irreparable injury."  *RoDa Drilling*, 552 F.3d at 1211 (citation and internal quotation marks omitted).  In response, plaintiffs emphasize that the Final Rule is scheduled to

go into effect on July 1, 2024.  For that reason, plaintiffs argue, they didn't delay their suit at all.  But plaintiffs' argument misses an important point:  parts of the SAVE Plan already took effect in February 2024, and plaintiffs didn't file their lawsuit until March 28, 2024.[8]  Doc. 1.

Specifically, two provisions of the SAVE Plan already are in effect:  (i) the increase in the discretionary income line from 150% to 225% of the federal poverty line and (ii) the shorter path to forgiveness for borrowers who took out small loans—*i.e.*, ten years of payments for a borrower who took out $12,000 or less.  Indeed, plaintiffs' First Amended Complaint confirms that the Department began implementing the rule in February.  Doc. 57 at 3 (1st Am. Compl.).  The Secretary implemented this outcome by using his authority to designate provisions for early implementation—authority plaintiffs don't challenge here.  And defendants published advance warning that they would implement these provisions early.  When the Final Rule was published on July 23, 2023, it specifically tagged the increase to 225% of the federal poverty line for early implementation.  88 Fed. Reg. at 43,821.  And, according to defendants, they announced early implementation of forgiveness for borrowers with low original balances a month in advance.  All of this is to ask why:  if these parts of the SAVE Plan promised an irreparable harm to plaintiffs, why didn't they move to enjoin the SAVE Plan *before* they took effect?

Plaintiffs attributed the delay to their need to gather data on FFEL loan consolidation.  Otherwise, they reason, they would've had to rely on speculative, insufficient harm.  The court isn't persuaded.  Plaintiffs didn't include any allegations about FFEL loan consolidation when

---

[8]     Defendants argue that the SAVE Plan is severable.  So, defendants assert, "to the extent the Court concludes that only some portions of the Rule are unlawful . . . [the court] should still decline Plaintiffs' invitation to enjoin the Rule in its entirety."  Doc. 47 at 57.  Plaintiffs' brief never responds to this argument.  Plaintiffs argued against severability at the court's hearing on this motion, but the court considers this argument waived.  *Murphy v. City of Tulsa*, 950 F.3d 641, 645 n.4 (10th Cir. 2019) ("'[A]rguments made for the first time at oral argument are waived.'" (quoting *Ross v. Univ. of Tulsa*, 859 F.3d 1280, 1294 (10th Cir. 2017))).

they filed their Complaint.  *See generally* Doc. 1.  Plaintiffs' original Complaint alleged

Louisiana has a state instrumentality that would suffer irreparable harm from the SAVE Plan

"because broader loan cancellation under the SAVE plan would decrease demand for its

services."  Doc. 1 at 21 (Compl. ¶¶ 108– 11).  Plaintiffs didn't assert their FFEL loan

consolidation theory for plaintiffs South Carolina, Texas, and Alaska until May 10, 2024.  Doc.

50.  And plaintiffs ultimately abandoned their theory based on harm to Louisiana's public

instrumentality.  So, if plaintiffs delayed filing this lawsuit to gather information about FFEL

loan consolidations to supply factual assertions in their declarations, that information didn't

actually find its way into the March 2024 Complaint.  The court declines to excuse plaintiffs'

delay on this basis.

Nor does the court credit plaintiffs' assertion that they needed time to develop their tax

revenue theory of harm.  Here's an overview of plaintiffs' tax revenue theory:  nine states tie

their definition of taxable income to the federal definition of income or adjusted gross income.

Doc. 57 at 17 (1st Am. Compl. ¶ 90).  And the federal tax code defines taxable income to include

student loan forgiveness granted under income-driven repayment plans.  But the American

Rescue Plan Act of 2021 provides that all student loan forgiveness won't "count toward the

federal definition of taxable income until December 31, 2025."  Doc. 57 at 17 (1st Am. Compl.

¶ 89).  So, the states can't tax student loan debt forgiveness income until 2026.  Plaintiffs alleged

the Final Rule "will reduce income tax revenue by decreasing the amount of outstanding student

loan debt."  Doc. 57 at 18 (1st Am. Compl. ¶ 96).  This is so, they say, because the "Final Rule

accelerates the timeline for cancelation on income-driven repayment plans to as low as 10 years

for certain loan balances."  *Id.* (1st Am. Compl. ¶ 92).  Under the old version of the rule, the

federal government wouldn't forgive these loans for 20 to 25 years.  So, plaintiffs allege, "but for

the Final Rule, significant amounts of federal loan cancellation would occur *after* December 31, 2025" for residents of the relevant states. *Id.* (1st Am. Compl. ¶ 95) (emphasis in original). In this but-for world, the relevant states would have more student loan forgiveness income to tax. *Id.* The challenged Final Rule, in contrast, "shift[s] forward some debt forgiveness that would otherwise occur in a period in which it would be taxable income . . . into a period where it is not taxable[.]" *Id.* (1st Am. Compl. ¶ 96).

Plaintiffs assert that they delayed filing suit so that this tax revenue theory of harm could coalesce and thus become less speculative. The court isn't convinced. All pieces of this tax revenue theory—the states' income tax definition, the American Rescue Plan, and the SAVE Plan's shift in forgiveness—were present long before plaintiffs filed their Complaint in March 2024.

Plaintiffs thus have failed to proffer a reasonable explanation for the delay. "'[D]elay is an important consideration in the assessment of irreparable harm for purposes of a preliminary injunction.'" *Mont. Wyo. State Area Conf. of NAACP v. U.S. Election Integrity Plan*, No. 22-cv-00581, 2022 WL 1061906, at *5 (D. Colo. Apr. 8, 2022) (collecting cases) (quoting *GTE Corp.*, 731 F.2d at 679); *see also* 11A Mary Kay Kane et al., *Federal Practice & Procedure* § 2948.1 (3d ed. 2024) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."). The court is not impressed by plaintiffs' timing. The delay—combined with plaintiffs' abstractions about harm—fail to establish an irreparable harm. The court thus concludes that plaintiffs haven't demonstrated irreparable harm attributable to the parts of the SAVE Plan already in effect.

28

## 2.    Plaintiffs Have Shown an Irreparable Harm from the SAVE Plan Provisions Not Yet in Effect.

The court reaches a different conclusion for the parts of the SAVE Plan that have yet to go into effect.  Plaintiffs haven't delayed their lawsuit challenging the SAVE Plan's unimplemented parts, so their delay doesn't prevent a finding of irreparable harm.  And plaintiffs correctly point out that their harms are "irrecoverable."  Doc. 24 at 29.  That is so because the sovereign immunity bars plaintiffs from recovering monetary damages from the federal government.  *See Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994) ("Because the Eleventh Amendment bars a legal remedy in damages, and the court concluded no adequate state administrative remedy existed, the court held that plaintiffs' injury was irreparable.  We agree.").

Plaintiffs also point out that "[o]ne cannot unscramble this egg; loan forgiveness has an 'irreversible impact.'"  Doc. 24 at 29 (quoting *Nebraska v. Biden*, 52 F.4th 1044, 1047 (8th Cir. 2022)).  Indeed, before the case reached the Supreme Court, the Eighth Circuit concluded that the HEROES Act student loan forgiveness posed irreparable harm "considering the irreversible impact the Secretary's debt forgiveness action would have[.]"[9]  *Nebraska v. Biden*, 52 F.4th at

---

[9]    *Nebraska v. Biden* provides more support for differentiating between parts of the SAVE Plan already in effect and those parts set to go into effect on July 1.  In that case, the Eighth Circuit enjoined the HEROES Act student loan forgiveness before it went into effect.  The Circuit explained,

> the equities strongly favor an injunction considering the irreversible impact the Secretary's debt forgiveness would have as compared to the lack of harm an injunction would presently impose.  Among the considerations is the fact that collection of student loan payments as well as accrual of interest on student loans have both been suspended.

*Nebraska v. Biden*, 52 F.4th at 1047–48.  Not so here—the SAVE Plan is far from suspended.  Plaintiffs ask the court to enjoin defendants "from implementing or acting pursuant to the Final Rule[.]"  Doc. 23 at 1.  Yet they acknowledge that the Department already has "unilaterally erased the debt of 153,000 borrowers."  Doc. 57 at 3 (1st Am. Compl.).  And, as plaintiffs elegantly phrase it, "[o]ne cannot unscramble this egg; loan forgiveness has an irreversible impact."  Doc. 24 at 29 (quotation cleaned up).  As explained below, when considering the scope of the preliminary injunction, plaintiffs' failure to take

1047.  The court thus concludes that plaintiffs have shown an irreparable harm if the SAVE Plan is allowed to take full effect on July 1, 2024.

### C.  Public Interest

As the final merged factor in the preliminary injunction analysis, the court must examine whether plaintiffs have shown that their "threatened injury outweighs the harms that the preliminary injunction will cause the government or that the injunction, if issued, will not adversely affect the public interest."  *Aposhian*, 958 F.3d at 990.  Plaintiffs argue they've satisfied this standard because they face harm to their public instrumentalities and defendants "have no interest in enforcing a rule that completely bypasses constitutional separation of powers principles."  Doc. 24 at 30.  Defendants respond that the SAVE Plan serves the public interest because it solves a long list of harms:  student loan defaults and delinquencies; adverse effects on credit scores; decreased liquidity for large purchases; decreased enrollment in higher education; drags on national growth; and increased reliance on federal welfare programs.  Doc. 47 at 54.  How to weigh these competing interests?

The Supreme Court's decision in *National Federation of Independent Business v. Department of Labor, Occupational Safety & Health Administration*, 595 U.S. 109 (2022), is helpful here.  It involved a challenge to OSHA's COVID-19 vaccine mandate.  *Id.* at 112–13.  Several entities filed petitions for review and moved for a stay pending judicial review[10] of OSHA's mandate.  *Id.* at 113.

---

into account the loan forgiveness already in effect makes their proposed injunction unworkable.  *See below*, § III.D.2.

[10]     Of course, a stay pending judicial review is a different procedural creature than a preliminary injunction.  *Compare* Fed. R. Civ. P. 62, *and* Fed. R. App. P. 8(a), *with* Fed. R. Civ. P. 65.  But the standard governing a stay still requires the court to weigh the public interest.  The stay factors include:

Petitioners maintained "that OSHA's mandate w[ould] force them to incur billions of dollars in unrecoverable compliance costs and w[ould] cause hundreds of thousands of employees to leave their jobs." *Id.* The federal government countered "that the mandate w[ould] save over 6,500 lives and prevent hundreds of thousands of hospitalizations." *Id.* at 120. The Court declined to compare the two: "It is not our role to weigh such tradeoffs." *Id.* And the Court emphasized that Congress hadn't given OSHA the power it sought to exercise. *Id.* The Court thus agreed with petitioners that they were entitled to a stay, because, among other things, the Court concluded the "equities do not justify withholding interim relief."

The court can't weigh the tradeoffs here either. A layperson might wonder how Alaska's relatively meager harm—$100,000 in lost FFEL loan interest over two years—can justify blocking millions of student loan borrowers nationwide from getting billions in debt relief. But in "our system of government," weighing these tradeoffs "is the responsibility of those chosen by the people through democratic processes." *Id.* In the court's view, Congress—a branch of government elected by the people—didn't delegate to the Secretary clear power to enact the SAVE Plan. The equities thus favor a preliminary injunction of some sort. But what sort of injunction do they favor? That's a more daunting question, and the court takes it up next.

---

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The Supreme Court applied this standard in *National Federation of Independent Businesses*, which means that it had to evaluate the public interest and balance the equities. 595 U.S. at 120. So, even though *National Federation of Independent Businesses* occupied a different procedural posture and thus applied a different procedural standard, the Supreme Court still weighed the public interest—exactly what the court must do here.

### D.     Scope of Relief

Having concluded that plaintiffs have shouldered their burden under the preliminary injunction standard, the court must fashion an injunction with an appropriate scope.  Rule 65(d)(1)(C) requires the court to "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  The Supreme Court has emphasized that "the specificity provisions of Rule 65(d) are no mere technical requirements.  The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood."  *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (citation omitted).

Plaintiffs' Motion for Preliminary Injunction requests two forms of injunctive relief.  *One*, it asks the court to enjoin defendants "their agents, employees, and attorneys from implementing or acting pursuant to the Final Rule[.]"  Doc. 23 at 1.  And *two*, it seeks to enjoin defendants "from undertaking any form of student debt relief not expressly authorized by Congress."  *Id.*  The court begins with plaintiffs' second request.

This vague request—asking the court to enjoin defendants from undertaking any form of unlawful debt relief—is not helpful.  Indeed, plaintiffs never mention it in their supporting briefs.  *See generally* Doc. 24; Doc. 50.  Our Circuit has held that "injunctions simply requiring the defendant to obey the law are too vague" to enforce and they thus violate Fed. R. Civ. P. 65(d).  *Keyes v. Sch Dist. No. 1, Denver, Colo.*, 895 F.2d 659, 668 (10th Cir. 1990); *see also* 11A Mary Kay Kane et al., *Federal Practice & Procedure* § 2955 (3d ed. 2024) ("[O]rders simply requiring defendants to 'obey the law' uniformly are found to violate the specificity requirement.").  The court will not enter such a broad, unguided injunction.  The court thus denies this part of plaintiffs' motion.

The court next evaluates plaintiffs' request that the court enjoin defendants from implementing the SAVE Plan. It divides this analysis into two considerations: whether to issue a nationwide injunction and whether to enjoin the SAVE Plan in its entirety. The analysis concludes by considering whether the court may enjoin the President of the United States, a defendant and a target of plaintiffs' motion.

### 1.      The Injunction Should Apply Nationwide.

Plaintiffs request a nationwide injunction.[11] The court must tread carefully here because a nationwide injunction risks an overbroad injunction. "Traditionally, when a federal court finds

---

[11]      The proper terminology for this request is unsettled. Some, like the parties here, use the term "nationwide injunction" because plaintiffs seek an injunction that applies nationwide. Others, like Justice Jackson and Justice Gorsuch, use the term "universal injunction." *See Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 936 (2024) (Jackson, J., dissenting) ("Idaho maintains that this case is certworthy because it raises the question of whether a district court can issue an injunction that grants relief directed to all potentially impacted parties—a so-called 'universal injunction.'"); *United States v. Texas*, 599 U.S. 670, 694 (2023) (Gorsuch, J., concurring) ("[T]he routine issuance of universal injunctions has proven unworkable, sowing chaos for litigants, the government, courts, and all those affected by these sometimes conflicting decrees." (citation, internal quotation marks, and brackets omitted)). Here, the court uses the parties' term—nationwide injunction.

Plaintiffs' request for a nationwide injunction is a loaded one. Nationwide injunctions are the subject of much debate. Justice Gorsuch has questioned whether nationwide injunctions are consistent with separation of powers principles and Supreme Court precedent. *United States v. Texas*, 599 U.S. at 694–95 (Gorsuch, J., concurring) ("Universal injunctions continue to intrude on powers reserved for the elected branches."); *see also Labrador*, 144 S. Ct. at 926–27 (Gorsuch, J., concurring) (calling "universal" injunctions "a relatively new phenomenon" that "virtually guarantee[] that a rising number of 'high-profile' cases will find their way to" the Supreme Court and lamenting that "universal injunction practice is almost by design a fast and furious business"). Justice Thomas shares the same concerns. *Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring) ("I am skeptical that district courts have the authority to enter universal injunctions. These injunctions did not emerge until a century and a half after the founding. And they appear to be inconsistent with longstanding limits on equitable relief and the power of Article III counts.").

The debate rages outside the Supreme Court, too. "Some scholars, jurists, and attorneys criticize the practice of district courts issuing nationwide injunctions as an inappropriate abuse of power. Others defend nationwide injunctions as a powerful way to check federal agency overreach and ensure robust relief for plaintiffs." *District Court Reform: Nationwide Injunctions*, 137 Harv. L. Rev. 1701, 1702 (Apr. 2024).

The court wades into this controversy reluctantly, and with caution.

a remedy merited, it provides party-specific relief, directing the defendant to take or not take some action relative to the plaintiff."  *United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring).  In contrast, a nationwide injunction forbids a defendant from taking some action against *everyone*—not just plaintiffs.  With the gravity of this request in mind, the court briefly outlines the parties' arguments for and against a nationwide injunction.

Plaintiffs' First Amended Complaint asks the court to "set aside" the SAVE Plan.  Doc. 57 at 28, 30 (1st Am. Compl. ¶¶ 154, 173).  This language comes from the APA, which allows courts to "hold unlawful and set aside agency action[.]"  5 U.S.C. § 706(2).  Plaintiffs assert that when "'a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'"[12]  Doc. 24 at 31 (quoting *Harmon v. Thornburg*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)).  And when a court finds agency action unlawful, it often issues a nationwide injunction.  *See, e.g.*, *Texas v. United States*, 787 F.3d 733, 768–69 (5th Cir. 2015) (affirming district court's nationwide injunction of program benefitting undocumented immigrant parents of American citizens in suit where the state of Texas—and only Texas—had standing because there was "a substantial likelihood that a partial injunction would be ineffective because [program] beneficiaries would be free to move between states"); *Faust v. Vilsack*, 519 F. Supp. 3d 470, 478

---

[12]  The court acknowledges the controversial nature of this proposition—and, indeed, other propositions throughout this Order:

> Courts have supposed that the APA's instruction to "set aside" agency action authorizes vacatur.  There are, however, good reasons to conclude that "set aside," properly understood, merely instructs a court to ignore an illegal agency action for the purpose of resolving the case before it—much like a court ignores (rather than vacates or erases) an unconstitutional statute when resolving a case.  At oral argument, the Chief Justice responded to this rather shocking assault on a long accepted, foundational aspect of judicial control of agency action with an understated "[w]ow."

33 Richard Murphy et al., *Federal Practice & Procedure* § 8381 (2d ed. 2024).

(E.D. Wisc. 2021) (applying "universal" injunction to Department of Agriculture program forgiving debts of Black farmers); *Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 384–85, 397–98 (M.D.N.C. 2019) (issuing nationwide injunction against U.S. Citizenship and Immigration Services' policy memorandum changing USCIS policy on calculating unlawful presence under the Immigration and Nationality Act); *Texas v. United States*, 201 F. Supp. 3d 810, 815–16, 836 (N.D. Tex. 2016) (applying nationwide injunction to federal policy requiring that "all persons must be afforded the opportunity to have access to restrooms, locker rooms, showers, and other intimate facilities which match their gender identity rather than their biological sex").

In support of their nationwide injunction, plaintiffs also invoke the Eighth Circuit's opinion in *Nebraska v. Biden*, 52 F.4th 1044 (8th Cir. 2022). This decision became the ruling reviewed by the Supreme Court in *Biden v. Nebraska*. The Eighth Circuit reversed a district court's decision denying a preliminary injunction against loan forgiveness based on the HEROES Act. *Nebraska v. Biden*, 52 F.4th at 1045–46, *rev'g* 636 F. Supp. 3d 991 (E.D. Mo. 2022). The Eighth Circuit then granted a preliminary injunction pending appeal, concluding, after "balancing the equities," that "the merits of the appeal before this court involve substantial questions of law which remain to be resolved, but the equities strongly favor an injunction considering the irreversible impact the Secretary's debt forgiveness action would have as compared to the lack of harm an injunction would presently impose." *Id.* at 1047 (citation and internal quotation marks omitted). The Circuit thus imposed the requested injunction pending future orders by that court or the Supreme Court. *Id.* at 1048.

The President and his fellow defendants quickly petitioned the Supreme Court, asking it to vacate the injunction entered by the Eighth Circuit. The Court declined in a Memorandum

Decision issued by Justice Kavanaugh. *Biden v. Nebraska*, 143 S. Ct. 477 (2022) (Mem.). The Justice's Memorandum Decision elected to treat the application to vacate the injunction as also amounting to a petition for a writ of certiorari before judgment. *Id.* The Court granted that request. *Id.* And ultimately, of course, the Supreme Court's decision on the merits held for plaintiffs. The Court thus reversed the "judgment of the Eastern District of Missouri" and denied as moot defendants' "application to vacate the Eighth Circuit's injunction[.]" *Biden v. Nebraska*, 143 S. Ct. at 2376.

This series of appellate decisions embraced the proposition that the HEROES Act student loan forgiveness program required a nationwide injunction. *Id.* at 1048. The Circuit explained that "an injunction limited to the plaintiff States, or even more broadly to student loans affecting the States, would be impractical and would fail to provide complete relief to the plaintiffs." *Id.* The Circuit emphasized that MOHELA—Missouri's public instrumentality that conferred standing on the state of Missouri because of impending harm to MOHELA's service fees—was "purportedly one of the largest nonprofit student loan secondary markets in America." *Id.* Because of "MOHELA's national role in servicing accounts," the Eighth Circuit could "discern no workable path in this emergency posture for narrowing the scope of relief." *Id.* Plaintiffs ask the court to apply the same analysis here and reach the same result.

Defendants, for their part, Doc. 46 at 55, emphasize the Supreme Court's bedrock principle "that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs[,]" *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And defendants emphasize two things. The Eighth Circuit's decision doesn't control our court. And the Supreme Court's decision never addressed the propriety of a nationwide injunction. *Biden v. Nebraska*, 143 S. Ct. at 2355. They're right about the first part. Eighth Circuit

36

decisions aren't binding precedent here. But the court's not so sure about defendants' second point. The Eighth Circuit plainly enjoined the Secretary from implementing his "debt forgiveness action." *Nebraska v. Biden*, 52 F.4th at 1047. And the Supreme Court explicitly reversed the district court's decision denying an injunction. *Biden v. Nebraska*, 143 S. Ct. at 2376.

Defendants also emphasize that the Eighth Circuit relied on MOHELA's national role in finding a preliminary injunction necessary, and plaintiffs haven't proffered any evidence that their public instrumentalities play a similarly important national role. Defendants are right about that point, too. But ultimately, defendants' arguments can't carry the day.

The court concludes that it must issue a nationwide injunction. A broad rule, like the SAVE Plan, requires a broad injunction, given the compelling need for nationwide uniformity in the Department's administration of student loan programs. *See Nebraska v. Biden*, 52 F.4th at 1048 (worrying that "tailoring an injunction to address the alleged harms to the remaining States would entail delving into complex issues and contested facts that would make any limits uncertain in their application and effectiveness"). Also, a limited injunction like the one defendants promote would stand the court's conclusion here on its head. Imagine the scenario advanced by defendants. In it, the court would confine its injunction to the three states with standing to sue. This scenario would free the Secretary to implement the SAVE Plan in the other 47 states. Thus, the Secretary could grant loan forgiveness to students under a regulation that the Secretary—under this court's conclusion, at least—lacked legal authority to promulgate. Defendants have articulated no good reason why student debtors in 47 states should do better than those in the three plaintiff states with standing to sue. And the court can imagine no such reason.

### 2.    The Court Doesn't Enjoin the SAVE Plan in its Entirety.

The court has concluded that a nationwide injunction should issue, and now it must decide what the injunction should, well, enjoin.  Plaintiffs move the court "for a Preliminary Injunction enjoining Defendants . . . , their agents, employees, and attorneys from implementing or acting pursuant to the Final Rule[.]"  Doc. 23 at 1.  But as discussed already, there's a problem with this request:  defendants already have implemented parts of the SAVE Plan.  Plaintiffs' papers fail to account for this reality.[13]  And so plaintiffs have failed to present the court with any meaningful direction—*i.e.*, what a preliminary injunction undoing the already-active parts of the SAVE Plan would look like.  This presents a formidable problem for the court.

Plaintiffs' First Amended Complaint explicitly mentions that defendants "unilaterally erased the debt of 153,000 borrowers" in February 2024.  Doc. 57 at 3 (1st Am. Compl.).  To enjoin the entire SAVE Plan thus would require defendants to unwind those actions, modifying the status quo.  To be sure, usually, the "status quo refers to the last peaceable uncontested status existing between the parties before the dispute developed."  *Am. Civil Liberties Union of Kan. and W. Mo. v. Praeger*, 815 F. Supp. 2d 1204, 1208 (D. Kan. 2011) (citing *Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 n.5 (10th Cir. 2006)).  But by this point, the SAVE Plan has been in effect for months.  *See Louisiana ex rel. Landry v. Biden*, No. 22-30087, 2022 WL 866282, at *3 (5th Cir. Mar. 16, 2022) ("The Interim Estimates were published in February 2021.  This lawsuit was filed in April 2021.  The Plaintiff States moved for a preliminary injunction in July 2021.  And the preliminary injunction was entered in February 2022.  By the time the

---

[13]    Plaintiffs' briefing devotes most of its requested relief to arguing that any injunction should apply nationwide.  *See* Doc. 24 at 31–32; Doc. 50 at 27–28.  And when arguing about their delay in bringing suit, plaintiffs emphasize that they brought suit before the Final Rule's July 2024 effective date, without acknowledging that parts of the Final Rule already have taken effect.  Doc. 50 at 27.  Their approach grossly oversimplifies the state of play.

preliminary injunction was entered, the Interim Estimates had been in place for one year.  The status quo at this point is the continued use of the Interim Estimates.").  And plaintiffs never dispute that defendants gave them explicit advance warning of their early implementation of the SAVE Plan.

The court thus declines to enjoin the parts of the SAVE Plan defendants already have implemented.  "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579–80 (2017).  The "court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." *Id.* at 580 (citation and internal quotation marks omitted).  The equities of this case simply don't favor unwinding the parts of the SAVE Plan that defendants already have implemented.  Plaintiffs waited until defendants already had done so to bring suit.  And, because of this delay, plaintiffs have failed to show an irreparable injury from the parts of the SAVE Plan already in effect that a preliminary injunction could forestall.  *See above* § III.B.

Even without the delay, the court would decline to enjoin the entire SAVE Plan because plaintiffs have failed to present a workable injunction.  Plaintiffs ask for an injunction barring defendants "from implementing or acting pursuant to the Final Rule[.]"  Doc. 23 at 1.  But defendants already have "implement[ed]" a part of the Final Rule and "act[ed] pursuant to the Final Rule[.]"  *Id.*  Defendants have persuaded the court that, at this point, a preliminary injunction that would enjoin the entire SAVE Plan would create pointless uncertainty.  Such a disruptive preliminary injunction is disfavored, and the court won't enter one here.  *RoDa Drilling*, 552 F.3d at 1208 n.3 ("Certain types of preliminary injunctions are disfavored:  (1)

39

preliminary injunctions that alter the status quo, (2) mandatory preliminary injunctions, and (3) preliminary injunctions that give the movant all the relief it would be entitled to if it prevailed in a full trial." (citation omitted)).  This outcome may not qualify as a perfect one.  But it's the best one the court can craft based on the information supplied to date.

The court thus will enter a preliminary injunction that forbids defendants from implementing the parts of the Final Rule set to take effect on July 1, 2024.  Such a preliminary injunction will "preserve the relative positions of the parties until a trial on the merits can be held." *Camenisch*, 451 U.S. at 395.

### 3.    The Court Lacks Jurisdiction Over the President.

Defendants assert that this court lacks authority to enjoin the President, whom plaintiffs have named as a defendant.  Doc. 47 at 58–59.  They're right.  "With regard to the President, courts do not have jurisdiction to enjoin him . . . and have never submitted the President to declaratory relief[.]"  *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (first citing *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866), then citing *Franklin v. Massachusetts*, 505 U.S. 788, 827–28 (1992)).  Plaintiffs never dispute this proposition.  *See generally* Doc. 50.  The court thus dismisses the President of the United States as a party defendant in this action.  The court also directs the Clerk to recaption the case so that it doesn't portray the President as a defendant.

## IV.    Conclusion and Next Steps

The courts grants in part and denies in part plaintiffs' Motion for Preliminary Injunction (Doc. 23).  The court will enter the following preliminary injunction:  Defendants United States Department of Education and United States Secretary of Education Miguel Cardona, and their agents, employees, and attorneys, are enjoined from implementing or acting pursuant to the parts of Final Rule—promulgated by the Department of Education titled "Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family

Education Loan (FFEL) Program," 88 Fed. Reg. 43,820—set to become effective on July 1, 2024.[14]

The court is mindful of the gravity of this ruling.  Drawing the legal conclusions leading to it required the court to apply a developing legal doctrine to complex legislative and regulatory terrain.  And all on a limited evidentiary record.

