# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

———————————————

STATE OF ALASKA, et al.,

*Plaintiffs-Appellees*,

v.

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

*Defendants-Appellants*.

———————————————

On Appeal from the United States District Court
for the District of Kansas District Court Case
No. 6:24-CV-01057-DDC-ADM

———————————————

# APPELLEES' RESPONSE TO APPELLANTS' EMERGENCY MOTION
# FOR AN IMMEDIATE ADMINISTRATIVE STAY AND A STAY
# PENDING APPEAL

———————————————

ALAN WILSON
*Attorney General of South Carolina*
ABHISHEK S. KAMBLI
*Special Counsel*
*(Counsel of Record)*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ............................................................................................... 1

ARGUMENT ....................................................................................................... 3

Defendants' Likelihood of Success on the Merits Are Negligible ......................... 4

  A.  Alaska, South Carolina, and Texas Have Standing ...................................... 5

  B.  The Defendants' Major Questions Analysis is Meritless ........................... 8

    1.  The Final Rule Implicates the Major Questions Doctrine ....................... 8

    2.  The Defendants Cannot Point to Clear Authorization ............................. 9

I.    THE STATES ARE ALSO LIKELY TO PREVAIL ON THEIR OTHER CHALLENGES TO THE RULE .......................................................................... 11

  A.  The Defendants' Failure to Account for the True Cost of the Final Rule is Arbitrary and Capricious .................................................................................. 12

  B.  The Department's 30-Day Comment Period Violated The APA .............. 16

III.    THE DEFENDANTS HAVE NOT ESTABLISHED THE REMAINING FACTORS SUPPORT THEIR REQUESTED STAY ......................................... 17

  A.  The Defendants' Alleged Irreparable Harms Are Overstated............ **Error! Bookmark not defined.**

  B.  The Balance of Harms and Public Interest Factors Weigh Against A Stay Pending Appeal .................................................................................................. 20

IV.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ISSUING A BROAD INJUNCTION ................................................................. 22

  A.  The District Court's Nationwide Injunction Was Not An Abuse Of Discretion ........................................................................................................... 22

  B.  The Defendants Waived Their Severability Arguments .......................... 26

CONCLUSION .................................................................................................. 27

CERTIFICATE OF SERVICE .......................................................................... 28

CERTIFICATE OF COMPLIANCE........................................................................29

CERTIFICATE OF DIGITAL SUBMISSION .......................................................30

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) ........................................................ 9, 21

*Biden v. Nebraska*,
600 U.S. 477 (2023) ........................... 1, 5-6, 8-9, 13, 14, 23

*Biden v. Nebraska*,
143 S. Ct. 477 (2022) ....................................................14, 23

*Bradford v. U.S. DOL*,
101 F.4th 707 (10th Cir. 2024) ............................................ 8

*BST Holdings, L.L.C. v. OSHA*,
17 F.4th 604 (5th Cir. 2021) ....................................... 18, 25

*NRDC v. Perry*,
940 F.3d 1071 (9th Cir. 2019) ........................................... 14

*Califano v. Yamasaki*,
442 U.S. 682 (1979) .................................................... 25, 26

*Citizens for Const. Integrity v. United States*,
70 F.4th 1289 (10th Cir. 2023) ......................................... 14

*City of Portland v. EPA*,
507 F.3d 706 (D.C. Cir. 2007) .......................................... 15

*Copar Pumice Co. v. Tidwell*,
603 F.3d 780 (10th Cir. 2010) .......................................... 12

*Dayton Bd. of Educ. v. Brinkman*,
433 U.S. 406 (1977) ......................................................... 25

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ............................................................. 15

*Gill v. Whitford*,
585 U.S. 48 (2018) ........................................................... 24

*Glossip v. Gross*,

576 U.S. 863 (2015) ................................................................ 19

*Kentucky v. Biden*,
23 F.4th 585 (6th Cir. 2022) ............................................ 21

*Lewis v. Casey*,
518 U.S. 343 (1996) ................................................... 24, 25

*Michigan v. EPA*,
576 U.S. 743 (2015) ................................................... 15, 16

*Nat'l Fed'n of Indep. Bus. v. DOL, OSHA*,
595 U.S. 109 (2022) ................................................... 21, 25

*Nat'l Fitness Holdings, Inc. v. Grand View Corp. Ctr., L.L.C.*,
749 F.3d 1202 (10th Cir. 2014) ........................................ 5, 6

*Nebraska v. Biden*,
52 F.4th 1044 (8th Cir. 2022) .......................... 14, 22, 23

*New York v. U.S. Dep't of Homeland Sec.*,
969 F.3d 42 (2d Cir. 2020) ................................................ 6

*Nken v. Holder*,
556 U.S. 418 (2009) ..................................................... 3, 4

*Ohio v. EPA*,
No. Nos. 23A349, 23A350, 23A351 and 23A384., 2024 U.S. LEXIS 2846 (June 27, 2024) ............................................................ 15

*Petry v. Block*,
737 F.2d 1193 (D.C. Cir. 1984) ...................................... 17

*United States v. Supreme Court*,
839 F.3d 888 (10th Cir. 2016) ........................................ 22

*Wages & White Lion Invs., L.L.C. v. U.S. FDA* ,
16 F.4th 1130 (5th Cir. 2021) ................................. 21-22

