# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

STATE OF ALASKA, et al.,

Plaintiffs-Appellees / Cross-Appellants,

v.

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

Defendants-Appellants / Cross-Appellees.

On Appeal from the United States District Court
for the District of Kansas
District Court Case No. 6:24-CV-01057-DDC-ADM (Judge Daniel D. Crabtree)

## BRIEF FOR APPELLANTS

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

MICHAEL S. RAAB
THOMAS PULHAM
SIMON C. BREWER
SARAH N. SMITH
*Attorneys, Appellate Staff*
*Civil Division, Room 7529*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5367*

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED APPEALS

GLOSSARY

INTRODUCTION ...................................................................................................... 1

STATEMENT OF JURISDICTION ........................................................................ 3

STATEMENT OF THE ISSUE ............................................................................... 3

PERTINENT STATUTES ....................................................................................... 3

STATEMENT OF THE CASE ................................................................................ 4

    A.    Statutory and Regulatory Background ......................................... 4

    B.    The Final Rule .................................................................................... 7

    C.    Prior Proceedings ............................................................................. 9

SUMMARY OF ARGUMENT ............................................................................... 12

STANDARD OF REVIEW ..................................................................................... 14

ARGUMENT ............................................................................................................ 14

I.    The government is likely to prevail on the merits. ............................... 15

    A.    Alaska, South Carolina, and Texas lack Article III standing. ................... 15

    B.    The Department has clear statutory authority to promulgate the Final Rule. .................................................................................... 22

        1.    The major-questions doctrine does not apply here. ...................... 23

        2.    Even if the major-questions doctrine applied, the HEA clearly authorizes the Final Rule. .................................................... 28

II.    The equitable factors greatly favor the government. ........................... 32

A.      Plaintiffs fail to demonstrate irreparable harm absent preliminary relief ............................................................................................. 32

B.      The equities tilt strongly in the government's favor. ............................... 34

III.    At a minimum, the preliminary injunction should be narrowly tailored. ........... 36

CONCLUSION ............................................................................................. 41

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

ATTACHMENTS REQUIRED BY CIRCUIT RULE 28.2(A)

Memorandum and Order (June 7, 2024)

Memorandum and Order (June 24, 2024)

Preliminary Injunction (June 24, 2024)

# TABLE OF AUTHORITIES

**Cases:**                                                               **Page(s)**

*Arizona Pub. Serv. Co. v. U.S. EPA*,
562 F.3d 1116 (10th Cir. 2009) ............................................................ 40

*Atlantic Mut. Ins. Co. v. Commissioner*,
523 U.S. 382 (1998) .................................................................... 17-18

*Becerra v. Empire Health Found.*,
597 U.S. 424 (2022) ........................................................................ 27

*Benisek v. Lamone*,
585 U.S. 155 (2018) .................................................................... 32, 33

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023) ....................................... 26, 27, 28, 30, 32

*Blum v. Yaretsky*,
457 U.S. 991 (1982) ........................................................................ 38

*Bradford v. U.S. Dep't of Labor*,
101 F.4th 707 (10th Cir. 2024) ............................... 23-24, 24, 25

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ........................................................................ 37

*California v. Texas*,
593 U.S. 659 (2021) ........................................................................ 21

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................ 19

*Colorado v. Griswold*,
99 F.4th 1234 (10th Cir. 2024) ................................................ 14, 22

*Colorado v. U.S. EPA*,
989 F.3d 874 (10th Cir. 2021) ........................................................ 32

*Conkright v. Frommert,*
  559 U.S. 506 (2010) ................................................................. 18

*Denver Homeless Out Loud v. Denver,*
  32 F.4th 1259 (10th Cir. 2022) ................................................. 34

*Department of Educ. v. Brown,*
  600 U.S. 551 (2023) ................................................................. 27

*Diné Citizens Against Ruining Our Env't v. Jewell,*
  839 F.3d 1276 (10th Cir. 2016) ................................................. 14

*Does 1-11 v. Board of Regents of the Univ. of Colo.,*
  100 F.4th 1251 (10th Cir. 2024) ............................................... 14

*EPA v. EME Homer City Generation, L.P.,*
  572 U.S. 489 (2014) ................................................................. 27

*FDA v. Alliance for Hippocratic Med.,*
  602 U.S. 367 (2024) ........................................................... 16, 19

*Gill v. Whitford,*
  585 U.S. 48 (2018) ................................................................... 37

*Habitat Educ. Ctr. v. U.S. Forest Serv.,*
  607 F.3d 453 (7th Cir. 2010) .................................................... 18

*Labrador v. Poe ex rel. Poe,*
  144 S. Ct. 921 (2024) ......................................... 34, 36, 37, 38

*Lewis v. Casey,*
  518 U.S. 343 (1996) ........................................................... 37, 38

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
  591 U.S. 657 (2020) ............................................................. 31-32

*Loper Bright Enters. v. Raimondo,*
  144 S. Ct. 2244 (2024) ......................................................... 24, 30

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ................................................................. 16

iv

*Maine Cmty. Health Options v. United States,*
590 U.S. 296 (2020) ........................................................... 31

*Maryland v. King,*
567 U.S. 1301 (2012) ......................................................... 34

*Monsanto Co. v. Geertson Seed Farms,*
561 U.S. 139 (2010) ........................................................... 38

*Murthy v. Missouri,*
144 S. Ct. 1972 (2024) ...........................15, 18, 19, 20, 21, 22

*National Fed'n of Indep. Bus. v. Department of Labor, Occupational Safety & Health Admin.,*
595 U.S. 109 (2022) ........................................................... 36

*RoDa Drilling Co. v. Siegal,*
552 F.3d 1203 (10th Cir. 2009) ........................................ 33

*Simon v. Eastern Ky. Welfare Rights Org.,*
426 U.S. 26 (1976) ............................................................. 20

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ............................................15, 17, 21

*United States v. Texas,*
599 U.S. 670 (2023) .......................................................15-16

*Walker v. UPS, Inc.,*
240 F.3d 1268 (10th Cir. 2001) ........................................ 31

*West Virginia v. EPA,*
597 U.S. 697 (2022) ..........................................23, 25, 26

*Winter v. Natural Res. Def. Council, Inc.,*
555 U.S. 7 (2008)............................................14, 34, 36

**Statutes:**

Higher Education Act of 1965,
Pub. L. No. 89-329, 79 Stat. 1219.................................... 4

Student Loan Reform Act of 1993,
  Pub. L. No. 103-66, 107 Stat. 341 ................................................................... 4

20 U.S.C. § 1071(d) ........................................................................................... 7

20 U.S.C. § 1078(b)(1)(D)(i) ........................................................................... 17

20 U.S.C. § 1078-3(b)(1)(D) ...................................................................... 7, 16

20 U.S.C. § 1078-3(b)(5) .................................................................................. 7

20 U.S.C. § 1087e(d)(1) .................................................................................... 4

20 U.S.C. § 1087e(d)(1)(D) ....................................... 1, 4, 5, 8, 24, 28, 29, 30

20 U.S.C. § 1087e(d)(1)(E) ............................................................................... 6

20 U.S.C. § 1087e(e)(1) ............................................................................. 4, 28

20 U.S.C. § 1087e(e)(2) .................................................................................... 4

20 U.S.C. § 1087e(e)(4) ........................................... 4, 22, 24, 28, 29, 30

20 U.S.C. § 1087e(e)(5) .................................................................................... 4

20 U.S.C. § 1087e(m)(1) ............................................................................ 7, 20

20 U.S.C. § 1089(c)(1) ..................................................................................... 9

20 U.S.C. § 1089(c)(2) ..................................................................................... 9

20 U.S.C. § 1098e ............................................................................................. 6

20 U.S.C. § 1098e(a)(3)(B) ......................................................................... 6, 30

20 U.S.C. § 1098e(b)(7)(B) ......................................................................... 6, 30

20 U.S.C. § 1098e(e) .................................................................................... 6, 30

28 U.S.C. § 1291 ............................................................................................. 11

28 U.S.C. § 1292(a)(1) ................................................................. 3

28 U.S.C. § 1331 ........................................................................... 3

28 U.S.C. § 1361 ........................................................................... 3

**Regulations:**

34 C.F.R. § 682.209(b)(2) ........................................................... 17

34 C.F.R. § 685.219(b) .......................................................... 7, 20

34 C.F.R. § 685.220(f)(1)-(2) ................................................ 7, 16

**Rule:**

10th Cir. R. 28.1(A)(1) ................................................................ 3

Fed. R. App. P. 4(a)(1)(B) ........................................................... 3

**Other Authorities:**

Cong. Budget Office, *Re: Costs of the Proposed Income-Driven Repayment Plan for Student Loans* (Mar. 13, 2023), https://perma.cc/KG4U-RWXU ..................................... 26

59 Fed. Reg. 24,278 (July 1, 1994) ........................................... 5

59 Fed. Reg. 61,664 (Dec. 1, 1994) ...................................... 5, 6

77 Fed. Reg. 66,088 (Nov. 1, 2012) ..................................... 5, 6

80 Fed. Reg. 67,204 (Oct. 30, 2015) .................................... 5, 6

86 Fed. Reg. 28,299 (May 26, 2021) ......................................... 7

88 Fed. Reg. 1894 (Jan. 11, 2023) ........................................... 8

88 Fed. Reg. 43,820 (July 10, 2023) ............ 3, 5, 7, 8, 9, 25, 26, 29, 31, 35, 39, 40

88 Fed. Reg. 72,685 (Oct. 23, 2023) ........................................ 9

89 Fed. Reg. 2489 (Jan. 16, 2024) .......................................................... 9

Fed. Student Aid, *Consolidating Student Loans*, https://studentaid.gov/manage-loans/consolidation (last visited July 14, 2024).......................................... 19

## STATEMENT OF RELATED APPEALS
## PURSUANT TO CIRCUIT RULE 28.2(C)(3)

Counsel for appellants is aware of the following related appeal:

*Kansas et al. v. Biden et al.*, No. 24-3093 (10th Cir.).

# GLOSSARY

| | |
|---|---|
| FFEL | Federal Family Education Loan |
| HEA | Higher Education Act |
| IBR | Income-Based Repayment |
| ICR | Income Contingent Repayment |
| IDR | Income-Driven Repayment |
| PAYE | Pay As You Earn |
| REPAYE | Revised Pay As You Earn |
| SAVE | Saving on a Valuable Education |

**INTRODUCTION**

Over 30 years ago, Congress directed the Department of Education
(Department) to offer student-loan borrowers an "income contingent repayment
plan," under which the "repayment amounts" are "based on the [borrower's]
income." 20 U.S.C. § 1087e(d)(1)(D). Although such a plan is statutorily required,
Congress left most of the details up to the Department to implement via rulemaking,
including how large the payments must be. Over the years, the Department has
created various income contingent repayment plans, each of which sets payment
amounts based on a percentage of the borrower's discretionary income.

In July 2023, the Department published a final rule amending one of those
plans and renaming the updated offering the Saving on a Valuable Education (SAVE)
plan. Nine months later, after much of the rule had been implemented, the plaintiff
States brought suit. Plaintiffs challenged three discrete provisions of the final rule as
contrary to the statute: (1) an increase in the amount of a borrower's income
protected from loan payments; (2) a shortening of the repayment period, and thus the
timeline to forgiveness, for borrowers with smaller original loan balances; and (3) a
decrease in the percentage of a borrower's discretionary income that should go toward
undergraduate-loan payments.

The district court declined to enjoin the first two provisions, which had already
been in effect for months, finding that plaintiffs had failed to show that they would
suffer irreparable harm from them. But the district court preliminarily enjoined the

Department from implementing the third provision—and extended the injunction to all other portions of the rule that had not already taken effect, even though plaintiffs had not alleged that those portions were contrary to the statute or the source of any injury to them. The injunction compounds multiple legal errors and, if upheld, would disrupt the student-loan repayment system for millions of borrowers in a profoundly inequitable way.

To start, no plaintiff has Article III standing to seek the injunction. The district court held that plaintiffs are injured when borrowers swap their existing loans held by plaintiffs for new loans to take advantage of the SAVE plan—even though plaintiffs are repaid in full, and even though third-party borrowers make that decision. Even if there were standing, the SAVE plan is plainly lawful. Federal law requires the Department to offer income contingent repayment plans such as SAVE, and it commits the details of repayment terms—including the determination of payment amounts—to the Secretary's discretion, subject to certain limits. Indeed, the district court recognized that a plain-text reading of the statute authorizes the SAVE plan. That should have been dispositive. And all that aside, plaintiffs have failed to make the necessary showing that the equities justify any interim relief here—let alone the universal and overbroad injunction entered by the district court.

This Court previously stayed the preliminary injunction pending appeal. It should now reverse the district court's order and allow the Department to continue

implementing critical payment protections for millions of borrowers enrolled in the SAVE plan.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1361. App. Vol. II, at 419.[1] As explained below, however, the district court lacked subject-matter jurisdiction because no plaintiff has established Article III standing. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1). The district court entered a preliminary injunction on June 24, 2024, and the government filed its notice of appeal on June 27, 2024. *See* Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF THE ISSUE

Whether the district court erred by preliminarily enjoining the Department and the Secretary of Education (Secretary) "from implementing or acting pursuant to the parts of Final Rule—promulgated by the Department of Education titled 'Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program,' 88 Fed. Reg. 43,820—set to become effective on July 1, 2024." App. Vol. II, at 544.

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

---

[1] Citations in this format refer to the volume and page number of the appellants' appendix. *See* 10th Cir. R. 28.1(A)(1).

## STATEMENT OF THE CASE

### A.     Statutory and Regulatory Background

1.  Congress enacted the Higher Education Act of 1965 (HEA) to provide financial assistance for students in postsecondary and higher education.  Pub. L. No. 89-329, 79 Stat. 1219.  In 1993, Congress amended the HEA to authorize the Secretary to lend money directly to student borrowers.  Student Loan Reform Act of 1993, Pub. L. No. 103-66, 107 Stat. 341.  As amended, the statute requires the Secretary to give borrowers the choice of various plans to repay their Federal Direct Loans.  20 U.S.C. § 1087e(d)(1).  One type of plan that the Secretary must offer is "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years."  *Id.* § 1087e(d)(1)(D).

As the name of the plan suggests, the amount that a borrower must repay under an income contingent repayment (ICR) plan depends on the borrower's income.  *See* 20 U.S.C. § 1087e(e)(2).  The statute expressly authorizes the Secretary to "determine[]" the "appropriate portion" of the borrower's income on which payments shall be based.  *Id.* § 1087e(e)(4); *see also, e.g., id.* § 1087e(e)(1) ("The Secretary shall establish procedures for determining the borrower's repayment obligation on [a direct] loan for such year, and such other procedures as are necessary to implement effectively income contingent repayment."); *id.* § 1087e(e)(5) ("The Secretary may promulgate regulations limiting the amount of interest that may be

capitalized on such loan.").  The statute also explicitly authorizes the Secretary to "prescribe[]" the "period of time" over which the borrower makes payments.  *Id.* § 1087e(d)(1)(D).  That must be an "extended" period "not to exceed 25 years."  *Id.*

2.  Since 1993, the Secretary has offered several different ICR plans.  The Secretary created the first ICR plan in 1994.  *See* 59 Fed. Reg. 24,278 (July 1, 1994); 59 Fed. Reg. 61,664 (Dec. 1, 1994).  In 2012, the Secretary created a new ICR plan, known as the Pay As You Earn (PAYE) plan.  *See* 77 Fed. Reg. 66,088 (Nov. 1, 2012).  And in 2015, the Secretary created another new ICR plan, known as the Revised Pay As You Earn (REPAYE) plan.  *See* 80 Fed. Reg. 67,204 (Oct. 30, 2015).

The original ICR plan, the PAYE plan, and the REPAYE plan differed in their details but shared the same essential features.  First, each plan involved a determination by the Secretary regarding the amount of a borrower's income that should be "protected from [loan] payments."  88 Fed. Reg. 43,820, 43,827 (July 10, 2023).  Each plan calculated a borrower's discretionary income by subtracting that protected amount from the borrower's adjusted gross income.  *See* 80 Fed. Reg. at 67,239; 77 Fed. Reg. at 66,137; 59 Fed. Reg. at 61,698.  Second, each plan involved a determination by the Secretary regarding the percentage of a borrower's discretionary income that should "go[] toward [monthly] loan payments."  88 Fed. Reg. at 43,827; *see* 80 Fed. Reg. at 67,239; 77 Fed. Reg. at 66,137; 59 Fed. Reg. at 61,698.  Third, each plan involved a determination by the Secretary regarding the period "of time borrowers must pay before repayment ends."  88 Fed. Reg. at 43,827.  Under each

plan, the Secretary forgave any outstanding loan balance (principal plus interest) at the end of that period. *See* 80 Fed. Reg. at 67,209; 77 Fed. Reg. at 66,114; 59 Fed. Reg. at 61,666.

Under the 2015 version of the REPAYE plan, for instance, the amount of income protected from loan payments was 150% of the federal poverty line; a borrower's discretionary income was calculated as the borrower's adjusted gross income minus that protected amount. 80 Fed. Reg. at 67,239. Monthly loan payments were capped at 10% of a borrower's discretionary income. *Id.* And borrowers could qualify for loan forgiveness after making payments for 20 or 25 years. *Id.* at 67,241.

3. Since 2007, the HEA also has directed the Department to offer an income-based repayment (IBR) plan. *See* 20 U.S.C. §§ 1087e(d)(1)(E), 1098e. IBR is another type of repayment plan under which a borrower's payment amount is based on income, but IBR plans differ from ICR plans in key respects, including that they are subject to statutory limitations that Congress did not impose on ICR. For example, starting in 2014 IBR plans require payments of 10% of the borrower's discretionary income (calculated as income exceeding 150% of the federal poverty line) for a period of time "not to exceed" 20 years. *See id.* § 1098e(a)(3)(B), (b)(7)(B), (e).

4. Federal student loans also used to be issued through the Federal Family Education Loan (FFEL) Program. Under that program, private lenders made loans to students which were subsidized and reinsured by the federal government. No new

FFELs have been made since 2010, *see* 20 U.S.C. § 1071(d), but FFELs remain outstanding even as borrowers have paid down their existing balances.

Existing FFEL borrowers have the option to "consolidate" their loans into Direct Consolidation Loans. If a borrower elects that option, the Department issues a new loan to the borrower, with the proceeds used to repay the FFEL lender for the principal and interest accrued on the borrower's existing loan. *See* 20 U.S.C. § 1078-3(b)(1)(D); 34 C.F.R. § 685.220(f)(1)-(2). Borrowers who consolidate their FFELs into Direct Consolidation Loans generally have more repayment options available, including ICR plans, and may be eligible for other benefits, including Public Service Loan Forgiveness. *See* 20 U.S.C. § 1078-3(b)(5) (authorizing various repayment options for Direct Consolidation Loans); *id.* § 1087e(m)(1) (authorizing Public Service Loan Forgiveness for borrowers with "any eligible Federal Direct Loan"); 34 C.F.R. § 685.219(b) (*Eligible Direct Loan* includes "a Direct Consolidation Loan").

## B. The Final Rule

1. More than three years ago, the Department announced the establishment of negotiated rulemaking committees that would debate numerous changes to the Federal student financial aid programs, including to income-driven repayment (IDR) plans.[2] 86 Fed. Reg. 28,299, 28,300 (May 26, 2021). Then, in January 2023, the Department published a notice of proposed rulemaking soliciting comments on its

---

[2] Income-driven repayment is the "umbrella term" that the agency now uses to refer collectively to ICR and IBR plans. 88 Fed. Reg. at 43,820.

intended changes to the IDR regulations. 88 Fed. Reg. 1894 (Jan. 11, 2023). Citing the immense (and growing) deleterious effects of student-loan debt on American borrowers, the proposed rule took aim at elements of the repayment rules then in effect that inhibited borrowers' ability to repay. *Id.* Among the anticipated changes, relevant here were several alterations to the REPAYE plan: an increase in the amount of income exempt from the calculation of monthly payments; a decrease in the share of discretionary income borrowers must pay monthly; a shorter maximum repayment window for borrowers with low original balances (to be followed by discharge of remaining balances at the end of that window); not charging accrued interest remaining after accounting for a borrower's monthly payment; and modifications to allow borrowers increased credit toward qualifying for loan forgiveness. *Id.* at 1895 (summarizing these changes).

2. In July 2023, nine months before this lawsuit was filed, the Department published a final rule that broadly tracks its proposal. 88 Fed. Reg. at 43,820 (the Final Rule or Rule). In particular, the Final Rule decreases monthly payments for REPAYE borrowers and limits the repayment window to 10 years (from 20 or 25 years) of qualifying payments for loans with original balances of $12,000 or less;[3]

_____

[3] The Rule provides for forgiveness after one additional year for each additional $1,000 in original loan balance above $12,000, up to 20 or 25 years, the latter of which is the statutory maximum. 88 Fed. Reg. at 43,903; 20 U.S.C. § 1087e(d)(1)(D). A REPAYE borrower whose original balance was $14,000, for example, would be eligible for forgiveness after 12 years of qualifying payments.

decreases the percentage of discretionary income available for repayment (from 10% to 5%) for undergraduate borrowers; and increases the exemption for borrower income from 150% to 225% of the federal poverty line. The Rule provided that this amended payment plan could also be referred to as the Saving on a Valuable Education (SAVE) plan.

The HEA generally requires that final regulations for the federal student-financial-aid programs go into effect the following July 1. 20 U.S.C. § 1089(c)(1). The HEA also confers on the Secretary discretion to designate certain provisions for early implementation. *Id.* § 1089(c)(2). As announced in the Final Rule and several Federal Register notices, the Secretary has exercised early implementation authority with respect to several provisions in the Rule, including the provisions increasing the income-protection threshold to 225% of the federal poverty line and shortening the timeline to loan forgiveness eligibility for certain borrowers. 89 Fed. Reg. 2489 (Jan. 16, 2024); 88 Fed. Reg. 72,685 (Oct. 23, 2023); 88 Fed. Reg. at 43,820-21. The result is that some repayment plans have been modified and some borrowers have had their loan balances forgiven under the SAVE plan as early as February 23, 2024, well before this lawsuit was filed.

## C.    Prior Proceedings

Eleven States filed this suit on March 28, 2024, some nine months after publication of the Final Rule and several months after the Department announced in

January 2024 the early implementation of the shortened timeline to loan forgiveness. *See* App. Vol. I, at 10.

1.  The government filed a motion to dismiss for lack of standing, which the district court granted in part and denied in part. App. Vol. II, at 501. As principally relevant here, the court held that the three appellee States—Alaska, South Carolina, and Texas—"just barely" met their burden to establish Article III standing. App. Vol. II, at 457. Each of those States has a public instrumentality that holds FFELs. Plaintiffs argued that the existence of the SAVE plan would induce FFEL borrowers to consolidate their loans into Federal Direct Loans, and that such consolidation would deprive the State instrumentalities that hold FFELs of future interest revenue. *See* App. Vol. II, at 478-80. Despite plaintiffs' "conflicting" evidence for this theory, App. Vol. II, at 457, the court concluded that the asserted lost interest revenue constitutes an injury in fact traceable to the Final Rule.

Plaintiffs also asserted other theories of harm, including that the Final Rule would diminish their tax revenues (for those States that have an individual income tax) and would impair their ability to recruit and retain public-sector employees. *See* App. Vol. II, at 457. The district court rejected both, *see* App. Vol. II, at 486-500, and

accordingly it dismissed from this suit the eight States that relied exclusively on those latter two theories, App. Vol. II, at 500-01.[4]

2.  The district court granted in part the remaining plaintiffs' motion for a preliminary injunction. App. Vol. II, at 544. The court's order enjoined the Department "from implementing or acting pursuant to the parts of Final Rule . . . set to become effective on July 1, 2024." App. Vol. II, at 544.

The district court held that plaintiffs were likely to succeed on their claim that the Department had exceeded its statutory authority. While recognizing that the "HEA's [p]lain [t]ext [a]uthorizes [t]he SAVE [p]lan," App. Vol. II, at 515, the district court concluded that statutory "context" failed to provide the clear authority required by the major-questions doctrine. App. Vol. II, at 511-14, 518-25. After briefly considering the equitable factors, App. Vol. II, at 530-32, the district court determined that it would grant a preliminary injunction with nationwide scope against those provisions of the Rule scheduled to take effect on July 1, App. Vol. II, at 533-41.

In contrast, the district court denied the preliminary-injunction motion insofar as plaintiffs sought to enjoin the parts of the Final Rule that had taken effect prior to July 1. The court explained that plaintiffs failed to show irreparable harm from those

---

[4] Those eight States have filed a notice of appeal from the district court's dismissal order, purporting to invoke this Court's jurisdiction over final decisions of the district courts under 28 U.S.C. § 1291. *See* App. Vol. I, at 21 (Dkt. No. 88). That appeal is docketed as No. 24-3093. The government will present its arguments relating to that appeal, including any jurisdictional arguments, in filings in that case.

provisions of the SAVE plan already in effect—including "(i) the increase in the discretionary income line from 150% to 225% of the federal poverty line and (ii) the shorter path to forgiveness for borrowers who took out small loans." App. Vol. II, at 527. It explained that plaintiffs' "delay" in bringing this suit until after those provisions took effect—"combined with plaintiffs' abstractions about harm—fail to establish an irreparable harm." App. Vol. II, at 529.

3. On the government's motion, this Court stayed the preliminary injunction pending appeal. Order (June 30, 2024). Alaska, South Carolina, and Texas have sought an order vacating that stay in the Supreme Court. *See* Application to Vacate Stay, *Alaska v. Department of Educ.*, No. 24A11 (U.S. July 5, 2024). The government's response is requested by July 17, 2024, at 4:00 PM EDT.

## SUMMARY OF ARGUMENT

The preliminary injunction should be reversed under the traditional four-factor test for preliminary relief.

I. Plaintiffs are unlikely to prevail on the merits, as they have failed to clearly establish jurisdiction or that the enjoined portions of Final Rule—including the provision adjusting the percentage of undergraduate borrowers' discretionary income used to calculate their payment—are likely unlawful.

A. Plaintiffs have failed to clearly demonstrate Article III standing. The district court accepted plaintiffs' counterintuitive theory that they suffer an injury when borrowers consolidate FFELs into Federal Direct Loans. But consolidation

12

means that the State instrumentalities holding those loans are repaid in full. Even if that could be characterized as an injury, it would be attributable to the independent decisions made by third-party borrowers.

B.    The HEA provides clear statutory authority for the SAVE plan, regardless of whether the major-questions doctrine applies in this case. That doctrine is not implicated where, as here, an agency action builds on a longstanding program and adjusts some of the program's parameters. Even if it were, though, the statute expressly authorizes the Department to establish the terms of ICR plans, such as the SAVE plan, including by setting the appropriate portion of a borrower's income used to determine monthly payment amounts.

II.    The equitable factors likewise favor the government. Plaintiffs have not shown any cognizable injury, let alone an imminent, irreparable harm—as their delay in bringing this suit underscores. Even if they had, any modest injury they would suffer during this suit's pendency would be far outweighed by the certain and great harms to the Department and the public interest that the injunction would inflict.

III.    Assuming some relief were proper, the preliminary injunction should be narrowly tailored to match the injuries plaintiffs could establish. Both Article III and traditional equitable principles limit the proper scope of relief. But the district court entered a universal injunction that would prohibit the Department from implementing parts of the Final Rule for anyone, anywhere, regardless of their (lack of) connection to the plaintiff States. The injunction also covers parts of the Final Rule that no

plaintiff has asserted, let alone shown, injures it or is unlawful.  At a minimum, the

injunction must be narrowed.

## STANDARD OF REVIEW

This Court reviews for abuse of discretion an order granting a preliminary

injunction.  *Does 1-11 v. Board of Regents of the Univ. of Colo.*, 100 F.4th 1251, 1261 (10th

Cir. 2024).  The district court's legal conclusions are reviewed de novo and its factual

findings are reviewed for clear error.  *Id.*

## ARGUMENT

A preliminary injunction is an "extraordinary remedy never awarded as of

right."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Plaintiffs seeking

such a remedy must therefore "make a clear and unequivocal showing [they are]

entitled to such relief."  *Colorado v. Griswold*, 99 F.4th 1234, 1240 (10th Cir. 2024)

(quotation marks omitted).  To meet that burden, plaintiffs must establish that they

are likely to succeed on the merits, that they are likely to suffer irreparable harm

absent a preliminary injunction, that the balance of the equities tips in their favor, and

that an injunction is in the public interest.  *Diné Citizens Against Ruining Our Env't v.

Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016).

Plaintiffs cannot meet their burden.  Of the Final Rule provisions contested by

plaintiffs, the district court enjoined only one, which decreases the percentage of

discretionary income available for repayment (from 10% to 5%) for undergraduate

borrowers.  The injunction also covers numerous provisions that no plaintiff has

asserted, let alone shown, cause injury or are unlawful. The district court declined to enjoin the remainder of the Rule, including the other challenged provisions increasing the income-protection threshold and lowering the number of required payments for certain borrowers.

The preliminary injunction should be reversed. As an initial matter, Alaska, South Carolina, and Texas lack Article III standing because they suffer no injury fairly traceable to the enjoined provisions. That aside, the government is likely to succeed on the merits because the HEA clearly authorizes the Department to adopt regulations setting the terms of ICR plans, including, as most relevant here, the appropriate portion of borrower's income used to determine payment amounts. And the equities strongly favor the government. Even if the States suffered some harm, it would be far outweighed by the preliminary injunction's deleterious effects on the Department and the public interest.

## I. The government is likely to prevail on the merits.

### A. Alaska, South Carolina, and Texas lack Article III standing.

The requirement that plaintiffs demonstrate Article III standing "is built on a single basic idea—the idea of separation of powers." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422 (2021) (quotation marks omitted). Federal courts do not exercise "general legal oversight" of the Executive Branch. *Murthy v. Missouri*, 144 S. Ct. 1972, 1997 (2024). Standing doctrine thus "helps safeguard the Judiciary's proper—and properly limited—role in our constitutional system," *United States v. Texas*, 599 U.S.

670, 675-76 (2023), even though that "means that the federal courts decide some contested legal questions later rather than sooner," *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

To establish standing, a plaintiff must demonstrate (1) that it has suffered or likely will suffer an injury in fact, (2) that the injury likely was caused or will be caused by the defendant, and (3) that the injury likely would be redressed by the requested judicial relief. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The district court accepted a single theory of injury pressed by the three appellee States: that the SAVE plan would encourage student-loan borrowers to consolidate FFELs, which would deprive the State instrumentalities that hold such loans of future interest revenue. App. Vol. II, at 500-01. That theory is deficient in multiple respects.

1. Alaska, South Carolina, and Texas fail to establish that they will "suffer[] an injury in fact—an invasion of a legally protected interest." *Lujan*, 504 U.S. at 560 (quotation marks omitted). That is because consolidation does not entail any financial injury to the State instrumentalities at all. When a borrower consolidates a FFEL into a Federal Direct Consolidation Loan, the prior loans are repaid in full, including both outstanding principal and any interest due. *See* 20 U.S.C. § 1078-3(b)(1)(D) ("[T]he proceeds of each consolidation loan will be paid by the lender to the holder or holders of the loans so selected to discharge the liability on such loans . . . ."); 34 C.F.R. § 685.220(f)(1)-(2) (same). In other words, as the district court recognized,

"consolidation cashes out the private corporation holding the FFEL." App. Vol. II, at 467.

As a general matter, a party holding a loan suffers no injury when the loan is repaid in full. Indeed, the terms of the FFEL program specifically provide that borrowers have the right to "accelerate" their loans at any time (and to do so without penalty). *See* 20 U.S.C. § 1078(b)(1)(D)(i); 34 C.F.R. § 682.209(b)(2). A State instrumentality is not injured by early repayment solely because a borrower uses funds that originated from a third party. Consider, for example, a borrower who wins the lottery and then uses those winnings to repay a privately held FFEL. No one would say that loan holder has been "injured" by the borrower's winning lottery ticket. That is because, in that scenario, the lender receives full satisfaction of the outstanding principal and accrued interest in accordance with the loan's terms. And that "would ordinarily be cause for celebration, not a lawsuit." *TransUnion*, 594 U.S. at 437. From the FFEL holder's perspective, consolidation is no different from early repayment for any other reason—the borrower has simply used the proceeds of a new loan rather than the proceeds of a winning lottery ticket.

The district court, however, accepted plaintiffs' characterization of consolidation as injury because the lenders do not receive future interest payments (to which they have no entitlement) after a FFEL is repaid. *See* App. Vol. II, at 479-80. The court did not explain how that theory of injury can be squared with a fundamental economic concept: the time value of money. *See Atlantic Mut. Ins. Co. v.*

*Commissioner*, 523 U.S. 382, 384 (1998) ("[A] dollar today is worth more than a dollar tomorrow[.]" (quotation marks omitted)); *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010) (explaining the value of "having cash now rather than a promise, however reliable, of cash later").  Early repayment in full lets the holder recoup the time value of the loaned money and avoid the risk of loss from a borrower's default, which is the economic equivalent of the interest payments that it would otherwise collect in the future.  *See Habitat Educ. Ctr*, 607 F.3d at 458 ("If you part with money, you lose liquidity (the instant ability to deploy cash) and in addition incur a risk of never getting your money back.  So you demand compensation for parting with money, and that compensation normally takes the form of interest at a specified rate . . . .").

Plaintiffs' declarants disregarded the time value of the repaid principal, which fatally undermines their asserted injury.  *See Conkright v. Frommert*, 559 U.S. 506, 519 (2010) (explaining that, "[i]n the actuarial world," failing to "account for the time value of money" is "heresy").  Instead, they merely assert that the inability to collect future interest payments is itself a financial injury.  *See* App. Vol. II, at 410, 412-13. That falls far short of their burden to "make a 'clear showing' that [they are] 'likely' to establish each element of standing."  *Murthy*, 144 S. Ct. at 1986.

Plaintiffs' primary response is that the value of early repayment should not be considered because it merely "offset[s] the harms that the instrumentalities have suffered."  Stay Opp'n 6.  But early repayment is not some unrelated benefit; it is the

18

very reason the States' instrumentalities would not be owed interest in the future. The value of early repayment goes to whether the States would suffer any pocketbook injury in the first place—not whether such an injury would be outweighed by some other benefit.

2. Even if they could demonstrate an injury in fact, plaintiffs fail to establish that such injury is fairly traceable to the enjoined portions of the Final Rule rather than the independent decisions of third-party borrowers. "[P]laintiffs attempting to show causation generally cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts.'" *Alliance for Hippocratic Med.*, 602 U.S. at 383 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)); *see also Murthy*, 144 S. Ct. at 1986 ("[W]e have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." (quotation marks omitted)). Instead, plaintiffs bear the burden of showing that borrowers "will likely react in predictable ways to the defendants' conduct." *Murthy*, 144 S. Ct at 1986 (quotation marks omitted).

Plaintiffs' evidence fails to clear that hurdle. Borrowers considering consolidation must weigh various considerations that vary from person to person. *See* Fed. Student Aid, *Consolidating Student Loans*, https://studentaid.gov/manage-loans/consolidation (last visited July 15, 2024) (listing possible benefits and disadvantages). And the possible benefits of consolidation are not limited to enrolling in the SAVE plan: to take one example, FFEL borrowers must consolidate into

Direct Loans to become eligible for Public Service Loan Forgiveness. *See* 20 U.S.C. § 1087e(m)(1); 34 C.F.R. § 685.219(b). Given those various incentives, it is "purely speculative" whether borrowers' consolidation decisions are driven by a desire to obtain benefits offered by the SAVE plan as a whole—let alone the provisions enjoined by the district court—or are instead "made by the [borrowers] without regard to" those benefits. *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 42-43 (1976). Thus, even if it were plausibly alleged that the Final Rule "encouraged" certain borrowers to consolidate FFEL loans, that would be insufficient to establish causation. *Id.* at 42. Indeed, plaintiffs' own evidence demonstrates that consolidation payments have varied significantly over time, including prior to the announcement of the SAVE plan, without a readily discernable pattern. *See* App. Vol. II, at 407. That kind of "murky" evidence is insufficient to make a clear showing of traceability. *Murthy*, 144 S. Ct. at 1992 n.8.

The district court recognized these weaknesses in plaintiffs' evidence, but it held that a declaration from an employee of the Alaska Student Loan Corporation (App. Vol. II, at 412-14) provided the necessary causal link. App. Vol. II, at 478. That declaration baldly asserts that "borrowers are rapidly consolidating their loans away from FFEL[] loans held by [the Alaska Student Loan Corporation] and into Direct Loans held by the federal government," App. Vol. II, at 412, and it identifies several features of the SAVE plan that may make consolidation desirable for borrowers, App. Vol. II, at 412-13. That assertion is inadequate to justify the

preliminary injunction, as Alaska made no effort to demonstrate harm attributable to the enjoined provision setting payment amounts, as opposed to other features of the SAVE plan.  *See TransUnion*, 594 U.S. at 431 ("[S]tanding is not dispensed in gross . . . .").

Moreover, as noted, plaintiffs' own evidence shows that "borrowers already were consolidating their loans long before the SAVE Plan's incentives."  App. Vol. II, at 473.  Because borrowers had potent incentives to consolidate before SAVE "entered the picture . . . it is therefore difficult to say" whether those decisions were driven by SAVE or something else.  *Murthy*, 144 S. Ct. at 1992 n.8.  Absent some method of discerning *why* borrowers consolidate—entirely absent from the declaration—there is no basis for attributing borrowers' decisions to the SAVE plan. *See* App. Vol. II, at 474 ("Plaintiffs haven't adduced any evidence that purports to suss out the amount of consolidation caused by . . . the SAVE plan[] and general market forces individually.").

At bottom, Alaska's declaration amounts to a threadbare, conclusory assertion that it stands to lose "approximately $100,000 over just the next two years" in interest revenue from consolidated FFELs.  App. Vol. II, at 413.  That kind of "predictive sentence without more cannot show" the necessary causal link to establish traceability. *California v. Texas*, 593 U.S. 659, 677 (2021).

3.  Finally, even if this attenuated standing theory was sufficient to survive a motion to dismiss, it falls short of the "clear showing" necessary to obtain a

preliminary injunction. *Murthy*, 144 S. Ct. at 1986; *see also Griswold*, 99 F.4th at 1240 (plaintiffs seeking a preliminary injunction must make a "clear and unequivocal" showing). In denying the motion to dismiss, the district court observed that Alaska, South Carolina, and Texas "just barely" met their burden to establish jurisdiction. App. Vol. II, at 457. At another point, it observed that "South Carolina has succeed[ed] in showing standing by the thinnest of margins." App. Vol. II, at 480. Given that plaintiffs could "barely" demonstrate standing at the motion to dismiss stage, they have failed to establish the requisite likelihood of success on the merits for a preliminary injunction.

### B. The Department has clear statutory authority to promulgate the Final Rule.

Even if there were jurisdiction to reach the merits of plaintiffs' claims, the government would be likely to succeed. Of the three discrete provisions that plaintiffs challenged as contrary to the statute, the district court enjoined only one of them: the provision setting the percentage of undergraduate borrowers' discretionary income used to calculate payments. Plaintiffs are unlikely to succeed on their claim that that provision is contrary to the statute because the HEA grants the Department broad discretion to set the terms of ICR plans. In particular, it directs the Secretary to set payment amounts based on "the appropriate portion" of a borrower's income. 20 U.S.C. § 1087e(e)(4). Nonetheless, the district court held that plaintiffs were likely to succeed based on its conclusion that the major-questions doctrine applies. But the

major-questions doctrine has no application here, and even if it did, the statute provides clear authorization for the enjoined payment provision.

## 1. The major-questions doctrine does not apply here.

In certain "extraordinary cases," the Supreme Court has held that "separation of powers principles and a practical understanding of legislative intent" counsel caution before "read[ing] into ambiguous statutory text the delegation claimed to be lurking there." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quotation marks omitted). In such cases, the agency "must point to clear congressional authorization" for its action. *Id.* The major-questions doctrine is not implicated here, however, where the relevant program is longstanding and the agency has exercised its explicit statutory authority to adjust some of the policy's parameters.

This Court has recognized four hallmarks of cases implicating the major-questions doctrine: (1) when "the executive branch seeks to locate expansive authority in modest words, vague terms or ancillary provisions"; (2) when an action involves an "enormous and transformative expansion in regulatory authority without clear congressional authorization"; (3) when "an agency [has] claimed to discover regulatory authority for the first time in a long-extant statute"; and (4) when "the agency . . . lacks expertise in the relevant area of policymaking." *Bradford v. U.S. Dep't of Labor*,

101 F.4th 707, 725-26, 728 (10th Cir. 2024) (alterations and quotation marks omitted).[5]

As the district court recognized, the third and fourth factors plainly favor the government. App. Vol. II, at 524. The court nonetheless held that the doctrine applies principally because of the first and second factors. *See* App. Vol. II, at 511-14, 518-25. But those factors also cut against application of the major-questions doctrine. There is clear congressional authorization because the statute explicitly "empower[s]" the Secretary "to prescribe rules to 'fill up the details'" of ICR plans. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263, 2269 (2024) (quotation marks omitted). The HEA expressly directs the Secretary to set payments based on "the appropriate portion" of a borrower's income, 20 U.S.C. § 1087e(e)(4), a "phrase that leaves [the agency] with flexibility," *Loper Bright*, 144 S. Ct. at 2263 (quotation marks omitted). And the statute further directs the Secretary to set the period of repayment "not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D).

---

[5] The district court distilled these factors, App. Vol. II, at 519, but it misunderstood *Bradford*'s holding. These factors determine whether the major-questions doctrine applies. Based on its consideration of those factors, *Bradford* "decline[d] to apply" the major-questions doctrine because that case "differ[ed] markedly from those in which the Supreme Court" had applied it. 101 F.4th at 728. The district court stated that *Bradford* "assumed without deciding that the [major-questions doctrine] applied." App. Vol. II, at 519; *see also* App. Vol. II, at 514. That is not correct. Rather, *Bradford* only "assume[d]—without deciding"—that the plaintiffs' "framing of the specific 'question'" at issue was correct. 101 F.4th at 725; *see also id.* at 725 n.5 ("[W]e will assume that Appellants' framing is correct for purposes of resolving this appeal.").

24

Likewise, the Final Rule does not represent an "enormous and transformative expansion in regulatory authority." *Bradford*, 101 F.4th at 726 (alteration and quotation marks omitted). The Final Rule adjusts the parameters of existing repayment options, including by decreasing the percentage of discretionary income used to set monthly payments from 10% to 5% for undergraduate loans (leaving unchanged the percentage for graduate loans).[6] That is hardly a "transformative" expansion of the Department's authority; to the contrary, it is plaintiffs' interpretation of the statute that would "effect[] a fundamental revision of the statute," *West Virginia*, 597 U.S. at 728 (quotation marks omitted), by dramatically curtailing the Department's authority to offer ICR plans.

That leaves only whether the action involves "vast economic and political significance." App. Vol. II, at 511 (quotation marks omitted). But in deciding whether the major-questions doctrine applies, the Supreme Court has considered not just the "economic and political significance" of the asserted authority, but other surrounding circumstances, such as the "history and the breadth of th[at] authority."

---

[6] As discussed, the SAVE plan also adjusts the income-protection threshold and decreases the number of payments some borrowers with low initial balances will be required to make. The district court did not enjoin those provisions. But even if they were properly considered here, they would not alter the conclusion. The Department estimated that approximately 30% of borrowers entering repayment in fiscal year 2024 would benefit from the shortened timeline to forgiveness. 88 Fed. Reg. at 43,891. The other approximately 70% of borrowers would still be required to make between 20 and 25 years of payments under the SAVE plan, as they were under other IDR plans. *Id.* Those figures further illustrate that the Final Rule's changes are incremental, not transformative.

*West Virginia*, 597 U.S. at 721 (citation omitted); *see also, e.g.*, *Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023) (same). And as discussed above, those other circumstances provide no reason to be skeptical of the Department's exercise of authority here.

The district court focused in large part on an estimate of the SAVE plan's cost. App. Vol. II, at 251-22. The SAVE plan as a whole is economically substantial.[7] But that does not make this an "extraordinary case" involving a major question. Given the size of the Department's student-loan portfolio—approximately $1.6 trillion, 88 Fed. Reg. at 43,872—many potential agency actions could have many billions of dollars in economic impact. The same is true of the Medicare program, and the Supreme Court has not treated that as a reason to apply the major-questions doctrine.

---

[7] The district court stated that the SAVE plan "forgives nearly one-third of all student loan debt" based on a comparison of one estimate of its budgetary impact ($475 billion over 10 years) to the current balance of all federal student loans ($1.6 trillion). App. Vol. II, at 524. Even assuming the accuracy of that cost estimate, the comparison is apples-to-oranges: it fails to account for the approximately "$872 billion [that] will be lent over the coming decade." 88 Fed. Reg. at 43,872. More importantly, it is not clear that the cost estimate used by the district court is even approximately correct. For example, the Congressional Budget Office produced a cost estimate (cited in plaintiffs' complaint, App. Vol. II, at 427) nearly $200 billion *lower* over 10 years, even accounting for the ultimate invalidation of the Department's prior action to provide one-time debt cancellation in *Nebraska*, 143 S. Ct. 2355. Cong. Budget Office, *Re: Costs of the Proposed Income-Driven Repayment Plan for Student Loans* (Mar. 13, 2023), https://perma.cc/KG4U-RWXU. In all events, the cost implicated by this injunction does not include the *entire* cost of the Rule. The district court enjoined only one of the three provisions that plaintiffs challenged as contrary to the HEA. That provision—the decrease in certain monthly payments to 5% of a borrower's discretionary income—accounted for approximately $59 billion of the Rule's estimated cost of $156 billion before *Nebraska*. 88 Fed. Reg. at 43,890 (Tbl. 5.4).

*See, e.g.*, *Becerra v. Empire Health Found.*, 597 U.S. 424 (2022). The same holds for various agency actions implicating billions of dollars in costs to other industries. *See, e.g.*, *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489 (2014).

Citing *Nebraska*, 143 S. Ct. 2355, the district court also appeared to assume that any agency action involving substantial debt forgiveness would be a "major question[]." App. Vol. II, at 514. In *Nebraska*, the Secretary invoked his authority under the HEROES Act to "'waive or modify'" existing statutory or regulatory provisions to "cancel $430 billion of student loan principal." 143 S. Ct. at 2368 (citation omitted). In holding that the HEROES Act did not authorize the Secretary's actions, the Court emphasized that the Secretary's "modifications" had "created a novel and fundamentally different loan forgiveness program," *id.* at 2369, and that his "invocation of the waiver power" did "not remotely resemble how it ha[d] been used on prior occasions," *id.* at 2370.

But *Nebraska* involved a different kind of agency action (one-time debt cancellation rather than regulatory adjustments to a statutorily required repayment plan) under a different statutory authority, with different political and economic significance. *See* 143 S. Ct. at 2372-74; *see also Department of Educ. v. Brown*, 600 U.S. 551, 567 (2023) ("HEROES Act loan relief and HEA loan relief function independently of each other."). It does not follow that the issue here—whether the SAVE plan is a proper invocation of the Department's authority to establish or modify the terms of an IDR plan—is a major question, particularly given the

Department's unbroken practice (described above) of setting payment amounts and repayment schedules for ICR plans. *See Nebraska*, 143 S. Ct. at 2372 (recognizing the importance of "past practice under" the relevant statutory authority).

> ### 2. Even if the major-questions doctrine applied, the HEA clearly authorizes the Final Rule.

Regardless of whether the major-questions doctrine applies, though, the HEA clearly authorizes the only challenged provision that the district court enjoined: the decrease in monthly payments for undergraduate loans to 5% of a borrower's discretionary income. The statutory text and context support that conclusion.

Start with the statutory text. The Department must offer "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D). The Secretary has explicit authority to set the "repayment schedules" for such a plan: "repayment schedules shall be established by regulations promulgated by the Secretary and shall require payments that vary in relation to the appropriate portion of the annual income of the borrower . . . as determined by the Secretary." *Id.* § 1087e(e)(4). The Secretary also must "establish procedures for determining the borrower's repayment obligation . . . and such other procedures as are necessary to implement effectively income contingent repayment." *Id.* § 1087e(e)(1).

The statutory language thus clearly authorizes the decrease in monthly payments for undergraduate loans to 5% of a borrower's discretionary income. The Final Rule sets "[i]ncome contingent repayment schedules" via "regulations." 20 U.S.C. § 1087e(e)(4). The Final Rule "require[s] payments that vary in relation to the appropriate portion of the annual income of the borrower . . . as determined by the Secretary." *Id.* The Secretary has determined that the "appropriate portion" of a borrower's income is 5% of discretionary income for undergraduate loans and 10% of discretionary income for graduate loans, with discretionary income defined as income exceeding 225% of the federal poverty line. 88 Fed. Reg. at 43,832, 43,845.

The statutory language also clearly authorizes the other provisions of the Final Rule that plaintiffs challenged but that the district court did not enjoin. The HEA provides that "varying annual repayment amounts" shall be "paid over an extended period of time prescribed by the Secretary," which does not "exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D). Here, the Secretary has determined that "10 years of monthly payments represents an extended period of time" for borrowers with low initial balances. 88 Fed. Reg. at 43,833. For borrowers with higher initial balances, or those with graduate loans, the length of payment "prescribed by the Secretary" is longer—up to the 25-year statutory maximum. And at the end of the borrower's repayment term, the SAVE plan forgives any remaining balance—just as every other ICR plan has, and as the district court concluded that the statute contemplates. App. Vol. II, at 518 ("The court thus agrees with the Secretary's time-honored

interpretation that the statute imagines repayment for less than 25 years, with forgiveness at the end.").

Despite concluding that the HEA's "plain text" provides authority for the Final Rule, App. Vol. II, at 518, the district court went on to hold that the statutory context was insufficiently clear to authorize the SAVE plan, App. Vol. II, at 518-25. That approach erroneously used the major-questions doctrine as a reason for "departing from[ ]the text's most natural interpretation." *Nebraska*, 143 S. Ct. at 2376 (Barrett, J., concurring); *see also Loper Bright*, 144 S. Ct. at 2263 ("When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court [is] . . . recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries." (cleaned up)). Regardless, though, the statutory context only confirms the Department's authority to adopt the SAVE plan.

Consider the HEA's provisions for income-based repayment plans. Since 2014, IBR plans for new borrowers require payments of 10% of the borrower's discretionary income (calculated based on 150% of the federal poverty line) for up to 20 years. *See* 20 U.S.C. § 1098e(a)(3)(B), (b)(7)(B), (e). In ICR plans, by contrast, Congress granted the Secretary the authority to determine "the appropriate portion of the annual income of the borrower" used for payments made "over an extended period of time prescribed by the Secretary." *Id.* § 1087e(d)(1)(D), (e)(4). The district court was therefore wrong (App. Vol. II, at 523) to fault the SAVE plan for offering a

different repayment formula than a different type of plan that is based in different statutory language enacted at a different time. *See Maine Cmty. Health Options v. United States*, 590 U.S. 296, 314 (2020) ("[W]hen Congress includes particular language in one section of a statute but omits it in another, Congress intended a difference in meaning." (quotation marks omitted)).

Historical context also supports the agency's interpretation. While the Department has created and amended ICR plans in various ways over the years, including reducing payment amounts and shortening the maximum repayment periods, "Congress has made minimal changes to the Department's authority relating to ICR in the intervening years, even as it has acted to create and then amend the IBR plan." 88 Fed. Reg. at 43,827.[8] In making those changes, Congress has never limited or repudiated the agency's consistent approach of forgiving any remaining balance at the end of the borrower's repayment period, which supports that interpretation. *See Walker v. UPS, Inc.*, 240 F.3d 1268, 1276 (10th Cir. 2001).

The statutory text and context therefore provide robust authority for the SAVE plan. The district court's contrary holding cannot be squared with the Supreme Court's admonition against "introducing a limitation [on an agency's authority] not found in the statute." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,

---

[8] In 2007, for instance, Congress "provided more specificity over the periods that can be counted toward the maximum repayment period. Even then, it did not adjust language related to how much borrowers would pay each month." 88 Fed. Reg. at 43,830.

591 U.S. 657, 677 (2020); *see also Nebraska*, 143 S. Ct. at 2381 (Barrett, J., concurring) (major-questions doctrine "does not mean that courts have an obligation (or even permission) to choose an inferior-but-tenable alternative that curbs the agency's authority"). Accordingly, the government is likely to succeed on the merits of plaintiffs' challenge to the Final Rule.

## II. The equitable factors greatly favor the government.

Even if plaintiffs could establish a likelihood of success on the merits, "a preliminary injunction does not follow as a matter of course." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam). The other equitable factors weigh against injunctive relief, providing several independently adequate grounds to reverse the preliminary injunction.

### A. Plaintiffs fail to demonstrate irreparable harm absent preliminary relief.

To obtain a preliminary injunction, plaintiffs were required to demonstrate that they would suffer irreparable injury absent preliminary relief. Their failure to do so is "dispositive." *Colorado v. U.S. EPA*, 989 F.3d 874, 884 (10th Cir. 2021).

As plaintiffs have not shown any Article III injury, they necessarily have not shown irreparable harm. *See supra* pp. 15-22. But even if plaintiffs had established standing, their consolidation theory fails to establish irreparable harm necessitating a preliminary injunction. As the district court observed, plaintiffs' "theories of irreparable harm aren't all that substantial," App. Vol. II, at 526, and they showed, at

most, a "relatively meager harm," App. Vol. II, at 532. That weighs against their request for interim relief.

Plaintiffs' delay in bringing this suit underscores the inadequacy of their showing. *See Benisek*, 585 U.S. at 159 ("[A] party requesting a preliminary injunction must generally show reasonable diligence."); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009) ("[D]elay in seeking preliminary relief cuts against finding irreparable injury." (quotation marks omitted)). Plaintiffs waited some nine months after the publication of the Final Rule—and after the effective date of several provisions, including the shortened timeline to forgiveness—to file suit. The district court appropriately recognized that plaintiffs' "fail[ure] to proffer a reasonable explanation for the delay" was a significant factor in denying an injunction as to the parts of the Rule already in effect. App. Vol. II, at 529 (citing also plaintiffs' reliance on "abstractions about harm").

The court reached a different conclusion as to the parts of the rule scheduled to take effect on July 1. App. Vol. II, at 530-31. The court appeared to believe that plaintiffs' delay was less significant there, notwithstanding the substantial preparation necessary for the Department to implement those aspects of the Final Rule. More fundamentally, though, the district court did not elucidate what harm it believed plaintiffs would suffer from those provisions taking effect on July 1—most notably, the decrease in payment amounts due to the lower percentage of discretionary income used to calculate undergraduate borrowers' payments. The court alluded to the

impossibility of reversing loan forgiveness provided under the SAVE plan, *see* App. Vol. II, at 530-31—but it had already declined to enjoin the provisions providing a shortened timeline for forgiveness. That evidentiary gap is no surprise, as plaintiffs submitted no evidence attempting to parse out the effects of different portions of the SAVE plan and to establish the extent to which each portion contributed to the injury relied upon to support their standing. Consequently, there is no basis to conclude that the Rule's provisions that took effect on July 1 have or will imminently injure plaintiffs.

### B. The equities tilt strongly in the government's favor.

Finally, the preliminary injunction is improper because the balance of the equities and the public interest strongly favor the government. *See Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1278 (10th Cir. 2022) ("[T]he final two factors merge when the Government is the opposing party." (quotation marks omitted)). Given the mismatch between plaintiffs' meager injuries and the government's strong interests in implementing the Final Rule, "consideration of these factors alone requires denial of the requested injunctive relief." *Winter*, 555 U.S. at 23.

