# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

STATE OF ALASKA, et al.,

Plaintiffs-Appellees / Cross-Appellants,

v.

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

Defendants-Appellants / Cross-Appellees.

On Appeal from the United States District Court
for the District of Kansas
District Court Case No. 6:24-CV-01057-DDC-ADM (Judge Daniel D. Crabtree)

## APPELLANTS' APPENDIX: VOLUME I OF II, PAGES 1-281

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

MICHAEL S. RAAB
THOMAS PULHAM
SIMON C. BREWER
SARAH N. SMITH
*Attorneys, Appellate Staff*
*Civil Division, Room 7529*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5367*

# TABLE OF CONTENTS

**Page(s)**

## VOLUME I

District Court Docket Entries ............................................................................. App. 003

Plaintiffs' Motion for a Preliminary Injunction (Apr. 5, 2024), Dkt. 23.............App. 023

Memorandum in Support of Plaintiffs' Motion for a Preliminary
    Injunction and Exhibits (Apr. 5, 2024), Dkt. 24...............................................App. 027


## VOLUME II

Defendants' Combined Memorandum of Law in Opposition to
    Plaintiffs' Motion for a Preliminary Injunction and in Support of
    Defendants' Motion to Dismiss (Apr. 26, 2024), Dkt. 46.............................App. 284

Plaintiffs' Combined Reply in Support of Their Motion for a
    Preliminary Injunction and Response in Opposition to Defendants'
    Motion to Dismiss and Exhibits (May 10, 2024), Dkt. 53 .............................App. 349

First Amended Complaint (May 16, 2024), Dkt. 57.............................................App. 415

Memorandum and Order (June 7, 2024), Dkt. 68.................................................App. 456

Memorandum and Order (June 24, 2024), Dkt. 76...............................................App. 502

Preliminary Injunction (June 24, 2024), Dkt. 77..................................................App. 544

Defendants' Notice of Appeal (June 27, 2024), Dkt. 78 .......................................App. 545

Plaintiffs' Amended Notice of Cross-Appeal (July 8, 2024), Dkt. 90.................App. 546

**U.S. District Court**
**DISTRICT OF KANSAS (Wichita)**
**CIVIL DOCKET FOR CASE #: 6:24-cv-01057-DDC-ADM**

Kansas, State of et al v. Biden et al
Assigned to: District Judge Daniel D. Crabtree
Referred to: Magistrate Judge Angel D. Mitchell
Case in other court:  10cca, 24-03089
                  10CCA, 24-03093
                  10CCA, 24-03094
Cause: 05:702 Administrative Procedure Act

Date Filed: 03/28/2024
Jury Demand: Plaintiff
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Kansas, State of**
*TERMINATED: 06/07/2024*

represented by **Abhishek Kambli**
Office of the Kansas Attorney General
Special Litigation and Constitutional Issues
Division
120 SW 10th Avenue, 2nd Floor
Topeka, KS 66612
785-296-6109
Email: abhishek.kambli@ag.ks.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Drew C. Ensign**
Holtzman Vogel Baran Torchinsky &
Josefiak, PLLC
2575 E. Camelback Road, Suite 860
Phoenix, AZ 85016
602-388-1262
Fax: 540-341-8809
Email: densign@holtzmanvogel.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Erin Gaide**
Office of the Kansas Attorney General
120 SW 10th Avenue
Second Floor
Topeka, KS 66612
785-296-7109
Email: erin.gaide@ag.ks.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kris W. Kobach**

Kobach Law, LLC
PO Box 155
Lecompton, KS 66050
913-638-5567
Email: kkobach@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alabama, State of**
*TERMINATED: 06/07/2024*

represented by **Abhishek Kambli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edmund G. LaCour , Jr.**
Office of the Alabama Attorney General
501 Washington Avenue
Montgomery, AL 36130
334-242-7300
Fax: 334-353-8400
Email: edmund.lacour@alabamaag.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Erin Gaide**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alaska, State of**

represented by **Abhishek Kambli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erin Gaide**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William E. Milks**
Alaska Department of Law
PO Box 110300
Juneau, AK 99811-0300
907-465-3600
Fax: 907-465-2520
Email: bill.milks@alaska.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Idaho, State of**
*TERMINATED: 06/07/2024*

represented by **Abhishek Kambli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erin Gaide**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua Nathaniel Turner**
Idaho Attorney General's Office
700 W. Jefferson Street, Suite 210
PO Box 83720
Boise, ID 83720
208-332-3548
Email: josh.turner@ag.idaho.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Iowa, State of**
*TERMINATED: 06/07/2024*

represented by **Abhishek Kambli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric H. Wessan**
Solicitor General
1305 E. Walnut Street
Des Moines, IA 50319
515-823-9117
Fax: 515-281-8894
Email: eric.wessan@ag.iowa.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Erin Gaide**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Louisiana, State of**
*TERMINATED: 06/07/2024*

represented by **Abhishek Kambli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erin Gaide**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kelsey LeeAnn Smith**
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70802
225-428-7432
Email: smithkel@ag.louisiana.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Montana, State of**
*TERMINATED: 06/07/2024*

represented by **Abhishek Kambli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christian Brian Corrigan**
Montana Attorney General's Office
Office of the Attorney General
215 North Sanders
Helena, MT 59620
406-444-2026
Email: christian.corrigan@mt.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erin Gaide**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Nebraska, State of**
*TERMINATED: 06/07/2024*

represented by **Abhishek Kambli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erin Gaide**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lincoln J. Korell**
Office of the Attorney General of Nebraska
2115 State Capitol
Lincoln, NB 68509
402-471-2682
Fax: 402-471-3297
Email: lincoln.korell@nebraska.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**South Carolina, State of**      represented by **Abhishek Kambli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erin Gaide**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph D. Spate**
Office of the South Carolina Attorney
General
1000 Assembly Street
Columbia, SC 29201
803-734-3371
Fax: 803-734-3677
Email: josephspate@scag.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

## Plaintiff

**Texas, State of**      represented by **Abhishek Kambli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles K. Eldred**
Office of the Attorney General of Texas
PO Box 12548
Austin, TX 78711
512-936-1706
Fax: 512-474-2697
Email: charles.eldred@oag.texas.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Erin Gaide**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

## Plaintiff

**Utah, State of**      represented by **Abhishek Kambli**
*TERMINATED: 06/07/2024* (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erin Gaide**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lance F. Sorenson**
Utah Attorney General's Office
350 N. State Street, Suite 230
Salt Lake City, UT 84114
801-366-0260
Fax: 801-366-0101
Email: lancesorenson@agutah.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Joseph R. Biden**
*President of the United States of America, in his official capacity*
*TERMINATED: 06/24/2024*

represented by **Simon Gregory Jerome**
DOJ-Civ
Federal Programs Branch
1100 L Street NW, Room 12306
Washington, DC 20005
202-445-4127
Email: simon.g.jerome@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen Michael Pezzi**
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
202-305-8576
Email: stephen.pezzi@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Clayton Louis Bailey**
United States Department of Justice
Civil Division
1100 L Street NW
Washington, DC 20005
202-598-1226
Email: clayton.l.bailey@usdoj.gov
*TERMINATED: 04/16/2024*

**<u>Defendant</u>**

**United States Department of Education**

represented by **Simon Gregory Jerome**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen Michael Pezzi**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Clayton Louis Bailey**
(See above for address)
*TERMINATED: 04/16/2024*

**Defendant**

**United States Secretary of Education**          represented by    **Simon Gregory Jerome**
*Miguel Cardona, in his official capacity*                          (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Stephen Michael Pezzi**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Clayton Louis Bailey**
                                                                    (See above for address)
                                                                    *TERMINATED: 04/16/2024*

**Amicus**

**Buckeye Institute, The**                        represented by    **Alexander M. Certo**
                                                                    The Buckeye Institute
                                                                    88 E. Broad Street, Suite 1300
                                                                    Columbus, OH 43215
                                                                    614-224-4422
                                                                    Email: a.certo@buckeyeinstitute.org
                                                                    *LEAD ATTORNEY*
                                                                    *PRO HAC VICE*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **David C. Tryon**
                                                                    The Buckeye Institute
                                                                    88 E. Broad Street, Suite 1300
                                                                    Columbus, OH 43215
                                                                    614-224-4422
                                                                    Email: d.tryon@buckeyeinstitute.org
                                                                    *LEAD ATTORNEY*
                                                                    *PRO HAC VICE*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Jeffrey Shaw**
                                                                    Kansas Justice Institute
                                                                    12980 Metcalf Avenue, Suite 130
                                                                    Overland Park, KS 66213
                                                                    913-213-5121
                                                                    Email: jeff@kansasjusticeinstitute.org
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
| --- | --- | --- |

| 03/28/2024 | 1 | COMPLAINT with trial location of Wichita (Filing fee $405, Internet Payment Receipt Number AKSDC-6309870.), filed by Alabama, State of, Alaska, State of, Idaho, State of, Iowa, State of, Kansas, State of, Louisiana, State of, Montana, State of, Nebraska, State of, South Carolina, State of, Texas, State of, Utah, State of. (Attachments: # 1 Exhibit 1) (Kambli, Abhishek) Modified on 3/29/2024 to correct the filers. (mam) (Entered: 03/28/2024) |
|---|---|---|
| 03/28/2024 | 2 | CIVIL COVER SHEET by Plaintiffs Alabama, State of, Alaska, State of, Idaho, State of, Iowa, State of, Kansas, State of, Louisiana, State of, Montana, State of, Nebraska, State of, South Carolina, State of, Texas, State of, Utah, State of. (Kambli, Abhishek) Modified on 3/29/2024 to correct the filers. (mam) (Entered: 03/28/2024) |
| 03/28/2024 | 3 | MOTION to Exceed the Page Limits by Plaintiffs Alabama, State of, Alaska, State of, Idaho, State of, Iowa, State of, Kansas, State of, Louisiana, State of, Montana, State of, Nebraska, State of, South Carolina, State of, Texas, State of, Utah, State of. (Kambli, Abhishek) (Entered: 03/28/2024) |
| 03/28/2024 | | NOTICE OF JUDGE ASSIGNMENT: Case assigned to District Judge Daniel D. Crabtree and Magistrate Judge Angel D. Mitchell for all proceedings. (This is a TEXT ENTRY ONLY. There is no .pdf document associated with this entry.)<br><br>**NOTICE OF MAGISTRATE JUDGE AVAILABILITY: A United States magistrate judge is available to conduct all proceedings in this civil action if all parties voluntarily consent. Information & consent forms are available at http://www.uscourts.gov/forms/civil-forms/notice-consent-and-reference-civil-action-magistrate-judge (jk) (Entered: 03/28/2024)** |
| 03/29/2024 | | Summons Issued as to Joseph R. Biden, United States Department of Education, The, United States Secretary of Education, U.S. Attorney (issued to Attorney for service). Notice, Consent, and Reference of a Civil Action to a Magistrate Judge Form provided to counsel for service with complaint. (jk) (Entered: 03/29/2024) |
| 03/29/2024 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 3 Motion to Exceed the Page Limits. The motion will be resolved by the District Judge.(alh)** (Entered: 03/29/2024) |
| 04/02/2024 | 4 | MOTION for attorney Drew C. Ensign to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6313474.) by Plaintiffs Alabama, State of, Alaska, State of, Idaho, State of, Iowa, State of, Kansas, State of, Louisiana, State of, Montana, State of, Nebraska, State of, South Carolina, State of, Texas, State of, Utah, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Kambli, Abhishek) (Entered: 04/02/2024) |
| 04/02/2024 | 5 | MOTION for attorney Drew C. Ensign to appear pro hac vice by Plaintiff Kansas, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Attachments: # 1 Pro Hac Vice E-Filing Registration Form) (Kambli, Abhishek) (Modified on 4/3/2024 to correct filing party; entry is for State of Kansas only. (heo)) (Entered: 04/02/2024) |
| 04/02/2024 | 6 | ORDER finding as moot 4 MOTION for attorney Drew C. Ensign to appear pro hac vice due to insufficient documentation. Signed by Magistrate Judge Angel D. Mitchell on 4/2/2024. (This is a TEXT ENTRY ONLY. There is no .pdf document associated with this entry.) (alh) (Entered: 04/02/2024) |
| 04/02/2024 | 7 | MOTION for attorney Lincoln Korell to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number BKSDC-6313724.) by Plaintiff Nebraska, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Attachments: # 1 Pro Hac Vice E-Filing |

| | | |
|---|---|---|
| | | Registration Form) (Kambli, Abhishek) (Modified on 4/3/2024 to correct filing party; entry for State of Nebraska only. (heo)) (Entered: 04/02/2024) |
| 04/02/2024 | 8 | NOTICE TO ALL COUNSEL AND PARTIES. The court directs counsel for plaintiffs and defendants to inform the court as soon as possible of (a) the identity of lead counsel for plaintiffs and defendants; and (b) direct contact information for lead counsel for both plaintiffs and defendants. In addition, the court directs such lead counsel to confer with one another about the schedule the parties propose for managing all the work needed to resolve the anticipated motion for preliminary injunction. To the extent the parties agree on a proposed schedule, they should submit a proposed interim Scheduling Order. If the parties cannot agree on all aspects of an interim Scheduling Order, each side must submit the interim Scheduling Order they separately propose. Signed by District Judge Daniel D. Crabtree on 4/2/2024. (mam) (Entered: 04/02/2024) |
| 04/02/2024 | 9 | ORDER. Plaintiffs have filed a Motion to Exceed the Page Limits (Doc. 3 ) that asks the court for permission to file a no-more-than-35-page Motion for Preliminary Injunction. Plaintiffs inform the court that these excess pages are necessary due "to the complex nature of the Final Rule and Plaintiffs' injuries[.]" *Id.* at 1. Plaintiffs note that they don't know whether defendants oppose the Motion to Exceed Page Limits because defendants haven't entered an appearance in the case yet. *Id.* The court grants plaintiffs' request and, to avoid any potential for prejudice to defendants, grants defendants a commensurate 35-page limit on their consolidated response brief. Signed by District Judge Daniel D. Crabtree on 04/02/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (mig) (Entered: 04/02/2024) |
| 04/02/2024 | 10 | ORDER granting 5 Motion to Appear Pro Hac Vice of Drew C. Ensign for Kansas, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 4/2/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 04/02/2024) |
| 04/02/2024 | 11 | ORDER granting 7 Motion to Appear Pro Hac Vice of Lincoln J. Korell for Nebraska, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 4/2/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (Modified on 4/3/2024 to correct state of representation per ADM chambers. (heo)) (Entered: 04/02/2024) |
| 04/02/2024 | 12 | MOTION for attorney Joshua Nathaniel Turner to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6313840.) by Plaintiff Idaho, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Attachments: # 1 Pro Hac Vice E-Filing Registration Form)(Kambli, Abhishek) (Modified on 4/3/2024 to correct filing party. (heo)) (Entered: 04/02/2024) |
| 04/02/2024 | 13 | MOTION for attorney Charles K. Eldred to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6313879.) by Plaintiff Texas, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Attachments: # 1 Pro Hac Vice E-Filing Registration Form)(Kambli, Abhishek) Modified on 4/3/2024 to include attorney's name in docket text. (kas) (Entered: 04/02/2024) |
| 04/02/2024 | 14 | Summons Returned Executed -- served by Personal Service on 4/1/2024. Summons served on United States Attorney. (Kambli, Abhishek) (Entered: 04/02/2024) |
| 04/02/2024 | 15 | Summons Returned Executed -- served by Personal Service on 4/1/2024 U.S. Department of Education. Summons served on United States Attorney. (Kambli, Abhishek) (Entered: 04/02/2024) |
| 04/02/2024 | 16 | Summons Returned Executed -- United States Secretary of Education served on 4/1/2024 by Personal Service. Answer due 5/31/2024. Summons served on United States Attorney. |

| | | |
|---|---|---|
| | | (Kambli, Abhishek) (Entered: 04/02/2024) |
| 04/03/2024 | 17 | ENTRY OF APPEARANCE by Stephen Michael Pezzi on behalf of All Defendants. (Pezzi, Stephen) (Entered: 04/03/2024) |
| 04/03/2024 | 18 | ENTRY OF APPEARANCE by Clayton Louis Bailey on behalf of All Defendants. (Bailey, Clayton) (Entered: 04/03/2024) |
| 04/03/2024 | 19 | ORDER granting 12 Motion to Appear Pro Hac Vice of Joshua Nathaniel Turner for Idaho, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 4/3/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 04/03/2024) |
| 04/03/2024 | 20 | ORDER granting 13 Motion to Appear Pro Hac Vice of Charles K. Eldred for Texas, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 4/3/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 04/03/2024) |
| 04/03/2024 | | DOCKET ANNOTATION: Corrections to the attorney/party association have been made to the text of docket entries 5 , 7 , and 12 motions to appear pro hac vice. Docket entry 11 Order on Motion to Appear Pro Hac Vice, has also been corrected to read representation is for the State of Nebraska, not for the State of Kansas. (heo) (Entered: 04/03/2024) |
| 04/04/2024 | 21 | MOTION for attorney Eric Wessan to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6315271.) by Plaintiff Iowa, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Attachments: # 1 Pro Hac Vice E-Filing Registration Form)(Kambli, Abhishek) (Entered: 04/04/2024) |
| 04/04/2024 | 22 | MOTION for attorney Joseph D. Spate to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6315943.) by Plaintiff South Carolina, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Attachments: # 1 Pro Hac Vice E-Filing Registration Form)(Kambli, Abhishek) (Entered: 04/04/2024) |
| 04/05/2024 | 23 | MOTION for Preliminary Injunction by Plaintiffs Alabama, State of, Alaska, State of, Idaho, State of, Iowa, State of, Kansas, State of, Louisiana, State of, Montana, State of, Nebraska, State of, South Carolina, State of, Texas, State of, Utah, State of. (Gaide, Erin) Modified on 5/28/2024 to correct the filers. (mam) (Entered: 04/05/2024) |
| 04/05/2024 | 24 | MEMORANDUM IN SUPPORT of 23 Motion for Preliminary Injunction by Plaintiffs Alabama, State of, Alaska, State of, Idaho, State of, Iowa, State of, Kansas, State of, Louisiana, State of, Montana, State of, Nebraska, State of, South Carolina, State of, Texas, State of, Utah, State of. (Attachments: # 1 List Table of Plaintiff's Exhibits, # 2 Ex. 1 - Def. of Freedom Inst. Comments, # 3 Ex. 2 - D. Kan. Job Posting, # 4 Ex. 3 - Gish Aff., # 5 Ex. 4 - De la Garza Decl., # 6 Ex. 5 - U.S. Budget 2023, # 7 Ex. 6 - KPMG Audit)(Gaide, Erin) Modified on 4/8/2024 to correct exhibit text. (kas) Modified on 5/28/2024 to correct the filers. (mam) (Entered: 04/05/2024) |
| 04/08/2024 | 25 | ORDER granting 21 Motion to Appear Pro Hac Vice of Eric H. Wessan for Iowa, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 4/8/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 04/08/2024) |
| 04/08/2024 | 26 | ORDER granting 22 Motion to Appear Pro Hac Vice of Joseph D. Spate for South Carolina, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 4/8/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 04/08/2024) |
| 04/08/2024 | 27 | MOTION for attorney Lance Sorenson to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6318240.) by Plaintiff Utah, State of. (Motion |

| | | |
|---|---|---|
| | | referred to Magistrate Judge Angel D. Mitchell.) (Attachments: # 1 Pro Hac Vice E-Filing Registration Form)(Kambli, Abhishek) (Entered: 04/08/2024) |
| 04/08/2024 | 28 | MOTION for attorney William E. Milks to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6318251.) by Plaintiff Alaska, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Attachments: # 1 Pro Hac Vice E-Filing Registration Form)(Kambli, Abhishek) (Entered: 04/08/2024) |
| 04/08/2024 | 29 | ENTRY OF APPEARANCE by Kris W. Kobach on behalf of Kansas, State of. (Kobach, Kris W.) Modified on 4/8/2024 to update text. (nac) (Entered: 04/08/2024) |
| 04/08/2024 | 30 | Summons Returned Executed -- Personal Service on 4/8/2024 United States Secretary of Education, answer due 6/7/2024. Summons served on United States Attorney. (Kambli, Abhishek) (Entered: 04/08/2024) |
| 04/08/2024 | 31 | Summons Returned Executed -- Personal Service on 4/8/2024 United States Department of Education, answer due 6/7/2024. Summons served on United States Attorney. (Kambli, Abhishek) (Entered: 04/08/2024) |
| 04/08/2024 | 32 | Summons Returned Executed -- Personal Service on 4/8/2024, Joseph R. Biden, answer due 6/7/2024. Summons served on United States Attorney. (Kambli, Abhishek) (Entered: 04/08/2024) |
| 04/10/2024 | 33 | ORDER granting 27 Motion to Appear Pro Hac Vice of Lance F. Sorenson for Utah, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 4/10/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 04/10/2024) |
| 04/10/2024 | 34 | ORDER granting 28 Motion to Appear Pro Hac Vice of William E. Milks for Alaska, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 4/10/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 04/10/2024) |
| 04/11/2024 | 35 | MOTION for attorney Edmund G. LaCour Jr. to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6321285.) by Plaintiff Alabama, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Attachments: # 1 Pro Hac Vice E-Filing Registration Form)(Kambli, Abhishek) (Entered: 04/11/2024) |
| 04/11/2024 | 36 | MOTION for attorney Kelsey LeeAnn Smith to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6321652.) by Plaintiff Louisiana, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Attachments: # 1 Pro Hac Vice E-Filing Registration Form)(Kambli, Abhishek) (Entered: 04/11/2024) |
| 04/11/2024 | 37 | ORDER granting 35 Motion to Appear Pro Hac Vice of Edmund G. LaCour, Jr for Alabama, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 4/11/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 04/11/2024) |
| 04/11/2024 | 38 | ORDER granting 36 Motion to Appear Pro Hac Vice of Kelsey LeeAnn Smith for Louisiana, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 4/11/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 04/11/2024) |
| 04/11/2024 | 39 | MOTION for Scheduling Order by Plaintiffs Alabama, State of, Alaska, State of, Idaho, State of, Iowa, State of, Kansas, State of, Louisiana, State of, Montana, State of, Nebraska, State of, South Carolina, State of, Texas, State of, Utah, State of. (Attachments: # 1 Party Stipulation)(Kambli, Abhishek) Modified event and title on 4/12/2024. (ca) (Entered: 04/11/2024) |

| | | |
|---|---|---|
| 04/12/2024 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 39 MOTION for a Scheduling Order. The motion will be resolved by the District Judge.**(alh) (Entered: 04/12/2024) |
| 04/12/2024 | 40 | (DISREGARD - SEE DE 42 FOR CORRECTED FILING) -- RESPONSE to the Court's Scheduling Notice and Proposed Interim Scheduling Order by Defendants Joseph R. Biden, United States Department of Education, The, United States Secretary of Education. (Pezzi, Stephen) Modified on 4/15/2024 to update docket text to match document and terminate motion due to incorrect event used. (kas) (Entered: 04/12/2024) |
| 04/12/2024 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 40 MOTION for Order *Setting Schedule (Defendants' Response to the Court's Scheduling Notice and Proposed Interim Scheduling Order)*. The motion will be resolved by the District Judge.**(alh) (Entered: 04/12/2024) |
| 04/12/2024 | 41 | REPLY TO RESPONSE TO MOTION by Plaintiff Kansas, State of re 39 Motion for Briefing Order. (Gaide, Erin) (Entered: 04/12/2024) |
| 04/12/2024 | 42 | (RE-FILED FOR ADMINISTRATIVE PURPOSES) -- RESPONSE by Defendants Joseph R. Biden, United States Department of Education, The, United States Secretary of Education re 39 Motion for Scheduling Order. (kas) Modified on 4/15/2024 to update docket text. (kas) (Entered: 04/15/2024) |
| 04/16/2024 | 43 | WITHDRAWAL OF COUNSEL by Clayton L. Bailey and ENTRY OF APPEARANCE OF SUBSTITUTED COUNSEL by Simon Gregory Jerome on behalf of All Defendants. (Jerome, Simon) (Entered: 04/16/2024) |
| 04/16/2024 | 44 | MEMORANDUM AND ORDER. Plaintiffs' Motion for a Scheduling Order (Doc. 39 ) is granted in part and denied in part. Specifically, the court grants plaintiffs' request to issue a short-term schedule. But the court declines to adopt the schedule plaintiffs have proposed. The court adopts the following schedule for briefing these early issues - April 26, 2024: Defendants' combined Motion to Dismiss and response in opposition to plaintiffs' Motion for a Preliminary Injunction (Doc. 23 ); May 10, 2024: Plaintiffs' combined response in opposition to defendants' Motion to Dismiss and reply in support of their Motion for Preliminary Injunction (Doc. 23 ) and May 24, 2024: Defendants' reply in support of their Motion to Dismiss. The court also sets the following hearings. Though both hearings might not prove necessary, the court nonetheless schedules them now so the parties can reserve both dates on their calendars and staff the case appropriately: Hearing on defendants' forthcoming Motion to Dismiss set for 5/31/2024 at 09:00 AM and Hearing on plaintiffs' Motion for Preliminary Injunction (Doc. 23 ) set for 6/11/2024 at 01:00 PM. Both hearings will be held in KC Courtroom 476 (DDC) before District Judge Daniel D. Crabtree. The defendants' request to dismiss plaintiffs' Motion for Preliminary Injunction without prejudice is denied. Signed by District Judge Daniel D. Crabtree on 4/16/2024. (mam) (Entered: 04/16/2024) |
| 04/16/2024 | | **Deadlines set per 44 : Defendants' response in opposition to 23 by 4/26/2024. Plaintiffs' reply to 23 by 5/10/2024. Deadlines set in 44 but not set in ECF: Defendants' combined Motion to Dismiss by 4/26/2024 and Plaintiffs' combined response in opposition to defendants' Motion to Dismiss by 5/10/2024. Defendants' reply in support of their Motion to Dismiss by 5/24/2024. Hearings set per 44 : Hearing on defendants' forthcoming Motion to Dismiss set for 5/31/2024 at 09:00 AM in KC Courtroom 476 (DDC) before District Judge Daniel D. Crabtree. Hearing on plaintiffs' Motion for Preliminary Injunction (Doc. 23 ) set for 6/11/2024 at 01:00 PM in KC Courtroom 476 (DDC) before District Judge Daniel D. Crabtree.** (mam) (Entered: 04/16/2024) |

| | | |
|---|---|---|
| 04/26/2024 | 45 | MOTION to Dismiss for Lack of Jurisdiction by Defendants Joseph R. Biden, United States Department of Education, The, United States Secretary of Education. (Pezzi, Stephen) (Entered: 04/26/2024) |
| 04/26/2024 | 46 | MEMORANDUM IN SUPPORT of 45 Motion to Dismiss for Lack of Jurisdiction by Defendants Joseph R. Biden, United States Department of Education, The, United States Secretary of Education. (Attachments: # 1 Schlichter Declaration)(Pezzi, Stephen) Modified on 5/28/2024, see 47 for the opposition portion. (mam) (Entered: 04/26/2024) |
| 04/26/2024 | 47 | MEMORANDUM IN OPPOSITION by Defendants Joseph R. Biden, United States Department of Education, The, United States Secretary of Education re 23 Motion for Preliminary Injunction. (RE-FILING OF DE 46 FOR ADMINISTRATIVE PURPOSES) (Attachments: # 1 Schlichter Declaration)(kas) (Entered: 04/29/2024) |
| 05/10/2024 | 48 | MOTION for Leave to File an Amicus Curiae Brief in Opposition to 45 Defendants' Motion to Dismiss by Amicus Buckeye Institute, The. (Attachments: # 1 Exhibit Amicus Curiae Brief of The Buckeye Institute in Support of Plaintiffs)(Shaw, Jeffrey) (Entered: 05/10/2024) |
| 05/10/2024 | 49 | MOTION for attorney Alex Certo to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6344922.) by Amicus Buckeye Institute, The. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Attachments: # 1 Alex Certo Pro Hac Vice Affidavit, # 2 Alex Certo Pro Hac Vice Registration Form)(Shaw, Jeffrey) (Entered: 05/10/2024) |
| 05/10/2024 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 48 MOTION to File Amicus Brief *In Opposition to Defendants' Motion to Dismiss*. The motion will be resolved by the District Judge.(alh)** (Entered: 05/10/2024) |
| 05/10/2024 | 50 | (TWO PART FILING made in error - see Doc. 53 concerning Response portion of this entry.) REPLY TO RESPONSE TO MOTION by Plaintiffs Alabama, State of, Alaska, State of, Idaho, State of, Iowa, State of, Kansas, State of, Louisiana, State of, Montana, State of, Nebraska, State of, South Carolina, State of, Texas, State of, Utah, State of re 23 Motion for Preliminary Injunction. (Attachments: # 1 Table of Exhibits, # 2 Exhibit A - Tran Declaration, # 3 Exhibit B - Abrams Declaration, # 4 Exhibit C - Kraly Declaration, # 5 Exhibit D - Yost Declaration, # 6 Exhibit E - Spate Declaration, # 7 Exhibit F - Keyton Declaration, # 8 Exhibit G - Efird Declaration)(Kambli, Abhishek) Modified on 5/13/2024 to update docket text. (jal) (Entered: 05/10/2024) |
| 05/10/2024 | 53 | RESPONSE IN OPPOSITION by Plaintiffs Alabama, State of, Alaska, State of, Idaho, State of, Iowa, State of, Kansas, State of, Louisiana, State of, Montana, State of, Nebraska, State of, South Carolina, State of, Texas, State of, Utah, State of re 45 Motion to Dismiss. (Attachments: # 1 Table of Exhibits, # 2 Exhibit A - Tran Declaration, # 3 Exhibit B - Abrams Declaration, # 4 Exhibit C - Kraly Declaration, # 5 Exhibit D - Yost Declaration, # 6 Exhibit E - Spate Declaration, # 7 Exhibit F - Keyton Declaration, # 8 Exhibit G - Efird Declaration) (This is a duplicate of Doc. 50 which was incorrectly filed as a two-part document containing both a Reply to a Response to a Motion and a Response to a Motion. This entry is being made for administrative purposes only.)(jal) (Entered: 05/13/2024) |
| 05/13/2024 | 51 | ORDER granting 49 Motion to Appear Pro Hac Vice of Alexander M. Certo for The Buckeye Institute pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 5/13/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 05/13/2024) |
| 05/13/2024 | 52 | MEMORANDUM AND ORDER granting 48 MOTION to File Amicus Brief In Opposition to Defendants' Motion to Dismiss. The Court will consider the amicus brief |

| | | |
|---|---|---|
| | | (Doc. 48-1) filed and part of the record. Signed by District Judge Daniel D. Crabtree on 5/13/2024. (kas) (Entered: 05/13/2024) |
| 05/14/2024 | 54 | MOTION for attorney David C. Tryon to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6347466.) by Amicus Buckeye Institute, The. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Attachments: # 1 David Tryon Pro Hac Vice Affidavit, # 2 David Tryon Pro Hac Vice Registration Form)(Shaw, Jeffrey) (Entered: 05/14/2024) |
| 05/15/2024 | 55 | MOTION for Leave to file Response to Amicus Brief by Defendants Joseph R. Biden, United States Department of Education, United States Secretary of Education. (Pezzi, Stephen) (Entered: 05/15/2024) |
| 05/15/2024 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 55 MOTION for Leave to file Response to Amicus Brief of the Buckeye Institute. The motion will be resolved by the District Judge.**(alh) (Entered: 05/15/2024) |
| 05/16/2024 | 56 | ORDER granting 54 Motion to Appear Pro Hac Vice of David C. Tryon for The Buckeye Institute pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 5/16/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 05/16/2024) |
| 05/16/2024 | 57 | FIRST AMENDED COMPLAINT against defendants, filed by Plaintiffs Alabama, State of, Alaska, State of, Idaho, State of, Iowa, State of, Kansas, State of, Louisiana, State of, Montana, State of, Nebraska, State of, South Carolina, State of, Texas, State of, Utah, State of .(Kambli, Abhishek) Modified text. (mls). Modified on 5/28/2024 to correct the filers. (mam) (Entered: 05/16/2024) |
| 05/17/2024 | 58 | ORDER denying defendants Joseph R. Biden, United States Department of Education, and United States Secretary of Education's Motion to Dismiss (Doc. 45 ) as moot. Defendants' motion seeks dismissal of plaintiffs' Complaint (Doc. 1). Plaintiffs since have filed an Amended Complaint (Doc. 57). The court thus denies defendants' Motion to Dismiss (Doc. 45) as moot but without prejudice to filing any future motion addressing plaintiffs' Amended Complaint. Signed by District Judge Daniel D. Crabtree on 05/17/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (mig) (Entered: 05/17/2024) |
| 05/18/2024 | 59 | JOINT MOTION Regarding Schedule by Defendants Joseph R. Biden, United States Department of Education, United States Secretary of Education. (Pezzi, Stephen) (Entered: 05/18/2024) |
| 05/20/2024 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 59 Joint MOTION for Order *Regarding Schedule*. The motion will be resolved by the District Judge.**(alh) (Entered: 05/20/2024) |
| 05/22/2024 | 60 | MEMORANDUM AND ORDER granting 59 Joint MOTION for Order Regarding Schedule. Defendants' Motion to Dismiss (Doc. 45) is reinstated. Signed by District Judge Daniel D. Crabtree on 5/22/2024. (kas) (Entered: 05/22/2024) |
| 05/23/2024 | 61 | ORDER. The court previously granted a Motion for Leave to File an Amicus Curiae Brief (Doc. 48) filed by the Buckeye Institute. Doc. 52. In its Memorandum and Order, the court gave defendants an opportunity to seek the court's permission to file a response to the amicus brief. Defendants have done so, filing a Motion for Leave to File Response to Amicus Brief (Doc. 55 ). Defendants seek to file a three-page response addressing the amicus brief's arguments. Plaintiffs don't oppose defendants' motion. The court thus grants the motion. Defendants have until June 7 to file their three-page response to the amicus brief. Signed by District Judge Daniel D. Crabtree on 05/23/2024. (This is a TEXT |

| | | |
|---|---|---|
| | | ENTRY ONLY. There is no.pdf document associated with this entry.) (mig) (Entered: 05/23/2024) |
| 05/23/2024 | 62 | MOTION to Consolidate Hearings by Plaintiff Kansas, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Kambli, Abhishek) (Entered: 05/23/2024) |
| 05/23/2024 | 63 | NOTICE OF TELEPHONE CONFERENCE LINE FOR UPCOMING HEARING ON 5/31/2024: An in-person hearing is set for 5/31/2024 at 9:00 AM in Courtroom #476. The hearing's start time is subject to change. The court will issue an additional notice if the start time changes. A telephone conference line will be available for interested counsel, the parties, and the public to listen to the hearing. Participants on the phone line will NOT be able to speak or otherwise participate in the hearing. **This is a listening line only.** To join the conference line, interested participants shall dial into the conference line at 1-888-363-4749 and enter the access code 8354715. Participants will follow the instructions to join the call. (mig) (Entered: 05/23/2024) |
| 05/24/2024 | 64 | ORDER denying 62 Motion to Modify. Plaintiffs' Motion to Consolidate Hearings. Doc. 62 asks the court to combine two upcoming hearings: one on defendants' Motion to Dismiss for lack of subject matter jurisdiction and one on plaintiffs' Motion for Preliminary Injunction. Plaintiffs assert that many "of the issues that will be addressed at these hearings overlap[.]" Doc. 62 at 1. And, according to plaintiffs, consolidating the hearings will serve the interests of time and judicial economy. Id. While there's a kernel of truth about plaintiffs' reasoning, that kernel isn't big enough to convince the court to combine the two issues--standing and merits--into one hearing. Standing is an essential element of subject matter jurisdiction. And it's imperative that Federal Courts exercise their limited jurisdiction only when it's proper to do so. The Court is resolute about deciding the first question first--have plaintiffs demonstrated that this court has subject matter jurisdiction to decide this case's claims. The Court, in its discretion, concludes that the bifurcated approach established in the court's Memorandum and Order Doc. 44 should remain in effect. The Court thus denies plaintiffs' Motion to Consolidate Hearings Doc. 62 . Signed by District Judge Daniel D. Crabtree on 5/24/24. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ss) (Entered: 05/24/2024) |
| 05/24/2024 | 65 | REPLY TO RESPONSE TO MOTION by Defendants Joseph R. Biden, United States Department of Education, United States Secretary of Education re 45 Motion to Dismiss. (Jerome, Simon) (Entered: 05/24/2024) |
| 05/31/2024 | 66 | MINUTE ENTRY for proceedings held before District Judge Daniel D. Crabtree: MOTION HEARING held on 5/31/2024. The court takes under under advisement 45 Motion to Dismiss for Lack of Jurisdiction filed by Joseph R. Biden, United States Secretary of Education, United States Department of Education as set forth in full on the record. (Court Reporter Kim Greiner.) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (mig) (Entered: 05/31/2024) |
| 06/06/2024 | 67 | NOTICE. The court will issue a Memorandum and Order on defendants' Motion to Dismiss (Doc. 45 ) tomorrow, June 7, 2024, after 12:00 PM CST. (mig) (Entered: 06/06/2024) |
| 06/07/2024 | 68 | MEMORANDUM AND ORDER granting in part and denying in part 45 Motion to Dismiss for Lack of Jurisdiction. Exercising discretion conferred by our Circuit, the court, consistent with Fed. R. Civ. P. 1, grants defendants' Motion to Dismiss as it applies to Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, and Utah. The court dismisses without prejudice all claims made by these eight states and directs the Clerk to terminate them as parties to this action. Signed by District Judge Daniel D. Crabtree on 6/7/2024. (sz) (Entered: 06/07/2024) |

| 06/07/2024 | 69 | ENTRY OF APPEARANCE by Abhishek Kambli on behalf of South Carolina, State of. (Kambli, Abhishek) (Entered: 06/07/2024) |
|---|---|---|
| 06/07/2024 | 70 | RESPONSE to 48 Motion to File Amicus Brief, by Defendants Joseph R. Biden, United States Department of Education, United States Secretary of Education. (Jerome, Simon) (Entered: 06/07/2024) |
| 06/10/2024 | 71 | NOTICE OF TELEPHONE CONFERENCE LINE FOR UPCOMING HEARING ON 6/11/2024: An in-person hearing is set for 6/11/2024 at 1:00 PM in Courtroom #476. A telephone conference line will be available for interested counsel, the parties, and the public to listen to the hearing. Participants on the phone line will NOT be able to speak or otherwise participate in the hearing. **This is a listening line only.** To join the conference line, interested participants shall dial into the conference line at 1-888-363-4749 and enter the access code 8354715. Participants will follow the instructions to join the call. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (md) (Entered: 06/10/2024) |
| 06/11/2024 | 72 | TRANSCRIPT of Motion Hearing held May 31, 2024 before Judge Daniel D. Crabtree, Court Reporter Kim Greiner, 913-735-2314, kim  greiner@ksd.uscourts.gov. Transcript purchased by: Simon Jerome.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 9/9/2024. (kg) (Entered: 06/11/2024) |
| 06/11/2024 | 73 | MINUTE ENTRY for proceedings held before District Judge Daniel D. Crabtree: MOTION HEARING held on 6/11/2024 re 23 Motion for Preliminary Injunction. Plaintiffs appear by Abhishek Kambli. Defendants United States Department of Education, United States Secretary of Education, and Joseph R. Biden appear by Simon Gregory Jerome and Stephen Michael Pezzi. Oral argument presented as to motion. Plaintiffs' 23 Motion for Preliminary Injunction taken under advisement by court as set forth on the record. (Court Reporter Kim Greiner.) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (jsh) (Entered: 06/11/2024) |
| 06/18/2024 | 74 | TRANSCRIPT of Motion Hearing held June 11, 2024 before Judge Daniel D. Crabtree, Court Reporter Kim Greiner, 913-735-2314, kim  greiner@ksd.uscourts.gov. Transcript purchased by: Simon Jerome.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** |

| | | |
|---|---|---|
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 9/16/2024. (kg) (Entered: 06/18/2024) |
| 06/24/2024 | 75 | NOTICE. The court will issue a Memorandum and Order on plaintiffs' Motion for Preliminary Injunction (Doc. 23 ) today, June 24, 2024, after 12:00 PM CST or tomorrow, June 25, 2024, before 12:00 PM CST. (mig) (Entered: 06/24/2024) |
| 06/24/2024 | 76 | MEMORANDUM AND ORDER granting in part and denying in part 23 Motion for Preliminary Injunction. the injunction will take effect at 10:00 PM Central Daylight Time on June 30, 2024. Defendant Joseph R. Biden, in his official capacity as the President of the United States, is dismissed from the case for lack of jurisdiction. See Order for further details. Signed by District Judge Daniel D. Crabtree on 6/24/2024. (kas) (Entered: 06/24/2024) |
| 06/24/2024 | 77 | PRELIMINARY INJUNCTION. Signed by District Judge Daniel D. Crabtree on 6/24/2024. (kas) (Entered: 06/24/2024) |
| 06/27/2024 | 78 | NOTICE OF INTERLOCUTORY APPEAL as to 77 Preliminary Injunction, 76 Order on Motion for Preliminary Injunction, by Defendants United States Department of Education, United States Secretary of Education (Pezzi, Stephen) (Entered: 06/27/2024) |
| 06/27/2024 | | APPEAL FEE STATUS: filing fee waived re: Notice of Interlocutory Appeal 78 on behalf of Defendants United States Department of Education, United States Secretary of Education. (THIS IS A TEXT ONLY ENTRY-NO DOCUMENT IS ASSOCIATED WITH THIS TRANSACTION) (sz) (Entered: 06/27/2024) |
| 06/27/2024 | 79 | PRELIMINARY RECORD ON APPEAL transmitted to 10CCA re 78 Notice of Interlocutory Appeal. (Attachments: # 1 Preliminary Packet)(sz) (Entered: 06/27/2024) |
| 06/27/2024 | 80 | MOTION for a Stay Pending Appeal by Defendants United States Department of Education, United States Secretary of Education (referred to Magistrate Judge Angel D. Mitchell) (Pezzi, Stephen) (Entered: 06/27/2024) |
| 06/27/2024 | 81 | MEMORANDUM IN SUPPORT of 80 MOTION for a Stay Pending Appeal by Defendants United States Department of Education, United States Secretary of Education (Attachments: # 1 Ex. 1 - Carter Decl. (Dep't of Education), # 2 Ex. 2 - Salas Decl. (CFPB))(Pezzi, Stephen) (Entered: 06/27/2024) |
| 06/28/2024 | 82 | MOTION for Extension of Time to File Response as to 81 Memorandum in Support of Motion, 80 MOTION for a Stay Pending Appeal by Plaintiff South Carolina, State of (Attachments: # 1 Exhibit 1)(Kambli, Abhishek) (Entered: 06/28/2024) |
| 06/28/2024 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 82 MOTION for Extension of Time to File Response as to 81 Memorandum in Support of Motion, 80 MOTION for a Stay Pending Appeal , 80 MOTION for a Stay Pending Appeal . The motion will be resolved by the District Judge.(alh)** (Entered: 06/28/2024) |
| 06/28/2024 | 83 | APPEAL DOCKETED in 10CCA on 6/27/2024 and assigned Appeal No. 24-3089 re 78 Notice of Interlocutory Appeal filed by United States Secretary of Education, United States Department of Education. (sz) (Entered: 06/28/2024) |
| 06/28/2024 | 84 | ORDER denying Defendant's 80 Motion to Stay Pending Appeal. The Court grants plaintiff's 82 MOTION for Extension of Time to File Response. Response deadline 6/28/2024 at 11:59 PM. Defendants have moved the court to stay its Preliminary Injunction under Fed. R. Civ. P. 62 while they appeal to the Tenth Circuit. Doc. 80 . Defendants assert that the court's earlier decisions got it wrong and so, defendants likely will succeed on appeal. The court disagrees. Defendants also assert that the court's Preliminary Injunction |

will cause significant and irreparable harm to defendants and related processes. Defendants also attached two declarations about this purported harm--but this is the first time the court has seen these declarations or heard about any of the difficulties that they predict. The court very much regrets any difficulty imposed by its decisions. But defendants have known for some time about the Supreme Court's ruling in Biden v. Nebraska and, likewise, have known that it fueled a fulsome challenge to the SAVE Plan. Defendants nonetheless elected to adhere to the July 1 implementation date despite these risks. In the court's view, the Preliminary Injunction balances the equities of the case appropriately. The court thus declines defendants' request for a stay. In the alternative, defendants ask the court to narrow its injunction. Defendants assert that the court failed to tailor its injunction appropriately because it's a nationwide injunction that enjoins the entirety of the SAVE Plan. To be clear, the preliminary injunction doesn't touch any aspect of the SAVE Plan that already has taken effect. See Doc. 76 at 38-40 ("The court declines to enjoin the parts of the SAVE Plan defendants already have implemented."). The court apprehends defendants' reservations about a nationwide injunction. That's why the court's Memorandum and Order devoted so much ink to explaining its reasoning for that broad form injunction. None of defendants' latest arguments convince the court to narrow the injunction to apply only to the Alaska, South Carolina, and Texas public instrumentalities. Defendants also ask the court to narrow the injunction to certain aspects of the SAVE Plan. There's something to be said for this approach, the one used by the court in the Eastern District of Missouri case. See Preliminary Injunction, Missouri v. Biden, No. 24-520-JAR (E.D. Mo. June 24, 2024), ECF No. 36. But it surfaces in this Kansas case just now, for the first time. Asking the court to adopt it on the accelerated schedule defendants now fashion is both too little and too late. Defendants earlier asked the court to sever unlawful portions of the SAVE Plan from lawful ones, but they never provided any kind of roadmap for which portions should make the cut. They didn't, that is, until last night's late-night filing, when defendants peeled the SAVE Plan apart in a fashion never before furnished to the court. The court may modify its injunction in the future, but it's not going to do so now on some 15 hours' notice--and without giving plaintiffs a meaningful chance to respond to a request that defendants could have presented long ago. The court thus denies defendants' Motion for a Stay Pending Appeal Doc. 80 . Two final notes: First, defendants filed their motion late last night shortly before midnight, CDT, and asked for a ruling by 3:00 PM CDT today. That schedule, in effect, gives plaintiffs no meaningful time to respond. Still, plaintiffs have filed a motion asking for time to respond--until 11:59 PM today. Doc. 82 . The court grants plaintiffs' motion. While it's not ideal to rule defendants' motion without the benefit of plaintiffs' response, the court issues its ruling now to allow defendants to seek any appellate relief they wish to seek. And plaintiffs' response may inform future consideration of narrowing the injunction--whether by the Circuit or our court. Second, defendants ask, as a final alternative, for an administrative stay. The court already gave defendants such a stay, staying the effective date of its earlier rulings until ten o'clock p.m. on June 30. See Doc. 76 at 42 (staying effective date of court's injunction). This timeline remains in place and defendants haven't demonstrated why the court should extend the existing administrative stay. So, the court denies that form of relief as well. Signed by District Judge Daniel D. Crabtree on 6/28/24. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ss) (Entered: 06/28/2024)

| 06/28/2024 | 85 | Second MOTION for Extension of Time to File Reponse as to 81 Memorandum in Support of 80 Motion, by Plaintiff South Carolina, State of (Kambli, Abhishek) Modified on 7/1/2024 to add Motion (ca). (Entered: 06/28/2024) |
| 06/28/2024 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 85 Second MOTION for Extension of Time to File Reponse as to 81 Memorandum in Support of Motion, . The motion will be resolved by the District Judge.(amh)** (Entered: 06/28/2024) |

| | | |
|---|---|---|
| 07/01/2024 | 86 | ORDER granting Second Motion for Extension of Time (Doc. 85 ). Plaintiff's deadline to respond to defendants' Emergency Motion for a Stay Pending Appeal (Doc. 80) is July 12, 2024. Signed by District Judge Daniel D. Crabtree on 07/01/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (mig) (Entered: 07/01/2024) |
| 07/01/2024 | 87 | ORDER of 10CCA. Having considered the parties' materials, the court grants Appellants' motion for a stay pending appeal. The district court's preliminary injunction is stayed pending this appeal. Appellees' motion to exceed the word limit is granted. Judge Tymkovich would deny the emergency motion for a stay pending appeal. ( Appeal No. 24-3089) (sz) (Entered: 07/01/2024) |
| 07/03/2024 | 88 | NOTICE OF APPEAL by Plaintiff Kansas, State of. Filing fee $ 605, Internet Payment Receipt Number AKSDC-6406480. (Kambli, Abhishek) (Entered: 07/03/2024) |
| 07/05/2024 | 89 | NOTICE OF CROSS APPEAL as to 76 Order on Motion for Preliminary Injunction, by South Carolina, State of Filing fee $ 605, Internet Payment Receipt Number AKSDC-6406565. (Kambli, Abhishek) (Entered: 07/05/2024) |
| 07/08/2024 | 90 | AMENDED NOTICE OF CROSS APPEAL as to 78 Notice of Appeal by South Carolina, State of (Kambli, Abhishek) Modified text and to relink to correct appeal (mls). (Entered: 07/08/2024) |
| 07/09/2024 | 91 | PRELIMINARY RECORD ON APPEAL transmitted to 10CCA re 88 Notice of Appeal (Attachments: # 1 Preliminary Packet). (mls) (Entered: 07/09/2024) |
| 07/09/2024 | 92 | PRELIMINARY RECORD ON APPEAL transmitted to 10CCA re 90 Amended Notice of Cross Appeal (Attachments: # 1 Preliminary Packet). (mls) (Entered: 07/09/2024) |
| 07/09/2024 | 93 | TRANSCRIPT ORDER FORM: Transcript Already on File filed by United States Department of Education, United States Secretary of Education re 78 Notice of Interlocutory Appeal (Pezzi, Stephen) (Entered: 07/09/2024) |
| 07/09/2024 | 94 | APPEAL DOCKETED in 10CCA on 7/9/2024 and assigned Appeal No. 24-3093 re 88 Notice of Appeal filed by Kansas, State of. (mls) (Entered: 07/09/2024) |
| 07/09/2024 | 95 | APPEAL DOCKETED in 10CCA on 7/9/2024 and assigned Appeal No. 24-3094 re 90 Notice of Cross Appeal filed by South Carolina, State of. (mls) (Entered: 07/09/2024) |
| 07/10/2024 | 96 | LETTER TO 10CCA stating record is complete re 78 Notice of Interlocutory Appeal (Appeal No. 24-3089). (mls) (Entered: 07/10/2024) |
| 07/12/2024 | 97 | ORDER SETTING SCHEDULING CONFERENCE. A scheduling conference is set for 7/26/2024 at 11:00 AM by Video Conference - Zoom before Magistrate Judge Angel D. Mitchell. The court will send Zoom information by email prior to the hearing. By **July 17, 2024**, the parties are directed to submit, by email to the undersigned's chambers, a joint status report outlining their proposed next steps to move this case forward. The status report should include proposed case-management deadlines. Signed by Magistrate Judge Angel D. Mitchell on 7/12/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(alh) (Entered: 07/12/2024) |

| **PACER Service Center** |
|---|
| **Transaction Receipt** |
| 07/14/2024 20:24:40 |

| | | | |
|---|---|---|---|
| **PACER Login:** | Simon_Brewer | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 6:24-cv-01057-DDC-ADM |
| **Billable Pages:** | 18 | **Cost:** | 1.80 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS, ET AL., | § | |
| | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, ET AL.; | § | Civil Action No. 2024-CV-1057-DDC-ADM |
| | § | |
| | § | |
| | § | |
| | § | |
| *Defendants*. | § | |

## MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65(a), Plaintiffs States of Kansas, Alabama, Alaska, Iowa, Idaho, Louisiana, Montana, Nebraska, South Carolina, Texas, and Utah (the "States") by and through their Attorneys General move for a Preliminary Injunction enjoining Defendants Joseph R. Biden, Michael Cardona, and the Department of Education, their agents, employees, and attorneys from implementing or acting pursuant to the Final Rule promulgated by the Department of Education titled "Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program," 88 Fed. Reg. 43,820, or from undertaking any form of student debt relief not expressly authorized by Congress.

Though the Final Rule is not set to take effect until July 2024, Defendants are actively implementing it by forgiving student loans, causing harm to the States. The present, ongoing, and irreparable harm makes a preliminary injunction necessary. *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001). A memorandum in support of this motion explains it more fully.

Respectfully submitted this 5th day of April, 2024.

KRIS W. KOBACH
**Attorney General of Kansas**

*/s/ Erin B. Gaide*
Erin B. Gaide, Kan. SC No. 29691
*Assistant Attorney General*
Abhishek S. Kambli, Kan. SC No. 29788
*Deputy Attorney General*
KANSAS OFFICE OF THE
 ATTORNEY GENERAL
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Email: abhishek.kambli@ag.ks.gov
erin.gaide@ag.ks.gov

Drew C. Ensign, *pro hac vice*
Holtzman Vogel Baran Torchinsky
& Josefiak PLLC
2575 E. Camelback Road, #860
Phoenix, Arizona 85016
Phone: (602) 388-1262
Email: densign@holtzmanvogel.com

_/s/ Edmund LaCour_
Edmund LaCour*
    _Solicitor General_
OFFICE OF THE ALABAMA
ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36104
(334) 353-2196
edmund.lacour@alabamaag.gov
_Counsel for Plaintiff State of Alabama_

_/s/ Bill Milks_
Bill Milks*
    _Chief Assistant Attorney General_
ALASKA DEPARTMENT OF LAW
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
(907) 465-4239
bill.milks@alaska.gov
_Counsel for Plaintiff State of Alaska_

_/s/ Joshua Turner_
Joshua Turner, _pro hac vice_
    _Chief of Constitutional Litigation &_
    _Policy_
700 W. Jefferson St., Suite 210,
PO Box 83720,
Boise, Idaho 83720
(208) 334-2400
josh.turner@ag.idaho.gov
_Counsel for Plaintiff State of Idaho_

_/s/ Eric H. Wessan_
Eric H. Wessan, _pro hac vice_
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov
_Counsel for Plaintiff State of Iowa_

_/s/ Kelsey Smith_
Kelsey Smith*
    _Deputy Solicitor General_
OFFICE OF THE LOUISIANA ATTORNEY
GENERAL
1885 North Third Street
Baton Rouge, Louisiana 70804
(225) 428-7432
smithkel@ag.louisiana.gov
_Counsel for Plaintiff State of Louisiana_

_/s/ Christian B. Corrigan_
Christian B. Corrigan, Kan. SC No. 25622
    _Solicitor General_
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
_Counsel for Plaintiff State of Montana_

_/s/ Lincoln J. Korell_
Lincoln J. Korell, _pro hac vice_
    _Assistant Solicitor General_
OFFICE OF THE ATTORNEY GENERAL
OF NEBRASKA
2115 State Capitol
Lincoln, Nebraska 68509
(402) 471-2682
lincoln.korell@nebraska.gov
_Counsel for Plaintiff State of Nebraska_

_/s/ Joseph D. Spate_
Joseph D. Spate, _pro hac vice_
Assistant Deputy Solicitor General
1000 Assembly Street
Columbia, South Carolina 29201
(803) 734-3371
josephspate@scag.gov
_Counsel for Plaintiff State of South Carolina_

_/s/ Charles K. Eldred_
Charles K. Eldred, _pro hac vice_
Chief, Legal Strategy Division
PO Box 12548
Austin, Texas 78711-2548
(512) 463-2100 charles.eldred@oag.texas.gov
Counsel for Plaintiff State of Texas

_/s/ Lance F. Sorenson_
Lance F. Sorenson*
    _Assistant Utah Attorney General_
UTAH ATTORNEY GENERAL
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114
(801) 366-0100
lancesorenson@agutah.gov
_Counsel for Plaintiff State of Utah_

      **pro hac vice forthcoming*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS, et al., | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Civil Action No. 2024-CV-1057-DDC-ADM |
| | § | |
| JOSEPH R. BIDEN, in his official | § | |
| capacity as President of the United States, | § | |
| et al., | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

This case is about an administration that is hell-bent on pursuing unlawful administrative action mainly for political gain. Defendants are seeking to forgive hundreds of billions of dollars in student debt with the stroke of a pen. Their first attempt to do the same thing was struck down by the Supreme Court just last summer.

While no one wants a system where people carry large amounts of student debt well into their adult years, any major changes to the program—particularly changes involving the expenditure of hundreds of billions in taxpayer dollars—require Congressional authorization. Instead of acknowledging the constitutional limits of their power, Defendants decided to violate federal law and cancel debt unilaterally.

Although the Final Rule (commonly known as the SAVE plan) is branded with a different name and different authority from what the Supreme Court struck down in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), it is just as unlawful. The new rule was promulgated just ten days after the Supreme Court invalidated Defendants' first attempt to unilaterally cancel student debt.

But in their rush to curry political favor as the election cycle was beginning, Defendants issued a slapdash rule committing multiple fundamental errors. Defendants' cost estimates are impossible to reconcile with reality. But even if such estimates were correct, the $156 billion cost Defendants put on the program tags it as a major policy question that needs clear Congressional authorization (which Defendants lack). And the rushed nature of the rule also resulted in multiple procedural violations of the Administrative Procedure Act (APA). The result is that the final rule is unlawful from top to bottom. It conflicts with the Higher Education Act (HEA) in multiple respects, the justifications for the rule are arbitrary and capricious, and Defendants violated APA notice-and-comment procedures in issuing it.

This unlawful executive action has harmed the Plaintiff States. The States stand to lose millions of dollars in tax revenue, lose much-needed talent in the state employment system, and suffer pocketbook injuries to their state instrumentalities or quasi-instrumentalities. These injuries result from Defendants' unlawful actions and are mounting daily. The States can only stop this irreparable harm with another court order blocking this second illegal debt forgiveness. Plaintiffs therefore ask this Court to grant a preliminary injunction.

BACKGROUND

**I.      History of the Higher Education Act**

In 1965, Congress enacted the HEA to address (among other things) the increasing cost of higher education. Among other things, the HEA created a government-backed student loan program. *See* Higher Education Act of 1965, Pub. L. No. 89-329 §§ 421–35, 79 Stat. 1219, 1236–49 (1965). Congress amended the HEA in 1993 to authorize direct loans to students from the federal government and allowed the Department of Education to offer plans to repay those student loans. Congress also gave the Department authority to create an "income-contingent repayment" (ICR) plan that based repayment terms on the income of the borrower. Such plans allowed borrowers to repay over an extended period of time, not to exceed twenty-five years. *See* 20 U.S.C. § 1087e(d)(1)(D). Two years later, the Department implemented this amendment and

designed the first income-contingent repayment plan, which limited annual loan payments to 20% of a borrower's income that exceeds the federal poverty line. *See* 59 Fed. Reg. 66,132 (Dec. 22, 1994). Congress has not amended § 1087(d)(1)(D) since its creation in 1993.

In 2007, Congress amended the HEA again, this time creating "income-based repayment" (IBR) plans for borrowers with "partial financial hardship." *See* College Cost Reduction and Access Act, Pub. L. No. 110-84, § 203, 121 Stat. 784, 792–95 (2007) (codified as amended at 20 U.S.C. § 1098e). "Partial financial hardship" relief was defined as applying to borrowers whose annual total payment "based on a 10-year repayment period; exceeds . . . 15 percent of . . . the amount by which—the borrower's, and the borrower's spouse's (if applicable), adjusted gross income; exceeds . . . 150 percent of the [applicable] poverty line." § 1098e(a)(3). Congress explicitly authorized the Department to "repay or cancel any outstanding balance of principal and interest due" under certain conditions and after "a period of time prescribed by the Secretary, not to exceed 25 years." § 1098e(b)(7).

That same year, Congress established the Public Service Loan Forgiveness (PSLF) Program, which allowed those who enter public service to have their loans canceled after ten years instead of twenty-five. 20 U.S.C. § 1087e(1)(B). The PSLF Program "is intended to encourage individuals to enter and continue in full-time public service employment by forgiving the remaining balance of their Direct loans." 34 C.F.R. § 685.219(a).

In 2010, Congress changed the cap on payments for income-based plans to 10% of income exceeding 150% of the poverty line for loans made after 2014 and decreased the maximum repayment period to twenty years. *See* Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 2213, 124 Stat. 1029, 1081 (2010) (codified at 20 § 1098e(e)). After that, the Department (through the rulemaking process) established first the PAYE Program, and then the REPAYE program, extending the 2010 amendments to all borrowers regardless of when they took out the loans. 77 Fed. Reg. 66,088 (Jul. 1, 2013); 80 Fed. Reg. 67,204, 67,236–42 (Oct. 30, 2015).

Apart from the PSLF Program, Congress authorized the Department to reduce or cancel loans in only three other narrow circumstances: (1) when the borrower has "died or been permanently and totally disabled, such that they cannot engage in any substantial gainful activity"; (2) when the borrower has become bankrupt; and (3) when the borrower was falsely certified by their schools, when the borrowers' schools close down, or when the schools failed to pay loan proceeds they owed to lenders. *Biden*, 143 S. Ct. at 2363 (internal quotes omitted) (citing 20 U.S.C. § 1087).

## II.   The Three-Part Biden Loan Forgiveness Gambit

In 2022, facing activists who were not content with the limited avenues of loan forgiveness authorized by Congress, Defendant Biden announced a massive student loan forgiveness program to be created through executive action.[1] There are three phases of his plan, each claiming to be based on different statutes. The first phase was tied to the HEROES Act, a statute Congress passed in the wake of 9/11 that allowed Defendants to "modify" student loans in the event of a national emergency. Defendants argued that canceling $10,000–$20,000 of student debt per person was a "modification" of the loans. The total cost of the plan to taxpayers was to be approximately $430 billion.

Step two is the final rule that Plaintiffs have challenged here—the so-called SAVE Plan. Defendants estimate (with questionable credibility) that this plan will cost "only" $156 billion. The final step, which has not yet reached a final rule, is the proposed regulatory insertion of "hardship" into 20 U.S.C. § 1082(a)(6).[2]

## III.   *Biden v. Nebraska*

Six states (including some of the Plaintiff States here) challenged the HEROES loan

---

[1] Press Release, The White House, Fact Sheet: President Biden Announces Student Loan Relief for Borrowers Who Need It Most (Aug. 24, 2022), https://tinyurl.com/mtscpw2k.

[2] *See* Arlette Saenz & Betsy Klein, *Biden Administration Preparing to Announce New Proposals to Reduce, Cancel Student Loan Debt*, CNN, Apr. 5, 2024, https://tinyurl.com/mr2apj2u.

forgiveness plan, arguing that canceling the debts was no mere "modification" of the loans, and so the action lacked Congressional authorization. The Supreme Court agreed. Concluding that the major questions doctrine applied, the Court held Defendants could not cancel $430 billion in student debt without clear authorization from Congress. *Biden*, 143 S. Ct. at 2375–76. Nothing in the HEROES Act provided that requisite clear authorization, so Defendants were without authority to "modify" loans by canceling them. *Id.* The Court vacated the rule, and Defendants were prevented from canceling the debt as they had planned.

## IV.   SAVE Plan

While the HEROES Act litigation was ongoing, Defendants announced phase two of their debt forgiveness program: the SAVE Plan. *See* 88 Fed. Reg. 1,894 (Jan. 11, 2023). Under the SAVE Plan, Defendants proposed to revise the REPAYE Plan in two significant ways. First, the SAVE Plan changes how much borrowers are required to repay each month by increasing the statutory definition of discretionary income exceeding 225% of the federal poverty guidelines and reducing the cap on payments for undergraduate debt from 10% of income exceeding the poverty guidelines to 5% of the excess. Second, it cancels loans for everyone with a principal at or below $12,000 after ten years of payments. And for balances above $12,000, it adds a year to the period for each $1,000. For example, a principal of $13,000 could be canceled after eleven years.

At the time of the proposed rule, Defendants anticipated that the SAVE Plan would cost $137.9 billion over ten years. *Id.* at 1,895. That estimate assumed that many loans would already be partially or completely forgiven under the HEROES Act, and it therefore did not account for the $430 billion in student debt that their HEROES plan was meant to eradicate. *See* 88 Fed. Reg. 43,820, 43,897 (July 10, 2023). The proposed rule provided only thirty days for comments. 88 Fed. Reg. at 1930.

During the comment period, one commenter recommended that the Department conduct an alternate cost estimate to account for the possibility that the Supreme Court could reject

Defendants' HEROES Act forgiveness plan. *See* 88 Fed. Reg. at 43,875; *see also* Comments from Def. of Freedom Inst. (attached as Ex. 1). Defendants brushed aside these concerns in the final rule, stating that they were "confident in [their] authority to pursue debt relief" even though they were "awaiting the Supreme Court's ruling on the issue." 88 Fed. Reg. at 43,875. Therefore, they would not attempt to update their cost estimates for the SAVE Plan. *Id.* However, this statement was published in the Federal Register *ten days after* Defendants had already lost *Biden v. Nebraska.* Defendants have not updated their cost estimate since.

The final rule waved away other meaningful concerns as well. As to the effect the SAVE Plan might have on PSLF forgiveness, Defendants explained that the PSLF Program was a creature of a different statute and in some cases was "more generous." *Id.* at 43,833–34. They did not address the fact that State and local government agencies across the country rely on the ability to offer loan forgiveness to attract employees who would otherwise take higher-paying private sector jobs. Nor did they consider the impact of the SAVE Plan on State tax revenue. *See id., passim.*

While the major provisions of the Final Rule are set to take effect on July 1, 2024, Defendants have already started forgiving massive numbers of student loans. *Accord id.* at 43,820. The total amount of loan forgiveness so far in 2024—before the rule even "officially" goes into effect—has been $1.2 billion spread among 152,880 (former) borrowers.[3] Among Plaintiff States, a total of 28,350 borrowers had $225.4 million in debt canceled.[4]

## APPLICABLE LEGAL STANDARD

A party moving for a preliminary injunction must show: "(1) he is likely to succeed on the merits of his claim; (2) he will suffer irreparable harm if the injunction is denied; (3) his

---

[3] Press Release, U.S. Dep't of Ed., Biden-Harris Administration Releases State-by-State Breakdown of $1.2 Billion in SAVE Plan Forgiveness (Feb. 23, 2024), *available at* https://tinyurl.com/2j42estw [hereinafter "SAVE Plan Breakdown"].

[4] Among states with an income tax, that amount is $107.4 million.  *Id.*

threatened injury outweighs the harm the grant of the injunction will cause the opposing party; and (4) if issued, the injunction will not adversely affect the public interest." *McDonnell v. City & Cty. of Denver*, 878 F.3d 1247, 1252 (10th Cir. 2018). Each element is required for a preliminary injunction to issue. *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016). The Court has the power under the APA to issue such a preliminary order. 5 U.S.C. § 705.

## ARGUMENT

### I.   Plaintiffs Have Standing.

The States have standing to challenge the Final Rule. "Under Article III of the Constitution, a plaintiff needs a personal stake in the case." *Biden*, 143 S. Ct. at 2365 (internal quotes omitted). "That is, the plaintiff must have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit. If at least one plaintiff has standing, the suit may proceed." *Id.* (citation omitted). The States enjoy "special solicitude" in standing analysis. *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). That special solicitude relaxes the traceability and redressability prongs of standing. *Id.* at 523–26; *accord Texas v. United States*, 809 F.3d 134, 159 (5th Cir. 2015), *aff'd by an equally divided court*, 579 U.S. 547 (2016).

Here, the States have suffered the requisite injury in fact in four ways. *First*, many of them will lose tax revenue because of Defendants' unlawful rule. Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah conform their definition of "adjusted gross income," "taxable income," or other definitions related to income to the Internal Revenue Code.[5] *See, e.g.*, Kan. Stat. Ann. 79-32,117; Ala. Code § 40-18-14(a)(3)(h); Idaho Code § 63-3004;

---

[5] Such conformity comes in two flavors: static and rolling. Static-conformity states set their definitions to the Internal Revenue Code as of a certain date. Rolling-conformity states automatically update their definitions as the federal definitions change.

Iowa Code § 422.7; La. Stat. Ann. § 47:293(1); Mont. Code Ann. § 15-30-2102; Neb. Rev. Stat. § 77-2714; S.C. Code Ann. § 12-6-1110; Utah Code § 59-10-103. Conformity simplifies filing and causes less confusion for taxpayers. Any revision of these statutes would not only require action from the state legislatures themselves, but would also impose administrative costs on the States and their citizens.

The loan forgiveness at issue in the SAVE Plan—which is a financial award to each debtor—ordinarily would be taxable as income under federal law. 26 U.S.C. §§ 61(a)(11), 63(a). But, in 2021 Congress excluded from the definition of taxable income any forgiveness of student debt between December 31, 2020, and January 1, 2026. *See* 26 U.S.C. § 108(f)(5). By law, this exclusion applies both in rolling-conformity States (such as Kansas, Alabama, Iowa, Louisiana, Montana, Nebraska, and Utah) and in States with a static conformity date after tax year 2020 (such as Idaho and South Carolina). As a result, these States will not receive income-tax receipts from student debt forgiveness during that period.

The Final Rule means that loans, especially those with balances of $12,000 or less, will be forgiven much earlier than previously possible—which means that much of that forgiveness will fall in the federal and State tax forgiveness holiday. For example, a $12,000 loan on which the borrower has made ten years or more of payments can be forgiven today, while previously it would not have been eligible for forgiveness until 2026 to 2039, depending on the number of years that have been paid.[6] Consequently, Defendants are forgiving more loans during the untaxable period than they otherwise would have.

The States not only stand to lose revenue because of Defendants' loan-forgiveness scheme, they already are losing such revenue. On March 27, 2024, the Department boasted that

---

[6] If a borrower started making payments in 2006, for example, he ordinarily would not be eligible for relief until at least 2026 (assuming, among other things, that he made payments during the entire time period).

Defendants had already forgiven $9.9 million in student debt in Kansas.[7] Because Kansas conforms to the federal definition of taxable income, it will not be able to tax any of this, and consequently lost tax revenue. Other States are similarly harmed, and these harms are sufficient to establish an injury-in-fact for Article III standing. *See Wyoming v. Oklahoma*, 502 U.S. 437, 448, 454 (1992).

This harm is, of course, traceable to Defendants. By unlawfully shifting forward loan forgiveness to the tax-free period, Defendants have pulled the rug out from under States, exempting millions of dollars of debt forgiveness from State taxation. This would not have happened but for Defendants' unlawful final rule.

The second form of injury in fact suffered by the States is damage to the recruiting, hiring, and retention of State- and local-government employees. As the Department's regulations acknowledge, the PSLF Program was expressly created for the benefit of government employers[8] and non-profit entities. 34 C.F.R. § 685.219(a). Knowing that public and non-profit employers would not be able to offer the same high salaries or attractive benefit packages as the for-profit sector, Congress provided a recruitment advantage for public and non-profit employers by letting their employees get loans forgiven earlier.

Plaintiff States have benefited from this program, as they are entitled (and were expected) to do. For example, Kansas publishes notice of the PSLF Program on its State job website, alerting potential employees about the program. *See* Gish Aff. ¶ 6 (attached as Ex. 3). Hiring managers discuss the program with job candidates in interviews. *Id.* ¶ 7. Many Kansas state employees are active in the PSLF program. For example, many employees in the State's Office of the Attorney General are enrolled in, and actively pursuing, loan forgiveness through PSLF.

[7] SAVE Plan Breakdown, *supra*.

[8] This Court advertised PSLF as a benefit in a recent job posting. *See* Ex. 2 at 3 (job posting for a Human Resource Specialist in D. Kan.).

Similarly, the Office of the Texas Attorney General advertises the PSLF Program and its employees are enrolled in it. *See* Garza Dec. ¶¶ 4, 10, 11 (attached as Ex. 4). Similarly, South Carolina advertises PSLF as a way to encourage people to teach in the State. S.C. Dep't of Edu., Recruitment and Recognition, https://tinyurl.com/32besjkf (last visited Apr. 5, 2024).

This has been a powerful benefit to Plaintiffs. Each state's legislature and local governing bodies appropriates a necessarily limited amount of taxpayer dollars to its agencies. That is the agency's budget for the year, and such budgets rarely—if ever—can support salaries comparable to those in the private sector. Without PSLF offering a special benefit to those who work in public service careers, the states' ability to attract and retain employees will deteriorate.

This harm is attributable to Defendants. By promulgating the Final Rule, Defendants are forgiving *all* eligible borrowers' loans after only ten years of payments, even if they chose to work for private, for-profit employers. Under the final rule, one of the distinguishing benefits of working in a public service position disappears.

A third form of injury to the states is harm to their state instrumentalities or quasi-instrumentalities. Plaintiff states have such instrumentalities, and they will suffer irreparable financial harm as a result of the final rule. Cmpl. ¶¶ 108-12.[9] Harm to those instrumentalities is harm to the Plaintiff states.

## II.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

Plaintiffs are likely to succeed on their claims that (1) the final rule exceeds Defendants' authority under the HEA, (2) the final rule is arbitrary and capricious, and (3) the rule's thirty-day comment period violated the APA.

### A.    The final rule violates the major questions doctrine.

Over the past several years, the Supreme Court has applied a new label to a doctrine that has developed over decades: the "major questions doctrine." *See Biden*, 143 S. Ct. at 2374. The

---

[9] Plaintiffs anticipate having proof of these facts at the time of any hearing scheduled on this motion.

doctrine requires "clear congressional authorization" for agency action in cases where an agency invokes broad authority over matters of great economic or political significance. *See West Virginia v. EPA*, 142 S. Ct. 697, 721–22 (2022). If Congress has given no such authorization, then the agency's action must be set aside or enjoined. The relevant question in assessing whether the question is a major one is "the breadth of the authority that the agency has asserted." *Id.* at 2608. Thus, if an agency asserts the authority to expend $1 trillion unilaterally without Congressional approval, but only writes a check for $100, the relevant number to analyze under the doctrine is $1 trillion—not $100. *See id.*

Many circumstances may trigger the major questions doctrine, including the economic or political effect of the agency action. *See Biden*, 143 S. Ct. at 2375 (applying doctrine to mass student debt cancellation); *West Virginia*, 597 U.S. at 724 (applying doctrine to EPA regulation restructuring energy market). Although these considerations "need not be present in every major-questions case, they are among the things that cause [a court] to hesitate and look for clear congressional authorization before proceeding." *N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 297 (4th Cir. 2023). It ultimately boils down to "common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000), and goes back to the fundamental idea that Congress ordinarily legislates on the "important subjects" while delegating to the executive branch only the authority to "fill up the details." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825).

When the doctrine is triggered, "a decision of such magnitude and consequence rests with Congress itself, or an agency acting pursuant to clear delegation from that representative body." *West Virginia*, 597 U.S. at 735. The burden is on *the agency* to demonstrate is has the necessary clear authorization. *See Biden*, 143 S. Ct. at 2375 ("In such circumstances, we have required the Secretary to point to clear congressional authorization to justify the challenged program." (internal quotes omitted)). And a "colorable" or "plausible" textual basis is not sufficient. *West*

*Virginia*, 597 U.S. at 723. As Justice Scalia famously said, Congress "does not . . . hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Although no precise formula establishes what clear authorization looks like, there are several factors a court should consider, including (1) where the legislative provision the agency relies on fits within the broader statutory scheme, (2) the age and focus of the statute the agency invokes in relation to the problem the agency seeks to address, and (3) the agency's past interpretation of the relevant statute. *West Virginia*, 597 U.S. 746–48 (Gorsuch, J., concurring).

Defendants' asserted authority for the Final Rule—*i.e.*, the authority to unilaterally forgive at least a hundred billion dollars in student debt under a highly strained interpretation of the HEA—triggers the major questions doctrine for several reasons. *First*, the rule is of vast economic significance. The rule estimates the cost of the program to be $156 billion. This is more than three times the amount that the Court found triggered the doctrine in 2021. *See Ala. Ass'n of Realtors v. Dep't of Health and Human Servs.*, 141 S. Ct. 2485, 2489 (2021). Inflation has been high the past few years, but it hasn't been *that* high.

Indeed, $156 billion is likely a severe underestimate because the final rule presumed as a baseline the $430 billion of debt forgiveness that never occurred due to the decision in *Biden*. Private estimates that do account for the correct baseline numbers put the expected cost at approximately $475 billion.[10] This more accurate cost estimate would be *higher* than the amount in *Biden*, which the Supreme Court found was well beyond the threshold necessary to trigger major-questions analysis, 143 S. Ct. at 2373. Regardless of whether the program costs $156 billion or $475 billion, it is plainly a matter of vast economic significance. And "the breadth of the authority that the agency has asserted," *West Virginia*, 142 S. Ct. at 2608, is significantly broader than the $156 billion or $475 billion cost. Defendants are claiming the power to cancel

---

[10] Univ. of Penn, Penn Warton Budget Model, Biden's New Income-Driven Repayment ("Save") Plan: Budgetary Cost Estimate Update, July 17, 2023, https://tinyurl.com/4u33f5du [hereinafter Wharton Model].

essentially *all* student debt, *see infra* pp. 15-16, 23—which amounts to $1.6 trillion currently and at least another $872 billion that "will be lent over the coming decade," 88 Fed. Reg. at 43,781. Defendants are thus arrogating to themselves the power to abolish, unilaterally, more than $2.4 trillion dollars in debt. If whether Defendants possess such awesome unilateral authority to spend federal dollars is not a "major" question, it is doubtful that any agency assertion of power ever would be.

Beyond the economic significance of the program, it is also an issue of vast political significance. Indeed, the Supreme Court has already recognized that "the basic and consequential tradeoffs inherent in a mass debt cancellation program" present major questions, due in part to their political significance. *Biden*, 143 S. Ct. at 2375 (cleaned up). The tradeoffs in requiring taxpayers—including a large portion who did not attend college, worked their way through college, or responsibly paid off their own loans—to assume the debt burdens of a minority of the populace are profound. Implementing such a program is a controversial and value-laden political judgment that only Congress can make. Furthermore, just as in *Biden*, *West Virginia*, and *Alabama Realtors*, the political significance here is underscored by the fact that "the Secretary's assertion of administrative authority has 'conveniently enabled him to enact a program' that Congress has chosen not to enact itself." *Biden*, 143 S. Ct. at 2373 (quoting *West Virginia*, 142 S. Ct. at 2587). As the *Biden* Court noted, "more than 80 student loan forgiveness bills" were introduced in the 116th Congress alone. 143 S. Ct. at 2373 (internal quotes omitted). Such congressional inaction is as telling here.[11]

It is clear, then, that whether the Department possesses the power to forgive an unlimited amount of student debt is a major question. The relevant inquiry thus becomes whether there is clear authorization from Congress for the Department exercise such power.

---

[11] Perhaps more so in the wake of *Biden*, when it has become certain that Defendants lack the broad forgiveness authority they crave. Surely, if Congress wanted Defendants to have that authority, it would have acted by now.

B.      **The final rule exceeds the Department's statutory authority.**

Because the major questions doctrine applies, the Final Rule is lawful only if the HEA provides "clear congressional authorization" to forgive hundreds of billions of dollars of student debt, including the principal owed by millions of borrowers. *Biden*, 143 S. Ct. at 2375. But the section the Department relies on, § 455(d), does not authorize debt forgiveness at all, let alone give "clear . . . authorization" for it. That lack of authority is apparent in the provision's text, context, the applicable canons of construction, and in the severe constitutional doubts that the Department's interpretation creates.

        i.      *Section 455(d)'s Plain Text*

Defendants' asserted authority relies on § 455(d)(1)(D) of the HEA — a section that does not authorize loan forgiveness. That section instead allows the Department to create "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D).

The Department asserts that § 455(d)(1)(D) gives it "discretion as to how much a borrower must pay," with the *only* limitations being that repayment period "cannot exceed 25 years" and the amount repaid "must be set based upon the borrower's annual adjusted gross income and that the payment calculation must account for the spouse's income if the borrower is married and files a joint tax return." 88 Fed. Reg. at 43,826–27.

But the Department's interpretation ignores the crucial word "repayment"—which, rather than supplying the requisite "clear congressional authorization" to abolish debt, *affirmatively precludes* massive debt forgiveness. "Repayment" is the noun form of "repay," which means "to pay back," with a fitting example being "repaid a debt." Repay, *American Heritage Dictionary* (4th ed. 2001) (definition 1). It similarly means "to pay back (money)." Repay, *American Heritage Dictionary* (new college ed. 1976) [hereinafter *New College Edition*].

The upshot of these straightforward definitions is that "repayment" requires the actual

*paying back* of the principal borrowed, with interest—not (1) abolition or forgiveness of the debt or (2) transformation of the debt into a partial grant/gift. Neither of those is "repayment." They are its antithesis: forgiveness, *non*-repayment.

That "repayment" in § 455(d)(1)(D) means actual *repayment* is underscored by the preceding text of § 455(d), which provides that the Department "shall offer . . . a variety of plans for repayment of such loan, *including principal and interest* on the loan." 20 U.S.C. § 1087e(d) (emphasis added). Congress thus *specifically insisted* that "repayment" "includ[e] principal and interest on the loan," which demonstrates Congress' unequivocal intent that borrowers repay the principal of the loan and at least some amount of interest. *Id.* But where debt is forgiven outright under the Final Rule, there is little to no repayment of interest, and the borrower falls short of repaying the principal, contrary to § 455(d)'s demand. That result is underscored by Congress including the word "paid" in § 455(d)(1)(D)—an antonym of forgiven/not paid.

The plain meaning of "loan" further supports the states here, since § 455(d) demands repayment of the "loan." The word "loan" has a well-understood meaning: "A sum of money lent at interest." Loan, *New College Edition* (definition 1); *accord* Loan, *American Heritage* (definition 2: "A sum of money lent at interest.").

Under § 455(d)'s plain text, then, the Department can devise only plans that provide *repayment* of the loan amounts—*not* ones that forgive some borrowed amounts entirely. Perhaps the Secretary could take actions such as varying the payment amounts that are due if a requisite reduction in a borrower's income occurs—*i.e.*, creating plans for "repayment" that are "income contingent." *Id.* § 1087e(d). Or perhaps the Secretary could defer the timing of repayment, contingent on a borrower's income falling below a threshold. But the Secretary has no power to alter the statute's fundamental requirement: *repayment*, "including principal and interest on the loan." *Id.* § 1087e(d). The Final Rule's construction thus violates the HEA's repeated mandate of "repayment." And the Department's abrupt cancellation of debt for borrowers that have already made ten years of payments and have balances under $12,000

necessarily fails for the same reasons—because it rests on the same faulty construction of the income-contingent repayment plan authorization in § 455(d)(1)(D).

Of course, a loan can be forgiven or cancelled. But when Congress authorizes such forgiveness or cancellation, it does so explicitly. The HEA expressly allows for loan forgiveness in certain specific circumstances—but "repayment" under § 455(d) is not one of them. *Biden*, 143 S. Ct. at 2358 (citing 20 U.S.C. § 1087); *see also* 20 U.S.C. § 1087e(m) (authorizing "cancel[lation]" and "forgiveness" of loans under the PSLF). Thus, the interpretive canon of *expressio unius est exclusio alterius* (also known as the negative-implication canon) defeats the Department's interpretation of the HEA. Under this "familiar maxim . . . , when a statute expresses certain exceptions to a general rule, other exceptions are necessarily excluded.'" *White v. W. Title Ins.*, 710 P.2d 309, 314 n.4 (Cal. 1985); *accord* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107–11 (2012). This makes it implausible that there was clear authorization for Defendants to undertake loan forgiveness, cancellation, or discharge under additional circumstances outside of those expressly authorized by Congress. Congress has spoken clearly within the broader statutory scheme, so there is no reason to hide the elephant Defendants insist they have discovered in the § 455(d) mousehole. *Accord infra*, pp. 18–19.

The Department's non-responsive response to these obvious issues was to offer the straw-man contention that "[n]othing in the HEA requires [income-contingent repayment] plans or Department regulations to be cost neutral." 88 Fed. Reg. at 43,829. But the States are not insisting on cost neutrality. Rather, the States are merely seeking a Rule that complies with what § 455(d) already mandates explicitly: *i.e.*, a "repayment" plan that actually requires repayment.

All earlier rules establishing income-contingent repayment plans under § 455(d)(1)(D) were at least arguably consistent with the repayment mandate. Under those earlier approaches, "borrowers with only undergraduate debt" would on average pay "per $10,000 borrowed . . .

$11,844 under the standard 10-year plan and $10,956 under . . . REPAYE." 88 Fed. Reg. at 43,880. In other words, borrowers repaid their student loan principals with some interest. The numbers are similar for student debt overall (including graduate-school debt): "for every $10,000 in debt taken out, the amount repaid under the standard 10-year plan is $11,880, [and] $11,844 under the current REPAYE plan." *Id.*

Thus, in the aggregate, the Department's prior income-contingent plans preserved the requirement of repaying all principal borrowed, along with at least some amount of interest. The Final Rule, however, obliterates § 455(d)'s mandate that income-contingent plans provide for "repayment . . . including principal and interest." 20 U.S.C. § 455(d)(1). Under the Department's own estimates for undergraduate-only debt, "expected payments per $10,000 borrowed drop from $11,844 under the standard 10-year plan and $10,956 under the current REPAYE plan to $6,121 under the new REPAYE plan." 88 Fed. Reg. at 43,880. The numbers are similar where overall student debt (not just undergraduate) is considered. For every $10,000 in debt taken out, the amount repaid drops to just $7069. *Id.* In other words, the Rule not only ignores the concept of paying interest, it also blots out the obligation to repay principal. It effectively transforms more than one-third of all federal dollars "loaned" into an outright gift.

And these are just the numbers in aggregate. By focusing on particular subgroups, the final rule's violation of § 455(d)'s requirement of "repayment . . . including principal and interest" becomes even starker. The Department predicts that: "Borrowers with only undergraduate debt who have lifetime income in the bottom quintile are projected to repay $873 per $10,000 in the new REPAYE plan compared to $8,724 per $10,000 in the current REPAYE plan." 88 Fed. Reg. at 43,881. For those borrowers, the new rule thus reduces repayment of principal by approximately 90%—less than a dime on the dollar. And for many borrowers, the Department dispenses with the pretext of repayment entirely: "more than 1 million borrowers . . . could see their payments go to $0 based upon the parameters of the plan in this final rule." 88 Fed. Reg. at 43,870. Indeed, under the Department's own estimates, 57% of the 7.5 million borrowers under the SAVE plan

would have $0 payments.[12] But a $0 payment by its very definition cannot possibly qualify as a payment.

Thus, far from providing clear congressional authorization for the Rule, § 455(d) plainly precludes the massive debt forgiveness the Final Rule attempts to effectuate.

ii.      *Context*

That § 455(d)(1) means exactly what it says—*i.e.*, that the Department's plans must provide for "repayment . . . including principal and interest"—is further confirmed by the statutory context. Two aspects of the HEA underscore the fact that § 455(d)(1)(D) does not provide sweeping authority to forgive the principal of student debt and abolish interest payments.

*First*, Congress has already spoken to the precise issue of forgiving debt based on limited incomes, creating the "partial hardship exemption" in the very next subsection, § 455(d)(1)(E). The partial hardship exception applies to individuals for whom the "annual amount due" exceeds "15 percent" of their income exceeding "150 percent of the poverty line." 20 U.S.C. § 1098e(a)(3)(B), (b)(1). By creating a particular provision for debt relief based on economic/income-based hardship, and by defining the income thresholds precisely, Congress impliedly denied the Department authority to create its own exceptions to the repayment requirement and likewise denied the Department authority to modify the income thresholds for the hardship relief Congress did authorize. *See Sebelius v. Cloer*, 569 U.S. 369, 378 (2013) ("We have long held that where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (internal quotes omitted)); *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974) ("When a statute limits a thing to be done in a particular mode, it includes the negative of any other

[12] Press Release, U.S. Dep't of Educ., Biden-Harris Administration Announces Nearly 5.5 Million Borrowers Are Enrolled in the SAVE Plan (Nov. 8, 2023), https://tinyurl.com/4h9kxje9.

mode." (internal quotation omitted)). What's more, the fact that Congress tied the thresholds to the inflation-adjusted federal poverty line shows that Congress did not expect the Department to alter that formula.

*Second*, the Department's interpretation ignores Congress' careful separation between loans and grants, which § 455 reflects. Section 455 twice refers to "Federal Pell Grants" in subsections (j)(2), (k)(3), and Congress has separately provided extensive provisions governing grants, *see* 20 U.S.C. §§ 1070a–1070a-6. Unlike loans, a "grant" is "[a] giving of funds for a specific purpose." Grant, *American Heritage Dictionary*, *supra*. By carefully creating separate programs for "loans" and "grants," Congress demonstrated its intent that these crucial differences be respected. The Final Rule, however, effectively transforms student loans into partial grants by ensuring that much of the principal of the loans are never paid back.

### iii.    *Canons of Construction*

Defendants' belief that § 455 gives them authority to cancel hundreds of billions of dollars in debt also violates several canons of construction. Four are particularly relevant here.

**First, the canon of *expressio unius est exclusio alterius*.** As noted above, this canon of construction prohibits Defendants from creating any additional circumstances under which student loan debts can be discharged, other than the ones expressly listed in the statute.

**Second, the presumption against radical changes from past practice.** Courts have routinely recognized "that Congress is unlikely to intend any radical departures from past practice without making a point of saying so." *Jones v. United States*, 526 U.S. 227, 234 (1999). The massive transformation of student debt into outright grants would be just such a "radical departure[] from past practice." *Id.*

**Third, the canon of *in pari materia*.** Defendants' interpretation violates the canon "that courts do not interpret statutes in isolation, but in the context of the corpus juris of which they are a part." *Branch v. Smith*, 538 U.S. 254, 281 (2003). Section 455 thus must be read in conjunction with other statutes governing debts and obligations owed to the federal

government. *Id.* Other federal statutes make clear that federal agencies are required to pursue debts owed to the federal government diligently, and cannot simply discharge or cancel those debts for policy (or political) reasons. For example, the Federal Claims Collection Act mandates that federal agencies "try to collect a claim of the United States Government for money . . . arising out of the activities of, or referred to, the agency," and further severely restricts the authority of such agencies to compromise or otherwise settle such debts. *See* 31 U.S.C. § 3711(a). The statute's implementing regulations also require that agencies "aggressively collect all debts." 31 C.F.R. 901.1(a). Against that backdrop, an agency having the power to cancel hundreds of billions of dollars in debt is an enormous aberration and one that Congress likely did not intend.

**Fourth, the constitutional-doubt canon.** Defendants' interpretation of § 455 invites doubts as to the statute's constitutionality. This Court is thus obliged to construe the statute otherwise to avoid those constitutional doubts. *See, e.g., United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994). These substantial doubts are present here for three reasons.

*First*, "[a]mong Congress's most important authorities is its control of the purse." *Biden*, 143 S. Ct. at 2375. Indeed, the Constitution itself prohibits any government expenditures that are not authorized by Congress. U.S. Const., art. I, § 9. But under Defendants' interpretation, an executive branch agency could unilaterally abolish over $2.4 trillion in student debt in a single stroke of the pen—substantially exceeding "the [federal] Government's $1.7 trillion in annual discretionary spending." *Biden*, 143 S. Ct. at 2373. In other words, under Defendants' construction, the Department could exercise its own asserted power of the purse in a single rule to an extent greater than Congress does in an omnibus bill providing for all discretionary spending for the entire government for an entire fiscal year. Given the Supreme Court's treatment of a similar attempt in *Biden*, this effort is of doubtful constitutionality.

*Second*, with the exception of the first round of mass student debt cancellation—swiftly invalidated by the Court in *Biden*—there are *no* precedents for an agency rule expending over $100 billion dollars without Congressional authorization. Such a lack of any historical analogues

is often "the most telling indication of [a] severe constitutional problem." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010) (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 537 F.3d 667, 699 (D.C. Cir. 2008) (Kavanaugh, J., dissenting)).

*Third*, Defendants' interpretation creates substantial doubts as to whether § 455 satisfies the non-delegation doctrine. If § 455 truly gives the Department power to cancel hundreds of billions of dollars of debt, it supplies no obvious intelligible principle to guide how that awesome power should be exercised.

Under Defendants' reading, the Secretary enjoys near-absolute discretion to cancel as much or as little student debt as he wishes as long as he (in Defendants' view) complies with the minimal requirement that Defendants' plans (1) do not exceed 25 years in length and (2) set repayment "based upon the borrower's annual adjusted gross income" including "the spouse's income if the borrower is married and files a joint tax return." 88 Fed. Reg. at 43,827. Defendants recognize no other limitations—and do not consider themselves bound by the income thresholds that Congress set for the "partial hardship exemption." *Supra*, pp. 4, 13–14. The constitutional-doubt canon requires this Court to interpret the Final Rule in a way that avoids these severe constitutional problems.

### C.     The final rule is arbitrary and capricious.

The States are also likely to prevail on their claim that the Final Rule is arbitrary and capricious, thereby violating the APA. 5 U.S.C. § 706(2).

An agency action is arbitrary or capricious if, among other things, the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983), or otherwise did not "engage[] in reasoned decisionmaking," *Judulang v. Holder*, 565 U.S. 42, 53 (2011). Here, the final rule is arbitrary and capricious for several reasons, including that Defendants purposefully failed to account for up to $430 billion in costs and failed to consider the states' reliance interests.

i.    *Defendants Failed to Consider a $430 Billion Aspect of the Problem.*

Defendants' estimate of the cost of the Final Rule never accounts for up to $430 billion in costs. To justify the Final Rule, Defendants ignore the *Biden* decision's effects and other "important relevant factors," *Nw. Pipeline Corp. v. FERC*, 61 F.3d 1479, 1485–86 (10th Cir. 1995). The Final Rule is a loan-cancellation program, so its cost to the federal government must be considered carefully. But the cost estimate provided here is particularly suspect. At the time the Final Rule was announced, Defendants presumed that some $430 billion in student loans already would have been forgiven under another program. *See* 88 Fed. Reg. 43,875. But the Supreme Court had struck down that other program *before* the final rule issued. *See Biden*, 143 S. Ct. at 2374. Many borrowers who would have had their loans forgiven under the HEROES plan are now eligible to have their loans forgiven under the Final Rule.[13]

Even though Defendants published the Rule *after Biden* was decided, and thus were forewarned that these debts remained outstanding, Defendants forged ahead and published the Final Rule anyway, as if they existed in an alternate reality. *See* 88 Fed. Reg. 43,875 ("The Department is confident in our authority to pursue debt relief and is awaiting the Supreme Court's ruling on the issue. Our cost estimates account for the Department's current and anticipated programs and policies."); *id.* at 43,886 (assuming some debt would have been forgiven under HEROES authority). As a result of Defendants' arbitrary and capricious failure to consider the impact of *Biden*—a preexisting and well-publicized decision that Defendants

---

[13] For example, HEROES forgiveness was intended to eliminate up to $10,000 for every borrower who had not received a Pell Grant. *Biden*, 143 S. Ct. at 2364. Under that plan, a borrower with a $12,000 original principal balance would have had all but $2000 canceled. If that borrower had made ten years of payments, he would be eligible to have the remaining $2000 forgiven under SAVE. However, because HEROES was found to be unlawful, none of those loans were canceled. The borrower still holds a $12,000 debt, all of which can be forgiven under SAVE, and which is $10,000 more than what Defendants included in their estimates.

undoubtedly knew about[14]—the cost of forgiving existing loans will be much higher than the final rule estimates. Thus, Defendants plainly failed to consider "important aspect[s] of the problem." *Michigan v. EPA*, 576 U.S. 743, 750-52 (2015) (cleaned up). It is unfathomable that Defendants did not include this in their estimates; it is certainly arbitrary and capricious.

Nonpartisan third-parties recognized that Defendants' slapdash estimates were off. The Wharton School at the University of Pennsylvania estimates the plan is likely to cost closer to $475 billion over ten years.[15] This estimate *does* account for the *Biden* decision, *id.*, and it shows how impossibly low Defendants' estimate actually is. Given this, and given the fact that Defendants' previous accounting was so full of errors that it could not be corroborated by an auditor,[16] the Court should not rely on Defendants' estimate in any way. Rather, the Court should find that the estimate was not adequately explained or supported and was thus arbitrary and capricious.

> **ii.** *Defendants Failed to Consider Plaintiff States' Reliance Interests.*

Defendants also failed to consider the States' reliance interests on tax revenue from forgiven student loans and the recruiting and retention benefits of the PSFL program. As explained above, *supra*, pp. 7–9, Plaintiffs ordinarily tax the income that is realized when student loans are discharged. But after passage of the American Rescue Plan, Pub. L. No. 117-2, 135 Stat. 4 (2021), they will not do so until January 1, 2026. Any loan that is forgiven between now and that date is untaxable. Because Defendants are now attempting to forgive loans after

---

[14] Indeed, they were parties to the case.

[15] Wharton Model, *supra*.

[16] Defendants engaged accounting firm KPMG to audit the Department's loan program. *See* KPMG Audit (attached as Ex. 6). KPMG accountants informed Defendants they "identified errors in the underlying data used to develop assumptions used to calculate the subsidy re-estimates for the Department's direct loan and loan guaranty programs." *Id.* Due to a lack of "sufficient appropriate audit evidence," KPMG was "unable to determine the extent of the impact of these issues on the balance sheet and related notes." *Id.*

only ten years of payment—instead of twenty to twenty-five years as before—many of the loans that would otherwise be forgiven after December 31, 2025, are being forgiven now. This deprives the States of expected revenue. That negative effect on the States did not receive an adequate consideration or explanation in the Final Rule.

Relatedly, the Final Rule also fails to consider the States' reliance on the PSLF program. Again, as explained above, *supra*, pp. 9–10, state- and local-government agencies generally offer college graduates lower salaries than they could earn in the private sector. To offset those lower salaries in public service, and to encourage more employees to work for them, those governments use and advertise PSLF. *Id.* Under the Final Rule, however, borrowers can have their loans discharged after ten years irrespective of whether they work in a public service position. This will likely result in fewer qualified applicants for state and local governments. And employers are not able to quickly adapt to this change. Government agencies operate off yearly budgets that are passed by the legislature or a local government body. *Id.* They are not able to adjust those budgets until a new budget is passed (if they are able to do so at all). This failure to consider the States' reliance interests renders the rule arbitrary and capricious. *See Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1913 (2020) ("When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account. . . . It [is] arbitrary and capricious to ignore such matters." (internal quotes omitted)).

iii.     *The Final Rule is Arbitrary and Capricious for Other Reasons.*

The failure to consider the *Biden* decision or the reliance interests of state and local governments are substantial and glaring reasons to strike down the Final Rule. But it is arbitrary and capricious in less obvious ways as well.

For example, the Final Rule also changes course from nearly thirty years of Department practice on loan forgiveness. Never before have the terms of loan repayment been transformed into loan forgiveness so that the average undergraduate borrower repays only $6121 for every

$10,000 borrowed. Yet rather than admit the departure from practice, Defendants justify the Final Rule by pointing to similar past actions, which were not challenged. However, while an agency's "longstanding practice . . . in implementing the relevant statutory authorities" is relevant to ascertaining the meaning of those statutory authorities, it cannot be the only evidence used to evaluate an agency's power to act under a statute. *Career Colleges & Sch. of Texas v. U.S. Dep't of Edu.*, No. 23-50491, 2024 WL 1461737, at *13 (5th Cir. Apr. 4, 2024). Allowing the agency to rely exclusively on past practices "would greenlight the aggregation of Executive power through adverse possession by engaging in a consistent and unchallenged practice over a long period of time" and "is irreconcilable with the judicial obligation to interpret the statute that Congress actually enacted." *Id.* (internal citations omitted).

Legal merits aside, the PAYE and REPAYE programs required the average undergraduate borrower pay back more than they were loaned. *See supra*, pp. 17–18. This is the first time Defendants have set the term of repayment at a level at which the average borrower pays significantly less than what he borrowed. Courts have been suspicious when an agency stretches past practice into something unprecedented. *Career Colleges*, 2024 WL 1461737, at *14. Defendants assert broad authority to use the terms of repayment to allow the average borrower under an income driven repayment plan to pay back almost 40% less than what they owe, an authority they have never asserted before. Doing so without even acknowledging the departure is arbitrary and capricious.

The rule also contains internal contradictions. For example, it repeatedly states that it is designed to avoid delinquencies and defaults. 88 Fed. Reg. 43,820. However, the rule also states that the last change to the income-driven repayment plan (which lowered payments for individuals) was accompanied by an *increase* in delinquencies and defaults. *See id.* at 43,827. In addition, the rule acknowledges that the majority of those who default on loans have low original balances. *See id.* at 43,820-01. However, the final rule provides payments as low as $0 a month for *any* borrower below a certain income threshold regardless of loan balance or risk of

default. *See id.* at 43,840 It seems, therefore, that the justifications for the rule may just be post-hoc reasoning to justify what Defendants wanted to do anyway.

Finally, the rule is arbitrary and capricious because it fails to consider meaningfully its inflationary effects, both specifically in the secondary education market and more generally for the entire U.S. economy.[17] Those enormous inflationary pressures are an "important aspect of the problem" that Defendants were obliged to evaluate. *Michigan*, 576 U.S. at 750–52 (cleaned up). They failed to do so and thereby violated the APA.

### D.    The rule's short comment period violated the APA.

The final rule also violates the APA because of the brevity of the comment period that the Department provided for the proposed rule. In light of the complexity of the rule and its enormous importance, more time was necessary.

Here, the Final Rule was subject to the APA's notice-and-comment requirement. This requirement was "enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those who are regulated." *Dep't of Lab. v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n.17 (5th Cir. 1984); *see also Spring Corp. v. FCC*, 315 F.3d 369, 373 (D.C. Cir. 2003) (notice and comment "ensures fairness to affected parties[] and provides a well-developed record that enhances the quality of judicial review").

Here, Defendants only permitted thirty days for comments on the proposed rule. *See* 88 Fed. Reg. at 43,821. This limited time period violated the APA. "When substantial rule changes are proposed, a 30-day comment period is generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment." *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019) (citation omitted). "Indeed, a thirty-day period is, in the Administrative Conference's view, 'an inadequate time to

---

[17] *See, e.g.*, Nick Perry, *College Will Cost Up to $95,000 This Fall. Schools Say It's OK, Financial Aid Can Numb Sticker Shock*, Associated Press (Apr. 2, 2024), https://tinyurl.com/8xyfw3mz.

allow people to respond to proposals that are complex or based on scientific or technical data.' The Administrative Conference itself thus suggests 'a sixty-day period as a more reasonable *minimum* time for comment.'" *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) (quoting Admin. Conf. of the U.S., *A Guide to Federal Agency Rulemaking* 124 (1983)).

For these reasons, most other agencies routinely provide at least sixty days of commenting.[18] That is particularly true for major, far-reaching rules—and this rule is about as far-reaching as they come.

Here the rule is both complex and enormously important—tens or hundreds of billions of dollars turn on each of its major parameters. In these circumstances, "a sixty-day period [w]as a more reasonable *minimum* time for comment," *Petry*, 737 F.2d at 1201 (internal quotes omitted). Indeed, the Final Rule even by its own counter-factual cost estimates would cost $156 billion. 88 Fed. Reg. at 43,866. That is more than the Department's entire annual budget,[19] and may be the most expensive rule issued by the Department under notice-and-comment rulemaking in its *entire history*. If *any* rule issued by the Department ever required at least sixty days of commenting, this one did. By providing only thirty days, Defendants violated the APA.

The unusually short nature of the thirty-day period is particularly apparent, given the fact that multiple Presidents have instructed agencies to provide at least sixty days of commenting on *all* rules (not just major ones). President Clinton, for example, directed that "agenc[ies] should afford the public a meaningful opportunity to comment on any proposed regulation, *which in most cases should include a comment period of not less than 60 days.*" Exec. Order No. 12,866 § 6(a)(2), 58 Fed. Reg. 51,735, 51,740 (Sept. 30, 1993) (emphasis added). President Obama similarly mandated that agencies "[t]o the extent feasible and permitted by law, . . . afford the

---

[18] Regulations.gov, "Learn About the Regulatory Process," https://tinyurl.com/4cjbr7cp.

[19] *See* Off. of Mgmt. & Budget, Budget of the U.S. Government Fiscal Year 2023, at 57 (attached as Ex. 5).

public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that *should generally be at least 60 days*." Exec. Order No. 13,563 § 2(b), 76 Fed. Reg. 3,281, 3,821–22 (Jan. 21, 2011) (emphasis added).

Although the Department acknowledged these Executive Orders, it never even attempted to argue that a sixty-day period was not feasible or was somehow not permitted by law. *See* 88 Fed. Reg. 43,821. Instead, it offered only vague generalities, asserting that "the Department believes that the 30-day public comment period provided sufficient time for interested parties to submit comments." *Id.* That rationale does not suffice. And the fact that the Final Rule was rushed out so quickly after *Biden* came out—even though it was premised on the Supreme Court *upholding* the HEROES Act loan forgiveness plan—underscores the unnecessarily rushed and consequently slapdash nature of the rule's adoption.

The Department points to the negotiated rulemaking sessions it conducted as justification for a shorter notice period. *Id.* But neither the APA, nor the two executive orders discussed above, recognizes any such exception for negotiated rulemakings. Moreover, given the enormous stakes of the final rule—expending hundreds of billions of dollars—the idea that its contours could be shaped after a few public meetings is farfetched. Instead, proper notice-and-comment procedures, with appropriate time for a major and complicated rule, were required here.

This short comment period contrasts to prior rulemakings in which the Department promulgated rules under § 455. In 1994, the Department provided fifty-one days (from August 18 to October 3, 1994) to comment on the proposed rule. *See* 59 Fed. Reg. 42,646 (Aug. 18, 1994). Similarly, in 2015 the Department provided forty-five days to comment (from May 18 to July 2, 2015). *See* 80 Fed. Reg. 28,484 (May 18, 2015). The amount of debt relief involved here, as well as the complexity of the Final Rule, *vastly* exceeds that of the 1994 and 2015 rules. The Department thus should have provided *at least* 45 days to comment on the proposed rule.  Indeed, it should have followed the approach of the Administrative Conference and Executive Orders 12,866 and 13,563 and permitted at least sixty days of comments.

By providing only thirty days, the Department violated the APA. This error had a prejudicial effect because it prevented the States from developing their arguments regarding reliance interests and the Department's wildly inaccurate cost estimates. *See, e.g., Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 96 (2002) (holding that "failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure").

    E.    **The remaining requirements for a preliminary injunction are met here.**

    i.    *Without Relief, the States Will Suffer Irreparable Harm.*

"Although irreparable harm does not readily lend itself to definition, a plaintiff must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages." *N.M. Dep't of Game & Fish v. Dep't of the Interior*, 854 F.3d 1236, 1250 (10th Cir. 2017) (quotation marks omitted). Plaintiff States will clearly suffer irreparable harm if the Court does not grant immediate injunctive relief.

Defendants have sent and are sending notices to borrowers informing them that their loans have been "forgiven" under this plan.[20] It is unrealistic to think that any loan forgiveness that occurs during this litigation will ever be clawed back. Thus, the States that ordinarily tax loan forgiveness (but for the current pause on such taxation) are losing out on future tax revenue that cannot realistically be recovered.

One cannot unscramble this egg; loan forgiveness has an "irreversible impact." *Nebraska v. Biden*, 52 F.4th 1044, 1047 (8th Cir. 2022). Plaintiff States cannot obtain money damages from the federal government due to sovereign immunity. As such, these are irrecoverable injuries, which constitute irreparable harm. *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994).

States are also suffering, and will continue to suffer, irreparable harm to the hiring and

---

[20] SAVE Plan Breakdown, *supra*.

retention of State and local government employees. Once an employee has left public service for a job in the private sector, or has turned down a public-service position, this Court cannot later provide relief that compels that employee to work in public service. Employees that are no longer enticed by the PSLF Program are precisely the sort of irreparable injury that preliminary injunctions are intended to address.

ii.    *The Balance of Harms and Public Interest Favor Preliminary Relief.*

A party requesting a preliminary injunction must also show that the balance of equities tips in its favor. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 980 (10th Cir. 2004). The Court should consider the harms each party would suffer if returned to the status quo. The status quo—"the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing," *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005)—is the time before Defendants began unlawfully forgiving loans.

Plaintiff States face an imminent, irreversible, and substantial loss of tax revenue and hiring and retention ability, as well as harm to their state and quasi-state instrumentalities. Yet an injunction will cause "little or no harm" to Defendants. *Moore v. Brown*, 448 U.S. 1335, 1339 (1980). Defendants have no interest in enforcing a rule that completely bypasses constitutional separation of powers principles. *See Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019). Nor can Defendants count as harm the desire of borrowers to receive this colossal gift from the Department. The agency's interests are defined by Congress and cannot include the violation of federal law. Furthermore, even if Plaintiffs are wrong and, in the final weighing, the rule is lawful, Defendants could simply put it into effect after the Court makes that ruling, with no apparent injury suffered by Defendants in the meantime.

The public interest also weighs heavily in favor of injunctive relief. The public have an interest in making sure the only rules federal agencies are allowed to enact are lawful ones. *See Free the Nipple-Fort Collins*, 916 F.3d at 806. They have a strong interest in making sure that, at the very least, Defendants properly account for the money—the taxpayer money—they plan to

spend. Finally, while some borrowers will have their debts forgiven completely or their payments greatly reduced, any individual savings pale in comparison to the hundreds of billions of dollars taxpayers will have to provide if the unlawful rule is not enjoined.

### III.   If This Court Enters a Preliminary Injunction, that Injunction Should Apply Nationwide.

This Court should grant a nationwide injunction and prevent Defendants from unlawfully forgiving hundreds of billions in loans, pending a final decision on the merits. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n. 21 (D.C. Cir. 1989). "Courts have, thus, found a nationwide injunction appropriate in such cases." *Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 397 (M.D.N.C. 2019) (collecting cases); *accord Jordan v. Pugh*, No. CIV.A. 02-CV-01239MS, 2007 WL 2908931, at *4 (D. Colo. Oct. 4, 2007). Indeed, the APA itself allows a reviewing court to "hold unlawful and set aside agency action," 5 U.S.C. § 706(2), a power that is consistent with a nationwide injunction.

There are practical reasons to extend the injunction nationwide as well. "[T]ailoring an injunction to address the alleged harms to the . . . States would entail delving into complex issues and contested facts that would make any limits uncertain in their application and effectiveness." *Biden*, 52 F.4th at 1048. Further, an injunction that is limited to eleven states creates perverse incentives for those who are able to change their addresses to a different state (or could hurt Plaintiffs more by enticing their citizens to leave). A nationwide injunction would also prevent unfairness—there is no good reason for the Defendant to forgive the student loans of a resident of Kansas City, Missouri, while an otherwise identical resident of Kansas City, Kansas, must still pay his.

In conclusion, the Final Rule is unlawful and should be set aside for multiple reasons. There is no good reason to allow Defendants to continue to unlawfully discharge billions of dollars of student debt while this litigation is underway, shifting the massive cost of those loans

from those who willingly undertook it (and reaped the benefits) to taxpayers who did not. The final rule should be stayed across the country while this Court examines the legality of Defendants' actions.

CONCLUSION

For all these reasons, this Court should grant Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted this 5th day of April, 2024.

KRIS W. KOBACH
**Attorney General of Kansas**

*/s/ Erin B. Gaide*
Erin B. Gaide, Kan. SC No. 29691
*Assistant Attorney General*
Abhishek S. Kambli, Kan. SC No. 29788
*Deputy Attorney General*
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Email: abhishek.kambli@ag.ks.gov
erin.gaide@ag.ks.gov

Drew C. Ensign, pro hac vice
Holtzman Vogel Baran Torchinsky
 & Josefiak PLLC
2575 E. Camelback Road, #860
Phoenix, Arizona 85016
Phone: (602) 388-1262
Email: densign@holtzmanvogel.com
*Counsel for Plaintiff State of Kansas*

/s/ Edmund LaCour
Edmund LaCour*
Solicitor General
OFFICE OF THE ALABAMA
 ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36104
(334) 353-2196
edmund.lacour@alabamaag.gov
Counsel for Plaintiff State of Alabama


/s/ Bill Milks
Bill Milks*
Chief Assistant Attorney General
ALASKA DEPARTMENT OF LAW
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
(907) 465-4239
bill.milks@alaska.gov
Counsel for Plaintiff State of Alaska


/s/ Joshua Turner
Joshua Turner, pro hac vice
Chief of Constitutional Litigation & Policy
700 W. Jefferson St., Suite 210,
PO Box 83720,
Boise, Idaho 83720
(208) 334-2400
josh.turner@ag.idaho.gov
Counsel for Plaintiff State of Idaho


/s/ Eric H. Wessan
Eric H. Wessan, pro hac vice
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov
Counsel for Plaintiff State of Iowa


/s/ Kelsey Smith
Kelsey Smith*
Deputy Solicitor General
OFFICE OF THE LOUISIANA ATTORNEY
 GENERAL
1885 North Third Street
Baton Rouge, Louisiana 70804
(225) 506-3746
smithkel@ag.louisiana.gov
Counsel for Plaintiff State of Louisiana


/s/ Christian B. Corrigan
Christian B. Corrigan, Kan. SC No. 25622
Solicitor General
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
Counsel for Plaintiff State of Montana

_/s/ Lincoln J. Korell_                                             *pro hac vice forthcoming*
Lincoln J. Korell, pro hac vice
_Assistant Solicitor General_
OFFICE OF THE ATTORNEY GENERAL
 OF NEBRASKA
2115 State Capitol
Lincoln, Nebraska 68509
(402) 471-2682
lincoln.korell@nebraska.gov
_Counsel for Plaintiff State of Nebraska_


_/s/ Joseph D. Spate_
Joseph D. Spate, _pro hac vice_
_Assistant Deputy Solicitor General_
1000 Assembly Street
Columbia, South Carolina 29201
(803) 734-3371
josephspate@scag.gov
_Counsel for Plaintiff State of South Carolina_


_/s/ Charles K. Eldred_
Charles K. Eldred, _pro hac vice_
Chief, Legal Strategy Division
PO Box 12548
Austin, Texas 78711-2548
(512) 463-2100 charles.eldred@oag.texas.gov
_Counsel for Plaintiff State of Texas_


_/s/ Lance F. Sorenson_
Lance F. Sorenson**
_Assistant Utah Attorney General_
UTAH ATTORNEY GENERAL
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114
(801) 366-0100
lancesorenson@agutah.gov
_Counsel for Plaintiff State of Utah_

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS, ET AL., | § § § | |
| *Plaintiffs*, | § § § | |
| v. | § § | |
| JOSEPH R. BIDEN IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, ET AL.; | § § § § § | Civil Action No. 2024-CV-1057-DDC-ADM |
| *Defendants*. | § § § | |

## Table of Plaintiffs' Exhibits
## Motion for Preliminary Injunction

<u>**Exhibit Name**</u>                                                                                   <u>**Page No.**</u>

1.  Plaintiffs' Exhibit 1 – Defense of Freedom Institute Comment Letter ................................. 6

2.  Plaintiffs' Exhibit 2 - Human Resources Specialist –
    Kansas City _ Dist. of Kansas _ U. S. District Court ................................................. 9

3.  Plaintiffs' Exhibit 3 - Affidavit of Leslie Gish ........................................................ 9

    a.  Plaintiffs' Exhibit 3a - Leslie Gish Resume' 2024

    b.  Plaintiffs' Exhibit 3b - KDOT Construction Engineer

    c.  Plaintiffs' Exhibit 3c - KDHE Chemist

4.  Plaintiffs' Exhibit 4 – Declaration-PSLF-April 2024
    Henry de la Garza Texas ......................................................................................10

5.  Plaintiffs' Exhibit 5 - Office of Management and Budget FY 2023 ....................................... 27

6.  Plaintiffs' Exhibit 6 - KPMG Audit ......................................................................... 23

**EXHIBIT 1**



February 10, 2023

**SUBMITTED VIA FEDERAL eRULEMAKING PORTAL**
**(www.regulations.gov)**

Dr. Miguel Cardona, Secretary of Education
Attention: Richard Blasen
U.S. Department of Education
400 Maryland Ave. SW
PCP-6125
Washington, DC 20202

Re:     **Comment on the Department's Notice of Proposed Rulemaking**
        **Improving Income-Driven Repayment for the William D. Ford**
        **Federal Direct Loan Program**
        **Agency/Docket Number: ED–2023–OPE–0004**
        **RIN: 1840-AD81**
        **Document Number: 2022–28605**

Dear Secretary Cardona:

The Defense of Freedom Institute for Policy Studies ("DFI") is a national nonprofit organization dedicated to defending and advancing freedom and opportunity for every American family, student, entrepreneur, and worker and to protecting the civil and constitutional rights of Americans at school and work. DFI envisions a republic where freedom, opportunity, creativity, and innovation flourish in our schools and workplaces. Our organization is composed of former U.S. Department of Education ("Department") appointees who are experts in education law and policy, in particular the areas covered by the Department's proposed regulations.

On January 11, 2023, the Department's Office of Postsecondary Education published a notice of proposed rulemaking ("NPRM") "to amend the regulations governing income-contingent repayment plans by amending the Revised Pay as You Earn (REPAYE) repayment plan, and to restructure and rename the repayment plan regulations under the William D. Ford Federal Direct Loan (Direct Loan) Program . . . ."[1]

The Department's proposed regulations purport to act under Title IV of the Higher Education Act of 1965, as amended ("HEA"), requiring that the U.S. Secretary of Education ("Secretary") "offer

---

[1] 88 Fed. Reg. 1894, 1894 (Jan. 11, 2023) (hereinafter "NPRM").



an income-contingent repayment plan with varying annual repayment amounts based on the borrower's income, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years."[2] The Department asserts that its authority to issue the proposed rule also stems from two statutory provisions, Section 410 of the General Education Provisions Act[3] and Section 414 of the Department of Education Organization Act,[4] authorizing the Secretary to create rules and regulations governing the Department's operations, programs, and functions.[5]

Despite the unprecedented nature, immense cost, and vast implications of the Department's proposal to create a new IDR program, as outlined in this comment, the Department has only permitted the public 30 days to review and comment on its proposed rule.[6]

The Department's proposed regulatory scheme does the following:

- Purports to transform student loans issued under Title IV into a grant program in violation of the clear terms prescribed by Congress in the HEA;

- Exceeds the Department's statutory authority by effectively canceling student loan debt on a massive scale, reading into the clear terms Congress used to define federal student loan programs in the HEA an ambiguity that does not exist;

- Violates the Department's statutory obligation to collect all U.S. monetary claims;

- Ignores the Department's statutory duty to charge interest on Title IV student loan debt;

- Pretends, in clear contradiction to the unambiguous terms of the HEA, that "payments" that count toward student loan forgiveness can refer to circumstances in which the borrower pays nothing to the Department;

---

[2] *Id.* at 1898.
[3] 20 U.S.C. 1221e–3 ("The Secretary, in order to carry out functions otherwise vested in the Secretary by law or by delegation of authority pursuant to law, and subject to limitations as may be otherwise imposed by law, is authorized to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department.").
[4] 20 U.S.C. 3474 ("The Secretary is authorized to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department.").
[5] NPRM at 1899.
[6] *Id.* at 1894.



- Justifies the need for a massive, taxpayer-funded subsidy to borrowers and postsecondary institutions with what appear to be pretextual reasons that mislead the public in violation of the statutory requirement that the Department offer genuine justifications for its decisions;

- Grossly underestimates the immense cost of the proposal to American taxpayers; and

- Fails, in violation of federal law, to weigh appropriately against any claimed benefits of the proposal the inevitable rise in tuition and living costs it will generate at postsecondary institutions, its likely contribution to a proliferation of low-quality academic programs, its negative impacts on affordable community colleges and trade schools, its encouragement of millions more students to incur debt to pay for college with no intention of paying it off, its contribution to administrative costs for which the Department appears to be unprepared, and its negative impacts on hiring by small entities.

This proposal, in addition to being inherently unfair to taxpayers who either never attended college or who have settled any debt they took on in doing so, is unauthorized by the HEA, is arbitrary and capricious in violation of federal law, and violates the principle enshrined in the Constitution of the United States that Congress has the exclusive power to make law and appropriate funds. The clear purpose behind the Department's proposed rule is to take a regulatory leap toward free college for all, funded by the American taxpayer, a policy that finds no basis in the statutory authority cited by the Department.

The Department should abandon its proposed rule in full and follow the law requiring the collection of student loan debt under Title IV of the HEA.

**I. Background**

       A. Federal Law Establishing Student Loan Repayment Plans

Since Congress enacted the HEA in 1965, it has amended the law several times to require the Department to establish various plans for the repayment of student loans.[7] Of relevance to the current NPRM, Congress first provided for the creation of a repayment plan with varying payments based on the income of the borrower in 1994 with the introduction of the income-contingent

---

[7] As the NPRM notes, Department regulations now contain the following plans for the repayment of Direct Loans: standard, extended, graduated, alternative, IBR, ICR, Pay As You Earn (PAYE), and REPAYE. *Id.* at 1896.



repayment ("ICR") plan.[8] In 2009, Congress introduced income-based repayment ("IBR") plans,[9] and the Department made available a Pay as You Earn ("PAYE") repayment plan in 2012 under HEA authority to establish an income-contingent repayment plan.[10]

Under the rules of the PAYE program, borrowers' required payments are limited to 10 percent of their discretionary income, defined as household income above 150 percent of the federal poverty guideline, and are capped at the amount they would have paid under a standard, 10-year payment plan.[11]

In 2016, the Obama Administration created a new program, the Revised Pay as You Earn ("REPAYE") plan, modeled on the PAYE program while broadly expanding its availability among borrowers and limiting the amount of interest charged to borrowers each month by 50 percent when their repayment amount does not cover the accrued interest.[12]

    B. The President's Announcement of Student Loan Debt Cancellation and Changes to Income-Driven Repayment Rules

On August 24, 2022, President Biden announced a "three-part plan" to subvert the student loan provisions of Title IV of the HEA.[13] In the most notorious portion of the announced plan, the Biden Administration announced that it would cancel up to $20,000 in student loan debt for every borrower in America whose individual annual income is less than $125,000—or $250,000 for married couples ("Debt Cancellation Program").[14] In a less-heralded portion of the plan that will likely be more costly and pernicious in its long-term impacts, President Biden announced the proposal of "a new income-driven repayment plan that protects more low-income borrowers from making any payments and caps monthly payments for undergraduate loans at 5% of a borrower's discretionary income—half of the rate that borrowers must pay now under most existing plans."[15] The White House fact sheet announcing the plan touts that the proposal "means that the average annual student loan payment will be lowered by more than $1,000 for both current and future

---

[8]
https://www.cbo.gov/publication/56277#:~:text=Discretionary%20income%20is%20defined%20as,Payments%20and%20Forgiveness

[9] *Id.*

[10] https://crsreports.congress.gov/product/pdf/R/R45931 at 49.

[11] *Id.*

[12] 80 Fed. Reg. 67,204, 67,204–67,205 (Oct. 30, 2015).

[13] https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/24/fact-sheet-president-biden-announces-student-loan-relief-for-borrowers-who-need-it-most/

[14] *Id.*

[15] *Id.*



borrowers."[16] The fact sheet fails to mention that the Biden Administration is placing American taxpayers on the hook for these payments.

The U.S. Court of Appeals for the Eighth Circuit has issued a preliminary injunction preventing the Department from carrying out the Debt Cancellation Program,[17] and the U.S. District Court for the Northern District of Texas has struck down that plan as "an unconstitutional exercise of Congress's legislative power . . . ."[18] Both cases are now before the U.S. Supreme Court, with oral arguments scheduled for February 28, 2023.[19]

> C. The Department Publishes Its NPRM and a Request for Information on Transparency for Low-Value Postsecondary Programs

On January 11, 2023, the Department published a NPRM entitled "Improving Income-Driven Repayment for the William D. Ford Federal Direct Loan Program."[20] The NPRM proposes to replace the current REPAYE plan with a new plan ("New IDR Plan"), which masquerades as a student loan repayment plan but, because of its highly generous terms for all borrowers who enroll, is in reality a program that offers delayed grants to students after they attend undergraduate or postgraduate institutions.

The New IDR Plan would raise the discretionary income excluded from the borrower's adjusted gross income (AGI), which is used to calculate his or her monthly payment, from 150 percent to 225 percent of the federal poverty level—or $30,600 per year.[21] Borrowers with undergraduate or graduate loans in the New IDR Plan who have an annual income below that level would be charged zero dollars each month for their student loans.

For holders of undergraduate loans, enrolling in the New IDR Plan would halve their monthly payment from 10 percent to 5 percent of their AGI, excluding the $30,600 per year of discretionary income noted above.[22]

---

[16] *Id.*

[17] https://www.supremecourt.gov/DocketPDF/22/22A444/247359/20221123113738326_2022.11.23%20-%20SCOTUS%20Response%20to%20Application.pdf at 10.

[18] *Brown, et al., v. U.S. Dep't of Ed., et al.*, No. 4:22-cv-0908-P, slip op. at 1 (N.D. Tx. Nov. 10, 2022).

[19] https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/22-506.html

[20] NPRM at 1894.

[21] *Id.* at 1925.

[22] *Id.* at 1926.



Those who have borrowed less than $12,000 to pay for undergraduate education and enroll in the New IDR Plan would see their remaining debt completely canceled after only 10 years (as opposed to 20 years under the REPAYE plan) of payments—including payments of zero dollars if their income is lower than 225 percent of the poverty level during that time.[23] Every thousand dollars former students have borrowed over that $12,000 threshold translates to an additional year beyond which their full debt is wiped out, whether or not the borrower has actually made any payments.[24]

The Department proposes that, for holders of undergraduate and graduate loans who enroll in its New IDR Plan, it will charge no interest that is not covered by the borrower's monthly payment.[25] That means any borrowers enrolled in the New IDR Plan whose monthly payments are zero dollars because their discretionary income is below 225 percent of the poverty level have their interest fully erased each month.

In yet another example of coerced, taxpayer-funded benevolence, the Department proposes to define "[m]onthly payment or the equivalent," for the purpose of counting such payments toward the cancellation of remaining student loan debt for borrowers enrolled in the New IDR Plan, as including months when a borrower has received deferment or forbearance of their loans—in other words, when they do not make any payments.[26]

On the same day that the Department proposed its New IDR Plan, it also published a "Request for Information ["RFI"] Regarding Public Transparency for Low-Financial-Value Postsecondary Programs."[27] Recognizing that its New IDR Plan "do[es] not address the underlying problems stemming from the high prices charged by some institutions and low graduation rates across postsecondary education over the last few decades," the Department "seek[s] input from the public on which measures and metrics to use to determine 'financial-value', what data could be leveraged to assist this effort, and other technical considerations."[28]

The RFI forecasts policies such as publishing an annual list of low-value programs and a letter-writing campaign to tackle the problem of credential inflation that, as we shall see below, it will only exacerbate and accelerate through the creation of its New IDR Plan.[29]

---

[23] *Id.* at 1927.
[24] *Id.*
[25] *Id.*
[26] *Id.* at 1925.
[27] 88 Fed. Reg. 1567, 1567 (Jan. 11, 2023) (hereinafter "Name-and-Shame RFI").
[28] *Id.* at 1568.
[29] *Id.*



**II. The New IDR Plan Proposed by the Department Would Violate the Principle of the Separation of Powers Enshrined in the U.S. Constitution**

    A. In *West Virginia v. EPA*, the U.S. Supreme Court Recognized that the Constitution Forbids Agencies from Basing a "Transformative Expansion" of Their Regulatory Authority on Vague Statutory Language

The Department must consider its attempt to enact its New IDR Plan, which is unauthorized under Title IV of the HEA, in the context of the U.S. Supreme Court's decision in *West Virginia v. EPA*.[30]

In that case, the Court held that the Clean Air Act provided no authority to the U.S. Environmental Protection Agency ("EPA") to promulgate a rule seeking to reduce carbon dioxide emissions from existing coal- and natural-gas-fired power plants by requiring a shift to natural gas and renewable energy sources.[31] The Court concluded that the EPA, by basing its rule on a novel application of a rarely used provision of the federal statute that would have forced a significant shift in electricity production sources,[32] "claim[ed] to discover in a long-extant statute an unheralded power representing a transformative expansion in [its] regulatory authority,"[33] thus implicating the Court's major questions doctrine.

Applying this doctrine, the Court held that the EPA could not point to "clear congressional authorization" for the power it purported to assert in the rule,[34] noting that such extraordinary grants of regulatory authority are rarely accomplished through "modest words," "vague terms," or "subtle device[s]."[35] The Court also emphasized Congress's previous rejection of legislative proposals that would have required regulation of carbon dioxide emissions from existing facilities[36] and determined that the EPA's regulatory scheme constituted a "fundamental revision of the statute, changing it from [one sort of] scheme of . . . regulation into an entirely different kind."[37] Finding that a "decision of such magnitude and consequence rests with Congress itself, or

---

[30] 142 S. Ct. 2587 (2022).
[31] *Id.* at 2603, 2616.
[32] *Id.* at 2610.
[33] *Id.* (internal quotation marks omitted) (quoting *Util. Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014)).
[34] *Id.* at 2614 (quoting *Utility Air*, 573 U. S. at 324).
[35] *Id.* at 2609 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)).
[36] *Id.* at 2614.
[37] *Id.* at 2612 (internal quotation marks omitted) (quoting *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 231 (1994)).



an agency acting pursuant to a clear delegation from that representative body," the Court held that the EPA had no authority to issue the rule.[38]

   B. The Department's New IDR Plan Is a Matter of Economic and Political Significance Implicating the Major Questions Doctrine

      *i. The Department's Proposed Regulatory Scheme Would Effect a "Fundamental Revision of the Statute" by Transforming a Student Loan Program into a Delayed Grant Program*

In creating the New IDR Plan, the Department's NPRM points with hope[39] to direction from Congress requiring the Department to offer "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years . . . ."[40] By effectively canceling the debt of a broad segment of former students of postsecondary institutions, as well as offering free money for prospective students to attend college, the Department's NPRM ignores one of the most basic operative terms in the statute: "repayment." The Department has proposed such generous terms for student "loans" that they purport to fundamentally revise the statute beyond all recognition, no longer requiring repayment of all debt for a huge proportion of the population and instead placing the cost of college education on taxpayers. Such a revision of the statute to support an "unheralded power" giving the Department a "transformative expansion [of] its regulatory authority" implicates the Supreme Court's major questions doctrine.

In its NPRM, the Department also relies on two general grants of power to the Secretary to make rules and regulations as authority for the creation of the New IDR Plan. Section 410 of the General Education Provisions Act authorizes "[t]he Secretary, in order to carry out functions otherwise vested in the Secretary by law or by delegation of authority pursuant to law, and subject to limitations as may be otherwise imposed by law," to issue rules and regulations.[41] Section 414 of the Department of Education Organization Act grants the Secretary the authority "to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department."[42] Neither of these general grants of authority gives the Secretary the power to contravene the much more specific limitations on student loan terms and conditions set out in Title IV of the HEA, which require the Secretary to offer programs for the repayment of loans, not the gifting of grants.

---

[38] *Id.* at 2616.
[39] NPRM at 1898.
[40] 20 U.S.C. § 1087e(d)(1)(D).
[41] 20 U.S.C. 1221e–3.
[42] 20 U.S.C. 3474.



*ii. The Department's Proposed New IDR Plan Is a Matter of Economic Significance*

The Department's proposed regulatory scheme is unquestionably, as conceded by the Department, a matter of economic significance. The Department estimates the New IDR Plan's net budget impact as $137.9 billion, "with annualized transfers of $14.8 billion at 3 percent discounting and $16.3 billion at 7 percent discounting," and recognizes that the proposal is "economically significant" under the terms of Executive Order 12866, requiring review by the Office of Management and Budget ("OMB").[43] Demonstrating its extraordinary cost in the context of the Department's student aid programs, this annual estimated cost comprises over 10 percent of the total federal student aid the Department delivered in fiscal year 2022.[44]

As described in more detail below, the Department's projected cost has been widely panned as an underestimate, to a large extent because the Department arbitrarily and capriciously declines in its NPRM even to attempt to estimate the number of students who would switch to its generous new plan and fails to take into account the increased cost of the program if the Supreme Court strikes down the Debt Cancellation Program. A study from the University of Pennsylvania's Wharton School states that the cost of the New IDR Plan could exceed $520 billion.[45] If the Supreme Court strikes down the Debt Cancellation Program, one comprehensive review of the program estimates that the cost could represent a total cost of over $1 trillion.[46] This is back door student loan cancellation through other means.

As discussed below, the Department also arbitrarily and capriciously fails to account in its estimated costs for the rise in tuition and living expenses that will inevitably result from its New IDR Plan and, even more importantly, the general inflationary impacts of the program, which will represent a double blow to taxpayers as they pay for the Department's redistribution scheme and face the higher prices that result from profligate government spending.

In short, these extraordinary budgetary and other impacts of the Department's proposed regulatory scheme mean that it is a matter of economic significance implicating the major questions doctrine.

---

[43] NPRM at 1912.
[44] https://www2.ed.gov/about/reports/annual/2022report/fsa-report.pdf at 8 (containing a graph, labeled Figure 5, showing $111.6 billion in federal student aid delivered in fiscal year 2022).
[45] https://budgetmodel.wharton.upenn.edu/issues/2022/8/26/biden-student-loan-forgiveness
[46] https://www.studentloanplanner.com/new-repaye-plan-ten-year-cost/



*iii. The Department's Proposed New IDR Plan Is a Matter of Political Significance*

Despite the fact that the New IDR Plan has received less media attention than the Debt Cancellation Program, it is worth recalling that the President announced the proposed New IDR Plan with his cancellation program as part of his "three-part plan" to address student loan costs.[47] The Debt Cancellation Program and the New IDR Plan are part and parcel of the same effort that will have a massive impact, never envisioned by Congress in legislating and amending Title IV of the HEA, on the funding of higher education.

Moreover, the New IDR Plan is, in effect, a loan cancellation program that will likely result in the same or even higher level of taxpayer-funded subsidies to student loan borrowers as the Debt Cancellation Program.[48] President Biden presented the loan cancellation scheme, including the New IDR Plan, as a "*comprehensive effort* to address the burden of growing college costs and make the student loan system more manageable for working families."[49] The Department has characterized the New IDR Plan as "deliver[ing] on President Biden's commitment to *fix the student loan repayment system*, as part of the debt relief announcement in August, and is a *key step* in the Biden-Harris Administration's broader effort to *make higher education more affordable*."[50] These terms demonstrate the view of President Biden and political appointees at the Department that canceling student loan debt at the expense of the taxpayer, as it proposed to do through the New IDR Plan, is a critical part of its plan to subsidize the cost of college for a massive segment of the population.

Demonstrating the political controversy generated by the Debt Cancellation Program, the announcement of the plan, which has been held unconstitutional by a federal district court as being beyond the authority of the Biden Administration, generated at least half a dozen lawsuits across the country,[51] two of which are now before the Supreme Court. These two lawsuits include a suit by six states—Nebraska, Missouri, Arkansas, Iowa, Kansas, and South Carolina—all of which contest the President's statutory and constitutional authority to cancel student loans on a

---

[47] https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/24/fact-sheet-president-biden-announces-student-loan-relief-for-borrowers-who-need-it-most/

[48] *See supra* notes 45, 46.

[49] https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/24/fact-sheet-president-biden-announces-student-loan-relief-for-borrowers-who-need-it-most/ (emphasis added).

[50] https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/idrfactsheetfin.pdf at 1 (emphases added). As discussed below, the New IDR Plan would not "make higher education more affordable," but rather force taxpayers to shoulder more of the rising burden of college tuition and living expenses while doing nothing to address the root cause of such credential inflation.

[51] https://www.highereddive.com/news/a-running-list-of-lawsuits-against-bidens-student-loan-forgiveness-plan/634707/



categorical basis.[52] The U.S. Court of Appeals for the Eighth Circuit, in issuing a preliminary injunction prohibiting the Biden Administration from implementing the program, concluded that these states raised "substantial questions of law" regarding the program's legality.[53] Since that case reached the Supreme Court, 17 other states filed an amicus brief in support of the plaintiffs' lawsuit.[54] 128 Members of the House of Representatives submitted an amicus brief in the case,[55] as have 43 Senators[56] and five former secretaries of education.[57]

Because it is part of the same plan to "fix" the problem of student loan debt, the Department's proposed New IDR Plan is inextricably linked to the political controversy surrounding the Debt Cancellation Program, and it would serve to do precisely the same thing as the Debt Cancellation Program—cancel the student loan debt of a large proportion of borrowers—albeit less obviously and on a more permanent scale. As discussed previously, it may cost even more than the Debt Cancellation Program, whose cost the Congressional Budget Office ("CBO") has projected to be approximately $400 billion,[58] and its cost will certainly increase dramatically if the Supreme Court strikes down the Debt Cancellation Program.

The Department's proposed New IDR Plan is thus, for the same reasons as the Debt Cancellation Program, a matter of political importance, implicating the major questions doctrine and requiring the Department's review, as part of the rulemaking process, of whether it is based on "clear authorization" from Congress.

> *iv. Congress Has Considered and Rejected Massive Taxpayer Subsidies to Cancel All or Portions of Student Loan Debt*

In his concurring opinion in *West Virginia v. EPA*, U.S. Supreme Court Justice Neil Gorsuch reasoned that Congress's consideration and rejection of proposals similar to those contained in a

---

[52] *See* https://www.supremecourt.gov/DocketPDF/22/22A444/247359/20221123113738326_2022.11.23%20-%20SCOTUS%20Response%20to%20Application.pdf.

[53] *Id.* at 11.

[54] https://www.supremecourt.gov/DocketPDF/22/22A444/247371/20221123114518033_Motion%20for%20Leave%20to%20File%20Brief%20-%20FINAL.pdf

[55] https://www.supremecourt.gov/DocketPDF/22/22-506/253929/20230203131154392_22-506%20Amicus%20Brief%20of%20128%20U.S.%20Representatives.pdf

[56] https://www.supremecourt.gov/DocketPDF/22/22-506/253935/20230203133433451_Final%20Senators%20Amicus%20Brief%20-%20Biden%20v.%20Nebraska.pdf

[57] https://dfipolicy.org/wp-content/uploads/2023/02/DFI-Amicus-Brief-Biden-v.-Nebraska-S.Ct_.pdf

[58] https://www.npr.org/2022/09/27/1125272287/student-loan-forgiveness-cost-billion



regulation "may be a sign that an agency is attempting to 'work around' the legislative process to resolve for itself a question of great political significance."[59] In recent years, Congress has considered multiple attempts to legislate categorical cancellation of loans, which is at issue in the Department's proposal of its New IDR Plan, and has failed to adopt any of these proposals.

In 2019, Senator Elizabeth Warren and House Majority Whip James Clyburn introduced in their respective chambers legislation that would cancel up to $50,000 in loan debt for each borrower making under $100,000 per year.[60] In fact, during the 2019–20 legislative session, Members of Congress introduce over 80 bills seeking to cancel loans on a categorical basis or otherwise reform the student loan system.[61] Congress failed to pass any debt-forgiveness legislation.[62]

During its 2021–22 session, Congress considered proposals that would, among other things, cancel the debts of educators; permit borrowers to discharge their loans in bankruptcy; give the Department the authority to pay $25,000 to settle student loans of each borrower; and, most pertinently with regard to the Department's present proposal, refinance student loans at a zero-percent interest rate.[63] Representative Al Lawson proposed legislation to cancel outstanding student loan balances for anyone making under $100,00 per year individually or $200,000 per year for married couples filing their taxes jointly.[64] Congress passed none of these bills.

Former House Speaker Nancy Pelosi only recently explained, "People think that the president of the United States has the power for debt forgiveness. . . . He does not. He can postpone, he can delay, but he does not have that power. That has to be [accomplished through] an act of Congress."[65] This statement applies just as much to a permanent program of canceling all or a portion of former, current, and prospective students' debt, as set out in the Department's proposed New IDR Program, as it does to the Debt Cancellation Program.

---

[59] https://dfipolicy.org/wp-content/uploads/2023/02/DFI-Amicus-Brief-Biden-v.-Nebraska-S.Ct_.pdf at 16–17 (quoting *West Virginia*, 142 S. Ct. at 2621 (Gorsuch, J., concurring)).

[60] https://www.supremecourt.gov/DocketPDF/22/22-506/253811/20230202144517744_AFPI%20Amicus%20Brief.pdf at 16 (citing Press Release, Sen. Elizabeth Warren, Senator Warren, House Majority Whip Clyburn Introduce Legislation to Cancel Student Loan Debt for Millions of Americans (July 23, 2019)).

[61] https://www.supremecourt.gov/DocketPDF/22/22-535/253308/20230127141422535_22-535 Respondents Brief Final.pdf at 10 (citing Kantrowitz, Year in Review: Student Loan Forgiveness Legislation, Forbes (Dec. 24, 2020)).

[62] *Id.* at 11.

[63] https://www.supremecourt.gov/DocketPDF/22/22-506/253811/20230202144517744_AFPI Amicus Brief.pdf at 17.

[64] *Brown, et al., v. U.S. Dep't of Ed., et al.*, No. 4:22-cv-0908-P, slip op. at 2 (N.D. Tx. Nov. 10, 2022) (citing H.R. 2034, 117th Cong. (2021)).

[65] *Quoted in id.* at 3.



The extensive legislative efforts described above simply make no sense in a universe where the Department, through its use of pens and phones, can simply transform a student loan system into a delayed grant program, ensuring zero-dollar payments and *de facto* mass cancellation of unpaid loans in the process. Members of Congress of both parties have demonstrated very clearly that they believe Congress holds the reins regarding authorization of spending to cancel student loan debt or to convert loans into grants. The Department's proposal to co-opt this authority thus implicates the major questions doctrine.

> *v. The Department Has Never Interpreted Its Authority to Offer Income-Contingent Student Loan Repayment Plans to Convert Student Loans into Grants*

As Chief Justice John Roberts wrote in the Court's decision in *West Virginia v. EPA*, "[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred."[66] It is thus telling and consequential that, since Congress introduced the first income-contingent repayment plan in 1994, the Department has never determined that it has the authority effectively to cancel massive amounts of student debt through such plans.

Even the most radical revamp of income-contingent repayment before the current NPRM—the Obama Administration's REPAYE program, made available to borrowers in 2016—broadly accepted the contours of the repayment plans that came before it, such as maintaining the 150 percent discretionary income exemption, the limit on monthly payments to 10 percent of adjusted gross income, and at least 20 years of repayment prior to cancellation.[67] In keeping with statutory requirements, the REPAYE plan limited *but did not eliminate* the interest capitalized on student loans when borrowers did not cover interest accrual in their monthly payments.[68]

The Department's proposed New IDR Plan leaves behind any of the regulatory or statutory guardrails the Department observed in previous interpretations of the law and attempts to establish a program that drastically increases the share of student loan debt that is paid by the taxpayer rather than the borrower who agreed to the loan. As explained above, the New IDR Plan radically departs from previous plans by increasing the discretionary income threshold from 150 percent to 225 percent of federal poverty guidelines; halves the percentage borrowers must pay from their

---

[66] *West Virginia*, 142 S. Ct. at 2610.
[67] 80 Fed. Reg. 67,204 (Oct. 30, 2015); NPRM at 1896 (stating that the REPAYE plan was "modeled on the PAYE plan").
[68]
https://www.cbo.gov/publication/56277#:~:text=Discretionary%20income%20is%20defined%20as,Payments%20and%20Forgiveness (noting that "borrowers in the REPAYE plan are eligible for an interest subsidy, which reduces the unpaid interest added to their loan balance by half").



discretionary incomes to five percent; slashes to 10 years the time after which a large proportion of borrowers who used loans to fund their undergraduate studies will have their remaining balances wiped out; and charges no interest on loans when borrowers' monthly payments do not cover that interest. This is a brave new world of funding college and graduate degrees, unrelated to anything that has come before it in the Department's regulatory efforts.

The Department's overreach without any regard to its previous interpretations of its authority of the HEA clearly implicates the major questions doctrine and requires it to evaluate its authority to propose the New IDR Plan in the context of the Supreme Court's ruling in *West Virginia v. EPA*.

> C. To Comply with Federal Law, the Department Must Evaluate Its Authority to Establish the New IDR Plan in Light of the Major Questions Doctrine

In Title IV of the HEA, Congress required the Department to offer a variety of student "loan" plans, including income contingent "repayment." If Congress had intended to require the Department to offer a new grant program rather than a loan program for students, it would have done so. As discussed previously, Congress has considered various proposals for categorical student loan cancellation and an expansion of college and university grant programs but has not adopted any legislation that could give the Department the authority it currently claims. The Department cannot point to any "clear authorization" of its New IDR Plan in the statutory text; therefore, its proposal would arrogate to the Department the lawmaking power granted exclusively to Congress in violation of the constitutional principle of the separation of powers.

In light of these considerations, if the Department proceeds to the promulgation of a final rule on this matter, it must explain to the public how a statute intended to provide options for students receiving undergraduate or postgraduate degrees to fund their education using loans that are to be repaid could possibly authorize the Department to instead subsidize the cost of college on a massive scale and at a correspondingly massive cost to the taxpayer. If it does not explain this, the Department's proposed rule is arbitrary and capricious, in violation of federal law.

**III. The Department's Proposed New IDR Plan Would Violate the APA Because It Exceeds the Department's Statutory Authority**

> A. The Department's Proposed Rule, by Twisting the Terms of a Statutory Student Loan Scheme into a Delayed Grant Program, Has No Basis in the Statutory Text

The Administrative Procedure Act ("APA") requires courts to set aside federal agency rulemaking that exceeds the agency's statutory jurisdiction or authority. Section 706(2)(A) of the APA provides that agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise



not in accordance with law" shall be held unlawful and set aside.[69] Section 706(2)(C) requires that when the agency action is found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," the action shall be held unlawful and set aside.[70]

This comment provides a robust explanation as to why the proposed rulemaking ignores clear statutory terms requiring the Department to offer "loans"—not grants—and providing for the "repayment" of these loans. This proposed trespass beyond Congress's clearly marked statutory boundaries violates the principle of separation of powers embedded in the Constitution. The proposed regulations transform the statute into something that it is not and do so without clear congressional authorization; the Department can point to no legislative or regulatory precedent allowing it to accomplish its extraordinary aim of paying for all or part of the cost of college for a massive segment of the population. The Department abuses its statutory authority to provide "free college" for those who would benefit from its scheme.

Because the proposed New IDR Plan goes far beyond any congressional authorization found in the text of Title IV of the HEA, which requires the offering of an income-contingent loan option but says nothing of the taxpayer-funded *de facto* grant program proposed in the NPRM, the Department's proposed rule is "in excess of statutory jurisdiction" and in violation of the APA, and must be withdrawn.

The Department must explain why its attempt to transform a student loan debt program into a reduced-cost college program is not "in excess of statutory jurisdiction" in violation of the APA, or it is acting in an arbitrary and capricious manner.

> B. The Department's Statutory Obligation to "Aggressively Collect All Debts" Precludes Its Authority to Issue the Proposed Rule

Under the Federal Claims Collection Act,[71] federal agencies must "try to collect a claim of the United States Government for money . . . arising out of the activities of, or referred to, the agency"[72] and narrowly cabins the authority of such agencies to compromise or otherwise settle such debts.[73] Federal regulation requires that the Secretary "aggressively collect all debts."[74] Against this backdrop, the Secretary has no authority to refuse to collect student loan debts, which are monetary claims of the United States Government. This refusal, through a delayed grant

---

[69] 5 U.S.C. § 706(2)(A).
[70] 5 U.S.C. § 706(2)(C).
[71] 31 U.S.C. § 3711, *et seq.*
[72] 31 U.S.C. § 3711(a)(1).
[73] 31 U.S.C. § 3711(a)(2).
[74] 31 CFR 901.1(a).



program masquerading as a student loan repayment plan, is not in accordance with law and thus violates the APA.

The Department must explain why it has the authority to ignore statutory and regulatory mandates requiring it to collect claims and limits on its authority to compromise such claims, or it is acting in an arbitrary and capricious manner.

###### C. The Department's Proposal to Waive Interest Charges Exceeds Its Statutory Authority

In its NPRM, the Department proposes to provide in 34 C.F.R. § 685.209(h)(1) that, "[u]nder the REPAYE plan, during all periods of repayment on all loans being repaid under the REPAYE plan, the Secretary does not charge the borrower's account any accrued interest that is not covered by the borrower's payment."[75] The Department explains, "This would be an expansion of the current REPAYE plan interest benefit," which *limits* to 50 percent the interest charged to borrowers whose payments do not cover their interest accrual.[76]

The Department has no statutory authority to decline to calculate the interest due on a student loan and add it to the amount to be repaid. At most the statute gives the Secretary the power to *limit* the amount of interest capitalized,[77] but this is a far cry from permitting the Secretary to ignore it completely. By vastly expanding the proportion of undergraduate and graduate borrowers who are charged no monthly payment for their student loans, and then failing to charge any interest on those loans—in many cases until they are forgiven after only 10 years—the New IDR Plan would contravene the statute by charging no interest to a large category of student loan borrowers.

The Department must explain its statutory authority to refuse to charge any interest on a substantial proportion of student loans in light of that proposal's contradiction of the terms of the HEA, which only permit the Department to limit the charging of such interest, or it is acting in an arbitrary and capricious manner.

---

[75] NPRM at 1927.
[76] NPRM at 1905.
[77] 20 U.S.C. § 1087e(e)(5) ("The balance due on a loan made under this part [20 USCS §§ 1087a et seq.] that is repaid pursuant to income contingent repayment shall equal the unpaid principal amount of the loan, *any accrued interest*, and any fees, such as late charges, assessed on such loan. The Secretary may promulgate regulations *limiting* the amount of interest that may be capitalized on such loan, and the timing of any such capitalization." (emphases added)).



D. The Department's Proposal to Count Months Where Borrowers Make No Payments Because They Are in Deferment or Forbearance Toward Forgiveness Is Not Permitted by Statute

In its NPRM, the Department proposes to count toward the maximum student loan repayment period months when borrowers have made no payments because they are in deferment or forbearance.[78] This is in clear contravention of 20 U.S.C. § 1087e(e)(7), which states that, "[i]n calculating the extended period of time for which an income contingent repayment plan under this subsection may be in effect for a borrower, the Secretary shall include all time periods during which a borrower of loans" is not in default on any such loans, and either "in deferment due to an economic hardship" as described elsewhere in the HEA or making various kinds of "payments" on student loans.[79] The Department's proposed rule would count toward the definition of "payments" any deferment or forbearance, far beyond the kind of deferment "due to an economic hardship" described in the statute.

The Department seems to believe that this statutory mandate setting out how the Secretary must calculate a maximum payment period is simply advisory, asserting in its NPRM that "[t]his section does not specifically limit the calculation to only those periods or specifically preclude the Secretary from using the regulatory authority to add additional periods."[80] But its transformation of the definition of "payment" to include months where a student loan borrower makes *no* payment because he or she is in deferment or forbearance is a twisting of simple language worthy of Orwell and is not allowed under the statute.

The Department must explain how its redefinition of "payment" to include periods of non-payment is authorized by the clear language of the statute, or it is acting in an arbitrary and capricious manner.

## IV. The Department's Proposed Rule Violates the APA Because It Is Based on a Contrived Reason

A. The Refusal of the Department to Tailor Its New IDR Plan to the Students It Claims to Help Reveals that the NPRM's Reasoning Is Contrived in Violation of the APA

In *Department of Commerce v. New York*,[81] the U.S. Supreme Court invalidated a rule issued by the U.S. Department of Commerce ("Commerce") adding to the 2020 Decennial Census

---

[78] NPRM at 1925 (redefining "Monthly payment or the equivalent" in 685.209(b)).
[79] 20 U.S.C. § 1087e(e)(7).
[80] NPRM at 1899.
[81] 139 S. Ct. 2551 (2019).



questionnaire a question about respondents' U.S. citizenship.[82] The Court found that the sole reason for the addition of the question as stated by Commerce in the contemporaneous record—that it "was simply acting on a routine data request from another agency," in this case the U.S. Department of Justice seeking data to help enforce the Voting Rights Act—"seems to have been contrived."[83] In his opinion for the Court, Chief Justice Roberts explained:

> The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise. If judicial review is to be more than an empty ritual, it must demand something better than the explanation offered for the action taken in this case.[84]

In the present rulemaking, the Department states that its New IDR Plan is necessary to help "struggling borrowers . . . improve their chances of avoiding delinquency and default."[85] It bolsters this reasoning by offering analyses showing that "low-income borrowers" are not enrolling in IDR plans, thus exposing them to default on their student loans.[86] The NPRM also identifies the goal of allowing borrowers to access "effective *and affordable* loan repayment plans."[87]

The Department's explanation for giving what it (arbitrarily and capriciously) estimates to be $137.9 billion in taxpayer funds haphazardly to cancel the student loan debt of a broad segment of the population of borrowers in this country simply does not match its stated reason of assisting student loan borrowers who are struggling under their debt. If the Department had such an intention, it would no doubt have attempted in some way to tailor the program to student loan borrowers who are struggling. The fact that it abjectly fails to perform any such tailoring clearly demonstrates that the Department is actually pursuing a different aim that it assiduously avoids setting out in its NPRM, to the detriment of those seeking to comment on the NPRM and in violation of the APA under the Supreme Court's *New York* precedent.

Independent analysis of the Department's proposed New IDR Plan indicates that it constitutes a taxpayer gift to nearly all former, current, and prospective students. For instance, the Department estimates that the point at which it will no longer make sense for a borrower to choose the plan is

---

[82] *Id.* at 2576.
[83] *Id.* at 2574, 2575.
[84] *Id.* at 2575–2576.
[85] NPRM at 1913.
[86] *Id.*
[87] *Id.* (emphasis added).



$75,500, which is in the 98th percentile for ages 22 to 25.[88] 225 percent of the current poverty line is $30,600, which is at the 78th percentile for ages 22 to 25.[89] No one earning below this level would pay a cent toward his or her student loans under the New IDR Plan.

Research published by the Brookings Institution indicates that approximately 85 percent of those with undergraduate loans of age 25 to 34 will receive taxpayer subsidies for their loans under the New IDR Plan.[90] While the CBO currently estimates that the average borrower will pay nearly $1.11 per dollar he or she borrows, the Department's proposed plan would drop this number to 50 cents on every dollar for undergraduate borrowers.[91]

This result goes so far beyond targeting a policy measure to solve the specific problem of young borrowers struggling with debt that it seems explainable only if the Department is attempting to fulfill some other goal that it leaves unstated. One possible reason the Department may have for permanently saddling taxpayers with student loan debt of a large majority of those who attended college, including those who have the resources to pay off such debt, would be to implement a quiet policy of paying for at least part of the undergraduate and graduate education for everyone in America. Unlike the unpersuasive reasoning cited by the Department regarding helping borrowers who are struggling with their debt, this reasoning would explain the unnecessarily massive, untargeted scope of the New IDR Plan. Again, the NPRM is a "free college" plan by another name.

The Department must state whether one of its purposes in proposing the New IDR Plan is to implement a policy of replacing at least a portion of federal student loans with taxpayer funding of postsecondary education. If it does not address this issue, it is acting arbitrarily and capriciously. If it maintains that it truly is only interested in helping borrowers who are struggling with paying their loans, then it must explain why it is subsidizing (and in many cases canceling) the debt of so many borrowers—many of them doctors, lawyers, and other professionals—who will have no trouble repaying it.

Regardless of whether or not it issues a late, more realistic explanation for the massive scope of its program, the Department has already failed, arbitrarily and capriciously, to offer a reasoned explanation for its non-tailored proposal to subsidize nearly everyone's postsecondary education.

---

[88] https://www.dailysignal.com/2023/01/11/biden-education-departments-plan-for-socializing-higher-education-via-student-loan-repayment-scheme/?fbclid=IwAR09ZwE4opHw9uMoEIkNCPhrpXTG2i5uuO4e5nBhXxSAHDOcZy7LUFcoVSw
[89] *Id.*
[90] https://www.brookings.edu/opinions/bidens-income-driven-repayment-plan-would-turn-student-loans-into-untargeted-grants/
[91] *Id.*



The Department's should therefore withdraw its current NPRM and go back to the drawing board to produce a NPRM that adequately explains its proposed rule.

> B. The Department Appears to Justify Its Proposed New IDR Plan with Reasoning About Its Varying Impacts on Racial Groupings that It Fails to Include in the NPRM

In its fact sheet introducing the proposed New IDR Plan, the Department includes the following reasoning that appears nowhere in its NPRM:

> Where differences exist in earnings, unemployment, and other factors for borrowers of different races and ethnicities, these groups may also experience differences in average benefits received from the new REPAYE plan for borrowers in these groups. For Black, Hispanic, American Indian and Alaska Native borrowers, the Department estimates that lifetime payments per dollar borrowed would be around 50 percent of what they would be on the current REPAYE plan. White borrowers' projected lifetime payments per dollar borrowed would be 37 percent less than under the current REPAYE plan. Asian and Pacific Islander borrowers would see average lifetime payments per dollar borrowed fall by approximately 33 percent.[92]

As a substantive matter, this statement is a bewildering admission that, in the name of so-called "equity," the Department is attempting to justify its New IDR Plan on the varying impacts of the program on different racial groups, apparently favoring "Black, Hispanic, American Indian and Alaska Native borrowers," who would purportedly receiver greater monetary benefits from the program over white and Asian and Pacific Islander borrowers. Making decisions on the basis of which racial groups win and lose as a result of their implementation is improper and violates the Constitution and federal civil rights laws.

This reasoning also appears nowhere in the NPRM. The Department must therefore explain whether it based its proposed rule on considerations regarding racial "equity"—namely, determining which racial groups would benefit the most from the New IDR Plan to justify its proposal. If it did rely on this reasoning in proposing the rule but did not include it in the NPRM, then the Department has deprived the public of an adequate opportunity to comment on its reasoning, and it should withdraw its current NPRM in favor of a NPRM that fully states the Department's reasoning.

---

[92] https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/idrfactsheetfin.pdf at 6.



### V. The Department's Proposed New IDR Plan Violates the APA Because It Is Arbitrary and Capricious

#### A. The Department Grossly Underestimates the Cost of Its New IDR Plan to Taxpayers

The Department's proposed rule is arbitrary and capricious because it makes no serious attempt to project a realistic anticipated cost for the New IDR Plan.

As discussed previously, the NPRM estimates that "[t]he changes to the REPAYE plan would offer borrowers a more generous IDR plan that would have a net budget impact of approximately $137.9 billion, consisting of a modification of $76.8 billion for cohorts through 2022 and $61.1 for cohorts 2023–2032."[93] The Department bases this estimate in part on the implementation of the Debt Cancellation Program,[94] whose lawfulness is currently under review by the U.S. Supreme Court.

It is widely agreed that the Department's cost estimate is inadequate, for multiple reasons that should have been apparent to the Department in developing its NPRM.[95] First, it declines to take into account the possibility that the Supreme Court will invalidate the Debt Cancellation Program, resulting in a much higher uptake of the proposed New IDR Plan by borrowers and producing massive taxpayer transfers to existing borrowers for which the Department fails to account.[96] The Department arbitrarily and capriciously declined to account for this possibility, depriving commenters of the opportunity to provide input on the Department's views of this potential cost.

Another major failing of the NPRM, which deprives the public of the opportunity to comment meaningfully on the impacts of the proposed regulations on taxpayers and borrowers in violation of the APA, is that it declines to estimate the cost impacts of borrowers who are currently in non-

---

[93] NPRM at 1919.

[94] *Id.*

[95] https://www.studentloanplanner.com/new-repaye-plan-ten-year-cost/ ("The Department of Education estimates the net budget impact at $137.9 billion. That's a massive understatement of the benefit to current and future borrowers." (link omitted)); https://www.forbes.com/sites/prestoncooper2/2023/01/11/bidens-quiet-student-loan-cancellation-income-driven-repayment-expansion/?sh=33afeadff4b0 ("ED's proposed rule pegs the cost of the new IDR plan at $138 billion. That is almost certainly an underestimate, for several reasons.").

[96] https://www.forbes.com/sites/prestoncooper2/2023/01/11/bidens-quiet-student-loan-cancellation-income-driven-repayment-expansion/?sh=33afeadff4b0 ("[I]f the court strikes down the loan-cancellation scheme, as is likely, borrowers who would have received forgiveness will instead repay their loans through IDR. The cost of making IDR more generous will shoot up.").



IDR plans enrolling in the Department's proposed New IDR Plan.[97] Yet a major objective of the Department's proposal is to provide an IDR plan that is so attractive that it motivates existing borrowers to enroll in it.[98] Due to the much-expanded availability of zero-dollar or near-zero-dollar payments in the proposed New IDR Plan, it is likely that those who enroll in the program will further increase the costs of the program. Data on borrowers who would likely enroll in the program is readily available to the Department through such resources as the Department's College Scorecard and the U.S. Census Bureau's American Community Survey. The Department's failure even to attempt to account for the impact of one of its core motivations for proposing the New IDR Plan in the calculation of the program's cost is arbitrary and capricious.

The NPRM's cost estimate also excludes any impacts of increased borrowing, rising tuition costs, and ballooning living expenses in postsecondary education that would drive up the costs of the New IDR Plan.[99] The Department's refusal to estimate these costs, which are likely to be substantial, in its analysis of the rule's budget impacts is arbitrary and capricious.

---

[97] NPRM at 1920 ("The impact of borrowers switching into IDR plans from non-IDR plans is also a potential factor that we do not estimate here.").

[98] https://www.forbes.com/sites/prestoncooper2/2023/01/11/bidens-quiet-student-loan-cancellation-income-driven-repayment-expansion/?sh=33afeadff4b0 ("[T]he cost estimate does not account for the likelihood that some borrowers in non-IDR plans will switch into IDR. This is nonsensical, as a central goal of the proposal is to offer more borrowers an affordable monthly payment through IDR.").

[99] https://www.forbes.com/sites/prestoncooper2/2023/01/11/bidens-quiet-student-loan-cancellation-income-driven-repayment-expansion/?sh=33afeadff4b0 ("[T]he estimate makes no allowances for increases in borrowing or tuition rates that stem from the IDR plan's enactment."); https://www.studentloanplanner.com/new-repaye-plan-ten-year-cost/ ("The Department admits that their estimate does not incorporate the strong possibility of 'increased take up' of IDR plans and increased borrowing resulting from more generous loan terms."); id. ("The Department of Education assumes that high-income graduate borrowers would see their payments increase on the New REPAYE plan, perhaps because of paying back loans for 25 years instead of 20 years. . . . This assumption is faulty because it assumes borrowers on the Old IBR plan will not switch, that borrowers who could benefit from lower payments by filing separately will not do so, and borrowers who could benefit from 20-year repayment terms will not stay on plans that offer them. It also assumes that borrowers will not take advantage of lower New REPAYE payments and switch before the 10-year period of payments locks them into New REPAYE."); id. ("If information flows to borrowers efficiently, we could see up to 80% of borrowers signing up for an IDR plan overall as more lower-income borrowers opt to go to school and students become less price sensitive about educational investment."); https://www.urban.org/sites/default/files/2023-01/Few%20College%20Students%20Will%20Repay%20Student%20Loans%20under%20the%20Biden%20Administrations%20Proposal.pdf at 8 ("The Biden plan will transform IDR from a safety net that supports borrowers with low incomes into a substantial subsidy for most undergraduate students who take on debt. Under current IDR plans, most borrowers can expect



This comment notes above the study from the University of Pennsylvania's Wharton School estimating that the cost of the New IDR Plan could exceed $520 billion,[100] along with independent analysis suggesting that a Supreme Court ruling against the Debt Cancellation Program would cause the cost of the New IDR Plan to skyrocket to over $1 trillion.[101] The Department must review these analyses and state in its final rule whether they represent accurate potential estimates of the proposed New IDR Plan's cost; otherwise, the Department is acting arbitrarily and capriciously.

KPMG's decision not to certify the Department's fiscal year 2022 consolidated financial statements over the estimated cost of the Debt Cancellation Program heightens the need for the Department to demonstrate that it is performing an analysis of the New IDR Plan that adequately informs the public of its potential cost. On January 23, 2023, the Department's Office of the Inspector General released findings from accounting firm KPMG declining to certify the Department's financial statements due to failures in estimating the cost of student loan cancellation, explaining as follows:

> Management's internal controls were not properly designed at an appropriate level of precision to address the relevance and reliability of the underlying data used to develop the take-up rate assumption used in the various loan program estimates. In addition, management did not design sufficiently precise controls over the relevance and reliability of certain data used in other key assumptions for the SLM cash flow model to develop the subsidy cost estimates.[102]

KPMG also made the following finding:

> Management's risk assessment process was not sufficient to identify the relevance and reliability of the underlying data used in significant assumptions for the estimates, including the take-up rate assumption, as a risk that required additional

---

to repay some or all their debt. If the Biden plan is implemented as proposed, fully repaying a student loan will be the exception rather than the rule. For typical Pell grant recipients, the additional loan forgiveness will be larger than the total Pell grants they receive while in college."); *id.* ("This large increase in generosity for borrowers will come at a substantial cost to taxpayers. The US Department of Education estimates that the proposed changes will cost $138 billion over the next 10 years, which is likely an underestimate because it does not account for the increases in borrowing that are likely to occur as the loan program becomes more heavily subsidized or for borrowers switching into IDR plans from non-IDR plans.").

[100] https://budgetmodel.wharton.upenn.edu/issues/2022/8/26/biden-student-loan-forgiveness
[101] https://www.studentloanplanner.com/new-repaye-plan-ten-year-cost/
[102] https://www2.ed.gov/about/reports/annual/2022report/agency-financial-report.pdf?source=email at 110.



controls. As a result, the documentation over the subsidy cost estimates in the financial statements was not supportive to evidence the estimate calculations. Inadequate controls over the relevance and reliability of the underlying data used to develop the estimate calculations increases the risk that the financial statements could be materially misstated.[103]

With regard to these shortcomings, KPMG recommended that the Department's management "[d]esign and implement controls that require the validation of the relevance and reliability of underlying data used in developing the assumptions related to the subsidy cost estimates."[104]

In response to these findings, which represented the first time in at least 20 years that the Department failed to receive a clean audit of its annual financial statements,[105] the Department conceded that "controls may not have operated as intended due to the lack of strictly comparable other federal benefit programs."[106]

Because the Department's proposed New IDR Plan is a portion of the "three-part plan" announced by President Biden that includes the Debt Cancellation Program, and because the Department's NPRM also involves questionable assumptions regarding take-up rates described previously, the Department must explain whether it has fixed relevant internal controls and risk assessment processes to the extent that it is able to produce a reliable estimated cost for its New IDR Plan that allows the Department and the public to weigh the costs and benefits of the program appropriately.[107] Specifically, the Department must explain why the faulty internal controls and risk assessment process at issue in KPMG's finding did not taint its calculation of the cost of the New IDR Plan. Otherwise, it is acting in an arbitrary and capricious manner.

If the same problems that resulted in KPMG's refusal to certify the Department's financial statements affected the Department's estimate of the cost of its proposed New IDR Plan, then the Department should withdraw the NPRM and issue a new one that adequately estimates the proposed program's costs and weighs them against its purported benefits. In any event, the

---

[103] *Id.*
[104] *Id.* at 111.
[105] https://subscriber.politicopro.com/article/2023/01/auditors-ding-education-department-over-cost-estimate-for-biden-student-debt-relief-00079546
[106] https://www2.ed.gov/about/reports/annual/2022report/agency-financial-report.pdf?source=email at 118.
[107] This concern is heightened by the fact that any reliable estimate of the cost of the Department's proposed New IDR Plan must depend considerably on the extent of the implementation of the Debt Cancellation Program, whose cost estimate is at issue in the KPMG finding on the Department's financial statements.



Department must delay its IDR rulemaking until it receives a clean audit of its annual financial statements. Otherwise, the Department is acting in an arbitrary and capricious manner.

B. The Department's Failure to Estimate the Impact of Its Proposal on Tuition and Living Expenses at Postsecondary Institutions Is Arbitrary and Capricious

In his remarks announcing the "three-part plan" on student loans that included the proposed New IDR Plan, President Biden lamented that "[t]he cost of education beyond high school has gone up significantly. The total cost to attend a public four-year university has tripled—nearly tripled in 40 years—tripled."[108]

It is surprising, then, that the Department concedes in its NPRM that the introduction of its New IDR Plan could *exacerbate* the problem the President identified in his remarks as a key motivation behind the policy:

> [I]nstitutions may be more inclined to raise tuition in order to shift costs to students when loans are more affordable. This effect may be more pronounced at graduate-level programs than at the undergraduate level because of differences in loan limits. Increases in tuition would not solely affect borrowers and, indirectly, taxpayers; students who do not borrow would face higher education costs as well.[109]

Despite this admission, the Department does not attempt to estimate the costs of such tuition increases or weigh their impacts against the purported benefits of the proposed rule. In fact, as discussed previously, the "Name-and-Shame" RFI the Department published the same day as the NPRM candidly recognizes that the Department's New IDR Plan "do[es] not address the underlying problems stemming from the high prices charged by some institutions . . . ."[110]

Such a failure to engage with the problem of the proposed program's negative impacts on students, especially in light of the President's statement that these proposals were intended *as a solution* to this problem, is arbitrary and capricious.

The proposed New IDR Plan would place substantial upward pressure on tuition, especially at undergraduate and community colleges, due to the new availability of loans that the borrower likely will not have to pay back.[111] While undergraduate loans are capped, the New IDR Plan

---

[108] https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/08/25/remarks-by-president-biden-announcing-student-loan-debt-relief-plan/
[109] NPRM at 1916.
[110] *Supra* note 27.
[111] https://freopp.org/bidens-income-based-repayment-expansion-could-prove-costlier-than-loan-forgiveness-2b7ada225d36 ("Community college is one of the few arenas of higher education



would almost certainly drive students who otherwise would not have borrowed to pay for their undergraduate degree to take out loans,[112] leading to higher tuition and living expenses on college campuses.[113]

Some graduate programs have already discovered how to use student loan cancellation in the form of plans like the New IDR Plan to their benefit in raising tuition at taxpayers' expense without charging their students any extra money.[114] With the generous taxpayer subsidies available under the New IDR Plan, undergraduate institutions would undoubtedly find similar ways to game the system.

Beyond the increased tuition that would result from the New IDR Plan, students would naturally use the increased availability of free money to pay for "living expenses" that have no direct relation to obtaining a college or university education.[115] The increase in these living expenses has

---

where debt is not a major financing tool; just 17 percent of community college students borrow. But the new [IDR] plan means that community college students can get essentially free money by taking out a loan. Though community colleges have done a decent job keeping tuition down in recent years, that may change if federal loans become a larger part of their funding." (links omitted)); *id.* ("Colleges are sure to point this fact out to students as a justification for the loan-heavy aid packages they will inevitably offer. A greater willingness to borrow will lead to higher tuition as colleges pass more costs onto taxpayers."); https://www.brookings.edu/blog/brown-center-chalkboard/2022/09/20/democrats-high-wire-act-on-student-loan-forgiveness/ ("Price subsidies—in this case, the new IDR rules—increase demand and that increases prices to some degree.").

[112] https://freopp.org/bidens-income-based-repayment-expansion-could-prove-costlier-than-loan-forgiveness-2b7ada225d36 ("Remarkably, 45 percent of undergraduates do not take out loans. These students may think they're being responsible, but under the new system they would be leaving money on the table. A new willingness to borrow among this group would reduce sensitivity to price. The result will be upward pressure on tuition." (link omitted)).

[113] *See, e.g.*, https://www.newyorkfed.org/medialibrary/media/research/staff_reports/sr733.pdf?la=en at 2 (finding that "increases in institution-specific subsidized . . . loan maximums lead to a sticker-price increase of about 60 . . . cents on the dollar" and that unsubsidized loan maximum increases lead to a sticker-price increase of approximately 40 cents on the dollar).

[114] *See, e.g.*, https://www.washingtonpost.com/news/wonk/wp/2013/08/09/how-georgetown-law-gets-uncle-sam-to-pay-its-students-bills/ (describing Georgetown University Law Center's practice of decreasing the amount students pay for tuition while using a loan forgiveness program to make up the difference).

[115] https://www.brookings.edu/opinions/bidens-income-driven-repayment-plan-would-turn-student-loans-into-untargeted-grants/ ("While students certainly need to pay rent and buy food while in school, under the administration proposal a student can borrow significant amounts for 'living expenses,' deposit the check in a bank account, and not pay it all back. Gaming the system like this wasn't possible when students were asked, on average, to repay loans in full, and



constituted a major part of the increase in the cost of college in the recent years,[116] and the Department's proposed New IDR Plan would push them even higher.

The "Name-and-Shame" RFI, which is merely an information-gathering exercise, does nothing to change these negative impacts, particularly as research has indicated that "shame lists do little to control tuition or deter enrollment."[117]

The Department must attempt to calculate the impacts of its regulations on the rising cost of tuition and living expenses at postsecondary institutions and properly weigh these negative impacts against any purported benefits of its proposed New IDR Plan. If it fails to do so, then it acts in an arbitrary and capricious manner.

> C. The Department's Failure to Properly Weigh the Proposal's Impacts on the Growth of Low-Quality Academic Programs Is Arbitrary and Capricious

The Department notes in its NPRM the "possibility" that the proposed New IDR Plan "would result in more aggressive recruiting by institutions that do not provide valuable returns on the premise that borrowers who do not find a job do not have to pay."[118] Despite mentioning this concern in passing, the Department proposes no measures to alleviate it (beyond issuing the "Name-and-Shame" RIA that, as previously discussed, is not a solution[119]) and does not explain why the purported benefits of the rule outweigh this admitted cost. The Department's failure to engage in a sincere balancing of the equities of its rule in this manner is arbitrary and capricious.

---

it's not a problem in systems where loans are used exclusively for tuition. But that's not the system we have. Some people will use loans like an ATM, which will be costly for taxpayers and is certainly not the intended use of the loans.").

[116] *Id.* ("Colleges that participate in federal aid programs are required to estimate the cost of rent, food, travel, a computer, and other spending students are expected to incur while enrolled. As the chart below shows, these living expenses are a large share of the top line cost of attendance and are the largest contributor to the increase in the net cost of college over the last 16 years. In fact, at public colleges and 4-year private nonprofits, net tuition (published tuition minus grants) has been falling over the last 15 years; the entire increase in cost of attendance is due to living expenses. . . . At 4-year public colleges in America, living expenses are the largest share of cost of attendance, and they're about half the cost of attendance at for-profit schools." (links omitted)).

[117] https://www.forbes.com/sites/prestoncooper2/2023/01/11/bidens-quiet-student-loan-cancellation-income-driven-repayment-expansion/?sh=33afeadff4b0 (citing https://journals.sagepub.com/doi/full/10.3102/0162373720937672).

[118] NPRM at 1916.

[119] *Supra* note 117.



Independent analysis of the Department's proposed New IDR Plan shows that it will have substantial impacts in incentivizing postsecondary institutions to market low-value programs to students in exchange for free money from the American taxpayers.[120] The Department must review this analysis and explain why the claimed benefits of its proposed New IDR Plan would outweigh the substantial cost of encouraging prospective students to pursue worthless degrees that do not prepare them to start meaningful careers.

      D. The Department's Failure to Consider the Negative Impacts of Its Proposed Rule on Affordable Community Colleges and Trade Schools Is Arbitrary and Capricious

The Department's NPRM fails to consider that its proposed New IDR Plan will encourage students to attend four-year colleges at the expense of affordable community colleges and trade schools, contributing to already-rampant credential inflation fueled by the demand for four-year undergraduate and postgraduate degrees.[121] The Department must consider this impact among the costs imposed by its proposed rule and weigh it against the purported benefits of its proposal, or it is acting in an arbitrary and capricious manner.

---

[120] *See, e.g.*, https://www.brookings.edu/opinions/bidens-income-driven-repayment-plan-would-turn-student-loans-into-untargeted-grants/ ("Because the IDR subsidy is based primarily on post-college earnings, programs that leave students without a degree or that don't lead to a good job will get a larger subsidy. Students at good schools and high-return programs will be asked to repay their loans nearly in full. Want a free ride to college? You can have one, but only if you study cosmetology, liberal arts, or drama, preferably at a for-profit school. Want to be a nurse, an engineer, or major in computer science or math? You'll have to pay full price (especially at the best programs in each field). This is a problem because most student outcomes—both bad and good—are highly predictable based on the quality, value, completion rate, and post-graduation earnings of the program attended. IDR can work if designed well, but this IDR imposed on the current U.S. system of higher education means programs and institutions with the worst outcomes and highest debts will accrue the largest subsidies.").

[121] https://freopp.org/bidens-income-based-repayment-expansion-could-prove-costlier-than-loan-forgiveness-2b7ada225d36 ("The new [IDR] plan also puts a thumb on the scales in favor of traditional four-year colleges. Students can maximize the subsidy they get from the federal government if they take out more loans. Suddenly, it might make more financial sense to attend an expensive private university rather than a community college or a trade school. Traditional colleges already enjoy an enormous funding advantage relative to alternatives, and the new [IDR] plan will only multiply it. This dynamic will fuel credential inflation—as more students pursue a bachelor's degree, employers will ratchet up their education requirements and further restrict opportunities for people without a college degree." (link omitted)).



E. The Department's Failure to Consider the Negative Consequences of Encouraging a Massive Expansion in Student Loan Debt Is Arbitrary and Capricious

Independent analyses of the Department's proposed New IDR Plan project that, by offering to subsidize student loans with taxpayer money and cancel these loans before they are repaid, the proposal will encourage a substantial increase in those who decide to fund their postsecondary education using debt.[122] The Department must consider whether the purported benefits of its proposed rule outweigh its contribution to rising student debt, which could have significant impacts on students' financial futures whether or not it is canceled. If the Department fails to do so, then it is acting in an arbitrary and capricious manner.

---

[122] *See, e.g.*, https://www.forbes.com/sites/prestoncooper2/2023/01/11/bidens-quiet-student-loan-cancellation-income-driven-repayment-expansion/?sh=33afeadff4b0 ("Because most undergraduate students will receive a subsidy on their federal loans, the rational thing to do is borrow the maximum amount possible from taxpayers, and then repay through the new IDR plan. Currently, 45% of all undergraduates and 77% of community college students do not take out loans. Under the new plan, those students will be leaving money on the table." (link omitted)); *id.* ("The result will be an increased willingness to borrow. The Biden administration intends to reduce the burden of student loans, but it could actually cement the role of debt in our higher education system. Borrowing for college will become more common, especially at community colleges and previously inexpensive public schools." (link omitted)); https://www.brookings.edu/opinions/bidens-income-driven-repayment-plan-would-turn-student-loans-into-untargeted-grants/ ("In 2016, undergraduate students borrowed $48 billion in federal student loans. But students were eligible to borrow an additional $105 billion that year and chose not to. Graduate students borrowed about $34 billion, but left $79 billion in unused eligibility on the table. Perhaps they didn't borrow because their parents paid out of pocket or because they chose to save money by living at home—they still were eligible for federal loans. When those students are offered a substantial discount by paying with a federal loan, they will borrow billions more each year."); https://www.brookings.edu/blog/brown-center-chalkboard/2022/09/20/democrats-high-wire-act-on-student-loan-forgiveness/ ("[I]t's clear that, under just about any implementation of the plan, most people will have incentives to borrow more (and no one has an incentive to borrow less). So, the first effect of this of this 'loan forgiveness' policy is going to be raising debt levels."); https://www.urban.org/sites/default/files/2023-01/Few%20College%20Students%20Will%20Repay%20Student%20Loans%20under%20the%20Biden%20Administrations%20Proposal.pdf at 2 ("The proposed IDR plan is the most generous yet, but it will make the student loan program significantly more expensive and risks encouraging students to take on more debt, which could have implications for their personal finances even if it is eventually forgiven.").



F. The Department's Basis for Waiving Interest Accrual Is Arbitrary and Capricious

The Department bases its proposal not to charge any interest to borrowers enrolled in its New IDR Plan beyond what they cover in their monthly payments (which in many cases will be payments of zero dollars) on its concern "that growing balances due to unpaid interest may discourage borrowers from repaying their loans and, thus, result in lower amounts repaid to the government."[123] The Department's proposed program does not alleviate such a "discouragement" effect and may even make it worse by encouraging borrowers who otherwise could afford to do so not to repay their loans. By offering widespread taxpayer subsidies to student loan borrowers, the Department ensures that a substantial proportion of these borrowers will not see their loan balance decrease by a single dollar throughout the life of their loans, thus fueling the very frustration among borrowers that the Department claims to alleviate.[124] The Department's interest proposal arbitrarily and capriciously fails to address the problem it claims to resolve.

The Department warns that "[t]he potential for these negative incentives [related to discouraging repayment as a result of growing loan balances] could be even greater as a result of the increases in the amount of income protected from payments and the reduction in payments tied to undergraduate loan balances."[125] With its substantially increased discretionary income exemption and reduced monthly payments, the Department creates the very problem it claims it must solve with the interest accrual provision. The Department must explain why, instead of proposing an IDR plan that causes this problem and then proposing to fix that problem by not charging interest, it instead proposes no changes at all. Otherwise, the Department is acting arbitrarily and capriciously.

---

[123] NPRM at 1905.
[124] https://freopp.org/bidens-income-based-repayment-expansion-could-prove-costlier-than-loan-forgiveness-2b7ada225d36 ("Many borrowers complain of making payments year after year, yet never seeing their balances drop; the promise of future forgiveness is cold comfort to people watching interest charges rack up. But the exceedingly low payments under the new [IDR] plan will be insufficient to cover interest for millions of borrowers. While the government will forgive unpaid interest every month, these borrowers still won't make a dent in principal. They will make payments year after year, yet some will never see their balance drop by one penny." (link omitted)); https://www.urban.org/sites/default/files/2023-01/Few%20College%20Students%20Will%20Repay%20Student%20Loans%20under%20the%20Biden%20Administrations%20Proposal.pdf ("Forgiving unpaid interest every month could provide a psychological benefit to borrowers, but they would still see their balance remain the same even if they are making payments.").
[125] NPRM at 1905.



G. The Department's Failure to Consider the Inflationary Impacts of Its Proposed New IDR Plan Is Arbitrary and Capricious

Research published by the Committee for a Responsible Federal Budget indicates that President Biden's "three-part plan" to address student loans announced in August "would boost inflation by 15 to 27 basis points over the next year."[126] As noted previously, analysis of the New IDR Plan, which forms a part of the "three-part plan," pegs its cost as potentially exceeding $520 billion.[127] The Department must attempt to calculate the inflationary impacts of that massive giveaway of taxpayer money to fund undergraduate and graduate education as a major cost of the proposed rule to the economy and to American consumers. It must then weigh that cost against the purported benefits of its New IDR Plan. If the Department fails to do so, then it is acting in an arbitrary and capricious manner.

H. The Department Arbitrarily and Capriciously Underestimates the Administrative Costs that Would Flow from Its Proposed Rule

In its NPRM, the Department estimates that the "modest administrative costs to the Department to implement the changes to the [New IDR] plan, which would require modifications to contracts with servicers," would total about $10 million.[128] The characterization of the administrative costs to the Department (and ultimately to taxpayers) as "modest" is surprising considering the millions of student loan borrowers who will seek to enroll in the New IDR Plan due to its generous terms and the fact that the IDR repayment system has struggled to accommodate users in the past.[129] The Department must explain whether it has included these considerations in its estimation of administrative costs. If not, it must estimate such costs and weigh them against any purported benefits of the proposed New IDR Plan. If it does not do so, then the Department has acted arbitrarily and capriciously.

---

[126] https://www.crfb.org/blogs/student-debt-changes-would-boost-inflation
[127] *Supra* note 45.
[128] NPRM at 1916.
[129] https://www.urban.org/sites/default/files/2023-01/Few%20College%20Students%20Will%20Repay%20Student%20Loans%20under%20the%20Biden%20Administrations%20Proposal.pdf ("[It] is important to note that in order to receive the benefits of IDR, most borrowers have to sign up for an IDR plan and successfully navigate the repayment system for 10 to 20 years. Historically, this system has not worked well for borrowers who try to use it, and there are significant resource limitations at the agency charged with implementing this new plan for a potentially much larger number of borrowers." (citing https://www.marketplace.org/2022/12/29/federal-student-aid-office-has-a-big-to-do-list-in-2023-but-the-same-budget/)).



I. The Department's Failure to Consider the Negative Impacts of Its Proposed Rule on Small Entities Is Arbitrary and Capricious

In its NPRM, the Department states that it "has determined that there would be no economic impact on small entities affected by the regulations" under the Regulatory Flexibility Act[130] "because IDR plans are between borrowers and the Department."[131] By denying any impacts on small entities, the Department arbitrarily and capriciously neglects to consider the significant harm nonprofit entities would suffer in their ability to hire recent graduates as a result of the proposed New IDR Plan. This shortcoming may also violate the Department's responsibilities to calculate the burdens of its proposed rule on small entities under the Regulatory Flexibility Act.

By substantially increasing the proportion of undergraduate student loan borrowers who pay nothing or nearly nothing to settle their loans, and especially by offering 10-year debt cancellation to such borrowers, the Department fails to consider whether it would drastically reduce the desire of recent graduates to pursue loan cancellation under the Department's Public Service Loan Forgiveness program in a way that might discourage job seekers from working at small, nonprofit employers.

The Department must consider the negative impacts of its proposed New IDR Plan on nonprofit employers that constitute "small entities" under the Regulatory Flexibility Act. Otherwise, it acts in an arbitrary and capricious manner and may be in violation of its statutory duty to consider such impacts in rulemaking.

## VI. The Department Is Correct to Simplify Student Loan Offerings, Automatically Verify Borrowers' Income on an Annual Basis, and Refuse to Engage in Annual Cancellation of Debt

Because of the numerous substantive and procedural defects identified above, DFI urges the Department to withdraw its proposed rule in full. However, in its NPRM, the Department has identified policies that could be included in a future rulemaking effort that works within the bounds of Title IV of the HEA to benefit borrowers without turning federal student loans into grants at the expense of American taxpayers.

One objective the Department identifies that it could pursue in a future, more-restrained rulemaking is its proposal to simplify the student loan programs on offer by consolidating the currently available IDR programs into a single, easy-to-understand program that still requires former students to pay back their student loans.

---

[130] 5 U.S.C. 601 *et seq.*
[131] NPRM at 1923.



Another policy that could be included in a future rulemaking effort is the Department's proposal to verify borrowers' income or family size automatically on an annual basis by consulting accurate tax data.[132] Such a policy is a common-sense solution to a problem the Department has identified in persuading borrowers to self-certify their information.

Finally, DFI strongly agrees with the Department's determination that it does not have the statutory authority under the HEA to engage in "annual cancellation of some debt for borrowers."[133] DFI urges the Department to continue to abide by this determination if it chooses to issue its final rule and refrain from providing for such a mechanism of annual debt cancellation in violation of its authority granted by Congress.

## VII. The Department Should Honor the Authorities It Cites in the NPRM by Extending Its Public Comment Period

The 30-day period the Department has allotted for public comments does not provide sufficient opportunity for experts and members of the public who will face substantial impacts from the proposed rule to weigh fully its implications and offer meaningful input for the Department to consider as it develops its final regulations on this subject. The Department should offer at least an additional 30 days for the public to comment on the proposed rule and end the comment period no earlier than March 12, 2023.

Allowing at least 60 days for public comment is standard practice under the governing authorities cited by the Department's NPRM. The "Invitation to Comment" section of the proposed rule seeks the public's assistance "in complying with the specific requirements of Executive Orders 12866 and 13563 . . . ."[134] Executive Order 13563, "Improving Regulation and Regulatory Review," states that "each agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, *with a comment period that should generally be at least 60 days*."[135] Executive Order 12866, "Regulatory Planning and Review," includes similar language: "[E]ach agency should afford the public a meaningful opportunity to comment on any proposed regulation, *which in most cases should include a comment period of not less than 60 days*."[136]

The Department should heed the authorities it cites and offer at least 30 more days for public comment on its NPRM.

---

[132] *Id.* at 1911.
[133] *Id.* at 1922.
[134] *Id.* at 1895.
[135] Executive Order 13563, Sec. 2(b) (emphasis added).
[136] Executive Order 12866, Sec. 6(a) (emphasis added).



## VIII. Conclusion

Hoping to achieve its goal of "free college" by working around Congress, the Department's proposed rulemaking would convert a congressionally authorized student loan program into a delayed grant scheme that extensively subsidizes postsecondary education at the expense of American taxpayers. It is contrary to the HEA's express statutory authorization, beyond the Department's authority to enact, arbitrary and capricious, and otherwise not in accordance with law. It would force taxpayers, many of whom never took on debt to attend college or have paid off their college debt, to fund a policy priority of the Biden Administration—free college for all—that it has no statutory authority to impose on the American people.

For the reasons discussed above, the Department should immediately withdraw the NPRM in its entirety.

Sincerely,

/s/ *Robert S. Eitel*
Robert S. Eitel
President
Defense of Freedom Institute for Policy Studies

/s/ *Paul F. Zimmerman*
Paul F. Zimmerman
Policy Counsel
Defense of Freedom Institute for Policy Studies

# Human Resources Specialist – Kansas City    **EXHIBIT 2**



## UNITED STATES DISTRICT COURT – DISTRICT OF KANSAS

Robert J. Dole U.S. Courthouse

500 State Avenue

Kansas City, KS 66101

[www.ksd.uscourts.gov](http://www.ksd.uscourts.gov)

**Human Resources Specialist**     Vacancy Announcement #KC24-07

| | |
|---|---|
| **Position Title:** | Human Resources Specialist |
| **Position Type:** | Full-Time, Permanent |
| **Location:** | Kansas City, Kansas |
| **Open Date:** | March 8, 2024 |
| **Closing Date:** | Open until filled |
| **Salary Range:** | CL 26 - CL 27 ($53,658 - $95,816 Annually) |

**POSITION OVERVIEW**

The United States District Court for the District of Kansas is recruiting for a Human Resources (HR) Specialist.  The HR Specialist is responsible for performing a variety of administrative, technical, and strategic duties in support of the HR programs. The HR department supports the District Court, the Office of Probation and Pretrial Services, and the Bankruptcy Court.  Supported personnel include

- App. 096 -

federal judges, administrative staff, attorneys, and law enforcement officers. Travel to the divisional offices in Topeka and Wichita is required, as well as the potential for occasional travel to national training events or conferences.

**REPRESENTATIVE DUTIES**

- Manage the recruitment process for assigned positions – develop position descriptions; define the necessary knowledge, skills, and abilities of the position; attend career fairs; identify and pursue advertising and networking opportunities; screen candidates; organize and conduct interviews and assessments; perform background investigations; make hiring recommendations to executive managers, maintain employment statistics.
- Oversee employee onboarding and offboarding processes, including employee counseling, training, coordination with supervisors on integrating new staff into departmental operations.
- Process and/or quality check a variety of HR and payroll actions such as new hires, promotions, separations, and within grade increases.  Maintain an automated personnel records system.  Prepare and utilize spreadsheets to track personnel actions and communicate with supervisory staff regarding employee actions.
- Coordinate federal benefits programs, including maintaining and distributing benefits materials, addressing benefit questions, advising employees on retirement and benefits issues, creating and presenting benefits training programs, and resolving benefits discrepancies.
- Track, make recommendations for, and coordinate employee recognition initiatives.
- Administer background checks and investigations, fingerprint new employees and interns. Issue IDs and law enforcement badges.
- Handle employment-related inquiries from applicants, employees, supervisors and relay local and national policy guidance and best-practice recommendations.
- Facilitate activities such as new employee orientations, benefits fairs, other training events. Develop and present HR content to varying audiences.
- Organize continuing legal education events for attorneys and seek state registration.
- Perform leave tracking tasks, respond to leave related inquiries, act as time administrator. Counsel employees and supervisors on leave eligibility and policies.
- Administer judicial chambers internship program with area law schools or other institutions and organizations.
- Remain up to date on HR initiatives, national guidance, and industry trends.
- Participate in a variety of agency and HR programs and events, such as national committee membership.
- Support a variety of HR special projects, such as website development, wellness initiatives.

**REQUIRED EXPERIENCE AND QUALIFICATIONS**

- A high school diploma or equivalent.

- Two years of general clerical experience, which may be substituted with post-secondary education.

- Three years of specialized experience in at least one but preferably two or more functional areas of HR management and administration (classification, staffing, training, employee relations, etc.) that provided knowledge of the rules, regulations, terminology, etc. of the area of HR administration.

- The ability to handle sensitive matters confidentially, decisively, and appropriately.

- Accuracy and attention to detail.
- Excellent verbal and written communication skills.
- A professional demeanor and strong work ethic.

**PREFERRED EXPERIENCE AND QUALIFICATIONS**

- Experience in HR in a governmental, legal, or law enforcement environment.
- A post-secondary or advanced degree in HR or a related field.
- Experience leading multiple processes, projects, and initiatives in a dynamic organization such as recruitment, employee relations, benefits, classification and compensation, performance management.
- Experience in developing training programs and presenting information.

**BENEFITS**

1. 13 days paid vacation for each of the first three years
2. 20 days paid vacation during years 4-14
3. 26 days paid vacation annually after 15 years of service
4. 13 days paid sick leave annually
5. 11 paid federal holidays
6. Participation in the Federal Employees Retirement System
7. Participation in the Thrift Savings Plan (TSP) with government match up to 5%
8. Health, Dental, Vision, Group Life, and Long-Term Care Insurance Plans
9. Participation in the Flexible Benefits Program for Health and Dependent Care
10. Up to 12 weeks of Paid Parental Leave for eligible employees
11. Participation in Federal Occupational Health (FOH)/Employee Assistance Programs (EAP)
12. Student loan forgiveness for qualified individuals, pursuant to the terms of the PSLF program
13. Free onsite parking
14. Free onsite fitness center

**ADDITIONAL INFORMATION**

The U.S. District Court reserves the right to modify or withdraw this job announcement without prior written notice. This position subject to mandatory participation in electronic payment of net pay (i.e.

- App. 098 -

Direct Deposit). This position is high-sensitive and requires a favorable background investigation (including criminal, credit checks) with 5-year periodic reinvestigations. The U.S. District Court requires employees to adhere to a Code of Ethics and Conduct. Due to the volume of applications received, the court may only communicate to those individuals selected for an interview. Travel and relocation expenses will not be paid. Applicants must be United States citizens or eligible to work for the United States Government.

**APPLICATION PROCEDURE:**

To apply for this position, please submit the following items in a single PDF document by email to HR@ksd.uscourts.gov and include the "HR Specialist, Vacancy #KC24-07" in the email subject line:

1. Cover letter explaining your interest in the position
2. Current resume
3. Federal Judicial Branch Application for Employment

Form AO-78: separate forms available for PC and Mac users

\* Current District of Kansas employees do not need to submit the AO 78 application form.

**\* You SHOULD respond to questions 18, 19, and 20 of the AO 78 application form, in accordance with the Fair Chance to Compete with Jobs Act of 2019.**

**THE FEDERAL JUDICIARY IS AN EQUAL OPPORTUNITY EMPLOYER**

Expiration Date: *Sunday, December 15, 2024*

📄 HR Specialist 2024.pdf

EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## WICHITA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS, ET AL., | § § § | |
| *Plaintiffs*, | § § § | |
| v. | § § § | |
| JOSEPH R. BIDEN IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, ET AL.N; | § § § § § | Civil Action No. 2024-CV-1057-DDC-ADM |
| *Defendants*. | § § § | |

### <u>AFFIDAVIT OF LESLIE GISH</u>

I, Leslie Gish, declare as follows:

1. I am the Human Resources Director ("HR Director") at the Kansas Office of the Attorney General ("OAG"). I am over the age of 18, and I have personal knowledge of the facts contained in this Affidavit. I could competently testify as to the contents of this Affidavit if called upon to do so.

2. I have served as the HR Director at the OAG for approximately six months.

3. Prior to this, I worked in the HR Department of the following state agencies: the Kansas Department of Transportation ("KDOT"), the Kansas Department of Aging, and the Kansas Neurological Institute. I held these positions over approximately nine years. A true and correct copy of my resume as is attached as Exhibit 13(a).

4. My responsibilities as the HR Director at the OAG and other state agencies include advertising and filling vacant positions.

1

LG

5.   When a person applies for a state job in Kansas, they apply through a portal maintained by the Department of Administration.   *See* Kansas Department of Administration, Jobs, https://admin.ks.gov/offices/personnel-services/jobs (last accessed April 2, 2024).   The Department of Administration advertises Public Service Loan Forgiveness ("PSLF") on this website. *Id.*

6.   Many of these positions require a college degree.

7.   I also am responsible for onboarding new employees.   As part of the onboarding process, I explain PSLF program.

8.   I am also responsible for certifying employees' PSLF employment certification forms.   In the past six months, I have signed approximately three PSLF employment certification forms for OAG employees.   I am aware of other employees who are eligible for PSL forgiveness.

9.   I am also familiar with the HR and hiring practices in other Kansas State agencies.

10. Other agencies advertise open positions, many of which have a lower salary or wage range than the private sector.

11. As an example, KDOT employs engineers for various duties.   A KDOT construction engineer position advertises a salary range of $73,320.00–$78,936.00.   *See* Exh. 3(b).   The mean wage of a civil engineer in Kansas as of May 2022 is $91,030,[1] and that of a construction manager is $96,800.[2]

---

[1] *See* Bureau of Labor and Statistics, *Occupational Employment and Wage Statistics, May 2022*, located at https://www.bls.gov/oes/current/oes172051.htm.
[2] *See* Bureau of Labor and Statistics, *Occupational Employment and Wage Statistics, May 2022*, located at https://www.bls.gov/oes/current/oes119021.htm.

LG

12. As another example, the Kansas Department of Health and the Environment ("KDHE")
    employs chemists for various duties.  A KDHE chemist position advertises an hourly
    wage of $25.05–$26.98.  *See* Exh. 3(c).  The mean wage of a chemist in Kansas as of
    May 2022 is $77,290.[3]

13. Further the affiant sayeth naught.

                                      _Leslie E. l_

                                      Leslie Gish

Subscribed and sworn to before me this 5th day of April, 2024.

                                      _Connie Deckard_

                                      Notary Public

My Commission Expires:
_09/13/2027_



CONNIE F. DECKARD
Notary Public - State of Kansas
My Appt. Expires 09/13/2027

---

[3] *See* Bureau of Labor and Statistics, *Occupational Employment and Wage Statistics, May 2022,*
located at https://www.bls.gov/oes/current/oes192031.htm.

LG

# Leslie E. Gish, SHRM-CP

**(785) 230-0556 – Mobile**
legish78@gmail.com

## EMPLOYMENT

**Oct. 2023 – Present        Office of the Kansas Attorney General Topeka, KS        *Human Resources Director***
Provided leadership and direction regarding HR functions, including performance management, recruitment, benefits administration and counseling, compensation and position evaluation, organizational and employee development, records management, position budgeting, employee relations, FMLA, workers compensation, and human resource information systems. Ensured consistent and equitable application of personnel policies and government regulations by advising managers about applicable policies and regulations and enforcing the personnel rules and regulations of the State and agency. Served as agency liaison to the Department of Administration, Division of Personnel Service and other entities on matters related to human resources. Developed and recommended personnel policies, practices, and procedures by reviewing and analyzing reports, applicable regulations, professional literature, and statistical data concerning all aspects of personnel administration.

**Aug. 2019 – Oct. 2023    Kansas Neurological Institute Topeka, KS                *Human Resources Director***
Managed all Human Resources functions within KNI. Provided guidance, clarification, and education and instruction on policies, regulations, and processes related to HR. Resolved issues related to reallocation requests, monitored processes to reduce turnover and increase retention by making recommendations to appropriate staff. Interpreted laws, rules, regulations and polices related to Equal Employment Opportunity (EEO) and managed the EEO program for KNI. Advised agency managers, supervisors and staff on issues pertaining to diversity as it relates to EEO/Affirmative Action, sexual harassment and other issues involving diversity and employment rights. Investigated and responded to external and internal EEO complaints, conducted interviews of all parties involved, witnesses or others and obtained written statements as appropriate. Provided consultation, guidance, assistance and discipline to managers and employees on a variety of work-related matters including compensation and classification. Constructed all formal letters regarding performance management, progressive discipline, and grievances and administered the employee evaluation appeal and grievance processes. Assisted in resolution of KOSE MOA grievances, appeals and possible MOA violations by meeting with union representatives.

**Dec. 2017 – Aug. 2019  Kansas Department of Aging Topeka, KS            *Hospital Employee Relations Manager***
Conducted internal investigations and gathered information at the four State hospitals (OSH, PSH, LSH, and KNI). Provided recommendations to appointed authority on discipline in accordance with KOSE and the State Civil Service Act. Provided feedback, information, and made recommendations to improve efficiency and communication to central office and others as needed. Mediated employment and workplace disputes and provided follow up and documentation of mediation efforts. Researched, conducted, or assisted with trainings at state hospitals and central office. Created online training for KDADS and state hospital staff. Provided recommendations for training to address specific issues at state hospitals. Coordinated mandated annual sexual harassment training between all hospitals and KDADS central office.

**Sep. 2014 – Dec. 2017    Kansas Department of Transportation Topeka, KS        *Human Resources Professional II***
Administered the recruitment and hiring process for classified and unclassified positions. Prepared requests to the Department of Administration and the Governor's Office to fill positions. Reviewed and screened applications, worked with managers to determine required skills and competencies. Provided support in developing interview questions and selection criteria and monitored interview selection process. Developed and delivered training content and materials regarding the hiring and selection process as well as the new hire onboarding process for KDOT supervisors and employees. Coordinated and participated in job fairs and applicant workshops, worked with

schools and colleges to create interest in KDOT careers. Provided career and job search guidance and training to high school students and other groups within the state.

**July 2008 – Sep. 2014   Stormont Vail HealthCare Topeka, KS**                    *Medical Assistant*
Processed referrals into and out of neurology clinic, filled out FMLA, disability, insurance, and patient medication assistance paperwork, coded patient charge sheets. Ordered procedures and medications, educated patients and families as needed. Resolved internal and external issues via phone and/or email. Coordinated treatments and hospital admissions and patient scheduling. Handled correspondence to and from neurologist, drafted communications as needed. Obtained insurance precertification and authorizations. Maintained logs and other Joint Commission required duties.

**Oct. 2007 – July 2008   Terracon Engineering Consultants Topeka, KS**                    *Administrative Staff I*
Data entry, prepared reports, provided customer service for clients, filing and answering phones.

**July 2006 – May 2007   M-C Industries, Inc. Topeka, KS**                    *Customer Support Associate*
Acted as liaison between purchasing, sales, and project managers, territory managers, manufacturing plants in 2 states and 2 countries, and clients. Provided customer service to a client base of over 130 clients. Traveled to company and customer manufacturing facilities to enhance working knowledge and client satisfaction. Assisted with project management from concept to production.

**Jan. 2002 – Sep. 2005   City of Topeka Planning Department Topeka, KS**                    *Office Assistant II*
Provided administrative support to planners and other City and County staff members, attended zoning, planning, and landmarks commission meetings and took minutes for future publication. Assisted with special projects as needed such as making regional transportation planning guides and filling out historic resource survey paperwork. Typed agendas and other mailings. Maintained files and logs, and scanned documents for future electronic retrieval. Served as front office contact for the public.

**Jan. 2001 – Nov. 2001   Express Personnel Topeka, KS** *Human Resources Assistant (Temp – Stormont Vail HealthCare)*
Assisted in Benefits with administration of FMLA/Leave of Absence by tracking leave dates, entering them into logs, and sending letters to employees on FMLA/LOA for insurance purposes. Maintained retirement vesting information in software and provided information to employees on request regarding retirement plans. Processed retiree/vested term employee calculations for the Defined Benefit retirement plan, and reviewed personnel action worksheets for accuracy. Also served as receptionist in human relations, processing onboarding paperwork for new hire employees and volunteers, coordinating materials for new hire orientation, and assisted Employee Staff with clerical duties.

## MILITARY SERVICE
**May 1996 – July 2004 312th Army Reserve Band Lawrence, KS** *Specialist (E-4)*
Army Achievement Medal, Army Reserve Components Achievement Medal, Army Service Ribbon

## *EDUCATION/CERTIFICATIONS*
**University of Illinois, Urbana-Champaign, IL**
**Master of Business Administration**, Expected Graduation December 2025

**Washburn University Topeka, KS**
*Bachelor of Public Administration May 2016*
Concentration in Local Economic and Community Development

**Society for Human Resources Management Certified Professional**

**Federal Emergency Management Institute Ind. Study Program**
*ICS100 – Introduction to the Incident Command System*
*ICS200 – ICS for Single Resources and Initial Action Incidents*
*ICS700 – National Incident Management System (NIMS), An Introduction*

 *State of Kansas*
*Careers Portal*



Search Jobs

## Job Description

◀ Previous Job                    **Construction Engineer (EA III)**                    Next Job ▶

works for all Kansans today and in the future. Our employees are our most valuable resource. We depend on our employees and business partners to get the job done. KDOT strives to provide a work environment that motivates people and encourages them to be productive. KDOT is a great place to work, so come be part of our team!

Verification of identity and employment eligibility to work in the United States is required by federal law. For a list of acceptable documents that establish these criteria, please refer to the federal Form I-9. KDOT does not provide sponsorships for this position.

E-Verify: The Kansas Department of Transportation (KDOT) participates in E-Verify and will provide the federal government with your I-9 information to confirm that you are authorized to work in the U.S. For additional information regarding E-Verify, please click here. For additional information regarding Immigrant and Employee Rights (IER) please click here.

## About the Position:

- **Who can apply:** Anyone
- **Classified/Unclassified Service:** Unclassified
- **Full/Part-time:** Full-Time
- **Regular/Temporary:** Regular
- **Work Schedule:** Monday - Friday
- **Eligible to Receive Benefits:** Yes
- **Veteran Preference Eligible:** Yes
- **Search Keywords:** KDOT, Topeka, Construction

## Compensation:

- **Annual Salary Range:** $73,320.00 - $78,936.00

  *Note: Salary can vary depending upon education, experience, or qualifications*

## Employment Benefits:

- **Work-Life Balance Programs:**
  - Paid Leave: Vacation, Holidays, Parental, Military, Sick, Funeral and Jury Duty
  - Employee Assistance Program
    - For help managing daily life at no cost to you
  - Infant at Work Program
  - Voluntary Benefits: Accident, Critical Illness, and Hospital Indemnity Insurance

- App. 106 -

https //jobs sok ks gov/psc/sokhrprdcg/APPLICANT/HRMS/c/HRS  HRAM  FL HRS  CG  SEARCH  FL GBL?Page  HRS  APP  SCHJOB  FL&Action  U        1/1

3/26/24, 3 23 PM

Careers

**EXHIBIT 3c**

 **Careers** | *State of Kansas*
*Careers Portal*



| Search Jobs | Job Description |
|---|---|

◀ **Previous Job**            **Chemist**            **Next Job** ▶



- **Who can apply:**  Anyone (External)

- **Classified/Unclassified Service:**  Unclassified

- **Full-Time/Part-Time:**  Full-Time

- **Regular/Temporary:**  Regular

- **Work Schedule:**  Monday-Friday, 8am-5pm (Flexible schedules available)

- **Eligible to Receive Benefits:**  Yes

- **Veterans' Preference Eligible:**  Yes

## Compensation:

- **Hourly Pay Range:** $25.05 - $26.98

*\* Salary can vary depending upon education, experience, or qualifications.*

## Employment Benefits

- **Comprehensive medical, mental, dental, vision, and additional coverage**

- **Sick & Vacation leave**

- **Work-Life Balance programs: parental leave, military leave, jury leave, funeral leave**

- **Paid State Holidays (designated by the Governor annually)**

- **Fitness Centers in select locations**

- **Employee discounts with the STAR Program**

- **Retirement and deferred compensation programs**

Visit the Employee Benefits page for more information…

## Position Summary & Responsibilities

**Position Summary:**

The position (K0244359)

The Kansas Department of Health and Environment has a Chemist opening in Topeka. The Kansas Health and Environmental Laboratories is seeking an experienced chemist to work with the Toxicology unit. Primary duties are to analyze clinical and environmental samples using ICPMS, CVAA and ICPOES. Chemist will also participate in the development of new testing for wastewater in the analysis of emerging contaminants of public health interest, such as PFAS.

EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| STATE OF KANSAS,<br>STATE OF ARKANSAS,<br>STATE OF ALASKA<br>STATE OF IDAHO<br>STATE OF IOWA,<br>STATE OF LOUISIANA<br>STATE OF MONTANA,<br>STATE OF NEBRASKA,<br>STATE OF SOUTH CAROLINA,<br>STATE OF TEXAS,<br>STATE OF UTAH<br><br>    *Plaintiffs,*<br><br>v.<br><br>JOSEPH R. BIDEN IN HIS OFFICIAL<br>CAPACITY AS PRESIDENT OF THE<br>UNITED STATES,<br>MIGUEL CARDONA IN HIS OFFICIAL<br>CAPACITY AS SECRETARY OF<br>EDUCATION,<br>UNITED STATES DEPARTMENT OF<br>EDUCATION;<br><br>    *Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§    Civil Action No. 6:24-CV-01057 |

## DECLARATION OF HENRY DE LA GARZA

I, Henry De La Garza, declare as follows

1. I am over the age of 18, of sound mind, competent to testify, and have personal
   knowledge of the facts stated herein, except where stated on information and belief.

2. I am the Human Resources Director at the Office of the Attorney General of Texas
   ("OAG"). I have held this position since November 2020. I also serve as the agency's
   Chief Employment Counsel and Ethics Advisor.

3. As part of my role, I oversee the Employer Certification portion of the "Public Service Loan Forgiveness (PSLF) & Temporary Expanded PSLF (TEPSLF) Certification & Application" ("PSLF Certification Form").

4. I am also responsible for overseeing the advertising and filling of vacant positions at OAG.

5. Many of these positions require a college degree.

6. PSLF is a federal program that was created under the College Cost and Reduction Access Act of 2007. 20 U.S.C. § 1087e(m). Upon information and belief, the program was created to encourage public service.

7. The U.S. Department of Education is responsible for the administration of PSLF.

8. In order to qualify for PSLF, these requirements must be met: (1) be employed by a federal, state, local, or tribal government or a qualifying not-for-profit organization, (2) work full-time at that agency or organization, (3) have Direct Loans, (4) repay the loans under an accepted repayment plan, and (5) make a total of 120 qualifying monthly payments.

9. OAG is a qualifying employer under PSLF.

10. OAG advertises PSLF as an advantage of employment with OAG on its website.[1]

11. Employees frequently take advantage of PSLF while working at OAG.

12. Upon information and belief, employees are not required to complete a PSLF Certification Form until they are eligible for forgiveness, but the Department of Education encourages employees to periodically complete the form for recordkeeping purposes.

13. OAG's Human Resources Division is responsible for completing the employer portion of the PSLF Certification Form.

14. OAG's Human Resources Division frequently completes the employer portion of the PSLF Certification Form for current and former employees. In Fiscal Year 2022, the Human Resources Division completed the employer portion on 573 PSLF certification forms; in Fiscal Year 2023, the Human Resources Division completed the employer portion on 526 PSLF certification forms; and so far, in Fiscal Year 2024, 284 forms have been completed.

---

[1] https://www.texasattorneygeneral.gov/careers/state-employment-benefits

15. Employees can and have become eligible for forgiveness of their student loans under PSLF while employed at OAG.

16. Further the declarant sayeth naught.

I declare under penalty of perjury under the laws of the United States of America and the State of

Texas that the foregoing is true and correct.

Executed in Austin, Texas, this 5ᵗʰ day of April 2024.

_____
HENRY DE LA GARZA



# Budget of the U.S. Government

**FISCAL YEAR 2023**

OFFICE OF MANAGEMENT AND BUDGET

THE WHITE HOUSE
WASHINGTON



# BUDGET OF THE U.S. GOVERNMENT

**FISCAL YEAR 2023**

OFFICE OF MANAGEMENT AND BUDGET

pp. 112 -



THE WHITE HOUSE
WASHINGTON

# THE BUDGET DOCUMENTS

***Budget of the United States Government***, Fiscal Year 2023 contains the Budget Message of the President, information on the President's priorities, and summary tables.

***Analytical Perspectives,*** Budget of the United States Government, Fiscal Year 2023 contains analyses that are designed to highlight specified subject areas or provide other significant presentations of budget data that place the budget in perspective. This volume includes economic and accounting analyses, information on Federal receipts and collections, analyses of Federal spending, information on Federal borrowing and debt, baseline or current services estimates, and other technical presentations.

Supplemental tables and other materials that are part of the Analytical Perspectives volume are available at https://whitehouse.gov/omb/analytical-perspectives/.

***Appendix, Budget of the United States Government***, Fiscal Year 2023 contains detailed information on the various appropriations and funds that constitute the budget and is designed primarily for the use of the Appropriations Committees. The Appendix contains more detailed financial information on individual programs and appropriation accounts than any of the other budget documents. It includes for each agency:  the proposed text of appropriations language; budget schedules for each account; legislative proposals; narrative explanations of each budget account; and proposed general provisions applicable to the appropriations of entire agencies or group of agencies.  Information is also provided on certain activities whose transactions are not part of the budget totals.

### BUDGET INFORMATION AVAILABLE ONLINE

The President's Budget and supporting materials are available online at https://whitehouse.gov/omb/budget/.  This link includes electronic versions of all the budget volumes, supplemental materials that are part of the Analytical Perspectives volume, spreadsheets of many of the budget tables, and a public use budget database.  This link also includes Historical Tables that provide data on budget receipts, outlays, surpluses or deficits, Federal debt, and Federal employment over an extended time period, generally from 1940 or earlier to 2027.  Also available are links to documents and materials from budgets of prior years.

For more information on access to electronic versions of the budget documents, call (202) 512-1530 in the D.C. area or toll-free (888) 293-6498.  To purchase the printed documents call (202) 512-1800.

---

### GENERAL NOTES

1. All years referenced for budget data are fiscal years unless otherwise noted. All years referenced for economic data are calendar years unless otherwise noted.

2. At the time the Budget was prepared, none of the full-year appropriations bills for 2022 have been enacted, therefore, the programs and activities normally provided for in the full-year appropriations bills were operating under a continuing resolution (Public Law 117-43, division A, as amended by Public Law 117-70, division A; Public Law 117-86, division A; and Public Law 117-95). References to 2022 spending in the text and tables reflect the levels provided by the continuing resolution, and, if applicable, the following Public Laws which provided additional appropriations to certain accounts in 2022—

   • The Disaster Relief Supplemental Appropriations Act, 2022 (Public Law 117-43, division B);

   • The Afghanistan Supplemental Appropriations Act, 2022 (Public Law 117-43, division C);

   • The Infrastructure Investment and Jobs Appropriations Act (Public Law 117-58, division J); and

   • The Additional Afghanistan Supplemental Appropriations Act, 2022 (Public Law 117-70, division B).

3. The estimates in the 2023 Budget do not reflect the effects of the Ukraine Supplemental Appropriations Act, 2022 (included in Public Law 117-103) due to the late date of enactment.

4. Detail in this document may not add to the totals due to rounding.

---

**U.S. GOVERNMENT PUBLISHING OFFICE, WASHINGTON 2022**

For sale by the  Superintendent of Documents,  U.S. Government Publishing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512-1800;   DC area (202) 512-1800
Fax: (202) 512-2104 Mail: Stop IDCC, Washington, DC 20402-0001

ISBN 978-0-16-095232-6

# Table of Contents

*Page*

The Budget Message of the President ...................................................................................1

Confronting Urgent Crises and Delivering Historic Progress .......................................3

Building a Better America ...............................................................................................13

Ensuring an Equitable, Effective, and Accountable Government
    that Delivers Results for All ........................................................................................37

Department of Agriculture .............................................................................................45

Department of Commerce ...............................................................................................49

Department of Defense ....................................................................................................53

Department of Education ................................................................................................57

Department of Energy .....................................................................................................61

Department of Health and Human Services ................................................................65

Department of Homeland Security .................................................................................71

Department of Housing and Urban Development ........................................................73

Department of the Interior .............................................................................................77

Department of Justice ......................................................................................................81

Department of Labor .......................................................................................................85

Department of State and Other International Programs .............................................89

Department of Transportation ........................................................................................93

Department of the Treasury ............................................................................................97

Department of Veterans Affairs .....................................................................................99

Corps of Engineers—Civil Works ................................................................................103

Environmental Protection Agency ...............................................................................105

National Aeronautics and Space Administration .......................................................109

National Science Foundation ........................................................................................111

Small Business Administration .....................................................................................113

Social Security Administration .....................................................................................115

Summary Tables ............................................................................................................117

OMB Contributors to the 2023 Budget .......................................................................145

# THE BUDGET MESSAGE OF THE PRESIDENT

To the Congress of the United States:

There is no greater testament to the grit and resilience of the American people than the extraordinary progress we have made together over the last year.

America entered 2021 in the midst of a devastating health crisis, on the heels of the worst economic crisis since the Great Depression. We ended 2021 having created over 6.5 million new jobs, the most our Nation has ever recorded in a single year. Our economy grew at a rate of 5.7 percent, the strongest growth in nearly 40 years. As of February, the unemployment rate has fallen from 6.4 percent when I took office to 3.8 percent—the fastest decline in recorded history. We are bringing everyone along, and leaving no one behind; child poverty is projected to reach the lowest level ever recorded, while long-term unemployment, youth unemployment, and Black and Hispanic unemployment have all dropped at record rates. Though family budgets are still tight, millions more Americans are earning paychecks today—and families have more money in their pockets than they did a year ago.

This progress was no accident. It was a direct result of the new economic vision for America I ran on—to build our economy from the bottom up and the middle out.

That vision was reflected in the American Rescue Plan Act of 2021, which lifted our Nation out of crisis; fueled our efforts to vaccinate America and combat the COVID-19 pandemic globally; enabled small businesses and State and local governments to hire, rehire, and retain workers; and delivered immediate economic relief to tens of millions of Americans—to put food on their tables, keep a roof over their heads, enable them to work by keeping schools and child care providers open, and maintain their dignity in the face of the pandemic.

That vision was also reflected in the Bipartisan Infrastructure Law—the most sweeping investment to rebuild America in history. After years of merely talking about fixing our infrastructure, we brought together Democrats and Republicans to finally get it done. Already, that law is paving the way for better jobs for millions of Americans—modernizing roads, bridges, ports, and airports; building a national network of charging stations, so America can own the electric car market; replacing lead pipes across the Nation, so every child can drink clean water at home and at school; providing affordable high-speed internet for every American; and strengthening our resilience to withstand both cyber and physical threats, including the devastating effects of the climate crisis.

There have been challenges as we have recovered from the COVID-19 pandemic. Due to the speed of our recovery, businesses have had a hard time hiring workers quickly enough to keep pace with resurgent demand. Disruptions to global supply chains have also contributed to higher prices. As a result, America was not immune to the worldwide inflation that has followed the pandemic—leaving too many families struggling to keep up with their bills. Since January, that pain has also been compounded by the anticipation and aftermath of Vladimir Putin's invasion of Ukraine—from the time he began amassing troops on Ukraine's borders, triggering a response in global oil markets, the price of a gallon of gas has risen by more than a dollar here at home as of mid-March.

Today, however, as a result of the new economic vision we are building our economy around, we are well-positioned to meet the challenges and seize the opportunities of this decisive decade. We are competing with China from a position of strength, while leading a global coalition united in

1

condemnation of Russian aggression against Ukraine.  We are tackling the climate crisis with urgency, strengthening the global health architecture to combat COVID-19 and future pandemics, and enhancing cybersecurity and addressing emerging cyber threats.  We are joining with allies and partners to write the rules of 21st Century economics, trade, and technology.

My Budget details the next steps forward on our journey to execute a new economic vision, reduce costs for families, reduce the deficit, and build a better America.  It is a Budget anchored in my bedrock belief that America is at its best when we invest in the backbone of our Nation: the hardworking people in every community who make our Nation run.

My Budget lays out detailed investments to build on a record-breaking year of broad-based, inclusive growth—and meet the challenges of the 21st Century.  It is a call to reduce costs for families' biggest expenses; grow, educate, and invest in our workforce; bolster our public health infrastructure; save lives by investing in strategies such as community policing and community violence interventions, strategies proven to reduce gun crime; and advance equity, environmental justice, and opportunity for all Americans.

As I discussed in my 2022 State of the Union Address, my Budget also reflects a bipartisan unity agenda—areas where we can all come together to make progress.  That includes investments to help beat the opioid epidemic; take on the invisible costs of the mental health crisis, especially among our children; support our veterans; and end cancer as we know it.  My super-charged Cancer Moonshot plan has a goal of cutting cancer death rates by at least 50 percent over the next 25 years—while my vision for ARPA-H, the Advanced Research Projects Agency for Health, seeks breakthroughs in cancer, Alzheimer's, diabetes, and more.

Critically, my Budget would also keep our Nation on a sound fiscal course.  It fights inflation and helps families deal with rising costs by growing our economy, making more goods in America, and lowering the costs families face.  Its bold ideas are fully paid for, with tax reforms that more than offset the cost of new investments.  It fulfills my ironclad promise that no one earning less than $400,000 per year would pay an additional penny in new taxes—while ensuring that the wealthiest Americans and the biggest corporations begin to pay their fair share.  It keeps us on track to reduce the deficit this year to less than half of what it was before I took office.

After a year of historic progress, I am more optimistic about America today than I have ever been.  We are on a path to win the competition for the 21st Century.  We are prepared once again to turn a moment of crisis into a breathtaking opportunity.  We are stronger today than we were a year ago—and we will be stronger a year from now than we are today.

All we have to do is keep coming together—to keep building, keep giving working families a fighting chance, and keep expanding the possibilities of our Nation.  That is what my Budget is all about, and I look forward to working together to keep delivering for the American people.


JOSEPH R. BIDEN, JR.



THE WHITE HOUSE.

# CONFRONTING URGENT CRISES AND DELIVERING HISTORIC PROGRESS

When the President took office, the United States was confronting overlapping crises of unprecedented scope and scale: a once-in-a-century pandemic; a sharp economic downturn; an accelerating climate crisis; and a legacy of persistent inequity. On day one of his Administration, the President immediately got to work leveraging every tool at his disposal to tackle these crises head-on—mobilizing the Nation around an ambitious agenda to deliver results for working families. Under the President's leadership—and thanks to the grit and resilience of the American people in the face of significant challenges—America has made historic progress.

## POWERING A HISTORIC ECONOMIC RESURGENCE

When the President took office, he faced an economy that was struggling to recover from the most severe downturn since the Great Depression. The unemployment rate stood at 6.4 percent, with 10 million Americans unable to find a job. Factoring in workers who dropped out of the labor force or couldn't find full-time work, the unemployment rate was closer to 11 percent. Between February 2020 and January 2021, the labor force participation rate for women dropped by 3.7 percent overall, 6.4 percent for Black women, and 7.1 percent for Hispanic women, undoing more than 35 years of progress in labor force participation. More than 18 million Americans were receiving unemployment benefits, and more than half of the unemployed had been without a job for more than 15 weeks. Thousands of small businesses—the backbone of the American economy—were forced to close their doors, some permanently. Millions of Americans reported that they were struggling to pay their rent or mortgage, put food on the table, and cover basic expenses.

In the face of these challenges, the President took decisive action—not only to put a floor under the immediate economic fallout, but to begin rebuilding the economy from the bottom-up and the middle-out. The President's strategy helped rescue the economy, delivered urgently needed relief to families and small businesses, fueled record-breaking economic growth and job creation, and bolstered American competitiveness and manufacturing.

### *Fueling Record-Breaking Economic Growth and Job Creation*

Thanks to the American Rescue Plan Act of 2021 (American Rescue Plan) and the President's vaccination program, the American economy is recovering faster than other advanced economies around the world, with record-breaking economic growth and job creation. In 2021, the Administration achieved the best record of job creation in American history, with the single largest calendar year decrease in the unemployment rate on record. As of February 2022, the unemployment rate had fallen to 3.8 percent. Prior to passage of the American Rescue Plan, the Congressional Budget Office did not project the unemployment rate dropping to 3.8 percent at any point over this entire decade. Since the

President took office, the economy has created 7.4 million jobs. The number of long-term unemployed Americans decreased by two million during the President's first year in office—a record decline. More than 1.6 million women have reentered the workforce.

As more Americans have gotten back to work, the economy has come roaring back to life. In 2021, the American economy grew at 5.7 percent, the fastest rate in nearly four decades. For the first time in 20 years, the economy grew faster than China's. Applications for new small businesses increased 30 percent since before the pandemic. Retail sales rose by $90 billion. Between the American Rescue Plan's tax cuts for families that are raising children and rising wages for middle class families, the average American had more money in their pocket each month in 2021 than they did in 2020—after accounting for inflation.

### Strengthening Supply Chains, Promoting Competition, and Bolstering Manufacturing

To sustain and build on this economic momentum, the President has taken aggressive actions to address other global challenges triggered by the COVID-19 pandemic and expand the productive capacity of the economy—strengthening domestic supply chains, promoting competition and innovation to help lower prices, and bolstering American manufacturing.

In the face of global supply chain bottlenecks and global inflation, last year the President issued an Executive Order 14017, "America's Supply Chains," to strengthen the Nation's supply chains and launched the Supply Chain Disruptions Task Force to address disruptions linked to the COVID-19 pandemic. Thanks to those efforts, more cargo is moving through American ports than at any time in the Nation's history. The number of containers sitting on the docks at the Ports of Los Angeles and Long Beach—two of the largest ports in America—for more than eight days has been cut by more than 70 percent since the beginning of November 2021. Holiday

sales surged 14 percent last year—a new record. Despite dire predictions about delivery delays at the end of last year, holiday season delivery times dropped below their pre-pandemic levels, while retail inventories hit an all-time record. In addition, the Administration's Action Plan for America's Ports and Waterways and Trucking Action Plan to Strengthen America's Trucking Workforce continue to help American port operators move a record amount of goods from ships to shelves as quickly as possible and connect more Americans to good jobs in the trucking industry.

The President has also taken key steps to promote greater competition, protect consumers, and lower prices. In July 2021, the President signed a historic Executive Order 14036, "Promoting Competition in the American Economy," to encourage competition across industries, including travel, healthcare, food, internet service, and more. Executive Order 14036 includes 72 initiatives by more than a dozen Federal agencies to promptly tackle some of the most pressing competition problems across the economy. In the months since, the Administration has worked to lower prices for hearing aids and has taken on meat processors that are raking in record profits while raising prices for consumers at the grocery store. Also, enforcement agencies like the Federal Trade Commission and the Department of Justice (DOJ) have taken strong actions to protect consumers from anti-competitive mergers that could have raised prices for consumers and businesses.

The President has also relentlessly focused on implementing an industrial strategy to revitalize America's manufacturing base. During his first week in office, the President signed Executive Order 14005, "Ensuring the Future is Made in All of America by All of America's Workers," that created the first-ever Made in America Office within the Office of Management and Budget and launched a Government-wide initiative to leverage the Federal Government's procurement power to support American manufacturing and American workers. To help translate that commitment into action, the President announced the most robust changes to the Buy American Act of

1933 in more than 70 years—raising the domestic content threshold, strengthening domestic supply chains for critical goods, and increasing transparency and accountability. Since the President took office, the economy has added more than 423,000 new manufacturing jobs. Manufacturing as a share of Gross Domestic Product has returned to pre-pandemic levels. In recent months, major companies have announced significant investments in new manufacturing lines and factories that will create thousands of good-paying jobs in the United States.

## MOUNTING A FORCEFUL RESPONSE TO THE PANDEMIC

In January 2021, the United States lacked the tools to fully protect people against COVID-19. Less than one percent of Americans—some two million people—were fully vaccinated. Less than half of our Nation's schools were open for in-person instruction. Zero at-home tests were on the market. The Nation faced shortages of protective equipment for frontline workers and didn't have enough vaccines, vaccinators, or locations where people could get vaccinated. Meanwhile, the rapid spread of the virus had disrupted the education of millions of students, forced an estimated 1-in-4 child care providers to close their doors, taken a significant toll on Americans' mental health, produced a massive surge in domestic violence incidents and overdose deaths, worsened food and housing insecurity, and deepened longstanding health inequities in communities across the Nation.

From the day he took office, the President has been unrelenting in his focus on ensuring that the American people have the tools necessary to protect themselves against COVID-19: more vaccines, boosters, tests, masks, and treatments. Through the American Rescue Plan, the Administration secured $160 billion to support the President's vaccination program, therapeutics, testing and mitigation, personal protective equipment, and the broader COVID-19 response. These resources have played a key role in preventing hospitalizations and deaths from COVID-19 and combatting the Delta and Omicron variants.

As a result of these efforts, the United States is moving forward safely. As of March 2022, more than 216 million Americans—including more than 75 percent of adults—had been fully vaccinated. Vaccines are approved or authorized for all Americans five years of age and older. There are more than 90,000 vaccination locations in communities across the Nation, with 90 percent of Americans living within five miles of a site. The Administration is securing millions of doses of a highly effective pill to treat COVID-19. In addition, the President's focus on equity is delivering results: the latest CDC data show that gaps in vaccination rates among Latino, Black, and White adults have been effectively closed.

After a year of children falling behind on learning, the President took action to open schools and get kids and teachers back into their classrooms. The American Rescue Plan provided $130 billion to schools to allow for their safe operation and address the COVID-19 pandemic's impacts on learning, as well as an additional $10 billion to support COVID-19 testing. The Administration has also ensured schools have the flexibility and resources they need to ensure children are fed healthy meals. As a result, about 99 percent of schools are now open, full-time and in person—up from just 46 percent when the President took office. This progress has been crucial to ensuring that all students can safely be back where they belong—learning alongside their peers—and to helping them recover from any learning loss or mental health setbacks they experienced since the onset of the COVID-19 pandemic.

As the Administration combats the COVID-19 pandemic at home, the United States is also leading the international effort to respond to the Global COVID-19 pandemic and vaccinate the world. At the President's direction, the United States has committed to donating 1.2 billion vaccine doses for free with no strings attached—the largest commitment in the world—and has

already shipped 500 million doses to 112 countries, four times more doses than any other country. The Administration is also working to expand access to tests, treatments, and personal protective equipment globally. These efforts are saving lives, improving our national and economic security, and helping prevent the emergence and spread of other dangerous variants and future biological catastrophes like pandemics.

### Delivering Urgent Relief

With the passage of the American Rescue Plan, the Administration quickly mobilized vital resources to help families and small businesses weather the worst of the pandemic and create a bridge to an economic recovery.

In 2021, the Administration delivered more than 175 million economic impact payments of $1,400 to the vast majority of Americans—totaling over $400 billion in relief. The American Rescue Plan expanded the Child Tax Credit for families of more than 61 million children, with up to $3,600 available for families with children under six, and $3,000 for families with children 6 to 17 years old. For the first time—and beginning just four months after the American Rescue Plan's passage—these payments were made on a monthly basis, providing a reliable boost to working families to help cover essential expenses. The American Rescue Plan also helped make quality health insurance coverage through the Affordable Care Act more affordable than ever—with

families saving an average of $2,400 on their annual premiums, and 4 out of 5 consumers finding quality coverage for under $10 a month.

At the same time, the American Rescue Plan provided funding to all 50 States and more than 34,000 cities, towns, and counties to help prevent layoffs and get workers back on the job. It provided $28 billion through the Restaurant Revitalization Fund (RRF) to help more than 100,000 restaurants and bars keep their doors open. The RRF was part of the more than $450 billion in emergency relief delivered to more than six million small businesses in 2021 through the Administration's implementation of the Paycheck Protection Program, COVID Economic Injury Disaster Loan (EIDL) program, the COVID EIDL Targeted and Supplemental Advance programs, and the Shuttered Venue Operators Grants program.

The Administration also implemented the Emergency Rental Assistance program, which delivered 3.8 million payments totaling over $33 billion to eligible households in 2021. Over 80 percent of the assistance was delivered to lowest-income households (those earning 50 percent of area median income and below). As a result of these efforts, the Administration has built a nationwide infrastructure for rental assistance and eviction prevention, helping keep eviction filings below 60 percent of historical levels and preventing households from experiencing further economic setbacks associated with housing insecurity.

## DELIVERING PROGRESS AT HOME

Under the President's leadership, our Nation has not only risen to meet urgent crises, but we have begun building a better and more resilient America. Since taking office, the President has advanced an agenda to bring more dignity, opportunity, security, and prosperity to working families across the Nation—from rebuilding America's infrastructure and laying a new foundation for growth, to taking historic action to combat the

climate crisis, to embedding equity as a priority across the Federal Government.

### Rebuilding America's Crumbling Infrastructure

After decades of talk in Washington about rebuilding our crumbling infrastructure, last year

the President worked with members of both parties in the Congress to pass and sign into law the Infrastructure Investment and Jobs Act (Bipartisan Infrastructure Law)—a once-in-a-generation investment in our Nation's infrastructure and competitiveness that will help build a better America, create good-paying union jobs, ease inflationary pressures, and grow the economy sustainably and equitably so that everyone has the chance to get ahead for decades to come.

For the up to 10 million American households that lack safe drinking water, the Bipartisan Infrastructure Law invests $55 billion to deliver clean water to all American families and eliminate the Nation's lead service lines—including in tribal, rural, and disadvantaged communities. To ensure that every American has access to reliable, affordable, high-speed internet, it invests a historic $65 billion for broadband deployment to help lower the cost of internet service and to close the digital divide. To fix and rebuild our roads and bridges, it reauthorizes surface transportation programs for five years and makes the single largest investment in repairing and reconstructing our Nation's bridges since the construction of the interstate highway system.

The Bipartisan Infrastructure Law also: includes crucial resources to improve transportation options for millions of Americans and reduce greenhouse emissions through the largest investment in public transit in U.S. history; upgrades the Nation's airports and ports to strengthen domestic supply chains; makes the largest investment in passenger rail since the creation of Amtrak; builds a national network of electric vehicle chargers; makes our Nation's infrastructure resilient against the impacts of climate change, cyber-attacks, and extreme weather events; and includes more for our Nation.

In the months since the President signed the Bipartisan Infrastructure Law into law, the Administration has hit the ground running to deliver results. Already, the Administration has mobilized resources to: connect tribal Nations to reliable, affordable high-speed internet; replace, repair, and rehabilitate bridges across the Nation;

upgrade critical infrastructure at 3,075 airports; update America's aging water infrastructure, sewerage systems, pipes and service lines; and stop toxic waste from harming communities.

## Taking Aggressive Action to Tackle the Climate Crisis

When the President took office, he made tackling the climate crisis a central priority across the entire Federal Government. At his direction, the Administration has launched an unprecedented effort to reduce climate pollution while creating good-paying union jobs, advancing environmental justice, strengthening the Nation's resilience, and protecting public health.

On the first day of his Administration, the President rejoined the Paris Agreement. The President set an ambitious goal to reduce greenhouse gas pollution 50 to 52 percent from 2005 levels by 2030, while rallying countries around the world to make their own bold contributions. At the 2021 United Nations Climate Change Conference, the President launched the *U.S. Methane Emissions Reduction Action Plan* in support of the Global Methane Pledge of September 18, 2021 (Global Methane Pledge) to reduce the world's methane emissions 30 percent from 2020 levels by 2030. To advance the global phasedown of hydrofluorocarbons, the President secured domestic action to reduce emissions of these super pollutants by 85 percent within 15 years. Also, to reward clean manufacturing in the global marketplace, the President announced a groundbreaking commitment to negotiate the world's first carbon-based arrangement on steel and aluminum trade with the European Union.

The President also set a target to eliminate carbon pollution from the electricity sector by 2035 and is fast-tracking clean energy—including the launch of the American offshore wind industry, with the first approvals of large-scale projects on the path to 30 gigawatts by 2030. The President's support for innovation and deployment of wind, solar, storage, transmission, and more is creating good-paying union jobs and lowering energy bills

for consumers. To jumpstart an electric transportation future that's Made in America, the President brought together automakers and autoworkers around a new ambitious goal for 50 percent electric vehicle sales share in 2030. The President also launched a Federal Sustainability Plan to lead by example through the Federal Government's vehicle fleet, buildings, and purchasing power. The President has pursued new climate-smart agriculture and forestry initiatives, protections for cherished monuments and habitats, and the America the Beautiful initiative to conserve 30 percent of U.S. lands and waters by 2030. Also, the President launched whole-of-Government efforts to build resilience to intensifying climate impacts, protect the economy and financial systems from climate-related financial risks, and secured emergency funding last year to help communities recover from disasters and related crop losses.

The President is also making good on his Justice40 commitment to deliver 40 percent of the benefits from Federal investments in climate and clean energy to disadvantaged communities to build their economies. To create good-paying union jobs in hard-hit energy communities, the President has driven Federal resources to coal, oil and gas, and power plant communities. The President made environmental justice and economic revitalization a centerpiece of the Bipartisan Infrastructure Law, which includes the largest investment in addressing legacy pollution in American history, including capping orphaned oil and gas wells that are major sources of methane emissions and local air pollution. The Environmental Protection Agency has committed to cleanup and clear the backlog of 49 previously unfunded Superfund sites and accelerate cleanup at dozens of other sites across the Nation.

Through the Bipartisan Infrastructure Law, the Administration also secured the largest investments ever in the Nation's water infrastructure, power grid, public transit, and resilience. The law will help replace lead service lines and reduce exposure to the dangerous per- and polyfluoroalkyl chemical substances. It will make communities safer and our infrastructure more resilient to the impacts of climate change and cyber-attacks, with an investment of over $50 billion to protect against droughts, heat, floods, and wildfires, in addition to a major investment in weatherization. It invests more than $65 billion through the Department of Energy to upgrade our power infrastructure, facilitate the expansion of renewables and clean energy, and fund new programs to support the development, demonstration, and deployment of cutting-edge clean energy technologies to accelerate our transition to a zero-emission economy. Also, it will deliver thousands of electric school buses nationwide, including in rural communities, helping school districts across the Nation buy clean, American-made, zero-emission buses, and replace the yellow school bus fleet for America's children.

### Advancing Equity across the Economy and Nation

The promise of our Nation is that every American has an equal chance to live to their full potential. Yet persistent systemic inequities and barriers to opportunity have denied this promise for so many. That is why the President has taken historic steps to put equity at the center of his agenda—and why the President assembled the most diverse cabinet in American history to deliver on this Government-wide effort.

Beginning on his first day in office, the President took a series of landmark executive actions to advance equity. The President signed a day-one Executive Order 13985, "Advancing Racial Equity and Support for Underserved Communities Through the Federal Government," on advancing equity and racial justice across the Federal Government; a day-one Executive Order 13988, "Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation," directing Federal agencies to extend protections against discrimination based on gender identity and sexual orientation, upon which agencies have already acted in the areas of housing, lending services, education, healthcare, and more; and Executive Order 14035, "Diversity, Equity, Inclusion, and Accessibility in the Federal Workforce," on advancing diversity, equity,

inclusion, and accessibility (DEIA) across the Federal workforce. In the months since, Federal agencies have been hard at work implementing these orders—delivering more equitable external work, revised DEIA policies and trainings, and updated civil rights guidance and regulations.

The Administration set a Government-wide goal of increasing the share of Federal contracts to small disadvantaged businesses, including those owned by people of color, by 50 percent by 2025—which would translate to an increase of $100 billion to these firms over five years. The Bipartisan Infrastructure Law made permanent the Minority Business Development Agency, the only Federal entity focused exclusively on promoting growth and competitiveness of minority-owned businesses, and elevated the head of the Agency to the Under Secretary level. The Administration provided $32 billion specifically for tribal communities and Native Americans as part of the American Rescue Plan, as well as $13 billion in direct investments in tribal communities through the Bipartisan Infrastructure Law. Also, the American Rescue Plan's $122 billion Elementary and Secondary School Emergency Relief Fund, in addition to providing critically needed funds to safely reopen and operate schools and support students, included landmark maintenance of equity requirements that protected high-poverty districts and schools from disproportionate funding reductions and the highest poverty districts from any reductions.

On International Women's Day in March 2021, the President signed Executive Order 14020, "Establishment of the White House Gender Policy Council," establishing the first White House Gender Policy Council within the Executive Office of the President and charged the office with leading a Government-wide effort to advance gender equity and equality. To guide that work, last year the Administration issued the first ever *National Strategy on Gender Equity and Equality* in the United Sates to advance equal opportunity for people of all genders—now, agencies are developing action plans to achieve their top priorities for advancing gender equity and equality. The Administration has also: taken critical steps to eliminate racial disparities in maternal health; advanced historic military justice reform; deployed resources from the American Rescue Plan for domestic violence and sexual assault prevention and services; and announced bold commitments to advance women's economic security, gender-based violence prevention and response, and sexual and reproductive health and rights both at home and around the world.

The President has also moved decisively to condemn racism, xenophobia, and intolerance against Asian Americans (AA) and Native Hawaiian and Other Pacific Islanders (NHOPI). In his first week in office, the President signed a Presidential Memorandum establishing an official policy to ensure the Federal Government stands up against racism, xenophobia, nativism, and bias. The memorandum directed all Federal agencies to take steps to ensure their actions mitigate anti-Asian bias and xenophobia, especially in the response to the COVID-19 pandemic, and charged DOJ to partner with AA and NHOPI communities to respond to and prevent hate crimes and violence. In May 2021, the President signed into law the COVID-19 Hate Crimes Act, bipartisan legislation that makes significant improvements to the Nation's response to hate crimes.

The Administration is also creating opportunity and building wealth in rural communities. For example, the American Rescue Plan's Coronavirus State and Local Fiscal Recovery Fund has enabled States to invest in critical rural broadband and water infrastructure. In addition, the Administration's efforts to strengthen the food system through American Rescue Plan funding are opening up new markets for farmers and ranchers in rural America and supporting a fairer, more competitive, and more resilient meat and poultry supply chain. The Administration is also working to keep rural hospitals open, supporting rural providers, expanding rural healthcare coverage, and making it more affordable than ever, with nearly 700,000 rural Americans gaining coverage through the Patient Protection and Affordable Care Act in 2021 alone and families saving an average of $2,400 per year due to the American Rescue Plan.

## RESTORING AMERICAN LEADERSHIP ON THE WORLD STAGE

As the President has restored the Nation's strength at home, he has revitalized our alliances and partnerships around the world, brought American leadership to bear on the defining issues of our time, and invested in our military advantage. The President has prioritized strategic competition with China and worked with allies and partners to resist coercion and deter aggression from Beijing and Moscow, and ended America's 20-year war in Afghanistan while removing all U.S. troops. The President has led a global response to the COVID-19 pandemic and made historic investments to confront the climate crisis. As the United States enters what will be a decisive decade, the President is positioning America to win the competition for the 21st Century.

The President strengthened our foundational partnership with Europe on the full range of global challenges, including climate, health security, trade and technology, and our collective and decisive response to Russian aggression against Ukraine. In the Indo-Pacific, America is strengthening its role and expanding its cooperation with longtime allies and partners, including new diplomatic, defense and security, critical and emerging technology and supply chain, and climate and global health initiatives, while supporting stronger ties between our European and Indo-Pacific allies. Closer to home, the United States has invested in relationships in the Western Hemisphere, including by reviving the North American Leaders' Summit to consult with neighboring countries, committing to work together on major regional migration efforts, and collaborating on health security, democratic renewal, and shared economic growth. In the Middle East and North Africa, the United States is working to de-escalate tensions, curb Iran's destabilizing activities, and help regional partners lay the foundation for greater security, prosperity, and opportunity for their people. The United States is partnering with African nations and publics to solve problems of common interest—from health security to shared economic prosperity to countering terrorism—mindful of the continent's importance to critical global issues.

From his first days in office, the President has restored U.S. leadership to the most significant global challenges of our time. At the President's direction, the United States has served as the world's vaccine arsenal, pledging more than 1.2 billion COVID-19 vaccines to countries around the world, providing lifesaving supplies, and hosting a Global COVID-19 Summit to build better health security for the future. The President renewed U.S. leadership on climate, including by rejoining the Paris Agreement. Alongside the Group of Seven partners, the United States launched the Build Back Better World Initiative to meet the developing world's infrastructure needs transparently, sustainably, and with high standards. The President convened 110 governments in the first Summit for Democracy to catalyze action to strengthen democracy at home and abroad. The United States rejoined and reinforced international institutions such as the World Health Organization and the United Nations Human Rights Council. In addition, the Administration reprioritized cybersecurity by strengthening resilience at home and accelerating cooperation with allies and the private sector.

Under the President's leadership, the United States has resolved significant trade disputes, including on airplanes, steel, and aluminum, and protected American workers by centering them in our foreign policy. Last year, the United States rallied more than 100 countries to join the Global Methane Pledge to cut emissions by 30 percent by 2030. In addition to fueling the global economic recovery, America secured a historic win for workers and middle-class families through the agreement of 130 countries to support a global minimum tax for the world's largest corporations.

As America leads with diplomacy, we are also investing in our military—the strongest fighting force the world has ever known. We are investing in our warfighting advantages, understanding

that a combat-credible military is the foundation of deterrence and America's ability to prevail in conflict. At the same time, the United States is making disciplined choices about the use of military force and focusing its attention on the military's primary responsibilities: to defend the homeland; deter conflict; and to fight and win the Nation's wars, while remaining committed to the wellbeing of its servicemembers and their families.

# BUILDING A BETTER AMERICA

Under the President's leadership, America is on the move again. Together, in the face of unprecedented crises and ongoing challenges, we have begun to change the trajectory of our economy to finally make it work for working people—with historic job creation, faster economic growth, and more money in workers' pockets. We are moving forward safely, continuing to combat the pandemic and building better preparedness for the next health emergency. We have mobilized the Federal Government to tackle the climate crisis with the urgency that the science demands. We have launched a Government-wide effort to advance equity and expand opportunity across our Nation and economy. We have revitalized our global alliances and our leadership on the world stage. While much work remains, we are poised to meet the challenges and opportunities ahead.

The President's Budget details his vision for how to carry this momentum forward and build a better America. It is a Budget anchored in the President's bedrock belief that the economy grows from the bottom up and the middle out, and that America is at its best when all Americans—not just the wealthiest few—can get ahead and pursue their promise and potential.

In last year's Budget, the President put forward a set of proposals designed to ensure America emerged from the pandemic even stronger than before. Just months later, the President's proposals to rebuild America's crumbling infrastructure, expand access to clean drinking water, and invest in communities too often left behind were enacted in the Infrastructure Investment and Jobs Act (Bipartisan Infrastructure Law). Earlier this month, the Congress reached a bipartisan agreement to fund the Government for 2022, ending a damaging series of short-term continuing resolutions and taking a first step to reinvest in research, education, public health, and other core functions of the Government.

In the State of the Union, the President reiterated his commitment to work with the Congress to pass legislation to lower costs for American families, reduce the deficit, and expand the productive capacity of the American economy. The President supports legislation that: cuts costs for prescription drugs, healthcare premiums, child care, long-term care, housing, and college, including tuition-free community college and expanded support for Historically Black Colleges and Universities (HBCUs), Tribally Controlled Colleges and Universities (TCCUs), and Minority-Serving Institutions (MSIs); reduces energy costs by combatting climate change and accelerating the transition to a clean energy economy while creating good-paying jobs for American workers; supports families with access to free, high-quality preschool and paid family and medical leave and by continuing the enhanced Child Tax Credit and Earned Income Tax Credit; and provides health coverage to millions of uninsured Americans. The President believes these proposals must be paired with reforms that ensure corporations and the wealthiest Americans pay their fair share, including by paying the taxes they already owe and closing loopholes that they exploit.

Because discussions with the Congress continue, the President's Budget includes a deficit

13

neutral reserve fund to account for future legislation, preserving the revenue from proposed tax and prescription drug reforms for the investments needed to bring down costs for American families and expand our productive capacity. This approach reflects the President's continued commitments to: advancing the policies that strengthen our economy and reduce costs for American families; working collaboratively with the Congress to shape this legislation; and fully paying for the long-term costs of all new investments and reducing the deficit. As the President said in the State of the Union, he is committed to working with the Congress on legislation that both cuts costs for families and reduces the Federal deficit. To be conservative, however, the Budget reflects this reserve fund as deficit neutral.

In addition, the President's 2023 Budget proposes other targeted investments that would: help expand the productive capacity of our economy to create jobs, bring down prices, and continue our historic recovery; improve our public health infrastructure and spur transformational medical research; combat and prevent gun violence and other violent crime; drive action to lead the world in combating the climate crisis; and make higher education more affordable and accessible while advancing equity, opportunity, and security for all Americans. (Due to the timing of enactment, the 2023 Budget does not reflect the details of the 2022 appropriations bill, and investment levels in the Budget are compared to 2021 funding.)

The Budget also provides the resources necessary to deliver on our commitments to the American people's security and prosperity by revitalizing American leadership on the world stage. We are at the beginning of a decisive decade that will determine the future of strategic competition with China, the trajectory of the climate crisis, and whether the rules governing technology, trade, and international economics enshrine or violate our democratic values. The Budget enables us to meet these challenges by investing both in our domestic and international sources of strength—from our dynamic and diverse workforce, to our industrial and innovation base, to our military and development enterprise, to our unparalleled network of allies and partners. In doing so, the Budget enables us to marshal global coalitions to act from a position of strength, whether in the face of Russian aggression or transnational threats.

The Budget also delivers on the President's commitment to fiscal responsibility. The deficit is on track to drop by more than $1 trillion this year, the largest-ever one-year decline. Under the Budget policies, annual deficits would fall to less than half of last year's levels as a share of the economy, while the economic burden of debt would remain low. The Budget's investments are more than paid for through additional tax reforms that ensure corporations and the wealthiest Americans pay their fair share, allowing us to cut costs for American families, strengthen our economy, and cut deficits and debt by more than $1 trillion over the coming decade.

## PROMOTING JOB CREATION, REDUCING COST PRESSURES, AND BOOSTING THE PRODUCTIVE CAPACITY OF THE ECONOMY

In 2021, America saw the strongest monthly job growth ever recorded, the largest decline in unemployment ever recorded, and the strongest economic growth in nearly four decades. Importantly, the benefits from this growth were broadly shared, and not only concentrated among those at the very top. At the same time, the United States—like virtually all advanced economies

around the world—is facing pandemic-driven price increases that strain family budgets. That is why the President is laser focused on building a more productive economy that can deliver more goods and services to the American people while bringing down costs and driving growth and job creation. The Budget builds on the progress the Administration has already made—as well

as additional steps the President is pursuing—through a package of investments that would bolster the supply-side of the economy, create jobs and address cost pressures, and expand the economy's capacity over the medium- and long-term.

### Strengthening Supply Chains, Bolstering Manufacturing, and Improving Infrastructure

**Strengthens the Nation's Supply Chains through Domestic Manufacturing.** To help ignite a resurgence of American manufacturing and strengthen domestic supply chains, the Budget provides $372 million, an increase of $206 million over the 2021 enacted level, for the National Institutes of Standards and Technology's manufacturing programs to launch two additional manufacturing innovation institutes in 2023 and continue support for the two institutes funded in 2022. The Budget includes a $125 million increase for the Manufacturing Extension Partnership to make America's small and medium manufacturers more competitive, as well as $200 million for a new Solar Manufacturing Accelerator at the Department of Energy (DOE) to build domestic capacity in solar energy supply chains while moving away from imported products manufactured using unacceptable labor practices. The Budget provides $30 million to support programs that help ensure entrepreneurs have the tools and networks they need to bring cutting-edge innovation to the market.

**Accelerates Efforts to Move More Goods Faster through American Ports and Waterways.** The Budget continues support for the historic levels of Federal investment to modernize America's port and waterway infrastructure provided under the Bipartisan Infrastructure Law. The Budget includes $230 million for the Port Infrastructure Development Program to strengthen maritime freight capacity. In addition to keeping the Nation's supply chain moving by improving efficiency, the Department of Transportation will prioritize projects that also lower emissions—reducing environmental impact in and around America's ports. The Budget also includes $1.7 billion for the Harbor Maintenance Trust Fund to facilitate safe, reliable, and environmentally sustainable navigation at the Nation's coastal ports.

**Reduces Bottlenecks and Commute Times through Investments in Competitive Programs.** The Budget provides robust support for transportation projects that reduce commute times, improve safety, reduce freight bottlenecks, better connect communities, and reduce transportation-related greenhouse gas emissions. For example, investments include $4 billion for the new Bipartisan Infrastructure Law-authorized National Infrastructure Investments grant programs to support transportation projects with significant benefits across multiple modes.

**Modernizes and Upgrades Roads and Bridges.** To modernize, repair, and improve the safety and efficiency of the Nation's network of roads and bridges, the Budget provides $68.9 billion for the Federal-aid Highway program, including: $9.4 billion provided by the Bipartisan Infrastructure Law for 2023; $8 billion to rebuild the Nation's bridges; $1.4 billion to deploy a nationwide, publicly-accessible network of electric vehicle chargers and other alternative fueling infrastructure; $1.3 billion for a new carbon reduction grant program; and $1.7 billion for a new resiliency grant program to make surface transportation infrastructure more resilient to hazards such as climate change.

**Invests in Reliable Passenger and Freight Rail.** To ensure the safety and performance of the rail industry today and deliver the passenger rail network of the future, the Budget provides a historic $17.9 billion, a $15 billion increase over the 2021 enacted level. This includes $4.7 billion in additional funding on top of the $13.2 billion already provided by the Bipartisan Infrastructure Law for 2023. These resources would support $7.4 billion to significantly improve Amtrak's rolling stock and facilities, and $10.1 billion for existing and new competitive grant programs to support passenger rail modernization and expansion, address critical safety needs, and support the vitality of the freight rail network.

**Connects All Americans to High-Speed, Affordable, and Reliable Internet.** The President is committed to ensuring that every American has access to broadband, which would not only strengthen rural economies, but also create high-paying union jobs installing broadband. Building on key investments in the Bipartisan Infrastructure Law, the Budget provides $600 million for the ReConnect program, which provides grants and loans to deploy broadband to unserved areas—especially tribal areas—and $25 million to help rural telecommunications co-operatives refinance their Rural Utilities Service debt and upgrade their broadband facilities.

### Addressing Cost Pressures and Expanding Economic Capacity

**Increases Affordable Housing Supply.** To address the critical shortage of affordable housing in communities throughout the Nation, the Budget proposes $50 billion in mandatory funding and additional Low-Income Housing Tax Credits (LIHTC) to address market gaps, increase housing supply, and help to stabilize housing prices over the long-term. Specifically, the Budget provides $35 billion in mandatory funding at the Department of Housing and Urban Development (HUD) for State and local housing finance agencies and their partners to provide grants, revolving loan funds and other streamlined financing tools, as well as grants to advance State and local jurisdictions' efforts to remove barriers to affordable housing development. In addition, the Budget proposes $5 billion in mandatory funding for the Department of the Treasury's Community Development Financial Institutions Fund to support financing of new construction and substantial rehabilitation that creates net new units of affordable rental and for sale housing. The Budget also proposes modifying LIHTC to better incentivize new unit production, with a 10-year cost of nearly $10 billion. The Budget also provides more than $1.9 billion in discretionary funding for the HOME Investment Partnerships Program to construct and rehabilitate affordable rental housing and provide homeownership opportunities—the highest funding level for HOME in nearly 15 years.

**Fosters Competitive and Productive Markets and Targets Corporate Concentration.** The Budget reflects the Administration's commitment to vigorous marketplace competition through robust enforcement of antitrust law by including historic increases of $88 million for the Antitrust Division of the Department of Justice (DOJ) and $139 million for the Federal Trade Commission. The President also supports legislation that would align executives' interests with the long-term interests of shareholders, workers, and the economy by requiring executives to hold on to company shares that they receive for several years after receiving them, and prohibiting them from selling shares in the years after a stock buyback. This would discourage corporations from using profits to repurchase stock and enrich executives, rather than investing in long-term growth and innovation.

**Builds a Competitive and Resilient Food Supply Chain.** The Budget strengthens market oversight through investments in the Agricultural Marketing Service and the Animal and Plant Health Inspection Service, resulting in competitive meat and poultry product prices for American families and increased protection against invasive pests and zoonotic diseases. These programs build on the pandemic and supply chain assistance funding in the American Rescue Plan Act of 2021 (American Rescue Plan) to address pandemic-related vulnerabilities in the food system and create new market opportunities and good-paying jobs.

**Promotes Innovation and Science in Underrepresented Communities.** The Budget supports programs, including community-led capacity building and training, that expand equitable inclusion in Federal science and technology programs and the use of scientific and technological innovation to advance equitable outcomes. The Budget provides $393 million for the National Science Foundation (NSF), an increase of $172 million or 78 percent above the 2021 enacted level, for programs dedicated to increasing the participation of historically underrepresented communities in science and engineering fields. The Budget also provides $260 million

for DOE initiatives to build science and technology capacity in underserved institutions, including HBCUs, Hispanic Serving Institutions (HSIs), and TCCUs.  In addition, the Budget provides $315 million through the U.S. Department of Agriculture (USDA) in agriculture research, education, and extension grants to build capacity in underserved institutions, including HBCUs, HSIs, and TCCUs.

### Expanding Opportunities for Workers and Small Businesses

**Expands Access to Capital for Small Businesses.**  The Budget addresses the need for greater access to affordable capital, particularly in underserved communities.  The Budget increases the authorized lending levels in key Small Business Administration (SBA) programs by a total of $9.5 billion to significantly expand the availability of working capital, fixed capital, and venture capital funding for small businesses.  The Administration looks forward to working with the Congress to ensure small manufacturers have sufficient working capital to help them meet human resource needs and purchase raw materials/inventory, while incentivizing them to finance renewable energy equipment projects.

**Supports Minority-Owned Businesses to Narrow Racial Wealth Gaps.**  The Budget elevates the stature and increases the capacity of the Minority Business Development Agency by providing the full $110 million authorized in the Bipartisan Infrastructure Law.  This funding would bolster services provided to minority-owned enterprises by expanding the Business Center program, funding Rural Business Centers, opening new regional offices, and supporting innovative initiatives to foster economic resiliency.

**Creates New Global Markets for American Goods.**  The Budget provides an additional $26 million over 2021 enacted levels to bolster commercial diplomacy and enhance export promotion through a targeted expansion of the Foreign Commercial Service at the International Trade Administration, which would help American businesses seeking to increase exports abroad, navigate new foreign markets, or find market opportunities.

**Equips Workers with Skills They Need to Obtain High-Quality Jobs.**  The Budget invests $100 million to help community colleges work with the public workforce development system and employers to design and deliver high-quality workforce programs.  The Budget also provides $100 million for a new Sectoral Employment through Career Training for Occupational Readiness program, which would support training programs focused on growing industries, enabling disadvantaged workers to enter on-ramps to middle class jobs, and creating the skilled workforce the economy needs to thrive.

**Expands Access to Registered Apprenticeships (RA).**  RA is a proven earn-and-learn model that raises participants' wages and puts them on a reliable path to the middle class.  The Budget invests $303 million, a $118 million increase above the 2021 enacted level, to expand RA opportunities in high growth fields, such as information technology, advanced manufacturing, healthcare, and transportation, while increasing access for historically underrepresented groups, including people of color and women.  To improve access to RA for women, the Budget doubles the Department of Labor's (DOL) investment in its Women in Apprenticeship and Nontraditional Occupations grants, which provide pre-apprenticeship opportunities to boost women's participation in RA.

**Provides Youth Training and Employment Pathways.**  The Budget invests in programs that provide young people with equitable access to high-quality training and career opportunities, including $75 million for a new National Youth Employment Program to create high-quality summer and year-round job opportunities for underserved youth.  The Budget also provides $145 million for YouthBuild, $48 million above the 2021 enacted level, to enable more at-risk youth to gain the education and occupational skills they need to obtain good jobs.  To further advance equity and inclusion, the Budget also

provides $15 million to test new ways to enable low-income youth with disabilities—including youth who are in foster care, involved in the justice system, or are experiencing homelessness—to successfully transition to employment.

# RESTORING AMERICAN LEADERSHIP AND CONFRONTING GLOBAL THREATS

To ensure and strengthen American security, prosperity, and democracy, we must both deliver at home and lead on the world stage. The Budget invests in the key pillars of our international strength in order to position us to contend with determined competitors, address transnational threats, and manage crises as they arise. The Budget invests in deepening and modernizing our alliances and partnerships, as we are stronger in managing challenges—whether in the form of China's trade abuses, Russian aggression, or the worsening climate crisis—when we work in concert with those who share our values or interests. The Budget bolsters our cybersecurity and strengthens our military by ensuring we have the resources necessary to sustain deterrence and backstop our diplomacy, as well as fight and win the Nation's wars if necessary. Also, the Budget renews our commitment to sustainable and inclusive development, including through the President's Build Back Better World initiative, which supports building stronger infrastructure to confront the climate crisis, strengthening global health security, working toward gender equality, and shaping the rules of the road for digital connectivity. In addition, the Budget makes critical investments in addressing the root causes of migration while strengthening our immigration system, and in meeting the sacred commitments we have made to our Nation's veterans.

## Confronting 21st Century Threats

**Supports United States' European Allies and Partners.** The Budget supports Ukraine, the United States' strong partnerships with North Atlantic Treaty Organization (NATO) allies, and other European partner states by bolstering funding to enhance the capabilities and readiness of U.S. forces, NATO allies, and regional partners in the face of Russian aggression.

**Promotes Integrated Deterrence in the Indo-Pacific and Globally.** The Budget proposes $773 billion for the Department of Defense (DOD). To sustain and strengthen deterrence, the Budget prioritizes China as the Department's pacing challenge. The 2023 Pacific Deterrence Initiative highlights some of the key investments that DOD is making that are focused on strengthening deterrence in the Indo-Pacific region. Also, DOD is building the concepts, capabilities, and posture necessary to meet these challenges, working in concert with the interagency and America's allies and partners to ensure that deterrence is integrated across domains, theaters, and the spectrum of conflict.

**Defends Freedom Globally.** To support American leadership in defending democracy, freedom, and security worldwide, the Budget includes nearly $1.8 billion to support a free and open, connected, secure, and resilient Indo-Pacific Region and the Indo-Pacific Strategy, and $400 million for the Countering the People's Republic of China Malign Influence Fund. In addition, the Budget provides $682 million for Ukraine, an increase of $219 million above the 2021 enacted level, to counter Russian malign influence and to meet emerging needs related to security, energy, cybersecurity issues, disinformation, macroeconomic stabilization, and civil society resilience.

**Supports Democracy Globally.** In response to political fragility and increasing authoritarianism around the world, the Budget provides more than $3.2 billion to support global democracy, human rights, anti-corruption,

and governance programming, consistent with the commitments made during the President's Summit for Democracy. The Budget advances the Presidential Memorandum on Advancing the Human Rights of Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex Persons around the World, the U.S. Strategy on Countering Corruption, and the Presidential Initiative on Democratic Renewal.

**Counters Persistent Threats.** While focused on maintaining robust deterrence against China and Russia, the Budget would also enable DOD to counter other persistent threats including those posed by North Korea, Iran, and violent extremist organizations.

**Advances U.S. Cybersecurity.** The Budget invests in cybersecurity programs to protect the Nation from malicious cyber actors and cyber campaigns. Last year, the President signed Executive Order 14028, "Improving the Nation's Cybersecurity," charting a new course to improve the Nation's cybersecurity. Executive Order 14028 prioritizes protecting and modernizing Federal Government systems and data, improving information-sharing between the U.S. Government and the private sector, enhancing standards for secure software development, improving detection of cyber threats and vulnerabilities on Federal systems, and strengthening the United States' ability to respond to incidents when they occur.

**Modernizes the Nuclear Deterrent.** The Budget maintains a strong, credible nuclear deterrent, as a foundational aspect of integrated deterrence, for the security of the Nation and U.S. allies. The Budget supports the U.S. nuclear triad and the necessary ongoing nuclear modernization programs, to include the nuclear command, control, and communication networks.

## Marshalling American Leadership to Tackle Global Challenges

**Renews America's Leadership in International Institutions.** The Budget continues the Administration's efforts to lead through international organizations by meeting the Nation's commitments to fully fund U.S. contributions and to pay United Nations peacekeeping dues on time and in full. The Budget also provides $1.4 billion for the World Bank's International Development Association (IDA). This investment restores the United States' historical role as the largest World Bank donor to support the development of low- and middle-income countries, which benefits the American people by increasing global stability, mitigating climate and health risks, and developing new markets for U.S exports. The U.S. contribution would also support the United States' $3.5 billion pledge to the next IDA replenishment, a critical component of the global response to the devastating impacts of the COVID-19 pandemic on developing countries.

**Advances American Leadership in Global Health, Including Global Health Security and Pandemic Preparedness.** The Budget includes $10.6 billion to bolster U.S. leadership in addressing global health and health security challenges, a $1.4 billion increase above the 2021 enacted level. Within this total, the Budget demonstrates U.S. leadership by supporting a $2 billion contribution to the Global Fund's seventh replenishment, for an intended pledge of $6 billion over three years, to save lives and continue the fight against HIV/AIDS, tuberculosis, and malaria, and to support the Global Fund's expanding response to the COVID-19 pandemic and global health strengthening. This total also includes $1 billion to prevent, prepare for, and respond to future infectious disease outbreaks, including the continued expansion of Global Health Security Agenda capacity-building programs and a multilateral financial intermediary fund for health security and pandemic preparedness. The Budget also invests in the global health workforce and systems to enhance countries' abilities to provide core health services, improve health systems

resiliency, and respond to crises while mitigating the impacts of crises on routine health services. In addition, the Budget includes $6.5 billion in mandatory funding for the Department of State and the U.S. Agency for International Development over five years to make transformative investments in pandemic and other biological threat preparedness globally in support of U.S. biodefense and pandemic preparedness strategies and plans. This pandemic preparedness funding would strengthen the global health workforce, support pandemic preparedness research and development (R&D), advance global R&D capacity, and support health security capacity and financing to prevent, detect, and respond to future COVID-19 variants and other infectious disease outbreaks.

**Advances Equity and Equality Globally.** The Budget provides $2.6 billion to advance gender equity and equality across a broad range of sectors. This includes $200 million for the Gender Equity and Equality Action Fund to advance the economic security of women and girls. This total also includes funding to strengthen the participation of women in conflict prevention, resolution, and recovery through the implementation of the Women, Peace, and Security Act of 2017.

**Continues Collaborative U.S. Leadership in Central America and Haiti.** As part of a comprehensive strategy to drive systemic reform while addressing the root causes of irregular migration from Central America to the United States, the Budget invests $987 million in the region to continue meeting the President's four-year commitment of $4 billion. Further, in response to deteriorating conditions and widespread violence in Haiti, the Budget invests $275 million to strengthen Haiti's recovery from political and economic shocks, such as strengthening the capacity of the Haitian National Police, combating corruption, strengthening the capacity of civil society, and support services for marginalized populations. These investments would ensure that the United States is able to revitalize partnerships that build economic resilience, democratic stability, and citizen security in the region.

**Strengthens U.S. Leadership on Refugee and Humanitarian Issues.** The Budget provides more than $10 billion to respond to the unprecedented need arising from conflict and natural disasters around the world to serve over 70 countries and approximately 240 million people. The Budget continues rebuilding the Nation's refugee admissions program and supports up to 125,000 admissions in 2023.

### Strengthening America's Immigration System

**Ensures a Fair and Efficient Immigration System.** The Administration is committed to ensuring that United States Citizenship and Immigration Services (USCIS) meets its mission of administering the Nation's lawful immigration system and safeguarding its integrity and promise by efficiently and fairly adjudicating requests for immigration benefits. The Budget provides $765 million for USCIS to efficiently process increasing asylum caseloads, address the immigration application backlog, and improve refugee processing.

**Supports America's Promise to Refugees.** The Budget provides $6.3 billion to the Office of Refugee Resettlement (ORR) to help rebuild the Nation's refugee resettlement infrastructure and support the resettling of up to 125,000 refugees in 2023. The Budget would also help ensure that unaccompanied immigrant children are unified with relatives and sponsors as safely and quickly as possible and receive appropriate care and services while in ORR custody.

**Improves Border Processing and Management.** The Budget provides $15.3 billion for the U.S. Customs and Border Protection and $8.1 billion for the U.S. Immigration and Customs Enforcement to enforce the immigration laws, further secure the border, and effectively manage irregular migration along the Southwest border, including $309 million for border security technology and $494 million for noncitizen processing and care costs.

**Improves Immigration Courts.** The Budget invests $1.4 billion, an increase of $621 million above the 2021 enacted level, in the Executive Office for Immigration Review (EOIR) to continue addressing the backlog of over 1.5 million cases that are currently pending in the immigration courts. This funding supports 100 new immigration judges, including the support personnel required to create maximum efficiencies in the court systems, as well as an expansion of EOIR's virtual court initiative. The Budget would also invest new resources in legal access programming, including $150 million in discretionary resources to provide access to representation for adults and families in immigration proceedings. Complementing this new program is a proposal for $4.5 billion in mandatory resources to expand these efforts over a 10-year period. Providing resources to support legal representation in the immigration court system creates greater efficiencies in processing cases while making the system fairer and more equitable.

### Delivering on Our Commitments to Veterans

**Prioritizes Veteran Medical Care.** The Budget provides $119 billion—a historic 32-percent increase above the 2021 enacted level for the Department of Veterans Affairs (VA). In addition to fully funding inpatient, outpatient, mental health, and long-term care services, the Budget supports programs that improve VA healthcare quality and delivery, including investments in training programs for clinicians, health professionals, and medical students. With more women choosing VA for their healthcare than ever before, the Budget also invests $9.8 billion for all of women veterans' healthcare, including $767 million toward women's gender specific care. The Budget also further supports VA's preparedness for regional and national public health emergencies.

**Prioritizes Veteran Suicide Prevention.** The Budget provides $497 million to support the Administration's veteran suicide prevention initiatives, including:  implementation of the Veterans Crisis Line's 988 expansion initiative;

the suicide prevention 2.0 program to grow public health efforts in communities; a lethal means safety campaign in partnership with other agencies; and the Staff Sergeant Parker Gordon Fox Suicide Prevention Grant Program to enhance community-based clinical strategies.

**Bolsters Efforts to End Veteran Homelessness.** The Budget increases resources for veterans' homelessness programs to $2.7 billion, with the goal of ensuring every veteran has permanent, sustainable housing with access to healthcare and other supportive services to prevent and end veteran homelessness.

**Invests in Caregivers Support Program.** The Budget recognizes the important role of family caregivers in supporting the health and wellness of veterans. The Budget provides funding for the Program of General Caregivers Support Services. The Budget also provides $1.8 billion for the Program of Comprehensive Assistance for Family Caregivers, which includes stipend payments and support services to help empower family caregivers of eligible veterans.

**Supports Research Critical to Veterans' Health Needs.** Extensive research at VA medical centers, outpatient clinics, and nursing homes each year has significantly contributed to advancements in healthcare for veterans and all Americans. The Budget provides $916 million to continue the development of VA's research enterprise, including research in support of the *American Pandemic Preparedness: Transforming Our Capabilities* plan's goals. The Budget also invests $81 million within VA research programs for precision oncology to provide access to the best possible cancer care for veterans.

**Continues and Enhances Efficient Delivery of Veterans Benefits.** The Budget would ensure that veterans receive the benefits they have earned and deserve, such as disability compensation, education and employment training, and home loan guarantees. The Budget invests $120 million for VA to support automating the disability compensation claims process from submission to authorization which would

increase VA's ability to deliver faster and more accurate claim decisions for veterans.

**Addresses Environmental Exposures.** The Budget increases resources for new presumptive disability compensation claims related to environmental exposures from military service. The Budget also invests $51 million within VA research programs and $63 million within the VA medical care program for Health Outcomes Military Exposures to increase scientific understanding of and clinical support for veterans and healthcare providers regarding the potential adverse impacts from environmental exposures during military service.

**Honors the Memory of All Veterans.** The Budget includes $430 million to ensure veterans and their families have access to exceptional memorial benefits, including two new and replacement national cemeteries. These funds maintain national shrine standards at the 158 VA managed cemeteries and provide the initial operational investment required to open new cemeteries.

## STRENGTHENING AMERICA'S PUBLIC HEALTH INFRASTRUCTURE

From the President's first days in office, the Administration has mounted a forceful response to the COVID-19 pandemic and taken action to advance the health and well-being of the American people. Through the American Rescue Plan, the Administration secured critical resources to support the President's historic vaccination program, testing and mitigation, therapeutics, and personal protective equipment—and to help make quality health insurance available through the Patient Protection and Affordable Care Act more affordable. To build on this progress and bolster America's public health infrastructure, the Budget includes key investments to ensure the United States is prepared to confront future pandemics and other biological threats domestically and globally, expand access to critical health services, address other diseases and epidemics, and advance and accelerate transformative medical research.

### *Ensuring World-Class Public Health Infrastructure*

**Prepares for Future Pandemics and Other Biological Threats.** While combating the ongoing COVID-19 pandemic, the United States must catalyze advances in science, technology, and core capabilities to prepare the Nation for the next biological threat and strengthen U.S. and global health security. The Budget makes transformative investments in pandemic preparedness across the Department of Health and Human Services (HHS) public health agencies—$81.7 billion available over five years—to enable an agile, coordinated, and comprehensive public health response to protect American lives, families, and the economy and to prevent, detect, and respond to emerging biological catastrophes. The Budget builds toward a goal of making effective vaccines and therapeutics available within 100 days of identifying a new pathogen by investing in basic and advanced R&D of medical countermeasures for high priority viral families and biological threats, including expansion and modernization of clinical trial infrastructure and regulatory capacity necessary to inform evaluation and subsequent authorizations or approvals, as well as expansion of domestic manufacturing capacity to ensure sufficient supply is available. The Budget also enhances public health infrastructure by making significant investments in public health laboratory capacity, domestic and global threat surveillance, and public health workforce development that would enable States, localities, tribal nations, and Territories to mount a rapid and robust response to future threats. Further, the Budget encourages development of innovative antimicrobial drugs through advance market commitments for critical-need antimicrobial drugs. The President also supports extending telehealth coverage under Medicare beyond the COVID-19 Public Health Emergency to study

its impact on utilization of services and access to care. In addition, the Budget supports enhanced DOD and DOE investments in: medical countermeasures, including vaccines, diagnostics, and therapeutics research and manufacturing; disease detection and biosurveillance; advanced computing; lab biosafety and biosecurity; and threat reduction activities with America's global partners.

**Builds Advanced Public Health Systems and Capacity.** The Budget includes $9.9 billion in discretionary funding to build capacity at the Centers for Disease Control and Prevention (CDC) and at the State and local levels, an increase of $2.8 billion over the 2021 enacted level. These resources would improve the core immunization program, expand public health infrastructure in States and Territories, strengthen the public health workforce, support efforts to modernize public health data collection, increase capacity for forecasting and analyzing future outbreaks, including at Center for Forecasting and Outbreak Analytics, and conduct studies on long COVID conditions to inform diagnosis and treatment options. In addition, to advance health equity, the Budget invests in CDC programs related to viral hepatitis, youth mental health, and sickle cell disease. To address gun violence as a public health epidemic, the Budget invests in community violence intervention and firearm safety research.

**Expands Access to Vaccines.** The Budget establishes a new Vaccines for Adults (VFA) program, which would provide uninsured adults with access to all vaccines recommended by the Advisory Committee on Immunization Practices at no cost. As a complement to the successful Vaccines for Children (VFC) program, the VFA program would reduce disparities in vaccine coverage and promote infrastructure for broad, access to routine and outbreak vaccines. The Budget would also expand the VFC program to include all children under age 19 enrolled in the Children's Health Insurance Program and consolidate vaccine coverage under Medicare Part B, making more preventive vaccines available at no cost to Medicare beneficiaries.

**Guarantees Adequate and Stable Funding for the Indian Health Service (IHS).** The Budget significantly increases IHS's funding over time, and shifts it from discretionary to mandatory funding. For the first year of the proposal, the Budget includes $9.1 billion in mandatory funding, an increase of $2.9 billion above 2021. After that, IHS funding would automatically grow to keep pace with healthcare costs and population growth and gradually close longstanding service and facility shortfalls. Providing IHS stable and predictable funding would improve access to high quality healthcare, rectify historical underfunding of the Indian Health system, eliminate existing facilities backlogs, address health inequities, and modernize IHS' electronic health record system. This proposal has been informed by consultations with tribal nations on the issue of IHS funding and will be refined based on ongoing consultation.

**Advances Maternal Health and Health Equity.** The United States has the highest maternal mortality rate among developed nations, with an unacceptably high mortality rate for Black and American Indian and Alaska Native women. The Budget includes $470 million to: reduce maternal mortality and morbidity rates; expand maternal health initiatives in rural communities; implement implicit bias training for healthcare providers; create pregnancy medical home demonstration projects; and address the highest rates of perinatal health disparities, including by supporting the perinatal health workforce. The Budget also extends and increases funding for the Maternal, Infant, and Early Childhood Home Visiting Program, which serves approximately 71,000 families at risk for poor maternal and child health outcomes each year, and is proven to reduce disparities in infant mortality. To address the lack of data on health disparities and further improve access to care, the Budget strengthens collection and evaluation of health equity data. Recognizing that maternal mental health conditions are the most common complications of pregnancy and childbirth, the Budget continues to support the maternal mental health hotline and the screening and treatment for maternal depression and related behavioral

health disorders. The Administration also looks forward to working with the Congress to advance the President's goal of doubling the Federal investment in community health centers, which would help reduce health disparities by expanding access to care.

**Supports Survivors of Domestic Violence and Other Forms of Gender Based-Violence.** The Budget proposes significant increases to support and protect survivors of gender-based violence, including $519 million for the Family Violence Prevention and Services (FVPSA) program to support domestic violence survivors—more than double the 2021 enacted level. This amount continues funding availability for FVPSA-funded resource centers, including those that support the Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex community. The Budget would provide additional funding for domestic violence hotlines and cash assistance for survivors of domestic violence, as well as funding to support a demonstration project evaluating services for survivors at the intersection of housing instability, substance use coercion, and child welfare. In addition, the Budget would provide over $66 million for victims of human trafficking and survivors of torture, an increase of nearly $21 million over the 2021 enacted level. The Budget also proposes a historic investment of $1 billion to support Violence Against Women Act of 1994 (VAWA) programs, a $487 million or 95-percent increase over the 2021 enacted level. The Budget supports substantial increases for longstanding VAWA programs, including in legal assistance for victims, transitional housing, and sexual assault services. The Budget also provides resources for new programs to support transgender survivors, build community-based organizational capacity, combat online harassment and abuse, and address emerging issues in gender-based violence.

**Expands Access to Healthcare Services for Low-Income Women.** The Budget provides $400 million, an increase of nearly 40 percent over the 2021 enacted level, to the Title X Family Planning program, which provides family planning and other healthcare to low-income individuals. This increase in Title X funding would improve overall access to vital reproductive and preventive health services and advance gender and health equity.

### Addressing Other Diseases and Epidemics

**Transforms Mental Healthcare.** Mental health is essential to overall health, and the United States faces a mental health crisis that has been exacerbated by the COVID-19 pandemic. To address this crisis, the Budget proposes reforms to health coverage and major investments in the mental health workforce. For people with private health insurance, the Budget requires all health plans to cover mental health and substance use disorder benefits and ensures that plans have an adequate network of behavioral health providers. For Medicare, TRICARE, the VA healthcare system, health insurance issuers, group health plans, and the Federal Employees Health Benefit Program, the Budget lowers costs for mental health services for patients. The Budget also requires parity in coverage between mental health and substance use disorder—or behavioral health—and other medical benefits, and expands the types of providers covered under Medicare to treat these conditions. The Budget invests in increasing the number of mental health providers serving Medicaid beneficiaries, as well as in behavioral health workforce development and service expansion, including in primary care clinics and at non-traditional sites. The Budget also provides sustained and increased funding for community-based centers and clinics, including a State option to receive enhanced Medicaid reimbursement on a permanent basis. In addition, the Budget makes historic investments in youth mental health and suicide prevention programs and in training, educational loan repayment, and scholarships that help address the shortage of behavioral health providers, especially in underserved communities. The Budget also strengthens access to crisis services by building out the National Suicide Prevention Lifeline, which will transition from a 10-digit number to 988 in July 2022.

**Accelerates Innovation through the Advanced Research Projects Agency for Health (ARPA-H).** The Budget proposes a major investment of $5 billion for ARPA-H, significantly increasing direct Federal R&D spending in health to improve the health of all Americans. With an initial focus on cancer and other diseases such as diabetes and dementia, this major investment would drive transformational innovation in health technologies and speed the application and implementation of health breakthroughs. Funding for ARPA-H, along with additional funding for the National Institutes of Health, total a $49 billion request to continue to support research that enhances health, lengthens life, reduces illness and disability, and spurs new biotechnology productions and innovation.

**Advances the Cancer Moonshot Initiative.** The Budget proposes investments in ARPA-H, the National Cancer Institute, CDC, and the Food and Drug Administration to accelerate the rate of progress against cancer by working toward reducing the cancer death rate by at least 50 percent over the next 25 years and improving the experience of people who are living with or who have survived cancer.

**Commits to Ending the HIV/AIDS Epidemic.** The *National HIV/AIDS Strategy for the United States 2022–2025* commits to a 75-percent reduction in HIV infection by 2025. To meet this ambitious target and ultimately end the HIV/AIDS epidemic in the United States, the Budget includes $850 million across HHS to aggressively reduce new HIV cases by increasing access to HIV prevention and care programs and ensuring equitable access to support services. This includes increasing access to pre-exposure prophylaxis (also known as PrEP) among Medicaid beneficiaries, which is expected to improve health and lower Medicaid costs for HIV treatment. The Budget also proposes a new mandatory program to guarantee PrEP at no cost for all uninsured and underinsured individuals, provide essential wrap-around services through States and localities, and establish a network of community providers to reach underserved areas and populations.

**Addresses the Opioid and Drug Overdose Epidemic.** The drug overdose epidemic claimed an estimated 104,000 lives in the 12-month period ending in September, 2021. To end this epidemic, a full range of service and supports are needed for individuals who use or are at risk of using substances that cause overdose, and their families. The Budget invests in services that prevent substance use disorder, expand quality evidence-based treatment, and help individuals sustain recovery. The Budget also includes $663 million specific to VA's Opioid Prevention and Treatment programs, including programs in support of the Jason Simcakoski Memorial and Promise Act.

## TAKING HISTORIC STEPS TO COMBAT THE CLIMATE CRISIS AND ADVANCE ENVIRONMENTAL JUSTICE

The President has not only taken bold action to confront the climate crisis, but he has turned it into an opportunity to create good-paying union jobs, advance environmental justice, and position America to lead the industries of the future. At his direction, the Administration has moved swiftly and decisively to restore America's global climate leadership, accelerate clean energy to lower costs and create jobs, jumpstart an electric future that is Made in America, advance environmental justice in line with Justice40 and economic revitalization, and bolster our Nation's resilience in the face of accelerating extreme weather and natural disasters. To build on this progress, the President's Budget invests a total of $44.9 billion to tackle the climate crisis, a $16.7 billion increase over 2021 enacted. The Budget also makes historic investments in environmental justice, coal and powerplant communities facing energy transition, and innovation. These investments would enhance U.S. competitiveness and put America on a path to reduce greenhouse gas emissions 50

to 52 percent by 2030—all while supporting communities that have been left behind and ensuring that 40 percent of the benefits from tackling the climate crisis are targeted toward addressing the disproportionately high cumulative impacts on disadvantaged communities.

## Advancing Clean Energy, Climate Data, and Resilience

**Invests in Clean Energy Infrastructure and Innovation.** The Budget invests $3 billion to support clean energy projects that would create good-paying jobs and drive progress toward the Administration's climate goals. Investments include $502 million to weatherize and retrofit low-income homes, including $100 million for a new Low Income Home Energy Assistance Program (LIHEAP) Advantage pilot to electrify and decarbonize low-income homes. In addition, the Budget funds $150 million to electrify tribal homes and transition tribal colleges and universities to renewable energy, and $90 million for a new Grid Deployment Office to build the grid of the future. In addition, the Budget provides $150 million in credit subsidy for the DOE Title XVII Innovative Technology Loan Guarantee Program to support up to $5 billion in loans to eligible projects that avoid, reduce, or sequester greenhouse gas emissions. DOE would also launch a new Net-Zero Laboratory Initiative with a $58 million competition to reduce emissions across the national laboratory complex.

**Strengthens Domestic Clean Energy Manufacturing.** Meeting the challenge of climate change will require a dramatic scale-up in domestic manufacturing of key climate and clean energy equipment, providing opportunities for U.S. workers. The Budget includes $200 million to launch a new Solar Manufacturing Accelerator that would help create a robust domestic manufacturing sector capable of meeting the Administration's solar deployment goals without relying on imported goods manufactured using unacceptable labor practices. At the same time, it is imperative that the United States partners with its allies to create resilient clean energy supply chains. In addition, the Budget proposes a new $1 billion mandatory investment to launch a Global Clean Energy Manufacturing effort that would build resilient supply chains for climate and clean energy equipment through engagement with allies, enabling an effective global response to the climate crisis while creating economic opportunities for the United States to increase its share of the global clean technology market.

**Increases Demand for American Made, Zero-Emission Vehicles through Federal Procurement.** The Budget invests $757 million for zero-emission fleet vehicles and supporting charging or fueling infrastructure in the individual budgets of 19 Federal agencies to provide an immediate, clear, and stable source of demand to help accelerate American industrial capacity to produce clean vehicles and components. This includes $300 million for dedicated funds at the General Services Administration for other agencies and for charging infrastructure at the United States Postal Service (USPS).

**Provides Resources, Tools, and Coordination to Reduce Greenhouse Gas Emissions.** To help reduce greenhouse gas emissions and make the Nation's infrastructure more resilient, the Budget invests $100 million in grants to States and Tribes that would support the implementation of on-the-ground efforts to reduce and prevent greenhouse gas emissions in communities across the Nation, such as ensuring safe and effective oil and gas well pollution management and prevention, and supporting State and local government development of zero emissions vehicle charging infrastructure. The Budget also provides an additional $35 million over the 2021 enacted level to continue phasing out potent greenhouse gases known as hydrofluorocarbons, as well as resources to spur the development of a Federal climate data portal with support from the Department of the Interior (DOI) that would provide the public with accessible information on historical and projected climate impacts. The Budget also supports multi-agency efforts to integrate science-based tools into conservation planning in order to measure, monitor, report, and verify carbon sequestration,

BUDGET OF THE U. S. GOVERNMENT FOR FISCAL YEAR 2023                    27

greenhouse gas reduction, wildlife stewardship, and other environmental services at the farm level and on Federal lands. In addition, the Budget supports enhancement of greenhouse monitoring and measurement capabilities, as well as efforts to make greenhouse gas data more accessible to a broad range of users.

**Strengthens Climate Resilience.** The Budget provides more than $18 billion for climate resilience and adaptation programs across the Federal Government, including $3.5 billion for the Department of Homeland Security, $5.9 billion at DOI, $1 billion for HUD, and $376 million for the National Oceanic and Atmospheric Administration (NOAA). These critical investments would reduce the risk of damages from floods and storms, restore the Nation's aquatic ecosystems, and make HUD-assisted multifamily homes more energy and water efficient and climate resilient. Resources include $507 million, $93 million above the 2021 enacted level, for the Federal Emergency Management Agency's (FEMA) flood hazard mapping program to incorporate climate science and future risks and robust investments in FEMA programs that help disadvantaged communities build resilience against natural disasters. The Budget also sustains funding for key conservation and ecosystem management initiatives, including the Civilian Climate Corps, alongside a historic $1.4 billion investment in the Bipartisan Infrastructure Law for ecosystem restoration across America.

**Invests in Conservation and Carbon Sequestration.** The Budget invests in the Administration's America the Beautiful Initiative, a multi-agency, multi-jurisdictional ecosystem management effort that would strengthen conservation partnerships between communities and Federal partners such as DOI, USDA, and NOAA. The President's historic goal of conserving and restoring 30 percent of America's lands and waters by 2030 incentivizes America's farmers, ranchers, and forest landowners to sequester carbon in soils and vegetation, and support the efforts and visions of States and tribal nations.

**Bolsters the Nation's Frontline Defenses against Catastrophic Wildfires.** Protecting communities, ecosystems, and infrastructure from wildfire requires a resilient and reliable Federal workforce. The Budget provides nearly $3.9 billion for Forest Service Wildland Fire Management, an increase of $778 million, plus an additional $2.6 billion authorized in the suppression cap adjustment. The Budget upholds the President's commitment that no Federal firefighter will make less than $15 an hour, and increases the size of the Federal firefighting workforce by providing $1.8 billion for personnel and preparedness. Consistent with the President's commitment to use the latest technologies in the fight against wildfires, the Budget also permanently sustains a pilot program that leverages sensitive satellite imagery to rapidly detect wildfires. The Budget also invests $646 million in Hazardous Fuels Management and Burned Area Rehabilitation programs to help reduce the risk and severity of wildfires and restore lands that were devastated by catastrophic fire over the last several years. This funding complements the $2.5 billion for hazardous fuels management and $650 million for burned area rehabilitation projects provided through the Bipartisan Infrastructure Law.

## Securing Environmental Justice and Delivering for Communities Left Behind

**Advances Equity and Environmental Justice.** The Budget provides historic support for underserved communities, and advances the President's Justice40 commitment to ensure 40 percent of the benefits of Federal investments in climate and clean energy reach disadvantaged communities. The Budget includes more than $12 million to coordinate implementation of the Justice40 initiative at impacted agencies. The Budget bolsters the Environmental Protection Agency's (EPA) environment justice efforts by investing over $1.5 billion across numerous programs that would help create good-paying jobs, clean up pollution, implement Justice40, advance racial equity, and secure environmental justice for communities that too often have been left behind,

including rural and tribal communities. To better align with this vision, EPA's Budget structure includes the new Environmental Justice National Program Manager to help administer this work. The Budget also provides over $670 million for EPA's enforcement and compliance assurance efforts, including funding to implement an enforcement plan for climate and environmental justice inspections and community outreach. The Budget invests over $3 billion in DOI programs covered under the Justice40 initiative, such as tribal housing improvements, wildlife conservation grants, and energy infrastructure development in insular communities. In addition, the Budget provides DOE with $47 million to strengthen the Agency's environmental justice mission, $100 million to launch a new LIHEAP Advantage pilot to retrofit low-income homes with efficient electric appliances and systems, and $31 million for a new Equitable Clean Energy Transition initiative to help energy and environmental justice communities navigate and benefit from the transition to a clean energy economy. The Budget also provides $1.4 million for DOJ to establish an Office for Environmental Justice to further this important work.

**Supports the Clean Energy Transition in Rural America.** The Budget provides $300 million in new funding for grants, loans, and debt forgiveness for rural electric providers as they transition to clean energy, as well as $6.5 billion in loan authority for rural electric loans, an increase of $1 billion over the 2021 enacted level. The Budget also provides $20 million to support the new Rural Clean Energy Initiative, to provide technical assistance and promote coordination between USDA, DOE, and DOI that is necessary to achieve the President's de-carbonization goals and ensure clean energy funding is implemented effectively in rural areas. The Budget also supports multi-agency efforts to integrate science-based tools into conservation planning in order to measure, monitor, report, and verify carbon sequestration, greenhouse gas reduction, wildlife stewardship, and other environmental services at the farm level and on Federal lands.

**Supports Legacy Energy Communities.** The Budget includes over $9 billion in discretionary funding for priority programs and initiatives across the Federal Government that support economic revitalization and job creation in hard-hit coal, oil and gas, and power plant communities. This includes $100 million to support DOL's role in the multi-agency POWER+ Initiative, which aims to assist displaced workers and transform local economies and communities transitioning away from fossil fuel production to new, sustainable industries. The Budget also includes $35 million, administered by DOL in partnership with the Appalachian Regional Commission and the Delta Regional Authority, to help Appalachian and Delta communities develop local and regional workforce development strategies that promote long-term economic stability and opportunities for workers, especially those connected to the energy industry.

**Upgrades Drinking Water and Wastewater Infrastructure Nationwide.** The Budget provides roughly $4 billion for EPA water infrastructure programs, an increase of $1 billion over the 2021 enacted level. This includes full funding of grant programs authorized by the Drinking Water and Wastewater Infrastructure Act of 2021, an increase of $160 million over 2021 enacted for EPA's Reducing Lead in Drinking Water grant program. Outside of EPA, the Budget also includes $717 million in direct appropriation and $1.5 billion in loan level for USDA's Water and Wastewater Grant and Loan Program. These resources would help upgrade drinking water and wastewater infrastructure nationwide, with a focus on underserved communities that have historically been overlooked.

**Protects Communities from Hazardous Waste and Environmental Damage.** Preventing and cleaning up environmental damage that harms communities and poses a risk to public health and safety is a top Administration priority. The Budget includes $7.6 billion for DOE's Environmental Management program to support the cleanup of community sites used during the Manhattan Project and Cold War for nuclear weapons production, including $40 million

for a new initiative to support historically under-served communities. The Budget also provides $1.2 billion for the Superfund program for EPA to continue cleaning up some of the Nation's most contaminated land, respond to environmental emergencies and natural disasters, and begin to adjust for revenue from the Superfund Tax. The Budget also provides $215 million for EPA's Brownfields program to enable EPA to provide technical assistance and grants to communities, including disadvantaged communities, so they can safely clean up and reuse contaminated properties. These funds complement Brownfields funding provided in the Bipartisan Infrastructure Law. These programs also support presidential priorities such as the Cancer Moonshot Initiative, by addressing contaminants that lead to greater cancer risk.

**Tackles Per- and Polyfluoroalkyl Substances (PFAS) Pollution.** PFAS are a set of man-made chemicals that threaten the health and safety of communities across the Nation, disproportionately impacting historically disadvantaged communities. As part of the President's commitment to tackling PFAS pollution, the Budget provides approximately $126 million, $57 million over the 2021 enacted level, for EPA to: increase the understanding of PFAS impacts to human health, as well as its ecological effects; restrict use to prevent PFAS from entering the air, land, and water; and remediate PFAS that have been released into the environment.

## Investing in Innovation and Climate Science

**Improves Climate Data and Forecasting.** The Budget significantly improves the Nation's ability to predict extreme weather and climate events so that American businesses and communities can have accurate and accessible information to allow them to better prepare for such events. This includes a bold investment of $2.3 billion for the next generation of weather satellites at NOAA which would help support the development of next generation technologies, and $2.4 billion for the Earth Science program at the

National Aeronautics and Space Administration, including more than $200 million to develop an Earth System Observatory that would provide a three-dimensional, holistic view of Earth to better understand natural hazards and climate change. The Budget also provides an additional $13 million over 2021 enacted levels to bolster EPA's abilities to forecast where smoke from wildfires could harm people and communicate where smoke events are occurring.

**Makes Historic Investments in Innovation and Climate Research.** To support the Administration's whole-of-Government approach to tackle the climate crisis, the Budget provides a historic investment of $17 billion for climate science and innovation, including more than $9 billion to DOE for clean energy research, development and demonstration, an increase of more than 33 percent over the 2021 enacted level. Within this total, the Budget provides $700 million for the Advanced Research and Projects Agency–Energy (ARPA-E) and proposes expanded authority for ARPA-E to more fully address innovation gaps around adaptation, mitigation, and resilience to the impacts of climate change. The Budget provides $913 million at NSF for research to better understand climate change and its adverse impacts and $500 million for R&D in clean energy and emission mitigation technologies. The Budget invests $6 million in USDA's climate hubs, a multi-agency undertaking to leverage climate science and increase landowner awareness of—and engagement in—efforts to combat climate change. In addition, the overall budget for DOE's Office of Science would grow 11 percent over 2021 enacted levels.

## Restoring America's Global Climate Leadership

**Advances the President's Historic Climate Pledge.** The Budget request includes over $11 billion in international climate finance, meeting the President's pledge to quadruple international climate finance a year early. U.S. international climate assistance and financing would: accelerate the global energy

transition to net-zero emissions by 2050; help developing countries build resilience to the growing impacts of climate change, including through the *President's Emergency Plan for Adaptation and Resilience (PREPARE)* and other programs; and support the implementation of the President's *Plan to Conserve Global Forests: Critical Carbon Sinks*. Among these critical investments are $1.6 billion for the Green Climate Fund, a critical multilateral tool for financing climate adaptation and mitigation projects in developing countries and support for a $3.2 billion loan to the Clean Technology Fund to finance clean energy projects in developing countries.

# EXPANDING ECONOMIC OPPORTUNITY, ADVANCING EQUITY, AND STRENGTHENING AMERICAN DEMOCRACY

From his first days in office, the President has pursued an agenda to ensure all Americans can lead lives of dignity and extend the reach of America's promise. To further that agenda, the Budget includes a range of crucial investments to help ensure that all Americans can pursue their potential and fully participate in our economy and our democracy—improving education and supporting students; advancing equity, dignity, and security across our Nation and economy; expanding housing opportunities; and ensuring safety and justice and reinvigorating American democracy.

## *Improving Education*

**Makes Historic Investments in High-Poverty Schools.** To advance the goal of providing a high-quality education to every student, the Budget provides $36.5 billion for Title I, more than doubling the program's funding compared to the 2021 enacted level, through a combination of discretionary and mandatory funding. Title I helps schools provide students in low-income communities the learning opportunities and supports they need to succeed. This substantial new support for the program, which serves 25 million students in nearly 90 percent of school districts across the Nation, would be a major step toward fulfilling the President's commitment to addressing long-standing funding disparities between under-resourced schools—which disproportionately serve students of color—and their wealthier counterparts.

**Makes Historic Investments in College Affordability and Completion.** To help low- and middle-income students overcome financial barriers to postsecondary education, the Budget proposes to double the maximum Pell Grant by 2029. This begins with a historic $2,175 increase for the 2023-2024 school year, compared to the 2021-2022 school year, thereby expanding access and reaching nearly 6.7 million students. The Budget would also support strategies to improve the retention, transfer, and completion of students by investing the Federal TRIO Programs, Gaining Early Awareness and Readiness for Undergraduate Programs, and new retention and completion grants. The Budget also invests in institutional capacity at HBCUs, TCCUs, MSIs, and low-resourced institutions such as community colleges, by providing an increase of $752 million over the 2021 enacted level. This funding includes $450 million in four-year HBCUs, TCCUs, and MSIs to expand research and development infrastructure at these institutions. The Administration also looks forward to working with the Congress on changes to the Higher Education Act that ease the burden of student debt, including through improvements to the Income Driven Repayment and Public Service Loan Forgiveness programs.

**Expands Access to Affordable, High-Quality Early Child Care and Learning.** The Budget provides $20.2 billion for HHS's early care and education programs, an increase of $3.3 billion over the 2021 enacted level. This includes $7.6 billion for the Child Care and Development

Block Grant, an increase of $1.7 billion over the 2021 enacted level, to expand access to quality, affordable child care for families. In addition, the Budget helps young children enter kindergarten ready to learn by providing $12.2 billion for Head Start, an increase of $1.5 billion over the 2021 enacted level. The Budget also helps States identify and fill gaps in early education programs by funding the Preschool Development Grants program at $450 million, an increase of $175 million over the 2021 enacted level.

**Prioritizes the Health and Well-Being of Students.** Disruptions caused by the COVID-19 pandemic continue to take a toll on the physical and mental health of students, teachers, and school staff. Recognizing the profound effect of physical and mental health on academic achievement, the Budget includes a $1 billion investment to increase the number of school counselors, psychologists, social workers, nurses, and other health professionals in schools.

**Increases Support for Children with Disabilities.** The President is committed to ensuring that children with disabilities receive the services and support they need to thrive in school and graduate ready for college or a career. The Budget provides an additional $3.3 billion over 2021 enacted levels—the largest two-year increase ever—for Individuals with Disabilities Education Act (IDEA) Grants to States, with a total of $16.3 billion to support special education and related services for students in grades Pre-K through 12. The Budget also doubles funding to $932 million for IDEA Part C grants, which support early intervention services for infants and families with disabilities that have a proven record of improving academic and developmental outcomes.

### *Advancing Equity, Dignity, and Security*

**Expands Opportunities for Minority- and Women-Owned Businesses.** The Budget provides a $31 million increase over the 2021 enacted level to support women, people of color, veterans, and other underserved entrepreneurs through SBA's Entrepreneurial Development programs. This bold commitment ensures entrepreneurs have access to counseling, training, and mentoring services. The Budget also provides $331 million for the Department of the Treasury's Community Development Financial Institutions (CDFI) Fund, an increase of $61 million, or 23 percent, above the 2021 enacted level. CDFIs provide historically underserved and often low-income communities access to credit, capital, and financial support to grow businesses, increase affordable housing, and reinforce healthy neighborhood development.

**Supports Economic Development and Invests in Underserved Communities.** The Budget provides $3.8 billion for the Community Development Block Grant program to help communities modernize infrastructure, invest in economic development, create parks and other public amenities, and provide social services. The Budget includes a targeted increase of $195 million to spur equitable development and the removal of barriers to revitalization in 100 of the most underserved neighborhoods in the United States.

**Empowers and Protects Workers.** To ensure workers are treated with dignity and respect in the workplace, the Budget invests $2.2 billion, an increase of $397 million above the 2021 enacted level, in DOL's worker protection agencies. Between 2016 and 2020, these agencies lost approximately 14 percent of their staff, limiting their ability to perform inspections and conduct investigations. The Budget would enable DOL to conduct the enforcement and regulatory work needed to ensure workers' wages and benefits are protected, address the misclassification of workers as independent contractors, and improve workplace health and safety. The Budget also ensures fair treatment for millions of workers by restoring resources to oversee and enforce the equal employment obligations of Federal contractors, including protections against discrimination based on race, gender, disability, gender identity, and sexual orientation.

**Reduces Lead and Other Home Health Hazards for Vulnerable Families.** The Budget provides $400 million, an increase of $40 million above the 2021 enacted level, for States, local governments, and nonprofits to reduce lead-based paint and other health hazards in the homes of low-income families with young children. The Budget also includes $25 million to address lead-based paint and $60 million to prevent and mitigate other housing-related hazards, such as fire safety and mold, in Public Housing.

**Provides Robust Support for Tribal Communities.** The Budget requests $4.5 billion for DOI tribal programs, more than $1 billion above the 2021 enacted level. These investments would support public safety and justice, social services, climate resilience, and educational needs to uphold Federal trust responsibilities and promote equity for historically underserved communities. This includes a $156 million increase to support reconstruction work at seven Bureau of Indian Education schools. This funding complements Bipartisan Infrastructure Law investments to address climate resilience needs in tribal communities. The Budget proposes to reclassify Contract Support Costs and Indian Self-Determination and Education Assistance Act of 1975 Section 105(l) leases as mandatory spending, providing certainty in meeting these ongoing needs through dedicated funding sources. The Budget further proposes to provide mandatory funding to the Bureau of Reclamation for operation and maintenance of previously enacted Indian Water Rights Settlements, and the Administration is interested in working with the Congress on an approach to provide a mandatory funding source for future settlements. The Budget also complements Bipartisan Infrastructure Law investments to address climate resilience needs in tribal communities with $673 million in tribal climate funding at DOI.

**Advances Child and Family Well-Being in the Child Welfare System.** The Budget proposes to expand and incentivize the use of evidence-based foster care prevention services to keep families safely together and to reduce the number of children entering foster care. For children who do need to be placed into foster care, the Budget provides States with support and incentives to place more children with relatives or other adults who have an existing emotional bond with the child and fewer children in group homes and institutions, while also providing additional funding to support youth who age out of care without a permanent caregiver. The Budget proposes to nearly double flexible funding for States through the Promoting Safe and Stable Families program and proposes new provisions to expand access to legal representation for children and families in the child welfare system. The Budget also provides $100 million in competitive grants for States and localities to advance reforms that would reduce the overrepresentation of children and families of color in the child welfare system, address the disparate experiences and outcomes of these families, and provide more families with the support they need to remain safely together. In addition, the Budget provides $215 million for States and community-based organizations to respond to and prevent child abuse.

**Supports Health and Economic Security of America's Seniors and People with Disabilities.** The Budget provides $14.8 billion, an increase of $1.8 billion above the 2021 enacted level, to improve services at the Social Security Administration's field offices, State disability determination services, and teleservice centers for retirees, people with disabilities, and their families. At HUD, the Budget supports 2,000 units of new permanently affordable housing specifically for seniors and people with disabilities, supporting the Administration's priority to maximize independent living for people with disabilities. The Budget also includes nearly $500 million to Centers for Medicare and Medicaid Services Survey and Certification, a 24-percent increase, to support health and safety inspections at nursing homes and enhances Medicare for seniors by expanding behavioral health benefits, eliminating cost sharing for vaccines, and adding coverage of services from community health workers. The President also looks forward to working with the Congress on other policies to improve economic security and access to healthcare for seniors and people with disabilities.

**Strengthens the Unemployment Insurance (UI) Program and Combats Fraud.** The UI program has helped millions of Americans through periods of unemployment during the COVID-19 pandemic. The Budget invests $3.4 billion, an increase of $769 million above the 2021 enacted level, to modernize, protect, and strengthen this critical program. This includes several investments aimed at tackling fraud in the UI program, including funding to support more robust identity verification for UI applicants, help States develop and test fraud-prevention tools and strategies, and allow the Office of Inspector General to increase its investigations into fraud rings targeting the UI program.

**Improves Healthcare, Nutrition Assistance, and Economic Support for Americans in Puerto Rico and Other Territories.** The President supports: eliminating Medicaid funding caps for Puerto Rico and other Territories while aligning their matching rate with States; granting U.S. Territories the option to transition from current block grants to the Supplemental Nutrition Assistance Program; and providing parity to U.S. Territories in the Supplemental Security Income Program. The Administration will continue to work with the Congress to advance these policies.

### *Expanding Housing Opportunity*

**Expands the Housing Choice Voucher Program and Enhances Household Mobility.** The Housing Choice Voucher program currently provides 2.3 million low-income families with rental assistance to obtain housing in the private market. The Budget provides $32.1 billion, an increase of $6.4 billion—including emergency funding—over the 2021 enacted level, to maintain services for all currently assisted families and to expand assistance to an additional 200,000 households compared to the 2021 level, particularly those who are experiencing homelessness or fleeing, or attempting to flee, domestic violence or other forms of gender-based violence. The Budget also funds mobility-related supportive services to provide low-income families with greater options to move to higher-opportunity neighborhoods.

**Advances Efforts to End Homelessness.** To prevent and reduce homelessness, the Budget provides $3.6 billion, an increase of $580 million over the 2021 enacted level, for Homeless Assistance Grants to meet renewal needs and expand assistance to nearly 25,000 additional households, including survivors of domestic violence and homeless youth.

**Prevents and Redresses Housing Discrimination and Supports Access to Homeownership for First-Generation Homebuyers.** The Budget provides $86 million in grants to support State and local fair housing enforcement organizations and bolster education, outreach, and training on rights and responsibilities under Federal fair housing laws. The Budget supports access to homeownership for underserved borrowers, including many first-time and minority homebuyers, through Federal Housing Administration and Ginnie Mae credit guarantees. The Budget also provides $115 million for complementary loan and down payment assistance pilot proposals to expand homeownership opportunities for first-generation and/or low-wealth first-time homebuyers.

**Invests in Affordable Housing in Tribal Communities.** Native Americans are seven times more likely to live in overcrowded conditions and five times more likely to have inadequate plumbing, kitchen, or heating systems than all U.S. households. The Budget helps address poor housing conditions in tribal areas by providing $1 billion to fund tribal efforts to expand affordable housing, improve housing conditions and infrastructure, and increase economic opportunities for low-income families.

**Addresses Housing Needs in Rural America.** The Budget includes $1.9 billion for USDA's rural housing loan and grant programs, including increases for the rural multifamily housing programs which would help address housing insecurity, rent burdens, and the impacts of climate change in rural America, including through a new

policy requiring construction practices to improve energy or water efficiency, implement green features, or strengthen climate resilience. The multifamily housing programs would fund the preservation or development of 224 affordable multifamily housing properties, totaling 11,100 units and provide rental assistance to 270,000 units. USDA's single-family housing loans would provide new homeownership opportunities to 171,000 rural borrowers. The Budget also provides $39 million to continue the Rural Partners Network initiative from 2022, which connects America's rural communities to a broad range of programs and resources throughout the Federal Government.

### Addressing Violent Crime, Ensuring Justice, and Strengthening American Democracy

**Invests in Federal Law Enforcement to Combat Gun Crime and Other Violent Crime.** The Budget once again makes robust investments to bolster Federal law enforcement capacity. The Budget includes $17.4 billion, an increase of $1.7 billion above the 2021 enacted level, for DOJ law enforcement, including a total of $1.7 billion for the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) to expand multijurisdictional gun trafficking strike forces with additional personnel, increase regulation of the firearms industry, enhance ATF's National Integrated Ballistic Information Network, and modernize the National Tracing Center. The Budget includes $1.8 billion for the U.S. Marshals Service to support personnel dedicated to fighting violent crime, including through fugitive apprehension and enforcement operations. The Budget also provides the Federal Bureau of Investigation with an additional $69 million to address violent crime, including violent crimes against children and crime in Indian Country. In addition, the U.S. Attorneys are provided with $72.1 million to prosecute violent crimes.

**Supports State and Local Law Enforcement and Community Violence Prevention and Intervention Programs to Make Our Neighborhoods Safer.** The Budget provides $3.2 billion in discretionary resources for State and local grants and $30 billion in mandatory resources to support law enforcement, crime prevention, and community violence intervention.

**Reinvigorates Federal Civil Rights Enforcement.** In order to address longstanding inequities and strengthen civil rights protections, the Budget invests $367 million, an increase of $101 million over the 2021 enacted level, in civil rights protection across DOJ. These resources support police reform, the prosecution of hate crimes, enforcement of voting rights, and efforts to provide equitable access to justice. Investments also provide mediation and conciliation services through the Community Relations Service.

**Reforms the Federal Criminal Justice System.** The Budget leverages the capacity of the Federal justice system to advance innovative criminal justice reform initiatives and serve as a model for reform that is not only comprehensive in scope, but evidence-informed and high-impact. The Budget supports key investments in First Step Act implementation, including $100 million for a historic collaboration with the Bureau of Prisons (BOP), DOJ, and DOL for a national initiative to provide comprehensive workforce development services to people in the Federal prison system, both during their time in the BOP facilities and after they are transferred to community placement. In support of Federal law enforcement reform and oversight, the Budget also proposes $106 million to support the deployment of body-worn cameras (BWC) to DOJ's law enforcement officers, as well as an impact evaluation to assess the role of BWC in advancing criminal justice reform.

**Protects U.S. Elections and the Right to Vote.** As America's democracy faces threats across the Nation, the State, county, and municipal governments that run Federal elections have struggled to obtain resources commensurate with the improved access and security that voters expect and deserve. Federal funding for the equipment, systems, and personnel that comprise the Nation's critical election infrastructure has been episodic or crisis-driven. To provide State and local election officials with a predictable funding

stream for critical capital investments and increased staffing and services, the Budget proposes $10 billion in new elections assistance funding to be allocated over 10 years. The Budget also proposes to fund an expansion of USPS delivery capacity in underserved areas and support for vote-by-mail, including making ballots postage-free and reducing the cost of other election-related mail for jurisdictions and voters.

# PUTTING THE NATION ON A SOUND FISCAL AND ECONOMIC COURSE

When the President took office, the COVID-19 pandemic and resulting economic crisis had driven deficits to high levels: $3.1 trillion, or 14.9 percent, of Gross Domestic Product (GDP) in 2020. Thanks in part to the success of the American Rescue Plan and the President's economic strategy, strong economic growth has driven deficits down dramatically. The Budget projects a deficit of $1.4 trillion, or 5.8 percent, of GDP for 2022—less than half the deficit the President inherited and more than $1 trillion less than the deficit for 2021.

The Budget builds on this progress by proposing smart, targeted, and fully-offset investments designed to expand economic capacity, spur durable economic growth, create jobs, reduce cost pressures, and foster shared prosperity. The Budget reflects the President's belief that growing the economy from the bottom up and the middle out creates more growth, higher wages, more jobs, lower prices, less poverty, and makes it easier to achieve fiscal sustainability.

The Budget also reflects the President's commitment to put the Nation on a sound fiscal course by more than fully offsetting the cost of its new investments. Overall, the Budget's policies would reduce deficits by more than $1 trillion over 10 years through additional tax reforms that ensure corporations and the wealthiest Americans pay their fair share. Under the Budget policies, annual deficits would fall further as a share of the economy, while the economic burden of debt would stay low.

## *Paying for Investments through a Fairer Tax System*

The Budget's investments are more than paid for through reforms that would create a fairer tax system.

**Proposes a New Minimum Tax on Billionaires.** The tax code currently offers special treatment for the types of income that wealthy people enjoy. This special treatment, combined with sophisticated tax planning and giant loopholes, allows many of the very wealthiest people in the world to end up paying a lower tax rate on their full income than many middle-class households. To finally address this glaring problem, the Budget includes a 20 percent minimum tax on multi-millionaires and billionaires who so often pay indefensibly low tax rates. This minimum tax would apply only to the wealthiest 0.01 percent of households—those with more than $100 million—and over half the revenue would come from billionaires alone.

**Ensures Corporations Pay Their Fair Share.** The Budget also includes an increase to the rate that corporations pay in taxes on their profits. Corporations received an enormous tax break in 2017. While their profits have soared, their investment in the economy did not. Those tax breaks did not trickle down to workers or consumers. Instead of allowing some of the most profitable corporations in the world to avoid paying their fair share, the Budget would raise the corporate tax rate to 28 percent, still well below the 35 percent rate that prevailed for most of the last several decades. This increase is complemented by other changes to the corporate tax code that would incentivize job creation and investment in

the United States and ensure that large corporations pay their fair share.

**Prevents Multinational Corporations from Using Tax Havens to Game the System.** For decades, American workers and taxpayers have paid the price for a tax system that has rewarded multinational corporations for shipping jobs and profits overseas. Last year, the Administration rallied more than 130 countries to agree to a global minimum tax that will ensure that profitable corporations pay their fair share and incentivizes U.S. multinationals to create jobs and invest in the United States. The Budget contains additional measures to ensure that multinationals operating in the United States cannot use tax havens to undercut the global minimum.

### Improving the Nation's Fiscal Outlook

The Budget's investments boost economic growth, reduce cost pressures, and promote shared prosperity in a way that improves the fiscal outlook of the United States and reduces fiscal risks over the long term.

The Administration is on track to becoming the first in history to reduce the deficit by more than $1 trillion in a single year. Under the Budget's policies, deficits would continue to decline from recent levels. Deficits would fall from 14.9 percent of GDP in 2020 to 5.8 percent of GDP this year and then decline further and remain below 5 percent of GDP through the 10-year window.

Moreover, under the Budget's policies, the medium-term economic burden of Federal debt would remain low. Real interest—the Federal Government's annual interest payments after adjusting for inflation—directly measures the cost of servicing the debt: the real resources that are going toward paying off old debt, instead of investing in the future.

The widespread, persistent, and global phenomenon of interest rates falling even as debt has risen has meant that the burden associated with debt over the near and medium term has decreased. Even as the economy has recovered and growth has come roaring back, interest rates remain well below historical averages.

Real interest has averaged about one percent of the economy since 1980 and was about two percent in the 1990s. Since then, the effective real interest rate on Federal debt has fallen ten-fold, from over 4 percent to 0.4 percent in the 2010s. As a result, real interest has fallen—and real interest costs are expected to remain negative in 2022. The Budget's economic assumptions anticipate that real interest rates would rise over the coming decade, using projections in line with private forecasters. Nevertheless, under these assumptions, the President's policies would keep real interest at or below the historical average over the coming decade. This means that we have the capacity to make fully-offset, critical investments that expand the productive capacity of the economy while also keeping real interest cost burdens low by historical standards.

At the same time, the United States does face fiscal challenges over the long term—driven largely by demographic pressures on health and retirement programs, an inequitable tax system, and rising healthcare costs. There is also uncertainty about the interest rate outlook. The Budget's proposals prudently address these future challenges by reforming the tax system and more than paying for all new policies, reducing deficits over the long run. In total, the Budget policies reduce deficits by more than $1 trillion over the next 10 years

Overall, the Budget details an economically and fiscally responsible path forward—addressing the long-term fiscal challenges facing the Nation while making investments that produce stronger economic growth and broadly shared prosperity well into the future.

# ENSURING AN EQUITABLE, EFFECTIVE, AND ACCOUNTABLE GOVERNMENT THAT DELIVERS RESULTS FOR ALL

Under the President's leadership, the Nation is rising to meet the full range of challenges and opportunities before us. As set forth in the President's Management Agenda (PMA), making the most of this historic moment and delivering on the President's agenda also requires strengthening the Government's capacity to meet the needs of all Americans—toward a Government that works for people by meeting them where they are. To help deliver that future, the President's Budget advances the goals of the PMA across three key priority areas: strengthening and empowering the Federal workforce; delivering excellent, equitable, and secure Federal services and customer experience; and managing the business of Government to build a better America. This work—including the investments the Budget puts forward in support of the PMA—is critical for bolstering the Federal Government's capacity and capabilities to deliver for the American people today and for years to come.

## *Values in Action*

The Administration's work to further develop and implement the PMA, including through the Budget, is guided by values: equity, dignity, accountability, and results. These values guide the Administration's work to deliver results for the public and strengthen the capacity of Federal agencies. For example, the Budget advances these values by:

**Advancing Equity as a Core Part of Government Management and Decision-Making Processes.** To support the Administration's whole-of-Government approach to advancing equity, the Budget provides resources to hire Federal agency talent and expertise needed to help embed equity in agency decision-making and policy-making, such as civil rights legal expertise, human-centered design, public engagement and participatory design, evaluation and evidence design, planning and analysis, and data science. For example, the Budget includes resources to: expand the Department of Labor's Civil Rights Center in order to begin establishing regional offices across the Nation that can be more responsive to regional equity challenges; promote greater equity in service delivery at the Veterans Benefits Administration by placing evaluation analysts to assess potential disparities among veterans who have historically been disadvantaged based on their race, ethnicity, sex, sexual orientation, or gender identity; and help to bolster the Federal Emergency Management Agency's capacity to identify inequities and barriers to access in the application process for disaster assistance.

**Treating Every Person with Dignity and Meeting the American People Where They Are.** The Administration values and respects the inherent dignity of all people. The Government of the United States is working to recommit to being "of the people, by the people, [and] for the people" in order to solve the complex challenges the Nation faces. Through the PMA and the President's Executive Order 14058, "Transforming Federal Customer Experience and Service Delivery to Rebuild Trust in Government," the Administration has developed an accountability framework for designing and delivering services with a focus on the actual

experience of the people whom Federal agencies are meant to serve. The Budget supports agencies conducting activities in support of this framework, including building increased mechanisms for providing feedback and input from the public into the work of the Government, hiring for the skills and expertise required to conduct human centered design, and forming interagency teams to tackle pain points from the lens of how *people* experience the Government's role in important events in their lives.

**Managing Federal Funding with Accountability and Integrity.** The Administration is committed to improving program integrity and ensuring effective stewardship of taxpayer dollars, including through implementation of the American Rescue Plan Act of 2021 (American Rescue Plan) and the Infrastructure Investment and Jobs Act (Bipartisan Infrastructure Law). To deliver on those commitments, the Administration has provided comprehensive guidance to Federal agencies to ensure coordinated and consistent approaches to fostering program integrity and delivering on the intended outcomes for financial assistance programs. In addition, as the President has made clear, results and accountability go hand-in-hand. To that end, the Administration is committed to collaborating with the Congress and the oversight community, including Offices of Inspectors General and the U.S. Government Accountability Office, as appropriate, and across various sectors and levels of the Government. Also, the Administration will apply its commitment to accountability and transparency to implementation of the resources provided by the President's Budget as well, through sound financial management and a focus on delivering effective and equitable funding.

**Managing the Government to Deliver Results that Improve Lives.** As part of the Administration's commitment to deliver results for all, Federal agencies have worked with external stakeholders and their own workforces to create four-year strategic plans that define mission success, as well as two-year Agency Priority Goals (APGs), reflecting each agency's top implementation priorities. Concurrent with the President's

Budget, Federal agencies have identified strategic goals, strategic objectives, and APGs that reflect the bottom line of the Government advancing outcomes across key Administration priorities, including improving customer experience, advancing equity, combatting climate change, improving the Nation's infrastructure, and meeting the health, welfare, and economic challenges of the COVID-19 pandemic. In addition, the Office of Management and Budget (OMB) has deployed Cross-Agency Priority (CAP) Goals to establish cross-cutting targets that cover a limited number of mission and management areas where Government-wide direction will be helpful to drive collective action on these cross-cutting issues. The public will be able to follow progress toward PMA priorities, agency strategic plans, and APGs, on *https://Performance.gov*, which will be updated quarterly.

### Strengthening and Empowering the Federal Workforce

The strength of any organization rests on its people. As the Nation's largest employer, more than four million Americans work for the Federal Government, both at home in the United States and overseas. Those serving in Government today are dedicated and talented professional public servants. That is why the President has taken significant steps to protect, empower, and rebuild the career Federal workforce, and why the President charged the White House Task Force on Worker Organizing and Empowerment with developing steps to augment the voice of frontline Federal workers. The Budget makes further investments in the Federal workforce by providing agencies with new tools to help win the competition for highly-skilled talent. The Budget builds on this work and advances the first PMA priority—strengthening and empowering the Federal workforce—by:

**Making Every Federal Job a Good Job, Where All Employees are Engaged, Supported, Heard, and Empowered.** Federal agencies must cultivate the passion of their employees and empower them to advance agency

missions—and the Federal Government must be a model employer with respect to worker organizing, collective bargaining, and labor-management partnership.   The voices of Federal employees are critical to agency management, which is why the Administration is strengthening the annual Federal Employee Viewpoint Survey and piloting a Government-wide pulse survey of Federal employees.   These efforts will help agencies retain qualified employees, empower workers to make their agencies better, create a pipeline of qualified leaders, and provide better services to the public.   The Budget supports these objectives by ensuring that all those in Federal jobs earn at least $15 per hour and providing a pay increase of 4.6 percent for civilian and military personnel. The Budget also supports the Office of Personnel Management (OPM) and agencies' ability to answer the President's call for agencies to lead by example in supporting worker organizing and collective bargaining.

**Helping Agencies Attract and Hire Talent that Reflect America's Diversity across the Federal Government.**   Federal agencies are focused on attracting more people to Federal service over the long term, while also addressing immediate agency hiring needs to rebuild capacity. The Federal Government is continuing to implement practices to hire based on skills rather than educational qualifications alone.   Certain agency hiring practices are changing, including applicant assessment methods, to ensure that those most capable of performing the role do not get needlessly overlooked because they do not have a college degree. Agencies are also aligning with the *Government-wide Strategic Plan to Advance Diversity, Equity, Inclusion, and Accessibility in the Federal Workforce*, including through efforts to develop cultures within agencies that can foster a more diverse, equitable, inclusive, and accessible environment.   To support hiring surges necessary to deliver on the Bipartisan Infrastructure Law and streamline hiring practices across the Federal Government, the Budget includes resources to help Federal agencies increase capacity for recruiting and talent management.   This includes continued support for agency "talent teams" in each of the 24 Chief Financial Officers Act agencies.   Given that internships can introduce students and those in

the early stages of their careers to public service, the Budget prioritizes internships and equitable access to internships. Developing pipelines for internships would also be prioritized around the Nation through a reinvigorated vision and funding model for Federal Executive Boards, to ensure a pulse on the Federal impact in communities and support Federal employees and agencies across the Nation. The Budget also provides resources to support new requirements for personnel vetting and the Trusted Workforce 2.0 Initiative, which is designed to ensure all Americans can trust the Federal workforce to protect people, property, information, and mission.

**Reimagining and Building a Roadmap to the Future of Federal Work.**   The Federal Government has an opportunity to reimagine the way Federal employees work.   By utilizing expanded flexibilities in work arrangements such as:   expanded telework and alternative work schedules;  increased adoption of technology, such as cloud computing collaboration tools; and automation supported by information technology investments in the Budget the Government can enhance its ability to recruit and retain top talent, staying competitive with broader trends in how Americans work.   A changing world has proven that innovation is possible in the way Federal employees work and operate, including changing needs and uses for Federal workplaces, which agencies will continue to evaluate and assess.

**Building the Personnel System and Support Required to Sustain the Federal Government as a Model Employer.**   As the Government faces increasingly complex challenges, the need for Federal leaders, managers, and front-line staff with the right skills in the right jobs has never been greater.   To meet this need, the Budget supports OPM in enhancing its ability to lead Federal human capital management, and serve as a central, strategic leader in Federal human resources, in alignment with OPM's Strategic Plan.   In support of this work, the Budget requests $418 million, a $88 million increase over the 2021 enacted level, for OPM's Salaries and Expenses account, its primary discretionary appropriation.   This funding would support staffing to enhance customer service

provided by OPM to Federal agencies, allowing further collaboration in support of the Federal Government's strategic workforce planning and talent acquisition functions.

### Delivering Excellent, Equitable, and Secure Federal Services and Customer Experience

Every interaction between the Government and the public is an opportunity to deliver the value and competence Americans expect and deserve. The American people rely on Federal services to support them through disasters, advance their businesses, provide opportunities for their families, safeguard their rights, and help rebuild their communities. That is why the President signed Executive Order 14058 that will help agencies center services around those who use them—toward delivering simple, secure, effective, equitable, and responsive solutions. The Budget advances these efforts and the second PMA priority—delivering excellent, equitable, and secure Federal services and customer experience—by:

**Improving the Service Design, Digital Products, and Customer-Experience Management of Federal High-Impact Service Providers.** The Budget supports Federal High Impact Service Providers—those services that serve the largest percentage of people, conduct the greatest volume of transactions annually, and have an outsized impact on the lives of the individuals they serve. Focusing on these high-impact services would yield capabilities, tools, and practices that cascade to other Federal programs and services Government-wide. For example, the Budget includes an additional $2 million to build the Office of Customer Experience at the U.S. Department of Agriculture, which would improve delivery of critical programs for farmers, producers, and ranchers, as well as support for the nutrition of more than six million participants in the Women, Infants, and Children program. The Budget supports the Small Business Administration's efforts to establish baseline customer experience measures for application processes across the Agency's loan, grant, and

contracting programs, as well as streamlining the online disaster assistance application experience. The Budget also includes resources to advance customer experience efforts at the Department of Housing and Urban Development, to help deliver on the President's housing priorities, including eliminating barriers that restrict housing and neighborhood choice, furthering fair housing, and providing redress to those who have experienced housing discrimination. In addition, the Budget's investments in digital modernization would allow the U.S. Fish and Wildlife Service to enable Americans to access more permits online, and the Budget would help the Transportation Security Administration expand the use of innovative technologies to reduce passenger wait times at airport security checkpoints. The Budget also invests in the Social Security Administration's efforts to make it easier for individuals to file for Social Security retirement benefits, apply for replacement Social Security cards, and apply for need-based Supplemental Security Income disability payments. In addition, the Budget would also provide $2.7 billion to the Department of Education's Office of Federal Student Aid to provide better support to student loan borrowers by implementing customer experience improvements and ensuring the successful transition from the current short-term loan servicing contracts into a more stable long-term contract and servicing environment.

**Designing, Building, and Managing Government Service Delivery for Key Life Experiences that Reach across Federal Agencies.** When a person experiences a disaster, loses a job, or faces another key moment in their lives, Federal Government services should meet them where they are instead of forcing them to navigate Government siloes. By better coordinating service delivery based on the life experience of the customer, instead of around existing funding streams or organizational structures, Government can better serve the public. The Budget advances these efforts by providing funding for interagency teams to simplify the process of accessing Government services, such as, services for those surviving a natural disaster,

approaching retirement, having a child, and navigating supports after a financial shock.

**Enabling Simple, Seamless, and Secure Customer Experiences across High Impact Service Providers.** The Budget supports efforts to develop shared products, services, and standards while designing safe and secure products that better meet customer needs. For example, these resources would support efforts at the Departments of Veterans Affairs and Defense to provide streamlined login credentials for servicemembers to access the benefits they have earned through their service as they transition to veterans status, as well as a $61 million increase over the 2021 enacted level for the Federal Citizen Services Fund at the General Services Administration (GSA) to power shared products and platforms that enable simple, seamless, and secure services across the Federal Government. As part of this request, GSA is investing an additional $35 million in the Public Experience Portfolio to continue to evolve *USA.gov* to deliver a seamless public experience when transacting with the Government and provide the public an optimal experience when seeking voting resources on *https://Vote.gov*.

### Managing the Business of Government

The Federal Government influences and reshapes markets, supports key supply chains, drives technological advances, and supports domestic manufacturing. This scale creates an opportunity to leverage Federal systems for managing the business of Government—the goods and services the Government buys and the financial assistance and resources it provides and oversees—to create and sustain good quality union jobs, address persistent wealth and wage gaps, and tackle other challenges. The Administration has taken bold action to leverage Federal acquisition, financial assistance, and financial management systems to take on some of the Nation's most pressing challenges. That is why the Budget supports improvements that would make continued progress and improvements in these systems. The Budget supports this work and advances the

third PMA priority—managing the business of Government—by:

**Ensuring the Future is Made in America by America's Workers.** The Administration is working to ensure that Federal resources and programs advance domestic jobs and industries. Two recent examples of that work include the creation of a new review process to ensure Made in America waivers are transparent and consistently applied and a change in the Buy American Act rule for procurement to increase domestic content. The Made in America Office within OMB will continue its work with Federal agencies to maximize the use of Federal procurement and assistance on domestic goods and services that provide good value while strengthening the U.S. industrial base in critical sectors and creating good-paying jobs and economic opportunities in communities across the Nation.

**Leveraging Federal Contracting as a Catalyst to Drive Clean Energy Solutions, Support American Jobs, and Advance Equity.** Federal agencies spent over $619 billion in 2021 through millions of contracts for goods and services, providing an opportunity to transform the marketplace in ways that mitigate the effects of climate change, bolster American manufacturing, and increase opportunities for small disadvantaged businesses (SDBs) and other small businesses in underserved communities. The Administration is leveraging Federal procurement power to move toward a clean energy future, including 100 percent carbon pollution-free Federal electricity on a net annual basis by 2030, 100 percent zero-emission vehicle acquisitions by 2035, and a net-zero emissions in the Federal building portfolio by 2045. The Administration is also using the Federal acquisition system to increase the procurement of Made in America products to support domestic manufacturing, including through greater transparency in agency acquisition plans so domestic providers can help meet agency requirements, and a new Government-wide acquisition regulation that establishes an aggressive schedule to raise domestic content to 75 percent by 2029. In addition, the Administration is taking steps

through Federal acquisitions to better disclose and mitigate the risks that climate change poses in Federal contracting. Agencies are taking aggressive actions to increase contract awards to SDBs and other underserved entrepreneurs to advance the President's commitment to break down barriers and build generational wealth for underserved communities through procurement and contracting. This includes increasing contract awards for SDBs from just over 10 percent to 15 percent of total Federal contract spend by 2025. Agencies will continue to apply category management principles for common goods and services to ensure strong stewardship of taxpayer dollars, supported by increased use of business intelligence and data analytics. The President has directed the Administration to explore additional actions that strengthen the United States as a buyer, improving the efficiency and effectiveness of the Federal procurement system, including, for example, by utilizing approaches such as skills-based hiring, Registered Apprenticeship, and work-based learning.

### Supporting Ongoing Improvements to Federal Government Capabilities and Systems in Support of the PMA

The Budget also supports ongoing improvements to Federal Government capabilities that support an equitable, effective, and accountable Government by:

**Modernizing Federal Information Technology (IT) Systems and Strengthening Federal Data Capabilities.** The Administration continues to prioritize the modernization of Federal IT systems to better deliver agency mission and services to the American public in an effective, efficient, and secure manner. This includes continued efforts by Federal agencies to leverage, utilize, and implement data as a resource and strategic asset, with focus on opening data, advancing equity through data collection, use, and management, and data sharing, accountability, and transparency in support of Administration priorities. The Budget supports the interagency driving data sharing practices

project that promotes data sharing activities in support of the Administration's priorities on racial equity and climate. To support IT modernization efforts, the Budget also includes an additional $300 million for the Technology Modernization Fund (TMF). In the first tranche of TMF awards funded by the American Rescue Plan, the TMF Board invested $187 million in *Login.gov*, a secure sign-on service used by over 30 million citizens and businesses that: supports easy access to over 200 Government services spanning 27 agencies; reduces Government costs; prevents fraud; and protects individual privacy. This first tranche of TMF investments also is contributing to protecting the data and privacy of 100 million students and borrowers, two million civilian Federal employees, and millions of users of Government-wide shared services, as well as the security of hundreds of Federal facilities.

**Bolstering Federal Cybersecurity.** The Budget funds a strategic shift in the defense of Federal infrastructure and service delivery, better positioning agencies to guard against sophisticated adversaries. The Budget provides for investments across Federal agencies that align them to foundational cybersecurity practices and priorities as outlined in Executive Order 14028, "Improving the Nation's Cybersecurity." This includes funding to facilitate the ongoing transition to a "zero trust" approach, which would enable agencies to more rapidly detect, isolate, and respond to cyber threats. To support these efforts, the Budget provides $2.5 billion to the Cybersecurity and Infrastructure Security Agency, a $486 million increase above 2021 enacted, to: maintain critical cybersecurity capabilities implemented in the American Rescue Plan; expand network protection throughout the Federal Executive Branch; and bolster support capabilities, such as cloud business applications, enhanced analytics, and stakeholder engagement. The Budget also supports the Office of the National Cyber Director, which would improve national coordination in the face of escalating cyber attacks on Government and critical infrastructure.

**Promoting Evidence-Based Policymaking and Decision Making in Federal Agencies.**

The President has made clear that the Administration will make decisions guided by the best available science and data, which requires the Federal Government to foster and strengthen a culture of evidence where generation and use is routine and integrated across all agency functions. The Budget's investments have been informed by existing evidence of effectiveness. The Budget also includes investments to build evidence in critical areas where it is lacking and invests in agency capacity to execute priority studies, including those identified in publicly posted Learning Agendas and Annual Evaluation Plans required by the Foundations for Evidence-Based Policymaking Act of 2018. The Budget's investments in statistical infrastructure recognize the importance of Federal statistics in strengthening the evidence base. New investments also support cross-agency evaluation efforts aligned with Administration priorities, where policy and programmatic solutions span agencies and functions.



# DEPARTMENT OF AGRICULTURE

The U.S. Department of Agriculture (USDA) is responsible for providing nutrition assistance to low-income Americans and income support for the farm sector, and for conserving and preserving the Nation's forests and private agricultural lands.  The President's 2023 Budget for USDA:  invests in tackling the climate crisis while mitigating its ongoing impacts on communities; strengthens the food supply chain and nutrition safety net; advances environmental justice; creates new jobs and opportunities in rural communities; supports underserved farmers and producers; and restores America's advantage in agriculture.

The Budget requests $28.5 billion in discretionary funding for USDA, a $4.2 billion or 17.1-percent increase from the 2021 enacted level, excluding Food for Peace Title II Grants, which is included in the State and International Programs total.  Resources provided through the 2023 Budget complement investments in conservation, forest management, and broadband deployment provided in the Infrastructure Investment and Jobs Act (Bipartisan Infrastructure Law).

**The President's 2023 Budget:**

- **Bolsters the Nation's Frontline Defenses against Catastrophic Wildfires.**  Protecting communities, ecosystems, and infrastructure from wildfire requires a resilient and reliable Federal workforce.  The Budget provides nearly $4.9 billion for Forest Service Wildland Fire Management, including $2.2 billion for the Wildfire Suppression Operations Reserve Fund. The Budget also upholds the President's commitment that no Federal firefighter would make less than $15 an hour, increases the size of the Federal firefighting workforce, and provides critical technological support for wildfire detection and response, including FireGuard satellite imagery.  The Budget also complements investments provided in the Bipartisan Infrastructure Law to reduce the risk and severity of wildfires through smart investments in Forest Service hazardous fuels management and ecosystem restoration.

- **Builds a Fair and Resilient Food Supply Chain.** The Budget strengthens market oversight through investments in the Agricultural Marketing Service and the Animal and Plant Health Inspection Service, resulting in competitive meat and poultry product prices for American families and increased protection against invasive pests and zoonotic diseases. These programs build on the pandemic and supply chain assistance funding in the American Rescue Plan Act of 2021 to address pandemic-related vulnerabilities in the food system and create new market opportunities and good-paying jobs.

- **Spurs Climate Research.**  To support the Administration's whole-of-Government approach to tackle the climate crisis, the Budget invests $24 million in USDA's climate hubs, a multi-agency

45

undertaking to leverage climate science and increase landowner awareness of—and engagement in—efforts to combat climate change. The Budget also supports multi-agency efforts to integrate science-based tools into conservation planning in order to measure, monitor, report, and verify carbon sequestration, greenhouse gas reduction, wildlife stewardship, and other environmental services at the farm level and on Federal lands. In addition, the Budget increases funding for priority climate research and for innovative mechanisms to incentivize the adoption of innovative agricultural practices and open new markets for climate-smart commodities at scale, while complementing actions being undertaken by stakeholders and the private sector.

- **Advances Equity and Environmental Justice.** The Budget supports the Administration's ongoing work to advance racial justice and provide more equitable program delivery. Certain USDA programs and initiatives, such as High Cost Energy grants, Rural Energy for America grants and loan guarantees, Private Lands Conservation Operations, Urban Agriculture, and Water and Wastewater direct loans, would support the President's Justice40 Initiative, which directs that at least 40 percent of the overall benefits from climate and clean energy investments be directed to historically disadvantaged communities. In addition, the Budget includes $39 million for the Rural Partners Network, which would connect America's rural communities to a broad range of programs and resources throughout the Federal Government. The Budget also provides $31 million for USDA's Office of Civil Rights, an increase of $9 million over the 2021 enacted level.

- **Addresses Climate Change and Housing Insecurity in Rural Communities.** The Budget provides $1.8 billion for USDA multifamily housing programs, an increase of $259 million from the 2021 enacted level, including over twice the loan level as in 2021. This significant investment would help address housing insecurity, rent burdens, and the impacts of climate change in rural America, including through a new policy requiring construction practices to improve energy or water efficiency, implement green features, or facilitate climate resilience.

- **Helps Rural Communities Transition to Clean Energy.** Rural communities are critical to achieving the goal of transitioning to 100 percent zero carbon electricity by 2035. The Budget provides $300 million in new funding for grants, loans, and debt forgiveness for rural electric providers as they transition to clean energy. The Budget also provides $6.5 billion in loan authority for rural electric loans, an increase of $1 billion over the 2021 enacted level, to support additional clean energy, energy storage, and transmission projects that would create good-paying jobs and meet the ambitious climate progress that science demands. In addition, the Budget includes $15 million in new funding to support the creation of the Rural Clean Energy Initiative to help achieve the President's decarbonization goals and ensure clean energy funding is implemented effectively in rural areas.

- **Restores America's Advantage in Agriculture.** American farmers must be able to leverage new technologies to compete in world markets. The Budget provides $4 billion, $644 million above the 2021 enacted level, for USDA's research, education, and outreach programs, including $315 million targeted to under-served populations.

- **Connects All Americans to High-Speed, Affordable, and Reliable Internet.** The President is committed to ensuring that every American has access to broadband. High-speed internet strengthens rural economies, and the work of installing broadband creates high-paying union jobs. Building on the $2 billion for USDA broadband programs provided in the Bipartisan Infrastructure Law, the Budget provides $600 million for the ReConnect program, which provides grants and loans to deploy broadband to unserved areas, especially tribal areas. The Budget also provides $25 million to help rural telecommunications cooperatives refinance their Rural Utilities Service debt and upgrade their broadband facilities.

- **Protects America's Food Supply.** The Budget provides $1.2 billion for the Food Safety and Inspection Service (FSIS), an increase of $134 million from the 2021 enacted level. This funding would enable the hiring of more inspectors and Public Health Veterinarians, which would increase the strength and flexibility of FSIS to provide inspection services so that meat and poultry producers would be better able to respond to market demands and provide safe and healthy food products. The Budget is providing targeted funds to support smaller producers so that they may increase their production capacity, which in turn would create a more diverse food supply chain.

- **Invests in Tribal Communities.** The Budget invests $62 million for agriculture research, education, and extension grants to tribal institutions; $7 million to assist Native Americans with home ownership through the Single-Family Housing Native American Community Development Financial Institutions Re-lending Program, and $7 million to support Native American farmers and ranchers through the Intertribal Assistance Network. In addition, through the Tribal Forest Protection Act of 2004 and other authorities, the Forest Service would make initial investments of at least $11 million in 2023 to increase equity and expand tribal self-governance, allowing Tribes to participate in restoration activities under agreements and contracts.

- **Supports a Strong Nutrition Safety Net.** The Budget provides $6.8 billion for critical nutrition programs, including $6 billion for the Special Supplemental Nutrition Program for Women, Infants, and Children, to help vulnerable families put healthy food on the table and address racial disparities in maternal and child health outcomes.

- **Supports Economically Distressed Farmers.** USDA is committed to examining barriers faced by all underserved borrowers, especially those in economic distress, beginning farmers, and veterans. The Administration is interested in working with the Congress on legislative changes that would ease the debt burden for economically distressed farm loan borrowers to achieve a robust and competitive agriculture sector.

- **The 2023 Farm Bill.** The Administration looks forward to working this year with the Congress, partners, stakeholders, and the public to identify shared priorities for the 2023 Farm Bill that position USDA to live up to its moniker as "the People's Department" and deliver on its mission to serve all Americans by providing effective, innovative, science-based public policy leadership in agriculture, food and nutrition, natural resource protection and management, and rural development. The Administration also looks forward to working with the Congress to address climate change through climate-smart agriculture and forestry and investments in renewable energy that open new market opportunities and provide a competitive advantage for American producers of climate-smart commodities, including small and historically underserved producers and early adopters, and through voluntary incentives to reduce climate risk. The 2023 Farm Bill is also a critical opportunity to ensure that the wealth created in rural America stays there and to empower rural communities with the tools necessary to advance their locally-led vision. In addition, USDA's nutrition programs are among the most far-reaching tools available to improve health and well-being and to ensure that all Americans have access to healthy, affordable food. This is an important moment to reconsider barriers to food assistance for vulnerable groups that are likely undermining their chances of success, including low-income college students, individuals reentering society and seeking a second chance, youth who have aged out of foster care, kinship families, and low-income individuals in the U.S. Territories.



# DEPARTMENT OF COMMERCE

The Department of Commerce (Commerce) is responsible for:  promoting job creation; supporting and overseeing international trade; and providing economic, environmental, and scientific information needed by businesses, citizens, and governments.  The President's 2023 Budget for Commerce makes historic investments to strengthen domestic supply chains, help American entrepreneurs bring their products to the market, support minority business development, tackle the climate crisis, and promote opportunity and safety in space.

The Budget requests $11.7 billion in discretionary funding for Commerce, a $2.8 billion or 31.2-percent increase from the 2021 enacted level.  Resources provided through the 2023 Budget complement major investments in broadband Internet access and climate resilience through the Infrastructure Investment and Jobs Act (Bipartisan Infrastructure Law).

**The President's 2023 Budget:**

- **Strengthens the Nation's Supply Chains through Domestic Manufacturing.**  To help ignite a resurgence of American manufacturing, the Budget provides $372 million, an increase of $206 million from the 2021 enacted level, for the National Institutes of Standards and Technology's (NIST) manufacturing programs.  These resources would help launch two additional Manufacturing Innovation Institutes in 2023 and continue support for two institutes funded in 2022 as part of the Administration's growing Manufacturing USA network, which brings together industry, academia, and Government to accelerate manufacturing innovation and commercialization.  The Budget also expands the Manufacturing Extension Partnership, providing an increase of $125 million to make America's small and medium manufacturers more competitive and to ensure that the future is made in all of America by all of America's workers.  The Budget also provides $11 million to the International Trade Administration (ITA) to build analytical capacity in meeting new requirements on supply chain resilience across the manufacturing and services industries, as well as $5 million for the Bureau of Economic Analysis (BEA) to develop new data tools to measure American competitiveness in global supply chains.

- **Revitalizes Coal Communities and Other Economically Distressed Communities.**  To foster investment and economic revitalization in communities impacted by the transition from fossil fuel to a clean energy economy, the Budget provides more than $70 million in new funding to the Economic Development Administration (EDA) to create jobs and drive growth in economically distressed communities.  This funding would allow EDA to more than double its Assistance to Coal Communities initiative.  The Budget also provides $50 million for

an EDA pilot program to address structural prime-age employment gaps and boost competitiveness in persistently distressed communities through innovative, flexible, and locally-led grants.

- **Supports Minority-Owned Business to Narrow Racial Wealth Gaps.** The Budget elevates the stature and increases the capacity of the Minority Business Development Agency by providing the full $110 million authorized in the Bipartisan Infrastructure Law. This funding would bolster services provided to minority-owned enterprises by expanding the Business Center program, funding Rural Business Centers, opening new regional offices, and supporting innovative initiatives to foster economic resiliency.

- **Creates New Markets for American Goods by Expanding Economic Engagement Abroad.** The Budget provides an additional $26 million from the 2021 enacted level to bolster commercial diplomacy and enhance export promotion through a targeted expansion of the Foreign Commercial Service at the ITA. With this funding, Commerce would augment staff to assist American businesses seeking to increase exports abroad, navigate new foreign markets, or find market opportunities. These activities would focus on areas of high economic and geo-strategic value, including the Indo-Pacific.

- **Responds to the Impacts of Climate Change and Extreme Weather.** The Budget invests $6.9 billion in the National Oceanic and Atmospheric Administration (NOAA), an increase of $1.4 billion from the 2021 enacted level, supporting programs that would catalyze wind energy, restore habitats, protect the oceans and coasts, and improve NOAA's ability to predict extreme weather associated with climate change. This includes $45 million to support NOAA's role in deploying 30 gigawatts of offshore wind energy by 2030, and a $30 million increase in funding for marine sanctuaries and other marine protected areas to assess and address climate change impacts. The Budget also supports the Administration's America the Beautiful initiative, and $92 million for expanded climate competitive research grants. Through a bold investment of $2.3 billion in the next generation of weather satellites, the Budget also provides a robust and predictable long-term funding strategy to develop new weather detection capabilities to help plan for extreme weather events.

- **Safeguards America's Burgeoning Space Industry.** The Budget expands opportunities for civil space situational awareness and supports the long-term sustainability of the space environment by committing $88 million, a $78 million increase from the 2021 enacted level, for the Office of Space Commerce in order to improve real-time tracking and reporting of space objects and debris, helping the space industry safely navigate a congested space environment. The Budget also provides $2 million for BEA to develop new data tools to measure the space economy.

- **Advances Key Emerging Technologies and U.S. Leadership in International Standards Development.** The Budget supports U.S. industry competing in the global communications market by providing $13 million for cutting-edge advanced communications research and engineering at the National Telecommunications and Information Administration. The Budget also includes a $187 million increase for research initiatives at NIST that would focus on developing standards to accelerate adoption of critical and emerging technologies with a focus on artificial intelligence, quantum science, and advanced biotechnologies. As part of this investment, the Budget includes an $8 million increase to strengthen U.S. leadership in international standards development for critical and emerging technologies.

- **Secures the American Economy and American's Sensitive Data against Foreign Threats.** The Budget strengthens the Nation's national and economic security by protecting the information and communications technology (ICT) supply chain and improving the security of the commercial cyber ecosystem. This includes a $36 million increase to review ICT transactions that pose an undue risk to the United States, and an enforcement program to deter and mitigate foreign malicious cyber-enabled activities. The Budget also provides the Bureau of Industry and Security (BIS) with a $30 million increase to advance national security and secure trade by bolstering BIS's ability to implement and enforce export controls. In addition, BIS monitors industrial base and supply chain trends with regard to critical and emerging technologies, such as microelectronics.

- **Supports Evidence-Based Policymaking.** The Budget supports evidence-based policy making and strengthens the ability of the Census Bureau to deliver reliable, high-quality data and innovative statistical products that improve understanding of the Nation's people and economy. The Budget includes $408 million to finalize and evaluate the Decennial Census and lay the groundwork for a successful 2030 Census and $141 million for BEA to support the production of vital economic indicators such as Gross Domestic Product. In 2023, BEA will transition the prototype Annual National and Annual State Distribution of Personal Income measures into regular production, providing policymakers and the public with crucial new information about how families across the income distribution spectrum are faring.



# DEPARTMENT OF DEFENSE

The Department of Defense (DOD) is responsible for the military forces needed to safeguard U.S. vital national interests.  The President's 2023 Budget for DOD provides the resources necessary to sustain and strengthen U.S. deterrence, advancing our vital national interests through integrated deterrence, campaigning, and investments that build enduring advantages.  The Budget:  supports America's servicemembers and their families; strengthens alliances and partnerships; preserves America's technological edge; bolsters economic competitiveness; and combats 21st Century security threats.

The Budget requests $773 billion in discretionary funding for DOD, a $69 billion or 9.8-percent increase from the 2021 enacted level.  This two-year growth enables DOD to make the investments necessary to execute the Administration's *Interim National Security Strategic Guidance* and forthcoming National Security Strategy and National Defense Strategy.

**The President's 2023 Budget:**

- **Supports United States' European Allies and Partners.**  The Budget supports Ukraine, the United States' strong partnerships with North Atlantic Treaty Organization (NATO) allies, and other European partner states by bolstering funding to enhance the capabilities and readiness of U.S. forces, NATO allies, and regional partners in the face of Russian aggression.

- **Promotes Integrated Deterrence in the Indo-Pacific and Globally.** The Budget proposes $773 billion for DOD. To sustain and strengthen deterrence, the Budget prioritizes China as the Department's pacing challenge.  DOD's 2023 Pacific Deterrence Initiative highlights some of the key investments the Department is making that are focused on strengthening deterrence in the Indo-Pacific region.  DOD is building the concepts, capabilities, and posture necessary to meet these challenges, working in concert with the interagency and U.S. allies and partners to ensure U.S. deterrence is integrated across domains, theaters, and the spectrum of conflict.

- **Counters Persistent Threats.**  While focused on maintaining robust deterrence against China and Russia, the Budget also enables DOD to counter other persistent threats including those posed by North Korea, Iran, and violent extremist organizations.

- **Modernizes the Nuclear Deterrent.**  The Budget maintains a strong, credible nuclear deterrent, as a foundational aspect of integrated deterrence, for the security of the Nation and U.S. allies.  The Budget supports the U.S. nuclear triad and the necessary ongoing nuclear modernization programs, to include the nuclear command, control, and communication networks.

53

- **Advances U.S. Cybersecurity.** The Budget invests in cybersecurity programs to protect the Nation from malicious cyber actors and cyber campaigns. These priorities include strengthening cyber protection standards for the defense industrial base and investing in the cybersecurity of DOD networks.

- **Takes Care of Servicemembers and the DOD Civilian Workforce.** The Budget invests in America's servicemembers and civilian workforce with robust 4.6 percent pay raises—the largest in a generation—and addresses economic insecurity by funding a newly authorized basic needs allowance. The Budget also continues to combat the COVID-19 pandemic.

- **Fulfills America's Commitment to Military Families.** Military families are key to the readiness and well-being of the All-Volunteer Force, and therefore are critical to national security. The Budget supports military families by prioritizing programs that directly support military spouses, children, caregivers, survivors, and other dependents.

- **Strengthens Programs to Prevent and Respond to Sexual Assault.** The Budget fully funds DOD's implementation of the recommendations of the Independent Review Commission on Sexual Assault in the Military to improve the Department's ongoing work to enhance accountability, prevention, climate and culture, and victim care and support. Examples of these efforts include the establishment of a violence prevention workforce and enabling servicemembers who experience sexual harassment to access services from a sexual assault victim advocate. The Budget also supports the establishment of an independent Office of Special Trial Counsel in each military department, as required under the National Defense Authorization Act for Fiscal Year 2022, to carry out changes to the military justice process for handling sexual assault, domestic violence, and other serious crimes.

- **Promotes Climate Resilience and Energy Efficiency to Support Warfighting Operations.** It is vital to examine the security implications of climate-induced extreme weather and to adapt DOD platforms and military installations to protect mission critical capabilities. The Budget supports efforts to plan for and mitigate the impacts of climate change and improve the resilience of DOD facilities and operations. The Budget invests in power and energy performance, which makes U.S. forces more agile, efficient, and survivable in this complex and changing environment.

- **Enhances Biodefense and Pandemic Preparedness.** The Budget provides robust funding for programs that support the Administration's biodefense and pandemic preparedness priorities as outlined in U.S. biodefense and pandemic preparedness strategies and plans, including the Office of the Assistant Secretary for Health Affairs, Chemical and Biological Defense Program, and Biological Threat Reduction Program. The Budget supports enhanced investments in medical countermeasures, including vaccines, diagnostics, and therapeutics research and manufacturing; clinical research and testing; early warning and real-time monitoring; biosafety and biosecurity; and threat reduction activities with global partners.

- **Builds the Air Forces Needed for the 21st Century.** The Budget procures a mix of highly capable aircraft while continuing to make investments in the fighter, bomber, and training aircraft of the future. Investing in this mix of aircraft provides an opportunity to reduce the future fleet's operational costs while increasing its resiliency and flexibility to meet future threats.

- **Optimizes U.S. Naval Shipbuilding.** Maintaining U.S. naval power is critical to reassuring allies and deterring potential adversaries. The Budget proposes executable and responsible investments in the U.S. Navy fleet. In addition, the Budget continues the recapitalization of

the Nation's strategic ballistic missile submarine fleet while also investing in the submarine industrial base.

- **Supports a Ready and Modern Army.** The Budget maintains a ready Army capable of responding globally as part of the Joint Force through investments in Army modernization initiatives, force posture improvements, and deterrence capabilities.

- **Invests in Long-Range Fire Capabilities.** The safety and security of the Nation requires a strong, sustainable, and responsive mix of long-range strike capabilities. The Budget invests in the development and testing of hypersonic strike capabilities while enhancing existing long-range strike capabilities to bolster deterrence and improve survivability.

- **Increases Space Resilience.** Space is vital to U.S. national security and integral to modern warfare. The Budget maintains America's advantage by improving the resilience of U.S. space architectures to bolster deterrence and increase survivability during hostilities.

- **Ensures Readiness.** The Budget continues to ensure that U.S. Soldiers, Sailors, Airmen, Marines, and Guardians remain the best trained and equipped fighting force in the world. At the same time, the Budget strengthens and empowers DOD's civilian workforce as a critical contributor to the Nation's security.

- **Optimizes Force Structure.** In line with the forthcoming National Defense Strategy, the Budget optimizes force structure to build a Joint Force that is lethal, resilient, sustainable, survivable, agile, and responsive. The Budget supports DOD's plan to responsibly upgrade capabilities by redirecting resources to cutting edge technologies in high-priority platforms. Some force structure is too costly to maintain and operate, and no longer provides the capabilities needed to address the current and future national security challenges. The Budget enables DOD to reinvest savings associated with optimized force structure to higher priority investments.

- **Supports Defense Research and Development and the Defense Technology Industrial Base.** DOD plays a critical role in overall Federal research and development that spurs innovation, yields high-value technology, ensures American dominance over strategic competitors, and creates good-paying jobs. The Budget prioritizes defense research, development, test, and evaluation funding to invest in breakthrough technologies that drive innovation, support capacity in the defense technology industrial base, ensure American technological leadership, and underpin the development of next-generation defense capabilities.

- **Strengthens the U.S. Supply Chain and Industrial Base.** The Budget invests in key technologies and sectors of the U.S. industrial base such as microelectronics, casting and forging, and critical materials.

- **Empowers Small Disadvantaged Businesses and Underserved Communities.** The Budget advances equity and supports small disadvantaged businesses and underserved communities. DOD will continue to explore opportunities to serve the American people, with a focus on these communities, through supplier and contracting operations.



# DEPARTMENT OF EDUCATION

> The Department of Education assists States, school districts, and institutions of higher education in providing a high-quality education to all students and addressing the inequitable barriers underserved students face in education. The President's 2023 Budget for the Department of Education makes historic investments in the Nation's future prosperity: increases aid for high-poverty schools; meets the needs of students with disabilities; and expands access to higher education.
>
> The Budget requests $88.3 billion in discretionary funding for the Department of Education, a $15.3 billion or 20.9-percent increase from the 2021 enacted level.

**The President's 2023 Budget:**

## *K-12 Education*

- **Makes Historic Investments in High-Poverty Schools.** To advance the goal of providing a high-quality education to every student, the Budget provides $36.5 billion for Title I, including $20.5 billion in discretionary funding and $16 billion in mandatory funding, which more than doubles the program's funding compared to the 2021 enacted level. Title I helps schools provide students in low-income communities the learning opportunities and support they need to succeed. This substantial new support for the program, which serves 25 million students in nearly 90 percent of school districts across the Nation, would be a major step toward fulfilling the President's commitment to address long-standing funding disparities between under-resourced schools—which disproportionately serve students of color—and their wealthier counterparts.

- **Prioritizes the Health and Well-Being of Students.** Disruptions caused by the COVID-19 pandemic continue to take a toll on the physical and mental health of students, teachers, and school staff. Recognizing the profound effect of physical and mental health on academic achievement, the Budget includes a $1 billion investment to increase the number of counselors, nurses, school psychologists, social workers, and other health professionals in schools.

- **Increases Support for Children with Disabilities.** The President is committed to ensuring that children and youth with disabilities receive the services and support they need to thrive in school and graduate ready for college or a career. The Budget provides an additional $3.3 billion from the 2021 enacted level—the largest two-year increase ever—for Individuals with Disabilities Education Act (IDEA) grants to States, with a total of $16.3 billion to support special education and related services for students in grades Pre-K through 12. The

Budget also doubles funding to $932 million for IDEA Part C grants, which support early intervention services for infants and families with disabilities that have a proven record of improving academic and developmental outcomes.  The increased funding would support States in implementing critical reforms to expand their enrollment of underserved children, including children of color, children from low-income families, and children living in rural areas.  The increase also includes $200 million to expand and streamline enrollment of children at risk of developing disabilities, such as children born with very low-birth weight or who have been exposed to environmental toxins, which would help mitigate the need for more extensive services later in childhood and further expand access to the program for underserved children.  The Budget also more than doubles funding to $250 million for IDEA Part D Personnel Preparation grants to support a pipeline of special educators at a time when the majority of States are experiencing a shortage of special educators.

- **Supports Full Service Community Schools.**  Community schools play a critical role in providing comprehensive wrap-around services to students and their families, from afterschool to adult education opportunities, and health and nutrition services.  The Budget includes $468 million for this program, an increase of $438 million from the 2021 enacted level.  The increase would also help school districts implement integrated student supports to meet student and family mental health needs through partnerships with community-based organizations and other entities.

- **Invests in Education Recruitment and Retention.**  While the education sector has faced shortages in critical staffing areas for decades, the COVID-19 pandemic and tight labor market has made shortages worse, which has negatively impacted students and fallen hardest on students in underserved communities.  The Budget includes $514 million for the Education Innovation and Research program, $350 million of which the Department would target toward identifying and scaling models that improve recruitment and retention of staff in education.  Such models include those that would improve support for educators and provide teacher access to leadership opportunities that improve teacher retention and maximize the impact of great teachers beyond their classrooms.

- **Supports Multi-Language Learners.**  Students learning English as a second language were disproportionately impacted by the multiple transitions to and from remote learning during the COVID-19 pandemic.  The Budget would provide $1.1 billion for the English Language Acquisition (ELA) program, an increase of $278 million, or 35 percent, from the 2021 enacted level, including additional funding to provide technical assistance and build local capacity to better support multilanguage learners and their teachers.  The ELA program helps students learning English attain English proficiency and achieve academic success.

- **Fosters Diverse Schools.**  The segregation of students by race and income undermines the promise that public schools provide an equal opportunity for all students to learn and succeed.  The Budget includes $100 million for a grant program to help communities develop and implement strategies to promote racial and socioeconomic diversity in their schools.

### Education Beyond High School

- **Makes Historic Investments in College Affordability and Completion.**  To help low- and middle-income students overcome financial barriers to postsecondary education, the Budget proposes to double the maximum Pell Grant by 2029.  This begins with a historic $2,175 increase for the 2023-2024 school year compared to the 2021-2022 school year, thereby expanding access and reaching nearly 6.7 million students.  The Budget would also support strategies

Case 6:24-cv-01057-DDC-ADM   Document 24-6   Filed 04/05/24   Page 64 of 158

to improve the retention, transfer, and completion rates of students by investing in the Federal TRIO Programs, Gaining Early Awareness and Readiness for Undergraduate Programs, and new retention and completion grants.

- **Increases Funding for Historically Black Colleges and Universities (HBCUs), Tribally Controlled Colleges and Universities (TCCUs), Minority-Serving Institutions (MSIs), and Community Colleges.** The Budget would increase institutional capacity at HBCUs, TCCUs, MSIs, and low-resourced institutions, including community colleges, by providing an increase of $752 million from the 2021 enacted level. This funding includes $450 million for four-year HBCUs, TCCUs, and MSIs to expand research and development infrastructure at these institutions.

- **Invests in Services for Student Borrowers.** The Budget provides $2.7 billion to the Department of Education's Office of Federal Student Aid (FSA), an $800 million, or 43-percent, increase compared to the 2021 enacted level. This additional funding is needed to provide better support to student loan borrowers. Specifically, the increase allows FSA to implement customer service improvements to student loan servicing and to ensure the successful transition from the current short-term loan servicing contracts into a more stable long-term contract and servicing environment.

### *Office for Civil Rights*

- **Strengthens Civil Rights Enforcement.** The Budget provides $161 million to the Department of Education's Office for Civil Rights, an 18-percent increase compared to the 2021 enacted level. This additional funding would ensure that the Department has the capacity to protect equal access to education through the enforcement of civil rights laws, such as Title IX of the Education Amendments of 1972.



# DEPARTMENT OF ENERGY

The Department of Energy (DOE) is responsible for supporting the Nation's prosperity by addressing its climate, energy, environmental, and nuclear security challenges through transformative science and technology solutions.  The President's 2023 Budget for DOE:  invests in domestic clean energy manufacturing; advances environmental justice; tackles the climate crisis; and modernizes and ensures the safety and security of the nuclear weapons stockpile.

The Budget requests $48.2 billion in discretionary funding for DOE, a $6.3 billion or 15.1-percent increase from the 2021 enacted level.  Resources provided through the 2023 Budget complement major investments in clean energy demonstrations, advanced manufacturing, grid infrastructure, and low-income home weatherization funded in the Infrastructure Investment and Jobs Act (Bipartisan Infrastructure Law).

**The President's 2023 Budget:**

- **Enables Progress toward Climate Goals.**  The Budget supports investments in research, development, demonstration, and deployment, which are central to enabling achievement of the Administration's climate goals of a 50- to 52-percent reduction from 2005 levels in economy-wide net greenhouse gas pollution in 2030 and zero emissions economy-wide by no later than 2050.

- **Creates Jobs through Support for Clean Energy Infrastructure.**  The Budget invests $2.1 billion to support clean energy workforce and infrastructure projects across the Nation, including:  $502 million to weatherize and retrofit low-income homes; $150 million to electrify tribal homes and transition tribal colleges and universities to renewable energy; and $90 million for a new Grid Deployment Office to build a grid that is more reliable and resilient and that integrates accelerating levels of renewable energy.  In addition, the Budget includes $58 million to launch the Net-Zero Labs Initiative, competitively selecting clean energy deployment projects across the national laboratories.  These investments would create good-paying jobs while driving progress toward the Administration's climate goals, including the President's goal of carbon pollution-free electricity by 2035.

- **Tackles the Climate Crisis through Clean Energy Innovation.**  To support U.S. preeminence in developing innovative technologies that accelerate the transition to a clean energy economy, the Budget invests $9.2 billion in DOE clean energy research, development, and demonstration, an increase of more than 33 percent from the 2021 enacted level.  These investments strengthen clean energy-enabling transmission and distribution systems, decarbonize transportation, advance carbon management technologies, improve energy efficiency

61

in industry and buildings, and secure the availability of high-assay low-enriched uranium. Funding would also leverage the tremendous innovation capacity of the national laboratories, universities, and entrepreneurs to transform America's power, transportation, buildings, and industrial sectors to achieve a net-zero emissions economy by 2050.

- **Strengthens Domestic Clean Energy Manufacturing.** Meeting the challenge of climate change will require a dramatic scale-up in domestic manufacturing of key climate and clean energy equipment, providing opportunities for U.S. workers. Across the $11.3 billion in discretionary DOE clean energy investments described above, the Budget reflects the importance of strategically supporting the U.S. domestic manufacturing base through innovation, technical assistance, and training. Specifically, the Budget includes $200 million for a new Solar Manufacturing Accelerator that would help create a robust domestic manufacturing sector capable of meeting the Administration's solar deployment goals without relying on imported goods manufactured using unacceptable labor practices. The Budget also funds a new ManufacturingUSA institute and increases support for Industrial Assessment Centers, giving students valuable experience conducting energy audits for small and medium-sized manufacturers. In addition, the Budget also proposes a $1 billion mandatory investment to launch a Global Clean Energy Manufacturing effort that would build resilient supply chains for climate and clean energy equipment through engagement with allies, enabling an effective global response to the climate crisis while creating economic opportunities for the United States to increase its share of the global clean technology market.

- **Advances Environmental Justice and Equity.** The Budget provides historic support for underserved communities, including: $34 million for the Office of Economic Impact and Diversity to play a critical role in implementing the Department's Justice40 efforts and equity action plan; $40 million in new resources for capacity building assistance in areas of persistent poverty around the Department's cleanup sites; and $13 million for the Office of Legacy Management to strengthen its environmental justice mission. New programs, including Funding for Accelerated, Inclusive Research, would train and support a diverse and inclusive scientific workforce for the future. In addition, the newly established Office of State and Community Programs would launch Low Income Home Energy Assistance Program Advantage with a $100 million pilot to retrofit low-income homes with efficient electric appliances and systems; and the Office of Energy Efficiency and Renewable Energy would lead a $31 million Equitable Clean Energy Transition initiative to build capacity and provide technical assistance to help energy and environmental justice communities navigate and benefit from the transition to a clean energy economy. These investments would build healthy, culturally vibrant, sustainable, and resilient communities.

- **Supports Energy Communities.** The Budget provides $893 million for DOE's Office of Fossil Energy and Carbon Management to advance technologies that can provide economic revitalization opportunities in energy communities. This includes dedicated funding for the Interagency Working Group on Coal and Power Plant Communities and Economic Revitalization to coordinate interagency efforts and stakeholder engagement across at least 10 Federal agencies. This interagency effort would expand the delivery of Federal resources to those communities affected by the energy transition.

- **Advances Transformational Clean Energy and Climate Solutions.** The Budget provides $700 million for the Advanced Research and Projects Agency – Energy (ARPA-E). This investment in high-potential, high-impact research and development would help remove the technological barriers to advance energy and environmental missions. The Budget also

proposes expanded authority for ARPA-E to more fully address innovation gaps around adaptation, mitigation, and resilience to the impacts of climate change.

- **Invests in Research and Innovation.** The Budget provides a historic investment of $7.8 billion for the Office of Science to support cutting-edge research at the national laboratories and universities to: advance the Nation's understanding of climate change; identify and accelerate novel technologies for clean energy solutions; provide new computing insight through quantum information science and artificial intelligence that would address scientific and environmental challenges; leverage data, analytics, and computational infrastructure to strengthen pandemic preparedness in support of U.S. biodefense and pandemic preparedness strategies and plans; and support the Nation's leading scientific user facilities. New programs would promote U.S. leadership in the industries of the future, including biotechnology and biomanufacturing, and support the Cancer Moonshot initiative.

- **Reduces Health and Environmental Hazards for At-Risk Communities.** The Budget includes $7.6 billion for the Environmental Management program to support the cleanup of communities used during the Manhattan Project and Cold War for nuclear weapons production. The Administration would ensure that investments in the remediation of legacy soil and groundwater contamination provide benefits to disadvantaged communities.

- **Strengthens the Nation's Nuclear Security, Biological Security, and Cybersecurity.** The Budget supports a safe, secure, and effective nuclear stockpile by robustly funding investments in the recapitalization of the National Nuclear Security Administration's physical infrastructure and essential facilities to modernize the U.S. nuclear deterrent. The Budget also increases funding for: key arms control and nuclear nonproliferation and counterterrorism programs; the Naval Nuclear Propulsion Program, which designs, builds, operates, maintains, and manages the reactor systems of the naval nuclear fleet; and biosecurity innovation, as well as highly-skilled staff capacity to carry out these missions. The Budget also invests in energy-sector cybersecurity through the Office of Cybersecurity, Energy Security, and Emergency Response.



# DEPARTMENT OF HEALTH AND HUMAN SERVICES

The Department of Health and Human Services (HHS) is responsible for protecting the health and well-being of Americans through its research, public health, and social services programs. The President's 2023 Budget for HHS invests in:  mental healthcare and suicide prevention; healthcare access and outcomes for vulnerable populations; health research and innovation; public health systems and pandemic preparedness; ending the HIV/AIDS epidemic; social service equity; access to child care and early learning programs; and support services for survivors of domestic violence.

The Budget requests $127.3 billion in discretionary funding for HHS, a $26.9 billion or 26.8-percent increase from the 2021 enacted level, excluding amounts requested for the Indian Health Service (IHS), which the Budget proposes to shift from discretionary to mandatory funding.  This request includes appropriations for 21st Century Cures Act and program integrity activities.

**The President's 2023 Budget:**

- **Accelerates Innovation through the Advanced Research Projects Agency for Health (ARPA-H).**  The Budget proposes a major investment of $5 billion for ARPA-H, significantly increasing direct Federal research and development spending in health.  With an initial focus on cancer and other diseases such as diabetes and dementia, this major investment would drive transformational innovation in health research and speed application and implementation of health breakthroughs.  Funding for ARPA-H, along with additional funding for the National Institutes of Health, total a $49 billion request to continue to support research that enhances health, lengthens life, reduces illness and disability, and spurs new biotechnology productions and innovation.

- **Advances the Cancer Moonshot Initiative.** The Budget proposes investments in ARPA-H, the National Cancer Institute, the Centers for Disease Control and Prevention (CDC), and the Food and Drug Administration (FDA) to accelerate the rate of progress against cancer by working toward reducing the cancer death rate by at least 50 percent over the next 25 years and improving the experience of people who are living with or who have survived cancer.

- **Transforms Mental Healthcare.**  Mental health is essential to overall health, and the United States faces a mental health crisis that has been exacerbated by the COVID-19 pandemic.  To address this crisis, the Budget proposes reforms to health coverage and major investments in the mental health workforce.  For people with private health insurance, the Budget requires all health plans to cover mental health benefits and ensures that plans have an adequate network of behavioral health providers.  For Medicare, TRICARE, the

65

Department of Veterans Affairs healthcare system, health insurance issuers, group health plans, and the Federal Health Employee Benefit Program, the Budget lowers patients' costs for mental health services. The Budget also requires parity in coverage between behavioral health and medical benefits, and expands coverage for behavioral health providers under Medicare. The Budget invests in increasing the number of mental health providers serving Medicaid beneficiaries, as well as in mental health workforce development and service expansion, including at primary care clinics and non-traditional sites. The Budget also provides sustained and increased funding for community-based centers and clinics, including a State option to receive enhanced Medicaid reimbursement on a permanent basis. In addition, the Budget makes historic investments in youth mental health and suicide prevention programs and in training, educational loan repayment, and scholarships that help address the shortage of behavioral health providers, especially in underserved communities. The Budget also strengthens access to crisis services by building out the National Suicide Prevention Lifeline, which will transition from a ten-digit number to 988 in July 2022.

- **Commits to Ending the HIV/AIDS Epidemic.** The *National HIV/AIDS Strategy for the United States 2022–2025* commits to a 75-percent reduction in HIV infection by 2025. To meet this ambitious target and ultimately end the HIV/AIDS epidemic in the United States, the Budget includes $850 million across HHS to aggressively reduce new HIV cases, increase access to pre-exposure prophylaxis (also known as PrEP), and ensure equitable access to services and supports for those living with HIV. This includes increasing access to PrEP among Medicaid beneficiaries, which is expected to improve health and lower Medicaid costs for HIV treatment. The Budget also proposes a new mandatory program to guarantee PrEP at no cost for all uninsured and underinsured individuals, provide essential wrap-around services through States, IHS, tribal entities, and localities, and establish a network of community providers to reach underserved areas and populations.

- **Guarantees Adequate and Stable Funding for IHS.** As part of the Administration's commitment to honor the United States' trust responsibility to tribal nations and strengthen the Nation-to-Nation relationship, the Budget significantly increases IHS's funding over time, and shifts it from discretionary to mandatory funding. For the first year of the proposal, the Budget includes $9.1 billion in mandatory funding, an increase of $2.9 billion from the 2021 enacted level. After the first year, IHS funding would automatically grow to keep pace with healthcare costs and population growth and gradually close longstanding service and facility shortfalls. By providing IHS stable and predictable funding, the proposal would improve access to high-quality healthcare, rectify historical underfunding of the Indian health system, reduce existing facility backlogs such as the Healthcare Facilities Construction Priority List, address health inequities, and modernize IHS' electronic health record system. This proposal has been informed by consultations with tribal nations on the issue of mandatory funding and will be refined based on ongoing consultation.

- **Prepares for Future Pandemics and Advances Health Security for Other Biological Threats.** While combatting the ongoing COVID-19 pandemic, the United States must catalyze advances in science, technology, and core capabilities to prepare the Nation for the next biological threat and strengthen U.S. and global health security. The Budget makes transformative investments in pandemic preparedness and biodefense across HHS public health agencies—$81.7 billion available over five years—to enable an agile, coordinated, and comprehensive public health response to future threats, and to protect American lives, families and the economy. The Budget provides $40 billion to the Office of the Assistant Secretary for Preparedness and Response to invest in advanced development and manufacturing of vaccines,

therapeutics, and diagnostics for high priority threats.  The Budget provides $28 billion for CDC to enhance public health system infrastructure, domestic and global threat surveillance, public health workforce development, public health laboratory capacity, and global health security.  The Budget provides $12.1 billion to NIH for:  research and development of vaccines, diagnostics, and therapeutics against high priority biological threats; biosafety and biosecurity research and innovation to prevent biological incidents; and safe and secure laboratory capacity and clinical trial infrastructure.  The Budget also includes $1.6 billion for FDA to expand and modernize regulatory capacity information technology and laboratory infrastructure to support the evaluation of medical countermeasures.  Further, the Budget encourages the development of innovative antimicrobial drugs through advance market commitments for critical-need antimicrobial drugs.

- **Builds Advanced Public Health Systems and Capacity.**  The Budget includes $9.9 billion in discretionary funding to build capacity at CDC and at the State and local levels, an increase of $2.8 billion over the 2021 enacted level.  These resources would:  improve the core immunization program; expand public health infrastructure in States and Territories and strengthen the public health workforce; support efforts to modernize public health data collection; including at the Center for Forecasting and Outbreak Analytics; and conduct studies on long COVID conditions to inform diagnosis and treatment options.  In addition, to advance health equity, the Budget invests in CDC programs related to viral hepatitis, youth mental health, and sickle cell disease.  To address gun violence as a public health epidemic, the Budget invests in community violence intervention and firearm safety research.

- **Expands Access to Vaccines.**  The Budget establishes a new Vaccines for Adults (VFA) program, which would provide uninsured adults with access to all vaccines recommended by the Advisory Committee on Immunization Practices at no cost.  As a complement to the successful Vaccines for Children (VFC) program, the VFA program would reduce disparities in vaccine coverage and promote infrastructure for broad access to routine and outbreak vaccines.  The Budget would also expand the VFC program to include all children under age 19 enrolled in the Children's Health Insurance Program and consolidate vaccine coverage under Medicare Part B, making more preventive vaccines available at no cost to Medicare beneficiaries.

- **Advances Maternal Health and Health Equity.**  The United States has the highest maternal mortality rate among developed nations, and rates are disproportionately high for Black and American Indian and Alaska Native women.  The Budget includes $470 million to:  reduce maternal mortality and morbidity rates; expand maternal health initiatives in rural communities; implement implicit bias training for healthcare providers; create pregnancy medical home demonstration projects; and address the highest rates of perinatal health disparities, including by supporting the perinatal health workforce.  The Budget also extends and increases funding for the Maternal, Infant, and Early Childhood Home Visiting program, which serves approximately 71,000 families at risk for poor maternal and child health outcomes each year, and is proven to reduce disparities in infant mortality.  To address the lack of data on health disparities and further improve access to care, the Budget strengthens collection and evaluation of health equity data.  Recognizing that maternal mental health conditions are the most common complications of pregnancy and childbirth, the Budget continues to support the maternal mental health hotline and the screening and treatment for maternal mental depression and related behavioral disorders.

- **Expands Access to Healthcare Services for Low-Income Women.**  The Budget provides $400 million, an increase of nearly 40 percent from the 2021 enacted level, to the Title X Family Planning program, which provides family planning and other healthcare to low-income

communities. This increase in Title X funding would improve overall access to vital reproductive and preventive health services and advance gender and health equity.

- **Expands Access to Affordable, High-Quality Early Child Care and Learning.** The Budget provides $20.2 billion for HHS's early care and education programs, an increase of $3.3 billion, or 19 percent, from the 2021 enacted level. This includes $7.6 billion for the Child Care and Development Block Grant, an increase of $1.7 billion from the 2021 enacted level to expand access to quality, affordable child care for families across the Nation. In addition, the Budget helps young children enter kindergarten ready to learn by providing $12.2 billion for Head Start, an increase of $1.5 billion from the 2021 enacted level. The Budget also helps States identify and fill gaps in early education programs by funding the Preschool Development Grants program at $450 million, an increase of $175 million from the 2021 enacted level.

- **Advances Child and Family Well-Being in the Child Welfare System.** The Budget proposes to expand and incentivize the use of evidence-based foster care prevention services to keep families safely together and to reduce the number of children entering foster care. For children who do need to be placed into foster care, the Budget provides States with support and incentives to place more children with relatives or other adults who have an existing emotional bond with the children and fewer children in group homes and institutions, while also providing additional funding to support youth who age out of care without a permanent caregiver. The Budget proposes to nearly double flexible funding for States through the Promoting Safe and Stable Families program, and proposes new provisions to expand access to legal representation for children and families in the child welfare system. The Budget also provides $100 million in competitive grants for States and localities to advance reforms that would reduce the overrepresentation of children and families of color in the child welfare system, address the disparate experiences and outcomes of these families, and provide more families with the support they need to remain safely together. Further, the Budget provides $215 million for States and community-based organizations to respond to and prevent child abuse.

- **Supports Survivors of Domestic Violence and Other Forms of Gender Based-Violence.** The Budget proposes significant increases to support and protect survivors of gender-based violence, including $519 million for the Family Violence Prevention and Services (FVPSA) program to support domestic violence survivors—more than double the 2021 enacted level. This amount continues funding availability for FVPSA-funded resource centers, including those that support the Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex community. The Budget would provide additional funding for domestic violence hotlines and cash assistance for survivors of domestic violence, as well as funding to support a demonstration project evaluating services for survivors at the intersection of housing instability, substance use coercion, and child welfare. In addition, the Budget would provide over $66 million for victims of human trafficking and survivors of torture, an increase of nearly $21 million from the 2021 enacted level.

- **Supports America's Promise to Refugees.** The Budget provides $6.3 billion to the Office of Refugee Resettlement (ORR). This funding would help rebuild the Nation's refugee resettlement infrastructure and support the resettling of up to 125,000 refugees in 2023. The Budget would also help ensure that unaccompanied immigrant children are unified with relatives and sponsors as safely and quickly as possible and receive appropriate care and services while they are in ORR's custody. The Budget makes additional investments in services, including expanded access to counsel to help children navigate complex immigration court proceedings, and enhanced case management and post-release services. The Budget also includes mandatory investments in the Unaccompanied Children (UC) program, including a multiyear contingency

fund that would automatically provide additional resources when there are large increases in UC referrals, and a proposal to scale up to universal UC legal representation. The Budget redresses past wrongs by providing resources for critical reunification services—including trauma-related and mental health services—to children and families unduly separated from each other through policies of the previous administration.

- **Supports Families Struggling with Home Energy and Water Bills.** The Budget provides $4 billion, a $225 million increase from the 2021 enacted level, for the Low Income Home Energy Assistance Program (LIHEAP). LIHEAP helps families access home energy and weatherization assistance, vital tools for protecting vulnerable families' health in response to extreme weather and climate change. As part of the Justice40 pilot, HHS plans to increase efforts to prevent energy shutoffs and increase support for households with young children and older people, and high energy burdens. Since the Low Income Household Water Assistance Program (LIHWAP) expires at the end of 2023, the Budget proposes to expand LIHEAP to advance the goals of both LIHEAP and LIHWAP. Specifically, the Budget increases LIHEAP funding and gives States the option to use a portion of their LIHEAP funds to provide water bill assistance to low-income households.



# DEPARTMENT OF HOMELAND SECURITY

The Department of Homeland Security (DHS) is responsible for safeguarding the American people by:  preventing terrorism and countering domestic violent extremism; securing and managing U.S. borders; administering and enforcing U.S. immigration laws; defending and securing Federal cyberspace and critical infrastructure; and ensuring disaster resilience, response, and recovery.  The President's 2023 Budget for DHS advances key Administration priorities by:  investing in climate resilience; research and development; Federal cybersecurity; maritime security; and secure and humane border management.  The Budget also enhances DHS's capacity to prepare for and respond to pandemics and other biological threats.

The Budget requests $56.7 billion in discretionary funding for the Department of Homeland Security, a $2.9 billion or 5.4-percent increase from the 2021 enacted level.  Resources provided through the 2023 Budget complement investments in cybersecurity, hazard mitigation, and others areas provided in the Infrastructure Investment and Jobs Act (Bipartisan Infrastructure Law).

**The President's 2023 Budget:**

- **Bolsters Federal Cybersecurity and Critical Infrastructure Security.**  The Budget provides $2.5 billion to the Cybersecurity and Infrastructure Security Agency (CISA), a $486 million increase from the 2021 enacted level, to maintain critical cybersecurity capabilities implemented in the American Rescue Plan Act of 2021, expand network protection throughout the Federal Executive Branch, and bolster support capabilities, such as cloud business applications, enhanced analytics, and stakeholder engagement.  The Budget also provides significant enhancements across DHS to modernize protection of systems, networks, assets, and information, as required by Executive Order 14028, "Improving the Nation's Cybersecurity."  In addition to bolstering Federal cybersecurity, the Budget includes funding to ensure safe and secure elections, build and maintain critical public-private partnerships, enhance critical infrastructure protection, and prioritize and reinforce CISA's role as the national risk manager.

- **Enhances Natural Disaster Resilience.**  The Budget provides $3.5 billion for DHS's climate resilience programs.  This includes $507 million, a $93 million increase from the 2021 enacted level, for the Federal Emergency Management Agency's (FEMA) flood hazard mapping program to incorporate climate science and future risks.  The Budget also makes robust investments in FEMA's hazard mitigation grant programs, including the Building Resilient Infrastructure and Communities grant program, which helps communities build resilience against natural disasters, including disadvantaged communities who are disproportionately at risk from climate crises.

71

- **Expands U.S. Coast Guard (USCG) Capabilities.** The Budget provides $11.5 billion for the USCG, a $564 million increase from the 2021 enacted level, to address emerging national security concerns and goals. This includes expanding USCG cyber operations capacity to protect and respond to cyber threats in the maritime sector, as well as expanding its presence in the Pacific, the Atlantic, and the Arctic—including procuring a commercially available icebreaker. These efforts would expand the capabilities of partners and deepen U.S. ties in each of the above-mentioned regions in order to strengthen maritime security and governance, which would protect economic activity and counter transnational criminal organizations.

- **Upgrades Research Laboratory Infrastructure.** The Budget makes historic investments in research and development infrastructure, providing $89 million to improve and modernize laboratories in the DHS Science and Technology Directorate (S&T). This funding would allow S&T to replace and enhance mission-critical equipment, make necessary information technology improvements, and allow DHS to construct the Detection Sciences Testing and Applied Research Center, which would enable DHS to more efficiently and effectively test and evaluate threat screening devices and counter homemade explosives to further secure transportation systems and other public venues.

- **Modernizes Transportation Security Administration (TSA) Pay and Workforce Policies.** The Budget provides a total of $7.1 billion for TSA pay and benefits, an increase of $1.6 billion from the 2021 enacted level, to compensate TSA employees at rates comparable to their peers in the Federal workforce. By establishing salary parity with other Federal employees, the Budget addresses retention issues faced by the Transportation Security Officer workforce, improving service delivery. The Budget also supports expanding TSA workforce access to labor benefits such as collective bargaining and merit systems protection. These enhancements support the President's commitment to fostering diversity, equity, and inclusion in the Federal workforce.

- **Ensures a Safe, Humane, and Efficient Immigration System.** The Administration is committed to ensuring the U.S. Citizenship and Immigration Services (USCIS) meets its mission administering the Nation's lawful immigration system and safeguarding its integrity and promise by efficiently and fairly adjudicating requests for immigration benefits. The Budget provides $765 million in discretionary funding for USCIS to: efficiently process increasing asylum caseloads; address the backlog of applications for work authorization, naturalization, adjustment of status, and other immigration benefits; and improve refugee processing.

- **Improves Border Processing and Management.** The Budget provides $15.3 billion for the U.S. Customs and Border Protection and $8.1 billion for the U.S. Immigration and Customs Enforcement to enforce immigration law, further secure U.S. borders and ports of entry, and effectively manage irregular migration along the Southwest border, including through $309 million in modern border security technology and $494 million for noncitizen processing and care costs.



# DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

The Department of Housing and Urban Development (HUD) is responsible for creating healthy, safe, sustainable, inclusive communities and affordable homes for all.  The President's 2023 Budget for HUD: significantly expands rental assistance to low-income households; advances efforts to end homelessness; increases affordable housing supply; expands homeownership opportunities for underserved borrowers; improves affordable housing by increasing climate resilience and energy efficiency; strengthens communities facing underinvestment; and prevents and redresses housing-related discrimination.

The Budget requests $71.9 billion in discretionary funding for HUD, a $12.3 billion or 21-percent increase from the 2021 enacted level.

**The President's 2023 Budget:**

- **Expands the Housing Choice Voucher Program and Enhances Household Mobility.** The Housing Choice Voucher program currently provides 2.3 million low-income families with rental assistance to obtain housing in the private market.  The Budget provides $32.1 billion, an increase of $6.4 billion (including emergency funding) over the 2021 enacted level, to maintain services for all currently assisted families and to expand assistance to an additional 200,000 households, particularly for those who are experiencing homelessness or fleeing, or attempting to flee, domestic violence or other forms of gender-based violence.  The Budget also funds mobility-related supportive services to provide low-income families with greater options to move to higher-opportunity neighborhoods.

- **Increases Affordable Housing Supply.**  To address the critical shortage of affordable housing in communities throughout the Nation, the Budget provides nearly $2 billion for the HOME Investment Partnerships Program (HOME), an increase of $600 million over the 2021 enacted level, to construct and rehabilitate affordable rental housing and provide homeownership opportunities.  If enacted, this would be the highest funding level for HOME in nearly 15 years.  In addition, the Budget provides $180 million to support 2,000 units of new permanently affordable housing specifically for the elderly and persons with disabilities, supporting the Administration's priority to maximize independent living for people with disabilities.  To complement these investments, the Budget contains a total of $50 billion in mandatory funding and additional Low-Income Housing Tax Credits to increase affordable housing development.  Specifically, the Budget provides $35 billion in HUD funding for State and local housing finance agencies and their partners to provide grants, revolving loan funds, and other streamlined financing tools that reduce transactional costs and increase housing

supply, as well as grants to advance State and local jurisdictions' efforts to remove barriers to affordable housing development.

- **Advances Efforts to End Homelessness.** To prevent and reduce homelessness, the Budget provides $3.6 billion, an increase of $580 million over the 2021 enacted level, for Homeless Assistance Grants to meet renewal needs and expand assistance to nearly 25,000 additional households, including survivors of domestic violence and homeless youth.

- **Promotes Equity by Preventing and Redressing Housing Discrimination.** The Budget provides $86 million in grants to support State and local fair housing enforcement organizations and to further education, outreach, and training on rights and responsibilities under Federal fair housing laws. The Budget also invests in HUD staff and operations capacity to deliver on the President's housing priorities, including to lift barriers that restrict housing and neighborhood choice, affirmatively further fair housing, and provide redress to those who have experienced housing discrimination.

- **Supports Access to Homeownership.** The Budget supports access to homeownership for underserved borrowers, including many first-time and minority homebuyers, through Federal Housing Administration (FHA) and Ginnie Mae credit guarantees. The Budget, via FHA and HOME, also provides $115 million for complementary loan and down payment assistance pilot proposals to expand homeownership opportunities for first-generation and/or low-wealth first-time homebuyers.

- **Invests in Resilience and Energy Efficiency across HUD Multifamily Programs.** Multifamily properties with HUD rental assistance and Public Housing provide 2.3 million affordable homes to low-income families. The Budget not only fully funds operating costs across this portfolio and provides critical Public Housing capital investments, but also provides about $900 million in resources across HUD programs for modernization activities aimed at energy efficiency and resilience to climate change impacts. These investments would help improve the quality of public and HUD-assisted housing while creating good-paying jobs.

- **Reduces Lead and Other Home Health Hazards for Vulnerable Families.** The Budget provides $400 million, an increase of $40 million above the 2021 enacted level, for States, local governments, and nonprofits to reduce lead-based paint and other health hazards in the homes of low-income families with young children. The Budget also includes $25 million to address lead-based paint in Public Housing. The Centers for Disease Control and Prevention identifies the risk for lead exposure as greatest for children from racial and ethnic minority groups and children in families living below the poverty level, and the Lead Hazard and Healthy Homes grants complement additional Government-wide lead remediation investments included in the Infrastructure Investment and Jobs Act (Bipartisan Infrastructure Law), and target interventions to these most at-risk communities. In addition, the Budget targets $60 million specifically to prevent and mitigate housing-related health hazards, such as fire safety and mold, in HUD-assisted housing.

- **Supports Economic Development and Invests in Underserved Communities.** The Budget provides $3.8 billion for the Community Development Block Grant program to help communities modernize infrastructure, invest in economic development, create parks and other public amenities, and provide social services. The Budget includes a targeted increase of $195 million to spur equitable development and the removal of barriers to revitalization in 100 of the most underserved neighborhoods in the United States.

- **Invests in Affordable Housing in Tribal Communities.** Native Americans are seven times more likely to live in overcrowded conditions and five times more likely to have inadequate plumbing, kitchen, or heating systems than all U.S. households. The Budget helps address the poor housing conditions in tribal areas by providing $1 billion to fund tribal efforts to expand affordable housing, improve housing conditions and infrastructure, and increase economic opportunities for low-income families. Of this total, $150 million would prioritize activities that advance resilience and energy efficiency in housing-related projects.



# DEPARTMENT OF THE INTERIOR

The Department of the Interior (DOI) conserves and manages the Nation's natural resources and cultural heritage for the benefit and enjoyment of the American people. The President's 2023 Budget for DOI invests in climate change mitigation and adaptation, honors commitments to tribal nations, supports development in U.S. Territories and freely associated states, and funds reclamation and resilience work that ensures healthy lands and waters and creates good-paying jobs.

The Budget requests $17.5 billion in discretionary funding for DOI, a $2.8 billion or 19.3-percent increase from the 2021 enacted level, excluding amounts requested for Contract Support Costs and Indian Self-Determination and Education Assistance Act of 1975 Section 105(l) leases, which the Budget proposes to shift from discretionary to mandatory funding. Resources provided through the 2023 Budget complement major investments in wildfire management, tribal programs, methane emissions reduction, abandoned mine land reclamation, western water infrastructure, and ecosystem restoration through the Infrastructure Investment and Jobs Act (Bipartisan Infrastructure Law).

**The President's 2023 Budget:**

- **Strengthens Climate Resilience for Communities and Ecosystems.** As steward for 20 percent of the Nation's lands and waters and with a primary responsibility to uphold the Nation's commitments to American Indians and Alaska Natives, DOI plays an integral role in addressing the climate crisis through strengthened conservation partnerships, including the Administration's America the Beautiful Initiative, and science-based ecosystem management. The Budget invests $5 billion in climate adaptation and resilience, including for several priorities listed below, to mitigate the impacts of climate change—such as drought, wildfire and severe storms—on America's communities, lands, waters, and wildlife. The Budget also sustains funding for key conservation and ecosystem management initiatives, including the Civilian Climate Corps, alongside a historic $1.4 billion investment in the Bipartisan Infrastructure Law for ecosystem restoration across America.

- **Honors Trust and Treaty Responsibilities to Tribal Communities through Robust Program Funding.** The Budget makes the largest annual investment in tribal nations in history, reflecting input received from the first Government-wide tribal consultation on the development of the President's Budget. With $4.5 billion for DOI's tribal programs, more than $1 billion above the 2021 enacted level, investments would support public safety and justice, social services, climate resilience, and educational needs to uphold Federal trust responsibilities and advance equity for Native communities. This includes a $156 million

77

increase to support construction work at seven Bureau of Indian Education schools, providing quality facilities for culturally-appropriate education with high academic standards, as well as $7 million for the Indian Boarding School Initiative, which takes preliminary steps to address the injustices of past Federal Indian boarding school policy. The Budget also includes $632 million in Tribal Public Safety and Justice funding at DOI, which collaborates closely with the Department of Justice, including on continued efforts to address the crisis of Missing and Murdered Indigenous Persons. The Budget also proposes to reclassify Contract Support Costs and Indian Self-Determination and Education Assistance Act of 1975 Section 105(l) leases as mandatory spending, providing certainty for tribal communities in meeting these ongoing needs through dedicated funding sources. The Budget further proposes to provide mandatory funding to the Bureau of Reclamation for operation and maintenance of previously enacted Indian Water Rights Settlements, and the Administration is interested in working with the Congress on an approach to provide a mandatory funding source for future settlements. The Budget also complements Bipartisan Infrastructure Law investments to address climate resilience needs in tribal communities.

- **Advances Climate Science.** The Budget invests $375 million at DOI to advance understanding of the impacts of climate change, unlock new opportunities to reduce climate risk through innovative mitigation and adaptation research, measure and monitor greenhouse gas emissions and sinks on Federal lands, and ensure that coastal, fire-prone, and other particularly vulnerable communities have accurate and accessible information to allow them to better respond to the climate crisis. The Budget also supports the development of a Federal climate data portal that would provide the public with accessible information on historical and projected climate impacts, inform decision-making, and strengthen community climate resilience.

- **Mitigates the Risk of Catastrophic Wildfires.** The Budget invests $325 million in Hazardous Fuels Management and Burned Area Rehabilitation programs to help reduce the risk and severity of wildfires, and restore lands that were devastated by catastrophic fire over the last several years. This funding complements the $878 million for hazardous fuels management and $325 million for burned area rehabilitation projects provided through the Bipartisan Infrastructure Law.

- **Invests in the Wildland Firefighting Workforce.** Protecting communities, ecosystems, and infrastructure from wildfire requires a resilient and reliable Federal workforce. The Budget includes $477 million, an increase of $130 million over the 2021 enacted level, to ensure that no Federal firefighter will make less than $15 an hour, to increase the Federal firefighting workforce, and to support these men and women with competitive compensation. This funding is further supported by $120 million made available in the Bipartisan Infrastructure Law to address firefighting workforce needs.

- **Increases Drought Resilience.** The Budget helps to ensure that all communities across the Nation have access to a resilient and reliable water supply by investing in water conservation, development of desalination technologies, and water recycling and reuse projects. In addition, nearly $1.7 billion provided through the Bipartisan Infrastructure Law for 2023, the Budget invests over $675 million in Western water resource infrastructure and to provide potable water to rural areas, serving both tribal and non-tribal communities. The Budget also provides funding to address the ongoing drought in the western United States, including funding to implement the Drought Contingency Plans to conserve water in the Colorado River System, which is at historically low levels.

- **Promotes Racial Justice and Equity.** The Budget supports DOI's ongoing work to advance racial justice and more equitably deliver services to all Americans with discrete investments in each bureau. The Budget provides over $3 billion to programs covered under the Justice40 initiative, such as tribal housing improvements, wildlife conservation grants, and energy infrastructure development in insular communities, which ensures that at least 40 percent of the overall benefits from certain Federal investments are delivered to disadvantaged communities. Moreover, the Budget includes a $48 million initiative to build a more equitable National Park System (NPS). Through this initiative, DOI would expand operations at parks that preserve and tell the story of historically underrepresented and marginalized groups, further integrate tribal viewpoints into park management, address transportation barriers to parks from underserved communities, and improve park accessibility for visitors and employees with disabilities.

- **Accelerates Renewable Energy Development on Public Lands.** The Budget includes $254 million, an increase of $151 million from the 2021 enacted level, to accelerate and expand activities that support economic development and the creation of thousands of good-paying jobs through clean energy deployment on public lands and offshore waters. Funding would support the leasing, planning, and permitting of solar, wind and geothermal energy projects, and associated transmission infrastructure that would help mitigate climate change impacts and meet the Administration's goal of deploying 30 gigawatts of offshore wind capacity by 2030.

- **Creates Jobs Remediating and Reclaiming Abandoned Wells and Mines.** The Budget provides over $321 million to remediate orphaned oil and gas wells and reclaim abandoned mine lands on Federal and non-Federal lands. The funding complements the $16 billion provided in the Bipartisan Infrastructure Law for orphaned well remediation and abandoned mine reclamation, and would help create good union jobs, mitigate climate change by reducing greenhouse gas emissions, and ultimately allow for more productive land uses.

- **Rebuilds Critical Capacity.** The Budget rebuilds core functions and capabilities across DOI, including science capacity at the U.S. Geological Survey, and land management operations of the NPS, Fish and Wildlife Service, and Bureau of Land Management.



# DEPARTMENT OF JUSTICE

The Department of Justice (DOJ) is responsible for defending the interests of the United States and protecting all Americans as the chief enforcer of Federal laws.  The President's 2023 Budget for DOJ invests in:  combating gun crime and other violent crime, terrorism, violence against women, and cyber threats; protecting civil rights; implementing Federal, State, and local criminal justice reforms; improving the immigration court system; bolstering antitrust enforcement; and advancing environmental justice.

The Budget requests $37.7 billion in discretionary funding for DOJ, a $4.2 billion or nearly 13-percent increase from the 2021 enacted level.

**The President's 2023 Budget:**

- **Invests in Federal Law Enforcement to Combat Gun Crime and Other Violent Crime.** The Budget makes robust investments to bolster Federal law enforcement capacity.  The Budget includes $17.4 billion, an increase of $1.7 billion above the 2021 enacted level, for DOJ law enforcement including a total of $1.7 billion for the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) to expand multijurisdictional gun trafficking strike forces with additional personnel, increase regulation of the firearms industry, enhance ATF's National Integrated Ballistic Information Network, and modernize the National Tracing Center.  The Budget includes $1.8 billion for the U.S. Marshals Service to support personnel dedicated to fighting violent crime, including through fugitive apprehension and enforcement operations.  The Budget also provides the Federal Bureau of Investigation (FBI) with an additional $69 million to address violent crime, including violent crimes against children and crime in Indian Country.  In addition, the Budget provides the U.S. Attorneys with $72.1 million to prosecute violent crimes.

- **Supports State and Local Law Enforcement and Community Violence Prevention and Intervention Programs to Make Our Neighborhoods Safer.** The Budget provides $3.2 billion in discretionary resources for State and local grants and $30 billion in mandatory resources to support law enforcement, crime prevention, and community violence intervention.

- **Reinvigorates Federal Civil Rights Enforcement.**  In order to address longstanding inequities and strengthen civil rights protections, the Budget invests $367 million, an increase of $101 million over the 2021 enacted level, in civil rights protection across DOJ.  These resources would support police reform, the prosecution of hate crimes, enforcement of voting rights, and efforts to provide equitable access to justice.  Investments also provide mediation

and conciliation services through the Community Relations Service. The Budget also continues investments in civil rights enforcement at the FBI by providing $18 million to expand civil rights investigations across the Nation, $8 million to the U.S. Attorneys to expand prosecutions of violations of civil rights, and nearly $1 million to the Criminal Division to expand investigations of election-related crimes, including voter suppression.

- **Reforms the Federal Criminal Justice System.** The Budget leverages the capacity of the Federal justice system to advance innovative criminal justice reform initiatives and serve as a model for reform that is not only comprehensive in scope, but evidence-informed and high-impact. The Budget supports key investments in First Step Act (FSA) implementation, including $100 million for a historic collaboration between the Bureau of Prisons (BOP) and the Department of Labor (DOL) for a national initiative to provide comprehensive workforce development services to people in the Federal prison system, both during their time in BOP facilities and after they are transferred to community placement. Thousands of incarcerated people would have access to a wide variety of evidence-informed models and practices, and in service of continuing to build the evidence base, DOL and BOP would oversee a ground-breaking, large-scale evaluation that assesses the impact of these programs on recidivism, labor market outcomes, and other key metrics. To support rehabilitative programming, improve conditions of confinement, and address augmentation in BOP facilities, the Budget proposes $151 million to hire additional staff, including $72 million for FSA-dedicated programmatic staff and $79 million for front-line correctional officers. In support of Federal law enforcement reform and oversight, the Budget also proposes $106 million to support the deployment of body-worn cameras (BWC) to DOJ's law enforcement officers, as well as an impact evaluation to assess the role of BWC in advancing criminal justice reform.

- **Reforms the Juvenile Justice System and Supports Existing Criminal Justice Reform Programs.** The Budget proposes $760 million for juvenile justice programs, an increase of $414 million over the 2021 enacted level, to bolster diversionary juvenile justice strategies. In addition to these resources, funding is provided to support existing reform programs such as the Second Chance Act of 2007, research and innovation programs, and alternative court systems.

- **Addresses Terrorism**. The Budget invests resources to address the threats of both foreign and domestic terrorism while respecting civil rights and civil liberties. The FBI is provided an increase of $33 million for domestic terrorism investigations.

- **Prioritizes Efforts to End Gender-Based Violence.** The Budget proposes a historic investment of $1 billion to support Violence Against Women Act of 1994 (VAWA) programs, a $487 million or 95-percent increase over the 2021 enacted level. The Budget supports substantial increases for longstanding VAWA programs, including key investments in legal assistance for victims, transitional housing, and sexual assault services. Resources are also provided for new programs to support transgender survivors, build community-based organizational capacity, combat online harassment and abuse, support community-based restorative practices, and address emerging issues in gender-based violence, including a new financial assistance program for survivors. The Budget strongly supports underserved and tribal communities by providing $35 million for culturally-specific services, $10 million for underserved populations, $5.5 million to assist enforcement of tribal special domestic violence jurisdiction, and $3 million to support tribal Special Assistant U.S. Attorneys. In addition, the Budget provides $120 million, an increase of $72 million above the 2021 enacted level, to the Office of Justice Programs for the Sexual Assault Kit Initiative to address the rape kit backlog, and for a new Regional Sexual Assault Investigative Training Academies Program.

- **Counters Cyber Threats.** The Budget expands DOJ's ability to pursue cyber threats through investments that support a multiyear effort to build cyber investigative capabilities at FBI field divisions nationwide. These investments include an additional $52 million for more agents, enhanced response capabilities, and strengthened intelligence collection and analysis capabilities. These investments are in line with the Administration's counter-ransomware strategy that emphasizes disruptive activity and combatting the misuse of cryptocurrency.

- **Improves Immigration Courts.** The Budget invests $1.4 billion, an increase of $621 million above the 2021 enacted level, in the Executive Office for Immigration Review (EOIR) to continue addressing the backlog of over 1.5 million cases that are currently pending in the immigration courts. This funding supports 100 new immigration judges, including the support personnel required to create maximum efficiencies in the court systems, as well as an expansion of EOIR's virtual court initiative. The Budget would also invest new resources in legal access programming, including $150 million in discretionary resources to provide access to representation for adults and families in the immigration proceedings. Complementing this new program is a proposal for $4.5 billion in mandatory resources to expand these efforts over a ten-year period. Providing resources to support legal representation in the immigration system would create greater efficiencies in processing cases while making the system fairer and more equitable.

- **Bolsters Antitrust Enforcement.** The Budget reflects the Administration's commitment to vigorous marketplace competition through robust enforcement of antitrust law by including a historic increase of $88 million over the 2021 enacted level for the Antitrust Division.

- **Supports Environmental Justice.** The Budget expands DOJ's work in environmental justice, providing $1.4 million to launch an Office for Environmental Justice. An additional $6.5 million funds the Environment and Natural Resources Division's work in securing environmental justice and combatting the climate crisis. These resources would be central to the Division and DOJ's execution of a comprehensive environmental justice strategy in support of the President's Executive Order 14008, "Tackling the Climate Crisis at Home and Abroad."



# DEPARTMENT OF LABOR

> The Department of Labor (DOL) is responsible for protecting the health, safety, wages, and income security of workers and retirees. The President's 2023 Budget for DOL invests in: building the skills of America's workers; protecting workers' rights, health and safety, and wages; strengthening the integrity and accessibility of the Unemployment Insurance (UI) program; and creating good, middle-class jobs that are safe, equitable, pay fair wages and benefits, empower workers, and offer opportunities for advancement.
>
> The Budget requests $14.6 billion in discretionary funding for DOL, a $2.2 billion or 18-percent increase from the 2021 enacted level.

**The President's 2023 Budget:**

- **Empowers and Protects Workers.** To ensure workers are treated with dignity and respect in the workplace, the Budget invests $2.2 billion, an increase of $397 million above the 2021 enacted level, in the Department's worker protection agencies. Between 2016 and 2020, DOL worker protection agencies lost approximately 14 percent of their staff, limiting their ability to perform inspections and conduct investigations. The Budget would enable DOL to conduct the enforcement and regulatory work needed to ensure workers' wages and benefits are protected, address the misclassification of workers as independent contractors, and improve workplace health and safety. The Budget also ensures fair treatment for millions of workers by restoring resources to oversee and enforce the equal employment obligations of Federal contractors, including protections against discrimination based on race, gender, disability, gender identity, and sexual orientation.

- **Equips Workers with Skills They Need to Obtain High-Quality Jobs.** The Budget invests in effective, evidence-based training models to equip workers with the skills they need to obtain high-quality jobs. Community colleges play a critical role in providing accessible, low-cost, and high-quality training, and the Budget invests $100 million to build their capacity to work with the public workforce development system and employers to design and deliver high-quality workforce programs. The Budget also provides $100 million for a new Sectoral Employment through Career Training for Occupational Readiness program, which would support training programs focused on growing industries, enabling underserved and underrepresented workers to access good jobs and creating the skilled workforce the economy needs to thrive.

- **Expands Access to Registered Apprenticeships (RA).** RA is a proven earn-and-learn model that raises participants' wages and places them on a reliable path to the middle class.

The Budget invests $303 million, a $118 million increase above the 2021 enacted level, to expand RA opportunities in high-growth fields, such as technology, advanced manufacturing, healthcare, and transportation, while increasing access for historically underrepresented groups, including people of color and women, and diversifying the industry sectors involved. To improve access to RAs for women, the Budget doubles DOL's investment in its Women in Apprenticeship and Nontraditional Occupations grants, which provide pre-apprenticeship opportunities to boost women's participation in RA.

- **Provides Training and Employment Pathways for Youth.** The Budget invests in programs that provide youth with equitable access to high-quality training and career opportunities. The Budget invests $75 million for a new National Youth Employment Program, which would create high-quality summer and year-round job opportunities for underserved youth. The Budget also provides $145 million for YouthBuild, $48 million above the 2021 enacted level, to enable more at-risk youth to gain both the education and occupational skills they need to obtain good jobs. To further advance equity and inclusion, the Budget provides $15 million to test new ways to enable low-income youth with disabilities, including youth who are in foster care, involved in the justice system, or who are experiencing homelessness, to successfully transition to employment.

- **Supports Legacy Energy Communities.** In order to address changes in the energy economy, the Budget continues to invest in strategic planning, partnership development, and training and reemployment activities for displaced workers. The Budget provides $100 million to support DOL's role in the multi-agency POWER+ Initiative, which aims to assist displaced workers and transform local economies and communities transitioning away from fossil fuel production to new, sustainable industries. The Budget also includes $35 million, administered in partnership with the Appalachian Regional Commission and the Delta Regional Authority, to help Appalachian and Delta communities develop local and regional workforce development strategies that promote long-term economic stability and opportunities for workers, especially those connected to the energy industry. Further, the Budget provides $20 million for DOL to partner with AmeriCorps and other agencies to establish a Civilian Climate Corps program to help communities address the climate crisis by creating service opportunities and job training programs in emerging industries.

- **Modernizes, Protects, and Strengthens the UI Safety Net.** The UI program has helped millions of Americans through periods of unemployment during the COVID-19 pandemic. The Budget invests $3.4 billion, an increase of $769 million above the 2021 enacted level, to modernize, protect, and strengthen this critical program. This includes several investments aimed at tackling fraud in the UI program, including funding to support more robust identity verification for UI applicants, help States develop and test fraud-prevention tools and strategies, and allow the DOL Office of Inspector General to increase its investigations into fraud rings targeting the UI program. To allow States to serve claimants more quickly and effectively while strengthening program integrity, the Budget also updates the formula for determining the amount States receive to administer UI, the first comprehensive update in decades. The Budget also proposes principles to guide future efforts to reform the UI system, including improving benefit levels and access, scaling UI benefits automatically during recessions, expanding eligibility to reflect the modern labor force, improving State and Federal solvency through more equitable and progressive financing, expanding reemployment services, and safeguarding the program from fraud.

- **Strengthens Mental Health Parity Protections.** The Budget requires all health plans to cover mental health benefits, ensures that plans have an adequate network of behavioral

health providers, and improves DOL's ability to enforce the law. In addition, the Budget includes $275 million over 10 years to increase the Department's capacity to ensure that large group market health plans and issuers comply with mental health and substance use disorder requirements, and expand the Agency's capacity to take action against plans and issuers that do not comply.



# DEPARTMENT OF STATE AND OTHER INTERNATIONAL PROGRAMS

The Department of State (State), U.S. Agency for International Development (USAID), and other international programs advance the interests and security of the American people by using diplomatic and development tools to address global challenges and advance a free, peaceful, and prosperous world.  The President's 2023 Budget for State, USAID, and other international programs strengthens American power and influence by working with allies and partners to solve global challenges including through the launch of the President's Build Back Better World Initiative.  These investments would position the United States to compete with China, and any other nation, from a position of strength.

The Budget requests $67.6 billion in discretionary funding for the Department of State and other international programs, a $10.2 billion or 18-percent increase from the 2021 enacted level, excluding emergency funding.  Within this total, the Budget includes $60.4 billion for the Department of State and USAID, an increase of $7.4 billion or 14 percent above the 2021 enacted levels.  This Budget also includes $4.4 billion for the international programs at the Department of the Treasury, an increase of $2.5 billion or 131 percent above the 2021 enacted level.

**The President's 2023 Budget:**

- **Advances the President's Historic Climate Finance Pledge.**  The Budget includes over $11 billion in international climate finance, meeting the President's pledge to quadruple international climate finance, a year early.  This includes $5.3 billion in appropriations, including a $1.6 billion contribution to the Green Climate Fund, a critical multilateral tool for financing climate adaptation and mitigation projects in developing countries.  The Budget also supports a $3.2 billion loan to the Clean Technology Fund to finance clean energy projects in developing countries.  U.S. international climate assistance and financing would:  accelerate the global energy transition to net zero emissions by 2050; help developing countries build resilience to the growing impacts of climate change, including through the *President's Emergency Plan for Adaptation and Resilience (PREPARE)* and other programs; and support the implementation of the President's *Plan to Conserve Global Forests: Critical Carbon Sinks*–while increasing energy independence by decreasing reliance on producers of non-renewable resources.

- **Advances American Leadership in Global Health, Including Global Health Security and Pandemic Preparedness.**  The Budget includes $10.6 billion to bolster U.S. leadership

in addressing global health and health security challenges, a $1.4 billion increase above the 2021 enacted level.  Within this total, the Budget demonstrates U.S. leadership by support-ing a $2 billion contribution for the Global Fund's seventh replenishment, for an intended pledge of $6 billion over three years, to save lives and continue the fight against HIV/AIDS, tuberculosis, and malaria, and to support the Global Fund's expanded response to COVID-19 and global health strengthening. This total also includes $1 billion to prevent, prepare for, and respond to infectious disease outbreaks, including the continued expansion of Global Health Security Agenda capacity-building programs and a multilateral financial intermediary fund for health security and pandemic preparedness.  The Budget also invests in the global health workforce and systems to enhance countries' abilities to provide core health services, improve health systems resiliency, and respond to crises while mitigating the impacts of crises on rou-tine health services.  In addition, the Budget includes $6.5 billion in mandatory funding for State and USAID over five years to make transformative investments in pandemic and other biological threat preparedness globally in support of U.S. biodefense and pandemic prepared-ness strategies and plans.  The pandemic preparedness funding would strengthen the global health workforce, support pandemic preparedness research and development (R&D), advance global R&D capacity, and support health security capacity and financing to strengthen global capacity to prevent, detect, and respond to future COVID-19 variants and other infectious disease outbreaks.

- **Revitalizes Alliances and Partnerships in the Indo-Pacific and Europe.**  To strengthen and modernize America's alliances and partnerships in vital global regions and assert U.S. leadership in strategic competition, the Budget includes nearly $1.8 billion to support a free and open, connected, secure, and resilient Indo-Pacific Region and the Indo-Pacific Strategy, and $400 million for the Countering the People's Republic of China Malign Influence Fund.  In addition, the Budget provides $682 million for Ukraine, an increase of $219 million above the 2021 enacted level, to continue to counter Russian malign influence and to meet emerging needs related to security, energy, cyber security issues, disinformation, macroeconomic stabili-zation, and civil society resilience.

- **Champions an Open and Secure Digital and Technological Ecosystem.**  The Budget invests more than $350 million to expand reliable and affordable internet access through the development and deployment of secure digital and technological infrastructure.  The Budget would improve international cybersecurity practices and promote the adoption of policies that support an open, interoperable, secure, and reliable internet.  These resources would further development programming across sectors in line with the State's cyberspace and emerging technology diplomacy and USAID's digital development strategy.  State and USAID will also seek to close the digital gender gap in low- and middle-income countries by increasing women and girls' access to information communication technologies and addressing online harass-ment and abuse globally.

- **Renews America's Leadership in International Institutions.**  The Budget continues the Administration's efforts to lead through international organizations by meeting the Nation's commitments to fully fund U.S. contributions and to pay United Nations peacekeeping dues on time and in full.  Strengthening the Nation's international partnerships is critical to meeting the Sustainable Development Goals, including global education, ending hunger and malnutri-tion, building more sustainable, equitable, and resilient food systems and addressing other global challenges.

- **Supports Democracy Globally.**  In response to political fragility and increasing authori-tarianism around the world, the Budget provides more than $3.2 billion to support global

democracy, human rights, anti-corruption, and good governance programming, consistent with the commitments made during the President's Summit for Democracy. The Budget advances the Presidential Memorandum on Advancing the Human Rights of Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex Persons Around the World, the U.S. Strategy on Countering Corruption, and the Presidential Initiative on Democratic Renewal.

- **Restores U.S. Leadership in International Development.** The Budget provides $1.4 billion for the World Bank's International Development Association (IDA). This investment restores the United States' historical role as the largest World Bank donor to support the development of low- and middle-income countries, which benefits the American people by increasing global stability, mitigating climate and health risks, and developing new markets for U.S exports. The U.S. contribution would also support the United States' $3.5 billion pledge to the next replenishment of the IDA, a critical component of the global response to the devastating impacts of the COVID-19 pandemic on developing countries. The Budget also funds bilateral partner capacity building efforts in key areas such as judicial sector strengthening, countering and preventing terrorism, and provision of basic services.

- **Continues Collaborative U.S. Leadership in Central America and Haiti.** As part of a comprehensive strategy to advance systemic reform while addressing the root causes of irregular migration from Central America to the United States, the Budget invests $987 million in the region to continue meeting the President's four-year commitment of $4 billion. Further, in response to deteriorating conditions and widespread violence in Haiti, the Budget invests $275 million to strengthen Haiti's recovery from political and economic shocks, such as strengthening the capacity of the Haitian National Police, combating corruption, strengthening the capacity of civil society, and supporting services for marginalized populations. These investments would ensure that the United States is able to revitalize partnerships that build economic resilience, democratic stability, and citizen security in the region.

- **Supports America's Allies in the Middle East.** The Budget fully supports the U.S.-Israel Memorandum of Understanding, provides $1.4 billion in economic and security assistance for Jordan, and includes $1.4 billion to support the U.S. diplomatic and security partnership with Egypt. As part of the Administration's commitment to advancing security, prosperity, and freedom for both Israelis and Palestinians, the Budget also provides $219 million for critical assistance to the Palestinian people in the West Bank and Gaza, as well as across the region, in support of a two-state solution with Israel.

- **Strengthens African Engagement.** The Budget includes more than $7.7 billion for sub-Saharan Africa, including more than $250 million to support the second United States-Africa Leaders' Summit to strengthen ties with African partners based on principles of mutual respect and shared interests and values. These investments would strengthen collaboration, trade and investment, electrification, ecosystems for mutual growth and prosperity, and the promotion of digital transformation in Africa.

- **Strengthens U.S. Leadership on Refugee and Humanitarian Issues.** The Budget provides more than $10 billion to respond to the unprecedented need arising from conflict and natural disasters around the world to serve over 70 countries and approximately 240 million people. The Budget continues rebuilding the Nation's refugee admissions program and supports up to 125,000 admissions in 2023.

- **Advances Equity and Equality Globally.** The Budget provides $2.6 billion to advance gender equity and equality across a broad range of sectors, more than doubling the gender attributions of the policies of this Administration. This includes $200 million for the Gender

Equity and Equality Action Fund to advance the economic security of women and girls. This total also includes funding to strengthen the participation of women in conflict prevention, resolution, and recovery through the implementation of the Women, Peace, and Security Act of 2017. To further implement the President's Executive Order 13985, "Advancing Racial Equity and Support for Underserved Communities," the Budget would better integrate equity through more inclusive policies, strategies, and practice including enhancing the ability of potential non-traditional partners to pursue Federal opportunities and address the barriers they face in the Federal award process, and new efforts to identify spaces to support and advance underserved population appropriate to the country context.

- **Addresses Food Insecurity and Fosters Inclusive and Sustainable Agriculture-led Economic Growth.** The Budget supports the President's pledge to alleviate global food insecurity by providing over $1 billion in bilateral agriculture and food security programming, and continuing robust support for the International Fund for Agricultural Development. These investments are key to increasing communities' access to nutritious food, strengthening their resilience to shocks and stresses, and lifting them from entrenched poverty.

- **Revitalizes and Expands the Diplomatic and Development Workforce.** Strengthening American diplomacy and development requires rebuilding and modernizing the State and USAID workforce. The 2023 Budget provides $7.6 billion to recruit, retain, and develop the diverse, highly capable workforce needed to support efforts around the world and manage increasingly complex national security issues, particularly in the Indo-Pacific region. The Budget also increases investments to diversify the workforce of foreign affairs agencies to reflect and draw on the richness and diversity of the United States, including through paid internships and targeted fellowship programs, and strengthening partnerships with Minority Serving Institutions, and expanded professional development opportunities.



# DEPARTMENT OF TRANSPORTATION

The Department of Transportation (DOT) is responsible for ensuring that the United States has the safest, most equitable, reliable, and modern transportation system in the world.  The President's 2023 Budget for DOT supports the historic investments in surface transportation, aviation, and maritime made by the Infrastructure and Investment Jobs Act (Bipartisan Infrastructure Law), which will strengthen the Nation's transportation system while tackling climate change and protecting environmental resources, addressing inequities and advancing environmental justice, and promoting good-paying jobs and economic vitality.

The Budget requests $26.8 billion in discretionary budget authority for 2023, a $1.5 billion or six-percent increase from the 2021 enacted level.  Consistent with the Bipartisan Infrastructure Law, the Budget also includes $78.4 billion in mandatory funds, including contract authority and obligation limitations, and $36.8 billion in emergency-designated advance budget authority, for transportation infrastructure investments in 2023.

**The President's 2023 Budget:**

- **Modernizes and Upgrades Roads and Bridges.**  To modernize, repair, and improve the safety and efficiency of the Nation's network of roads and bridges, the Budget provides $68.9 billion for the Federal-aid Highway program, a $19.8 billion increase from the 2021 enacted level.  This includes $9.4 billion provided by the Bipartisan Infrastructure Law for 2023 and which also supports:  $8 billion for new competitive and formula grant programs to rebuild the Nation's bridges; $1.4 billion to deploy a nationwide, publicly-accessible network of electric vehicle chargers and other alternative fueling infrastructure; $1.3 billion for a new carbon reduction grant program; and $1.7 billion for a new resiliency grant program to enhance the resilience of surface transportation infrastructure to hazards and climate change.

- **Improves Highway Safety.**  The Budget provides more than $2.5 billion for the Federal Motor Carrier Safety Administration and the National Highway Traffic Safety Administration (NHTSA), an $857 million increase above the 2021 enacted level.  The Budget also provides critical resources to support NHTSA's rulemaking efforts including those to address climate change and emerging technologies.  This builds on the Agency's National Roadway Safety Strategy, which uses a safe system approach to address the crisis of roadway fatalities.

- **Provides High-Quality Transit Options to More Americans.** To strengthen the Nation's transit systems, reduce emissions, and improve transportation access for people with disabilities and historically disadvantaged communities, the Budget provides the Federal Transit Administration with $21.1 billion, an $8.2 billion increase over the 2021 enacted level.  This

93

includes $3.2 billion in additional funding on top of the $4.3 billion already provided by the Bipartisan Infrastructure Law for 2023. The Budget includes $4.5 billion for the Capital Investment Grant program, which would advance the construction of new, high-quality transit corridors to reduce travel time and increase economic development.

- **Invests in Reliable Passenger and Freight Rail.** To ensure the safety and performance of the rail industry today and deliver the passenger rail network of the future, the Budget provides the Federal Railroad Administration a historic investment of $17.9 billion, a $15 billion increase over the 2021 enacted level. This includes $4.7 billion in additional funding on top of $13.2 billion already provided by the Bipartisan Infrastructure Law for 2023. These resources would provide $7.4 billion to significantly improve Amtrak's rolling stock and facilities and $10.1 billion for existing and new competitive grant programs to support passenger rail modernization and expansion, address critical safety needs, and support the vitality of the freight rail network.

- **Reduces Bottlenecks and Commute Times through Investments in Competitive Programs.** The Budget provides robust support for transportation projects that reduce commute times, improve safety, reduce freight bottlenecks, better connect communities, and reduce transportation-related greenhouse gas emissions. Investments include $4 billion, $3 billion above the 2021 enacted level, for National Infrastructure Investments grant programs to support transportation projects with significant benefits across multiple modes, and $1.64 billion, a $640 million increase above the 2021 enacted level for the Infrastructure for Rebuilding America grants program which focuses on reducing freight and highway bottlenecks.

- **Advances Racial Equity and Supports Underserved Communities.** The Budget requests an additional $20 million above the 2021 enacted level for the Office of the Secretary to lead DOT's efforts to promote equity and inclusion. With these resources, DOT would better ensure that historic investments under the Bipartisan Infrastructure Law deliver resources and benefits equitably, including communities that have been historically underserved and adversely affected by persistent poverty or income inequality. DOT actions include workforce development, disadvantaged business enterprise procurement, data collection, reporting, public participation, and assistance measures mitigating or negating the effects of structural obstacles to building wealth.

- **Prioritizes Aviation Safety and Infrastructure.** The Budget provides $15.2 billion in discretionary budget authority for the Federal Aviation Administration (FAA) to improve aviation safety, transform the Nation's aviation infrastructure, and improve cybersecurity. These investments also promote environmental justice and climate change mitigation by prioritizing sustainable design and construction, and enhancing equity through more inclusive contracting and workforce development. The resources provided through the Budget complement the $5 billion already provided by the Bipartisan Infrastructure Law for 2023 to upgrade the FAA's air traffic control facilities and to improve the safety, capacity, accessibility, and efficiency of the Nation's airports.

- **Accelerates Efforts to Move More Goods Faster through the Nation's Ports and Waterways.** The Budget continues support for the historic levels of Federal investment to modernize America's port and waterway infrastructure initiated under the Bipartisan Infrastructure Law. The Budget includes $230 million for the Port Infrastructure Development Program to strengthen maritime freight capacity. In addition to keeping the Nation's supply chain moving by improving efficiency, DOT would prioritize projects that also lower emissions—reducing environmental impact in and around the Nation's ports.

- **Supports Pipeline and Hazardous Materials Safety.** The Budget improves pipeline and hazardous material transportation safety through new investments to hire additional safety inspectors and engineers, and for robust data collection to inform safety standards. The Budget would help reduce methane emissions and preserve the climate, with investments in new safety standards for pipelines and continued safety checks on underground natural gas storage facilities. The Budget also increases hazardous materials staffing for accident investigations and additional outreach and training to improve compliance with safety requirements.



# DEPARTMENT OF THE TREASURY

The Department of the Treasury (Treasury) is responsible for maintaining a strong economy, promoting conditions that enable economic growth and stability, protecting the integrity of the financial system, combating global financial crime and corruption, and managing the U.S. Government's finances and resources effectively.  The President's 2023 Budget for Treasury invests in:  a fair and robust tax system; enforcing the tax code and ensuring compliance by the wealthy and corporations; improving the taxpayer experience and customer service; providing resources to expand job-creating investments and access to credit in disadvantaged communities; and enhancing cybersecurity.

The Budget requests $16.2 billion in discretionary funding for Treasury, a $2.7 billion or 20-percent increase from the 2021 enacted level.

**The President's 2023 Budget:**

- **Improves Taxpayer Experience and Supports a Fair and Equitable Tax System.** Last year, the IRS delivered more than $600 billion in direct economic relief to American households and businesses through Economic Impact Payments, monthly advance child tax credit payments, and more.  Yet the agency's funding and staffing levels have not kept pace with its expanding scope.  To ensure that taxpayers receive the highest quality customer service and that all Americans are treated fairly by the U.S. tax system, the Budget provides a total of $14.1 billion for the Internal Revenue Service (IRS), $2.2 billion, or 18 percent, above the 2021 enacted level.  This includes an increase of $798 million to improve the taxpayer experience and expand customer service outreach to underserved communities and the taxpaying public at large.  The Budget also provides $310 million for IRS Business Systems Modernization, which is 39 percent above the 2021 enacted level, to accelerate the development of new digital tools to enable better communication between taxpayers and the IRS.  Increased funding for the IRS would also facilitate more effective oversight of high-income and corporate tax returns.  In addition to these resources, the Administration continues to support multiyear investments in IRS tax enforcement to increase tax compliance and revenues that the President has previously proposed.  This investment reflects decades of analysis demonstrating that program integrity investments to enforce existing tax laws increase revenues in a progressive way by closing the tax gap—the difference between taxes owed and taxes paid.

- **Expands Lending in Disadvantaged Communities and Increases Affordable Housing Supply.**  The Budget provides $331 million for the Community Development Financial Institutions (CDFI) Fund, an increase of $61 million, or 23 percent, above the

2021 enacted level.  To address the critical shortage of affordable housing in communities, the Budget also proposes $5 billion in long-term mandatory funding for CDFI financing of new construction and substantial rehabilitation that creates net new units of affordable rental and for sale housing.  CDFIs provide historically underserved and often low-income communities access to credit, capital, and financial support to grow businesses, increase affordable housing, and reinforce healthy neighborhood development.

- **Increases Corporate Transparency and Safeguards the Financial System.**  Treasury plays a leading role in monitoring and disrupting corruption, money laundering, terrorist financing, and the use of the financial system by malicious actors domestically and abroad.  Investment in Treasury staff and technical capabilities is critical to these efforts, including closing financial reporting loopholes that allow illicit actors to evade scrutiny, mask their dealings, and undermine corporate accountability.  The Budget provides $210 million for the Financial Crimes Enforcement Network, $83 million above the 2021 enacted level, to increase oversight of the financial sector, strengthen corporate accountability, and provide adequate support to law enforcement and investigative entities.  In addition, the Budget provides $212 million to the Office of Terrorism and Financial Intelligence, $37 million above the 2021 enacted level, to modernize and update the sanctions process consistent with the findings of the Treasury 2021 Sanctions Review.

- **Strengthens Enterprise Cybersecurity.**  The Budget provides $215 million, an increase of $197 million above the 2021 enacted level, to protect and defend sensitive agency systems and information, including those designated as high-value assets.  The Budget increases centralized funding to strengthen Treasury's overall cybersecurity efforts and establish a Zero Trust Architecture.  These investments would protect Treasury systems from future attacks and accelerate Treasury's response to the SolarWinds incident and Log4j vulnerabilities.

- **Restores Critical Agency Capacity.**  The Budget provides $293 million for Treasury's Departmental Offices, a 26-percent increase over the 2021 enacted level, to rebuild institutional capacity and strengthen the role of Treasury policy offices.  Additional funding for Treasury's Climate Hub would support a sustainable economic recovery and advance climate goals both domestically and internationally, including domestic coal transition and engagement with international financial institutions.  Increased staffing would also support assessments of climate-related financial risk arising from private insurance coverage gaps in regions of the Nation particularly vulnerable to climate change impacts.  The Budget also builds institutional capacity to expand engagement with historically underrepresented and underserved groups and develop actionable goals to advance equity across all Treasury programs.



# DEPARTMENT OF VETERANS AFFAIRS

The Department of Veterans Affairs (VA) is responsible for providing military veterans and VA survivors with the benefits, care, and support they have earned through sacrifice and service to the Nation. The President's 2023 Budget for VA honors the Nation's sacred obligation to veterans by investing in: world-class healthcare, including mental health, and enhancing veterans' general well-being; benefits delivery, including disability claims processing; education; employment training; and insurance, burial, and other benefits to enhance veterans' prosperity. The Budget ensures that all veterans, including women veterans, veterans of color, and Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex veterans receive the care they have earned, and prioritizes addressing veteran homelessness, suicide prevention, and caregiver support.

The Budget requests $135 billion in discretionary funding for VA, a $31 billion or 29-percent increase, from the 2021 enacted level. The Budget also includes $128 billion in advance appropriations for VA medical care programs in 2024.

**The President's 2023 Budget:**

- **Prioritizes VA Medical Care.** The Budget provides $119 billion—a historic 32-percent increase above the 2021 enacted level for VA. In addition to fully funding inpatient, outpatient, mental health, and long-term care services, the Budget supports programs that improve VA healthcare quality and delivery, including investments in training programs for clinicians, health professionals, and medical students. The Budget also further supports VA's preparedness for regional and national public health emergencies.

- **Prioritizes Veteran Suicide Prevention.** The Budget provides $497 million to support the Administration's veteran suicide prevention initiatives, including implementation of: the Veterans Crisis Line's 988 expansion initiative; the suicide prevention 2.0 program to grow public health efforts in communities; a lethal means safety campaign in partnership with other agencies; and the Staff Sergeant Parker Gordon Fox Suicide Prevention Grant Program to enhance community-based prevention strategies.

- **Improves Veterans' Mental Healthcare Services.** The Budget provides $13.9 billion for VA mental healthcare, which offers a system of comprehensive treatments and services to meet the needs of each veteran and the family members involved in the veteran's care. The Budget focuses on increasing access to quality mental healthcare and lowering the cost of mental health services for veterans, with the goal of helping veterans take charge of their treatment and live full and meaningful lives.

- **Supports Women Veterans' Healthcare.** The Budget invests $9.8 billion for all of women veterans' healthcare, including $767 million toward women's gender specific care. More women are choosing VA healthcare than ever before, with women accounting for over 30 percent of the increase in veterans enrolled over the past five years. Investments support comprehensive specialty medical and surgical services for women veterans at a VA facility or through referrals to the community. The Budget proposes to increase access to infertility counseling and assisted reproductive technology and to eliminate copayments for contraceptive coverage. The Budget also improves the safety of women veterans seeking healthcare at VA facilities by supporting implementation of the zero-tolerance policy for sexual harassment and assault.

- **Bolsters Efforts to End Veteran Homelessness.** The Budget increases resources for veterans' homelessness programs to $2.7 billion, with the goal of ensuring every veteran has permanent, sustainable housing with access to healthcare and other supportive services to prevent and end veteran homelessness.

- **Invests in Caregivers Support Program.** The Budget recognizes the important role of family caregivers in supporting the health and wellness of veterans. The Budget provides funding for the Program of General Caregivers Support Services. The Budget also provides $1.8 billion for the Program of Comprehensive Assistance for Family Caregivers, which includes stipend payments and support services to help empower family caregivers of eligible veterans.

- **Invests in Overdose Prevention and Treatment Programs.** The Budget provides $663 million toward opioid use disorder prevention and treatment programs, including programs authorized in the Jason Simcakoski Memorial and Promise Act.

- **Supports Research Critical to Veterans' Health Needs.** VA conducts thousands of studies at VA medical centers, outpatient clinics, and nursing homes each year. This research has significantly contributed to advancements in healthcare for veterans and other Americans from every walk of life. The Budget provides $916 million to continue the development of VA's research enterprise, including research in support of *American Pandemic Preparedness: Transforming Our Capabilities* plan goals.

- **Addresses Environmental Exposures.** The Budget increases resources for new presumptive disability compensation claims related to environmental exposures from military service. The Budget also invests $51 million within VA research programs and $63 million within the VA medical care program for Health Outcomes Military Exposures to increase scientific understanding of and clinical support for veterans and healthcare providers regarding the potential adverse impacts from environmental exposures during military service.

- **Supports Cancer Moonshot and Precision Oncology.** The Budget invests $81 million within VA research programs, together with $167 million within the VA medical care program, for precision oncology to provide access to the best possible cancer care for veterans. Funds support research and programs that address cancer care, rare cancers, and cancers in women, as well as genetic counseling and consultation that advance tele-oncology and precision oncology care.

- **Provides Claims Processing Automation.** The Budget provides $120 million for VA to support automating the disability compensation claims process from submission to authorization. Investments in automation would increase VA's ability to deliver faster and more accurate claim decisions for veterans.

- **Supports VA Home Loan Programs.** The Budget provides $284 million for VA housing program administration to ensure that all eligible veterans receive maximum benefits and protections as new or existing homeowners, and enable VA to manage record growth in its home loan guaranty volume, which exceeded $860 billion in outstanding principal in 2021. In addition, in accordance with the President's Executive Order 14030, "Climate-Related Financial Risk," the VA housing program is working with the Departments of Agriculture and Housing and Urban Development to consider approaches to better integrate climate-related financial risk into Federal credit programs. Efforts to date include contracting for additional expert analytical support, identifying and sharing initial risk assessments in working groups comprised of credit representatives of these agencies, and exploring the financial sensitivity of proposed 2023 activity to adverse movements in default and recovery performance that could be related to climate-change risks.

- **Modernizes VA Information Technology.** The Budget includes $5.8 billion for VA's Office of Information Technology to prioritize cybersecurity, financial management business transformation, claims automation, and the Infrastructure Readiness program, with the mission to ensure a seamless customer experience for veterans. The Budget also provides $1.8 billion to continue modernizing VA's Electronic Health Record to ensure veterans receive world-class healthcare well into the future.

- **Invests in New and Replacement Medical and Cemetery Facilities.** The Budget includes $3 billion for construction and expansion of critical infrastructure and facilities. This funding supports seven major investments in new and replacement medical facilities and new or expanded cemeteries in three locations. In addition, VA would make improvements and alterations to existing medical facilities, further expanding healthcare capacities. These capital investments enable the delivery of high-quality healthcare, benefits, and services for veterans.

- **Honors the Memory of All Veterans.** The Budget includes $430 million to ensure veterans and their families have access to exceptional memorial benefits including two new and replacement national cemeteries. These funds maintain national shrine standards at the 158 VA managed cemeteries and provide the initial operational investment required to open new cemeteries.



# CORPS OF ENGINEERS—CIVIL WORKS

The Army Corps of Engineers—Civil Works program (Corps) is responsible for:  developing, managing, restoring, and protecting water resources primarily through the construction, operation and maintenance, and study of water-related infrastructure projects; regulating development in waters of the United States; and working with other Federal agencies to help communities respond to and recover from floods and other natural disasters.  The President's 2023 Budget for the Corps invests in modernizing the Nation's water infrastructure, including U.S. coastal ports, increasing climate resilience, and advancing environmental justice.

The Budget requests $6.6 billion in discretionary funding for the Corps.  Resources provided through the 2023 Budget complement historic investments in modernizing the Nation's ports and waterways and improving resilience of water resources infrastructure to climate change through the Infrastructure Investment and Jobs Act (Bipartisan Infrastructure Law).

**The President's 2023 Budget:**

- **Restores Aquatic Ecosystems.**  The Budget invests in the restoration of some of the Nation's most unique aquatic ecosystems, such as the Chesapeake Bay, Great Lakes, Upper Mississippi, and Columbia River.  For Florida's Everglades restoration project, the Budget invests $407 million—building on the Bipartisan Infrastructure Law's single largest investment in history for Everglades restorations.  This iconic American landscape provides drinking water supply for more than 8 million Floridians, supports the State's $90 billion tourism economy, and is home to dozens of endangered or threatened species.

- **Increases Resilience to Climate Change.**  The Budget invests in programs and projects that would reduce the risk of damages from floods and storms and restore the Nation's aquatic ecosystems.  The Budget also invests in helping local communities identify and address their risks associated with climate change and improve resilience of Corps' infrastructure to climate change, including taking climate resilience into account in developing options and selecting projects.

- **Facilitates Safe, Reliable, and Sustainable Commercial Navigation.**  The Budget includes $1.7 billion for the Harbor Maintenance Trust Fund to facilitate safe, reliable, and environmentally sustainable navigation at the Nation's coastal ports.

- **Advances Equity and Environmental Justice.**  The Budget invests in technical assistance, studies, and the construction of projects to address water resources challenges in disadvantaged and tribal communities in line with the President's Justice40 Initiative.  For example, the Budget includes funding for remedial clean-up of the Bradford Island site on

103

the Columbia River to address decades of contamination, including in important tribal fishing areas.

- **Invests in High Return Projects.** The Budget invests in projects that would provide a high economic or environmental return or address a significant risk to public safety.  For example, the Budget prioritizes funding to address the highest dam safety risks the Corps has identified at its dams, and to facilitate safe and efficient navigation on the highest use inland waterways.



# ENVIRONMENTAL PROTECTION AGENCY

The Environmental Protection Agency (EPA) is responsible for protecting human health and the environment. The President's 2023 Budget for EPA: restores the Agency's capacity to carry out its mission; implements the President's historic Justice40 commitment; and funds a broad suite of recently authorized programs to improve the Nation's water infrastructure.

The Budget requests $11.9 billion in discretionary funding for EPA, a $2.6 billion or 29-percent increase from the 2021 enacted level. Resources provided through the 2023 Budget complement investments in water infrastructure, including lead pipe replacements, and in the remediation of contaminated and idle land provided in the Infrastructure Investment and Jobs Act (Bipartisan Infrastructure Law).

**The President's 2023 Budget:**

- **Tackles the Climate Crisis with Urgency.** To help address greenhouse gas emissions and make the Nation's infrastructure more resilient, the Budget invests $100 million in grants to States and Tribes that would support the implementation of on-the-ground efforts in communities across the Nation, such as reducing methane emissions. The Budget proposes an additional $35 million over the 2021 enacted level to implement the recently enacted American Innovation and Manufacturing Act to continue phasing out potent greenhouse gases known as hydrofluorocarbons (HFCs). The Budget also invests an additional $13 million over the 2021 enacted level in wildfire prevention and readiness to bolster EPA's abilities to forecast where smoke will harm people and better communicate where smoke events are occurring.

- **Restores Critical Capacity to Carry Out EPA's Core Mission.** Staffing reductions under the previous administration continue to impact the Agency's ability to carry out its mission to protect human health and the environment. The Budget adds more than 1,900 Full Time Equivalents (FTEs) relative to 2021 levels, for a total of more than 16,200 FTEs, to help rebuild the Agency's capacity. Restoring staffing capacity across the Agency would allow EPA to help cut air, water, and climate pollution, and advance environmental justice. Staffing resources would also fund a significant expansion of EPA's paid student internship program to develop a pipeline of qualified staff.

- **Advances Environmental Justice.** The Administration continues to prioritize efforts to deliver environmental justice in communities across the United States, including meeting the President's Justice40 commitment to ensure at least 40 percent of the benefits of Federal investments in climate and clean energy reach disadvantaged communities. The Budget bolsters these efforts by investing nearly $1.5 billion across numerous programs that would help

create good-paying jobs, clean up pollution, implement Justice40, advance racial equity, and secure environmental justice for communities that too often have been left behind, including rural and tribal communities. This funding includes $100 million for support of a new community air quality monitoring and notification program and additional investments in protection for fenceline communities, civil rights compliance, and environmental permitting.

- **Upgrades Drinking Water and Wastewater Infrastructure Nationwide.** The Budget provides roughly $4 billion for water infrastructure, an increase of $1 billion over the 2021 enacted level. These resources would advance efforts to upgrade drinking water and wastewater infrastructure nationwide, with a focus on underserved communities that have historically been overlooked. The Budget funds all of the authorizations in the original Drinking Water and Wastewater Infrastructure Act of 2021, including the creation of 20 new targeted water grant programs and an increase of over $160 million above 2021 enacted levels for the Reducing Lead in Drinking Water grant program. The Budget also maintains funding for EPA's State Revolving Funds (SRF) at 2021 enacted levels, which would complement the $23.4 billion provided for the traditional SRF programs in the Bipartisan Infrastructure Law.

- **Protects Communities from Hazardous Waste and Environmental Damage.** Preventing and cleaning up environmental damage that harms communities and poses a risk to public health and safety continues to be a top priority for the Administration. The Budget provides nearly $1.2 billion for the Superfund program for EPA to continue cleaning up some of the Nation's most contaminated land and respond to environmental emergencies and natural disasters, and begins to adjust for revenue from the Superfund tax. The Budget also provides $215 million for EPA's Brownfields program to enable EPA to provide technical assistance and grants to communities, including disadvantaged communities, so they can safely clean up and reuse contaminated properties. These funds complement Brownfields funding provided in the Bipartisan Infrastructure Law. These programs also support presidential priorities such as the Cancer Moonshot initiative, by addressing contaminants that lead to greater cancer risk.

- **Strengthens the Administration's Commitment to Successfully Implement the Toxic Substances Control Act (TSCA) and Transform the Science of New Chemical Reviews.** The Budget provides $124 million and 449 FTE for TSCA efforts to deliver on the promises made to the American people by the Frank R. Lautenberg Chemical Safety for the 21st Century Act. These resources would provide resources to complete EPA-initiated chemical risk evaluations, issue protective regulations in accordance with statutory timelines and establish a pipeline of prioritized chemicals for risk evaluation.

- **Tackles Per- and Polyfluoroalkyl Substances (PFAS) Pollution.** PFAS are a set of man-made chemicals that threaten the health and safety of communities across the Nation, disproportionately impacting historically disadvantaged communities. As part of the President's commitment to tackling PFAS pollution, the Budget provides approximately $126 million, $57 million over the 2021 enacted level, for EPA to: increase the understanding of PFAS impacts to human health, as well as its ecological effects; restrict use to prevent PFAS from entering the air, land, and water; and remediate PFAS that have been released into the environment.

- **Enforces and Assures Compliance with the Nation's Environmental Laws.** The Budget provides $213 million for civil enforcement efforts, which includes funding to increase enforcement efforts in communities with high pollution exposure and to prevent the illegal importations and use of HFCs in the United States. The Budget also includes: $7 million to operate a coal combustion residuals compliance program; $148 million for compliance monitoring

efforts, including funds to conduct inspections in underserved and overburdened communities; and $69 million for criminal enforcement efforts, which includes funding to increase outreach to victims of environmental crimes and to develop a specialized criminal enforcement task force to address environmental justice issues in partnership with the Department of Justice.



# NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

The National Aeronautics and Space Administration (NASA) inspires the Nation by sending astronauts and robotic missions to explore the solar system, advances the Nation's understanding of the Earth and space, and develops new technologies and approaches to improve aviation and space activities.  The President's 2023 Budget for NASA invests in:  human and robotic exploration of the Moon; new technologies to improve the Nation's space capabilities; and addressing the climate crisis through cutting-edge research satellites and green aviation research.

The Budget requests $26 billion in discretionary funding for NASA, a $2.7 billion or 11.6-percent increase from the 2021 enacted level.

**The President's 2023 Budget:**

- **Enhances U.S. Human Spaceflight Leadership.**  The Budget provides $7.5 billion, $1.1 billion above the 2021 enacted level, for Artemis lunar exploration.  Artemis would return American astronauts to the Moon as early as 2025, land the first woman and person of color on the Moon, deepen the Nation's scientific understanding of the Moon, and test technologies that would allow humans to safely and sustainably explore Mars.  Lunar landing missions would also include astronauts from international partners.

- **Addresses the Climate Crisis.**  The Budget invests $2.4 billion in Earth-observing satellites and related research to improve the Nation's understanding of climate change.  The new satellite missions would form an Earth System Observatory that would provide a three-dimensional, holistic view of Earth that is needed to better understand natural hazards and climate change.  In addition, NASA would collaborate with other agencies to enhance greenhouse gas monitoring and make greenhouse gas data more accessible to a broad range of users.  The Budget also provides more than $500 million to reduce the climate impacts of the aviation industry as part of a $972 million request for NASA's Aeronautics program.  This includes the Sustainable Flight National Partnership, through which NASA and U.S. companies would develop and fly a highly-efficient, next-generation airliner prototype as early as 2026.

- **Supports the Development of Commercial Space Stations.**  The Budget supports operations of the International Space Station, paving the way for its continued operation through 2030, and allocates $224 million to support the development of commercial space stations

109

that NASA, other Government agencies, the Nation's international partners, and the private sector can use after the International Space Station is retired.

- **Advances Robotic Exploration of the Moon and Mars.** The Budget invests over $480 million in lunar robotic missions, including a rover to investigate ice deposits that could provide future astronauts with fuel and oxygen and the Commercial Lunar Payload Services initiative that supports low-cost deliveries to the Moon. The Budget also provides $822 million for the Mars Sample Return mission, which would return Martian rock and soil samples to Earth.

- **Spurs Research and Development.** The Budget increases funding for NASA's Space Technology research and development portfolio to more than $1.4 billion, a $338 million increase above the 2021 enacted level. This investment would support new technologies to help the commercial space industry grow, enhance mission capabilities, and reduce costs. NASA has a key role in better understanding the worsening orbital debris environment and supporting the development of innovative approaches to help protect the Nation's satellites and reduce the risk posed by space debris. The Budget provides over $30 million for orbital debris research, early-stage technology, and measurement technologies.

- **Broadens Participation in Science, Technology, Engineering, and Mathematics (STEM).** The Budget provides $150 million, $23 million above the 2021 enacted level, for NASA's Office of STEM Engagement in order to attract diverse groups of students to STEM through learning opportunities that spark interest and provide connections to NASA's mission and work. This effort includes targeted engagement of underserved populations, including underserved students and people of color.



# NATIONAL SCIENCE FOUNDATION

The National Science Foundation (NSF) is responsible for promoting the progress of science and for science education.  The President's 2023 Budget for NSF invests in combatting the climate crisis, strengthening U.S. leadership in emerging technologies, boosting research and development, and advancing equity.

The Budget requests $10.5 billion in discretionary funding for NSF, a $2 billion or 24-percent increase from the 2021 enacted level.

**The President's 2023 Budget:**

- **Spurs Climate Research and Development.**  The Budget provides $1.6 billion for research and development, an increase of more than $500 million above the 2021 enacted level, to better understand and prepare for the adverse impacts of climate change.  This robust investment would support research in atmospheric composition, water and carbon cycles, modeling climate systems, renewable energy technologies, materials sciences, plant genomics, climate resilience technologies for communities heavily affected by climate change, and social, behavioral, and economic research on human responses to climate change.

- **Strengthens U.S. Leadership in Emerging Technologies.**  The Budget provides $880 million for the Directorate for Technology, Innovation, and Partnerships within NSF to help translate research into practical applications.  The Directorate will work with programs across the Agency and with other Federal and non-Federal entities to expedite technology development in emerging areas that are crucial for U.S. technological leadership, including trustworthy artificial intelligence, high performance computing, disaster response and resilience, quantum information systems, robotics, advanced communications technologies, biotechnology, cybersecurity, advanced energy technologies, and materials science.  The Budget provides an additional $10 million to build and strengthen the national cybersecurity workforce pipeline through education, K-12 programs, and funding to universities and colleges.  These investments would help improve U.S. competitiveness in emerging technologies.

- **Advances Racial Equity in Science and Engineering.**  The Budget provides $393 million, an increase of $172 million or 78 percent above the 2021 enacted level, for programs to increase the participation of historically underrepresented communities in science and engineering fields.  Funding would support:  curriculum design; research on successful recruitment and retention methods; development of outreach or mentorship programs; fellowships; and building science and engineering research and education capacity at Historically Black Colleges

111

and Universities and other Minority-Serving Institutions. These investments would help ensure the U.S. science and technology workforce reflects the Nation as a whole.

- **Fosters Scientific and Technological Advances.** The Budget provides $2 billion for research infrastructure at NSF, an increase of $65 million above the 2021 enacted level. Funding would support the construction and procurement of research facilities and instrumentation across the Nation to enable scientific and technological advances. The Budget also supports major NSF research facilities, including long-term upgrades of NSF's major Antarctic infrastructure, construction of the Vera C. Rubin Observatory to support astronomy research, and upgrades to the Large Hadron Collider, the world's largest particle accelerator.



# SMALL BUSINESS ADMINISTRATION

The Small Business Administration (SBA) helps to ensure that small businesses and entrepreneurs have access to the information and resources they need to start, grow, or recover their business.  The President's 2023 Budget for SBA makes historic investments in counseling and training programs, expanding access to capital, supporting domestic manufacturing and innovation, and promoting access to Government contracting opportunities.

The Budget requests $914 million in discretionary funding for SBA, a $159 million or 21-percent increase from the 2021 enacted level.

**The President's 2023 Budget:**

- **Supports Underserved Entrepreneurs.**  The Budget provides a $31 million increase over the 2021 enacted level to support women, people of color, veterans, and other underserved entrepreneurs through SBA's Entrepreneurial Development programs.  This bold commitment ensures entrepreneurs have access to counseling, training, and mentoring services.  Access to these services is essential to addressing inequities, expanding economic opportunity, and ensuring small businesses have the tools to succeed.

- **Expands Access to Capital for Small Businesses.**  The Budget addresses the need for greater access to affordable capital, particularly in underserved communities.  The Budget increases the authorized lending levels in SBA's flagship 7(a) loan guarantee program, the 504 loan program for fixed assets, Small Business Investment Companies, and the Secondary Market Guarantee program by a total of $9.5 billion.  Increasing these lending levels would drive economic growth by significantly expanding the availability of working capital, fixed capital, and venture capital funding for small businesses.

- **Strengthens Domestic Manufacturing.**  Investing in Growth Accelerators, Regional Innovation Clusters, as well as the Federal and State Technology Partnership Program is key to ensuring entrepreneurs have access to the tools, networks, and services they need to bring cutting-edge innovation to the market.  The Budget provides $30 million, an $18 million increase over the 2021 enacted level, to build and strengthen these innovation ecosystems. The Budget also provides $4 million for the creation of a Manufacturing Hub to expand SBA's capacity to support domestic manufacturing by helping small businesses connect with service providers to commercialize innovation, automate processes, enter new markets, expand capacity, and strengthen their resiliency.

113

SMALL BUSINESS ADMINISTRATION

- **Implements a Government-Wide Certification Program for Veterans.** The Budget provides $20 million for a uniform certification process to enable veteran and service-disabled veteran-owned small businesses to access business opportunities across the Federal Government.

- **Engages Small Businesses in Combatting Climate Change.** The Budget provides $10 million to facilitate access to capital for investments to help small businesses become more resilient to climate change or support the clean energy economy.



# SOCIAL SECURITY ADMINISTRATION

The Social Security Administration (SSA) provides essential benefits to retirees, survivors, individuals with disabilities, and older Americans with limited income and resources.  The President's 2023 Budget for SSA invests in improving service delivery, advancing equity, and promoting program integrity.

The Budget requests $14.8 billion in discretionary funding for SSA, a $1.8 billion or 14-percent increase from the 2021 enacted level, including funding for program integrity activities.

**The President's 2023 Budget:**

- **Improves Service Delivery.**  Each year, SSA processes more than six million retirement, survivors, and Medicare claims, as well as more than two million disability and Supplemental Security Income claims.  The Budget provides an increase of $1.6 billion, or 14 percent over the 2021 enacted level, to improve services at SSA's field offices, State disability determination services, and teleservice centers for retirees, individuals with disabilities, and their families who rely on the Agency.  The Budget also improves access to SSA's services by adding staff to speed disability claims processing and reduce wait times.

- **Advances Equity and Accessibility.**  SSA remains committed to breaking down barriers to access experienced by people who rely on its services, including individuals experiencing homelessness, children with disabilities, and people with mental and intellectual disabilities.  The Budget makes investments to decrease customer wait times, simplify application processes, and increase outreach to people who are difficult to reach.  SSA will also continue to modernize its information technology systems to make more services available online and improve 800 Number access.

- **Promotes Program Integrity.**  The Budget includes $1.8 billion, $224 million above the 2021 enacted level, for dedicated program integrity activities to promote responsible spending of Social Security funds and ensure that the Agency is providing the correct benefit amounts only to those who qualify.  These funds also support actions to investigate and help prosecute fraud.

115

# Summary Tables

## Table S–1.   Budget Totals[1]

(In billions of dollars and as a percent of GDP)

| | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | Totals 2023–2027 | Totals 2023–2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Budget totals in billions of dollars:** | | | | | | | | | | | | | | |
| Receipts ............................................... | 4,047 | 4,437 | 4,638 | 4,874 | 5,076 | 5,406 | 5,696 | 5,969 | 6,227 | 6,500 | 6,795 | 7,083 | 25,690 | 58,264 |
| Outlays ................................................ | 6,822 | 5,852 | 5,792 | 6,075 | 6,406 | 6,734 | 7,048 | 7,502 | 7,670 | 8,114 | 8,477 | 8,867 | 32,055 | 72,685 |
| Deficit[2] ............................................. | 2,775 | 1,415 | 1,154 | 1,201 | 1,330 | 1,328 | 1,352 | 1,533 | 1,443 | 1,614 | 1,682 | 1,784 | 6,364 | 14,421 |
| Debt held by the public ................................ | 22,284 | 24,836 | 26,033 | 27,271 | 28,644 | 29,988 | 31,368 | 32,923 | 34,388 | 36,022 | 37,727 | 39,542 | | |
| Debt held by the public net of financial assets ............................................... | 20,673 | 22,085 | 23,238 | 24,439 | 25,769 | 27,097 | 28,449 | 29,982 | 31,425 | 33,045 | 34,732 | 36,516 | | |
| Gross domestic product (GDP) ...................... | 22,358 | 24,256 | 25,567 | 26,694 | 27,787 | 28,912 | 30,080 | 31,307 | 32,615 | 34,018 | 35,498 | 37,041 | | |
| **Budget totals as a percent of GDP:** | | | | | | | | | | | | | | |
| Receipts ............................................... | 18.1% | 18.3% | 18.1% | 18.3% | 18.3% | 18.7% | 18.9% | 19.1% | 19.1% | 19.1% | 19.1% | 19.1% | 18.5% | 18.8% |
| Outlays ................................................ | 30.5% | 24.1% | 22.7% | 22.8% | 23.1% | 23.3% | 23.4% | 24.0% | 23.5% | 23.9% | 23.9% | 23.9% | 23.0% | 23.4% |
| Deficit ............................................. | 12.4% | 5.8% | 4.5% | 4.5% | 4.8% | 4.6% | 4.5% | 4.9% | 4.4% | 4.7% | 4.7% | 4.8% | 4.6% | 4.7% |
| Debt held by the public ................................ | 99.7% | 102.4% | 101.8% | 102.2% | 103.1% | 103.7% | 104.3% | 105.2% | 105.4% | 105.9% | 106.3% | 106.7% | | |
| Debt held by the public net of financial assets ............................................... | 92.5% | 91.0% | 90.9% | 91.6% | 92.7% | 93.7% | 94.6% | 95.8% | 96.4% | 97.1% | 97.8% | 98.6% | | |
| **Memorandum, real net interest:** | | | | | | | | | | | | | | |
| Real net interest in billions of dollars ........ | –291 | –514 | –146 | –48 | 20 | 73 | 129 | 181 | 221 | 254 | 298 | 337 | 29 | 1,319 |
| Real net interest as a percent of GDP ........ | –1.3% | –2.1% | –0.6% | –0.2% | 0.1% | 0.3% | 0.4% | 0.6% | 0.7% | 0.7% | 0.8% | 0.9% | 0.0% | 0.4% |

[1] The Budget includes a reserve for legislation that reduces costs, expands productive capacity, and reforms the tax system. While the President is committed to reducing the deficit with this legislation, this allowance is shown as deficit neutral to be conservative for purposes of the budget totals. Because discussions with Congress continue, the Budget does not break down the reserve among specific policies or between revenues and outlays.

[2] The estimated deficit for 2022 is based on partial year actual data and generally incorporates actuals through February. At the time the 2023 Budget was prepared, 2022 appropriations remained incomplete. The baseline reflects annualized continuing appropriations for 2022.

## Table S–2.   Effect of Budget Proposals on Projected Deficits

(Deficit increases (+) or decreases (–) in billions of dollars)

| | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | Totals 2023–2027 | Totals 2023–2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Projected deficits in the baseline**[1] ................ | **2,775** | **1,421** | **1,176** | **1,279** | **1,422** | **1,399** | **1,419** | **1,630** | **1,562** | **1,748** | **1,818** | **2,014** | **6,694** | **15,466** |
| Percent of GDP .......................................... | 12.4% | 5.9% | 4.6% | 4.8% | 5.1% | 4.8% | 4.7% | 5.2% | 4.8% | 5.1% | 5.1% | 5.4% | | |
| **Proposals in the 2023 Budget:** | | | | | | | | | | | | | | |
| Reserve for legislation that reduces costs, expands productive capacity, and reforms the tax system[2] ............................................. | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Invest in K–12 education and college affordability ............................................. | ......... | ......... | 3 | 22 | 28 | 33 | 38 | 44 | 50 | 54 | 55 | 56 | 125 | 383 |
| Improve public health by investing in preparedness, mental health, tribal health, and other areas ............................................. | ......... | ......... | 22 | 44 | 38 | 36 | 37 | 37 | 35 | 37 | 39 | 41 | 177 | 365 |
| Increase affordable housing supply .................... | ......... | ......... | 1 | 3 | 6 | 7 | 8 | 8 | 6 | 4 | 3 | 2 | 25 | 48 |
| Combat and prevent crime ................................. | ......... | ......... | 1 | 2 | 3 | 4 | 5 | 4 | 3 | 2 | 2 | 2 | 15 | 28 |
| Minimum tax on billionaires ............................. | ......... | ......... | ......... | –36 | –40 | –43 | –43 | –43 | –43 | –38 | –36 | –38 | –163 | –361 |
| Additional investments and reforms .................. | ......... | –6 | –50 | –112 | –124 | –103 | –104 | –137 | –158 | –176 | –180 | –269 | –493 | –1,413 |
| Debt service and other interest effects .............. | ......... | –* | –* | –1 | –3 | –5 | –7 | –9 | –12 | –15 | –19 | –24 | –16 | –95 |
| **Total proposals in the 2023 Budget**[3] ................ | **.........** | **–6** | **–22** | **–78** | **–93** | **–70** | **–67** | **–97** | **–119** | **–133** | **–136** | **–229** | **–330** | **–1,045** |
| **Resulting deficits in the 2023 Budget** ............. | **2,775** | **1,415** | **1,154** | **1,201** | **1,330** | **1,328** | **1,352** | **1,533** | **1,443** | **1,614** | **1,682** | **1,784** | **6,364** | **14,421** |
| Percent of GDP .......................................... | 12.4% | 5.8% | 4.5% | 4.5% | 4.8% | 4.6% | 4.5% | 4.9% | 4.4% | 4.7% | 4.7% | 4.8% | | |

*$500 million or less

[1] At the time the 2023 Budget was prepared, 2022 appropriations remained incomplete. The baseline reflects annualized continuing appropriations for 2022.

[2] The Budget includes a reserve for legislation that reduces costs, expands productive capacity, and reforms the tax system. While the President is committed to reducing the deficit with this legislation, this allowance is shown as deficit neutral to be conservative for purposes of the budget totals. Because discussions with Congress continue, the Budget does not break down the reserve among specific policies or between revenues and outlays.

[3] Reflects budget deficit reduction compared to a baseline that does not include the Consolidated Appropriations Act, 2022 (Public Law 117–103), which was enacted after the baseline was finalized. Deficit reduction relative to a baseline that incorporated that legislation would be significantly greater.

## Table S–3.   Baseline by Category[1]

(In billions of dollars)

| | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | Totals 2023–2027 | Totals 2023–2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Outlays:** | | | | | | | | | | | | | | |
| Discretionary programs: | | | | | | | | | | | | | | |
| Defense ........................................ | 742 | 766 | 766 | 784 | 802 | 815 | 828 | 847 | 866 | 886 | 906 | 927 | 3,995 | 8,426 |
| Non-defense ................................. | 895 | 928 | 873 | 949 | 931 | 935 | 952 | 974 | 994 | 1,013 | 1,033 | 1,055 | 4,641 | 9,710 |
| Subtotal, discretionary programs ....... | 1,636 | 1,694 | 1,639 | 1,733 | 1,733 | 1,750 | 1,781 | 1,822 | 1,860 | 1,899 | 1,939 | 1,981 | 8,636 | 18,137 |
| Mandatory programs: | | | | | | | | | | | | | | |
| Social Security ........................................ | 1,129 | 1,214 | 1,313 | 1,398 | 1,482 | 1,571 | 1,663 | 1,760 | 1,858 | 1,958 | 2,061 | 2,167 | 7,427 | 17,231 |
| Medicare .................................................. | 689 | 753 | 847 | 853 | 972 | 1,071 | 1,158 | 1,311 | 1,261 | 1,420 | 1,492 | 1,645 | 4,901 | 12,031 |
| Medicaid .................................................. | 521 | 562 | 536 | 566 | 595 | 627 | 661 | 703 | 749 | 796 | 844 | 896 | 2,984 | 6,972 |
| Other mandatory programs ..................... | 2,495 | 1,272 | 954 | 852 | 854 | 870 | 862 | 929 | 915 | 962 | 989 | 1,035 | 4,393 | 9,222 |
| Subtotal, mandatory programs .......... | 4,834 | 3,800 | 3,650 | 3,670 | 3,904 | 4,138 | 4,344 | 4,703 | 4,783 | 5,136 | 5,386 | 5,743 | 19,705 | 45,456 |
| Net interest ............................................. | 352 | 357 | 396 | 477 | 567 | 653 | 736 | 818 | 891 | 963 | 1,038 | 1,116 | 2,829 | 7,655 |
| Total outlays ....................................... | 6,822 | 5,852 | 5,685 | 5,880 | 6,204 | 6,540 | 6,861 | 7,342 | 7,534 | 7,998 | 8,363 | 8,840 | 31,171 | 71,248 |
| **Receipts:** | | | | | | | | | | | | | | |
| Individual income taxes ............................ | 2,044 | 2,257 | 2,305 | 2,319 | 2,431 | 2,727 | 2,926 | 3,074 | 3,241 | 3,420 | 3,610 | 3,789 | 12,708 | 29,843 |
| Corporation income taxes .......................... | 372 | 383 | 412 | 447 | 454 | 437 | 445 | 468 | 465 | 457 | 454 | 455 | 2,196 | 4,495 |
| Social insurance and retirement receipts: | | | | | | | | | | | | | | |
| Social Security payroll taxes ................. | 952 | 1,047 | 1,101 | 1,158 | 1,208 | 1,264 | 1,315 | 1,381 | 1,439 | 1,505 | 1,575 | 1,644 | 6,046 | 13,590 |
| Medicare payroll taxes .......................... | 295 | 329 | 343 | 361 | 376 | 393 | 409 | 430 | 448 | 469 | 491 | 514 | 1,883 | 4,233 |
| Unemployment insurance ....................... | 57 | 58 | 55 | 55 | 55 | 55 | 56 | 56 | 60 | 62 | 62 | 64 | 275 | 580 |
| Other retirement .................................... | 10 | 12 | 12 | 13 | 13 | 14 | 15 | 15 | 16 | 16 | 17 | 18 | 67 | 149 |
| Excise taxes ............................................. | 75 | 84 | 90 | 95 | 95 | 96 | 96 | 96 | 98 | 100 | 101 | 103 | 473 | 971 |
| Estate and gift taxes ................................ | 27 | 26 | 25 | 25 | 26 | 27 | 41 | 42 | 44 | 47 | 50 | 53 | 144 | 380 |
| Customs duties ......................................... | 80 | 93 | 54 | 46 | 47 | 49 | 51 | 53 | 55 | 58 | 60 | 53 | 247 | 526 |
| Deposits of earnings, Federal Reserve System | 100 | 108 | 76 | 43 | 34 | 35 | 39 | 45 | 50 | 57 | 65 | 73 | 227 | 516 |
| Other miscellaneous receipts ................... | 34 | 35 | 36 | 39 | 42 | 45 | 49 | 52 | 56 | 58 | 60 | 62 | 211 | 499 |
| Total receipts ....................................... | 4,047 | 4,431 | 4,509 | 4,601 | 4,782 | 5,142 | 5,442 | 5,712 | 5,972 | 6,250 | 6,545 | 6,826 | 24,476 | 55,781 |
| **Deficit** ................................................. | 2,775 | 1,421 | 1,176 | 1,279 | 1,422 | 1,399 | 1,419 | 1,630 | 1,562 | 1,748 | 1,818 | 2,014 | 6,694 | 15,466 |
| Net interest ............................................. | 352 | 357 | 396 | 477 | 567 | 653 | 736 | 818 | 891 | 963 | 1,038 | 1,116 | 2,829 | 7,655 |
| Primary deficit ........................................ | 2,423 | 1,064 | 780 | 801 | 855 | 746 | 683 | 813 | 672 | 784 | 780 | 898 | 3,865 | 7,812 |
| On-budget deficit ..................................... | 2,724 | 1,381 | 1,090 | 1,164 | 1,277 | 1,224 | 1,220 | 1,406 | 1,300 | 1,456 | 1,495 | 1,656 | 5,976 | 13,289 |
| Off-budget deficit/surplus (–) ................. | 52 | 41 | 86 | 115 | 145 | 174 | 198 | 225 | 262 | 292 | 323 | 357 | 718 | 2,178 |

[1] Baseline estimates are on the basis of the economic assumptions shown in Table S–9, which incorporate the effects of the Administration's fiscal policies and incorporate certain adjustments described in the "Current Services" chapter of the *Analytical Perspectives* volume. At the time the 2023 Budget was prepared, 2022 appropriations remained incomplete. The baseline reflects annualized continuing appropriations for 2022. See Tables S–7 and S–8 for more information about discretionary funding levels.

## Table S–4.   Proposed Budget by Category [1]

(In billions of dollars)

| | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | Totals 2023–2027 | Totals 2023–2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Outlays:** | | | | | | | | | | | | | | |
| Discretionary programs: | | | | | | | | | | | | | | |
| Defense | 742 | 766 | 795 | 822 | 837 | 843 | 853 | 864 | 872 | 879 | 885 | 891 | 4,150 | 8,541 |
| Non-defense | 895 | 928 | 915 | 1,022 | 1,012 | 1,019 | 1,026 | 1,030 | 1,039 | 1,051 | 1,065 | 1,083 | 4,993 | 10,261 |
| Subtotal, discretionary programs | 1,636 | 1,694 | 1,709 | 1,844 | 1,848 | 1,862 | 1,879 | 1,894 | 1,911 | 1,930 | 1,950 | 1,974 | 9,142 | 18,802 |
| Mandatory programs: | | | | | | | | | | | | | | |
| Social Security | 1,129 | 1,214 | 1,313 | 1,398 | 1,482 | 1,570 | 1,662 | 1,759 | 1,857 | 1,957 | 2,059 | 2,165 | 7,425 | 17,222 |
| Medicare | 689 | 753 | 846 | 853 | 971 | 1,070 | 1,157 | 1,310 | 1,260 | 1,420 | 1,513 | 1,612 | 4,898 | 12,013 |
| Medicaid | 521 | 562 | 536 | 567 | 599 | 631 | 666 | 706 | 752 | 799 | 847 | 898 | 2,999 | 7,001 |
| Other mandatory programs | 2,495 | 1,272 | 993 | 937 | 942 | 953 | 954 | 1,024 | 1,012 | 1,060 | 1,088 | 1,126 | 4,778 | 10,089 |
| Subtotal, mandatory programs | 4,834 | 3,800 | 3,687 | 3,755 | 3,994 | 4,224 | 4,439 | 4,800 | 4,880 | 5,236 | 5,508 | 5,801 | 20,099 | 46,324 |
| Net interest | 352 | 357 | 396 | 476 | 564 | 648 | 729 | 808 | 879 | 948 | 1,019 | 1,092 | 2,813 | 7,559 |
| Total outlays | 6,822 | 5,852 | 5,792 | 6,075 | 6,406 | 6,734 | 7,048 | 7,502 | 7,670 | 8,114 | 8,477 | 8,867 | 32,055 | 72,685 |
| **Receipts:** | | | | | | | | | | | | | | |
| Individual income taxes | 2,044 | 2,263 | 2,345 | 2,427 | 2,549 | 2,819 | 3,007 | 3,156 | 3,324 | 3,502 | 3,692 | 3,876 | 13,147 | 30,698 |
| Corporation income taxes | 372 | 383 | 501 | 616 | 633 | 612 | 620 | 644 | 638 | 627 | 623 | 625 | 2,982 | 6,139 |
| Social insurance and retirement receipts: | | | | | | | | | | | | | | |
| Social Security payroll taxes | 952 | 1,047 | 1,101 | 1,158 | 1,208 | 1,264 | 1,315 | 1,381 | 1,439 | 1,505 | 1,575 | 1,644 | 6,046 | 13,590 |
| Medicare payroll taxes | 295 | 329 | 342 | 360 | 375 | 392 | 408 | 428 | 446 | 467 | 489 | 512 | 1,876 | 4,218 |
| Unemployment insurance | 57 | 58 | 55 | 55 | 55 | 55 | 56 | 56 | 60 | 62 | 62 | 64 | 275 | 579 |
| Other retirement | 10 | 12 | 12 | 13 | 13 | 14 | 15 | 15 | 16 | 16 | 17 | 18 | 67 | 149 |
| Excise taxes | 75 | 84 | 91 | 96 | 95 | 96 | 97 | 96 | 99 | 101 | 101 | 103 | 474 | 974 |
| Estate and gift taxes | 27 | 26 | 25 | 23 | 25 | 25 | 40 | 42 | 45 | 47 | 51 | 54 | 138 | 376 |
| Customs duties | 80 | 93 | 54 | 46 | 47 | 49 | 51 | 53 | 55 | 58 | 60 | 53 | 247 | 526 |
| Deposits of earnings, Federal Reserve System | 100 | 108 | 76 | 43 | 34 | 35 | 39 | 45 | 50 | 57 | 65 | 73 | 227 | 516 |
| Other miscellaneous receipts | 34 | 35 | 36 | 39 | 42 | 45 | 49 | 52 | 56 | 58 | 60 | 62 | 211 | 499 |
| Total receipts | 4,047 | 4,437 | 4,638 | 4,874 | 5,076 | 5,406 | 5,696 | 5,969 | 6,227 | 6,500 | 6,795 | 7,083 | 25,690 | 58,264 |
| **Deficit** | **2,775** | **1,415** | **1,154** | **1,201** | **1,330** | **1,328** | **1,352** | **1,533** | **1,443** | **1,614** | **1,682** | **1,784** | **6,364** | **14,421** |
| Net interest | 352 | 357 | 396 | 476 | 564 | 648 | 729 | 808 | 879 | 948 | 1,019 | 1,092 | 2,813 | 7,559 |
| Primary deficit | 2,423 | 1,058 | 758 | 724 | 766 | 680 | 622 | 725 | 565 | 667 | 663 | 692 | 3,551 | 6,862 |
| On-budget deficit | 2,724 | 1,374 | 1,068 | 1,085 | 1,184 | 1,153 | 1,153 | 1,308 | 1,181 | 1,323 | 1,360 | 1,428 | 5,643 | 12,243 |
| Off-budget deficit/surplus (–) | 52 | 41 | 86 | 116 | 146 | 175 | 199 | 225 | 262 | 292 | 322 | 356 | 721 | 2,178 |

[1] The Budget includes a reserve for legislation that reduces costs, expands productive capacity, and reforms the tax system. While the President is committed to reducing the deficit with this legislation, this allowance is shown as deficit neutral to be conservative for purposes of the budget totals. Because discussions with Congress continue, the Budget does not break down the reserve among specific policies or between revenues and outlays.

## Table S–5.   Proposed Budget by Category as a Percent of GDP[1]

(As a percent of GDP)

| | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | Averages 2023–2027 | Averages 2023–2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Outlays:** | | | | | | | | | | | | | | |
| Discretionary programs: | | | | | | | | | | | | | | |
| Defense ......................................... | 3.3 | 3.2 | 3.1 | 3.1 | 3.0 | 2.9 | 2.8 | 2.8 | 2.7 | 2.6 | 2.5 | 2.4 | 3.0 | 2.8 |
| Non-defense ................................... | 4.0 | 3.8 | 3.6 | 3.8 | 3.6 | 3.5 | 3.4 | 3.3 | 3.2 | 3.1 | 3.0 | 2.9 | 3.6 | 3.3 |
| Subtotal, discretionary programs ....... | 7.3 | 7.0 | 6.7 | 6.9 | 6.7 | 6.4 | 6.2 | 6.0 | 5.9 | 5.7 | 5.5 | 5.3 | 6.6 | 6.1 |
| Mandatory programs: | | | | | | | | | | | | | | |
| Social Security ............................... | 5.0 | 5.0 | 5.1 | 5.2 | 5.3 | 5.4 | 5.5 | 5.6 | 5.7 | 5.8 | 5.8 | 5.8 | 5.3 | 5.5 |
| Medicare ........................................ | 3.1 | 3.1 | 3.3 | 3.2 | 3.5 | 3.7 | 3.8 | 4.2 | 3.9 | 4.2 | 4.3 | 4.4 | 3.5 | 3.8 |
| Medicaid ........................................ | 2.3 | 2.3 | 2.1 | 2.1 | 2.2 | 2.2 | 2.2 | 2.3 | 2.3 | 2.3 | 2.4 | 2.4 | 2.2 | 2.2 |
| Other mandatory programs .................. | 11.2 | 5.2 | 3.9 | 3.5 | 3.4 | 3.3 | 3.2 | 3.3 | 3.1 | 3.1 | 3.1 | 3.0 | 3.5 | 3.3 |
| Subtotal, mandatory programs ......... | 21.6 | 15.7 | 14.4 | 14.1 | 14.4 | 14.6 | 14.8 | 15.3 | 15.0 | 15.4 | 15.5 | 15.7 | 14.4 | 14.9 |
| Net interest ..................................... | 1.6 | 1.5 | 1.5 | 1.8 | 2.0 | 2.2 | 2.4 | 2.6 | 2.7 | 2.8 | 2.9 | 2.9 | 2.0 | 2.4 |
| Total outlays ................................. | 30.5 | 24.1 | 22.7 | 22.8 | 23.1 | 23.3 | 23.4 | 24.0 | 23.5 | 23.9 | 23.9 | 23.9 | 23.0 | 23.4 |
| **Receipts:** | | | | | | | | | | | | | | |
| Individual income taxes ..................... | 9.1 | 9.3 | 9.2 | 9.1 | 9.2 | 9.8 | 10.0 | 10.1 | 10.2 | 10.3 | 10.4 | 10.5 | 9.4 | 9.9 |
| Corporation income taxes ................... | 1.7 | 1.6 | 2.0 | 2.3 | 2.3 | 2.1 | 2.1 | 2.1 | 2.0 | 1.8 | 1.8 | 1.7 | 2.1 | 2.0 |
| Social insurance and retirement receipts: | | | | | | | | | | | | | | |
| Social Security payroll taxes ................. | 4.3 | 4.3 | 4.3 | 4.3 | 4.3 | 4.4 | 4.4 | 4.4 | 4.4 | 4.4 | 4.4 | 4.4 | 4.3 | 4.4 |
| Medicare payroll taxes ....................... | 1.3 | 1.4 | 1.3 | 1.3 | 1.3 | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | 1.3 | 1.4 |
| Unemployment insurance ...................... | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Other retirement ............................... | * | * | * | * | * | * | * | * | * | * | * | * | * | * |
| Excise taxes .................................... | 0.3 | 0.3 | 0.4 | 0.4 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| Estate and gift taxes ......................... | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Customs duties ................................ | 0.4 | 0.4 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.1 | 0.2 | 0.2 |
| Deposits of earnings, Federal Reserve System ............................................. | 0.4 | 0.4 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Other miscellaneous receipts .................. | 0.2 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Total receipts ............................... | 18.1 | 18.3 | 18.1 | 18.3 | 18.3 | 18.7 | 18.9 | 19.1 | 19.1 | 19.1 | 19.1 | 19.1 | 18.5 | 18.8 |
| **Deficit** ........................................... | **12.4** | **5.8** | **4.5** | **4.5** | **4.8** | **4.6** | **4.5** | **4.9** | **4.4** | **4.7** | **4.7** | **4.7** | **4.6** | **4.7** |
| Net interest ..................................... | 1.6 | 1.5 | 1.5 | 1.8 | 2.0 | 2.2 | 2.4 | 2.6 | 2.7 | 2.8 | 2.9 | 2.9 | 2.0 | 2.4 |
| Primary deficit ................................. | 10.8 | 4.4 | 3.0 | 2.7 | 2.8 | 2.4 | 2.1 | 2.3 | 1.7 | 2.0 | 1.9 | 1.9 | 2.6 | 2.3 |
| On-budget deficit .............................. | 12.2 | 5.7 | 4.2 | 4.1 | 4.3 | 4.0 | 3.8 | 4.2 | 3.6 | 3.9 | 3.8 | 3.9 | 4.1 | 4.0 |
| Off-budget deficit/surplus (–) .................. | 0.2 | 0.2 | 0.3 | 0.4 | 0.5 | 0.6 | 0.7 | 0.7 | 0.8 | 0.9 | 0.9 | 1.0 | 0.5 | 0.7 |

*0.05 percent of GDP or less

[1] The Budget includes a reserve for legislation that reduces costs, expands productive capacity, and reforms the tax system. While the President is committed to reducing the deficit with this legislation, this allowance is shown as deficit neutral to be conservative for purposes of the budget totals. Because discussions with Congress continue, the Budget does not break down the reserve among specific policies or between revenues and outlays.

123

## Table S–6.   Mandatory and Receipt Proposals

(Deficit increases (+) or decreases (–) in millions of dollars)

|  | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | Totals 2023–2027 | Totals 2023–2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Mandatory initiatives and savings:** | | | | | | | | | | | | | |
| Multi-agency proposals: | | | | | | | | | | | | | |
| Reserve for legislation that reduces costs, expands productive capacity, and reforms the tax system ..... | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ |
| Transform mental health & substance use disorder coverage and infrastructure: | | | | | | | | | | | | | |
| Department of Health and Human Services: | | | | | | | | | | | | | |
| Invest in behavioral health workforce and delivery ............................................................ | ........ | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 3,750 | 7,500 |
| Expand and convert Medicaid demonstration programs to improve community behavioral health services into a permanent program ...... | ........ | 45 | 1,430 | 1,960 | 2,430 | 2,560 | 2,750 | 2,930 | 3,120 | 3,320 | 3,520 | 8,425 | 24,065 |
| Establish Medicaid provider capacity grants for mental health & substance use disorder treatment ........................................................ | ........ | 40 | 170 | 1,640 | 2,340 | 2,600 | 710 | ........ | ........ | ........ | ........ | 6,790 | 7,500 |
| Utilize clinically appropriate criteria for Medicaid behavioral health services ................ | ........ | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 270 | 280 | 290 | 1,050 | 2,380 |
| Establish performance bonus fund to improve behavioral health in Medicaid ......................... | ........ | 500 | 500 | 500 | 500 | 500 | ........ | ........ | ........ | ........ | ........ | 2,500 | 2,500 |
| Apply the Mental Health Parity and Addiction Equity Act (MHPAEA) to Medicare ................. | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ |
| Eliminate the 190-day lifetime limit on psychiatric hospital services ............................. | ........ | 30 | 90 | 110 | 110 | 120 | 120 | 130 | 140 | 140 | 150 | 460 | 1,140 |
| Revise criteria for psychiatric hospital terminations from Medicare ........................... | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ |
| Modernize Medicare mental health benefits [1] ...... | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ |
| Require Medicare to cover three behavioral health visits without cost-sharing .................... | ........ | ........ | 100 | 130 | 140 | 150 | 160 | 150 | 170 | 170 | 180 | 520 | 1,350 |
| Increase access to consumer protections in self-insured non-federal governmental plans ......... | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ |
| Provide mandatory funding for state enforcement of mental health parity requirements ................................................... | ........ | 10 | 40 | 25 | 25 | 25 | ........ | ........ | ........ | ........ | ........ | 125 | 125 |
| Permanently extend funding for Community Mental Health Centers (CMHCs) .................... | ........ | 124 | 289 | 372 | 413 | 413 | 413 | 413 | 413 | 413 | 413 | 1,611 | 3,676 |
| Department of Labor: | | | | | | | | | | | | | |
| Authorize the Department of Labor (DOL) to pursue parity violations by entities that provide administrative services to Employee Retirement Income Security Act (ERISA) group health plans ..................................... | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ |
| Amend ERISA to allow participants and beneficiaries to recover losses due to parity violations ............................................... | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ |
| Authorize DOL to impose civil monetary penalties for MHPAEA noncompliance ............ | ........ | ........ | –3 | –4 | –4 | –4 | –4 | –4 | –4 | –4 | –4 | –15 | –35 |

## Table S–6.   Mandatory and Receipt Proposals—Continued

(Deficit increases (+) or decreases (–) in millions of dollars)

| | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | Totals 2023–2027 | Totals 2023–2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Provide mandatory funding for DOL to perform additional Non-Quantitative Treatment Limitations (NQTL) audits | ......... | 2 | 5 | 25 | 25 | 34 | 35 | 36 | 37 | 38 | 38 | 91 | 275 |
| Cross-Cutting proposals: | | | | | | | | | | | | | |
| Improve access to behavioral healthcare in the private insurance market[2] | ......... | 1,881 | 2,664 | 2,842 | 2,933 | 3,052 | 3,184 | 3,354 | 3,503 | 3,661 | 3,847 | 13,371 | 30,920 |
| Require coverage of three behavioral health visits and three primary care visits without cost-sharing[2] | ......... | 1,202 | 1,740 | 1,823 | 1,937 | 2,025 | 2,117 | 2,229 | 2,316 | 2,388 | 2,506 | 8,728 | 20,284 |
| Subtotal, transform mental health & substance use disorder coverage and infrastructure | ......... | 4,774 | 7,975 | 10,383 | 11,819 | 12,455 | 10,475 | 10,238 | 10,715 | 11,156 | 11,690 | 47,406 | 101,680 |
| Increase affordable housing supply: | | | | | | | | | | | | | |
| Department of Housing and Urban Development: | | | | | | | | | | | | | |
| Fund affordable housing production grants | ......... | 500 | 2,000 | 3,500 | 4,500 | 5,000 | 4,500 | 3,000 | 1,500 | 500 | ......... | 15,500 | 25,000 |
| Reduce affordable housing barriers | ......... | 200 | 800 | 1,400 | 1,800 | 2,000 | 1,800 | 1,200 | 600 | 200 | ......... | 6,200 | 10,000 |
| Department of the Treasury: | | | | | | | | | | | | | |
| Establish Community Development Financial Institutions Affordable Housing Supply Fund | ......... | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 2,500 | 5,000 |
| Allow selective basis boosts for bond-financed Low-Income Housing Credit projects[2] | ......... | 2 | 29 | 140 | 354 | 617 | 895 | 1,148 | 1,359 | 1,561 | 1,769 | 1,142 | 7,874 |
| Subtotal, increase affordable housing supply | ......... | 1,202 | 3,329 | 5,540 | 7,154 | 8,117 | 7,695 | 5,848 | 3,959 | 2,761 | 2,269 | 25,342 | 47,874 |
| Protect our elections and the right to vote: | | | | | | | | | | | | | |
| Election Assistance Commission: | | | | | | | | | | | | | |
| Fund election grants to increase access and security | ......... | 2,040 | 810 | 830 | 840 | 860 | 880 | 900 | 920 | 950 | 970 | 5,380 | 10,000 |
| Postal Service: | | | | | | | | | | | | | |
| Expand affordability and reliability of election-related mail service | ......... | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 2,500 | 5,000 |
| Subtotal, protect our elections and the right to vote | ......... | 2,540 | 1,310 | 1,330 | 1,340 | 1,360 | 1,380 | 1,400 | 1,420 | 1,450 | 1,470 | 7,880 | 15,000 |
| Expand legal representation for asylum seekers: | | | | | | | | | | | | | |
| Department of Health and Human Services: | | | | | | | | | | | | | |
| Provide unaccompanied children with legal representation | ......... | 120 | 302 | 470 | 644 | 892 | 1,063 | 1,121 | 1,161 | 1,194 | 1,223 | 2,428 | 8,190 |
| Department of Justice: | | | | | | | | | | | | | |
| Provide representation in the immigration court system | ......... | 68 | 248 | 428 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 1,644 | 3,894 |
| Subtotal, expand legal representation for asylum seekers | ......... | 188 | 550 | 898 | 1,094 | 1,342 | 1,513 | 1,571 | 1,611 | 1,644 | 1,673 | 4,072 | 12,084 |
| Advance child welfare: | | | | | | | | | | | | | |
| Department of Health and Human Services: | | | | | | | | | | | | | |

## Table S–6.   Mandatory and Receipt Proposals—Continued

(Deficit increases (+) or decreases (–) in millions of dollars)

| | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | Totals 2023–2027 | Totals 2023–2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Create new flexibilities and support in the Chafee program for youth who experienced foster care ............................................. | ......... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 500 | 1,000 |
| Prevent and combat religious, sexual orientation, gender identity, gender expression, or sex discrimination in the child welfare system ..... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Expand and encourage participation in the title IV-E Prevention Services and Kinship Navigator programs ........................................... | 161 | 280 | 318 | 376 | 445 | 389 | 457 | 539 | 628 | 701 | 767 | 1,808 | 4,900 |
| Reauthorize, increase funding for, and amend the Promoting Safe and Stable Families program .... | ......... | 78 | 250 | 292 | 295 | 300 | 300 | 300 | 300 | 300 | 300 | 1,215 | 2,715 |
| Increase support for foster care placements with kin caregivers ......................................................... | ......... | 91 | 100 | 108 | 116 | 126 | 136 | 145 | 155 | 162 | 169 | 541 | 1,308 |
| Reduce reimbursement rates for foster care congregate care placements ............................... | ......... | –27 | –24 | –21 | –18 | –17 | –16 | –15 | –14 | –14 | –14 | –107 | –180 |
| Department of the Treasury: | | | | | | | | | | | | | |
| Make the adoption tax credit refundable and allow certain guardianship arrangements to qualify [2] ............................................................ | ......... | 11 | 2,037 | 1,244 | 1,015 | 1,038 | 1,009 | 1,016 | 1,031 | 1,043 | 1,050 | 5,345 | 10,494 |
| Subtotal, advance child welfare .......................... | 161 | 533 | 2,781 | 2,099 | 1,953 | 1,936 | 1,986 | 2,085 | 2,200 | 2,292 | 2,372 | 9,302 | 20,237 |
| Ensure future pandemic and public health preparedness: | | | | | | | | | | | | | |
| Department of Health and Human Services: | | | | | | | | | | | | | |
| Invest in development of medical countermeasures, surge capacity, and public health systems ............................................... | ......... | 13,509 | 28,734 | 17,183 | 10,354 | 6,627 | 4,449 | 723 | 120 | ......... | ......... | 76,407 | 81,699 |
| Establish the Vaccines for Adults program .......... | ......... | 1,712 | 2,155 | 2,238 | 2,326 | 2,416 | 2,511 | 2,608 | 2,711 | 2,816 | 2,926 | 10,847 | 24,419 |
| Expand Vaccines for Children (VFC) program to all Children's Health Insurance Program (CHIP) children and make program improvements ........................................................ | ......... | 20 | 30 | 30 | 30 | 20 | 40 | 30 | 30 | 20 | 30 | 130 | 280 |
| Authorize coverage for drugs and devices authorized for emergency use [1] .......................... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Encourage development of innovative antimicrobial drugs [1] ......................................... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Consolidate all vaccine coverage under Medicare Part B ...................................................... | ......... | ......... | 400 | 460 | 450 | 440 | 420 | 400 | 370 | 350 | 290 | 1,750 | 3,580 |
| Ensure consistency and clarity of data reporting requirements for Medicare providers, suppliers, and contractors during public health emergencies ............................................. | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Enable the Secretary to temporarily modify or waive the application of specific requirements of the Clinical Laboratory Improvement Amendments of 1988 (CLIA) Act [1] ..................... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Department of State and United States Agency for International Development (USAID) | | | | | | | | | | | | | |

## Table S–6.   Mandatory and Receipt Proposals—Continued

(Deficit increases (+) or decreases (–) in millions of dollars)

| | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | Totals 2023–2027 | 2023–2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Strengthen the global health workforce, advance research and development capacity, and increase health security financing ................... | ......... | 2,275 | 1,950 | 1,625 | 325 | 325 | ......... | ......... | ......... | ......... | ......... | 6,500 | 6,500 |
| Subtotal, ensure future pandemic and public health preparedness ........................................... | ......... | 17,516 | 33,269 | 21,536 | 13,485 | 9,828 | 7,420 | 3,761 | 3,231 | 3,186 | 3,246 | 95,634 | 116,478 |
| Reclassifications: | | | | | | | | | | | | | |
| Shift the Indian Health Service from discretionary to mandatory funding | | | | | | | | | | | | | |
| Technical Reclassification: | | | | | | | | | | | | | |
| *Reduction in discretionary spending (non-add)* ... | ......... | *–7,398* | *–8,977* | *–9,498* | *–9,716* | *–9,939* | *–10,170* | *–10,402* | *–10,641* | *–10,886* | *–11,136* | *–45,528* | *–98,763* |
| Shift to mandatory spending ............................ | ......... | 7,398 | 8,977 | 9,498 | 9,716 | 9,939 | 10,170 | 10,402 | 10,641 | 10,886 | 11,136 | 45,528 | 98,763 |
| Provide adequate funding and close service gaps | ......... | ......... | 2,721 | 6,272 | 10,022 | 13,986 | 18,178 | 20,207 | 21,762 | 23,421 | 25,191 | 33,001 | 141,760 |
| *Total IHS Request (Budget authority) (non-add)* .. | ......... | *9,121* | *12,731* | *16,535* | *20,545* | *24,777* | *29,246* | *30,956* | *32,771* | *34,697* | *36,741* | *83,709* | *248,120* |
| End Deficit Reduction Contributions from Passenger Security Fee ....................................... | ......... | 1,520 | 1,560 | 1,600 | 1,640 | 1,680 | ......... | ......... | ......... | ......... | ......... | 8,000 | 8,000 |
| *Discretionary effects (non-add)* ............................ | ......... | *–1,520* | *–1,560* | *–1,600* | *–1,640* | *–1,680* | ......... | ......... | ......... | ......... | ......... | *–8,000* | *–8,000* |
| Provide mandatory funding for previously enacted Tribal Water Settlements Operations and Maintenance ................................................................ | ......... | 20 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 156 | 326 |
| *Discretionary effects (non-add)* ............................ | ......... | *–20* | *–34* | *–34* | *–34* | *–34* | *–34* | *–34* | *–34* | *–34* | *–34* | *–156* | *–326* |
| Reclassify Tribal Lease Payments ............................ | ......... | 55 | 56 | 57 | 58 | 60 | 61 | 62 | 63 | 64 | 66 | 286 | 602 |
| *Discretionary effects (non-add)* ............................ | ......... | *–55* | *–56* | *–57* | *–58* | *–60* | *–61* | *–62* | *–63* | *–64* | *–66* | *–286* | *–602* |
| Reclassify Contract Support Costs ........................... | ......... | 237 | 397 | 410 | 422 | 434 | 447 | 456 | 466 | 474 | 484 | 1,900 | 4,227 |
| *Discretionary effects (non-add)* ............................ | ......... | *–237* | *–397* | *–410* | *–422* | *–434* | *–447* | *–456* | *–466* | *–474* | *–484* | *–1,900* | *–4,227* |
| Subtotal, reclassifications ..................................... | ......... | 9,230 | 13,745 | 17,871 | 21,892 | 26,133 | 28,890 | 31,161 | 32,966 | 34,879 | 36,911 | 88,871 | 253,678 |
| Program integrity proposals: | | | | | | | | | | | | | |
| Capture savings to Medicare and Medicaid from Health Care Fraud and Abuse Control (HCFAC) allocation adjustment ............................................ | ......... | –1,119 | –1,181 | –1,246 | –1,315 | –1,354 | –1,393 | –1,435 | –1,479 | –1,523 | –1,569 | –6,215 | –13,614 |
| *Implement HCFAC allocation adjustment, discretionary outlays (non-add)* ...................... | ......... | *576* | *593* | *611* | *629* | *648* | *667* | *687* | *708* | *729* | *751* | *3,057* | *6,599* |
| *Net effect of HCFAC allocation adjustment (non-add)* ............................................................... | ......... | *–543* | *–588* | *–635* | *–686* | *–706* | *–726* | *–748* | *–771* | *–794* | *–818* | *–3,158* | *–7,015* |
| Capture savings to Unemployment Insurance (UI) from Reemployment Services and Eligibility Assessments (RESEA) allocation adjustment [2] ... | –290 | –474 | –684 | –701 | –630 | –618 | –597 | –583 | –574 | –851 | –911 | –3,107 | –6,623 |
| *Implement RESEA allocation adjustment, discretionary outlays (non-add)* ...................... | 79 | 249 | 424 | 528 | 605 | 631 | 648 | 661 | 677 | 692 | 709 | 2,437 | 5,824 |
| *Net effect of RESEA allocation adjustment (non-add)* ............................................................... | –211 | –225 | –260 | –173 | –25 | 13 | 51 | 78 | 103 | –159 | –202 | –670 | –799 |
| Capture savings from the Social Security Administration (SSA) allocation adjustments [3] ... | ......... | –112 | –1,776 | –3,142 | –3,992 | –4,885 | –6,021 | –6,289 | –7,440 | –8,242 | –8,981 | –13,907 | –50,880 |
| *Implement SSA allocation adjustments, discretionary outlays (non-add)* ...................... | | *1,516* | *1,579* | *1,405* | *1,502* | *1,577* | *1,626* | *1,683* | *1,765* | *1,801* | *1,834* | *7,579* | *16,288* |

## Table S–6.   Mandatory and Receipt Proposals—Continued

(Deficit increases (+) or decreases (–) in millions of dollars)

| | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | Totals 2023–2027 | Totals 2023–2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Net effect of SSA allocation adjustments (non-add)* | ......... | *1,404* | *–197* | *–1,737* | *–2,490* | *–3,308* | *–4,395* | *–4,606* | *–5,675* | *–6,441* | *–7,147* | *–6,328* | *–34,592* |
| Subtotal, program integrity proposals | –290 | –1,705 | –3,641 | –5,089 | –5,937 | –6,857 | –8,011 | –8,307 | –9,493 | –10,616 | –11,461 | –23,229 | –71,117 |
| Increase Afghan Special Immigrant Visas | ......... | 52 | 81 | 80 | 72 | 66 | 64 | 58 | 52 | 53 | 54 | 351 | 632 |
| Smooth and extend BBEDCA Section 251A sequestration | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | 1,730 | 22,450 | –36,537 | ......... | –12,357 |
| **Proposals by Agency:** | | | | | | | | | | | | | |
| **Department of Defense--Military Programs:** | | | | | | | | | | | | | |
| Extend authority to provide increased voluntary separation incentive pay for civilian employees of the Department of Defense | ......... | 1 | 1 | 1 | ......... | ......... | ......... | ......... | ......... | ......... | ......... | 3 | 3 |
| Authorize mandatory collection of Survivor Benefit Plan premiums from Veterans Disability Compensation | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Expand the current Medicare Eligible Retiree Health Care Fund to include all uniformed services retiree health care costs | ......... | ......... | 464 | 462 | 406 | 351 | 209 | 52 | –99 | –235 | –355 | 1,683 | 1,255 |
| Establish reserve component duty reform | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| **Department of Education** | | | | | | | | | | | | | |
| Double the maximum Pell Grant by 2029 | ......... | 2,847 | 8,442 | 12,710 | 16,988 | 21,428 | 26,563 | 32,148 | 35,348 | 36,010 | 36,671 | 62,415 | 229,155 |
| Increase the Pell Grant discretionary award (effect on mandatory costs) | ......... | ......... | 54 | 125 | 125 | 126 | 135 | 148 | 148 | 149 | 150 | 430 | 1,160 |
| Shift mandatory funds to support Pell award increase | ......... | ......... | –54 | –125 | –125 | –126 | –135 | –148 | –148 | –149 | –150 | –430 | –1,160 |
| Increase Title I funding | ......... | 640 | 13,455 | 15,205 | 16,354 | 17,050 | 17,442 | 17,844 | 18,252 | 18,674 | 19,102 | 62,704 | 154,018 |
| *Title I Mandatory Request (Budget authority) (non-add)* | ......... | *16,000* | *16,368* | *16,745* | *17,130* | *17,523* | *17,927* | *18,338* | *18,761* | *19,192* | *19,634* | *83,766* | *177,618* |
| **Department of Energy:** | | | | | | | | | | | | | |
| Strengthen clean energy manufacturing | ......... | 40 | 100 | 160 | 180 | 190 | 160 | 100 | 40 | 20 | 10 | 670 | 1,000 |
| **Department of Health and Human Services:** | | | | | | | | | | | | | |
| Fund the Administration's HIV/AIDS strategy: Eliminate barriers to pre-exposure prophylaxis (PrEP) under Medicaid | ......... | –290 | –310 | –340 | –370 | –390 | –430 | –460 | –500 | –530 | –580 | –1,700 | –4,200 |
| Establish PrEP Delivery Program to end the HIV epidemic | ......... | 213 | 371 | 526 | 687 | 853 | 1,027 | 1,206 | 1,394 | 1,587 | 1,789 | 2,650 | 9,653 |
| Extend and expand the Maternal Infant Early Childhood Home Visiting (MIECHV) program | ......... | 19 | 142 | 415 | 532 | 611 | 646 | 502 | 116 | 22 | ......... | 1,719 | 3,005 |
| Provide CMS Program Management Implementation Funding | ......... | 50 | 150 | 100 | ......... | ......... | ......... | ......... | ......... | ......... | ......... | 300 | 300 |
| Standardize data collection to improve quality and promote equitable care | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Add Medicare coverage of services furnished by community health workers[1] | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Establish a Contingency Fund for the Unaccompanied Children Program | ......... | 696 | 1,315 | 1,439 | 789 | 201 | 108 | 62 | 31 | ......... | ......... | 4,440 | 4,641 |

## Table S–6.   Mandatory and Receipt Proposals—Continued

(Deficit increases (+) or decreases (–) in millions of dollars)

| | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | Totals 2023–2027 | Totals 2023–2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Treat certain populations as refugees for public benefit purposes ...... | ........ | 111 | 122 | 127 | 132 | 138 | 133 | 11 | 4 | 4 | 4 | 630 | 786 |
| Prohibit unsolicited Medicare beneficiary contacts[1] ... | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ |
| Expand tools to identify and investigate fraud in the Medicare Advantage program[1] ...... | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ |
| Hold long-term care facility owners accountable for noncompliant closures and substandard care ..... | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ |
| Increase transparency by disclosing accreditation surveys ...... | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ |
| Remove restrictions on the certification of new entities as Organ Procurement Organizations and increase enforcement flexibility ...... | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ |
| Enhance the physician fee schedule conversion factor update in CY 2025 ...... | ........ | ........ | ........ | 250 | 380 | 410 | 430 | 460 | 480 | 500 | 540 | 1,040 | 3,450 |
| Modify the Medicaid Drug Rebate Program in the Territories ...... | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ |
| Enhance Medicaid managed care enforcement ...... | ........ | –100 | –200 | –200 | –200 | –200 | –200 | –200 | –200 | –300 | –300 | –900 | –2,100 |
| Medicaid interactions ...... | ........ | ........ | ........ | 60 | 100 | 100 | 30 | ........ | ........ | ........ | ........ | 260 | 290 |
| Department of Homeland Security: | | | | | | | | | | | | | |
| Establish Electronic Visa Update System user fee[2] ...... | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ |
| Extend expiring Customs and Border Protection (CBP) user fees ...... | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | –5,939 | ........ | –5,939 |
| Establish an affordability program for the National Flood Insurance Program ...... | ........ | 43 | 328 | 375 | 427 | 480 | 534 | 580 | 630 | 676 | 720 | 1,653 | 4,793 |
| Department of Justice: | | | | | | | | | | | | | |
| Combat and prevent crime ...... | ........ | 1,064 | 2,055 | 3,289 | 4,157 | 4,535 | 3,551 | 2,875 | 2,249 | 1,992 | 1,892 | 15,100 | 27,662 |
| Department of Labor: | | | | | | | | | | | | | |
| Shift timing of Pension Benefit Guarantee Corporation's Single Employer premiums ...... | ........ | ........ | ........ | 3,314 | –3,314 | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ |
| Expand Foreign Labor Certification Fees ...... | ........ | 4 | 5 | –40 | –2 | 4 | 4 | 5 | 6 | 6 | 7 | –29 | –1 |
| Department of the Treasury: | | | | | | | | | | | | | |
| Reduce paperwork burden by permanently authorizing current home to work transportation for the IRS Commissioner ...... | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ |
| Amend the Bank Merger Act to allow for the transition of Treasury-sponsored debit cards accounts ...... | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ |
| Fund the Federal Payment Levy Program via collections[2] ...... | ........ | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 110 | 220 |
| Department of Veterans Affairs: | | | | | | | | | | | | | |
| Modernize records management program ...... | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ | ........ |
| Extend authority for the Specially Adapted Housing Assistive Technology Grant Program .... | ........ | 1 | 1 | 1 | 1 | 1 | ........ | ........ | ........ | ........ | ........ | 5 | 5 |
| Extend authority for Specially Adapted Housing Temporary Residence Adaptation grant ...... | ........ | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 5 | 10 |

## Table S–6.  Mandatory and Receipt Proposals—Continued

(Deficit increases (+) or decreases (–) in millions of dollars)

| | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | Totals 2023–2027 | Totals 2023–2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Environmental Protection Agency:** | | | | | | | | | | | | | |
| Expand use of pesticide licensing user fees ............. | ......... | 2 | 2 | 2 | 2 | 1 | 1 | 1 | ......... | ......... | ......... | 9 | 11 |
| **General Services Administration:** | | | | | | | | | | | | | |
| Establish and capitalize the Federal Capital Revolving Fund [4] ....................................... | ......... | 966 | 2,264 | 1,132 | 133 | –133 | 83 | –183 | 33 | –47 | –123 | 4,362 | 4,125 |
| Expand the Disposal Fund authorities ................... | ......... | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 5 | 10 |
| **International Assistance Programs:** | | | | | | | | | | | | | |
| Fund renegotiated Compacts of Free Association [1] ... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| **National Aeronautics and Space Administration:** | | | | | | | | | | | | | |
| Distribute the Science, Space, and Technology Education Trust Fund ............................................. | ......... | 16 | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | 16 | 16 |
| **Office of Personnel Management:** | | | | | | | | | | | | | |
| Amend Administration of Tribal Federal Employees Health Benefits Program (FEHBP) Enrollment System ....................................................... | ......... | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 10 | 20 |
| Expand Family Member Eligibility under the Federal Employees Dental and Vision Insurance Program (FEDVIP) ............................................. | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Expand FEDVIP to Tribal Employers ...................... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Expand FEHBP to Tribal Colleges and Universities ... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| **Small Business Administration:** | | | | | | | | | | | | | |
| Support SBA COVID programs' oversight and servicing ..................................................... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| **Consumer Product Safety Commission:** | | | | | | | | | | | | | |
| Strengthen mandatory recall authorities ............... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| **Total, mandatory initiatives and savings  ...............** | **–129** | **40,679** | **88,132** | **93,662** | **90,280** | **100,036** | **101,729** | **102,844** | **106,201** | **127,660** | **65,151** | **412,789** | **916,374** |
| **Tax proposals:** | | | | | | | | | | | | | |
| Reform business and international taxation: | | | | | | | | | | | | | |
| Raise the corporate income tax rate to 28 percent ....... | ......... | –83,500 | –138,893 | –136,355 | –134,942 | –137,761 | –139,987 | –137,573 | –135,244 | –134,857 | –135,448 | –631,451 | –1,314,560 |
| Adopt the Undertaxed Profits Rule .............................. | ......... | ......... | –20,427 | –33,464 | –29,329 | –26,655 | –26,170 | –25,638 | –25,109 | –25,665 | –27,006 | –109,875 | –239,463 |
| Provide tax incentives for locating jobs and business activity in the United States and remove tax deductions for shipping jobs overseas: | | | | | | | | | | | | | |
| Provide tax credit for inshoring jobs to the United States ....................................................... | ......... | 8 | 13 | 14 | 14 | 15 | 16 | 16 | 17 | 18 | 18 | 64 | 149 |
| Remove tax deductions for shipping jobs overseas . | ......... | –8 | –13 | –14 | –14 | –15 | –16 | –16 | –17 | –18 | –18 | –64 | –149 |
| Subtotal, provide tax incentives for locating jobs and business activity in the United States and remove tax deductions for shipping jobs overseas ................................................ | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Prevent basis shifting by related parties through partnerships ............................................. | ......... | –3,320 | –5,676 | –5,912 | –6,153 | –6,401 | –6,621 | –6,785 | –6,887 | –6,959 | –7,025 | –27,462 | –61,739 |

**Table S–6.   Mandatory and Receipt Proposals—Continued**

(Deficit increases (+) or decreases (–) in millions of dollars)

| | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | Totals 2023–2027 | Totals 2023–2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Conform definition of "control" with corporate affiliation test | ......... | –761 | –1,104 | –1,125 | –1,143 | –1,158 | –1,170 | –1,179 | –1,182 | –1,182 | –1,176 | –5,291 | –11,180 |
| Expand access to retroactive qualified electing fund elections | ......... | ......... | –1 | –2 | –2 | –3 | –4 | –5 | –6 | –7 | –9 | –8 | –39 |
| Expand the definition of foreign business entity to include taxable units | ......... | –300 | –324 | –290 | –193 | –89 | –96 | –103 | –112 | –120 | –130 | –1,196 | –1,757 |
| Subtotal, reform business and international taxation | ......... | –87,881 | –166,425 | –177,148 | –171,762 | –172,067 | –174,048 | –171,283 | –168,540 | –168,790 | –170,794 | –775,283 | –1,628,738 |
| Support housing and urban development: | | | | | | | | | | | | | |
| Make permanent the New Markets Tax Credit | ......... | ......... | ......... | ......... | 97 | 278 | 483 | 716 | 990 | 1,290 | 1,602 | 375 | 5,456 |
| Subtotal, support housing and urban development | ......... | ......... | ......... | ......... | 97 | 278 | 483 | 716 | 990 | 1,290 | 1,602 | 375 | 5,456 |
| Modify fossil fuel taxation: | | | | | | | | | | | | | |
| Eliminate fossil fuel tax preferences: | | | | | | | | | | | | | |
| Repeal the enhanced oil recovery credit | ......... | ......... | ......... | –31 | –80 | –130 | –186 | –237 | –271 | –301 | –330 | –241 | –1,566 |
| Repeal the deduction for costs paid or incurred for any tertiary injectant used as part of tertiary recovery method [5] | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Repeal credit for oil and gas produced from marginal wells | ......... | ......... | –3 | –52 | –144 | –219 | –265 | –288 | –301 | –317 | –333 | –418 | –1,922 |
| Repeal expensing of intangible drilling costs | ......... | –1,508 | –2,231 | –1,806 | –1,401 | –847 | –600 | –597 | –601 | –590 | –561 | –7,793 | –10,742 |
| Repeal exception to passive loss limitation provided to working interests in oil and natural gas properties | ......... | –10 | –9 | –9 | –9 | –8 | –8 | –8 | –8 | –7 | –7 | –45 | –83 |
| Repeal the use of percentage depletion with respect to oil and natural gas wells | ......... | –925 | –1,037 | –1,085 | –1,178 | –1,267 | –1,351 | –1,433 | –1,510 | –1,579 | –1,649 | –5,492 | –13,014 |
| Increase geological and geophysical amortization period for independent producers | ......... | –631 | –831 | –930 | –1,008 | –1,045 | –1,086 | –1,128 | –1,158 | –1,193 | –1,218 | –4,445 | –10,228 |
| Repeal expensing of mine exploration and development costs | ......... | –131 | –194 | –156 | –122 | –74 | –52 | –52 | –52 | –50 | –49 | –677 | –932 |
| Repeal percentage depletion for hard mineral fossil fuels | ......... | –163 | –183 | –191 | –208 | –224 | –239 | –253 | –267 | –279 | –291 | –969 | –2,298 |
| Repeal capital gains treatment for royalties | ......... | –27 | –52 | –54 | –57 | –62 | –64 | –66 | –69 | –71 | –73 | –252 | –595 |
| Repeal the exemption from the corporate income tax for fossil fuel publicly traded partnerships | ......... | ......... | ......... | ......... | ......... | ......... | –90 | –176 | –216 | –253 | –288 | ......... | –1,023 |
| Eliminate the Oil Spill Liability Trust Fund (OSLTF) excise tax exemption for crude oil derived from bitumen and kerogen-rich rock | ......... | –29 | –38 | –39 | –40 | –41 | –41 | –42 | –43 | –45 | –46 | –187 | –404 |
| Repeal accelerated amortization of air pollution control equipment | ......... | –14 | –34 | –54 | –71 | –88 | –103 | –117 | –115 | –103 | –92 | –261 | –791 |
| Subtotal, eliminate fossil fuel tax preferences | ......... | –3,438 | –4,612 | –4,407 | –4,318 | –4,005 | –4,085 | –4,397 | –4,611 | –4,788 | –4,937 | –20,780 | –43,598 |
| Modify OSLTF financing and Superfund excise taxes: | | | | | | | | | | | | | |
| Eliminate the tax exemption for crude oil from bitumen and kerogen-rich rock for the Superfund | ......... | –64 | –85 | –87 | –88 | –88 | –89 | –90 | –92 | –95 | –95 | –412 | –873 |
| Eliminate drawback for the OSLTF | ......... | –53 | –70 | –71 | –72 | –72 | –72 | –72 | –72 | –72 | –72 | –338 | –698 |
| Subtotal, modify OSLTF financing and Superfund excise taxes | ......... | –117 | –155 | –158 | –160 | –160 | –161 | –162 | –164 | –167 | –167 | –750 | –1,571 |
| Subtotal, modify fossil fuel taxation | ......... | –3,555 | –4,767 | –4,565 | –4,478 | –4,165 | –4,246 | –4,559 | –4,775 | –4,955 | –5,104 | –21,530 | –45,169 |

## Table S–6.   Mandatory and Receipt Proposals—Continued

(Deficit increases (+) or decreases (–) in millions of dollars)

| | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | Totals 2023–2027 | 2023–2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Strengthen taxation of high-income taxpayers:** | | | | | | | | | | | | | |
| Increase the top marginal income tax rate for high earners ..................... | –5,861 | –23,895 | –39,877 | –46,351 | –19,648 | –7,909 | –8,573 | –9,153 | –9,796 | –10,451 | –11,156 | –137,680 | –186,809 |
| Reform the taxation of capital income ......................... | –263 | –5,464 | –15,229 | –17,487 | –17,979 | –17,969 | –18,452 | –19,224 | –20,025 | –20,885 | –21,774 | –74,128 | –174,488 |
| Impose a minimum income tax on the wealthiest taxpayers ................... | ......... | ......... | –36,115 | –40,478 | –42,662 | –43,395 | –43,053 | –42,591 | –38,087 | –36,047 | –38,415 | –162,650 | –360,843 |
| Subtotal, strengthen taxation of high-income taxpayers ................... | –6,124 | –29,359 | –91,221 | –104,316 | –80,289 | –69,273 | –70,078 | –70,968 | –67,908 | –67,383 | –71,345 | –374,458 | –722,140 |
| **Support families and students:** | | | | | | | | | | | | | |
| Provide income exclusion for student debt relief [6] ...... | ......... | ......... | ......... | ......... | 2 | 17 | 41 | 266 | 292 | 320 | 351 | 19 | 1,289 |
| Subtotal, support families and students .................. | ......... | ......... | ......... | ......... | 2 | 17 | 41 | 266 | 292 | 320 | 351 | 19 | 1,289 |
| **Modify estate and gift taxation:** | | | | | | | | | | | | | |
| Modify income, estate, and gift tax rules for certain grantor trusts ........................... | ......... | –452 | –1,699 | –2,405 | –2,349 | –3,950 | –4,949 | –5,504 | –6,049 | –6,912 | –7,261 | –10,855 | –41,530 |
| Require consistent valuation of promissory notes ...... | ......... | –342 | –716 | –747 | –697 | –695 | –658 | –649 | –637 | –619 | –601 | –3,197 | –6,361 |
| Improve tax administration for trusts and decedents' estates ......................... | ......... | 15 | 23 | 24 | 25 | 30 | 34 | 38 | 43 | 45 | 49 | 117 | 326 |
| Limit duration of generation-skipping transfer tax exemption ............................ | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Subtotal, modify estate and gift taxation ................ | ......... | –779 | –2,392 | –3,128 | –3,021 | –4,615 | –5,573 | –6,115 | –6,643 | –7,486 | –7,813 | –13,935 | –47,565 |
| **Close loopholes:** | | | | | | | | | | | | | |
| Tax carried (profits) interests as ordinary income ...... | ......... | –406 | –677 | –675 | –674 | –672 | –679 | –692 | –706 | –720 | –735 | –3,104 | –6,636 |
| Repeal deferral of gain from like-kind exchanges ....... | ......... | –676 | –1,857 | –1,914 | –1,971 | –2,030 | –2,091 | –2,154 | –2,218 | –2,285 | –2,354 | –8,448 | –19,550 |
| Require 100 percent recapture of depreciation deductions as ordinary income for certain depreciable real property ........................... | ......... | –35 | –113 | –233 | –364 | –505 | –657 | –821 | –1,000 | –1,192 | –1,400 | –1,250 | –6,320 |
| Limit a partner's deduction in certain syndicated conservation easement transactions ......................... | ......... | –925 | –4,689 | –2,739 | –2,114 | –1,488 | –1,261 | –1,299 | –1,337 | –1,377 | –1,419 | –11,955 | –18,648 |
| Limit use of donor advised funds to avoid private foundation payout requirement ........................... | ......... | –16 | –15 | –10 | –6 | –3 | –2 | –3 | –3 | –3 | –3 | –50 | –64 |
| Extend the period for assessment of tax for certain Qualified Opportunity Fund investors ......................... | ......... | –4 | –13 | –15 | –15 | –13 | –10 | –9 | –8 | –6 | –2 | –60 | –95 |
| Establish an untaxed income account regime for certain small insurance companies ........................... | ......... | –908 | –2,241 | –1,017 | –865 | –795 | –764 | –757 | –748 | –739 | –730 | –5,826 | –9,564 |
| Expand pro rata interest expense disallowance for business-owned life insurance ........................... | ......... | –530 | –540 | –582 | –619 | –665 | –704 | –739 | –774 | –812 | –850 | –2,936 | –6,815 |
| Correct drafting errors in the taxation of insurance companies under the Tax Cuts and Jobs Act of 2017 .... | ......... | –86 | –112 | –116 | –100 | –75 | –70 | –63 | –59 | –55 | –51 | –489 | –787 |
| Define the term "ultimate purchaser" for purposes of diesel fuel exportation ........................... | ......... | –4 | –6 | –9 | –10 | –13 | –14 | –17 | –20 | –22 | –24 | –42 | –139 |
| Subtotal, close loopholes ................ | ......... | –3,590 | –10,263 | –7,310 | –6,738 | –6,259 | –6,252 | –6,554 | –6,873 | –7,211 | –7,568 | –34,160 | –68,618 |
| **Improve tax administration and compliance:** | | | | | | | | | | | | | |
| Enhance accuracy of tax information: | | | | | | | | | | | | | |

## Table S–6.  Mandatory and Receipt Proposals—Continued

(Deficit increases (+) or decreases (–) in millions of dollars)

| | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | Totals 2023–2027 | Totals 2023–2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Expand the Secretary's authority to require electroning filing for forms and returns .............. | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Improve information reporting for reportable payments subject to backup withholding ........... | ......... | –38 | –87 | –148 | –202 | –211 | –221 | –231 | –241 | –252 | –276 | –686 | –1,907 |
| Subtotal, enhance accuracy of tax information ... | ......... | –38 | –87 | –148 | –202 | –211 | –221 | –231 | –241 | –252 | –276 | –686 | –1,907 |
| Address taxpayer noncompliance with listed transactions: | | | | | | | | | | | | | |
| Extend statute of limitations for listed transactions | ......... | –23 | –51 | –64 | –78 | –76 | –74 | –73 | –72 | –70 | –69 | –292 | –650 |
| Impose liability on shareholders to collect unpaid income taxes of applicable corporations ......... | ......... | –430 | –448 | –466 | –485 | –505 | –525 | –548 | –571 | –596 | –622 | –2,334 | –5,196 |
| Subtotal, address taxpayer noncompliance ..... | ......... | –453 | –499 | –530 | –563 | –581 | –599 | –621 | –643 | –666 | –691 | –2,626 | –5,846 |
| Amend the centralized partnership audit regime to permit the carryover of a reduction in tax that exceeds a partner's tax liability ................................. | ......... | 5 | 5 | 5 | 5 | 6 | 6 | 7 | 7 | 7 | 7 | 26 | 60 |
| Incorporate Chapters 2/2A in centralized partnership audit regime proceedings ................................. | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Authorize limited sharing of business tax return information to measure the economy more accurately .............................................................. | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Require employers to withhold tax on failed nonqualified deferred compensation plans .............. | ......... | –555 | –580 | –605 | –631 | –658 | –687 | –718 | –752 | –787 | –824 | –3,029 | –6,797 |
| Impose an affirmative requirement to disclose a position contrary to a regulation ............................... | ......... | –5 | –7 | –11 | –11 | –12 | –12 | –14 | –14 | –15 | –15 | –46 | –116 |
| Extend to six years the statute of limitations for certain tax assessments ......................................... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Expand and increase penalties for noncompliant return preparation and e-filing and authorize IRS oversight of paid preparers: | | | | | | | | | | | | | |
| Expand and increase penalties for noncompliant return preparation and e-filing [6] ......................... | ......... | –14 | –31 | –38 | –45 | –51 | –53 | –55 | –58 | –60 | –63 | –179 | –468 |
| Grant authority to IRS for oversight of all paid preparers [6] .............................................................. | ......... | –25 | –34 | –45 | –51 | –50 | –54 | –58 | –64 | –70 | –76 | –205 | –527 |
| Subtotal, expand and increase penalties for noncompliant return preparation and e-filing and authorize IRS oversight of paid preparers | ......... | –39 | –65 | –83 | –96 | –101 | –107 | –113 | –122 | –130 | –139 | –384 | –995 |
| Address compliance in connection with tax responsibilities of expatriates ............................... | ......... | ......... | –1 | –1 | –1 | –1 | –1 | –2 | –2 | –2 | –2 | –4 | –13 |
| Simplify foreign exchange gain or loss rules and exchange rate rules for individuals ....................... | ......... | 1 | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 3 | 10 | 25 |
| Increase threshold for simplified foreign tax credit rules and reporting ............................................. | ......... | 14 | 25 | 27 | 29 | 31 | 31 | 32 | 32 | 32 | 34 | 126 | 287 |
| Subtotal, improve tax administration and compliance ........................................................ | ......... | –1,070 | –1,207 | –1,344 | –1,468 | –1,524 | –1,587 | –1,657 | –1,732 | –1,810 | –1,903 | –6,613 | –15,302 |

## Table S–6.   Mandatory and Receipt Proposals—Continued

(Deficit increases (+) or decreases (–) in millions of dollars)

| | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | Totals 2023–2027 | Totals 2023–2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Modernize rules, including those for digital assets: | | | | | | | | | | | | | |
| Modernize rules treating loans of securities as tax-free to include other asset classes and address income inclusion | ........ | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Provide for information reporting by certain financial institutions and digital asset brokers for purposes of exchange of information | ........ | –48 | –95 | –179 | –209 | –222 | –237 | –251 | –267 | –287 | –303 | –753 | –2,098 |
| Require reporting by certain taxpayers of foreign digital asset accounts | ........ | –50 | –100 | –188 | –220 | –234 | –250 | –264 | –282 | –302 | –319 | –792 | –2,209 |
| Amend the mark-to-market rules to include digital assets | ........ | –4,846 | –133 | –146 | –161 | –177 | –194 | –214 | –235 | –259 | –284 | –5,463 | –6,649 |
| Subtotal, modernize rules, including those for digital assets | ........ | –4,944 | –328 | –513 | –590 | –633 | –681 | –729 | –784 | –848 | –906 | –7,008 | –10,956 |
| Improve benefits tax administration: | | | | | | | | | | | | | |
| Clarify tax treatment of fixed indemnity health policies | ........ | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Clarify tax treatment of on-demand pay arrangements | ........ | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Rationalize funding for post-retirement medical and life insurance benefits | ........ | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Subtotal, improve benefits tax administration | ........ | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| **Total, receipt proposals** | **–6,124** | **–131,178** | **–276,603** | **–298,324** | **–268,247** | **–258,241** | **–261,941** | **–260,883** | **–255,973** | **–256,873** | **–263,480** | **–1,232,593** | **–2,531,743** |
| **Grand total, mandatory and receipt proposals** | **–6,253** | **–90,499** | **–188,471** | **–204,662** | **–177,967** | **–158,205** | **–160,212** | **–158,039** | **–149,772** | **–129,213** | **–198,329** | **–819,804** | **–1,615,369** |

[1] Estimates were not available at the time of Budget publication.
[2] The estimates for this proposal include effects on receipts. The receipt effects included in the totals above are as follows:

| | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | Totals 2023–2027 | Totals 2023–2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Improve access to behavioral healthcare in the private insurance market | ........ | 1,435 | 1,991 | 2,089 | 2,305 | 2,449 | 2,564 | 2,683 | 2,812 | 2,948 | 3,093 | 10,269 | 24,369 |
| Require coverage of three primary care visits and three behavioral health visits without cost-sharing | ........ | 916 | 1,271 | 1,335 | 1,490 | 1,585 | 1,657 | 1,738 | 1,822 | 1,909 | 2,005 | 6,597 | 15,728 |
| Allow selective basis boosts for bond-financed Low-Income Housing Credit projects | ........ | 2 | 29 | 140 | 354 | 617 | 895 | 1,148 | 1,359 | 1,561 | 1,769 | 1,142 | 7,874 |
| Make adoption tax credit refundable and allow certain guardianship arrangements to qualify | ........ | 11 | 42 | 42 | 42 | 42 | 42 | 42 | 42 | 42 | 42 | 179 | 389 |
| Capture savings to UI from RESEA allocation adjustment | ........ | ......... | 24 | 62 | 115 | 158 | 195 | 225 | 250 | –12 | –54 | 359 | 963 |
| Establish user fee for Electronic Visa Update System | ........ | –47 | –52 | –58 | –64 | –72 | –79 | –88 | –108 | –118 | –130 | –293 | –816 |
| Fund the Federal Payment Levy Program via collections | ........ | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 110 | 220 |
| Total, receipt effects of mandatory proposals | ........ | 2,339 | 3,327 | 3,632 | 4,264 | 4,801 | 5,296 | 5,770 | 6,199 | 6,352 | 6,747 | 18,363 | 48,727 |

[3] Represents the savings associated with continuing to provide dedicated funding, through a discretionary allocation adjustment, for program integrity activities to confirm program participants remain eligible to receive benefits.
[4] This proposal includes an intragovernmental transfer between the Federal Capital Revolving Fund (FCRF) and the Federal Building Fund (FBF). The collections and spending in the FBF, the receiving account, are not counted for PAYGO purposes because the proposal expects the PAYGO cost to be recorded in the FCRF. The intragovernmental transfers net to zero and are as follows:

## Table S–6.  Mandatory and Receipt Proposals—Continued

(Deficit increases (+) or decreases (–) in millions of dollars)

| | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | Totals 2023–2027 | 2023–2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Establish and capitalize the Federal Capital Revolving Fund | ......... | –1,004 | 104 | 217 | 321 | 259 | 103 | ......... | ......... | ......... | ......... | ......... | ......... |

[5] Effects are included in the estimate of "Repeal the enhanced oil recovery credit."
[6] The estimates for this proposal includes effects on outlays. The outlay effects included in the totals above are as follows:

| | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | Totals 2023–2027 | 2023–2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Provide income exclusion for student debt relief | ......... | ......... | ......... | ......... | ......... | 1 | 1 | 21 | 24 | 27 | 29 | 1 | 103 |
| Expand and increase penalties for noncompliant return preparation and e-filing | ......... | ......... | –6 | –6 | –6 | –7 | –7 | –7 | –8 | –8 | –8 | –25 | –63 |
| Grant authority to IRS for oversight of all paid preparers | ......... | –12 | –14 | –21 | –23 | –19 | –20 | –21 | –23 | –25 | –27 | –89 | –205 |
| Total, outlay effects of receipt proposals | ......... | –12 | –20 | –27 | –29 | –25 | –26 | –7 | –7 | –6 | –6 | –113 | –165 |

## Table S–7.   Funding Levels for Appropriated ("Discretionary") Programs by Category

(Budget authority in billions of dollars)

| | Actual[1] | CR[2] | CAA[3] | Request | | | | Outyears | | | | | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2021 | 2022 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2023-2027 | 2023-2032 |
| **Base Discretionary Funding Allocation** ....... | 1,374 | 1,393 | 1,473 | 1,582 | 1,643 | 1,670 | 1,703 | 1,728 | 1,754 | 1,780 | 1,807 | 1,834 | 1,862 | 8,326 | 17,362 |
| **Non-Defense Shifts to Mandatory**[4] ................ | ......... | ......... | ......... | –10 | –10 | –10 | –10 | –10 | –11 | –11 | –11 | –11 | –12 | –50 | –106 |
| Bureau of Indian Affairs ...................................... | ......... | ......... | ......... | –* | –* | –* | –* | –1 | –1 | –1 | –1 | –1 | –1 | –2 | –5 |
| Indian Health Service ........................................... | ......... | ......... | ......... | –9 | –9 | –10 | –10 | –10 | –10 | –10 | –11 | –11 | –11 | –48 | –101 |
| **Non-Base Discretionary Funding (not included above):**[5] | | | | | | | | | | | | | | | |
| Emergency and COVID–19 Supplemental Funding | 198 | 45 | 58 | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Program Integrity ................................................. | 2 | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 13 | 29 |
| Disaster Relief ...................................................... | 17 | 17 | 19 | 20 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 64 | 119 |
| Wildfire Suppression ........................................... | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 13 | 26 |
| 21st Century Cures Appropriations ................. | * | * | 1 | 1 | * | * | * | | | | | | | 2 | 2 |
| **Total, Non-Base Funding** ............................... | 220 | 67 | 82 | 26 | 17 | 16 | 17 | 16 | 17 | 17 | 17 | 17 | 17 | 92 | 175 |
| **Grand Total, Discretionary Budget Authority** ...................................................... | 1,594 | 1,461 | 1,555 | 1,598 | 1,650 | 1,676 | 1,709 | 1,734 | 1,759 | 1,786 | 1,812 | 1,839 | 1,867 | 8,367 | 17,431 |
| *Memorandum: Presentation of base discretionary by defense and non-defense*[6] | | | | | | | | | | | | | | | |
| *Defense Allocation*[7] ........................................... | *741* | *746* | *782* | *813* | *843* | *851* | *865* | *871* | *877* | *883* | *889* | *895* | *902* | *4,242* | *8,688* |
| *Non-Defense Allocation* ...................................... | *544* | *551* | *594* | *650* | *665* | *680* | *696* | *712* | *728* | *745* | *762* | *780* | *797* | *3,402* | *7,215* |
| *Veterans Affairs Medical Care Program* ......... | *90* | *96* | *97* | *119* | *136* | *139* | *142* | *145* | *149* | *152* | *156* | *159* | *163* | *681* | *1,459* |
| *Memorandum: Presentation of base discretionary by security and nonsecurity*[6] | | | | | | | | | | | | | | | |
| *Security Allocation* ............................................. | *850* | *855* | *894* | *936* | *968* | *979* | *996* | *1,005* | *1,016* | *1,026* | *1,035* | *1,045* | *1,055* | *4,884* | *10,062* |
| *Nonsecurity Allocation* ...................................... | *434* | *442* | *482* | *527* | *540* | *552* | *565* | *578* | *589* | *602* | *616* | *630* | *644* | *2,761* | *5,841* |
| *Veterans Affairs Medical Care Program* ......... | *90* | *96* | *97* | *119* | *136* | *139* | *142* | *145* | *149* | *152* | *156* | *159* | *163* | *681* | *1,459* |
| *Memorandum: Discretionary appropriations provided in the Infrastructure, Investment, and Jobs Act*[8] ...... | ......... | *174* | *N/A* | *69* | *69* | *68* | *66* | *2* | *2* | *2* | *2* | *2* | *2* | *273* | *283* |

\* Less than $500 million.

[1] The 2021 actual level includes changes that occur after appropriations are enacted that are part of budget execution such as transfers, reestimates, and the rebasing as mandatory any changes in mandatory programs (CHIMPs) enacted in appropriations bills. The 2021 levels are adjusted to add back OMB's scoring of CHIMPs enacted in 2021 appropriations Acts for a better illustrative comparison with the 2023 request.

[2] At the time the 2023 Budget was prepared, 2022 appropriations remained incomplete and the 2022 column reflects at the account level annualized continuing appropriations provided under the Continuing Appropriations Act, 2022 (division A of Public Law 117-43, as amended by division A of Public Law 117-70, division A of Public Law 117-86, and Public Law 117-95; CR). The 2022 column also reflects enacted full-year emergency appropriations enacted in the Disaster Relief Supplemental Appropriations Act, 2022, the Afghanistan Supplemental Appropriations Act, 2022, and the Additional Afghanistan Supplemental Appropriations Act, 2022 (divisions B and C of Public Law 117-43 and division B of Public Law 117-70, respectively).

[3] The 2023 Budget was finalized before 2022 appropriations were completed. To allow a high-level comparison of the 2023 Budget with enacted appropriations, this column provides a preliminary summary of 2022 enacted appropriations in the Consolidated Appropriations Act, 2022 (Public Law 117-103; CAA), using the Congressional Budget Office (CBO) estimate of the legislation (see CBO estimate for H.R. 2471, the Consolidated Appropriations Act, 2022 on CBO's website). CBO estimates of IIJA appropriations are not included since OMB includes its own estimate for 2022.

## Table S–7.   Funding Levels for Appropriated ("Discretionary") Programs by Category—Continued

(Budget authority in billions of dollars)

BUDGET OF THE U. S. GOVERNMENT FOR FISCAL YEAR 2023

[4] The 2023 Budget proposes to shift the Indian Health Service (IHS) in HHS as well as contract support costs and 105(l) leases within the Bureau of Indian Programs (BIA) in the Department of the Interior to the mandatory side of the Budget starting in 2023.  See the "Budget Process" chapter of the *Analytical Perspectives* volume of the Budget for more information on these proposals.

[5] The 2023 Budget presents funding for anomalous or above-base activities such as emergency requirements, program integrity, disaster relief, wildfire suppression, and 21st Century Cures appropriations outside of base allocations, which is largely consistent with allocation adjustments in the FY 2022 Congressional Budget Resolution (H.Con.Res. 14).

[6] The section presents base discretionary funding by both defense and non-defense and by security and nonsecurity allocations.  The definition of security and nonsecurity is the same as the definition specified in the Budget Control Act of 2011 with security including the Departments of Defense, Homeland Security, Veterans Affairs, the National Nuclear Security Administration, the International Budget Function (150), and the Intelligence Community Management Account and with all other discretionary programs in the nonsecurity category.  This presentation of discretionary excludes the proposed shifts to mandatory.

[7] The amounts in the 2023 Budget are based on the forthcoming National Security and National Defense strategies and the Department of Defense Future Years Defense Program, which includes a five-year appropriations plan and estimated expenditures necessary to support the programs, projects, and activities of the Department of Defense.  After 2027, the Budget mechanically extrapolates the growth rate from the final year of the five-year appropriations plan.

[8] Section 905(c) of division J of the Infrastructure Investment and Jobs Act (Public Law 117-58; IIJA) specified that amounts provided in division J and certain rescissions in section 90007 of IIJA should be considered as emergency discretionary appropriations.  The amounts provided as discretionary appropriations in IIJA are summarized here, however, these amounts are kept separate from other discretionary amounts included above that are considered during the regular appropriations process.

## Table S–8.   2023 Discretionary Request by Major Agency

(Budget authority in billions of dollars)

| | 2021 | 2022 | 2023 | 2023 Request Less 2021 Enacted | |
|---|---|---|---|---|---|
| | Actual[1] | CR[2] | Request | Dollar | Percent |
| **Base Discretionary Funding:** | | | | | |
| **Cabinet Departments:** | | | | | |
| Agriculture[3] | 24.4 | 23.7 | 28.5 | +4.2 | +17.1% |
| Commerce | 8.9 | 8.9 | 11.7 | +2.8 | +31.2% |
| Defense | 703.7 | 709.2 | 773.0 | +69.3 | +9.8% |
| Education | 73.0 | 73.0 | 88.3 | +15.3 | +20.9% |
| Energy (DOE)[4] | 41.9 | 41.8 | 48.2 | +6.3 | +15.1% |
| Health and Human Services (HHS)[5] | 108.6 | 110.4 | 138.0 | +29.4 | +27.1% |
| *Proposed IHS Shift to Mandatory (non-add)[6]* | *(6.5)* | *(6.6)* | *(9.1)* | *(+2.6)* | *N/A* |
| *HHS, BA excluding IHS (non-add)* | *(102.0)* | *(103.9)* | *(128.9)* | *(+26.9)* | *(+26.3%)* |
| Homeland Security (DHS) | 53.8 | 52.7 | 56.7 | +2.9 | +5.4% |
| Housing and Urban Development (HUD): | | | | | |
| *HUD program level* | *59.6* | *60.3* | *71.9* | *+12.3* | *+20.5%* |
| *HUD receipts* | *−16.1* | *−13.1* | *−11.1* | *+5.0* | *N/A* |
| Interior (DOI) | 14.9 | 15.1 | 17.9 | +3.0 | +20.5% |
| *Proposed BIA Shift to Mandatory (non-add)[6]* | *(0.2)* | *(0.4)* | *(0.5)* | *(+0.2)* | *N/A* |
| *DOI, BA excluding BIA (non-add)* | *(14.6)* | *(14.7)* | *(17.5)* | *(+2.8)* | *(+19.3%)* |
| Justice | 33.5 | 33.6 | 37.7 | +4.2 | +12.5% |
| Labor | 12.5 | 12.5 | 14.6 | +2.2 | +17.6% |
| State and International Programs[3,7] | 57.5 | 57.9 | 67.6 | +10.2 | +17.7% |
| Transportation (DOT) | 25.3 | 25.5 | 26.8 | +1.5 | +6.0% |
| Treasury[7] | 13.5 | 13.5 | 16.2 | +2.7 | +19.9% |
| Veterans Affairs | 104.5 | 111.1 | 135.2 | +30.7 | +29.4% |
| **Major Agencies:** | | | | | |
| Corps of Engineers (Corps) | 7.8 | 7.8 | 6.6 | −1.2 | −15.3% |
| Environmental Protection Agency | 9.2 | 9.2 | 11.9 | +2.6 | +28.6% |
| General Services Administration | −0.9 | −1.3 | 1.3 | +2.2 | N/A |
| National Aeronautics and Space Administration | 23.3 | 23.3 | 26.0 | +2.7 | +11.6% |
| National Science Foundation | 8.5 | 8.5 | 10.5 | +2.0 | +23.6% |
| Small Business Administration | 0.8 | 0.8 | 0.9 | +0.2 | +21.0% |
| Social Security Administration[5] | 9.0 | 8.9 | 10.1 | +1.1 | +12.8% |
| Other Agencies | 23.3 | 23.3 | 28.1 | +4.8 | +20.7% |
| Changes in mandatory program offsets[8] | −26.0 | −23.3 | −34.7 | −8.7 | +33.5% |
| **Subtotal, Base Discretionary Budget Authority (BA)** | **1,374.2** | **1,393.5** | **1,582.0** | **+207.8** | **+15.1%** |
| *Subtotal, BA excluding programs shifted to mandatory* | *1,367.5* | *1,386.5* | *1,572.4* | *+205.0* | *+15.0%* |

## Table S–8.   2023 Discretionary Request by Major Agency—Continued

(Budget authority in billions of dollars)

| | 2021 | 2022 | 2023 | 2023 Request Less 2021 Enacted | |
|---|---|---|---|---|---|
| | Actual[1] | CR[2] | Request | Dollar | Percent |
| **Non-Base Discretionary Funding:** | | | | | |
| Emergency Requirements and COVID–19 Supplemental Funding: | | | | | |
| Agriculture | 1.0 | 11.6 | ......... | –1.0 | N/A |
| Commerce | 0.3 | 0.4 | ......... | –0.3 | N/A |
| Defense | 1.0 | 7.4 | ......... | –1.0 | N/A |
| Education | 81.6 | ......... | ......... | –81.6 | N/A |
| Energy | –2.3 | 0.0 | ......... | +2.3 | N/A |
| Health and Human Services | 73.8 | 5.5 | ......... | –73.8 | N/A |
| Homeland Security | 2.8 | 1.0 | ......... | –2.8 | N/A |
| Housing and Urban Development | 0.7 | 5.0 | ......... | –0.7 | N/A |
| Interior | 0.4 | 0.6 | ......... | –0.4 | N/A |
| Justice | 0.6 | 0.1 | ......... | –0.6 | N/A |
| Labor | 1.5 | ......... | ......... | –1.5 | N/A |
| State and International Programs | 5.9 | 3.4 | ......... | –5.9 | N/A |
| Transportation | 27.0 | 2.7 | ......... | –27.0 | N/A |
| Treasury | 0.5 | ......... | ......... | –0.5 | N/A |
| Corps of Engineers (Corps) | ......... | 5.7 | ......... | ......... | N/A |
| Small Business Administration | 2.0 | 1.2 | ......... | –2.0 | N/A |
| Other Agencies | 0.9 | 0.4 | ......... | –0.9 | N/A |
| Subtotal, Emergency Requirements | 197.8 | 45.1 | ......... | –197.8 | N/A |
| Program Integrity: | | | | | |
| Health and Human Services | 0.5 | 0.5 | 0.6 | +0.1 | +16.1% |
| Labor | 0.1 | 0.1 | 0.3 | +0.2 | +210.8% |
| Social Security Administration | 1.3 | 1.3 | 1.5 | +0.2 | +16.1% |
| Subtotal, Program Integrity | 1.9 | 1.9 | 2.3 | +0.5 | +24.7% |
| Disaster Relief: | | | | | |
| Homeland Security | 17.1 | 17.1 | 19.7 | +2.6 | +15.2% |
| Small Business Administration | 0.1 | 0.1 | 0.1 | ......... | ......... |
| Subtotal, Disaster Relief | 17.3 | 17.3 | 19.9 | +2.6 | +15.0% |
| Wildfire Suppression: | | | | | |
| Agriculture | 2.0 | 2.0 | 2.2 | +0.2 | +8.3% |
| Interior | 0.3 | 0.3 | 0.3 | +* | +9.7% |
| Subtotal, Wildfire Suppression | 2.4 | 2.4 | 2.6 | +0.2 | +8.5% |
| 21st Century Cures appropriations: | | | | | |
| Health and Human Services | 0.5 | 0.5 | 1.1 | +0.7 | +139.5% |
| **Subtotal, Non-Base Discretionary Funding** | **219.8** | **67.1** | **25.9** | **–193.9** | **–88.2%** |

## Table S–8.   2023 Discretionary Request by Major Agency—Continued

(Budget authority in billions of dollars)

| | 2021 | 2022 | 2023 | 2023 Request Less 2021 Enacted | |
|---|---|---|---|---|---|
| | Actual[1] | CR[2] | Request | Dollar | Percent |
| **Total, Discretionary BA** ................................................................ | **1,594.0** | **1,460.5** | **1,607.9** | **+13.9** | **+0.9%** |
| *Total, BA excluding programs shifted to mandatory* .................................... | *1,587.2* | *1,453.6* | *1,598.3* | *+11.1* | *+0.7%* |

| | | 2022 CAA | 2023 Request | 2023 Request Less 2022 CAA | |
|---|---|---|---|---|---|
| *Memorandum - Comparison of 2022 Omnibus to 2023 Request:*[9] | | | | | |
| *Total, Base Discretionary Funding* ..................................................... | | *1,472.9* | *1,582.0* | *+109.0* | *+7.4%* |
| *Base Discretionary by Defense and Non-Defense:* | | | | | |
| *Defense* ................................................................................ | | *782.2* | *813.3* | *+31.2* | *+4.0%* |
| *Non-Defense* .......................................................................... | | *593.6* | *649.9* | *+56.3* | *+9.5%* |
| *Veterans Affairs Medical Care Program* ............................................ | | *97.2* | *118.7* | *+21.5* | *+22.2%* |
| *Base Discretionary by Security and Nonsecurity:*[10] | | | | | |
| *Security* ............................................................................... | | *894.2* | *935.9* | *+41.7* | *+4.7%* |
| *Nonsecurity* ........................................................................... | | *481.6* | *527.3* | *+45.8* | *+9.5%* |
| *Veterans Affairs Medical Care Program* ............................................ | | *97.2* | *118.7* | *+21.5* | *+22.2%* |

\* Less than $50 million.

[1] The 2021 actual level includes changes that occur after appropriations are enacted that are part of budget execution such as transfers, reestimates, and the rebasing as mandatory any changes in mandatory programs (CHIMPs) enacted in appropriations bills.  The 2021 levels are adjusted to add back OMB's scoring of CHIMPs enacted in 2021 appropriations Acts for a better illustrative comparison with the 2023 request.

[2] At the time the 2023 Budget was prepared, 2022 appropriations remained incomplete and the 2022 column reflects at the account level annualized continuing appropriations provided under the Continuing Appropriations Act, 2022 (division A of Public Law 117–43, as amended by division A of Public Law 117–70, division A of Public Law 117–86, and Public Law 117–95; CR).  The 2022 column also reflects enacted full-year emergency appropriations enacted in the Disaster Relief Supplemental Appropriations Act, 2022, the Afghanistan Supplemental Appropriations Act, 2022, and the Additional Afghanistan Supplemental Appropriations Act, 2022 (divisions B and C of Public Law 117–43 and division B of Public Law 117–70, respectively).

[3] Funding for Food for Peace Title II Grants is included in the State and International Programs total.  Although the funds are appropriated to the Department of Agriculture, the funds are administered by the U.S. Agency for International Development (USAID).

[4] The Department of Energy base total in 2021 includes an appropriation of $2.3 billion that had been designated as emergency in Public Law 116–260 since the activities were for regular operations and not emergency purposes.

[5] Funding from the Hospital Insurance and Supplementary Medical Insurance trust funds for administrative expenses incurred by the Social Security Administration that support the Medicare program are included in the Health and Human Services total and not in the Social Security Administration total.

[6] The 2023 Budget proposes to shift the Indian Health Service (IHS) in HHS as well as contract support costs and 105(l) leases within the Bureau of Indian Programs (BIA) in DOI to the mandatory side of the Budget starting in 2023.  See the "Budget Process" chapter of the *Analytical Perspectives* volume of the Budget for more information on these proposals.

[7] The State and International Programs total includes funding for the Department of State, USAID, Treasury International, and 11 international agencies while the Treasury total excludes Treasury's International Programs.

[8] The limitation enacted and proposed in the Justice Department's Crime Victims Fund program and cancellations in the Children's Health Insurance Program in HHS make up the bulk of these offsets.

[9] The 2023 Budget was finalized before 2022 appropriations were completed.  To allow a high-level comparison of the 2023 Budget with enacted appropriations, this memorandum section provides a preliminary summary of 2022 enacted base appropriations in the Consolidated Appropriations Act, 2022 (Public Law 117–103; CAA), using the Congressional Budget Office (CBO) estimate of the legislation (see CBO estimate for H.R. 2471, the Consolidated Appropriations Act, 2022 on CBO's website).  This presentation of discretionary excludes the proposed shifts to mandatory.

[10] The definition of security and nonsecurity is the same as the definition specified in the Budget Control Act of 2011 with security including the Departments of Defense, Homeland Security, Veterans Affairs, the National Nuclear Security Administration, the International Budget Function (150), and the Intelligence Community Management Account and with all other discretionary programs in the nonsecurity category.

## Table S–9.   Economic Assumptions[1]

(Calendar years)

| | Actual 2020 | Projections | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 |
| **Gross Domestic Product (GDP):** | | | | | | | | | | | | | |
| Nominal level, billions of dollars | 20,894 | 22,899 | 24,631 | 25,853 | 26,966 | 28,064 | 29,200 | 30,380 | 31,626 | 32,957 | 34,382 | 35,877 | 37,437 |
| Percent change, nominal GDP, year/year | –2.2 | 9.6 | 7.6 | 5.0 | 4.3 | 4.1 | 4.0 | 4.0 | 4.1 | 4.2 | 4.3 | 4.3 | 4.3 |
| Real GDP, percent change, year/year | –3.4 | 5.5 | 4.2 | 2.8 | 2.2 | 2.0 | 2.0 | 2.0 | 2.1 | 2.2 | 2.3 | 2.3 | 2.3 |
| Real GDP, percent change, Q4/Q4 | –2.3 | 5.1 | 3.8 | 2.5 | 2.1 | 2.0 | 2.0 | 2.0 | 2.1 | 2.2 | 2.3 | 2.3 | 2.3 |
| GDP chained price index, percent change, year/year | 1.3 | 3.9 | 3.3 | 2.1 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| **Consumer Price Index,[2] percent change, year/year** | 1.2 | 4.6 | 4.7 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 |
| **Interest rates, percent:[3]** | | | | | | | | | | | | | |
| 91-day Treasury bills[4] | 0.4 | * | 0.2 | 0.9 | 1.6 | 1.9 | 2.1 | 2.2 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 |
| 10-year Treasury notes | 0.9 | 1.5 | 2.1 | 2.5 | 2.7 | 2.8 | 3.0 | 3.1 | 3.1 | 3.2 | 3.2 | 3.2 | 3.3 |
| **Unemployment rate, civilian, percent[3]** | 8.1 | 5.4 | 3.9 | 3.6 | 3.7 | 3.8 | 3.8 | 3.8 | 3.8 | 3.8 | 3.8 | 3.8 | 3.8 |

* 0.05 percent or less

Note: A more detailed table of economic assumptions appears in Chapter 2, "Economic Assumptions and Overview," in the *Analytical Perspectives* volume of the Budget.

[1] The Administration's forecast was finalized on November 10, 2021.

[2] Seasonally adjusted CPI for all urban consumers.

[3] Annual average.

[4] Average rate, secondary market (bank discount basis).

## Table S–10.   Federal Government Financing and Debt

(Dollar amounts in billions)

| | Actual 2021 | Estimate | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 |
| **Financing:** | | | | | | | | | | | | |
| Unified budget deficit: | | | | | | | | | | | | |
| Primary deficit ............................................................ | 2,423 | 1,058 | 758 | 724 | 766 | 680 | 622 | 725 | 565 | 667 | 663 | 692 |
| Net interest ................................................................ | 352 | 357 | 396 | 476 | 564 | 648 | 729 | 808 | 879 | 948 | 1,019 | 1,092 |
| Unified budget deficit ............................................. | 2,775 | 1,415 | 1,154 | 1,201 | 1,330 | 1,328 | 1,352 | 1,533 | 1,443 | 1,614 | 1,682 | 1,784 |
| As a percent of GDP ............................................. | 12.4% | 5.8% | 4.5% | 4.5% | 4.8% | 4.6% | 4.5% | 4.9% | 4.4% | 4.7% | 4.7% | 4.8% |
| Other transactions affecting borrowing from the public: | | | | | | | | | | | | |
| Changes in financial assets and liabilities:[1] | | | | | | | | | | | | |
| Change in Treasury operating cash balance ..................... | –1,567 | 535 | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Net disbursements of credit financing accounts: | | | | | | | | | | | | |
| Direct loan and Troubled Asset Relief Program (TARP) equity purchase accounts ............................................. | –18 | 147 | 42 | 32 | 38 | 11 | 24 | 19 | 19 | 17 | 20 | 27 |
| Guaranteed loan accounts ................................................ | 310 | 219 | 3 | 7 | 8 | 7 | 6 | 6 | 5 | 5 | 5 | 5 |
| Net purchases of non-Federal securities by the National Railroad Retirement Investment Trust (NRRIT) ........... | 4 | –1 | –2 | –2 | –2 | –2 | –1 | –1 | –2 | –2 | –1 | –1 |
| Net change in other financial assets and liabilities[2] ......... | –237 | 238 | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... | ......... |
| Subtotal, changes in financial assets and liabilities ...... | –1,508 | 1,138 | 44 | 37 | 44 | 17 | 28 | 23 | 22 | 20 | 23 | 31 |
| Seigniorage on coins ......................................................... | –* | –* | –1 | –1 | –1 | –1 | –1 | –1 | –1 | –1 | –1 | –1 |
| Total, other transactions affecting borrowing from the public .............................................................................. | –1,508 | 1,137 | 43 | 37 | 43 | 16 | 28 | 23 | 22 | 20 | 23 | 30 |
| Total, requirement to borrow from the public (equals change in debt held by the public) ................................ | 1,267 | 2,552 | 1,197 | 1,237 | 1,373 | 1,344 | 1,380 | 1,555 | 1,465 | 1,634 | 1,705 | 1,815 |
| **Changes in Debt Subject to Statutory Limitation:** | | | | | | | | | | | | |
| Change in debt held by the public ..................................... | 1,267 | 2,552 | 1,197 | 1,237 | 1,373 | 1,344 | 1,380 | 1,555 | 1,465 | 1,634 | 1,705 | 1,815 |
| Change in debt held by Government accounts ..................... | 216 | 354 | 104 | 136 | 29 | 13 | –146 | –252 | –148 | –282 | –281 | –374 |
| Change in other factors ...................................................... | –2 | 1 | 1 | 1 | –* | * | 1 | 1 | * | –1 | –1 | –1 |
| Total, change in debt subject to statutory limitation ............. | 1,481 | 2,907 | 1,302 | 1,374 | 1,402 | 1,358 | 1,235 | 1,304 | 1,317 | 1,352 | 1,423 | 1,440 |
| **Debt Subject to Statutory Limitation, End of Year:** | | | | | | | | | | | | |
| Debt issued by Treasury ...................................................... | 28,365 | 31,271 | 32,572 | 33,945 | 35,347 | 36,704 | 37,938 | 39,241 | 40,558 | 41,909 | 43,332 | 44,772 |
| Adjustment for discount, premium, and coverage[3] ................... | 36 | 38 | 39 | 40 | 40 | 40 | 41 | 42 | 43 | 43 | 43 | 43 |
| Total, debt subject to statutory limitation[4] ........................... | 28,401 | 31,309 | 32,611 | 33,984 | 35,386 | 36,744 | 37,979 | 39,283 | 40,600 | 41,952 | 43,374 | 44,814 |
| **Debt Outstanding, End of Year:** | | | | | | | | | | | | |
| Gross Federal debt:[5] | | | | | | | | | | | | |
| Debt issued by Treasury ...................................................... | 28,365 | 31,271 | 32,572 | 33,945 | 35,347 | 36,704 | 37,938 | 39,241 | 40,558 | 41,909 | 43,332 | 44,772 |
| Debt issued by other agencies ............................................ | 21 | 21 | 21 | 21 | 22 | 22 | 22 | 22 | 22 | 23 | 24 | 25 |
| Total, gross Federal debt ................................................ | 28,386 | 31,292 | 32,593 | 33,966 | 35,368 | 36,726 | 37,960 | 39,263 | 40,580 | 41,933 | 43,356 | 44,797 |
| As a percent of GDP ...................................................... | 127.0% | 129.0% | 127.5% | 127.2% | 127.3% | 127.0% | 126.2% | 125.4% | 124.4% | 123.3% | 122.1% | 120.9% |

## Table S–10.   Federal Government Financing and Debt—Continued

(Dollar amounts in billions)

| | Actual 2021 | Estimate | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 |
| Held by: | | | | | | | | | | | | |
| Debt held by Government accounts ........................... | 6,102 | 6,456 | 6,560 | 6,695 | 6,725 | 6,738 | 6,592 | 6,340 | 6,192 | 5,911 | 5,629 | 5,256 |
| Debt held by the public[6] ........................................ | 22,284 | 24,836 | 26,033 | 27,271 | 28,644 | 29,988 | 31,368 | 32,923 | 34,388 | 36,022 | 37,727 | 39,542 |
| As a percent of GDP ........................................... | 99.7% | 102.4% | 101.8% | 102.2% | 103.1% | 103.7% | 104.3% | 105.2% | 105.4% | 105.9% | 106.3% | 106.7% |
| **Debt Held by the Public Net of Financial Assets:** | | | | | | | | | | | | |
| Debt held by the public .......................................... | 22,284 | 24,836 | 26,033 | 27,271 | 28,644 | 29,988 | 31,368 | 32,923 | 34,388 | 36,022 | 37,727 | 39,542 |
| Less financial assets net of liabilities: | | | | | | | | | | | | |
| Treasury operating cash balance ............................ | 215 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 |
| Credit financing account balances: | | | | | | | | | | | | |
| Direct loan and TARP equity purchase accounts ............... | 1,595 | 1,742 | 1,784 | 1,816 | 1,854 | 1,865 | 1,889 | 1,908 | 1,926 | 1,943 | 1,963 | 1,990 |
| Guaranteed loan accounts .................................... | –156 | 63 | 66 | 72 | 80 | 87 | 93 | 99 | 105 | 110 | 115 | 120 |
| Government-sponsored enterprise stock[7] .............................. | 221 | 221 | 221 | 221 | 221 | 221 | 221 | 221 | 221 | 221 | 221 | 221 |
| Air carrier worker support warrants and notes[8] .................. | 15 | 15 | 15 | 15 | 14 | 13 | 13 | 12 | 12 | 6 | ......... | ......... |
| Emergency capital investment fund securities ...................... | ......... | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 2 | 2 |
| Non-Federal securities held by NRRIT .................................. | 28 | 26 | 25 | 23 | 22 | 20 | 19 | 17 | 16 | 14 | 13 | 11 |
| Other assets net of liabilities ............................................. | –307 | –69 | –69 | –69 | –69 | –69 | –69 | –69 | –69 | –69 | –69 | –69 |
| Total, financial assets net of liabilities ............................... | 1,611 | 2,751 | 2,795 | 2,832 | 2,875 | 2,891 | 2,919 | 2,941 | 2,963 | 2,977 | 2,994 | 3,025 |
| Debt held by the public net of financial assets ................ | 20,673 | 22,085 | 23,238 | 24,439 | 25,769 | 27,097 | 28,449 | 29,982 | 31,425 | 33,045 | 34,732 | 36,516 |
| As a percent of GDP ........................................... | 92.5% | 91.0% | 90.9% | 91.6% | 92.7% | 93.7% | 94.6% | 95.8% | 96.4% | 97.1% | 97.8% | 98.6% |

\* $500 million or less.

[1] A decrease in the Treasury operating cash balance (which is an asset) is a means of financing a deficit and therefore has a negative sign.  An increase in checks outstanding (which is a liability) is also a means of financing a deficit and therefore also has a negative sign.  More information on the levels and changes to the operating cash balance is available in Chapter 4, "Federal Borrowing and Debt" in the *Analytical Perspectives* volume of the Budget.

[2] Includes checks outstanding, accrued interest payable on Treasury debt, uninvested deposit fund balances, allocations of special drawing rights, and other liability accounts; and, as an offset, cash and monetary assets (other than the Treasury operating cash balance), other asset accounts, and profit on sale of gold.

[3] Consists mainly of debt issued by the Federal Financing Bank (which is not subject to limit), the unamortized discount (less premium) on public issues of Treasury notes and bonds (other than zero-coupon bonds), and the unrealized discount on Government account series securities.

[4] The statutory debt limit is $31,381 billion, as enacted on December 16, 2021.

[5] Treasury securities held by the public and zero-coupon bonds held by Government accounts are almost all measured at sales price plus amortized discount or less amortized premium.  Agency debt securities are almost all measured at face value.  Treasury securities in the Government account series are otherwise measured at face value less unrealized discount (if any).

[6] At the end of 2021, the Federal Reserve Banks held $5,433.2 billion of Federal securities and the rest of the public held $16,850.9 billion.  Debt held by the Federal Reserve Banks is not estimated for future years.

[7] Treasury's warrants to purchase 79.9 percent of the common stock of the enterprises expire after September 7, 2028.  The warrants were valued at $5 billion at the end of 2021.

[8] Portions of the notes and warrants issued under the Air carrier worker support program (Payroll support program) are scheduled to expire in 2025, 2026, 2030, and 2031.

# OMB CONTRIBUTORS TO THE 2023 BUDGET

The following personnel contributed to the preparation of this publication. Hundreds, perhaps thousands, of others throughout the Government also deserve credit for their valuable contributions.

## A

Lindsay Abate
Bryan Abbe
Allison Abbott
Andrew Abrams
Amal Abukar
Chandana L. Achanta
Laurie Adams
Jeffrey Adarkwa
Nana Abena Serwah
    Addo
Drew Aherne
Saran Ahluwalia
Shagufta Ahmed
Benjamin Aidoo
Lina Al Sudani
Joseph Albanese
Isabel Aldunate
Erin Cheese Alejandre
Jason Alleman
Victoria Allred
Aaron Alton
Marc Alvidrez
Samantha Ammons
Michaela Amos
Starlisha Anderson
Kimberly Anoweck
Lisa Anuszewski
Kristine Arboleda
Nickole M. Arbuckle
Rachel Arguello
Alison Arnold
Aviva Aron-Dine
Anna R. Arroyo
Elham Ashoori
Emily Schultz Askew
Lisa L. August
Jeffrey Auser

## B

Eileen Baca
Samuel Bagenstos
Drew Bailey

Jessie W. Bailey
Ally P. Bain
Paul W. Baker
Carol A. Bales
Pratik S. Banjade
Avital Bar-Shalom
Zachary Barger
Carl Barrick
Jody Barringer
Amy Batchelor
Paula M. Becker
Alicia Beckett
Sarah Belford
Jennifer Wagner Bell
Sara Bencic
Joseph J. Berger
Danielle Berman
Elizabeth A. Bernhard
Katherine Berrey
Timothy Best
William Bestani
James Bickford
Samuel J. Black
Sharon Block
Kate Bloniarz
Mathew C. Blum
Tia Boatman
    Patterson
Brandon Bodnar
Amira C. Boland
Cassie L. Boles
Melissa B. Bomberger
Matthew Bowen
Derick A. Boyd Jr.
William J. Boyd
Michael D. Branson
Alex M. Brant
Victoria Bredow
Joseph F. Breighner
Nicholas Brethauer
Andrea M. Brian
Candice M. Bronack
Ashley A. Brooks
Katherine W. Broomell

Dustin S. Brown
Sheila Bruce
Michael T. Brunetto
Pearl Buenvenida
Tom D. Bullers
Coulton Bunney
Scott H. Burgess
Ben Burnett
Jordan C. Burris
Angela S. Burton
John C. Burton
Mark Bussow
Sean Butler
Dylan W. Byrd

## C

Steven Cahill
Greg Callanan
Lekesha Fay Campbell
Amy Canfield
Eric D. Cardoza
Laura Carollo
Kevin Carpenter
Christina S. Carrere
William S. S. Carroll
Scott D. Carson
Corryne C. Carter
Mary I. Cassell
David Cassidy
Terry J. T. Cathopoulis
David Cerrato
Christina Cervantes
Dan Chandler
David Chang
Suzanne Chapman
Anthony Chase
James Chase
Nida Chaudhary
Anita Chellaraj
Fonda Chen
Amy Chenault
Dana Chisnell
Sophia Choudhry

Alex Ciepley
Damon J. Clark
Michael Clark
Sean Coari
Porchetta Cody
Alyssa Cogen
Jordan Cohen
Pamela Coleman
Victoria W. Collin
Debra M. Collins
Kelly T. Colyar
Jose A. Conde
David C. Connolly
Kyle Connors
Mary Rose Conroy
Shila R. Cooch
LaTiesha B. Cooper
Nicole Cordan
Benjamin E. Coyle
Brian Coyle
Drew W. Cramer
Ayana Crawford
William Creedon
Jill L. Crissman
Rose Crow
Jefferson Crowder
Albert Crowley
Juliana Crump
Lily Cuk
Pennee Cumberlander
C. Tyler Curtis
William Curtis
Patricia Cusack

## D

Amanda Dahl
Nadir Dalal
Shaibya Love Dalal
J. Alex Dalessio
D. Michael Daly
Rody Damis
Neil B. Danberg
Elisabeth C. Daniel

145

Kristy L. Daphnis
Joanne C. Davenport
Kelly Jo Davis
Kenneth L. Davis
Margaret B. Davis-Christian
Karen De Los Santos
Kara DeFrias
Thomas Delrue
Tasha M. Demps
Paul J. Denaro
Catherine A. Derbes
Christopher DeRusha
Suzy Deuster
Kelly A. Deutermann
Joseph A. Di Rocco
Selene Diaz
John H. Dick
Jamie Dickinson
Amie M. Didlo
Rachel M. Diedrick
Cle Diggins
Jean Diomi Kazadi
Daniel Dister
Angela M. Donatelli
Paul S. Donohue
Cristin Dorgelo
Vladik Dorjets
Michelle Dorsey
Tobias A. Dorsey
Prashant A. Doshi
Celeste Drake
Megan Dreher
Carlton Drew
Lisa Cash Driskill
Mark A. Dronfield
Vanessa Duguay
Nathaniel Durden
Ryan Durga
Reena Duseja

### E

Matthew C. Eanes
Jeanette Edwards
Melissa Eggleston
Christopher Eldredge
Matthew Eliseo
Michelle Enger
Diana F. Epstein
Troy M. Epstein
Bianca Escalante
Jorge Escobar
Celeste Espinoza

Robert Etter
Beatrix Evans
Erica Evans
Gillian Evans
Patrick Evans

### F

Farnoosh Faezi-Marian
Edna Falk Curtin
Hunter Fang
Louis E. Feagans
Iris R. Feldman
Lesley A. Field
Sean C. Finnegan
Mary S. Fischietto
John J. Fitzpatrick
Cleones Fleurima
Daniel G. Fowlkes
Nicholas A. Fraser
Rob Friedlander
Christopher Froehlich
Laurel Fuller
Steven Furnagiev

### G

Ethan Joshua Gabbour
Scott Gaines
Christopher D. Gamache
Joseph R. Ganahl
Kyle Gardiner
Mathias A. Gardner
Arpit Garg
Marc Garufi
Anthony R. Garza
Alex Gaynor
Johannes J. Geist
Anna M. Gendron
Mariam Ghavalyan
Daniel Giamo
Carolyn Gibson
Brian Gillis
Jacob Glass
Porter O. Glock
Christopher Glodosky
Andrea L. Goel
Jeffrey D. Goldstein
Christopher Gomba
Anthony A. Gonzalez
Oscar Gonzalez
Alex Goodenough
Jonathan Sidney

Gould
Michael D. Graham
Anthony M. Grasso
David M. Gratz
Vivian Graubard
Colleen M. Gravens
Aron Greenberg
Brandon H. Greene
Robin J. Griffin
Justin Grimes
Hester C. Grippando
Stephanie F. Grosser
Benjamin Guhin
Kamari Guthrie

### H

Michael B. Hagan
Tia Hall
Victor Hall
Dean Halstead
William F. Hamele
Christine E. Hammer
Rachel Han
Anna Hansen
Brian J. Hanson
Jennifer L. Hanson
Dionne Hardy
Deidre A. Harrison
Christopher Hart
Edward Hartwig
Paul Harvey
Abdullah Hasan
Sara A. Hastings
Joseph Hatzipanagiotis
Laurel Havas
Nichole M. Hayden
Mark Hazelgren
Kelly A. Healton
Paul Heayn
Noreen Hecmanczuk
Andrew Heimowitz
Gary Hellman
Natalie D. Hengstebeck
John David Henson
Matthew A. Herb
Mitchel Herckis
Jacobo Hernandez
Rachel Hernández
Alex Hettinger
Michael J. Hickey
Michael Hildner

Amanda M. Hill
Jonathan Hill
W. Frankie Hill
Nathaniel Hillard
Michelle Hilton
Leni Hirsch
Elke Hodson-Marten
Jennifer E. Hoef
Stuart Hoffman
Troy Holland
Shane Holloway
Brian Holm-Hansen
Javay C. Holmes
Michele Holt
Nicholas Holtz
Jennifer Ann Hommel
Alexander Hoover
Jack Hoskins
Clinton T. Hourigan
Devany Howard
Andrew P. Howe
Peter Hoy
Mina Hsiang
Grace Hu
Christine Huanasca
Rhea A. Hubbard
Kathy M. Hudgins
Thomas Huelskoetter
Shristi Humagai
Ashley Hungerford
Sally J. Hunnicutt
Alexander T. Hunt
Ginny Hunt
Lorraine D. Hunt
Timothy H. Hunt
James C. Hurban
Veta Hurst

### I

Tae H. Im
Shelley Irving
Maya Israni

### J

Maia Ruth Jachimowicz
Charmaine Jackson
Scott W. Jackson
Aryeh Jacobsohn
Manish Jain
Harrison M. Jarrett
Ames R. Jenkins

Carol Jenkins
Connor Jennings
Julie D. Jent
Jeremy Etra Jick
Carol Johnson
Michael D. Johnson
Danielle Y. Jones
Denise Bray Jones
Lauren H. Jones
Lisa M. Jones
Devansh R.
   Jotsinghani
Shannon Maire Joyce
Hursandbek
   Jumanyazov
Hee Jun
Mark Junda

### K

Jason Kahn
Riyad Kalla
Kosta Kalpos
Daniel S. Kaneshiro
Jacob H. Kaplan
Jenifer Liechty
   Karwoski
Florence Kasule
Natalie Kates
Jason Kattman
Regina L. Kearney
Andrew Keeney
Christopher Keller
Mary W. Keller
Nancy B. Kenly
Moses I. Kennedy
Kameron Kerger
Blair W. Kessler
Jung H. Kim
Maria Kim
Michael B. Kim
Rachael Y. Kim
Kelly C. King
Kelly A. Kinneen
Marina Kirakosian
Jessica Elizabeth
   Kirby
Robert T. Klein
Hank Knaack
Carmen Knight
Ellen Knight
Bobby Kogan
Lara Kohl
Nick Koo

Andrea G. Korovesis
Katelyn V. Koschewa
Steven Kovacs
Anneli Faride Kraft
Charles Kraiger
Lori A. Krauss
Harold Krent
Alyssa Kropp
Megan K. Kruse
Steven B. Kuennen
Jennifer J. Kuk
Anshul Kumar
Tara Kumar
Christine J. Kymn

### L

Vincent La
Christopher D. LaBaw
Sherry E. Lachman
Leonard L. Lainhart
Chad A. Lallemand
Kristine Lam
Lawrence L. Lambert
Michael Landry
Daniel LaPlaca
Tracie B. Lattimore
Eric P. Lauer
Jessie L. LaVine
Daniel Lawver
Loc N. Le
Jessica K. Lee
Theodore Taewoo Lee
Susan E. Leetmaa
Carmine Leggett
Stephen Leibman
Bryan P. León
Daniel Leonardini
Kerrie Leslie
Ariel Leuthard
John C. Levock-
   Spindle
Sheila Lewis
Andrew Lewndowski
Thomas M. Libert
Andrew Lieberman
Jennifer Liebschutz
Jane C. Lien
Ming Ligh
Kristina E. Lilac
Erika Liliedahl
Michael Linden
John E. Lindner
Jennifer M. Lipiew

Adam Lipton
Kim Lopez
Sara R. Lopez
Zuzana Love
Adrienne Lucas
Alisa Luu
Kelvin Luu

### M

Steven Parsons
   Mackey
Ryan MacMaster
Christian MacMillan
Brett Maden
Claire A. Mahoney
Bianca Majumder
Dominic J. Mancini
Caroline Manela
Noah S. Mann
Iulia Z. Manolache
Roman Manziyenko
Italy Martin
Rochelle Martinez
Nicole Martinez Moore
Clare Martorana
Gina Mason
Stephen Massoni
Kimie Matsuo
Beth Mattern
Joshua May
Steven M. McAndrews
Jessica Rae McBean
Alexander J.
   McClelland
John L. McClung
Malcolm P. McConnell
Daniela McCool
Jeremy P. McCrary
Charquinta Regina
   McCray
Anthony W. McDonald
Christine A. McDonald
Katrina A. McDonald
Renford McDonald
Trevor R. McKie
Michael McManus
Frank McNally
William McNavage
Christopher McNeal
Maya Mechenbier
Andrea Medina-Smith
Edward Meier
Julie Meloni

Barbara A. Menard
Flavio Menasce
Ryan Mercer
Margaret Mergen
P. Thaddeus
   Messenger
Lauren Michaels
Daniel J. Michelson-
   Horowitz
Eric Mill
Jason Miller
Kimberly Miller
Scott William Miller
Sofie Miller
Susan M. Minson
Katherine Mlika
Abdullahi Mohamed
Emily A. Mok
Kirsten J. Moncada
Allyce Moncton
Claire E. Monteiro
Joseph Montoni
Andrea J. Montoya
Julia C. Moore
Natalie Moore
Betty T. Morrison
Savannah M. Moss
Austin B. Mudd
Robin McLaughry
   Mullins
Ian Munoz
Daenuka
   Muraleetharan
Jonathan J. Murphy
Molly Murray
Christian G. Music
Hayley W. Myers
Heather Myers
Kimberley L Myers
David D. Myklegard

### N

Andrew Nacin
Jeptha E. Nafziger
Larry J. Nagl
Katherine Nammacher
Barry Napear
Robert Nassif
Emma Nechamkin
Beverly Nelson
Kimberly P. Nelson
Michael D. Nelson
Anthony Nerino

Melissa K. Neuman
Travis Newby
Joanie F. Newhart
Kimberly Armstrong
  Newman
Annie Nguyen
Hieu Nguyen
Stephanie Nguyen
Thomas Nielsen
Greg Novick
Tim H. Nusraty
Joseph B. Nye

**O**

Erin O'Brien
Kerry Clinton O'Dell
Melanie Ofiesh
Michael Ogren
Matthew J. O'Kane
Cassandra Olson
Kathryn Olson
Brendan J. O'Meara
Matthew Oreska
Timothy F. O'Shea
Jared Ostermiller

**P**

Heather C. Pajak
Farrah N. Pappa
Jacob A. Parcell
Amy Paris
John C. Pasquantino
Michael Pauls
Brian Paxton
Casey Pearce
Michael D. Pearlstein
Liuyi Pei
Zachary T. Pendolino
Sean Pennino
Falisa L. Peoples-Tittle
Emma C. Perron
Michael A. Perz
Erik Brandon Peters
Whitney L. Peters
William C. Petersen
Andrea M. Petro
Laura M. Pettus
Amy E. Petz
Kathy Pham (Evans)
Stacey Que-Chi Pham

Carolyn R. Phelps
Karen A. Pica
Brian Pickeral
Alexandria Elise
  Pinckney
Brian Pipa
Joseph Pipan
Amy Pitelka
Megan Policicchio
Nicholas Polk
Mark J. Pomponio
Ruxandra Pond
Imani Pope-Johns
Meril A. Pothen
Larrimer S. Prestosa
Jamie M. Price
Alanna B. Pugliese
Robert B. Purdy
Hannah Pyper

**Q**

Syeda Quadry

**R**

Lucas R. Radzinschi
Kazi Sabeel Rahman
Zahid Rashid
Houman Rasouli
Johnnie Ray
Alex Reed
Maurice Reeves
Heather Regen
Thomas M. Reilly
Cody Reinold
Bryant D. Renaud
Keri A. Rice
Natalie Rico
Kyle S. Riggs
Glorimar Ripoll Balet
Jamal Rittenberry
Maria Roat
Becci Roberts
Beth Higa Roberts
Brian Roberts
Donovan Robinson
Marshall J. Rodgers
Drew J. Rodriguez
Jung Mary Roh
Samantha Romero
Meredith B. Romley

Andrea L. Ross
Jeffrey R. Ross
Alicia Rouault
Alexander Joseph
  Rougeau
David J. Rowe
Amanda Roy
Danielle Royal
Brian Rozental
Tamia Russell
Erika H. Ryan

**S**

Julianna R. St. Onge
Adam N. Salazar
John Asa Saldivar
Sarah Saltiel
Zohaib Sameer
Mark S. Sandy
Nathan T. Sanfilippo
Ruth Saunders
Joel Savary
Jason K. Sawyer
Sarah Scheinman
Zachary Scherer
Kirsten Scheyer
Christina Schildroth
Tricia Schmitt
Andrea Schneider
Rio Schondelmeyer
Daniel K. Schory
Ian Schurr
Margo Schwab
Mariarosaria
  Sciannameo
Kristi Scott
Jasmeet K. Seehra
Owen Seely
Kimberly Segura
Robert B. Seidner
Andrew Self
Megan Shade
Vimal Shah
Shabnam
  Sharbatoghlie
Amy K. Sharp
Dianne Shaughnessy
Pooja Shaw
Paul Shawcross
Rachel Lee Shepherd
Gary F. Shortencarrier

Matthew Sidler
Becca Siegel
Jared Siegel
Leticia Sierra
Sara R. Sills
Celeste Simon
Daniel Liam Singer
Sarah Sisaye
Robert Sivinski
Benjamin J. Skidmore
Evan C. Skloot
Curtina O. Smith
Jennifer Smith
Matthew Smith
Sarah B. Smith
Stannis M. Smith
Silvana Solano
Roderic A. Solomon
Timothy Soltis
Suzanne Soroczak
Amanda R.K. Sousane
Megan Sowder-Staley
Candice G. Spalding
Rebecca L. Spavins
Valeria Spinner
Christopher Spiro
John H. Spittell
Sarah Whittle Spooner
Madhu Sreekumar
Langer Stacey
Travis C. Stalcup
Scott R. Stambaugh
Nora Stein
Christopher Paul
  Steiner
Erica Stephens
Meredith Stewart
Ryan Stoffers
Gary R. Stofko
Andrew Stoll
Kelly M. Strachan
Benjamin Strahs
Terry W. Stratton
Thomas J. Suarez
Kevin J. Sullivan
Patrick Sullivan
Abe Sussan
Ariana Sutton-Grier
Shelby Switzer
Katherine M. Sydor

## T

Jamie R. Taber
Naomi S. Taransky
Masrifa Tasnim
Andrea Taverna
Kelly Taylor
Myra Taylor
Whitney Teal
Jay F. Teitelbaum
Fatima Terry
Emma K. Tessier
Lan Thai
Amanda L. Thomas
Barbara E. Thomas
Jennifer Thomas
Judith F. Thomas
Payton A. Thomas
Will Thomas
Serita K. Thornton
Parth Tikiwala
Thomas Tobasko
Erika Tom
Gia Tonic
Gil M. Tran
Susanna Troxler
Patrick Trulock
Austin Turner

## U

Shraddha A.
 Upadhyaya
Darrell J. Upshaw

## V

Matthew J. Vaeth
Candace Vahlsing
Areletha L. Venson
Alexandra Ventura
Shaun Verch
Carl Vernetti
Jesus Vidaurri
Eileen Vidrine
Merici Vinton
Kalpana Vissa
Andrea Viza
Megha Vyas

## W

James A. Wade
Lucinda Wade
Brett Waite
Nicole Waldeck
Joseph Waldow
Rachel Wallace
Heather V. Walsh

Tim Wang
Ben A. Ward
Michelle Ward
Clarence Wardell
Benjamin Warfield
Peter H. Waterman
Gary Waxman
Bess M. Weaver
Jacqueline K. Webb
Daniel Week
William J. Weinig
David M. Weisshaar
Michael Weissman
Lillian Welch
Philip R. Wenger
Max West
Arnette C. White
Ashley M. White
Curtis C. White
Kim S. White
Sherron R. White
Alison Whitty
Amy Widman
Brian A. Widuch
Sabrina Williams
Alex O. Wilson
Kimberly Claire
 Wilson
Catherine Winters
Christopher Winters

Minzy Won
Alegra E. Woodard
Gwyneth Woolwine
Nicholas John
 Woroszylo
Christopher Wren
Sophia M. Wright
Bertram J. Wyman

## Y

Danny Yagan
Melany N. Yeung
David Y. Yi
Samantha Paige Yi
Christian T. Yonkeu
Xia You
Frank (Tom) Young
Rita Young
Shalanda D. Young
Susse Yuan
Janice Yun

## Z

Elizabeth Zahorian
Eliana M. Zavala
Erica H. Zielewski
Timothy Ziese
Jeremy Zitomer

ISBN 978-0-16-095232-6





9 780160 952326

90000



# EXECUTIVE OFFICE OF THE PRESIDENT
## OFFICE OF MANAGEMENT AND BUDGET

### WASHINGTON, D.C.  20503

THE WHITE HOUSE
WASHINGTON

# EXHIBIT 6



KPMG LLP
Suite 12000
1801 K Street, NW
Washington, DC 20006

### Independent Auditors' Report

Inspector General
United States Department of Education

Secretary
United States Department of Education:

**Report on the Audit of the Consolidated Financial Statement**

*Disclaimer of Opinion*

We were engaged to audit the consolidated balance sheet of the United States Department of Education (Department) as of September 30, 2023, and the related notes (the consolidated financial statement).

We do not express an opinion on the accompanying consolidated financial statement of the Department. Because of the significance of the matter described in the Basis for Disclaimer of Opinion section of our report, we have not been able to obtain sufficient appropriate audit evidence to provide a basis for an audit opinion on the consolidated financial statement.

*Basis for Disclaimer of Opinion*

During fiscal year 2023, we identified errors in the underlying data used to develop assumptions used to calculate the subsidy re-estimates for the Department's direct loan and loan guaranty programs. Management was unable to determine the extent of the impact of these issues on the balance sheet and related notes. As a result of this matter, we are unable to determine whether any adjustments to the balance sheet might have been necessary with respect to the fiscal year 2023 Loan Receivables, Net – Direct Loan Program; Loan Receivables, Net – Federal Family Education Loan (FFEL) Program; Subsidy Due to Treasury; Loan Guarantee Liabilities; Unexpended Appropriations; Cumulative Results of Operations; and the related notes.

*Other Matter - Interactive Data*

Management has elected to reference to information on websites or other forms of interactive data outside the fiscal year 2023 Agency Financial Report to provide additional information for the users of its consolidated financial statement. Such information is not a required part of the consolidated financial statement or supplementary information required by the Federal Accounting Standards Advisory Board. The information on these websites or the other interactive data has not been subjected to any of our auditing procedures, and accordingly we do not express an opinion or provide any assurance on it.

*Responsibilities of Management for the Consolidated Financial Statement*

Management is responsible for the preparation and fair presentation of the consolidated financial statement in accordance with U.S. generally accepted accounting principles, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of the consolidated financial statement that is free from material misstatement, whether due to fraud or error.

*Auditors' Responsibilities for the Audit of the Consolidated Financial Statement*

Our responsibility is to conduct an audit of the Department's consolidated financial statement in accordance with auditing standards generally accepted in the United States of America (GAAS), *Government Auditing Standards,* issued by the Comptroller General of the United States, and Office of Management and Budget

KPMG LLP a Delaware limited liability partnership and a member firm of
the KPMG global organization of independent member firms affiliated with
KPMG International Limited, a private English company limited by guarantee.



(OMB) Bulletin No. 24-01, *Audit Requirements for Federal Financial Statements,* and to issue an auditors' report. However, because of the matter described in the Basis for Disclaimer of Opinion section of our report, we were not able to obtain sufficient appropriate audit evidence to provide a basis for an audit opinion on this consolidated financial statement.

We are required to be independent of the Department and to meet our other ethical responsibilities, in accordance with the relevant ethical requirements relating to our audit.

*Required Supplementary Information*

U.S. generally accepted accounting principles require that the information in the Management's Discussion and Analysis and Required Supplementary Information sections be presented to supplement the basic consolidated financial statement. Such information is the responsibility of management and, although not a part of the basic consolidated financial statement, is required by the Federal Accounting Standards Advisory Board who considers it to be an essential part of financial reporting for placing the basic consolidated financial statement in an appropriate operational, economic, or historical context. We were unable to apply certain limited procedures to the required supplementary information in accordance with GAAS because of the significance of the matter described in the Basis for Disclaimer of Opinion paragraph. We do not express an opinion or provide any assurance on the information.

**Report on Internal Control Over Financial Reporting**

In connection with our engagement to audit the Department's consolidated financial statement as of September 30, 2023, we considered the Department's internal control over financial reporting (internal control) as a basis for designing audit procedures that are appropriate in the circumstances for the purpose of expressing an opinion on the consolidated financial statement, but not for the purpose of expressing an opinion on the effectiveness of the Department's internal control. Accordingly, we do not express an opinion on the effectiveness of the Department's internal control. We did not test all internal controls relevant to operating objectives as broadly defined by the *Federal Managers' Financial Integrity Act of 1982*.

Our consideration of internal control was for the limited purpose described in the preceding paragraph and was not designed to identify all deficiencies in internal control that might be material weaknesses or significant deficiencies and therefore, material weaknesses or significant deficiencies may exist that were not identified. However, as described in the accompanying Exhibits, we identified certain deficiencies in internal control that we consider to be a material weakness and significant deficiencies.

A deficiency in internal control exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent, or detect and correct, misstatements on a timely basis. A material weakness is a deficiency, or a combination of deficiencies, in internal control, such that there is a reasonable possibility that a material misstatement of the entity's financial statement will not be prevented, or detected and corrected, on a timely basis. We consider the deficiencies described in the accompanying Exhibit A, *Controls over the Relevance and Reliability of Underlying Data Used in Credit Reform Estimates Need Improvement*, to be a material weakness.

A significant deficiency is a deficiency, or a combination of deficiencies, in internal control that is less severe than a material weakness, yet important enough to merit attention by those charged with governance. We consider the deficiencies described in the accompanying Exhibit B, *Information Technology Controls Need Improvement* and *Entity Level Controls Need Improvement,* to be significant deficiencies.

**Report on Compliance and Other Matters**

In connection with our engagement to audit the Department's consolidated financial statement as of September 30, 2023, we performed tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements, noncompliance with which could have a direct and material effect on the consolidated financial statement. However, providing an opinion on compliance with those provisions was not an objective of our engagement, and accordingly, we do not express such an opinion. The results of our tests

2



disclosed instances of noncompliance or other matters that are required to be reported under *Government Auditing Standards* or OMB Bulletin No. 24-01, and which are described in Exhibit C.

We also performed tests of the Department's compliance with certain provisions referred to in Section 803(a) of the *Federal Financial Management Improvement Act of* 1996 (FFMIA). Providing an opinion on compliance with FFMIA was not an objective of our engagement, and accordingly, we do not express such an opinion. The results of our tests disclosed instances in which the Department's financial management systems did not substantially comply with the (1) Federal financial management systems requirements and (2) applicable Federal accounting standards. The results of our tests disclosed no instances in which the Department's financial management systems did not substantially comply with the United States Government Standard General Ledger at the transaction level.

Additionally, if the scope of our work had been sufficient to enable us to express an opinion on the consolidated financial statement, other instances of noncompliance or other matters may have been identified and reported herein.

**Department's Response to Findings**

*Government Auditing Standards* requires the auditor to perform limited procedures on the Department's response to the findings identified in our engagement and described in Exhibit D. The Department's response was not subjected to the other auditing procedures applied in the engagement to audit the consolidated financial statement and, accordingly, we express no opinion on the response.

**Purpose of the Reporting Required by Government Auditing Standards**

The purpose of the communication described in the Report on Internal Control Over Financial Reporting and the Report on Compliance and Other Matters sections is solely to describe the scope of our testing of internal control and compliance and the results of that testing, and not to provide an opinion on the effectiveness of the Department's internal control or compliance. Accordingly, this communication is not suitable for any other purpose.



Washington, D.C.
November 16, 2023

3

Exhibit A

**Material Weakness**

**Controls over the Relevance and Reliability of Underlying Data Used in Credit Reform Estimates Need Improvement**

**Background:**

The material weakness under this section is related to the Department's Direct and FFEL student loan portfolios.

The Department is required to perform interest rate and technical re-estimates of the subsidy costs (commonly referred to as subsidy re-estimates) of its direct loan and loan guaranty programs as of September 30 every year.

These subsidy re-estimates are calculated using an internally developed cash flow model, the Student Loan Model (SLM). The SLM utilizes assumptions based on internally sourced data elements from Information Technology (IT) systems. The future cash flow outputs generated from the SLM are input into the format required by the Office of Management and Budget (OMB) Credit Subsidy Calculator (CSC), a required present value discount tool for agencies with credit reform programs, to produce the subsidy re-estimates.

**Condition:**

Management did not design and implement sufficiently precise controls over the relevance and reliability of certain data used in key assumptions for the SLM.

**Cause/Effect:**

Management's risk assessment process was not sufficient to identify the risk related to the relevance and reliability of the underlying data used in significant assumptions for the subsidy re-estimates. Additionally, management did not sufficiently communicate errors in the underlying data internally to those responsible for calculating the subsidy re-estimates. Inadequate controls over the relevance and reliability of the underlying data used to develop the subsidy re-estimates led to errors which increases the risk that the balance sheet and related notes could be materially misstated.

**Criteria:**

The following criteria were considered in the evaluation of the material weakness presented in this exhibit:

- The Standards for Internal Control in the Federal Government issued by the Comptroller General of the United States (the Green Book), Principle 6, *Define Objectives and Risk Tolerances;* Principle No. 10, *Design Control Activities*; Principle No. 13, *Use Quality Information*; Principle No. 14, *Communicate Internally*.

- FASAB Technical Release 6, *Preparing Estimates for Direct Loan and Loan Guarantee Subsidies under the Federal Credit Reform Act – Amendments to Technical Release No. 3 Preparing and Auditing Direct Loan and Loan Guarantee Subsidies under the Federal Credit Reforms Act*, Paragraph 20.

**Recommendation:**

We recommend that management design and implement controls that require the validation of the relevance and reliability of underlying data used in developing the assumptions related to the subsidy re-estimates. Such review should be documented and maintained.

A-1

**Exhibit B**

**Significant Deficiencies**

**A.  Information Technology Controls Need Improvement**

The following control deficiencies in the areas of Information Technology (IT) logical access, security management, segregation of IT duties, application change management, and computer operations are related to both the Department and Federal Student Aid (FSA) systems.

**Conditions:**

In prior years, we reported a significant deficiency related to the Department and FSA's IT controls due to persistent unmitigated IT control deficiencies. During FY 2023, the FSA management demonstrated progress implementing corrective actions to remediate some prior-year deficiencies, such as change and configuration management controls. However, the Department management and FSA management have not fully remediated prior-year deficiencies related to logical access administration, separated and transferred user access removal, user access reviews and recertification, configuration management, and computer operations. New and existing IT control deficiencies related to security management, access controls, and segregation of IT duties for the Department's core financial management system, three of FSA's financial and mixed systems, and one identity and access management support system are as follows:

**Department:**

1.  Deficiencies in IT security management controls: System deficiencies, including those identified during external audits, for the Department's core financial management system were not documented in Plan of Action and Milestones (POA&M) and tracked in the security management tool, as required by Department policies and guidance.

2.  Deficiencies in IT logical access controls: Access controls for new and separated contractors were not consistently and accurately performed, including the inconsistent reporting of start and termination effective dates. Further, the access controls were not consistently followed for the Department's core financial management system. Specifically,

    a.  documentation supporting the completed security awareness training for new and modified users could not be provided;

    b.  evidence supporting complete and accurate access reviews and recertifications was not provided or retained;

    c.  password controls were not designed to meet the Department's requirements; and

    d.  the Department's requirement for the use and monitoring of generic and shared accounts for two of three of the Department's financially relevant applications was not met for all accounts.

3.  Deficiencies in IT controls related to the segregation of IT duties: For one of the Department's core financial management systems, users with developer access had access greater than read-only to the system's production environment.

4.  Deficiencies in IT application change management and patch management controls: The application change management and patch management policies and controls were not consistently followed for the Department's core financial management system in accordance with Department policy. The Department did not provide sufficient evidence supporting tracking, security assessment, and approval for certain application changes and patches.

B-1

5. Deficiencies in IT computer operations controls: Controls over computer operations were not properly designed and implemented. Specifically,

   a) changes to the job processing and scheduling tools were not centrally tracked;

   b) changes were made directly in the production environment; and

   c) the use and monitoring of generic and shared accounts for the job scheduling tool did not follow the Department's requirements.

**FSA:**

1. Deficiencies in IT security management controls: Management did not effectively operate corrective action, remediation, and quality review controls for IT security weaknesses. Specifically, Plan of Action and Milestone (POA&M) closure documentation for three FSA systems and one identity and access management system did not always address the root cause of the deficiencies, thereby increasing the potential of IT control deficiencies reoccurring in the future.

2. Deficiencies in IT logical access controls: The access control processes were not consistently followed for three FSA systems and one identity and access management system. Specifically,

   a. evidence supporting complete and accurate access listings and evidence supporting new, modified, or separated users was not provided or was provided with missing required information and/or approvals;

   b. unauthorized access was provisioned and/or access was provisioned without adhering to the least privileged principle;

   c. evidence supporting complete and accurate access reviews and recertification controls was unavailable or was retained; and

   d. the Department's requirement for multi-factor authentication control was not implemented for all internal system users.

**Cause/Effect:**

Management has not performed effective risk assessments and there was a lack of effective monitoring controls over the effectiveness of designed control activities by the Department and FSA to ensure the following:

1. All system deficiencies, including those identified during external audits, have a documented POA&M and are tracked in the required security management tool. Additionally, corrective actions to remediate prior-year conditions and associated causes are fully implemented, as well as verifying and validating that these corrective actions were effectively addressing the weakness with adequately documented supporting evidence.

2. Systems and support processes consistently adhered to documented agency-wide policies and procedures for the financial and mixed systems hosted and managed by FSA and the Department.

3. The established logical access control process is followed and requests and related evidence for new, modified, or separated users were retained, documented completely and accurately, and approved.

4. Complete and accurate access reviews are performed to detect and mitigate the risk of unauthorized accounts, access that is not commensurate with job responsibilities or least privilege, and access permissions not being revoked timely.

B-2

5. Password controls are designed to meet the Department's requirements.

6. The requirements for the use and monitoring of generic and shared accounts controls are followed and enforced.

7. Segregation of duties and least privilege principles are followed and enforced.

8. The established change process and patch management process are followed.

9. The established process for job processing changes is followed and the requirements for the use and monitoring of generic/shared accounts controls for the job scheduling tool are followed and enforced.

10. The established computer operations process detects and/or prevents unauthorized changes to the job processing tool and schedules within the core financial system environment.

Ineffective IT controls increases the risk of unauthorized use, disclosure, disruption, modification, or destruction of information, and information systems that could impact the integrity and reliability of information processed in the associated applications which may lead to misstatements of the financial statements.

**Criteria:**

The following criteria were considered in the evaluation of the significant deficiency presented in this exhibit:

- The Departmental Directive OCIO 3-112, Cybersecurity Policy.
- Department Information Technology (IT) System Access Control Standard.
- Department IT Identification and Authentication (IA) Standard.
- EDCAPS System Security Plan (SSP) control requirements.
- FMS SSP control requirements.
- EDCAPS Configuration Management Plan (CMP).
- Department Information Technology System and Information Integrity (SI) standard policy section 2.2 control SI-2, Flaw Remediation.
- EDCAPS Patch Management Plan, section 4.7 Patch Maintenance.
- Department Baseline Cybersecurity Standard, OCIO-STND-01, dated September 23, 2021, Section 3.15. Acceptable Use.
- Office of the Chief Information Officer (OCIO), Information Assurance Services (IAS) Plan of Action and Milestones, Standard Operating Procedures (SOP), Version 2.8 dated July 7, 2022, Section 1.4 *POA&M Management* and Section 4.7 *CAP POA&M Workflow*.
- Cybersecurity Policy, Departmental Directive ACSD-OCIO-004, section V. *Responsibilities*.
- Information Technology (IT) System Security Assessment and Authorization (CA) Standard dated January 31, 2023, Section 2.4 *CA-5 Plan of Action and Milestones (POA&M) (P, L, M, H and Control Overlay)*.
- IT Program Management (PM) Standard dated January 31, 2023, section 2.4 *PM-4 Plan of Action and Milestones Process (P, Deployed Organization-Wide)*.
- The Green Book, Principle No. 2, *Exercise Oversight Responsibility*, Principle No. 3 *Establish Structure, Responsibility, and Authority*, Principle No. 4, *Demonstrate Commitment to Competence*, Principle No. 7, *Identify, Analyze, and Respond to Risks*, Principle No. 8 *Assess Fraud Risk*, Principle No.10, *Design Control Activities*, Principle No. 11, *Design Activities for the Information System*, Principle No. 13, *Use*

B-3

*Quality Information*, Principle No.16, *Perform Monitoring Activities,* Principle No.17, *Evaluate Issues and Remediate Deficiencies.*

- Federal Information Processing Standards (FIPS) 200, *Minimum Security Requirements for Federal Information and Information Systems.*

- National Institute of Standards and Technology Special Publication 800-53, Security and Privacy Controls for Federal Information Systems and Organizations, Revision 5, specifically security control requirements CA-5 *Plan of Action and Milestones*, PM-4 *Plan of Action and Milestone Process*, AC-2 *Account Management*, AC-5 *Separation of Duties*, AC-6 *Least Privilege*, AT-3 *Role-based Training*, AT-4 *Training records*, IA-2 *Identification and Authentication (Organizational Users);* CM-3 *Configuration Change Control*, and SI-2 *Flaw Remediation*.

**Recommendations:**

We recommend that the Department:

1. Improve the risk assessment process over IT to help ensure the Department is appropriately defining objectives to enable the identification of risks and associated controls to help mitigate the risks.

2. Communicate control issues and/or weaknesses through established tools and relevant reporting lines to the appropriate parties on a timely basis to enable prompt evaluation and resolution of the issues and/or weaknesses.

3. Evaluate, design, and implement controls to track and report all new and separated contractors.

4. Ensure separated contractors are off-boarded and system personnel are notified in a timely manner to disable or remove access to IT resources.

5. Provide training and oversight to the Department's personnel with on/off-boarding controls to help ensure new/separated contractors are properly tracked.

6. Update access review procedures to require the reviewers to verify the access lists received to be used in the performance and operation of the access reviews is complete and accurate and not modified prior to commencing the access reviews.

7. Identify, design, and implement controls requiring a reviewer to validate the population generated for review is complete and accurate.

8. Enforce established access authorization controls and ensure all requirements are met prior to granting system access. Formally perform and document the periodic reviews of all database user accounts in accordance with Department policy to confirm access is current, authorized, and commensurate with job responsibilities.

9. Ensure the application and database server access review controls include the verification of access privileges assigned to the user accounts are commensurate with job responsibilities and follow the concept of least privilege.

10. Ensure the database and server layer controls comply and operate with the disabling of inactive accounts and account lockout duration password setting requirements, as required by Department Policy.

11. Adhere to the SSP control requirements and avoid the use of generic and shared accounts. If generic and shared accounts are required, obtain a formal risk acceptance and develop a policy and procedure to:

    a. Authorize the use of these accounts by approved personnel,

B-4

b. Control who can access the generic/shared accounts and those sensitive actions performed by the accounts are logged and reviewed every time the accounts are used, and

c. Require that generic/shared accounts' passwords are changed each time approved personnel separate or transfer from the Department.

We recommend that FSA:

12. Design and implement improvements for the risk assessment process over IT to help ensure the FSA is appropriately defining objectives to enable the identification of risks and associated controls to help mitigate the risks.

13. Design and implement controls to evaluate the magnitude of impact, likelihood of occurrence, and nature of the deficiency in order to tailor the corrective actions to remediate the risk and address the root cause. Further, update guidance to ensure that quality reviews over the POA&M closure documentation are conducted to confirm the noted deficiencies are fully addressed to help prevent future reoccurrences.

14. Formally develop and implement a quality control review process to ensure that logical access control processes are followed completely and accurately to validate logical access requests, reviews, and recertifications.

15. Ensure segregation of duties and least privilege principles are adhered to when granting user access.

16. Evaluate and update the access review controls based on risk and enforce segregation of duties.

17. Reconcile the list of users' roles and responsibilities from the identity and access software tools to the lists that reside in each system accessed by such users.

18. Update access review policies and controls to require the reviewer to verify the access list, received to be used in the performance of the access reviews, is complete and accurate and not modified prior to commencing the access reviews.

19. Enforce the operation of established access authorization controls and ensure all requirements are met prior to granting access to systems.

B-5

**B. Entity Level Controls Need Improvement**

A key factor in improving accountability in achieving an entity's mission is to implement an effective internal control system. The control environment sets the tone of an organization by influencing the control consciousness of its personnel. It is also the foundation for all components of internal control, providing discipline and structure. The Department and FSA need to address weaknesses in its entity-wide control environment as we have observed, through our procedures, two entity-wide control environment conditions in the areas of risk assessment and monitoring activities that have a pervasive influence on the effectiveness of controls.

**Conditions:**

1. Risk Assessment- The Department and FSA's entity level controls were not designed and implemented appropriately in order to define objectives related to financial reporting processes to enable the identification of risks, define risk tolerances and identify controls responsive to those risks.

2. Monitoring Activities- The Department and FSA's entity level controls were not designed and implemented appropriately in order to remediate identified internal control deficiencies in a timely manner.

**Cause/Effect:**

1. Inadequate risk assessment throughout the Department and FSA prevented the proper identification and analysis of certain risks related to the financial reporting process at the Department and FSA, and from designing appropriate risk responses.

2. Insufficient monitoring prevented the Department and FSA from implementing corrective action plans and remediating control deficiencies timely.

The conditions noted above contributed to the control deficiencies described earlier in Exhibits A and B.A and could lead to other weaknesses in internal control over financial reporting.

**Criteria:**

The following criteria were considered in the evaluation of the significant deficiency presented in this Exhibit:

- The Green Book Principle 6, Define Objectives and Risk Tolerances.
- The Green Book Principle 17, Evaluate Issues and Remediate Deficiencies.

**Recommendations:**

We recommend that management:

1. Improve the risk assessment process at the financial statement assertion level and at the process level to ensure the department is appropriately defining objectives to enable the identification of risks and define risk tolerances.

2. Implement key monitoring controls to ensure that corrective action plans are implemented to timely remediate control deficiencies identified. In addition, increase oversight, review, and accountability over the process among various offices and directorates within the Department and FSA.

B-6

**Exhibit C**

**Compliance and Other Matters**

**A.    Federal Managers' Financial Integrity Act of 1982 (FMFIA)**

**Condition:**

Management performed an internal control assessment as required under FMFIA; however, management's assessment did not substantially comply with FMFIA and the related OMB A-123 requirements. Specifically, management did not consistently identify and document financial statement and process level risks and key controls.

**Cause/Effect:**

Management did not substantially meet FMFIA requirements due to a lack of adequate risk assessments over key processes and data used in the consolidated financial statement. In addition, management did not sufficiently consider FMFIA and OMB Circular No. A-123 requirements when performing their evaluation of internal controls.

This resulted in the lack of timely identification of errors in data that impacted subsidy re-estimates in the consolidated financial statement. Furthermore, management could not determine the effect of these errors on the consolidated financial statement.

**Criteria:**

The following criteria were considered in the evaluation of the compliance matter presented in this Exhibit:

- Section 2 of FMFIA.
- OMB Circular No. A-123, *Management's Responsibility for Enterprise Risk Management and Internal Control*

**Recommendation:**

We recommend that management update the risk assessment regarding the evaluation of internal controls to ensure it includes all key processes, key data, and other material line items on the consolidated financial statement.

C-1

**B.    Federal Financial Management Improvement Act of 1996 (FFMIA)**

**Condition:**

Management did not establish and maintain financial management systems that substantially comply with the following FFMIA requirements:

1.  Federal Financial Management Systems Requirements. As discussed in Exhibit A, deficiencies in controls to prevent or detect errors in data used to calculate subsidy re-estimates prevented management from issuing reliable and accurate financial reporting. Specifically, management was unable to produce an auditable financial statement based on the data from the agency's financial system.

2.  Federal Accounting Standards. As discussed in Exhibit A, the control deficiencies identified during the audit provide an indication that the Department's financial management systems were substantially noncompliant with applicable federal accounting standards. Specifically, management was unable to provide evidence that the cash flow projections for the subsidy re-estimates were based on sufficient relevant and reliable data preventing the agency's ability to prepare an auditable financial statement.

**Cause/Effect:**

Management did not substantially meet FFMIA requirements due to an inadequate risk assessment over key processes and data used in the consolidated financial statement.

This increases the risk that transactions are incorrectly recorded to the general ledger, impacting the completeness, existence, and accuracy of the balances in the consolidated financial statement.

**Criteria:**

The following criteria were considered in the evaluation of the compliance matter presented in this Exhibit:

*   Section 803(a) of FFMIA.
*   Appendix D to OMB Circular No. A-123, *Compliance with the Federal Financial Management Improvement Act of 1996*

**Recommendation:**

We recommend that management implement the recommendation presented in the material weakness in Exhibit A.

C-2

**Exhibit D**

**Att: Management's Response**



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE OF FINANCE AND OPERATIONS

November 13, 2023

MEMORANDUM

TO:        Bryon S. Gordon
           Assistant Inspector General for Audit

FROM:      Denise L. Carter    DENISE CARTER  Digitally signed by DENISE CARTER
                                               Date: 2023.11.13 17:01:62 -05'00'
           Delegated the authority to perform the functions and duties of the position of Chief
           Financial Officer

           Luis Lopez    LUIS LOPEZ  Digitally signed by LUIS LOPEZ
                                      Date: 2023.11.13 18:05:01
                                      -05'00'
           Chief Information Officer

SUBJECT:   DRAFT INDEPENDENT AUDITORS' REPORT
           Fiscal Year 2023 Financial Statement
           U. S. Department of Education
           (ED-OIG/A23FS0127)


We appreciate the opportunity to provide input on the draft audit report and would like to thank the Office
of Inspector General audit team for their partnership and support during the annual audit.

The Department concurs with the findings and will take the appropriate actions to address the audit
recommendations. The agency takes its fiscal responsibilities seriously and will make it a priority to
implement business processes and internal controls to resolve the issues raised in the audit feedback as we
continue to strive to return to an unmodified opinion in the future.

Please contact Gary Wood, Deputy Assistant Secretary, Office of Financial Management, Office of
Finance and Operations at (202) 453-7631 with any questions or comments.


400 MARYLAND AVE., S.W., WASHINGTON, DC  20202
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by
fostering educational excellence and ensuring equal access.*

D-1