The court is equally mindful that human infallibility is what it is.  It thus temporarily stays the effective date of this Preliminary Injunction to permit the parties to seek any appellate relief they deem appropriate.  *See, e.g.*, *Fish v. Kobach*, 189 F. Supp. 3d 1107, 1152 (D. Kan. 2016) (staying preliminary injunction for 14 days to give parties time to appeal).  Absent further order by this court or any reviewing court, this court's injunction will take effect at ten o'clock p.m. Central Daylight Time on June 30, 2024.

As a final note, the court emphasizes that any decision about a preliminary injunction is just that:  preliminary.  Given the importance of the issues in this case, the court orders the parties immediately to confer and seek a scheduling conference with United States Magistrate Judge Angel D. Mitchell.  The court orders the parties to formulate and present to Judge Mitchell a schedule that will enable the court to reach a final decision (including a trial on the merits, if one is required) as soon as practicable.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' Motion for Preliminary Injunction (Doc. 23) is granted in part and denied in part, as set forth in full in this Order.

---

[14]  To comply with the separate document rule, the court will enter plaintiffs' preliminary injunction separately.  *MillerCoors LLC v. Anheuser-Busch Cos.*, 940 F.3d 922, 923 (7th Cir. 2019) (remanding for district court to enter preliminary injunction on separate document); *Beukema's Petrol. Co. v. Admiral Petrol. Co.*, 613 F.2d 626, 627 (6th Cir. 1979) ("[I]t appears to the court that the express provisions of Rule 58 for entry of judgment on a separate document applies not only to final judgments in the ordinary sense but also to preliminary injunctions entered pursuant to Rule 65[.]").

**IT IS FURTHER ORDERED THAT** defendants United States Department of Education and United States Secretary of Education Miguel Cardona, and their agents, employees, and attorneys, are enjoined from implementing or acting pursuant to the parts of Final Rule—promulgated by the Department of Education titled "Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program," 88 Fed. Reg. 43,820—set to become effective on July 1, 2024.

**IT IS FURTHER ORDERED THAT** the injunction will take effect at 10:00 PM Central Daylight Time on June 30, 2024.

**IT IS FURTHER ORDERED THAT** defendant Joseph R. Biden, in his official capacity as the President of the United States, is dismissed from the case for lack of jurisdiction.

**IT IS SO ORDERED.**

**Dated this 24th day of June, 2024, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

STATE OF KANSAS, et al.,

                        Plaintiffs,

v.

JOSEPH R. BIDEN, et al.,

                        Defendants.

Case No. 24-1057-DDC-ADM

## MEMORANDUM AND ORDER

A plaintiff must have standing to bring a lawsuit.  As future Justice Scalia once explained, standing asks, "What's it to you?"[1]  And if a plaintiff can't answer that question, that plaintiff doesn't have standing.

This case requires the court to answer a daunting question:  When do states have standing to sue the federal government?  The Supreme Court addressed this question in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023).  There, several states challenged a Department of Education student loan forgiveness plan.  The Supreme Court held that one state had standing.  Missouri had standing to sue on behalf of its "public instrumentality"—a nonprofit, government corporation that owned and serviced student loans.  That public instrumentality had suffered harm because the Department's plan forgave student loan debt, thereby reducing the number of student loans, and, as a result, reducing the service fees the public instrumentality would collect. And so, harm to Missouri's public instrumentality conferred standing on Missouri.  This case,

---

[1]     Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983) (revised version of Ninth Donahue Lecture at Suffolk University Law School) (cited in *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).

though it involves different states and a different student loan forgiveness plan, sits in the shadow of *Biden v. Nebraska*.

Plaintiffs here are 11 states challenging the Department of Education's new student loan regulations, called the SAVE Plan. As relevant here, the SAVE Plan does two things. *First*, it lowers monthly payments for eligible borrowers. *Second*, it shortens the maximum repayment period for eligible borrowers who took out small original loans. That is, if a student borrowed $12,000 or less, the new regulations require that borrower to make payments for 10 years—instead of 20 or 25 years. After 10 years of payments, the Department will forgive the remainder of the debt. Plaintiffs claim the new regulations violate the Constitution's separation of powers and the Administrative Procedures Act.

Defendants have moved to dismiss, arguing plaintiffs lack standing because the SAVE Plan doesn't cause the states any direct harm. Doc. 45. In response, plaintiffs argue the new regulations will harm them in three ways: (1) reduced revenue for the states' public instrumentalities who own student loans, (2) reduced tax revenue, and (3) a competitive harm to their ability to recruit and retain employees to state public service employment. The first theory works, thanks to *Biden v. Nebraska*. But the other two don't.

In short, plaintiffs have shouldered their burden to show the SAVE Plan likely will reduce the revenue of South Carolina, Texas, and Alaska's public instrumentalities—but just barely. Their standing theory is weaker than the one that prevailed in *Biden v. Nebraska*. And the allegations and declarations supporting their standing theory are conflicting. Plaintiffs even tried to sandbag their standing obligation. Their initial Complaint didn't allege standing facts adequately. Instead, plaintiffs wanted to hold onto their standing allegations until the preliminary injunction hearing. The court rejected that approach since standing, in federal court,

is an essential ingredient of subject matter jurisdiction.  So, they eventually filed an Amended Complaint disclosing their standing assertion.  This approach is far from perfect.

But despite these issues, plaintiffs have shouldered their burden to show that the new regulations, more likely than not, will injure South Carolina, Texas, and Alaska's public instrumentalities.  The other eight states—those without a public instrumentality participating in the student loan market—haven't shouldered their burden to show that the regulations will cause them any direct harm.

The other eight plaintiffs assert that they have standing because the SAVE Plan will reduce their income tax revenues.  But this is an incidental effect of the SAVE Plan, traceable to plaintiffs' own decisions about how to tax revenue.  Alternatively, these eight plaintiffs also assert that the SAVE Plan harms them directly because it reduces their ability to recruit staff to public service within state agencies.  No court has ever bought into this theory, and this court declines to become the first.  These plaintiffs simply have no skin in the game.  Their answer to Justice Scalia's colloquial expression of standing—What's it to you?—is this:  It's nothing.

The court thus grants defendants' Motion to Dismiss (Doc. 45) in part and denies it in part.  Plaintiffs South Carolina, Texas, and Alaska have standing based on their public instrumentalities.  The other eight states don't, and, exercising discretion conferred by Circuit authority, the court dismisses them from this action.  This is precisely how the court handles any lawsuit where some plaintiffs have viable claims and others don't.  Fed. R. Civ. P. 1 (directing courts to "secure the just, speedy, and inexpensive determination of every action and proceeding").  The court explains this result, below, beginning with the relevant background.

## I.        Background

The court begins with the statutory scheme that defendants here used to enact the SAVE Plan.  The court then recounts the details of the SAVE Plan and concludes this section with a short summary of this lawsuit.

### *The Higher Education Act (HEA)*

Congress enacted the Higher Education Act in 1965 "to assist in making available the benefits of postsecondary education to eligible students . . . in institutions of higher education[.]" 20 U.S.C. § 1070.  Initially, the HEA didn't authorize the federal government to loan money directly to students.  Doc. 57 at 10 (1st Am. Compl. ¶ 46).  Instead, the federal government guaranteed private loans.  *Id.*  That changed in 1993, when Congress amended the HEA and authorized the federal government to loan money directly to students.  *Id.*  This 1993 amendment also required the Department of Education to offer students a variety of repayment plans.  *Id.*; *see also* 20 U.S.C. § 1087e(d)(1).  Only one variety of repayment plan matters here:  income contingent repayment plans.  Doc. 57 at 10 (1st Am. Compl. ¶ 47); *see also* 20 U.S.C. § 1087e(d)(1)(D).  As the name implies, these plans base a borrower's loan repayments on the borrower's income.  The relevant statute provides for "an income contingent repayment plan, with varying annual payments based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years[.]"  20 U.S.C. § 1087e(d)(1)(D).

### *The SAVE Plan*

Plaintiffs challenge the Department's SAVE Plan, which sets new rules for income contingent (also known as income driven) repayment plans.  This section recounts the SAVE Plan's history and explains how it works.

In January 2023, the Department issued a Notice of Proposed Rulemaking (NPRM). Doc. 57 at 12 (1st Am. Compl. ¶ 57).  The NPRM "propose[d] to amend the regulations governing income-contingent repayment plans[.]"  Improving Income-Driven Repayment for the William D. Ford Federal Direct Loan Program, 88 Fed. Reg. 1894, 1894 (Jan. 11, 2023) (to be codified at 34 C.F.R. pt. 685).  After the NPRM and the comment period, the Department published the "Final Rule" in July 2023.  Doc. 57 at 14 (1st Am. Compl. ¶ 68); *see also* Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43820 (July 10, 2023) (to be codified at 34 C.F.R. pts. 682, 685).

Relevant here, the Final Rule[2] makes the following changes to income contingent repayment plans:

- Defines discretionary income as income above 225% of the applicable federal poverty guideline;

- Sets a borrower's monthly payment amount to $0 if the borrower's income falls below 225% of the applicable federal poverty guideline;

- For undergraduate loans, caps a borrower's monthly payment amount at 5% of the borrower's income above 225% of the applicable federal poverty guideline; and

- For borrowers whose original principal balance was $12,000 or less, cancels the remaining balance after the borrower has made 120 monthly payments or the equivalent.

Doc. 57 at 14 (1st Am. Compl. ¶ 70).  To summarize, the Final Rule decreases borrowers' monthly payments and, for loans with original balances of $12,000 or less, limits a borrower's repayment window to 10 years (from 20 or 25) of qualifying payments.

### *This Lawsuit*

---

[2]    This Memorandum and Order uses the terms "Final Rule" and "SAVE Plan" interchangeably.

Eleven states now sue Secretary of Education Miguel Cardona, the United States Department of Education, and President Joseph R. Biden.  According to these states, the Final Rule is "plainly unlawful" under the Constitution and the Administrative Procedures Act, especially in light of *Biden v. Nebraska*, 143 S. Ct. 2355 (2023).  They bring four claims:  (1) agency action in excess of statutory jurisdiction and in violation of separation of powers, violating Article I of the Constitution; (2) agency action in excess of statutory authority, violating the Administrative Procedures Act (APA); (3) arbitration and capricious agency action, violating the APA; and (4) agency action in violation of APA procedures.  Doc. 57 at 25–38 (1st Am. Compl. ¶¶ 133–227).

With this background, the court next recites the legal standard governing defendants' Motion to Dismiss.[3]

## II.      Legal Standard

Defendants move for dismissal under Fed. R. Civ. P. 12(b)(1), arguing plaintiffs lack standing, and so this court lacks subject matter jurisdiction.  Rule 12(b)(1) motions take one of two forms:  a facial attack or a factual attack.  *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001).  "A facial attack asserts that the allegations in the complaint, even if true, are insufficient to establish subject matter jurisdiction.  By contrast, a factual attack on the complaint challenges the veracity of the allegations upon which subject matter jurisdiction depends." *Cnty. Comm'rs v. U.S. Dep't of the Interior*, 614 F. Supp. 3d 944, 951 (D.N.M. 2022) (citation and internal quotation marks omitted).  Here, defendants bring a factual attack.[4]

---

[3]      Though defendants filed their Motion to Dismiss before plaintiffs filed their First Amended Complaint, the parties previously asked the court and it agreed to apply the Motion to Dismiss arguments to plaintiffs' First Amended Complaint.  Doc. 60 at 3.

[4]      Though defendants present no evidence of their own, the parties agreed at the hearing that this is a factual attack on the court's subject matter jurisdiction.

A factual attack allows the court to "reference . . . evidence outside the pleadings" including "affidavits, other documents, and [even conduct] a limited evidentiary hearing to resolve disputed jurisdictional facts." *Stuart*, 271 F.3d at 1225 (citation and internal quotation marks omitted). "When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations." *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995), *abrogated on other grounds by Cent. Green Co. v. United States*, 531 U.S. 425, 437 (2001). Instead, "when considering a Rule 12(b)(1) motion to dismiss, the court may weigh the evidence and make factual findings." *Los Alamos Study Grp. v. U.S. Dep't of Energy*, 692 F.3d 1057, 1063 (10th Cir. 2012).

"If jurisdiction is challenged, the burden is on the party claiming jurisdiction to show it by a preponderance of the evidence." *Celli v. Shoell*, 40 F.3d 324, 327 (10th Cir. 1994). So, when facing a factual attack, a plaintiff must "present affidavits or other evidence sufficient to establish the court's subject matter jurisdiction by a preponderance of the evidence." *U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 n.5 (10th Cir. 1999); *see also Sapp v. F.D.I.C.*, 876 F. Supp. 249, 251 (D. Kan. 1995) ("The allegations contained in the complaint are initially accepted as true, but if challenged the plaintiff has the duty to support the allegations with competent proof."). Our Circuit has analogized plaintiffs' Rule 12(b)(1) burden to the nonmovant's burden under Fed. R. Civ. P. 56(e). *Hafter D.O.*, 190 F.3d at 1160 n.5 ("Whether we consider [defendant's] motion as a motion to dismiss under Rule 12(b)(1) or a motion for summary judgment, [plaintiffs'] burden remains essentially the same—they must present affidavits or other evidence sufficient to establish the court's subject matter jurisdiction by a preponderance of the evidence.").

Defendants seek dismissal of plaintiffs' claims under Rule 12(b)(1) because, they assert, plaintiffs lack Article III standing.  Article III of our Constitution limits federal courts' jurisdiction to "cases" and "controversies."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  To present a case or controversy under Article III, a plaintiff must establish that it has standing to sue.  *Id.* (citations omitted).  To have standing, "a plaintiff needs a 'personal stake' in the case."  *Biden v. Nebraska*, 143 S. Ct. at 2365 (2023) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).  "To demonstrate their personal stake, plaintiffs must be able to sufficiently answer the question:  'What's it to you?'"  *TransUnion*, 594 U.S. at 423 (citation and internal quotation marks omitted).  "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (citation and internal quotation marks omitted).

Article III's standing analysis requires three things:

(1) an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical[;]"

(2) "a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court[;]" and

(3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted).

Plaintiffs must establish standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  *Id.* at 561.  At "the pleading stage, the plaintiff must clearly

allege facts demonstrating each element" of standing.  *Spokeo*, 578 U.S. at 338 (citation, internal quotation marks, and ellipsis omitted).  "If at least one plaintiff has standing, the suit may proceed."  *Biden v. Nebraska*, 143 S. Ct. at 2365 (citation omitted).

## III.      Analysis

Plaintiffs assert three[5] distinct theories of standing.  *First*, plaintiffs argue that the Final Rule harms their public instrumentalities—organizations who own and service student loans. *Second*, they argue that the Final Rule causes them direct injury because the Final Rule will decrease their tax revenues.  *Last*, plaintiffs allege the Final Rule hurts their ability to recruit employees into state employment.  The court considers each theory, in turn, below.

### A.      Public Instrumentalities

Plaintiffs' public instrumentality theory alleges, in a nutshell, that three of the plaintiff states have government corporations who own and service student loans, and the Final Rule will cause these organizations to lose revenue.  The organizations are public instrumentalities of the states, plaintiffs argue, so a harm to three instrumentalities is a direct injury to the three states themselves.  Because this standing theory relies on *Biden v. Nebraska*, 143 S. Ct. 2355, the court reviews that case's standing discussion, in detail, below.

### 1.      *Biden v. Nebraska*

*Biden v. Nebraska* involved student loan forgiveness under the Higher Education Relief Opportunities for Students Act (HEROES Act) of 2003, a law enacted out of Congress's concern for student loan borrowers in the wake of the September 11 terrorist attacks.  143 S. Ct. at 2363.

---

[5]      In their original Complaint, plaintiffs alleged a fourth kind of injury: "increased law enforcement costs[.]"  Doc. 1 at 21 (Compl. ¶ 113).  Plaintiffs alleged that the SAVE Plan "will create enormous opportunities for fraudsters to exploit student debt borrowers that would not otherwise exist."  *Id.* Plaintiffs' First Amended Complaint doesn't mention this injury.  *See generally* Doc. 57 (1st Am. Compl.).  And during the hearing on this motion, plaintiffs' counsel confirmed.  Plaintiffs have abandoned this theory.

The HEROES Act allows the Secretary of Education to "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs" during a "national emergency[.]" 20 U.S.C. § 1098bb(a)(1). During the COVID-19 pandemic, the Secretary used the HEROES Act to suspend interest accrual and repayment obligations on federal student loans several times. *Biden v. Nebraska*, 143 S. Ct. at 2364. In August 2022, the Secretary took a step further, and cancelled student loan debt under the HEROES Act to address financial harm stemming from the COVID-19 pandemic. *Id.* This plan sought "to reduce and eliminate student debts directly." *Id.* Here's how that batch of loan forgiveness worked:

> For borrowers with an adjusted gross income below $125,000 in either 2020 or 2021 who have eligible federal loans, the Department of Education will discharge the balance of those loans in an amount up to $10,000 per borrower. Borrowers who previously received Pell Grants qualify for up to $20,000 in loan cancellation.

*Id.* at 2364–65 (citations omitted).

Six states challenged this HEROES Act plan. *Id.* at 2365. The district court concluded the states lacked standing. *Id.* The Eighth Circuit disagreed, concluding the state of Missouri likely had standing based on the Missouri Higher Education Loan Authority (MOHELA). *Id.* The Supreme Court granted certiorari before judgment and, relevant here, concluded Missouri had standing because "the Secretary's plan harm[ed] MOHELA and thereby directly injure[d] Missouri[.]" *Id.*

The Court explained that MOHELA, a nonprofit government corporation, participated in the student loan market. *Id.* MOHELA owned over $1 billion in Federal Family Education Loans (FFELs) and serviced $150 billion in federal loans. *Id.* at 2365–66. The Court's standing analysis focused on service fees. *Id.* The Department of Education had hired MOHELA "to collect payments and provide customer service to borrowers. MOHELA receive[d] an

administrative fee for each of the five million federal accounts it services[.]" *Id.* (citations omitted).

Enter the HEROES Act student loan forgiveness plan.  Under this "plan, roughly half of all federal borrowers would have their loans completely discharged." *Id.* at 2366.  This meant "MOHELA could no longer service those closed accounts, costing it, by Missouri's estimate, $4 million a year in fees that it otherwise would have earned under its contract with the Department of Education." *Id.*  The Court concluded that this financial harm from reduced service fees qualified as "an injury in fact directly traceable to the Secretary's plan[.]" *Id.*  The Court went on to explain that MOHELA was a public instrumentality of Missouri, so a "harm to MOHELA in the performance of its public function [was] necessarily a direct injury to Missouri itself." *Id.* On that basis, Missouri had standing to sue and challenge that iteration of loan forgiveness.

With *Biden v. Nebraska*'s standing analysis firmly in mind, the court outlines plaintiffs' public instrumentality arguments here.

> ### 2.     Plaintiffs' Standing Theory Based on South Carolina, Texas, and Alaska's Public Instrumentalities

Plaintiffs allege that—like Missouri and MOHELA—South Carolina, Alaska, and Texas have "state instrumentalities or quasi instrumentalities" who will suffer financial harm under the SAVE Plan.  Doc. 57 at 23 (1st Am. Compl. ¶ 116).  These instrumentalities "(1) provide student loans to residents of the state, (2) hold loans issued by the Federal Family Education Loan Program ("FFELP[6] loans"), and/or (3) service student debt taken out by residents, former residents, and out-of-state students." *Id.*  The court pauses here to explain FFEL loans because they provide an important part of plaintiffs' public instrumentality harm theory.

---

[6]     Plaintiffs use the acronym "FFELP" in their First Amended Complaint to describe Federal Family Education loans.  Defendants use the acronym "FFEL" to reference these loans. *Biden v. Nebraska* used the acronym "FFEL".  This Order uses FFELP and FFEL interchangeably.

FFEL loans are student loans held by private corporations and guaranteed by the federal government.  "While FFELs . . . are no longer issued, many remain outstanding."  *Biden v. Nebraska*, 143 S. Ct. at 2362.  Holders of FFEL loans own the assets outright.  Doc. 65 at 14.  The federal government doesn't pay the holder to service the loans.  *Id.*  And federal law requires FFEL holders to pay rebate fees on certain FFEL loans to the government—fees the holders can't pass on to the borrower.  *Id.* (first citing 20 U.S.C. § 1078-3(f), then citing 34 C.F.R. §§ 682.406(a)(12), 682.202).

To understand plaintiffs' standing theory, the court also must explain FFEL loan consolidation.  Borrowers with FFEL loans can "consolidate" their loans into federal direct loans.  "Consolidate" is something of a term of art here because, it appears, consolidate seems to mean *convert* FFEL loans into federal direct loans.  That is, borrowers can exchange their FFEL loans—ones owned by private corporations—into direct loans owned by the federal government.  When borrowers consolidate their FFEL loans, the federal government pays the loan's holder the principal loan amount owed and accrued interest.  Putting it more succinctly, a consolidation cashes out the private corporation holding the FFEL loan.

Returning to plaintiffs' public instrumentality theory, plaintiffs allege that South Carolina, Texas, and Alaska have public instrumentalities who hold FFEL loans.  Plaintiffs allege the three instrumentalities "derive income from their loan portfolios, such as through collecting interest owed or service fees."  Doc. 57 at 23 (1st Am. Compl. ¶ 117).  So, plaintiffs allege, the instrumentalities' "amount of income thus collected is directly proportional to the size of the debt portfolio:  *i.e.*, decreasing the size of the portfolio will decrease the income collected by the instrumentalities/quasi-instrumentalities."  *Id.* (1st Am. Compl. ¶ 119).

Enter the Final Rule.  Plaintiffs allege the "Final Rule is virtually certain to decrease the size of these student-debt portfolios by inducing individuals to consolidate their FFELP loans into direct federal loans in order to take advantage of the extraordinary (and unlawful) generosity of the Final Rule." *Id.* (1st Am. Compl. ¶ 120).  Put a slightly different way, plaintiffs argue that the SAVE Plan will incentivize debtors to consolidate these FFEL loans into direct federal loans, shrinking the instrumentalities' debt portfolios, and decreasing their revenue.  Doc. 50 at 17–18. Defendants have several problems with this theory.

Defendants correctly point out that plaintiffs' theory of public instrumentality harm is different—and weaker—than the public instrumentality harm that prevailed in *Biden v. Nebraska*.  *Biden v. Nebraska* says nothing about FFEL loans and consolidation.  That case involved a simpler student loan forgiveness plan and a simpler state instrumentality harm.  Start with the plan.  The student loan forgiveness under the HEROES Act forgave $10,000 to $20,000 per eligible loan.  Here, the SAVE Plan operates with more finesse.  It reduces monthly payment amounts and, for loans with original balances of $12,000 or less, limits a borrower's repayment window to 10 years (from 20 or 25) of qualifying payments.  Next consider the harm to the state instrumentality.  In *Biden v. Nebraska*, the HEROES Act loan forgiveness would result in millions of fully forgiven loans.  So, MOHELA no longer could service those closed accounts, costing it revenues formerly derived from servicing direct loans.  Here, in contrast, plaintiffs haven't alleged any loss of revenue from *servicing* loans.  Instead, plaintiffs allege that the Final Rule will cost them interest revenue because third parties have incentive to consolidate their FFEL loans into direct loans—and thus pay interest to the federal government as the sole lender of direct loans.[7]

---

[7]       It's not clear from plaintiffs' First Amended Complaint or briefing how, exactly, the SAVE Plan will reduce the instrumentalities' revenue.  Plaintiffs talk about "revenue" without differentiating between

At bottom, plaintiffs' theory of standing is more attenuated—and therefore weaker—than MOHELA's standing in *Biden v. Nebraska*. Despite these issues, the court nonetheless concludes that South Carolina, Texas, and Alaska have pleaded plausibly and sufficiently established a likely injury to their state instrumentalities.

3.      **Plaintiffs Plausibly Have Alleged an Injury in Fact to South Carolina, Texas, and Alaska's Public Instrumentalities, Fairly Traceable to the SAVE Plan**

Because plaintiffs' theory of harm differs from MOHELA's harm in *Biden v. Nebraska*, the court must look beyond that case's holding. It must consider additional precedent defining the standing inquiry that applies to this dispute. Defendants argue that plaintiffs' public instrumentality theory fails two elements of standing: injury in fact and traceability. The court thus briefly recites the governing law.

To demonstrate Article III standing, a "plaintiff must have suffered an 'injury in fact'" and that injury must be "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560–61 (citations and internal quotation marks omitted). Plaintiffs allege an imminent injury, claiming the Final Rule will cause them financial harm in the future. Under *Clapper*, a future injury satisfies the "imminence" requirement only if it is "certainly impending." 568 U.S. at 401. The Supreme Court has "repeatedly reiterated that threated injury be *certainly impending* to

---

revenue from interest and revenue from fees. Plaintiffs' First Amended Complaint glosses over the difference, alleging the instrumentalities "derive income from their loan portfolios, such as through collecting interest owed or service fees." Doc. 57 at 23 (1st Am. Compl. ¶ 117). And plaintiffs' briefing applies more gloss, arguing that each instrumentality "holds a portfolio of FFELP loans, and the interest/fees that they receive from those portfolios is directly proportional to their portfolio's size." Doc. 50 at 17 (emphasis added).

Fortunately, at the hearing, plaintiffs confirmed that their public instrumentality theory relies on reduced *interest* revenue—not fees.

constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Id.* at 409 (emphases in original) (citation, brackets, and internal quotation marks omitted).

In addition to a future injury, plaintiffs also allege an indirect injury. When "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of *someone else*," the Supreme Court has instructed courts to require "much more." *Lujan*, 504 U.S. at 561–62 (emphasis in original). "In that circumstance, causation and redressability ordinarily hinge on the response of the regulated . . . third party the government action or inaction—and perhaps on the response of others as well." *Id.* at 562. When such

> essential elements of standing depend[] on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume to either control or to predict . . . , it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of injury.

*Id.* (citations and internal quotation marks omitted).

So, to show standing, plaintiffs must show two things: (1) borrowers likely will consolidate their FFEL loans into direct federal loans and (2) this consolidation likely will reduce the instrumentalities' revenue. To meet this burden, plaintiffs have provided declarations from each of the three state instrumentalities. The court reviews the evidence submitted by each instrumentality below, starting with South Carolina. After its review of each package of evidence, the court evaluates the evidence together. And, ultimately, the court concludes South Carolina, Texas, and Alaska have standing—at least for now.