**Regulations**

58 Fed. Reg. 51,735 (Oct. 4, 1993) ...................................... 17

76 Fed. Reg. 3,281 (Jan. 21, 2011) ...................................... 17

88 Fed. Reg. 43,820 (July 10, 2023) ....................... 9, 13, 14, 17

88 Fed. Reg. 1895 (Jan. 11, 2023) ........................................................ 12

**Rules**

10th Cir. R. 25.5 ................................................................................. 30

10th Cir. R. 32-1 ................................................................................. 29

Fed. R. App. P. 32(a) ......................................................................... 29

**Other**

Department of Education, *Secretary Cardona Statement on Supreme Court Ruling on Biden Administration's One Time Student Debt Relief Plan* (June 30, 2023) (emphasis added) available at https://tinyurl.com/2jeyaapa ................................. 14

Michael Stratford, *Education Dept. Freezes Loan Payments For 3M Student Borrowers After Court Rulings*, PoliticoPro (June 28, 2024), https://subscriber.politicopro.com/article/2024/06/education-dept-freezes-loan-payments-for-3m-student-borrowers-after-court-rulings-00165853?source=email .................................................................................................... 19

Univ. of Penn, Penn Warton Budget Model, Biden's New Income-Driven Repayment ("Save") Plan: Budgetary Cost Estimate Update, July 17, 2023, https://tinyurl.com/4u33f5du ................................................................ 13

**INTRODUCTION**

The story of this case begins not with the current round of debt cancellation called the SAVE plan (herein the "Final Rule") but with a different round of forgiveness. In 2022, the in order to improve their prospects in an election year, the same Defendants attempted to unilaterally cancel over $430 billion in loan forgiveness without Congressional approval and the Supreme Court rebuked that effort in the landmark case of *Biden v. Nebraska*, 600 U.S. 477 (2023).

Instead of following the law, the Defendants doubled down with an even more costly round of debt cancellation. The district court correctly found that this program is unlawful and parts of it should be enjoined nationwide. On the same day, another court in the Eastern District of Missouri also found that the Final Rule was unlawful and enjoined other parts of it nationwide. Despite this universal rebuke from the lower courts, the Defendants come to this Court and advance meritless arguments for an emergency stay pending appeal. The Court should reject them.

The Defendants engaged in the same unlawful conduct they did in *Nebraska*. The only difference is they used a different statute as a pretext for unilateral debt cancellation. The district court correctly concluded that the cost of the program ($475 billion) implicated the major questions doctrine because it is an issue of vast economic significance. The district court also correctly concluded that the Defendants lacked clear congressional authorization for this.

But even if this Court does not agree with the district court's analysis on the major questions doctrine, the Final Rule is still unlawful because (1) the Defendants failed to adequately consider the costs of the Final Rule which was arbitrary and capricious and (2) the truncated 30-day comment period was a procedural violation of the APA. Finally, their arguments that the Plaintiffs lacked standing are meritless as they quibble with the district court's factual findings on purely factual determinations without demonstrating why those findings were clearly erroneous.

The Defendants' arguments that they will suffer irreparable injury are overstated at best. They boil down to disruptions to the plans they made for the Final Rule and that it would create confusion among borrowers. To the extent these are even legally cognizable harms, they are of the Defendants' own making. Despite knowing about the decision in *Nebraska*, the Defendants pressed forward with a Final Rule they had to expect would face legal challenges and made no preparations for the possibility of an injunction.

Furthermore, their protests of an emergency ring hollow due to their delays here and forfeitures elsewhere. First, they are not seeking a stay of another (equally "disruptive") nationwide injunction in the Eastern District of Missouri. This acquiescence is fatal to any argument for emergency relief in this matter. The Defendants also waited until the very last moment to seek a stay in this case. The district court injunction was issued on June 24, 2024 and they waited until almost

midnight on June 27, 2024 to seek relief at the district court and did not seek a stay in this Court until only a few business hours remained before the district court's injunction went into effect. This type of delay undercuts any argument that this is some type of emergency that warrants relief. Finally, the Defendants are already advertising to borrowers the manner in which they plan to comply with the district court's injunction. At this point any stay would cause more, not less, confusion.

The remaining factors for emergency relief also cut against the Defendants. Unlike the Defendants, the Plaintiffs suffer immediate economic harm to their instrumentalities that cannot be reversed. Finally, the district court did not abuse its discretion in issuing a nationwide injunction. The Defendants' request for emergency relief is wholly without merit and should be denied in its entirety.

## ARGUMENT

The Defendants correctly state that the test in *Nken v. Holder*, 556 U.S. 418, 434 (2009) is what governs a motion for a stay pending appeal. What they ignore is that it is their burden (not the Plaintiffs') to demonstrate that they are entitled to a stay pending appeal. They even went as far as trying to flip the burden to the Plaintiffs, even though *Nken* was clear that a "party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433-34. When viewed through the proper lens, the Defendants arguments for relief are exceptionally weak.

"A stay is not a matter of right, even if irreparable injury might otherwise result." *Id.* at 433 (internal citation omitted). The four factors the court examines in whether to grant a stay are: (1) whether the stay applicant has made a strong showing they are likely to succeed on the merits, (2) whether the applicant will be irreparably injured absent a stay, (3) whether the issuance of a stay will substantially injure the other parties interested in the proceeding, and (4) where the public interest lies. *Id.* at 434 (internal citation omitted). "The first two factors of the traditional standard are the most critical." *Id.*

The Defendants' motion fails because they have not met their burden on any of the *Nken* factors.