The government is irreparably injured when it "is enjoined by a court from effectuating statutes enacted by representatives of its people." *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 929 (2024) (Gorsuch, J., concurring in the grant of stay) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). Congress directed the Department to offer borrowers an ICR plan on terms set by the

Secretary, but the district court's injunction prevents the Department from offering the full SAVE plan to millions of borrowers already enrolled. In turn, that will exacerbate the serious harms the Rule was designed to ameliorate, including student-loan defaults, 88 Fed. Reg. at 43,881, delinquency, *id.* at 43,882, adverse effects on credit scores, *id.*, decreased liquidity for important purchases, *id.*, decreased enrollment in higher education, *id.* at 43,883, drags on national economic growth, *id.* at 43,884, and increased reliance on federal welfare programs, *id.*

Moreover, as the government's stay motion set forth (at 17-19), the injunction would upend the months of preparation by the Department and its loan servicers to implement the outstanding provisions of the Final Rule and result in chaos, confusion, and unrecoverable cost for borrowers and the Department. If the injunction were upheld, the Department and its servicers would have to reprogram their systems, retrain their staff, and recalculate monthly payments. *Id.* at 17-18. Until servicers can correctly bill the new amounts, the Department would have no choice but to place many borrowers into forbearance. *Id.* at 18. And the Department would have to devote considerable staff time and other resources to the reprogramming effort, which would detract from other critical priorities. *Id.* In the meantime, many borrowers would experience intense confusion when they are told that their payments must be recalculated and that they must be placed in forbearance. *Id.* at 18-19. And many would suffer additional harm when they are sent new bills and charged up to

double what they expected. *Id.* The gravity of those harms is reflected in this Court's stay order.

The district court read *National Federation of Independent Business v. Department of Labor, Occupational Safety & Health Administration*, 595 U.S. 109 (2022) (per curiam), to mean that it was not the court's role to "weigh the tradeoffs." App. Vol. II, at 532. But that decision stands only for the proposition that "[t]he equities do not justify withholding interim relief," *National Fed'n*, 595 U.S. at 120, when "the harms and equities are very weighty on both sides," *Poe*, 144 S. Ct. at 929 (Kavanaugh, J., concurring in the grant of stay). In such cases, an assessment of "likelihood of success on the merits" may well be dispositive. *Id.* The Supreme Court did not repudiate the general rule that, "[i]n each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," with "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quotation marks omitted). Here, the harms and equities are weighty on only one side, so the balance of the equities decisively favors the government.

## III. At a minimum, the preliminary injunction should be narrowly tailored.

Assuming that some relief was proper, this Court should at least narrow the injunction to match any injury established by plaintiffs. Consistent with Article III, federal courts may grant relief only to remedy "the inadequacy that produced [the

plaintiff's] injury." *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Principles of equity reinforce those limitations. Injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). In line with these principles, the Supreme Court recently stayed a universal injunction based on five Justices' explicit conclusion that such injunctions are likely impermissible. *Poe*, 144 S. Ct. at 927 (2024) (Gorsuch, J., concurring in the grant of stay); *id.* at 933 n.4 (Kavanaugh, J., concurring in the grant of stay).

The preliminary injunction here violates those principles by enjoining the Final Rule on a universal (or nationwide) basis. The district court enjoined the Department from implementing the relevant portions of the SAVE plan for anyone, anywhere— even for the vast majority of federal student-loan borrowers who have no connection to Alaska's, South Carolina's, or Texas's FFEL holdings. Even accepting the theory of injury adopted by the district court, none of those States suffers harm when borrowers with Federal Direct loans enroll in the SAVE plan, or when borrowers with FFELs held by other entities obtain a Direct Consolidation Loan to enroll in the SAVE plan. Accordingly, this Court should at a minimum narrow the injunction to prohibit only the Department's processing of any further consolidation of FFELs held by the three relevant State instrumentalities.

The district court premised its universal relief on a desire for "nationwide uniformity," discerning "no good reason why student debtors in 47 states should do

better than those in the three plaintiff states with standing." App. Vol. II, at 538. To the extent that student borrowers would be better off if they were not covered by the district court's injunction, that would establish that the public interest weighs against the requested relief. But even on its own terms, the district court's inquiry was mistaken. After all, "[i]t is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should *not* issue; rather, a court must determine that an injunction *should* issue under the traditional four-factor test." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 158 (2010). And the fundamental jurisdictional and equitable limitations on the court's power to grant relief are exceedingly strong reasons to narrow the injunction.

Universal scope aside, the injunction also improperly covers provisions of the Final Rule that have not been shown to affect plaintiffs or to be unlawful. *See Poe*, 144 S. Ct. at 923 (Gorsuch, J., concurring in the grant of stay) (emphasizing that a district court "clearly strayed from equity's traditional bounds" by enjoining provisions of a law "that don't presently affect [the plaintiffs]"). Even if plaintiffs here had established an injury caused by some provisions of the Final Rule—for example, those they specifically identified as incentivizing consolidation—that would not justify an injunction against implementing the remaining parts of the Rule. *See Lewis*, 518 U.S. at 358 n.6 (explaining that "the right to complain of *one* administrative deficiency" does not "confer[] the right to complain of *all* administrative deficiencies"); *see also, e.g.*, *Blum v. Yaretsky*, 457 U.S. 991, 999-1002 (1982) (distinguishing portions of an

administrative regulatory scheme that the plaintiffs had standing to challenge from those that they did not).

For instance, the district court enjoined portions of the Final Rule include a statutorily mandated provision to allow automatic recertification of borrower income on multiple repayment plans, *see* 88 Fed. Reg. at 43,865, and a provision that allows borrowers with cancer to receive credit toward forgiveness on all IDR plans, *see id.* at 43,903.[9] There is no indication that plaintiffs experience any harm from those provisions, let alone that they are unlawful. Thus, if the Court declines to enter broader relief, it should narrow the injunction to apply only to the Final Rule's provision adjusting the percentage of a borrower's discretionary income used to calculate monthly payments—the only provision that went into effect on July 1 that plaintiffs attempted to link to their asserted injury.

Severability principles reinforce that conclusion.[10] When a court concludes that a portion of a rule is unlawful, it may sever that portion and leave the remainder

---

[9] This provision was originally designated for implementation "as soon as possible" after the Final Rule's publication, subject to the Department's publishing "a separate notice announcing the timing of the implementation." 88 Fed. Reg. at 43,821. No such notice has been published, and the provision has not been implemented yet.

[10] Plaintiffs' stay opposition (at 26) suggested that the government "waived" its arguments in favor of narrowly tailoring any injunction through severance. That is backwards. The district court observed that "[d]efendants argue[d] that the SAVE Plan is severable," but "[p]laintiffs' brief never respond[ed] to this argument." App. Vol. II, at 527; *see also* App. Vol. II, at 338-41 (defendants' severability argument). It is plaintiffs that have waived any argument against severability. App. Vol. II, at 527.

39

intact.  *See Arizona Pub. Serv. Co. v. U.S. EPA*, 562 F.3d 1116, 1122 (10th Cir. 2009)

("A regulation is severable if the severed parts operate entirely independently of one

another, and the circumstances indicate the agency would have adopted the regulation

even without the faulty provision." (quotation marks omitted)).  The Final Rule's

express severability clause makes that clear.  88 Fed. Reg. at 43,828 ("[E]ach of the

components of this final rule can operate in a manner that is independent and

severable of each other.  The analyses used to justify their inclusion are all different.

And while they help accomplish similar goals, they can contribute to those goals on

their own.").  Accordingly, this Court should reverse the injunction as to any portion

of the Final Rule that plaintiffs have not established injures them and is unlawful.

**CONCLUSION**

For the foregoing reasons, the preliminary injunction should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

MICHAEL S. RAAB
THOMAS PULHAM
*s/ Simon C. Brewer*
SIMON C. BREWER
SARAH N. SMITH
*Attorneys, Appellate Staff*
*Civil Division, Room 7529*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5367*
*Simon.C.Brewer@usdoj.gov*

July 2024

**STATEMENT REGARDING ORAL ARGUMENT**

Appellants respectfully defer to the Court on whether this case should be set for oral argument. If the Court determines that oral argument would be useful, appellants stand ready to present argument.

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 28.1(e)(2)(A)(i) because it contains 10,172 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Simon C. Brewer*
Simon C. Brewer

**CERTIFICATE OF SERVICE**

I hereby certify that on July 15, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Simon C. Brewer*
Simon C. Brewer

**ADDENDUM**

# TABLE OF CONTENTS

20 U.S.C. § 1087e.................................................................................. A1

20 U.S.C. § 1098e.................................................................................. A2

**20 U.S.C. § 1087e**

**§ 1087e. Terms and conditions of loans**

. . .

**(d) Repayment plans**

   **(1) Design and selection**

Consistent with criteria established by the Secretary, the Secretary shall offer a borrower of a loan made under this part a variety of plans for repayment of such loan, including principal and interest on the loan. The borrower shall be entitled to accelerate, without penalty, repayment on the borrower's loans under this part. The borrower may choose--

**(A)** a standard repayment plan, consistent with subsection (a)(1) of this section and with section 1078(b)(9)(A)(i) of this title;

**(B)** a graduated repayment plan, consistent with section 1078(b)(9)(A)(ii) of this title;

**(C)** an extended repayment plan, consistent with section 1078(b)(9)(A)(iv) of this title, except that the borrower shall annually repay a minimum amount determined by the Secretary in accordance with section 1078(b)(1)(L) of this title;

**(D)** an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years, except that the plan described in this subparagraph shall not be available to the borrower of a Federal Direct PLUS loan made on behalf of a dependent student; and

**(E)** beginning on July 1, 2009, an income-based repayment plan that enables borrowers who have a partial financial hardship to make a lower monthly payment in accordance with section 1098e of this title, except that the plan described in this subparagraph shall not be available to the borrower of a Federal Direct PLUS Loan made on behalf of a dependent student or a Federal Direct Consolidation Loan, if the proceeds of such loan were used to discharge the liability on such Federal Direct PLUS Loan or a loan under section 1078–2 of this title made on behalf of a dependent student.

. . .

**(e) Income contingent repayment**

. . .

### (4) Repayment schedules

Income contingent repayment schedules shall be established by regulations promulgated by the Secretary and shall require payments that vary in relation to the appropriate portion of the annual income of the borrower (and the borrower's spouse, if applicable) as determined by the Secretary.

### (5) Calculation of balance due

The balance due on a loan made under this part that is repaid pursuant to income contingent repayment shall equal the unpaid principal amount of the loan, any accrued interest, and any fees, such as late charges, assessed on such loan. The Secretary may promulgate regulations limiting the amount of interest that may be capitalized on such loan, and the timing of any such capitalization.

. . .

## 20 U.S.C. § 1098e

## § 1098e. Income-based repayment

## (a) Definitions

In this section:

. . .

### (3) Partial financial hardship

The term "partial financial hardship", when used with respect to a borrower, means that for such borrower--

**(A)** the annual amount due on the total amount of loans made, insured, or guaranteed under part B or D (other than an excepted PLUS loan or excepted consolidation loan) to a borrower as calculated under the standard repayment plan under section 1078(b)(9)(A)(i) or 1087e(d)(1)(A) of this title, based on a 10-year repayment period; exceeds

**(B)** 15 percent of the result obtained by calculating, on at least an annual basis, the amount by which--

(i) the borrower's, and the borrower's spouse's (if applicable), adjusted gross income; exceeds

**(ii)** 150 percent of the poverty line applicable to the borrower's family size as determined under section 9902(2) of Title 42.

**(b) Income-based repayment program authorized**

Notwithstanding any other provision of this chapter, the Secretary shall carry out a program under which--

**(1)** a borrower of any loan made, insured, or guaranteed under part B or D (other than an excepted PLUS loan or excepted consolidation loan) who has a partial financial hardship (whether or not the borrower's loan has been submitted to a guaranty agency for default aversion or had been in default) may elect, during any period the borrower has the partial financial hardship, to have the borrower's aggregate monthly payment for all such loans not exceed the result described in subsection (a)(3)(B) divided by 12;

. . .

**(7)** the Secretary shall repay or cancel any outstanding balance of principal and interest due on all loans made under part B or D (other than a loan under section 1078-2 of this title or a Federal Direct PLUS Loan) to a borrower who--

**(A)** at any time, elected to participate in income-based repayment under paragraph (1); and

**(B)** for a period of time prescribed by the Secretary, not to exceed 25 years, meets 1 or more of the following requirements--

**(i)** has made reduced monthly payments under paragraph (1) or paragraph (6);

**(ii)** has made monthly payments of not less than the monthly amount calculated under section 1078(b)(9)(A)(i) or 1087e(d)(1)(A) of this title, based on a 10-year repayment period, when the borrower first made the election described in this subsection;

**(iii)** has made payments of not less than the payments required under a standard repayment plan under section 1078(b)(9)(A)(i) or 1087e(d)(1)(A) of this title with a repayment period of 10 years;

**(iv)** has made payments under an income-contingent repayment plan under section 1087e(d)(1)(D) of this title; or

**(v)** has been in deferment due to an economic hardship described in section 1085(o) of this title;

. . .

**(e) Special terms for new borrowers on and after July 1, 2014**

With respect to any loan made to a new borrower on or after July 1, 2014--

**(1)** subsection (a)(3)(B) shall be applied by substituting "10 percent" for "15 percent"; and

**(2)** subsection (b)(7)(B) shall be applied by substituting "20 years" for "25 years".

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

STATE OF KANSAS, et al.,

                **Plaintiffs,**

v.

JOSEPH R. BIDEN, et al.,

                **Defendants.**

Case No. 24-1057-DDC-ADM

## MEMORANDUM AND ORDER

A plaintiff must have standing to bring a lawsuit. As future Justice Scalia once explained, standing asks, "What's it to you?"[1] And if a plaintiff can't answer that question, that plaintiff doesn't have standing.

This case requires the court to answer a daunting question: When do states have standing to sue the federal government? The Supreme Court addressed this question in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023). There, several states challenged a Department of Education student loan forgiveness plan. The Supreme Court held that one state had standing. Missouri had standing to sue on behalf of its "public instrumentality"—a nonprofit, government corporation that owned and serviced student loans. That public instrumentality had suffered harm because the Department's plan forgave student loan debt, thereby reducing the number of student loans, and, as a result, reducing the service fees the public instrumentality would collect. And so, harm to Missouri's public instrumentality conferred standing on Missouri. This case,

---

[1] Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983) (revised version of Ninth Donahue Lecture at Suffolk University Law School) (cited in *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).

though it involves different states and a different student loan forgiveness plan, sits in the shadow of *Biden v. Nebraska*.

Plaintiffs here are 11 states challenging the Department of Education's new student loan regulations, called the SAVE Plan. As relevant here, the SAVE Plan does two things. *First*, it lowers monthly payments for eligible borrowers. *Second*, it shortens the maximum repayment period for eligible borrowers who took out small original loans. That is, if a student borrowed $12,000 or less, the new regulations require that borrower to make payments for 10 years—instead of 20 or 25 years. After 10 years of payments, the Department will forgive the remainder of the debt. Plaintiffs claim the new regulations violate the Constitution's separation of powers and the Administrative Procedures Act.

Defendants have moved to dismiss, arguing plaintiffs lack standing because the SAVE Plan doesn't cause the states any direct harm. Doc. 45. In response, plaintiffs argue the new regulations will harm them in three ways: (1) reduced revenue for the states' public instrumentalities who own student loans, (2) reduced tax revenue, and (3) a competitive harm to their ability to recruit and retain employees to state public service employment. The first theory works, thanks to *Biden v. Nebraska*. But the other two don't.

In short, plaintiffs have shouldered their burden to show the SAVE Plan likely will reduce the revenue of South Carolina, Texas, and Alaska's public instrumentalities—but just barely. Their standing theory is weaker than the one that prevailed in *Biden v. Nebraska*. And the allegations and declarations supporting their standing theory are conflicting. Plaintiffs even tried to sandbag their standing obligation. Their initial Complaint didn't allege standing facts adequately. Instead, plaintiffs wanted to hold onto their standing allegations until the preliminary injunction hearing. The court rejected that approach since standing, in federal court,

is an essential ingredient of subject matter jurisdiction.  So, they eventually filed an Amended Complaint disclosing their standing assertion.  This approach is far from perfect.

But despite these issues, plaintiffs have shouldered their burden to show that the new regulations, more likely than not, will injure South Carolina, Texas, and Alaska's public instrumentalities.  The other eight states—those without a public instrumentality participating in the student loan market—haven't shouldered their burden to show that the regulations will cause them any direct harm.

The other eight plaintiffs assert that they have standing because the SAVE Plan will reduce their income tax revenues.  But this is an incidental effect of the SAVE Plan, traceable to plaintiffs' own decisions about how to tax revenue.  Alternatively, these eight plaintiffs also assert that the SAVE Plan harms them directly because it reduces their ability to recruit staff to public service within state agencies.  No court has ever bought into this theory, and this court declines to become the first.  These plaintiffs simply have no skin in the game.  Their answer to Justice Scalia's colloquial expression of standing—What's it to you?—is this:  It's nothing.

The court thus grants defendants' Motion to Dismiss (Doc. 45) in part and denies it in part.  Plaintiffs South Carolina, Texas, and Alaska have standing based on their public instrumentalities.  The other eight states don't, and, exercising discretion conferred by Circuit authority, the court dismisses them from this action.  This is precisely how the court handles any lawsuit where some plaintiffs have viable claims and others don't.  Fed. R. Civ. P. 1 (directing courts to "secure the just, speedy, and inexpensive determination of every action and proceeding").  The court explains this result, below, beginning with the relevant background.

I.        **Background**

The court begins with the statutory scheme that defendants here used to enact the SAVE Plan.  The court then recounts the details of the SAVE Plan and concludes this section with a short summary of this lawsuit.

*The Higher Education Act (HEA)*

Congress enacted the Higher Education Act in 1965 "to assist in making available the benefits of postsecondary education to eligible students . . . in institutions of higher education[.]" 20 U.S.C. § 1070.  Initially, the HEA didn't authorize the federal government to loan money directly to students.  Doc. 57 at 10 (1st Am. Compl. ¶ 46).  Instead, the federal government guaranteed private loans.  *Id.*  That changed in 1993, when Congress amended the HEA and authorized the federal government to loan money directly to students.  *Id.*  This 1993 amendment also required the Department of Education to offer students a variety of repayment plans.  *Id.*; *see also* 20 U.S.C. § 1087e(d)(1).  Only one variety of repayment plan matters here:  income contingent repayment plans.  Doc. 57 at 10 (1st Am. Compl. ¶ 47); *see also* 20 U.S.C. § 1087e(d)(1)(D).  As the name implies, these plans base a borrower's loan repayments on the borrower's income.  The relevant statute provides for "an income contingent repayment plan, with varying annual payments based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years[.]"  20 U.S.C. § 1087e(d)(1)(D).

*The SAVE Plan*

Plaintiffs challenge the Department's SAVE Plan, which sets new rules for income contingent (also known as income driven) repayment plans.  This section recounts the SAVE Plan's history and explains how it works.

In January 2023, the Department issued a Notice of Proposed Rulemaking (NPRM). Doc. 57 at 12 (1st Am. Compl. ¶ 57).  The NPRM "propose[d] to amend the regulations governing income-contingent repayment plans[.]"  Improving Income-Driven Repayment for the William D. Ford Federal Direct Loan Program, 88 Fed. Reg. 1894, 1894 (Jan. 11, 2023) (to be codified at 34 C.F.R. pt. 685).  After the NPRM and the comment period, the Department published the "Final Rule" in July 2023.  Doc. 57 at 14 (1st Am. Compl. ¶ 68); *see also* Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43820 (July 10, 2023) (to be codified at 34 C.F.R. pts. 682, 685).

Relevant here, the Final Rule[2] makes the following changes to income contingent repayment plans:

- Defines discretionary income as income above 225% of the applicable federal poverty guideline;

- Sets a borrower's monthly payment amount to $0 if the borrower's income falls below 225% of the applicable federal poverty guideline;

- For undergraduate loans, caps a borrower's monthly payment amount at 5% of the borrower's income above 225% of the applicable federal poverty guideline; and

- For borrowers whose original principal balance was $12,000 or less, cancels the remaining balance after the borrower has made 120 monthly payments or the equivalent.

Doc. 57 at 14 (1st Am. Compl. ¶ 70).  To summarize, the Final Rule decreases borrowers' monthly payments and, for loans with original balances of $12,000 or less, limits a borrower's repayment window to 10 years (from 20 or 25) of qualifying payments.

***This Lawsuit***

---

[2]     This Memorandum and Order uses the terms "Final Rule" and "SAVE Plan" interchangeably.

Eleven states now sue Secretary of Education Miguel Cardona, the United States Department of Education, and President Joseph R. Biden.  According to these states, the Final Rule is "plainly unlawful" under the Constitution and the Administrative Procedures Act, especially in light of *Biden v. Nebraska*, 143 S. Ct. 2355 (2023).  They bring four claims:  (1) agency action in excess of statutory jurisdiction and in violation of separation of powers, violating Article I of the Constitution; (2) agency action in excess of statutory authority, violating the Administrative Procedures Act (APA); (3) arbitration and capricious agency action, violating the APA; and (4) agency action in violation of APA procedures.  Doc. 57 at 25–38 (1st Am. Compl. ¶¶ 133–227).

With this background, the court next recites the legal standard governing defendants' Motion to Dismiss.[3]

## II.        Legal Standard

Defendants move for dismissal under Fed. R. Civ. P. 12(b)(1), arguing plaintiffs lack standing, and so this court lacks subject matter jurisdiction.  Rule 12(b)(1) motions take one of two forms:  a facial attack or a factual attack.  *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001).  "A facial attack asserts that the allegations in the complaint, even if true, are insufficient to establish subject matter jurisdiction.  By contrast, a factual attack on the complaint challenges the veracity of the allegations upon which subject matter jurisdiction depends."  *Cnty. Comm'rs v. U.S. Dep't of the Interior*, 614 F. Supp. 3d 944, 951 (D.N.M. 2022) (citation and internal quotation marks omitted).  Here, defendants bring a factual attack.[4]

---

[3]        Though defendants filed their Motion to Dismiss before plaintiffs filed their First Amended Complaint, the parties previously asked the court and it agreed to apply the Motion to Dismiss arguments to plaintiffs' First Amended Complaint.  Doc. 60 at 3.

[4]        Though defendants present no evidence of their own, the parties agreed at the hearing that this is a factual attack on the court's subject matter jurisdiction.

A factual attack allows the court to "reference . . . evidence outside the pleadings" including "affidavits, other documents, and [even conduct] a limited evidentiary hearing to resolve disputed jurisdictional facts." *Stuart*, 271 F.3d at 1225 (citation and internal quotation marks omitted). "When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations." *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995), *abrogated on other grounds by Cent. Green Co. v. United States*, 531 U.S. 425, 437 (2001). Instead, "when considering a Rule 12(b)(1) motion to dismiss, the court may weigh the evidence and make factual findings." *Los Alamos Study Grp. v. U.S. Dep't of Energy*, 692 F.3d 1057, 1063 (10th Cir. 2012).

"If jurisdiction is challenged, the burden is on the party claiming jurisdiction to show it by a preponderance of the evidence." *Celli v. Shoell*, 40 F.3d 324, 327 (10th Cir. 1994). So, when facing a factual attack, a plaintiff must "present affidavits or other evidence sufficient to establish the court's subject matter jurisdiction by a preponderance of the evidence." *U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 n.5 (10th Cir. 1999); *see also Sapp v. F.D.I.C.*, 876 F. Supp. 249, 251 (D. Kan. 1995) ("The allegations contained in the complaint are initially accepted as true, but if challenged the plaintiff has the duty to support the allegations with competent proof."). Our Circuit has analogized plaintiffs' Rule 12(b)(1) burden to the nonmovant's burden under Fed. R. Civ. P. 56(e). *Hafter D.O.*, 190 F.3d at 1160 n.5 ("Whether we consider [defendant's] motion as a motion to dismiss under Rule 12(b)(1) or a motion for summary judgment, [plaintiffs'] burden remains essentially the same—they must present affidavits or other evidence sufficient to establish the court's subject matter jurisdiction by a preponderance of the evidence.").

Defendants seek dismissal of plaintiffs' claims under Rule 12(b)(1) because, they assert, plaintiffs lack Article III standing.  Article III of our Constitution limits federal courts' jurisdiction to "cases" and "controversies."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  To present a case or controversy under Article III, a plaintiff must establish that it has standing to sue.  *Id.* (citations omitted).  To have standing, "a plaintiff needs a 'personal stake' in the case."  *Biden v. Nebraska*, 143 S. Ct. at 2365 (2023) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).  "To demonstrate their personal stake, plaintiffs must be able to sufficiently answer the question:  'What's it to you?'"  *TransUnion*, 594 U.S. at 423 (citation and internal quotation marks omitted).  "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (citation and internal quotation marks omitted).

Article III's standing analysis requires three things:

(1) an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical[;]"

(2) "a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court[;]" and

(3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted).

Plaintiffs must establish standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  *Id.* at 561.  At "the pleading stage, the plaintiff must clearly

allege facts demonstrating each element" of standing.  *Spokeo*, 578 U.S. at 338 (citation, internal quotation marks, and ellipsis omitted).  "If at least one plaintiff has standing, the suit may proceed."  *Biden v. Nebraska*, 143 S. Ct. at 2365 (citation omitted).

## III.      Analysis

Plaintiffs assert three[5] distinct theories of standing.  *First*, plaintiffs argue that the Final Rule harms their public instrumentalities—organizations who own and service student loans. *Second*, they argue that the Final Rule causes them direct injury because the Final Rule will decrease their tax revenues.  *Last*, plaintiffs allege the Final Rule hurts their ability to recruit employees into state employment.  The court considers each theory, in turn, below.

### A.      Public Instrumentalities

Plaintiffs' public instrumentality theory alleges, in a nutshell, that three of the plaintiff states have government corporations who own and service student loans, and the Final Rule will cause these organizations to lose revenue.  The organizations are public instrumentalities of the states, plaintiffs argue, so a harm to three instrumentalities is a direct injury to the three states themselves.  Because this standing theory relies on *Biden v. Nebraska*, 143 S. Ct. 2355, the court reviews that case's standing discussion, in detail, below.

#### 1.      *Biden v. Nebraska*

*Biden v. Nebraska* involved student loan forgiveness under the Higher Education Relief Opportunities for Students Act (HEROES Act) of 2003, a law enacted out of Congress's concern for student loan borrowers in the wake of the September 11 terrorist attacks.  143 S. Ct. at 2363.

---

[5]      In their original Complaint, plaintiffs alleged a fourth kind of injury:  "increased law enforcement costs[.]"  Doc. 1 at 21 (Compl. ¶ 113).  Plaintiffs alleged that the SAVE Plan "will create enormous opportunities for fraudsters to exploit student debt borrowers that would not otherwise exist."  *Id.* Plaintiffs' First Amended Complaint doesn't mention this injury.  *See generally* Doc. 57 (1st Am. Compl.).  And during the hearing on this motion, plaintiffs' counsel confirmed.  Plaintiffs have abandoned this theory.

The HEROES Act allows the Secretary of Education to "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs" during a "national emergency[.]"  20 U.S.C. § 1098bb(a)(1).  During the COVID-19 pandemic, the Secretary used the HEROES Act to suspend interest accrual and repayment obligations on federal student loans several times.  *Biden v. Nebraska*, 143 S. Ct. at 2364.  In August 2022, the Secretary took a step further, and cancelled student loan debt under the HEROES Act to address financial harm stemming from the COVID-19 pandemic.  *Id.*  This plan sought "to reduce and eliminate student debts directly."  *Id.*  Here's how that batch of loan forgiveness worked:

> For borrowers with an adjusted gross income below $125,000 in either 2020 or 2021 who have eligible federal loans, the Department of Education will discharge the balance of those loans in an amount up to $10,000 per borrower.  Borrowers who previously received Pell Grants qualify for up to $20,000 in loan cancellation.

*Id.* at 2364–65 (citations omitted).

Six states challenged this HEROES Act plan.  *Id.* at 2365.  The district court concluded the states lacked standing.  *Id.*  The Eighth Circuit disagreed, concluding the state of Missouri likely had standing based on the Missouri Higher Education Loan Authority (MOHELA).  *Id.*  The Supreme Court granted certiorari before judgment and, relevant here, concluded Missouri had standing because "the Secretary's plan harm[ed] MOHELA and thereby directly injure[d] Missouri[.]"  *Id.*

The Court explained that MOHELA, a nonprofit government corporation, participated in the student loan market.  *Id.*  MOHELA owned over $1 billion in Federal Family Education Loans (FFELs) and serviced $150 billion in federal loans.  *Id.* at 2365–66.  The Court's standing analysis focused on service fees.  *Id.*  The Department of Education had hired MOHELA "to collect payments and provide customer service to borrowers.  MOHELA receive[d] an

administrative fee for each of the five million federal accounts it services[.]"  *Id.* (citations omitted).