### a.    South Carolina's SEAA

Plaintiffs allege that South Carolina has a public instrumentality called the State Education Assistance Authority (SEAA). Doc. 57 at 23–24 (1st Am. Compl. ¶ 121). The First Amended Complaint alleges that "since 2011, SEAA's portfolio has decreased from

approximately $31.3 million to $6.4 million, which has reduced the amount of income generated for South Carolina's benefit[.]"  *Id.* at 24 (1st Am. Compl. ¶ 122).  Plaintiffs allege the SAVE Plan "will further decrease the size of SEAA's portfolio as borrowers convert FFELP loans to take advantage of available debt forgiveness."  *Id.*

Plaintiffs submitted a declaration from South Carolina officials confirming the information about SEAA.  Doc. 53-6 (Spate Decl.).  The declaration's exhibits confirm that SEAA holds FFEL loans, *id.* at 7 (Spate Decl. Ex. 2), and SEAA's FFEL portfolio has decreased steadily since 2011, *id.* at 8 (Spate Decl. Ex. 2).  The exhibit provides three figures.  The first figure shows SEAA's FFEL loan portfolio decreasing over time:

**History of SEAA's FFELP portfolio from 2010 to present:**

| Month End | Principal Balance |
|---|---|
| 6/30/2011 | $31,324,566.17 |
| 6/30/2012 | 29,589,044.81 |
| 6/30/2013 | 26,776,811.11 |
| 6/30/2014 | 24,974,750.48 |
| 6/30/2015 | 22,797,591.92 |
| 6/30/2016 | 20,975,542.24 |
| 6/30/2017 | 19,218,505.43 |
| 6/30/2018 | 16,654,982.40 |
| 6/30/2019 | 15,026,548.26 |
| 6/30/2020 | 12,872,804.70 |
| 6/30/2021 | 11,889,724.29 |
| 6/30/2022 | 10,771,880.55 |
| 6/30/2023 | 8,059,252.66 |
| 3/31/2024 | 6,423,362.52 |

*Id.*

The exhibit's second figure attributes this decrease to borrower consolidation, showing that borrowers have consolidated SSEA's FFEL loans for years.  At the hearing on the Motion to Dismiss, plaintiffs' counsel explained the following figure shows the total value of FFEL loans

consolidated each year (first column) and the value of FFEL loans paid down by FFEL borrowers (second column):

**Proportion of SEAA's FFELP loans that were consolidated versus paid down**

| Period | Consolidation Payment | Other Principal Payments |
|---|---|---|
| 7/1/2010 - 6/30/2011 | -$1,019,123.26 | -$814,057.50 |
| 7/1/2011 - 6/30/2012 | -1,076,871.56 | -$658,649.80 |
| 7/1/2012 - 6/30/2013 | -1,365,846.14 | -$1,446,387.56 |
| 7/1/2013 - 6/30/2014 | -590,101.34 | -$1,211,959.29 |
| 7/1/2014 - 6/30/2015 | -1,231,047.88 | -$946,110.68 |
| 7/1/2015 - 6/30/2016 | -909,836.74 | -$912,212.94 |
| 7/1/2016 - 6/30/2017 | -1,081,806.83 | -$675,229.98 |
| 7/1/2017 - 6/30/2018 | -1,064,526.12 | -$1,498,996.91 |
| 7/1/2018 - 6/30/2019 | -415,796.86 | -$1,212,637.28 |
| 7/1/2019 - 6/30/2020 | -622,083.17 | -$1,531,660.39 |
| 7/1/2020 - 6/30/2021 | -174,407.04 | -$808,673.37 |
| 7/1/2021 - 6/30/2022 | -954,393.67 | -$1,320,063.19 |
| 7/1/2022 - 6/30/2023 | -2,112,224.90 | -$600,402.99 |
| 7/1/2023 - 3/31/2024 | -1,111,945.46 | -$523,944.68 |

*Id.*

But, though SEAA's FFEL portfolio has gone down each year since 2011, the interest revenue doesn't follow that same pattern:

**Interest revenue generated by SEAA's FFELP loans per year**

| Period | Total Interest Revenue |
|---|---|
| 7/1/2010 - 6/30/2011 | $1,172,811.00 |
| 7/1/2011 - 6/30/2012 | $764,676.00 |
| 7/1/2012 - 6/30/2013 | $692,306.00 |
| 7/1/2013 - 6/30/2014 | $630,738.00 |
| 7/1/2014 - 6/30/2015 | $585,056.00 |
| 7/1/2015 - 6/30/2016 | $572,691.00 |
| 7/1/2016 - 6/30/2017 | $595,654.00 |
| 7/1/2017 - 6/30/2018 | $689,735.00 |
| 7/1/2018 - 6/30/2019 | $756,432.00 |
| 7/1/2019 - 6/30/2020 | $529,763.00 |
| 7/1/2020 - 6/30/2021 | $301,659.00 |
| 7/1/2021 - 6/30/2022 | $303,673.00 |
| 7/1/2022 - 6/30/2023 | $575,359.00 |
| 7/1/2023 - 3/31/2024 * | $432,455.00 |

*Id.*

This SEAA evidence creates some evident problems for South Carolina's standing theory. Remember, plaintiffs need to show two things: (1) the SAVE Plan makes it likely that borrowers will consolidate their loans and (2) if borrowers consolidate their loans, the public instrumentalities likely will suffer financial harm in the form of reduced interest payments. The SEAA evidence undermines both propositions.

The SEAA evidence casts doubt on plaintiffs' allegation that the SAVE Plan makes FFEL loan consolidation more likely. The SEAA evidence shows that SEAA's FFEL loan portfolio has decreased steadily since 2010. So, borrowers already were consolidating their loans long before the SAVE Plan's incentives. This conclusion poses a causation problem for plaintiffs. And this problem demonstrates the difficulty of establishing standing when a theory of harm relies on decisions by third parties. Where "the independent action of some third party not before the court—rather than that of the defendant—was the direct cause of the plaintiff's harm, causation may be lacking." *Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1225 (10th Cir. 2008) (citation and internal quotation marks omitted). Trying to cure this problem, plaintiffs direct the court to Alaska's declaration. It explains why the SAVE Plan incentivizes borrowers to consolidate their FFEL. Critically, the Alaska declaration alleges that borrowers already are consolidating their loans. More on Alaska in a moment.

The SEAA evidence also casts doubt on plaintiffs' theory that, as the instrumentalities' FFEL loan portfolios decrease, their interest revenue necessarily will decrease vis-à-vis interest revenue in the what if world where the SAVE Plan didn't happen. SEAA's FFEL portfolio has decreased steadily over the years, but SEAA's interest revenue on FFEL loans has moved up and moved down. Put differently, a graph of interest revenue wouldn't have the negative slope plaintiffs need.

At the hearing, plaintiffs introduced an additional layer of confusion about this data. Plaintiffs argued that the SEAA evidence demonstrates loan consolidation from the HEROES Act loan forgiveness.  Plaintiffs argued that the jump from -$954,393.67 in consolidation in fiscal year 2021 to -$2,112,224.90 in fiscal year 2022 resulted from defendants announcing the HEROES Act forgiveness.  This announcement, plaintiffs contend, led borrowers to consolidate their loans to take advantage.  To be sure, this would support plaintiffs' view that borrowers respond to incentives created by federal student loan forgiveness programs—*i.e.*, when borrowers thought they could benefit from the HEROES Act, they consolidated their loans.  But plaintiffs' argument makes it harder to attribute loan consolidation to the SAVE Plan loan forgiveness, and not the HEROES Act loan forgiveness.

And plaintiffs' argument is just that:  an argument.  Plaintiffs haven't adduced any evidence that purports to suss out the amount of consolidation caused by the HEROES Act, the SAVE Plan, and general market forces individually.  This gap particularly presents a problem given the timing of the two loan forgiveness plans.  Plaintiffs explained during the hearing that the fiscal year 2022 number captures HEROES Act-related consolidation.  According to plaintiffs, this increase in loan consolidation—from -$954,393.67 in fiscal year 2021 to -$2,112,224.90 in fiscal year 2022— shows the effects of the HEROES Act loan forgiveness— *i.e.*, borrowers consolidated their FFEL loans to take advantage of the HEROES Act.  That's all well and good, until the court considers the SAVE Plan.  Defendants announced the proposed rule in January 2023—within fiscal year 2022.  That leaves two loan forgiveness plans in play during one fiscal year.  And the court has no way to tell how much loan consolidation to attribute to the HEROES Act and how much to attribute to the SAVE Plan.

19

Given these issues with the South Carolina evidence, plaintiffs' theory finds its way to some thin ice. Fortunately, for them, plaintiffs' evidence from Texas helps them show that consolidation would cause reduced income revenue.

### b.    Texas's THECB

Plaintiffs allege that Texas has an agency named the Texas Higher Education Coordinating Board (THECB). Doc. 57 at 24 (1st Am. Compl. ¶ 127). THECB is a "student debt servicing public entity[.]" *Id.* Plaintiffs allege "THECB owns over $1,1295,236 [*sic*] in FFELP loans" and "collected $114,479 in interest in 2023." *Id.* at 25 (1st Am. Compl. ¶ 130). The record isn't clear if this is $11.2 million in FFEL loans or $1.12 million. Plaintiffs allege that if the SAVE Plan "were to decrease the size of that student debt portfolio, the amount of income that the THECB would collect would decrease." *Id.* (1st Am. Compl. ¶ 131).

Plaintiffs submitted a declaration from THECB. *See* Doc. 53-7 (Keyton Decl.). The declaration confirms the above amounts. *Id.* at 2 (Keyton Decl. ¶ 3). And, critically, the declarant testifies:

> To the extent that federal policy results in borrowers consolidating their loans out of FFELP into the Direct Loan Program, those consolidations will cause the State of Texas to lose revenue. Upon consolidation, the federal government compensates the holder (THECB) only for principal and accrued interest. Thus, such consolidations will result in reduced revenue [to the] THECB and therefore the State of Texas. The THECB would no longer collect interest on FFELP loans that have been consolidated, diminishing the value of its portfolio.

*Id.* (Keyton Decl. ¶ 4). So, declarant says, the "SAVE Plan could cause pecuniary harm to the State of Texas and THECB measured by a reduction in revenue to the State's FFELP program." *Id.* (Keyton Decl. ¶ 5). Defendants point out that this declaration "skims over consolidation entirely." Doc. 65 at 14. That is, the declarant assumes, without explaining, that borrowers will consolidate their loans.

Defendants have the better end of that narrow issue.  The Texas declaration doesn't help plaintiffs shoulder their burden to show that borrowers will consolidate their FFEL loans into direct loans—the first piece of the standing puzzle.  In contrast, the Texas declaration *does* help plaintiffs with the second piece of the standing puzzle:  it's evidence that consolidation will cause revenue loss to Texas through THECB.  The mismatched puzzle piece here is the SEAA exhibit, which contradicts the Texas evidence because the SEAA data shows that decreased FFEL portfolios don't necessarily mean decreased FFEL interest revenue.  Doc. 53-6 at 8 (Spate Decl. Ex. 2).

With these those two states behind us, the court turns to plaintiffs' strongest evidence:  Alaska's declaration.

### c.      Alaska's ASLC

Plaintiffs allege that Alaska's instrumentality is a public corporation, known as the Alaska Student Loan Corporation (ASLC).  It owns $16.8 million in FFEL loans.  Doc. 57 at 24 (1st Am. Compl. ¶¶ 123–24).  Plaintiffs allege the SAVE Plan will cause Alaska to lose significant revenues.  *Id.* (1st Am. Compl. ¶ 125).  Specifically, plaintiffs allege "ASLC estimates that the Final Rule will result in ASLC losing approximately $100,000 over just the next two years that it would otherwise collect as a FFELP loan holder."  *Id.* (1st Am. Compl. ¶ 126).

Plaintiffs also submitted a declaration from ASLC.  The declarant testifies, "The SAVE Plan entices borrowers to consolidate their loans away from FFELP into the Direct Loan Program (DLP), comprising loans held by the federal government."  Doc. 53-8 at 2 (Efird Decl. ¶ 6).  According to the declarant, three features of the SAVE Plan entice borrowers to consolidate their FFEL loans into direct loans:

1. The SAVE Plan offers benefits to direct loans only—*i.e.*, capped payments, waiving residual interest, and full forgiveness after ten years of payments;

2. The SAVE Plan doesn't treat consolidated loans as new loans, so borrowers' repayment clocks won't restart if they consolidate—a feature that previously disincentivized borrowers from consolidating; and

3. The federal government is advertising and encouraging borrowers to consolidate.

*Id.* at 2–3 (Efird Decl. ¶¶ 6–8). So, the declarant provides, "the federal government is strongly . . . incentivizing borrowers to consolidate their loans away from FFELP and into [direct] loans held by the federal government."[8]  *Id.* at 3 (Efird Decl. ¶ 8).

This testimony resembles—at some level anyway—theoretical, in-a-vacuum, "basic economic theory" allegations that struggle to carry plaintiffs' standing burden. *See Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 2024 WL 2237667, at *8 (6th Cir. May 17, 2024) ("Plaintiffs' allegations regarding supply and demand and the impact of financial incentive on third-party student-loan debtors are wholly speculative."). But the ASLC declaration goes a step further. It testifies, "Because these benefits are not available to borrowers with commercially-held FFELP loans, borrowers are rapidly consolidating their loans away from FFELP loans held by ASLC and into Direct Loans held by the federal government." *Id.* at 2 (Efird Decl. ¶ 6).

ASLC's declarant testifies these "consolidations will cause Alaska to lose significant revenues." *Id.* at 3 (Efird Decl. ¶ 9). Here's how: an FFEL loan is a loan held by a corporation (here, ASLC) and guaranteed by the federal government. When a borrower consolidates an FFEL loan into a direct loan from the federal government, the federal government compensates the holder (here, ASLC) for principal and accrued interest. *Id.* So, consolidation means the

---

[8]       The ASLC declaration contains several legal conclusions. For example, the declarant testifies that "the federal government is strongly, *and likely unlawfully*, incentivizing borrowers to consolidate their loans away from FFELP and into loans held by the federal government." Doc. 53-8 at 3 (Efird Decl. ¶ 8) (emphasis added). The lawfulness of the SAVE Plan is a legal conclusion reserved for the court to decide. The court declines to consider the declaration's legal conclusions.

holder (here, ASLC) will no longer collect interest on those consolidated FFEL loans.  *Id.*

Because of this phenomenon, "ASLC estimates that the SAVE Plan will result in ASLC losing

approximately $100,000 over just the next two years that it would otherwise collect as a FFELP

holder."  *Id.* (Efird Decl. ¶ 11).  This declaration represents plaintiffs' best evidence.

The Alaska declaration provides evidentiary support for both pieces of the standing

puzzle:  (1) borrowers are likely to consolidate their FFEL loans into direct loans because of the

SAVE Plan and (2) when borrowers consolidate, it will cause the public instrumentality to lose

interest revenue.  Defendants fault this declaration for "nakedly" stating that ASLC will lose

$100,000 "because of the SAVE Plan, without explaining how or why."  Doc. 65 at 14.  While

there's some truth to defendants' criticism, Alaska has adduced some facts.  The court can't say

the same for defendants.  They've proffered no evidence of their own.  Without any

contradictory evidence, defendants have given no facts to reach a different conclusion.  In short,

the court currently has no reason to doubt ASLC's $100,000, nor any other part of the

declaration.

Having summarized all three components of the public instrumentality evidence, the

court, next, synthesizes this information.

### d.  Summary of State Public Instrumentality Theory

Considering all three sources of evidence together, plaintiffs have shouldered their

burden to allege standing.  Recall that plaintiffs had to show two things to show an injury:  (1)

the SAVE Plan makes it likely that borrowers will consolidate their loans and (2) if borrowers

consolidate their loans, the states' public instrumentalities will suffer harm.  Plaintiffs have

shouldered their burden on both fronts.

*First*, plaintiffs have shown by a preponderance of the evidence that the SAVE Plan will

cause FFEL borrowers to consolidate their loans into direct loans.  This inquiry relies on the

choices of third parties not before the court, which means plaintiffs must allege "facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562.  Alaska's ASLC declarant testifies that consolidation makes economic sense for borrowers because the SAVE Plan provides benefits for direct loans that FFEL loan borrowers can't access.  And, critically, the ASLC declarant alleges "borrowers are rapidly consolidating their loans away from FFELP loans held by ASLC and into Direct loans held by the federal government."  Doc. 53-8 at 2 (Efird Decl. ¶ 6).

        To be sure, plaintiffs' SEAA evidence presents some problems for this theory because it shows borrowers consolidating their FFEL loans without the SAVE Plan.  The Alaska evidence overcomes these issues.  Alaska's ASLC declaration, in contrast, explains the SAVE Plan's incentives for borrowers to consolidate and testifies that the SAVE Plan already is causing borrowers to consolidate.  And defendants haven't rebutted this evidence with any evidence of their own.  So, despite the SEAA evidence,[9] plaintiffs have shouldered their burden to show "that third parties will likely react in predictable ways to" the SAVE Plan.  *Dep't of Comm. v. New York*, 139 S. Ct. 2551, 2566 (2019).

        *Second*, plaintiffs have shown that, when borrowers consolidate their loans, the states' public instrumentalities—and therefore the states—will suffer harm in the form of reduced interest income.  Plaintiffs' own evidence from SEAA casts doubt on this theory.  SEAA's FFEL loan portfolio has decreased steadily overtime, but its interest income has both increased and decreased over the same period.  Doc. 53-6 at 8 (Spate Decl. Ex. 2).  Despite these issues, the

---

[9]        South Carolina has squeaked over the preponderance of the evidence standard thanks to Alaska's evidence and a lack of evidence from defendants.  The court notes that the "need to satisfy the[] three [standing] requirements persists throughout the life of the lawsuit."  *Wittman v. Personhuballah*, 578 U.S. 539, 543 (2016).  Given its narrow victory here, the court questions whether South Carolina's evidence (at least the evidence plaintiffs have presented here) could survive if defendants submitted any contrary evidence at all.

Texas THECB and Alaska ASLC evidence suffices to confer standing to the three public instrumentalities.

The THECB declarant alleges that, if borrowers consolidate their FFEL loans into direct loans, "those consolidations will cause the State of Texas to lose revenue" because the "THECB will no longer collect interest on FFELP loans that have been consolidated, diminishing the value of its portfolio." Doc. 53-7 at 2 (Keyton Decl. ¶ 4). And the THECB's declarant further testifies the "SAVE Plan could cause pecuniary harm to the State of Texas and THECB measured by a reduction in revenue to the State's FFELP program." *Id.* (Keyton Decl. ¶ 5). Defendants argue that this declaration doesn't help plaintiffs shoulder their burden because the THECB "declarant skims over consolidation entirely"—that is, the declarant assumes that borrowers will consolidate their loans. Doc. 65 at 14. But, as just explained, plaintiffs have marshaled some evidence that some borrowers likely will consolidate their FFEL loans into direct loans. And Alaska's evidence also shows borrowers already are consolidating. Because it's likely that borrowers will consolidate, it's likely that Texas will suffer harm.

The same goes for Alaska's ASLC. The ASLC declarant testifies that "consolidations will cause Alaska to lose significant revenues." Doc. 53-8 at 3 (Efird Decl. ¶ 9). The declarant explains how consolidation will affect revenues. *Id.* And "ASLC estimates that the SAVE Plan will result in ASLC losing approximately $100,000 over just the next two years that it would otherwise collect as a FFELP holder." *Id.* (Efird Decl. ¶ 11). Plaintiffs thus have shouldered their current burden to allege a non-speculative, imminent, future injury to the public instrumentalities,[10] traceable to the SAVE Plan. And so, on the current record, South Carolina, Texas, and Alaska have standing.

---

[10]     The court again notes that South Carolina has succeed in showing standing by the thinnest of margins.

Before the court leaves the public instrumentality analysis altogether, it responds to another of defendants' arguments.

### 4.    Harm v. Benefit

Defendants argue plaintiffs haven't shown that these three instrumentalities likely will suffer an injury.  They argue that holding "a FFEL loan in no way guarantees interest income" for the instrumentalities.  Doc. 65 at 14.  According to defendants, many "FFEL borrowers are on income-based repayment plans under which they pay $0 monthly.  And a FFEL borrower is as susceptible to default as any other."  *Id.*  Defendants thus assert that the FFEL borrowers most likely to benefit from the SAVE Plan—and thus the borrowers most likely to consolidate— "would tend to be those borrowers at highest risk of delinquency and default[.]"  *Id.* at 14–15. Delinquency and default, of course, would reduce the instrumentalities' revenue.  *Id.* at 15. When a borrower consolidates an FFEL loan, however, the instrumentality avoids delinquency and default.  Indeed, "when a FFEL loan is consolidated, its prior owner receives payment for the full value of the loan's principal and outstanding interest."  *Id.* (first citing 20 U.S.C. § 1078-3(b)(1)(D), then citing 34 C.R.F. § 685.220(f)(1)).  So, defendants argue, the SAVE Plan actually could *benefit* the instrumentalities.

Tying this to standing, defendants argue plaintiffs

need to show that a potential loss of uncertain interest revenues to these entities is not outweighed by the certain profits of consolidation—including guaranteed payment and the elimination of rebate fees—to say nothing of the potential for reinvestment of the cash value of the loan at higher market interest rates.

*Id.* (citing 20 U.S.C. § 1107a(k), (l) (setting FFEL interest rates)).  While the court recognizes the logic of defendants' bottom-line, economic argument, it can't carry the day for them.

Plaintiffs cite authority that "[o]nce injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiffs has enjoyed from the relationship with the

defendant." 13A Edward H. Cooper, *Federal Practice & Procedure*, Jurisdiction § 3531.4 (3d ed. 2023).  District courts within our Circuit have cited a rule from a Second Circuit case: "'the fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing.'" *Budicak, Inc. v. Lansing Trade Grp., LLC*, 452 F. Supp. 3d 1029, 1044 n.36 (D. Kan. 2020) (quoting *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008)); *Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.*, 801 F. Supp. 2d 1163, 1179 (D.N.M. 2011) (same).

Plaintiffs' counterargument misses the point, defendants contend.  Defendants' argument doesn't weigh harm against benefit.  Instead, it asserts that there's simply no injury to begin with because the SAVE Plan will make money for the states' public instrumentalities.  The problem with defendants' rejoinder is a basic one:  they haven't adduced any evidence to support their theory.  More problematic yet, plaintiffs have marshaled evidence nullifying the theory.

Alaska's "ASLC estimates that the SAVE Plan will result in ASLC losing approximately $100,000 over just the next two years that it would otherwise collect as a FFELP holder."  Doc. 53-8 at 3 (Efird Decl. ¶ 11).  Defendants may disagree with this calculation, but they don't proffer any evidence or accounting of their own.  The court lacks any basis to find that this $100,000 doesn't account for the potential benefits of the SAVE Plan.  Similarly, the Texas declarant alleges that, if borrowers consolidate their FFEL loans into direct loans, "those consolidations will cause the State of Texas to lose revenue" because the "THECB will no longer collect interest on FFELP loans that have been consolidated, diminishing the value of its portfolio."  Doc. 53-7 at 2 (Keyton Decl. ¶ 4).  Without any evidence to the contrary, the court accredits the declarant's testimony that the SAVE Plan will cause THECB, and therefore Texas,

to lose interest revenue.  Again, there's no reason to believe that the THECB declarant failed to account for the SAVE Plan's potential benefits.

The court thus rejects defendants' argument that plaintiffs have failed to show an injury because the SAVE Plan might benefit the public instrumentalities.  As a result, South Carolina, Texas, and Alaska have suffered an injury in fact, fairly traceable to the SAVE Plan.  The court denies defendants' Motion to Dismiss South Carolina, Texas, and Alaska.

But what about the other states?  If some plaintiff states have standing, do they all have standing?

### 5.    "Standing for One is Standing for All"

When the court asked this question at the hearing, plaintiffs urged the court to answer this question yes.  They directed the court to *Biden v. Nebraska*, which held:  "If at least one plaintiff has standing, the suit may proceed."  143 S. Ct. at 2365 (citing *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).  And plaintiffs all bring the same legal claims.  Plaintiffs thus argue—correctly—that this suit will proceed.  And they ask the court to end its standing inquiry there:  conclude South Carolina, Texas and Alaska have standing and allow the suit to proceed with the other states tagging along.  The court declines this invitation.

Our Circuit, albeit in an unpublished opinion, has rejected the idea that "standing for one is" necessarily "standing for all."  *Thiebaut v. Colo. Springs Utils.*, 455 F. App'x 795, 802 (10th Cir. 2011).  The Supreme Court, as shown in *Biden v. Nebraska*, doesn't *require* district courts to consider the standing of all plaintiffs.  143 S. Ct. at 2365; *see also Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit [the Court] to consider the petition for review.").  The court realizes that moving on after deciding that at least one plaintiff has standing may "encourage[] judicial efficiency by permitting a court to proceed to the merits of a case involving multiple plaintiffs seeking identical relief when it is

28

A71

clear that at least one plaintiff has standing." *Thiebaut*, 455 F. App'x at 802.  "But . . . nothing in the cases addressing this principle suggests that a court *must* permit a plaintiff that *lacks* standing to remain in a case whenever it determines that a co-plaintiff has standing." *Id.* (emphases in original); *see also M.M.V. v. Garland*, 1 F.4th 1100, 1110–11 (D.C. Cir. 2021) ("The [*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*] line of cases stands only for the proposition that a court 'need not' decide the standing of each plaintiff seeking the same relief." (quoting *Clinton v. City of N.Y.*, 524 U.S. 417, 431 n.19 (1998))).

This alternative approach explains why the court "retain[s] discretion to analyze the standing of all plaintiffs in a case and to dismiss those plaintiffs that lack standing." *Thiebaut*, 455 F. App'x at 802 (first citing *Utah Ass'n of Cntys. v. Bush*, 455 F.3d 1094, 1098 (10th Cir. 2006) (noting district court concluded one plaintiff had standing, so court declined to address other plaintiff's standing in interest of judicial economy); then citing *Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1451–53 (10th Cir. 1994) (analyzing individual plaintiffs' standing separately and dismissing some plaintiffs for lack of standing even though other plaintiffs had standing); and then citing *We Are Am./Somos Am. v. Maricopa Cnty. Bd. of Supervisors*, 809 F. Supp. 2d 1084, 1091 (D. Ariz. 2011) ("Th[e] general rule [that only one plaintiff needs standing] does not strictly prohibit a district court, in a multiple plaintiff case such as this, from considering the standing of the other plaintiffs even if it finds that one plaintiff has standing.")); *see also M.M.V.*, 1 F.4th at 1111 (concluding the general rule—that court needn't decide standing of each plaintiff seeking same relief—"does not *prohibit* the court from paring down a case by eliminating plaintiffs who lack standing or otherwise fail to meet the governing jurisdictional requirements" (emphasis in original)).

29

Here, the court, in its discretion, concludes that paring down the case and dismissing the plaintiffs without standing aligns with the charter purposes recognized in Fed. R. Civ. P. 1.  At bottom, plaintiffs contend that uninjured plaintiffs can borrow another plaintiff's injury to satisfy Article III's standing requirement.  But that's not the way the court would approach any kind of lawsuit—especially a complicated one.  Narrowing the case to its viable claims and viable parties often narrows the burden of adjudicating the relevant issues, no matter whether the case is an auto accident or antitrust case.

The court also believes that winnowing the case is consistent with the holding in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021).  There, the Court reversed a district court's decision (as affirmed by the Ninth Circuit) certifying a class that included some 6,300 uninjured class members.  *Id.* at 421–22, 427–28.  The Court rejected plaintiffs' argument that Congress, by adopting the Fair Credit Reporting Act, had conferred a right to recover on uninjured class members.  *Id.* at 434–35.  Justice Kavanaugh's opinion crafted a hypothetical to explain why:

> Suppose first that a Maine citizen's land is polluted by a nearby factory.  She sues the company, alleging that it violated a federal environmental law and damaged her property.  Suppose also that a second plaintiff in Hawaii files a federal lawsuit alleging that the same company in Maine violated that same environmental law by polluting land in Maine.  The violation did not personally harm the plaintiff in Hawaii.
>
> Even if Congress affords both hypothetical plaintiffs a cause of action (with statutory damages available) to sue over the defendant's legal violation, Article III standing doctrine sharply distinguishes between those two scenarios.  The first lawsuit may of course proceed in federal court because the plaintiff has suffered concrete harm to her property.  But the second lawsuit may not proceed because that plaintiff has not suffered any physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts.  An uninjured plaintiff who sues in those circumstances is, by definition, not seeking to remedy any harm to herself but instead is merely seeking to ensure a defendant's "compliance with regulatory law" (and, of course, to obtain some money via the statutory damages).  Those are not grounds for Article III standing.

30

A73

*Id.* at 427–28 (internal citations omitted); *see also id.* at 429 ("A regime where Congress could freely authorize *unharmed* plaintiffs to sue defendants who violate federal law not only would violate Article III but also would infringe on the Executive Branch's Article II authority."). If all members of a class must have standing, then, of course, all plaintiffs here must have standing. And if Article III bars a subset of plaintiffs—even if *all* plaintiffs have the same claim—then that subset shouldn't piggyback on the injured plaintiffs' standing.

So, the court, in its discretion, continues its standing analysis. The court evaluates plaintiffs' argument that all 11 plaintiffs have standing based on assertions that (1) the SAVE Plan will decrease some of these states' income tax revenue and (2) the SAVE Plan harms these states' ability to recruit and retain talent.

If plaintiffs demonstrate that the other eight plaintiffs (or some of them) have standing on either one of these alternative standing theories, they will remain as plaintiffs. If any plaintiff fails to do so, the court will dismiss that plaintiff. This approach comports with Fed. R. Civ. P. 1, and it's consistent with the court's approach to any other lawsuit.