## I.    Defendants' Likelihood of Success on the Merits Are Negligible

The most crucial factor in whether a stay pending appeal should be granted is whether the Defendants have made a *strong* showing that they are likely to succeed on the merits. "It is not enough that the chance of success on the merits be 'better than negligible.'" *Id.* (internal citation omitted). The Defendants' chances are (at best) negligible because (1) they cannot demonstrate that the district court clearly erred in its factual finding that the evidence demonstrated Plaintiffs Alaska, South Carolina, and Texas have proven injury-in-fact and (2) the district court correctly applied the major questions doctrine and determined that the Defendants lacked clear congressional authorization to cancel hundreds of billions of dollars of student debt.

## A.     Alaska, South Carolina, and Texas Have Standing

The Defendants operated off the presumption that this court reviews the district court's finding that Plaintiffs Alaska, South Carolina, and Texas *de novo* and argued that the Plaintiffs did not meet their burden.   Not so. While this court determines jurisdictional issues *de novo*, it "review[s] the district court's factual findings under the clear-error standard." *Nat'l Fitness Holdings, Inc. v. Grand View Corp. Ctr., LLC*, 749 F.3d 1202, 1206 (10th Cir. 2014).   Under this standard, the Court "may reverse only if the district court's finding lacks factual support in the record or if, after reviewing all the evidence," the Court is left with "a definite and firm conviction that the district court erred." *Id.*   The Defendants simply cannot make a strong showing of likelihood of success on the merits for standing based on that standard—particularly as Defendants do not even *acknowledge* the applicable clearly-erroneous standard of review, let alone attempt to satisfy it.

The law at issue here is clear and essentially undisputed under *Biden v. Nebraska*. The Defendants never challenge the fact that the loan servicing entities in Alaska, South Carolina, and Texas are state instrumentalities and harm to them is harm to the states.   *See Nebraska*, 600 U.S. at 494 ("The Secretary's plan harms MOHELA in the performance of its public function and so directly harms the State that created and controls MOHELA.")   They also never dispute that if these instrumentalities suffer monetary loss because of the Final Rule, those states would

have standing—and *Nebraska* directly holds otherwise. The sole remaining issue is thus *purely factual*: whether such losses will in fact occur. And on this issue, the district court made *factual findings*, which can only be set aside if this Court is left with a "a definite and firm conviction that the district court erred." *National Fitness*, 749 F.3d at 1206.

Start with Defendants' argument (at 9-10) that somehow there are aspects of loan consolidation that offset the harms that the instrumentalities suffered. The Defendants cite no authority for the proposition that once the Plaintiffs demonstrate harm they are also required to show the harms still exist despite the potential benefits of the Final Rule. The governing law is squarely to the contrary: "Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant." Wright & Miller, § 3531.4 Injury in Fact, 13A Fed. Prac. & Proc. Juris. § 3531.4 (3d ed.). Thus, "the fact that an injury may be outweighed by other benefits ... does not negate standing.'" *New York v. DHS*, 969 F.3d 42, 60 (2d Cir. 2020) (citation omitted)).

But even if Defendants could rely on putative offsetting benefits, the district court correctly found that the Defendants "haven't adduced any evidence to support their theory" while the Plaintiffs "have marshaled evidence nullifying the theory." A70. The Defendants cannot say the district court clearly erred in weighing the

evidence of potential offsets (to the extent they can even be considered) when the *only* available evidence favored the Plaintiffs.

The Defendants' secondary argument (at 11) on standing is equally weak. For example, they contend that "no cogent analysis" supports the conclusion that Alaska will lose $100,000 as a result of the Final Rule.[1] Not so. The Plaintiffs submitted multiple declarations under oath that demonstrate: (1) the Final Rule entices borrowers with FFEL loans to consolidate with the federal direct loan program (FLP) because it provides generous benefits to borrowers that are not available for FFEL loans, (2) the Defendants are actively advertising and encouraging borrowers to consolidate their loans into federal loans, (3) once this consolidation occurs the instrumentalities will lose interest income. A163-174. In Alaska's case, the estimated loss was $100,000. A173. The district court correctly concluded that the Plaintiffs have "adduced some facts" and that the Defendants "proffered no evidence of their own." A66. In a nutshell, the district court did not clearly err in concluding that *some* evidence beats *none* at all.

The Defendants consistently critique the district court because they ultimately disagree with how it weighed the evidence to conclude that the Plaintiffs suffered an injury that is fairly traceable to the Defendants. But none of their arguments can

---

[1] The Defendants incorrectly state that this loss takes place over ten years. (App Motion at 11). This is incorrect. The loss will take place over two years. A173. However, for the purpose of standing that fact is not relevant.

leave this court with a "definite and firm conviction" that the district court erred. It is their burden at this stage to make a *strong* showing that they are likely to succeed on this issue. They do not even come close to demonstrating that.

## B.     The Defendants' Major Questions Analysis is Meritless

The district court correctly concluded that (1) the Final Rule implicated the major questions doctrine and (2) that the Defendants lacked clear authorization for it. A25. The Defendants' attempts to muddy the waters by misapplying *Bradford v. U.S. Department of Labor*, 101 F.4th 707 (10th Cir. 2024) should be rejected. The major questions doctrine is a straightforward test that the Defendants failed.