Enter the HEROES Act student loan forgiveness plan.  Under this "plan, roughly half of all federal borrowers would have their loans completely discharged."  *Id.* at 2366.  This meant "MOHELA could no longer service those closed accounts, costing it, by Missouri's estimate, $4 million a year in fees that it otherwise would have earned under its contract with the Department of Education."  *Id.*  The Court concluded that this financial harm from reduced service fees qualified as "an injury in fact directly traceable to the Secretary's plan[.]"  *Id.*  The Court went on to explain that MOHELA was a public instrumentality of Missouri, so a "harm to MOHELA in the performance of its public function [was] necessarily a direct injury to Missouri itself."  *Id.*  On that basis, Missouri had standing to sue and challenge that iteration of loan forgiveness.

With *Biden v. Nebraska*'s standing analysis firmly in mind, the court outlines plaintiffs' public instrumentality arguments here.

## 2.    Plaintiffs' Standing Theory Based on South Carolina, Texas, and Alaska's Public Instrumentalities

Plaintiffs allege that—like Missouri and MOHELA—South Carolina, Alaska, and Texas have "state instrumentalities or quasi instrumentalities" who will suffer financial harm under the SAVE Plan.  Doc. 57 at 23 (1st Am. Compl. ¶ 116).  These instrumentalities "(1) provide student loans to residents of the state, (2) hold loans issued by the Federal Family Education Loan Program ("FFELP[6] loans"), and/or (3) service student debt taken out by residents, former residents, and out-of-state students."  *Id.*  The court pauses here to explain FFEL loans because they provide an important part of plaintiffs' public instrumentality harm theory.

---

[6]    Plaintiffs use the acronym "FFELP" in their First Amended Complaint to describe Federal Family Education loans.  Defendants use the acronym "FFEL" to reference these loans.  *Biden v. Nebraska* used the acronym "FFEL".  This Order uses FFELP and FFEL interchangeably.

FFEL loans are student loans held by private corporations and guaranteed by the federal government.  "While FFELs . . . are no longer issued, many remain outstanding." *Biden v. Nebraska*, 143 S. Ct. at 2362.  Holders of FFEL loans own the assets outright.  Doc. 65 at 14. The federal government doesn't pay the holder to service the loans.  *Id.*  And federal law requires FFEL holders to pay rebate fees on certain FFEL loans to the government—fees the holders can't pass on to the borrower.  *Id.* (first citing 20 U.S.C. § 1078-3(f), then citing 34 C.F.R. §§ 682.406(a)(12), 682.202).

To understand plaintiffs' standing theory, the court also must explain FFEL loan consolidation.  Borrowers with FFEL loans can "consolidate" their loans into federal direct loans.  "Consolidate" is something of a term of art here because, it appears, consolidate seems to mean *convert* FFEL loans into federal direct loans.  That is, borrowers can exchange their FFEL loans—ones owned by private corporations—into direct loans owned by the federal government. When borrowers consolidate their FFEL loans, the federal government pays the loan's holder the principal loan amount owed and accrued interest.  Putting it more succinctly, a consolidation cashes out the private corporation holding the FFEL loan.

Returning to plaintiffs' public instrumentality theory, plaintiffs allege that South Carolina, Texas, and Alaska have public instrumentalities who hold FFEL loans.  Plaintiffs allege the three instrumentalities "derive income from their loan portfolios, such as through collecting interest owed or service fees."  Doc. 57 at 23 (1st Am. Compl. ¶ 117).  So, plaintiffs allege, the instrumentalities' "amount of income thus collected is directly proportional to the size of the debt portfolio:  *i.e.*, decreasing the size of the portfolio will decrease the income collected by the instrumentalities/quasi-instrumentalities."  *Id.* (1st Am. Compl. ¶ 119).

Enter the Final Rule.  Plaintiffs allege the "Final Rule is virtually certain to decrease the size of these student-debt portfolios by inducing individuals to consolidate their FFELP loans into direct federal loans in order to take advantage of the extraordinary (and unlawful) generosity of the Final Rule." *Id.* (1st Am. Compl. ¶ 120).  Put a slightly different way, plaintiffs argue that the SAVE Plan will incentivize debtors to consolidate these FFEL loans into direct federal loans, shrinking the instrumentalities' debt portfolios, and decreasing their revenue.  Doc. 50 at 17–18. Defendants have several problems with this theory.

Defendants correctly point out that plaintiffs' theory of public instrumentality harm is different—and weaker—than the public instrumentality harm that prevailed in *Biden v. Nebraska*.  *Biden v. Nebraska* says nothing about FFEL loans and consolidation.  That case involved a simpler student loan forgiveness plan and a simpler state instrumentality harm.  Start with the plan.  The student loan forgiveness under the HEROES Act forgave $10,000 to $20,000 per eligible loan.  Here, the SAVE Plan operates with more finesse.  It reduces monthly payment amounts and, for loans with original balances of $12,000 or less, limits a borrower's repayment window to 10 years (from 20 or 25) of qualifying payments.  Next consider the harm to the state instrumentality.  In *Biden v. Nebraska*, the HEROES Act loan forgiveness would result in millions of fully forgiven loans.  So, MOHELA no longer could service those closed accounts, costing it revenues formerly derived from servicing direct loans.  Here, in contrast, plaintiffs haven't alleged any loss of revenue from *servicing* loans.  Instead, plaintiffs allege that the Final Rule will cost them interest revenue because third parties have incentive to consolidate their FFEL loans into direct loans—and thus pay interest to the federal government as the sole lender of direct loans.[7]

---

[7]     It's not clear from plaintiffs' First Amended Complaint or briefing how, exactly, the SAVE Plan will reduce the instrumentalities' revenue.  Plaintiffs talk about "revenue" without differentiating between

At bottom, plaintiffs' theory of standing is more attenuated—and therefore weaker—than MOHELA's standing in *Biden v. Nebraska*.  Despite these issues, the court nonetheless concludes that South Carolina, Texas, and Alaska have pleaded plausibly and sufficiently established a likely injury to their state instrumentalities.

> **3.**     **Plaintiffs Plausibly Have Alleged an Injury in Fact to South Carolina, Texas, and Alaska's Public Instrumentalities, Fairly Traceable to the SAVE Plan**

Because plaintiffs' theory of harm differs from MOHELA's harm in *Biden v. Nebraska*, the court must look beyond that case's holding.  It must consider additional precedent defining the standing inquiry that applies to this dispute.  Defendants argue that plaintiffs' public instrumentality theory fails two elements of standing:  injury in fact and traceability.  The court thus briefly recites the governing law.

To demonstrate Article III standing, a "plaintiff must have suffered an 'injury in fact'" and that injury must be "actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560–61 (citations and internal quotation marks omitted).  Plaintiffs allege an imminent injury, claiming the Final Rule will cause them financial harm in the future.  Under *Clapper*, a future injury satisfies the "imminence" requirement only if it is "certainly impending."  568 U.S. at 401.  The Supreme Court has "repeatedly reiterated that threated injury be *certainly impending* to

---

revenue from interest and revenue from fees.  Plaintiffs' First Amended Complaint glosses over the difference, alleging the instrumentalities "derive income from their loan portfolios, such as through collecting interest owed or service fees."  Doc. 57 at 23 (1st Am. Compl. ¶ 117).  And plaintiffs' briefing applies more gloss, arguing that each instrumentality "holds a portfolio of FFELP loans, and the interest/fees that they receive from those portfolios is directly proportional to their portfolio's size."  Doc. 50 at 17 (emphasis added).

Fortunately, at the hearing, plaintiffs confirmed that their public instrumentality theory relies on reduced *interest* revenue—not fees.

constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Id.* at 409 (emphases in original) (citation, brackets, and internal quotation marks omitted).

In addition to a future injury, plaintiffs also allege an indirect injury. When "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of *someone else*," the Supreme Court has instructed courts to require "much more." *Lujan*, 504 U.S. at 561–62 (emphasis in original). "In that circumstance, causation and redressability ordinarily hinge on the response of the regulated . . . third party the government action or inaction—and perhaps on the response of others as well." *Id.* at 562. When such

> essential elements of standing depend[] on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume to either control or to predict . . . , it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of injury.

*Id.* (citations and internal quotation marks omitted).

So, to show standing, plaintiffs must show two things: (1) borrowers likely will consolidate their FFEL loans into direct federal loans and (2) this consolidation likely will reduce the instrumentalities' revenue. To meet this burden, plaintiffs have provided declarations from each of the three state instrumentalities. The court reviews the evidence submitted by each instrumentality below, starting with South Carolina. After its review of each package of evidence, the court evaluates the evidence together. And, ultimately, the court concludes South Carolina, Texas, and Alaska have standing—at least for now.

### a.        South Carolina's SEAA

Plaintiffs allege that South Carolina has a public instrumentality called the State Education Assistance Authority (SEAA). Doc. 57 at 23–24 (1st Am. Compl. ¶ 121). The First Amended Complaint alleges that "since 2011, SEAA's portfolio has decreased from

approximately $31.3 million to $6.4 million, which has reduced the amount of income generated for South Carolina's benefit[.]" *Id.* at 24 (1st Am. Compl. ¶ 122).  Plaintiffs allege the SAVE Plan "will further decrease the size of SEAA's portfolio as borrowers convert FFELP loans to take advantage of available debt forgiveness." *Id.*

Plaintiffs submitted a declaration from South Carolina officials confirming the information about SEAA.  Doc. 53-6 (Spate Decl.).  The declaration's exhibits confirm that SEAA holds FFEL loans, *id.* at 7 (Spate Decl. Ex. 2), and SEAA's FFEL portfolio has decreased steadily since 2011, *id.* at 8 (Spate Decl. Ex. 2).  The exhibit provides three figures.  The first figure shows SEAA's FFEL loan portfolio decreasing over time:

**History of SEAA's FFELP portfolio from 2010 to present:**

| Month End | Principal Balance |
|---|---|
| 6/30/2011 | $31,324,566.17 |
| 6/30/2012 | 29,589,044.81 |
| 6/30/2013 | 26,776,811.11 |
| 6/30/2014 | 24,974,750.48 |
| 6/30/2015 | 22,797,591.92 |
| 6/30/2016 | 20,975,542.24 |
| 6/30/2017 | 19,218,505.43 |
| 6/30/2018 | 16,654,982.40 |
| 6/30/2019 | 15,026,548.26 |
| 6/30/2020 | 12,872,804.70 |
| 6/30/2021 | 11,889,724.29 |
| 6/30/2022 | 10,771,880.55 |
| 6/30/2023 | 8,059,252.66 |
| 3/31/2024 | 6,423,362.52 |

*Id.*

The exhibit's second figure attributes this decrease to borrower consolidation, showing that borrowers have consolidated SSEA's FFEL loans for years.  At the hearing on the Motion to Dismiss, plaintiffs' counsel explained the following figure shows the total value of FFEL loans

consolidated each year (first column) and the value of FFEL loans paid down by FFEL

borrowers (second column):

**Proportion of SEAA's FFELP loans that were consolidated versus paid down**

| Period | Consolidation Payment | Other Principal Payments |
|---|---|---|
| 7/1/2010 - 6/30/2011 | -$1,019,123.26 | -$814,057.50 |
| 7/1/2011 - 6/30/2012 | -1,076,871.56 | -$658,649.80 |
| 7/1/2012 - 6/30/2013 | -1,365,846.14 | -$1,446,387.56 |
| 7/1/2013 - 6/30/2014 | -590,101.34 | -$1,211,959.29 |
| 7/1/2014 - 6/30/2015 | -1,231,047.88 | -$946,110.68 |
| 7/1/2015 - 6/30/2016 | -909,836.74 | -$912,212.94 |
| 7/1/2016 - 6/30/2017 | -1,081,806.83 | -$675,229.98 |
| 7/1/2017 - 6/30/2018 | -1,064,526.12 | -$1,498,996.91 |
| 7/1/2018 - 6/30/2019 | -415,796.86 | -$1,212,637.28 |
| 7/1/2019 - 6/30/2020 | -622,083.17 | -$1,531,660.39 |
| 7/1/2020 - 6/30/2021 | -174,407.04 | -$808,673.37 |
| 7/1/2021 - 6/30/2022 | -954,393.67 | -$1,320,063.19 |
| 7/1/2022 - 6/30/2023 | -2,112,224.90 | -$600,402.99 |
| 7/1/2023 - 3/31/2024 | -1,111,945.46 | -$523,944.68 |

*Id.*

But, though SEAA's FFEL portfolio has gone down each year since 2011, the interest

revenue doesn't follow that same pattern:

**Interest revenue generated by SEAA's FFELP loans per year**

| Period | Total Interest Revenue |
|---|---|
| 7/1/2010 - 6/30/2011 | $1,172,811.00 |
| 7/1/2011 - 6/30/2012 | $764,676.00 |
| 7/1/2012 - 6/30/2013 | $692,306.00 |
| 7/1/2013 - 6/30/2014 | $630,738.00 |
| 7/1/2014 - 6/30/2015 | $585,056.00 |
| 7/1/2015 - 6/30/2016 | $572,691.00 |
| 7/1/2016 - 6/30/2017 | $595,654.00 |
| 7/1/2017 - 6/30/2018 | $689,735.00 |
| 7/1/2018 - 6/30/2019 | $756,432.00 |
| 7/1/2019 - 6/30/2020 | $529,763.00 |
| 7/1/2020 - 6/30/2021 | $301,659.00 |
| 7/1/2021 - 6/30/2022 | $303,673.00 |
| 7/1/2022 - 6/30/2023 | $575,359.00 |
| 7/1/2023 - 3/31/2024 * | $432,455.00 |

*Id.*

This SEAA evidence creates some evident problems for South Carolina's standing theory.  Remember, plaintiffs need to show two things:  (1) the SAVE Plan makes it likely that borrowers will consolidate their loans and (2) if borrowers consolidate their loans, the public instrumentalities likely will suffer financial harm in the form of reduced interest payments.  The SEAA evidence undermines both propositions.

The SEAA evidence casts doubt on plaintiffs' allegation that the SAVE Plan makes FFEL loan consolidation more likely.  The SEAA evidence shows that SEAA's FFEL loan portfolio has decreased steadily since 2010.  So, borrowers already were consolidating their loans long before the SAVE Plan's incentives.  This conclusion poses a causation problem for plaintiffs.  And this problem demonstrates the difficulty of establishing standing when a theory of harm relies on decisions by third parties.  Where "the independent action of some third party not before the court—rather than that of the defendant—was the direct cause of the plaintiff's harm, causation may be lacking."  *Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1225 (10th Cir. 2008) (citation and internal quotation marks omitted).  Trying to cure this problem, plaintiffs direct the court to Alaska's declaration.  It explains why the SAVE Plan incentivizes borrowers to consolidate their FFEL.  Critically, the Alaska declaration alleges that borrowers already are consolidating their loans.  More on Alaska in a moment.

The SEAA evidence also casts doubt on plaintiffs' theory that, as the instrumentalities' FFEL loan portfolios decrease, their interest revenue necessarily will decrease vis-à-vis interest revenue in the what if world where the SAVE Plan didn't happen.  SEAA's FFEL portfolio has decreased steadily over the years, but SEAA's interest revenue on FFEL loans has moved up and moved down.  Put differently, a graph of interest revenue wouldn't have the negative slope plaintiffs need.

At the hearing, plaintiffs introduced an additional layer of confusion about this data. Plaintiffs argued that the SEAA evidence demonstrates loan consolidation from the HEROES Act loan forgiveness. Plaintiffs argued that the jump from -$954,393.67 in consolidation in fiscal year 2021 to -$2,112,224.90 in fiscal year 2022 resulted from defendants announcing the HEROES Act forgiveness. This announcement, plaintiffs contend, led borrowers to consolidate their loans to take advantage. To be sure, this would support plaintiffs' view that borrowers respond to incentives created by federal student loan forgiveness programs—*i.e.*, when borrowers thought they could benefit from the HEROES Act, they consolidated their loans. But plaintiffs' argument makes it harder to attribute loan consolidation to the SAVE Plan loan forgiveness, and not the HEROES Act loan forgiveness.

And plaintiffs' argument is just that: an argument. Plaintiffs haven't adduced any evidence that purports to suss out the amount of consolidation caused by the HEROES Act, the SAVE Plan, and general market forces individually. This gap particularly presents a problem given the timing of the two loan forgiveness plans. Plaintiffs explained during the hearing that the fiscal year 2022 number captures HEROES Act-related consolidation. According to plaintiffs, this increase in loan consolidation—from -$954,393.67 in fiscal year 2021 to -$2,112,224.90 in fiscal year 2022— shows the effects of the HEROES Act loan forgiveness— *i.e.*, borrowers consolidated their FFEL loans to take advantage of the HEROES Act. That's all well and good, until the court considers the SAVE Plan. Defendants announced the proposed rule in January 2023—within fiscal year 2022. That leaves two loan forgiveness plans in play during one fiscal year. And the court has no way to tell how much loan consolidation to attribute to the HEROES Act and how much to attribute to the SAVE Plan.

Given these issues with the South Carolina evidence, plaintiffs' theory finds its way to some thin ice. Fortunately, for them, plaintiffs' evidence from Texas helps them show that consolidation would cause reduced income revenue.

### b.    Texas's THECB

Plaintiffs allege that Texas has an agency named the Texas Higher Education Coordinating Board (THECB). Doc. 57 at 24 (1st Am. Compl. ¶ 127). THECB is a "student debt servicing public entity[.]" *Id.* Plaintiffs allege "THECB owns over $1,1295,236 [*sic*] in FFELP loans" and "collected $114,479 in interest in 2023." *Id.* at 25 (1st Am. Compl. ¶ 130). The record isn't clear if this is $11.2 million in FFEL loans or $1.12 million. Plaintiffs allege that if the SAVE Plan "were to decrease the size of that student debt portfolio, the amount of income that the THECB would collect would decrease." *Id.* (1st Am. Compl. ¶ 131).

Plaintiffs submitted a declaration from THECB. *See* Doc. 53-7 (Keyton Decl.). The declaration confirms the above amounts. *Id.* at 2 (Keyton Decl. ¶ 3). And, critically, the declarant testifies:

> To the extent that federal policy results in borrowers consolidating their loans out of FFELP into the Direct Loan Program, those consolidations will cause the State of Texas to lose revenue. Upon consolidation, the federal government compensates the holder (THECB) only for principal and accrued interest. Thus, such consolidations will result in reduced revenue [to the] THECB and therefore the State of Texas. The THECB would no longer collect interest on FFELP loans that have been consolidated, diminishing the value of its portfolio.

*Id.* (Keyton Decl. ¶ 4). So, declarant says, the "SAVE Plan could cause pecuniary harm to the State of Texas and THECB measured by a reduction in revenue to the State's FFELP program." *Id.* (Keyton Decl. ¶ 5). Defendants point out that this declaration "skims over consolidation entirely." Doc. 65 at 14. That is, the declarant assumes, without explaining, that borrowers will consolidate their loans.

Defendants have the better end of that narrow issue.  The Texas declaration doesn't help plaintiffs shoulder their burden to show that borrowers will consolidate their FFEL loans into direct loans—the first piece of the standing puzzle.  In contrast, the Texas declaration *does* help plaintiffs with the second piece of the standing puzzle:  it's evidence that consolidation will cause revenue loss to Texas through THECB.  The mismatched puzzle piece here is the SEAA exhibit, which contradicts the Texas evidence because the SEAA data shows that decreased FFEL portfolios don't necessarily mean decreased FFEL interest revenue.  Doc. 53-6 at 8 (Spate Decl. Ex. 2).

With these those two states behind us, the court turns to plaintiffs' strongest evidence: Alaska's declaration.

### c.      Alaska's ASLC

Plaintiffs allege that Alaska's instrumentality is a public corporation, known as the Alaska Student Loan Corporation (ASLC).  It owns $16.8 million in FFEL loans.  Doc. 57 at 24 (1st Am. Compl. ¶¶ 123–24).  Plaintiffs allege the SAVE Plan will cause Alaska to lose significant revenues.  *Id.* (1st Am. Compl. ¶ 125).  Specifically, plaintiffs allege "ASLC estimates that the Final Rule will result in ASLC losing approximately $100,000 over just the next two years that it would otherwise collect as a FFELP loan holder."  *Id.* (1st Am. Compl. ¶ 126).

Plaintiffs also submitted a declaration from ASLC.  The declarant testifies, "The SAVE Plan entices borrowers to consolidate their loans away from FFELP into the Direct Loan Program (DLP), comprising loans held by the federal government."  Doc. 53-8 at 2 (Efird Decl. ¶ 6).  According to the declarant, three features of the SAVE Plan entice borrowers to consolidate their FFEL loans into direct loans:

1. The SAVE Plan offers benefits to direct loans only—*i.e.*, capped payments, waiving residual interest, and full forgiveness after ten years of payments;

2. The SAVE Plan doesn't treat consolidated loans as new loans, so borrowers' repayment clocks won't restart if they consolidate—a feature that previously disincentivized borrowers from consolidating; and

3. The federal government is advertising and encouraging borrowers to consolidate.

*Id.* at 2–3 (Efird Decl. ¶¶ 6–8).  So, the declarant provides, "the federal government is strongly . . . incentivizing borrowers to consolidate their loans away from FFELP and into [direct] loans held by the federal government."[8]  *Id.* at 3 (Efird Decl. ¶ 8).

This testimony resembles—at some level anyway—theoretical, in-a-vacuum, "basic economic theory" allegations that struggle to carry plaintiffs' standing burden.  *See Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 2024 WL 2237667, at *8 (6th Cir. May 17, 2024) ("Plaintiffs' allegations regarding supply and demand and the impact of financial incentive on third-party student-loan debtors are wholly speculative.").  But the ASLC declaration goes a step further.  It testifies, "Because these benefits are not available to borrowers with commercially-held FFELP loans, borrowers are rapidly consolidating their loans away from FFELP loans held by ASLC and into Direct Loans held by the federal government."  *Id.* at 2 (Efird Decl. ¶ 6).

ASLC's declarant testifies these "consolidations will cause Alaska to lose significant revenues."  *Id.* at 3 (Efird Decl. ¶ 9).  Here's how:  an FFEL loan is a loan held by a corporation (here, ASLC) and guaranteed by the federal government.  When a borrower consolidates an FFEL loan into a direct loan from the federal government, the federal government compensates the holder (here, ASLC) for principal and accrued interest.  *Id.*  So, consolidation means the

---

[8]    The ASLC declaration contains several legal conclusions.  For example, the declarant testifies that "the federal government is strongly, *and likely unlawfully*, incentivizing borrowers to consolidate their loans away from FFELP and into loans held by the federal government."  Doc. 53-8 at 3 (Efird Decl. ¶ 8) (emphasis added).  The lawfulness of the SAVE Plan is a legal conclusion reserved for the court to decide.  The court declines to consider the declaration's legal conclusions.

holder (here, ASLC) will no longer collect interest on those consolidated FFEL loans. *Id.* Because of this phenomenon, "ASLC estimates that the SAVE Plan will result in ASLC losing approximately $100,000 over just the next two years that it would otherwise collect as a FFELP holder." *Id.* (Efird Decl. ¶ 11). This declaration represents plaintiffs' best evidence.

The Alaska declaration provides evidentiary support for both pieces of the standing puzzle: (1) borrowers are likely to consolidate their FFEL loans into direct loans because of the SAVE Plan and (2) when borrowers consolidate, it will cause the public instrumentality to lose interest revenue. Defendants fault this declaration for "nakedly" stating that ASLC will lose $100,000 "because of the SAVE Plan, without explaining how or why." Doc. 65 at 14. While there's some truth to defendants' criticism, Alaska has adduced some facts. The court can't say the same for defendants. They've proffered no evidence of their own. Without any contradictory evidence, defendants have given no facts to reach a different conclusion. In short, the court currently has no reason to doubt ASLC's $100,000, nor any other part of the declaration.

Having summarized all three components of the public instrumentality evidence, the court, next, synthesizes this information.

### d.     Summary of State Public Instrumentality Theory

Considering all three sources of evidence together, plaintiffs have shouldered their burden to allege standing. Recall that plaintiffs had to show two things to show an injury: (1) the SAVE Plan makes it likely that borrowers will consolidate their loans and (2) if borrowers consolidate their loans, the states' public instrumentalities will suffer harm. Plaintiffs have shouldered their burden on both fronts.

*First*, plaintiffs have shown by a preponderance of the evidence that the SAVE Plan will cause FFEL borrowers to consolidate their loans into direct loans. This inquiry relies on the

choices of third parties not before the court, which means plaintiffs must allege "facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562.  Alaska's ASLC declarant testifies that consolidation makes economic sense for borrowers because the SAVE Plan provides benefits for direct loans that FFEL loan borrowers can't access.  And, critically, the ASLC declarant alleges "borrowers are rapidly consolidating their loans away from FFELP loans held by ASLC and into Direct loans held by the federal government."  Doc. 53-8 at 2 (Efird Decl. ¶ 6).

To be sure, plaintiffs' SEAA evidence presents some problems for this theory because it shows borrowers consolidating their FFEL loans without the SAVE Plan.  The Alaska evidence overcomes these issues.  Alaska's ASLC declaration, in contrast, explains the SAVE Plan's incentives for borrowers to consolidate and testifies that the SAVE Plan already is causing borrowers to consolidate.  And defendants haven't rebutted this evidence with any evidence of their own.  So, despite the SEAA evidence,[9] plaintiffs have shouldered their burden to show "that third parties will likely react in predictable ways to" the SAVE Plan.  *Dep't of Comm. v. New York*, 139 S. Ct. 2551, 2566 (2019).

*Second*, plaintiffs have shown that, when borrowers consolidate their loans, the states' public instrumentalities—and therefore the states—will suffer harm in the form of reduced interest income.  Plaintiffs' own evidence from SEAA casts doubt on this theory.  SEAA's FFEL loan portfolio has decreased steadily overtime, but its interest income has both increased and decreased over the same period.  Doc. 53-6 at 8 (Spate Decl. Ex. 2).  Despite these issues, the

---

[9]   South Carolina has squeaked over the preponderance of the evidence standard thanks to Alaska's evidence and a lack of evidence from defendants.  The court notes that the "need to satisfy the[] three [standing] requirements persists throughout the life of the lawsuit."  *Wittman v. Personhuballah*, 578 U.S. 539, 543 (2016).  Given its narrow victory here, the court questions whether South Carolina's evidence (at least the evidence plaintiffs have presented here) could survive if defendants submitted any contrary evidence at all.

Texas THECB and Alaska ASLC evidence suffices to confer standing to the three public instrumentalities.

The THECB declarant alleges that, if borrowers consolidate their FFEL loans into direct loans, "those consolidations will cause the State of Texas to lose revenue" because the "THECB will no longer collect interest on FFELP loans that have been consolidated, diminishing the value of its portfolio." Doc. 53-7 at 2 (Keyton Decl. ¶ 4). And the THECB's declarant further testifies the "SAVE Plan could cause pecuniary harm to the State of Texas and THECB measured by a reduction in revenue to the State's FFELP program." *Id.* (Keyton Decl. ¶ 5). Defendants argue that this declaration doesn't help plaintiffs shoulder their burden because the THECB "declarant skims over consolidation entirely"—that is, the declarant assumes that borrowers will consolidate their loans. Doc. 65 at 14. But, as just explained, plaintiffs have marshaled some evidence that some borrowers likely will consolidate their FFEL loans into direct loans. And Alaska's evidence also shows borrowers already are consolidating. Because it's likely that borrowers will consolidate, it's likely that Texas will suffer harm.