## B.     Income Tax Revenue

Plaintiffs argue they have standing because the Final Rule will cause nine of the 11 plaintiff states[11] to suffer a loss of state tax revenue. To flesh out this theory, the court briefly must explain a few things about these states' income tax structure.

These nine states tie their definition of taxable income to the federal definition of income or adjusted gross income. Doc. 57 at 17 (1st Am. Compl. ¶ 90). And the federal tax code defines taxable income to include student loan forgiveness under income-driven repayment

---

[11]     These nine states are Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah. Doc. 57 at 17 (1st Am. Compl. ¶ 87). The two other plaintiffs have no state income tax. The court already has concluded South Carolina, for now, has standing, but it includes South Carolina in the tax revenue analysis nonetheless.

31

plans.  Simply put, student debt forgiveness is taxable income and, therefore, revenue for these plaintiff states.  But the American Rescue Plan Act of 2021 provides that all student loan forgiveness won't "count toward the federal definition of taxable income until December 31, 2025."  Doc. 57 at 17 (1st Am. Compl. ¶ 89).  So, the states can't tax student loan debt forgiveness income until 2026.

According to plaintiffs, the Final Rule affects plaintiffs' tax revenues because it's timing that matters.  Plaintiffs allege the Final Rule "will reduce income tax revenue by decreasing the amount of outstanding student loan debt."  Doc. 57 at 18 (1st Am. Compl. ¶ 96).  This is so, they say, because the "Final Rule accelerates the timeline for cancelation on income-driven repayment plans to as low as 10 years for certain loan balances."  *Id.* (1st Am. Compl. ¶ 92).  Under the old version of the rule, the federal government wouldn't forgive these loans for 20 to 25 years.  So, plaintiffs allege, "but for the Final Rule, significant amounts of federal loan cancellation would occur *after* December 31, 2025" for residents of the relevant states.  *Id.* (1st Am. Compl. ¶ 95).  In this but-for world, the relevant states would have more student loan forgiveness income to tax.  *Id.*  The challenged Final Rule, in contrast, "shift[s] forward some debt forgiveness that would otherwise occur in a period in which it would be taxable income . . . into a period where it is not taxable[.]"  *Id.* (1st Am. Compl. ¶ 96).  In sum, plaintiffs argue the Final Rule injures them directly because nontaxable forgiveness in 2024 and 2025 means less taxable forgiveness in 2026.

In response, defendants argue that the Final Rule's effects on state tax revenue are merely incidental.  And, according to defendants, a "federal policy's incidental effects on state tax revenues are not judicially cognizable injuries."  Doc. 46 at 24.  In support of this argument, defendants invoke *Florida v. Mellon*, 273 U.S. 12 (1927).

1.    *Florida v. Mellon*

In *Mellon*, Florida sought to invoke the Supreme Court's original jurisdiction in a suit against officers of the United States—specifically, the Secretary of the Treasury.  *Id.* at 15. Florida sought to challenge a federal inheritance tax.  *Id.*  Florida had no inheritance tax.  *Id.*  So, Florida alleged the federal law directly injured it "because the imposition of the federal tax, in the absence of a state tax which may be credited, w[ould] cause the withdrawal of property from the state" and diminish Florida's tax base.  *Id.* at 16.  The Supreme Court rejected Florida's argument, concluding this "anticipated result [was] purely speculative, and, at most, only remote and indirect."  *Id.* at 18.  The Court explained, even if "as alleged, the supposed withdrawal of property will diminish the revenues of the state, [it's not certain] that the deficiency cannot readily be made up by an increased rate of taxation."  *Id.*  The Court thus concluded Florida had failed to demonstrate a direct injury and declined to exercise its original jurisdiction.  *Id.*

Plaintiffs argue that *Mellon* doesn't apply here.  According to plaintiffs, they have alleged a more direct theory of harm because, in *Mellon*, Florida's standing theory "relied on an unproven assumption about the actions of independent third parties[.]"  Doc. 50 at 12.  Plaintiffs argue that they allege a more direct harm here because "it is the Final Rule alone that will reduce taxable income without any additional action [by] any third party."  *Id.*  At the hearing, plaintiffs added that *Mellon* only speaks to indirect effects of a federal policy, whereas plaintiffs have shown the Final Rule to have a direct effect.

Unfortunately for plaintiffs, in general, reduced state tax revenue doesn't qualify as an injury in fact sufficient to confer standing on a state.  Our Circuit has ruled that the "'unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers, suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury-in-fact

33

to support state standing.'" *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012) (quoting *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976)).  Fortunately, our Circuit also has explained when reduced tax revenue *does* confer standing to sue on a state.  A "state must show a 'fairly direct link between the state's status as a recipient of revenues and the legislative or administrative action being challenged.'" *Id.* (quoting *Kleppe*, 533 F.2d at 672).

The requisite "fairly direct link" is missing here.  Plaintiffs allege the Final Rule will reduce their tax revenue because it shifts loan forgiveness forward in time.  That is, the Final Rule will forgive student loan debt in 2024 and 2025, when plaintiffs can't tax it.  So, plaintiffs allege, "but for the Final Rule, significant amounts of federal loan cancellation would occur *after* December 31, 2025" and this "would result in taxable income being recognized from the loan cancelation and thus payment of income taxes to" the states.  Doc. 57 at 18 (1st Am. Compl. ¶ 95).  Put another way, absent the final rule, student loan debt would be forgiven after December 31, 2025, permitting the states to tax the forgiven loans as income.  This kind of harm is too distant from the SAVE Plan to justify standing for the states here.  The federal policy creates incentives, borrowers react to those incentives and consolidate their loans, and borrowers would've consolidated their loans later, when plaintiffs could tax it, but the American Rescue Plan prevents this.  Defendants correctly call the states' decreased tax revenue an "incidental" harm.  The SAVE Plan doesn't target plaintiffs or their tax policies.  *See Arizona v. Biden*, 40 F.4th 375, 383 (6th Cir. 2022) (explaining that federal policy did "not directly injure the States. It does not regulate the States by telling them what they can or cannot do in their jurisdiction.").  This distant, incidental harm doesn't persuade the court to deviate from our Circuit's general rule that reduced state tax revenue doesn't qualify as an injury in fact.

And, even if this harm did qualify as an injury, plaintiffs' tax injury argument has a traceability problem. The SAVE Plan didn't cause plaintiffs' injuries—plaintiffs' own tax policy caused them.

### 2.       Self-Inflicted

Defendants argue that plaintiffs' alleged harm is self-inflicted because it arises from plaintiffs' "own choice to tie their tax laws to the Internal Revenue Code." Doc. 46 at 23. To support this theory, defendants cite *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976).

In *Pennsylvania v. New Jersey*, Pennsylvania sought to challenge a New Jersey tax that taxed the New Jersey-derived income earned by nonresidents. *Id.* at 662–63. Pennsylvania reimbursed its residents for taxes levied by other states. *Id.* at 663. Pennsylvania asserted the law injured Pennsylvania because it "diverted" taxes from Pennsylvania's treasury. *Id.* The Supreme Court declined to exercise its original jurisdiction over this state v. state dispute, concluding Pennsylvania had failed to demonstrate "that the injury for which it s[ought] redress was directly caused by the action of another State." *Id.*

The Court explained that "injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective legislatures." *Id.* at 664. To put a finer point on it, the Court wrote, "nothing prevents Pennsylvania from withdrawing that credit for taxes paid to New Jersey." *Id.* "No state can be heard to complain about damage inflicted by its own hand." *Id.* Defendants urge this court to apply this case's reasoning here because these nine states, like Pennsylvania, have made their own decisions about their tax codes. So any taxation issues are ones caused by the states and the states alone.

Plaintiffs respond that *Pennsylvania* is inapposite; it involved two states suing each other and invoking the Supreme Court's original jurisdiction. Plaintiffs argue that "Supreme Court original jurisdiction is reserved for 'a dispute between States of such seriousness that it would

35

amount to *casus belli* if the States were fully sovereign.'"  Doc. 50 at 11 (quoting *Texas v. New Mexico*, 462 U.S. 554, 570 n.18 (1983)).  In other words, according to plaintiffs, the bar for Article III standing is much lower than the bar for invoking the Supreme Court's original jurisdiction.  Plaintiffs are wrong.

To be sure, *Pennsylvania* is a case in an unusual procedural posture.  Nonetheless, *Pennsylvania* addressed financial injury to a plaintiff state.  The Court held, quite simply, that the defendant state hadn't inflicted any injury upon the plaintiff state because plaintiff's injury was self-inflicted.  *Pennsylvania*, 426 U.S. at 664.  The injury to a state, of course, is an explicit component of the standing inquiry.

Plaintiffs also argue that, though defendants assert they have a choice, they really have no choice at all.  Plaintiffs point out that "[g]iven economic and administrative realities," 36 states tie their definition of taxable income to a federal definition.  Doc. 50 at 10.  Plaintiffs frame their dilemma this way:  under defendants' approach, plaintiffs must change their state tax laws to recapture the lost revenue, so the Final Rule will "depriv[e] the States of their sovereign choice to set their own tax policy."  *Id.*  And "the States will suffer financial injury under the Rule no matter what putative 'choice' they make."  *Id.*  The court finds this argument equally unpersuasive.

This argument stands federalism on its head.  Nothing requires plaintiffs to use the federal definitions of taxable income.  The SAVE Plan doesn't coerce or cajole plaintiffs into changing their tax code.  Plaintiffs have made their choice to tie their definition of income to the federal definition and, if they don't like that definition, they're fully free to change it.  Perhaps a change would produce some administrative costs, but those costs would trace to the state legislatures' decisions, not the SAVE Plan.  The Final Rule doesn't pose any threat to a state's

sovereign power to decide its own tax law.  *See Garrison v. U.S. Dep't of Educ.*, 636 F. Supp. 3d 935, 942 (S.D. Ind. 2022) (dismissing claim for lack of standing where individual plaintiffs challenged HEROES Act loan forgiveness, arguing loan forgiveness would increase his state tax bill, because the "Department of Education does not give silent approval to Indiana's tax code; those decisions are entirely within the discretion of the Indiana legislature" and concluding plaintiffs' injuries were traceable only to state tax law decisions—not federal student loan programs).

The court thus rejects plaintiffs' standing theory based on reduced income tax revenue. Next, the court takes up plaintiffs' final standing theory.

### C.       Recruiting and Retention Competitive Harm

Plaintiffs proffer a second theory of harm:  a competitive disadvantage in recruiting and retaining talent.  *See* Doc. 57 at 20 (1st Am. Compl. ¶ 103).  This theory requires an understanding of a different kind of student loan debt forgiveness:  The Public Service Loan Forgiveness (PSLF) program.  Under the PSLF, borrowers are eligible for forgiveness of their direct loans once they've made 120 qualifying monthly payments under a qualifying plan while—and this is the critical part—working full time for an eligible employer in public service. The incentive behind this program is evident:  work in public service for ten years and have your remaining student loan debt forgiven.

Returning to the Final Rule, plaintiffs allege that they rely on the PSLF program "to attract and maintain talent" because state "agencies typically cannot pay as much to recruit and retain talent as private sector employees."  *Id.*  Plaintiffs allege three states rely on the PSLF program to attract employees:  the Kansas Office of Attorney General and other Kansas agencies who use the PSLF to attract legal talent; South Carolina relies on the PSLF program to recruit and retain teachers; and Alaska's Attorney General's office relies on the PSLF program to recruit

37

and retain employees.  *Id.* at 20–21 (1st Am. Compl. ¶¶ 104–07).  According to plaintiffs, "the more debt that can be forgiven under the PSLF Program, the more powerful of an inducement it is."  *Id.* at 21 (1st Am. Compl. ¶ 108).  But, because the Final Rule will reduce "the amount of student debt held by current and potential employees . . . , the relative attractiveness of public employment for the Plaintiff States decreases."  *Id.*

Plaintiffs' recruitment-based standing theory relies, in their words, on "basic economic logic."  Doc. 50 at 13.  Plaintiffs argue that as "a matter of elementary economics, public service employment will no longer be as attractive an option to those with a lower amount of debt because of the direct effects of the Final Rule."  Doc. 50 at 13–14.  Plaintiffs proffer the following example:

> [Imagine] a current employee who had an original loan balance of $12,000 and has been in public service for 8 years.  Without the Final Rule, he would have a strong incentive to stay in public service for 2 more years.  However, because of the Final Rule, he would get his debt canceled in the same amount of time regardless of where he's employed.

*Id.* at 14.  In sum, plaintiffs argue that the Final Rule reduces the attractiveness of the PSLF program, and plaintiffs expect their current and prospective employees to respond to these incentives, making it harder for plaintiffs to recruit and retain employees.  So, plaintiffs reason, the Final Rule will injure plaintiffs.

Not so, defendants contend.  Defendants argue that plaintiffs' theory has a traceability problem.  Defendants point out that this theory of injury is an indirect one—it relies on the actions of a third party.  This means it's harder for plaintiffs to show causation by such an indirect injury.  "That an injury is indirect does not necessarily defeat standing, 'but it may make it substantially more difficult to establish that, in fact, the asserted injury was the consequence of the defendants' actions.'"  *Habecker*, 518 F.3d at 1225 (brackets and ellipsis omitted) (quoting *Warth v. Seldin*, 422 U.S. 490, 504–05 (1975)).  Where "'the independent action of some third

38

party not before the court'—rather than that of the defendant—was the direct cause of the

plaintiff's harm, causation may be lacking." *Id.* (quoting *Simon v. E. Ky. Welfare Rights Org.*,

426 U.S. 26, 40–41 (1976)).

Defendants are right.  Recently, the Sixth Circuit explicitly rejected this very theory.

### 1.     *Mackinac Center for Public Policy v. Cardona*

In *Mackinac Center for Public Policy v. Cardona*, the Sixth Circuit addressed a challenge

to action taken by the Department of Education affecting student loans.  102 F.4th 343, 2024 WL

2237667 (6th Cir. May 17, 2024).  In *Mackinac*, the Department of Education sought to address

problems with administration of the PSLF and income driven repayment (IDR) programs.  *Id.* at

*2.  Loan administrators allegedly steered "borrowers into long-term periods of forbearance in

violation of Department of Education rules[.]"  *Id.*  Under the PSLF and IDR programs at issue,

forbearance periods don't count toward the 120 month payments.  *Id.*  But, given the problems

administering the programs, the Department of Education decided to count certain forbearance

periods as payments.  *Id.*  As a result, about "40,000 borrowers would be eligible for immediate

discharge of debt under the PSLF program, and several thousand would be eligible for

forgiveness under IDR plans."  *Id.*

Plaintiffs sued to enjoin the policies counting forbearance periods toward the payment

requirement.  Those plaintiffs were "nonprofit, tax-exempt organizations that [were] qualified

public service employers under the PSLF program."  *Id.* at *3.  Plaintiffs alleged "that the action

would keep them from realizing the full statutory benefit to which they are entitled under PSLF

and make it more difficult for them to recruit and retain employees."  *Id.* (internal quotation

marks omitted).  Plaintiffs invoked competitor standing, which "recognizes that plaintiffs suffer

an economic injury when agencies lift regulatory restrictions on their competitors or otherwise

allow increased competition against them."  *Id.* at *4 (citation and internal quotation marks

omitted).  A party invoking competitor standing must show an imminent injury from increased competition.  *Id.*  Plaintiffs argued the Department's forbearance adjustment increased their competition for employees because it reduced plaintiffs' competitive benefit—*i.e.*, reduced the financial incentive for student loan borrowers to seek and remain in public service jobs.  *Id.* at *5.  The district court, sua sponte, dismissed plaintiffs' complaint for lack of standing.  *Id.*  The Sixth Circuit affirmed.  *Id.*

The Sixth Circuit concluded plaintiffs had "failed to allege specific, concrete facts to show that the adjustment has caused or will cause them competitive injury."  *Id.* (citation and internal quotation marks omitted).  The Sixth Circuit faulted plaintiffs for their complaint's broad, conclusory allegations because they had "not alleged any facts showing how the adjustment affects their ability to recruit and retain college-educated employees."  *Id.* at *6 (internal quotation marks omitted).  Plaintiffs had "not identified any current employee that ha[d] received credit under the adjustment, nor d[id] they claim that they expect[ed] to imminently hire any employee who ha[d] received such credit."  *Id.*  Nor did plaintiffs allege "that any employees have stopped working for them (or stated an intention to do so) based on the adjustment."  *Id.*

The Sixth Circuit even assumed the Department's adjustment would affect plaintiffs' ability to fill vacancies.  Even with that benefit, "several factors beyond the adjustment could have a similar impact."  *Id.* at *8.  An "employee may choose to work for a different public service employer to satisfy part of their 120-month obligation of any number of reasons unrelated to the adjustment, such as pay, location, work-life balance, or any combination of factors."  *Id.*  The *Mackinac* plaintiffs thus failed to establish a competitive injury because they had failed to allege "how many of Plaintiffs' employees will be impacted by the adjustment and how many individuals may make employment decisions based on the adjustment."  *Id.*  The

Sixth Circuit summarized plaintiffs' problem this way: "At bottom, how the adjustment impacts Plaintiffs is up to individuals who are not parties to this lawsuit."

So too here. Plaintiffs rely, in their own words, on "elementary economics." Doc. 50 at 13. They theorize that their current and future employees will respond to the incentives created by the Final Rule and reject public employment. This will cause plaintiffs a "competitive harm." *Id.* And they have provided declarations that the states use public loan forgiveness as a recruitment tool. But these are the very kind of broad, conclusory allegations that the Sixth Circuit flunked in *Mackinac*. As there, plaintiffs here "have not identified any current employee that has received" relief under the SAVE Plan. *Mackinac*, 2024 WL 2237667, at *6. Nor have they alleged "that they expect to imminently hire any employee who" is SAVE-Plan-eligible. *Id.* And "they have not alleged that any employees have stopped working for them (or stated an intent to do so) based on" the SAVE Plan. *Id.* So, like *Mackinac*, plaintiffs' hypotheticals insufficiently plead an imminent injury in fact. *Id.*; *see also id.* at *8 ("Plaintiffs' allegations regarding supply and demand and the impact of financial incentive on third-party student-loan debtors are wholly speculative.").

Separately, plaintiffs have a third party problem. Recall that "where a causal relation between injury and challenged action depends upon the decision of an independent third party . . . , standing is not precluded, but it is ordinarily substantially more difficult to establish." *California v. Texas*, 593 U.S. 659, 675 (2021) (citation and internal quotation marks omitted). To meet this "more difficult" standard, "the plaintiff must show at least that third parties will likely react in predictable ways." *Id.* (citation and internal quotation marks omitted). It's the "likely" part that causes plaintiffs' problems here.

Plaintiffs' standing allegations provide no basis for the court to find that job seekers and employees likely will avoid public service employment because of the SAVE Plan.  As defendants correctly point out, "career-related decisions are complicated, and PSLF is not the sole incentive in this economic picture."  Doc. 65 at 11.  The Sixth Circuit mentioned a few of these other incentives:  "pay, location, work-life balance, or any combination of factors." *Mackinac*, 2024 WL 2237667, at *8.  "At bottom, how the [SAVE Plan] impacts Plaintiffs is up to individuals who are not parties to this lawsuit."  *Id.*  Given all the factors that a person considers when making an employment decision, plaintiffs have failed to allege enough facts for the court to conclude that potential and current employments "will likely react in predictable ways."  *Dep't of Comm.*, 139 S. Ct. at 2566.

The court must abide by the Supreme Court's "usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors."  *Clapper*, 568 U.S. at 414.  Plaintiffs have failed to shoulder their burden to allege a competitive harm.  No court ever has embraced this competitive harm theory to hiring/retention theory.  Our court declines to become the first.

In a final bid to avoid this result, plaintiffs seek shelter from *Massachusetts v. EPA*, arguing they are entitled to "special solicitude" in the standing analysis.

## 2. *Massachusetts v. EPA*

Plaintiffs rely on the Supreme Court's decision in *Massachusetts v. EPA*, 549 U.S. 497, to support their competitive harm theory of standing.  In *Massachusetts v. EPA*, a group of states sued the EPA for failing to regulate certain greenhouse gases under the Clean Air Act.  *Id.* at 505.  The Court held Massachusetts had standing based on a risk that global warming would raise sea levels and thereby harm Massachusetts' coastal lands.  *Id.* at 526.  The Court explained, "according to petitioners' uncontested affidavits . . . the rise in sea levels associated with global

warming has already harmed and will continue to harm Massachusetts.  The risk of catastrophic harm, though remote, is nevertheless real." *Id.*

According to plaintiffs, *Massachusetts v. EPA* "relaxed" the standing requirements for states suing the federal government.  Doc. 50 at 15.  Relevant here, the *Massachusetts v. EPA* Court noted "that States are not normal litigants for the purposes of invoking federal jurisdiction."  549 U.S. at 518.  The Court emphasized "Massachusetts' well-founded desire to preserve its sovereign territory[.]" *Id.* at 519.  And the Court stressed that the states were exercising a procedural right. *Id.* at 520 (citing 42 U.S.C. § 7607(b)(1)).  "Given that procedural right and Massachusetts' stake in protecting its quasi-sovereign interests," the Court held Massachusetts was "entitled to special solicitude in our standing analysis." *Id.*  Based on *Massachusetts v. EPA*, plaintiffs argue for a "double relaxation of Article III standing requirements"—one for special solicitude and one for procedural rights.  Doc. 50 at 15.

*Massachusetts v. EPA* doesn't provide plaintiffs the safe harbor they find in the decision. Our Circuit has lamented "the lack of guidance on how lower courts are supposed to apply the special solicitude doctrine to standing questions." *Wyoming*, 674 F.3d at 1238.  Despite this absence of guidance, the Tenth Circuit has held, "'special solicitude does *not* eliminate the state petitioner's obligation to establish a concrete injury, as Justice Stevens' [*Massachusetts*] opinion amply indicates.'" *Id.* (emphasis in original) (quoting *Del. Dep't of Nat. Res. & Envt'l Control v. F.E.R.C.*, 558 F.3d 575, 579 n.6 (D.C. Cir. 2009)).  As our Circuit has explained, in *Massachusetts v. EPA*, the state of "Massachusetts proved that it had an 'actual' and 'imminent' injury."  But plaintiffs lack such evidence here.  Their competitive harm theory fails to plead an injury in fact, as shown by *Mackinac*.  Their theory of future harm simply is too speculative to qualify as an imminent injury.

43

The court also doubts that *Massachusetts v. EPA* even applies here.  At the hearing, plaintiffs argued that they are asserting quasi-sovereign interests, which brings them under the *Massachusetts v. EPA* umbrella.  "A quasi-sovereign interest generally concerns either the physical and economic health of a State's residents or the State's 'interest in not being discriminatorily denied its rightful status within the federal system.'"  *Navajo Nation v. Wells Fargo & Co.*, 344 F. Supp. 3d 1292, 1311 (D.N.M. 2018) (*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982)).  There's no "exhaustive formal definition nor a definitive list of qualifying interests[.]"  *Snapp*, 458 U.S. at 607.  "Examples of quasi-sovereign interests include abating a public nuisance, preventing environmental pollution, or avoiding economic damage of such severity and pervasiveness that it causes injury not only to individual citizens, but to the welfare, prosperity, and economic standing of the State as a whole."  *Navajo Nation*, 344 F. Supp. 3d at 1311 (citing *Snapp*, 458 U.S. at 603–06).

Plaintiffs' ability to hire and retain an undefined number of employees doesn't qualify as the kind of quasi-sovereign interest that this caselaw imagines.  Plaintiffs haven't directed the court to any authority holding that a state's ability to hire or retain employees in public service jobs qualifies as a quasi-sovereign interest.  The court concludes plaintiffs aren't entitled to special solicitude.  *See also Arizona v. Biden*, 40 F.4th at 386 (declining to apply *Massachusetts v. EPA* where states did "not protest regulation of them as States of preemption of local lawmaking authority[,] . . . [nor] any threatened incursions on their property or territory[,]" and case did "not involve the classic sovereign case, public nuisances in which a State invokes a desire to safeguard its domain and its health, comfort and welfare" (citation and internal quotation marks omitted)).

### 3.     Procedural Rights

Plaintiffs also ask for a relaxed standing standard again because, they argue, they're asserting procedural rights.  Doc. 50 at 15.  They take this standard from *Lujan*, where Justice Scalia called procedural rights "special."  504 U.S. at 573 n.7.  Justice Scalia explained, "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."  *Id.*  He gave the following example:

> [O]ne living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

*Id.*  So, plaintiffs argue, they "need not demonstrate that, if the Department [of Education] conducted a defensible cost estimate or provided a sufficient notice period, the result would be any different."  Doc. 50 at 15.

But this argument can't solve plaintiffs' problem with their standing theory.  Plaintiffs' problem is that their competitive harm theory is speculative and not traceable to the SAVE Plan because it relies on complicated employment decisions allegedly faced by an unknown number of third parties.  So, even if the court relaxes standing requirements for plaintiffs because they assert procedural rights, they still haven't met their standing obligation.  The court rejects this final standing theory.

### IV.     Conclusion

In sum, the court grants defendants' Motion to Dismiss (Doc. 45) in part and denies it in part.  Plaintiffs South Carolina, Texas, and Alaska have established, for now, standing based on harm to their public instrumentalities.  The court denies defendants' dismissal motion as it applies to the claims asserted by those three plaintiffs.  In contrast, plaintiffs Kansas, Alabama,

45

Idaho, Iowa, Louisiana, Montana, Nebraska, and Utah haven't shouldered their burden to show that they have standing. The court lacks subject matter jurisdiction over claims these eight plaintiffs wish to assert. It dismisses them from this case.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion to Dismiss (Doc. 45) is granted in part and denied in part. Exercising discretion conferred by our Circuit, the court, consistent with Fed. R. Civ. P. 1, grants defendants' Motion to Dismiss as it applies to Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, and Utah. The court dismisses without prejudice all claims made by these eight states and directs the Clerk to terminate them as parties to this action.

**IT IS SO ORDERED.**

**Dated this 7th day of June, 2024, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

---

STATE OF ALASKA, *et al.*,

               Plaintiffs,

    v.

MIGUEL A. CARDONA, in his official
capacity as Secretary of Education,
*et al.*,

               Defendants.

Case No. 24-1057-DDC-ADM

---

# <u>EXHIBIT 1</u>:

## Declaration of Denise L. Carter
## Department of Education

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| STATE OF ALASKA, *et al.*,<br><br>                    *Plaintiffs*,<br><br>          v.<br><br>MIGUEL A. CARDONA, in his official<br>capacity as Secretary of Education,<br>*et al.*,<br><br>                    *Defendants*. | Case No. 24-1057-DDC-ADM |

## <u>DECLARATION OF DENISE L. CARTER</u>

I, Denise L. Carter, do declare under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and accurate:

1. I am the Principal Deputy Chief Operating Officer at Federal Student Aid ("FSA") in the United States Department of Education.  In this role, my responsibilities include the coordination of major policies, programs, and activities related to federal student aid.  This includes, but is not limited to, overseeing the administration of the student loan programs, including the SAVE plan.  As such, I am familiar with the systems and processes used to administer the SAVE plan and other loan repayment plans.  I make this declaration based on my personal knowledge and based on information provided to me in my official capacity.

2. As described below, student loan repayment involves multiple complex systems that require many steps and significant time to create and change.  Small changes affect many people and systems; large changes, even more so.

3. Complying with the injunction will require the Department and its servicers to implement significant technical changes to their student loan databases, following over a year of preparation to implement SAVE.  This will entail reprogramming all the systems that process new enrollees in Income Driven Repayment plans.  During this process, which is anticipated to take at least several months and which will be quite costly, the Department will have to halt electronic applications for IDR and for consolidation loans for roughly 6 weeks, during which the Department will only be able to accept paper applications.  The Department and its loan servicers will also have to make technical changes for many borrowers currently enrolled in SAVE, and will need to place SAVE borrowers whose

payment amount is affected by the injunction into forbearance.  Overall, these compliance measures will create significant disruptions to loan servicing, require wasteful and costly stop-gap measures, and create widespread borrower confusion.