### 1.     The Final Rule Implicates the Major Questions Doctrine[2]

The Defendants spend much time (at 13-15) analyzing *Bradford* for the proposition that the major questions doctrine does not apply.[3] As initial matter, this argument is waived because it was not raised below. And it further ignores the elephant in this room which is that the Supreme Court has already determined that "'[t]he basic and consequential tradeoffs'" inherent in a mass debt cancellation program 'are ones that Congress would likely have intended for itself.'" *See Nebraska*, 600 U.S. at 480. (citation omitted). This Final Rule involves the same

---

[2] The Defendants arguably waived the argument that the major questions doctrine was not implicated as they did not make that contention in the district court. Regardless, their argument has no merit.

[3] This posture is puzzling since this court assumed without deciding that the major questions doctrine was implicated. *See Bradford*, 101 F.4th at 725.

issue of "mass debt cancellation" that the binding precedent in *Nebraska* held invokes a major question. There is no reason this Court should conclude any different.

Furthermore, the pure cost of the program invokes the major questions doctrine. In *Alabama Association of Realtors v. Department of Health and Human Services*, 594 U.S. 758, 764 (2021), the Supreme Court concluded that $50 billion of economic impact is sufficient to be an issue of vast economic significance and invoke the major questions doctrine. Even utilizing the Defendants' own (unreasonably low) cost estimate, the Final Rule would cost $156 billion. 88 Fed. Reg. at 43,886. That is three times the amount in *Alabama Association of Realtors*.

The district court "easily" concluded that the Final Rule triggered the major questions doctrine. A14. To the extent that Defendants preserved a challenge to that conclusion despite their failure to contest it below, it is specious in light of the Supreme Court's binding precedent to the contrary.

## 2. The Defendants Cannot Point to Clear Authorization

The Defendants fail to address the fact that once the major questions doctrine is implicated they have the burden of demonstrating clear congressional authorization for their actions. In the posture of a stay pending appeal, they have to make a strong showing of such clear authorization. They do not come close to meeting that burden.

The Defendants oddly begin with the premise that the Final Rule "incrementally changed aspects of the REPAYE plan." *Id.* at 15. This is akin to saying that driving a wrecking ball into a house incrementally changed aspects of the home. The district court noted that the cost "$475 billion versus $15.4 billion-expands agency authority to such an extent that it alters it." A22. A Final Rule that costs nearly 30 times as much as its predecessor is hardly incremental change. The district court correctly concluded that the Defendants cannot point to clear authorization for the Final Rule because (1) the Defendants attempt to locate expansive authority in modest words and (2) it involves an enormous and transformative (not incremental) expansion in regulatory authority. A20-21.

Instead of demonstrating where their clear authorization comes from, the Defendants rely primarily two unpersuasive arguments. The first is a conclusory argument (at 16) that Congress did not prescribe the terms for repayment plans and therefore granted "broad" authority for the Defendants to set the terms. This argument ignores the fact that once the major questions doctrine is implicated they cannot rely on Congressional silence in a statute but instead must point to clear authorization. The second argument they lean on is one of past agency practice. *Id.* This argument is equally meritless. The district court noted that the past plans took Congressionally established thresholds and expanded them to a broader group of individuals. *Id.* at A23. In this instance, the Final Rule was an "overreach" that

went beyond the "generosity Congress has authorized before." *Id.* As examples, the district court cited the following: (1) Congress authorized a floor of 10% of a borrower's discretionary income for repayments but the Final Rule lower the floor of 5% and (2) Congress authorized a floor of 20 years for debt cancellation but the Final Rule lowers the floor to 10 years. *Id.*

This break from what Congress authorized combined with the vast increase in costs over prior programs ($475 billion versus $15 billion) is not an instance where the Defendants were simply building upon past agency practice. Instead, they are creating something totally different than what Congress authorized. They cannot do so without clear congressional authorization. Since they have failed to demonstrate that, they cannot meet their burden of a strong showing of a likelihood of success on the merits.

## II. THE STATES ARE ALSO LIKELY TO PREVAIL ON THEIR OTHER CHALLENGES TO THE RULE

Even if this Court were to conclude that the district court's statutory holding on the major questions doctrine was erroneous, the Defendants are unlikely to prevail on appeal because this Court would likely affirm on alternative grounds. In particular, the Plaintiffs are likely to prevail on their claims that (1) the Rule is arbitrary and capricious because its estimate of costs/amount of loan forgiveness was expressly based on them prevailing in *Biden v. Nebraska*—even though they *knew*

they had lost that case conclusively, and (2) the Rule violated the APA because Defendants only provided a 30-day comment period.

### A. The Defendants' Failure to Account for the True Cost of the Final Rule is Arbitrary and Capricious

Here, the Plaintiffs are also likely to prevail on their claim that the Final Rule is arbitrary and capricious, thereby violating the APA. An agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency." *Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 793 (10th Cir. 2010) (citation omitted).

The Rule here rests on the premise that the Department would *prevail* in *Biden v. Nebraska*. It relied *exclusively* on that foundation to reject a comment urging that it update its cost estimates to account for the possibility that the Department might lose that case. And it did lose the case—*before* the Rule was published. But even though the Defendants knew this with absolute certainty, they pressed forward with a Final Rule premised on *prevailing* in *Biden v. Nebraska* despite their *conclusive loss*. Singularly relying on a proposition that is unambiguously wrong is quintessential arbitrary-and-capricious decision-making.