The same goes for Alaska's ASLC. The ASLC declarant testifies that "consolidations will cause Alaska to lose significant revenues." Doc. 53-8 at 3 (Efird Decl. ¶ 9). The declarant explains how consolidation will affect revenues. *Id.* And "ASLC estimates that the SAVE Plan will result in ASLC losing approximately $100,000 over just the next two years that it would otherwise collect as a FFELP holder." *Id.* (Efird Decl. ¶ 11). Plaintiffs thus have shouldered their current burden to allege a non-speculative, imminent, future injury to the public instrumentalities,[10] traceable to the SAVE Plan. And so, on the current record, South Carolina, Texas, and Alaska have standing.

---

[10]     The court again notes that South Carolina has succeed in showing standing by the thinnest of margins.

Before the court leaves the public instrumentality analysis altogether, it responds to another of defendants' arguments.

### 4.  Harm v. Benefit

Defendants argue plaintiffs haven't shown that these three instrumentalities likely will suffer an injury.  They argue that holding "a FFEL loan in no way guarantees interest income" for the instrumentalities.  Doc. 65 at 14.  According to defendants, many "FFEL borrowers are on income-based repayment plans under which they pay $0 monthly.  And a FFEL borrower is as susceptible to default as any other."  *Id.*  Defendants thus assert that the FFEL borrowers most likely to benefit from the SAVE Plan—and thus the borrowers most likely to consolidate— "would tend to be those borrowers at highest risk of delinquency and default[.]"  *Id.* at 14–15.  Delinquency and default, of course, would reduce the instrumentalities' revenue.  *Id.* at 15.  When a borrower consolidates an FFEL loan, however, the instrumentality avoids delinquency and default.  Indeed, "when a FFEL loan is consolidated, its prior owner receives payment for the full value of the loan's principal and outstanding interest."  *Id.* (first citing 20 U.S.C. § 1078-3(b)(1)(D), then citing 34 C.R.F. § 685.220(f)(1)).  So, defendants argue, the SAVE Plan actually could *benefit* the instrumentalities.

> Tying this to standing, defendants argue plaintiffs
>
> need to show that a potential loss of uncertain interest revenues to these entities is not outweighed by the certain profits of consolidation—including guaranteed payment and the elimination of rebate fees—to say nothing of the potential for reinvestment of the cash value of the loan at higher market interest rates.

*Id.* (citing 20 U.S.C. § 1107a(k), (l) (setting FFEL interest rates)).  While the court recognizes the logic of defendants' bottom-line, economic argument, it can't carry the day for them.

Plaintiffs cite authority that "[o]nce injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiffs has enjoyed from the relationship with the

defendant." 13A Edward H. Cooper, *Federal Practice & Procedure*, Jurisdiction § 3531.4 (3d ed. 2023). District courts within our Circuit have cited a rule from a Second Circuit case: "'the fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing.'" *Budicak, Inc. v. Lansing Trade Grp., LLC*, 452 F. Supp. 3d 1029, 1044 n.36 (D. Kan. 2020) (quoting *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008)); *Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.*, 801 F. Supp. 2d 1163, 1179 (D.N.M. 2011) (same).

Plaintiffs' counterargument misses the point, defendants contend. Defendants' argument doesn't weigh harm against benefit. Instead, it asserts that there's simply no injury to begin with because the SAVE Plan will make money for the states' public instrumentalities. The problem with defendants' rejoinder is a basic one: they haven't adduced any evidence to support their theory. More problematic yet, plaintiffs have marshaled evidence nullifying the theory.

Alaska's "ASLC estimates that the SAVE Plan will result in ASLC losing approximately $100,000 over just the next two years that it would otherwise collect as a FFELP holder." Doc. 53-8 at 3 (Efird Decl. ¶ 11). Defendants may disagree with this calculation, but they don't proffer any evidence or accounting of their own. The court lacks any basis to find that this $100,000 doesn't account for the potential benefits of the SAVE Plan. Similarly, the Texas declarant alleges that, if borrowers consolidate their FFEL loans into direct loans, "those consolidations will cause the State of Texas to lose revenue" because the "THECB will no longer collect interest on FFELP loans that have been consolidated, diminishing the value of its portfolio." Doc. 53-7 at 2 (Keyton Decl. ¶ 4). Without any evidence to the contrary, the court accredits the declarant's testimony that the SAVE Plan will cause THECB, and therefore Texas,

to lose interest revenue.  Again, there's no reason to believe that the THECB declarant failed to account for the SAVE Plan's potential benefits.

The court thus rejects defendants' argument that plaintiffs have failed to show an injury because the SAVE Plan might benefit the public instrumentalities.  As a result, South Carolina, Texas, and Alaska have suffered an injury in fact, fairly traceable to the SAVE Plan.  The court denies defendants' Motion to Dismiss South Carolina, Texas, and Alaska.

But what about the other states?  If some plaintiff states have standing, do they all have standing?

### 5.    "Standing for One is Standing for All"

When the court asked this question at the hearing, plaintiffs urged the court to answer this question yes.  They directed the court to *Biden v. Nebraska*, which held:  "If at least one plaintiff has standing, the suit may proceed."  143 S. Ct. at 2365 (citing *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).  And plaintiffs all bring the same legal claims.  Plaintiffs thus argue—correctly—that this suit will proceed.  And they ask the court to end its standing inquiry there:  conclude South Carolina, Texas and Alaska have standing and allow the suit to proceed with the other states tagging along.  The court declines this invitation.

Our Circuit, albeit in an unpublished opinion, has rejected the idea that "standing for one is" necessarily "standing for all."  *Thiebaut v. Colo. Springs Utils.*, 455 F. App'x 795, 802 (10th Cir. 2011).  The Supreme Court, as shown in *Biden v. Nebraska*, doesn't *require* district courts to consider the standing of all plaintiffs.  143 S. Ct. at 2365; *see also Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit [the Court] to consider the petition for review.").  The court realizes that moving on after deciding that at least one plaintiff has standing may "encourage[] judicial efficiency by permitting a court to proceed to the merits of a case involving multiple plaintiffs seeking identical relief when it is

28

clear that at least one plaintiff has standing." *Thiebaut*, 455 F. App'x at 802.  "But . . . nothing in the cases addressing this principle suggests that a court *must* permit a plaintiff that *lacks* standing to remain in a case whenever it determines that a co-plaintiff has standing." *Id.* (emphases in original); *see also M.M.V. v. Garland*, 1 F.4th 1100, 1110–11 (D.C. Cir. 2021) ("The [*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*] line of cases stands only for the proposition that a court 'need not' decide the standing of each plaintiff seeking the same relief." (quoting *Clinton v. City of N.Y.*, 524 U.S. 417, 431 n.19 (1998))).

This alternative approach explains why the court "retain[s] discretion to analyze the standing of all plaintiffs in a case and to dismiss those plaintiffs that lack standing." *Thiebaut*, 455 F. App'x at 802 (first citing *Utah Ass'n of Cntys. v. Bush*, 455 F.3d 1094, 1098 (10th Cir. 2006) (noting district court concluded one plaintiff had standing, so court declined to address other plaintiff's standing in interest of judicial economy); then citing *Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1451–53 (10th Cir. 1994) (analyzing individual plaintiffs' standing separately and dismissing some plaintiffs for lack of standing even though other plaintiffs had standing); and then citing *We Are Am./Somos Am. v. Maricopa Cnty. Bd. of Supervisors*, 809 F. Supp. 2d 1084, 1091 (D. Ariz. 2011) ("Th[e] general rule [that only one plaintiff needs standing] does not strictly prohibit a district court, in a multiple plaintiff case such as this, from considering the standing of the other plaintiffs even if it finds that one plaintiff has standing.")); *see also M.M.V.*, 1 F.4th at 1111 (concluding the general rule—that court needn't decide standing of each plaintiff seeking same relief—"does not *prohibit* the court from paring down a case by eliminating plaintiffs who lack standing or otherwise fail to meet the governing jurisdictional requirements" (emphasis in original)).

Here, the court, in its discretion, concludes that paring down the case and dismissing the plaintiffs without standing aligns with the charter purposes recognized in Fed. R. Civ. P. 1. At bottom, plaintiffs contend that uninjured plaintiffs can borrow another plaintiff's injury to satisfy Article III's standing requirement. But that's not the way the court would approach any kind of lawsuit—especially a complicated one. Narrowing the case to its viable claims and viable parties often narrows the burden of adjudicating the relevant issues, no matter whether the case is an auto accident or antitrust case.

The court also believes that winnowing the case is consistent with the holding in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). There, the Court reversed a district court's decision (as affirmed by the Ninth Circuit) certifying a class that included some 6,300 uninjured class members. *Id.* at 421–22, 427–28. The Court rejected plaintiffs' argument that Congress, by adopting the Fair Credit Reporting Act, had conferred a right to recover on uninjured class members. *Id.* at 434–35. Justice Kavanaugh's opinion crafted a hypothetical to explain why:

> Suppose first that a Maine citizen's land is polluted by a nearby factory. She sues the company, alleging that it violated a federal environmental law and damaged her property. Suppose also that a second plaintiff in Hawaii files a federal lawsuit alleging that the same company in Maine violated that same environmental law by polluting land in Maine. The violation did not personally harm the plaintiff in Hawaii.
>
> Even if Congress affords both hypothetical plaintiffs a cause of action (with statutory damages available) to sue over the defendant's legal violation, Article III standing doctrine sharply distinguishes between those two scenarios. The first lawsuit may of course proceed in federal court because the plaintiff has suffered concrete harm to her property. But the second lawsuit may not proceed because that plaintiff has not suffered any physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts. An uninjured plaintiff who sues in those circumstances is, by definition, not seeking to remedy any harm to herself but instead is merely seeking to ensure a defendant's "compliance with regulatory law" (and, of course, to obtain some money via the statutory damages). Those are not grounds for Article III standing.

*Id.* at 427–28 (internal citations omitted); *see also id.* at 429 ("A regime where Congress could freely authorize *unharmed* plaintiffs to sue defendants who violate federal law not only would violate Article III but also would infringe on the Executive Branch's Article II authority."). If all members of a class must have standing, then, of course, all plaintiffs here must have standing. And if Article III bars a subset of plaintiffs—even if *all* plaintiffs have the same claim—then that subset shouldn't piggyback on the injured plaintiffs' standing.

So, the court, in its discretion, continues its standing analysis. The court evaluates plaintiffs' argument that all 11 plaintiffs have standing based on assertions that (1) the SAVE Plan will decrease some of these states' income tax revenue and (2) the SAVE Plan harms these states' ability to recruit and retain talent.

If plaintiffs demonstrate that the other eight plaintiffs (or some of them) have standing on either one of these alternative standing theories, they will remain as plaintiffs. If any plaintiff fails to do so, the court will dismiss that plaintiff. This approach comports with Fed. R. Civ. P. 1, and it's consistent with the court's approach to any other lawsuit.

### B.    Income Tax Revenue

Plaintiffs argue they have standing because the Final Rule will cause nine of the 11 plaintiff states[11] to suffer a loss of state tax revenue. To flesh out this theory, the court briefly must explain a few things about these states' income tax structure.

These nine states tie their definition of taxable income to the federal definition of income or adjusted gross income. Doc. 57 at 17 (1st Am. Compl. ¶ 90). And the federal tax code defines taxable income to include student loan forgiveness under income-driven repayment

---

[11]    These nine states are Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah. Doc. 57 at 17 (1st Am. Compl. ¶ 87). The two other plaintiffs have no state income tax. The court already has concluded South Carolina, for now, has standing, but it includes South Carolina in the tax revenue analysis nonetheless.

plans.  Simply put, student debt forgiveness is taxable income and, therefore, revenue for these plaintiff states.  But the American Rescue Plan Act of 2021 provides that all student loan forgiveness won't "count toward the federal definition of taxable income until December 31, 2025."  Doc. 57 at 17 (1st Am. Compl. ¶ 89).  So, the states can't tax student loan debt forgiveness income until 2026.

According to plaintiffs, the Final Rule affects plaintiffs' tax revenues because it's timing that matters.  Plaintiffs allege the Final Rule "will reduce income tax revenue by decreasing the amount of outstanding student loan debt."  Doc. 57 at 18 (1st Am. Compl. ¶ 96).  This is so, they say, because the "Final Rule accelerates the timeline for cancelation on income-driven repayment plans to as low as 10 years for certain loan balances."  *Id.* (1st Am. Compl. ¶ 92).  Under the old version of the rule, the federal government wouldn't forgive these loans for 20 to 25 years.  So, plaintiffs allege, "but for the Final Rule, significant amounts of federal loan cancellation would occur *after* December 31, 2025" for residents of the relevant states.  *Id.* (1st Am. Compl. ¶ 95).  In this but-for world, the relevant states would have more student loan forgiveness income to tax.  *Id.*  The challenged Final Rule, in contrast, "shift[s] forward some debt forgiveness that would otherwise occur in a period in which it would be taxable income . . . into a period where it is not taxable[.]"  *Id.* (1st Am. Compl. ¶ 96).  In sum, plaintiffs argue the Final Rule injures them directly because nontaxable forgiveness in 2024 and 2025 means less taxable forgiveness in 2026.

In response, defendants argue that the Final Rule's effects on state tax revenue are merely incidental.  And, according to defendants, a "federal policy's incidental effects on state tax revenues are not judicially cognizable injuries."  Doc. 46 at 24.  In support of this argument, defendants invoke *Florida v. Mellon*, 273 U.S. 12 (1927).

1.      *Florida v. Mellon*

In *Mellon*, Florida sought to invoke the Supreme Court's original jurisdiction in a suit against officers of the United States—specifically, the Secretary of the Treasury.  *Id.* at 15. Florida sought to challenge a federal inheritance tax.  *Id.*  Florida had no inheritance tax.  *Id.*  So, Florida alleged the federal law directly injured it "because the imposition of the federal tax, in the absence of a state tax which may be credited, w[ould] cause the withdrawal of property from the state" and diminish Florida's tax base.  *Id.* at 16.  The Supreme Court rejected Florida's argument, concluding this "anticipated result [was] purely speculative, and, at most, only remote and indirect."  *Id.* at 18.  The Court explained, even if "as alleged, the supposed withdrawal of property will diminish the revenues of the state, [it's not certain] that the deficiency cannot readily be made up by an increased rate of taxation."  *Id.*  The Court thus concluded Florida had failed to demonstrate a direct injury and declined to exercise its original jurisdiction.  *Id.*

Plaintiffs argue that *Mellon* doesn't apply here.  According to plaintiffs, they have alleged a more direct theory of harm because, in *Mellon*, Florida's standing theory "relied on an unproven assumption about the actions of independent third parties[.]"  Doc. 50 at 12.  Plaintiffs argue that they allege a more direct harm here because "it is the Final Rule alone that will reduce taxable income without any additional action [by] any third party."  *Id.*  At the hearing, plaintiffs added that *Mellon* only speaks to indirect effects of a federal policy, whereas plaintiffs have shown the Final Rule to have a direct effect.

Unfortunately for plaintiffs, in general, reduced state tax revenue doesn't qualify as an injury in fact sufficient to confer standing on a state.  Our Circuit has ruled that the "'unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers, suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury-in-fact

to support state standing.'" *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012) (quoting *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976)).  Fortunately, our Circuit also has explained when reduced tax revenue *does* confer standing to sue on a state.  A "state must show a 'fairly direct link between the state's status as a recipient of revenues and the legislative or administrative action being challenged.'" *Id.* (quoting *Kleppe*, 533 F.2d at 672).

The requisite "fairly direct link" is missing here.  Plaintiffs allege the Final Rule will reduce their tax revenue because it shifts loan forgiveness forward in time.  That is, the Final Rule will forgive student loan debt in 2024 and 2025, when plaintiffs can't tax it.  So, plaintiffs allege, "but for the Final Rule, significant amounts of federal loan cancellation would occur *after* December 31, 2025" and this "would result in taxable income being recognized from the loan cancelation and thus payment of income taxes to" the states.  Doc. 57 at 18 (1st Am. Compl. ¶ 95).  Put another way, absent the final rule, student loan debt would be forgiven after December 31, 2025, permitting the states to tax the forgiven loans as income.  This kind of harm is too distant from the SAVE Plan to justify standing for the states here.  The federal policy creates incentives, borrowers react to those incentives and consolidate their loans, and borrowers would've consolidated their loans later, when plaintiffs could tax it, but the American Rescue Plan prevents this.  Defendants correctly call the states' decreased tax revenue an "incidental" harm.  The SAVE Plan doesn't target plaintiffs or their tax policies.  *See Arizona v. Biden*, 40 F.4th 375, 383 (6th Cir. 2022) (explaining that federal policy did "not directly injure the States. It does not regulate the States by telling them what they can or cannot do in their jurisdiction.").  This distant, incidental harm doesn't persuade the court to deviate from our Circuit's general rule that reduced state tax revenue doesn't qualify as an injury in fact.

And, even if this harm did qualify as an injury, plaintiffs' tax injury argument has a traceability problem.  The SAVE Plan didn't cause plaintiffs' injuries—plaintiffs' own tax policy caused them.

### 2.    Self-Inflicted

Defendants argue that plaintiffs' alleged harm is self-inflicted because it arises from plaintiffs' "own choice to tie their tax laws to the Internal Revenue Code."  Doc. 46 at 23.  To support this theory, defendants cite *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976).

In *Pennsylvania v. New Jersey*, Pennsylvania sought to challenge a New Jersey tax that taxed the New Jersey-derived income earned by nonresidents.  *Id.* at 662–63.  Pennsylvania reimbursed its residents for taxes levied by other states.  *Id.* at 663.  Pennsylvania asserted the law injured Pennsylvania because it "diverted" taxes from Pennsylvania's treasury.  *Id.*  The Supreme Court declined to exercise its original jurisdiction over this state v. state dispute, concluding Pennsylvania had failed to demonstrate "that the injury for which it s[ought] redress was directly caused by the action of another State."  *Id.*

The Court explained that "injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective legislatures."  *Id.* at 664.  To put a finer point on it, the Court wrote, "nothing prevents Pennsylvania from withdrawing that credit for taxes paid to New Jersey."  *Id.*  "No state can be heard to complain about damage inflicted by its own hand."  *Id.*  Defendants urge this court to apply this case's reasoning here because these nine states, like Pennsylvania, have made their own decisions about their tax codes.  So any taxation issues are ones caused by the states and the states alone.

Plaintiffs respond that *Pennsylvania* is inapposite; it involved two states suing each other and invoking the Supreme Court's original jurisdiction.  Plaintiffs argue that "Supreme Court original jurisdiction is reserved for 'a dispute between States of such seriousness that it would

amount to *casus belli* if the States were fully sovereign.'"  Doc. 50 at 11 (quoting *Texas v. New Mexico*, 462 U.S. 554, 570 n.18 (1983)).  In other words, according to plaintiffs, the bar for Article III standing is much lower than the bar for invoking the Supreme Court's original jurisdiction.  Plaintiffs are wrong.

To be sure, *Pennsylvania* is a case in an unusual procedural posture.  Nonetheless, *Pennsylvania* addressed financial injury to a plaintiff state.  The Court held, quite simply, that the defendant state hadn't inflicted any injury upon the plaintiff state because plaintiff's injury was self-inflicted.  *Pennsylvania*, 426 U.S. at 664.  The injury to a state, of course, is an explicit component of the standing inquiry.

Plaintiffs also argue that, though defendants assert they have a choice, they really have no choice at all.  Plaintiffs point out that "[g]iven economic and administrative realities," 36 states tie their definition of taxable income to a federal definition.  Doc. 50 at 10.  Plaintiffs frame their dilemma this way:  under defendants' approach, plaintiffs must change their state tax laws to recapture the lost revenue, so the Final Rule will "depriv[e] the States of their sovereign choice to set their own tax policy."  *Id.*  And "the States will suffer financial injury under the Rule no matter what putative 'choice' they make."  *Id.*  The court finds this argument equally unpersuasive.

This argument stands federalism on its head.  Nothing requires plaintiffs to use the federal definitions of taxable income.  The SAVE Plan doesn't coerce or cajole plaintiffs into changing their tax code.  Plaintiffs have made their choice to tie their definition of income to the federal definition and, if they don't like that definition, they're fully free to change it.  Perhaps a change would produce some administrative costs, but those costs would trace to the state legislatures' decisions, not the SAVE Plan.  The Final Rule doesn't pose any threat to a state's

36

sovereign power to decide its own tax law. *See Garrison v. U.S. Dep't of Educ.*, 636 F. Supp. 3d 935, 942 (S.D. Ind. 2022) (dismissing claim for lack of standing where individual plaintiffs challenged HEROES Act loan forgiveness, arguing loan forgiveness would increase his state tax bill, because the "Department of Education does not give silent approval to Indiana's tax code; those decisions are entirely within the discretion of the Indiana legislature" and concluding plaintiffs' injuries were traceable only to state tax law decisions—not federal student loan programs).

The court thus rejects plaintiffs' standing theory based on reduced income tax revenue. Next, the court takes up plaintiffs' final standing theory.

### C.   Recruiting and Retention Competitive Harm

Plaintiffs proffer a second theory of harm:  a competitive disadvantage in recruiting and retaining talent. *See* Doc. 57 at 20 (1st Am. Compl. ¶ 103).  This theory requires an understanding of a different kind of student loan debt forgiveness:  The Public Service Loan Forgiveness (PSLF) program.  Under the PSLF, borrowers are eligible for forgiveness of their direct loans once they've made 120 qualifying monthly payments under a qualifying plan while—and this is the critical part—working full time for an eligible employer in public service. The incentive behind this program is evident:  work in public service for ten years and have your remaining student loan debt forgiven.

Returning to the Final Rule, plaintiffs allege that they rely on the PSLF program "to attract and maintain talent" because state "agencies typically cannot pay as much to recruit and retain talent as private sector employees." *Id.*  Plaintiffs allege three states rely on the PSLF program to attract employees:  the Kansas Office of Attorney General and other Kansas agencies who use the PSLF to attract legal talent; South Carolina relies on the PSLF program to recruit and retain teachers; and Alaska's Attorney General's office relies on the PSLF program to recruit

37

and retain employees.  *Id.* at 20–21 (1st Am. Compl. ¶¶ 104–07).  According to plaintiffs, "the more debt that can be forgiven under the PSLF Program, the more powerful of an inducement it is."  *Id.* at 21 (1st Am. Compl. ¶ 108).  But, because the Final Rule will reduce "the amount of student debt held by current and potential employees . . . , the relative attractiveness of public employment for the Plaintiff States decreases."  *Id.*

Plaintiffs' recruitment-based standing theory relies, in their words, on "basic economic logic."  Doc. 50 at 13.  Plaintiffs argue that as "a matter of elementary economics, public service employment will no longer be as attractive an option to those with a lower amount of debt because of the direct effects of the Final Rule."  Doc. 50 at 13–14.  Plaintiffs proffer the following example:

> [Imagine] a current employee who had an original loan balance of $12,000 and has been in public service for 8 years.  Without the Final Rule, he would have a strong incentive to stay in public service for 2 more years.  However, because of the Final Rule, he would get his debt canceled in the same amount of time regardless of where he's employed.

*Id.* at 14.  In sum, plaintiffs argue that the Final Rule reduces the attractiveness of the PSLF program, and plaintiffs expect their current and prospective employees to respond to these incentives, making it harder for plaintiffs to recruit and retain employees.  So, plaintiffs reason, the Final Rule will injure plaintiffs.

Not so, defendants contend.  Defendants argue that plaintiffs' theory has a traceability problem.  Defendants point out that this theory of injury is an indirect one—it relies on the actions of a third party.  This means it's harder for plaintiffs to show causation by such an indirect injury.  "That an injury is indirect does not necessarily defeat standing, 'but it may make it substantially more difficult to establish that, in fact, the asserted injury was the consequence of the defendants' actions.'"  *Habecker*, 518 F.3d at 1225 (brackets and ellipsis omitted) (quoting *Warth v. Seldin*, 422 U.S. 490, 504–05 (1975)).  Where "'the independent action of some third

38

party not before the court'—rather than that of the defendant—was the direct cause of the

plaintiff's harm, causation may be lacking." *Id.* (quoting *Simon v. E. Ky. Welfare Rights Org.*,

426 U.S. 26, 40–41 (1976)).

Defendants are right.  Recently, the Sixth Circuit explicitly rejected this very theory.

### 1. *Mackinac Center for Public Policy v. Cardona*

In *Mackinac Center for Public Policy v. Cardona*, the Sixth Circuit addressed a challenge

to action taken by the Department of Education affecting student loans.  102 F.4th 343, 2024 WL

2237667 (6th Cir. May 17, 2024).  In *Mackinac*, the Department of Education sought to address

problems with administration of the PSLF and income driven repayment (IDR) programs.  *Id.* at

*2.  Loan administrators allegedly steered "borrowers into long-term periods of forbearance in

violation of Department of Education rules[.]"  *Id.*  Under the PSLF and IDR programs at issue,

forbearance periods don't count toward the 120 month payments.  *Id.*  But, given the problems

administering the programs, the Department of Education decided to count certain forbearance

periods as payments.  *Id.*  As a result, about "40,000 borrowers would be eligible for immediate

discharge of debt under the PSLF program, and several thousand would be eligible for

forgiveness under IDR plans."  *Id.*

Plaintiffs sued to enjoin the policies counting forbearance periods toward the payment

requirement.  Those plaintiffs were "nonprofit, tax-exempt organizations that [were] qualified

public service employers under the PSLF program."  *Id.* at *3.  Plaintiffs alleged "that the action

would keep them from realizing the full statutory benefit to which they are entitled under PSLF

and make it more difficult for them to recruit and retain employees."  *Id.* (internal quotation

marks omitted).  Plaintiffs invoked competitor standing, which "recognizes that plaintiffs suffer

an economic injury when agencies lift regulatory restrictions on their competitors or otherwise

allow increased competition against them."  *Id.* at *4 (citation and internal quotation marks

omitted).  A party invoking competitor standing must show an imminent injury from increased competition.  *Id.*  Plaintiffs argued the Department's forbearance adjustment increased their competition for employees because it reduced plaintiffs' competitive benefit—*i.e.*, reduced the financial incentive for student loan borrowers to seek and remain in public service jobs.  *Id.* at *5.  The district court, sua sponte, dismissed plaintiffs' complaint for lack of standing.  *Id.*  The Sixth Circuit affirmed.  *Id.*

The Sixth Circuit concluded plaintiffs had "failed to allege specific, concrete facts to show that the adjustment has caused or will cause them competitive injury."  *Id.* (citation and internal quotation marks omitted).  The Sixth Circuit faulted plaintiffs for their complaint's broad, conclusory allegations because they had "not alleged any facts showing how the adjustment affects their ability to recruit and retain college-educated employees."  *Id.* at *6 (internal quotation marks omitted).  Plaintiffs had "not identified any current employee that ha[d] received credit under the adjustment, nor d[id] they claim that they expect[ed] to imminently hire any employee who ha[d] received such credit."  *Id.*  Nor did plaintiffs allege "that any employees have stopped working for them (or stated an intention to do so) based on the adjustment."  *Id.*

The Sixth Circuit even assumed the Department's adjustment would affect plaintiffs' ability to fill vacancies.  Even with that benefit, "several factors beyond the adjustment could have a similar impact."  *Id.* at *8.  An "employee may choose to work for a different public service employer to satisfy part of their 120-month obligation of any number of reasons unrelated to the adjustment, such as pay, location, work-life balance, or any combination of factors."  *Id.*  The *Mackinac* plaintiffs thus failed to establish a competitive injury because they had failed to allege "how many of Plaintiffs' employees will be impacted by the adjustment and how many individuals may make employment decisions based on the adjustment."  *Id.*  The

Sixth Circuit summarized plaintiffs' problem this way:  "At bottom, how the adjustment impacts Plaintiffs is up to individuals who are not parties to this lawsuit."

So too here.  Plaintiffs rely, in their own words, on "elementary economics."  Doc. 50 at 13.  They theorize that their current and future employees will respond to the incentives created by the Final Rule and reject public employment.  This will cause plaintiffs a "competitive harm." *Id.*  And they have provided declarations that the states use public loan forgiveness as a recruitment tool.  But these are the very kind of broad, conclusory allegations that the Sixth Circuit flunked in *Mackinac*.  As there, plaintiffs here "have not identified any current employee that has received" relief under the SAVE Plan.  *Mackinac*, 2024 WL 2237667, at *6.  Nor have they alleged "that they expect to imminently hire any employee who" is SAVE-Plan-eligible.  *Id.* And "they have not alleged that any employees have stopped working for them (or stated an intent to do so) based on" the SAVE Plan.  *Id.*  So, like *Mackinac*, plaintiffs' hypotheticals insufficiently plead an imminent injury in fact.  *Id.*; *see also id.* at *8 ("Plaintiffs' allegations regarding supply and demand and the impact of financial incentive on third-party student-loan debtors are wholly speculative.").