## A.    Loan Servicing & Repayment Plans

4.   Administering a borrower's loan on an Income Driven Repayment ("IDR") Plan such as SAVE begins with the borrower choosing a repayment plan and submitting information to FSA to determine eligibility and the terms of repayment.  This is the process for new enrollees going forward.  There is another process for transitioning the repayment plans of current SAVE enrollees described in paragraph 14 below.  For new enrollees, applications are submitted through StudentAid.gov and then processed through the Department's Digital and Customer Care ("DCC") platform.  DCC is a system that is maintained by FSA through a vendor.

5.   For borrowers who permit FSA to obtain their data from the Internal Revenue Service, FSA determines the borrower's eligibility for her chosen repayment plan and monthly payment amount, drawing on information in the following database systems:

   a.      The Common Origination and Disbursement ("COD") system, which is the Department's system that facilitates the disbursement of loans.  COD is maintained by FSA through a vendor.

   b.      The National Student Loan Database System ("NSLDS"), which is a database system that records and stores information about federal student loans and grants.  NSLDS is maintained by FSA through a vendor.

   c.      For Direct loan borrowers only who provide their consent, the Federal Tax Information Module ("FTIM"), which is a system that securely pulls information from the IRS and uses that information to make income- and repayment-related calculations.  The FTI module is maintained by FSA through a vendor.  The database system from which the FTI module pulls tax information is maintained by the IRS.

6.   The borrower may also opt to forgo the automated process and submit records with income-related information. FFEL loan borrowers do not have the option of going through the automated process and must submit their own income-related information. In these cases, records are submitted directly to the servicer, which processes the records to determine the borrower's eligibility and the repayment plan's terms, time period, and other details.

7.   Once these eligibility and repayment determinations described in paragraphs 5-6 above are completed, the borrower's information is packaged and sent to the borrower's

servicer in a data file.  The tasks of servicing the loan then fall to the borrower's servicer, contracted by the Department to administer many aspects of the federal student loan programs.  The servicer processes the repayment-plan details in that data file; confirms the borrower's eligibility for the plan; communicates with the borrower to confirm the plan; begins managing borrower's repayment (including calculating monthly payment amounts, sending borrowers bills and collecting payments; interacting with borrowers to provide them information and support; and maintaining borrower accounts, including information about the loan status and progress toward any eligible forgiveness program); and regularly updates NSLDS throughout these processes. The Department currently employs five student loan servicers that service SAVE enrollees. Apart from CRI, which services 41,000 borrowers, each of the other servicers services between 7 and 14 million borrowers.

8. To complete the tasks described in paragraphs 4-7, the Department and servicers rely on database systems.  These systems are technically complex in their own right, as are the bridges linking them together (that is, between servicers' databases and the Department's).  To implement a repayment plan, the Department and its servicers write a considerable volume of computer code that is specific to each repayment plan.  That is, when a borrower who opts to use IRS data selects a particular plan on StudentAid.gov, the relevant information is recorded in DCC; then that information is processed through COD, NSLDS, and the FTIM, which includes FTIM pulling any relevant tax information from the IRS; the result of that processing is a determination that the borrower is eligible for the selected repayment plan under certain terms; that information is packaged in a data file and sent to the servicer; and the servicer uses that information to calculate payment amounts, send bills, and collect payments.  Each system (and the interfaces between them) contains computer code for each available payment plan so that the borrower gets billed the right amounts and so, eventually, the loan is processed according to the right plan.

## B.    Implementation of SAVE & the Final Rule

9. To make changes in those systems, the Department proceeds through a "change-request" (CR) process with specific parameters required by contract.

10. The CR process is a multi-step process that involves FSA drafting requirements and an Independent Government Cost Estimate ("IGCE") and issuing a CR to the vendor; an iterative question-and-answer process to reach consensus with the vendor on the CR's requirements; an impact analysis and cost proposal from the vendor that estimates the time and cost needed to implement the CR; FSA securing funding; and FSA finalizing the CR.  Once the CR is finalized, FSA gives the vendor the authority to proceed with implementing it.

11. The first main category of the Department's work to implement SAVE and the Final Rule involved borrowers who want to enroll in or switch to SAVE after July 1, 2024.  To do this, the Department, its system contractors, and its servicers utilized the CR process to create functionalities in all the above-referenced systems according to SAVE's particular terms.  In all, the engineering and testing processes required to coordinate and operationalize the systems under SAVE's parameters took more than a year.  More specifically, the development process required designing the platform and determining the necessary requirements for a vendor to build the platform; documenting these requirements in instructions to the vendor through a contractual change-management process; working with the vendor to develop the platform; overseeing the vendor's implementation of the platform; and testing all of the systems to ensure they operate and interact properly through an application programming interface (API).

12. FSA and its vendors have been working to build systems that accommodate the SAVE provisions scheduled to take effect July 1, 2024, since the draft plan was first announced in January 2023, and have been working to implement SAVE's specific repayment provisions since the rule was finalized in July 2023.  That is, it has required more than a year of work on the relevant systems' functionalities so that, on July 1, 2024, when a borrower enrolls in SAVE, the repayment plan administered is consistent with provisions that take effect on July 1. In tandem with these technical and engineering steps required to implement SAVE, the Department and its servicers have trained their staff and customer service representatives on the new regulations and new systems.

13. FSA had to undergo the same process with each servicer.  FSA provided CRs to each of the servicers to implement these changes.  The servicers provided time and cost estimates to FSA, which FSA approved or negotiated and then approved.  The servicers then updated their systems and trained their staff and customer service representatives.

14. The second main category of the Department's work to implement SAVE applies to borrowers currently enrolled in SAVE.  For these borrowers, the Department and its vendors have prepared the systems so that these borrowers' repayment plans transition to the reflect the new SAVE provisions set to go into effect July 1.  For these borrowers, the servicers programmed their systems to begin calculating new payment amounts for SAVE enrollees for the month of July.  Before issuance of the preliminary injunction in this case, the servicers had already been in the process of recalculating these borrowers' payment amounts to reflect the 5% rate that SAVE provides instead of the previous rate.  For many of these borrowers, the servicers' systems had already recalculated and implemented their new rate for July payments, and the servicers' systems are processing the remaining enrolled borrowers' rates on a daily basis.  Many borrowers whose rates have been recalculated have already received bills for July that reflect the new payment amount.

**C.**   **Compliance with the Court's Injunction & Harms Absent a Stay of the Injunction**

15. To comply with the court's injunction, and its prohibition on implementing the SAVE plan's provisions that cover a borrower's repayment plan, FSA must go through the process of implementing a new IDR payment plan all over again.

16. To change the system for new enrollees, FSA will first need to reprogram its own computer systems, such as NSLDS, FTIM, DCC and COD, to establish borrower's repayment plan eligibility and amount according to the parameters for prior payment plans that were slated to be phased out after July 1 and that were not built into the functionalities that have been created to implement the FUTURE Act and new USDS servicing framework.  This will require submitting CRs to vendors, responding to their questions, approving their cost estimates, and providing them Authority to Proceed ("ATP").  The vendors will then need to craft their own system requirements, program the systems for the new payment plan criteria, and do the required testing.  Once FSA's internal systems have been reprogrammed, FSA will need to communicate its determination concerning borrower eligibility and repayment amount to servicers.

17. FSA also needs to communicate the new system requirements to servicers, who need to update their computer systems by going through the full new cycle of development.  This will again include CRs, cost estimates, issuance of ATPs, crafting new system requirements, programming, and testing.  The servicers will also need to write new manuals and train their staff.

18. After the servicers have reprogrammed their systems, servicers will need to test them against FSA systems.  Servicers will also need to notify the borrowers of their new repayment terms.

19. Reprogramming the code changes that were slated to be implemented beginning on July 1 and calculating the new rates will take at least several months. This is so because all of FSA's and servicers' systems had to be programmed to match the new SAVE requirements and will need to be reprogrammed to revert back to the pre-SAVE rates.

20. In order to bring the process for new enrollees into compliance with the injunction, the Department will have to halt the electronic submissions of IDR applications and the electronic applications for consolidation loans, because these processes and the systems that facilitate them are all programmed to account for the SAVE provisions scheduled to take effect July 1.  The Department estimates it will take at least 6 weeks to implement a stop-gap measure that will accommodate electronic IDR applications and consolidations. During that time the Department will only be able to accept paper applications for IDR and consolidations.

21. The Department will also be forced to make significant changes for borrowers who are already enrolled in SAVE. For borrowers who are already enrolled in SAVE and whose rates have been recalculated, recalculating these borrowers' payment amounts in order to collect accurate payments will require a change carried out through the change-management process and cannot be done on a short timeframe. It will be particularly difficult to collect correct payment amounts for the recalculated borrowers who have already received bills for their July payments. The Department cannot simply change a borrower's payment and collect a new payment immediately and without notice. In addition to the time needed for these new payment amounts are recalculated, to demand the new payment amount, these borrowers must be given notice weeks in advance so that they know the accurate amount to pay. The Department estimates it will take at least several months for the servicers to reprogram their systems in order to recalculate these borrowers' payment amounts so that they revert back to the pre-July 1 SAVE parameters.

22. As a result of these administrative impracticalities and the short amount of time available before this Court's injunction takes effect, during the time it will take the Department and its servicers to recalculate monthly payments and bill borrowers with the correct amounts, the Department will be required to place borrowers whose payment amount is affected by the injunction into forbearance. Rapid changes to systems can lead to erroneous billing, and without such a forbearance, the Department would be unable to bill many of these borrowers at the appropriate amount and unable to avoid even greater borrower confusion.

23. During this period of forbearance, although interest will not accrue, these borrowers will not make payments and thus will not have any payments counted toward IDR forgiveness.

24. The process of conforming the Department's and servicers' database systems to the modified repayment rules applicable under the Court's injunction, alongside the forbearance necessary while that process is ongoing, will cause significant and irreparable harm to the Department, its servicers, and borrowers.

   **1.    Costs to the Department and Servicers**

25. Complying with the injunction will cause the Department to incur significant additional costs – some of the same types of costs it has already incurred in implementing the SAVE plan.

26. Rebuilding the framework to comply with the *Alaska* injunction will consume considerable staff time, interfering with other critical Department priorities including: the launch of the 2025-26 FAFSA Form; implementing the IDR payment count adjustment; managing the transition to the USDS servicing platform, which is the first such transition

in years; and implementation of the Gainful Employment and Financial Value Transparency rules.

27. Deprogramming the not-yet-implemented July 1 provisions out of ED systems would also affect millions of other student loan borrowers not on SAVE because of interdependencies across systems. For example, the system that counts time toward SAVE forgiveness also affects the forgiveness count for other IDR plans.

### 2.    Costs to Borrowers

28. The steps required to comply with the injunction will cause intense confusion among borrowers, stemming from several sources.  The SAVE plan's general contours have been public since the Notice of Proposed Rulemaking's publication in January of 2023, creating expectations among borrowers that its provisions—including lower payments— will go into effect.  These expectations will not be met when borrowers are placed into forbearance and eventually (after forbearance is completed) charged up to twice what they expected to pay monthly.

29. Additional confusion will result among the 124,000 borrowers who have already received billing notices calculated under the now-enjoined provisions of SAVE as of June 26, 2024.

30. The confusion experienced by borrowers will cause significant difficulties for servicers (already burdened by the technical adaptations required to update their database systems) as they are overwhelmed with email and phone inquiries from borrowers seeking information about the modified terms of SAVE under the injunction.

31. Forbearance will harm borrowers because months spent in forbearance will not count toward forgiveness under income-driven repayment plans, thus delaying any eventual loan forgiveness.

32. The measures necessary to comply with the injunction will impact borrowers who are not even enrolled in SAVE.

    a.      Complying with the injunction will also significantly impact many borrowers who are not enrolled in SAVE, because many elements of the Final Rule set for implementation on July 1 applied to other or multiple IDR plans. There are many provisions of the rule that are not part of the SAVE plan itself and have significant effects on the non-SAVE IDR plans, and those are also now affected.

    b.      For instance, borrowers who are in deferment on their loans while receiving treatment for cancer or serving in the military will now stop getting credit toward forgiveness on *any* IDR plan.

     c.     A statutorily-mandated provision to allow automatic recertification of borrower income on all income-driven repayment plans is also among the suspended provisions.

     d.     The injunction will impact other non-SAVE specific provisions in the final rule that were effective July 1, 2024, which include but are not limited to:

     i.     Providing borrowers who are diligently making payments on their confirmed bankruptcy plans credit toward loan forgiveness.

     ii.     Changing how payments prior to a loan consolidation are counted so that borrowers do not lose all credit toward IDR forgiveness if they consolidate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed this 27th day of June 2024.

DENISE CARTER

Digitally signed by DENISE CARTER
Date: 2024.06.27 23:13:35 -04'00'

Denise L. Carter

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

STATE OF ALASKA, *et al.*,

               Plaintiffs,

    v.

MIGUEL A. CARDONA, in his official
capacity as Secretary of Education,
*et al.*,

               Defendants.

Case No. 24-1057-DDC-ADM

# <u>EXHIBIT 2:</u>

## Declaration of Lorelei Salas
## Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

STATE OF ALASKA, *et al.*,

                        Plaintiffs,

        v.

MIGUEL A. CARDONA, in his official
capacity as Secretary of Education, *et al.*,

                        Defendants.

Case No. 24-1057-DDC-ADM

**DECLARATION OF LORELEI SALAS**

I, Lorelei Salas, hereby declare as follows:

*Biographical Information*

1.  I am the Supervision Director at the Consumer Financial Protection Bureau (CFPB) and have

    held that position since November 7, 2021. During this time, I have also held the titles of

    Assistant Director of the Office of Supervision Policy and Acting Assistant Director for the

    Office of Supervision Examinations, but my official duties have not changed. I am an

    attorney barred in New York State with a J.D. from Benjamin N. Cardozo Law School. I

    make this declaration based on my personal knowledge and on information available to me in

    my official capacity.

2.  The CFPB's jurisdiction and responsibilities are set forth in Title X of the Dodd-Frank Wall

    Street Reform and Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5301 *et seq*.,

    also known as the Consumer Financial Protection Act (CFPA). The CFPB was created to

    provide a single point of accountability for enforcing federal consumer financial laws,

1

protecting consumers in the financial marketplace, and facilitating transparent and competitive markets for consumer financial products and services. Previously, that responsibility was divided among multiple federal agencies. Consequently, the CFPA vests the CFPB with rulemaking, supervisory, and enforcement authority over 18 enumerated federal consumer financial protection laws and transferred to the Bureau supervisory authority over certain depository institutions as to consumer financial protection.

3. The CFPB is currently organized into seven functional areas that carry out or assist in carrying out the mandates of the CFPA: Supervision; Enforcement; Consumer Response & Education; Research, Monitoring & Regulations; Legal; External Affairs; and Operations.

4. I am the senior official overseeing the CFPB's supervisory functions. I have direct or indirect oversight of all activities of the offices that conduct supervisory work: the Office of Supervision Examinations and the Office of Supervision Policy (collectively "Supervision"). My responsibilities include overseeing the planning and conducting of the Bureau's supervisory activities, including examinations of supervised entities, managing operations and policy decisions, and leading a staff of more than 500 attorneys, examiners, analysts, and other employees charged with ensuring compliance with federal consumer financial laws.

5. Supervision performs examinations of large depository institutions and their affiliates and certain non-depository consumer financial service companies as provided for in the CFPA. The CFPA gives the CFPB supervisory authority over non-depository institutions in three ways. First, it provides authority over non-depository institutions that offer or provide three specific types of consumer financial products or services (consumer real estate loan origination, brokerage, or servicing, or loan modification or foreclosure relief services in

connection with such loans; private education loans; and payday loans).[1] Second, it authorizes the CFPB to supervise non-depository institutions on the basis of conduct that poses risks to consumers.[2] Third, it grants supervisory authority over a non-depository institution that "is a larger participant of a market for other consumer financial products or services, as defined by rule[.]"[3] The CFPB has promulgated regulations defining larger participants in five markets: consumer reporting, debt collection, student loan servicing, international money transfer, and automobile financing.

6.  Through examinations and other supervisory work, the office assesses compliance with federal consumer financial laws, obtains information about supervised entities' activities and compliance systems or procedures, and detects and assesses risks to consumers and to the functioning of the markets for consumer financial products and services. Supervision communicates findings to the supervised entities and directs corrective action where appropriate, all within the traditional supervisory framework of institutional confidentiality.

***Background on Supervision of Student Loan Servicers***

7.  Pursuant to the CFPA, as well as the CFPB's rules defining "larger participants" in markets for consumer financial products or services,[4] the CFPB regularly supervises both bank and non-bank financial services entities in numerous markets, including student loan servicing.

8.  The CFPB regularly performs supervisory examinations of servicers (including for-profit companies and not-for-profit entities) handling federal student loans—both those loans owned directly by the United States Department of Education (ED), including Direct

---

[1] 12 U.S.C. § 5514(a)(1)(A).
[2] 12 U.S.C. § 5514(a)(1)(C).
[3] 12 U.S.C. § 5514(a)(1)(B).
[4] *See* 12 C.F.R. § 1090.106.

Program loans and ED-held Federal Family Education Loan (FFEL) Program loans, and those loans that are federally-guaranteed but commercially-held (commercial FFEL loans).

9.  During a student loan servicing examination, CFPB staff conduct a weeks- to months-long engagement with the servicer in order to obtain information about specific topics relating to the servicer's activities and the impact of those activities on consumers. These topics can include billing practices, payment processing, payment application and allocation, communications about repayment options including income-driven repayment, processing of applications for repayment options including income-driven repayment, consumer reporting on student loans, debt collection practices, and servicing transfers (*i.e.*, the movement of loans on or off a servicer's systems).

10. The information requested can include responses to written questions, copies of policies and procedures, samples of borrower account-level information, consumer-facing written communications or call recordings, and statistics relating to servicer performance and borrower experiences, among other things. CFPB staff analyze this information in order to assess compliance with federal consumer financial law, obtain information about these companies' compliance systems or procedures, and detect and address risks to consumers and markets.[5] After this analysis, CFPB staff share preliminary findings with servicer representatives, intake any additional information that the servicer chooses to share, and may determine whether a servicer has engaged in a violation of federal consumer financial law, or has engaged in practices that create a risk of a violation.[6]

---

[5] 12 U.S.C. § 5514 (b)(1).

[6] *See* Consumer Financial Protection Bureau, CFPB Supervision and Examination Manual (Sept. 2023), *available at* https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_2023-09.pdf; *see also* Consumer Financial Protection Bureau, *Supervisory Highlights,* Issue 9, Fall 2015, at 2.5 *available at*

***Background on Income-Driven Repayment Plans***

11. Under federal law and regulation, federal student loan borrowers are entitled to important

protections against delinquency and default that are broadly called income-driven repayment

plans. These programs, enacted under Title IV of the Higher Education Act and implemented

via regulations promulgated by ED beginning in the 1990s,[7] index a student loan borrower's

monthly payments to their family size and discretionary income,[8] including by providing for

$0 payments when a borrower's income falls below certain levels.[9] Under an income-driven

repayment plan, a borrower can also obtain an interest subsidy in which the government

covers interest-based costs in the event the borrower's monthly payment does not cover

---

https://files.consumerfinance.gov/f/201510_cfpb_supervisory-highlights.pdf (finding that servicers processed auto-debits at the wrong time; allocated payments in a way that increased fees and deprived borrowers of effective choice in how to allocate payments; made deceptive statements about fees; violated the Fair Credit Reporting Act's implementing Regulation V); *Supervisory Highlights,* Issue 13, Fall 2016, at 2.5 *available at* https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.1 6.pdf (finding improper denial of income-driven repayment applications; wide-reaching systems errors that caused the servicer to bill and collect the wrong payment amount); *Supervisory Highlights,* Issue 15, Spring 2017, at 2.3 *available at* https://files.consumerfinance.gov/f/documents/201704_cfpb_Supervisory-Highlights_Issue-15.pdf (finding premature termination of deferments and improper interest capitalization; deceptive statements regarding interest capitalization); *Supervisory Highlights,* Issue 23, Winter 2021, at 3.3 *available at* https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-23_2021-01.pdf (finding improper auto-debits; payment allocation errors; failure to inform borrowers of their available repayment options); *Supervisory Highlights,* Issue 24, Summer 2021, at 2.10, *available at* https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-24_2021-06.pdf (finding deceptive statements relating to Public Service Loan Forgiveness; billing and collecting inaccurate monthly payment amounts); *Supervisory Highlights,* Issue 27, Fall 2022, at 4, *available at* https://files.consumerfinance.gov/f/documents/cfpb_student-loan-servicing-supervisory-highlights-special-edition_report_2022-09.pdf (finding wrongful denials for forgiveness programs; providing incorrect payment counts and estimated eligibility dates for forgiveness; excessive delays in processing forgiveness applications).

[7] *See, e.g.,* 60 Fed. Reg. at 61820 (Dec. 1, 1995).
[8] *See* Office of Federal Student Aid, Income-Driven Repayment Plans, *available at* https://studentaid.gov/manage-loans/repayment/plans/income-driven (last visited June 27, 2024).
[9] *See id.*

5

them.[10] By enrolling in income-driven repayment, a borrower can lower their monthly federal student loan payment to potentially $0, stay current on their loans, and avoid their loans going into delinquency and potentially default.

12. Generally, delinquency on federal student loans results in derogatory reporting on a consumer's credit report after 89 days.[11] Usually after 270 days of delinquency, unpaid loans enter default, which can result in further derogatory reporting; the imposition of fees; and garnishment of wages, tax refunds, or Social Security payments.[12] Unlike with garnishment by private creditors, these garnishment procedures can occur without court orders.[13]

13. Different income-driven repayment plans set different guidelines for what percentage of a borrower's discretionary income the plan requires to be paid toward a borrower's monthly student loan payment, and as well as different thresholds for the income floor that will trigger a borrower's monthly payment to be set at $0.[14] Because of these differences across plans, a borrower's monthly payment will not only vary based on whether they are in the 10-year standard payment or enrolled in income-driven repayment; it will also vary based on which income-driven repayment plan a borrower enters.

---

[10] *See* Office of Federal Student Aid, About Income-Driven Repayment (IDR) Plan Calculations, *available at* https://studentaid.gov/idr/application/assumptions (last visited June 27, 2024).
[11] Federal Student Aid, Student Loan Delinquency and Default, *available at* https://studentaid.gov/manage-loans/default (last visited June 26, 2024). ED has announced that during the return to repayment, some of the consequences of missing payments have been temporarily suspended or mitigated. *See* Federal Student Aid, Restarting Student Loan Payments, *available at* https://studentaid.gov/manage-loans/repayment/prepare-payments-restart (last visited June 27, 2024).
[12] *Id.*
[13] Procedural requirements for such garnishment, known as "administrative offset," can be found at 31 U.S.C. § 3716.
[14] *See supra* at n.4.

14. On July 10, 2023, ED published a final rule with a new income-driven repayment plan, called the Saving on a Valuable Education plan (SAVE), Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43820, 43901 (July 10, 2023) (SAVE Final Rule).

**_Prior CFPB Findings on Federal Student Loan Servicing_**

15. The CFPB has received complaints about student loan servicers from borrowers seeking to enroll in income-driven repayment plans since the CFPB began taking complaints.[15] In the decade that the CFPB has supervised federal student loan servicers, Supervision has observed a large number of violations of federal consumer financial law and harm experienced by student loan borrowers as a result of those violations.[16] And over the last two years, Supervision has observed particular weaknesses in the execution of servicing activities related to income-driven repayment plans, even for longstanding plans that predate SAVE. Supervision has documented a series of violations of federal consumer financial law, including the CFPA, relating to the servicing of accounts where borrowers were seeking or enrolled in income-driven repayment plans, suggesting that some servicers are already struggling with providing income-driven repayment plans to borrowers in accordance with federal law and regulation.[17]

---

[15] Consumer Financial Protection Bureau, _Supervisory Highlights,_ Issue 13, Fall 2016, at 2.5.1 _available at_
https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.1 6.pdf.
[16] _See supra_ at n.2.
[17] Consumer Financial Protection Bureau, _Supervisory Highlights Student Loan Servicing Special Edition_, Issue 27, Fall 2022, at Sec. 4.3, _available at_
https://files.consumerfinance.gov/f/documents/cfpb_student-loan-servicing-supervisory-highlights-special-edition_report_2022-09.pdf.

16. For example, Supervision has found that servicers have: wrongfully denied borrowers' applications for income-driven repayment plans; wrongfully inflated the payments borrowers owe under their income-driven repayment plans; failed to inform borrowers of documentation required for their income-driven repayment plans; sent misleading denial letters to borrowers recertifying their income-driven repayment plans; and wrongly told borrowers their loan types were not eligible for income-driven repayment when they actually were.[18]

17. Notably, our examination findings suggest that servicing-driven barriers to income-driven repayment plans can preclude significant shares of borrowers from accessing those plans.[19] For example, when a servicer failed to adequately communicate to borrowers certain requirements of an income-driven repayment plan's application, 88% of applicants were denied for missing the uncommunicated requirement. Of those, 74% were delinquent six months later, compared with 23% of borrowers who had successfully enrolled in the plan.[20]

18. Two recent events have highlighted the ways in which large-scale shifts in the federal student loan servicing portfolio are often followed by servicing breakdowns and heightened risks to borrowers. First, after the COVID-19 emergency payment pause expired, the entire federal student loan portfolio was returned to repayment. The CFPB determined that the return to repayment of federally owned student loans presents significant consumer risks and initiated

---

[18] *Id.*

[19] The Government Accountability Office has also issued consistent findings. *See* United States Government Accountability Office, Education Needs to Take Steps to Ensure Eligible Loans Receive Income-Driven Repayment Forgiveness (March 2022), GAO-22-103720, *available at* https://www.gao.gov/assets/gao-22-103720.pdf.

[20] Consumer Financial Protection Bureau, Supervisory Highlights Student Loan Servicing Special Edition, Issue 27, Fall 2022, at 23, *available at* https://files.consumerfinance.gov/f/documents/cfpb_student-loan-servicing-supervisory-highlights-special-edition_report_2022-09.pdf.

its supervisory response.[21] While this work is ongoing, the CFPB has already identified three significant, widespread risks to consumers and potential violations of federal and state consumer law. During the return to repayment, servicers sent billing statements with inaccurate due dates and payment amounts to borrowers, including borrowers with approved loan discharges in process. In addition, servicers struggled to handle the volume of borrower inquiries that accompanied the return to repayment, resulting in borrowers experiencing hours-long call wait times and the backlog of income-driven repayment applications grew to over 1.25 million.

19. Second, in 2021, two major federal student loan servicers exited their contracts with ED, triggering the transfer of more than 25 million borrowers' accounts from one servicer to another. The CFPB conducted near-real-time supervision of these transfers alongside ED's Office of Federal Student Aid and state regulators.[22] Through this work, the CFPB identified widespread servicing failures that affected basic loan information provided to hundreds of thousands of borrowers, including servicers sending incorrect information about payment amounts, due dates, capitalization history, or paid-ahead status.[23]

20. In both cases, these events and subsequent servicing breakdowns revealed servicing systems with a long history of inaccurate and missing data.[24]

***Kansas Injunction Effects and Consumer Impacts***

---

[21] Consumer Financial Protection Bureau*, Issue Spotlight: Federal Student Loan Return to Repayment*, January 2024, *available at* https://files.consumerfinance.gov/f/documents/cfpb_federal-student-loan-return-to-repayment-report_2024-01.pdf.
[22] *Id*. at 11.
[23] *Id*. At the same time, call volume and applications for payment relief increased. Some servicers were inadequately staffed, making them unable to effectively manage this volume. *Id*.
[24] *Id*. at 11.

9

21. The injunction entered by the United States District Court for the District of Kansas enjoins ED from implementing those provisions of the SAVE plan that had been "set to become effective on July 1, 2024."[25]

22. Among other provisions, it appears that the injunction prohibits ED from implementing a planned decrease in borrowers' monthly payments under the SAVE plan that would cut those payments in half: from 10% of the borrower's income above 225% of the federal poverty line to 5% of the borrower's income above 225% of the federal poverty line, for borrowers with undergraduate loans only.[26] For borrowers with graduate and undergraduate loans, borrowers would pay a weighted average of between 5% and 10% of their discretionary income based on the original principal balances of their loans taken to attend school.[27] This anticipated decrease had been announced publicly, was contained in the proposed and final rules implementing the SAVE plan, and communicated in individual borrower communications.