The Proposed Rule relied on the $430 billion of HEROES Act debt cancellation being effective to estimate that the Rule would cost about $137.9 billion. *See* 88 Fed. Reg. 1,895 (Jan. 11, 2023). A commenter specifically asked the

Department to consider the Rule's cost if the Supreme Court were to invalidate that HEREOS Act debt cancellation—a prospect that already appeared likely at the time that comment was submitted. *See* D. Ct. Doc. 24-2. This issue is material: the Rule's projected cost without the HEROES Act cancellation in effect balloons to an estimated $475 billion.[4]

The Defendants refused to update their cost estimates, however. Instead, they doubled down on prevailing in *Biden v. Nebraska*. They thus offered a *single* rationale for their refusal: they were "confident in [thei]r authority to pursue debt relief" under the HEROES Act even though they were "awaiting the Supreme Court's ruling on the issue." 88 Fed. Reg. 43,820, 44,875 (July 10, 2023).

But this reasoning was clearly false when the Final Rule was published. Instead, the Supreme Court had *ten days earlier* held that the Defendants lacked authority under the HEROES Act to cancel student debt. *See generally Biden v. Nebraska*, 600 U.S. 477 (June 30, 2023). The Defendants' "confiden[ce]" in prevailing in a case that they had already lost was thus the product of fantasy rather than the reasoned decision-making that the APA demands.

The Defendants defended this false premise on the basis that they had already sent the Final Rule to the General Printing Office before *Nebraska* was decided. *See*

---

[4]   Univ. of Penn, Penn Warton Budget Model, Biden's New Income-Driven Repayment ("Save") Plan: Budgetary Cost Estimate Update, July 17, 2023, https://tinyurl.com/4u33f5du.

D. Ct. Doc. 46 at 32-33 & n.12. That contention is flatly refuted by Defendant Cardona himself, who forthrightly announced that he approved the Final Rule *after* the Supreme Court's decision: declaring on June 30 that the Department "*today …* *finalized our new [Rule].*"[5] The Final Rule was thus finalized with *full knowledge* that its we-will-win-*Nebraska* premise was indefensible. Moreover: (1) the Department had ample authority to amend the Rule pre-publication to correct its known error[6] and violated the APA by refusing to do so, and (2) the Department's "confiden[ce]" was misplaced even pre-*Nebraska*: the Eighth Circuit had entered a nationwide injunction against the HEROES Act relief, which the Supreme Court declined to stay. *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (granting nationwide injunction pending appeal); *Biden v. Nebraska*, 143 S. Ct. 477 (2022) (granting certiorari but declining to stay injunction). That confidence was thus foolhardy at best.

The Defendants further argued below that they need not consider costs at all under the HEA. That argument is waived because it was never offered in the Final Rule as a basis for rejecting the commentor's request. *See* 88 Fed. Reg. at 44,875.

---

[5] *See* Department of Education, *Secretary Cardona Statement on Supreme Court Ruling on Biden Administration's One Time Student Debt Relief Plan* (June 30, 2023) (emphasis added) available at https://tinyurl.com/2jeyaapa

[6] *See NRDC v. Perry*, 940 F.3d 1071 (9th Cir. 2019) ("[A]gencies are free to withdraw a proposed rule before it has been published in the Federal Register, even if the rule has received final agency approval."); *accord Citizens for Const. Integrity v. United States*, 70 F.4th 1289, 1306–07 (10th Cir. 2023) (approvingly citing Perry).

The "*post hoc* rationalizations of the agency cannot serve as a sufficient predicate for agency action." *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 23 (2020) (citation omitted). The argument fails on the merits too: costs are an "'important aspect of the problem'" for agencies to consider. *Michigan v. EPA*, 576 U.S. 743, 752 (2015) (citation omitted). "Agencies have long treated cost as a centrally relevant factor when deciding whether to regulate." *Id.* at 752-53; *see also City of Portland v. EPA*, 507 F.3d 706, 713 (D.C. Cir. 2007) (Courts will not "tolerate rules based on arbitrary and capricious cost-benefit analyses").

The Department's violation of the APA has become clearer since the district court's injunction issued. In *Ohio v. EPA*, the Supreme Court held that EPA likely violated the APA by failing to update its cost estimates to reflect its actual and potential future losses in litigation: specifically, EPA's action was arbitrary and capricious in light of its "acknowledge[ment] that it could not represent with certainty whether the cost-effectiveness analysis it performed collectively for 23 States would yield the same results … if conducted for, say, just one State,"—a concern made manifest since "two circuits [had already] issued stays of EPA's SIP denials for four States" when the final rule issued. 2024 U.S. LEXIS 2846, at *13-14, 19 (June 27, 2024).

The Rule here violates the APA *a fortiori*. Unlike *EPA*—who had only lost *preliminarily* with respect to four states and faced additional *potential* losses—the

Department here knew with absolute certainty that it had lost conclusively in *Nebraska* and had no further court to which it could appeal to. Its refusal to update its cost estimates in light of that final loss is an even more severe APA violation than in *Ohio v. EPA*.