Separately, plaintiffs have a third party problem.  Recall that "where a causal relation between injury and challenged action depends upon the decision of an independent third party . . . , standing is not precluded, but it is ordinarily substantially more difficult to establish." *California v. Texas*, 593 U.S. 659, 675 (2021) (citation and internal quotation marks omitted). To meet this "more difficult" standard, "the plaintiff must show at least that third parties will likely react in predictable ways."  *Id.* (citation and internal quotation marks omitted).  It's the "likely" part that causes plaintiffs' problems here.

Plaintiffs' standing allegations provide no basis for the court to find that job seekers and employees likely will avoid public service employment because of the SAVE Plan. As defendants correctly point out, "career-related decisions are complicated, and PSLF is not the sole incentive in this economic picture." Doc. 65 at 11. The Sixth Circuit mentioned a few of these other incentives: "pay, location, work-life balance, or any combination of factors." *Mackinac*, 2024 WL 2237667, at *8. "At bottom, how the [SAVE Plan] impacts Plaintiffs is up to individuals who are not parties to this lawsuit." *Id.* Given all the factors that a person considers when making an employment decision, plaintiffs have failed to allege enough facts for the court to conclude that potential and current employments "will likely react in predictable ways." *Dep't of Comm.*, 139 S. Ct. at 2566.

The court must abide by the Supreme Court's "usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414. Plaintiffs have failed to shoulder their burden to allege a competitive harm. No court ever has embraced this competitive harm theory to hiring/retention theory. Our court declines to become the first.

In a final bid to avoid this result, plaintiffs seek shelter from *Massachusetts v. EPA*, arguing they are entitled to "special solicitude" in the standing analysis.

### 2.    *Massachusetts v. EPA*

Plaintiffs rely on the Supreme Court's decision in *Massachusetts v. EPA*, 549 U.S. 497, to support their competitive harm theory of standing. In *Massachusetts v. EPA*, a group of states sued the EPA for failing to regulate certain greenhouse gases under the Clean Air Act. *Id.* at 505. The Court held Massachusetts had standing based on a risk that global warming would raise sea levels and thereby harm Massachusetts' coastal lands. *Id.* at 526. The Court explained, "according to petitioners' uncontested affidavits . . . the rise in sea levels associated with global

warming has already harmed and will continue to harm Massachusetts.  The risk of catastrophic harm, though remote, is nevertheless real." *Id.*

According to plaintiffs, *Massachusetts v. EPA* "relaxed" the standing requirements for states suing the federal government.  Doc. 50 at 15.  Relevant here, the *Massachusetts v. EPA* Court noted "that States are not normal litigants for the purposes of invoking federal jurisdiction."  549 U.S. at 518.  The Court emphasized "Massachusetts' well-founded desire to preserve its sovereign territory[.]"  *Id.* at 519.  And the Court stressed that the states were exercising a procedural right.  *Id.* at 520 (citing 42 U.S.C. § 7607(b)(1)).  "Given that procedural right and Massachusetts' stake in protecting its quasi-sovereign interests," the Court held Massachusetts was "entitled to special solicitude in our standing analysis."  *Id.*  Based on *Massachusetts v. EPA*, plaintiffs argue for a "double relaxation of Article III standing requirements"—one for special solicitude and one for procedural rights.  Doc. 50 at 15.

*Massachusetts v. EPA* doesn't provide plaintiffs the safe harbor they find in the decision.  Our Circuit has lamented "the lack of guidance on how lower courts are supposed to apply the special solicitude doctrine to standing questions."  *Wyoming*, 674 F.3d at 1238.  Despite this absence of guidance, the Tenth Circuit has held, "'special solicitude does *not* eliminate the state petitioner's obligation to establish a concrete injury, as Justice Stevens' [*Massachusetts*] opinion amply indicates.'"  *Id.* (emphasis in original) (quoting *Del. Dep't of Nat. Res. & Envt'l Control v. F.E.R.C.*, 558 F.3d 575, 579 n.6 (D.C. Cir. 2009)).  As our Circuit has explained, in *Massachusetts v. EPA*, the state of "Massachusetts proved that it had an 'actual' and 'imminent' injury."  But plaintiffs lack such evidence here.  Their competitive harm theory fails to plead an injury in fact, as shown by *Mackinac*.  Their theory of future harm simply is too speculative to qualify as an imminent injury.

The court also doubts that *Massachusetts v. EPA* even applies here.  At the hearing, plaintiffs argued that they are asserting quasi-sovereign interests, which brings them under the *Massachusetts v. EPA* umbrella.  "A quasi-sovereign interest generally concerns either the physical and economic health of a State's residents or the State's 'interest in not being discriminatorily denied its rightful status within the federal system.'"  *Navajo Nation v. Wells Fargo & Co.*, 344 F. Supp. 3d 1292, 1311 (D.N.M. 2018) (*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982)).  There's no "exhaustive formal definition nor a definitive list of qualifying interests[.]"  *Snapp*, 458 U.S. at 607.  "Examples of quasi-sovereign interests include abating a public nuisance, preventing environmental pollution, or avoiding economic damage of such severity and pervasiveness that it causes injury not only to individual citizens, but to the welfare, prosperity, and economic standing of the State as a whole."  *Navajo Nation*, 344 F. Supp. 3d at 1311 (citing *Snapp*, 458 U.S. at 603–06).

Plaintiffs' ability to hire and retain an undefined number of employees doesn't qualify as the kind of quasi-sovereign interest that this caselaw imagines.  Plaintiffs haven't directed the court to any authority holding that a state's ability to hire or retain employees in public service jobs qualifies as a quasi-sovereign interest.  The court concludes plaintiffs aren't entitled to special solicitude.  *See also Arizona v. Biden*, 40 F.4th at 386 (declining to apply *Massachusetts v. EPA* where states did "not protest regulation of them as States of preemption of local lawmaking authority[,] . . . [nor] any threatened incursions on their property or territory[,]" and case did "not involve the classic sovereign case, public nuisances in which a State invokes a desire to safeguard its domain and its health, comfort and welfare" (citation and internal quotation marks omitted)).

### 3.      Procedural Rights

Plaintiffs also ask for a relaxed standing standard again because, they argue, they're asserting procedural rights.  Doc. 50 at 15.  They take this standard from *Lujan*, where Justice Scalia called procedural rights "special."  504 U.S. at 573 n.7.  Justice Scalia explained, "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."  *Id.*  He gave the following example:

> [O]ne living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

*Id.*  So, plaintiffs argue, they "need not demonstrate that, if the Department [of Education] conducted a defensible cost estimate or provided a sufficient notice period, the result would be any different."  Doc. 50 at 15.

But this argument can't solve plaintiffs' problem with their standing theory.  Plaintiffs' problem is that their competitive harm theory is speculative and not traceable to the SAVE Plan because it relies on complicated employment decisions allegedly faced by an unknown number of third parties.  So, even if the court relaxes standing requirements for plaintiffs because they assert procedural rights, they still haven't met their standing obligation.  The court rejects this final standing theory.

## IV.      Conclusion

In sum, the court grants defendants' Motion to Dismiss (Doc. 45) in part and denies it in part.  Plaintiffs South Carolina, Texas, and Alaska have established, for now, standing based on harm to their public instrumentalities.  The court denies defendants' dismissal motion as it applies to the claims asserted by those three plaintiffs.  In contrast, plaintiffs Kansas, Alabama,

Idaho, Iowa, Louisiana, Montana, Nebraska, and Utah haven't shouldered their burden to show that they have standing.  The court lacks subject matter jurisdiction over claims these eight plaintiffs wish to assert.  It dismisses them from this case.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion to Dismiss (Doc. 45) is granted in part and denied in part.  Exercising discretion conferred by our Circuit, the court, consistent with Fed. R. Civ. P. 1, grants defendants' Motion to Dismiss as it applies to Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, and Utah.  The court dismisses without prejudice all claims made by these eight states and directs the Clerk to terminate them as parties to this action.

**IT IS SO ORDERED.**

**Dated this 7th day of June, 2024, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **STATE OF ALASKA, et al.,** | |
| **Plaintiffs,** | **Case No. 24-1057-DDC-ADM** |
| **v.** | |
| **UNITED STATES DEPARTMENT OF EDUCATION, et al.,** | |
| **Defendants.** | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiffs have moved the court for a preliminary injunction that would prevent defendants from implementing their student loan regulations, known as the SAVE Plan.  Doc. 23.  The SAVE Plan lowers monthly payments for eligible borrowers and reduces the maximum repayment period for eligible borrowers who took out loans with low original balances.  To resolve plaintiffs' motion, the court must answer three questions.

*First*:  does defendants' SAVE Plan present a "major question"—one of such economic and political significance that defendants must show that Congress clearly authorized the SAVE Plan?  In *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), the Supreme Court answered this question. This recent, binding Supreme Court decision holds "that the basic and consequential tradeoffs inherent in a mass debt cancellation program are ones that Congress would likely have intended for itself."  *Id.* at 2375 (quotation cleaned up).  So, this is an easy yes.

*Second*, given that the case presents a major question, have defendants shown that the Higher Education Act clearly authorizes their SAVE Plan?  *Biden v. Nebraska* doesn't answer

this question because that case addressed a different statute with a different regulatory history. While it's a close and difficult question, the court answers this second question no. Defendants have offered colorable, plausible interpretations of the Higher Education Act that could authorize the SAVE Plan, but those interpretations fall short of *clear* congressional authorization.

*Last*, the court must decide whether the preliminary injunction should apply nationwide. Scope aside, part of plaintiffs' requested injunction is unworkable, and so the court denies it. But, for the workable part of plaintiffs' injunction, the court reluctantly answers yes—it should apply nationwide. Nationwide injunctions are the subject of much controversy, and this court is less than enthusiastic about entering one.

With these three answers, the court grants in part and denies in part plaintiffs' Motion for Preliminary Injunction (Doc. 23). The court enjoins the SAVE Plan—in part—nationwide. It declines, however, to unwind the parts of the SAVE Plan already in effect because plaintiffs have failed to demonstrate those provisions caused irreparable harm. Plaintiffs brought this lawsuit long after defendants already had implemented those aspects of the SAVE Plan, so the court doesn't see how plaintiffs can complain of irreparable harm from them. Nor have plaintiffs explained how a preliminary injunction could unwind the parts of the SAVE Plan already in effect. But the court grants plaintiffs' request to enjoin those aspects of the SAVE Plan not yet implemented.

The court emphasizes one more thing about its decision. This Order does not decide whether student loan forgiveness is good policy or bad policy. The popularly elected branches of our government—the President and the Congress—properly control that decision. Thus, no one should read this Order to take a position on that question because our Constitution doesn't assign any part of it to the federal courts.

The court explains each one of its decisions, below, beginning with the relevant background.

## I.        Background

The court begins with a fly-over of student loan repayment legislation and the Secretary of Education's role in it.

Congress enacted the Higher Education Act (HEA) in 1965 to "strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education." Pub. L. No. 89-329, 79 Stat. 1219 (1965). Twenty-eight years later, Congress passed the "Student Loan Reform Act," and allowed the Secretary of Education to issue federal student loans directly from the Department. Pub. L. No. 103-66, § 4011–21, 107 Stat. 312 (1993). The Student Loan Reform Act also created income-contingent repayment plans—the repayment plans at issue here. *Id.* at § 4021 (codified at 20 U.S.C. § 1087e(d)(1)(D)).

Here's the statutory provision establishing income-contingent repayment plans, which serves as this case's axis:

> Consistent with criteria established by the Secretary, the Secretary shall offer a borrower of a loan made under this part a variety of plans for repayment of such loan, including principal and interest on the loan. The borrower shall be entitled to accelerate, without penalty, repayment on the borrower's loans under this part. The borrower may choose . . . an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years[.]

20 U.S.C. § 1087e(d)(1)(D).

Before the action challenged here, the Secretary of Education—"the Secretary" in the remainder of this Order—has invoked this statutory authority three times:

1. In 1994, the Secretary created the first income-contingent repayment plan. William D. Ford Federal Direct Loan Program, 59 Fed. Reg. 61,664 (Dec. 1, 1994) (codified at 34 C.F.R. pt. 685).

2. In 2012, the Secretary created the PAYE Plan.  Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 77 Fed. Reg. 66,088 (Nov. 1, 2012) (codified at 34 C.F.R. pts. 674, 682, 685).

3. In 2015, the Secretary created the REPAYE Plan.  Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 80 Fed. Reg. 67,204 (Oct. 30, 2015) (codified at 34 C.F.R. pts. 668, 682, 685).

Each time, the Secretary imagined forgiving the remaining loan balance after a borrower had made payments for a specific period of time.  *See* 59 Fed. Reg. at 61,666 ("Some borrowers in the [income-contingent repayment] plan may not earn sufficient income to fully repay their loans within the statutory 25-year time period.  In this event, the Secretary will forgive any outstanding loan balance (principal plus interest) that is unpaid after 25 years."); 77 Fed. Reg. at 66,114 ("The revisions offer eligible borrowers lower payments and loan forgiveness after 20 years of qualifying payments."); 80 Fed. Reg. 67,209 ("We agree that borrowers are responsible for repaying their student loans, and we believe that most borrowers repaying their loans under the REPAYE plan will be successful in repaying their loans, in many cases before the end of the 20- or 25-year repayment period.  However, we also believe the REPAYE plan will provide relief to struggling borrowers who experience financial difficulties that prevent them from repaying their loans.  We note that the REPAYE plan requires 20 or 25 years of qualifying payments before a loan is forgiven.").

With this background about income-driven repayment plans, the court next explains relevant details about a different kind of repayment plan:  income-*based* repayment plans.

### *Income-Based Repayment (IBR) Plans*

In 2007, Congress amended the HEA and created income-based repayment plans for borrowers with "partial financial hardship."  Pub. L. No. 110-84, 121 Stat. 784 (2007).  The statute defines "partial financial hardship" to mean the borrower's annual total loan payment,

based on a 10-year repayment period, exceeds 15% of the amount by which "the borrower's and the borrower's spouse's . . . adjusted gross income[] exceeds" 150% of the applicable poverty line.  20 U.S.C. § 1098e(a)(3).  And the statute explicitly authorized the Secretary to "repay or cancel any outstanding balance of principal and interest due on all loans made" under certain conditions after "a period time prescribed the Secretary, not to exceed 25 years[.]"  *Id.* § 1098e(b)(7).

In 2010, Congress amended the IBR statute.  Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 2213, 124 Stat. 1029, 1081 (2010) (codified at 20 U.S.C. § 1098e(e)).  For borrowers taking out a loan on or after July 1, 2014, Congress lowered the cap on payments for IBR plans to 10%—down from 15%.  20 U.S.C. § 1098e(e)(1).  And for those same borrowers, Congress reduced the maximum payment time window to 20 years—down from 25 years.  *Id.* § 1098e(e)(2).  The Secretary then applied these IBR updates to all student loans.

Five years later, in 2015, the Secretary created the REPAYE Plan by rulemaking and applied the 10% payment cap to all borrowers, regardless of when they took out loans.  80 Fed. Reg. 67,204.  The REPAYE Plan also lowered the repayment window for borrowers with undergraduate debt from 25 years to 20 years.  *Id.* at 67,205 ("For a borrower who only has loans received to pay for undergraduate study, provide that the remaining balance of the borrower's loans that have been repaid under the REPAYE plan is forgiven after 20 years of qualifying payments.").  The REPAYE Plan set the repayment window for borrowers with graduate debt at 25 years.  *Id.* ("For a borrower who has at least one loan received to pay for graduate study, provide that the remaining balance of the borrower's loans that have been repaid under the REPAYE plan is forgiven after 25 years of qualifying payments.").

### *The SAVE Plan*

In 2023, the Secretary issued regulations creating the SAVE Plan—the plan challenged here.  Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43,820 (July 10, 2023) (to be codified at 34 C.F.R. pts. 682, 685).  First, a few notes about the SAVE Plan's terminology.  The SAVE Plan seeks to combine income-contingent repayment plans and income-based repayment plans under one umbrella term:  income-driven repayment plans.  *Id.* at 43,820.  And the SAVE Plan is the new name for the REPAYE plan.  *Id.*

The SAVE Plan first emerged in January 2023, when the Department issued a Notice of Proposed Rulemaking (NPRM).  Doc. 57 at 12 (1st Am. Compl. ¶ 57).  The NPRM "propose[d] to amend the regulations governing income-contingent repayment plans[.]"  Improving Income-Driven Repayment for the William D. Ford Federal Direct Loan Program, 88 Fed. Reg. 1894 (Jan. 11, 2023) (to be codified at 34 C.F.R. pt. 685).  After the NPRM and the corresponding comment period, the Department published the "Final Rule" in July 2023.  Doc. 57 at 14 (1st Am. Compl. ¶ 68); *see also* Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43,820 (July 10, 2023) (to be codified at 34 C.F.R. pts. 682, 685).

Here, plaintiffs attack several pieces of the Final Rule.[1]  Specifically, they challenge the following changes to income contingent repayment plans:

- those changes defining discretionary income as income above 225% of the applicable federal poverty guideline;

- those changes setting a borrower's monthly payment amount to $0 if the borrower's income falls below 225% of the applicable federal poverty guideline;

---

[1]   This Memorandum and Order uses the terms "Final Rule" and "SAVE Plan" interchangeably.

- those changes capping, for undergraduate loans, a borrower's monthly payment amount at 5% of the borrower's income above 225% of the applicable federal poverty guideline; and

- those changes cancelling, for borrowers whose original principal balance was $12,000 or less, the remaining balance after the borrower has made 120 monthly payments or the equivalent.

Doc. 57 at 14 (1st Am. Compl. ¶ 70).  So, summarizing, the Final Rule raises the floor of discretionary income, decreases borrowers' monthly payments, and, for loans with original balances of $12,000 or less, limits a borrower's repayment window to 10 years (from 20 or 25) of qualifying payments.

### *This Lawsuit*

According to plaintiffs, the Final Rule is "plainly unlawful" under the Constitution and the Administrative Procedures Act (APA).  They bring four claims targeting this purportedly unlawful conduct:  (1) agency action in excess of statutory jurisdiction and in violation of separation of powers, violating Article I of the Constitution; (2) agency action in excess of statutory authority, violating the Administrative Procedures Act; (3) arbitration and capricious agency action, violating the APA; and (4) agency action in violation of APA procedures.  Doc. 57 at 25–38 (1st Am. Compl. ¶¶ 133–227).  Relying on these legal theories, plaintiffs ask the court to enjoin defendants "from implementing or acting pursuant to the" SAVE Plan.  Doc. 23.

## II.     Legal Standard

Federal Rule of Civil Procedure 65(a) authorizes federal courts to issue preliminary injunctions.  The courts enjoy broad discretion when deciding whether to grant a preliminary injunction.  *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (citations omitted).

The relief afforded under Rule 65 embraces a limited purpose—a preliminary injunction serves "merely to preserve the relative positions of the parties until a trial on the merits can be

held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The Tenth Circuit instructs that the moving party—here plaintiffs—must satisfy four factors to deserve a preliminary injunction: "'(1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest.'" *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (quoting *Republican Party of N.M. v. King*, 741 F.3d 1089, 1092 (10th Cir. 2013)). When the government is the party opposing the preliminary injunction— as here—the third and fourth factors merge. *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)), *abrogated on other grounds*, *Garland v. Cargill*, No. 22-976, 2024 WL 2981505 (U.S. 2024).

"A preliminary injunction is an extraordinary remedy[.]" *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). So, the moving party must demonstrate a "'clear and unequivocal'" right to such relief. *Petrella v. Brownback*, 787 F.3d 1242, 1256 (10th Cir. 2015) (quoting *Beltronics*, 562 F.3d at 1070). "In general, 'a preliminary injunction . . . is the exception rather than the rule.'" *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007) (quoting *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984)).

## III.      Analysis

The court's analysis of plaintiffs' Motion for Preliminary Injunction unfolds in this fashion: it evaluates the three preliminary injunction factors, in turn. Then, after concluding that all three factors favor entry of a preliminary injunction, the court considers the scope of the relief warranted. The court begins with the first preliminary injunction factor: plaintiffs' likelihood of success on the merits.

A.      **Likelihood of Success on the Merits**

Plaintiffs assert they are likely to succeed on their statutory-based claims and their APA claims.  "Where a plaintiff seeks a preliminary injunction and asserts multiple claims upon which the relief may be granted, the plaintiff need only establish a likelihood of success on the merits of one of the claims."  *George v. Davis Sch. Dist.*, No. 23-cv-00139, 2023 WL 5000989, at *6 (D. Utah Aug. 4, 2023) (citation and internal quotation marks omitted).  The court's analysis of this factor begins and ends with plaintiffs' statutory claims[2]—ones asserting that the SAVE Plan exceeds defendants' authority under the HEA.  To show that their claims are likely to succeed, plaintiffs argue the SAVE Plan violates the "Major Questions Doctrine."

To apply the Major Questions Doctrine (MQD), the court must engage in a two-step analysis.  *First*, the court must determine whether this case presents a major question.  *Second*, if it does, the court must determine whether the statute the agency invokes provides clear congressional authorization for the challenged agency action.  The court takes up each question, in turn, below.

---

[2]      There's a slight discrepancy between plaintiffs' Motion for Preliminary Injunction and their First Amended Complaint.

Plaintiffs' First Amended Complaint asserts four claims for relief.  In Count I, plaintiffs assert defendants violated Article I of the Constitution by taking an agency action in excess of statutory jurisdiction and in violation of the separation of powers.  Doc. 57 at 25–28 (1st Am. Compl. ¶¶ 133–54). In Count II, plaintiffs assert defendants took an agency action in excess of their statutory authority, violating the APA.  *Id.* at 28–30 (1st Am. Compl. ¶¶ 155–73).  Count III asserts defendants took an arbitrary and capricious agency action, violating the APA.  *Id.* at 30–36 (1st Am. Compl. ¶¶ 174–215). And in Count IV, plaintiffs assert defendants violated APA procedures.  *Id.* at 36–38 (1st Am. Compl. ¶¶ 216–27).

In contrast, plaintiffs' brief asserts plaintiffs are likely to succeed on the merits of *three* claims: "(1) the final rule exceeds Defendants' authority under the HEA, (2) the final rule is arbitrary and capricious, and (3) the rule's thirty-day comment period violated the APA."  Doc. 24 at 10.  The court assumes that this first "statutory" claim mentioned in plaintiffs' brief supporting their Motion for Preliminary Injunction includes Count I and Count II from the First Amended Complaint.

1.     **The MQD Applies Because the SAVE Plan has Vast Economic and Political Significance.**

The "so-called Major Questions Doctrine applies where 'an agency claims to discover in a long-extant statute an unheralded power to regulate "a significant portion of the American economy"' or make 'decisions of vast "economic and political significance."'" *Bradford v. U.S. Dep't of Labor*, 101 F.4th 707, 725 (10th Cir. 2024) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S 120, 159–60 (2000))).  "Although courts generally enforce plain and unambiguous statutory language according to its terms, where the statute at issue is one that confers authority upon an administrative agency, there are certain extraordinary cases that provide a reason to hesitate before concluding that Congress meant to confer such authority." *Id.* at 726 (quotation cleaned up).  If the case is an "extraordinary" one, then "the agency must point to clear congressional authorization for the proposed regulation." *Id.* (internal quotation marks, citation, and ellipsis omitted).  In *West Virginia v. EPA*, the Supreme Court labelled several of its prior decisions as Major Question cases.  597 U.S. 697, 721 (2022).  The court reviews some of these examples, below, to demonstrate how the MQD works.

In *Brown & Williamson*, the Supreme Court rejected the FDA's attempt to regulate tobacco products under its authority to regulate "drugs" and "devices."  529 U.S. at 159–60.  It did so because the Court was "confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion." *Id.* at 160.

In *Alabama Association of Realtors v. Department of Health & Human Services*, the Court rejected the CDC's authority to issue a nationwide eviction moratorium in response to the COVID-19 pandemic.  594 U.S. 758, 759–60 (2021).  The CDC had claimed this kind of

authority under a provision of the Public Health Service Act because it allowed the CDC to "'make and enforce . . . regulations'" that it deemed "'necessary to prevent the introduction, transmission, or spread of communicable diseases[.]'" *Id.* at 760–61 (quoting 42 U.S.C. § 264(a)).  The Court called the CDC's "claim of expansive authority" under this statute "unprecedented" and found the statute "a wafer-thin reed on which to rest such sweeping power." *Id.* at 765.  The Court emphasized that the eviction moratorium covered millions at risk for eviction and likely had an economic impact around $50 billion. *Id.* at 764.

In *Utility Air Regulatory Group v. EPA*, the Court rejected the agency's attempt to include greenhouse gases under the Clean Air Act's definition of "air pollutant."  573 U.S. at 321.  The Court concluded EPA's interpretation "would be incompatible with the substance of Congress' regulatory scheme," *id.* at 322 (quotation cleaned up), because EPA's interpretation relied on "ambiguous statutory text[,]" *id.* at 324.  And, the Court emphasized, EPA's claimed authority would give it "unheralded power to regulate 'a significant portion of the American economy[.]'" *Id.* (quoting *Brown & Williamson*, 529 U.S. at 159).  Against this broader backdrop, the court turns to an MQD case involving student loans: *Biden v. Nebraska*.

*Biden v. Nebraska* involved student loan forgiveness under the Higher Education Relief Opportunities for Students Act (HEROES Act) of 2003, a law enacted out of Congress's concern for student loan borrowers in the wake of the September 11 terrorist attacks.  143 S. Ct. at 2363.  The HEROES Act allows the Secretary to "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs" during a "national emergency[.]"  20 U.S.C. § 1098bb(a)(1).  In August 2022, the Secretary cancelled student loan debt under the HEROES Act to address financial harm stemming from the COVID-19 pandemic.

*Biden v. Nebraska*, 143 S. Ct. at 2364.  This plan sought "to reduce and eliminate student debts directly."  *Id.*  Here's how that batch of loan forgiveness worked:

> For borrowers with an adjusted gross income below $125,000 in either 2020 or 2021 who have eligible federal loans, the Department of Education will discharge the balance of those loans in an amount up to $10,000 per borrower.  Borrowers who previously received Pell Grants qualify for up to $20,000 in loan cancellation.

*Id.* at 2364–65 (citations omitted).

Six states challenged this student loan forgiveness plan based on the HEROES Act.  *Id.* at 2365.  The Supreme Court—after determining that at least one state had standing—then applied the MQD.  That is, the Court concluded the "economic and political significance of the [HEROES Act plan was] staggering by any measure."  *Id.* at 2373 (citation and internal quotation marks omitted).  Given the significance of the Secretary's HEROES Act loan forgiveness, the Court found a "reason to hesitate before concluding that Congress meant to confer such authority."  *Id.* at 2372 (citation and internal quotation marks omitted).  The Court thus searched—in vain, as it turned out—for "clear congressional authorization for such a program."  *Id.* at 2375 (internal quotation marks omitted).  And the Court concluded with this: "[T]he basic and consequential tradeoffs inherent in a mass debt cancellation program are ones that Congress would likely have intended for itself."  *Id.* (citation and internal quotation marks omitted).

Here, defendants correctly point out that this case differs from *Biden v. Nebraska*.  As the Supreme Court already has noted, "HEROES Act loan relief and HEA loan relief function independently of each other."  *Dep't of Educ. v. Brown*, 600 U.S. 551, 567 (2023).  Indeed, the Supreme Court specified that its HEROES Act decision did "not opine on the substantive lawfulness of any action the Department might take under the HEA[.]"  *Id.* at 565 n.2.  This difference notwithstanding, *Biden v. Nebraska* definitively answers the question:  is the SAVE

12

Plan a major question?  The SAVE Plan, like the HEROES Act loan forgiveness, has "staggering" "'economic and political significance[.]'"  *Biden v. Nebraska*, 143 S. Ct. at 2373 (quoting *West Virginia v. EPA*, 597 U.S. at 721).  And so, the answer must be yes.