23. Our experience supervising student loan servicers as described above suggests that implementing the injunction (by not implementing the planned reduction in monthly payments) significantly raises the risk that monthly payments are not accurately calculated, payment systems are not operated in compliance with federal consumer financial law, and that servicers might fail to provide accurate and actionable information to consumers about the status of their loans and their other payment options.

*Impacts on Borrowers Currently Enrolled in SAVE*

---

[25] Doc. 77.

[26] SAVE Final Rule, 88 Fed. Reg. at 43901; *see also* https://studentaid.gov/announcements-events/save-plan ("Starting next summer, borrowers on the SAVE Plan will have their payments on undergraduate loans cut in half (reduced from 10% to 5% of income above 225% of the poverty line).")

[27] SAVE Final Rule, 88 Fed. Reg. at 43902 (July 10, 2023).

10

24. For borrowers who have already enrolled in SAVE, market intelligence received by the CFPB suggests the federal student loan servicing system, including ED and its servicing contractors, has already been adjusting operations to recalculate monthly payments and send borrowers communications in anticipation of their post-July payment amounts. Based on consumer complaints, many borrowers were already notified that their accounts were placed into a forbearance for the month of July while their payment amounts are adjusted.

25. Based on my experience as the head of Supervision, I have serious concerns about the ability of servicers to pivot away from the anticipated new payment amounts in a way that does not incur significant risk of harm to federal student loan borrowers whose accounts they service, on the timeline the injunction appears to contemplate. It is the CFPB's understanding that efforts have been underway for months, both at ED and its servicing contractors, to implement the new payment amounts in July 2024 and the changing of payment amounts normally occurs through processes that are more foreseeable and processed on lengthier timelines than the one that the injunction appears to contemplate.[28]

26. Given the substantial change in borrowers' expected monthly payments, a significant number of borrowers will likely reach out to their servicer for information (for example, about their monthly payment amounts, income-driven repayment plan options, ways to avoid delinquency and default, or servicing errors). A change in borrowers' anticipated monthly payments is likely to prompt a significant volume of outreach from student loan borrowers to servicers and other institutions in the student loan ecosystem. Many borrowers already enrolled in the SAVE plan have received direct communications informing them of the

---

[28] As noted above, *see supra* n.2, even under more typical circumstances, we have observed that servicers struggle to implement accurate payment amounts.

anticipated decrease in their monthly payments, and they may have also seen widespread public descriptions of the upcoming payment change. For some borrowers, 5% of their discretionary income might have been an affordable long-term monthly expense, while 10% might not. For some borrowers, 10% of their discretionary income might amount to a higher payment than the 10-year permanent standard payment they would incur were they not enrolled in SAVE. For these and other reasons, borrowers processing the effect of the injunction may need clarification on information about their student loans in order to make informed decisions regarding repayment—and those borrowers may reach out to their servicer for help. Based on my experience as the head of Supervision, I believe that borrowers seeking information (for example, about their monthly payment amounts, income-driven repayment plan options, ways to avoid delinquency and default, or servicing errors) are likely to encounter significantly increased call wait times, inaccurate information, and dropped calls, all of which will harm borrowers.

27. Given that more than 8 million borrowers are enrolled in SAVE already, enjoining the decrease in monthly payment amounts (alongside the other provisions of the Final Rule subject to the Court's preliminary injunction) set to be implemented in July will impact millions of Americans. Based on our experience through supervisory observations, this unanticipated change is likely to prompt a surge in borrower-side demand for contact with their servicers, with borrowers likely to seek accurate, individualized information on what their future monthly payment amounts will be, and what their options are if they find them unaffordable.[29]

---

[29] *Issue Spotlight supra* at n.12, p 4 (observing that the return to repayment of federal student loans prompted numerous borrowers to contact their servicer to "apply for income-driven

*Impacts on Borrowers Not Currently Enrolled in SAVE*

28. Beyond those borrowers already enrolled in SAVE, borrowers who are contemplating

    enrolling in SAVE and borrowers on other income-driven repayment plans may also reach

    out to servicers with questions about the injunction and its effects on their monthly payment

    amounts, accrual of qualifying months toward forgiveness, and repayment options. For

    example, borrowers may consider enrolling in SAVE even when they have not previously

    because they have newly entered repayment because they have recently graduated, or have

    been in repayment but have experienced losses in income. Whether or not the injunction

    carries implications for these borrowers, the complexity of the interaction between the Final

    Rule and the injunction's scope may raise questions among borrowers as to whether and how

    their student loan repayment options have changed. Borrowers who have exclusively Direct

    Loans, and who are not currently enrolled in SAVE, may also have questions arising from

    ambiguity about what their monthly payment amount would be under the SAVE plan in light

    of the injunction, and whether they can enroll in the plan at all.

29. Moreover, some of the provisions of the SAVE Final Rule scheduled to be implemented on

    July 1, 2024 apply to income-driven repayment plans other than SAVE. For example, the

    SAVE Final Rule addresses how federal student loans made under the FFEL Program (a

    precursor to the Direct Loan Program) and Direct Loans are treated for purposes of

    calculating credit toward forgiveness when a borrower consolidates their FFEL Loans or

    Direct Loans into a Direct Consolidation Loan. Prior rules provided that the time spent in

    repayment prior to consolidation would not count toward forgiveness under income-driven

---

repayment, make payments, understand their loan-cancellation or discharge options, or resolve
disputes").

repayment plans. These provisions of the SAVE Final Rule count time spent in eligible

repayment plans prior to consolidation towards any other income-driven repayment program,

not just SAVE.[30] Whether or not these periods of time count toward forgiveness—and

ambiguity about the status of those provisions—is highly material information for borrowers

considering consolidation.

30. For these and other reasons, borrowers may have questions about whether and how the

injunction may affect their student loan repayment options. Based on our experience, we

anticipate that borrowers who are not enrolled in SAVE but whose decisions might be

affected by whether particular provisions of the Final Rule are implemented might contact

their servicers to determine how the injunction will impact their eligibility for forgiveness

under income-driven repayment programs. Accordingly, the total population of borrowers

who may seek clarification about the effect of the injunction exceeds the 8 million borrowers

enrolled in SAVE.

*Systems Impacts Affecting All Borrowers*

31. In Supervision's experience in student loan servicing supervisory examinations, surges in

demand for servicer contact are often followed by breakdowns in the servicing system. CFPB

examinations detected servicing breakdowns following analogous widespread changes in the

terms or activities of federal student loan repayment. Even when the servicing system had

significantly more advanced notice, opportunity to prepare, and clarity on the nature of

upcoming changes, those changes were followed by widespread failures on the part of

servicers to provide borrowers with accurate, timely, complete, and actionable information

---

[30] *See* 34 C.F.R. § 685.209(k)(4)(iv)(K)(vi)(A).

about their loans and to take critical account actions for borrowers like enrollment in repayment plans and accurately crediting time toward loan forgiveness.[31]

32. For example, as described in paragraph 18, Supervision has been monitoring the return to repayment of federal student loans, wherein borrowers have had to resume making payments following a 3.5-year COVID-19 repayment pause. This required borrowers to set up new auto-debits, consider loan consolidations, and apply for new payment plans when prior plans no longer met their needs, among other things. As discussed in the CFPB's January 2024 *Issue Spotlight*, the return to repayment prompted numerous borrowers to contact their loan servicers to seek updated, individualized information about their loans and to obtain counseling on their repayment options.[32]

33. Supervision observed that certain servicers were not prepared for the increased level of borrower interaction during periods of the return to repayment. In 2022, federal student loan servicers had an average speed to answer of nearly 6 minutes and a 10.4 percent abandonment rate.[33] But in October 2023, the average federal loan servicer's call hold time increased to over an hour, causing 47 percent of borrowers to abandon the call before ever reaching an agent to get the information they needed. In some cases, borrowers waited for several hours on hold to reach their servicers. Because several servicers failed to meet borrowers' needs for contact, borrowers went without important information about their repayment status, payment amounts, and available options for obtaining affordable student

---

[31] Consumer Financial Protection Bureau, Supervisory Highlights Student Loan Servicing Special Edition, Issue 27, Fall 2022, *available at* https://files.consumerfinance.gov/f/documents/cfpb_student-loan-servicing-supervisory-highlights-special-edition_report_2022-09.pdf.
[32] *Issue Spotlight supra* at n.12.
[33] Federal Student Aid, FY 2022 Annual Report, p. 54, January 23, 2023, *available at* https://www2.ed.gov/about/reports/annual/2022report/fsa-report.pdf.

15

loan payments. Borrowers also were unable to get particularized information about errors in calculating their new income-driven repayment plan payments or resolve those errors.

34. Supervision has also observed these dynamics in the context of large-scale shifts relating to forgiveness programs. For example, in October 2021, ED announced the Public Service Loan Forgiveness (PSLF) Waiver program, which modified what periods of repayment were considered eligible for credit toward forgiveness under the PSLF program and opened a pathway for previously-excluded borrowers to become eligible for the program. The Waiver imposed a deadline of October 2022 for borrowers to take action in order to receive benefits under the Waiver. Prior to the October 2022 deadline, servicers received hundreds of thousands of new PSLF-related applications. Servicers were not prepared to adequately handle the volume of applications that they received, and applicants experienced excessive processing delays well beyond the expected processing time. In some cases, these delays lasted nearly a year.[34] A lack of certainty about the status of forgiveness-related applications carries implications for a host of financial decisions borrowers need to make, including which student loan repayment plan to pursue, whether or not they could make other significant financial expenditures (such as buying a home), and whether they could change jobs.

35. When the federal student loan servicing system fails to meet surges in borrower demand for individualized information, borrowers can experience harm beyond the confusion, frustration, and time and energy that they expend seeking clarity on their student loan status. Borrowers risk missing payments and other negative consequences, such as derogatory credit reporting, when they do not have adequate avenues to communicate with servicers or

---

[34] *Id.* at 19.

perform the tasks they need on their servicers' websites, such as verifying their payment amounts, making payments electronically, or applying for payment relief options like income-driven repayment, deferment, or forbearance. Indeed, the loan servicing failures during the return to repayment likely contributed to the fact that 30 percent of borrowers were delinquent on their loan payment by the end of 2024—3 months after the return to repayment. By comparison, only 15 percent of borrowers were delinquent after the first quarter of 2020, which was the last period of active repayment prior to the COVID-19 payment pause.[35]

36. Based on the CFPB's observations as described above, I would anticipate that the effects of a shift in expected federal student loan activities resulting from the injunction entered by this Court would be compounded by the uncertainty prompted by the injunction entered by the United States District Court for the Eastern District of Missouri, which differs in scope and will prompt additional requests for clarification from federal student loan borrowers.

37. Whether they are currently enrolled in the SAVE plan or not, borrowers may reasonably have questions about the effect of each injunction on their plans for paying their federal student loans. Because the injunction entered by the United States District Court for the Eastern District of Missouri concerns the availability of loan discharge under the SAVE plan, and the availability and timeline of discharge is a highly material element of income-driven repayment plans, borrowers are likely to seek clarification about the impact of the Missouri injunction in addition to the impact of the injunction entered by this Court. This additional

---

[35] Federal Student Aid Data Center, Federal Student Loan Portfolio, Portfolio by Delinquency Status, https://studentaid.gov/data-center/student/portfolio. *See also* Kvaal, James, A First Look at Student Loan Repayment After the Payment Pause, U.S. Department of Education (Dec. 15, 2023). https://blog.ed.gov/2023/12/a-first-look-at-student-loan-repayment-after-the-payment-pause/#more-32203.

17

complexity would further increase demand for servicer contact and exacerbate the risk of servicing breakdowns that adversely affect borrowers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 27, 2024 at Washington, D.C.

LORELEI SALAS

Supervision Director

Consumer Financial Protection Bureau

18

A118

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION**

| | | |
|---|---|---|
| STATE OF KANSAS, | § | |
| STATE OF ALABAMA, | § | |
| STATE OF ALASKA, | § | |
| STATE OF IDAHO, | § | |
| STATE OF IOWA, | § | |
| STATE OF LOUISIANA | § | |
| STATE OF MONTANA, | § | Civil Action No. 6:24-cv-01057-DDC- |
| STATE OF NEBRASKA, | § | ADM |
| STATE OF SOUTH CAROLINA, | § | |
| STATE OF TEXAS, | § | |
| STATE OF UTAH, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN IN HIS OFFICIAL | § | |
| CAPACITY AS PRESIDENT OF THE | § | |
| UNITED STATES, | § | |
| MIGUEL CARDONA IN HIS OFFICIAL | § | |
| CAPACITY AS SECRETARY OF | § | |
| EDUCATION, | | |
| UNITED STATES DEPARTMENT OF | | |
| EDUCATION; | | |
| | | |
| *Defendants*. | | |

<u>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**</u>

<u>**INTRODUCTION**</u>

In 2022, Defendant Joseph R. Biden attempted to unilaterally cancel student loans for millions of borrowers to the tune of $430 billion, relying on a strained interpretation of the HEROES Act. Six states sued in federal court to block this unlawful action. They succeeded. In the landmark case of *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), the Supreme Court rejected Defendant Biden's assertion that he could utilize an inapplicable provision of the HEROES Act as a pretext to burden the public with hundreds of billions of dollars in student debt.

1

Now, a coalition of States sues Defendant Biden, as well as co-defendants the Department of Education and Secretary of Education Miguel Cardona, to stop a second attempt to avoid Congress and pass an illegal student debt forgiveness. Last time Defendants tried this the Supreme Court said that this action was illegal. Nothing since then has changed, other than introducing more legal errors into this Rule's underlying analysis.

Just ten days after the Supreme Court's rebuke, Defendants released a Rule purporting to abolish at least $156 billion in student debt, with a new "SAVE Plan" as its centerpiece. Defendants proposed the SAVE plan to be step two of three in their massive student loan forgiveness scheme. The first step was the illegal loan cancellation based on the HEROES Act, with which Defendants tried to cancel $430 billion in loans and that the Supreme Court rejected as unconstitutional.[1] Because the SAVE Plan included the assumption that $430 billion in student loans would be forgiven before it kicked in, Defendants expressly did not consider that would-have-been forgiven $430 billion in their cost estimate. But the Supreme Court struck down HEROES loan forgiveness in *Biden v. Nebraska*. After that, Defendants' cost estimate was completely incorrect. Despite the failure to adjust the cost part of the Save Plan's justification, Defendants rushed to push through the SAVE Plan to salvage political capital. They failed to update the cost estimate of the SAVE Plan to reflect the fact that their baseline numbers were off by $430 billion. Because of that, the Rule severely underestimates the SAVE Plan's true cost. $156 billion is a floor—the Rule itself does not analyze how much of the $430 billion it assumed was already forgiven will be affected.

---

[1] Defendants announced the third "phase" last month. *See* Student Debt Relief for the William D. Ford Federal Direct Loan Program (Direct Loans), the Federal Family Education Loan (FFEL) Program, the Federal Perkins Loan (Perkins) Program, and the Health Education Assistance Loan (HEAL) Program, 89 Fed. Reg. 27,564 (Apr. 17, 2024).

Even worse, Defendants' Rule justifying the Save Plan left in sections prepared prior to *Biden v. Nebraska* being issued. That includes statements from Defendants that they are "confident in our authority to pursue debt relief" and that they are "awaiting the Supreme Court's ruling on the issue."  These absurdities highlight the arbitrary and capricious nature of issuing a rule based on the assumed constitutionality of a different rule that the Supreme Court found to be unlawful are just the tip of the iceberg in a plan that is not only poor policy but poorly thought out.

The Rule is set to take effect July 1, 2024.  But not content to wait for it to take effect, Defendants assumed the authority to engage in rolling loan forgiveness for individuals who had under some loans for at least 10 years and have begun doing so even before the Rule's effective date.  A major round of this "forgiveness" occurred on February 21, 2024, when the Department of Education unilaterally erased the debt of 153,000 borrowers.  Defendant Biden openly boasted about his defiance of the Supreme Court with this move, stating in Jacksonian fashion: "the Supreme Court blocked it.  They blocked it.  But that didn't stop me."[2]  This lawsuit is now necessary to prevent Defendants from continuing to flout the law, which includes ignoring Supreme Court decisions.

This is not the first time Defendant Biden has taken actions that he publicly admits are likely unlawful.  This is an administration that rules by will, not by law.  For example, in extending the CDC's eviction moratorium, Defendant Biden stated, "the bulk of constitutional

---

[2]  Remarks by President Biden on the Saving on a Valuable Education Plan, Culver City, CA, The White House (Feb. 21, 2024), https://www.whitehouse.gov/briefing-room/speeches-remarks/2024/02/21/remarks-by-president-biden-on-the-saving-on-a-valuable-education-plan-culver-city-ca/.

scholars say it's not likely to pass constitutional muster."[3]  But he ordered CDC to extend it anyway, boasting that delays in judicial review would mean that he could impose his will for at least a time.[4]  The constitutional scholars were correct; the Supreme Court set aside as unconstitutional the obviously illegal program in *Alabama Association of Realtors v. Department of Health & Human Services*, 141 S. Ct. 2485 (2021).

Defendant Biden is attempting the same lawless maneuver here.  Although this round of unilateral debt nullification takes on a new name, with a different putative authority, it is every bit as improper as his first unlawful attempt at debt forgiveness in *Biden v. Nebraska*.  Indeed, as the Defendants scrape ever deeper into the barrel for legal pretexts to abolish student debts, the illegality of those artifices becomes more obvious.

The authority that Defendants claim now lacks any substantive limits and amounts to claiming that they can abolish all student debt at any time by rulemaking alone.  For example, under Defendants' absurd interpretation of the Higher Education Act of 1965, they could limit student debt repayment to 5% of borrowers' income above $5,000,000 for five years and thereby abolish all remaining debt.  Defendants do so under the pretense that such debt forgiveness or debt erasure is merely modifying the terms of the loan repayment.  That is the power claimed— and challenged—in this suit.

The timing of these actions also makes plain their pretextual nature.  The first round of debt relief was rushed out in time for the 2022 elections in a transparent bread-and-circuses attempt to boost base turnout and, in essence, buy votes with federal funds.  This second round of

---

[3]  Jeff Stein & Tyler Pager, Seung Min Kim, Tony Romm, *Ban on Evictions is Back*, Washington Post (Aug. 4, 2021), https://www.washingtonpost.com/politics/2021/08/04/bidens-novel-evictions-defense-maybe-its-illegal-its-worth-it/.
[4] *Id.*

debt cancellation also—by remarkable coincidence—manages to take effect shortly before the 2024 election.  Had Defendants taken the complex and multipart rule back to the drawing board after *Biden v. Nebraska*, they would likely not be able to promulgate and finalize a rule before November 2024. So, they did not.  Accepting the propositions that the timing of these actions is mere coincidence and that neither is essentially a multi-hundred-billion-dollar vote-buying scheme would require this Court "to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (citation omitted). Regardless of the suspicious timing, the Court should still set aside this executive action as unlawful.

Because this second round of debt nullification is as plainly unlawful as the first invalidated by the Supreme Court in *Nebraska v. Biden*, Plaintiffs are suing to vindicate their interests and ensure that this lawlessness does not stand.

## JURISDICTION AND VENUE

1.       This Court has federal question jurisdiction over this case under 28 U.S.C. § 1331 because this case concerns whether the Department acted in compliance with the United States Constitution and federal law, including the Higher Education Act of 1965 and the Administrative Procedure Act ("APA").

2.       This Court also has jurisdiction pursuant to 5 U.S.C. §§ 701–706 (the APA) and 28 U.S.C. § 1361.

3.       Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because: (1) Plaintiff State of Kansas resides in this judicial district, (2) Kansas agencies harmed by the Final Rule reside in this District, (3) no real property is involved in this action.

4.       There is a present and actual controversy between the parties.

5.       Plaintiffs are challenging a final agency action pursuant to 5 U.S.C. §§ 551(13), and 704.

6.      This Court may grant Plaintiffs the relief they request under the Administrative Procedure Act, 5 U.S.C. §§ 705-06 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

7.      Plaintiffs request the United States District Court for the District of Kansas, Wichita Division, located at 401 N. Market, Wichita, Kansas 67202, for trial, if any.

## THE PARTIES

**A.  Plaintiffs**

8.      Plaintiff State of Kansas is a sovereign State of the United States of America.

9.      Kansas sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including protecting the reliance interests of state and local agencies.

10.     Kansas brings this suit through its attorney general Kris W. Kobach.  He is the chief legal officer of the State of Kansas and has the authority to represent Kansas in federal court. Kan. Stat. Ann. 75-702(a).

11.     Plaintiff State of Alabama is a sovereign State of the United States of America.

12.     Alabama sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including protecting the reliance interests of state and local agencies.

13.     Alabama brings this suit through its attorney general Steve Marshall.  He is the chief legal officer for the State of Alabama and has the authority to represent Alabama if federal court.  Ala. Code § 36-15-1(2).

14.     Plaintiff State of Alaska is a sovereign State of the United States of America.

15.     Alaska sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens.

16.     Alaska brings this suit through its attorney general, Treg Taylor.  He is the chief legal officer of the State of Alaska and has authority to institute any legal action on behalf of the state.  Alaska Statute 44.23.020.

17.     Plaintiff State of Idaho is a sovereign State of the United States of America.

18.     Idaho sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens.  The Final Rule will harm Idaho and its citizens.

19.     Idaho brings this suit through its attorney general, Raúl Labrador, the State's chief legal officer.  He is authorized by Idaho law to sue on the State's behalf under Idaho Code § 67-1401.  His address is 700 W. Jefferson St., Suite 210, P.O. Box 83720, Boise, Idaho 83720.

20.     Plaintiff State of Iowa is a sovereign State of the United States of America.

21.     Iowa sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens.

22.     Iowa brings this suit through its attorney ggeneral, Brenna Bird.  She is authorized by Iowa law to sue on the State's behalf under Iowa Code § 13.2.  Her address is 1305 E. Walnut St., Des Moines, Iowa 50309.  The aattorney ggeneral believes Iowa will be harmed by the Final Rule, and therefore joins.

23.     Plaintiff Louisiana is a sovereign State of the United States of America.

24.     Louisiana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

25.     Louisiana brings this suit through its attorney general, Liz Murrill.  She is the chief legal officer of the State of Louisiana and has authority to institute any civil action.  LA Constitution Art. IV, § 8.

26.     Plaintiff Montana is a sovereign State of the United States of America.  The Final Rule will harm Montana and its citizens.

27.     Montana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

28.     This action is brought by the State in its sovereign capacity through its attorney general, Austin Knudsen, who is the chief legal officer of the State.  Mont. Const. art VI, § 4(4).  He is authorized to bring legal actions to protect the interests of the State of Montana and its citizens. His offices are located at 215 N. Sanders St., Helena, MT 59601.

29.     Plaintiff State of Nebraska is a sovereign State of the United States of America.

30.     Nebraska sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

31.     Mike Hilgers is the attorney general of Nebraska.  General Hilgers is the chief legal officer of the State of Nebraska and has the authority to represent Nebraska in federal court. Neb. Rev. Stat. § 84-203.

32.     Plaintiff South Carolina is a sovereign State of the United States of America.

33.     South Carolina sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

34.     South Carolina brings this suit through its attorney general, Alan Wilson.  He is the chief legal officer of the State of South Carolina and has the authority to represent South Carolina in federal court.  *State ex rel. Condon v. Hodges*, 349 S.C. 232, 239–40, 562 S.E.2d 623, 627 (2002) (the South Carolina attorney general "'may institute, conduct and maintain all such suits and *proceedings* as *he deems* necessary for *the enforcement of the laws of the State,* the *preservation of order,* and the *protection* of *public rights*.'" (emphasis in original)) (quoting

*State ex rel. Daniel v. Broad River Power Co.*, 157 S.C. 1, 68, 153 S.E. 537, 560 (1929), *aff'd*

282 U.S. 187 (1930)).

35.     Plaintiff State of Texas is a sovereign State of the United States of America.

36.     Texas sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

37.     Texas brings this suit through its attorney general Ken Paxton.  He is the chief

legal officer of the State of Texas and has the authority to represent Texas in civil litigation.

*Perry v. Del Rio*, 67 S.W.3d 85, 92 (Tex. 2001).

38.     Plaintiff State of Utah is a sovereign State of the United States of America.

39.     Utah sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

40.     Sean D. Reyes is the Attorney General of Utah. He is authorized by Utah law to

sue on Utah's behalf.  *See, e.g.*, Utah Const. art. VII, § 16; Utah Code § 67-5-1(1)(b).

**B.  Defendants**

41.     Defendant Joseph R. Biden, Jr. is the president of the United States of America.

He is sued in his official capacity.  Defendant Biden instructed the Department of Education to

take the actions challenged here.

42.     Defendant Department of Education is an executive agency of the federal

government tasked with administering the federal student loan program.

43.     Defendant Miguel Cardona is the United States Secretary of Education and is

responsible for the operation of the Department, including the issuance of the challenged rule.

20 U.S.C. § 3411.  He is sued in his official capacity.

## FACTUAL ALLEGATIONS

**A.  The Higher Education Act of 1965 and its Amendments**

44.     Congress enacted the Higher Education Act of 1965 (the "HEA" or "Act") "to

increase educational opportunities and 'assist in making available the benefits of postsecondary

education to eligible students in institutions of higher education.'" *Biden*, 143 S. Ct. at 2362 (quoting 20 U.S.C. § 1070(a) (cleaned up)).

45.     Among other things, the HEA provided for two different forms of financial assistance: grants and loans.  *See* 20 U.S.C. § 1070-1070h, § 1071-1087-4.

46.     Initially, the HEA did not authorize directly loaning money to students; rather, the federal government guaranteed private loans.  However, Congress amended the HEA in 1993 to authorize direct loans to students from the federal government and allowed the Department to offer a variety plans for repayment of student loans.

47.     Among the repayment plans authorized by the 1993 amendments was an income-contingent repayment plan that based repayment amounts based on the income of the borrower, paid over an extended period of time not to exceed twenty-five years.  *See* 20 U.S.C. § 1087e(d)(1)(D).

48.     The premise of direct government lending was that there would be no ultimate cost to the government because the loans would accrue interest and eventually get paid back.[5] The cancelation of the remaining balance (if any) at the end of the 25-year period was designed to be a narrow and rare exception rather than the rule.[6]

49.     In 1994, the Department designed (by regulation) the first income-contingent repayment plan, which limited annual loan payments to 20% of a borrower's income that

---

[5] *Hearing of the Committee on Labor and Human Resources to Amend the Higher Education Act of 1965*, 103rd
Cong. (1993), 48, available at: https://files.eric.ed.gov/fulltext/ED363187.pdf.
[6] *Id.*

exceeds the federal poverty line.  It also established that if any amount of the loan remained after twenty-five years of payments, that remainder would be cancelled entirely.[7]

50.     In 2007, Congress authorized two major changes.  First, Congress established an income-based repayment plan (which is distinct under the HEA from income-*contingent* repayment plans) that provided relief for borrowers facing a temporary financial hardship by reducing the annual repayment cap to 15% of income above 150% of the federal poverty guideline.  *See* 20 U.S.C. §§ 1098e(a)(3)(B), (b)(1).  It also explicitly authorized cancellation of debt after 25 years.  *Id.* § 1098e(b)(7).  Income-based repayment plans are expressly limited to individuals with "partial financial hardship," *id.* § 1098e(d)(1)(E), which is defined by 20 U.S.C. § 1098e.

51.     The 2007 amendments also established the Public Service Loan Forgiveness ("PSLF") program, which allowed those who enter public service to have their loans canceled after ten years instead of twenty-five.  20 U.S.C. § 1087e(1)(B).

52.     In 2010, the last significant statutory changes were made to loan repayment.  That year, Congress lowered the cap of annual repayment to 10% of income above 150% of the federal poverty guideline and capped the timeline for loan cancelation at twenty years for income-based repayment.  This only applied to loans taken out after 2014.  20 U.S.C. § 1098e(e).