The Defendants also contended below that this error was harmless because they would have adopted the Rule no matter what it cost. But the Rule's cost is merely the flip side of the amount of debt cancelled under its auspices. *See* D. Ct. Doc. 46 at 34. And the Defendants' admission that they would have proceeded with the Rule even though they were unaware—and perfectly willing to act in a willfully-blind manner—how much debt would thereby be cancelled is the antithesis of the "reasoned decision-making" that the APA demands. *See*, *e.g.*, *Michigan*, 576 U.S. at 750 (citation omitted). The Department can hardly claim that the Final Rule cancels the "right" amount of student debt when it lacks even a ballpark estimate as to how much debt cancellation that is.

For all of these reasons, the Plaintiffs are likely to prevail on their arbitrary-and-capricious challenge to the Rule.

## B. The Department's 30-Day Comment Period Violated The APA

The Plaintiffs are also likely to prevail on their claim that the Department's bare 30-day notice period violated the APA. "*[A] thirty-day period is*, in the Administrative Conference's view, *'an inadequate time* to allow people to respond

to proposals *that are complex* or based on scientific or technical data.' The Administrative Conference itself thus suggests 'a *sixty-day period as a more reasonable minimum time* for comment.'" *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984)). (cleaned up) (emphasis added) (citation omitted). Similarly, both Presidents Clinton and Obama issued still-in-effect executive orders generally mandating 60-day comment periods. *See* Exec. Order 12,866 §6(a)(1), 58 Fed. Reg. 51,735, 51,740 (Oct. 4, 1993); Exec. Order 13,563 § 2(b) 76 Fed. Reg. 3,281, 3821-22 (Jan. 21, 2011). And while those orders (like virtually all executive orders) are not enforceable themselves by non-federal actors, they do provide crucial benchmarks for what constitutes adequate notice periods—which the Department flouted here. Indeed, although the Department acknowledged those orders, it never even attempted to argue that a 60-day period was not "feasible" or was somehow not permitted by law, as those EOs mandate. *See* 88 Fed. Reg. at 43,821.

Tellingly, in briefing below the Defendants *never* identified any rule with equivalent scope, complexity, or cost for which only a 30-day comment period was provided—let alone an instance where an agency did so and was *affirmed* by a federal court. There is little reason to believe that this Court would become the first.

## III.   THE DEFENDANTS HAVE NOT ESTABLISHED THE REMAINING FACTORS SUPPORT THEIR REQUESTED STAY

The court need not look to the remaining *Nken* factors because the Defendants have failed to show a make a strong showing of likelihood of success on the merits.

This is fatal as the likelihood of success on the merits is the most critical factor. Regardless, the Defendants' stay request should be denied because they have not satisfied their burden as to any of the final three *Nken* factors either.

## A. The Defendants' Alleged Irreparable Harms are Overstated

The Defendants have not established likely irreparable harm that could support the stay that they seek. As an initial matter, they have not established irreparable harm at all: "Any interest [that the Department] may claim in enforcing an unlawful … [rule] is illegitimate." *BST Holdings*, 17 F.4th 604, 618 (5th Cir. 2021). Because the Final Rule is unlawful, the Defendants will not suffer any cognizable injury from their inability to carry it out. In any event, the Defendants have failed to establish irreparable harm here. While the Defendants have asserted (at 19) that the injunction will cause them disruptions, their refusal to seek an injunction of the Eastern District of Missouri's nationwide injunction overwhelmingly makes any such disruptions a *fait accompli* no matter what this Court does. The Defendants' argument that the District of Kansas's injunction creates intolerable disruptions is thus belied by Defendants' perfect willingness to tolerate equivalent disruptions in another circuit.

Moreover, the Defendants' intentional refusal to prepare for the possibility that they might have injunctions issued against them is hardly a reason to provide them judicial relief. Instead, the Defendants' putative harms from *their* failure to

prepare for contingencies are purely self-inflicted and "call[] to mind the man sentenced to death for killing his parents, who pleads for mercy on the ground that he is an orphan." *Glossip v. Gross*, 576 U.S. 863, 898 (2015) (Scalia, J., concurring). The Defendants' baseless assumption that victory was assured in the district courts hardly warrants the extraordinary relief of a stay pending appeal.

The Defendants' protestations that an injunction would cause disruptions are also gravely undermined by the fact that the Department has already apparently taken steps to implement the district court's purportedly unimplementable injunction. As reported by Politico, "Department officials said Friday they would freeze the student loans of borrowers who are enrolled in the program—known as the SAVE plan—and required to make payments in July."[7] The Defendants' failure to account to this Court implementation measures that they freely disclosed to the press suggests that the putative implementation problems are not as insurmountable as the Defendants claim.

Finally, the Defendants' irreparable harm arguments are undermined by their delay in seeking a stay. Although the district court's injunction was issued Monday, and the White House itself announced it would appeal Tuesday, the Defendants

---

[7] Michael Stratford, *Education Dept. Freezes Loan Payments For 3M Student Borrowers After Court Rulings*, PoliticoPro (June 28, 2024), https://subscriber.politicopro.com/article/2024/06/education-dept-freezes-loan-payments-for-3m-student-borrowers-after-court-rulings-00165853?source=email

inexplicably waited until 11:36pm on Thursday to seek a stay pending appeal from the district court. If the harms that the Defendants assert were nearly as significant as they now contend, the Defendants should have—and almost certainly *would have*—sought a stay pending appeal sooner. Instead, Defendants allowed crucial time to elapse, forcing (1) the Plaintiffs to draft a needlessly expedited response where they did not receive even a single business day to respond to a motion that the Defendants took four business days to draft and (2) this Court to consider their belated request on a needlessly hurried schedule.