The Supreme Court has determined that student loan debt cancellation plans that forgive enormous amounts of debt are major questions.  *Id.* at 2375 ("[T]he basic and consequential tradeoffs inherent in a mass debt cancellation program are ones that Congress would likely have intended for itself." (citation and internal quotation marks omitted)).  Defendants estimate the net federal budget effect of the SAVE Plan at $156 billion.  88 Fed. Reg. at 43,886.  Recall that the $50 billion cost of the CDC's eviction moratorium triggered the MQD in *Alabama Association of Realtors*, 594 U.S. at 764.  The court thus easily concludes that the SAVE Plan—with a price tag three times as high—is a "decision[] of vast economic and political significance."  *Bradford*, 101 F.4th at 725 (citation and internal quotation marks omitted).  And so, the court must proceed to step two of the MQD, scouring the HEA for clear congressional authorization.

2.    **The Statute Doesn't Provide Clear Congressional Authorization for the SAVE Plan.**

Step two is where things get tricky.  So, what, exactly, does "clear congressional authorization" mean?  The Supreme Court has dedicated much of its MQD analysis to defining what doesn't qualify as clear congressional authorization.[3]  But the Supreme Court's decisions to date have used a two-part approach.  First, the cases evaluate the statute's plain text.  Second, they consider the statute's context.  *See West Virginia v. EPA*, 597 U.S. at 721–23.  The court's analysis here, below, uses the same approach.

---

[3]    The court is not aware of, nor have the parties cited any MQD case where the Supreme Court has found clear congressional authorization.  Does this absence suggest that the Supreme Court views the MQD as the equivalent of strict scrutiny for regulations?  Our Circuit has answered no.  In *Bradford*, our Circuit assumed without deciding that the MQD applied and found clear congressional authorization for the challenged regulation.  101 F.4th at 725–28.  More on *Bradford* later.

### a.      The HEA's Plain Text Authorizes the SAVE Plan.

*Biden v. Nebraska* doesn't answer this case's statutory interpretation question—at least not directly—because that case involved an entirely different statute.  But it nonetheless illustrates the kind of routine textual analysis the Supreme Court directs district courts to conduct when applying the MQD.  For example, the HEROES Act authorizes the Secretary to "waive or modify" student loan programs in connection with a national emergency.  20 U.S.C. § 1098bb(a)(1).  The *Biden v. Nebraska* Court carefully considered the meaning of both words. 143 S. Ct. at 2368–69.

*First*, the Court held that the word "modify" "does not authorize basic and fundamental changes[.]"  *Id.* at 2368 (citation and internal quotation marks omitted).  Instead, the Court explained, modify "carries a connotation of increment or limitation, and must be read to mean to change moderately or in minor fashion."  *Id.* (citation and internal quotation marks omitted). The Court rejected the change imposed under the HEROES Act loan forgiveness as a modification.  It "modified the cited provisions only in the same sense that the French Revolution modified the status of the French nobility—it has abolished them and supplanted them with a new regime entirely."  *Id.* at 2369 (citation and internal quotation marks omitted).

*Second*, the Court rejected the Secretary's reliance on the word "waiver" in the statute. Previously, the Secretary had used his waiver power to identify particular legal requirements— *i.e.*, "the requirement that a student provide a written request for a leave of absence"—and waive such requirements.  *Id.* at 2370.  But, under the HEROES Act loan forgiveness, the Secretary never identified a particular legal requirement he had waived.  *Id.*  Ultimately, the Court held that what the Secretary had "actually done [was] draft a new section of the Education Act from scratch by 'waiving' provisions root and branch and then filling the empty space with radically new text."  *Id.* at 2371.  The Court thus invalidated the HEROES Act plan because the HEROES

14

Act text—allowing the Secretary to "waive or modify"—didn't clearly authorize student loan forgiveness. *Id.* at 2375. So, step two of the MQD analysis begins like any other statutory interpretation exercise: with the statute's text.

In the HEA, Congress gave the Secretary the following authority to set income-contingent repayment plans:

> Consistent with criteria established by the Secretary, the Secretary shall offer a borrower of a loan made under this part a variety of plans for repayment of such loan, including principal and interest on the loan. The borrower shall be entitled to accelerate, without penalty, repayment on the borrower's loans under this part. The borrower may choose . . . an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years[.]

20 U.S.C. § 1087e(d)(1)(D). Plaintiffs argue this statute doesn't clearly authorize the SAVE Plan because it consistently uses the word "repayment." Doc. 24 at 14. According to plaintiffs, the statute's operative term—"repayment"—"*affirmatively precludes* massive debt forgiveness." *Id.* (emphasis in original).

Plaintiffs argue that repay means "to pay back." Doc. 24 at 14 (citing Repay, *American Heritage Dictionary* (4th ed. 2001)); *see also Repay*, *Black's Law Dictionary* (6th ed. 1990) (defining repay first as "[t]o pay back"); Antonin Scalia & Bryan A. Garner, *A Note on the Use of Dictionaries*, 16 Green Bag 2d 419, 428 (2013) (approving use of *Black's Law Dictionary* sixth edition for legal terms from 1951–2000). Taking one more step, plaintiffs argue that repay means to pay back the entirety of the principal borrowed, with some interest. Doc. 24 at 14–15. Plaintiffs also point out that the statute requires "repayment . . . including principal and interest on the loan." 20 U.S.C. § 1087e(d)(1). Plaintiffs see the statutory terms "principal" and "interest" as signals that Congress intended for borrowers to repay the entire principal and at least some interest. But plaintiffs' argument ignores the rest of the statute.

The statute also requires annual payments "paid over an extended period of time prescribed by the Secretary, not to exceed 25 years[.]"  20 U.S.C. § 1087e(d)(1)(D).  What happens when 25 years' worth of payments doesn't "repay[]" a loan?  Loan forgiveness.  Indeed, every Secretary of Education since the HEA's enactment has interpreted this provision to mean that the Secretary must forgive the remaining balance of the loan after 25 years.  59 Fed. Reg. at 61,666 ("Some borrowers in the [income-contingent repayment] plan may not earn sufficient income to fully repay their loans within the statutory 25-year time period.  In this event, the Secretary will forgive any outstanding loan balance (principal plus interest) that is unpaid after 25 years."); 77 Fed. Reg. at 66,114 ("The revisions offer eligible borrowers lower payments and loan forgiveness after 20 years of qualifying payments."); 80 Fed. Reg. 67,209 ("We agree that borrowers are responsible for repaying their student loans, and we believe that most borrowers repaying their loans under the REPAYE plan will be successful in repaying their loans, in many cases before the end of the 20- or 25-year repayment period.  However, we also believe the REPAYE plan will provide relief to struggling borrowers who experience financial difficulties that prevent them from repaying their loans.  We note that the REPAYE plan requires 20 or 25 years of qualifying payments before a loan is forgiven.").

In the court's view, the Secretary's longstanding interpretation of the statute is the correct one.  The statute sets an upper limit for repayments.  Congress wanted borrowers on income-contingent repayment plans to make payments for no more than 25 years.  As defendants aptly put it, "a plan for *partial* repayment of a loan or *slower* repayment of a loan are both still 'plans for repayment of such loan, including principal and interest on the loan.'"  Doc. 47 at 34 (emphases in original) (quoting 20 U.S.C. § 1087e(d)(1)).  Plaintiffs' interpretation inserts the word "full" in the statute, rendering it to require "full repayment" of the loan's principal and

some interest.  But that's just not what the statute says.  The court thus agrees with the

Secretary's time-honored interpretation that the statute imagines repayment for less than 25

years, with forgiveness at the end.  *See Walker v. United Parcel Serv., Inc.*, 240 F.3d 1268, 1276

(10th Cir. 2001) ("'Where an agency's statutory construction has been fully brought to the

attention of the public and the Congress, and the latter has not sought to alter that interpretation

although it has amended the statute in other respects, then presumably the legislative intent has

been correctly discerned.'" (quoting *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982))).

The court doesn't buy plaintiffs' argument about the HEA's plain text.  It next addresses

plaintiffs' arguments about the statute's context.

> **b.** **The HEA's Context Does Not Provide Clear Congressional**
> **Authorization for the SAVE Plan.**

The Justices have emphasized that a statute's context plays an important role in the MQD

analysis.  *See West Virginia v. EPA*, 597 U.S. at 721 (emphasizing that "the words of a statute

must be read in their context and with a view to their place in the overall statutory scheme" and,

in ordinary cases, "context has no great effect on the appropriate analysis" but "there are

'extraordinary cases' that call for a different approach" (quotation cleaned up)); *see also Biden v.*

*Nebraska*, 143 S. Ct. at 2376 (Barrett, J., concurring) (responding to "the charge that the [Major

Questions] doctrine is inconsistent with textualism" by "understand[ing] it to emphasize the

importance of *context* when a court interprets a delegation to an administrative agency"

(emphasis in original) (citation omitted)).  To that end, a statute's context can tell the court a lot

about Congress's authorization in an MQD case.  As avid footnote readers already know, our

Circuit addressed this very issue in *Bradford*, 101 F.4th at 725–28.[4]

---

[4]  None of the parties here cited *Bradford* in its papers.  *See* Doc. 24; Doc. 47; Doc. 50.  The court's
analysis nonetheless uses *Bradford* because it's binding Circuit precedent and it provides a helpful
framework for a developing doctrine.  As the court already mentioned, the Supreme Court has directed

In *Bradford*, the Tenth Circuit assumed without deciding that the MQD applied to a Department of Labor rule requiring recreational service outfitters operating on federal land to pay their employees a $15 minimum wage, rescinding an exemption the outfitters previously enjoyed.  *Id.* at 713.  After assuming the MQD applied, the Circuit asked whether the Congress clearly had authorized the Department of Labor's rule.  In its clear congressional authorization analysis, the Circuit identified four touchstones:  (1) whether the agency "seeks to locate expansive authority in modest words, vague terms or ancillary provisions[;]" (2) whether the rule is "an enormous and transformative expansion in regulatory authority without clear congressional authorization[;]" (3) whether the agency is "claim[ing] to discover regulatory authority for the first time in a long-extant statute[;]" and (4) whether "the agency issuing the . . . rule lacks expertise in the relevant area of policymaking."[5]  *Id.* at 725–28 (quotation cleaned

---

most of its MQD efforts to deciding what is *not* clear congressional authorization.  *Bradford*, on the other hand, demonstrates what *is* clear congressional authorization.  And, in any event, the parties' papers make arguments that fall well within *Bradford*, though they don't structure them in *Bradford*'s style.

[5]  The court recognizes that our Circuit didn't explicitly name these four touchstones as considerations for the clear congressional authorization analysis.  The court nonetheless interprets *Bradford* this way because these four touchstones resemble Justice Gorsuch's four "clues" for a clear congressional authorization analysis, as laid out in his *West Virginia v. EPA* concurrence.  *West Virginia v. EPA*, 597 U.S. at 746–49 (Gorsuch, J., concurring).  There, Justice Gorsuch identified four "telling clues" for a court's clear congressional authorization inquiry:  (1) whether the agency relies on "[o]blique or elliptical language" or "seek[s] to hide elephants in mouseholes[;]" (2) "the age and focus of the statute the agency invokes in relation to the problem the agency seeks to address[;]" (3) "the agency's past interpretations of the relevant statute[;]" and (4) whether "there is a mismatch between an agency's challenged action and its congressionally assigned mission and expertise."  *Id.* at 746–48 (Gorsuch, J., concurring) (citations and internal quotation marks omitted).

Justice Gorsuch's four "clues" don't match our Circuit's four *Bradford* touchstones perfectly, but they're awfully close:

up).  The court applies each of these touchstones, below, to discern whether the Congress clearly

has authorized the measures adopted in the SAVE Plan.

*First*, the court considers whether the Department of Education's SAVE Plan "seeks to

locate expansive authority in 'modest words,' 'vague terms or ancillary provisions.'"  *Id.* at 725

(citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)).  Even if a regulation has "a

colorable textual basis[,]" a statute's context can make "it very unlikely that Congress" delegated

such expansive power to the agency.  *West Virginia v. EPA*, 597 U.S. at 722–23.  "Extraordinary

grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or

'subtle devices.'"  *Id.* at 723 (brackets omitted) (quoting *Whitman*, 531 U.S. at 468).  To survive

MQD scrutiny, the Secretary must show "something more than a merely plausible textual basis

for the agency action[.]"  *Id.*

Here, defendants haven't shown that something more.  As demonstrated above,

defendants have identified a colorable, even plausible textual basis for the SAVE Plan.  The

|   | **Touchstones from *Bradford v. U.S. Dep't of Labor*, 101 F.4th at 725–28.** | **"Clues" in *West Virginia v. EPA*, 597 U.S. at 746–49 (Gorsuch, J., concurring).** |
|---|---|---|
| 1 | Whether the agency "seeks **to locate expansive authority in modest words**, vague terms or ancillary provisions." | Whether the agency relies on "[o]**blique or elliptical language**[.]" |
| 2 | Whether the challenged rule is "an **enormous and transformative expansion in regulatory authority** without clear congressional authorization." | "[E]xamine **the age and focus of the statute** the agency invokes in relation to the problem the agency seeks to address. . . .  [I]t is unlikely that Congress will make **extraordinary grants of regulatory authority** through vague language in a long-extant statute." |
| 3 | Whether the agency is "claim[ing] **to discover regulatory authority for the first time** in a long-extant statute." | "[C]ourts may examine the agency's **past interpretations** of the relevant statute." |
| 4 | Whether "the agency issuing the . . . rule **lacks expertise** in the relevant area of policymaking." | "[S]kepticism may be merited where there is **a mismatch** between an agency's challenged action and its congressionally assigned **mission** and **expertise**." |

The court thus applies these four touchstones in its clear congressional authority analysis.

SAVE Plan creates "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years[.]" 20 U.S.C. § 1087e(d)(1)(D).  While it's plausible to interpret the SAVE Plan to comply with the statute, plausibility won't suffice.  Take, for example, "not to exceed 25 years[.]" *Id.*  Recall that the SAVE Plan limits some borrowers' repayment window to 10 years.  To be sure, 10 years of repayments doesn't exceed 25.  And the Secretary's discretion to set a repayment time window is constrained by the phrase "*extended period of time[.]*" 20 U.S.C. § 1087e(d)(1)(D) (emphasis added).  But defendants' plausible textual basis doesn't rise to the level of "clear."  The statute sets a clear ceiling, but not a clear floor.  That is why the statute's language is, at most, a "subtle device[]" and so, it can't support an "[e]xtraordinary grant[] of regulatory authority[.]" *West Virginia v. EPA*, 597 U.S. at 723 (internal quotation marks and citation omitted).  Without a clear floor—only a plausible floor and a "subtle device"—the court can't find clear congressional authorization for the SAVE Plan.

*Second*, the court asks whether the SAVE Plan is "an 'enormous and transformative expansion in regulatory authority without clear congressional authorization.'" *Bradford*, 101 F.4th at 726 (ellipsis omitted) (quoting *Utility Air*, 573 U.S. at 324).  In *Utility Air*, summarized above, the Supreme Court struck down the EPA's interpretation of the term "air pollutant" because—though plausible—the interpretation gave the EPA "unheralded power to regulate a significant portion of the American economy[.]" 573 U.S. at 324 (citation and internal quotation marks omitted).

Here, defendants estimate the SAVE Plan will cost $156 billion over 10 years.  88 Fed. Reg. at 43,820.  But, when defendants calculated that number, they assumed the Supreme Court would uphold the HEROES Act loan forgiveness.  The Supreme Court invalidated the HEROES

Act loan forgiveness in *Biden v. Nebraska*, and none of those loans were cancelled.  And that has

significant implications for the SAVE Plan's cost.  Plaintiffs proffer a new SAVE Plan cost

estimate that accounts for *Biden v. Nebraska*, and that cost is $475 billion over ten years.  Doc.

24 at 23 (citing Penn Wharton, *Biden's New Income-Driven Repayment ("SAVE") Plan:*

*Budgetary Cost Estimate Update*, University of Pennsylvania (July 17, 2023),

https://budgetmodel.wharton.upenn.edu/issues/2023/7/17/biden-income-driven-repayment-

budget-update).  As points of reference, the REPAYE Plan cost an estimated $15.4 billion.  80

Fed. Reg. at 67,225.  This difference—$475 billion versus $15.4 billion—expands agency

authority to such an extent that it alters it.[6]  So, the court concludes that the SAVE Plan

represents "an 'enormous and transformative expansion in regulatory authority without clear

congressional authorization.'"  *Bradford*, 101 F.4th at 726 (ellipsis omitted) (quoting *Utility Air*,

573 U.S. at 324).

---

[6]     The court recognizes that this second *Bradford* touchstone seems to overlap with step one of the
MQD analysis.  The court differentiates between the two this way:  step one of the MQD analysis asks
about the sheer size of the regulatory action—*i.e.*, is it one of huge economic and political significance?
The second *Bradford* touchstone asks, in contrast, not only whether the regulatory action is enormous but,
crucially, whether the regulatory action is *transformative*.  This requires the court's context analysis to
look back at the agency's previous actions and compare them to the challenged action.

Justice Barrett provided a helpful example in her *Biden v. Nebraska* concurrence, where she
explained the importance of context:

> [I]magine a grocer instructs a clerk to "go to the orchard and buy apples for the store."
> Though this grant of apple-purchasing authority sounds unqualified, a reasonable clerk
> would know that there are limits.  For example, if the grocer usually keeps 200 apples on
> hand, the clerk does not have actual authority to buy 1,000—the grocer would have spoken
> more directly if she meant to authorize such an out-of-the-ordinary purchase.

143 S. Ct. at 513 (Barrett, J., concurring).  So, comparing prior apple orders to the existing apple orders
provided important context.  And the court must look for "out-of-the-ordinary" grants of authority.  All
this is to say:  the sheer cost of the SAVE Plan is relevant to MQD step one; the cost of the SAVE Plan
compared to the cost of the REPAYE Plan is relevant to *Bradford*'s second touchstone.

Beyond cost, the SAVE Plan is a transformative expansion in regulatory authority in another important way: it represents the first time the Secretary has gone beyond the number set by Congress. Recall that Congress modified the laws for income-based repayment programs in 2010. Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 2213, 124 Stat. 1029, 1081 (2010) (codified at 20 U.S.C. § 1098e(e)). For borrowers who had taken out a loan on or after July 1, 2014, Congress lowered the cap on payments for IBR plans to 10%—down from 15%. 20 U.S.C. § 1098e(e)(1). And for those same borrowers, Congress reduced the maximum repayment window to 20 years—down from 25 years. *Id.* § 1098e(e)(2). In 2015, the REPAYE Plan took these numbers—10% instead of 15% and 20 years instead of 25 years—and applied them to eligible loans taken out before July 2014.[7] Putting it another way, the REPAYE Plan took Congress's generosity with income-based repayment plans from § 1098e(e) and applied that generosity to some income-driven repayment plans. So, the REPAYE Plan took Congressionally-blessed numbers and applied them more broadly.

Not so here. Both the monthly payment cap and the payment period limitation overreach any generosity Congress has authorized before. Here, the SAVE Plan caps a borrower's monthly payment amount at 5% of the borrower's income above 225% of the applicable federal poverty guideline. Congress has gone as low as 10%, but it's never gone as low as 5%. The SAVE Plan also cancels the remaining balance after the borrower has made 120 monthly payments for borrowers whose original principal balance was $12,000 or less. Congress has gone as low as 20 years, but it's never gone as low as 10 years. Because the Final Rule goes beyond Congress's limits—for the first time—the SAVE Plan is a "'transformative expansion in regulatory authority

---

[7]     Borrowers with graduate debt were excepted. The REPAYE Plan still required those borrowers to pay for 25 years.

without clear congressional authorization.'" *Bradford*, 101 F.4th at 726 (ellipsis omitted) (quoting *Utility Air*, 573 U.S. at 324).

*Third*, the court asks whether the Secretary is "claim[ing] to discover regulatory authority for the first time in a long-extant statute." *Id.* at 726–27 (citation and internal quotation marks omitted). This *Bradford* touchstone favors defendants. The Secretary has used its HEA authority three times before: to create the first income-contingent repayment plan, to create the PAYE Plan, and to create the REPAYE Plan.

*Last*, the court considers whether the Department of Education "lacks 'expertise' in the relevant area of policymaking." *Id.* at 728. That is not the case here. The current record demonstrates that the Department of Education has a great deal of expertise in the area of student loans. This final touchstone also favors defendants.

In sum, two of the touchstones guiding the MQD favor plaintiffs. Two favor defendants. But this calculus doesn't produce a dead heat. That's so because one of the touchstones favors plaintiffs so compellingly that it overpowers the others. It's the second factor: whether the SAVE Plan represents "an enormous and transformative expansion in statutory authority without clear congressional authorization." *Bradford*, 101 F.4th at 726 (quotation cleaned up). Unquestionably it does.

The record here contains just one estimate of the price tag for the SAVE Plan's forgiveness: $475 billion, over ten years. *Biden v. Nebraska* reported the total value of all outstanding federal student loans at $1.6 trillion. 143 S. Ct. at 2362. So, the SAVE Plan forgives nearly one-third of all student loan debt. And while this $1.6 trillion figure is a 2022 number—the record here doesn't contain a current figure—the court has no doubt that $475 billion in forgiveness qualifies as "enormous" and a "transformative expansion." *Bradford*, 101

F.4th at 726 (quotation cleaned up).  Indeed, the SAVE Plan's forgiveness towers over earlier

iterations.  For instance, the REPAYE Plan cost $15.4 billion.

This unprecedented and dramatic expansion shifts the overall balance of *Bradford*'s four

touchstones in favor of plaintiffs.  The court finds that plaintiffs are likely to prevail on the first

of their statutory claims, *i.e.*, that the SAVE Plan exceeds the Secretary's authority under the

HEA.  The court so finds even though defendants have mustered a plausible construction

suggesting that Congress conferred such authority.  But they haven't assembled what *Biden v.*

*Nebraska* and the MQD require:  a clear showing of such authority.  The court thus concludes

that plaintiffs are likely to prevail on the merits of their bellwether claim.

Next, the court analyzes the second preliminary injunction factor.

**B.**      **Irreparable Harm**

At the hearing on this motion, plaintiffs emphasized that the SAVE Plan will cause

irreparable harm to their public instrumentalities.  A "plaintiff satisfies the irreparable harm

requirement by demonstrating 'a significant risk that he or she will experience harm that cannot

be compensated after the fact by monetary damages.'"  *RoDa Drilling Co. v. Siegal*, 552 F.3d

1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250,

1258 (10th Cir. 2003)).  According to plaintiffs, their public instrumentalities hold FFEL loans,

and the SAVE Plan incentivizes student loan borrowers to consolidate their loans away from

FFEL loans.  And, according to plaintiffs, borrowers already have consolidated their loans,

seeking to reap the benefits of the SAVE Plan.  Once a borrower consolidates an FFEL loan, that

loan is gone, depriving the public instrumentalities of interest income.  And plaintiffs can't

recover money damages from defendants due to sovereign immunity.  So, plaintiffs argue,

they've suffered an irreparable harm.

As an initial matter, the court must reiterate its concerns about plaintiffs' evidence of the harms to their public instrumentalities.  As mentioned in the Memorandum and Order deciding defendants' Motion to Dismiss, South Carolina's evidence about its public instrumentality doesn't demonstrate that the SAVE Plan is leading to FFEL loan consolidation, nor does it show that FFEL loan consolidation leads to decreased interest revenue.  Doc. 68 at 18–20.  And Texas's evidence merely shows that—*assuming* borrowers consolidate their loans—loan consolidation will cause revenue loss to Texas's public instrumentality *in the future*.  *See* Doc. 53-7 at 2 (Keyton Decl. ¶ 4) ("*To the extent that* federal policy results in borrowers consolidating their loans out of FFELP into the Direct Loan Program, those consolidations will cause the State of Texas to lose revenue." (emphasis added)).  Only Alaska's evidence adduces evidence of a *current* harm to its public instrumentality.  *See* Doc. 53-8 at 3 (Efird Decl. ¶ 9) ("[T]he enticed consolidation has already harmed and will continue to harm ASLC[.]").  So, plaintiffs' theories of irreparable harm aren't all that substantial.

Defendants argue that plaintiffs' delay in seeking a preliminary injunction further undermines their claims of irreparable harm.  To evaluate this argument, the court divides its analysis of plaintiffs' irreparable harm in two:  (i) irreparable harm from the SAVE Plan provisions already in effect and (ii) irreparable harm from the SAVE Plan provisions set to go into effect on July 1.

### 1.    Plaintiffs Have Failed to Show an Irreparable Harm from SAVE Plan Provisions Already in Effect.

Defendants point out that the Secretary published the Final Rule in July 2023—nine months before plaintiffs filed suit in March 2024.  A party's "delay in seeking preliminary relief cuts against finding irreparable injury."  *RoDa Drilling*, 552 F.3d at 1211 (citation and internal quotation marks omitted).  In response, plaintiffs emphasize that the Final Rule is scheduled to

go into effect on July 1, 2024. For that reason, plaintiffs argue, they didn't delay their suit at all. But plaintiffs' argument misses an important point: parts of the SAVE Plan already took effect in February 2024, and plaintiffs didn't file their lawsuit until March 28, 2024.[8] Doc. 1.

Specifically, two provisions of the SAVE Plan already are in effect: (i) the increase in the discretionary income line from 150% to 225% of the federal poverty line and (ii) the shorter path to forgiveness for borrowers who took out small loans—*i.e.*, ten years of payments for a borrower who took out $12,000 or less. Indeed, plaintiffs' First Amended Complaint confirms that the Department began implementing the rule in February. Doc. 57 at 3 (1st Am. Compl.). The Secretary implemented this outcome by using his authority to designate provisions for early implementation—authority plaintiffs don't challenge here. And defendants published advance warning that they would implement these provisions early. When the Final Rule was published on July 23, 2023, it specifically tagged the increase to 225% of the federal poverty line for early implementation. 88 Fed. Reg. at 43,821. And, according to defendants, they announced early implementation of forgiveness for borrowers with low original balances a month in advance. All of this is to ask why: if these parts of the SAVE Plan promised an irreparable harm to plaintiffs, why didn't they move to enjoin the SAVE Plan *before* they took effect?

Plaintiffs attributed the delay to their need to gather data on FFEL loan consolidation. Otherwise, they reason, they would've had to rely on speculative, insufficient harm. The court isn't persuaded. Plaintiffs didn't include any allegations about FFEL loan consolidation when

---

[8]     Defendants argue that the SAVE Plan is severable. So, defendants assert, "to the extent the Court concludes that only some portions of the Rule are unlawful . . . [the court] should still decline Plaintiffs' invitation to enjoin the Rule in its entirety." Doc. 47 at 57. Plaintiffs' brief never responds to this argument. Plaintiffs argued against severability at the court's hearing on this motion, but the court considers this argument waived. *Murphy v. City of Tulsa*, 950 F.3d 641, 645 n.4 (10th Cir. 2019) ("'[A]rguments made for the first time at oral argument are waived.'" (quoting *Ross v. Univ. of Tulsa*, 859 F.3d 1280, 1294 (10th Cir. 2017))).

they filed their Complaint.  *See generally* Doc. 1.  Plaintiffs' original Complaint alleged

Louisiana has a state instrumentality that would suffer irreparable harm from the SAVE Plan

"because broader loan cancellation under the SAVE plan would decrease demand for its

services."  Doc. 1 at 21 (Compl. ¶¶ 108– 11).  Plaintiffs didn't assert their FFEL loan

consolidation theory for plaintiffs South Carolina, Texas, and Alaska until May 10, 2024.  Doc.

50.  And plaintiffs ultimately abandoned their theory based on harm to Louisiana's public

instrumentality.  So, if plaintiffs delayed filing this lawsuit to gather information about FFEL

loan consolidations to supply factual assertions in their declarations, that information didn't

actually find its way into the March 2024 Complaint.  The court declines to excuse plaintiffs'

delay on this basis.