53.     Congress has set very specific limits on loan forgiveness.  Nevertheless, the Department has tried to give itself the power to set its own lower thresholds.  The Department has attempted to unilaterally override some of these statutory provisions through the rulemaking process to make them more generous.  First, in 2012 the Department established the Pay as You

---

[7] CRS, *The Federal Direct Student Loan Program* 10 (1995), available at: https://files.eric.ed.gov/fulltext/ED378875.pdf.

Earn (PAYE) plan, which extended the 2010 amendments to loans taken out as far back as 2007. *See* 77 Fed. Reg. 66,088.

54.     In 2015, the Department established the REPAYE Plan, extending the 2010 amendments to all borrowers regardless of when they took out the loans.  80 Fed. Reg. 67,204.

55.     Despite that, the average individual under the current REPAYE plan would ultimately pay back more than the amount that they took out in loans (*i.e.*, pay back the entire amount of principal plus at least some amount of interest), 88 Fed Reg. 43,880, which arguably broadly follows the contours of other repayment plans established by Congress.

**B.     The Proposed Rule**

56.     Not satisfied with the specified thresholds and criteria set by Congress for debt cancellation, the Department has contrived to set its own through the challenged rule.

57.     Defendants issued a *Notice of Proposed Rulemaking on Improving IDR for the Direct Loan Program* to that effect on January 11, 2023.  88 Fed. Reg 1,895 (Jan. 11, 2023).

58.     The NPRM allowed for only a thirty-day comment period.  *Id.*

59.     The Proposed Rule estimated that the net budget impact would be $137.9 billion across all loan cohorts through 2032.  *Id.*  This number assumed as part of its baseline estimate that the HEROES forgiveness at issue in *Biden v. Nebraska* would be upheld.

**C.     Commenting on the Proposed Rule**

60.     Despite the significance of the Proposed Rule, the Department denied all requests for extensions beyond the thirty-day period it had originally established.  88 Fed. Reg 43,821.

61.     As a result of the condensed timeline, some number of people who would have otherwise provided comment did not do so.  Similarly, other individuals and entities that

ultimately submitted comments were unable to develop their arguments adequately due to the truncated period.

62.    Regardless, there were some commenters who raised legal issues that were addressed by the Department in the Final Rule.

63.    Multiple commenters challenged the legal authority of Defendants to implement these regulations, to include: (1) acting in excess of statutory authority, (2) implicating the major questions doctrine, and (3) promulgating a rule that is arbitrary and capricious.  *See generally* 88 Fed. Reg. 43,820-905.

64.    One commenter noted that the true cost of the program was underestimated because Defendants presumed that the $430 billion of loan forgiveness at issue in *Biden v. Nebraska* would be upheld.  *Id.*

65.    The Congressional Budget Office ("CBO") was also aware of this issue.  While the CBO was not able to produce a cost estimate within the short 30-day comment period allowed by Defendants,[8] the ultimate estimate did consider the contingency that step one of Defendants' scheme, HEROES forgiveness, would be invalidated.[9]

66.    The CBO estimate also noted that Defendants' estimate "assum[ed] that there would be no increase in enrollment in the proposed IDR plan among current or future borrowers and no increase in borrowing among eligible students in the future."[10]

---

[8] *See* Congressional Budget Office, *Re: Costs of the Proposed Income-Driven Repayment Plan for Student Loans*, March 13, 2023, located at https://www.cbo.gov/system/files/2023-03/58983-IDR.pdf.
[9] *Id.* at 10 n.5.
[10] *Id.* at 7–8.

**D.      The Final Rule**

67.      Following the comment period, the Department opted to ignore the statutory limitations on its authority and press forward with the Final Rule.

68.      On July 10, 2023, the Department issued a final administrative rule titled "Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan ("FFEL Program")" (the "Final Rule" or "Rule").  The Final Rule was published in the Federal Register at 88 Fed. Reg. 43,820-905.  A true and correct copy of the Final Rule is attached as Exhibit 1 in ECF #1.

69.      The Final Rule amends 34 C.F.R. § 685.  88 Fed. Reg. at 43,900.

70.      The Final Rule makes several significant changes to preexisting regulations: for the "REPAYE" or "SAVE" Plan, the Final Rule (1) defines "discretionary income" to be income above 225% of the applicable Federal poverty guideline, (2) sets the monthly payment amount at $0 if the borrower's income falls below that threshold, (3) caps the monthly payment amount at 5% of the borrower's income that goes above that threshold for undergraduate loans, and (4) cancels all loans where the original principal balance was $12,000 or less after the borrower has made 120 monthly payments or the equivalent.

71.      Under the guise of modifying the terms of loan repayment, the Final Rule will in fact forgive billions of dollars in student debt.

72.      The Final Rule emphasized that the goal of these changes was to help more borrowers avert delinquency and default, as well as the negative consequences associated with those events, 88 Fed. Reg. 43,280, and not to create a grant, *id.* at 43,832.

73.     However, the data within the Final Rule demonstrates that the average undergraduate borrower under this new "SAVE" Plan would pay only about $6,121 for every $10,000 borrowed.  *Id.* at 43,880.

74.     Under the current/pre-Final Rule "REPAYE" Plan, that amount is $10,956 for every $10,000 borrowed.  *Id.*

75.     In effect, the Rule transforms the REPAYE Plan into a system of massive federal grants whereby borrowers pay only a fraction of the amount borrowed from the government. The remainder of the loan is forgiven.  Thus, while styled as "loans," the Final Rule partially transforms many or most loans into outright grants from the federal government—without any appropriation from Congress for the resulting tens or hundreds of billions of dollars in additional federal spending.

76.     The Final Rule brushes off most of the challenges to the Department's legal authority by taking the position that the statute "sets an explicit upper limit, but no lower limit for the 'extended period' time that a borrower must spend in repayment" and that the Secretary has "discretion as to how much a borrower must pay, specifying only that payments must be set based upon the borrower's annual adjusted gross income."  *Id.* at 43,826–27.

77.     The Final Rule asserts that the Secretary has the "authority to make the changes in this rule related to the amount of income protected from payments, the amount of income above the income protection threshold that goes toward loan payments, and the amount of time borrowers must pay before repayment ends."  *Id.* at 43,827.

78.     The only limitation the Final Rule envisions is that the Department provide a "reasoned basis for the parameters it chose."  *Id.*

79.     Aside from the APA's procedural requirement of providing a rationale, the Final Rule does not acknowledge **any** limiting principle on the Secretary's authority to abolish debts. It recognizes no substantive limit in the assigned statutory authority under the HEA whatsoever.

80.     To put this in perspective, there is **nothing** in the Secretary's interpretation of the HEA that would prevent him from limiting debt repayment on income-driven repayment plans to 1% of income over $1,000,000 for 1 year only, with all remaining debt—typically 100%—cancelled by the federal government.

81.     The Final Rule brushes off comments that the proposed program was a matter of economic significance that did not have clear Congressional authorization by stating that there is not anything "unprecedented or novel about the Department relying on section 455 of the HEA as statutory authority for designing and administering repayment plans based on income." 88 Fed. Reg. 43,830.

82.     But by the Department's own estimates, the Final Rule would abolish over one hundred billion dollars in student debt—something that is incontestably "unprecedented [and] novel"—save for the first debt cancellation invalidated by the Supreme Court in *Biden v. Nebraska.*

83.     There was no legitimate discussion on the part of Defendants about whether the Final Rule was an issue of economic or political significance that required clear Congressional authorization.

84.     The Final Rule estimates that the cost of the program would be $156 billion[11] across the span of ten years. 88 Fed. Reg. 43,820.  As with the proposed rule, this presumed a

---

[11] Although the final rule increased the cost estimate, that increase was due to factors other than the debt forgiveness struck down in *Biden v. Nebraska.*

baseline with $430 billion of debt already being eliminated.  But that did not happen as a result of *Biden v. Nebraska*.  *Id.*

85.     The Final Rule never updated the cost based on *Biden v. Nebraska*, even though it came out ten days later than the Supreme Court decision.  As a result, no one knows the true cost of the program.

**E.     The Final Rule Irreparably Harms Plaintiffs**

86.     The Final Rule irreparably harms Plaintiffs in several independent ways.

87.     The Final Rule will cause financial harm for Plaintiff States including Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah through loss of state tax revenue.

88.     Student loan forgiveness under income-driven repayment plans (other than public service loan forgiveness) is normally considered taxable income for federal purposes.

89.     The American Rescue Plan Act of 2021 contained a provision that made all student loan forgiveness, regardless of the program, not count toward the federal definition of taxable income until December 31, 2025.

90.     Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah automatically base their definition of taxable income on the federal definition of income or adjusted gross income from the Internal Revenue Code, as amended.  The States automatically update their definitions of taxable income to reflect changes in federal law.

91.     As a result of the Final Rule, Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah cannot count forgiveness of loans under income-driven repayment plans as taxable income for state tax purposes until December 31, 2025.

92.     The Final Rule accelerates the timeline for cancelation on income-driven repayment plans to as low as 10 years for certain loan balances.

93.     Under the prior Final Rule, these loans would not be forgiven for twenty to twenty-five years.

94.     Under the pre-Final Rule plans, the Government Accountability Office (GAO) estimates that by 2030, "about 1.5 million loans held by about 600,000 borrowers" would be eligible for loan cancellation.[12]  Of those loans, roughly 1.2 million would be canceled between 2026 and 2030.[13]

95.     Thus, but for the Final Rule, significant amounts of federal loan cancellation would occur *after* December 31, 2025 for residents of the Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina and Utah. This would result in taxable income being recognized from the loan cancelation and thus payment of income taxes to Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah.

96.     The challenged Final Rule, however, will reduce income tax revenue by decreasing the amount of outstanding student loan debt.  It does so because one of its effects is to shift forward some debt forgiveness that would otherwise occur in a period in which it would be taxable income (*i.e.*, December 31, 2025 and on) into a period where it is not taxable (*i.e.*, 2024-25).  As a result, the Defendants' actions will cost Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah tax revenue.

---

[12] U.S. Gov't Accountability Office, GAO-22-103720, Federal Student Aid: Education Needs to Take Steps to Ensure Eligible Loans Receive Income-Driven Repayment Forgiveness 15 (2022), https://tinyurl.com/bdhzca8z.
[13] *See id.* at 16 fig. 3.

97.     In fact, Defendants' representatives publicly announced, "In Kansas, nearly 1,300 borrowers have already received $9.9 million in debt relief under the Biden-Harris Administration's SAVE plan."[14]  Plaintiff Kansas cannot collect income taxes on any of this $9.9 million.  Most of this amount would not have been forgiven prior to January 1, 2026.

98.     Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah have no option to avoid harm from the Final Rule.  Even if they were to break their linkage to the federal definition of income and separately tax student debt cancellation for 2024 and 2025, they would incur significant administrative costs as a result.  At a bare minimum, these States would have to expend sums to amend all of their tax forms—since they could no longer simply use federal income as the starting point.  These States likely would also have to promulgate guidance and expend sums enforcing the new requirements, which would likely confuse their taxpayers (who are otherwise used to having their state income taxes based on their federal income).

99.     More fundamentally, a Final-Rule-induced divorce from the federal definition of income is likely to cause significant and costly administrative complexity and confusion. There is a reason that the *vast* majority of States with income taxes conform to the federal definition of income.  *See* Tax Policy Center, *Tax Policy Center Briefing Book: State and Local Tax Policies* (Jan. 2024) *available at* https://www.taxpolicycenter.org/briefing-book/how-do-state-individual-income-taxes-conform-federal-income-taxes.  There are enormous economies and efficiencies to be had from such conformity.  That is why so many States follow the federal definition income.

---

[14] Haisten Willis, *Kansas Attorney General Will Sue Biden Administration Over Student Loans*, Washington Examiner, Mar. 27, 2024, https://www.washingtonexaminer.com/news/white-house/2942016/kansas-attorney-general-will-sue-biden-administration-over-student-loans/.

100.    Nor does that conformity to the federal definition of income have anything to do with taxation of student debt cancellation.  Each of Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah adopted their conformation policies for reasons other than taxation relating to student debt.

101.    If the States are forced to break their linkage to the federal definition of income, they will lose the efficiency and economic benefits that have long been a mainstay of state tax policy.  Such losses of efficiency and economic benefits is cognizable injury.

102.    If the Final Rule were to coerce States into changing their income tax systems to avoid harms from that Rule, that would also inflict sovereign injury: States have "sovereign power . . . to create and enforce a legal code."  *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 601 (1982).  Coercing States to adopting different laws other than their actual preferences, solely to avoid injuries inflicted upon them by unlawful federal regulations, thus inflicts sovereign injuries upon the States.

103.    In addition to loss of tax revenue, the Final Rule harms Plaintiffs' ability to recruit and retain talent, including legal talent in state attorney general offices.  State agencies typically cannot pay as much to recruit and retain talent as private sector employers.  One of the benefits they rely on to attract and maintain talent is the PSLF program established in the HEA.

104.    For example, the Kansas Office of the Attorney General ("OAG") and other Kansas state agencies rely upon the availability of other student debt forgiveness programs to recruit legal talent.  Indeed, they currently have many employees eligible for relief under the PSLF program for undergraduate and graduate student loans.

105.    South Carolina schools also rely on the PSLF program to aid with recruitment and retention of teachers.  According to the South Carolina Department of Education, "[t]he issue of

loan forgiveness directly relates to the issue of salary, as teachers report they often do not make enough money to afford monthly student loan payments upon graduation forcing them to pursue careers outside of education. . . . Our ability to recruit future educators to the field of education, specifically public education, is dependent upon financial support of pre-service candidates interested in entering the field."  S.C. DEPARTMENT OF EDUCATION, *Teacher Recruitment and Retention Task Force Recommendations*, at 11, May 2023 (https://ed.sc.gov/newsroom/teacher-recruitment-and-retention-task-force-recommendations/).

106.    South Carolina struggles with a growing teacher shortage.  At the start of the 2022-2023 school year, there were 1,474 vacant teaching positions, a 39% increase in vacancies over the previous year.  *Id.* at 2.  That same year, 6,134 teachers left the profession, up from 5,359 the previous year.  *Id.*  Recruiting and retaining talent is difficult enough; removing the incentive of PSLF would strike another crushing blow to the South Carolina public education system.

107.    Similarly, the Alaska Attorney General's office relies on the PSLF Program as a tool for recruiting and retaining employees.

108.    Put simply, the value of the PSLF Program as a recruiting and retention tool is directly proportional to the amount of student debt that a current or potential employee holds: *i.e.*, the more debt that can be forgiven under the PSLF Program, the more powerful of an inducement it is. Conversely, if the amount of student debt held by current and potential employees decreases, the relative attractiveness of public employment for the Plaintiff States decreases.

109.    These premises flow from rudimentary economic principles of supply-and-demand and incentives. The inducement of the PSLF Program is cancellation of all remaining

student debt. Thus: less debt equals less incentive to accept a job with the States or continue to work for them.

110.     By unilaterally writing off enormous amounts of debts—including student debt that is disproportionately held by law school graduates and other prospective State employees—the Final Rule harms the state's ability to recruit talent, and directly makes it less lucrative for current and prospective employees to work for the state.  *See*, *e.g.*, *Louisiana Energy & Power Auth. V. Fed. Energy Regul. Comm'n*, 141 F.3d 364, 367 (D.C. Cir. 1998) (A party "suffer[s] injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition" against them.").

111.     Similarly, other Plaintiff States rely on the availability of loan forgiveness under the PSLF program to recruit and retain employees.  The Final Rule harms them by reducing the attractiveness of that incentive to work for Plaintiff States.

112.     During the early roll out phase of the Final Rule, hundreds of thousands of borrowers who had loan balances below a certain amount after ten years had their loans retroactively forgiven even if they never performed public service.

113.     Once the Final Rule takes effect, additional individuals who have $12,000 or less in loans will have them forgiven after ten years of repayment—the same amount of time required for public service loan forgiveness.

114.     Once the Final Rule takes effect, most individuals on an income-driven repayment plan will have monthly payments that equal $0 per month.  As a result, they would receive less benefit from the PSLF Program, which makes working for state agencies less attractive.  Many will therefore leave their jobs with agencies of the Plaintiff States because one of the primary financial benefits for them to remain will have been eliminated by the Final Rule.

115.     Therefore, state and local government employers in Plaintiff States will be harmed in their ability to recruit and retain talent.

116.     Plaintiff States also have state instrumentalities or quasi instrumentalities that (1) provide student loans to residents of the state, (2) hold loans issued under the Federal Family Education Loan Program ("FFELP loans"), and/or (3) service student debt taken out by residents, former residents, and out-of-state students.

117.     These entities derive income from their loan portfolios, such as through collecting interest owed or service fees.

118.     That income is typically either provided directly to their respective States or spent on items for which the State would otherwise have to expend its own funds.

119.     The amount of income thus collected is directly proportional to the size of the debt portfolio: *i.e.*, decreasing the size of the portfolio will decrease the income collected by the instrumentalities/quasi-instrumentalities.

120.     The Final Rule is virtually certain to decrease the size of these student-debt portfolios by inducing individuals to consolidate their FFELP loans into direct federal loans in order to take advantage of the extraordinary (and unlawful) generosity of the Final Rule. The Final Rule itself predicts as much and further sought to make such consolidation more attractive by providing "more clarity" that borrowers "retain the borrower's progress toward forgiveness when they consolidate Direct or FFEL Program Loans into a Direct Consolidation Loan," 88 Fed. Reg. at 43,865.

121.     South Carolina has one such affected entity, the State Education Assistance Authority ("SEAA"), which is a "public instrumentality of the State."  S.C. Code Ann. § 59-115-40.  "[T]he exercise by the authority of any power" conferred by the State is "deemed and held to

be the performance of an essential public function." *Id.* SEAA, in turn, relies on the South Carolina Student Loan Corporation ("SCSLC") to service its FFELP loan portfolio.

122.     Already, since 2011, SEAA's portfolio has decreased from approximately $31.3 million to $6.4 million, which has reduced the amount of income generated for South Carolina's benefit from approximately $1.173 million to around $433,000. The Final Rule will further decrease the size of SEAA's portfolio as borrowers convert FFELP loans to take advantage of available debt forgiveness. This, in turn, will result in additional losses of revenue to South Carolina, thereby causing cognizable injury and irreparable harm.

123.     Similarly, Alaska has the Alaska Student Loan Corporation ("ASLC") that performs a similar role. ASLC is a public corporation and enterprise instrumentality of the State of Alaska that was created by statute. *See* Alaska Stat. § 14.42.100. It is run by a Board of Directors, each of whom is appointed by the Governor of Alaska. *Id.* § 14.42.120.

124.     As of March 2024, ASLC owns over $16.8 million in Federal Family Education Loan Program (FFELP) loans. Through these loans, ASLC collects $1.9 million in interest and other FFELP portfolio income annually.

125.     The Final Rule will cause Alaska to lose significant revenues.

126.     ASLC estimates that the Final Rule will result in ASLC losing approximately $100,000 over just the next two years that it would otherwise collect as a FFELP loan holder.

127.     Texas also has a student debt servicing public entity, the Texas Higher Education Coordinating Board ("THECB").

128.     The THECB is an agency of the State of Texas and was created by statute. *See* Tex. Educ. Code. § 61.021.

129.     THECB is run by a nine-member governing board, each of whom are appointed by the Governor of Texas with the advice and consent of the Senate of Texas.

130.     As of May 1, 2024, THECB owns over $1,1295,236 in FFELP loans. Through these loans, THECB collected $114,479 in interest in 2023.

131.     If the Final Rule were to decrease the size of that student debt portfolio, the amount of income that the THECB would collect would decrease.

132.     As set forth above, the Final Rule will cause such a decrease, thereby decreasing the income collected by the THECB, and causing harm to Texas.

## CLAIMS FOR RELIEF

### COUNT I
**Agency Action in Excess of Statutory Jurisdiction and in Violation of the Separation of Powers**
**U.S. Const. art. I, § 1**

133.     Paragraphs 1–132 are realleged as if fully set out herein.

134.     The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).

135.     The Final Rule is final agency action subject to judicial review.  *Id*. § 704.

136.     The Final Rule is a "rule[]" under the APA.  *Id*. § 701(b)(2).

137.     The Department is an "agency" under the APA.  *Id*. § 701(b)(1).

138.     Separation-of-powers principles prohibit an agency from deciding questions of great economic or political significance, or issues traditionally governed by state or local law,

absent clear authorization from Congress to do so.  *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (discussing the "major questions" doctrine).

139.     The major questions doctrine is triggered when an agency invokes broad authority over matters of great economic and political significance.  *See id.* at 721-22.

140.     The Rule triggers the doctrine because forgiving hundreds of billions of dollars in student loans for thousands of borrowers is an issue of vast political significance.  *Biden*, 143 S. Ct. at 2375 (2023).

141.     The Final Rule also invokes the major questions doctrine because the cost of the program makes it an issue of vast economic significance.  When all of the aspects of the Final Rule are taken together, the average undergraduate borrower repays only $6,121 for every $10,000 borrowed.  88 Fed. Reg. 43,880.

142.     In practice, this has created a situation where 4.3 million out of 7.8 million borrowers under the income-driven repayment plan from the Final Rule have a monthly payment of $0 on their loans.  Their loans are completely forgiven.

143.     This results in a price tag of $156 billion according to the Final Rule.  However, this number came with a baseline assumption that $430 billion of student loan debt at issue in *Biden v. Nebraska* would already be forgiven.  It was not.  As a result, the actual cost of the program is much higher.

144.     The Final Rule violates the major questions doctrine because questions regarding the nature and scope of student loan forgiveness are issues of vast political significance subject to earnest and profound debate across the country.

145.    Departure from longstanding practice without new authorization from Congress is strong evidence the agency is acting without Congressional authorization.  *See Nat'l Fed'n Indp. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022) [hereinafter *NFIB*].

146.    The Final Rule also departs from Defendants' nearly thirty-year definition of "income contingent repayment plan" by effectively turning a repayment plan into an outright grant in the form of loan forgiveness without new authorization from Congress.

147.    In fact, nothing in the HEA or any of its amendments gives Defendants the authority to turn the terms of income-driven loan repayment into a grant.

148.    Nothing in the HEA nor its amendments gives Defendants the authorization to spend significantly more than $156 billion.

149.    As noted in *Biden*, the HEA does give Defendants express authorization to forgive loans in four other instances: (1) loans held by public servants, *see* 20 U.S.C. §§ 1078–10, 1087j, 1087ee, (2) borrowers who have become "permanently and totally" disabled, *id.* § 1087(a)(1), (3) borrowers who are bankrupt, *id.* § 1087(b), and (4) borrowers whose schools falsely certify them, close down, or fail to pay lenders, *id.* § 1087(c).  143 S. Ct. at 2363.

150.    That Defendants chose to rely on a completely different provision, 20 U.S.C. §§ 1087e(d) and (e)), strongly suggests Congress did not authorize this action.  Congress does not "hide elephants in mouseholes," *Witman v. American Trucking Ass'n*, 531 U.S. 457, 468 (2001), or authorize by implication where it has does so expressly elsewhere.

151.    Even if the Final Rule did not implicate the major questions doctrine, it would still violate the separation of powers.  Congress only gave the Department authority to cancel student loans in some very limited scenarios.  *See Biden*, 143 S. Ct. at 2362-63.

152.    And while Congress is no doubt aware of the issue, it has chosen not to rewrite the HEA by adding a new category of loan forgiveness as the Department has unilaterally done. By doing so unilaterally, Defendants have "seiz[ed]he power of the Legislature." *Id.* at 2373.

153.    Members of Congress have introduced legislation that would accomplish this or similar goals, *see, e.g.*, S.3953 (2022); H.R. 3027 (2019), but Congress has chosen not to enact such legislation.

154.    The Department therefore has no authorization to forgive student loans in this context, and the Department exceeded its authority when it issued the Final Rule. Because the Final Rule violates the separation of powers, it should be set aside.

## COUNT II
### Agency Action That Is In Excess of Statutory Authority
### 5 U.S.C. § 706

155.    Paragraphs 1–132 are realleged as if fully set forth herein.

156.    The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) . . . not in accordance with law; . . . [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

157.    The Final Rule is contrary to law and exceeds the Department's statutory authority.

158.    The HEA and its amendments separate grants and loans into separate chapters. The income-driven repayment plan is in the chapter that addresses loans and by its nature anticipates actual ***repayment*** of the principal borrowed.

159.    Defendants have some discretion in setting the terms of loan repayment under the statute, and there are circumstances where someone on this program would pay less than they would otherwise owe. However, the broad nature of Defendants' actions in the Final Rule make it so that the average undergraduate borrower only repays $6,121 for every $10,000 borrowed.

160.    At this point, the loan becomes at least a partial grant because, rather than paying back loans with interest, most borrowers will pay back significantly less than the principal they borrowed.

161.    Congress already spoke in a separate chapter of the HEA and its amendments about what qualifies as a grant.  There is no authority for the proposition that Congress intended to turn the terms of a loan into an outright grant.

162.    The HEA also states that the standard term of loan repayment is ten years or less. The statute that authorizes income-driven repayment requires payment over an ***extended*** period of time.  20 U.S.C. § 1087e(d)(1)(D).  However, the Final Rule allows borrowers with loans balances of $12,000 or less to have their loans canceled after only ten years.

163.    This erases any meaningful difference between a standard repayment plan and an extended repayment plan because an extended repayment plan necessarily envisions a longer repayment period than the standard repayment plan.

164.    Because the Final Rule conflicts with what Congress explicitly spoke on in the HEA, it should be set aside.

165.    Furthermore, Congress already defined the terms of repayment for someone facing a partial financial hardship as payments capped at 10% of income above 150% of the federal poverty line.

166.    The Final Rule caps undergraduate payments at 5% of income above 225% of the federal poverty line.  No authority suggests that Congress intended most borrowers have a plan more generous than those who are experiencing a partial financial hardship.

167.    By setting the applicable income thresholds for financial hardship itself, Congress precluded Defendants from adopting their own more-generous thresholds.

168.     Congress has already given Defendants very limited ability to "waive" loans with regard to FFEL loans.  *See* 20 U.S.C. § 1082(a)(6).  This provision shows the limits of what Congress authorized the Secretary to do with respect to "waiving" student loans.  Defendants disclaimed reliance on this provision.  88 Fed. Reg. 43,834.  By cancelling loan debt on a mass basis through the income-driven loan repayment plan, Defendants are sidestepping those limits and flouting their statutory authority.

169.     Finally, Congress only provided one avenue where a borrower can receive loan forgiveness after ten years of repayment.  That is through the PSLF program.  CITE.

170.     Debates surrounding the bill that authorized public service loan forgiveness emphasized the importance of forgiving loans through this program because of the need to gear specific relief for those who pursue a career in public service.

171.     This Final Rule provides forgiveness after ten years for anyone who has an original balance of $12,000 or less.  In fact, Defendants have already retroactively forgiven hundreds of thousands of such loans regardless of the amount of interest accumulated on the principal balance.

172.     No authority suggests that anyone—regardless of career, income, or even unemployment—would have the same timeline for loan forgiveness as those who dedicated a decade of their career to public service.

173.     The Final Rule is contrary to the HEA and its amendments.  It should be set aside.

## COUNT III
### Arbitrary and Capricious Agency Action
### 5 U.S.C. § 706

174.     Paragraphs 1–132 are realleged as if fully set forth herein.

175.     The final Rule is arbitrary and capricious for a number of independent reasons. In short, Defendants failed to consider numerous important factors, including the full cost of the rule and important reliance interests.  Despite being aware of the shortcomings, Defendants declined to address them in the Final Rule or provided wholly inadequate explanations, brushing off concerns.  Elsewhere, the Final Rule's explanation is internally inconsistent.

176.     The Final Rule is arbitrary and capricious in that it fails to capture, account for, or report the full cost.  The Proposed Rule estimated it would cost $137.9 billion.  This estimate was increased to $156 billion in the Final Rule.

177.     This is without a doubt a severe underestimation.  The Final Rule states that the baseline used to compute this number included an assumption that $430 billion in student loans that were at issue in *Biden v. Nebraska* would be forgiven.  That was not the case.