The Defendants' assertions of harms are thus belied by (1) their delay in seeking relief, (2) their refusal to seek any stay from the Eastern District's substantially similar nationwide injunction, and (3) the fact that Defendants have apparently already demonstrated their ability to implement the district court's injunction notwithstanding their instant protests about disruptive consequences. All of these factors strongly militate against granting Defendants' stay request.

### B. The Balance of Harms and Public Interest Factors Weigh Against A Stay Pending Appeal

The final two *Nken* factors, which merge here, also militate against a stay pending appeal. As explained above, the Defendants' harms are not cognizable, distinctly overstated, and belied by their own conduct. Moreover, the harms at issue here could be remedied later. The only provision genuinely at issue here—given Defendants' refusal to seek a stay in the Eighth Circuit—is capping payments at 5%-

vs-10% of discretionary income. But if this Court were to reverse the preliminary injunction after plenary consideration, the Department could readily credit such overpayments against future ones—thus rendering Defendants' putative harms (which are actually harms to non-parties) easily remediable. Nor is Defendants' palpable desire to have such debt cancellation occur before the November election a cognizable harm.

In contrast, the district court properly recognized that the Plaintiffs' harms are difficult to remedy: "one cannot unscramble this egg; loan forgiveness has an irreversible impact." A30 (cleaned up). The district court hardly abused its discretion in concluding that the public interest favored preservation of the status quo— particularly where the Defendants' harms could be readily remedied later but Plaintiffs' harms were likely irreversible.

The district court also did not abuse its discretion in following the Supreme Court's default rule that the public interest favored enjoining unlawful agency action under *NFIB v. OSHA*, 595 U.S. 109 (2022). *See* A30-31. That general rule is well-established and properly enforced here. *See also Alabama Association of Realtors* 141 S. Ct. at 2490 ("[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends."); *Kentucky v. Biden*, 23 F.4th 585, 612 (6th Cir. 2022) ("[T]he public's true interest lies in the correct application of the law."); *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021) ("[T]here is

generally no public interest in the perpetuation of unlawful agency action." (citation omitted)). Perhaps the district court could have held otherwise. But it hardly abused its discretion in refusing to do so.

## IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ISSUING A BROAD INJUNCTION

This Court reviews "the scope of the injunction … [only] for an abuse of discretion." *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 928 (10th Cir. 2016). The district court committed no such abuse here.

### A. The District Court's Nationwide Injunction Was Not an Abuse of Discretion

The district court did not abuse its discretion in issuing a nationwide injunction here. As an initial matter, the Defendants do not even *attempt* to squeeze their arguments within this Court's applicable standard of review—the word "abuse" does not appear even a single time in their entire stay motion. Having failed even to *allege* an abuse of discretion—let alone establish such an abuse—Defendants have failed to offer this Court *any* basis to conclude the district court's injunction was overbroad.

In any event, the district court's decision walks well-trodden ground. When the Eighth Circuit concluded that a prior 12-digit-cost round of student debt cancellation was unlawful, it did not hesitate to issue a nationwide injunction. *Nebraska*, 52 F.4th at 1048. The Defendants then advanced virtually all of the same

objections to a nationwide injunction that they raised here. *See https://shorturl.at/mtCIT*. This was to no avail. The Supreme Court refused to stay the nationwide injunction even in part and then affirmed it entirely. *See* 143 S. Ct. 477; 600 U.S. 477.

The Defendants' protests here (at 2) that "[n]ationwide relief cannot be squared with a minimal showing by just three States" of harm are thus sorely misplaced. The nationwide injunction in *Nebraska* was based on harms to a *single* state entity, MOHELA. *Nebraska*, 52 F.4th at 1048. That *three times* as many States have injured instrumentalities here supports the district court's nationwide injunction *a fortiori*.

The district court also provided ample explanation for the nationwide scope of its injunction, which can hardly be considered an abuse of discretion (which, again, the Defendants do not even argue). As the district court rightly explained, "[a] broad rule, like the SAVE Plan, requires a broad injunction, given the compelling need for nationwide uniformity in the Department's administration of student loan programs." A38. The district court further noted the bizarre horizonal equities that a more-limited injunction would occasion: "Defendants have articulated no good reason why student debtors in 47 states should do better than those in the three plaintiff states with standing to sue." A38. And that failure to articulate any "good reason" for such disparate treatment persists on appeal. The district court did not

abuse its discretion given the Defendants' inability to answer this central flaw in their arguments.

The Defendants' objections to the nationwide scope are further undercut by their refusal to seek a stay of the Eastern District of Missouri's *nationwide* injunction against the *same Rule*. *See* Opp. at 8 n.3. If a nationwide injunction against the Rule were truly as indefensible as the Defendants claim here, they would also be seeking a stay in the Eighth Circuit since the Eastern District of Missouri committed an *identical* putative abuse of discretion. That the Defendants will not even *attempt* to seek any stay in the Eighth Circuit—even on the limited issue of scope—should tell this Court all that it needs to know as to whether the District of Kansas abused its discretion.