Nor does the court credit plaintiffs' assertion that they needed time to develop their tax

revenue theory of harm.  Here's an overview of plaintiffs' tax revenue theory:  nine states tie

their definition of taxable income to the federal definition of income or adjusted gross income.

Doc. 57 at 17 (1st Am. Compl. ¶ 90).  And the federal tax code defines taxable income to include

student loan forgiveness granted under income-driven repayment plans.  But the American

Rescue Plan Act of 2021 provides that all student loan forgiveness won't "count toward the

federal definition of taxable income until December 31, 2025."  Doc. 57 at 17 (1st Am. Compl.

¶ 89).  So, the states can't tax student loan debt forgiveness income until 2026.  Plaintiffs alleged

the Final Rule "will reduce income tax revenue by decreasing the amount of outstanding student

loan debt."  Doc. 57 at 18 (1st Am. Compl. ¶ 96).  This is so, they say, because the "Final Rule

accelerates the timeline for cancelation on income-driven repayment plans to as low as 10 years

for certain loan balances."  *Id.* (1st Am. Compl. ¶ 92).  Under the old version of the rule, the

federal government wouldn't forgive these loans for 20 to 25 years.  So, plaintiffs allege, "but for

the Final Rule, significant amounts of federal loan cancellation would occur *after* December 31, 2025" for residents of the relevant states.  *Id.* (1st Am. Compl. ¶ 95) (emphasis in original).  In this but-for world, the relevant states would have more student loan forgiveness income to tax. *Id.*  The challenged Final Rule, in contrast, "shift[s] forward some debt forgiveness that would otherwise occur in a period in which it would be taxable income . . . into a period where it is not taxable[.]"  *Id.* (1st Am. Compl. ¶ 96).

Plaintiffs assert that they delayed filing suit so that this tax revenue theory of harm could coalesce and thus become less speculative.  The court isn't convinced.  All pieces of this tax revenue theory—the states' income tax definition, the American Rescue Plan, and the SAVE Plan's shift in forgiveness—were present long before plaintiffs filed their Complaint in March 2024.

Plaintiffs thus have failed to proffer a reasonable explanation for the delay.  "'[D]elay is an important consideration in the assessment of irreparable harm for purposes of a preliminary injunction.'"  *Mont. Wyo. State Area Conf. of NAACP v. U.S. Election Integrity Plan*, No. 22-cv-00581, 2022 WL 1061906, at *5 (D. Colo. Apr. 8, 2022) (collecting cases) (quoting *GTE Corp.*, 731 F.2d at 679); *see also* 11A Mary Kay Kane et al., *Federal Practice & Procedure* § 2948.1 (3d ed. 2024) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.").  The court is not impressed by plaintiffs' timing.  The delay—combined with plaintiffs' abstractions about harm—fail to establish an irreparable harm.  The court thus concludes that plaintiffs haven't demonstrated irreparable harm attributable to the parts of the SAVE Plan already in effect.

> ## 2. Plaintiffs Have Shown an Irreparable Harm from the SAVE Plan Provisions Not Yet in Effect.

The court reaches a different conclusion for the parts of the SAVE Plan that have yet to go into effect. Plaintiffs haven't delayed their lawsuit challenging the SAVE Plan's unimplemented parts, so their delay doesn't prevent a finding of irreparable harm. And plaintiffs correctly point out that their harms are "irrecoverable." Doc. 24 at 29. That is so because the sovereign immunity bars plaintiffs from recovering monetary damages from the federal government. *See Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994) ("Because the Eleventh Amendment bars a legal remedy in damages, and the court concluded no adequate state administrative remedy existed, the court held that plaintiffs' injury was irreparable. We agree.").

Plaintiffs also point out that "[o]ne cannot unscramble this egg; loan forgiveness has an 'irreversible impact.'" Doc. 24 at 29 (quoting *Nebraska v. Biden*, 52 F.4th 1044, 1047 (8th Cir. 2022)). Indeed, before the case reached the Supreme Court, the Eighth Circuit concluded that the HEROES Act student loan forgiveness posed irreparable harm "considering the irreversible impact the Secretary's debt forgiveness action would have[.]"[9] *Nebraska v. Biden*, 52 F.4th at

---

[9]     *Nebraska v. Biden* provides more support for differentiating between parts of the SAVE Plan already in effect and those parts set to go into effect on July 1. In that case, the Eighth Circuit enjoined the HEROES Act student loan forgiveness before it went into effect. The Circuit explained,

> the equities strongly favor an injunction considering the irreversible impact the Secretary's debt forgiveness would have as compared to the lack of harm an injunction would presently impose. Among the considerations is the fact that collection of student loan payments as well as accrual of interest on student loans have both been suspended.

*Nebraska v. Biden*, 52 F.4th at 1047–48. Not so here—the SAVE Plan is far from suspended. Plaintiffs ask the court to enjoin defendants "from implementing or acting pursuant to the Final Rule[.]" Doc. 23 at 1. Yet they acknowledge that the Department already has "unilaterally erased the debt of 153,000 borrowers." Doc. 57 at 3 (1st Am. Compl.). And, as plaintiffs elegantly phrase it, "[o]ne cannot unscramble this egg; loan forgiveness has an irreversible impact." Doc. 24 at 29 (quotation cleaned up). As explained below, when considering the scope of the preliminary injunction, plaintiffs' failure to take

1047.  The court thus concludes that plaintiffs have shown an irreparable harm if the SAVE Plan is allowed to take full effect on July 1, 2024.

### C.      Public Interest

As the final merged factor in the preliminary injunction analysis, the court must examine whether plaintiffs have shown that their "threatened injury outweighs the harms that the preliminary injunction will cause the government or that the injunction, if issued, will not adversely affect the public interest." *Aposhian*, 958 F.3d at 990.  Plaintiffs argue they've satisfied this standard because they face harm to their public instrumentalities and defendants "have no interest in enforcing a rule that completely bypasses constitutional separation of powers principles."  Doc. 24 at 30.  Defendants respond that the SAVE Plan serves the public interest because it solves a long list of harms:  student loan defaults and delinquencies; adverse effects on credit scores; decreased liquidity for large purchases; decreased enrollment in higher education; drags on national growth; and increased reliance on federal welfare programs.  Doc. 47 at 54. How to weigh these competing interests?

The Supreme Court's decision in *National Federation of Independent Business v. Department of Labor, Occupational Safety & Health Administration*, 595 U.S. 109 (2022), is helpful here.  It involved a challenge to OSHA's COVID-19 vaccine mandate.  *Id.* at 112–13. Several entities filed petitions for review and moved for a stay pending judicial review[10] of OSHA's mandate.  *Id.* at 113.

_____

into account the loan forgiveness already in effect makes their proposed injunction unworkable.  *See below*, § III.D.2.

[10]      Of course, a stay pending judicial review is a different procedural creature than a preliminary injunction.  *Compare* Fed. R. Civ. P. 62, *and* Fed. R. App. P. 8(a), *with* Fed. R. Civ. P. 65.  But the standard governing a stay still requires the court to weigh the public interest.  The stay factors include:

Petitioners maintained "that OSHA's mandate w[ould] force them to incur billions of dollars in unrecoverable compliance costs and w[ould] cause hundreds of thousands of employees to leave their jobs." *Id.* The federal government countered "that the mandate w[ould] save over 6,500 lives and prevent hundreds of thousands of hospitalizations." *Id.* at 120. The Court declined to compare the two: "It is not our role to weigh such tradeoffs." *Id.* And the Court emphasized that Congress hadn't given OSHA the power it sought to exercise. *Id.* The Court thus agreed with petitioners that they were entitled to a stay, because, among other things, the Court concluded the "equities do not justify withholding interim relief."

The court can't weigh the tradeoffs here either. A layperson might wonder how Alaska's relatively meager harm—$100,000 in lost FFEL loan interest over two years—can justify blocking millions of student loan borrowers nationwide from getting billions in debt relief. But in "our system of government," weighing these tradeoffs "is the responsibility of those chosen by the people through democratic processes." *Id.* In the court's view, Congress—a branch of government elected by the people—didn't delegate to the Secretary clear power to enact the SAVE Plan. The equities thus favor a preliminary injunction of some sort. But what sort of injunction do they favor? That's a more daunting question, and the court takes it up next.

---

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The Supreme Court applied this standard in *National Federation of Independent Businesses*, which means that it had to evaluate the public interest and balance the equities. 595 U.S. at 120. So, even though *National Federation of Independent Businesses* occupied a different procedural posture and thus applied a different procedural standard, the Supreme Court still weighed the public interest—exactly what the court must do here.

D.      **Scope of Relief**

Having concluded that plaintiffs have shouldered their burden under the preliminary injunction standard, the court must fashion an injunction with an appropriate scope.  Rule 65(d)(1)(C) requires the court to "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  The Supreme Court has emphasized that "the specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood."  *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (citation omitted).

Plaintiffs' Motion for Preliminary Injunction requests two forms of injunctive relief. *One*, it asks the court to enjoin defendants "their agents, employees, and attorneys from implementing or acting pursuant to the Final Rule[.]"  Doc. 23 at 1.  And *two*, it seeks to enjoin defendants "from undertaking any form of student debt relief not expressly authorized by Congress."  *Id.*  The court begins with plaintiffs' second request.

This vague request—asking the court to enjoin defendants from undertaking any form of unlawful debt relief—is not helpful.  Indeed, plaintiffs never mention it in their supporting briefs. *See generally* Doc. 24; Doc. 50.  Our Circuit has held that "injunctions simply requiring the defendant to obey the law are too vague" to enforce and they thus violate Fed. R. Civ. P. 65(d). *Keyes v. Sch Dist. No. 1, Denver, Colo.*, 895 F.2d 659, 668 (10th Cir. 1990); *see also* 11A Mary Kay Kane et al., *Federal Practice & Procedure* § 2955 (3d ed. 2024) ("[O]rders simply requiring defendants to 'obey the law' uniformly are found to violate the specificity requirement.").  The court will not enter such a broad, unguided injunction.  The court thus denies this part of plaintiffs' motion.

The court next evaluates plaintiffs' request that the court enjoin defendants from implementing the SAVE Plan. It divides this analysis into two considerations: whether to issue a nationwide injunction and whether to enjoin the SAVE Plan in its entirety. The analysis concludes by considering whether the court may enjoin the President of the United States, a defendant and a target of plaintiffs' motion.

### 1.   The Injunction Should Apply Nationwide.

Plaintiffs request a nationwide injunction.[11] The court must tread carefully here because a nationwide injunction risks an overbroad injunction. "Traditionally, when a federal court finds

---

[11]    The proper terminology for this request is unsettled. Some, like the parties here, use the term "nationwide injunction" because plaintiffs seek an injunction that applies nationwide. Others, like Justice Jackson and Justice Gorsuch, use the term "universal injunction." *See Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 936 (2024) (Jackson, J., dissenting) ("Idaho maintains that this case is certworthy because it raises the question of whether a district court can issue an injunction that grants relief directed to all potentially impacted parties—a so-called 'universal injunction.'"); *United States v. Texas*, 599 U.S. 670, 694 (2023) (Gorsuch, J., concurring) ("[T]he routine issuance of universal injunctions has proven unworkable, sowing chaos for litigants, the government, courts, and all those affected by these sometimes conflicting decrees." (citation, internal quotation marks, and brackets omitted)). Here, the court uses the parties' term—nationwide injunction.

     Plaintiffs' request for a nationwide injunction is a loaded one. Nationwide injunctions are the subject of much debate. Justice Gorsuch has questioned whether nationwide injunctions are consistent with separation of powers principles and Supreme Court precedent. *United States v. Texas*, 599 U.S. at 694–95 (Gorsuch, J., concurring) ("Universal injunctions continue to intrude on powers reserved for the elected branches."); *see also Labrador*, 144 S. Ct. at 926–27 (Gorsuch, J., concurring) (calling "universal" injunctions "a relatively new phenomenon" that "virtually guarantee[] that a rising number of 'high-profile' cases will find their way to" the Supreme Court and lamenting that "universal injunction practice is almost by design a fast and furious business"). Justice Thomas shares the same concerns. *Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring) ("I am skeptical that district courts have the authority to enter universal injunctions. These injunctions did not emerge until a century and a half after the founding. And they appear to be inconsistent with longstanding limits on equitable relief and the power of Article III counts.").

     The debate rages outside the Supreme Court, too. "Some scholars, jurists, and attorneys criticize the practice of district courts issuing nationwide injunctions as an inappropriate abuse of power. Others defend nationwide injunctions as a powerful way to check federal agency overreach and ensure robust relief for plaintiffs." *District Court Reform: Nationwide Injunctions*, 137 Harv. L. Rev. 1701, 1702 (Apr. 2024).

     The court wades into this controversy reluctantly, and with caution.

a remedy merited, it provides party-specific relief, directing the defendant to take or not take some action relative to the plaintiff." *United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring).  In contrast, a nationwide injunction forbids a defendant from taking some action against *everyone*—not just plaintiffs.  With the gravity of this request in mind, the court briefly outlines the parties' arguments for and against a nationwide injunction.

Plaintiffs' First Amended Complaint asks the court to "set aside" the SAVE Plan.  Doc. 57 at 28, 30 (1st Am. Compl. ¶¶ 154, 173).  This language comes from the APA, which allows courts to "hold unlawful and set aside agency action[.]"  5 U.S.C. § 706(2).  Plaintiffs assert that when "'a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'"[12]  Doc. 24 at 31 (quoting *Harmon v. Thornburg*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)).  And when a court finds agency action unlawful, it often issues a nationwide injunction. *See, e.g.*, *Texas v. United States*, 787 F.3d 733, 768–69 (5th Cir. 2015) (affirming district court's nationwide injunction of program benefitting undocumented immigrant parents of American citizens in suit where the state of Texas—and only Texas—had standing because there was "a substantial likelihood that a partial injunction would be ineffective because [program] beneficiaries would be free to move between states"); *Faust v. Vilsack*, 519 F. Supp. 3d 470, 478

---

[12]    The court acknowledges the controversial nature of this proposition—and, indeed, other propositions throughout this Order:

> Courts have supposed that the APA's instruction to "set aside" agency action authorizes vacatur.  There are, however, good reasons to conclude that "set aside," properly understood, merely instructs a court to ignore an illegal agency action for the purpose of resolving the case before it—much like a court ignores (rather than vacates or erases) an unconstitutional statute when resolving a case.  At oral argument, the Chief Justice responded to this rather shocking assault on a long accepted, foundational aspect of judicial control of agency action with an understated "[w]ow."

33 Richard Murphy et al., *Federal Practice & Procedure* § 8381 (2d ed. 2024).

(E.D. Wisc. 2021) (applying "universal" injunction to Department of Agriculture program forgiving debts of Black farmers); *Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 384–85, 397–98 (M.D.N.C. 2019) (issuing nationwide injunction against U.S. Citizenship and Immigration Services' policy memorandum changing USCIS policy on calculating unlawful presence under the Immigration and Nationality Act); *Texas v. United States*, 201 F. Supp. 3d 810, 815–16, 836 (N.D. Tex. 2016) (applying nationwide injunction to federal policy requiring that "all persons must be afforded the opportunity to have access to restrooms, locker rooms, showers, and other intimate facilities which match their gender identity rather than their biological sex").

In support of their nationwide injunction, plaintiffs also invoke the Eighth Circuit's opinion in *Nebraska v. Biden*, 52 F.4th 1044 (8th Cir. 2022). This decision became the ruling reviewed by the Supreme Court in *Biden v. Nebraska*. The Eighth Circuit reversed a district court's decision denying a preliminary injunction against loan forgiveness based on the HEROES Act. *Nebraska v. Biden*, 52 F.4th at 1045–46, *rev'g* 636 F. Supp. 3d 991 (E.D. Mo. 2022). The Eighth Circuit then granted a preliminary injunction pending appeal, concluding, after "balancing the equities," that "the merits of the appeal before this court involve substantial questions of law which remain to be resolved, but the equities strongly favor an injunction considering the irreversible impact the Secretary's debt forgiveness action would have as compared to the lack of harm an injunction would presently impose." *Id.* at 1047 (citation and internal quotation marks omitted). The Circuit thus imposed the requested injunction pending future orders by that court or the Supreme Court. *Id.* at 1048.

The President and his fellow defendants quickly petitioned the Supreme Court, asking it to vacate the injunction entered by the Eighth Circuit. The Court declined in a Memorandum

Decision issued by Justice Kavanaugh. *Biden v. Nebraska*, 143 S. Ct. 477 (2022) (Mem.). The Justice's Memorandum Decision elected to treat the application to vacate the injunction as also amounting to a petition for a writ of certiorari before judgment. *Id.* The Court granted that request. *Id.* And ultimately, of course, the Supreme Court's decision on the merits held for plaintiffs. The Court thus reversed the "judgment of the Eastern District of Missouri" and denied as moot defendants' "application to vacate the Eighth Circuit's injunction[.]" *Biden v. Nebraska*, 143 S. Ct. at 2376.

This series of appellate decisions embraced the proposition that the HEROES Act student loan forgiveness program required a nationwide injunction. *Id.* at 1048. The Circuit explained that "an injunction limited to the plaintiff States, or even more broadly to student loans affecting the States, would be impractical and would fail to provide complete relief to the plaintiffs." *Id.* The Circuit emphasized that MOHELA—Missouri's public instrumentality that conferred standing on the state of Missouri because of impending harm to MOHELA's service fees—was "purportedly one of the largest nonprofit student loan secondary markets in America." *Id.* Because of "MOHELA's national role in servicing accounts," the Eighth Circuit could "discern no workable path in this emergency posture for narrowing the scope of relief." *Id.* Plaintiffs ask the court to apply the same analysis here and reach the same result.

Defendants, for their part, Doc. 46 at 55, emphasize the Supreme Court's bedrock principle "that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs[,]" *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And defendants emphasize two things. The Eighth Circuit's decision doesn't control our court. And the Supreme Court's decision never addressed the propriety of a nationwide injunction. *Biden v. Nebraska*, 143 S. Ct. at 2355. They're right about the first part. Eighth Circuit

decisions aren't binding precedent here.  But the court's not so sure about defendants' second point.  The Eighth Circuit plainly enjoined the Secretary from implementing his "debt forgiveness action."  *Nebraska v. Biden*, 52 F.4th at 1047.  And the Supreme Court explicitly reversed the district court's decision denying an injunction.  *Biden v. Nebraska*, 143 S. Ct. at 2376.

Defendants also emphasize that the Eighth Circuit relied on MOHELA's national role in finding a preliminary injunction necessary, and plaintiffs haven't proffered any evidence that their public instrumentalities play a similarly important national role.  Defendants are right about that point, too.  But ultimately, defendants' arguments can't carry the day.

The court concludes that it must issue a nationwide injunction.  A broad rule, like the SAVE Plan, requires a broad injunction, given the compelling need for nationwide uniformity in the Department's administration of student loan programs.  *See Nebraska v. Biden*, 52 F.4th at 1048 (worrying that "tailoring an injunction to address the alleged harms to the remaining States would entail delving into complex issues and contested facts that would make any limits uncertain in their application and effectiveness").  Also, a limited injunction like the one defendants promote would stand the court's conclusion here on its head.  Imagine the scenario advanced by defendants.  In it, the court would confine its injunction to the three states with standing to sue.  This scenario would free the Secretary to implement the SAVE Plan in the other 47 states.  Thus, the Secretary could grant loan forgiveness to students under a regulation that the Secretary—under this court's conclusion, at least—lacked legal authority to promulgate.  Defendants have articulated no good reason why student debtors in 47 states should do better than those in the three plaintiff states with standing to sue.  And the court can imagine no such reason.

### 2.      The Court Doesn't Enjoin the SAVE Plan in its Entirety.

The court has concluded that a nationwide injunction should issue, and now it must decide what the injunction should, well, enjoin.  Plaintiffs move the court "for a Preliminary Injunction enjoining Defendants . . . , their agents, employees, and attorneys from implementing or acting pursuant to the Final Rule[.]"  Doc. 23 at 1.  But as discussed already, there's a problem with this request:  defendants already have implemented parts of the SAVE Plan.  Plaintiffs' papers fail to account for this reality.[13]  And so plaintiffs have failed to present the court with any meaningful direction—*i.e.*, what a preliminary injunction undoing the already-active parts of the SAVE Plan would look like.  This presents a formidable problem for the court.

Plaintiffs' First Amended Complaint explicitly mentions that defendants "unilaterally erased the debt of 153,000 borrowers" in February 2024.  Doc. 57 at 3 (1st Am. Compl.).  To enjoin the entire SAVE Plan thus would require defendants to unwind those actions, modifying the status quo.  To be sure, usually, the "status quo refers to the last peaceable uncontested status existing between the parties before the dispute developed."  *Am. Civil Liberties Union of Kan. and W. Mo. v. Praeger*, 815 F. Supp. 2d 1204, 1208 (D. Kan. 2011) (citing *Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 n.5 (10th Cir. 2006)).  But by this point, the SAVE Plan has been in effect for months.  *See Louisiana ex rel. Landry v. Biden*, No. 22-30087, 2022 WL 866282, at *3 (5th Cir. Mar. 16, 2022) ("The Interim Estimates were published in February 2021.  This lawsuit was filed in April 2021.  The Plaintiff States moved for a preliminary injunction in July 2021.  And the preliminary injunction was entered in February 2022.  By the time the

---

[13]      Plaintiffs' briefing devotes most of its requested relief to arguing that any injunction should apply nationwide.  *See* Doc. 24 at 31–32; Doc. 50 at 27–28.  And when arguing about their delay in bringing suit, plaintiffs emphasize that they brought suit before the Final Rule's July 2024 effective date, without acknowledging that parts of the Final Rule already have taken effect.  Doc. 50 at 27.  Their approach grossly oversimplifies the state of play.

preliminary injunction was entered, the Interim Estimates had been in place for one year.  The status quo at this point is the continued use of the Interim Estimates.").  And plaintiffs never dispute that defendants gave them explicit advance warning of their early implementation of the SAVE Plan.

The court thus declines to enjoin the parts of the SAVE Plan defendants already have implemented.  "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."  *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579–80 (2017).  The "court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case."  *Id.* at 580 (citation and internal quotation marks omitted).  The equities of this case simply don't favor unwinding the parts of the SAVE Plan that defendants already have implemented.  Plaintiffs waited until defendants already had done so to bring suit.  And, because of this delay, plaintiffs have failed to show an irreparable injury from the parts of the SAVE Plan already in effect that a preliminary injunction could forestall.  *See above* § III.B.

Even without the delay, the court would decline to enjoin the entire SAVE Plan because plaintiffs have failed to present a workable injunction.  Plaintiffs ask for an injunction barring defendants "from implementing or acting pursuant to the Final Rule[.]"  Doc. 23 at 1.  But defendants already have "implement[ed]" a part of the Final Rule and "act[ed] pursuant to the Final Rule[.]"  *Id.*  Defendants have persuaded the court that, at this point, a preliminary injunction that would enjoin the entire SAVE Plan would create pointless uncertainty.  Such a disruptive preliminary injunction is disfavored, and the court won't enter one here.  *RoDa Drilling*, 552 F.3d at 1208 n.3 ("Certain types of preliminary injunctions are disfavored:  (1)

preliminary injunctions that alter the status quo, (2) mandatory preliminary injunctions, and (3) preliminary injunctions that give the movant all the relief it would be entitled to if it prevailed in a full trial." (citation omitted)).  This outcome may not qualify as a perfect one.  But it's the best one the court can craft based on the information supplied to date.

The court thus will enter a preliminary injunction that forbids defendants from implementing the parts of the Final Rule set to take effect on July 1, 2024.  Such a preliminary injunction will "preserve the relative positions of the parties until a trial on the merits can be held." *Camenisch*, 451 U.S. at 395.

### 3.  The Court Lacks Jurisdiction Over the President.

Defendants assert that this court lacks authority to enjoin the President, whom plaintiffs have named as a defendant.  Doc. 47 at 58–59.  They're right.  "With regard to the President, courts do not have jurisdiction to enjoin him . . . and have never submitted the President to declaratory relief[.]" *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (first citing *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866), then citing *Franklin v. Massachusetts*, 505 U.S. 788, 827–28 (1992)).  Plaintiffs never dispute this proposition.  *See generally* Doc. 50.  The court thus dismisses the President of the United States as a party defendant in this action.  The court also directs the Clerk to recaption the case so that it doesn't portray the President as a defendant.

## IV.      Conclusion and Next Steps

The courts grants in part and denies in part plaintiffs' Motion for Preliminary Injunction (Doc. 23).  The court will enter the following preliminary injunction:  Defendants United States Department of Education and United States Secretary of Education Miguel Cardona, and their agents, employees, and attorneys, are enjoined from implementing or acting pursuant to the parts of Final Rule—promulgated by the Department of Education titled "Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family

Education Loan (FFEL) Program," 88 Fed. Reg. 43,820—set to become effective on July 1, 2024.[14]

The court is mindful of the gravity of this ruling. Drawing the legal conclusions leading to it required the court to apply a developing legal doctrine to complex legislative and regulatory terrain. And all on a limited evidentiary record.

The court is equally mindful that human infallibility is what it is. It thus temporarily stays the effective date of this Preliminary Injunction to permit the parties to seek any appellate relief they deem appropriate. *See, e.g.*, *Fish v. Kobach*, 189 F. Supp. 3d 1107, 1152 (D. Kan. 2016) (staying preliminary injunction for 14 days to give parties time to appeal). Absent further order by this court or any reviewing court, this court's injunction will take effect at ten o'clock p.m. Central Daylight Time on June 30, 2024.

As a final note, the court emphasizes that any decision about a preliminary injunction is just that: preliminary. Given the importance of the issues in this case, the court orders the parties immediately to confer and seek a scheduling conference with United States Magistrate Judge Angel D. Mitchell. The court orders the parties to formulate and present to Judge Mitchell a schedule that will enable the court to reach a final decision (including a trial on the merits, if one is required) as soon as practicable.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' Motion for Preliminary Injunction (Doc. 23) is granted in part and denied in part, as set forth in full in this Order.

---

[14] To comply with the separate document rule, the court will enter plaintiffs' preliminary injunction separately. *MillerCoors LLC v. Anheuser-Busch Cos.*, 940 F.3d 922, 923 (7th Cir. 2019) (remanding for district court to enter preliminary injunction on separate document); *Beukema's Petrol. Co. v. Admiral Petrol. Co.*, 613 F.2d 626, 627 (6th Cir. 1979) ("[I]t appears to the court that the express provisions of Rule 58 for entry of judgment on a separate document applies not only to final judgments in the ordinary sense but also to preliminary injunctions entered pursuant to Rule 65[.]").

**IT IS FURTHER ORDERED THAT** defendants United States Department of Education and United States Secretary of Education Miguel Cardona, and their agents, employees, and attorneys, are enjoined from implementing or acting pursuant to the parts of Final Rule—promulgated by the Department of Education titled "Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program," 88 Fed. Reg. 43,820—set to become effective on July 1, 2024.

**IT IS FURTHER ORDERED THAT** the injunction will take effect at 10:00 PM Central Daylight Time on June 30, 2024.

**IT IS FURTHER ORDERED THAT** defendant Joseph R. Biden, in his official capacity as the President of the United States, is dismissed from the case for lack of jurisdiction.

**IT IS SO ORDERED.**

**Dated this 24th day of June, 2024, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

|  |  |
|---|---|
| **STATE OF ALASKA, et al.,** | |
| **Plaintiffs,** | **Case No. 24-1057-DDC-ADM** |
| **v.** | |
| **UNITED STATES DEPARTMENT OF EDUCATION, et al.,** | |
| **Defendants.** | |

## PRELIMINARY INJUNCTION

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants United States

Department of Education and United States Secretary of Education Miguel Cardona, and their

agents, employees, and attorneys, are enjoined from implementing or acting pursuant to the parts

of Final Rule—promulgated by the Department of Education titled "Improving Income Driven

Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family

Education Loan (FFEL) Program," 88 Fed. Reg. 43,820—set to become effective on July 1,

2024.

**IT IS SO ORDERED.**

**Dated this 24th day of June, 2024, at Kansas City, Kansas.**

s/ Daniel D. Crabtree
**Daniel D. Crabtree**
**United States District Judge**