178.     The reality is that no one, including Defendants calculated the true cost of the program, but they pushed it through anyway.

179.     The Final Rule was released 10 days after the decision in *Biden v. Nebraska* was issued.  Defendants knew or should have known prior to the Final Rule being released that their estimates were way off.  In fact, at least one commenter warned them about it.

180.     Defendants themselves noted, "One commenter expressed concern with our cost estimates, which account for the Administration's one-time debt relief plan to forgive $20,000 for Pell Grant eligible borrowers and $10,000 for other borrowers.  This issue remains before the Supreme Court.  The commenter suggests that we should produce a secondary cost estimate in the event that the loan cancellation plan does not go into effect."  88 Fed. Reg. 48,375.

181.     The CBO also warned of this issue.

182.    Instead of heeding that warning, Defendants cavalierly responded, "the Department is confident in our authority to pursue debt relief and is awaiting the Supreme Court's ruling on the issue." *Id.* This was, again, 10 days **after** the Court in *Biden v. Nebraska* had already informed Defendants that their confidence in their authority to pursue debt relief was misplaced.

183.    Ultimately, Defendants made no change to their estimates despite having ample warning that their estimates were off by a wide margin. *Id.*

184.    This is a violation of Defendants' statutory duty to "reasonably explain" the Rule, including by responding "significant points" raised by the comments. *See Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 343-344 (D.C. Cir. 2019). The Rule's estimate was just wrong.

185.    The Defendants cost estimate also does not anticipate the increased costs that will come when more borrowers, both present and future, sign up for what is likely to be a very attractive program. This despite expressly noting that future borrowers would be also to take advantage of its terms. 88 Fed. Reg. 43,822–23.

186.    The CBO warned of this as well.

187.    Furthermore, the Final Rule is also arbitrary and capricious because it fails to consider the reliance interests of the Plaintiffs and their entities. *See, e.g., DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1913 (2020) ("When an agency changes course . . . it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" (cleaned up) (citation omitted)).

188.    *First*, the Final Rule did not consider Plaintiff reliance interest on tax revenue from loan forgiveness.

189.     Normally, "forgiveness" through income-driven repayment is considered taxable income by the Internal Revenue service.

190.     Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah follow the federal definitions when defining taxable income tax for state purposes. Therefore, income-driven repayment "forgiveness" is normally taxable income at the state level for these states.

191.     However, the American Rescue Act of 2021 barred states from collecting taxes on any loan forgiveness until December 31, 2025.

192.     Despite being aware of this law, Defendants still unilaterally forgave hundreds of thousands of loans retroactively as they roll out this program.  At least some of those loans would have been forgiven after December 31, 2025, forcing Plaintiff States to lose tax revenue.

193.     The Final Rule ignored this and forgave the loans anyway.

194.     *Second*, the Rule failed to consider the Plaintiffs' reliance interest in using PSLF to recruit talent and remain competitive.  *See XY Plan. Network, LLC v. United States Sec. & Exch. Comm'n*, 963 F.3d 244, 251 (2d Cir. 2020).  State and local government employers cannot pay as much as private sector employers because they are primarily funded by taxpayer dollars and operate on yearly, limited budgets.

195.     One of the tools they rely on to recruit and retain talent is public service loan forgiveness.

196.     This Final Rule eliminates that incentive through a combination of awaiting most borrowers regardless of loan size with $0 monthly payments and awarding anyone with a loan balance of less than $12,000 with loan forgiveness after 10 years, regardless of career choice or unemployment.

197.     Commentators also warned of this issue, but Defendant cavalierly brushed aside concerns despite noting "the benefits discussed in this regulation would also be available to those seeking PSL[F]."  88 Fed. Reg. 43,880.

198.     The Final Rule did not consider the Plaintiffs' reliance interest in this important program and therefore it is arbitrary and capricious.

199.     Furthermore, the Final Rule is also arbitrary and capricious because it changes course from nearly 30 years of Defendants' practice on loan forgiveness.  Never before have the terms of loan repayment been transformed into loan forgiveness so that the average undergraduate borrower repays only $6,121 for every $10,000 borrowed.  These borrowers no longer have to repay the full principal of their debts.  This is a huge change of course.

200.     Defendants have not only changed course without explanation, but also, they are denying they are changing course at all.  They state that they have taken actions similar to this in the past through the PAYE and REPAYE programs and were never challenged on it.

201.     Regardless of the legality of past actions (and the fact that the absence of a challenge does not create legality), their own data demonstrate that this is not true. Prior to this change, the average undergraduate borrower paid more than what they owed.  This is arguably consistent with other loan programs Congress established.  This makes sense because they are loans that collect interest.

202.     This is the first time that loan repayment has reached the level at which the average borrower pays almost 40% less than the principal he borrowed.  This is a huge change of course that Defendants refuse to acknowledge.

203.    In addition, Defendants also changed course on the timing of loan cancelation. Previously, all income-driven loan repayment plans allow cancelation after twenty to twenty-five years.  Only public service loan cancelation had a ten-year repayment timeline.

204.    The Final Rule changes course by allowing anyone with $12,000 or less of an original balance to receive loan forgiveness after ten years.  This is a significant deviation from past practice.

205.    Defendants refuse to acknowledge this change of course and instead claims that always had this authority.

206.    Furthermore, the Final Rule is also arbitrary and capricious because it contains numerous internal contradictions.  For example, the Final Rule repeatedly states that it is designed to avoid delinquencies and defaults.  Defendants believe this is done through offering a more generous income-driven repayment plan.

207.    However, the Final Rule also states that the last change to the income-driven repayment plan that lowered payments for individuals resulted in an increase is delinquencies and defaults.

208.    In addition, the Final Rule acknowledges that the majority of those who default on loans had low original balances.

209.    However, a major portion of the Final Rule provides payments as low as $0 a month for any borrower below a certain income threshold regardless of loan balance.

210.    Furthermore, the Final Rule is also arbitrary and capricious because it failed to consider meaningfully the inflationary effects that the Rule will have, both specifically in the secondary education market and more generally for the entire U.S. economy.  The enormous inflationary pressures are an "important aspect of the problem" that Defendants were obliged to

evaluate. *Michigan v. EPA*, 576 U.S. 743, 750-52 (2015) (cleaned up). They failed to do so and thereby violated the APA.

211.    The Final Rule insists it is not offering a grant but merely reducing defaults.  This is belied by their own data demonstrating that most, under the Final Rule, undergraduate borrowers will pay back significantly less than what they owe, regardless of whether they are suffering financial hardship or are at risk of default.  That is clearly a grant.

212.    This only makes sense when viewed through the lens of Defendants using these justifications as a pretext and post hoc justification for political ends.

213.    This Final Rule is not the product of a well-reasoned decision.  It was a rushed product to evasively do what the Supreme Court already told Defendants they cannot do.

214.    The Final Rule came out ten days after that the Supreme Court in *Biden v. Nebraska* struck down Defendants' last ill-considered attempt at loan forgiveness.  Defendant Biden stated that "the Supreme Court blocked it.  They blocked it.  But that didn't stop [him]." In addition, Defendant Cordona stated in an interview that if this Final Rule was not challenged in court they were not trying hard enough.

215.    For all these reasons, the Final Rule is arbitrary and capricious.

<u>**COUNT IV**</u>
**Agency Action in Violation of APA Procedures**
**5 U.S.C. § 706(2)(D)**

216.    The allegations in Paragraphs 1–132 are reincorporated herein.

217.    The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

218.    The APA requires agencies to publish notice of all "proposed rulemaking" in the Federal Register, *id.* § 553(b), and to "give interested persons an opportunity to participate in the

rule making through submission of written data, views, or arguments," *id.* § 553(c).  The Rule, therefore, only can be issued, if at all, pursuant to notice-and-comment rulemaking under the APA.  5 U.S.C. § 553.

219.   Here, Defendants only permitted 30 days for comments on the proposed rule. This limited time period violated the APA.

220.   The Rule is not an interpretive rule or a  general statement of policy, nor is it a rule of agency organization, procedure, or practice otherwise exempt from notice-and-comment rulemaking.  Rather, the Rule is a substantive rule for APA purposes.  5 U.S.C. § 551(4)–(5). Further, it is a final rule because it represents the culmination of the agency's consideration and affects rights and obligations.

221.   "[A] thirty-day period is, in the Administrative Conference's view, 'an inadequate time to allow people to respond to proposals ***that are complex*** or based on scientific or technical data.'  The Administrative Conference itself thus suggests 'a sixty-day period as a more reasonable ***minimum*** time for comment.'"  *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) (cleaned up) (emphases added).

222.   Executive Orders 12866 and 13563 both state that comment periods should generally be at least 60 days.  *See* 58 Fed. Reg. 51735 (Sept. 30, 1995) ("[E]ach agency should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of ***not less than*** 60 days." (emphasis added)); 76 Fed. Reg. 3821-22 (Jan. 21, 2011) ("To the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be ***at least*** 60 days." (emphasis added)).  The proposed rule asks for the public's help in "complying with the specific

requirements" of these Executive Orders, 88 Fed. Reg. 1,895, then ignores what these orders actually say with respect to the comment period.

223.    For these reasons, most other agencies routinely provide at least a sixty-day comment period for major rules.

224.    Providing only thirty days for commenting on a major rule such as this one is an outlier—and one for which Defendants offered no meaningful explanation.

225.    Here the Final Rule is both complex and enormously impactful—tens or hundreds of billions of dollars turn on each of its major components.

226.    In these circumstances, Defendants violated the APA by providing only thirty days for comment.

227.    This error was prejudicial and denied the public (including Plaintiffs) an adequate opportunity to comment adequately on the proposed rule.

## PRAYER FOR RELIEF AND DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs respectfully request the following relief:

(1)    A declaratory judgment holding the Final Rule unlawful;

(2)    A declaratory judgment holding that Defendants lacked authority to issue the Final Rule;

(3)    A judgment vacating and setting aside the Final Rule;

(4)    A permanent injunction prohibiting Defendants and their officers, agents, servants, employees, attorneys, and any other persons who are in active concert or participation with those individuals from enforcing the Final Rule; and

(5)    An award to Plaintiffs of their reasonable fees, costs, expenses, and disbursements, including attorney's fees, associated with this litigation; and

(6)    Such additional and further relief as the Court may deem just and proper.

Respectfully submitted this the 16th day of May, 2024.

**KRIS W. KOBACH**
**Attorney General of Kansas**

*/s/ Abhishek S. Kambli*
Abhishek S. Kambli, Kan. SC No. 29788
  *Deputy Attorney General*
Erin B. Gaide, Kan. SC No. 29691
  *Assistant Attorney General*
OFFICE OF THE KANSAS
ATTORNEY GENERAL
Memorial Building, 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Fax: (785) 291-3767
Email: abhishek.kambli@ag.ks.gov
          erin.gaide@ag.ks.gov

Drew C. Ensign*
Holtzman Vogel Baran Torchinsky
& Josefiak PLLC
2575 E. Camelback Road, #860
Phoenix, Arizona 85016
Phone: (602) 388-1262
Fax: (540) 341-8809
Email: densign@holtzmanvogel.com

*Counsel for the State of Kansas*

**STEVE MARSHALL**
**Attorney General of Alabama**

*/s/ Edmund LaCour*
Edmund LaCour*
  *Solicitor General*
OFFICE OF THE ALABAMA
ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36104
(334) 353-2196
(334) 353-8400 (fax)
edmund.lacour@alabamaag.gov

*Counsel for Plaintiff State of Alabama*


**TREG TAYLOR**
**Attorney General of Alaska**

*/s/ Bill Milks*
Bill Milks*
  *Chief Assistant Attorney General*
ALASKA DEPARTMENT OF LAW
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
(907) 465-4239
(515) 281-4209 (fax)
bill.milks@alaska.gov

*Counsel for Plaintiff State of Alaska*

**RAÚL LABRADOR**
**Attorney General of Idaho**

*/s/ Joshua Turner*
Joshua Turner*
  *Chief of Constitutional Litigation and
Policy*
700 W. Jefferson St., Suite 210,
PO Box 83720,
Boise, Idaho 83720
(208) 334-2400
josh.turner@ag.idaho.gov


*Counsel for Plaintiff State of Idaho*

**BRENNA BIRD**
**Attorney General of Iowa**

*/s/ Eric H. Wessan*
Eric H. Wessan*
  *Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

**ELIZABETH B. MURRILL**
**Attorney General of Louisiana**

*/s/ J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga*
  *Solicitor General*
OFFICE OF THE LOUISIANA
ATTORNEY GENERAL
1885 North Third Street
Baton Rouge, Louisiana 70804
(225) 506-3746
aguinagab@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

**AUSTIN KNUDSEN**
**Attorney General of Montana**

*/s/ Christian B. Corrigan*
Christian B. Corrigan, Kan. SC No. 25622
  *Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov

*Counsel for Plaintiff State of Montana*

37

**MICHAEL T. HILGERS**
**Attorney General of Nebraska**

/s/ *Lincoln J. Korell*
Lincoln J. Korell*
  *Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
OF NEBRASKA
2115 State Capitol
Lincoln, Nebraska 68509
(402) 471-2682
lincoln.korell@nebraska.gov

*Counsel for Plaintiff State of Nebraska*


**ALAN WILSON**
**Attorney General of South Carolina**

/s/ *Joseph D. Spate*
Joseph D. Spate*
  *Assistant Deputy Solicitor General*
1000 Assembly Street
Columbia, South Carolina 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for Plaintiff State of South Carolina*


**KEN PAXTON**
**Attorney General of Texas**
BRENT WEBSTER
First Assistant
Attorney General of Texas
RALPH MOLINA
Deputy Attorney General
for Legal Strategy

/s/ *Charles K. Eldred*
Charles K. Eldred*
  *Chief, Legal Strategy Division*
PO Box 12548
Austin, Texas 78711-2548
(512) 463-2100
charles.eldred@oag.texas.gov

*Counsel for Plaintiff State of Texas*


**SEAN REYES**
**Attorney General of Utah**

/s/ *Lance F. Sorenson*
Lance F. Sorenson*
  *Assistant Utah Attorney General*
UTAH ATTORNEY GENERAL
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114
(801) 366-0100
lancesorenson@agutah.gov

*Counsel for Plaintiff State of Utah*


*\*Pro hac vice*

38

# EXHIBIT E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## WICHITA DIVISION

| | |
|---|---|
| STATE OF KANSAS,<br>STATE OF ALABAMA,<br>STATE OF ALASKA,<br>STATE OF IDAHO,<br>STATE OF IOWA,<br>STATE OF LOUISIANA,<br>STATE OF MONTANA,<br>STATE OF NEBRASKA,<br>STATE OF SOUTH CAROLINA,<br>STATE OF TEXAS,<br>STATE OF UTAH,<br><br>*Plaintiffs*,<br><br>v.<br><br>JOSEPH R. BIDEN IN HIS OFFICIAL<br>CAPACITY AS PRESIDENT OF THE<br>UNITED STATES, MIGUES CARDONA IN<br>HIS OFFICIAL CAPACITY AS SECRETARY<br>OF EDUCATION, UNITED STATES<br>DEPARTMENT OF EDUCATION,<br><br>*Defendants*. | C/A No. 6:24-cv-01057 |

## DECLARATION OF JOSEPH D. SPATE

I, Joseph D. Spate, hereby declare and state under penalty of perjury that the following is

true and correct to the best of my knowledge:

1. My name is Joseph D. Spate, and my business address is 1000 Assembly Street, Columbia,

   SC 29201. I am over the age of eighteen, have personal knowledge of the subject matter,

   and am competent to testify concerning the matters in this declaration.

1

2. I have served as Assistant Deputy Solicitor General with the Office of the South Carolina Attorney General since May 2023. I am licensed to practice law in the state of South Carolina and various federal courts.

3. I am submitting this declaration in reference to Plaintiffs' Motion for Preliminary Injunction as to a final rule published by the U.S. Department of Education on July 10, 2023, entitled "Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program," 88 Fed. Reg. 43,820 (Jul. 10, 2023) (Final Rule).

4. On April 19, 2024, I received an email from David A. "Trey" Simon, III, President and CEO of the South Carolina Student Loan Corporation, with the following subject line: "Requested information for the State Education Assistance Authority." Exhibit 1 to this declaration is a true and correct copy of that email.

5. The aforementioned email from Mr. Simon included a letter attachment entitled "Response to SC Attorney General on SEAA - 4-19-24," dated April 19, 2024, and bearing Mr. Simon's signature. Exhibit 2 to this declaration is a true and correct copy of that letter.

6. This the 8th day of May, 2024.

Joseph D. Spate
Assistant Deputy Solicitor General
Office of the South Carolina Attorney General

2

# EXHIBIT 1

**From:**         Trey Simon <TSimon@scstudentloan.org>
**Sent:**         Friday, April 19, 2024 1:21 PM
**To:**         Joseph Spate; Ray Jones; Macdonald, Robert; Chris Majure (Chris.Majure@sto.sc.gov)
**Cc:**         Thomas Hydrick
**Subject:**         Requested information for the State Education Assistance Authority
**Attachments:**         Response to SC Attorney General on SEAA - 4-19-24.pdf

Joseph,

Please find the information requested by the State Education Assistance Authority attached.

Please let us know if you have any questions.

Have a great weekend.

Thank you,



**Trey Simon**
President and CEO

---

 (803) 612-5052 (O) (931) 200-3827 (M)

 tsimon@scstudentloan.org

 scstudentloan.org

📍 1901 Main Street, Suite 400, Columbia, SC 29201

This e-mail, and any documents, files, or previous e-mail messages attached to it, may contain confidential, proprietary, or legally privileged information. If you are not the intended recipient, any dissemination, distribution, or copying of this e-mail or its attachments is strictly prohibited. If you have received this in error, please notify the sender by e-mail immediately and destroy the original e-mail and any attachments.

# EXHIBIT 2



SOUTH CAROLINA

(800) 347-2752

1901 Main Street
Suite 400
Columbia, SC 29201

April 19, 2024

Dear Mr. Spate:

In response to your request, we are providing the information below regarding the State Education Assistance Authority (SEAA). As we have discussed, South Carolina Student Loan Corporation (SCSLC) is a private nonprofit corporation organized under the laws of the State of South Carolina. SCSLC performs certain administrative functions on a contractual basis for SEAA, including acting as the servicing agent for SEAA's loan portfolio. SCSLC is providing the data as requested below regarding the federal loan portfolio that is wholly owned by SEAA.

The Federal Family Education Loan Program, FFELP, was a federal student loan program that offered federally-backed loans funded by private companies. FFELP ended with the 2009-2010 academic year to make way for direct loans, which are loans provided directly by the federal government to students. Although no new FFELP loans are offered to students, FFELP loans that existed prior to the 2009-2010 academic year with unpaid balances are still held by certain lenders.

SEAA is empowered by statute to "make," "insure," and "guarantee student loans under such terms and conditions as [SEAA] shall from time to time prescribe . . . ." SEAA is further empowered by statute "[t]o develop and administer all programs and to perform all functions necessary or convenient to promote and facilitate the making, guaranteeing and insuring of student loans and to provide such other student loan assistance and services."

As requested, please find the following data regarding SEAA's FFELP loan portfolio:

**History of SEAA's FFELP portfolio from 2010 to present:**

| Month End | Principal Balance |
| --- | --- |
| 6/30/2011 | $31,324,566.17 |
| 6/30/2012 | 29,589,044.81 |
| 6/30/2013 | 26,776,811.11 |
| 6/30/2014 | 24,974,750.48 |
| 6/30/2015 | 22,797,591.92 |
| 6/30/2016 | 20,975,542.24 |
| 6/30/2017 | 19,218,505.43 |
| 6/30/2018 | 16,654,982.40 |
| 6/30/2019 | 15,026,548.26 |
| 6/30/2020 | 12,872,804.70 |
| 6/30/2021 | 11,889,724.29 |
| 6/30/2022 | 10,771,880.55 |
| 6/30/2023 | 8,059,252.66 |
| 3/31/2024 | 6,423,362.52 |

**Proportion of SEAA's FFELP loans that were consolidated versus paid down**

| Period | Consolidation Payment | Other Principal Payments |
| --- | --- | --- |
| 7/1/2010 - 6/30/2011 | -$1,019,123.26 | -$814,057.50 |
| 7/1/2011 - 6/30/2012 | -1,076,871.56 | -$658,649.80 |
| 7/1/2012 - 6/30/2013 | -1,365,846.14 | -$1,446,387.56 |
| 7/1/2013 - 6/30/2014 | -590,101.34 | -$1,211,959.29 |
| 7/1/2014 - 6/30/2015 | -1,231,047.88 | -$946,110.68 |
| 7/1/2015 - 6/30/2016 | -909,836.74 | -$912,212.94 |
| 7/1/2016 - 6/30/2017 | -1,081,806.83 | -$675,229.98 |
| 7/1/2017 - 6/30/2018 | -1,064,526.12 | -$1,498,996.91 |
| 7/1/2018 - 6/30/2019 | -415,796.86 | -$1,212,637.28 |
| 7/1/2019 - 6/30/2020 | -622,083.17 | -$1,531,660.39 |
| 7/1/2020 - 6/30/2021 | -174,407.04 | -$808,673.37 |
| 7/1/2021 - 6/30/2022 | -954,393.67 | -$1,320,063.19 |
| 7/1/2022 - 6/30/2023 | -2,112,224.90 | -$600,402.99 |
| 7/1/2023 - 3/31/2024 | -1,111,945.46 | -$523,944.68 |

**Interest revenue generated by SEAA's FFELP loans per year**

| Period | Total Interest Revenue |
|---|---|
| 7/1/2010 - 6/30/2011 | $1,172,811.00 |
| 7/1/2011 - 6/30/2012 | $764,676.00 |
| 7/1/2012 - 6/30/2013 | $692,306.00 |
| 7/1/2013 - 6/30/2014 | $630,738.00 |
| 7/1/2014 - 6/30/2015 | $585,056.00 |
| 7/1/2015 - 6/30/2016 | $572,691.00 |
| 7/1/2016 - 6/30/2017 | $595,654.00 |
| 7/1/2017 - 6/30/2018 | $689,735.00 |
| 7/1/2018 - 6/30/2019 | $756,432.00 |
| 7/1/2019 - 6/30/2020 | $529,763.00 |
| 7/1/2020 - 6/30/2021 | $301,659.00 |
| 7/1/2021 - 6/30/2022 | $303,673.00 |
| 7/1/2022 - 6/30/2023 | $575,359.00 |
| 7/1/2023 - 3/31/2024 * | $432,455.00 |

*Total includes draft interest revenue through 3/31/24. Annual interest revenue will be calculated and audited after 6/2024.

Should you have any further questions concerning the data presented above, please feel free to contact SCSLC directly as the acting servicing agent for SEAA.

David A. Simon III

President and CEO
SC Student Loan

# EXHIBIT F

## DECLARATION OF SARAH KEYTON

I, Sarah Keyton, declare:

1. I am over the age of 18, of sound mind, competent to testify, and have personal knowledge of the facts stated herein, except where stated on information and belief.

2. I am employed as the Deputy Commissioner for Administration at the Texas Higher Education Coordinating Board (THECB). I have been employed by THECB for two years. As part of my role, I have oversight responsibilities for the agency division that administers student financial aid funds and the agency finance division.

   THECB is an agency of the State of Texas and was created by statute. Tex. Educ. Code. § 61.021. THECB is run by a nine-member governing board, each of whom are appointed by the Governor of Texas with the advice and consent of the Senate of Texas.

3. As of May 1, 2024, THECB owns over $1,1295,236 in Federal Family Education Loan Program ("FFELP") loans. Through these loans, THECB collected $114,479 in interest in 2023.

4. To the extent that federal policy results in borrowers consolidating their loans out of FFELP into the Direct Loan Program, those consolidations will cause the State of Texas to lose revenue. Upon consolidation, the federal government compensates the holder (THECB) only for principal and accrued interest. Thus, such consolidations will result in reduced revenue THECB and therefore the State of Texas. The THECB would no longer collect interest on FFELP loans that have been consolidated, diminishing the value of its portfolio.

5. The SAVE Plan could cause pecuniary harm to the State of Texas and THECB measured by a reduction in revenue to the State's FFELP program.

   I declare under penalty of perjury under laws of the United States, 28 U.S.C. § 1746, that the foregoing statements are true and correct.

Signed this 10th day of May 2024.

Sarah Keyton

# EXHIBIT G

### Declaration of Sana Efird in Support of Plaintiffs' Motion for a Preliminary Injunction and in Opposition to Defendants' Motion to Dismiss

1.        My name is Sana Efird. I am over 21 years of age, of sound mind, and competent to testify. Unless otherwise stated, I have personal knowledge of the facts stated in this declaration.

2.        From December 2021 to the present, I have been an employee of Alaska Commission on Postsecondary Education and the Alaska Student Loan Corporation (ASLC).

3.        ASLC is a public corporation and enterprise instrumentality of the State of Alaska that was created by statute. ALASKA STAT. § 14.42.100. It is run by a Board of Directors, each of whom is appointed by the Governor of Alaska. ALASKA STAT. § 14.42.120. ASLC has the authority to adopt regulations to carry out its mission, which carry the force of law. ALASKA STAT. § 14.42.200.

4.        Since 2012, ASLC has administered $113.0 million in funding for college scholarships, and since 2005, ASLC has administered $72.9 million in funding for college needs-based grants in the State of Alaska.

5.        As of March 2024, ASLC owns over $16.8 million in Federal Family Education Loan Program (FFELP) loans. Through these loans, ASLC collects $1.9 million in interest and other FFELP portfolio income annually.

6.        The SAVE Plan entices borrowers to consolidate their loans away from FFELP and into the Direct Loan Program (DLP), comprising loans held by the federal government. Three features of the SAVE Plan are enticing borrowers to consolidate their loans away from FFELP and into DLP. First, the SAVE Plan offers benefits—including payments being capped at 5% of the borrower's discretionary income, residual interest being waived each month that the borrower makes a qualifying payment, and full forgiveness being offered in as few as ten years—to only borrowers with loans held by the federal government. Because these benefits are not available to borrowers with commercially-held FFELP loans, borrowers are rapidly consolidating their loans away from FFELP loans held by ASLC and into Direct Loans held by the federal government.

7.        Second, the SAVE Plan is refusing to treat consolidated loans as new loans,

1

meaning borrowers maintain their accrued repayment history when they consolidate. Under all prior regimes, borrowers' repayment clocks would restart, providing a disincentive to consolidation.

8.      Third, the federal government is actively advertising and encouraging borrowers to consolidate their loans into federal loans, including borrowers ineligible for consolidation into the direct loan program such as borrowers in good standing who only possess a FFELP consolidated loan. Given this three-part scheme, the federal government is strongly, and likely unlawfully, incentivizing borrowers to consolidate their loans away from FFELP and into loans held by the federal government.

9.      These consolidations will cause Alaska to lose significant revenues. Upon consolidation, the federal government compensates the holder (ASLC) only for principal and accrued interest. Thus, the enticed consolidation has already harmed and will continue to harm ASLC, as ASLC no longer collects interest on FFELP loans that have been consolidated, diminishing the value of its portfolio.

10.     Prior to the announcement of the SAVE Plan, the paydown rate for ASLC's FFELP portfolio for fiscal year 2023 was 27%.  After the announcement of the SAVE Plan that became effective July 2023, that annualized percentage for fiscal year 2024 is 21%.

11.     In total, ASLC estimates that the SAVE Plan will result in ASLC losing approximately $100,000 over just the next two years that it would otherwise collect as a FFELP holder.

12.     Because the State of Alaska relies on revenue from ASLC to support programs such as Alaska Education Loans, Alaska Performance Scholarship, Alaska Education Grant, WWAMI Medical Education Program and FAFSA completion and outreach resources to support Alaskans enrollment in higher education programs, ASLC's loss in revenue would directly harm Alaska's ability to fund and administer these programs.

13.     The SAVE Plan, then, directly harms both the State of Alaska and ASLC.

I declare under penalty of perjury under laws of the United States, 28 U.S.C. § 1746, that the foregoing statements are true and correct.

Signed this 10th day of May 2024.

Sana Efird
Executive Officer
Alaska Student Loan Corporation