Finally, the Defendants also appear to suggest (at 20) that Article III prohibits the entry of nationwide injunctive relief, relying on *Gill v. Whitford*, 585 U.S. 48, 66 (2018), which in turn cites *Lewis v. Casey*, 518 U. S. 343, 357 (1996). But the Article III problem in *Lewis* was that injunctive relief was provided to non-English-speaking prisoners even though *no such violations* relating to them had been found, whereas the only injury actually proven related to a single *illiterate* (English-speaking) prisoner. *Id.* at 358. In contrast, the Supreme Court made clear that Article III does not establish *any* bar to systemwide relief: the "inappropriateness of systemwide relief for illiterate inmates *does not rest upon the application of standing rules*, but

24

rather … upon 'the respondents' failure to prove that denials of access to illiterate prisoners pervaded the State's prison system.'" *Id.* at 360 n.7 (emphasis added). *Lewis* instead makes clear that "'[o]nly if there has been a systemwide impact may there be a systemwide remedy.'" *Id.* (quoting *Dayton Bd. of Ed. v. Brinkman*, 433 U.S. 406, 417 (1977)).

That is manifestly the case here: under the district court's holdings, the Final Rule is unlawful *everywhere* in the U.S.—and legal *nowhere*. Because the illegality here pervades "systemwide," the Defendants' own case law supports *systemwide relief*.[8] The district court did not abuse its discretion in issuing a systemwide injunction to remedy a systemwide violation. And Defendants' reliance (at 20) on *Califano v. Yamasaki*, 442 U.S. 682 (1979), actually supports Plaintiffs here. *Califano* explains that "[t]he scope of injunctive relief is dictated *by the extent of the violation established*, not by the geographical extent of the plaintiff class." *Id.* at 702 (emphasis added). Because the violation established here applies *everywhere* in the

---

[8] More generally, Defendants are simply mistaken in suggesting that Article III precludes relief that benefits non-parties. As a recent example, when the Fifth Circuit concluded that the OSHA vaccine mandate was unlawful nationwide, it did not hesitate to order a nationwide stay—even though tens of millions of Americans who were non-parties that would thereby benefit. *BST Holdings*, 17 F.4th at 619. And the Supreme Court subsequently granted *its own nationwide* stay even though no nationwide class was before it. *See generally NFIB v. DOL, OSHA*, 595 U.S. 109 (2022). Similarly, *all* of Defendants' instant scope arguments were also made to the Supreme Court in seeking to limit the Eighth Circuit's nationwide injunction against the first round of student debt cancellation—and all failed. The same result should obtain here.

U.S., *Califano* affirmative supports entry of a nationwide injunction here rather than limiting the injunction to "the geographical extent of" Plaintiffs.

### B. The Defendants Waived Their Severability Arguments

The Defendants also protest that the district court should have severed provisions of the Rule from its injunction. Once again, the Defendants do not even *argue* that the district court abused its discretion. In any event, this argument is waived because it was not presented below. As the district court properly explained yesterday, this argument "surface[d] in this Kansas case just now, for the first time" in Defendants' request for a stay pending appeal. D. Ct. Doc. 84. Defendants "never provided any kind of roadmap for which portions should make the cut. They didn't, that is, until last night's late-night filing, when defendants peeled the SAVE Plan apart in a fashion never before furnished to the court." *Id.*

The Defendants' severability arguments are thus waived on appeal here. In any event, even now Defendants do not genuinely explain *which* provisions could survive in light of the district court's statutory holding. And even those that could survive the statutory holding would necessarily be invalid under Plaintiffs' arbitrary-and-capricious claim (since they add to the inadequately analyzed costs) and inadequate-comment-period claim (which would invalidate the entire rule).

For all of these reasons, the district court did not abuse its discretion in declining to tailor its injunction according to Defendants' waived and meritless

severability arguments.

## CONCLUSION

None of what the district court concluded was a surprise as the Defendants attempted to unilaterally cancel hundreds of billions of dollars debt, which the Supreme Court already told them they cannot do. And in doing so, they harm the Plaintiffs. The Court should reject the Defendants' meritless arguments that they are entitled to an emergency stay pending appeal for their unlawful actions. The Defendants' motion should be rejected in its entirety.


Respectfully Submitted,


ALAN WILSON
Attorney General of South Carolina

*/s/ Abhishek S. Kambli*
Abhishek S. Kambli,
*Special Counsel*
*Office of South Carolina Attorney General*
*Alan Wilson*
Rembert C. Dennis Building
P O Box 11549
Columbia, South Carolina 29211-1549
Phone: (785) 296-6109
Fax: (785) 291-3767

Email: abhishek.kambli@ag.ks.gov

*Counsel for Plaintiff South Carolina*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 29, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Abhishek S. Kambli*
Abhishek S. Kambli

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a), and Tenth Circuit Rule 32-1, I certify that the attached response brief is proportionately spaced, has a typeface of 14 points or more, and contains 6,129 words.

Date: June 29, 2024

*/s/ Abhishek S. Kambli*
Abhishek S. Kambli

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing: (1) all required privacy redactions have been made per 10th Cir. R. 25.5; (2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents; (3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Sophos Endpoint Agent, and according to the program are free of viruses.

*/s/ Abhishek S. Kambli*
Abhishek S. Kambli