# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

STATE OF ALASKA, et al.,

> Plaintiffs-Appellees / Cross-Appellants,

v.

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

> Defendants-Appellants / Cross-Appellees.

On Appeal from the United States District Court
for the District of Kansas
District Court Case No. 6:24-CV-01057-DDC-ADM (Judge Daniel D. Crabtree)

## APPELLANTS' APPENDIX: VOLUME II OF II, PAGES 282-547

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

MICHAEL S. RAAB
THOMAS PULHAM
SIMON C. BREWER
SARAH N. SMITH
*Attorneys, Appellate Staff*
*Civil Division, Room 7529*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5367*

# TABLE OF CONTENTS

**Page(s)**

## VOLUME I

District Court Docket Entries ............................................................. App. 003

Plaintiffs' Motion for a Preliminary Injunction (Apr. 5, 2024), Dkt. 23............App. 023

Memorandum in Support of Plaintiffs' Motion for a Preliminary
Injunction and Exhibits (Apr. 5, 2024), Dkt. 24...............................................App. 027

## VOLUME II

Defendants' Combined Memorandum of Law in Opposition to
Plaintiffs' Motion for a Preliminary Injunction and in Support of
Defendants' Motion to Dismiss (Apr. 26, 2024), Dkt. 46..............................App. 284

Plaintiffs' Combined Reply in Support of Their Motion for a
Preliminary Injunction and Response in Opposition to Defendants'
Motion to Dismiss and Exhibits (May 10, 2024), Dkt. 53 .............................App. 349

First Amended Complaint (May 16, 2024), Dkt. 57.............................................App. 415

Memorandum and Order (June 7, 2024), Dkt. 68.................................................App. 456

Memorandum and Order (June 24, 2024), Dkt. 76...............................................App. 502

Preliminary Injunction (June 24, 2024), Dkt. 77.................................................App. 544

Defendants' Notice of Appeal (June 27, 2024), Dkt. 78 ......................................App. 545

Plaintiffs' Amended Notice of Cross-Appeal (July 8, 2024), Dkt. 90.................App. 546

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

STATE OF KANSAS, *et al.*,

                Plaintiffs,

      v.

JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*,

                Defendants.

Case No. 24-1057-DDC-ADM

## DEFENDANTS' COMBINED MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

MARCIA BERMAN
*Assistant Branch Director*

STEPHEN M. PEZZI (D.C. Bar No. 995500)
 Senior Trial Counsel
SIMON G. JEROME (D.C. Bar No. 1779245)
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

    A.   The Higher Education Act and Prior Income-Contingent Repayment Plans .......................2

    B.   The SAVE Plan ..............................................................................................................4

    C.   Loan Forgiveness and Litigation Under the HEROES Act ..........................................5

    D.   This Lawsuit ...................................................................................................................7

ARGUMENT .......................................................................................................................8

I.    THE CASE SHOULD BE DISMISSED FOR LACK OF ARTICLE III STANDING...9

    A.   Plaintiffs' tax-revenue theory is foreclosed by Supreme Court precedent. ..............9

    B.   Plaintiffs' recruiting theory is speculative and unsupported. ....................................12

    C.   Plaintiffs' state-instrumentality theory fails. ..............................................................15

    D.   Plaintiffs' theory of increased law-enforcement costs is abandoned, speculative, and foreclosed by precedent. ............................................................................................16

II.    THE PRELIMINARY-INJUNCTION MOTION SHOULD BE DENIED. ..............17

    A.   Plaintiffs are not likely to succeed on the merits of their statutory-authority claims ...........18

        1.   The Final Rule is authorized by the Higher Education Act. ............................18

        2.   The major-questions doctrine does not warrant a different result. ..................26

        3.   There is no constitutional doubt that warrants departure from the statutory text. ................................................................................................................29

    B.   Plaintiffs are not likely to succeed on their other APA claims. ...............................31

        1.   Policy disagreements with the agency do not support an arbitrary-and-capricious claim. ....................................................................................................31

        2.   The agency provided notice and an opportunity to comment. .........................37

    C.   Plaintiffs have not shown irreparable harm. ..............................................................39

    D.   A preliminary injunction would be contrary to the public interest. .........................41

III.    PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD. ...........................................42

    A.   Any relief should be limited to redressing any cognizable injuries of any Plaintiff State that can establish standing. ....................................................................................42

    B.   The Final Rule is severable. .........................................................................................44

    C.   The Court lacks authority to enter relief directly against the President. ..................45

CONCLUSION ..................................................................................................................46

## TABLE OF AUTHORITIES

**Cases**

*Affordable Bio Feedstock, Inc. v. United States,*
   42 F.4th 1288 (11th Cir. 2022) .................................................................30

*Air Transp. Ass'n v. FAA,*
   169 F.3d 1 (D.C. Cir. 1999) ......................................................................33

*Ala. Ass'n of Realtors v. HHS,*
   594 U.S. 758 (2021) ..................................................................................29

*Allen v. Wright,*
   468 U.S. 737 (1984) ....................................................................................9

*Am. Ass'n of People with Disabilities v. Herrera,*
   580 F. Supp. 2d 1195 (D.N.M. 2008) .......................................................41

*Am. Petroleum Inst. v. Dep't of Interior,*
   81 F.4th 1048 (10th Cir. 2023) ...........................................................34, 36

*Am. Textile Mfrs. Inst., Inc. v. Donovan,*
   452 U.S. 490 (1981) ..................................................................................32

*Ariz. Pub. Serv. Co. v. EPA,*
   562 F.3d 1116 (10th Cir. 2009) .........................................................44, 45

*Arizona v. Biden,*
   40 F.4th 375 (6th Cir. 2022) .....................................................................43

*Bartenwerfer v. Buckley,*
   598 U.S. 69 (2023) ..............................................................................18, 27

*Benisek v. Lamone,*
   585 U.S. 155 (2018) ..................................................................................40

*Biden v. Nebraska,*
   143 S. Ct. 2355 (2023) .........................................................................*passim*

*Biden v. Texas,*
   597 U.S. 785 (2022) ..................................................................................22

*Big Time Vapes, Inc. v. FDA,*
   963 F.3d 436 (5th Cir. 2020) ....................................................................31

*Biodiversity Conservation All. v. Jiron,*
   762 F.3d 1036 (10th Cir. 2014) ................................................................32

*Bostock v. Clayton County,*
    590 U.S. 644 (2020)..................................................................................22

*Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos,*
    344 F. Supp. 3d 158 (D.D.C. 2018)...........................................................39

*Califano v. Yamasaki,*
    442 U.S. 682 (1979)..................................................................................42

*Career Colls. & Schs. of Tex. v. Dep't of Educ.,*
    98 F.4th 220 (5th Cir. 2024) ....................................................................36

*Cato Inst. v. Cardona,*
    No. 1:23-cv-11906, --- F. Supp. 3d ----, 2023 WL 5232910 (E.D. Mich. Aug. 14, 2023)..................14

*Chevron USA, Inc. v. Echazabal,*
    536 U.S. 73 (2002)....................................................................................24

*Citizens Comm. to Save Our Canyons v. Krueger,*
    513 F.3d 1169 (10th Cir. 2008) ................................................................32

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)......................................................................12, 13, 14

*ClearOne Commc'ns, Inc. v. Bowers,*
    643 F.3d 735 (10th Cir. 2011) ..................................................................42

*Colorado v. EPA,*
    989 F.3d 874 (10th Cir. 2021) ............................................................39, 40

*Combat Veterans for Cong. Pol. Action Comm. v. FEC,*
    795 F.3d 151 (D.C. Cir. 2015) .................................................................34

*Conn. Light & Power Co. v. NRC,*
    673 F.2d 525 (D.C. Cir. 1982) .................................................................38

*Conn. Nat'l Bank v. Germain,*
    503 U.S. 249 (1992)..................................................................................19

*Ctr. for Biological Diversity v. Dep't of the Interior,*
    72 F.4th 1166 (10th Cir. 2023) ................................................................32

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006)....................................................................................9

*Dep't of Educ. v. Brown,*
    600 U.S. 551 (2023)...........................................................................passim

*DHS v. Regents of the Univ. of Cal.*,
 140 S. Ct. 1891 (2020) ........................................................................................33

*DHS v. Thuraissigiam*,
 591 U.S. 103 (2020) ...........................................................................................30

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
 356 F.3d 1256 (10th Cir. 2004) ....................................................................17, 29

*Facebook, Inc. v. Duguid*,
 592 U.S. 395 (2021) ...........................................................................................24

*FCC v. Fox Television Stations*,
 556 U.S. 502 (2009) .......................................................................................31, 36

*FCC v. Prometheus Radio Project*,
 592 U.S. 414 (2021) .......................................................................................31, 37

*FEC v. Cruz*,
 596 U.S. 289 (2022) ...........................................................................................10

*Florida v. Mellon*,
 273 U.S. 12 (1927) ........................................................................................11, 12

*FPC v. Hope Nat. Gas Co.*,
 320 U.S. 591 (1944) ...........................................................................................31

*Franklin v. Massachusetts*,
 505 U.S. 788 (1992) ...........................................................................................46

*Garrison v. Baker Hughes Oilfield Operations, Inc.*,
 287 F.3d 955 (10th Cir. 2002) ...........................................................................42

*Garrison v. Dep't of Educ.*,
 636 F. Supp. 3d 935 (S.D. Ind. 2022) ................................................................10

*GeoMetWatch Corp. v. Behunin*,
 38 F.4th 1183 (10th Cir. 2022) ...........................................................................29

*Gill v. Whitford*,
 585 U.S. 48 (2018) .............................................................................................42

*Gregory v. Ashcroft*,
 501 U.S. 452 (1991) ...........................................................................................44

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
 527 U.S. 308 (1999) ...........................................................................................42

*GTE Corp. v. Williams,*
  731 F.2d 676 (10th Cir. 1984) ...................................................................40

*Haaland v. Brackeen,*
  599 U.S. 255 (2023)...................................................................................11

*Habecker v. Town of Estes Park,*
  518 F.3d 1217 (10th Cir. 2008) .................................................................13

*Heideman v. S. Salt Lake City,*
  348 F.3d 1182 (10th Cir. 2003) .................................................................17

*Hobby Lobby Stores, Inc. v. Sebelius,*
  723 F.3d 1114 (10th Cir. 2013) .................................................14, 16, 18

*Jones v. Hendrix,*
  599 U.S. 465 (2023)...................................................................................19

*Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.,*
  31 F.3d 1536 (10th Cir. 1994) ...................................................................40

*Keyes v. Sch. Dist. No. 1,*
  895 F.2d 659 (10th Cir. 1990) ...................................................................44

*Labrador v. Poe,*
  144 S. Ct. 921 (Mem.) ...............................................................................43

*Lewis v. Casey,*
  518 U.S. 343 (1996)............................................................................42, 43

*Little Sisters of the Poor v. Pennsylvania,*
  591 U.S. 657 (2020)...................................................................22, 34, 38

*Lomax v. Ortiz-Marquez,*
  140 S. Ct. 1721 (2020)...............................................................................22

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992).......................................................................9, 12, 14

*Marx v. Gen. Revenue Corp.,*
  568 U.S. 371 (2013)...................................................................................24

*MD/DC/DE Broads. Ass'n v. FCC,*
  236 F.3d 13 (D.C. Cir. 2001).....................................................................45

*MD/DC/DE Broads. Ass'n v. FCC,*
  253 F.3d 732 (D.C. Cir. 2001)...................................................................45

*Michigan v. EPA,*
    576 U.S. 743 (2015)................................................................................................ 32, 33

*Mississippi v. Johnson,*
    71 U.S. (4 Wall.) 475 (1866) ........................................................................................46

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)...................................................................................................... 32, 34

*N. Haven Bd. of Educ. v. Bell,*
    456 U.S. 512 (1982)........................................................................................................20

*NFIB v. OSHA,*
    595 U.S. 109 (2022)........................................................................................................29

*N.M. Health Connections v. HHS,*
    946 F.3d 1138 (10th Cir. 2019) ....................................................................................33

*N.Y. Cent. Sec. Corp. v. United States,*
    287 U.S. 12 (1932)..........................................................................................................31

*N.Y. Tr. Co. v. Eisner,*
    256 U.S. 345 (1921)........................................................................................................19

*Nat'l Broad. Co. v. United States,*
    319 U.S. 190 (1943)........................................................................................................31

*Nat'l Truck Equip. Ass'n v. NHTSA,*
    711 F.3d 662 (6th Cir. 2013).........................................................................................32

*Nebraska v. Biden,*
    52 F.4th 1044 (8th Cir. 2022) .............................................................................7, 43, 44

*Nebraska v. Biden,*
    636 F. Supp. 3d 991 (E.D. Mo. 2022)............................................................................7

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010) ....................................................................................46

*Nitro-Lift Techs., LLC v. Howard,*
    568 U.S. 17 (2012).........................................................................................................26

*Nken v. Holder,*
    556 U.S. 418 (2009)................................................................................................. 17, 41

*Nova Health Sys. v. Edmondson,*
    460 F.3d 1295 (10th Cir. 2006) ....................................................................................14

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,*
    389 F.3d 973 (10th Cir. 2004) ...............................................................42

*Oklahoma v. Biden,*
    577 F. Supp. 3d 1245 (W.D. Okla. 2021) ...........................................46

*Oklahoma v. Castro-Huerta,*
    142 S. Ct. 2486 (2022)............................................................................18

*OPM v. Richmond,*
    496 U.S. 414 (1990)................................................................................30

*PDK Lab'ys, Inc. v. DEA,*
    362 F.3d 786 (D.C. Cir. 2004) ........................................................ 34, 39

*Pennaco Energy, Inc. v. Dep't of Interior,*
    377 F.3d 1147 (10th Cir. 2004) .............................................................37

*Pennsylvania v. Kleppe,*
    533 F.2d 668 (D.C. Cir. 1976) ..............................................................11

*Pennsylvania v. New Jersey,*
    426 U.S. 660 (1976)................................................................................10

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015)..................................................................................37

*Petry v. Block,*
    737 F.2d 1193 (D.C. Cir. 1984) ............................................................38

*Phillips Petroleum Co. v. EPA,*
    803 F.2d 545 (10th Cir. 1986) ..............................................................38

*Prairie Band Pottawatomie Nation v. FHA,*
    684 F.3d 1002 (10th Cir. 2012) .............................................................34

*Quince Orchard Valley Citizens Ass'n v. Hodel,*
    872 F.2d 75 (4th Cir. 1989).................................................................40

*Raines v. Byrd,*
    521 U.S. 811 (1997)................................................................................17

*Rezac Livestock Comm'n Co. v. Pinnacle Bank,*
    255 F. Supp. 3d 1150 (D. Kan. 2017)...................................................16

*Rocky Mountain Gun Owners v. Polis,*
    No. 23-cv-01077, --- F. Supp. 3d ---, 2023 WL 5017253 (D. Colo. Aug. 7, 2023)............................17

*RoDa Drilling Co. v. Siegal,*
    552 F.3d 1203 (10th Cir. 2009) ....................................................................40

*Rotkiske v. Klemm,*
    589 U.S. 8 (2019) ............................................................................... 19, 22

*Salient Power Sols., LLC v. Cullari Indus., LLC,*
    No. 1:23-cv-479, 2023 WL 3847307 (D. Colo. June 6, 2023) ...................41

*Salinas v. United States,*
    522 U.S. 52 (1997) .....................................................................................30

*Salt Lake Tribune Publ'g Co., LLC v. AT&T Corp.,*
    320 F.3d 1081 (10th Cir. 2003) ................................................................40

*San Juan Citizens All. v. Stiles,*
    654 F.3d 1038 (10th Cir. 2011) ................................................................32

*Schrier v. Univ. of Colo.,*
    427 F.3d 1253 (10th Cir. 2005) ................................................................39

*Sebelius v. Cloer,*
    569 U.S. 369 (2013) ..................................................................................25

*Shaffer v. Globe Prot., Inc.,*
    721 F.2d 1121 (7th Cir. 1983) ..................................................................41

*Shinseki v. Sanders,*
    556 U.S. 396 (2009) ..................................................................................34

*Simon v. E. Ky. Welfare Rts. Org.,*
    426 U.S. 26 (1976) .....................................................................................15

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ............................................................................. 9, 16

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ....................................................................................8

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ..................................................................................43

*Tyson Foods, Inc. v. Bouaphakeo,*
    577 U.S. 442 (2016) ..................................................................................43

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n,*
    590 U.S. 604 (2020) ..................................................................................23

*U.S. Navy SEALs 1-26 v. Biden,*
   578 F. Supp. 3d 822 (N.D. Tex. 2022) .................................................46

*United States v. Brown,*
   348 F.3d 1200 (10th Cir. 2003) ............................................................31

*United States v. Grimaud,*
   220 U.S. 506 (1911) ..............................................................................31

*United States v. Richardson,*
   418 U.S. 166 (1974) ..............................................................................11

*United States v. Texas,*
   599 U.S. 670 (2023) .......................................................................*passim*

*Univ. of Tex. v. Camenisch,*
   451 U.S. 390 (1981) ..............................................................................42

*Utah Gospel Mission v. Salt Lake City Corp.,*
   316 F. Supp. 2d 1201 (D. Utah 2004), *aff'd*, 425 F.3d 1249 (10th Cir. 2005) .................41

*Va. Uranium v. Warren,*
   139 S. Ct. 1894 (2019) ..........................................................................21

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
   435 U.S. 519 (1978) ........................................................................37, 38

*Walker v. UPS,*
   240 F.3d 1268 (10th Cir. 2001) ............................................................19

*Warth v. Seldin,*
   422 U.S. 490 (1975) ........................................................................13, 16

*Weight Watchers Int'l v. Luigino's,*
   423 F.3d 137 (2d Cir. 2005) .................................................................40

*West Virginia v. EPA,*
   597 U.S. 697 (2022) ........................................................................26, 27

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001) ..............................................................................31

*Willis v. HHS,*
   38 F. Supp. 3d 1274 (W.D. Okla. 2014) ..............................................46

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ..........................................................................*passim*

*Wreal, LLC v. Amazon.com, Inc.*,
   840 F.3d 1244 (11th Cir. 2016) ..................................................................40

*Wyoming v. Dep't of Interior*,
   674 F.3d 1220 (10th Cir. 2012) ..................................................................12

*Wyoming v. Oklahoma*,
   502 U.S. 437 (1992)............................................................................... 6, 12

*Wyoming v. USDA*,
   661 F.3d 1209 (10th Cir. 2011) ..................................................................38

*Yakus v. United States*,
   321 U.S. 414 (1944)....................................................................................31

*Youngberg v. Gen. Motors LLC*,
   No. 22-7047, 2023 WL 7126422 (10th Cir. Oct. 30, 2023) ......................29

**U.S. Constitution**

U.S. Const., art. I, § 9, cl. 7............................................................................30

**Statutes**

2 U.S.C. § 661c.................................................................................................30

5 U.S.C. § 553...................................................................................................37

5 U.S.C. § 706.......................................................................................31, 34, 37

20 U.S.C. § 1078-1...........................................................................................25

20 U.S.C. § 1087a.............................................................................................30

20 U.S.C. § 1087b.............................................................................................30

20 U.S.C. § 1087e.......................................................................................*passim*

20 U.S.C. § 1087i.............................................................................................25

20 U.S.C. § 1089.................................................................................................5

20 U.S.C. § 1098bb...................................................................................6, 27, 29

26 U.S.C. § 61...................................................................................................10

26 U.S.C. § 108.................................................................................................10

31 U.S.C. § 3711 .................................................................................................................26

Mo. Rev. Stat. § 173.360 .....................................................................................................7

Pub. L. No. 89-329, 79 Stat. 1219 (1965) ...........................................................................2

Pub. L. No. 102-325, 106 Stat. 448 (1992) .........................................................................2

Pub. L. No. 103-66, 107 Stat. 312 (1993) ...........................................................................3

Pub. L. No. 118-5, 137 Stat. 10 (2023) ...............................................................................6

**Rules**

Fed. R. Civ. P. 12 .......................................................................................................... 17, 46

**Regulations**

34 C.F.R. § 685.208 ...........................................................................................................20

34 C.F.R. § 685.219 ...........................................................................................................13

59 Fed. Reg. 61,664 (Dec. 1, 1994) ......................................................................3, 4, 20, 28

77 Fed. Reg. 66,088 (Nov. 1, 2012) .....................................................................3, 4, 20, 28

80 Fed. Reg. 67,204 (Oct. 30, 2015) ...................................................................3, 4, 20, 28

85 Fed. Reg. 79,856, (Dec. 11, 2020) ...................................................................................6

86 Fed. Reg. 28,299 (May 26, 2021) .....................................................................................4

87 Fed. Reg. 61,512 (Oct. 12, 2022) .............................................................................. 6, 34

88 Fed. Reg. 1894 (Jan. 11, 2023) ............................................................................. 4, 33, 34

88 Fed. Reg. 43,820 (July 10, 2023) ............................................................................passim

Executive Order 12,866 ...........................................................................................32, 33, 38

Executive Order 13,563 ......................................................................................................38

**Other Authorities**

A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts (2012) ...................22

Kate Stith, *Congress' Power of the Purse*,
   97 Yale L.J. 1343 (1988) ...............................................................................................30

Kris W. Kobach, *Why Kansas Plans To Sue the Biden Administration Over the Latest Student Loan Gambit*, Washington Free Beacon (Feb. 28, 2024), https://perma.cc/B67K-H6ZE ........................................7

*Press Release, White House, FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most* (Aug. 24, 2022), https://perma.cc/R2ND-6RQI ....................................................34

Repay, *American Heritage Dictionary* (4th ed. 2001)...............................................................................22

Tax Foundation, *State Individual Income Tax Rates, 2024* (Feb. 20, 2024),
https://perma.cc/CU4A-5LT2................................................................................................................10

U.S. Dep't of Educ., *Combined Public Service Loan Forgiveness Form Report* (June 30, 2023),
https://perma.cc/R87N-PQBX..............................................................................................................14

## INTRODUCTION

With respect to federal student loans, Congress has long provided, and the Secretary of Education has long exercised, clear statutory authority to create "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D). This lawsuit challenges the creation of exactly that sort of plan. That is all the Court needs to know to resolve the merits of most of Plaintiffs' claims.

But the Court should not reach the merits at all, because Plaintiffs have not carried their burden to establish Article III standing. Plaintiffs clearly have policy and legal disagreements with the Secretary's approach to student loans, but their standing theories give them no basis to air those grievances in federal court. Their complaint seems to reference as many as five different standing theories. *See* Compl. ¶ 113, ECF No. 1. Their preliminary-injunction motion says that "the States have suffered the requisite injury in fact in four ways," but then lists only three. Pls.' Mem. in Supp. of Mot. for Prelim. Inj. ("Pls.' Br.") at 7, ECF No. 24. And one of those three theories—that is, injury to state instrumentalities, which is the only theory that the Supreme Court accepted in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023)—is accompanied by an extraordinary concession: that, rather than alleging facts to show Article III standing in the complaint, Plaintiffs "anticipate having proof of these facts at the time of any hearing scheduled on this motion." Pls.' Br. at 10 n.9. But "Article III standing is not merely a troublesome hurdle to be overcome if possible so as to reach the merits of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787." *United States v. Texas*, 599 U.S. 670, 675 (2023) (quotations omitted). Because Plaintiffs have not carried their burden on that critical threshold issue, their complaint should be dismissed, and their preliminary-injunction motion should be denied.

Regardless, even if Plaintiffs had alleged Article III standing, they are not likely to succeed on the merits of any of their claims. Plaintiffs' basic submission is that the relevant provision of the Higher Education Act (HEA) "does not authorize debt forgiveness *at all*." Pls.' Br. at 14 (emphasis added). But that interpretation is hard to square with the text of the statute, which expressly authorizes

creation of "an income contingent repayment plan" just like this one.  20 U.S.C. § 1087e(d)(1)(D).  Plaintiffs jumble together various canons of construction in an effort to show that, notwithstanding the plain text, Congress somehow "impliedly denied" this authority to the agency, Pls.' Br. at 18, but those arguments cannot overcome the straightforward statutory text, and are also meritless on their own terms.  In fact, *every* Secretary since the enactment of this authority has offered plans that allow forgiveness of the remaining balance after a borrower has paid his or her loans for "an extended period of time" that is "not to exceed 25 years," 20 U.S.C. § 1087e(d)(1)(D).  So what Plaintiffs caricature as a "radical departure[] from past practice," Pls.' Br. at 19, in fact reflects the consistent position of the Department of Education under Presidents Clinton, Bush, Obama, Trump, and Biden.  Ultimately, even if the major-questions doctrine applies, the HEA is sufficiently clear to satisfy it.

Plaintiffs' remaining merits arguments fare no better.  They contend the Department "failed to consider" an accurate estimate of the Rule's cost, States' reliance interests on the loans it will forgive, and inflationary effects, despite the Rule's explanation of the Department's resolution of these issues.  Pls.' Br. at 21-24, 26.  The limited scope of arbitrary-and-capricious review under the Administrative Procedure Act (APA) asks whether the agency's decision was reasoned, however, not whether Plaintiffs' policy views should trump the Department's.  So these, and Plaintiffs' sundry other APA arguments, are doomed to fail.  Finally, Plaintiffs also quibble with the length of the comment period.  But the APA does not specify any required timing, and precedent from the Supreme Court and the Tenth Circuit confirms that these procedural details are left to the agency's discretion.

This case should be dismissed, and Plaintiffs' motion should be denied.

## **BACKGROUND**

### A.    **The Higher Education Act and Prior Income-Contingent Repayment Plans**

The Higher Education Act was signed into law by President Lyndon B. Johnson in 1965 "[t]o strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education."  Pub. L. No. 89-329, 79 Stat. 1219 (1965).  In 1992, bipartisan majorities in both Houses of Congress reauthorized and amended the statute, in revisions that were signed into law by President George H.W. Bush.  Pub. L. No. 102-325,

106 Stat. 448 (1992).  A year later, Congress enacted the Student Loan Reform Act as part of the Omnibus Budget Reconciliation Act of 1993, which was signed into law by President Bill Clinton. Pub. L. No. 103-66, 107 Stat. 312 (1993).  Those amendments, for the first time, provided for issuance of federal student loans directly from the Department of Education, and authorized the creation of income-contingent repayment plans, in language that (after additional reauthorizations and amendments over the years) is now codified at 20 U.S.C. § 1087e.

Under the HEA, the Secretary "shall offer a borrower" five different types of repayment plans from which "[t]he borrower may choose," 20 U.S.C. § 1087e(d)(1), including "a standard repayment plan," *id.* § 1087e(d)(1)(A), "a graduated repayment plan," *id.* § 1087e(d)(1)(B), "an extended repayment plan," *id.* § 1087e(d)(1)(C), "an income contingent repayment plan," *id.* § 1087e(d)(1)(D), and "an income-based repayment plan," *id.* § 1087e(d)(1)(E).  As relevant here, § 1087e(d)(1)(D) provides for:

> an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years, except that the plan described in this subparagraph shall not be available to the borrower of a Federal Direct PLUS loan made on behalf of a dependent student[.]

Before the agency action at issue in this case, the Secretary had used this authority three times: (1) to create the first income-contingent repayment plan in 1994, *see William D. Ford Direct Loan Program*, 59 Fed. Reg. 61,664 (Dec. 1, 1994); (2) to create the PAYE plan in 2012, *see Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program*, 77 Fed. Reg. 66,088 (Nov. 1, 2012); and (3) to create the REPAYE plan in 2015, *see Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program*, 80 Fed. Reg. 67,204 (Oct. 30, 2015).  The parameters varied, but each plan involved determinations by the Secretary about the "amount of income protected from payments, the amount of income above the income protection threshold that goes toward loan payments, and the amount of time borrowers must pay before repayment ends." *Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program*, 88 Fed. Reg. 43,820, 43,827 (July 10, 2023).  And

each included significant loan forgiveness at the end of the plan, as long as a borrower had already completed a specified period of time making payments. *See* 59 Fed. Reg. at 61,666 ("Some borrowers in the ICR plan may not earn sufficient income to fully repay their loans within the statutory 25-year time period. In this event, the Secretary will forgive any outstanding loan balance (principal plus interest) that is unpaid after 25 years."); 77 Fed. Reg. at 66,114 ("The revisions offer eligible borrowers lower payments and loan forgiveness after 20 years of qualifying payments."); 80 Fed. Reg. at 67,209 ("[T]he REPAYE plan requires 20 or 25 years of qualifying payments before a loan is forgiven.").

"Congress has made minimal changes to the Department's authority relating to [income-contingent repayment] in the intervening years, even as" the agency "has acted to create and then amend" those prior plans, 88 Fed. Reg. at 43,827. Congress has never curtailed that authority.

## B.   The SAVE Plan

Almost three years ago, the Department announced the establishment of negotiated rulemaking committees that would debate numerous changes to student financial aid programs, including to income-driven repayment (IDR) plans.[1] *Negotiated Rulemaking Committee; Public Hearings*, 86 Fed. Reg. 28,299, 28,300 (May 26, 2021). Then, fifteen months ago, the Department published a notice of proposed rulemaking (NPRM) soliciting comments on its intended changes to the IDR regulations. 88 Fed. Reg. 1894 (Jan. 11, 2023). Citing the immense (and growing) deleterious effects of student-loan debt on American borrowers, the NPRM took aim at elements of the repayment rules then in effect that inhibited borrowers' ability to repay. *Id.* Among the anticipated changes, relevant here were several alterations to the REPAYE plan: an increase in the amount of income exempt from the calculation of monthly payments; a decrease in the share of discretionary income borrowers must pay monthly; a shorter maximum repayment window for borrowers with low original balances (to be followed by discharge of remaining balances at the end of that window); the cessation of accrued interest charges in certain circumstances; and modifications to allow borrowers increased credit toward qualifying for loan forgiveness. *Id.* at 1895 (summarizing these changes).

---

[1] Income-Driven Repayment is the "umbrella term" that the agency now uses instead of Income Contingent Repayment (ICR) or Income-Based Repayment (IBR). 88 Fed. Reg. at 43,820.

In July 2023, nine months before this lawsuit was filed, the Department published the Final Rule, which created the "Saving on a Valuable Education" or "SAVE" Plan. 88 Fed. Reg. at 43,820. The Secretary signed the Rule and the Department sent it to the Federal Register for publication on June 14, 2023; it was published on July 10, 2023. *Id.*; Decl. of Levon Schlichter (Schlichter Decl.), Ex. 1 ¶ 3. Following the Department's transmission of the Rule to the Federal Register but before its publication, the Supreme Court issued its decision in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023).

The Rule's operative provisions track the broad contours the NPRM identified. In particular, the Rule decreases monthly payments for REPAYE borrowers and limits that plan's repayment window to ten years (from 20 or 25) of qualifying payments for loans with original balances of $12,000 or less.[2] The Rule also addressed input on the NPRM from a wide range of commenters. 88 Fed. Reg. at 43,821-80. Of the 13,621 comments received, none came from Plaintiffs. *See id.* at 43,821.

The HEA requires that proposed regulations be published by November 1 of the year preceding the award year (which begins July 1) those regulations will take effect. 20 U.S.C. § 1089(c)(1). The Rule, published in July 2023, thus provided an additional four months' notice beyond what the statute requires. The HEA also provides, however, that the Secretary may designate certain provisions for early implementation before July 1 of the following year. *Id.* § 1089(c)(2). As announced in the Rule and a series of specific Federal Register notices published months in advance, the Secretary has exercised early implementation authority with respect to several provisions of the Rule, including the changed provision governing credit toward loan forgiveness eligibility. 88 Fed. Reg. at 43,820-21. The result is that repayment plans have been modified and some loan balances have been forgiven under the SAVE Plan as early as February 23, 2024, well before this lawsuit was filed.

## C.    Loan Forgiveness and Litigation Under the HEROES Act

During the COVID-19 pandemic, Congress and the Executive Branch took many steps to alleviate burdens on student-loan borrowers. On March 20, 2020, the Secretary of Education

---

[2] The Rule provides for forgiveness after one additional year for each additional $1,000 in original loan balance above $12,000, up to the statutory 25-year maximum. 88 Fed. Reg. at 43,903; 20 U.S.C. § 1087e(d)(1)(D). A REPAYE borrower whose original balance was $14,000, for example, would be eligible for forgiveness after 12 years of qualifying payments.

announced the suspension of interest accrual and repayment obligations on federal student loans. *Federal Student Aid Programs*, 85 Fed. Reg. 79,856, 79,862 (Dec. 11, 2020).  In taking this step, the Secretary relied not on the HEA, but instead on distinct authority under the Higher Education Relief Opportunities for Students Act (HEROES Act) to "waive or modify any provision . . . applicable to the student financial assistance programs" during a "national emergency."  20 U.S.C. § 1098bb(a)(2), (1).  In the Coronavirus Aid, Relief, and Economic Security Act, Congress extended both pauses through October 2020.  85 Fed. Reg. at 79,857.  After that action lapsed, the Secretary invoked the HEROES Act on several occasions, ultimately suspending interest accrual and repayment obligations until August 28, 2023.  Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, § 271, 137 Stat. 10, 33.

To minimize disruption for borrowers who would transition back to repayment after a long period of suspension, the Secretary announced in August 2022 that the Department would provide additional forms of debt relief.  Specifically, Pell Grant recipients earning less than $125,000 annually (or $250,000 in household income for married recipients) were eligible for $20,000 in federal debt cancellation.  *Id.*  For non-Pell Grant recipients satisfying the same income threshold, $10,000 in relief was announced.  *Id.*  Later that year, the Secretary again published a notice identifying the waivers and modifications of the statutory and regulatory requirements needed to implement those policies, in accordance with the HEROES Act.  *Federal Student Aid Programs*, 87 Fed. Reg. 61,512 (Oct. 12, 2022).

A group of six States challenged that HEROES Act loan relief in the Eastern District of Missouri.  *Nebraska v. Biden*, 4:22-cv-1040 (E.D. Mo. filed Sept. 29, 2022).  Missouri asserted standing vicariously through the Higher Education Loan Authority of the State of Missouri (MOHELA), a servicer of federally held student loans, which Missouri argued was injured by the reduction of fees MOHELA stood otherwise to receive by servicing loans that were forgiven.  In addition, the *Nebraska* plaintiffs put forward alternative theories of injuries to the States themselves.  Four claimed a "direct injury in the form of a loss of specific tax revenues," Pls.' Mem. in Supp. of Mots. for TRO & Prelim. Inj. at 20, ECF No. 5 (quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992)), in that their tax codes defined "income" with reference to the federal definition, which Congress had temporarily altered to exclude student loan debt discharge.  *Id.* at 21.  The plaintiffs also alleged inchoate injuries to their

"sovereign and quasi-sovereign" interests, including to Missouri's "chosen . . . regulatory scheme for accomplishing its constitutional prerogatives" and its "educational system," and to Nebraska's "interest in protecting the well-being of its public employees," through the harms MOHELA and a Nebraska analogue stood to suffer. *Id.* at 22, 23, 24.

The district court denied the motion for a preliminary injunction, holding that no State had shown standing. *Nebraska v. Biden*, 636 F. Supp. 3d 991, 1002 (E.D. Mo. 2022). The Eighth Circuit entered an emergency injunction pending appeal. *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022). Two weeks later, the Supreme Court granted certiorari before judgment and set the case for expedited argument. In its subsequent opinion, the Court held for the States. *Nebraska*, 143 S. Ct. at 2376. On standing, the Court held that Missouri could claim injury through MOHELA, which had alleged a financial injury through the loss of servicing revenues. *Id.* at 2366. And Missouri could claim MOHELA's injury as its own, as MOHELA was a "public instrumentality" of the state. *Id.* (quoting Mo. Rev. Stat. § 173.360). The Court's analysis of the relationship between Missouri and MOHELA went beyond state-law labels into a fact-bound, functional analysis of MOHELA's origins, purpose, governing structure, and reporting scheme. *See id.* Finding standing, the Court went on to conclude that the agency's action exceeded the authority in the HEROES Act. *Id.* at 2368-76.

## D.    This Lawsuit

Plaintiffs—the States of Alabama, Alaska, Idaho, Iowa, Kansas, Louisiana, Montana, Nebraska, South Carolina, Texas, and Utah—announced their intent to file this lawsuit in an online editorial on February 28, 2024, *see* Kris W. Kobach, *Why Kansas Plans To Sue the Biden Administration Over the Latest Student Loan Gambit*, Washington Free Beacon (Feb. 28, 2024), https://perma.cc/B67K-H6ZE, though they waited another month before they actually filed it, on March 28, 2024, *see* Compl. Plaintiffs named three Defendants: President Biden in his official capacity, the Department of Education, and Dr. Miguel A. Cardona in his official capacity as Secretary of Education. The complaint includes four counts: Counts I and II allege that the agency exceeded its statutory authority in issuing the Rule (with the only material distinction being references to the major-questions doctrine in Count I), *see* Compl. ¶¶ 116-55; Count III alleges that the Rule was arbitrary and capricious under

the APA, *see id.* ¶¶ 157-97; and Count IV alleges that the agency violated the APA by providing a 30-day comment period instead of a 60-day comment period, *see id.* ¶¶ 198-209.

## ARGUMENT

Plaintiffs clearly believe that the SAVE Plan is both unwise as a policy matter and unlawful as a legal matter.  But it is the Secretary of Education, not Plaintiff States, to whom Congress has delegated both the authority and the responsibility to manage the large and growing burdens of federal student-loan debt faced by millions of Americans.  Ultimately, Plaintiffs want this Court to supplant both Congress's judgment and the Secretary's about how to address these issues.  But not every question of law or policy is to be resolved by the judiciary, and the central premise of Article III standing is that the "[f]ederal courts do not possess a roving commission to publicly opine on every legal question." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  This case can and should be resolved on that bedrock principle of federal jurisdiction.

If the Court does reach the merits, it should reach the same conclusion reached by every Secretary of Education since 1993, under Presidents Clinton, Bush, Obama, Trump, and Biden: that Congress meant what it said when it authorized the creation of "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years," 20 U.S.C. § 1087e(d)(1)(D)—no more, and no less.  Because this plan satisfies all criteria listed in the statute, it is lawful—even if Plaintiffs would prefer, for policy reasons, additional restrictions that Congress omitted from the text.  As for Plaintiffs' other APA claims, they seek judicial second-guessing of both the agency's detailed explanation for its policy choices and the procedures used during the rulemaking.  Both attempts fail on their own terms and are also inconsistent with the APA's deferential standard of review, particularly on questions of policy and agency procedure.  And the remaining equitable factors for preliminary relief weigh strongly against this eleventh-hour attempt to halt further implementation of a rule that was published last summer, and that has already been implemented in part.

The case should be dismissed; the motion for a preliminary injunction should be denied.

# I.    THE CASE SHOULD BE DISMISSED FOR LACK OF ARTICLE III STANDING.[3]

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  A plaintiff who seeks to show standing "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  "The party invoking federal jurisdiction bears the burden of establishing these elements," which "are not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561.  More than a mere "troublesome hurdle to be overcome" in racing to adjudicate the merits of a case, standing "is 'built on a single basic idea—the idea of separation of powers.'" *Texas*, 599 U.S. at 675 (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984)).

A party generally lacks standing to challenge the provision of benefits to a third party.  *See, e.g.*, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342-46 (2006).  And States do not have any direct or personal stake in the account balances of student-loan borrowers.  So although many alternative theories of standing were on the table in the litigation arising out of the Secretary's prior debt relief action, in the end, only Missouri's state-instrumentality theory prevailed in *Nebraska*, 143 S. Ct. at 2365.  But here, despite filing their complaint nine months after the Rule's publication, Plaintiffs have not identified any analogue to MOHELA, and Missouri is not a plaintiff.[4]  Their remaining theories are legally deficient and speculative, meriting dismissal for lack of standing—just as many challenges to HEROES Act debt relief were dismissed.  *See, e.g.*, *Dep't of Educ. v. Brown*, 600 U.S. 551 (2023).

## A.    Plaintiffs' tax-revenue theory is foreclosed by Supreme Court precedent.

Nine of the eleven Plaintiff States assert that the plan will diminish their tax revenues.  *See* Compl. ¶¶ 87-97; Pls.' Br. at 7-9.[5]  They contend that some student loans that might have been

---

[3] Part I, which supports Defendants' Motion to Dismiss, spans approximately nine pages.  In conjunction with the portions of the Introduction and Background that also apply to the Motion to Dismiss (with the remainder about the preliminary-injunction motion), this length complies with the Court's April 16 order about page limits.  *See* Mem. & Order, ECF No. 44, at 4 n.3.

[4] Missouri has filed its own lawsuit.  *See Missouri v. Biden*, No. 4:24-cv-00520 (E.D. Mo.).

[5] That includes South Carolina.  To be precise, the complaint does not allege that South Carolina will suffer harm based on this theory, *see* Compl. ¶ 172, but the preliminary-injunction motion does, Pls.' Br. at 7.  Nothing turns on this discrepancy, because the theory is meritless.

discharged in the future will instead be discharged under the plan. *See id.* That hypothesized shift in timing matters, they say, because the Internal Revenue Code normally treats "discharge of indebtedness" as a form of "gross income," 26 U.S.C. § 61(a)(11), but a temporary provision excludes discharges of student loans from 2021 to 2025, *see* 26 U.S.C. § 108(f)(5). *See* Pls.' Br. at 7-9. These nine States argue that, because they have chosen to incorporate the Internal Revenue Code's definition of "gross income" into their own state tax codes, a change in the timing of discharges will diminish their revenues. *Id.* That roundabout standing theory is incorrect for multiple independent reasons.

First, these States' alleged harm results from their own choice to tie their tax laws to the Internal Revenue Code. The Supreme Court's decision in *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) (per curiam), squarely forecloses a State's effort to claim standing on such a self-generated basis. There, Pennsylvania sought to show standing to challenge a New Jersey tax by arguing that, because Pennsylvania provided a credit for taxes paid to other States, a tax increase in New Jersey could lead to a loss of tax revenue in Pennsylvania. *Id.* at 664-65. The Supreme Court rejected that theory, explaining that nothing required Pennsylvania to extend the credit, that any harm to Pennsylvania was thus "self-inflicted," and that "[n]o State can be heard to complain about damage inflicted by its own hand." *Id.* at 664; *see also FEC v. Cruz*, 596 U.S. 289, 297 (2022) (summarizing *Pennsylvania*).

Any reduction in the States' tax revenues here is self-inflicted in the same way. States need not use the same definition of gross income as the federal government does, and in fact they routinely exercise their independence in this area by defining income in a variety of different ways. Plaintiffs Alaska and Texas, for example, choose not to tax personal income at all. *See* Tax Foundation, *State Individual Income Tax Rates, 2024* (Feb. 20, 2024), https://perma.cc/CU4A-5LT2. All other States are likewise free to depart from the Internal Revenue Code's approach and to treat student-loan discharges from 2021 to 2025 as taxable state income. If they choose not to, any resulting reduction in their tax revenues is fairly traceable not to the Secretary's plan, but instead, as in *Pennsylvania*, to "decisions by their respective state legislatures" about how to structure their own tax laws. 426 U.S. at 664; *see also Garrison v. Dep't of Educ.*, 636 F. Supp. 3d 935, 937 (S.D. Ind. 2022) (no standing to challenge debt relief based on "an increased state tax burden" because "the Federal Government's student loan relief

program did not injure" plaintiffs, rather, "[t]he State's legislative decision did").

Second, even apart from the self-inflicted nature of the States' asserted harm, the Supreme Court's decision in *Florida v. Mellon*, 273 U.S. 12 (1927), establishes that a federal policy's incidental effects on state tax revenues are not judicially cognizable injuries. There, Florida sought to establish standing to challenge a federal inheritance tax by arguing that the tax would prompt the "withdrawal of property" from the State, diminishing its tax base. *Id.* at 18. The Supreme Court rejected that argument, explaining that Florida was required to show a "direct injury" and that any harm caused by the federal tax was, "at most, only remote and indirect." *Id.* (emphasis omitted). That analysis equally applies here: Just as Florida could not establish standing by claiming that state tax revenues would decline because of a federal policy, the States here cannot do so either.

Plaintiffs' contrary view has dramatic implications. Virtually all federal actions—from prosecuting crime to imposing taxes to managing property—have some incidental effects on state finances. If such incidental effects suffice for standing, every State would have standing to challenge almost any federal policy. That would flout Article III's case-or-controversy requirement and convert the federal courts into "an open forum for the resolution of political or ideological disputes." *United States v. Richardson*, 418 U.S. 166, 192 (1974) (Powell, J., concurring); *see Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976) ("[T]he unavoidable economic repercussions of virtually all federal policies . . . suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury in fact to support state standing."). The Supreme Court has repeatedly acknowledged those sorts of concerns in rebuffing broad theories of Article III standing, including in other recent litigation between States and the United States. *Cf., e.g.*, *Texas*, 599 U.S. at 670.[6]

Third, the States' theory of reduced tax revenues is speculative. "Standing is not 'an ingenious academic exercise in the conceivable'"; rather, a plaintiff must show that its asserted injury is "certainly

---

[6] To that end, Plaintiffs' complaint (but not their preliminary-injunction motion) contains unexplained references to their "sovereign" and "quasi-sovereign" interests. Compl. ¶¶ 8-40. To the extent that Plaintiffs mean to half-heartedly invoke some sort of *parens patriae* theory, it is settled that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (citation omitted).

impending." *Lujan*, 504 U.S. at 564 n.2, 566 (citations omitted); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Plaintiffs' hypothesized loss of tax revenues starting in 2026 is neither certain nor impending. Instead, it depends on the assumption that if borrowers did not receive discharges under the plan, they would receive discharges for other reasons; that those discharges would not occur until 2026 or later; and that neither state nor federal law would change in the meantime. *See* Compl. ¶¶ 87-97. The States' theory thus depends on a "speculative chain of possibilities," which does not suffice to establish standing. *Clapper*, 568 U.S. at 410.

The only authority Plaintiffs cite in support of their tax-revenue standing theory, *Wyoming v. Oklahoma*, 502 U.S. at 448, 454, is not to the contrary. In *Wyoming*, there was "unrebutted evidence" of a loss of "hundreds of thousands of dollars in severance taxes" as a direct result of the challenged Oklahoma regulations, which had been adopted with the avowed purpose of reducing purchases of coal from Wyoming. *Id.* at 443. Wyoming thus had standing to invoke the Supreme Court's original jurisdiction and challenge the Oklahoma laws under the Commerce Clause because it had suffered "a direct injury in the form of a loss of specific [coal] tax revenues." *Id.* at 448. This is not a suit by one State against another in the forum the Constitution provides for resolving such disputes. Nor do the States claim that the Secretary targeted or discriminated against them. They allege, at most, that the SAVE Plan will have incidental effects on their general tax revenues. That is not enough. *See Florida*, 273 U.S. at 18; *Wyoming v. Dep't of Interior*, 674 F.3d 1220, 1234-35 (10th Cir. 2012) (summarizing Supreme Court's decision in *Wyoming* and reiterating that "merely speculative" "assertions of future lost tax revenues" are insufficient).

### B.  Plaintiffs' recruiting theory is speculative and unsupported.

Plaintiffs next point to a purported competitive disadvantage in "recruiting, hiring, and retention" of state and local employees that they predict will result from the Rule. Pls.' Br. at 9-10.[7]

---

[7] As the source of Plaintiffs' purported harm, the preliminary-injunction motion cites only the Rule's forgiveness of eligible borrowers' loans after ten years. Pls.' Br. at 9; *see* 88 Fed. Reg. at 43,903. As discussed elsewhere in this brief, however, the Rule enacts myriad regulatory changes apart from the loan-forgiveness provision. Following Plaintiffs' framing, the government responds here only to the notion that the loan-forgiveness provisions have harmed Plaintiffs.

The existence of the Public Service Loan Forgiveness (PSLF) program, the theory goes, incentivizes graduates burdened by student-loan debt to accept state and local public-service jobs that they could otherwise not afford to take. And the Rule, Plaintiffs say, will eliminate "one of the distinguishing benefits" of those jobs by forgiving loans for "*all* eligible borrowers" in public and private sector jobs alike. *Id.* at 10 (emphasis in original). Accepting the recruitment theory means crediting two assertions: (1) that the Rule makes the PSLF program less attractive to borrowers, and (2) that public-sector recruitment will actually suffer as a result.

Both links in this causal chain are riddled with exactly the sort of logical inconsistency and speculation on which Article III does not permit a federal case to rest. *Clapper*, 568 U.S. at 409. Moreover, the second standing element, traceability, requires "proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact." *Habecker v. Town of Estes Park*, 518 F.3d 1217, 1225 (10th Cir. 2008) (citation omitted). Where the causation chain alleged runs through an independent third party, the burden of demonstrating standing rises: "That an injury is indirect does not necessarily defeat standing, 'but it may make it substantially more difficult to establish that, in fact, the asserted injury was the consequence of the defendants' actions.'" *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 504-05 (1975)). Plaintiffs' "speculative inferences" do not surmount that bar here. *See id.*

Start with the notion that the Rule inhibits the attractiveness of the PSLF program. Under PSLF, a borrower is eligible for forgiveness of direct loan balances of any amount after she has made the equivalent of 120 qualifying monthly payments under a qualifying plan while working full-time for an eligible employer in public service. 34 C.F.R. § 685.219(c), (d). In contrast, borrowers enrolled in the SAVE Plan will receive forgiveness of direct loan balances after ten years of regular monthly payments so long as the total original principal balance of the loan did not exceed $12,000. 88 Fed. Reg. at 43,903. For direct loans with original balances exceeding $12,000, the required years of regular monthly payments increases with each additional $1,000 of original principal balance. *Id.* In other words, the PSLF program allows for forgiveness of (1) a greater loan balance (2) after a shorter period of time (3) on a broader range of repayment plans. That means the PSLF program retains significant

benefits for public-service employment beyond what the SAVE Plan makes available.[8]  *See* 88 Fed. Reg. at 43,834, 43,880.  So it is not only speculative, but counterintuitive, to assume that the Rule will materially diminish the PSLF program's appeal.  *Lujan*, 504 U.S. at 560-61.[9]

What about the rest of the Rule?  There are good reasons to think that it incentivizes *more* public-service work, not less.  As detailed above, a borrower intending to avail herself of the PSLF program may enroll in SAVE, thereby obtaining discharge of certain loan balances on a faster timetable.  In addition, that borrower will benefit from lower monthly payments and limited interest accrual under SAVE, smoothing the road to PSLF forgiveness.  88 Fed. Reg. at 43,888 ("[T]he SAVE plan will produce lower monthly payments than those other plans for most borrowers[.]"); *id.* at 43,952 ("[A]ddressing the accrual of unpaid interest on a monthly basis will provide significant benefits to borrowers by ensuring they don't see their balances grow while they make required payments.").

---

[8] In fact, as of June 2023, the average balance of a borrower seeking PSLF was approximately $88,000—more than seven times the SAVE Plan's forgiveness threshold.  U.S. Dep't of Educ., *Combined Public Service Loan Forgiveness Form Report* (June 30, 2023), https://perma.cc/R87N-PQBX.

[9] This theory is even more meritless when considered in the context of Plaintiffs' motion for a preliminary injunction.  After all, standing to obtain a preliminary injunction requires more than conceivable allegations in the complaint alone.  *Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 (10th Cir. 2006) ("A preliminary injunction is an extraordinary remedy, and thus the right to relief must be clear and unequivocal." (quotation omitted)); *see also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1185 (10th Cir. 2013) (Matheson, J., concurring in part) ("[A]t the preliminary injunction stage, the [plaintiffs] must make a 'clear showing' that they have standing." (citation omitted)).

PSLF's *actual* utility in recruiting, intuitive or not, is a proposition wholly without evidentiary support in this record.  Plaintiffs attach to their motion the affidavit of the human resources director at the Kansas Attorney General's office to show the relevance of PSLF availability to her recruiting efforts.  Decl. of Leslie Gish (Gish Decl.), ECF No. 24-4.  The affidavit, however, identifies no employee who accepted a job in the attorney general's office because of PSLF availability.  Nor does it even point to an individual employee, or candidate, to whom PSLF availability was meaningful in hiring.  Rather, the director asserts that she advertises PSLF to candidates, ¶ 5, explains the PSLF program to new employees, ¶ 7, and has signed "approximately three" PSLF eligibility forms, ¶ 8.  And she says nothing at all about how (or why) she expects any of this to change if the SAVE plan goes into effect.  The declaration submitted by the equivalent director at the Texas Attorney General's office is to the same effect.  Decl. of Henry de la Garza (de la Garza Decl.), ECF No. 24-5.

As a result, one is left with only a speculative connection between PSLF and hiring in two of the eleven Plaintiff States.  *Clapper*, 568 U.S. at 409; *Cato Inst. v. Cardona*, No. 1:23-cv-11906, --- F. Supp. 3d ----, 2023 WL 5232910, at *7 (E.D. Mich. Aug. 14, 2023) ("Plaintiffs' presidents' own declarations do not suggest that any employee was *actually impacted* by the [challenged action].  Their declarations merely assert that Plaintiffs plan to recruit PSLF participants in the future, some of whom may be impacted by the Adjustment.  This is far too speculative for standing." (citations omitted)).

More fundamentally, Plaintiffs' entire theory of standing based on PSLF is premised on the idea that student-loan debt makes public-sector employment less attractive than higher-paid private-sector work, if not downright infeasible. Pls.' Br. at 9. It stands to reason, then, that additional relief from such burdens—whether labeled "PSLF," the "SAVE Plan," or something else entirely—would make it *easier* for a borrower to pursue lower-paying jobs in the public sector. Plaintiffs do not explain or account for this logical inconsistency in their own theory, even though it was discussed at length in the Rule itself. *See* 88 Fed. Reg. at 43,884. Ultimately, the relief they request might *exacerbate* any recruiting problems related to student debt, which is fatal to their reliance on this theory to establish Article III standing—as a matter of injury, causation, *and* redressability. *Cf.* Pls.' Br. at 31 (asserting that "an injunction limited to" the borders of Plaintiff States would "entic[e] their citizens to leave").

At day's end, many factors affect a job candidate's choice of where to work, and an employee's choice of whether to stay or leave in a role. To be viable, Plaintiffs' theory of recruitment harm would need to simplify this multivariate equation through plausible allegations—and to obtain a preliminary injunction, a clear evidentiary showing—that any drop in recruitment can reasonably be attributed to the Rule, rather than unsupported speculation about "the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976). They have not done so.

### C.     Plaintiffs' state-instrumentality theory fails.

Taking a lesson from Missouri's success in establishing standing in *Nebraska* via injury to MOHELA, Plaintiffs allege that Louisiana has "a state instrumentality or quasi instrumentality that provides student loans" to its residents. Compl. ¶ 108; *see also* Pls.' Br. at 10 ("Plaintiff states have [state] instrumentalities, and they will suffer irreparable financial harm as a result of the final rule."). The name of that instrumentality, though, is unstated. And the complaint does not even allege that this undefined instrumentality services federal student loans, like MOHELA did. Rather, nine months after the Rule's publication, Plaintiffs say only that they "anticipate having proof of" the existence of such instrumentalities "at the time of any hearing scheduled on this motion." Pls.' Br. at 10 n.9.

The Constitution and the Federal Rules require more than a "you'll-find-out" allegation of standing. To invoke this Court's jurisdiction, Plaintiffs were required to "clearly allege facts

demonstrating" each element of standing, in the complaint.[10]  *Spokeo*, 578 U.S. at 338 (quoting *Warth*, 422 U.S. at 518).  Their failure to name any affected state instrumentality is fatal.

### D.  Plaintiffs' theory of increased law-enforcement costs is abandoned, speculative, and foreclosed by precedent.

In two brief paragraphs in their complaint, Plaintiffs faintly sketch a fourth standing theory: that the Rule's eventual downstream effects on the broader American economy will require them to increase their consumer-protection and anti-fraud law-enforcement costs.  *See* Compl. ¶ 113-14.  This argument's absence from the preliminary-injunction motion strongly suggests that Plaintiffs have abandoned it.  *See Rezac Livestock Comm'n Co. v. Pinnacle Bank*, 255 F. Supp. 3d 1150, 1158 (D. Kan. 2017).  For good reason—this theory is far too speculative to support Article III standing.  Accepting for argument's sake the (entirely unsupported) prediction that loan discharge will one day result in fraud attempts on a greater scale, Compl. ¶ 113, it is not at all self-evident that state enforcement efforts will actually increase, or come at a higher cost.  Indeed, even putting aside that a State's enforcement costs are ascribable to its own budgetary choices, not federal regulation, Plaintiffs do not even allege that they in fact intend to expend greater resources on anti-fraud law enforcement if the Rule goes into full effect as planned.  Plaintiffs have thus not carried their burden.

On top of all that, the Supreme Court's recent decision in *United States v. Texas*, 599 U.S. 670 (2023), reinforces the need for courts to scrutinize standing carefully even in cases brought by States. In that case, Texas and its co-plaintiffs sued for an injunction altering the federal government's 2021 immigration enforcement guidelines, with which they were dissatisfied.  *Id.* at 673.  To support standing, the States alleged monetary harms stemming from the need to incarcerate and supply social services to noncitizens whom, in their view, the immigration laws obligated the federal government to arrest.  *Id.* at 674.  The Supreme Court rejected that theory.  "Monetary costs," the Court reasoned, "are of course an injury."  *Id.* at 676.  But increased costs alone would not suffice to open the federal courthouse door.  Rather, the plaintiffs also had to show that the dispute was "traditionally thought

---

[10] Equity, of course, demands even more.  *Hobby Lobby Stores*, 723 F.3d at 1185 (Matheson, J., concurring in part) (preliminary injunctions require a "clear showing" of standing).

to be capable of resolution through the judicial process." *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). And because the States had shown no "precedent, history, or tradition of courts" ordering the type of relief requested, they lacked standing. *Id.* at 677.

*Texas* thus not only reaffirms core principles of Article III standing as applied to the States, but also confirms that where the alleged harm is limited to the costs that a State might otherwise incur as a sovereign, something more—a "precedent, history, or tradition" of judicial involvement in the type of federal-state dispute at issue—is required. *Id.* Beyond not raising their claim of financial harm above the level of speculation, Plaintiffs have not made that additional showing here.

## II.    THE PRELIMINARY-INJUNCTION MOTION SHOULD BE DENIED.

Because Plaintiffs have not carried their burden to plead Article III standing, this suit can and should be dismissed on that basis, in its entirety. *See* Fed. R. Civ. P. 12(b)(1), (h)(3). Plaintiffs' preliminary-injunction motion should then be denied as moot. But even if the Court separately considers Plaintiffs' motion, it is meritless.

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S 7, 24 (2008), and may only issue when the movant's entitlement to relief is "clear and unequivocal," *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1261 (10th Cir. 2004) (citation omitted). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. Where, as here, the federal government is the defendant, the third and fourth factors merge into a consideration of the public interest. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "It is the movant's burden to establish that each of these factors tips in his or her favor." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188-89 (10th Cir. 2003).

Plaintiffs are not likely to succeed on the merits of any of their claims. That is not only because they are meritless (for the reasons below), but also because of their standing problems (for the reasons above). Indeed, the burden to show standing to obtain a preliminary injunction is higher than it is to survive a motion to dismiss. *See, e.g.*, *Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01077,

--- F. Supp. 3d ---, 2023 WL 5017253, at *4 (D. Colo. Aug. 7, 2023) (citing *Hobby Lobby Stores*, 723 F.3d at 1185 (Matheson, J., concurring) (requiring a "clear showing" of standing)); *see supra* at 14 n.9. Plaintiffs also fail to show irreparable harm that would justify this "extraordinary remedy." *Winter*, 555 U.S. at 24, and the public interest weighs strongly against an injunction—particularly the sweeping nationwide relief that Plaintiffs request here, at the eleventh hour. Plaintiffs' motion should be denied.

### A.    Plaintiffs are not likely to succeed on the merits of their statutory-authority claims.

Relying heavily on *Nebraska*, Plaintiffs argue that the Rule "conflicts with the Higher Education Act (HEA) in multiple respects." Pls.' Br. at 2. But *Nebraska* was a statutory-interpretation case about a different statute, and the Supreme Court has never "opine[d] on the substantive lawfulness of any action the Department might take under the HEA." *Brown*, 600 U.S. at 565 n.2. Applying the traditional tools of statutory construction—most importantly, by reading the statute's plain text—the Rule fits comfortably within Congress's grant of authority to the Secretary in the HEA. And, to the extent necessary under the major-questions doctrine, that statutory authorization is "clear"—which is why the Department of Education has consistently interpreted it that way in enacting similar (albeit smaller) programs, for the past three decades, across five Presidential Administrations.

#### 1.    *The Final Rule is authorized by the Higher Education Act.*

Statutory interpretation starts, as always, "with the text of the statute." *Bartenwerfer v. Buckley*, 598 U.S. 69, 74 (2023). After all, "[t]he Court may not replace the actual text with speculation as to Congress' intent. Rather, the Court [should] presume more modestly that the legislature says what it means and means what it says." *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2496-97 (2022).

a. The text of the HEA explicitly calls for the creation of "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D). The authority to set the "repayment schedules" for such a plan is delegated to the Secretary: "Income contingent repayment schedules shall be established by regulations promulgated by the Secretary and shall require payments that vary in relation to the appropriate portion of the

annual income of the borrower (and the borrower's spouse, if applicable) as determined by the Secretary." *Id.* § 1087e(e)(4). Congress also directed the Secretary to "establish procedures for determining the borrower's repayment obligation on that loan for such year, and such other procedures as are necessary to implement effectively income contingent repayment." *Id.* § 1087e(e)(1).

The Rule is an exercise of this clear statutory authority. It sets "[i]ncome contingent repayment schedules" for federal student loans. *Id.* § 1087e(e)(4). It does so via "regulations promulgated by the Secretary." *Id.* Those regulations "require payments that vary in relation to the appropriate portion of the annual income of the borrower . . . as determined by the Secretary." *Id.* Those "varying annual repayment amounts" are "paid over an extended period of time prescribed by the Secretary." *Id.* § 1087e(d)(1)(D). That "extended period of time" does not "exceed 25 years." *Id.* And "the borrower's repayment obligation on that loan for such year" is "determin[ed]" by "procedures" created by the Secretary. *Id.* § 1087e(e)(1). No more was required, under the plain text of the statute.

**b.** Where, as here, "the words of a statute are unambiguous, th[e] first step of the interpretive inquiry is" also the "last." *Rotkiske v. Klemm*, 589 U.S. 8, 13 (2019) (citing *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)). Nevertheless, "[i]n understanding this statutory text, 'a page of history is worth a volume of logic.'" *See Jones v. Hendrix*, 599 U.S. 465, 472 (2023) (quoting *N.Y. Tr. Co. v. Eisner*, 256 U.S. 345, 349 (1921))—and here, the relevant history further supports Defendants' interpretation of the plain text. Since this statutory authority was first enacted in 1993, the agency has consistently created "income contingent repayment plan[s]" structured like this one—that is, by setting "annual repayment amounts based on the income of the borrower," determining the "extended period of time for repayment," and then, at the end of that period (which is "not to exceed 25 years") forgiving the balance that remains. 20 U.S.C. § 1087e(d)(1)(D); *see supra* at 3-4 (discussing previous income-driven repayment plans). Congress has been fully on notice of this consistent and well-established practice. But despite making other adjustments to these programs over the years, Congress has never sought to limit the agency's consistent approach. *See, e.g.*, *Walker v. UPS*, 240 F.3d 1268, 1276 (10th Cir. 2001) ("Where an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the

statute in other respects, then presumably the legislative intent has been correctly discerned.") (quoting *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982)).[11]

Despite this long-settled understanding, Plaintiffs' position is that 20 U.S.C. § 1087e(d)(1)(D) "does not authorize debt forgiveness at all." Pls.' Br. at 14. That position proves too much. After all, the statute explicitly authorizes the creation of "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, *not to exceed 25 years*." 20 U.S.C. § 1087e(d)(1)(D) (emphasis added). And such plans exist as an alternative to standard repayment plans, *id.* § 1087e(d)(1)(A), which require borrowers to repay on fixed schedules in equal amounts that total the entire principal and interest accrued thereon. 34 C.F.R. § 685.208(b)(1). On Plaintiffs' view, one wonders, what is supposed to happen to any outstanding loan balance after 25 years? They do not say. In fact, what has always happened—under consistent interpretations by the Department of Education under Presidents Clinton, Bush, Obama, Trump, and Biden—is that any outstanding balance is then forgiven. *See* 59 Fed. Reg. at 61,664; 77 Fed. Reg. at 66,088; 80 Fed. Reg. at 67,204. After all, any payment obligations beyond that time would effectively result in a "repayment plan" that *does* "exceed 25 years," which Congress explicitly prohibited. 20 U.S.C. § 1087e(d)(1)(D). So Plaintiffs' position cannot be correct.

**c.** Plaintiffs' remaining arguments are similarly atextual—that is, they largely reflect implicit limitations that Plaintiffs think *should* be in the statute. For example, Plaintiffs repeatedly object to the provision of the plan that forgives debt "for borrowers that have already made ten years of payments and have balances under $12,000," Pls.' Br. at 15, emphasizing that "Defendants are now attempting to forgive loans after only ten years of payment—instead of twenty to twenty-five years," as in prior plans. But again, all the statute says about timing is that the "extended period of time prescribed by the Secretary" is "not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D). Ten years is an "extended period of time" that does not "exceed 25 years." *Id.*; *accord* 88 Fed. Reg. at 43,826-27 ("[T]he statute

---

[11] "The only time Congress acted to constrain or adjust the Department's authority relating to [income-contingent repayment plans] was in 2007 legislation when it provided more specificity over the periods that can be counted toward the maximum repayment period. Even then, it did not adjust language related to how much borrowers would pay each month." 88 Fed. Reg. at 43,830.

sets an explicit upper limit, but no lower limit for the 'extended period' [of] time that a borrower must spend in repayment."). That is sufficient.

Likewise, Plaintiffs clearly feel strongly that the plan is too expensive. *See* Pls.' Br. at 18 (arguing that the statute "plainly precludes" any "massive debt forgiveness"); *id.* at 4, 6, 14, 19, 31 (repeatedly using the word "massive"). But there is nothing in the statute that limits the Secretary to small or medium-sized relief (as the Secretary has provided several times before), rather than larger-scale relief. This Court should "respect not only what Congress wrote but, as importantly, what it didn't write," *Va. Uranium v. Warren*, 139 S. Ct. 1894, 1900 (2019)—and Congress did not codify Plaintiffs' policy preferences about the size or cost of these programs.

Plaintiffs also rely heavily on a statutory reference to "plans for repayment of such loan, including principal and interest on the loan." 20 U.S.C. § 1087e(d)(1). In Plaintiffs' telling, that language "demonstrates Congress' unequivocal intent that borrowers repay the principal of the loan and at least some amount of interest." Pls.' Br. at 15. Again, although Congress could have said exactly what Plaintiffs wish it did, Congress instead chose language that is (at least) equally consistent with repayment plans that call for repayment of *some*, but not all, "principal and interest on the loan." 20 U.S.C. § 1087e(d)(1). That is because a plan for *partial* repayment of a loan or *slower* repayment of a loan are both still "plans for repayment of such loan, including principal and interest on the loan." *Id.* If Congress intended to authorize only "plans for" *full* or *complete* "repayment of such loan," it could have used those words in the statute. It did not.

Plaintiffs next turn to the word "paid" in 20 U.S.C. § 1087e(d)(1)(D), calling it "an antonym of forgiven/not paid." Pls.' Br. at 15. Sure. But the word "paid," standing alone, says nothing about *how much* must be paid, or *when*. The surrounding statutory text that Plaintiffs ignore, however, does exactly that. As for how much, the answer is "varying annual repayment amounts based on the income of the borrower." 20 U.S.C. § 1087e(d)(1)(D). As for when, the answer is "over an extended period of time prescribed by the Secretary, not to exceed 25 years." *Id.* The plan satisfies those criteria.

All of Plaintiffs' atextual limitations should be rejected. After all, "'[i]t is a fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts.' This

principle applies not only to adding terms not found in the statute, but also to imposing limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 677 (2020) (quoting *Rotkiske*, 589 U.S. at 14 (in turn quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 94 (2012))).  Plaintiffs might prefer that the statute were written differently, but the courts "may not narrow a provision's reach by inserting words Congress chose to omit." *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020); *accord Bostock v. Clayton County*, 590 U.S. 644, 654-55 (2020) ("If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives.").  Many of Plaintiffs' arguments are foreclosed by this bedrock interpretive principle.

**d.**  Plaintiffs also assert that Congress revealed its intent to prohibit loan forgiveness (without saying so explicitly) by using the word "repayment," which "affirmatively precludes massive debt forgiveness."  Pls.' Br. at 14 (emphasis omitted).  How so?  On Plaintiffs' telling, simply because "'[r]epayment' is the noun form of 'repay,' which means 'to pay back.'"  Pls.' Br. at 14 (citing Repay, *American Heritage Dictionary* (4th ed. 2001) (definition 1)).  But "[i]f Congress had wanted the provision to have that effect, it could have said so in words far simpler than those that it wrote."  *Biden v. Texas*, 597 U.S. 785, 798 (2022).  This argument also continues to ignore that a plan for *partial* repayment is still a "repayment plan."

In any event, the premise of Plaintiffs' "repayment" argument is that, by calling something a "repayment plan" in 20 U.S.C. §§ 1087e(d) and (e), Congress has necessarily taken loan forgiveness off the table.  That premise is demonstrably mistaken.  Consider 20 U.S.C. § 1087e(m)—which creates the PSLF program—notably titled "Repayment plan for public service employees."  The "repayment plans" at issue in that sub-section, however, do not just *contemplate* loan forgiveness, they affirmatively *require* it, at least in some circumstances.  *See* 20 U.S.C. § 1087e(m)(1) ("The Secretary shall cancel the balance of interest and principal due . . . .").  So it cannot be right that Congress's use of the phrase "repayment plan," standing alone, confirms that loan forgiveness is off the table.  If anything, just the opposite—20 U.S.C. § 1087e(m) shows that when Congress talks about a "repayment plan" in 20

U.S.C. § 1087e, it knows that loan forgiveness is *on* the table.  After all, courts "do not lightly assume that Congress silently attaches different meanings to the same term in the same statute."  *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 614 (2020) (quotation omitted).

Plaintiffs would support their wooden reading of "repayment" with reference to the agency's own statistical projections.  They point to the Rule's prediction that an average borrower (and an average borrower with only undergraduate loans) will pay more than the loan principal under the old REPAYE plan and less than the principal on the SAVE Plan as proof that prior plans abided by the atextual reading of "repayment" they would now impose onto the statute, and to do otherwise would "obliterate" the "repayment" requirement.  Pls.' Br. at 17.  But Plaintiffs never explain why the agency's projections for the "average" borrower, considered "in the aggregate," *id.* at 16-17, have any legal significance.  If the HEA authorizes loan forgiveness, then it authorizes loan forgiveness—for both typical and atypical borrowers, as long as they meet its criteria.

The logical problems with this aggregation theory are laid bare by Plaintiffs' convenient choice to focus only on "undergraduate-only debt" and "overall student debt," Pls.' Br. at 17—which occupy only two of the three columns on the chart that they cite.  Plaintiffs ignore the numbers for borrowers "with any graduate debt," which cut sharply against their narrative, even otherwise accepting Plaintiffs' theory.  *See* 88 Fed. Reg. at 43,880-81 ($11,645 in total payments, on average, for every $10,000 borrowed).  Ultimately, projected outcomes for the "average" borrower considered "in the aggregate," Pls.' Br. at 16-17, have nothing to do with the statutory-interpretation question at issue here.

Plaintiffs also contend that the agency's "interpretation ignores Congress' careful separation between loans and grants."  Pls.' Br. at 19.  Plaintiffs do not actually establish any such "careful separation" in their brief.  *See id.* (citing unrelated provisions largely without explanation).  But regardless, partial loan forgiveness is not at all inconsistent with the concept of a "loan"—particularly after "an extended period of time" has passed.  20 U.S.C. § 1087e(d)(1)(D).  As Plaintiffs eventually acknowledge, loans are sometimes forgiven, in both the public and the private sectors, without anyone thinking that the forgiven loan was not actually a "loan" at all.  In Plaintiffs' words: "Of course, a loan

can be forgiven or cancelled." Pls.' Br. at 16.  So nothing in this case turns on the meaning of the words "loan" or "grant" standing in isolation.

**e.**  Plaintiffs argue more generally that Defendants' interpretation "violates several canons of construction." Pls.' Br. at 19.  But "[l]inguistic canons are tools of statutory interpretation whose usefulness depends on the particular statutory text and context at issue." *Facebook, Inc. v. Duguid*, 592 U.S. 395, 404 n.5 (2021).  None is useful to Plaintiffs here.

First, Plaintiffs argue that Congress's creation of the PSLF program "defeats the Department's interpretation of the HEA" due to the "the interpretive canon of *expressio unius est exclusio alterius* (also known as the negative-implication canon)." Pls.' Br. at 16, 19.  On Plaintiffs' telling, "[t]he HEA expressly allows for loan forgiveness in certain specific circumstances," such as the PSLF program, but "'repayment' under § 455(d) is not one of them." Pls.' Br. at 16.  This argument fails.

"The interpretive canon, *expressio unius est exclusio alterius*, means expressing one item of [an] associated group or series excludes another left unmentioned." *Chevron USA, Inc. v. Echazabal*, 536 U.S. 73, 80 (2002).  "The force of any negative implication, however, depends on context." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013).  And here, the statutory structure and context—and the text itself—undermines Plaintiffs' arguments about the applicability of this canon.

Loan forgiveness under the PSLF program is mandatory, as a matter of statute—that is, the Secretary does not have discretion to provide a PSLF program *without* loan forgiveness.  *See* 20 U.S.C. § 1087e(m)(1) ("The Secretary shall cancel the balance of interest and principal due . . . for a borrower who . . . .").  By contrast, the Secretary does have the discretion to design an "income contingent repayment plan" without loan forgiveness (at least for the first 25 years of the plan).  *See id.* § 1087e(d)(1)(D) (requiring only "varying annual repayment amounts").  For that reason, Congress had to enact 20 U.S.C. § 1087e(m) to create a permanent PSLF program—without that sub-section, the agency would have no statutory obligation to implement such a generous program, including loan forgiveness within 10 years.  In other words, it is imprecise to say (as Plaintiffs do) that "[t]he HEA expressly *allows* for loan forgiveness in certain specific circumstances," Pls.' Br. at 16 (emphasis added)—in fact, the HEA expressly *requires* loan forgiveness in certain circumstances (*i.e.*, under 20

U.S.C. § 1087e(m)(1), which creates PSLF.  Defendants do not rely on any statutory provision that *requires* loan forgiveness (at least, not within 10 years), so Plaintiffs' *expressio unius* argument fails.

Similarly, Plaintiffs argue that Congress "impliedly denied" the agency authority to act under 20 U.S.C. § 1087e(d)(1)(D) when it enacted 20 U.S.C. § 1087e(d)(1)(E), which created a "partial hardship exception" with certain specific requirements.  Pls.' Br. at 18.  But the sorts of repayment plans listed in 20 U.S.C. § 1087e(d)(1)(A)-(E) create a menu of five partially overlapping options, all to be designed by the Secretary, from which "[t]he borrower may choose."  Each comes with different statutory (and regulatory) authority, criteria, and limits.  So the restrictions on the "partial hardship exception" authority in § 1087e(d)(1)(E)—in particular, how far above or below the poverty line the Secretary may go in modifying repayment obligations under that exception, *see* Pls.' Br. at 18—do not apply to the other four options.  Plaintiffs' own authority supports this common-sense approach.  *See id.* at 18 ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *Sebelius v. Cloer*, 569 U.S. 369, 378 (2013))).

If anything, taking the *expressio unius* canon seriously favors Defendants' position.  That is because there are several places in the HEA that *do* include the sort of cost limitations that do not appear in (but that Plaintiffs want this Court to read into) the text of the provisions at issue in this case.  For example, 20 U.S.C. § 1087e(d)(4) allows for the creation of "an alternative repayment plan," but also requires "the Secretary [to] ensure that such plans do not exceed the cost to the Federal Government . . . of loans made using" certain other plans.  Other examples abound.  *See, e.g.*, 20 U.S.C. § 1078-1(b)(2)(B) ("[I]n no case may the cost to the Secretary of the agreement . . . exceed the cost to the Secretary . . . in the absence of the agreement."); *id.* § 1087e(b)(9)(A) ("may be offered only if the Secretary determines the reductions are cost neutral"); *id.* § 1087e(b)(9)(B) ("The Secretary shall not prescribe such regulations in final form unless an official report from the Director of the Office of Management and Budget to the Secretary and a comparable report from the Director of the Congressional Budget Office to the Congress each certify that any such reductions will be completely cost neutral."); *id.* § 1087i (authorizing the Secretary "to sell loans," but then providing that "any such

sale shall not result in any cost to the Federal Government"). It is Plaintiffs, not Defendants, who rely on implicit cost limitations "other than the ones expressly listed in the statute." Pls.' Br. at 19.

Plaintiffs' second canon is what they call "the presumption against radical changes from past practice." *Id.* (citing one case). That is simply a repackaged version of Plaintiffs' arguments about the major-questions doctrine, which Defendants address more fully below. *See infra* at 26-29. For now, it suffices to say that the factual premise is incorrect—the plan does not reflect any "radical change[] from past practice," given the long history of income-contingent repayment plans created by the Secretary, which have always included loan forgiveness. *See supra* at 3-4.

Third, Plaintiffs argue that the HEA "must be read in conjunction with other statutes governing debts and obligations owed to the federal government," Pls.' Br. at 19-20, though they only identify one: the Federal Claims Collection Act (FCCA). That statute, as a general matter, provides that all federal agencies "[s]hall try to collect a claim of the United States Government," though it also acknowledges circumstances in which an agency "may compromise" such a claim. 31 U.S.C. § 3711(a). But the SAVE Plan "is not the implementation of the Department's authority to compromise claims, it is an implementation of the Department's authority to prescribe income contingent repayment plans," 88 Fed. Reg. at 43,834, which is governed by the far more specific language in 20 U.S.C. § 1087e(d)(1)(D). *See Nitro-Lift Techs., LLC v. Howard*, 568 U.S. 17, 21-22 (2012) (discussing "the ancient interpretive principle that the specific governs the general").

       **2.**     *The major-questions doctrine does not warrant a different result.*

The normal tools of statutory interpretation thus favor the Secretary's reading. But Plaintiffs move the goalposts, arguing that the major-questions doctrine requires not just congressional authorization, but "*clear* congressional authorization" for the Secretary's action. Pls.' Br. at 10-11 (emphasis added). That is because, on Plaintiffs' view, the agency has "invoke[d] broad authority over" a "matter[] of great economic or political significance." *Id.* at 11 (citing *West Virginia v. EPA*, 597 U.S. 697, 721-22 (2022)). But whether or not that doctrine applies here, Plaintiffs' claims still fail.

       **a.** For all the reasons above, Congress *did* provide sufficiently "clear" authorization for the Rule, by authorizing the creation of "an income contingent repayment plan," with certain specified

textual requirements, all of which are satisfied here. 20 U.S.C. § 1087e(d)(1)(D). So the Court could—and, in Defendants' view, should—resolve this case by holding that, whether or not the major-questions doctrine applies, there is sufficiently "clear congressional authorization" to satisfy it. After all, the "the major questions doctrine is a tool for discerning—not departing from—the text's most natural interpretation." *Nebraska*, 143 S. Ct. at 2376 (Barrett, J., concurring).

   **b.** *Biden v. Nebraska*—a statutory-interpretation case about a different statute—is not to the contrary. Defendants acknowledge the Supreme Court's statement that "[t]he basic and consequential tradeoffs inherent in a mass debt cancellation program are ones that Congress would likely have intended for itself." *Id.* at 2375 (quoting *West Virginia*, 597 U.S. at 730). For that reason, the Court stated that the major-questions doctrine applied to the Secretary's invocation of different statutory authority to adopt a different loan-forgiveness plan, which the Court held exceeded the agency's authority under that statute. *See id.* But the majority also made clear that its holding was limited to the program before the Court, which relied on the HEROES Act. *See Nebraska*, 143 S. Ct. at 2371 n.5 ("We decide only the case before us."). And in another case decided the same day, a unanimous Supreme Court correctly explained that "HEROES Act loan relief and HEA loan relief function independently of each other." *Brown*, 600 U.S. at 567. So the Supreme Court has never "opine[d] on the substantive lawfulness of any action the Department might take under the HEA." *Id.* at 565 n.2.

   In addition, there are several material distinctions between *Nebraska* and this case. The most obvious is the starting point of the analysis, which is "the text of the statute." *Bartenwerfer*, 598 U.S. at 74. "The HEROES Act authorizes the Secretary to 'waive or modify any statutory or regulatory provision applicable to'" certain student-loan programs "'in connection with a war or other military operation or national emergency.'" *Nebraska*, 143 S. Ct. at 2368 (quoting 20 U.S.C. § 1098bb(a)(1)). The word "modify," the Court held, "does not authorize basic and fundamental changes." *Id.* "Instead, that term carries 'a connotation of increment or limitation,' and must be read to mean 'to change moderately or in minor fashion.'" *Id.* (citation omitted). But none of that is true of the relevant HEA provision, 20 U.S.C. § 1087e(d)(1)(D), which is not constrained by words like "modify," which carry any comparable "connotation of increment or limitation." *Id.* at 2368.

Second, much of the Court's analysis in *Nebraska* was about the unprecedented nature of the "waivers and modifications" issued by the Secretary under the HEROES Act, which differed in kind—not just in dollar amount—from previous invocations of that authority.  As the Court explained, "[p]rior to the COVID-19 pandemic, 'modifications' issued under the [HEROES] Act implemented only minor changes, most of which were procedural."  *Id.* at 2369.  "Examples include reducing the number of tax forms borrowers are required to file, extending time periods in which borrowers must take certain actions, and allowing oral rather than written authorizations."  *Id.*  In the plan at issue in *Nebraska*, however, in the Court's view, the Secretary had "created a novel and fundamentally different loan forgiveness program."  *Id.*; *see also id.* ("The Secretary's plan has 'modified' the cited provisions only in the same sense that the French Revolution 'modified' the status of the French nobility—it has abolished them and supplanted them with a new regime entirely.").

Again, none of that is true here.  Before the SAVE Plan, the agency had used this HEA authority three times since its enactment: (1) to create the first income-contingent repayment plan in 1994, *see* 59 Fed. Reg. at 61,664; (2) to create the PAYE plan in 2012, *see* 77 Fed. Reg. at 66,088; and (3) to create the REPAYE plan in 2015, *see* 80 Fed. Reg. at 67,204.  To be sure, those programs were smaller in scope than the SAVE Plan.  But all three included similar and significant loan forgiveness, after a borrower completed a designated period in repayment.  *See* 59 Fed. Reg. at 61,666 ("Some borrowers in the ICR plan may not earn sufficient income to fully repay their loans within the statutory 25-year time period.  In this event, the Secretary will forgive any outstanding loan balance (principal plus interest) that is unpaid after 25 years."); 77 Fed. Reg. at 66,114 ("The revisions offer eligible borrowers lower payments and loan forgiveness after 20 years of qualifying payments."); 80 Fed. Reg. at 67,209 ("[T]he REPAYE plan requires 20 or 25 years of qualifying payments before a loan is forgiven.").  In other words, this is not "a novel and fundamentally different loan forgiveness program" that differs in kind from prior agency practice.  *Nebraska*, 143 S. Ct. at 2369.  Indeed, it is ultimately a revision to the REPAYE plan itself, which has been in effect for nearly a decade.

Third, *Nebraska* turned, at least in part, on the Supreme Court's skepticism that COVID-19—at least as the "pandemic wind[ed] down to its end," 143 S. Ct. at 2374—was the sort of "war or other

military operation or national emergency" that Congress had in mind, 20 U.S.C. § 1098bb(a)(1), when it enacted the HEROES Act in the aftermath of September 11th.  *Compare Nebraska*, 143 S. Ct. at 2364 (referencing President Biden's statement that "the pandemic is over"), *with id.* at 2363 (multiple references to "the September 11 terrorist attacks"); *see also* Pls.' Br. at 4 (calling the HEROES Act a "statute Congress passed in the wake of 9/11").  In that sense, it is of a piece with a series of pandemic-era opinions in which the Supreme Court scrutinized Executive Branch invocation of "emergency" powers.  *See, e.g.*, *NFIB v. OSHA*, 595 U.S. 109, 113 (2022) (OSHA vaccine mandate); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021) (CDC eviction moratorium).

Yet again, none of those concerns apply here.  This Rule has nothing to do with any "national emergency" authority, *Nebraska*, 143 S. Ct. at 2364, nor did any of three similar rules that the Secretary previously issued under this statute.  For all these reasons, this Court should take the Supreme Court at its word: it has never "opine[d] on the substantive lawfulness of any action the Department might take under the HEA."  *Brown*, 600 U.S. at 565 n.2.

**3.**      *There is no constitutional doubt that warrants departure from the statutory text.*

After developing their statutory-interpretation arguments, Plaintiffs cram three constitutional objections into the final page of their statutory merits argument, arguing that "[t]he constitutional-doubt canon requires this Court to interpret the Final Rule in a way that avoids these severe constitutional problems."  Pls.' Br. at 21.

Plaintiffs' drive-by constitutional arguments should be rejected.  As a threshold matter, such a cursory and undeveloped presentation is insufficient to preserve these arguments, which are thus forfeited.  *See, e.g.*, *Youngberg v. Gen. Motors LLC*, No. 22-7047, 2023 WL 7126422, at *4 (10th Cir. Oct. 30, 2023) ("cursory references" to an argument "did not adequately raise the issue before the district court"); *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1207 (10th Cir. 2022) (even if a litigant "did proffer some sort of a general, underdeveloped . . . theory in the district court," it "has still forfeited the theory by its skeletal and inadequate presentation").  Particularly in the context of a motion in which Plaintiffs bear the burden to show they have a "clear and unequivocal" right to relief, *Dominion*

*Video*, 356 F.3d at 1261, one paragraph per embedded constitutional sub-theory is a thin reed on which to rest a request for nationwide relief.

In addition, the constitutional avoidance canon has no application where, as here, there is no relevant statutory ambiguity. *See, e.g.*, *DHS v. Thuraissigiam*, 591 U.S. 103, 133 (2020); *see supra* at 18-19. After all, although "[s]tatutes should be construed to avoid constitutional questions," "this interpretative canon is not a license for the judiciary to rewrite language enacted by the legislature." *Salinas v. United States*, 522 U.S. 52, 59-60 (1997) (quotation omitted).

Regardless, if the Court wishes to engage on any or all of Plaintiffs' constitutional-doubt arguments, each is meritless. First, without explicitly identifying it by name or citation, Plaintiffs seem to invoke the Appropriations Clause, paraphrasing it to mean that "the Constitution . . . prohibits any government expenditures that are not authorized by Congress." Pls.' Br. at 20. In fact, the text of the Appropriations Clause is more specific: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const., art. I, § 9, cl. 7. Importantly though, "'[t]he Treasury' does not consist of all potential government revenue." Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343, 1359 (1988). Although the Supreme Court and others have recognized this distinction, Plaintiffs ignore it. *See, e.g.*, *OPM v. Richmond*, 496 U.S. 414, 424 (1990) ("[N]o money can be paid out of the Treasury unless it has been appropriated by an act of Congress." (quotation omitted)); *Affordable Bio Feedstock, Inc. v. United States*, 42 F.4th 1288, 1292 (11th Cir. 2022) ("[t]he only relevant fact is that this money is currently within the Federal Treasury"). And here, the discharge of student-loan debt does not require any "Money" to "be drawn from the Treasury." U.S. Const., art. I, § 9, cl. 7. At least under the Appropriations Clause, that is dispositive. In any event, Congress *has* authorized the agency actions at issue here, *see supra* at 18-26, including by "ma[king] available . . . such sums as may be necessary" for the administration of the federal student-loan program. 20 U.S.C. § 1087a(a); *see also id.* §§ 1087b, 1087e(h), (m); 2 U.S.C. § 661c(c). That is enough to satisfy the Appropriations Clause, if it applies.

Second, Plaintiffs assert that "there are no precedents for an agency rule expending over $100 billion dollars without Congressional authorization." Pls.' Br. at 20. The question of congressional

authorization goes to Plaintiffs' other arguments, which Defendants have already addressed.  But as for the price tag, even accepting Plaintiffs' cost estimate, they never identify any constitutional provision that would be violated solely on the basis that the agency's action is expensive.

Third, over two sentences and citing no authority, Plaintiffs assert that there are "substantial doubts as to whether § 455 satisfies the non-delegation doctrine" because, in their view, it "supplies no obvious intelligible principle." *Id.* at 21.  This argument is foreclosed by binding precedent. Although Congress has delegated authority "[f]rom the beginning of the government," *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 442 (5th Cir. 2020) (quoting *United States v. Grimaud*, 220 U.S. 506, 517 (1911)), the Supreme Court "has invalidated statutes under the nondelegation doctrine only twice, both times in 1935." *United States v. Brown*, 348 F.3d 1200, 1216-17 (10th Cir. 2003).  In the intervening 90 years, the Supreme Court has upheld every delegation it has confronted, including delegations to regulate in the "public interest," *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 216 (1943), *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24 (1932)); to set "fair and equitable" prices and "just and reasonable" rates, *Yakus v. United States*, 321 U.S. 414, 422, 427 (1944), *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591 (1944)); and to issue whatever air quality standards are "requisite to protect the public health," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (quoting 42 U.S.C. § 7409(b)(1)).  The relevant delegations here are far more specific and circumscribed than those that have been upheld by the Supreme Court—which is why the parties have devoted so many pages to debating their intricacies. *See supra* at 18-26; Pls.' Br. at 14-21.

## B.     Plaintiffs are not likely to succeed on their other APA claims.

### 1.     *Policy disagreements with the agency do not support an arbitrary-and-capricious claim.*

The APA directs that an agency action be set aside if it is arbitrary or capricious.  5 U.S.C. § 706(2)(A).  Plaintiffs' efforts notwithstanding, the APA does not permit the courts to become arenas of policymaking of second resort.  Nor does it permit a court to substitute its own—or a plaintiff's— judgment for that of the agency.  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  Rather, the scope of inquiry is "narrow."  *FCC v. Fox Television Stations*, 556 U.S. 502, 513 (2009).  A reviewing court's task is only to determine whether an agency has engaged in "reasoned decisionmaking,"

*Michigan v. EPA*, 576 U.S. 743, 750 (2015), by asking if the agency considered "the relevant factors and whether there has been a clear error of judgment." *Ctr. for Biological Diversity v. Dep't of the Interior*, 72 F.4th 1166, 1178 (10th Cir. 2023) (quoting *Citizens Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008)).  The burden of persuasion falls on the challenger, as the agency's decision is entitled to a presumption of regularity.  *Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1060 (10th Cir. 2014) (quoting *San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1045 (10th Cir. 2011)).

Plaintiffs try to wedge their substantive policy disagreements with the agency into the APA's narrow lane for arbitrary-or-capricious review, taking aim at the Final Rule's consideration of costs, at its treatment of state reliance interests, and with assorted "other reasons." Pls.' Br. at 22-26.  The Court should rebuff these attempts.

**a.**  One variety of arbitrary-and-capricious decisionmaking arises when an agency "entirely fail[s] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Plaintiffs assert that the Department committed such an error when it failed to consider the downstream cost effects of the Supreme Court's decision in *Nebraska*—which the Court handed down after the Secretary signed the Final Rule and sent it to the Federal Register for publication, but before that publication took place.  Schlichter Decl. ¶ 3.  On Plaintiffs' view, "[m]any borrowers who would have had their loans forgiven under the HEROES plan are now eligible to have their loans forgiven under the Final Rule," the Department supposedly erred in not accounting for the costs of the former program in its cost-benefit analysis. Pls.' Br. at 22.

A threshold obstacle to this argument lies in its unreviewability.  The HEA itself does not require *any* cost-benefit analysis, let alone a perfect one. *See Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 510 (1981) ("When Congress has intended that an agency engage in cost-benefit analysis, it has [generally] clearly indicated such intent on the face of the statute.").  Here, the only reason the agency was obligated to conduct a cost-benefit analysis at all was for internal Executive Branch purposes, in accordance with Executive Order 12,866.  *See* 88 Fed. Reg. at 43,867.  But Executive Order 12,866 creates no rights enforceable by litigation plaintiffs outside the Executive Branch.  E.O. 12,866, prmbl.  Accordingly, that analysis is not subject to judicial review. *See, e.g., Nat'l Truck Equip.*

*Ass'n v. NHTSA*, 711 F.3d 662, 670 (6th Cir. 2013) ("Executive Order 12,866 does not create judicially enforcement rights, nor does it provide a basis for rejecting final agency action."); *Air Transp. Ass'n v. FAA*, 169 F.3d 1, 8-9 (D.C. Cir. 1999) (rejecting plaintiff's argument that "it does not seek to assert rights under the order but is merely referencing it to provide evidence of the arbitrary and capricious nature of the . . . decision," calling it "nothing more than an indirect—and impermissible—attempt to enforce private rights under the order"). So any errors in that analysis cannot be the basis for a conclusion that the Rule is arbitrary and capricious under the APA.

Even were the cost-benefit argument reviewable, it fails on the merits. To start, the Secretary signed the Final Rule on June 14, 2023, and his subordinates sent it to the Federal Register for publication later that day. Schlichter Decl. ¶ 3. Because that was two weeks before *Nebraska* was released, the factual development that Plaintiffs claim the agency failed to consider had not even happened yet, as of the date that the Rule was finalized and signed by the Secretary. Subsequent factual developments cannot be held against the agency through the lens of hindsight. Instead, "[i]t is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (quoting *Michigan*, 576 U.S. at 758); *see also, e.g.*, *N.M. Health Connections v. HHS*, 946 F.3d 1138, 1161-62 (10th Cir. 2019) ("Our review is limited to the administrative record, including all materials compiled by the agency that were before the agency at the time the decision was made.").[12]

In any event, Plaintiffs' argument is without merit. Pls.' Br. at 22. In its summary of comments pertaining to the HEROES Act plan and the *Nebraska* litigation, the Department expressly noted that one commenter suggested producing "a secondary cost estimate in the event that the loan cancellation plan does not go into effect." 88 Fed. Reg. at 43,875. The Department responded, "[o]ur cost estimates account for the Department's current and anticipated programs and policies." *Id.* The Department thus explicitly considered and declined an invitation to prepare an alternative cost-benefit

---

[12] This timeline further refutes Plaintiffs' overheated rhetoric about how the SAVE Plan was issued in "defiance of the Supreme Court," Compl. at 3—again, the NPRM was published in January 2023, 88 Fed. Reg. 1894, and the agency completed its work on the Rule in mid-June 2023, Schlichter Decl. ¶ 3, both well before *Nebraska*.

analysis, instead referring to its extensive considerations of cost and reaffirming the Secretary's multipart effort to reduce student-loan burdens. *See State Farm*, 463 U.S. at 43; *Am. Petroleum Inst. v. Dep't of Interior*, 81 F.4th 1048, 1063 (10th Cir. 2023). That the Department expressed confidence in its chances of prevailing in *Nebraska* is unsurprising and legally irrelevant, even if that confidence turned out in hindsight to be misplaced. Pls.' Br. at 22; 88 Fed. Reg. at 43,875.

In the alternative, were the Court inclined to disagree, to grant relief it would also be required to find that prejudice resulted from this error. *Prairie Band Pottawatomie Nation v. FHA*, 684 F.3d 1002, 1008 (10th Cir. 2012) (citing 5 U.S.C. § 706). That is because the APA provides that "due account shall be taken of the rule of prejudicial error," 5 U.S.C. § 706, which is like "an administrative law harmless error rule," *Little Sisters of the Poor*, 591 U.S. at 684 (alteration and citation omitted). Accordingly, "[i]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand." *PDK Lab'ys, Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004). "The party claiming injury bears the burden of demonstrating harm; the agency need not prove its absence." *Combat Veterans for Cong. Pol. Action Comm. v. FEC*, 795 F.3d 151, 157 (D.C. Cir. 2015); *see also Shinseki v. Sanders*, 556 U.S. 396, 409-11 (2009) (explaining that the "burden of showing that an error is harmful normally falls upon the party attacking the agency's determination").

To find the agency's consideration of cost prejudicially erroneous here would effectively require the assumption that the Department was unaware that its overall debt-relief program would come at a large financial cost. That assumption defies common sense. For both the President and the Secretary, reducing the crushing burdens of student-loan debt is an important priority, and the Department undertook this rulemaking and its prior action under the HEROES Act as part of a multiprong effort to alleviate those burdens. 88 Fed. Reg. at 1894; *Press Release, White House, FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most* (Aug. 24, 2022), https://perma.cc/R2ND-6RQJ. The HEROES Act plan held unlawful in *Nebraska* and the SAVE Plan at issue here both reflect efforts to advance those policy priorities. 88 Fed. Reg. at 43,820; 87 Fed. Reg. at 61,512. There is little reason to think, then, that the Secretary would have found the additional costs not to be worthwhile if they were tied to this Rule, rather than to the prior plan.

**b.** Changing tack, Plaintiffs assert that the Department failed to consider their reliance interests on tax revenue and on the recruitment benefits of the PSLF program, as well as on the inflationary effects of the Final Rule, rendering its action arbitrary and capricious. Pls.' Br. at 23-24, 26. Those contentions are without merit.

As the Rule details at some length, the agency received comments from individuals concerned that the plan would have "significant State-level budgetary implications because of the loan forgiveness provisions." 88 Fed. Reg. at 43,877. It also noted comments from individuals concerned that "borrowers may now be less inclined to pursue Public Service Loan Forgiveness (PSLF) since the greater generosity of the proposed plan would make that kind of relief less necessary." *Id.* at 43,879. Likewise, the Department documented comments "arguing that the IDR NPRM failed to consider the potential effects of the proposed changes on inflation." *Id.*

In each instance, the agency responded to the comments raising these issues. In declining to make any responsive changes regarding tax revenues, it explained that "a minority of States tax student loan forgiveness," and that the small number of borrowers on IDR plans to date had not established, in the agency's view, any significant evidence of those States' reliance on tax revenues that might be lost under the SAVE Plan. *Id.* at 43,877. And "[b]ecause only the original ICR plan has been around long enough for borrowers to reach the required number of monthly payments for forgiveness, only a few borrowers have earned forgiveness through an IDR plan." *Id.* Accordingly, there existed no meaningful reliance interest, as States could not have accounted for a rise in that number. *Id.*

The same is true for the Department's consideration of impacts the Rule might have on the PSLF program and on inflation. Pls.' Br. at 23-24, 26. The Department considered but was unconvinced by concerns about PSLF, explaining that the commenters had provided no analysis of these purported effects, that revised repayment provisions of the Rule would benefit PSLF program participants, and that PSLF remained a program with valuable potential benefits to borrowers, the SAVE Plan's benefits notwithstanding. 88 Fed. Reg. at 43,880. In the same vein, the Department referred commenters concerned about inflation to its regulatory impact analysis, which "captured the costs and benefits that [it thought were] most likely to be affected by this final rule." *Id.* at 43,879.

These discussions more than satisfy any legal obligation the agency had to consider state reliance on tax revenues from forgiven loans, on PSLF as a recruitment tool, and on inflation. *Am. Petroleum Inst.*, 81 F.4th at 1063 ("Reasonable minds may differ on the desirability of proceeding with the decision despite these costs, but that is not enough to show that [the agency] 'failed to *consider* an important aspect of the problem' or the relevant factors." (quotation omitted)).

**c.** Plaintiffs end their assertions of arbitrary-and-capricious decisionmaking with various arguments recast from other sections of their motion into procedural terms. Pls.' Br. at 24-26. First, they aver, the Rule "changes course from nearly thirty years of Department practice on loan forgiveness." *Id.* at 24. Even assuming the truth of that (incorrect) statement, this theory fails—it is black-letter administrative law that agencies are permitted to depart from prior policies so long as they reasonably explain such departures. *Fox Television Stations*, 556 U.S. at 514. Even so, the historical record, which was detailed in the Final Rule, flatly contradicts the notion that the Rule represents an aberration from past practice. *See, e.g.*, 88 Fed. Reg. at 43,829 ("Forgiveness of the remaining loan balance after an established time has been a part of the IDR plans since the creation of the Direct Loan Program in 1993-1994." (footnote omitted)); *supra*, at 3-4.

On the subject of historical practice, Plaintiffs' brief is ultimately at war with itself. Eventually conceding the existence of this past agency precedent, Plaintiffs change course and insist that allowing an agency "to rely exclusively on past practices 'would greenlight the aggregation of Executive power through adverse possession.'" Pls.' Br. at 25 (quoting *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 241 (5th Cir. 2024)). In other words, on Plaintiffs' view, unprecedented agency actions are unlawful, but prior agency precedent is also meaningless—heads Plaintiffs win, tails Defendants lose. Moreover, they add, unprecedented agency action should raise questions about the agency's authority to act at all. *Id.* The Court should (at best) treat these arguments as challenges to the Department's legal authority, *see supra* at 18-31, and analyze them accordingly.

Finally, Plaintiffs try to raise "internal contradictions" in the rule. Pls.' Br. at 25-26. Again, neither the law nor the facts are on Plaintiffs' side. "The fact that the administrative record contains some evidence arguably contrary to the [agency's] findings . . . does not render [its] decision arbitrary

and capricious." *Pennaco Energy, Inc. v. Dep't of Interior*, 377 F.3d 1147, 1159 (10th Cir. 2004). And a court does not sit as a factfinder of first resort in an APA case. Rather, it must uphold the agency's factual findings so long as they are supported by substantial evidence. *Id.* at 1156; 5 U.S.C. § 706.

In any event, here, no contradiction lies in any of the facts Plaintiffs cite. Plaintiffs fault the agency for seeking to reduce future delinquencies and defaults while acknowledging that prior changes to the income-driven repayment plan have not fully succeeded in doing so. Pls.' Br. at 25. That one set of changes to REPAYE in 2015 did not reduce defaults thereafter has no bearing on the changes outlined in the Rule, which are distinct. Nor does that fact undermine the need for further revisions to assist borrowers; if anything, it underscores a continuing need. But even if the Court perceived a contradiction, the Department's finding that reducing monthly payments reduces the likelihood of default is supported by substantial evidence (indeed, it is a matter of common sense). *Prometheus Radio Project*, 592 U.S. at 426; 88 Fed. Reg. at 43,881-85. That is enough.

### 2.     *The agency provided notice and an opportunity to comment.*

**a.**     The APA "prescribes a three-step procedure for so-called 'notice-and-comment rulemaking.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). "First, the agency must issue a '[g]eneral notice of proposed rulemaking,' ordinarily by publication in the Federal Register." *Id.* (quoting 5 U.S.C. § 553(b)). Second, "the agency must 'give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments.'" *Id.* (quoting 5 U.S.C. § 553(c)). "Third, when the agency promulgates the final rule, it must include . . . 'a concise general statement of [its] basis and purpose.'" *Id.* (quoting 5 U.S.C. § 553(c)). The Supreme Court has "held that generally speaking this section of the [APA] established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978). Although "[a]gencies are free to grant additional procedural rights in the exercise of their discretion," "reviewing courts are generally not free to impose them if the agencies have not chosen to grant them." *Id.*

The *Vermont Yankee* principle is fatal to Plaintiffs' notice-and-comment claim, which quibbles with the length of the agency's comment period. The APA "does not specify a minimum time for submission of comments in an informal rulemaking." *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984). To the contrary, as the Tenth Circuit has explained, some "opportunity to participate is all that the APA requires." *Phillips Petroleum Co. v. EPA*, 803 F.2d 545, 559 (10th Cir. 1986). Therefore, courts generally lack the authority to arbitrarily impose some minimum required comment-period length. *See id.* (citing *Vt. Yankee*, 435 U.S. at 543); *Wyoming v. USDA*, 661 F.3d 1209, 1239 (10th Cir. 2011) (a court-ordered extension of a time period "would violate the well-settled principle articulated by the Supreme Court in *Vermont Yankee* 'that the formulation of procedure is to be basically left within the discretion of the agencies'" (quoting *Phillips*, 803 F.2d at 559)); *see also, e.g.*, *Conn. Light & Power Co. v. NRC*, 673 F.2d 525, 534 (D.C. Cir. 1982) ("We cannot say that the NRC's choice of a [30-day] comment period was unreasonable. Neither statute nor regulation mandates that the agency do more.").

Plaintiffs rely on out-of-circuit authority and forty-year-old nonbinding guidance from the Administrative Conference of the United States for the proposition that the agency should have "permitted at least sixty days of comments." Pls.' Br. at 28. But although it goes unmentioned in Plaintiffs' brief, that is not the law in the Tenth Circuit, which has recognized that "[c]ourts have uniformly upheld comment periods of 45 days or less." *Phillips*, 803 F.2d at 559 (citing *Conn. Light & Power Co.*, 673 F.2d at 534 (30 days)). That precedent is binding here, whether or not the agency could have offered a longer comment period, in its discretion.[13]

**b.** In the alternative, any procedural notice-and-comment error was harmless. *See Little Sisters of the Poor*, 591 U.S. at 684. Nothing material would have changed had the agency offered a 60-day comment period instead of a 30-day comment period. In fact, none of these Plaintiffs even bothered to comment at all, and they nowhere suggest that their failure to participate had anything to do with the need for another 30 days. While Plaintiffs sat on the sidelines, the agency "received over 13,600

---

[13] Plaintiffs also cite (at 27–28) Executive Orders issued by Presidents Clinton and Obama. But those Executive Orders did not create judicially enforceable obligations, *see* Exec. Order 12,866 § 10; Exec. Order 13,563 § 7, *supra* at 32–33, and in any event they "do not require a 60-day comment period," as the agency explained in the Final Rule, 88 Fed. Reg. at 43,821.

written comments," 88 Fed. Reg. at 43,821, including about issues that are now the subject of this litigation. That is all in addition to the "5,300 public comments" that the agency received "as part of the public hearing process" required by the HEA's negotiated-rulemaking provisions, *id.*—which Plaintiffs do not dispute that the agency complied with fully, and that the Supreme Court has described as "a lengthy deliberative process involving many stakeholders." *Brown*, 600 U.S. at 557. Plaintiffs identify no novel issues that they (or anyone) would have raised during a longer comment period.

Plaintiffs do assert, in one conclusory sentence, that the length of the comment period "prevented the States from developing their arguments regarding reliance interests and the Department's wildly inaccurate cost estimates." Pls.' Br. at 28-29. That factual assertion is accompanied by no sworn statement, nor any explanation of why not one of these eleven States had time to comment within 30 days—that is, on an action that they now describe as raising "major questions" that require expeditious attention from this Court. But even if the statement is true, those issues were aired before the agency, which addressed each of them at length in the Rule. *See supra* at 31-36. So "it would be senseless to vacate and remand" (or issue an injunction) on this basis, just to force the agency to say the same things again. *PDK Lab'ys*, 362 F.3d at 799.

### C. Plaintiffs have not shown irreparable harm.

**1.** A preliminary injunction requires more than a mere possibility of irreparable harm. *Winter*, 555 U.S. at 22. Plaintiffs must show certainly impending injury "of such imminence that there is a clear and present need for equitable relief." *Colorado v. EPA*, 989 F.3d 874, 884 (10th Cir. 2021) (quoting *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005)). Here however, despite the requirement to show (not just allege) irreparable harm, Plaintiffs rest on the same threadbare allegations and meager exhibits that fail even to establish standing. In fact, they narrow their claims of irreparable injury to two: lost tax revenue and missed recruitment and retention opportunities. Pls.' Br. at 29-30; *Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) (describing the irreparable-injury showing as more stringent than injury-in-fact). Once again, those assertions are insufficient.

Take the tax-revenue argument first.  Self-inflicted injuries do not establish irreparable harm for a preliminary injunction.  *Salt Lake Tribune Publ'g Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003).  As explained above, the States possess the ability to alter their tax codes (now or later) to tax the income they claim they fear they will lose forever.  *See supra* at 9-12.  Nor do speculative injuries fit the bill.  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).  Plaintiffs have not shown that the Final Rule will have any obvious effect on the attractiveness of their state and local public-service positions, *see supra* at 12-15, much less the "clear and unequivocal showing" of likely and imminent irreparable harm that equity demands.  *Colorado*, 989 F.3d at 886.

**2.**  Plaintiffs' claim of irreparable harm fails for an additional, independent reason: their significant delay in seeking this purportedly time-sensitive relief.  "[A] party requesting a preliminary injunction must generally show reasonable diligence."  *Benisek v. Lamone*, 585 U.S. 155, 159 (2018).  For that reason, "delay is an important consideration in the assessment of irreparable harm for purposes of a preliminary injunction."  *GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984); *accord RoDa Drilling Co.*, 552 F.3d at 1211 ("[C]ase law dictates that 'delay in seeking preliminary relief cuts against finding irreparable injury.'" (quoting *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543-44 (10th Cir. 1994))).

Plaintiffs challenge an agency rule that was published in the Federal Register over nine months ago, on July 10, 2023.  *See* 88 Fed. Reg. at 43,820.  And even *after* Plaintiffs' counsel announced an intent to file the lawsuit in an online editorial, Plaintiffs waited an additional month to actually sue.  *See supra* at 7.  Courts within the Tenth Circuit and around the country have rejected claims of irreparable harm because of delays that are comparable to (or shorter than) Plaintiffs' nine-month delay here.  *See, e.g.*, *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm."); *Weight Watchers Int'l v. Luigino's*, 423 F.3d 137, 144 (2d Cir. 2005) ("We have found delays of as little as ten weeks sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction.") (citation omitted); *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (affirming denial of preliminary injunction,

calling six months "a long delay in seeking relief" that "indicates that speedy action is not required") (citation omitted); *Shaffer v. Globe Prot., Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983) (affirming denial of preliminary-injunction after plaintiffs "wait[ed] two months . . . to make the request," because "[s]uch a delay is inconsistent with a claim of irreparable injury"); *Salient Power Sols., LLC v. Cullari Indus.*, LLC, No. 1:23-cv-479, 2023 WL 3847307, at *3 (D. Colo. June 6, 2023) (plaintiffs' "considerable three-month delay in filing this TRO motion undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury"); *Am. Ass'n of People with Disabilities v. Herrera*, 580 F. Supp. 2d 1195, 1246 (D.N.M. 2008) (two-week delay from filing lawsuit to seeking preliminary injunction "considerably undercut[ ] their allegation of irreparable harm"); *Utah Gospel Mission v. Salt Lake City Corp.*, 316 F. Supp. 2d 1201, 1221 (D. Utah 2004) ("The court finds that Plaintiffs' [five-month] delay belies any irreparable injury to their rights."), *aff'd*, 425 F.3d 1249 (10th Cir. 2005).

Plaintiffs' nine-month delay here likewise weighs against their request for extraordinary time-sensitive relief. *See* Mem. & Order, ECF No. 17, *Missouri v. Biden*, No. 4:24-cv-00520 (E.D. Mo. April 24, 2024) (in resolving a scheduling dispute in another lawsuit challenging this program, pointing to a similar delay in "find[ing] that Plaintiffs' urgency is of their own making").

### D.     A preliminary injunction would be contrary to the public interest.

Where the federal government is the defendant in a suit seeking a preliminary injunction, the two latter factors of the *Winter* test merge into a single consideration: would an injunction, on balance, serve the public interest? *Nken*, 556 U.S. at 435. The public interest in this case favors Defendants. Certain harm to borrowers and, by extension, to the American public would result from putting the Rule's forgiveness provisions—debuted, it bears repeating, almost a year ago—on hold now. Unlike Plaintiffs, Defendants have identified certainly impending, serious harms in the form of student-loan defaults, 88 Fed. Reg. at 43,881, delinquency, *id.* at 43,882, adverse effects on credit scores, *id.*, decreased liquidity for important purchases, *id.*, decreased enrollment in higher education, *id.* at 43,883, drags on national economic growth, *id.* at 43,884, and increased reliance on federal welfare programs, *id.* The public can expect to suffer more of these harms without the Rule's timely implementation.

Weighed against, say, uncertain injuries to an unidentified instrumentality in an unknown state, it is easy to see where the public interest lies. *See Winter*, 555 U.S. at 23-24, 26 (finding harm to the public interest dispositive in denial of a preliminary injunction).

Moreover, the public interest would not be served by a preliminary injunction modifying the status quo. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (the purpose of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held"); *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc) (preliminary injunctions altering the status quo are "historically disfavored"). As much as Plaintiffs would like to cast themselves as white knights arriving just in time, in reality the Secretary began to implement early loan forgiveness in February, just as the public was notified that he would. 88 Fed. Reg. at 43,821. An injunction disrupting this ongoing plan would result in chaos and uncertainty.

## III.   PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD.

For the reasons above, the Rule is lawful. Nevertheless, should the Court conclude otherwise, the relief that Plaintiffs request is overbroad, for several independent reasons.

### A.   Any relief should be limited to redressing any cognizable injuries of any Plaintiff State that can establish standing.

Plaintiffs call on the Court to exceed longstanding constitutional and historical limits on its equitable powers by issuing a nationwide injunction. Pls.' Br. at 1, 31-32. The Court should decline that invitation, even if Plaintiffs were to prevail on every other issue.

Article III demands that "a plaintiff's remedy . . . be 'limited to the inadequacy that produced his injury.'" *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Principles of equity reinforce that constitutional limitation. A federal court's authority is generally confined to the relief "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Such relief must be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 752 (10th Cir. 2011) ("It is well settled that an injunction must be narrowly tailored to remedy the harm shown." (quoting *Garrison v.*

*Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 962 (10th Cir. 2002))).   Thus, English and early American courts of equity typically "did not provide relief beyond the parties to the case." *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring).   These same principles suggest that any equitable relief issued here must be limited to any Plaintiff State that can establish standing, doubtful though that proposition may be.   *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.");   *see also Labrador v. Poe*, 144 S. Ct. 921, 923 (Mem.) (2024) (Gorsuch, J., concurring) ("The district court's universal injunction defied [equity's] foundational principles.   It did not just vindicate the plaintiffs' access to the drug treatments they sought.   It purported to bar the enforcement of 'any provision' of the law against anyone." (internal citation omitted));   *see also Texas*, 599 U.S. at 693-702 (Gorsuch, J., concurring) (suggesting that the same limitations apply to actions seeking vacatur under the APA);   *Arizona v. Biden*, 40 F.4th 375, 396-97 (6th Cir. 2022) (Sutton, C.J., concurring) (similar).

Honoring the remedial bounds of equity in this case would also mean limiting any injunctive relief not only to any Plaintiff State that can show standing, but to the specific provisions of the Rule allegedly causing harm.   *Lewis*, 518 U.S. at 357 ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established.").   Here, the only relevant provision shortens the maximum repayment period for REPAYE loans, thus accelerating loan forgiveness.   88 Fed. Reg. at 43,903.   And Plaintiffs have not offered any serious argument that any other features of the Rule are unlawful, so the Court should leave them intact for that reason alone.

All of Plaintiffs' arguments to the contrary lack merit.   Quoting the Eighth Circuit's decision in the HEROES Act litigation, they appear to claim that "contested facts" render tailoring an injunction to the Plaintiff States alone unworkable under these circumstances.   Pls.' Br. at 31 (quoting *Nebraska*, 52 F.4th at 1048).   But what precisely those facts are, or why they present difficulties at this juncture, is left to the imagination.   To the contrary, an injunction excluding residents of any Plaintiff States with standing from the Final Rule's loan forgiveness provisions (or with respect to any

borrowers whose loans are serviced by the unnamed Louisiana instrumentality) would be more workable than a nationwide injunction.

Moreover, Plaintiffs' failure to identify any instrumentality akin to MOHELA makes any present assessment of workability only speculative. Central to the Eighth Circuit's tailoring of relief was MOHELA's "national role in servicing" federal student loan accounts, a role that purportedly made it "one of the largest nonprofit student loan secondary markets in America." *Nebraska*, 52 F.4th at 1048. Plaintiffs identify no similar facts here. Nor would undue unfairness follow from an injunction limited to Plaintiffs. They offer no evidence that would-be beneficiaries of the Final Rule would move across state lines to avail themselves of the Final Rule's coverage. Pls.' Br. at 31. As for the contention that an injunction would disadvantage Plaintiffs' own residents, such a consequence is attributable to no more than the States' own decision to bring this lawsuit. That our federal system makes the States answerable to citizens for the policy choices of the former is a feature, not a bug. *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) ("This federalist structure . . . makes government more responsive by putting the States in competition for a mobile citizenry."). The Court should not shift that practical burden onto the federal government (including the federal judiciary).[14]

### B.    The Final Rule is severable.

At a minimum, to the extent the Court concludes that only some portions of the Rule are unlawful (or that only some portions cause Plaintiffs a cognizable Article III injury) it should still decline Plaintiffs' invitation to enjoin the Rule in its entirety. *See Ariz. Pub. Serv. Co. v. EPA*, 562 F.3d 1116, 1122 (10th Cir. 2009) ("We may partially set aside a regulation if the invalid portion is severable."). Typically, "[w]hether the offending portion of a regulation is severable depends upon

---

[14] Plaintiffs' brief requests and argues for a nationwide preliminary injunction against the Final Rule. *See* Pls.' Br. at 31-32 ("The final rule should be stayed across the country while this Court examines the legality of Defendants' actions."). The cover motion, however, includes even broader language, seeking a nationwide injunction against the Rule, as well as "any form of student debt relief not expressly authorized by Congress." Pls.' Mot. for a Prelim. Inj. at 1, ECF No. 23. Plaintiffs have not even attempted to justify that additional measure of broad and amorphous relief, so Defendants do not address it further—other than to say that it resembles a request for an impermissible obey-the-law injunction. *See, e.g.*, *Keyes v. Sch. Dist. No. 1*, 895 F.2d 659, 668 (10th Cir. 1990).

[1] the intent of the agency and [2] upon whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001); *accord Ariz. Pub. Serv. Co.*, 562 F.3d at 1122 (same). This Rule satisfies both requirements.

As for "the intent of the agency," *MD/DC/DE Broads.*, 236 F.3d at 22, the Rule contains a lengthy discussion of the agency's explicit intent that the rule be severable. *See* 88 Fed. Reg. at 43,828-29. It "is composed of a series of distinct and significant improvements . . . that individually provide borrowers with critical benefits." *Id.* at 43,828. And, in the agency's view, "[e]ach of these new provisions standing independently is clearly superior to the current terms of REPAYE or any other IDR plan." *Id.* So the intent of the agency plainly favors severability.

The second and final severability question is "whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broads.*, 236 F.3d at 22. Here again, the agency made explicit and detailed findings about why "each of the components of this final rule can operate in a manner that is independent and severable of each other." 88 Fed. Reg. at 43,828. And it provided specific "[e]xamples" that "highlight how this is the case," addressing virtually all significant features of the rule in various combinations. *Id.*; *see also, e.g.*, *id.* ("increasing the income protection" while "maintain[ing] the interest benefit in the existing REPAYE plan"); *id.* ("consider the reduction in payments without the increased income protection"); *id.* ("the increased income protection by itself"); *id.* at 43,829 ("[p]roviding forgiveness after as few as 120 payments for the lowest balance borrowers"); *id.* ("the awarding of credit toward forgiveness for periods spent in different types of deferments and forbearances"). Plaintiffs offer no basis to question the agency's reasonable resolution of any of these complicated and policy-laden judgments about how parts of the Rule could function independently. Therefore, because enjoining only a portion of the Rule would still "leave a sensible regulation in place," *MD/DC/DE Broads. Ass'n v. FCC*, 253 F.3d 732, 735 (D.C. Cir. 2001), the Court should sever any unlawful portions of the Final Rule from the lawful remainder.

### C.  The Court lacks authority to enter relief directly against the President.

Plaintiffs have named President Biden as a defendant. Compl. ¶ 41. But "[w]ith regard to the President, courts do not have jurisdiction to enjoin him . . . and have never submitted the President

to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citations omitted); *see Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) ("[I]n general this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties."); *id.* at 827 (Scalia, J., concurring in part) ("[W]e cannot issue a declaratory judgment against the President."); *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866). Accordingly, if the Court does not dismiss the case in its entirety, it should at least dismiss the President as a defendant, and likewise should not include him within the scope of any injunction. *See, e.g.*, *Oklahoma v. Biden*, 577 F. Supp. 3d 1245, 1254 (W.D. Okla. 2021); *Willis v. HHS*, 38 F. Supp. 3d 1274, 1278 (W.D. Okla. 2014); *U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 829 (N.D. Tex. 2022).

## **CONCLUSION**

For these reasons, the Court should grant Defendants' motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and deny Plaintiffs' motion for a preliminary injunction.

Dated: April 26, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Stephen M. Pezzi*
STEPHEN M. PEZZI (D.C. Bar No. 995500)
 Senior Trial Counsel
SIMON G. JEROME (D.C. Bar No. 1779245)
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| STATE OF KANSAS, *et al.*,<br><br>                    Plaintiffs,<br><br>          v.<br><br>JOSEPH R. BIDEN, JR., in his official<br>capacity as President of the United States,<br>*et al.*,<br><br>                    Defendants. | Case No. 24-1057-DDC-ADM |

## <u>INDEX OF EXHIBITS</u>

- Exhibit 1:  Declaration of Levon Schlichter

- Exhibit 1-A:  June 14, 2023 Email from the Office of the Federal Register

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

---

STATE OF KANSAS, *et al.*,

               Plaintiffs,

     v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United States,
*et al.*,

            Defendants.

Case No. 24-1057-DDC-ADM

---

# EXHIBIT 1:

## Declaration of Levon Schlichter

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| STATE OF KANSAS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Case No. 24-1057-DDC-ADM |

## <u>DECLARATION OF LEVON SCHLICHTER</u>

1.  I, Levon Isaac Quattrone Schlichter, am a General Attorney, Division of Regulatory Services (DRS), Office of General Counsel, at the United States Department of Education (Department).  My employment in this role began on February 28, 2011.

2.  As a General Attorney within DRS, my responsibilities include ensuring the submission of regulations to the Secretary for signature and, upon receipt of signature, ensuring the transmission of regulations to the Office of the Federal Register (OFR) for publication in the *Federal Register* pursuant to the Federal Register Act, 44 U.S.C. §§ 1501-11.  The statements in this declaration are based on my personal knowledge or information provided to me in my official capacity.

3.  On June 14, 2023, the Secretary signed the Final Rule titled *Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program*.  On the same day, following receipt of the Secretary's signature, the Final Rule was uploaded to the OFR document submission portal for publication.  The Final Rule was later published at 88 Fed. Reg. 43,820 (July 10, 2023).

4.  An email from OFR, confirming that the Final Rule was received for publication, is attached hereto as Exhibit 1-A.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 26 day of April 2024.

*Levon Schlichter*

Levon Schlichter

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| STATE OF KANSAS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Case No. 24-1057-DDC-ADM |

# <u>EXHIBIT 1-A</u>:

## June 14, 2023 Email from the Office of the Federal Register

| | |
|---|---|
| **From:** | Collins, Jackie |
| **To:** | Burton, Vanessa; Malawer, Hilary |
| **Subject:** | FW: Office of the Federal Register:Submission Status: ID:W614202316553766 |
| **Date:** | Monday, April 22, 2024 4:48:54 PM |

**From:** noreply@fedreg.gov <noreply@fedreg.gov>
**Sent:** Wednesday, June 14, 2023 4:06 PM
**To:** Collins, Jackie <Jackie.Collins@ed.gov>
**Subject:** Office of the Federal Register:Submission Status: ID:W614202316553766

> **CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

**Submission ID: W614202316553766**

| Signed Document | Digital Signature | Special Handling | Digital Signature | Upload Status | Remarks |
|---|---|---|---|---|---|
| NFR IDR Preamble RIA PRA Regulatory Text CLEAN FOR SIGNATURE.docx | VALID | Emergency Pub Request-OPE IDR -06-14-2023 letter.hm.docx | VALID | PASSED | |

**Note:** Please verify the submission status of each document row in the **Upload Status** column.

Please contact ofrtechgroup@gpo.gov if you have any questions and concerns.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS, et al., | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, et al.; | § | Civil Action No. 6:24-cv-01057-DDC-ADM |
| | § | |
| *Defendants.* | § | |
| | § | |

**PLAINTIFF STATES' COMBINED REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION AND RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS[1]**

---

[1] Per the Court's order in Dkt. 44, Plaintiffs complied with the page limits.  The portions of the brief related to the motion to dismiss (to include the introduction) within the 15-page limit. Similarly, the portions of the brief related to the preliminary injunction are within the 10-page limit.

i

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

MOTION TO DISMISS RESPONSE ................................................................... 3

   I.    THE STATES HAVE STANDING ON MULTIPLE BASES. ........................... 3

      A.    The States May Support Their Standing Here with Declarations in Response to
        Defendants' Motion to Dismiss. ........................................................................ 3

      B.    The States' Loss of Tax Revenue Establishes Article III Standing. ...................... 4

      C.    The States Will Suffer Competitive Harm to Their Ability to Recruit and Retain
        Employees. .......................................................................................................... 9

      D.    State Instrumentalities ........................................................................................ 13

PRELIMINARY INJUNCTION REPLY .............................................................. 15

   II.    Plaintiffs are likely to succeed on the Merits .................................................... 15

      A.    The Final Rule Exceeds the Department's Statutory Authority ......................... 15

      B.    The Final Rule is Arbitrary and Capricious. ...................................................... 18

      C.    Defendants' Remaining APA Arguments Are Unavailing .................................. 20

   III.    The Department's Truncated 30-Day Notice Period Violated the APA ............. 21

   IV.    The Remaining Requirements for Equitable Relief are Met Here. ..................... 22

      A.    Without Relief from this Court, the States Will Suffer Irreparable Harm. ........ 22

      B.    The Balance of Harms and Public Interest Favor Relief Here. ........................... 23

   V.    The Preliminary Injunction Should Apply Nationwide. .................................... 23

CONCLUSION ..................................................................................................... 24

APPENDIX ............................................................................................................ A

# TABLE OF AUTHORITES

## Cases

*Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592 (1982) ................................. 6

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002) .......................................... 16

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ........................................... 3, 13, 15

*Bull v. United States*, 295 U.S. 247 (1935) ..................................................... 20

*Califano v. Yamasaki*, 442 U.S. 682 (1979) .................................................. 23

*Citizens for Const. Integrity v. United States*, 70 F.4th 1289 (10th Cir. 2023) ............ 18

*Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019) ........................... 8, 13, 18, 19

*DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) ................................ 19

*Does 1-11 v. Bd. of Regents of Univ. of Colorado*, No. 21-1414, slip op. (10th Cir. May 7, 2024) ............. 14

*Florida v. Mellon*, 273 U.S. 12 (1927) ...................................................... 2, 8

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010) ............................ 17

*Hinojos v. United States*, 2024 U.S. Dist. LEXIS 71821 (D. Kan. Apr. 19, 2024) ................................ 3

*Holt v. United States*, 46 F.3d 1000 (10th Cir. 1995) ........................................... 4

*Humane Soc'y of the U.S. v. USDA*, 41 F.4th 564 (D.C. Cir. 2022) ..................................... 18

*Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Soc. & Rehab. Servs.*,
    31 F.3d 1536 (10th Cir. 1994) ............................................................ 22

*Kentucky v. Biden*,
    23 F.4th 585 (5th Cir. 2022) ............................................................. 17

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................. 11, 12

*Michigan v. EPA*, 576 U.S. 743 (2015) ...................................................... 19

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29 (1983) ............................ 1

*Mount Evans Co. v. Madigan*, 14 F.3d 1444 (10th Cir. 1994) ...................................... 7

*Nat'l Fed. Indp. Bus. v. OSHA*, 142 S. Ct. 661 (2022) ........................................ 23

*New York v. DHS*, 969 F.3d 42 (2d Cir. 2020) .............................................. 12

*NRDC v. Perry*, 940 F.3d 1071 (9th Cir. 2019) ............................................. 18

*Paper, Allied-Industrial, Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285 (10th Cir. 2005) ........................................................................... 4

*Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) ......................................... 6

*Phillips Petroleum Co. v. EPA*, 803 F.2d 545 (10th Cir. 1986) ........................... 21

*Ruiz v. McDonnell*, 299 F.3d 1173 (10th Cir. 2002) ....................................... 3

*Sessions v. Dimaya*, 584 U.S. 148 (2018) .................................................. 21

*Sherley v. Sebelius*, 776 F. Supp. 2d 1 (D.D.C. 2011) ................................... 20

*Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772 (10th Cir. 2006) ....... 22

*Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269 (2008) ........................ 4

*Sprint Corp. v. FCC*, 315 F.3d 369 (D.C. Cir. 2003) ...................................... 22

*Texas v. New Mexico*, 462 U.S. 554 (1983) .................................................. 7

*United States v. Texas*, 143 S. Ct. 1964 (2023) ............................................ 8

*Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1978) .................... 21

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022) .............................................. 15

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) .................................... 16

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992) ............................................... 7

## Statutes

20 U.S.C. § 1087e .......................................................................... 15, 16

S.C. Code Ann. § 59-115-40 .............................................................. 14

## Other Authorities

Richard D. Freer & Edward H. Cooper, 13B Federal Practice & Procedure § 3531.11.1 (3d ed.) ..... 7

*Wright & Miller*, § 3531.4 Injury in Fact, 13A Fed. Prac. & Proc. Juris. § 3531.4 (3d ed.) ................. 11

## INTRODUCTION

Defendants believe this Court's authority to exercise review over the challenged rule abolishing *hundreds of billions of dollars* of student debt is non-existent or so narrow as to be outright toothless. Take arbitrary-and-capricious review. Here, the challenged Final Rule did not merely "fail[]to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Instead, the Final Rule operates in an alternative reality. The Final Rule is premised on the Department's authority to waive *$430 billion* of student debt under the HEROES ACT being so entirely unassailable that contingencies need not be considered and victory at the Supreme Court in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023) was an absolute certainty (even though it was already enjoined nationwide by the 8th Circuit and the Supreme Court had refused to stay that injunction). But when the Final Rule was published, the Department had *already* decisively *lost* in *Biden*. Yet the Department chose to press ahead under the reality-defying premise that it had actually *won* that case. And it doesn't even bother to deny that it possessed *absolute authority* to withdraw the Final Rule *pre-publication* to correct its fundamental error. It simply *chose* not to do so.

As a fallback argument, Defendants resort to a "close enough for government work" claim: in Defendants' view, because the HEA does not specifically mandate consideration of costs, it is ultimately completely irrelevant whether the Final Rule will cost the $156 billion that the Rule claims or the more realistic *half trillion dollars* accounting for *Biden*. Thus, the Department did not need to expend a scintilla of thought as to what the Final Rule's actual cost would be post-*Biden*. In the Department's view, it can satisfy the APA's reasoned-decision-making mandate *even though* it does not have a clue how much debt the Final Rule will abolish and its *only cost estimate* was concededly indefensible at the time it was published. But if this can satisfy arbitrary-and-capricious review, federal courts owe the APA a formal burial.

Given the substantive indefensibility of the Final Rule's merits, Defendants predictably attempt to evade judicial review by fixating on standing arguments to preclude this Court's examination of the Final Rule's severely deficient merits. But those arguments fail. The States

1

here have Article III standing on at least three independent bases.

First, the States will suffer lost tax revenues. Defendants do not dispute the basic factual premise that accelerating any debt cancellation from the years 2026-on into the 2024-25 period will cost the States tax revenues. And if a single debt cancellation in any of the Plaintiff States is thus moved up, the States have Article III standing.

Defendants raise various objections, which all ring hollow. They first argue the States' injuries are "speculative." But Defendants' own admissions make plain that $107.4 million from 13,650 borrowers has *already been cancelled* in the Plaintiff States and continues. If even a dollar of that debt cancellation would have otherwise occurred after 2025, the States have standing. Defendants further contend that the States' injuries are "self-inflicted." Not so. The States' longstanding decisions to conform to the federal definition of income have nothing to do with the Final Rule, and Defendants do not even allege as much. Nor do Plaintiffs have any "option" to avoid injury, thus defeating the "self-inflicted" premise: either the States maintain their conformity, and thus suffer lost tax revenue, or they break the link to the federal definition, and suffer new administrative costs. Either way, the fact of injury resulting from the Final Rule is an inescapable reality. Finally, Defendants rely on the long dormant decision in *Florida v. Mellon*, 273 U.S. 12 (1927)—which predates all modern standing precedents—as somehow precluding the States' standing. But *Mellon* is nowhere near as broad as Defendants contend.

The States also have standing because the Final Rule will inflict competitive harms to their ability to recruit and retain employees under the Public Service Loan Forgiveness ("PSLF") Program. As a matter of rudimentary economics, borrowers with an original principal balance of $12,000 or less will lose a significant incentive to stay in lower paying public service jobs if they can have that debt forgiven in the same amount of time wherever they go. Even if the States lose or fail to recruit one employee as a result of this Final Rule, they will be harmed. That is not just unassailable economic logic but borne out by the States' actual evidence.

In contrast, Defendants refused to offer even a scintilla of evidence themselves. Instead, they castigate the States' harms as "speculative"—ironically, based on nothing more than

Defendants' *own counter-intuitive speculation*. Rather than supplying actual evidence or citations, Defendants' arguments devolve into transparent speculation: contending (at 14-15), for example, without citation that "there are good reasons to think…." and "[i]t stands to reason." Such citation-less musings cannot outweigh the actual evidence supplied by the States.

*Third*, States will suffer harm to their instrumentalities. South Carolina, Alaska, and Texas have instrumentalities that each hold a federal family education loan ("FFEL") program portfolio. *See* Exs. E-G. The interest and fees these loans generate provide direct benefits to those states. *Id.* The Final Rule's benefits do not extend to FFEL loans and a borrower would have to consolidate directly with the federal government to receive the benefits. This consolidation will reduce those States' FFEL portfolio and the accompanying interest and fees. *Id.* Harm to these entities are harms to their respective states. *See Biden*, 143 S. Ct. at 2366. ("This acknowledged harm to MOHELA in the performance of its public function is necessarily a direct injury to Missouri itself.")

**MOTION TO DISMISS RESPONSE**

I.     **THE STATES HAVE STANDING ON MULTIPLE BASES.**

Plaintiff States have demonstrated sufficient Article III standing to bring this suit. Their injuries are concrete and imminent, and would not occur but for the Final Rule.

    **A.  The States May Support Their Standing Here with Declarations in Response to Defendants' Motion to Dismiss.**

Motions to dismiss under Rule 12(b)(1) "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based." *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002). For facial attacks, "the district court must accept all [factual] allegations as true." *Hinojos v. United States*, 2024 U.S. Dist. LEXIS 71821, at *4 (D. Kan. Apr. 19, 2024). By contrast, "the analysis differs if the movant goes beyond the complaint's allegations and challenges the facts on which subject matter jurisdiction depends." *Id.* "When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the

truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) (citations omitted).

Here, Defendants have lodged a factual attack on the States' standing, questioning whether the harms that Plaintiffs have alleged are likely to occur in reality. *See* Opp. at 9–17. Hence, the Court is not only permitted but *required* to "look beyond the complaint and has wide discretion to allow documentary and even testimonial evidence under Rule 12(b)(1)." *Paper, Allied-Industrial, Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1292 (10th Cir. 2005). To that end, Plaintiffs have attached the Tran, Abrams, Kraly, Yost, Spate, Keyton, and Efird Declarations as Exhibits A-G, respectively, in support of their Article III standing, in addition to those previously submitted.

### B.   The States' Loss of Tax Revenue Establishes Article III Standing.

Unsurprisingly given the *enormous* amount of money at issue, the Final Rule will affect the amount of tax revenues that Plaintiffs will collect. While Defendants contend (at 11) that any such injuries would be "self-inflicted," "not judicially cognizable," and "speculative," all of those arguments fail.

As an initial matter, Defendants' arguments are badly miscast and distort the governing legal standard. While Defendants frequently fixate as to putative uncertainty as to the *quantity* of harm, this case does *not* involve any issue as to the certainty or ascertainability of damages—which are not available here due to sovereign immunity. Instead, the relevant factual question is solely the *existence* of any *injury* whatsoever—not the extent of damages. And even a "a dollar or two" of injury suffices to establish Article III standing. *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008). Moreover, only a single State need establish standing here for this Court to have jurisdiction. *See, e.g., Massachusetts*, 549 U.S. at 518 ("Only one of the [parties] needs to have standing to permit us to consider [the merits.]"). Nor do Defendants bother to dispute the States' basic premise that advancing *any* cancellation of student debt whatsoever from the 2026-

4

beyond period to 2024-25 would result in decreased State tax revenue in any State that conforms to the federal definition of income. *See also* Exhibits A-D (explaining States' harms from lost tax revenues).

If the Final Rule advances the cancellation of *any debt whatsoever* from the 2026-beyond window to 2024-25 in *any one* of Plaintiff States that conform to the federal definition of income, then the States have standing. And because the applicable burden of proof is a preponderance of the evidence, it need only be 50.1% likely that the Final Rule would so accelerate even a *single debt forgiveness* in *any one* of Plaintiff States.

Measured against this proper legal standard, Defendants' objections that the States' tax-revenue standing arguments are "speculative" badly miss the mark. That the States will suffer *some* amount of injury from loss of tax revenues here is a mathematical certainty, rather than the product of less-likely-than-not speculation. One need look no further than *Defendants' own publications/admissions* to see why that is so. Defendants gleefully published a state-by-state breakdown of $1.2 billion in debt from 153,000 borrowers that had already been forgiven under the Rule as of February 23, 2024.[2]

Of that abolished debt, $107.4 million from 13,650 borrowers is for residents of the Plaintiff States that ordinarily tax student loan debt cancellation as income. *See id.*. And the prospect that *none* of that debt from 13,650 borrowers would have otherwise been forgiven from 2026 to the indefinite future, but is now accelerated into the tax-free 2024-25 period, rests on nothing more than Defendants' own rank speculation. And what holds true for that $1.2 billion applies equally to the $156 billion or more in forthcoming total debt forgiveness that the Rule projects (which is a dramatic underestimate, given the indefensible we-will-win-*Biden* central premise).

Shifting tacks from challenging the States' injuries as a factual matter, Defendants instead contend (at 10-11) that the States' injuries are "self-inflicted" because they putatively

---

[2]  *See* Department of Education, *Biden-Harris Administration Releases State-by-State Breakdown of $1.2 Billion in SAVE Plan Forgiveness* (Feb. 23, 2024) *available at* https://www.ed.gov/news/press-releases/biden-harris-administration-releases-state-state-breakdown-12-billion-save-plan-forgiveness.  This is also set forth in the Appendix here.

"result[] from their own choice to tie their tax laws to the Internal Revenue Code," relying principally on *Pennsylvania v. New Jersey*, [426 U.S. 660](#) (1976). That contention is unavailing because the States will suffer financial injury under the Rule no matter what putative "choice" they make. Because the Final Rule presents no injury-free option, it necessarily follows that the resulting injuries are attributable to the Final Rule and the Hobbesian choice it foisted upon the States, rather than any "self-inflicted" injury.

To begin with, Defendants drastically overstate the States' actual freedom of choice here. Given economic and administrative realities, *36 States* use either federal adjusted gross income or federal taxable income to calculate state income tax liability.[3] This is the national norm, not an aberration—a reality that predates the Final Rule and has nothing to do with it. Defendants' apparent position that the Final Rule obliged the States to change the widely-prevailing practice of conformation itself represents a form of sovereign injury—depriving the States of their sovereign choice to set their own tax policy. *See Alfred L. Snapp & Son v. Puerto Rico*, [458 U.S. 592, 601](#) (1982) (States have "sovereign power ... to create and enforce a legal code."). Furthermore, *Pennsylvania* involved a *State's* attempt to invoke the Privileges and Immunities Clause and Equal Protection Clauses—even though *both* "protect people, not States." [426 U.S. at 665](#). Here the States do not attempt to invoke any personal rights held by their citizens as the basis for their standing, but rather invoke their *own* sovereign and proprietary interests.

Moreover, there is an even more significant difference between *Pennsylvania* and this case: as Defendants admit (at 12) "[t]his is not a suit by one state against another in the forum the Constitution provides for resolving such disputes." In fact, the word "standing" appears only once in *Pennsylvania* and only in reference to a State's authority to bring a *parens patriae* suit— which this suit incontestably is not. *Id. Pennsylvania* should be understood as a product of the context from which it arose: an original action filed in the Supreme Court pursuant to its "original and exclusive jurisdiction of all controversies between two or more States," 28 U.S.C.

---

[3] Tax Policy Center, *Tax Policy Center Briefing Book: State and Local Tax Policies* (Jan. 2024) *available at* [https://tinyurl.com/yc67h33t](https://tinyurl.com/yc67h33t)

§ 1251(a)—a milieu that implicates "special concerns" that "do not provide a sure basis for analogous reasoning in other areas of state standing." Richard D. Freer & Edward H. Cooper, 13B Federal Practice & Procedure § 3531.11.1 (3d ed.). Supreme Court original jurisdiction is reserved for "a dispute between States of such seriousness that it would amount to *casus belli* if the States were fully sovereign." *Texas v. New Mexico*, 462 U.S. 554, 570 n.18 (1983). Needless to say, a *casus belli* is a higher threshold than the States' burden here under the governing "special solicitude."

In any event, even in the context of original state-versus-state actions—where jurisdiction is much more severely circumscribed—"a direct injury in the form of a loss of specific tax revenues" is judicially cognizable. *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992). And the Tenth Circuit has further confirmed that governmental entities have Article III standing where they "ha[ve] been injured by a loss of ... tax monies, and these injuries are traceable to the [Defendant]'s decision[.]" *Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1451 (10th Cir. 1994). Such losses of tax injuries are redressable by invaliding the challenged regulations, "because the [States] would again collect a portion of ... [the] taxes" that would otherwise be lost from the challenged rule. *Id.*

But even assuming that the Constitution otherwise compelled the States to break their policy choice to conform to the federal definition of income to preserve their rights, such a coerced choice to define income independently would *itself* inflict cognizable injuries upon Plaintiff States. Conforming to the federal definition of income provides significant administrative efficiencies that would otherwise be destroyed: that the States would incur administrative costs from breaking the link to the federal definition of income is an incontestable reality that Defendants do not even attempt to dispute.

Injuries to the States' tax collections are certain if they retain their existing tax laws that conform to the federal definition of income. *See* Exs. A-B, D. But the fact of injury is equally certain if all of the Plaintiff States are forced to break free from the federal definition of income. *See* Ilo. A ¶¶7, 10; Ex. B ¶¶9-10; Ex. D ¶¶5-6. Thus, while the Final Rule might theoretically leave

the States "free" to pick their proverbial poison, the Final Rule leaves them with no poison-free—*i.e.*, injury-free—option. The Final Rule therefore inflicts concrete injury upon the States that confers Article III standing.

As a final retreat, Defendants argue that the States' injuries are not cognizable under the ancient precedent of *Florida v. Mellon*, 273 U.S. 12. But *Mellon* is nowhere near as broad as Defendants contend—as the ensuing 97 years have made plain (as does Defendants' inability to cite any precedent applying that 1927 precedent in the manner they suggest in the ensuing century confirms). The Supreme Court recently clarified the scope of *Mellon*'s holding, explaining that "federal policies frequently generate indirect effects on state revenues or state spending" and a "State's claim for standing *can* become more attenuated" when it asserts "that a federal law has produced *only those kinds* of indirect effects." *United States v. Texas*, 143 S. Ct. 1964, 1972 n.3 (2023) (emphases added). But the harm here is clearly more direct than that alleged in *Mellon*. In that case, Florida's theory of standing relied on an unproven assumption about the actions of independent third parties—namely, Florida residents who may have "withdraw[n] property from the state" in response to a new federal statute, "thereby diminishing the subjects upon which the state power of taxation may operate." 273 U.S. at 17–18. In contrast here, however, the States' tax-revenue-based harms do not rely on any similar assumptions about the actions of third parties not before the Court; it is the Final Rule alone that will reduce taxable income without any additional action any third party.

More recently the Supreme Court unanimously held that States had Article III standing to challenge inclusion of a citizenship question on the census because they alleged that they would "lose out on federal funds" as a result. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019). Such a loss of federal funds because of agency action is economically indistinguishable from agency-cause loss of state tax revenues—both involve decreases in funds flowing into State treasuries as a result of challenged federal actions. Just as New York had standing in *Department of Commerce*, so too do the States here.

Defendants argue that even if the States suffer real declines in revenue that are

attributable to the Final Rule, there are still consequentialist reasons to deny standing because of the danger that "every State would have standing to challenge almost any federal policy." Defs.' Br. at 11.  But that naked policy-based reasoning cannot change what Article III means. Nor did it carry the day in either *Massachusetts or Department of Commerce.* Either a party has Article III standing or it does not. Policy considerations are irrelevant. In this case, Plaintiff States have established Article III standing.

### C. The States Will Suffer Competitive Harm to Their Ability to Recruit and Retain Employees.

The States also have Article III standing to challenge the Final Rule because it will harm their ability to recruit and retain employees under the PSLF Program. *See* PI at 9-10. That harm flows from two basic premises that are unassailable as a matter of basic economic logic: (1) the availability of loan forgiveness under the PSLF program is a powerful recruiting tool for States and (2) the magnitude of that recruiting incentive to potential employees has a relationship to the amount of student debt that could be forgiven (*i.e.,* a would-be employee with $10,000 in student debt would find potential total debt forgiveness under the PSLF less of an inducement than a would-be employee with $100,000 in student debt). From those two propositions the States' resulting injuries and Article III standing flow inexorably.

Defendants do not appear to dispute the first proposition: *i.e.,* that availability of student debt cancellation under the PSLF program is an important and powerful recruiting tool for the States and public-interest organizations. Public service jobs, especially at the state and local level, cannot pay as much as the private sector. A strong inventive for potential employees to make that sacrifice in compensation is the promise of public service loan forgiveness after ten years. Indeed, Defendants themselves contend "the PSLF program *retains* significant benefits for public-service employment," thereby admitting that it provided such recruiting benefits pre-Rule too. Opp. at 13-14 (emphasis added).

Somewhat amazingly, Defendants do contest the second principle. But that effort is unavailing. As a matter of elementary economics, public service employment will no longer be as

attractive an option to those with a lower amount of debt because of the direct effects of the Final Rule. This applies to both current and prospective state employees. Take for example, a current employee who had an original loan balance of $12,000 and has been in public service for 8 years. Without the Final Rule, he would have a strong incentive to stay in public service for 2 more years. However, because of the Final Rule, he would get his debt canceled in the same amount of time regardless of where he's employed. Relatedly, a college senior with $12,000 in debt will naturally be less inclined to take a public service position if he knows his debt will be canceled in ten years regardless of where he accepts a job. This presents imminent harm to the States because it is more likely than not that at least one person would leave public service early or not pursue it at all as a direct result of the Final Rule.

Rejecting the concept of economic incentives altogether, Defendants castigate such basic economic reasoning (at 12) as "speculative." In doing so, the Department appears to be projecting its own warped reasoning onto student debt holders: Defendants admit (at 34) that they were entirely indifferent as to the Final Rule's actual cost and would have adopted it whether it cost $1 billion or $1 trillion. But unlike the Department, borrowers *do* weigh actual costs and benefits, and the value that they place on potential PSLF debt relief is proportional to the amount of debt relief that is available and alternative options for obtaining the same relief. The States previously submitted declarations explaining as much, which confirm the basic economic rationality of their actual and potential employees. *See* PI. at 9-10 & Exs. 3-4; *see also* Ex. C.

In stark contrast, Defendants do not submit *any* actual evidence of their own. Instead, rather ironically, they offer nothing more than their own speculation that the ordinary principles of economics will somehow uniformly fail to work here. "Incentives are totally irrelevant" may fly in Defendants' parallel universe in which they also won at the Supreme Court in *Biden*, but it defies economics and logic in ours. Recall the governing standard here: if even a *single* Plaintiff State suffers *any* injury to its recruiting efforts, that establishes Article III standing. So, if even a one employee or potential employee reject incentives, that would result in cognizable injury

here.

Furthermore, standing requirements are relaxed because the States are Plaintiffs. *See Massachusetts v. EPA*, <u>549 U.S. 497, 520</u> (2007). The States argued as much (at 7), and Defendants made no effort to deny that special solicitude applies, thereby conceding the issue. This "special solicitude" has significant bite. In *Massachusetts*, the Commonwealth premised standing on EPA's non-regulation of carbon emissions in the transportation sector over the course of the next *century*, which would allegedly affect Massachusetts's coastline in unknowable amounts and places, in the teeth of international carbon emissions beyond the scope of any conceivable federal regulation; moreover, the regulations that EPA would issue if Massachusetts won were completely unknown and unknowable (and still not all that clear 17 years later); but *all* of that uncertainty did not preclude Article III standing. *Massachusetts*, <u>549 U.S. at 521</u>–26.

Standing requirements are relaxed a second time here because the States are asserting "procedural right[s] to protect [their] concrete interests." *Lujan v. Defs. of Wildlife*, <u>504 U.S. 555, 572</u> n.7 (1992). The States can thus assert their procedural rights under the APA "'without meeting all the normal standards for redressability and immediacy.'" *Massachusetts*, <u>549 U.S. at 498</u> (quoting *Lujan*, <u>504 U.S. at 573</u> n.7). Thus, for example, as the dam-adjacent resident in the *Lujan* example did not need to trace his dam-construction-caused harms through the deficient environmental analysis, the States similarly need not demonstrate that, if the Department conducted a defensible cost estimate or provided a sufficient notice period, the result would be any different.  *Lujan*, <u>504 U.S. at 573</u> n.7.

Defendants' protests that the States' harms are speculative ring particularly hollow given the double relaxation of Article III standing requirements that applies here. *Supra* at 10-11. Indeed, Defendants do not even *attempt* to argue that their "speculative" objections can be reconciled with the special solicitude owed to the States. And the States' recruiting injuries here are *far* less speculative than the potential loss of coastlines over the course of a century that Massachusetts posited in *Massachusetts*. Indeed, Defendants' contentions about "this causal chain" (at 13) are deeply unserious without addressing the relaxation of the causal chain that

*Massachusetts* mandates here. Defendants were not at liberty to ignore that binding precedent. Yet one can scour Defendants' brief in vain for the slightest acknowledgment of that case.

Lacking any serious argument that the States will not suffer competitive harms to their ability to recruit employees, Defendants offer a lengthy contention (at 14 & n.9) that those implicitly acknowledged harms will be offset by other provisions of the Final Rule (i.e., "the rest of the Final Rule"). That fallback position is unavailing for three reasons.

*First*, Defendants' "net benefits" arguments do not defeat Article III standing. "Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury." *Wright & Miller*, § 3531.4 Injury in Fact, 13A Fed. Prac. & Proc. Juris. § 3531.4 (3d ed.). Thus, "the fact that an injury may be outweighed by other benefits … does not negate standing.'" *Accord New York v. DHS*, 969 F.3d 42, 60 (2d Cir. 2020) (citation omitted)).

*Second*, Defendants' contention founders on basic legal logic. If those *other* provisions would provide a net benefit to the States, this Court could simply decline to enjoin *those other provisions* and instead enjoin only those provisions that cause the States injuries. Such tailored relief would easily satisfy any Article III redressability concerns as enjoining only those harm-causing provisions would make it "'likely,' … that the [States'] injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (citation omitted). That is particularly so as redressability requirements are doubly relaxed here. *Supra* at 10-11.[4]

*Third*, Defendants couch their arguments in explicitly speculative terms, all offered without citation or legal support. For example, Defendants offer this Court citation-less arguments (at 14-15) that "there are good reasons to think…." and "[i]t stands to reason." Defendants are thus casting "speculative" stones from a glass house. While the States have

---

[4] This question is largely academic here, however, since Defendants make no effort to parse out *which specific provisions* in "the rest of the [Final] Rule" would actually benefit the States and purported outweigh the competitive harms to recruiting efforts caused by the Final Rule's primary provisions. Should Defendants identify such provisions with specificity, the States would be happy to consider narrower relief that does not include them

provided actual evidence supporting standing on competitive recruiting harms, Defendants offer no actual evidence themselves. Instead, they advance only cries of "speculation" that, rather ironically, are premised on nothing but speculation. Such speculation-based objections do not defeat the States' Article III standing. Nor do Defendants even *attempt* to explain how the States' injuries here are *more* speculative than the Commonwealth's in *Massachusetts*—which nonetheless was not so speculative as to defeat Article III standing.

Defendants' stark and telling refusal to address *Massachusetts* thus silently concedes Article III standing. But in fairness to Defendants, what could they say? Their calculated decision that "nothing" was more persuasive than any actual response they could offer should tell this Court all that it needs to know.

### D.  State Instrumentalities

The States also have standing based on their instrumentalities and quasi-instrumentalities. In Biden, MOHELA, "an instrumentality of Missouri," was harmed "in the performance of its public function" by the first round of debt forgiveness under the HEROES Act. <u>143 S. Ct. at 2365-68</u>. That debt cancellation "harm[ed] MOHELA and thereby directly injure[d] Missouri [therefore] conferring standing on that State." *Id.* at 2365 (cleaned up). And because "at least one plaintiff has standing, the suit [could] proceed." *Id.*

Specifically, MOHELA owned a portfolio of FFELP loans and "receive[d] an administrative fee for each of the" loans it serviced. *Id.* And because the Department's debt cancellation plan would result in discharge of debts that MOHELA serviced, MOHELA would lose "fees that it otherwise would have earned." *Id.* at 2366. That was sufficient to confer standing on Missouri, particularly as MOHELA's "profits help fund education in Missouri" and MOHELA was "subject to the State's supervision and control." *Id.*

The States have standing here on that same basis. Alaska, Texas, and South Carolina all have similar public instrumentalities that would suffer decreased income under the Final Rule. Each entity holds a portfolio of FFELP loans, and the interest/fees that they receive from those portfolios is directly proportional to their portfolio's size. Because some debtors will

undoubtedly consolidate those FFELP loans to direct federal loans so that they can take advantage of the extremely (and intentionally) generous terms of the Final Rule, these entities will see their debt portfolios, and thus resulting income, decrease. That is particularly true as States (and others) may premise Article III standing on the "predictable effect of Government action on the decisions of third parties," and "Article III 'requires no more than *de facto* causality.'" *Dep't of Com.*, <u>139 S. Ct. at 2566</u>. Indeed, the Final Rule specifically added "more clarity" that borrowers "retain the borrower's progress toward forgiveness when they consolidate Direct or FFEL Program Loans into a Direct Consolidation Loan," <u>88 Fed. Reg. at 43,865</u>—making conversion of FFELP loans to direct federal loans even more attractive.

Take South Carolina first, which established the State Education Assistance Authority ("SEAA") as a "public instrumentality of the State." <u>S.C. Code Ann. § 59-115-40</u>. "[T]he exercise by the authority of any power" conferred by the State is "deemed and held to be the performance of an essential public function." *Id.* SEAA, in turn, relies on the South Carolina Student Loan Corporation ("SCSLC") to service its FFELP loan portfolio. *See* Ex. E Ex. 2. Already, since 2011, the portfolio has already decreased from $31 million to $6 million, which has reduced the amount of income generated. *Id.* The Final Rule will decrease the size of SEAA's portfolio further as borrowers convert FFELP loans to take advantage of available debt forgiveness. *See also* Ex. G ¶¶6-8. This, in turn, will result in further loss of revenue to South Carolina.

The same essential story holds true for each of Alaska and Texas. For example, "To the extent that federal policy results in borrowers consolidating their loans out of FFELP into the Direct Loan Program, those consolidations will cause the State of Texas to lose revenue." Ex. F ¶4. Similarly, Alaska "estimates that the SAVE Plan will result in [the State instrumentality] losing approximately $100,000 over just the next two years that it would otherwise collect as a FFELP holder." Ex. G ¶11. And if even a single one of those state instrumentalities would suffer harm from the Final Rule, the States have Article III standing here.

PRELIMINARY INJUNCTION REPLY

## II.   Plaintiffs are likely to succeed on the Merits

While each theory on its own is enough to grant the injunction, there is an even stronger argument for preliminary relief when they are viewed in combination.  *Does 1-11 v. Bd. of Regents of Univ. of Colorado*, No. 21-1414, slip op at 11 (10th Cir. May 7, 2024). Plaintiffs are likely to succeed here on multiple grounds because the Final Rule: (1) exceeds the Department's statutory authority, (2) is arbitrary and capricious, and (3) violated the procedural mandates of the APA.

### A.   The Final Rule Exceeds the Department's Statutory Authority

The Final Rule exceeds Defendants' authority under §455. Defendants' response makes two concessions that make that statutory violation clear: (1) they do not genuinely dispute that the major questions doctrine applies and thus *clear congressional authorization* is required to justify the Final Rule, and (2) they never dispute that their construction of the HEA has *no limiting principle whatsoever*, and would thus permit them to abolish *all student debt* and expend more than a *trillion dollars* in a single rule. As in *Biden*, the HEA "provides no authorization for the Secretary's plan even when examined using the ordinary tools of statutory interpretation—let alone 'clear congressional authorization' for such a program." <u>143 S. Ct. at 2375</u>.

### 1. The Statute Doesn't Clearly Authorize Unlimited Debt Cancellation

As the States previously explained (at 14-18), Congress in §455 explicitly required actual "repayment," which specifically "includ[es] principal *and interest*." <u>20 U.S.C. § 1087e(d)</u> (emphasis added). Indeed, Defendants' carefully chosen pejorative (at 23) that the States' interpretation is "wooden" effectively concedes that the *literal* meanings of "repayment" including "principal and interest" are exactly what the States read them to mean—and that some more "creative" and impressionistic reading is required to reach Defendants' desired construction that "repayment" actually means "forgiveness" and that "principal and interest" means that *not even all principal* be repaid, *let alone interest*. Such Newspeak would make even Orwell blush. In Defendants' view, Congress's reiterated requirements of "repayment" that "includ[es] principal and interest" impose *no restrictions whatsoever* on Defendants' putative authority to cancel *any and all student debt.*

Indeed, Defendants go so far as to contend that "[i]f Congress had wanted the provision [§455] to have that effect, it could have said so in words far simpler than those that it wrote.'" Opp. at 22 (quoting *Biden v. Texas*, 597 U.S. 785, 798 (2022)). But there are few simpler ways to require repayment of student debt including interest than mandating "repayment" to "includ[e] principal and interest." 20 U.S.C. § 1087e(d).

More fundamentally though, this far-simpler-way-to-say principle is readily turned on—and fatal to—Defendants' interpretation. If Congress intended to give the Department *unbounded and unlimited* power to cancel essentially *all* student debt in the United States, why not say so directly? Why hide such awesome power in "'oblique,'" "'subtle devices,'" and "modest words'" of "repayment" including "principal and interest"—to which debt cancellation is the antithesis? *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (cleaned up).

Defendants' refusal to acknowledge *any* limiting principle confirms the stakes here and just how unlikely it is that Congress meant to authorize Defendants' actions here. Under Defendants' interpretation, they could abolish more than *$2.4 trillion* dollars in student debt if they wanted to in a single rule. That exceeds *all annual federal discretionary spending*. That is not merely like "hid[ing] elephants in mouseholes," but rather the entire federal budget. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).[5]

2. **Context Further Militates Against Defendants' Interpretation**

The HEA's context further demonstrates that Defendants lack clear congressional authorization for three reasons. *First*, Congress's *explicit* authorization and mandate that the Department engage in "cancel[lation]" and "forgiveness" of PSLF loans in §455(m)—and refusal to provide any equivalent explicit authority in §455(d)—makes plain that Congress did not supply clear authorization in §455(d). Defendants' interpretation that the differing language in §455(m) and (d) should be read to give it identical debt cancellation authority (or perhaps even

---

[5] Defendants' also split hairs (at 23-24) about whether Plaintiffs' interpretation of "repayment" would operate at the level of individual loans or in the aggregate. That distinction is immaterial here, however, given that the Final Rule eliminates the obligation of "repayment ... includ[ing] ... principal and interest" at both levels. The Final Rule changes the aggregate character from true debt into one of partial grants—requiring, on average, repayment of only $7,069 per $10,000 in debt on average. 88 Fed. Reg. at 43,880.

broader authority in §455(d)) is untenable. *See, e.g., Barnhart v. Sigmon Coal Co.*, <u>534 U.S. 438, 452</u> (2002) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally[.]").

*Second*, Congress's specific definition of hardship thresholds (*see* § 1098e(a)(3)) makes it particularly unlikely it meant for the Department to be able to upend those thresholds at will with its own preferred definitions—especially where the resulting cost could exceed $1 trillion.

*Third*, Congress's creation of separate programs for *grants* under the Pell Grant system and student *loans* is simply incompatible with Defendants' construction that they can transform *all* student loans into grants at will with the stroke of a pen. And Defendants' contention (at 23) that "loans are sometimes forgiven" hardly means that they necessarily must possess the power to forgive *all* such loans, which is the limitless authority they arrogate to themselves here.

### 3.   Defendants' Construction Creates Severe Constitutional Doubts

Defendants' response does little to address the severe constitutional doubts their interpretation would create. Defendants have no answer (at 30-31) to the States' demonstration that there are *no historical analogs* for Defendants' claimed power to spend more than the *entire federal discretionary budget* at will in a single rule, which is "the most telling indication of a severe constitutional problem." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, <u>561 U.S. 477, 505</u> (2010) (citation omitted) (cleaned up). Such "severe constitutional" doubts oblige this Court to read §455(d) in a more constitutionally sound manner.

*Second*, Defendants' construction of §455 creates substantial non-delegation concerns. *Kentucky v. Biden*, <u>23 F.4th 585</u> (6th Cir. 2022) is particularly instructive. There, accepting the President's interpretation that he could "do essentially whatever he want[ed] so long as he determines it necessary to make federal contractors more 'economical and efficient' ... *certainly* would present non-delegation concerns." *Id.* at 606 n.14. Here, however, the HEA does not provide even such minimal "economical and efficient" guidance to advise the Secretary how to exercise his putatively unlimited power to cancel *any and all* student debt. Such unguided and unlimited power "certainly ... presents non-delegation concerns" here too. *Id.*

**B.  The Final Rule is Arbitrary and Capricious.**

As the States have previously explained, the Final Rule rests on a central premise that is not only indefensible but outright reality-defying: *i.e.*, that Defendants' were certain to prevail in *Biden v. Nebraska*, which they had just unequivocally lost 10 days previously. On that basis alone the Department refused to analyze the cost of the Rule in light of the $430 billion in debt that would no longer be cancelled. Further, the Department simply has *no idea how much* student debt the Final Rule will cancel—yet continues to insist that it is meticulously calibrated and the "right" amount. That is arbitrary and capricious decision-making.

Defendants' attempt (at 33) to evade these indefensible APA violations by resetting the clock to June 14, when it dispatched the Rule to the Office of the Federal Register ("OFR"). But it is well established that agencies have complete discretion to withdraw or alter rules submitted to OFR at least until they are made available for public inspection (and likely published in the Federal Register).[6] That occurred here on either July 7 or July 10, 2023—7 or 10 days after *Nebraska* was decided.[7]

Even more troublingly, Defendant Cardona explicitly declared on June 30—hours *after Biden* was decided—that the Department "*today … finalized* our new [Rule]."[8] That "today … finalized" statement is *flatly inconsistent* with the Schlichter Declaration, and further confirms that the Department retained authority to amend or withdraw the Final Rule after June 13. Indeed, Defendant Cardona himself did not regard the rule as finalized until *after Biden* was decided—and publicly declared that fact that Defendants now deny.  Given that absolute authority to withdraw or amend the Final Rule, the Department gravely abused its discretion by pressing forward. Defendants tellingly do not cite any precedent permitting them to ignore such

---

[6]  *Compare Humane Soc'y of the U.S. v. USDA*, 41 F.4th 564, 570 (D.C. Cir. 2022) (holding that the "critical date … [is] the date a rule is filed for public inspection") *with NRDC v. Perry*, 940 F.3d 1071 (9th Cir. 2019) ("[A]gencies are free to withdraw a proposed rule before it has been published in the Federal Register, even if the rule has received final agency approval."); *accord Citizens for Const. Integrity v. United States*, 70 F.4th 1289, 1306–07 (10th Cir. 2023) (approvingly citing *Perry*).

[7]  *See* https://www.federalregister.gov/public-inspection/2023/07/07#regular-filing (July 7, 2023) (July 7 Public Inspection Issue in which the Final Rule first appeared, which indicates a "07/03/2023 at 8:45 am" "filed on" time).

[8]  *See* Department of Education, *Secretary Cardona Statement on Supreme Court Ruling on Biden Administration's One Time Student Debt Relief Plan* (June 30, 2023) (emphasis added) *available at* https://tinyurl.com/2jeyaapa

pivotal, central-assumption-destroying developments that occurred prior to publication.

It is also worth noting what Defendants' declaration tellingly does not say: it makes no effort to deny the obvious implication that the Department sensed that it was likely to lose *Biden* and thus furiously attempted to rush its Final Rule out *before* the Supreme Court could issue its decision. *See generally* Doc. 46-1.  Why else would the Department not wait a single week to obtain the *highest* court's definitive answer for a rule with an effective date more than a *year away* on July 1, 2024? Accepting that Defendants just coincidentally happened to send the Final Rule to OFR mere days before *Biden* was certain to come down would require this Court to "'exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Com.*, 139 S. Ct. at 2575 (citation omitted). Given the obviously pretextual nature of Defendants' actions here, it cannot survive APA review. *Id.* at 2574–76.

Regardless, the Final Rule was arbitrary and capricious even when judged by the state of the world on (or before) June 14, 2023: the Eighth Circuit had issued a nationwide injunction pending appeal, which the Supreme Court refused to stay. 143 S. Ct. 5177 (2022). In fact, the Proposed Rule came out on January 11, 2023—*after* this injunction was in place. *See* 88 Fed. Reg. 1,894. There was never a point in time where it was reasonable for the Department to believe the HEROES Act forgiveness would occur; they relied solely on the Supreme Court intervening to save it. Victory was hardly so obvious that the agency could reasonably place all of its eggs in the basket of winning *Biden*. But that was the Final Rule's *only* rationale on that front. 88 Fed. Reg. at 4,387. The Final Rule's singular "we will win" *Biden* premise was thus arbitrary and capricious from the time the proposed rule was published until it was final.

Defendants also argue (at 32–33) that the HEA does not impose any requirement that the Final Rule consider costs. This is irrelevant—and waived—because *the Final Rule* did not offer any such rationale—instead placing all the agency's proverbial eggs in the we-will-win-*Biden* basket. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) ("[P]ost hoc rationalizations of the agency cannot serve as a sufficient predicate for agency action." (cleaned up) (citation omitted)).  This argument fails on the merits too. The cost of the Final Rule—*i.e.*, the amount of

debt forgiven—is an "'important aspect of the problem.'" *Michigan v. EPA*, <u>576 U.S. 743, 752</u> (2015) (citation omitted). "Agencies have long treated cost as a centrally relevant factor when deciding whether to regulate." *Id.* at 752–53. The Department thus could not entirely ignore costs. Indeed, there is every reason to believe—given the Department's stated goals—that the Final Rule's provisions *should* vary if they produced $1 million rather than $1 trillion in debt cancellation. Calibrating an appropriate amount of debt relief necessarily requires *some* comprehension of how much debt would actually be cancelled to satisfy the APA's mandate that "agencies … [must] engage in 'reasoned decisionmaking.'" *Id.* at 750 (citation omitted).

Sensing the untenability of their arguments, Defendants resort (at 34) to arguing harmless error: contending that they would have adopted the Final Rule *no matter what it cost*. But that is a *confession* rather than a *defense*: one demonstrating an incurably closed mind incapable of the reasoned decision-making that the APA demands. *See, e.g.*, *Sherley v. Sebelius*, <u>776 F. Supp. 2d 1, 21</u> (D.D.C. 2011) ("The APA's procedural requirements would [] be rendered meaningless if an agency [] had 'an unalterably closed mind'" (citation omitted)). The APA fairly demanded that the Department have *some clue* as to the cost of the Final Rule—and thus how much student debt it would be cancelling/its objective that it would be achieving. And an accurate cost is necessary for the States to know the amount of tax revenue they stand to lose. Defendants' confession that they had no such clue post-*Biden*—but would have adopted the Final Rule in precisely the same form no matter whether its cost was a two- or *twelve*-digit number—fails to establish harmless error and shows the severity of the APA violation.

### C. Defendants' Remaining APA Arguments Are Unavailing

The Final Rule is also arbitrary and capricious because it failed to consider harm to the States and their reliance interests, and further rests on internal contradictions. As to lost tax revenues, Defendants do not contend that the Rule made *any* effort to analyze the magnitude of the tax losses to the States *whatsoever*. Instead, they argue only (at 35) that the States had "no meaningful reliance interest" in lost tax revenues as a matter of law. That is legally indefensible: "*taxes are the life-blood of government*, and their prompt and certain availability an *imperious need*." *Bull*

*v. United States*, 295 U.S. 247, 259 (1935) (emphases added). Defendants' blithe dismissal that the States lack any "meaningful reliance interest" in their tax revenue streams flouts the APA. The Federal Government would never be so blasé if its *own* tax revenues were on the line.

Defendants also contend the Final Rule satisfies the APA with respect to impacts on the PSLF program and inflation by pointing to the Final Rule's analysis of "'costs and benefits.'" Opp. at 35-36 (quoting 88 Fed. Reg. at 43,879). But as explained above and previously, that analysis of costs is indefensible since it relied on the reality-defying premise that they would win *Biden*—which they had already lost. Without defensible estimate of actual costs post-*Biden*, the Final Rule's analysis of these issues is necessarily arbitrary and capricious.

Finally, the Final Rule is arbitrary and capricious because it (1) never denies that it is more of the same as the 2015 Rule, (2) admits the 2015 Rule failed to decrease delinquencies and defaults, and (3) never explains how the Final Rule's more-of-the-same relief here would produce a different result. Rather than satisfying the APA, the Final Rule's analysis is the very definition of "'insanity'": *i.e.*, "'doing the same thing over and over again, but expecting different results.'" *Sessions v. Dimaya*, 584 U.S. 148, 174 (2018) (cleaned up). Defendants' vague and unexplained "this time is different" rationale does not satisfy the APA.

### III.     The Department's Truncated 30-Day Notice Period Violated the APA

Defendants' provision of just a 30-day notice period violated the APA. No court has ever upheld such a short notice period for a rule of equivalent importance and cost. Defendants provide no reason for this Court to be the first. Defendants' reliance (at 37–38) on *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1978) is misplaced. *Vermont Yankee* stands for the unexceptional principle that "reviewing courts are generally not free to impose" "additional procedural rights" beyond what APA provides. *Id.* at 524. But the APA *itself* mandates a reasonable notice period in §553, which is thus not a court-imposed "additional procedural right." Moreover, Defendants' overreading (at 38) of *Vermont Yankee* as "fatal" to any notice-period challenge proves far too much. Under Defendants' absolutist arguments here, courts would be compelled to bless a seven-day or even *seven-hour* notice period. But that is not—and never has

been—the law. Defendants cite *Phillips Petroleum Co. v. EPA*, 803 F.2d 545, 559 (10th Cir. 1986) to argue that "[c]ourts have uniformly upheld comment periods of 45 days or less." Opp. at 38. But Defendants did not provide 45 days here, but rather only 30. They do they even attempt to argue why such a truncated period was necessary when the Final Rule was released *nearly a year* before its July 1, 2024 effective date. The apparent motivation was to *reduce* the number of comments.

Defendants also wrongly discount the import of the *two* Executive Orders that the Department violated here. While EOs are not privately enforceable, they reflect the prevailing understanding of the APA's requirements and agency norms. There is a reason that the Department cannot point to 30-day-notice period for any comparable rule and why there is a dearth of case law on this subject: other agencies follow the widespread practice the EOs mandate. Those agencies honor their obligations under the APA and avoid the legal risks that the Department's 30-day-notice-period occasioned here. Should federal courts indulge Defendants' transgressive gambit here, they should expect many more agencies to follow suit.

Defendants' fallback reliance on harmless error is equally unavailing. In the APA context, it applies "only 'when a mistake of the administrative body is one that *clearly* had *no bearing* on the procedure used or the substance of the decision reached.'" *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 786 n.6 (10th Cir. 2006) (citation omitted) (cleaned up). Here, the length of the notice period unequivocally had significant "bearing on the procedure used." Moreover, an APA notice-and-comment violation "'cannot be harmless if there is any uncertainty at all as to the effect of that failure;'" since any more-lenient standard would "virtually repeal section 553's requirements." *Sprint Corp. v. FCC*, 315 F.3d 369, 376 (D.C. Cir. 2003) (citation omitted).

IV.   **The Remaining Requirements for Equitable Relief are Met Here.**

A.  **Without Relief from this Court, the States Will Suffer Irreparable Harm.**

Plaintiff States cannot obtain money damages from the federal government due to sovereign immunity.  Their injuries are irrecoverable injuries, which constitute irreparable harm. *Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994). The same harms that establish standing here thus necessarily also constitute irreparable harm.

Those harms are not just imminent but have happened and are ongoing.

Defendants do not contest genuinely that if the States' harms exist, that they would be irreparable. Instead, they rely (at 40-41) on putative delay to discount those harms. But the cases they cite are inapposite (including trademark cases). More generally, the purported "delay" here is nonsensical: here the statute of limitations is six years, *see* 28 U.S.C. § 2401(a), so Defendants' contention that the harms at issue somehow became entirely irremediable by this Court after not even 13% of that time passed is untenable. Moreover, the States filed this suit more than three months before the Final Rule's stated effective date. That is not delay, and Defendants do not cite a single case where a court has found material delay in equivalent circumstances.

### B. The Balance of Harms and Public Interest Favor Relief Here.

Defendants' contentions (at 41-42) that the public interest requires that the Rule be allowed to be implemented *even if* it is unlawful is simply not the law. Where, as here, the agency lacks authority, "the equities do not justify withholding interim relief." *Nat'l Fed. Indp. Bus. v. OSHA*, 142 S. Ct. 661, 666 (2022). That was so even when the agency claimed its action would "save over 6,500 lives." *Id.* Here the Department cannot claim any remotely equivalent interest.

### V.    The Preliminary Injunction Should Apply Nationwide.

Finally, Defendants' objections to a nationwide injunction are ill-taken, since a more limited injunction would not provide the requisite "complete relief" to the States. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) The United States is a nation with tremendous internal migration. For example, the single greatest intra-state movement is from non-Plaintiff California to Plaintiff Texas.[9] This undeniable demographic reality makes plain the irreparable harms that would flow from a narrower injunction: cancelled student debt of individuals currently in other States who will move to Plaintiff States will result in lower tax revenues from 2026 on as a result of the Final Rule. Similarly, because States recruit employees from beyond their borders, the competitive harms to their recruiting efforts from cancelled debt in other States is already

---

[9] *See, e.g.,* https://www2.census.gov/programs-surveys/demo/tables/geographic-mobility/2022/state-to-state-migration/State_to_State_Migration_Table_2022_T13.xlsx.

occurring and ongoing. And because some individuals with FFELP loans serviced by Plaintiff States' entities have necessarily already moved to other States, they too will suffer irreparable injury from a narrower injunction.

In addition, a narrower injunction would raise enormous equity issues and may even violate the Constitution. If Defendants had attempted to cancel debt only in *some* States (*e.g.*, battleground states) that would likely violate the APA (lacking a defensible rationale) and the Equal Protection Clause (by irrationally discriminating against residents of some States). This Court should not adopt a remedy that would be illegal and inequitable. Tellingly, *everything* that Defendants argue here against nationwide scope was also advanced to the Supreme Court in *Biden*, where the United States sought an outright stay or narrowing to the Plaintiff States. *See https://shorturl.at/mtCIT*. To no avail: the Supreme Court rejected those arguments and refused to narrow the injunction. 143 S. Ct. 5177 (2022). The same result should happen here.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff States' Motion for Preliminary Injunction and deny Defendants' motion to dismiss.

Respectfully submitted,

**KRIS W. KOBACH**
**Attorney General of Kansas**

*/s/ Abhishek S. Kambli*
Abhishek S. Kambli, Kan. SC No. 29788
*Deputy Attorney General*
Erin B. Gaide, Kan. SC No. 29691
Assistant Attorney General
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Email: abhishek.kambli@ag.ks.gov
erin.gaide@ag.ks.gov

Drew C. Ensign, *pro hac vice*
Holtzman Vogel Baran Torchinsky
 & Josefiak PLLC
2575 E. Camelback Road, #860
Phoenix, Arizona 85016
Phone: (602) 388-1262
Email: densign@holtzmanvogel.com

*Counsel for Plaintiff State of Kansas*

/s/ Edmund LaCour
Edmund LaCour, *pro hac vice*
*Solicitor General*
OFFICE OF THE ALABAMA
 ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36104
(334) 353-2196
edmund.lacour@alabamaag.gov
*Counsel for Plaintiff State of Alabama*


/s/ Bill Milks
Bill Milks, *pro hac vice*
*Chief Assistant Attorney General*
ALASKA DEPARTMENT OF LAW
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
(907) 465-4239
bill.milks@alaska.gov
*Counsel for Plaintiff State of Alaska*


/s/ Joshua Turner
Joshua Turner, *pro hac vice*
*Chief of Constitutional Litigation & Policy*
700 W. Jefferson St., Suite 210,
PO Box 83720,
Boise, Idaho 83720
(208) 334-2400
josh.turner@ag.idaho.gov
*Counsel for Plaintiff State of Idaho*

/s/ Eric H. Wessan
Eric H. Wessan, *pro hac vice*
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov
*Counsel for Plaintiff State of Iowa*


/s/ Kelsey Smith
Kelsey Smith, *pro hac vice*
*Deputy Solicitor General*
OFFICE OF THE LOUISIANA ATTORNEY
 GENERAL
1885 North Third Street
Baton Rouge, Louisiana 70804
(225) 506-3746
smithkel@ag.louisiana.gov
*Counsel for Plaintiff State of Louisiana*


/s/ Christian B. Corrigan
Christian B. Corrigan, Kan. SC No. 25622
*Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
*Counsel for Plaintiff State of Montana*

25

/s/ Lincoln J. Korell
Lincoln J. Korell, *pro hac vice*
*Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
 OF NEBRASKA
2115 State Capitol
Lincoln, Nebraska 68509
(402) 471-2682
lincoln.korell@nebraska.gov
*Counsel for Plaintiff State of Nebraska*


/s/ Joseph D. Spate
Joseph D. Spate, *pro hac vice*
*Assistant Deputy Solicitor General*
1000 Assembly Street
Columbia, South Carolina 29201
(803) 734-3371
josephspate@scag.gov
*Counsel for Plaintiff State of South Carolina*

/s/ Charles K. Eldred
Charles K. Eldred, *pro hac vice*
Chief, Legal Strategy Division
PO Box 12548
Austin, Texas 78711-2548
(512) 463-2100 charles.eldred@oag.texas.gov
*Counsel for Plaintiff State of Texas*


/s/ Lance F. Sorenson
Lance F. Sorenson, *pro hac vice*
*Assistant Utah Attorney General*
UTAH ATTORNEY GENERAL
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114
(801) 366-0100
lancesorenson@agutah.gov
*Counsel for Plaintiff State of Utah*

APPENDIX

**State-By-State Breakout of Debt Cancelled Under Final Rule as of Mid-February 2024**

Source: Department of Education, *Biden-Harris Administration Releases State-by-State Breakdown of $1.2 Billion in SAVE Plan Forgiveness* (Feb. 23, 2024) *available at* https://www.ed.gov/news/press-releases/biden-harris-administration-releases-state-state-breakdown-12-billion-save-plan-forgiveness

## Borrowers Identified for Early SAVE Forgiveness by Location

| State | Borrower Count | Amount Forgiven (in millions) |
|---|---|---|
| Alabama | 2,550 | $20.80 |
| Alaska | 190 | $1.40 |
| Arizona | 3,990 | $33.00 |
| Arkansas | 1,190 | $8.70 |
| California | 13,580 | $114.80 |
| Colorado | 2,530 | $19.80 |
| Connecticut | 1,600 | $13.70 |
| Delaware | 650 | $5.30 |
| District of Columbia | 350 | $2.90 |
| Florida | 12,790 | $105.40 |
| Georgia | 6,050 | $49.70 |
| Hawaii | 280 | $1.90 |
| Idaho | 1,130 | $9.20 |
| Illinois | 5,560 | $43.80 |
| Indiana | 3,330 | $26.00 |
| Iowa | 2,120 | $17.30 |
| Kansas | 1,270 | $9.90 |
| Kentucky | 2,110 | $16.10 |
| Louisiana | 2,160 | $16.30 |
| Maine | 700 | $5.30 |
| Maryland | 2,680 | $22.70 |
| Massachusetts | 2,490 | $19.50 |
| Michigan | 6,040 | $47.00 |
| Minnesota | 2,060 | $14.50 |
| Mississippi | 1,790 | $13.30 |
| Missouri | 2,780 | $22.40 |

| | | |
|---|---|---|
| Montana | 300 | $2.20 |
| Nebraska | 750 | $5.30 |
| Nevada | 1,650 | $13.90 |
| New Hampshire | 490 | $3.60 |
| New Jersey | 4,180 | $35.30 |
| New Mexico | 860 | $6.80 |
| New York | 8,190 | $63.40 |
| North Carolina | 4,170 | $33.30 |
| North Dakota | 220 | $1.60 |
| Ohio | 7,540 | $60.00 |
| Oklahoma | 1,690 | $12.90 |
| Oregon | 2,220 | $17.40 |
| Pennsylvania | 5,600 | $45.10 |
| Puerto Rico | 1,060 | $6.10 |
| Rhode Island | 450 | $3.40 |
| South Carolina | 2,520 | $20.60 |
| South Dakota | 270 | $1.90 |
| Tennessee | 3,340 | $25.70 |
| Texas | 14,510 | $116.60 |
| Utah | 850 | $5.80 |
| Vermont | 190 | $1.30 |
| Virginia | 3,040 | $24.60 |
| Washington | 2,630 | $20.10 |
| West Virginia | 1,070 | $8.80 |
| Wisconsin | 1,990 | $13.80 |
| Wyoming | 150 | $1.00 |
| All Other Locations | 990 | $7.40 |
| **Total** | **152,880** | **$1,218.10** |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION**

| | | |
|---|---|---|
| STATE OF KANSAS, ET AL., | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN IN HIS OFFICIAL | § | Civil Action No. 2024-cv-1057-DDC- |
| CAPACITY AS PRESIDENT OF THE | § | ADM |
| UNITED STATES, ET AL., | § | |
| ; | § | |
| | § | |
| *Defendants.* | § | |

**TABLE OF EXHIBITS**

| Exhibit Number | Exhibit Name | Pages |
|---|---|---|
| Exhibit A | Declaration of Hoa Phu Tran | 4, 5, 7 |
| Exhibit B | Declaration of Kathleen F. Abrams | 4, 5, 7 |
| Exhibit C | Declaration of Stacie L. Kraly | 4, 5, 10 |
| Exhibit D | Declaration of Aaron Yost | 4, 5, 7 |
| Exhibit E | Declaration of Joseph D. Spate | 3, 4, 14 |
| Exhibit E.1 | Email of Trey Simon | 3, 4 |
| Exhibit E.2 | Letter from David A. Simon III | 3, 4, 14 |
| Exhibit F | Declaration of Sarah Keyton | 3, 4, 14 |
| Exhibit G | Declaration of Sana Efird | 3, 4, 14 |

1

KRIS W. KOBACH
Attorney General of Kansas

/s/ Abhishek S. Kambli
Abhishek S. Kambli
Deputy Attorney General
Erin B. Gaide
Assistant Attorney General
Memorial Building, 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Fax: (785) 291-3767
Email: abhishek.kambli@ag.ks.gov
        erin.gaide@ag.ks.gov

Drew C. Ensign
Holtzman Vogel Baran Torchinsky
& Josefiak PLLC
2575 E. Camelback Road, #860
Phoenix, Arizona 85016
Phone: (602) 388-1262
Fax: (540) 341-8809
Email: densign@holtzmanvogel.com

## CERTIFICATE OF SERVICE

I certify that on May 10, 2024, a copy of the foregoing document was electronically filed

on the CM/ECF system, which will automatically serve a Notice of Electronic Filing on all

attorneys in this case.

/s/ Abhishek S. Kambli
Abhishek S. Kambli
Deputy Attorney General
Kansas Office of the Attorney General

Counsel for Plaintiffs

2

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| STATE OF KANSAS, | § |
| STATE OF ALABAMA, | § |
| STATE OF ALASKA, | § |
| STATE OF IDAHO, | § |
| STATE OF IOWA, | § |
| STATE OF LOUISIANA, | § |
| STATE OF MONTANA, | § |
| STATE OF NEBRASKA, | §   Civil Action No. _____ |
| STATE OF SOUTH CAROLINA, | § |
| STATE OF TEXAS, | § |
| STATE OF UTAH, | § |
| | § |
| *Plaintiffs,* | § |
| | § |
| v. | § |
| | § |
| JOSEPH R. BIDEN IN HIS OFFICIAL | § |
| CAPACITY AS PRESIDENT OF THE | § |
| UNITED STATES, | § |
| MIGUEL CARDONA IN HIS OFFICIAL | § |
| CAPACITY AS SECRETARY OF | § |
| EDUCATION, | § |
| UNITED STATES DEPARTMENT OF | § |
| EDUCATION; | § |
| | § |
| *Defendants.* | § |

## DECLARATION OF HOA PHU TRAN

I, Dr. Hoa Phu Tran, declare as follows

1. I am the Revenue Economist Manager at the Nebraska Department of Revenue. I am over the age of 18, and I have personal knowledge of the facts contained in this declaration. I could competently testify as to the contents of this Declaration if called upon to do so.

2. I have served as the Revenue Economist Manager at the Nebraska Department of Revenue for 11 years.

3. Prior to this, I worked as a Revenue Economist for the Nebraska Department of Revenue.

4. I have a Ph.D in Economics.

5. As a result of my current duties, I am familiar with the state's tax conformity code and how it relates to the federal one.

6. Under Nebraska Revised Statutes section 77-2715(2)(b) Nebraska imposes tax upon resident individuals based on their federal adjusted gross income as modified by sections 77-2716 and 77-2716.01, plus a percentage of the federal tax on premature or lump-sum distributions from qualified retirement plans.   Nebraska Revised Statute section 77-2716 does not provide for any addition to federal adjusted gross income for the cancelation of debt that is excluded from federal adjusted gross income.   Nebraska Revised Statute section 77-2716(18) only provides for a subtraction from federal adjusted gross income of any amount received by an individual as student loan repayment assistance under the Teach in Nebraska Today Act, to the extent such amount is included in federal adjusted gross income.

7. This provides uniformity and simplicity in our tax code as taxpayers can begin the process of filing state income taxes through listing their federal adjusted gross income.

8. Ordinarily, federal student debt cancelation is considered income and is taxable by the federal government.  By extension, it is taxable in Nebraska.

9. However, Section 9675 of Public Law No: 117-2 (commonly known as the American Rescue Plan Act) prohibits such debt cancelation from counting toward gross income from January 1, 2021 to December 31, 2025.  By extension, absent amendment of Nebraska law to provide for an addition to federal adjusted gross income for this debt cancelation, it is not taxable in Nebraska during this period.

10. Amending Nebraska law to provide for an addition to federal adjusted gross income for this debt cancelation would require updating Nebraska's tax booklets and forms, Nebraska regulations, and processing systems at an additional cost to the State.

11. I am aware that the Final Rule cuts the required cancellation timeline of 20-25 years to 10 years for loans with an original principal balance of $12,000 or less.

12. It also allows cancellation one extra year later for every $1,000 above $12,000.  For example, if someone has an original principal balance of $13,000 they would receive cancellation after 11 years.

13. I am also aware that this provision of the Final Rule has retroactively forgiven loans that meet the criteria noted above.

14. Based on publicly available information, this has resulted in 750 Nebraska borrowers having $5.3 million in loans cancelled already.

15. This cancelation cannot be taxed.  At least some of that forgiveness would have been taxable after January 1, 2026, due to the fact that the ordinary timeline of these loans being forgiven is 20-25 years.

16. Nebraska has lost out on tax revenue as a result of this Final Rule.  Absent statutory change to Nebraska law to provide for an addition to federal adjusted gross income, that loss will continue into the future as more Nebraska residents will likely have their loans forgiven under the provisions of the Final Rule until December 31, 2025.

17. Further the declarant sayeth naught.

I declare under penalty of perjury under the laws of the United States of American and the State of Nebraska that the foregoing is true and correct.

Executed in Lincoln, Nebraska this this _8_ day of April 2024.

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| STATE OF KANSAS, | § | |
| STATE OF ALABAMA, | § | |
| STATE OF ALASKA, | § | |
| STATE OF IDAHO, | § | |
| STATE OF IOWA, | § | |
| STATE OF LOUISIANA | § | |
| STATE OF MONTANA, | § | |
| STATE OF NEBRASKA, | § | Civil Action No. 6:24-cv-1057 |
| STATE OF SOUTH CAROLINA, | § | |
| STATE OF TEXAS, | § | |
| STATE OF UTAH, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN IN HIS OFFICIAL | § | |
| CAPACITY AS PRESIDENT OF THE | § | |
| UNITED STATES, | § | |
| MIGUEL CARDONA IN HIS OFFICIAL | § | |
| CAPACITY AS SECRETARY OF | § | |
| EDUCATION, | | |
| UNITED STATES DEPARTMENT OF | | |
| EDUCATION; | | |
| *Defendants*. | | |

## <u>DECLARATION OF KATHLEEN F. ABRAMS</u>

I, <u>Kathleen F. Abrams</u>, declare as follows:

1.  I am the Director of the Income Tax Administration Division at the Alabama Department of Revenue.  I am over the age of 18, and I have personal knowledge of the facts contained in this declaration.  I could competently testify as to the contents of this Declaration if called upon to do so.

2.  I have served as the Director of the Income Tax Administration Division at the Alabama Department of Revenue for eight years.

3.  Prior to this, I served as the Assistant Director of the Individual and Corporate Tax Division at the Alabama Department of Revenue for four years and the Income Tax Field Audit Manager at the Alabama Department of Revenue for six years.

4.  As a result of my current duties, I am familiar with the state's tax conformity code and how it relates to the federal one.

5.  Alabama's tax code conforms to certain sections of the federal Internal Revenue Code.

6.  Relevant here, Alabama Code § 40-18-14(a)(3)h. provides that gross income for an individual does not include "[i]ncome from discharge of indebtedness to the extent allowed by 26 U.S.C. 108."

7.  Alabama Code § 40-18-1.1(b) provides that "the term '26 U.S.C.' means the Internal Revenue Code, Title 26 of the United States Code, as in effect from time to time," which means that Alabama's tax code automatically conforms to any revisions of any sections of the Internal Revenue Code that are referenced in Alabama law.

8.  Section 9675 of The American Rescue Plan Act of 2021 (Public Law. 117-2), modified 26 U.S.C. § 108(f) to create a special rule for discharges of student debt for the 2021 through 2025 tax years. Because the modified student loan forgiveness provisions are in 26 U.S.C. § 108, Alabama follows the federal student loan forgiveness treatment as modified by the American Rescue Plan Act of 2021.  Any student loan forgiveness that is excluded from federal income pursuant to 26 U.S.C. § 108 will also be excluded from Alabama income.

9.  Alabama's longstanding statute syncing certain aspects of the Alabama tax code with the Internal Revenue Code provides uniformity and simplicity in our tax code as taxpayers

can follow the same definitions and guidance for both federal and state tax filing and compliance.

10. If this rolling conformity did not exist, the state would incur additional administrative costs to update its tax system to create numerous different definitions of taxable income and to create the necessary guidance for taxpayers explaining the differences between federal and state tax provisions.

11. Ordinarily, federal student debt cancelation is considered income and is treated as taxable by the federal government, except under the limited circumstances provided in 26 U.S.C. § 108(f). By extension, it is normally treated as taxable by Alabama.

12. But as referenced above, Section 9675 of the American Rescue Plan Act modifies 26 U.S.C. §108(f) to expand the circumstances under which such debt cancelation is excluded from counting toward gross income from January 1, 2021, to December 31, 2025. By extension, it is not taxable in Alabama during this period.

13. I am aware that the U.S. Department of Education recently promulgated a rule (the "Final Rule" or "Rule") entitled the Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan. *See* 88 Fed. Reg. 43,820-905.

14. The Final Rule cuts the required cancellation timeline of 20-25 years to 10 years for loans with an original principal balance of $12,000 or less.

15. It also allows cancellation one extra year later for every $1,000 above $12,000. For example, if someone has an original principal balance of $13,000 they would receive cancellation after 11 years.

16. I am also aware that this provision of the Final Rule has retroactively forgiven loans that meet the criteria noted above.

17. The U.S. Department of Education has reported[1] that this has resulted in 2,550 Alabama borrowers having $20.8 million in loans cancelled already.

18. This cancelation cannot be taxed. At least some of that forgiveness would have been taxable after January 1, 2026, due to the fact that the ordinary timeline for these loans being forgiven is 20-25 years.

19. Alabama has lost out on tax revenue as a result of this Final Rule. That loss will continue into the future as more Alabama residents will likely have their loans forgiven under the provisions of the Final Rule until December 31, 2025.

20. Further the declarant sayeth naught.

I declare under penalty of perjury under the laws of the United States of American and the State of Alabama that the foregoing is true and correct.

Executed in  Montgomery County, Alabama                        , this  11th   day of April 2024.

_____

---

[1] U.S. Department of Education, *Biden-Harris Administration Releases State-by-State Breakdown of $1.2 Billion in SAVE Plan Forgiveness*, Feb. 23, 2024, https://www.ed.gov/news/press-releases/biden-harris-administration-releases-state-state-breakdown-12-billion-save-plan-forgiveness.

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION**

| | | |
|---|---|---|
| STATE OF KANSAS, ET AL., | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN IN HIS OFFICIAL | § | Civil Action No. 2024-cv-1057-DDC- |
| CAPACITY AS PRESIDENT OF THE | § | ADM |
| UNITED STATES, ET AL., | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

**DECLARATION OF STACIE L. KRALY**

I, Stacie L. Kraly, declare as follows

1.  I am the director of the Civil Division of the Alaska Department of Law, also known as
    the Office of the Alaska Attorney General.

2.  In my position, I oversee recruitment and employment of attorneys and other professional
    staff employed by the Department of Law.

3.  As part of the Alaska Attorney General's Office recruitment process, we identify
    "Potential eligibility for student loan forgiveness through the Public [Service] Loan
    Forgiveness Program" as part of our State Benefits Package for all Civil and Criminal
    Division attorney recruitments. Careers - Civil Attorney Positions (alaska.gov); Careers -
    Criminal Attorney Positions (alaska.gov). The Attorney General's Office includes on its
    website a link directing applicants to the Public Service Loan Forgiveness (PSLF)
    website. https://studentaid.gov/manage-loans/forgiveness-cancellation/public-service.

1

4.  The State of Alaska is a qualified employer under the PSLF Program, and our office encourages new employees to apply, so they can start getting credit for qualifying student loan payments as soon as possible.

5.  In my opinion, the ability of attorneys who come to work for the Alaska Attorney General's Office to utilize the PSLF program is a valuable recruitment tool for our office.

6.  Further the declarant sayeth naught.

I declare under penalty of perjury under the laws of the United States of American and the State of Alaska that the foregoing is true and correct.

Executed in _Juneau, AK_, this this __4th__ day of April 2024.

2

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS, ET AL., <br><br> *Plaintiffs,* <br><br> v. <br><br> JOSEPH R. BIDEN IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, ET AL.N; <br><br> *Defendants.* | § § § § § § § § § § § § § § | Civil Action No. 2024-CV-1057-DDC-ADM |

**DECLARATION OF** Aaron Yost

I, Aaron Yost, declare as follows

1. I am the Government Affairs Program Manager at the Idaho State Tax Commission. I am over the age of 18, and I have personal knowledge of the facts contained in this declaration. I could competently testify as to the contents of this Declaration if called upon to do so.

2. I have served as the Government Affairs Program manager at the Commission for 2 years.

3. *As a result of my current duties, I am familiar with the Idaho's tax conformity law and how it relates to federal law.*

4.  Under Idaho Code Section 63-3011 the state updates its definition of gross income to match the federal definition.

5.  This provides uniformity and simplicity in our tax code as taxpayers can begin the process of filing state income taxes through listing their federal income.

6.  If this conformity did not exist, the state would incur additional administrative costs to update its tax system to create its own definitions of taxable income.

7.  Ordinarily, federal student debt cancelation is considered income and is taxable by the federal government.  By extension, it is taxable in Idaho.

8.  However, Section 9675 of Public Law No: 117-2 (commonly known as the American Rescue Plan Act) prohibits such debt cancelation from counting toward gross income from January 1, 2021 to December 31, 2025.  By extension, it is not taxable in Idaho during this period.

9.  I am aware that the Final Rule cuts the required cancellation timeline of 20-25 years to 10 years for loans with an original principal balance of $12,000 or less.

10. It also allows cancellation one extra year later for every $1,000 above $12,000.  For example, if someone has an original principal balance of $13,000 they would receive cancellation after 11 years.

11. I am also aware that this provision of the Final Rule has retroactively forgiven loans that meet the criteria noted above.

12. Based on publicly available information, this has resulted in 1,130 Idaho borrowers having $9.2 million in loans cancelled already.

2

13. This cancelation cannot be taxed.  At least some of that forgiveness would have been taxable after January 1, 2026 due to the ordinary timeline of these loans being forgiven is 20-25 years.

14. Idaho has lost out on tax revenue as a result of this Final Rule.  That loss will continue as more Idaho residents will likely have their loans forgiven under the provisions of the Final Rule until December 31, 2025.

15. Further the declarant sayeth naught.

I declare under penalty of perjury under the laws of the United States of American and the State of Idaho that the foregoing is true and correct.

IDAHO STATE TAX COMMISSION

Dated: ____4/8/24___.

_____
Aaron Yost
Government Affairs Program Manager

Executed in ___Boise, ID___, this this 8 day of April 2024.

KARA LANSBERRY
NOTARY PUBLIC - STATE OF IDAHO
COMMISSION NUMBER 48469
MY COMMISSION EXPIRES 10-30-2024

3

# EXHIBIT E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## WICHITA DIVISION

| | |
|---|---|
| STATE OF KANSAS,<br>STATE OF ALABAMA,<br>STATE OF ALASKA,<br>STATE OF IDAHO,<br>STATE OF IOWA,<br>STATE OF LOUISIANA,<br>STATE OF MONTANA,<br>STATE OF NEBRASKA,<br>STATE OF SOUTH CAROLINA,<br>STATE OF TEXAS,<br>STATE OF UTAH,<br><br>                    *Plaintiffs,*<br><br>v.<br><br>JOSEPH R. BIDEN IN HIS OFFICIAL<br>CAPACITY AS PRESIDENT OF THE<br>UNITED STATES, MIGUES CARDONA IN<br>HIS OFFICIAL CAPACITY AS SECRETARY<br>OF EDUCATION, UNITED STATES<br>DEPARTMENT OF EDUCATION,<br><br>                    *Defendants.* | C/A No. 6:24-cv-01057 |

## DECLARATION OF JOSEPH D. SPATE

I, Joseph D. Spate, hereby declare and state under penalty of perjury that the following is true and correct to the best of my knowledge:

1. My name is Joseph D. Spate, and my business address is 1000 Assembly Street, Columbia, SC 29201. I am over the age of eighteen, have personal knowledge of the subject matter, and am competent to testify concerning the matters in this declaration.

1

2.  I have served as Assistant Deputy Solicitor General with the Office of the South Carolina Attorney General since May 2023. I am licensed to practice law in the state of South Carolina and various federal courts.

3.  I am submitting this declaration in reference to Plaintiffs' Motion for Preliminary Injunction as to a final rule published by the U.S. Department of Education on July 10, 2023, entitled "Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program," 88 Fed. Reg. 43,820 (Jul. 10, 2023) (Final Rule).

4.  On April 19, 2024, I received an email from David A. "Trey" Simon, III, President and CEO of the South Carolina Student Loan Corporation, with the following subject line: "Requested information for the State Education Assistance Authority." Exhibit 1 to this declaration is a true and correct copy of that email.

5.  The aforementioned email from Mr. Simon included a letter attachment entitled "Response to SC Attorney General on SEAA - 4-19-24," dated April 19, 2024, and bearing Mr. Simon's signature. Exhibit 2 to this declaration is a true and correct copy of that letter.

6.  This the 8th day of May, 2024.

_Joseph D. Spate_
Joseph D. Spate
Assistant Deputy Solicitor General
Office of the South Carolina Attorney General

# EXHIBIT 1

| | |
|---|---|
| **From:** | Trey Simon <TSimon@scstudentloan.org> |
| **Sent:** | Friday, April 19, 2024 1:21 PM |
| **To:** | Joseph Spate; Ray Jones; Macdonald, Robert; Chris Majure (Chris.Majure@sto.sc.gov) |
| **Cc:** | Thomas Hydrick |
| **Subject:** | Requested information for the State Education Assistance Authority |
| **Attachments:** | Response to SC Attorney General on SEAA - 4-19-24.pdf |

Joseph,

Please find the information requested by the State Education Assistance Authority attached.

Please let us know if you have any questions.

Have a great weekend.

Thank you,



**Trey Simon**

President and CEO

---

📞 (803) 612-5052 (O) (931) 200-3827 (M)

✉ tsimon@scstudentloan.org

🌐 scstudentloan.org

📍 1901 Main Street, Suite 400, Columbia, SC 29201

This e-mail, and any documents, files, or previous e-mail messages attached to it, may contain confidential, proprietary, or legally privileged information. If you are not the intended recipient, any dissemination, distribution, or copying of this e-mail or its attachments is strictly prohibited. If you have received this in error, please notify the sender by e-mail immediately and destroy the original e-mail and any attachments.

# EXHIBIT 2



(800) 347-2752

1901 Main Street
Suite 400
Columbia, SC 29201

April 19, 2024

Dear Mr. Spate:

In response to your request, we are providing the information below regarding the State Education Assistance Authority (SEAA). As we have discussed, South Carolina Student Loan Corporation (SCSLC) is a private nonprofit corporation organized under the laws of the State of South Carolina. SCSLC performs certain administrative functions on a contractual basis for SEAA, including acting as the servicing agent for SEAA's loan portfolio. SCSLC is providing the data as requested below regarding the federal loan portfolio that is wholly owned by SEAA.

The Federal Family Education Loan Program, FFELP, was a federal student loan program that offered federally-backed loans funded by private companies. FFELP ended with the 2009-2010 academic year to make way for direct loans, which are loans provided directly by the federal government to students. Although no new FFELP loans are offered to students, FFELP loans that existed prior to the 2009-2010 academic year with unpaid balances are still held by certain lenders.

SEAA is empowered by statute to "make," "insure," and "guarantee student loans under such terms and conditions as [SEAA] shall from time to time prescribe . . . ." SEAA is further empowered by statute "[t]o develop and administer all programs and to perform all functions necessary or convenient to promote and facilitate the making, guaranteeing and insuring of student loans and to provide such other student loan assistance and services."

As requested, please find the following data regarding SEAA's FFELP loan portfolio:

**History of SEAA's FFELP portfolio from 2010 to present:**

| Month End | Principal Balance |
|-----------|-------------------|
| 6/30/2011 | $31,324,566.17 |
| 6/30/2012 | 29,589,044.81 |
| 6/30/2013 | 26,776,811.11 |
| 6/30/2014 | 24,974,750.48 |
| 6/30/2015 | 22,797,591.92 |
| 6/30/2016 | 20,975,542.24 |
| 6/30/2017 | 19,218,505.43 |
| 6/30/2018 | 16,654,982.40 |
| 6/30/2019 | 15,026,548.26 |
| 6/30/2020 | 12,872,804.70 |
| 6/30/2021 | 11,889,724.29 |
| 6/30/2022 | 10,771,880.55 |
| 6/30/2023 | 8,059,252.66 |
| 3/31/2024 | 6,423,362.52 |

**Proportion of SEAA's FFELP loans that were consolidated versus paid down**

| Period | Consolidation Payment | Other Principal Payments |
|--------|-----------------------|--------------------------|
| 7/1/2010 - 6/30/2011 | -$1,019,123.26 | -$814,057.50 |
| 7/1/2011 - 6/30/2012 | -1,076,871.56 | -$658,649.80 |
| 7/1/2012 - 6/30/2013 | -1,365,846.14 | -$1,446,387.56 |
| 7/1/2013 - 6/30/2014 | -590,101.34 | -$1,211,959.29 |
| 7/1/2014 - 6/30/2015 | -1,231,047.88 | -$946,110.68 |
| 7/1/2015 - 6/30/2016 | -909,836.74 | -$912,212.94 |
| 7/1/2016 - 6/30/2017 | -1,081,806.83 | -$675,229.98 |
| 7/1/2017 - 6/30/2018 | -1,064,526.12 | -$1,498,996.91 |
| 7/1/2018 - 6/30/2019 | -415,796.86 | -$1,212,637.28 |
| 7/1/2019 - 6/30/2020 | -622,083.17 | -$1,531,660.39 |
| 7/1/2020 - 6/30/2021 | -174,407.04 | -$808,673.37 |
| 7/1/2021 - 6/30/2022 | -954,393.67 | -$1,320,063.19 |
| 7/1/2022 - 6/30/2023 | -2,112,224.90 | -$600,402.99 |
| 7/1/2023 - 3/31/2024 | -1,111,945.46 | -$523,944.68 |

**Interest revenue generated by SEAA's FFELP loans per year**

| Period | Total Interest Revenue |
| --- | --- |
| 7/1/2010 - 6/30/2011 | $1,172,811.00 |
| 7/1/2011 - 6/30/2012 | $764,676.00 |
| 7/1/2012 - 6/30/2013 | $692,306.00 |
| 7/1/2013 - 6/30/2014 | $630,738.00 |
| 7/1/2014 - 6/30/2015 | $585,056.00 |
| 7/1/2015 - 6/30/2016 | $572,691.00 |
| 7/1/2016 - 6/30/2017 | $595,654.00 |
| 7/1/2017 - 6/30/2018 | $689,735.00 |
| 7/1/2018 - 6/30/2019 | $756,432.00 |
| 7/1/2019 - 6/30/2020 | $529,763.00 |
| 7/1/2020 - 6/30/2021 | $301,659.00 |
| 7/1/2021 - 6/30/2022 | $303,673.00 |
| 7/1/2022 - 6/30/2023 | $575,359.00 |
| 7/1/2023 - 3/31/2024 * | $432,455.00 |

*Total includes draft interest revenue through 3/31/24. Annual interest revenue will be calculated and audited after 6/2024.

Should you have any further questions concerning the data presented above, please feel free to contact SCSLC directly as the acting servicing agent for SEAA.

David A. Simon III

President and CEO
SC Student Loan

# EXHIBIT F

## DECLARATION OF SARAH KEYTON

I, Sarah Keyton, declare:

1. I am over the age of 18, of sound mind, competent to testify, and have personal knowledge of the facts stated herein, except where stated on information and belief.

2. I am employed as the Deputy Commissioner for Administration at the Texas Higher Education Coordinating Board (THECB). I have been employed by THECB for two years. As part of my role, I have oversight responsibilities for the agency division that administers student financial aid funds and the agency finance division.

   THECB is an agency of the State of Texas and was created by statute. Tex. Educ. Code. § 61.021. THECB is run by a nine-member governing board, each of whom are appointed by the Governor of Texas with the advice and consent of the Senate of Texas.

3. As of May 1, 2024, THECB owns over $1,1295,236 in Federal Family Education Loan Program ("FFELP") loans. Through these loans, THECB collected $114,479 in interest in 2023.

4. To the extent that federal policy results in borrowers consolidating their loans out of FFELP into the Direct Loan Program, those consolidations will cause the State of Texas to lose revenue. Upon consolidation, the federal government compensates the holder (THECB) only for principal and accrued interest. Thus, such consolidations will result in reduced revenue THECB and therefore the State of Texas. The THECB would no longer collect interest on FFELP loans that have been consolidated, diminishing the value of its portfolio.

5. The SAVE Plan could cause pecuniary harm to the State of Texas and THECB measured by a reduction in revenue to the State's FFELP program.

   I declare under penalty of perjury under laws of the United States, 28 U.S.C. § 1746, that the foregoing statements are true and correct.

Signed this 10th day of May 2024.

_____
Sarah Keyton

# EXHIBIT G

**Declaration of Sana Efird in Support of Plaintiffs' Motion for a Preliminary Injunction and in Opposition to Defendants' Motion to Dismiss**

1.      My name is Sana Efird. I am over 21 years of age, of sound mind, and competent to testify. Unless otherwise stated, I have personal knowledge of the facts stated in this declaration.

2.      From December 2021 to the present, I have been an employee of Alaska Commission on Postsecondary Education and the Alaska Student Loan Corporation (ASLC).

3.      ASLC is a public corporation and enterprise instrumentality of the State of Alaska that was created by statute. ALASKA STAT. § 14.42.100. It is run by a Board of Directors, each of whom is appointed by the Governor of Alaska. ALASKA STAT. § 14.42.120. ASLC has the authority to adopt regulations to carry out its mission, which carry the force of law. ALASKA STAT. § 14.42.200.

4.      Since 2012, ASLC has administered $113.0 million in funding for college scholarships, and since 2005, ASLC has administered $72.9 million in funding for college needs-based grants in the State of Alaska.

5.      As of March 2024, ASLC owns over $16.8 million in Federal Family Education Loan Program (FFELP) loans. Through these loans, ASLC collects $1.9 million in interest and other FFELP portfolio income annually.

6.      The SAVE Plan entices borrowers to consolidate their loans away from FFELP and into the Direct Loan Program (DLP), comprising loans held by the federal government. Three features of the SAVE Plan are enticing borrowers to consolidate their loans away from FFELP and into DLP. First, the SAVE Plan offers benefits—including payments being capped at 5% of the borrower's discretionary income, residual interest being waived each month that the borrower makes a qualifying payment, and full forgiveness being offered in as few as ten years—to only borrowers with loans held by the federal government. Because these benefits are not available to borrowers with commercially-held FFELP loans, borrowers are rapidly consolidating their loans away from FFELP loans held by ASLC and into Direct Loans held by the federal government.

7.      Second, the SAVE Plan is refusing to treat consolidated loans as new loans,

meaning borrowers maintain their accrued repayment history when they consolidate. Under all prior regimes, borrowers' repayment clocks would restart, providing a disincentive to consolidation.

8.      Third, the federal government is actively advertising and encouraging borrowers to consolidate their loans into federal loans, including borrowers ineligible for consolidation into the direct loan program such as borrowers in good standing who only possess a FFELP consolidated loan. Given this three-part scheme, the federal government is strongly, and likely unlawfully, incentivizing borrowers to consolidate their loans away from FFELP and into loans held by the federal government.

9.      These consolidations will cause Alaska to lose significant revenues. Upon consolidation, the federal government compensates the holder (ASLC) only for principal and accrued interest. Thus, the enticed consolidation has already harmed and will continue to harm ASLC, as ASLC no longer collects interest on FFELP loans that have been consolidated, diminishing the value of its portfolio.

10.     Prior to the announcement of the SAVE Plan, the paydown rate for ASLC's FFELP portfolio for fiscal year 2023 was 27%.  After the announcement of the SAVE Plan that became effective July 2023, that annualized percentage for fiscal year 2024 is 21%.

11.     In total, ASLC estimates that the SAVE Plan will result in ASLC losing approximately $100,000 over just the next two years that it would otherwise collect as a FFELP holder.

12.     Because the State of Alaska relies on revenue from ASLC to support programs such as Alaska Education Loans, Alaska Performance Scholarship, Alaska Education Grant, WWAMI Medical Education Program and FAFSA completion and outreach resources to support Alaskans enrollment in higher education programs, ASLC's loss in revenue would directly harm Alaska's ability to fund and administer these programs.

13.     The SAVE Plan, then, directly harms both the State of Alaska and ASLC.

I declare under penalty of perjury under laws of the United States, 28 U.S.C. § 1746, that the foregoing statements are true and correct.

Signed this 10th day of May 2024.

_____
Sana Efird
Executive Officer
Alaska Student Loan Corporation

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION**

| | | |
|---|---|---|
| STATE OF KANSAS, | § | |
| STATE OF ALABAMA, | § | |
| STATE OF ALASKA, | § | |
| STATE OF IDAHO, | § | |
| STATE OF IOWA, | § | |
| STATE OF LOUISIANA | § | |
| STATE OF MONTANA, | § | Civil Action No. 6:24-cv-01057-DDC-ADM |
| STATE OF NEBRASKA, | § | |
| STATE OF SOUTH CAROLINA, | § | |
| STATE OF TEXAS, | § | |
| STATE OF UTAH, | § | |
| | § | |
|     *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN IN HIS OFFICIAL | § | |
| CAPACITY AS PRESIDENT OF THE | § | |
| UNITED STATES, | § | |
| MIGUEL CARDONA IN HIS OFFICIAL | § | |
| CAPACITY AS SECRETARY OF | § | |
| EDUCATION, | | |
| UNITED STATES DEPARTMENT OF | | |
| EDUCATION; | | |
| | | |
|     *Defendants*. | | |

**<u>FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>**

**INTRODUCTION**

In 2022, Defendant Joseph R. Biden attempted to unilaterally cancel student loans for millions of borrowers to the tune of $430 billion, relying on a strained interpretation of the HEROES Act. Six states sued in federal court to block this unlawful action. They succeeded. In the landmark case of *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), the Supreme Court rejected Defendant Biden's assertion that he could utilize an inapplicable provision of the HEROES Act as a pretext to burden the public with hundreds of billions of dollars in student debt.

1

Now, a coalition of States sues Defendant Biden, as well as co-defendants the Department of Education and Secretary of Education Miguel Cardona, to stop a second attempt to avoid Congress and pass an illegal student debt forgiveness. Last time Defendants tried this the Supreme Court said that this action was illegal. Nothing since then has changed, other than introducing more legal errors into this Rule's underlying analysis.

Just ten days after the Supreme Court's rebuke, Defendants released a Rule purporting to abolish at least $156 billion in student debt, with a new "SAVE Plan" as its centerpiece. Defendants proposed the SAVE plan to be step two of three in their massive student loan forgiveness scheme. The first step was the illegal loan cancellation based on the HEROES Act, with which Defendants tried to cancel $430 billion in loans and that the Supreme Court rejected as unconstitutional.[1] Because the SAVE Plan included the assumption that $430 billion in student loans would be forgiven before it kicked in, Defendants expressly did not consider that would-have-been forgiven $430 billion in their cost estimate. But the Supreme Court struck down HEROES loan forgiveness in *Biden v. Nebraska*. After that, Defendants' cost estimate was completely incorrect. Despite the failure to adjust the cost part of the Save Plan's justification, Defendants rushed to push through the SAVE Plan to salvage political capital. They failed to update the cost estimate of the SAVE Plan to reflect the fact that their baseline numbers were off by $430 billion. Because of that, the Rule severely underestimates the SAVE Plan's true cost. $156 billion is a floor—the Rule itself does not analyze how much of the $430 billion it assumed was already forgiven will be affected.

---

[1] Defendants announced the third "phase" last month. *See* Student Debt Relief for the William D. Ford Federal Direct Loan Program (Direct Loans), the Federal Family Education Loan (FFEL) Program, the Federal Perkins Loan (Perkins) Program, and the Health Education Assistance Loan (HEAL) Program, 89 Fed. Reg. 27,564 (Apr. 17, 2024).

Even worse, Defendants' Rule justifying the Save Plan left in sections prepared prior to *Biden v. Nebraska* being issued. That includes statements from Defendants that they are "confident in our authority to pursue debt relief" and that they are "awaiting the Supreme Court's ruling on the issue." These absurdities highlight the arbitrary and capricious nature of issuing a rule based on the assumed constitutionality of a different rule that the Supreme Court found to be unlawful are just the tip of the iceberg in a plan that is not only poor policy but poorly thought out.

The Rule is set to take effect July 1, 2024. But not content to wait for it to take effect, Defendants assumed the authority to engage in rolling loan forgiveness for individuals who had under some loans for at least 10 years and have begun doing so even before the Rule's effective date. A major round of this "forgiveness" occurred on February 21, 2024, when the Department of Education unilaterally erased the debt of 153,000 borrowers. Defendant Biden openly boasted about his defiance of the Supreme Court with this move, stating in Jacksonian fashion: "the Supreme Court blocked it. They blocked it. But that didn't stop me."[2] This lawsuit is now necessary to prevent Defendants from continuing to flout the law, which includes ignoring Supreme Court decisions.

This is not the first time Defendant Biden has taken actions that he publicly admits are likely unlawful. This is an administration that rules by will, not by law. For example, in extending the CDC's eviction moratorium, Defendant Biden stated, "the bulk of constitutional

---

[2] Remarks by President Biden on the Saving on a Valuable Education Plan, Culver City, CA, The White House (Feb. 21, 2024), https://www.whitehouse.gov/briefing-room/speeches-remarks/2024/02/21/remarks-by-president-biden-on-the-saving-on-a-valuable-education-plan-culver-city-ca/.

scholars say it's not likely to pass constitutional muster."[3]  But he ordered CDC to extend it anyway, boasting that delays in judicial review would mean that he could impose his will for at least a time.[4]  The constitutional scholars were correct; the Supreme Court set aside as unconstitutional the obviously illegal program in *Alabama Association of Realtors v. Department of Health & Human Services*, 141 S. Ct. 2485 (2021).

Defendant Biden is attempting the same lawless maneuver here.  Although this round of unilateral debt nullification takes on a new name, with a different putative authority, it is every bit as improper as his first unlawful attempt at debt forgiveness in *Biden v. Nebraska*.  Indeed, as the Defendants scrape ever deeper into the barrel for legal pretexts to abolish student debts, the illegality of those artifices becomes more obvious.

The authority that Defendants claim now lacks any substantive limits and amounts to claiming that they can abolish all student debt at any time by rulemaking alone.  For example, under Defendants' absurd interpretation of the Higher Education Act of 1965, they could limit student debt repayment to 5% of borrowers' income above $5,000,000 for five years and thereby abolish all remaining debt.  Defendants do so under the pretense that such debt forgiveness or debt erasure is merely modifying the terms of the loan repayment.  That is the power claimed— and challenged—in this suit.

The timing of these actions also makes plain their pretextual nature.  The first round of debt relief was rushed out in time for the 2022 elections in a transparent bread-and-circuses attempt to boost base turnout and, in essence, buy votes with federal funds.  This second round of

---

[3]  Jeff Stein & Tyler Pager, Seung Min Kim, Tony Romm, *Ban on Evictions is Back*, Washington Post (Aug. 4, 2021), https://www.washingtonpost.com/politics/2021/08/04/bidens-novel-evictions-defense-maybe-its-illegal-its-worth-it/.
[4] *Id.*

debt cancellation also—by remarkable coincidence—manages to take effect shortly before the 2024 election.  Had Defendants taken the complex and multipart rule back to the drawing board after *Biden v. Nebraska*, they would likely not be able to promulgate and finalize a rule before November 2024. So, they did not.  Accepting the propositions that the timing of these actions is mere coincidence and that neither is essentially a multi-hundred-billion-dollar vote-buying scheme would require this Court "to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (citation omitted). Regardless of the suspicious timing, the Court should still set aside this executive action as unlawful.

Because this second round of debt nullification is as plainly unlawful as the first invalidated by the Supreme Court in *Nebraska v. Biden*, Plaintiffs are suing to vindicate their interests and ensure that this lawlessness does not stand.

### JURISDICTION AND VENUE

1. This Court has federal question jurisdiction over this case under 28 U.S.C. § 1331 because this case concerns whether the Department acted in compliance with the United States Constitution and federal law, including the Higher Education Act of 1965 and the Administrative Procedure Act ("APA").

2. This Court also has jurisdiction pursuant to 5 U.S.C. §§ 701–706 (the APA) and 28 U.S.C. § 1361.

3. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because: (1) Plaintiff State of Kansas resides in this judicial district, (2) Kansas agencies harmed by the Final Rule reside in this District, (3) no real property is involved in this action.

4. There is a present and actual controversy between the parties.

5. Plaintiffs are challenging a final agency action pursuant to 5 U.S.C. §§ 551(13), and 704.

6.     This Court may grant Plaintiffs the relief they request under the Administrative Procedure Act, 5 U.S.C. §§ 705-06 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

7.     Plaintiffs request the United States District Court for the District of Kansas, Wichita Division, located at 401 N. Market, Wichita, Kansas 67202, for trial, if any.

## THE PARTIES

**A.  Plaintiffs**

8.     Plaintiff State of Kansas is a sovereign State of the United States of America.

9.     Kansas sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including protecting the reliance interests of state and local agencies.

10.     Kansas brings this suit through its attorney general Kris W. Kobach.  He is the chief legal officer of the State of Kansas and has the authority to represent Kansas in federal court. Kan. Stat. Ann. 75-702(a).

11.     Plaintiff State of Alabama is a sovereign State of the United States of America.

12.     Alabama sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including protecting the reliance interests of state and local agencies.

13.     Alabama brings this suit through its attorney general Steve Marshall.  He is the chief legal officer for the State of Alabama and has the authority to represent Alabama if federal court.  Ala. Code § 36-15-1(2).

14.     Plaintiff State of Alaska is a sovereign State of the United States of America.

15.     Alaska sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens.

16.     Alaska brings this suit through its attorney general, Treg Taylor.  He is the chief legal officer of the State of Alaska and has authority to institute any legal action on behalf of the state.  Alaska Statute 44.23.020.

17.     Plaintiff State of Idaho is a sovereign State of the United States of America.

18.     Idaho sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens.  The Final Rule will harm Idaho and its citizens.

19.     Idaho brings this suit through its attorney general, Raúl Labrador, the State's chief legal officer.  He is authorized by Idaho law to sue on the State's behalf under Idaho Code § 67-1401.  His address is 700 W. Jefferson St., Suite 210, P.O. Box 83720, Boise, Idaho 83720.

20.     Plaintiff State of Iowa is a sovereign State of the United States of America.

21.     Iowa sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens.

22.     Iowa brings this suit through its attorney ggeneral, Brenna Bird.  She is authorized by Iowa law to sue on the State's behalf under Iowa Code § 13.2.  Her address is 1305 E. Walnut St., Des Moines, Iowa 50309.  The aattorney ggeneral believes Iowa will be harmed by the Final Rule, and therefore joins.

23.     Plaintiff Louisiana is a sovereign State of the United States of America.

24.     Louisiana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

25.     Louisiana brings this suit through its attorney general, Liz Murrill.  She is the chief legal officer of the State of Louisiana and has authority to institute any civil action.  LA Constitution Art. IV, § 8.

26.     Plaintiff Montana is a sovereign State of the United States of America.  The Final Rule will harm Montana and its citizens.

27.     Montana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

28.     This action is brought by the State in its sovereign capacity through its attorney general, Austin Knudsen, who is the chief legal officer of the State.  Mont. Const. art VI, § 4(4).  He is authorized to bring legal actions to protect the interests of the State of Montana and its citizens. His offices are located at 215 N. Sanders St., Helena, MT 59601.

29.     Plaintiff State of Nebraska is a sovereign State of the United States of America.

30.     Nebraska sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

31.     Mike Hilgers is the attorney general of Nebraska.  General Hilgers is the chief legal officer of the State of Nebraska and has the authority to represent Nebraska in federal court.  Neb. Rev. Stat. § 84-203.

32.     Plaintiff South Carolina is a sovereign State of the United States of America.

33.     South Carolina sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

34.     South Carolina brings this suit through its attorney general, Alan Wilson.  He is the chief legal officer of the State of South Carolina and has the authority to represent South Carolina in federal court.  *State ex rel. Condon v. Hodges*, 349 S.C. 232, 239–40, 562 S.E.2d 623, 627 (2002) (the South Carolina attorney general "'may institute, conduct and maintain all such suits and *proceedings* as *he deems* necessary for *the enforcement of the laws of the State,* the *preservation of order,* and the *protection* of *public rights*.'" (emphasis in original)) (quoting

*State ex rel. Daniel v. Broad River Power Co.*, 157 S.C. 1, 68, 153 S.E. 537, 560 (1929), *aff'd* 282 U.S. 187 (1930)).

35.    Plaintiff State of Texas is a sovereign State of the United States of America.

36.    Texas sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

37.    Texas brings this suit through its attorney general Ken Paxton.  He is the chief legal officer of the State of Texas and has the authority to represent Texas in civil litigation. *Perry v. Del Rio*, 67 S.W.3d 85, 92 (Tex. 2001).

38.    Plaintiff State of Utah is a sovereign State of the United States of America.

39.    Utah sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

40.    Sean D. Reyes is the Attorney General of Utah. He is authorized by Utah law to sue on Utah's behalf.  *See, e.g.*, Utah Const. art. VII, § 16; Utah Code § 67-5-1(1)(b).

**B.  Defendants**

41.    Defendant Joseph R. Biden, Jr. is the president of the United States of America. He is sued in his official capacity.  Defendant Biden instructed the Department of Education to take the actions challenged here.

42.    Defendant Department of Education is an executive agency of the federal government tasked with administering the federal student loan program.

43.    Defendant Miguel Cardona is the United States Secretary of Education and is responsible for the operation of the Department, including the issuance of the challenged rule. 20 U.S.C. § 3411.  He is sued in his official capacity.

## <u>FACTUAL ALLEGATIONS</u>

**A.  The Higher Education Act of 1965 and its Amendments**

44.    Congress enacted the Higher Education Act of 1965 (the "HEA" or "Act") "to increase educational opportunities and 'assist in making available the benefits of postsecondary

education to eligible students in institutions of higher education.'"  *Biden*, 143 S. Ct. at 2362 (quoting 20 U.S.C. § 1070(a) (cleaned up)).

45.     Among other things, the HEA provided for two different forms of financial assistance: grants and loans.  *See* 20 U.S.C. § 1070-1070h, § 1071-1087-4.

46.     Initially, the HEA did not authorize directly loaning money to students; rather, the federal government guaranteed private loans.  However, Congress amended the HEA in 1993 to authorize direct loans to students from the federal government and allowed the Department to offer a variety plans for repayment of student loans.

47.     Among the repayment plans authorized by the 1993 amendments was an income-contingent repayment plan that based repayment amounts based on the income of the borrower, paid over an extended period of time not to exceed twenty-five years.  *See* 20 U.S.C. § 1087e(d)(1)(D).

48.     The premise of direct government lending was that there would be no ultimate cost to the government because the loans would accrue interest and eventually get paid back.[5] The cancelation of the remaining balance (if any) at the end of the 25-year period was designed to be a narrow and rare exception rather than the rule.[6]

49.     In 1994, the Department designed (by regulation) the first income-contingent repayment plan, which limited annual loan payments to 20% of a borrower's income that

---

[5] *Hearing of the Committee on Labor and Human Resources to Amend the Higher Education Act of 1965*, 103rd Cong. (1993), 48, available at: https://files.eric.ed.gov/fulltext/ED363187.pdf.
[6] *Id.*

exceeds the federal poverty line.  It also established that if any amount of the loan remained after twenty-five years of payments, that remainder would be cancelled entirely.[7]

50.     In 2007, Congress authorized two major changes.  First, Congress established an income-based repayment plan (which is distinct under the HEA from income-*contingent* repayment plans) that provided relief for borrowers facing a temporary financial hardship by reducing the annual repayment cap to 15% of income above 150% of the federal poverty guideline.  *See* 20 U.S.C. §§ 1098e(a)(3)(B), (b)(1).  It also explicitly authorized cancellation of debt after 25 years.  *Id.* § 1098e(b)(7).  Income-based repayment plans are expressly limited to individuals with "partial financial hardship," *id.* § 1098e(d)(1)(E), which is defined by 20 U.S.C. § 1098e.

51.     The 2007 amendments also established the Public Service Loan Forgiveness ("PSLF") program, which allowed those who enter public service to have their loans canceled after ten years instead of twenty-five.  20 U.S.C. § 1087e(1)(B).

52.     In 2010, the last significant statutory changes were made to loan repayment.  That year, Congress lowered the cap of annual repayment to 10% of income above 150% of the federal poverty guideline and capped the timeline for loan cancelation at twenty years for income-based repayment.  This only applied to loans taken out after 2014.  20 U.S.C. § 1098e(e).

53.     Congress has set very specific limits on loan forgiveness.  Nevertheless, the Department has tried to give itself the power to set its own lower thresholds.  The Department has attempted to unilaterally override some of these statutory provisions through the rulemaking process to make them more generous.  First, in 2012 the Department established the Pay as You

---

[7] CRS, *The Federal Direct Student Loan Program* 10 (1995), available at: https://files.eric.ed.gov/fulltext/ED378875.pdf.

Earn (PAYE) plan, which extended the 2010 amendments to loans taken out as far back as 2007. *See* 77 Fed. Reg. 66,088.

54.     In 2015, the Department established the REPAYE Plan, extending the 2010 amendments to all borrowers regardless of when they took out the loans.  80 Fed. Reg. 67,204.

55.     Despite that, the average individual under the current REPAYE plan would ultimately pay back more than the amount that they took out in loans (*i.e.*, pay back the entire amount of principal plus at least some amount of interest), 88 Fed Reg. 43,880, which arguably broadly follows the contours of other repayment plans established by Congress.

**B.     The Proposed Rule**

56.     Not satisfied with the specified thresholds and criteria set by Congress for debt cancellation, the Department has contrived to set its own through the challenged rule.

57.     Defendants issued a *Notice of Proposed Rulemaking on Improving IDR for the Direct Loan Program* to that effect on January 11, 2023.  88 Fed. Reg 1,895 (Jan. 11, 2023).

58.     The NPRM allowed for only a thirty-day comment period.  *Id.*

59.     The Proposed Rule estimated that the net budget impact would be $137.9 billion across all loan cohorts through 2032.  *Id.*  This number assumed as part of its baseline estimate that the HEROES forgiveness at issue in *Biden v. Nebraska* would be upheld.

**C.     Commenting on the Proposed Rule**

60.     Despite the significance of the Proposed Rule, the Department denied all requests for extensions beyond the thirty-day period it had originally established.  88 Fed. Reg 43,821.

61.     As a result of the condensed timeline, some number of people who would have otherwise provided comment did not do so.  Similarly, other individuals and entities that

ultimately submitted comments were unable to develop their arguments adequately due to the truncated period.

62.     Regardless, there were some commenters who raised legal issues that were addressed by the Department in the Final Rule.

63.     Multiple commenters challenged the legal authority of Defendants to implement these regulations, to include: (1) acting in excess of statutory authority, (2) implicating the major questions doctrine, and (3) promulgating a rule that is arbitrary and capricious.  *See generally* 88 Fed. Reg. 43,820-905.

64.     One commenter noted that the true cost of the program was underestimated because Defendants presumed that the $430 billion of loan forgiveness at issue in *Biden v. Nebraska* would be upheld.  *Id.*

65.     The Congressional Budget Office ("CBO") was also aware of this issue.  While the CBO was not able to produce a cost estimate within the short 30-day comment period allowed by Defendants,[8] the ultimate estimate did consider the contingency that step one of Defendants' scheme, HEROES forgiveness, would be invalidated.[9]

66.     The CBO estimate also noted that Defendants' estimate "assum[ed] that there would be no increase in enrollment in the proposed IDR plan among current or future borrowers and no increase in borrowing among eligible students in the future."[10]

---

[8] *See* Congressional Budget Office, *Re: Costs of the Proposed Income-Driven Repayment Plan for Student Loans*, March 13, 2023, located at https://www.cbo.gov/system/files/2023-03/58983-IDR.pdf.
[9] *Id.* at 10 n.5.
[10] *Id.* at 7–8.

**D.     The Final Rule**

67.     Following the comment period, the Department opted to ignore the statutory limitations on its authority and press forward with the Final Rule.

68.     On July 10, 2023, the Department issued a final administrative rule titled "Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan ("FFEL Program")" (the "Final Rule" or "Rule").  The Final Rule was published in the Federal Register at 88 Fed. Reg. 43,820-905.  A true and correct copy of the Final Rule is attached as Exhibit 1 in ECF #1.

69.     The Final Rule amends 34 C.F.R. § 685.  88 Fed. Reg. at 43,900.

70.     The Final Rule makes several significant changes to preexisting regulations: for the "REPAYE" or "SAVE" Plan, the Final Rule (1) defines "discretionary income" to be income above 225% of the applicable Federal poverty guideline, (2) sets the monthly payment amount at $0 if the borrower's income falls below that threshold, (3) caps the monthly payment amount at 5% of the borrower's income that goes above that threshold for undergraduate loans, and (4) cancels all loans where the original principal balance was $12,000 or less after the borrower has made 120 monthly payments or the equivalent.

71.     Under the guise of modifying the terms of loan repayment, the Final Rule will in fact forgive billions of dollars in student debt.

72.     The Final Rule emphasized that the goal of these changes was to help more borrowers avert delinquency and default, as well as the negative consequences associated with those events, 88 Fed. Reg. 43,280, and not to create a grant, *id.* at 43,832.

73.     However, the data within the Final Rule demonstrates that the average undergraduate borrower under this new "SAVE" Plan would pay only about $6,121 for every $10,000 borrowed.  *Id.* at 43,880.

74.     Under the current/pre-Final Rule "REPAYE" Plan, that amount is $10,956 for every $10,000 borrowed.  *Id.*

75.     In effect, the Rule transforms the REPAYE Plan into a system of massive federal grants whereby borrowers pay only a fraction of the amount borrowed from the government.  The remainder of the loan is forgiven.  Thus, while styled as "loans," the Final Rule partially transforms many or most loans into outright grants from the federal government—without any appropriation from Congress for the resulting tens or hundreds of billions of dollars in additional federal spending.

76.     The Final Rule brushes off most of the challenges to the Department's legal authority by taking the position that the statute "sets an explicit upper limit, but no lower limit for the 'extended period' time that a borrower must spend in repayment" and that the Secretary has "discretion as to how much a borrower must pay, specifying only that payments must be set based upon the borrower's annual adjusted gross income."  *Id.* at 43,826–27.

77.     The Final Rule asserts that the Secretary has the "authority to make the changes in this rule related to the amount of income protected from payments, the amount of income above the income protection threshold that goes toward loan payments, and the amount of time borrowers must pay before repayment ends."  *Id.* at 43,827.

78.     The only limitation the Final Rule envisions is that the Department provide a "reasoned basis for the parameters it chose."  *Id.*

79.     Aside from the APA's procedural requirement of providing a rationale, the Final Rule does not acknowledge **any** limiting principle on the Secretary's authority to abolish debts. It recognizes no substantive limit in the assigned statutory authority under the HEA whatsoever.

80.     To put this in perspective, there is **nothing** in the Secretary's interpretation of the HEA that would prevent him from limiting debt repayment on income-driven repayment plans to 1% of income over $1,000,000 for 1 year only, with all remaining debt—typically 100%—cancelled by the federal government.

81.     The Final Rule brushes off comments that the proposed program was a matter of economic significance that did not have clear Congressional authorization by stating that there is not anything "unprecedented or novel about the Department relying on section 455 of the HEA as statutory authority for designing and administering repayment plans based on income."  88 Fed. Reg. 43,830.

82.     But by the Department's own estimates, the Final Rule would abolish over one hundred billion dollars in student debt—something that is incontestably "unprecedented [and] novel"—save for the first debt cancellation invalidated by the Supreme Court in *Biden v. Nebraska.*

83.     There was no legitimate discussion on the part of Defendants about whether the Final Rule was an issue of economic or political significance that required clear Congressional authorization.

84.     The Final Rule estimates that the cost of the program would be $156 billion[11] across the span of ten years. 88 Fed. Reg. 43,820.  As with the proposed rule, this presumed a

---

[11] Although the final rule increased the cost estimate, that increase was due to factors other than the debt forgiveness struck down in *Biden v. Nebraska*.

baseline with $430 billion of debt already being eliminated.  But that did not happen as a result of *Biden v. Nebraska.  Id.*

85.     The Final Rule never updated the cost based on *Biden v. Nebraska*, even though it came out ten days later than the Supreme Court decision.  As a result, no one knows the true cost of the program.

**E.     The Final Rule Irreparably Harms Plaintiffs**

86.     The Final Rule irreparably harms Plaintiffs in several independent ways.

87.     The Final Rule will cause financial harm for Plaintiff States including Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah through loss of state tax revenue.

88.     Student loan forgiveness under income-driven repayment plans (other than public service loan forgiveness) is normally considered taxable income for federal purposes.

89.     The American Rescue Plan Act of 2021 contained a provision that made all student loan forgiveness, regardless of the program, not count toward the federal definition of taxable income until December 31, 2025.

90.     Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah automatically base their definition of taxable income on the federal definition of income or adjusted gross income from the Internal Revenue Code, as amended.  The States automatically update their definitions of taxable income to reflect changes in federal law.

91.     As a result of the Final Rule, Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah cannot count forgiveness of loans under income-driven repayment plans as taxable income for state tax purposes until December 31, 2025.

92.     The Final Rule accelerates the timeline for cancelation on income-driven repayment plans to as low as 10 years for certain loan balances.

93.     Under the prior Final Rule, these loans would not be forgiven for twenty to twenty-five years.

94.     Under the pre-Final Rule plans, the Government Accountability Office (GAO) estimates that by 2030, "about 1.5 million loans held by about 600,000 borrowers" would be eligible for loan cancellation.[12]  Of those loans, roughly 1.2 million would be canceled between 2026 and 2030.[13]

95.     Thus, but for the Final Rule, significant amounts of federal loan cancellation would occur *after* December 31, 2025 for residents of the Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina and Utah. This would result in taxable income being recognized from the loan cancelation and thus payment of income taxes to Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah.

96.     The challenged Final Rule, however, will reduce income tax revenue by decreasing the amount of outstanding student loan debt.  It does so because one of its effects is to shift forward some debt forgiveness that would otherwise occur in a period in which it would be taxable income (*i.e.*, December 31, 2025 and on) into a period where it is not taxable (*i.e.*, 2024-25).  As a result, the Defendants' actions will cost Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah tax revenue.

---

[12] U.S. Gov't Accountability Office, GAO-22-103720, Federal Student Aid: Education Needs to Take Steps to Ensure Eligible Loans Receive Income-Driven Repayment Forgiveness 15 (2022), https://tinyurl.com/bdhzca8z.
[13] *See id.* at 16 fig. 3.

97.     In fact, Defendants' representatives publicly announced, "In Kansas, nearly 1,300 borrowers have already received $9.9 million in debt relief under the Biden-Harris Administration's SAVE plan."[14]  Plaintiff Kansas cannot collect income taxes on any of this $9.9 million.  Most of this amount would not have been forgiven prior to January 1, 2026.

98.     Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah have no option to avoid harm from the Final Rule.  Even if they were to break their linkage to the federal definition of income and separately tax student debt cancellation for 2024 and 2025, they would incur significant administrative costs as a result.  At a bare minimum, these States would have to expend sums to amend all of their tax forms—since they could no longer simply use federal income as the starting point.  These States likely would also have to promulgate guidance and expend sums enforcing the new requirements, which would likely confuse their taxpayers (who are otherwise used to having their state income taxes based on their federal income).

99.     More fundamentally, a Final-Rule-induced divorce from the federal definition of income is likely to cause significant and costly administrative complexity and confusion. There is a reason that the *vast* majority of States with income taxes conform to the federal definition of income.  *See* Tax Policy Center, *Tax Policy Center Briefing Book: State and Local Tax Policies* (Jan. 2024) *available at* https://www.taxpolicycenter.org/briefing-book/how-do-state-individual-income-taxes-conform-federal-income-taxes.  There are enormous economies and efficiencies to be had from such conformity.  That is why so many States follow the federal definition income.

---

[14] Haisten Willis, *Kansas Attorney General Will Sue Biden Administration Over Student Loans*, Washington Examiner, Mar. 27, 2024, https://www.washingtonexaminer.com/news/white-house/2942016/kansas-attorney-general-will-sue-biden-administration-over-student-loans/.

100.    Nor does that conformity to the federal definition of income have anything to do with taxation of student debt cancellation.  Each of Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah adopted their conformation policies for reasons other than taxation relating to student debt.

101.    If the States are forced to break their linkage to the federal definition of income, they will lose the efficiency and economic benefits that have long been a mainstay of state tax policy.  Such losses of efficiency and economic benefits is cognizable injury.

102.    If the Final Rule were to coerce States into changing their income tax systems to avoid harms from that Rule, that would also inflict sovereign injury: States have "sovereign power . . . to create and enforce a legal code."  *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 601 (1982).  Coercing States to adopting different laws other than their actual preferences, solely to avoid injuries inflicted upon them by unlawful federal regulations, thus inflicts sovereign injuries upon the States.

103.    In addition to loss of tax revenue, the Final Rule harms Plaintiffs' ability to recruit and retain talent, including legal talent in state attorney general offices.  State agencies typically cannot pay as much to recruit and retain talent as private sector employers.  One of the benefits they rely on to attract and maintain talent is the PSLF program established in the HEA.

104.    For example, the Kansas Office of the Attorney General ("OAG") and other Kansas state agencies rely upon the availability of other student debt forgiveness programs to recruit legal talent.  Indeed, they currently have many employees eligible for relief under the PSLF program for undergraduate and graduate student loans.

105.    South Carolina schools also rely on the PSLF program to aid with recruitment and retention of teachers.  According to the South Carolina Department of Education, "[t]he issue of

loan forgiveness directly relates to the issue of salary, as teachers report they often do not make enough money to afford monthly student loan payments upon graduation forcing them to pursue careers outside of education. . . . Our ability to recruit future educators to the field of education, specifically public education, is dependent upon financial support of pre-service candidates interested in entering the field."  S.C. DEPARTMENT OF EDUCATION, *Teacher Recruitment and Retention Task Force Recommendations*, at 11, May 2023 (https://ed.sc.gov/newsroom/teacher-recruitment-and-retention-task-force-recommendations/).

106.    South Carolina struggles with a growing teacher shortage.  At the start of the 2022-2023 school year, there were 1,474 vacant teaching positions, a 39% increase in vacancies over the previous year.  *Id.* at 2.  That same year, 6,134 teachers left the profession, up from 5,359 the previous year.  *Id.*  Recruiting and retaining talent is difficult enough; removing the incentive of PSLF would strike another crushing blow to the South Carolina public education system.

107.    Similarly, the Alaska Attorney General's office relies on the PSLF Program as a tool for recruiting and retaining employees.

108.    Put simply, the value of the PSLF Program as a recruiting and retention tool is directly proportional to the amount of student debt that a current or potential employee holds: *i.e.*, the more debt that can be forgiven under the PSLF Program, the more powerful of an inducement it is. Conversely, if the amount of student debt held by current and potential employees decreases, the relative attractiveness of public employment for the Plaintiff States decreases.

109.    These premises flow from rudimentary economic principles of supply-and-demand and incentives. The inducement of the PSLF Program is cancellation of all remaining

student debt. Thus: less debt equals less incentive to accept a job with the States or continue to work for them.

110.    By unilaterally writing off enormous amounts of debts—including student debt that is disproportionately held by law school graduates and other prospective State employees— the Final Rule harms the state's ability to recruit talent, and directly makes it less lucrative for current and prospective employees to work for the state.  *See*, *e.g.*, *Louisiana Energy & Power Auth. V. Fed. Energy Regul. Comm'n*, 141 F.3d 364, 367 (D.C. Cir. 1998) (A party "suffer[s] injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition" against them.").

111.    Similarly, other Plaintiff States rely on the availability of loan forgiveness under the PSLF program to recruit and retain employees.  The Final Rule harms them by reducing the attractiveness of that incentive to work for Plaintiff States.

112.    During the early roll out phase of the Final Rule, hundreds of thousands of borrowers who had loan balances below a certain amount after ten years had their loans retroactively forgiven even if they never performed public service.

113.    Once the Final Rule takes effect, additional individuals who have $12,000 or less in loans will have them forgiven after ten years of repayment—the same amount of time required for public service loan forgiveness.

114.    Once the Final Rule takes effect, most individuals on an income-driven repayment plan will have monthly payments that equal $0 per month.  As a result, they would receive less benefit from the PSLF Program, which makes working for state agencies less attractive.  Many will therefore leave their jobs with agencies of the Plaintiff States because one of the primary financial benefits for them to remain will have been eliminated by the Final Rule.

115.     Therefore, state and local government employers in Plaintiff States will be harmed in their ability to recruit and retain talent.

116.     Plaintiff States also have state instrumentalities or quasi instrumentalities that (1) provide student loans to residents of the state, (2) hold loans issued under the Federal Family Education Loan Program ("FFELP loans"), and/or (3) service student debt taken out by residents, former residents, and out-of-state students.

117.     These entities derive income from their loan portfolios, such as through collecting interest owed or service fees.

118.     That income is typically either provided directly to their respective States or spent on items for which the State would otherwise have to expend its own funds.

119.     The amount of income thus collected is directly proportional to the size of the debt portfolio: *i.e.*, decreasing the size of the portfolio will decrease the income collected by the instrumentalities/quasi-instrumentalities.

120.     The Final Rule is virtually certain to decrease the size of these student-debt portfolios by inducing individuals to consolidate their FFELP loans into direct federal loans in order to take advantage of the extraordinary (and unlawful) generosity of the Final Rule. The Final Rule itself predicts as much and further sought to make such consolidation more attractive by providing "more clarity" that borrowers "retain the borrower's progress toward forgiveness when they consolidate Direct or FFEL Program Loans into a Direct Consolidation Loan," 88 Fed. Reg. at 43,865.

121.     South Carolina has one such affected entity, the State Education Assistance Authority ("SEAA"), which is a "public instrumentality of the State."  S.C. Code Ann. § 59-115-40.  "[T]he exercise by the authority of any power" conferred by the State is "deemed and held to

be the performance of an essential public function." *Id.* SEAA, in turn, relies on the South Carolina Student Loan Corporation ("SCSLC") to service its FFELP loan portfolio.

122.    Already, since 2011, SEAA's portfolio has decreased from approximately $31.3 million to $6.4 million, which has reduced the amount of income generated for South Carolina's benefit from approximately $1.173 million to around $433,000. The Final Rule will further decrease the size of SEAA's portfolio as borrowers convert FFELP loans to take advantage of available debt forgiveness.  This, in turn, will result in additional losses of revenue to South Carolina, thereby causing cognizable injury and irreparable harm.

123.    Similarly, Alaska has the Alaska Student Loan Corporation ("ASLC") that performs a similar role.  ASLC is a public corporation and enterprise instrumentality of the State of Alaska that was created by statute. *See* Alaska Stat. § 14.42.100. It is run by a Board of Directors, each of whom is appointed by the Governor of Alaska. *Id.* § 14.42.120.

124.    As of March 2024, ASLC owns over $16.8 million in Federal Family Education Loan Program (FFELP) loans. Through these loans, ASLC collects $1.9 million in interest and other FFELP portfolio income annually.

125.    The Final Rule will cause Alaska to lose significant revenues.

126.    ASLC estimates that the Final Rule will result in ASLC losing approximately $100,000 over just the next two years that it would otherwise collect as a FFELP loan holder.

127.    Texas also has a student debt servicing public entity, the Texas Higher Education Coordinating Board ("THECB").

128.    The THECB is an agency of the State of Texas and was created by statute. *See* Tex. Educ. Code. § 61.021.

129.    THECB is run by a nine-member governing board, each of whom are appointed by the Governor of Texas with the advice and consent of the Senate of Texas.

130.    As of May 1, 2024, THECB owns over $1,1295,236 in FFELP loans. Through these loans, THECB collected $114,479 in interest in 2023.

131.    If the Final Rule were to decrease the size of that student debt portfolio, the amount of income that the THECB would collect would decrease.

132.    As set forth above, the Final Rule will cause such a decrease, thereby decreasing the income collected by the THECB, and causing harm to Texas.

### CLAIMS FOR RELIEF

### COUNT I
**Agency Action in Excess of Statutory Jurisdiction and in Violation of the Separation of Powers**
**U.S. Const. art. I, § 1**

133.    Paragraphs 1–132 are realleged as if fully set out herein.

134.    The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).

135.    The Final Rule is final agency action subject to judicial review.  *Id*. § 704.

136.    The Final Rule is a "rule[]" under the APA.  *Id*. § 701(b)(2).

137.    The Department is an "agency" under the APA.  *Id*. § 701(b)(1).

138.    Separation-of-powers principles prohibit an agency from deciding questions of great economic or political significance, or issues traditionally governed by state or local law,

absent clear authorization from Congress to do so.  *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (discussing the "major questions" doctrine).

139.     The major questions doctrine is triggered when an agency invokes broad authority over matters of great economic and political significance.  *See id.* at 721-22.

140.     The Rule triggers the doctrine because forgiving hundreds of billions of dollars in student loans for thousands of borrowers is an issue of vast political significance.  *Biden*, 143 S. Ct. at 2375 (2023).

141.     The Final Rule also invokes the major questions doctrine because the cost of the program makes it an issue of vast economic significance.  When all of the aspects of the Final Rule are taken together, the average undergraduate borrower repays only $6,121 for every $10,000 borrowed.  88 Fed. Reg. 43,880.

142.     In practice, this has created a situation where 4.3 million out of 7.8 million borrowers under the income-driven repayment plan from the Final Rule have a monthly payment of $0 on their loans.  Their loans are completely forgiven.

143.     This results in a price tag of $156 billion according to the Final Rule.  However, this number came with a baseline assumption that $430 billion of student loan debt at issue in *Biden v. Nebraska* would already be forgiven.  It was not.  As a result, the actual cost of the program is much higher.

144.     The Final Rule violates the major questions doctrine because questions regarding the nature and scope of student loan forgiveness are issues of vast political significance subject to earnest and profound debate across the country.

145.     Departure from longstanding practice without new authorization from Congress is strong evidence the agency is acting without Congressional authorization.  *See Nat'l Fed'n Indp. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022) [hereinafter *NFIB*].

146.     The Final Rule also departs from Defendants' nearly thirty-year definition of "income contingent repayment plan" by effectively turning a repayment plan into an outright grant in the form of loan forgiveness without new authorization from Congress.

147.     In fact, nothing in the HEA or any of its amendments gives Defendants the authority to turn the terms of income-driven loan repayment into a grant.

148.     Nothing in the HEA nor its amendments gives Defendants the authorization to spend significantly more than $156 billion.

149.     As noted in *Biden*, the HEA does give Defendants express authorization to forgive loans in four other instances: (1) loans held by public servants, *see* 20 U.S.C. §§ 1078–10, 1087j, 1087ee, (2) borrowers who have become "permanently and totally" disabled, *id.* § 1087(a)(1), (3) borrowers who are bankrupt, *id.* § 1087(b), and (4) borrowers whose schools falsely certify them, close down, or fail to pay lenders, *id.* § 1087(c).  143 S. Ct. at 2363.

150.     That Defendants chose to rely on a completely different provision, 20 U.S.C. §§ 1087e(d) and (e)), strongly suggests Congress did not authorize this action.  Congress does not "hide elephants in mouseholes," *Witman v. American Trucking Ass'n*, 531 U.S. 457, 468 (2001), or authorize by implication where it has does so expressly elsewhere.

151.     Even if the Final Rule did not implicate the major questions doctrine, it would still violate the separation of powers.  Congress only gave the Department authority to cancel student loans in some very limited scenarios.  *See Biden*, 143 S. Ct. at 2362-63.

152.    And while Congress is no doubt aware of the issue, it has chosen not to rewrite the HEA by adding a new category of loan forgiveness as the Department has unilaterally done. By doing so unilaterally, Defendants have "seiz[ed]he power of the Legislature." *Id.* at 2373.

153.    Members of Congress have introduced legislation that would accomplish this or similar goals, *see, e.g.*, S.3953 (2022); H.R. 3027 (2019), but Congress has chosen not to enact such legislation.

154.    The Department therefore has no authorization to forgive student loans in this context, and the Department exceeded its authority when it issued the Final Rule.  Because the Final Rule violates the separation of powers, it should be set aside.

**COUNT II**
**Agency Action That Is In Excess of Statutory Authority**
**5 U.S.C. § 706**

155.    Paragraphs 1–132 are realleged as if fully set forth herein.

156.    The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) . . . not in accordance with law; . . . [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

157.    The Final Rule is contrary to law and exceeds the Department's statutory authority.

158.    The HEA and its amendments separate grants and loans into separate chapters. The income-driven repayment plan is in the chapter that addresses loans and by its nature anticipates actual ***repayment*** of the principal borrowed.

159.    Defendants have some discretion in setting the terms of loan repayment under the statute, and there are circumstances where someone on this program would pay less than they would otherwise owe.  However, the broad nature of Defendants' actions in the Final Rule make it so that the average undergraduate borrower only repays $6,121 for every $10,000 borrowed.

160.     At this point, the loan becomes at least a partial grant because, rather than paying back loans with interest, most borrowers will pay back significantly less than the principal they borrowed.

161.     Congress already spoke in a separate chapter of the HEA and its amendments about what qualifies as a grant.  There is no authority for the proposition that Congress intended to turn the terms of a loan into an outright grant.

162.     The HEA also states that the standard term of loan repayment is ten years or less.  The statute that authorizes income-driven repayment requires payment over an ***extended*** period of time.  20 U.S.C. § 1087e(d)(1)(D).  However, the Final Rule allows borrowers with loans balances of $12,000 or less to have their loans canceled after only ten years.

163.     This erases any meaningful difference between a standard repayment plan and an extended repayment plan because an extended repayment plan necessarily envisions a longer repayment period than the standard repayment plan.

164.     Because the Final Rule conflicts with what Congress explicitly spoke on in the HEA, it should be set aside.

165.     Furthermore, Congress already defined the terms of repayment for someone facing a partial financial hardship as payments capped at 10% of income above 150% of the federal poverty line.

166.     The Final Rule caps undergraduate payments at 5% of income above 225% of the federal poverty line.  No authority suggests that Congress intended most borrowers have a plan more generous than those who are experiencing a partial financial hardship.

167.     By setting the applicable income thresholds for financial hardship itself, Congress precluded Defendants from adopting their own more-generous thresholds.

168.    Congress has already given Defendants very limited ability to "waive" loans with regard to FFEL loans.  *See* 20 U.S.C. § 1082(a)(6).  This provision shows the limits of what Congress authorized the Secretary to do with respect to "waiving" student loans.  Defendants disclaimed reliance on this provision.  88 Fed. Reg. 43,834.  By cancelling loan debt on a mass basis through the income-driven loan repayment plan, Defendants are sidestepping those limits and flouting their statutory authority.

169.    Finally, Congress only provided one avenue where a borrower can receive loan forgiveness after ten years of repayment.  That is through the PSLF program.  CITE.

170.    Debates surrounding the bill that authorized public service loan forgiveness emphasized the importance of forgiving loans through this program because of the need to gear specific relief for those who pursue a career in public service.

171.    This Final Rule provides forgiveness after ten years for anyone who has an original balance of $12,000 or less.  In fact, Defendants have already retroactively forgiven hundreds of thousands of such loans regardless of the amount of interest accumulated on the principal balance.

172.    No authority suggests that anyone—regardless of career, income, or even unemployment—would have the same timeline for loan forgiveness as those who dedicated a decade of their career to public service.

173.    The Final Rule is contrary to the HEA and its amendments.  It should be set aside.

## COUNT III
### Arbitrary and Capricious Agency Action
### 5 U.S.C. § 706

174.    Paragraphs 1–132 are realleged as if fully set forth herein.

175.    The final Rule is arbitrary and capricious for a number of independent reasons. In short, Defendants failed to consider numerous important factors, including the full cost of the rule and important reliance interests.  Despite being aware of the shortcomings, Defendants declined to address them in the Final Rule or provided wholly inadequate explanations, brushing off concerns.  Elsewhere, the Final Rule's explanation is internally inconsistent.

176.    The Final Rule is arbitrary and capricious in that it fails to capture, account for, or report the full cost.  The Proposed Rule estimated it would cost $137.9 billion.  This estimate was increased to $156 billion in the Final Rule.

177.    This is without a doubt a severe underestimation.  The Final Rule states that the baseline used to compute this number included an assumption that $430 billion in student loans that were at issue in *Biden v. Nebraska* would be forgiven.  That was not the case.

178.    The reality is that no one, including Defendants calculated the true cost of the program, but they pushed it through anyway.

179.    The Final Rule was released 10 days after the decision in *Biden v. Nebraska* was issued.  Defendants knew or should have known prior to the Final Rule being released that their estimates were way off.  In fact, at least one commenter warned them about it.

180.    Defendants themselves noted, "One commenter expressed concern with our cost estimates, which account for the Administration's one-time debt relief plan to forgive $20,000 for Pell Grant eligible borrowers and $10,000 for other borrowers.  This issue remains before the Supreme Court.  The commenter suggests that we should produce a secondary cost estimate in the event that the loan cancellation plan does not go into effect."  88 Fed. Reg. 48,375.

181.    The CBO also warned of this issue.

182.     Instead of heeding that warning, Defendants cavalierly responded, "the Department is confident in our authority to pursue debt relief and is awaiting the Supreme Court's ruling on the issue." *Id.*  This was, again, 10 days **after** the Court in *Biden v. Nebraska* had already informed Defendants that their confidence in their authority to pursue debt relief was misplaced.

183.     Ultimately, Defendants made no change to their estimates despite having ample warning that their estimates were off by a wide margin.  *Id.*

184.     This is a violation of Defendants' statutory duty to "reasonably explain" the Rule, including by responding "significant points" raised by the comments.  *See Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 343-344 (D.C. Cir. 2019).  The Rule's estimate was just wrong.

185.     The Defendants cost estimate also does not anticipate the increased costs that will come when more borrowers, both present and future, sign up for what is likely to be a very attractive program.  This despite expressly noting that future borrowers would be also to take advantage of its terms.  88 Fed. Reg. 43,822–23.

186.     The CBO warned of this as well.

187.     Furthermore, the Final Rule is also arbitrary and capricious because it fails to consider the reliance interests of the Plaintiffs and their entities.  *See*, *e.g.*, *DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1913 (2020) ("When an agency changes course . . . it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" (cleaned up) (citation omitted)).

188.     *First*, the Final Rule did not consider Plaintiff reliance interest on tax revenue from loan forgiveness.

189.     Normally, "forgiveness" through income-driven repayment is considered taxable income by the Internal Revenue service.

190.     Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah follow the federal definitions when defining taxable income tax for state purposes. Therefore, income-driven repayment "forgiveness" is normally taxable income at the state level for these states.

191.     However, the American Rescue Act of 2021 barred states from collecting taxes on any loan forgiveness until December 31, 2025.

192.     Despite being aware of this law, Defendants still unilaterally forgave hundreds of thousands of loans retroactively as they roll out this program.  At least some of those loans would have been forgiven after December 31, 2025, forcing Plaintiff States to lose tax revenue.

193.     The Final Rule ignored this and forgave the loans anyway.

194.     *Second*, the Rule failed to consider the Plaintiffs' reliance interest in using PSLF to recruit talent and remain competitive.  *See XY Plan. Network, LLC v. United States Sec. & Exch. Comm'n*, 963 F.3d 244, 251 (2d Cir. 2020).  State and local government employers cannot pay as much as private sector employers because they are primarily funded by taxpayer dollars and operate on yearly, limited budgets.

195.     One of the tools they rely on to recruit and retain talent is public service loan forgiveness.

196.     This Final Rule eliminates that incentive through a combination of awaiting most borrowers regardless of loan size with $0 monthly payments and awarding anyone with a loan balance of less than $12,000 with loan forgiveness after 10 years, regardless of career choice or unemployment.

197.    Commentators also warned of this issue, but Defendant cavalierly brushed aside concerns despite noting "the benefits discussed in this regulation would also be available to those seeking PSL[F]."  88 Fed. Reg. 43,880.

198.    The Final Rule did not consider the Plaintiffs' reliance interest in this important program and therefore it is arbitrary and capricious.

199.    Furthermore, the Final Rule is also arbitrary and capricious because it changes course from nearly 30 years of Defendants' practice on loan forgiveness.  Never before have the terms of loan repayment been transformed into loan forgiveness so that the average undergraduate borrower repays only $6,121 for every $10,000 borrowed.  These borrowers no longer have to repay the full principal of their debts.  This is a huge change of course.

200.    Defendants have not only changed course without explanation, but also, they are denying they are changing course at all.  They state that they have taken actions similar to this in the past through the PAYE and REPAYE programs and were never challenged on it.

201.    Regardless of the legality of past actions (and the fact that the absence of a challenge does not create legality), their own data demonstrate that this is not true. Prior to this change, the average undergraduate borrower paid more than what they owed.  This is arguably consistent with other loan programs Congress established.  This makes sense because they are loans that collect interest.

202.    This is the first time that loan repayment has reached the level at which the average borrower pays almost 40% less than the principal he borrowed.  This is a huge change of course that Defendants refuse to acknowledge.

203.     In addition, Defendants also changed course on the timing of loan cancelation. Previously, all income-driven loan repayment plans allow cancelation after twenty to twenty-five years.  Only public service loan cancelation had a ten-year repayment timeline.

204.     The Final Rule changes course by allowing anyone with $12,000 or less of an original balance to receive loan forgiveness after ten years.  This is a significant deviation from past practice.

205.     Defendants refuse to acknowledge this change of course and instead claims that always had this authority.

206.     Furthermore, the Final Rule is also arbitrary and capricious because it contains numerous internal contradictions.  For example, the Final Rule repeatedly states that it is designed to avoid delinquencies and defaults.  Defendants believe this is done through offering a more generous income-driven repayment plan.

207.     However, the Final Rule also states that the last change to the income-driven repayment plan that lowered payments for individuals resulted in an increase is delinquencies and defaults.

208.     In addition, the Final Rule acknowledges that the majority of those who default on loans had low original balances.

209.     However, a major portion of the Final Rule provides payments as low as $0 a month for any borrower below a certain income threshold regardless of loan balance.

210.     Furthermore, the Final Rule is also arbitrary and capricious because it failed to consider meaningfully the inflationary effects that the Rule will have, both specifically in the secondary education market and more generally for the entire U.S. economy.  The enormous inflationary pressures are an "important aspect of the problem" that Defendants were obliged to

evaluate. *Michigan v. EPA*, 576 U.S. 743, 750-52 (2015) (cleaned up). They failed to do so and thereby violated the APA.

211.    The Final Rule insists it is not offering a grant but merely reducing defaults.  This is belied by their own data demonstrating that most, under the Final Rule, undergraduate borrowers will pay back significantly less than what they owe, regardless of whether they are suffering financial hardship or are at risk of default.  That is clearly a grant.

212.    This only makes sense when viewed through the lens of Defendants using these justifications as a pretext and post hoc justification for political ends.

213.    This Final Rule is not the product of a well-reasoned decision.  It was a rushed product to evasively do what the Supreme Court already told Defendants they cannot do.

214.    The Final Rule came out ten days after that the Supreme Court in *Biden v. Nebraska* struck down Defendants' last ill-considered attempt at loan forgiveness.  Defendant Biden stated that "the Supreme Court blocked it.  They blocked it.  But that didn't stop [him]." In addition, Defendant Cordona stated in an interview that if this Final Rule was not challenged in court they were not trying hard enough.

215.    For all these reasons, the Final Rule is arbitrary and capricious.

## COUNT IV
### Agency Action in Violation of APA Procedures
### 5 U.S.C. § 706(2)(D)

216.    The allegations in Paragraphs 1–132 are reincorporated herein.

217.    The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

218.    The APA requires agencies to publish notice of all "proposed rulemaking" in the Federal Register, *id.* § 553(b), and to "give interested persons an opportunity to participate in the

rule making through submission of written data, views, or arguments," *id.* § 553(c).  The Rule, therefore, only can be issued, if at all, pursuant to notice-and-comment rulemaking under the APA.  5 U.S.C. § 553.

219.    Here, Defendants only permitted 30 days for comments on the proposed rule. This limited time period violated the APA.

220.    The Rule is not an interpretive rule or a  general statement of policy, nor is it a rule of agency organization, procedure, or practice otherwise exempt from notice-and-comment rulemaking.  Rather, the Rule is a substantive rule for APA purposes.  5 U.S.C. § 551(4)–(5). Further, it is a final rule because it represents the culmination of the agency's consideration and affects rights and obligations.

221.    "[A] thirty-day period is, in the Administrative Conference's view, 'an inadequate time to allow people to respond to proposals ***that are complex*** or based on scientific or technical data.'  The Administrative Conference itself thus suggests 'a sixty-day period as a more reasonable ***minimum*** time for comment.'"  *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) (cleaned up) (emphases added).

222.    Executive Orders 12866 and 13563 both state that comment periods should generally be at least 60 days.  *See* 58 Fed. Reg. 51735 (Sept. 30, 1995) ("[E]ach agency should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of ***not less than*** 60 days." (emphasis added)); 76 Fed. Reg. 3821-22 (Jan. 21, 2011) ("To the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be ***at least*** 60 days." (emphasis added)).  The proposed rule asks for the public's help in "complying with the specific

requirements" of these Executive Orders, 88 Fed. Reg. 1,895, then ignores what these orders actually say with respect to the comment period.

223.    For these reasons, most other agencies routinely provide at least a sixty-day comment period for major rules.

224.    Providing only thirty days for commenting on a major rule such as this one is an outlier—and one for which Defendants offered no meaningful explanation.

225.    Here the Final Rule is both complex and enormously impactful—tens or hundreds of billions of dollars turn on each of its major components.

226.    In these circumstances, Defendants violated the APA by providing only thirty days for comment.

227.    This error was prejudicial and denied the public (including Plaintiffs) an adequate opportunity to comment adequately on the proposed rule.

## PRAYER FOR RELIEF AND DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs respectfully request the following relief:

(1)    A declaratory judgment holding the Final Rule unlawful;

(2)    A declaratory judgment holding that Defendants lacked authority to issue the Final Rule;

(3)    A judgment vacating and setting aside the Final Rule;

(4)    A permanent injunction prohibiting Defendants and their officers, agents, servants, employees, attorneys, and any other persons who are in active concert or participation with those individuals from enforcing the Final Rule; and

(5)    An award to Plaintiffs of their reasonable fees, costs, expenses, and disbursements, including attorney's fees, associated with this litigation; and

(6)    Such additional and further relief as the Court may deem just and proper.

Respectfully submitted this the 16th day of May, 2024.

**KRIS W. KOBACH**
**Attorney General of Kansas**

*/s/ Abhishek S. Kambli*
Abhishek S. Kambli, Kan. SC No. 29788
  *Deputy Attorney General*
Erin B. Gaide, Kan. SC No. 29691
  *Assistant Attorney General*
OFFICE OF THE KANSAS
ATTORNEY GENERAL
Memorial Building, 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Fax: (785) 291-3767
Email: abhishek.kambli@ag.ks.gov
         erin.gaide@ag.ks.gov

Drew C. Ensign*
Holtzman Vogel Baran Torchinsky
& Josefiak PLLC
2575 E. Camelback Road, #860
Phoenix, Arizona 85016
Phone: (602) 388-1262
Fax: (540) 341-8809
Email: densign@holtzmanvogel.com

*Counsel for the State of Kansas*

**STEVE MARSHALL**
**Attorney General of Alabama**

*/s/ Edmund LaCour*
Edmund LaCour*
  *Solicitor General*
OFFICE OF THE ALABAMA
ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36104
(334) 353-2196
(334) 353-8400 (fax)
edmund.lacour@alabamaag.gov

*Counsel for Plaintiff State of Alabama*


**TREG TAYLOR**
**Attorney General of Alaska**

*/s/ Bill Milks*
Bill Milks*
  *Chief Assistant Attorney General*
ALASKA DEPARTMENT OF LAW
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
(907) 465-4239
(515) 281-4209 (fax)
bill.milks@alaska.gov

*Counsel for Plaintiff State of Alaska*

**RAÚL LABRADOR**
**Attorney General of Idaho**

*/s/ Joshua Turner*
Joshua Turner*
  *Chief of Constitutional Litigation and
Policy*
700 W. Jefferson St., Suite 210,
PO Box 83720,
Boise, Idaho 83720
(208) 334-2400
josh.turner@ag.idaho.gov


*Counsel for Plaintiff State of Idaho*

**BRENNA BIRD**
**Attorney General of Iowa**

*/s/ Eric H. Wessan*
Eric H. Wessan*
  *Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

**ELIZABETH B. MURRILL**
**Attorney General of Louisiana**

*/s/ J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga*
  *Solicitor General*
OFFICE OF THE LOUISIANA
ATTORNEY GENERAL
1885 North Third Street
Baton Rouge, Louisiana 70804
(225) 506-3746
aguinagab@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

**AUSTIN KNUDSEN**
**Attorney General of Montana**

*/s/ Christian B. Corrigan*
Christian B. Corrigan, Kan. SC No. 25622
  *Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov

*Counsel for Plaintiff State of Montana*

37

**MICHAEL T. HILGERS**
**Attorney General of Nebraska**

/s/ *Lincoln J. Korell*
Lincoln J. Korell*
  *Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
OF NEBRASKA
2115 State Capitol
Lincoln, Nebraska 68509
(402) 471-2682
lincoln.korell@nebraska.gov

*Counsel for Plaintiff State of Nebraska*


**ALAN WILSON**
**Attorney General of South Carolina**

/s/ *Joseph D. Spate*
Joseph D. Spate*
  *Assistant Deputy Solicitor General*
1000 Assembly Street
Columbia, South Carolina 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for Plaintiff State of South Carolina*


**KEN PAXTON**
**Attorney General of Texas**
BRENT WEBSTER
First Assistant
Attorney General of Texas
RALPH MOLINA
Deputy Attorney General
for Legal Strategy

/s/ *Charles K. Eldred*
Charles K. Eldred*
  *Chief, Legal Strategy Division*
PO Box 12548
Austin, Texas 78711-2548
(512) 463-2100
charles.eldred@oag.texas.gov

*Counsel for Plaintiff State of Texas*

**SEAN REYES**
**Attorney General of Utah**

/s/ *Lance F. Sorenson*
Lance F. Sorenson*
  *Assistant Utah Attorney General*
UTAH ATTORNEY GENERAL
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114
(801) 366-0100
lancesorenson@agutah.gov

*Counsel for Plaintiff State of Utah*


*Pro hac vice*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

STATE OF KANSAS, et al.,

                       **Plaintiffs,**

v.

JOSEPH R. BIDEN, et al.,

                       **Defendants.**

Case No. 24-1057-DDC-ADM

## MEMORANDUM AND ORDER

A plaintiff must have standing to bring a lawsuit. As future Justice Scalia once explained, standing asks, "What's it to you?"[1] And if a plaintiff can't answer that question, that plaintiff doesn't have standing.

This case requires the court to answer a daunting question: When do states have standing to sue the federal government? The Supreme Court addressed this question in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023). There, several states challenged a Department of Education student loan forgiveness plan. The Supreme Court held that one state had standing. Missouri had standing to sue on behalf of its "public instrumentality"—a nonprofit, government corporation that owned and serviced student loans. That public instrumentality had suffered harm because the Department's plan forgave student loan debt, thereby reducing the number of student loans, and, as a result, reducing the service fees the public instrumentality would collect. And so, harm to Missouri's public instrumentality conferred standing on Missouri. This case,

---

[1] Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983) (revised version of Ninth Donahue Lecture at Suffolk University Law School) (cited in *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).

though it involves different states and a different student loan forgiveness plan, sits in the shadow of *Biden v. Nebraska*.

Plaintiffs here are 11 states challenging the Department of Education's new student loan regulations, called the SAVE Plan. As relevant here, the SAVE Plan does two things. *First*, it lowers monthly payments for eligible borrowers. *Second*, it shortens the maximum repayment period for eligible borrowers who took out small original loans. That is, if a student borrowed $12,000 or less, the new regulations require that borrower to make payments for 10 years—instead of 20 or 25 years. After 10 years of payments, the Department will forgive the remainder of the debt. Plaintiffs claim the new regulations violate the Constitution's separation of powers and the Administrative Procedures Act.

Defendants have moved to dismiss, arguing plaintiffs lack standing because the SAVE Plan doesn't cause the states any direct harm. Doc. 45. In response, plaintiffs argue the new regulations will harm them in three ways: (1) reduced revenue for the states' public instrumentalities who own student loans, (2) reduced tax revenue, and (3) a competitive harm to their ability to recruit and retain employees to state public service employment. The first theory works, thanks to *Biden v. Nebraska*. But the other two don't.

In short, plaintiffs have shouldered their burden to show the SAVE Plan likely will reduce the revenue of South Carolina, Texas, and Alaska's public instrumentalities—but just barely. Their standing theory is weaker than the one that prevailed in *Biden v. Nebraska*. And the allegations and declarations supporting their standing theory are conflicting. Plaintiffs even tried to sandbag their standing obligation. Their initial Complaint didn't allege standing facts adequately. Instead, plaintiffs wanted to hold onto their standing allegations until the preliminary injunction hearing. The court rejected that approach since standing, in federal court,

2

is an essential ingredient of subject matter jurisdiction.  So, they eventually filed an Amended Complaint disclosing their standing assertion.  This approach is far from perfect.

But despite these issues, plaintiffs have shouldered their burden to show that the new regulations, more likely than not, will injure South Carolina, Texas, and Alaska's public instrumentalities.  The other eight states—those without a public instrumentality participating in the student loan market—haven't shouldered their burden to show that the regulations will cause them any direct harm.

The other eight plaintiffs assert that they have standing because the SAVE Plan will reduce their income tax revenues.  But this is an incidental effect of the SAVE Plan, traceable to plaintiffs' own decisions about how to tax revenue.  Alternatively, these eight plaintiffs also assert that the SAVE Plan harms them directly because it reduces their ability to recruit staff to public service within state agencies.  No court has ever bought into this theory, and this court declines to become the first.  These plaintiffs simply have no skin in the game.  Their answer to Justice Scalia's colloquial expression of standing—What's it to you?—is this:  It's nothing.

The court thus grants defendants' Motion to Dismiss (Doc. 45) in part and denies it in part.  Plaintiffs South Carolina, Texas, and Alaska have standing based on their public instrumentalities.  The other eight states don't, and, exercising discretion conferred by Circuit authority, the court dismisses them from this action.  This is precisely how the court handles any lawsuit where some plaintiffs have viable claims and others don't.  Fed. R. Civ. P. 1 (directing courts to "secure the just, speedy, and inexpensive determination of every action and proceeding").  The court explains this result, below, beginning with the relevant background.

I.        **Background**

The court begins with the statutory scheme that defendants here used to enact the SAVE Plan.  The court then recounts the details of the SAVE Plan and concludes this section with a short summary of this lawsuit.

### *The Higher Education Act (HEA)*

Congress enacted the Higher Education Act in 1965 "to assist in making available the benefits of postsecondary education to eligible students . . . in institutions of higher education[.]" 20 U.S.C. § 1070.  Initially, the HEA didn't authorize the federal government to loan money directly to students.  Doc. 57 at 10 (1st Am. Compl. ¶ 46).  Instead, the federal government guaranteed private loans.  *Id.*  That changed in 1993, when Congress amended the HEA and authorized the federal government to loan money directly to students.  *Id.*  This 1993 amendment also required the Department of Education to offer students a variety of repayment plans.  *Id.*; *see also* 20 U.S.C. § 1087e(d)(1).  Only one variety of repayment plan matters here:  income contingent repayment plans.  Doc. 57 at 10 (1st Am. Compl. ¶ 47); *see also* 20 U.S.C. § 1087e(d)(1)(D).  As the name implies, these plans base a borrower's loan repayments on the borrower's income.  The relevant statute provides for "an income contingent repayment plan, with varying annual payments based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years[.]"  20 U.S.C. § 1087e(d)(1)(D).

### *The SAVE Plan*

Plaintiffs challenge the Department's SAVE Plan, which sets new rules for income contingent (also known as income driven) repayment plans.  This section recounts the SAVE Plan's history and explains how it works.

In January 2023, the Department issued a Notice of Proposed Rulemaking (NPRM). Doc. 57 at 12 (1st Am. Compl. ¶ 57).  The NPRM "propose[d] to amend the regulations governing income-contingent repayment plans[.]"  Improving Income-Driven Repayment for the William D. Ford Federal Direct Loan Program, 88 Fed. Reg. 1894, 1894 (Jan. 11, 2023) (to be codified at 34 C.F.R. pt. 685).  After the NPRM and the comment period, the Department published the "Final Rule" in July 2023.  Doc. 57 at 14 (1st Am. Compl. ¶ 68); *see also* Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43820 (July 10, 2023) (to be codified at 34 C.F.R. pts. 682, 685).

Relevant here, the Final Rule[2] makes the following changes to income contingent repayment plans:

- Defines discretionary income as income above 225% of the applicable federal poverty guideline;

- Sets a borrower's monthly payment amount to $0 if the borrower's income falls below 225% of the applicable federal poverty guideline;

- For undergraduate loans, caps a borrower's monthly payment amount at 5% of the borrower's income above 225% of the applicable federal poverty guideline; and

- For borrowers whose original principal balance was $12,000 or less, cancels the remaining balance after the borrower has made 120 monthly payments or the equivalent.

Doc. 57 at 14 (1st Am. Compl. ¶ 70).  To summarize, the Final Rule decreases borrowers' monthly payments and, for loans with original balances of $12,000 or less, limits a borrower's repayment window to 10 years (from 20 or 25) of qualifying payments.

### *This Lawsuit*

---

[2]     This Memorandum and Order uses the terms "Final Rule" and "SAVE Plan" interchangeably.

Eleven states now sue Secretary of Education Miguel Cardona, the United States Department of Education, and President Joseph R. Biden.  According to these states, the Final Rule is "plainly unlawful" under the Constitution and the Administrative Procedures Act, especially in light of *Biden v. Nebraska*, 143 S. Ct. 2355 (2023).  They bring four claims:  (1) agency action in excess of statutory jurisdiction and in violation of separation of powers, violating Article I of the Constitution; (2) agency action in excess of statutory authority, violating the Administrative Procedures Act (APA); (3) arbitration and capricious agency action, violating the APA; and (4) agency action in violation of APA procedures.  Doc. 57 at 25–38 (1st Am. Compl. ¶¶ 133–227).

With this background, the court next recites the legal standard governing defendants' Motion to Dismiss.[3]

## II.      Legal Standard

Defendants move for dismissal under Fed. R. Civ. P. 12(b)(1), arguing plaintiffs lack standing, and so this court lacks subject matter jurisdiction.  Rule 12(b)(1) motions take one of two forms:  a facial attack or a factual attack.  *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001).  "A facial attack asserts that the allegations in the complaint, even if true, are insufficient to establish subject matter jurisdiction.  By contrast, a factual attack on the complaint challenges the veracity of the allegations upon which subject matter jurisdiction depends."  *Cnty. Comm'rs v. U.S. Dep't of the Interior*, 614 F. Supp. 3d 944, 951 (D.N.M. 2022) (citation and internal quotation marks omitted).  Here, defendants bring a factual attack.[4]

---

[3]      Though defendants filed their Motion to Dismiss before plaintiffs filed their First Amended Complaint, the parties previously asked the court and it agreed to apply the Motion to Dismiss arguments to plaintiffs' First Amended Complaint.  Doc. 60 at 3.

[4]      Though defendants present no evidence of their own, the parties agreed at the hearing that this is a factual attack on the court's subject matter jurisdiction.

A factual attack allows the court to "reference . . . evidence outside the pleadings" including "affidavits, other documents, and [even conduct] a limited evidentiary hearing to resolve disputed jurisdictional facts." *Stuart*, 271 F.3d at 1225 (citation and internal quotation marks omitted). "When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations." *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995), *abrogated on other grounds by Cent. Green Co. v. United States*, 531 U.S. 425, 437 (2001). Instead, "when considering a Rule 12(b)(1) motion to dismiss, the court may weigh the evidence and make factual findings." *Los Alamos Study Grp. v. U.S. Dep't of Energy*, 692 F.3d 1057, 1063 (10th Cir. 2012).

"If jurisdiction is challenged, the burden is on the party claiming jurisdiction to show it by a preponderance of the evidence." *Celli v. Shoell*, 40 F.3d 324, 327 (10th Cir. 1994). So, when facing a factual attack, a plaintiff must "present affidavits or other evidence sufficient to establish the court's subject matter jurisdiction by a preponderance of the evidence." *U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 n.5 (10th Cir. 1999); *see also Sapp v. F.D.I.C.*, 876 F. Supp. 249, 251 (D. Kan. 1995) ("The allegations contained in the complaint are initially accepted as true, but if challenged the plaintiff has the duty to support the allegations with competent proof."). Our Circuit has analogized plaintiffs' Rule 12(b)(1) burden to the nonmovant's burden under Fed. R. Civ. P. 56(e). *Hafter D.O.*, 190 F.3d at 1160 n.5 ("Whether we consider [defendant's] motion as a motion to dismiss under Rule 12(b)(1) or a motion for summary judgment, [plaintiffs'] burden remains essentially the same—they must present affidavits or other evidence sufficient to establish the court's subject matter jurisdiction by a preponderance of the evidence.").

Defendants seek dismissal of plaintiffs' claims under Rule 12(b)(1) because, they assert, plaintiffs lack Article III standing.  Article III of our Constitution limits federal courts' jurisdiction to "cases" and "controversies."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  To present a case or controversy under Article III, a plaintiff must establish that it has standing to sue.  *Id.* (citations omitted).  To have standing, "a plaintiff needs a 'personal stake' in the case."  *Biden v. Nebraska*, 143 S. Ct. at 2365 (2023) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).  "To demonstrate their personal stake, plaintiffs must be able to sufficiently answer the question:  'What's it to you?'"  *TransUnion*, 594 U.S. at 423 (citation and internal quotation marks omitted).  "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (citation and internal quotation marks omitted).

Article III's standing analysis requires three things:

(1) an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical[;]"

(2) "a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court[;]" and

(3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted).

Plaintiffs must establish standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  *Id.* at 561.  At "the pleading stage, the plaintiff must clearly

allege facts demonstrating each element" of standing.  *Spokeo*, 578 U.S. at 338 (citation, internal quotation marks, and ellipsis omitted).  "If at least one plaintiff has standing, the suit may proceed."  *Biden v. Nebraska*, 143 S. Ct. at 2365 (citation omitted).

## III.      Analysis

Plaintiffs assert three[5] distinct theories of standing.  *First*, plaintiffs argue that the Final Rule harms their public instrumentalities—organizations who own and service student loans. *Second*, they argue that the Final Rule causes them direct injury because the Final Rule will decrease their tax revenues.  *Last*, plaintiffs allege the Final Rule hurts their ability to recruit employees into state employment.  The court considers each theory, in turn, below.

### A.      Public Instrumentalities

Plaintiffs' public instrumentality theory alleges, in a nutshell, that three of the plaintiff states have government corporations who own and service student loans, and the Final Rule will cause these organizations to lose revenue.  The organizations are public instrumentalities of the states, plaintiffs argue, so a harm to three instrumentalities is a direct injury to the three states themselves.  Because this standing theory relies on *Biden v. Nebraska*, 143 S. Ct. 2355, the court reviews that case's standing discussion, in detail, below.

#### 1.      *Biden v. Nebraska*

*Biden v. Nebraska* involved student loan forgiveness under the Higher Education Relief Opportunities for Students Act (HEROES Act) of 2003, a law enacted out of Congress's concern for student loan borrowers in the wake of the September 11 terrorist attacks.  143 S. Ct. at 2363.

---

[5]      In their original Complaint, plaintiffs alleged a fourth kind of injury: "increased law enforcement costs[.]"  Doc. 1 at 21 (Compl. ¶ 113).  Plaintiffs alleged that the SAVE Plan "will create enormous opportunities for fraudsters to exploit student debt borrowers that would not otherwise exist."  *Id.* Plaintiffs' First Amended Complaint doesn't mention this injury.  *See generally* Doc. 57 (1st Am. Compl.).  And during the hearing on this motion, plaintiffs' counsel confirmed.  Plaintiffs have abandoned this theory.

The HEROES Act allows the Secretary of Education to "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs" during a "national emergency[.]"  20 U.S.C. § 1098bb(a)(1).  During the COVID-19 pandemic, the Secretary used the HEROES Act to suspend interest accrual and repayment obligations on federal student loans several times.  *Biden v. Nebraska*, 143 S. Ct. at 2364.  In August 2022, the Secretary took a step further, and cancelled student loan debt under the HEROES Act to address financial harm stemming from the COVID-19 pandemic.  *Id.*  This plan sought "to reduce and eliminate student debts directly."  *Id.*  Here's how that batch of loan forgiveness worked:

> For borrowers with an adjusted gross income below $125,000 in either 2020 or 2021 who have eligible federal loans, the Department of Education will discharge the balance of those loans in an amount up to $10,000 per borrower.  Borrowers who previously received Pell Grants qualify for up to $20,000 in loan cancellation.

*Id.* at 2364–65 (citations omitted).

Six states challenged this HEROES Act plan.  *Id.* at 2365.  The district court concluded the states lacked standing.  *Id.*  The Eighth Circuit disagreed, concluding the state of Missouri likely had standing based on the Missouri Higher Education Loan Authority (MOHELA).  *Id.*  The Supreme Court granted certiorari before judgment and, relevant here, concluded Missouri had standing because "the Secretary's plan harm[ed] MOHELA and thereby directly injure[d] Missouri[.]"  *Id.*

The Court explained that MOHELA, a nonprofit government corporation, participated in the student loan market.  *Id.*  MOHELA owned over $1 billion in Federal Family Education Loans (FFELs) and serviced $150 billion in federal loans.  *Id.* at 2365–66.  The Court's standing analysis focused on service fees.  *Id.*  The Department of Education had hired MOHELA "to collect payments and provide customer service to borrowers.  MOHELA receive[d] an

administrative fee for each of the five million federal accounts it services[.]" *Id.* (citations omitted).

Enter the HEROES Act student loan forgiveness plan.  Under this "plan, roughly half of all federal borrowers would have their loans completely discharged." *Id.* at 2366.  This meant "MOHELA could no longer service those closed accounts, costing it, by Missouri's estimate, $4 million a year in fees that it otherwise would have earned under its contract with the Department of Education." *Id.*  The Court concluded that this financial harm from reduced service fees qualified as "an injury in fact directly traceable to the Secretary's plan[.]" *Id.*  The Court went on to explain that MOHELA was a public instrumentality of Missouri, so a "harm to MOHELA in the performance of its public function [was] necessarily a direct injury to Missouri itself." *Id.* On that basis, Missouri had standing to sue and challenge that iteration of loan forgiveness.

With *Biden v. Nebraska*'s standing analysis firmly in mind, the court outlines plaintiffs' public instrumentality arguments here.

### 2. Plaintiffs' Standing Theory Based on South Carolina, Texas, and Alaska's Public Instrumentalities

Plaintiffs allege that—like Missouri and MOHELA—South Carolina, Alaska, and Texas have "state instrumentalities or quasi instrumentalities" who will suffer financial harm under the SAVE Plan.  Doc. 57 at 23 (1st Am. Compl. ¶ 116).  These instrumentalities "(1) provide student loans to residents of the state, (2) hold loans issued by the Federal Family Education Loan Program ("FFELP[6] loans"), and/or (3) service student debt taken out by residents, former residents, and out-of-state students." *Id.*  The court pauses here to explain FFEL loans because they provide an important part of plaintiffs' public instrumentality harm theory.

---

[6]     Plaintiffs use the acronym "FFELP" in their First Amended Complaint to describe Federal Family Education loans.  Defendants use the acronym "FFEL" to reference these loans. *Biden v. Nebraska* used the acronym "FFEL".  This Order uses FFELP and FFEL interchangeably.

FFEL loans are student loans held by private corporations and guaranteed by the federal government.  "While FFELs . . . are no longer issued, many remain outstanding."  *Biden v. Nebraska*, 143 S. Ct. at 2362.  Holders of FFEL loans own the assets outright.  Doc. 65 at 14.  The federal government doesn't pay the holder to service the loans.  *Id.*  And federal law requires FFEL holders to pay rebate fees on certain FFEL loans to the government—fees the holders can't pass on to the borrower.  *Id.* (first citing 20 U.S.C. § 1078-3(f), then citing 34 C.F.R. §§ 682.406(a)(12), 682.202).

To understand plaintiffs' standing theory, the court also must explain FFEL loan consolidation.  Borrowers with FFEL loans can "consolidate" their loans into federal direct loans.  "Consolidate" is something of a term of art here because, it appears, consolidate seems to mean *convert* FFEL loans into federal direct loans.  That is, borrowers can exchange their FFEL loans—ones owned by private corporations—into direct loans owned by the federal government.  When borrowers consolidate their FFEL loans, the federal government pays the loan's holder the principal loan amount owed and accrued interest.  Putting it more succinctly, a consolidation cashes out the private corporation holding the FFEL loan.

Returning to plaintiffs' public instrumentality theory, plaintiffs allege that South Carolina, Texas, and Alaska have public instrumentalities who hold FFEL loans.  Plaintiffs allege the three instrumentalities "derive income from their loan portfolios, such as through collecting interest owed or service fees."  Doc. 57 at 23 (1st Am. Compl. ¶ 117).  So, plaintiffs allege, the instrumentalities' "amount of income thus collected is directly proportional to the size of the debt portfolio:  *i.e.*, decreasing the size of the portfolio will decrease the income collected by the instrumentalities/quasi-instrumentalities."  *Id.* (1st Am. Compl. ¶ 119).

Enter the Final Rule.  Plaintiffs allege the "Final Rule is virtually certain to decrease the size of these student-debt portfolios by inducing individuals to consolidate their FFELP loans into direct federal loans in order to take advantage of the extraordinary (and unlawful) generosity of the Final Rule." *Id.* (1st Am. Compl. ¶ 120).  Put a slightly different way, plaintiffs argue that the SAVE Plan will incentivize debtors to consolidate these FFEL loans into direct federal loans, shrinking the instrumentalities' debt portfolios, and decreasing their revenue.  Doc. 50 at 17–18.  Defendants have several problems with this theory.

Defendants correctly point out that plaintiffs' theory of public instrumentality harm is different—and weaker—than the public instrumentality harm that prevailed in *Biden v. Nebraska*.  *Biden v. Nebraska* says nothing about FFEL loans and consolidation.  That case involved a simpler student loan forgiveness plan and a simpler state instrumentality harm.  Start with the plan.  The student loan forgiveness under the HEROES Act forgave $10,000 to $20,000 per eligible loan.  Here, the SAVE Plan operates with more finesse.  It reduces monthly payment amounts and, for loans with original balances of $12,000 or less, limits a borrower's repayment window to 10 years (from 20 or 25) of qualifying payments.  Next consider the harm to the state instrumentality.  In *Biden v. Nebraska*, the HEROES Act loan forgiveness would result in millions of fully forgiven loans.  So, MOHELA no longer could service those closed accounts, costing it revenues formerly derived from servicing direct loans.  Here, in contrast, plaintiffs haven't alleged any loss of revenue from *servicing* loans.  Instead, plaintiffs allege that the Final Rule will cost them interest revenue because third parties have incentive to consolidate their FFEL loans into direct loans—and thus pay interest to the federal government as the sole lender of direct loans.[7]

---

[7] It's not clear from plaintiffs' First Amended Complaint or briefing how, exactly, the SAVE Plan will reduce the instrumentalities' revenue.  Plaintiffs talk about "revenue" without differentiating between

13

At bottom, plaintiffs' theory of standing is more attenuated—and therefore weaker—than MOHELA's standing in *Biden v. Nebraska*.  Despite these issues, the court nonetheless concludes that South Carolina, Texas, and Alaska have pleaded plausibly and sufficiently established a likely injury to their state instrumentalities.

> **3.      Plaintiffs Plausibly Have Alleged an Injury in Fact to South Carolina, Texas, and Alaska's Public Instrumentalities, Fairly Traceable to the SAVE Plan**

Because plaintiffs' theory of harm differs from MOHELA's harm in *Biden v. Nebraska*, the court must look beyond that case's holding.  It must consider additional precedent defining the standing inquiry that applies to this dispute.  Defendants argue that plaintiffs' public instrumentality theory fails two elements of standing:  injury in fact and traceability.  The court thus briefly recites the governing law.

To demonstrate Article III standing, a "plaintiff must have suffered an 'injury in fact'" and that injury must be "actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560–61 (citations and internal quotation marks omitted).  Plaintiffs allege an imminent injury, claiming the Final Rule will cause them financial harm in the future.  Under *Clapper*, a future injury satisfies the "imminence" requirement only if it is "certainly impending."  568 U.S. at 401.  The Supreme Court has "repeatedly reiterated that threated injury be *certainly impending* to

---

revenue from interest and revenue from fees.  Plaintiffs' First Amended Complaint glosses over the difference, alleging the instrumentalities "derive income from their loan portfolios, such as through collecting interest owed or service fees."  Doc. 57 at 23 (1st Am. Compl. ¶ 117).  And plaintiffs' briefing applies more gloss, arguing that each instrumentality "holds a portfolio of FFELP loans, and the interest/fees that they receive from those portfolios is directly proportional to their portfolio's size."  Doc. 50 at 17 (emphasis added).

Fortunately, at the hearing, plaintiffs confirmed that their public instrumentality theory relies on reduced *interest* revenue—not fees.

constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Id.* at 409 (emphases in original) (citation, brackets, and internal quotation marks omitted).

In addition to a future injury, plaintiffs also allege an indirect injury. When "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of *someone else*," the Supreme Court has instructed courts to require "much more." *Lujan*, 504 U.S. at 561–62 (emphasis in original). "In that circumstance, causation and redressability ordinarily hinge on the response of the regulated . . . third party the government action or inaction—and perhaps on the response of others as well." *Id.* at 562. When such

> essential elements of standing depend[] on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume to either control or to predict . . . , it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of injury.

*Id.* (citations and internal quotation marks omitted).

So, to show standing, plaintiffs must show two things: (1) borrowers likely will consolidate their FFEL loans into direct federal loans and (2) this consolidation likely will reduce the instrumentalities' revenue. To meet this burden, plaintiffs have provided declarations from each of the three state instrumentalities. The court reviews the evidence submitted by each instrumentality below, starting with South Carolina. After its review of each package of evidence, the court evaluates the evidence together. And, ultimately, the court concludes South Carolina, Texas, and Alaska have standing—at least for now.

### a.    South Carolina's SEAA

Plaintiffs allege that South Carolina has a public instrumentality called the State Education Assistance Authority (SEAA). Doc. 57 at 23–24 (1st Am. Compl. ¶ 121). The First Amended Complaint alleges that "since 2011, SEAA's portfolio has decreased from

approximately $31.3 million to $6.4 million, which has reduced the amount of income generated for South Carolina's benefit[.]" *Id.* at 24 (1st Am. Compl. ¶ 122).  Plaintiffs allege the SAVE Plan "will further decrease the size of SEAA's portfolio as borrowers convert FFELP loans to take advantage of available debt forgiveness." *Id.*

Plaintiffs submitted a declaration from South Carolina officials confirming the information about SEAA.  Doc. 53-6 (Spate Decl.).  The declaration's exhibits confirm that SEAA holds FFEL loans, *id.* at 7 (Spate Decl. Ex. 2), and SEAA's FFEL portfolio has decreased steadily since 2011, *id.* at 8 (Spate Decl. Ex. 2).  The exhibit provides three figures.  The first figure shows SEAA's FFEL loan portfolio decreasing over time:

**History of SEAA's FFELP portfolio from 2010 to present:**

| Month End | Principal Balance |
|---|---|
| 6/30/2011 | $31,324,566.17 |
| 6/30/2012 | 29,589,044.81 |
| 6/30/2013 | 26,776,811.11 |
| 6/30/2014 | 24,974,750.48 |
| 6/30/2015 | 22,797,591.92 |
| 6/30/2016 | 20,975,542.24 |
| 6/30/2017 | 19,218,505.43 |
| 6/30/2018 | 16,654,982.40 |
| 6/30/2019 | 15,026,548.26 |
| 6/30/2020 | 12,872,804.70 |
| 6/30/2021 | 11,889,724.29 |
| 6/30/2022 | 10,771,880.55 |
| 6/30/2023 | 8,059,252.66 |
| 3/31/2024 | 6,423,362.52 |

*Id.*

The exhibit's second figure attributes this decrease to borrower consolidation, showing that borrowers have consolidated SSEA's FFEL loans for years.  At the hearing on the Motion to Dismiss, plaintiffs' counsel explained the following figure shows the total value of FFEL loans

consolidated each year (first column) and the value of FFEL loans paid down by FFEL

borrowers (second column):

**Proportion of SEAA's FFELP loans that were consolidated versus paid down**

| Period | Consolidation Payment | Other Principal Payments |
|---|---|---|
| 7/1/2010 - 6/30/2011 | -$1,019,123.26 | -$814,057.50 |
| 7/1/2011 - 6/30/2012 | -1,076,871.56 | -$658,649.80 |
| 7/1/2012 - 6/30/2013 | -1,365,846.14 | -$1,446,387.56 |
| 7/1/2013 - 6/30/2014 | -590,101.34 | -$1,211,959.29 |
| 7/1/2014 - 6/30/2015 | -1,231,047.88 | -$946,110.68 |
| 7/1/2015 - 6/30/2016 | -909,836.74 | -$912,212.94 |
| 7/1/2016 - 6/30/2017 | -1,081,806.83 | -$675,229.98 |
| 7/1/2017 - 6/30/2018 | -1,064,526.12 | -$1,498,996.91 |
| 7/1/2018 - 6/30/2019 | -415,796.86 | -$1,212,637.28 |
| 7/1/2019 - 6/30/2020 | -622,083.17 | -$1,531,660.39 |
| 7/1/2020 - 6/30/2021 | -174,407.04 | -$808,673.37 |
| 7/1/2021 - 6/30/2022 | -954,393.67 | -$1,320,063.19 |
| 7/1/2022 - 6/30/2023 | -2,112,224.90 | -$600,402.99 |
| 7/1/2023 - 3/31/2024 | -1,111,945.46 | -$523,944.68 |

*Id.*

But, though SEAA's FFEL portfolio has gone down each year since 2011, the interest

revenue doesn't follow that same pattern:

**Interest revenue generated by SEAA's FFELP loans per year**

| Period | Total Interest Revenue |
|---|---|
| 7/1/2010 - 6/30/2011 | $1,172,811.00 |
| 7/1/2011 - 6/30/2012 | $764,676.00 |
| 7/1/2012 - 6/30/2013 | $692,306.00 |
| 7/1/2013 - 6/30/2014 | $630,738.00 |
| 7/1/2014 - 6/30/2015 | $585,056.00 |
| 7/1/2015 - 6/30/2016 | $572,691.00 |
| 7/1/2016 - 6/30/2017 | $595,654.00 |
| 7/1/2017 - 6/30/2018 | $689,735.00 |
| 7/1/2018 - 6/30/2019 | $756,432.00 |
| 7/1/2019 - 6/30/2020 | $529,763.00 |
| 7/1/2020 - 6/30/2021 | $301,659.00 |
| 7/1/2021 - 6/30/2022 | $303,673.00 |
| 7/1/2022 - 6/30/2023 | $575,359.00 |
| 7/1/2023 - 3/31/2024 * | $432,455.00 |

*Id.*

This SEAA evidence creates some evident problems for South Carolina's standing theory.  Remember, plaintiffs need to show two things:  (1) the SAVE Plan makes it likely that borrowers will consolidate their loans and (2) if borrowers consolidate their loans, the public instrumentalities likely will suffer financial harm in the form of reduced interest payments.  The SEAA evidence undermines both propositions.

The SEAA evidence casts doubt on plaintiffs' allegation that the SAVE Plan makes FFEL loan consolidation more likely.  The SEAA evidence shows that SEAA's FFEL loan portfolio has decreased steadily since 2010.  So, borrowers already were consolidating their loans long before the SAVE Plan's incentives.  This conclusion poses a causation problem for plaintiffs.  And this problem demonstrates the difficulty of establishing standing when a theory of harm relies on decisions by third parties.  Where "the independent action of some third party not before the court—rather than that of the defendant—was the direct cause of the plaintiff's harm, causation may be lacking."  *Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1225 (10th Cir. 2008) (citation and internal quotation marks omitted).  Trying to cure this problem, plaintiffs direct the court to Alaska's declaration.  It explains why the SAVE Plan incentivizes borrowers to consolidate their FFEL.  Critically, the Alaska declaration alleges that borrowers already are consolidating their loans.  More on Alaska in a moment.

The SEAA evidence also casts doubt on plaintiffs' theory that, as the instrumentalities' FFEL loan portfolios decrease, their interest revenue necessarily will decrease vis-à-vis interest revenue in the what if world where the SAVE Plan didn't happen.  SEAA's FFEL portfolio has decreased steadily over the years, but SEAA's interest revenue on FFEL loans has moved up and moved down.  Put differently, a graph of interest revenue wouldn't have the negative slope plaintiffs need.

At the hearing, plaintiffs introduced an additional layer of confusion about this data. Plaintiffs argued that the SEAA evidence demonstrates loan consolidation from the HEROES Act loan forgiveness. Plaintiffs argued that the jump from -$954,393.67 in consolidation in fiscal year 2021 to -$2,112,224.90 in fiscal year 2022 resulted from defendants announcing the HEROES Act forgiveness. This announcement, plaintiffs contend, led borrowers to consolidate their loans to take advantage. To be sure, this would support plaintiffs' view that borrowers respond to incentives created by federal student loan forgiveness programs—*i.e.*, when borrowers thought they could benefit from the HEROES Act, they consolidated their loans. But plaintiffs' argument makes it harder to attribute loan consolidation to the SAVE Plan loan forgiveness, and not the HEROES Act loan forgiveness.

And plaintiffs' argument is just that: an argument. Plaintiffs haven't adduced any evidence that purports to suss out the amount of consolidation caused by the HEROES Act, the SAVE Plan, and general market forces individually. This gap particularly presents a problem given the timing of the two loan forgiveness plans. Plaintiffs explained during the hearing that the fiscal year 2022 number captures HEROES Act-related consolidation. According to plaintiffs, this increase in loan consolidation—from -$954,393.67 in fiscal year 2021 to -$2,112,224.90 in fiscal year 2022— shows the effects of the HEROES Act loan forgiveness— *i.e.*, borrowers consolidated their FFEL loans to take advantage of the HEROES Act. That's all well and good, until the court considers the SAVE Plan. Defendants announced the proposed rule in January 2023—within fiscal year 2022. That leaves two loan forgiveness plans in play during one fiscal year. And the court has no way to tell how much loan consolidation to attribute to the HEROES Act and how much to attribute to the SAVE Plan.

Given these issues with the South Carolina evidence, plaintiffs' theory finds its way to some thin ice.  Fortunately, for them, plaintiffs' evidence from Texas helps them show that consolidation would cause reduced income revenue.

### b.      Texas's THECB

Plaintiffs allege that Texas has an agency named the Texas Higher Education Coordinating Board (THECB).  Doc. 57 at 24 (1st Am. Compl. ¶ 127).  THECB is a "student debt servicing public entity[.]"  *Id.*  Plaintiffs allege "THECB owns over $1,1295,236 [*sic*] in FFELP loans" and "collected $114,479 in interest in 2023."  *Id.* at 25 (1st Am. Compl. ¶ 130).  The record isn't clear if this is $11.2 million in FFEL loans or $1.12 million.  Plaintiffs allege that if the SAVE Plan "were to decrease the size of that student debt portfolio, the amount of income that the THECB would collect would decrease."  *Id.* (1st Am. Compl. ¶ 131).

Plaintiffs submitted a declaration from THECB.  *See* Doc. 53-7 (Keyton Decl.).  The declaration confirms the above amounts.  *Id.* at 2 (Keyton Decl. ¶ 3).  And, critically, the declarant testifies:

> To the extent that federal policy results in borrowers consolidating their loans out of FFELP into the Direct Loan Program, those consolidations will cause the State of Texas to lose revenue.  Upon consolidation, the federal government compensates the holder (THECB) only for principal and accrued interest.  Thus, such consolidations will result in reduced revenue [to the] THECB and therefore the State of Texas.  The THECB would no longer collect interest on FFELP loans that have been consolidated, diminishing the value of its portfolio.

*Id.* (Keyton Decl. ¶ 4).  So, declarant says, the "SAVE Plan could cause pecuniary harm to the State of Texas and THECB measured by a reduction in revenue to the State's FFELP program." *Id.* (Keyton Decl. ¶ 5).  Defendants point out that this declaration "skims over consolidation entirely."  Doc. 65 at 14.  That is, the declarant assumes, without explaining, that borrowers will consolidate their loans.

Defendants have the better end of that narrow issue.  The Texas declaration doesn't help plaintiffs shoulder their burden to show that borrowers will consolidate their FFEL loans into direct loans—the first piece of the standing puzzle.  In contrast, the Texas declaration *does* help plaintiffs with the second piece of the standing puzzle:  it's evidence that consolidation will cause revenue loss to Texas through THECB.  The mismatched puzzle piece here is the SEAA exhibit, which contradicts the Texas evidence because the SEAA data shows that decreased FFEL portfolios don't necessarily mean decreased FFEL interest revenue.  Doc. 53-6 at 8 (Spate Decl. Ex. 2).

With these those two states behind us, the court turns to plaintiffs' strongest evidence: Alaska's declaration.

### c.        Alaska's ASLC

Plaintiffs allege that Alaska's instrumentality is a public corporation, known as the Alaska Student Loan Corporation (ASLC).  It owns $16.8 million in FFEL loans.  Doc. 57 at 24 (1st Am. Compl. ¶¶ 123–24).  Plaintiffs allege the SAVE Plan will cause Alaska to lose significant revenues.  *Id.* (1st Am. Compl. ¶ 125).  Specifically, plaintiffs allege "ASLC estimates that the Final Rule will result in ASLC losing approximately $100,000 over just the next two years that it would otherwise collect as a FFELP loan holder."  *Id.* (1st Am. Compl. ¶ 126).

Plaintiffs also submitted a declaration from ASLC.  The declarant testifies, "The SAVE Plan entices borrowers to consolidate their loans away from FFELP into the Direct Loan Program (DLP), comprising loans held by the federal government."  Doc. 53-8 at 2 (Efird Decl. ¶ 6).  According to the declarant, three features of the SAVE Plan entice borrowers to consolidate their FFEL loans into direct loans:

1. The SAVE Plan offers benefits to direct loans only—*i.e.*, capped payments, waiving residual interest, and full forgiveness after ten years of payments;

2. The SAVE Plan doesn't treat consolidated loans as new loans, so borrowers' repayment clocks won't restart if they consolidate—a feature that previously disincentivized borrowers from consolidating; and

3. The federal government is advertising and encouraging borrowers to consolidate.

*Id.* at 2–3 (Efird Decl. ¶¶ 6–8).  So, the declarant provides, "the federal government is strongly . . . incentivizing borrowers to consolidate their loans away from FFELP and into [direct] loans held by the federal government."[8]  *Id.* at 3 (Efird Decl. ¶ 8).

This testimony resembles—at some level anyway—theoretical, in-a-vacuum, "basic economic theory" allegations that struggle to carry plaintiffs' standing burden.  *See Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 2024 WL 2237667, at *8 (6th Cir. May 17, 2024) ("Plaintiffs' allegations regarding supply and demand and the impact of financial incentive on third-party student-loan debtors are wholly speculative.").  But the ASLC declaration goes a step further.  It testifies, "Because these benefits are not available to borrowers with commercially-held FFELP loans, borrowers are rapidly consolidating their loans away from FFELP loans held by ASLC and into Direct Loans held by the federal government."  *Id.* at 2 (Efird Decl. ¶ 6).

ASLC's declarant testifies these "consolidations will cause Alaska to lose significant revenues."  *Id.* at 3 (Efird Decl. ¶ 9).  Here's how:  an FFEL loan is a loan held by a corporation (here, ASLC) and guaranteed by the federal government.  When a borrower consolidates an FFEL loan into a direct loan from the federal government, the federal government compensates the holder (here, ASLC) for principal and accrued interest.  *Id.*  So, consolidation means the

---

[8]    The ASLC declaration contains several legal conclusions.  For example, the declarant testifies that "the federal government is strongly, *and likely unlawfully*, incentivizing borrowers to consolidate their loans away from FFELP and into loans held by the federal government."  Doc. 53-8 at 3 (Efird Decl. ¶ 8) (emphasis added).  The lawfulness of the SAVE Plan is a legal conclusion reserved for the court to decide.  The court declines to consider the declaration's legal conclusions.

holder (here, ASLC) will no longer collect interest on those consolidated FFEL loans.  *Id.*
Because of this phenomenon, "ASLC estimates that the SAVE Plan will result in ASLC losing
approximately $100,000 over just the next two years that it would otherwise collect as a FFELP
holder."  *Id.* (Efird Decl. ¶ 11).  This declaration represents plaintiffs' best evidence.

The Alaska declaration provides evidentiary support for both pieces of the standing
puzzle:  (1) borrowers are likely to consolidate their FFEL loans into direct loans because of the
SAVE Plan and (2) when borrowers consolidate, it will cause the public instrumentality to lose
interest revenue.  Defendants fault this declaration for "nakedly" stating that ASLC will lose
$100,000 "because of the SAVE Plan, without explaining how or why."  Doc. 65 at 14.  While
there's some truth to defendants' criticism, Alaska has adduced some facts.  The court can't say
the same for defendants.  They've proffered no evidence of their own.  Without any
contradictory evidence, defendants have given no facts to reach a different conclusion.  In short,
the court currently has no reason to doubt ASLC's $100,000, nor any other part of the
declaration.

Having summarized all three components of the public instrumentality evidence, the
court, next, synthesizes this information.

### d.      Summary of State Public Instrumentality Theory

Considering all three sources of evidence together, plaintiffs have shouldered their
burden to allege standing.  Recall that plaintiffs had to show two things to show an injury:  (1)
the SAVE Plan makes it likely that borrowers will consolidate their loans and (2) if borrowers
consolidate their loans, the states' public instrumentalities will suffer harm.  Plaintiffs have
shouldered their burden on both fronts.

*First*, plaintiffs have shown by a preponderance of the evidence that the SAVE Plan will
cause FFEL borrowers to consolidate their loans into direct loans.  This inquiry relies on the

choices of third parties not before the court, which means plaintiffs must allege "facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562.  Alaska's ASLC declarant testifies that consolidation makes economic sense for borrowers because the SAVE Plan provides benefits for direct loans that FFEL loan borrowers can't access.  And, critically, the ASLC declarant alleges "borrowers are rapidly consolidating their loans away from FFELP loans held by ASLC and into Direct loans held by the federal government."  Doc. 53-8 at 2 (Efird Decl. ¶ 6).

To be sure, plaintiffs' SEAA evidence presents some problems for this theory because it shows borrowers consolidating their FFEL loans without the SAVE Plan.  The Alaska evidence overcomes these issues.  Alaska's ASLC declaration, in contrast, explains the SAVE Plan's incentives for borrowers to consolidate and testifies that the SAVE Plan already is causing borrowers to consolidate.  And defendants haven't rebutted this evidence with any evidence of their own.  So, despite the SEAA evidence,[9] plaintiffs have shouldered their burden to show "that third parties will likely react in predictable ways to" the SAVE Plan.  *Dep't of Comm. v. New York*, 139 S. Ct. 2551, 2566 (2019).

*Second*, plaintiffs have shown that, when borrowers consolidate their loans, the states' public instrumentalities—and therefore the states—will suffer harm in the form of reduced interest income.  Plaintiffs' own evidence from SEAA casts doubt on this theory.  SEAA's FFEL loan portfolio has decreased steadily overtime, but its interest income has both increased and decreased over the same period.  Doc. 53-6 at 8 (Spate Decl. Ex. 2).  Despite these issues, the

---

[9]     South Carolina has squeaked over the preponderance of the evidence standard thanks to Alaska's evidence and a lack of evidence from defendants.  The court notes that the "need to satisfy the[] three [standing] requirements persists throughout the life of the lawsuit."  *Wittman v. Personhuballah*, 578 U.S. 539, 543 (2016).  Given its narrow victory here, the court questions whether South Carolina's evidence (at least the evidence plaintiffs have presented here) could survive if defendants submitted any contrary evidence at all.

Texas THECB and Alaska ASLC evidence suffices to confer standing to the three public instrumentalities.

The THECB declarant alleges that, if borrowers consolidate their FFEL loans into direct loans, "those consolidations will cause the State of Texas to lose revenue" because the "THECB will no longer collect interest on FFELP loans that have been consolidated, diminishing the value of its portfolio." Doc. 53-7 at 2 (Keyton Decl. ¶ 4). And the THECB's declarant further testifies the "SAVE Plan could cause pecuniary harm to the State of Texas and THECB measured by a reduction in revenue to the State's FFELP program." *Id.* (Keyton Decl. ¶ 5). Defendants argue that this declaration doesn't help plaintiffs shoulder their burden because the THECB "declarant skims over consolidation entirely"—that is, the declarant assumes that borrowers will consolidate their loans. Doc. 65 at 14. But, as just explained, plaintiffs have marshaled some evidence that some borrowers likely will consolidate their FFEL loans into direct loans. And Alaska's evidence also shows borrowers already are consolidating. Because it's likely that borrowers will consolidate, it's likely that Texas will suffer harm.

The same goes for Alaska's ASLC. The ASLC declarant testifies that "consolidations will cause Alaska to lose significant revenues." Doc. 53-8 at 3 (Efird Decl. ¶ 9). The declarant explains how consolidation will affect revenues. *Id.* And "ASLC estimates that the SAVE Plan will result in ASLC losing approximately $100,000 over just the next two years that it would otherwise collect as a FFELP holder." *Id.* (Efird Decl. ¶ 11). Plaintiffs thus have shouldered their current burden to allege a non-speculative, imminent, future injury to the public instrumentalities,[10] traceable to the SAVE Plan. And so, on the current record, South Carolina, Texas, and Alaska have standing.

---

[10]     The court again notes that South Carolina has succeed in showing standing by the thinnest of margins.

Before the court leaves the public instrumentality analysis altogether, it responds to another of defendants' arguments.

### 4.    Harm v. Benefit

Defendants argue plaintiffs haven't shown that these three instrumentalities likely will suffer an injury.  They argue that holding "a FFEL loan in no way guarantees interest income" for the instrumentalities.  Doc. 65 at 14.  According to defendants, many "FFEL borrowers are on income-based repayment plans under which they pay $0 monthly.  And a FFEL borrower is as susceptible to default as any other."  *Id.*  Defendants thus assert that the FFEL borrowers most likely to benefit from the SAVE Plan—and thus the borrowers most likely to consolidate— "would tend to be those borrowers at highest risk of delinquency and default[.]"  *Id.* at 14–15. Delinquency and default, of course, would reduce the instrumentalities' revenue.  *Id.* at 15. When a borrower consolidates an FFEL loan, however, the instrumentality avoids delinquency and default.  Indeed, "when a FFEL loan is consolidated, its prior owner receives payment for the full value of the loan's principal and outstanding interest."  *Id.* (first citing 20 U.S.C. § 1078-3(b)(1)(D), then citing 34 C.R.F. § 685.220(f)(1)).  So, defendants argue, the SAVE Plan actually could *benefit* the instrumentalities.

Tying this to standing, defendants argue plaintiffs

> need to show that a potential loss of uncertain interest revenues to these entities is
> not outweighed by the certain profits of consolidation—including guaranteed
> payment and the elimination of rebate fees—to say nothing of the potential for
> reinvestment of the cash value of the loan at higher market interest rates.

*Id.* (citing 20 U.S.C. § 1107a(k), (l) (setting FFEL interest rates)).  While the court recognizes the logic of defendants' bottom-line, economic argument, it can't carry the day for them.

Plaintiffs cite authority that "[o]nce injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiffs has enjoyed from the relationship with the

defendant." 13A Edward H. Cooper, *Federal Practice & Procedure*, Jurisdiction § 3531.4 (3d ed. 2023). District courts within our Circuit have cited a rule from a Second Circuit case: "'the fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing.'" *Budicak, Inc. v. Lansing Trade Grp., LLC*, 452 F. Supp. 3d 1029, 1044 n.36 (D. Kan. 2020) (quoting *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008)); *Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.*, 801 F. Supp. 2d 1163, 1179 (D.N.M. 2011) (same).

Plaintiffs' counterargument misses the point, defendants contend. Defendants' argument doesn't weigh harm against benefit. Instead, it asserts that there's simply no injury to begin with because the SAVE Plan will make money for the states' public instrumentalities. The problem with defendants' rejoinder is a basic one: they haven't adduced any evidence to support their theory. More problematic yet, plaintiffs have marshaled evidence nullifying the theory.

Alaska's "ASLC estimates that the SAVE Plan will result in ASLC losing approximately $100,000 over just the next two years that it would otherwise collect as a FFELP holder." Doc. 53-8 at 3 (Efird Decl. ¶ 11). Defendants may disagree with this calculation, but they don't proffer any evidence or accounting of their own. The court lacks any basis to find that this $100,000 doesn't account for the potential benefits of the SAVE Plan. Similarly, the Texas declarant alleges that, if borrowers consolidate their FFEL loans into direct loans, "those consolidations will cause the State of Texas to lose revenue" because the "THECB will no longer collect interest on FFELP loans that have been consolidated, diminishing the value of its portfolio." Doc. 53-7 at 2 (Keyton Decl. ¶ 4). Without any evidence to the contrary, the court accredits the declarant's testimony that the SAVE Plan will cause THECB, and therefore Texas,

to lose interest revenue.  Again, there's no reason to believe that the THECB declarant failed to account for the SAVE Plan's potential benefits.

The court thus rejects defendants' argument that plaintiffs have failed to show an injury because the SAVE Plan might benefit the public instrumentalities.  As a result, South Carolina, Texas, and Alaska have suffered an injury in fact, fairly traceable to the SAVE Plan.  The court denies defendants' Motion to Dismiss South Carolina, Texas, and Alaska.

But what about the other states?  If some plaintiff states have standing, do they all have standing?

### 5.    "Standing for One is Standing for All"

When the court asked this question at the hearing, plaintiffs urged the court to answer this question yes.  They directed the court to *Biden v. Nebraska*, which held:  "If at least one plaintiff has standing, the suit may proceed."  143 S. Ct. at 2365 (citing *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).  And plaintiffs all bring the same legal claims.  Plaintiffs thus argue—correctly—that this suit will proceed.  And they ask the court to end its standing inquiry there:  conclude South Carolina, Texas and Alaska have standing and allow the suit to proceed with the other states tagging along.  The court declines this invitation.

Our Circuit, albeit in an unpublished opinion, has rejected the idea that "standing for one is" necessarily "standing for all."  *Thiebaut v. Colo. Springs Utils.*, 455 F. App'x 795, 802 (10th Cir. 2011).  The Supreme Court, as shown in *Biden v. Nebraska*, doesn't *require* district courts to consider the standing of all plaintiffs.  143 S. Ct. at 2365; *see also Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit [the Court] to consider the petition for review.").  The court realizes that moving on after deciding that at least one plaintiff has standing may "encourage[] judicial efficiency by permitting a court to proceed to the merits of a case involving multiple plaintiffs seeking identical relief when it is

clear that at least one plaintiff has standing." *Thiebaut*, 455 F. App'x at 802. "But . . . nothing in the cases addressing this principle suggests that a court *must* permit a plaintiff that *lacks* standing to remain in a case whenever it determines that a co-plaintiff has standing." *Id.* (emphases in original); *see also M.M.V. v. Garland*, 1 F.4th 1100, 1110–11 (D.C. Cir. 2021) ("The [*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*] line of cases stands only for the proposition that a court 'need not' decide the standing of each plaintiff seeking the same relief." (quoting *Clinton v. City of N.Y.*, 524 U.S. 417, 431 n.19 (1998))).

This alternative approach explains why the court "retain[s] discretion to analyze the standing of all plaintiffs in a case and to dismiss those plaintiffs that lack standing." *Thiebaut*, 455 F. App'x at 802 (first citing *Utah Ass'n of Cntys. v. Bush*, 455 F.3d 1094, 1098 (10th Cir. 2006) (noting district court concluded one plaintiff had standing, so court declined to address other plaintiff's standing in interest of judicial economy); then citing *Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1451–53 (10th Cir. 1994) (analyzing individual plaintiffs' standing separately and dismissing some plaintiffs for lack of standing even though other plaintiffs had standing); and then citing *We Are Am./Somos Am. v. Maricopa Cnty. Bd. of Supervisors*, 809 F. Supp. 2d 1084, 1091 (D. Ariz. 2011) ("Th[e] general rule [that only one plaintiff needs standing] does not strictly prohibit a district court, in a multiple plaintiff case such as this, from considering the standing of the other plaintiffs even if it finds that one plaintiff has standing.")); *see also M.M.V.*, 1 F.4th at 1111 (concluding the general rule—that court needn't decide standing of each plaintiff seeking same relief—"does not *prohibit* the court from paring down a case by eliminating plaintiffs who lack standing or otherwise fail to meet the governing jurisdictional requirements" (emphasis in original)).

Here, the court, in its discretion, concludes that paring down the case and dismissing the plaintiffs without standing aligns with the charter purposes recognized in Fed. R. Civ. P. 1. At bottom, plaintiffs contend that uninjured plaintiffs can borrow another plaintiff's injury to satisfy Article III's standing requirement. But that's not the way the court would approach any kind of lawsuit—especially a complicated one. Narrowing the case to its viable claims and viable parties often narrows the burden of adjudicating the relevant issues, no matter whether the case is an auto accident or antitrust case.

The court also believes that winnowing the case is consistent with the holding in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). There, the Court reversed a district court's decision (as affirmed by the Ninth Circuit) certifying a class that included some 6,300 uninjured class members. *Id.* at 421–22, 427–28. The Court rejected plaintiffs' argument that Congress, by adopting the Fair Credit Reporting Act, had conferred a right to recover on uninjured class members. *Id.* at 434–35. Justice Kavanaugh's opinion crafted a hypothetical to explain why:

> Suppose first that a Maine citizen's land is polluted by a nearby factory. She sues the company, alleging that it violated a federal environmental law and damaged her property. Suppose also that a second plaintiff in Hawaii files a federal lawsuit alleging that the same company in Maine violated that same environmental law by polluting land in Maine. The violation did not personally harm the plaintiff in Hawaii.
>
> Even if Congress affords both hypothetical plaintiffs a cause of action (with statutory damages available) to sue over the defendant's legal violation, Article III standing doctrine sharply distinguishes between those two scenarios. The first lawsuit may of course proceed in federal court because the plaintiff has suffered concrete harm to her property. But the second lawsuit may not proceed because that plaintiff has not suffered any physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts. An uninjured plaintiff who sues in those circumstances is, by definition, not seeking to remedy any harm to herself but instead is merely seeking to ensure a defendant's "compliance with regulatory law" (and, of course, to obtain some money via the statutory damages). Those are not grounds for Article III standing.

*Id.* at 427–28 (internal citations omitted); *see also id.* at 429 ("A regime where Congress could freely authorize *unharmed* plaintiffs to sue defendants who violate federal law not only would violate Article III but also would infringe on the Executive Branch's Article II authority."). If all members of a class must have standing, then, of course, all plaintiffs here must have standing. And if Article III bars a subset of plaintiffs—even if *all* plaintiffs have the same claim—then that subset shouldn't piggyback on the injured plaintiffs' standing.

So, the court, in its discretion, continues its standing analysis. The court evaluates plaintiffs' argument that all 11 plaintiffs have standing based on assertions that (1) the SAVE Plan will decrease some of these states' income tax revenue and (2) the SAVE Plan harms these states' ability to recruit and retain talent.

If plaintiffs demonstrate that the other eight plaintiffs (or some of them) have standing on either one of these alternative standing theories, they will remain as plaintiffs. If any plaintiff fails to do so, the court will dismiss that plaintiff. This approach comports with Fed. R. Civ. P. 1, and it's consistent with the court's approach to any other lawsuit.

## B.    Income Tax Revenue

Plaintiffs argue they have standing because the Final Rule will cause nine of the 11 plaintiff states[11] to suffer a loss of state tax revenue. To flesh out this theory, the court briefly must explain a few things about these states' income tax structure.

These nine states tie their definition of taxable income to the federal definition of income or adjusted gross income. Doc. 57 at 17 (1st Am. Compl. ¶ 90). And the federal tax code defines taxable income to include student loan forgiveness under income-driven repayment

---

[11]    These nine states are Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah. Doc. 57 at 17 (1st Am. Compl. ¶ 87). The two other plaintiffs have no state income tax. The court already has concluded South Carolina, for now, has standing, but it includes South Carolina in the tax revenue analysis nonetheless.

plans.  Simply put, student debt forgiveness is taxable income and, therefore, revenue for these plaintiff states.  But the American Rescue Plan Act of 2021 provides that all student loan forgiveness won't "count toward the federal definition of taxable income until December 31, 2025."  Doc. 57 at 17 (1st Am. Compl. ¶ 89).  So, the states can't tax student loan debt forgiveness income until 2026.

According to plaintiffs, the Final Rule affects plaintiffs' tax revenues because it's timing that matters.  Plaintiffs allege the Final Rule "will reduce income tax revenue by decreasing the amount of outstanding student loan debt."  Doc. 57 at 18 (1st Am. Compl. ¶ 96).  This is so, they say, because the "Final Rule accelerates the timeline for cancelation on income-driven repayment plans to as low as 10 years for certain loan balances."  *Id.* (1st Am. Compl. ¶ 92).  Under the old version of the rule, the federal government wouldn't forgive these loans for 20 to 25 years.  So, plaintiffs allege, "but for the Final Rule, significant amounts of federal loan cancellation would occur *after* December 31, 2025" for residents of the relevant states.  *Id.* (1st Am. Compl. ¶ 95).  In this but-for world, the relevant states would have more student loan forgiveness income to tax.  *Id.*  The challenged Final Rule, in contrast, "shift[s] forward some debt forgiveness that would otherwise occur in a period in which it would be taxable income . . . into a period where it is not taxable[.]"  *Id.* (1st Am. Compl. ¶ 96).  In sum, plaintiffs argue the Final Rule injures them directly because nontaxable forgiveness in 2024 and 2025 means less taxable forgiveness in 2026.

In response, defendants argue that the Final Rule's effects on state tax revenue are merely incidental.  And, according to defendants, a "federal policy's incidental effects on state tax revenues are not judicially cognizable injuries."  Doc. 46 at 24.  In support of this argument, defendants invoke *Florida v. Mellon*, 273 U.S. 12 (1927).

1.      *Florida v. Mellon*

In *Mellon*, Florida sought to invoke the Supreme Court's original jurisdiction in a suit against officers of the United States—specifically, the Secretary of the Treasury. *Id.* at 15. Florida sought to challenge a federal inheritance tax. *Id.* Florida had no inheritance tax. *Id.* So, Florida alleged the federal law directly injured it "because the imposition of the federal tax, in the absence of a state tax which may be credited, w[ould] cause the withdrawal of property from the state" and diminish Florida's tax base. *Id.* at 16. The Supreme Court rejected Florida's argument, concluding this "anticipated result [was] purely speculative, and, at most, only remote and indirect." *Id.* at 18. The Court explained, even if "as alleged, the supposed withdrawal of property will diminish the revenues of the state, [it's not certain] that the deficiency cannot readily be made up by an increased rate of taxation." *Id.* The Court thus concluded Florida had failed to demonstrate a direct injury and declined to exercise its original jurisdiction. *Id.*

Plaintiffs argue that *Mellon* doesn't apply here. According to plaintiffs, they have alleged a more direct theory of harm because, in *Mellon*, Florida's standing theory "relied on an unproven assumption about the actions of independent third parties[.]" Doc. 50 at 12. Plaintiffs argue that they allege a more direct harm here because "it is the Final Rule alone that will reduce taxable income without any additional action [by] any third party." *Id.* At the hearing, plaintiffs added that *Mellon* only speaks to indirect effects of a federal policy, whereas plaintiffs have shown the Final Rule to have a direct effect.

Unfortunately for plaintiffs, in general, reduced state tax revenue doesn't qualify as an injury in fact sufficient to confer standing on a state. Our Circuit has ruled that the "'unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers, suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury-in-fact

33

to support state standing.'" *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012) (quoting *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976)).  Fortunately, our Circuit also has explained when reduced tax revenue *does* confer standing to sue on a state.  A "state must show a 'fairly direct link between the state's status as a recipient of revenues and the legislative or administrative action being challenged.'" *Id.* (quoting *Kleppe*, 533 F.2d at 672).

The requisite "fairly direct link" is missing here.  Plaintiffs allege the Final Rule will reduce their tax revenue because it shifts loan forgiveness forward in time.  That is, the Final Rule will forgive student loan debt in 2024 and 2025, when plaintiffs can't tax it.  So, plaintiffs allege, "but for the Final Rule, significant amounts of federal loan cancellation would occur *after* December 31, 2025" and this "would result in taxable income being recognized from the loan cancelation and thus payment of income taxes to" the states.  Doc. 57 at 18 (1st Am. Compl. ¶ 95).  Put another way, absent the final rule, student loan debt would be forgiven after December 31, 2025, permitting the states to tax the forgiven loans as income.  This kind of harm is too distant from the SAVE Plan to justify standing for the states here.  The federal policy creates incentives, borrowers react to those incentives and consolidate their loans, and borrowers would've consolidated their loans later, when plaintiffs could tax it, but the American Rescue Plan prevents this.  Defendants correctly call the states' decreased tax revenue an "incidental" harm.  The SAVE Plan doesn't target plaintiffs or their tax policies.  *See Arizona v. Biden*, 40 F.4th 375, 383 (6th Cir. 2022) (explaining that federal policy did "not directly injure the States. It does not regulate the States by telling them what they can or cannot do in their jurisdiction.").  This distant, incidental harm doesn't persuade the court to deviate from our Circuit's general rule that reduced state tax revenue doesn't qualify as an injury in fact.

And, even if this harm did qualify as an injury, plaintiffs' tax injury argument has a traceability problem.  The SAVE Plan didn't cause plaintiffs' injuries—plaintiffs' own tax policy caused them.

### 2.  Self-Inflicted

Defendants argue that plaintiffs' alleged harm is self-inflicted because it arises from plaintiffs' "own choice to tie their tax laws to the Internal Revenue Code."  Doc. 46 at 23.  To support this theory, defendants cite *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976).

In *Pennsylvania v. New Jersey*, Pennsylvania sought to challenge a New Jersey tax that taxed the New Jersey-derived income earned by nonresidents.  *Id.* at 662–63.  Pennsylvania reimbursed its residents for taxes levied by other states.  *Id.* at 663.  Pennsylvania asserted the law injured Pennsylvania because it "diverted" taxes from Pennsylvania's treasury.  *Id.*  The Supreme Court declined to exercise its original jurisdiction over this state v. state dispute, concluding Pennsylvania had failed to demonstrate "that the injury for which it s[ought] redress was directly caused by the action of another State."  *Id.*

The Court explained that "injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective legislatures."  *Id.* at 664.  To put a finer point on it, the Court wrote, "nothing prevents Pennsylvania from withdrawing that credit for taxes paid to New Jersey."  *Id.*  "No state can be heard to complain about damage inflicted by its own hand."  *Id.*  Defendants urge this court to apply this case's reasoning here because these nine states, like Pennsylvania, have made their own decisions about their tax codes.  So any taxation issues are ones caused by the states and the states alone.

Plaintiffs respond that *Pennsylvania* is inapposite; it involved two states suing each other and invoking the Supreme Court's original jurisdiction.  Plaintiffs argue that "Supreme Court original jurisdiction is reserved for 'a dispute between States of such seriousness that it would

35

amount to *casus belli* if the States were fully sovereign.'"  Doc. 50 at 11 (quoting *Texas v. New Mexico*, 462 U.S. 554, 570 n.18 (1983)).  In other words, according to plaintiffs, the bar for Article III standing is much lower than the bar for invoking the Supreme Court's original jurisdiction.  Plaintiffs are wrong.

To be sure, *Pennsylvania* is a case in an unusual procedural posture.  Nonetheless, *Pennsylvania* addressed financial injury to a plaintiff state.  The Court held, quite simply, that the defendant state hadn't inflicted any injury upon the plaintiff state because plaintiff's injury was self-inflicted.  *Pennsylvania*, 426 U.S. at 664.  The injury to a state, of course, is an explicit component of the standing inquiry.

Plaintiffs also argue that, though defendants assert they have a choice, they really have no choice at all.  Plaintiffs point out that "[g]iven economic and administrative realities," 36 states tie their definition of taxable income to a federal definition.  Doc. 50 at 10.  Plaintiffs frame their dilemma this way:  under defendants' approach, plaintiffs must change their state tax laws to recapture the lost revenue, so the Final Rule will "depriv[e] the States of their sovereign choice to set their own tax policy." *Id.*  And "the States will suffer financial injury under the Rule no matter what putative 'choice' they make." *Id.*  The court finds this argument equally unpersuasive.

This argument stands federalism on its head.  Nothing requires plaintiffs to use the federal definitions of taxable income.  The SAVE Plan doesn't coerce or cajole plaintiffs into changing their tax code.  Plaintiffs have made their choice to tie their definition of income to the federal definition and, if they don't like that definition, they're fully free to change it.  Perhaps a change would produce some administrative costs, but those costs would trace to the state legislatures' decisions, not the SAVE Plan.  The Final Rule doesn't pose any threat to a state's

sovereign power to decide its own tax law.  *See Garrison v. U.S. Dep't of Educ.*, 636 F. Supp. 3d 935, 942 (S.D. Ind. 2022) (dismissing claim for lack of standing where individual plaintiffs challenged HEROES Act loan forgiveness, arguing loan forgiveness would increase his state tax bill, because the "Department of Education does not give silent approval to Indiana's tax code; those decisions are entirely within the discretion of the Indiana legislature" and concluding plaintiffs' injuries were traceable only to state tax law decisions—not federal student loan programs).

The court thus rejects plaintiffs' standing theory based on reduced income tax revenue. Next, the court takes up plaintiffs' final standing theory.

### C.  Recruiting and Retention Competitive Harm

Plaintiffs proffer a second theory of harm:  a competitive disadvantage in recruiting and retaining talent.  *See* Doc. 57 at 20 (1st Am. Compl. ¶ 103).  This theory requires an understanding of a different kind of student loan debt forgiveness:  The Public Service Loan Forgiveness (PSLF) program.  Under the PSLF, borrowers are eligible for forgiveness of their direct loans once they've made 120 qualifying monthly payments under a qualifying plan while—and this is the critical part—working full time for an eligible employer in public service. The incentive behind this program is evident:  work in public service for ten years and have your remaining student loan debt forgiven.

Returning to the Final Rule, plaintiffs allege that they rely on the PSLF program "to attract and maintain talent" because state "agencies typically cannot pay as much to recruit and retain talent as private sector employees."  *Id.*  Plaintiffs allege three states rely on the PSLF program to attract employees:  the Kansas Office of Attorney General and other Kansas agencies who use the PSLF to attract legal talent; South Carolina relies on the PSLF program to recruit and retain teachers; and Alaska's Attorney General's office relies on the PSLF program to recruit

37

and retain employees.  *Id.* at 20–21 (1st Am. Compl. ¶¶ 104–07).  According to plaintiffs, "the more debt that can be forgiven under the PSLF Program, the more powerful of an inducement it is."  *Id.* at 21 (1st Am. Compl. ¶ 108).  But, because the Final Rule will reduce "the amount of student debt held by current and potential employees . . . , the relative attractiveness of public employment for the Plaintiff States decreases."  *Id.*

Plaintiffs' recruitment-based standing theory relies, in their words, on "basic economic logic."  Doc. 50 at 13.  Plaintiffs argue that as "a matter of elementary economics, public service employment will no longer be as attractive an option to those with a lower amount of debt because of the direct effects of the Final Rule."  Doc. 50 at 13–14.  Plaintiffs proffer the following example:

> [Imagine] a current employee who had an original loan balance of $12,000 and has been in public service for 8 years.  Without the Final Rule, he would have a strong incentive to stay in public service for 2 more years.  However, because of the Final Rule, he would get his debt canceled in the same amount of time regardless of where he's employed.

*Id.* at 14.  In sum, plaintiffs argue that the Final Rule reduces the attractiveness of the PSLF program, and plaintiffs expect their current and prospective employees to respond to these incentives, making it harder for plaintiffs to recruit and retain employees.  So, plaintiffs reason, the Final Rule will injure plaintiffs.

Not so, defendants contend.  Defendants argue that plaintiffs' theory has a traceability problem.  Defendants point out that this theory of injury is an indirect one—it relies on the actions of a third party.  This means it's harder for plaintiffs to show causation by such an indirect injury.  "That an injury is indirect does not necessarily defeat standing, 'but it may make it substantially more difficult to establish that, in fact, the asserted injury was the consequence of the defendants' actions.'"  *Habecker*, 518 F.3d at 1225 (brackets and ellipsis omitted) (quoting *Warth v. Seldin*, 422 U.S. 490, 504–05 (1975)).  Where "'the independent action of some third

38

party not before the court'—rather than that of the defendant—was the direct cause of the

plaintiff's harm, causation may be lacking." *Id.* (quoting *Simon v. E. Ky. Welfare Rights Org.*,

426 U.S. 26, 40–41 (1976)).

Defendants are right. Recently, the Sixth Circuit explicitly rejected this very theory.

### 1.  *Mackinac Center for Public Policy v. Cardona*

In *Mackinac Center for Public Policy v. Cardona*, the Sixth Circuit addressed a challenge

to action taken by the Department of Education affecting student loans. 102 F.4th 343, 2024 WL

2237667 (6th Cir. May 17, 2024). In *Mackinac*, the Department of Education sought to address

problems with administration of the PSLF and income driven repayment (IDR) programs. *Id.* at

*2. Loan administrators allegedly steered "borrowers into long-term periods of forbearance in

violation of Department of Education rules[.]" *Id.* Under the PSLF and IDR programs at issue,

forbearance periods don't count toward the 120 month payments. *Id.* But, given the problems

administering the programs, the Department of Education decided to count certain forbearance

periods as payments. *Id.* As a result, about "40,000 borrowers would be eligible for immediate

discharge of debt under the PSLF program, and several thousand would be eligible for

forgiveness under IDR plans." *Id.*

Plaintiffs sued to enjoin the policies counting forbearance periods toward the payment

requirement. Those plaintiffs were "nonprofit, tax-exempt organizations that [were] qualified

public service employers under the PSLF program." *Id.* at *3. Plaintiffs alleged "that the action

would keep them from realizing the full statutory benefit to which they are entitled under PSLF

and make it more difficult for them to recruit and retain employees." *Id.* (internal quotation

marks omitted). Plaintiffs invoked competitor standing, which "recognizes that plaintiffs suffer

an economic injury when agencies lift regulatory restrictions on their competitors or otherwise

allow increased competition against them." *Id.* at *4 (citation and internal quotation marks

39

omitted).  A party invoking competitor standing must show an imminent injury from increased competition.  *Id.*  Plaintiffs argued the Department's forbearance adjustment increased their competition for employees because it reduced plaintiffs' competitive benefit—*i.e.*, reduced the financial incentive for student loan borrowers to seek and remain in public service jobs.  *Id.* at *5.  The district court, sua sponte, dismissed plaintiffs' complaint for lack of standing.  *Id.*  The Sixth Circuit affirmed.  *Id.*

The Sixth Circuit concluded plaintiffs had "failed to allege specific, concrete facts to show that the adjustment has caused or will cause them competitive injury."  *Id.* (citation and internal quotation marks omitted).  The Sixth Circuit faulted plaintiffs for their complaint's broad, conclusory allegations because they had "not alleged any facts showing how the adjustment affects their ability to recruit and retain college-educated employees."  *Id.* at *6 (internal quotation marks omitted).  Plaintiffs had "not identified any current employee that ha[d] received credit under the adjustment, nor d[id] they claim that they expect[ed] to imminently hire any employee who ha[d] received such credit."  *Id.*  Nor did plaintiffs allege "that any employees have stopped working for them (or stated an intention to do so) based on the adjustment."  *Id.*

The Sixth Circuit even assumed the Department's adjustment would affect plaintiffs' ability to fill vacancies.  Even with that benefit, "several factors beyond the adjustment could have a similar impact."  *Id.* at *8.  An "employee may choose to work for a different public service employer to satisfy part of their 120-month obligation of any number of reasons unrelated to the adjustment, such as pay, location, work-life balance, or any combination of factors."  *Id.*  The *Mackinac* plaintiffs thus failed to establish a competitive injury because they had failed to allege "how many of Plaintiffs' employees will be impacted by the adjustment and how many individuals may make employment decisions based on the adjustment."  *Id.*  The

Sixth Circuit summarized plaintiffs' problem this way:  "At bottom, how the adjustment impacts Plaintiffs is up to individuals who are not parties to this lawsuit."

So too here.  Plaintiffs rely, in their own words, on "elementary economics."  Doc. 50 at 13.  They theorize that their current and future employees will respond to the incentives created by the Final Rule and reject public employment.  This will cause plaintiffs a "competitive harm." *Id.*  And they have provided declarations that the states use public loan forgiveness as a recruitment tool.  But these are the very kind of broad, conclusory allegations that the Sixth Circuit flunked in *Mackinac*.  As there, plaintiffs here "have not identified any current employee that has received" relief under the SAVE Plan.  *Mackinac*, 2024 WL 2237667, at *6.  Nor have they alleged "that they expect to imminently hire any employee who" is SAVE-Plan-eligible.  *Id.* And "they have not alleged that any employees have stopped working for them (or stated an intent to do so) based on" the SAVE Plan.  *Id.*  So, like *Mackinac*, plaintiffs' hypotheticals insufficiently plead an imminent injury in fact.  *Id.*; *see also id.* at *8 ("Plaintiffs' allegations regarding supply and demand and the impact of financial incentive on third-party student-loan debtors are wholly speculative.").

Separately, plaintiffs have a third party problem.  Recall that "where a causal relation between injury and challenged action depends upon the decision of an independent third party . . . , standing is not precluded, but it is ordinarily substantially more difficult to establish." *California v. Texas*, 593 U.S. 659, 675 (2021) (citation and internal quotation marks omitted). To meet this "more difficult" standard, "the plaintiff must show at least that third parties will likely react in predictable ways."  *Id.* (citation and internal quotation marks omitted).  It's the "likely" part that causes plaintiffs' problems here.

Plaintiffs' standing allegations provide no basis for the court to find that job seekers and employees likely will avoid public service employment because of the SAVE Plan. As defendants correctly point out, "career-related decisions are complicated, and PSLF is not the sole incentive in this economic picture." Doc. 65 at 11. The Sixth Circuit mentioned a few of these other incentives: "pay, location, work-life balance, or any combination of factors." *Mackinac*, 2024 WL 2237667, at *8. "At bottom, how the [SAVE Plan] impacts Plaintiffs is up to individuals who are not parties to this lawsuit." *Id.* Given all the factors that a person considers when making an employment decision, plaintiffs have failed to allege enough facts for the court to conclude that potential and current employments "will likely react in predictable ways." *Dep't of Comm.*, 139 S. Ct. at 2566.

The court must abide by the Supreme Court's "usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414. Plaintiffs have failed to shoulder their burden to allege a competitive harm. No court ever has embraced this competitive harm theory to hiring/retention theory. Our court declines to become the first.

In a final bid to avoid this result, plaintiffs seek shelter from *Massachusetts v. EPA*, arguing they are entitled to "special solicitude" in the standing analysis.

## 2. *Massachusetts v. EPA*

Plaintiffs rely on the Supreme Court's decision in *Massachusetts v. EPA*, 549 U.S. 497, to support their competitive harm theory of standing. In *Massachusetts v. EPA*, a group of states sued the EPA for failing to regulate certain greenhouse gases under the Clean Air Act. *Id.* at 505. The Court held Massachusetts had standing based on a risk that global warming would raise sea levels and thereby harm Massachusetts' coastal lands. *Id.* at 526. The Court explained, "according to petitioners' uncontested affidavits . . . the rise in sea levels associated with global

42

warming has already harmed and will continue to harm Massachusetts.  The risk of catastrophic harm, though remote, is nevertheless real." *Id.*

According to plaintiffs, *Massachusetts v. EPA* "relaxed" the standing requirements for states suing the federal government.  Doc. 50 at 15.  Relevant here, the *Massachusetts v. EPA* Court noted "that States are not normal litigants for the purposes of invoking federal jurisdiction." 549 U.S. at 518.  The Court emphasized "Massachusetts' well-founded desire to preserve its sovereign territory[.]" *Id.* at 519.  And the Court stressed that the states were exercising a procedural right. *Id.* at 520 (citing 42 U.S.C. § 7607(b)(1)).  "Given that procedural right and Massachusetts' stake in protecting its quasi-sovereign interests," the Court held Massachusetts was "entitled to special solicitude in our standing analysis." *Id.*  Based on *Massachusetts v. EPA*, plaintiffs argue for a "double relaxation of Article III standing requirements"—one for special solicitude and one for procedural rights.  Doc. 50 at 15.

*Massachusetts v. EPA* doesn't provide plaintiffs the safe harbor they find in the decision.  Our Circuit has lamented "the lack of guidance on how lower courts are supposed to apply the special solicitude doctrine to standing questions." *Wyoming*, 674 F.3d at 1238.  Despite this absence of guidance, the Tenth Circuit has held, "'special solicitude does *not* eliminate the state petitioner's obligation to establish a concrete injury, as Justice Stevens' [*Massachusetts*] opinion amply indicates.'" *Id.* (emphasis in original) (quoting *Del. Dep't of Nat. Res. & Envt'l Control v. F.E.R.C.*, 558 F.3d 575, 579 n.6 (D.C. Cir. 2009)).  As our Circuit has explained, in *Massachusetts v. EPA*, the state of "Massachusetts proved that it had an 'actual' and 'imminent' injury."  But plaintiffs lack such evidence here.  Their competitive harm theory fails to plead an injury in fact, as shown by *Mackinac*.  Their theory of future harm simply is too speculative to qualify as an imminent injury.

The court also doubts that *Massachusetts v. EPA* even applies here.  At the hearing, plaintiffs argued that they are asserting quasi-sovereign interests, which brings them under the *Massachusetts v. EPA* umbrella.  "A quasi-sovereign interest generally concerns either the physical and economic health of a State's residents or the State's 'interest in not being discriminatorily denied its rightful status within the federal system.'"  *Navajo Nation v. Wells Fargo & Co.*, 344 F. Supp. 3d 1292, 1311 (D.N.M. 2018) (*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982)).  There's no "exhaustive formal definition nor a definitive list of qualifying interests[.]"  *Snapp*, 458 U.S. at 607.  "Examples of quasi-sovereign interests include abating a public nuisance, preventing environmental pollution, or avoiding economic damage of such severity and pervasiveness that it causes injury not only to individual citizens, but to the welfare, prosperity, and economic standing of the State as a whole."  *Navajo Nation*, 344 F. Supp. 3d at 1311 (citing *Snapp*, 458 U.S. at 603–06).

Plaintiffs' ability to hire and retain an undefined number of employees doesn't qualify as the kind of quasi-sovereign interest that this caselaw imagines.  Plaintiffs haven't directed the court to any authority holding that a state's ability to hire or retain employees in public service jobs qualifies as a quasi-sovereign interest.  The court concludes plaintiffs aren't entitled to special solicitude.  *See also Arizona v. Biden*, 40 F.4th at 386 (declining to apply *Massachusetts v. EPA* where states did "not protest regulation of them as States of preemption of local lawmaking authority[,] . . . [nor] any threatened incursions on their property or territory[,]" and case did "not involve the classic sovereign case, public nuisances in which a State invokes a desire to safeguard its domain and its health, comfort and welfare" (citation and internal quotation marks omitted)).

### 3.       Procedural Rights

Plaintiffs also ask for a relaxed standing standard again because, they argue, they're asserting procedural rights.  Doc. 50 at 15.  They take this standard from *Lujan*, where Justice Scalia called procedural rights "special."  504 U.S. at 573 n.7.  Justice Scalia explained, "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."  *Id.*  He gave the following example:

> [O]ne living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

*Id.*  So, plaintiffs argue, they "need not demonstrate that, if the Department [of Education] conducted a defensible cost estimate or provided a sufficient notice period, the result would be any different."  Doc. 50 at 15.

But this argument can't solve plaintiffs' problem with their standing theory.  Plaintiffs' problem is that their competitive harm theory is speculative and not traceable to the SAVE Plan because it relies on complicated employment decisions allegedly faced by an unknown number of third parties.  So, even if the court relaxes standing requirements for plaintiffs because they assert procedural rights, they still haven't met their standing obligation.  The court rejects this final standing theory.

## IV.      Conclusion

In sum, the court grants defendants' Motion to Dismiss (Doc. 45) in part and denies it in part.  Plaintiffs South Carolina, Texas, and Alaska have established, for now, standing based on harm to their public instrumentalities.  The court denies defendants' dismissal motion as it applies to the claims asserted by those three plaintiffs.  In contrast, plaintiffs Kansas, Alabama,

Idaho, Iowa, Louisiana, Montana, Nebraska, and Utah haven't shouldered their burden to show that they have standing.  The court lacks subject matter jurisdiction over claims these eight plaintiffs wish to assert.  It dismisses them from this case.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion to Dismiss (Doc. 45) is granted in part and denied in part.  Exercising discretion conferred by our Circuit, the court, consistent with Fed. R. Civ. P. 1, grants defendants' Motion to Dismiss as it applies to Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, and Utah.  The court dismisses without prejudice all claims made by these eight states and directs the Clerk to terminate them as parties to this action.

**IT IS SO ORDERED.**

**Dated this 7th day of June, 2024, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| STATE OF ALASKA, et al., | |
| Plaintiffs, | Case No. 24-1057-DDC-ADM |
| v. | |
| UNITED STATES DEPARTMENT OF EDUCATION, et al., | |
| Defendants. | |

## MEMORANDUM AND ORDER

Plaintiffs have moved the court for a preliminary injunction that would prevent defendants from implementing their student loan regulations, known as the SAVE Plan.  Doc. 23.  The SAVE Plan lowers monthly payments for eligible borrowers and reduces the maximum repayment period for eligible borrowers who took out loans with low original balances.  To resolve plaintiffs' motion, the court must answer three questions.

*First*:  does defendants' SAVE Plan present a "major question"—one of such economic and political significance that defendants must show that Congress clearly authorized the SAVE Plan?  In *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), the Supreme Court answered this question. This recent, binding Supreme Court decision holds "that the basic and consequential tradeoffs inherent in a mass debt cancellation program are ones that Congress would likely have intended for itself."  *Id.* at 2375 (quotation cleaned up).  So, this is an easy yes.

*Second*, given that the case presents a major question, have defendants shown that the Higher Education Act clearly authorizes their SAVE Plan?  *Biden v. Nebraska* doesn't answer

this question because that case addressed a different statute with a different regulatory history. While it's a close and difficult question, the court answers this second question no.  Defendants have offered colorable, plausible interpretations of the Higher Education Act that could authorize the SAVE Plan, but those interpretations fall short of *clear* congressional authorization.

*Last*, the court must decide whether the preliminary injunction should apply nationwide. Scope aside, part of plaintiffs' requested injunction is unworkable, and so the court denies it. But, for the workable part of plaintiffs' injunction, the court reluctantly answers yes—it should apply nationwide.  Nationwide injunctions are the subject of much controversy, and this court is less than enthusiastic about entering one.

With these three answers, the court grants in part and denies in part plaintiffs' Motion for Preliminary Injunction (Doc. 23).  The court enjoins the SAVE Plan—in part—nationwide.  It declines, however, to unwind the parts of the SAVE Plan already in effect because plaintiffs have failed to demonstrate those provisions caused irreparable harm.  Plaintiffs brought this lawsuit long after defendants already had implemented those aspects of the SAVE Plan, so the court doesn't see how plaintiffs can complain of irreparable harm from them.  Nor have plaintiffs explained how a preliminary injunction could unwind the parts of the SAVE Plan already in effect.  But the court grants plaintiffs' request to enjoin those aspects of the SAVE Plan not yet implemented.

The court emphasizes one more thing about its decision.  This Order does not decide whether student loan forgiveness is good policy or bad policy.  The popularly elected branches of our government—the President and the Congress—properly control that decision.  Thus, no one should read this Order to take a position on that question because our Constitution doesn't assign any part of it to the federal courts.

The court explains each one of its decisions, below, beginning with the relevant background.

## I.   Background

The court begins with a fly-over of student loan repayment legislation and the Secretary of Education's role in it.

Congress enacted the Higher Education Act (HEA) in 1965 to "strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education."  Pub. L. No. 89-329, 79 Stat. 1219 (1965).  Twenty-eight years later, Congress passed the "Student Loan Reform Act," and allowed the Secretary of Education to issue federal student loans directly from the Department.  Pub. L. No. 103-66, § 4011–21, 107 Stat. 312 (1993).  The Student Loan Reform Act also created income-contingent repayment plans—the repayment plans at issue here.  *Id.* at § 4021 (codified at 20 U.S.C. § 1087e(d)(1)(D)).

Here's the statutory provision establishing income-contingent repayment plans, which serves as this case's axis:

> Consistent with criteria established by the Secretary, the Secretary shall offer a borrower of a loan made under this part a variety of plans for repayment of such loan, including principal and interest on the loan.  The borrower shall be entitled to accelerate, without penalty, repayment on the borrower's loans under this part.  The borrower may choose . . . an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years[.]

20 U.S.C. § 1087e(d)(1)(D).

Before the action challenged here, the Secretary of Education—"the Secretary" in the remainder of this Order—has invoked this statutory authority three times:

1. In 1994, the Secretary created the first income-contingent repayment plan.  William D. Ford Federal Direct Loan Program, 59 Fed. Reg. 61,664 (Dec. 1, 1994) (codified at 34 C.F.R. pt. 685).

2.  In 2012, the Secretary created the PAYE Plan.  Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 77 Fed. Reg. 66,088 (Nov. 1, 2012) (codified at 34 C.F.R. pts. 674, 682, 685).

3.  In 2015, the Secretary created the REPAYE Plan.  Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 80 Fed. Reg. 67,204 (Oct. 30, 2015) (codified at 34 C.F.R. pts. 668, 682, 685).

Each time, the Secretary imagined forgiving the remaining loan balance after a borrower had made payments for a specific period of time.  *See* 59 Fed. Reg. at 61,666 ("Some borrowers in the [income-contingent repayment] plan may not earn sufficient income to fully repay their loans within the statutory 25-year time period.  In this event, the Secretary will forgive any outstanding loan balance (principal plus interest) that is unpaid after 25 years."); 77 Fed. Reg. at 66,114 ("The revisions offer eligible borrowers lower payments and loan forgiveness after 20 years of qualifying payments."); 80 Fed. Reg. 67,209 ("We agree that borrowers are responsible for repaying their student loans, and we believe that most borrowers repaying their loans under the REPAYE plan will be successful in repaying their loans, in many cases before the end of the 20- or 25-year repayment period.  However, we also believe the REPAYE plan will provide relief to struggling borrowers who experience financial difficulties that prevent them from repaying their loans.  We note that the REPAYE plan requires 20 or 25 years of qualifying payments before a loan is forgiven.").

With this background about income-driven repayment plans, the court next explains relevant details about a different kind of repayment plan:  income-*based* repayment plans.

### *Income-Based Repayment (IBR) Plans*

In 2007, Congress amended the HEA and created income-based repayment plans for borrowers with "partial financial hardship."  Pub. L. No. 110-84, 121 Stat. 784 (2007).  The statute defines "partial financial hardship" to mean the borrower's annual total loan payment,

4

based on a 10-year repayment period, exceeds 15% of the amount by which "the borrower's and the borrower's spouse's . . . adjusted gross income[] exceeds" 150% of the applicable poverty line. 20 U.S.C. § 1098e(a)(3). And the statute explicitly authorized the Secretary to "repay or cancel any outstanding balance of principal and interest due on all loans made" under certain conditions after "a period time prescribed the Secretary, not to exceed 25 years[.]" *Id.* § 1098e(b)(7).

In 2010, Congress amended the IBR statute. Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 2213, 124 Stat. 1029, 1081 (2010) (codified at 20 U.S.C. § 1098e(e)). For borrowers taking out a loan on or after July 1, 2014, Congress lowered the cap on payments for IBR plans to 10%—down from 15%. 20 U.S.C. § 1098e(e)(1). And for those same borrowers, Congress reduced the maximum payment time window to 20 years—down from 25 years. *Id.* § 1098e(e)(2). The Secretary then applied these IBR updates to all student loans.

Five years later, in 2015, the Secretary created the REPAYE Plan by rulemaking and applied the 10% payment cap to all borrowers, regardless of when they took out loans. 80 Fed. Reg. 67,204. The REPAYE Plan also lowered the repayment window for borrowers with undergraduate debt from 25 years to 20 years. *Id.* at 67,205 ("For a borrower who only has loans received to pay for undergraduate study, provide that the remaining balance of the borrower's loans that have been repaid under the REPAYE plan is forgiven after 20 years of qualifying payments."). The REPAYE Plan set the repayment window for borrowers with graduate debt at 25 years. *Id.* ("For a borrower who has at least one loan received to pay for graduate study, provide that the remaining balance of the borrower's loans that have been repaid under the REPAYE plan is forgiven after 25 years of qualifying payments.").

### *The SAVE Plan*

In 2023, the Secretary issued regulations creating the SAVE Plan—the plan challenged here.  Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43,820 (July 10, 2023) (to be codified at 34 C.F.R. pts. 682, 685).  First, a few notes about the SAVE Plan's terminology.  The SAVE Plan seeks to combine income-contingent repayment plans and income-based repayment plans under one umbrella term:  income-driven repayment plans.  *Id.* at 43,820.  And the SAVE Plan is the new name for the REPAYE plan.  *Id.*

The SAVE Plan first emerged in January 2023, when the Department issued a Notice of Proposed Rulemaking (NPRM).  Doc. 57 at 12 (1st Am. Compl. ¶ 57).  The NPRM "propose[d] to amend the regulations governing income-contingent repayment plans[.]"  Improving Income-Driven Repayment for the William D. Ford Federal Direct Loan Program, 88 Fed. Reg. 1894 (Jan. 11, 2023) (to be codified at 34 C.F.R. pt. 685).  After the NPRM and the corresponding comment period, the Department published the "Final Rule" in July 2023.  Doc. 57 at 14 (1st Am. Compl. ¶ 68); *see also* Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43,820 (July 10, 2023) (to be codified at 34 C.F.R. pts. 682, 685).

Here, plaintiffs attack several pieces of the Final Rule.[1]  Specifically, they challenge the following changes to income contingent repayment plans:

- those changes defining discretionary income as income above 225% of the applicable federal poverty guideline;

- those changes setting a borrower's monthly payment amount to $0 if the borrower's income falls below 225% of the applicable federal poverty guideline;

---

[1]      This Memorandum and Order uses the terms "Final Rule" and "SAVE Plan" interchangeably.

6

- those changes capping, for undergraduate loans, a borrower's monthly payment amount at 5% of the borrower's income above 225% of the applicable federal poverty guideline; and

- those changes cancelling, for borrowers whose original principal balance was $12,000 or less, the remaining balance after the borrower has made 120 monthly payments or the equivalent.

Doc. 57 at 14 (1st Am. Compl. ¶ 70).  So, summarizing, the Final Rule raises the floor of discretionary income, decreases borrowers' monthly payments, and, for loans with original balances of $12,000 or less, limits a borrower's repayment window to 10 years (from 20 or 25) of qualifying payments.

### *This Lawsuit*

According to plaintiffs, the Final Rule is "plainly unlawful" under the Constitution and the Administrative Procedures Act (APA).  They bring four claims targeting this purportedly unlawful conduct:  (1) agency action in excess of statutory jurisdiction and in violation of separation of powers, violating Article I of the Constitution; (2) agency action in excess of statutory authority, violating the Administrative Procedures Act; (3) arbitration and capricious agency action, violating the APA; and (4) agency action in violation of APA procedures.  Doc. 57 at 25–38 (1st Am. Compl. ¶¶ 133–227).  Relying on these legal theories, plaintiffs ask the court to enjoin defendants "from implementing or acting pursuant to the" SAVE Plan.  Doc. 23.

## II.     Legal Standard

Federal Rule of Civil Procedure 65(a) authorizes federal courts to issue preliminary injunctions.  The courts enjoy broad discretion when deciding whether to grant a preliminary injunction.  *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (citations omitted).

The relief afforded under Rule 65 embraces a limited purpose—a preliminary injunction serves "merely to preserve the relative positions of the parties until a trial on the merits can be

7

held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  The Tenth Circuit instructs that the moving party—here plaintiffs—must satisfy four factors to deserve a preliminary injunction: "'(1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest.'"  *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (quoting *Republican Party of N.M. v. King*, 741 F.3d 1089, 1092 (10th Cir. 2013)).  When the government is the party opposing the preliminary injunction— as here—the third and fourth factors merge.  *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)), *abrogated on other grounds*, *Garland v. Cargill*, No. 22-976, 2024 WL 2981505 (U.S. 2024).

"A preliminary injunction is an extraordinary remedy[.]"  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  So, the moving party must demonstrate a "'clear and unequivocal'" right to such relief.  *Petrella v. Brownback*, 787 F.3d 1242, 1256 (10th Cir. 2015) (quoting *Beltronics*, 562 F.3d at 1070).  "In general, 'a preliminary injunction . . . is the exception rather than the rule.'"  *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007) (quoting *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984)).

## III.    Analysis

The court's analysis of plaintiffs' Motion for Preliminary Injunction unfolds in this fashion:  it evaluates the three preliminary injunction factors, in turn.  Then, after concluding that all three factors favor entry of a preliminary injunction, the court considers the scope of the relief warranted.  The court begins with the first preliminary injunction factor:  plaintiffs' likelihood of success on the merits.

### A.      Likelihood of Success on the Merits

Plaintiffs assert they are likely to succeed on their statutory-based claims and their APA claims.  "Where a plaintiff seeks a preliminary injunction and asserts multiple claims upon which the relief may be granted, the plaintiff need only establish a likelihood of success on the merits of one of the claims."  *George v. Davis Sch. Dist.*, No. 23-cv-00139, 2023 WL 5000989, at *6 (D. Utah Aug. 4, 2023) (citation and internal quotation marks omitted).  The court's analysis of this factor begins and ends with plaintiffs' statutory claims[2]—ones asserting that the SAVE Plan exceeds defendants' authority under the HEA.  To show that their claims are likely to succeed, plaintiffs argue the SAVE Plan violates the "Major Questions Doctrine."

To apply the Major Questions Doctrine (MQD), the court must engage in a two-step analysis.  *First*, the court must determine whether this case presents a major question.  *Second*, if it does, the court must determine whether the statute the agency invokes provides clear congressional authorization for the challenged agency action.  The court takes up each question, in turn, below.

---

[2]      There's a slight discrepancy between plaintiffs' Motion for Preliminary Injunction and their First Amended Complaint.

Plaintiffs' First Amended Complaint asserts four claims for relief.  In Count I, plaintiffs assert defendants violated Article I of the Constitution by taking an agency action in excess of statutory jurisdiction and in violation of the separation of powers.  Doc. 57 at 25–28 (1st Am. Compl. ¶¶ 133–54).  In Count II, plaintiffs assert defendants took an agency action in excess of their statutory authority, violating the APA.  *Id.* at 28–30 (1st Am. Compl. ¶¶ 155–73).  Count III asserts defendants took an arbitrary and capricious agency action, violating the APA.  *Id.* at 30–36 (1st Am. Compl. ¶¶ 174–215).  And in Count IV, plaintiffs assert defendants violated APA procedures.  *Id.* at 36–38 (1st Am. Compl. ¶¶ 216–27).

In contrast, plaintiffs' brief asserts plaintiffs are likely to succeed on the merits of *three* claims: "(1) the final rule exceeds Defendants' authority under the HEA, (2) the final rule is arbitrary and capricious, and (3) the rule's thirty-day comment period violated the APA."  Doc. 24 at 10.  The court assumes that this first "statutory" claim mentioned in plaintiffs' brief supporting their Motion for Preliminary Injunction includes Count I and Count II from the First Amended Complaint.

9

1.      **The MQD Applies Because the SAVE Plan has Vast Economic and
        Political Significance.**

The "so-called Major Questions Doctrine applies where 'an agency claims to discover in

a long-extant statute an unheralded power to regulate "a significant portion of the American

economy"' or make 'decisions of vast "economic and political significance."'" *Bradford v. U.S.

Dep't of Labor*, 101 F.4th 707, 725 (10th Cir. 2024) (quoting *Util. Air Regul. Grp. v. EPA*, 573

U.S. 302, 324 (2014) (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529

U.S 120, 159–60 (2000))).  "Although courts generally enforce plain and unambiguous statutory

language according to its terms, where the statute at issue is one that confers authority upon an

administrative agency, there are certain extraordinary cases that provide a reason to hesitate

before concluding that Congress meant to confer such authority."  *Id.* at 726 (quotation cleaned

up).  If the case is an "extraordinary" one, then "the agency must point to clear congressional

authorization for the proposed regulation."  *Id.* (internal quotation marks, citation, and ellipsis

omitted).  In *West Virginia v. EPA*, the Supreme Court labelled several of its prior decisions as

Major Question cases.  597 U.S. 697, 721 (2022).  The court reviews some of these examples,

below, to demonstrate how the MQD works.

In *Brown & Williamson*, the Supreme Court rejected the FDA's attempt to regulate

tobacco products under its authority to regulate "drugs" and "devices."  529 U.S. at 159–60.  It

did so because the Court was "confident that Congress could not have intended to delegate a

decision of such economic and political significance to an agency in so cryptic a fashion."  *Id.* at

160.

In *Alabama Association of Realtors v. Department of Health & Human Services*, the

Court rejected the CDC's authority to issue a nationwide eviction moratorium in response to the

COVID-19 pandemic.  594 U.S. 758, 759–60 (2021).  The CDC had claimed this kind of

authority under a provision of the Public Health Service Act because it allowed the CDC to

"'make and enforce . . . regulations'" that it deemed "'necessary to prevent the introduction,

transmission, or spread of communicable diseases[.]'" *Id.* at 760–61 (quoting 42 U.S.C.

§ 264(a)). The Court called the CDC's "claim of expansive authority" under this statute

"unprecedented" and found the statute "a wafer-thin reed on which to rest such sweeping

power." *Id.* at 765. The Court emphasized that the eviction moratorium covered millions at risk

for eviction and likely had an economic impact around $50 billion. *Id.* at 764.

In *Utility Air Regulatory Group v. EPA*, the Court rejected the agency's attempt to

include greenhouse gases under the Clean Air Act's definition of "air pollutant." 573 U.S. at

321. The Court concluded EPA's interpretation "would be incompatible with the substance of

Congress' regulatory scheme," *id.* at 322 (quotation cleaned up), because EPA's interpretation

relied on "ambiguous statutory text[,]" *id.* at 324. And, the Court emphasized, EPA's claimed

authority would give it "unheralded power to regulate 'a significant portion of the American

economy[.]'" *Id.* (quoting *Brown & Williamson*, 529 U.S. at 159). Against this broader

backdrop, the court turns to an MQD case involving student loans: *Biden v. Nebraska*.

*Biden v. Nebraska* involved student loan forgiveness under the Higher Education Relief

Opportunities for Students Act (HEROES Act) of 2003, a law enacted out of Congress's concern

for student loan borrowers in the wake of the September 11 terrorist attacks. 143 S. Ct. at 2363.

The HEROES Act allows the Secretary to "waive or modify any statutory or regulatory

provision applicable to the student financial assistance programs" during a "national

emergency[.]" 20 U.S.C. § 1098bb(a)(1). In August 2022, the Secretary cancelled student loan

debt under the HEROES Act to address financial harm stemming from the COVID-19 pandemic.

*Biden v. Nebraska*, 143 S. Ct. at 2364.  This plan sought "to reduce and eliminate student debts

directly."  *Id.*  Here's how that batch of loan forgiveness worked:

> For borrowers with an adjusted gross income below $125,000 in either 2020 or
> 2021 who have eligible federal loans, the Department of Education will discharge
> the balance of those loans in an amount up to $10,000 per borrower.  Borrowers
> who previously received Pell Grants qualify for up to $20,000 in loan cancellation.

*Id.* at 2364–65 (citations omitted).

Six states challenged this student loan forgiveness plan based on the HEROES Act.  *Id.* at

2365.  The Supreme Court—after determining that at least one state had standing—then applied

the MQD.  That is, the Court concluded the "economic and political significance of the

[HEROES Act plan was] staggering by any measure."  *Id.* at 2373 (citation and internal

quotation marks omitted).  Given the significance of the Secretary's HEROES Act loan

forgiveness, the Court found a "reason to hesitate before concluding that Congress meant to

confer such authority."  *Id.* at 2372 (citation and internal quotation marks omitted).  The Court

thus searched—in vain, as it turned out—for "clear congressional authorization for such a

program."  *Id.* at 2375 (internal quotation marks omitted).  And the Court concluded with this:

"[T]he basic and consequential tradeoffs inherent in a mass debt cancellation program are ones

that Congress would likely have intended for itself."  *Id.* (citation and internal quotation marks

omitted).

Here, defendants correctly point out that this case differs from *Biden v. Nebraska*.  As the

Supreme Court already has noted, "HEROES Act loan relief and HEA loan relief function

independently of each other."  *Dep't of Educ. v. Brown*, 600 U.S. 551, 567 (2023).  Indeed, the

Supreme Court specified that its HEROES Act decision did "not opine on the substantive

lawfulness of any action the Department might take under the HEA[.]"  *Id.* at 565 n.2.  This

difference notwithstanding, *Biden v. Nebraska* definitively answers the question:  is the SAVE

Plan a major question?  The SAVE Plan, like the HEROES Act loan forgiveness, has "staggering" "'economic and political significance[.]'"  *Biden v. Nebraska*, 143 S. Ct. at 2373 (quoting *West Virginia v. EPA*, 597 U.S. at 721).  And so, the answer must be yes.

The Supreme Court has determined that student loan debt cancellation plans that forgive enormous amounts of debt are major questions.  *Id.* at 2375 ("[T]he basic and consequential tradeoffs inherent in a mass debt cancellation program are ones that Congress would likely have intended for itself." (citation and internal quotation marks omitted)).  Defendants estimate the net federal budget effect of the SAVE Plan at $156 billion.  88 Fed. Reg. at 43,886.  Recall that the $50 billion cost of the CDC's eviction moratorium triggered the MQD in *Alabama Association of Realtors*, 594 U.S. at 764.  The court thus easily concludes that the SAVE Plan—with a price tag three times as high—is a "decision[] of vast economic and political significance."  *Bradford*, 101 F.4th at 725 (citation and internal quotation marks omitted).  And so, the court must proceed to step two of the MQD, scouring the HEA for clear congressional authorization.

### 2.    The Statute Doesn't Provide Clear Congressional Authorization for the SAVE Plan.

Step two is where things get tricky.  So, what, exactly, does "clear congressional authorization" mean?  The Supreme Court has dedicated much of its MQD analysis to defining what doesn't qualify as clear congressional authorization.[3]  But the Supreme Court's decisions to date have used a two-part approach.  First, the cases evaluate the statute's plain text.  Second, they consider the statute's context.  *See West Virginia v. EPA*, 597 U.S. at 721–23.  The court's analysis here, below, uses the same approach.

---

[3]    The court is not aware of, nor have the parties cited any MQD case where the Supreme Court has found clear congressional authorization.  Does this absence suggest that the Supreme Court views the MQD as the equivalent of strict scrutiny for regulations?  Our Circuit has answered no.  In *Bradford*, our Circuit assumed without deciding that the MQD applied and found clear congressional authorization for the challenged regulation.  101 F.4th at 725–28.  More on *Bradford* later.

13

### a.   The HEA's Plain Text Authorizes the SAVE Plan.

*Biden v. Nebraska* doesn't answer this case's statutory interpretation question—at least not directly—because that case involved an entirely different statute.  But it nonetheless illustrates the kind of routine textual analysis the Supreme Court directs district courts to conduct when applying the MQD.  For example, the HEROES Act authorizes the Secretary to "waive or modify" student loan programs in connection with a national emergency.  20 U.S.C. § 1098bb(a)(1).  The *Biden v. Nebraska* Court carefully considered the meaning of both words. 143 S. Ct. at 2368–69.

*First*, the Court held that the word "modify" "does not authorize basic and fundamental changes[.]"  *Id.* at 2368 (citation and internal quotation marks omitted).  Instead, the Court explained, modify "carries a connotation of increment or limitation, and must be read to mean to change moderately or in minor fashion."  *Id.* (citation and internal quotation marks omitted). The Court rejected the change imposed under the HEROES Act loan forgiveness as a modification.  It "modified the cited provisions only in the same sense that the French Revolution modified the status of the French nobility—it has abolished them and supplanted them with a new regime entirely."  *Id.* at 2369 (citation and internal quotation marks omitted).

*Second*, the Court rejected the Secretary's reliance on the word "waiver" in the statute. Previously, the Secretary had used his waiver power to identify particular legal requirements— *i.e.*, "the requirement that a student provide a written request for a leave of absence"—and waive such requirements.  *Id.* at 2370.  But, under the HEROES Act loan forgiveness, the Secretary never identified a particular legal requirement he had waived.  *Id.*  Ultimately, the Court held that what the Secretary had "actually done [was] draft a new section of the Education Act from scratch by 'waiving' provisions root and branch and then filling the empty space with radically new text."  *Id.* at 2371.  The Court thus invalidated the HEROES Act plan because the HEROES

14

Act text—allowing the Secretary to "waive or modify"—didn't clearly authorize student loan forgiveness. *Id.* at 2375. So, step two of the MQD analysis begins like any other statutory interpretation exercise: with the statute's text.

In the HEA, Congress gave the Secretary the following authority to set income-contingent repayment plans:

> Consistent with criteria established by the Secretary, the Secretary shall offer a borrower of a loan made under this part a variety of plans for repayment of such loan, including principal and interest on the loan. The borrower shall be entitled to accelerate, without penalty, repayment on the borrower's loans under this part. The borrower may choose . . . an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years[.]

20 U.S.C. § 1087e(d)(1)(D). Plaintiffs argue this statute doesn't clearly authorize the SAVE Plan because it consistently uses the word "repayment." Doc. 24 at 14. According to plaintiffs, the statute's operative term—"repayment"—"*affirmatively precludes* massive debt forgiveness." *Id.* (emphasis in original).

Plaintiffs argue that repay means "to pay back." Doc. 24 at 14 (citing Repay, *American Heritage Dictionary* (4th ed. 2001)); *see also Repay*, *Black's Law Dictionary* (6th ed. 1990) (defining repay first as "[t]o pay back"); Antonin Scalia & Bryan A. Garner, *A Note on the Use of Dictionaries*, 16 Green Bag 2d 419, 428 (2013) (approving use of *Black's Law Dictionary* sixth edition for legal terms from 1951–2000). Taking one more step, plaintiffs argue that repay means to pay back the entirety of the principal borrowed, with some interest. Doc. 24 at 14–15. Plaintiffs also point out that the statute requires "repayment . . . including principal and interest on the loan." 20 U.S.C. § 1087e(d)(1). Plaintiffs see the statutory terms "principal" and "interest" as signals that Congress intended for borrowers to repay the entire principal and at least some interest. But plaintiffs' argument ignores the rest of the statute.

15

The statute also requires annual payments "paid over an extended period of time prescribed by the Secretary, not to exceed 25 years[.]" 20 U.S.C. § 1087e(d)(1)(D). What happens when 25 years' worth of payments doesn't "repay[]" a loan? Loan forgiveness. Indeed, every Secretary of Education since the HEA's enactment has interpreted this provision to mean that the Secretary must forgive the remaining balance of the loan after 25 years. 59 Fed. Reg. at 61,666 ("Some borrowers in the [income-contingent repayment] plan may not earn sufficient income to fully repay their loans within the statutory 25-year time period. In this event, the Secretary will forgive any outstanding loan balance (principal plus interest) that is unpaid after 25 years."); 77 Fed. Reg. at 66,114 ("The revisions offer eligible borrowers lower payments and loan forgiveness after 20 years of qualifying payments."); 80 Fed. Reg. 67,209 ("We agree that borrowers are responsible for repaying their student loans, and we believe that most borrowers repaying their loans under the REPAYE plan will be successful in repaying their loans, in many cases before the end of the 20- or 25-year repayment period. However, we also believe the REPAYE plan will provide relief to struggling borrowers who experience financial difficulties that prevent them from repaying their loans. We note that the REPAYE plan requires 20 or 25 years of qualifying payments before a loan is forgiven.").

In the court's view, the Secretary's longstanding interpretation of the statute is the correct one. The statute sets an upper limit for repayments. Congress wanted borrowers on income-contingent repayment plans to make payments for no more than 25 years. As defendants aptly put it, "a plan for *partial* repayment of a loan or *slower* repayment of a loan are both still 'plans for repayment of such loan, including principal and interest on the loan.'" Doc. 47 at 34 (emphases in original) (quoting 20 U.S.C. § 1087e(d)(1)). Plaintiffs' interpretation inserts the word "full" in the statute, rendering it to require "full repayment" of the loan's principal and

some interest.  But that's just not what the statute says.  The court thus agrees with the Secretary's time-honored interpretation that the statute imagines repayment for less than 25 years, with forgiveness at the end.  *See Walker v. United Parcel Serv., Inc.*, 240 F.3d 1268, 1276 (10th Cir. 2001) ("'Where an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.'" (quoting *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982))).

The court doesn't buy plaintiffs' argument about the HEA's plain text.  It next addresses plaintiffs' arguments about the statute's context.

### b.     The HEA's Context Does Not Provide Clear Congressional Authorization for the SAVE Plan.

The Justices have emphasized that a statute's context plays an important role in the MQD analysis.  *See West Virginia v. EPA*, 597 U.S. at 721 (emphasizing that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme" and, in ordinary cases, "context has no great effect on the appropriate analysis" but "there are 'extraordinary cases' that call for a different approach" (quotation cleaned up)); *see also Biden v. Nebraska*, 143 S. Ct. at 2376 (Barrett, J., concurring) (responding to "the charge that the [Major Questions] doctrine is inconsistent with textualism" by "understand[ing] it to emphasize the importance of *context* when a court interprets a delegation to an administrative agency" (emphasis in original) (citation omitted)).  To that end, a statute's context can tell the court a lot about Congress's authorization in an MQD case.  As avid footnote readers already know, our Circuit addressed this very issue in *Bradford*, 101 F.4th at 725–28.[4]

---

[4]        None of the parties here cited *Bradford* in its papers.  *See* Doc. 24; Doc. 47; Doc. 50.  The court's analysis nonetheless uses *Bradford* because it's binding Circuit precedent and it provides a helpful framework for a developing doctrine.  As the court already mentioned, the Supreme Court has directed

In *Bradford*, the Tenth Circuit assumed without deciding that the MQD applied to a Department of Labor rule requiring recreational service outfitters operating on federal land to pay their employees a $15 minimum wage, rescinding an exemption the outfitters previously enjoyed. *Id.* at 713. After assuming the MQD applied, the Circuit asked whether the Congress clearly had authorized the Department of Labor's rule. In its clear congressional authorization analysis, the Circuit identified four touchstones: (1) whether the agency "seeks to locate expansive authority in modest words, vague terms or ancillary provisions[;]" (2) whether the rule is "an enormous and transformative expansion in regulatory authority without clear congressional authorization[;]" (3) whether the agency is "claim[ing] to discover regulatory authority for the first time in a long-extant statute[;]" and (4) whether "the agency issuing the . . . rule lacks expertise in the relevant area of policymaking."[5] *Id.* at 725–28 (quotation cleaned

---

most of its MQD efforts to deciding what is *not* clear congressional authorization. *Bradford*, on the other hand, demonstrates what *is* clear congressional authorization. And, in any event, the parties' papers make arguments that fall well within *Bradford*, though they don't structure them in *Bradford*'s style.

[5]    The court recognizes that our Circuit didn't explicitly name these four touchstones as considerations for the clear congressional authorization analysis. The court nonetheless interprets *Bradford* this way because these four touchstones resemble Justice Gorsuch's four "clues" for a clear congressional authorization analysis, as laid out in his *West Virginia v. EPA* concurrence. *West Virginia v. EPA*, 597 U.S. at 746–49 (Gorsuch, J., concurring). There, Justice Gorsuch identified four "telling clues" for a court's clear congressional authorization inquiry: (1) whether the agency relies on "[o]blique or elliptical language" or "seek[s] to hide elephants in mouseholes[;]" (2) "the age and focus of the statute the agency invokes in relation to the problem the agency seeks to address[;]" (3) "the agency's past interpretations of the relevant statute[;]" and (4) whether "there is a mismatch between an agency's challenged action and its congressionally assigned mission and expertise." *Id.* at 746–48 (Gorsuch, J., concurring) (citations and internal quotation marks omitted).

Justice Gorsuch's four "clues" don't match our Circuit's four *Bradford* touchstones perfectly, but they're awfully close:

up).  The court applies each of these touchstones, below, to discern whether the Congress clearly

has authorized the measures adopted in the SAVE Plan.

*First*, the court considers whether the Department of Education's SAVE Plan "seeks to

locate expansive authority in 'modest words,' 'vague terms or ancillary provisions.'"  *Id.* at 725

(citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)).  Even if a regulation has "a

colorable textual basis[,]" a statute's context can make "it very unlikely that Congress" delegated

such expansive power to the agency.  *West Virginia v. EPA*, 597 U.S. at 722–23.  "Extraordinary

grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or

'subtle devices.'"  *Id.* at 723 (brackets omitted) (quoting *Whitman*, 531 U.S. at 468).  To survive

MQD scrutiny, the Secretary must show "something more than a merely plausible textual basis

for the agency action[.]"  *Id.*

Here, defendants haven't shown that something more.  As demonstrated above,

defendants have identified a colorable, even plausible textual basis for the SAVE Plan.  The

|   | **Touchstones from *Bradford v. U.S. Dep't of Labor*, 101 F.4th at 725–28.** | **"Clues" in *West Virginia v. EPA*, 597 U.S. at 746–49 (Gorsuch, J., concurring).** |
|---|---|---|
| 1 | Whether the agency "seeks **to locate expansive authority in modest words**, vague terms or ancillary provisions." | Whether the agency relies on "[o]**blique or elliptical language**[.]" |
| 2 | Whether the challenged rule is "an **enormous and transformative expansion in regulatory authority** without clear congressional authorization." | "[E]xamine **the age and focus of the statute** the agency invokes in relation to the problem the agency seeks to address. . . .  [I]t is unlikely that Congress will make **extraordinary grants of regulatory authority** through vague language in a long-extant statute." |
| 3 | Whether the agency is "claim[ing] **to discover regulatory authority for the first time** in a long-extant statute." | "[C]ourts may examine the agency's **past interpretations** of the relevant statute." |
| 4 | Whether "the agency issuing the . . . rule **lacks expertise** in the relevant area of policymaking." | "[S]kepticism may be merited where there is **a mismatch** between an agency's challenged action and its congressionally assigned **mission** and **expertise**." |

The court thus applies these four touchstones in its clear congressional authority analysis.

19

-App. 520-

SAVE Plan creates "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years[.]"  20 U.S.C. § 1087e(d)(1)(D).  While it's plausible to interpret the SAVE Plan to comply with the statute, plausibility won't suffice.  Take, for example, "not to exceed 25 years[.]"  *Id.*  Recall that the SAVE Plan limits some borrowers' repayment window to 10 years.  To be sure, 10 years of repayments doesn't exceed 25.  And the Secretary's discretion to set a repayment time window is constrained by the phrase "*extended period of time[.]*"  20 U.S.C. § 1087e(d)(1)(D) (emphasis added).  But defendants' plausible textual basis doesn't rise to the level of "clear."  The statute sets a clear ceiling, but not a clear floor.  That is why the statute's language is, at most, a "subtle device[]" and so, it can't support an "[e]xtraordinary grant[] of regulatory authority[.]"  *West Virginia v. EPA*, 597 U.S. at 723 (internal quotation marks and citation omitted).  Without a clear floor—only a plausible floor and a "subtle device"—the court can't find clear congressional authorization for the SAVE Plan.

*Second*, the court asks whether the SAVE Plan is "an 'enormous and transformative expansion in regulatory authority without clear congressional authorization.'"  *Bradford*, 101 F.4th at 726 (ellipsis omitted) (quoting *Utility Air*, 573 U.S. at 324).  In *Utility Air*, summarized above, the Supreme Court struck down the EPA's interpretation of the term "air pollutant" because—though plausible—the interpretation gave the EPA "unheralded power to regulate a significant portion of the American economy[.]"  573 U.S. at 324 (citation and internal quotation marks omitted).

Here, defendants estimate the SAVE Plan will cost $156 billion over 10 years.  88 Fed. Reg. at 43,820.  But, when defendants calculated that number, they assumed the Supreme Court would uphold the HEROES Act loan forgiveness.  The Supreme Court invalidated the HEROES

Act loan forgiveness in *Biden v. Nebraska*, and none of those loans were cancelled.  And that has

significant implications for the SAVE Plan's cost.  Plaintiffs proffer a new SAVE Plan cost

estimate that accounts for *Biden v. Nebraska*, and that cost is $475 billion over ten years.  Doc.

24 at 23 (citing Penn Wharton, *Biden's New Income-Driven Repayment ("SAVE") Plan:*

*Budgetary Cost Estimate Update*, University of Pennsylvania (July 17, 2023),

https://budgetmodel.wharton.upenn.edu/issues/2023/7/17/biden-income-driven-repayment-

budget-update).  As points of reference, the REPAYE Plan cost an estimated $15.4 billion.  80

Fed. Reg. at 67,225.  This difference—$475 billion versus $15.4 billion—expands agency

authority to such an extent that it alters it.[6]  So, the court concludes that the SAVE Plan

represents "an 'enormous and transformative expansion in regulatory authority without clear

congressional authorization.'"  *Bradford*, 101 F.4th at 726 (ellipsis omitted) (quoting *Utility Air*,

573 U.S. at 324).

---

[6]     The court recognizes that this second *Bradford* touchstone seems to overlap with step one of the
MQD analysis.  The court differentiates between the two this way:  step one of the MQD analysis asks
about the sheer size of the regulatory action—*i.e.*, is it one of huge economic and political significance?
The second *Bradford* touchstone asks, in contrast, not only whether the regulatory action is enormous but,
crucially, whether the regulatory action is *transformative*.  This requires the court's context analysis to
look back at the agency's previous actions and compare them to the challenged action.

   Justice Barrett provided a helpful example in her *Biden v. Nebraska* concurrence, where she
explained the importance of context:

> [I]magine a grocer instructs a clerk to "go to the orchard and buy apples for the store."
> Though this grant of apple-purchasing authority sounds unqualified, a reasonable clerk
> would know that there are limits.  For example, if the grocer usually keeps 200 apples on
> hand, the clerk does not have actual authority to buy 1,000—the grocer would have spoken
> more directly if she meant to authorize such an out-of-the-ordinary purchase.

143 S. Ct. at 513 (Barrett, J., concurring).  So, comparing prior apple orders to the existing apple orders
provided important context.  And the court must look for "out-of-the-ordinary" grants of authority.  All
this is to say:  the sheer cost of the SAVE Plan is relevant to MQD step one; the cost of the SAVE Plan
compared to the cost of the REPAYE Plan is relevant to *Bradford*'s second touchstone.

Beyond cost, the SAVE Plan is a transformative expansion in regulatory authority in another important way: it represents the first time the Secretary has gone beyond the number set by Congress. Recall that Congress modified the laws for income-based repayment programs in 2010. Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 2213, 124 Stat. 1029, 1081 (2010) (codified at 20 U.S.C. § 1098e(e)). For borrowers who had taken out a loan on or after July 1, 2014, Congress lowered the cap on payments for IBR plans to 10%—down from 15%. 20 U.S.C. § 1098e(e)(1). And for those same borrowers, Congress reduced the maximum repayment window to 20 years—down from 25 years. *Id.* § 1098e(e)(2). In 2015, the REPAYE Plan took these numbers—10% instead of 15% and 20 years instead of 25 years—and applied them to eligible loans taken out before July 2014.[7] Putting it another way, the REPAYE Plan took Congress's generosity with income-based repayment plans from § 1098e(e) and applied that generosity to some income-driven repayment plans. So, the REPAYE Plan took Congressionally-blessed numbers and applied them more broadly.

Not so here. Both the monthly payment cap and the payment period limitation overreach any generosity Congress has authorized before. Here, the SAVE Plan caps a borrower's monthly payment amount at 5% of the borrower's income above 225% of the applicable federal poverty guideline. Congress has gone as low as 10%, but it's never gone as low as 5%. The SAVE Plan also cancels the remaining balance after the borrower has made 120 monthly payments for borrowers whose original principal balance was $12,000 or less. Congress has gone as low as 20 years, but it's never gone as low as 10 years. Because the Final Rule goes beyond Congress's limits—for the first time—the SAVE Plan is a "'transformative expansion in regulatory authority

---

[7]    Borrowers with graduate debt were excepted. The REPAYE Plan still required those borrowers to pay for 25 years.

without clear congressional authorization.'" *Bradford*, 101 F.4th at 726 (ellipsis omitted) (quoting *Utility Air*, 573 U.S. at 324).

*Third*, the court asks whether the Secretary is "claim[ing] to discover regulatory authority for the first time in a long-extant statute." *Id.* at 726–27 (citation and internal quotation marks omitted). This *Bradford* touchstone favors defendants. The Secretary has used its HEA authority three times before: to create the first income-contingent repayment plan, to create the PAYE Plan, and to create the REPAYE Plan.

*Last*, the court considers whether the Department of Education "lacks 'expertise' in the relevant area of policymaking." *Id.* at 728. That is not the case here. The current record demonstrates that the Department of Education has a great deal of expertise in the area of student loans. This final touchstone also favors defendants.

In sum, two of the touchstones guiding the MQD favor plaintiffs. Two favor defendants. But this calculus doesn't produce a dead heat. That's so because one of the touchstones favors plaintiffs so compellingly that it overpowers the others. It's the second factor: whether the SAVE Plan represents "an enormous and transformative expansion in statutory authority without clear congressional authorization." *Bradford*, 101 F.4th at 726 (quotation cleaned up). Unquestionably it does.

The record here contains just one estimate of the price tag for the SAVE Plan's forgiveness: $475 billion, over ten years. *Biden v. Nebraska* reported the total value of all outstanding federal student loans at $1.6 trillion. 143 S. Ct. at 2362. So, the SAVE Plan forgives nearly one-third of all student loan debt. And while this $1.6 trillion figure is a 2022 number—the record here doesn't contain a current figure—the court has no doubt that $475 billion in forgiveness qualifies as "enormous" and a "transformative expansion." *Bradford*, 101

23

F.4th at 726 (quotation cleaned up).  Indeed, the SAVE Plan's forgiveness towers over earlier iterations.  For instance, the REPAYE Plan cost $15.4 billion.

This unprecedented and dramatic expansion shifts the overall balance of *Bradford*'s four touchstones in favor of plaintiffs.  The court finds that plaintiffs are likely to prevail on the first of their statutory claims, *i.e.*, that the SAVE Plan exceeds the Secretary's authority under the HEA.  The court so finds even though defendants have mustered a plausible construction suggesting that Congress conferred such authority.  But they haven't assembled what *Biden v. Nebraska* and the MQD require:  a clear showing of such authority.  The court thus concludes that plaintiffs are likely to prevail on the merits of their bellwether claim.

Next, the court analyzes the second preliminary injunction factor.

## B.      Irreparable Harm

At the hearing on this motion, plaintiffs emphasized that the SAVE Plan will cause irreparable harm to their public instrumentalities.  A "plaintiff satisfies the irreparable harm requirement by demonstrating 'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'"  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)).  According to plaintiffs, their public instrumentalities hold FFEL loans, and the SAVE Plan incentivizes student loan borrowers to consolidate their loans away from FFEL loans.  And, according to plaintiffs, borrowers already have consolidated their loans, seeking to reap the benefits of the SAVE Plan.  Once a borrower consolidates an FFEL loan, that loan is gone, depriving the public instrumentalities of interest income.  And plaintiffs can't recover money damages from defendants due to sovereign immunity.  So, plaintiffs argue, they've suffered an irreparable harm.

24

As an initial matter, the court must reiterate its concerns about plaintiffs' evidence of the harms to their public instrumentalities.  As mentioned in the Memorandum and Order deciding defendants' Motion to Dismiss, South Carolina's evidence about its public instrumentality doesn't demonstrate that the SAVE Plan is leading to FFEL loan consolidation, nor does it show that FFEL loan consolidation leads to decreased interest revenue.  Doc. 68 at 18–20.  And Texas's evidence merely shows that—*assuming* borrowers consolidate their loans—loan consolidation will cause revenue loss to Texas's public instrumentality *in the future*.  *See* Doc. 53-7 at 2 (Keyton Decl. ¶ 4) ("*To the extent that* federal policy results in borrowers consolidating their loans out of FFELP into the Direct Loan Program, those consolidations will cause the State of Texas to lose revenue." (emphasis added)).  Only Alaska's evidence adduces evidence of a *current* harm to its public instrumentality.  *See* Doc. 53-8 at 3 (Efird Decl. ¶ 9) ("[T]he enticed consolidation has already harmed and will continue to harm ASLC[.]").  So, plaintiffs' theories of irreparable harm aren't all that substantial.

Defendants argue that plaintiffs' delay in seeking a preliminary injunction further undermines their claims of irreparable harm.  To evaluate this argument, the court divides its analysis of plaintiffs' irreparable harm in two:  (i) irreparable harm from the SAVE Plan provisions already in effect and (ii) irreparable harm from the SAVE Plan provisions set to go into effect on July 1.

### 1.    Plaintiffs Have Failed to Show an Irreparable Harm from SAVE Plan Provisions Already in Effect.

Defendants point out that the Secretary published the Final Rule in July 2023—nine months before plaintiffs filed suit in March 2024.  A party's "delay in seeking preliminary relief cuts against finding irreparable injury."  *RoDa Drilling*, 552 F.3d at 1211 (citation and internal quotation marks omitted).  In response, plaintiffs emphasize that the Final Rule is scheduled to

go into effect on July 1, 2024. For that reason, plaintiffs argue, they didn't delay their suit at all. But plaintiffs' argument misses an important point: parts of the SAVE Plan already took effect in February 2024, and plaintiffs didn't file their lawsuit until March 28, 2024.[8]  Doc. 1.

Specifically, two provisions of the SAVE Plan already are in effect: (i) the increase in the discretionary income line from 150% to 225% of the federal poverty line and (ii) the shorter path to forgiveness for borrowers who took out small loans—*i.e.*, ten years of payments for a borrower who took out $12,000 or less. Indeed, plaintiffs' First Amended Complaint confirms that the Department began implementing the rule in February. Doc. 57 at 3 (1st Am. Compl.). The Secretary implemented this outcome by using his authority to designate provisions for early implementation—authority plaintiffs don't challenge here. And defendants published advance warning that they would implement these provisions early. When the Final Rule was published on July 23, 2023, it specifically tagged the increase to 225% of the federal poverty line for early implementation. 88 Fed. Reg. at 43,821. And, according to defendants, they announced early implementation of forgiveness for borrowers with low original balances a month in advance. All of this is to ask why: if these parts of the SAVE Plan promised an irreparable harm to plaintiffs, why didn't they move to enjoin the SAVE Plan *before* they took effect?

Plaintiffs attributed the delay to their need to gather data on FFEL loan consolidation. Otherwise, they reason, they would've had to rely on speculative, insufficient harm. The court isn't persuaded. Plaintiffs didn't include any allegations about FFEL loan consolidation when

---

[8]      Defendants argue that the SAVE Plan is severable. So, defendants assert, "to the extent the Court concludes that only some portions of the Rule are unlawful . . . [the court] should still decline Plaintiffs' invitation to enjoin the Rule in its entirety." Doc. 47 at 57. Plaintiffs' brief never responds to this argument. Plaintiffs argued against severability at the court's hearing on this motion, but the court considers this argument waived. *Murphy v. City of Tulsa*, 950 F.3d 641, 645 n.4 (10th Cir. 2019) ("'[A]rguments made for the first time at oral argument are waived.'" (quoting *Ross v. Univ. of Tulsa*, 859 F.3d 1280, 1294 (10th Cir. 2017))).

they filed their Complaint.  *See generally* Doc. 1.  Plaintiffs' original Complaint alleged

Louisiana has a state instrumentality that would suffer irreparable harm from the SAVE Plan

"because broader loan cancellation under the SAVE plan would decrease demand for its

services."  Doc. 1 at 21 (Compl. ¶¶ 108– 11).  Plaintiffs didn't assert their FFEL loan

consolidation theory for plaintiffs South Carolina, Texas, and Alaska until May 10, 2024.  Doc.

50.  And plaintiffs ultimately abandoned their theory based on harm to Louisiana's public

instrumentality.  So, if plaintiffs delayed filing this lawsuit to gather information about FFEL

loan consolidations to supply factual assertions in their declarations, that information didn't

actually find its way into the March 2024 Complaint.  The court declines to excuse plaintiffs'

delay on this basis.

Nor does the court credit plaintiffs' assertion that they needed time to develop their tax

revenue theory of harm.  Here's an overview of plaintiffs' tax revenue theory:  nine states tie

their definition of taxable income to the federal definition of income or adjusted gross income.

Doc. 57 at 17 (1st Am. Compl. ¶ 90).  And the federal tax code defines taxable income to include

student loan forgiveness granted under income-driven repayment plans.  But the American

Rescue Plan Act of 2021 provides that all student loan forgiveness won't "count toward the

federal definition of taxable income until December 31, 2025."  Doc. 57 at 17 (1st Am. Compl.

¶ 89).  So, the states can't tax student loan debt forgiveness income until 2026.  Plaintiffs alleged

the Final Rule "will reduce income tax revenue by decreasing the amount of outstanding student

loan debt."  Doc. 57 at 18 (1st Am. Compl. ¶ 96).  This is so, they say, because the "Final Rule

accelerates the timeline for cancelation on income-driven repayment plans to as low as 10 years

for certain loan balances."  *Id.* (1st Am. Compl. ¶ 92).  Under the old version of the rule, the

federal government wouldn't forgive these loans for 20 to 25 years.  So, plaintiffs allege, "but for

the Final Rule, significant amounts of federal loan cancellation would occur *after* December 31, 2025" for residents of the relevant states.  *Id.* (1st Am. Compl. ¶ 95) (emphasis in original).  In this but-for world, the relevant states would have more student loan forgiveness income to tax. *Id.*  The challenged Final Rule, in contrast, "shift[s] forward some debt forgiveness that would otherwise occur in a period in which it would be taxable income . . . into a period where it is not taxable[.]"  *Id.* (1st Am. Compl. ¶ 96).

Plaintiffs assert that they delayed filing suit so that this tax revenue theory of harm could coalesce and thus become less speculative.  The court isn't convinced.  All pieces of this tax revenue theory—the states' income tax definition, the American Rescue Plan, and the SAVE Plan's shift in forgiveness—were present long before plaintiffs filed their Complaint in March 2024.

Plaintiffs thus have failed to proffer a reasonable explanation for the delay.  "'[D]elay is an important consideration in the assessment of irreparable harm for purposes of a preliminary injunction.'"  *Mont. Wyo. State Area Conf. of NAACP v. U.S. Election Integrity Plan*, No. 22-cv-00581, 2022 WL 1061906, at *5 (D. Colo. Apr. 8, 2022) (collecting cases) (quoting *GTE Corp.*, 731 F.2d at 679); *see also* 11A Mary Kay Kane et al., *Federal Practice & Procedure* § 2948.1 (3d ed. 2024) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.").  The court is not impressed by plaintiffs' timing.  The delay—combined with plaintiffs' abstractions about harm—fail to establish an irreparable harm.  The court thus concludes that plaintiffs haven't demonstrated irreparable harm attributable to the parts of the SAVE Plan already in effect.

28

## 2.   Plaintiffs Have Shown an Irreparable Harm from the SAVE Plan Provisions Not Yet in Effect.

The court reaches a different conclusion for the parts of the SAVE Plan that have yet to go into effect.  Plaintiffs haven't delayed their lawsuit challenging the SAVE Plan's unimplemented parts, so their delay doesn't prevent a finding of irreparable harm.  And plaintiffs correctly point out that their harms are "irrecoverable."  Doc. 24 at 29.  That is so because the sovereign immunity bars plaintiffs from recovering monetary damages from the federal government.  *See Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994) ("Because the Eleventh Amendment bars a legal remedy in damages, and the court concluded no adequate state administrative remedy existed, the court held that plaintiffs' injury was irreparable.  We agree.").

Plaintiffs also point out that "[o]ne cannot unscramble this egg; loan forgiveness has an 'irreversible impact.'"  Doc. 24 at 29 (quoting *Nebraska v. Biden*, 52 F.4th 1044, 1047 (8th Cir. 2022)).  Indeed, before the case reached the Supreme Court, the Eighth Circuit concluded that the HEROES Act student loan forgiveness posed irreparable harm "considering the irreversible impact the Secretary's debt forgiveness action would have[.]"[9]  *Nebraska v. Biden*, 52 F.4th at

---

[9]     *Nebraska v. Biden* provides more support for differentiating between parts of the SAVE Plan already in effect and those parts set to go into effect on July 1.  In that case, the Eighth Circuit enjoined the HEROES Act student loan forgiveness before it went into effect.  The Circuit explained,

> the equities strongly favor an injunction considering the irreversible impact the Secretary's debt forgiveness would have as compared to the lack of harm an injunction would presently impose.  Among the considerations is the fact that collection of student loan payments as well as accrual of interest on student loans have both been suspended.

*Nebraska v. Biden*, 52 F.4th at 1047–48.  Not so here—the SAVE Plan is far from suspended.  Plaintiffs ask the court to enjoin defendants "from implementing or acting pursuant to the Final Rule[.]"  Doc. 23 at 1.  Yet they acknowledge that the Department already has "unilaterally erased the debt of 153,000 borrowers."  Doc. 57 at 3 (1st Am. Compl.).  And, as plaintiffs elegantly phrase it, "[o]ne cannot unscramble this egg; loan forgiveness has an irreversible impact."  Doc. 24 at 29 (quotation cleaned up).  As explained below, when considering the scope of the preliminary injunction, plaintiffs' failure to take

29

1047.  The court thus concludes that plaintiffs have shown an irreparable harm if the SAVE Plan is allowed to take full effect on July 1, 2024.

### C.      Public Interest

As the final merged factor in the preliminary injunction analysis, the court must examine whether plaintiffs have shown that their "threatened injury outweighs the harms that the preliminary injunction will cause the government or that the injunction, if issued, will not adversely affect the public interest."  *Aposhian*, 958 F.3d at 990.  Plaintiffs argue they've satisfied this standard because they face harm to their public instrumentalities and defendants "have no interest in enforcing a rule that completely bypasses constitutional separation of powers principles."  Doc. 24 at 30.  Defendants respond that the SAVE Plan serves the public interest because it solves a long list of harms:  student loan defaults and delinquencies; adverse effects on credit scores; decreased liquidity for large purchases; decreased enrollment in higher education; drags on national growth; and increased reliance on federal welfare programs.  Doc. 47 at 54.  How to weigh these competing interests?

The Supreme Court's decision in *National Federation of Independent Business v. Department of Labor, Occupational Safety & Health Administration*, 595 U.S. 109 (2022), is helpful here.  It involved a challenge to OSHA's COVID-19 vaccine mandate.  *Id.* at 112–13.  Several entities filed petitions for review and moved for a stay pending judicial review[10] of OSHA's mandate.  *Id.* at 113.

---

into account the loan forgiveness already in effect makes their proposed injunction unworkable.  *See below*, § III.D.2.

[10]      Of course, a stay pending judicial review is a different procedural creature than a preliminary injunction.  *Compare* Fed. R. Civ. P. 62, *and* Fed. R. App. P. 8(a), *with* Fed. R. Civ. P. 65.  But the standard governing a stay still requires the court to weigh the public interest.  The stay factors include:

Petitioners maintained "that OSHA's mandate w[ould] force them to incur billions of dollars in unrecoverable compliance costs and w[ould] cause hundreds of thousands of employees to leave their jobs." *Id.* The federal government countered "that the mandate w[ould] save over 6,500 lives and prevent hundreds of thousands of hospitalizations." *Id.* at 120. The Court declined to compare the two: "It is not our role to weigh such tradeoffs." *Id.* And the Court emphasized that Congress hadn't given OSHA the power it sought to exercise. *Id.* The Court thus agreed with petitioners that they were entitled to a stay, because, among other things, the Court concluded the "equities do not justify withholding interim relief."

The court can't weigh the tradeoffs here either. A layperson might wonder how Alaska's relatively meager harm—$100,000 in lost FFEL loan interest over two years—can justify blocking millions of student loan borrowers nationwide from getting billions in debt relief. But in "our system of government," weighing these tradeoffs "is the responsibility of those chosen by the people through democratic processes." *Id.* In the court's view, Congress—a branch of government elected by the people—didn't delegate to the Secretary clear power to enact the SAVE Plan. The equities thus favor a preliminary injunction of some sort. But what sort of injunction do they favor? That's a more daunting question, and the court takes it up next.

---

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The Supreme Court applied this standard in *National Federation of Independent Businesses*, which means that it had to evaluate the public interest and balance the equities. 595 U.S. at 120. So, even though *National Federation of Independent Businesses* occupied a different procedural posture and thus applied a different procedural standard, the Supreme Court still weighed the public interest—exactly what the court must do here.

31

D.      **Scope of Relief**

Having concluded that plaintiffs have shouldered their burden under the preliminary injunction standard, the court must fashion an injunction with an appropriate scope. Rule 65(d)(1)(C) requires the court to "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." The Supreme Court has emphasized that "the specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (citation omitted).

Plaintiffs' Motion for Preliminary Injunction requests two forms of injunctive relief. *One*, it asks the court to enjoin defendants "their agents, employees, and attorneys from implementing or acting pursuant to the Final Rule[.]" Doc. 23 at 1. And *two*, it seeks to enjoin defendants "from undertaking any form of student debt relief not expressly authorized by Congress." *Id.* The court begins with plaintiffs' second request.

This vague request—asking the court to enjoin defendants from undertaking any form of unlawful debt relief—is not helpful. Indeed, plaintiffs never mention it in their supporting briefs. *See generally* Doc. 24; Doc. 50. Our Circuit has held that "injunctions simply requiring the defendant to obey the law are too vague" to enforce and they thus violate Fed. R. Civ. P. 65(d). *Keyes v. Sch Dist. No. 1, Denver, Colo.*, 895 F.2d 659, 668 (10th Cir. 1990); *see also* 11A Mary Kay Kane et al., *Federal Practice & Procedure* § 2955 (3d ed. 2024) ("[O]rders simply requiring defendants to 'obey the law' uniformly are found to violate the specificity requirement."). The court will not enter such a broad, unguided injunction. The court thus denies this part of plaintiffs' motion.

The court next evaluates plaintiffs' request that the court enjoin defendants from implementing the SAVE Plan. It divides this analysis into two considerations: whether to issue a nationwide injunction and whether to enjoin the SAVE Plan in its entirety. The analysis concludes by considering whether the court may enjoin the President of the United States, a defendant and a target of plaintiffs' motion.

### 1.    The Injunction Should Apply Nationwide.

Plaintiffs request a nationwide injunction.[11] The court must tread carefully here because a nationwide injunction risks an overbroad injunction. "Traditionally, when a federal court finds

---

[11]    The proper terminology for this request is unsettled. Some, like the parties here, use the term "nationwide injunction" because plaintiffs seek an injunction that applies nationwide. Others, like Justice Jackson and Justice Gorsuch, use the term "universal injunction." *See Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 936 (2024) (Jackson, J., dissenting) ("Idaho maintains that this case is certworthy because it raises the question of whether a district court can issue an injunction that grants relief directed to all potentially impacted parties—a so-called 'universal injunction.'"); *United States v. Texas*, 599 U.S. 670, 694 (2023) (Gorsuch, J., concurring) ("[T]he routine issuance of universal injunctions has proven unworkable, sowing chaos for litigants, the government, courts, and all those affected by these sometimes conflicting decrees." (citation, internal quotation marks, and brackets omitted)). Here, the court uses the parties' term—nationwide injunction.

    Plaintiffs' request for a nationwide injunction is a loaded one. Nationwide injunctions are the subject of much debate. Justice Gorsuch has questioned whether nationwide injunctions are consistent with separation of powers principles and Supreme Court precedent. *United States v. Texas*, 599 U.S. at 694–95 (Gorsuch, J., concurring) ("Universal injunctions continue to intrude on powers reserved for the elected branches."); *see also Labrador*, 144 S. Ct. at 926–27 (Gorsuch, J., concurring) (calling "universal" injunctions "a relatively new phenomenon" that "'virtually guarantee[] that a rising number of 'high-profile' cases will find their way to" the Supreme Court and lamenting that "universal injunction practice is almost by design a fast and furious business"). Justice Thomas shares the same concerns. *Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring) ("I am skeptical that district courts have the authority to enter universal injunctions. These injunctions did not emerge until a century and a half after the founding. And they appear to be inconsistent with longstanding limits on equitable relief and the power of Article III counts.").

    The debate rages outside the Supreme Court, too. "Some scholars, jurists, and attorneys criticize the practice of district courts issuing nationwide injunctions as an inappropriate abuse of power. Others defend nationwide injunctions as a powerful way to check federal agency overreach and ensure robust relief for plaintiffs." *District Court Reform: Nationwide Injunctions*, 137 Harv. L. Rev. 1701, 1702 (Apr. 2024).

    The court wades into this controversy reluctantly, and with caution.

a remedy merited, it provides party-specific relief, directing the defendant to take or not take some action relative to the plaintiff." *United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring).  In contrast, a nationwide injunction forbids a defendant from taking some action against *everyone*—not just plaintiffs.  With the gravity of this request in mind, the court briefly outlines the parties' arguments for and against a nationwide injunction.

Plaintiffs' First Amended Complaint asks the court to "set aside" the SAVE Plan.  Doc. 57 at 28, 30 (1st Am. Compl. ¶¶ 154, 173).  This language comes from the APA, which allows courts to "hold unlawful and set aside agency action[.]"  5 U.S.C. § 706(2).  Plaintiffs assert that when "'a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'"[12]  Doc. 24 at 31 (quoting *Harmon v. Thornburg*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)).  And when a court finds agency action unlawful, it often issues a nationwide injunction.  *See, e.g.*, *Texas v. United States*, 787 F.3d 733, 768–69 (5th Cir. 2015) (affirming district court's nationwide injunction of program benefitting undocumented immigrant parents of American citizens in suit where the state of Texas—and only Texas—had standing because there was "a substantial likelihood that a partial injunction would be ineffective because [program] beneficiaries would be free to move between states"); *Faust v. Vilsack*, 519 F. Supp. 3d 470, 478

---

[12]    The court acknowledges the controversial nature of this proposition—and, indeed, other propositions throughout this Order:

> Courts have supposed that the APA's instruction to "set aside" agency action authorizes vacatur.  There are, however, good reasons to conclude that "set aside," properly understood, merely instructs a court to ignore an illegal agency action for the purpose of resolving the case before it—much like a court ignores (rather than vacates or erases) an unconstitutional statute when resolving a case.  At oral argument, the Chief Justice responded to this rather shocking assault on a long accepted, foundational aspect of judicial control of agency action with an understated "[w]ow."

33 Richard Murphy et al., *Federal Practice & Procedure* § 8381 (2d ed. 2024).

(E.D. Wisc. 2021) (applying "universal" injunction to Department of Agriculture program forgiving debts of Black farmers); *Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 384–85, 397–98 (M.D.N.C. 2019) (issuing nationwide injunction against U.S. Citizenship and Immigration Services' policy memorandum changing USCIS policy on calculating unlawful presence under the Immigration and Nationality Act); *Texas v. United States*, 201 F. Supp. 3d 810, 815–16, 836 (N.D. Tex. 2016) (applying nationwide injunction to federal policy requiring that "all persons must be afforded the opportunity to have access to restrooms, locker rooms, showers, and other intimate facilities which match their gender identity rather than their biological sex").

In support of their nationwide injunction, plaintiffs also invoke the Eighth Circuit's opinion in *Nebraska v. Biden*, 52 F.4th 1044 (8th Cir. 2022). This decision became the ruling reviewed by the Supreme Court in *Biden v. Nebraska*. The Eighth Circuit reversed a district court's decision denying a preliminary injunction against loan forgiveness based on the HEROES Act. *Nebraska v. Biden*, 52 F.4th at 1045–46, *rev'g* 636 F. Supp. 3d 991 (E.D. Mo. 2022). The Eighth Circuit then granted a preliminary injunction pending appeal, concluding, after "balancing the equities," that "the merits of the appeal before this court involve substantial questions of law which remain to be resolved, but the equities strongly favor an injunction considering the irreversible impact the Secretary's debt forgiveness action would have as compared to the lack of harm an injunction would presently impose." *Id.* at 1047 (citation and internal quotation marks omitted). The Circuit thus imposed the requested injunction pending future orders by that court or the Supreme Court. *Id.* at 1048.

The President and his fellow defendants quickly petitioned the Supreme Court, asking it to vacate the injunction entered by the Eighth Circuit. The Court declined in a Memorandum

Decision issued by Justice Kavanaugh.  *Biden v. Nebraska*, 143 S. Ct. 477 (2022) (Mem.).  The Justice's Memorandum Decision elected to treat the application to vacate the injunction as also amounting to a petition for a writ of certiorari before judgment.  *Id.*  The Court granted that request.  *Id.*  And ultimately, of course, the Supreme Court's decision on the merits held for plaintiffs.  The Court thus reversed the "judgment of the Eastern District of Missouri" and denied as moot defendants' "application to vacate the Eighth Circuit's injunction[.]"  *Biden v. Nebraska*, 143 S. Ct. at 2376.

This series of appellate decisions embraced the proposition that the HEROES Act student loan forgiveness program required a nationwide injunction.  *Id.* at 1048.  The Circuit explained that "an injunction limited to the plaintiff States, or even more broadly to student loans affecting the States, would be impractical and would fail to provide complete relief to the plaintiffs."  *Id.*  The Circuit emphasized that MOHELA—Missouri's public instrumentality that conferred standing on the state of Missouri because of impending harm to MOHELA's service fees—was "purportedly one of the largest nonprofit student loan secondary markets in America."  *Id.*  Because of "MOHELA's national role in servicing accounts," the Eighth Circuit could "discern no workable path in this emergency posture for narrowing the scope of relief."  *Id.*  Plaintiffs ask the court to apply the same analysis here and reach the same result.

Defendants, for their part, Doc. 46 at 55, emphasize the Supreme Court's bedrock principle "that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs[,]" *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  And defendants emphasize two things.  The Eighth Circuit's decision doesn't control our court.  And the Supreme Court's decision never addressed the propriety of a nationwide injunction.  *Biden v. Nebraska*, 143 S. Ct. at 2355.  They're right about the first part.  Eighth Circuit

decisions aren't binding precedent here. But the court's not so sure about defendants' second point. The Eighth Circuit plainly enjoined the Secretary from implementing his "debt forgiveness action." *Nebraska v. Biden*, 52 F.4th at 1047. And the Supreme Court explicitly reversed the district court's decision denying an injunction. *Biden v. Nebraska*, 143 S. Ct. at 2376.

Defendants also emphasize that the Eighth Circuit relied on MOHELA's national role in finding a preliminary injunction necessary, and plaintiffs haven't proffered any evidence that their public instrumentalities play a similarly important national role. Defendants are right about that point, too. But ultimately, defendants' arguments can't carry the day.

The court concludes that it must issue a nationwide injunction. A broad rule, like the SAVE Plan, requires a broad injunction, given the compelling need for nationwide uniformity in the Department's administration of student loan programs. *See Nebraska v. Biden*, 52 F.4th at 1048 (worrying that "tailoring an injunction to address the alleged harms to the remaining States would entail delving into complex issues and contested facts that would make any limits uncertain in their application and effectiveness"). Also, a limited injunction like the one defendants promote would stand the court's conclusion here on its head. Imagine the scenario advanced by defendants. In it, the court would confine its injunction to the three states with standing to sue. This scenario would free the Secretary to implement the SAVE Plan in the other 47 states. Thus, the Secretary could grant loan forgiveness to students under a regulation that the Secretary—under this court's conclusion, at least—lacked legal authority to promulgate. Defendants have articulated no good reason why student debtors in 47 states should do better than those in the three plaintiff states with standing to sue. And the court can imagine no such reason.

## 2.    The Court Doesn't Enjoin the SAVE Plan in its Entirety.

The court has concluded that a nationwide injunction should issue, and now it must decide what the injunction should, well, enjoin.  Plaintiffs move the court "for a Preliminary Injunction enjoining Defendants . . . , their agents, employees, and attorneys from implementing or acting pursuant to the Final Rule[.]"  Doc. 23 at 1.  But as discussed already, there's a problem with this request:  defendants already have implemented parts of the SAVE Plan.  Plaintiffs' papers fail to account for this reality.[13]  And so plaintiffs have failed to present the court with any meaningful direction—*i.e.*, what a preliminary injunction undoing the already-active parts of the SAVE Plan would look like.  This presents a formidable problem for the court.

Plaintiffs' First Amended Complaint explicitly mentions that defendants "unilaterally erased the debt of 153,000 borrowers" in February 2024.  Doc. 57 at 3 (1st Am. Compl.).  To enjoin the entire SAVE Plan thus would require defendants to unwind those actions, modifying the status quo.  To be sure, usually, the "status quo refers to the last peaceable uncontested status existing between the parties before the dispute developed."  *Am. Civil Liberties Union of Kan. and W. Mo. v. Praeger*, 815 F. Supp. 2d 1204, 1208 (D. Kan. 2011) (citing *Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 n.5 (10th Cir. 2006)).  But by this point, the SAVE Plan has been in effect for months.  *See Louisiana ex rel. Landry v. Biden*, No. 22-30087, 2022 WL 866282, at *3 (5th Cir. Mar. 16, 2022) ("The Interim Estimates were published in February 2021.  This lawsuit was filed in April 2021.  The Plaintiff States moved for a preliminary injunction in July 2021.  And the preliminary injunction was entered in February 2022.  By the time the

---

[13]    Plaintiffs' briefing devotes most of its requested relief to arguing that any injunction should apply nationwide.  *See* Doc. 24 at 31–32; Doc. 50 at 27–28.  And when arguing about their delay in bringing suit, plaintiffs emphasize that they brought suit before the Final Rule's July 2024 effective date, without acknowledging that parts of the Final Rule already have taken effect.  Doc. 50 at 27.  Their approach grossly oversimplifies the state of play.

preliminary injunction was entered, the Interim Estimates had been in place for one year.  The status quo at this point is the continued use of the Interim Estimates.").  And plaintiffs never dispute that defendants gave them explicit advance warning of their early implementation of the SAVE Plan.

The court thus declines to enjoin the parts of the SAVE Plan defendants already have implemented.  "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579–80 (2017).  The "court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." *Id.* at 580 (citation and internal quotation marks omitted). The equities of this case simply don't favor unwinding the parts of the SAVE Plan that defendants already have implemented.  Plaintiffs waited until defendants already had done so to bring suit.  And, because of this delay, plaintiffs have failed to show an irreparable injury from the parts of the SAVE Plan already in effect that a preliminary injunction could forestall.  *See above* § III.B.

Even without the delay, the court would decline to enjoin the entire SAVE Plan because plaintiffs have failed to present a workable injunction.  Plaintiffs ask for an injunction barring defendants "from implementing or acting pursuant to the Final Rule[.]"  Doc. 23 at 1.  But defendants already have "implement[ed]" a part of the Final Rule and "act[ed] pursuant to the Final Rule[.]"  *Id.*  Defendants have persuaded the court that, at this point, a preliminary injunction that would enjoin the entire SAVE Plan would create pointless uncertainty.  Such a disruptive preliminary injunction is disfavored, and the court won't enter one here.  *RoDa Drilling*, 552 F.3d at 1208 n.3 ("Certain types of preliminary injunctions are disfavored:  (1)

preliminary injunctions that alter the status quo, (2) mandatory preliminary injunctions, and (3) preliminary injunctions that give the movant all the relief it would be entitled to if it prevailed in a full trial." (citation omitted)).  This outcome may not qualify as a perfect one.  But it's the best one the court can craft based on the information supplied to date.

The court thus will enter a preliminary injunction that forbids defendants from implementing the parts of the Final Rule set to take effect on July 1, 2024.  Such a preliminary injunction will "preserve the relative positions of the parties until a trial on the merits can be held." *Camenisch*, 451 U.S. at 395.

### 3.      The Court Lacks Jurisdiction Over the President.

Defendants assert that this court lacks authority to enjoin the President, whom plaintiffs have named as a defendant.  Doc. 47 at 58–59.  They're right.  "With regard to the President, courts do not have jurisdiction to enjoin him . . . and have never submitted the President to declaratory relief[.]" *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (first citing *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866), then citing *Franklin v. Massachusetts*, 505 U.S. 788, 827–28 (1992)).  Plaintiffs never dispute this proposition.  *See generally* Doc. 50.  The court thus dismisses the President of the United States as a party defendant in this action.  The court also directs the Clerk to recaption the case so that it doesn't portray the President as a defendant.

## IV.      Conclusion and Next Steps

The courts grants in part and denies in part plaintiffs' Motion for Preliminary Injunction (Doc. 23).  The court will enter the following preliminary injunction:  Defendants United States Department of Education and United States Secretary of Education Miguel Cardona, and their agents, employees, and attorneys, are enjoined from implementing or acting pursuant to the parts of Final Rule—promulgated by the Department of Education titled "Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family

Education Loan (FFEL) Program," 88 Fed. Reg. 43,820—set to become effective on July 1, 2024.[14]

The court is mindful of the gravity of this ruling. Drawing the legal conclusions leading to it required the court to apply a developing legal doctrine to complex legislative and regulatory terrain. And all on a limited evidentiary record.

The court is equally mindful that human infallibility is what it is. It thus temporarily stays the effective date of this Preliminary Injunction to permit the parties to seek any appellate relief they deem appropriate. *See, e.g.*, *Fish v. Kobach*, 189 F. Supp. 3d 1107, 1152 (D. Kan. 2016) (staying preliminary injunction for 14 days to give parties time to appeal). Absent further order by this court or any reviewing court, this court's injunction will take effect at ten o'clock p.m. Central Daylight Time on June 30, 2024.

As a final note, the court emphasizes that any decision about a preliminary injunction is just that: preliminary. Given the importance of the issues in this case, the court orders the parties immediately to confer and seek a scheduling conference with United States Magistrate Judge Angel D. Mitchell. The court orders the parties to formulate and present to Judge Mitchell a schedule that will enable the court to reach a final decision (including a trial on the merits, if one is required) as soon as practicable.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' Motion for Preliminary Injunction (Doc. 23) is granted in part and denied in part, as set forth in full in this Order.

---

[14]     To comply with the separate document rule, the court will enter plaintiffs' preliminary injunction separately. *MillerCoors LLC v. Anheuser-Busch Cos.*, 940 F.3d 922, 923 (7th Cir. 2019) (remanding for district court to enter preliminary injunction on separate document); *Beukema's Petrol. Co. v. Admiral Petrol. Co.*, 613 F.2d 626, 627 (6th Cir. 1979) ("[I]t appears to the court that the express provisions of Rule 58 for entry of judgment on a separate document applies not only to final judgments in the ordinary sense but also to preliminary injunctions entered pursuant to Rule 65[.]").

**IT IS FURTHER ORDERED THAT** defendants United States Department of Education and United States Secretary of Education Miguel Cardona, and their agents, employees, and attorneys, are enjoined from implementing or acting pursuant to the parts of Final Rule—promulgated by the Department of Education titled "Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program," 88 Fed. Reg. 43,820—set to become effective on July 1, 2024.

**IT IS FURTHER ORDERED THAT** the injunction will take effect at 10:00 PM Central Daylight Time on June 30, 2024.

**IT IS FURTHER ORDERED THAT** defendant Joseph R. Biden, in his official capacity as the President of the United States, is dismissed from the case for lack of jurisdiction.

**IT IS SO ORDERED.**

**Dated this 24th day of June, 2024, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

42

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**STATE OF ALASKA, et al.,**

                              **Plaintiffs,**                    **Case No. 24-1057-DDC-ADM**

**v.**

**UNITED STATES DEPARTMENT OF EObservation EDUCATION, et al.,**

                              **Defendants.**

## PRELIMINARY INJUNCTION

 **IT IS THEREFORE ORDERED BY THE COURT THAT** defendants United States Department of Education and United States Secretary of Education Miguel Cardona, and their agents, employees, and attorneys, are enjoined from implementing or acting pursuant to the parts of Final Rule—promulgated by the Department of Education titled "Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program," 88 Fed. Reg. 43,820—set to become effective on July 1, 2024.

 **IT IS SO ORDERED.**

 **Dated this 24th day of June, 2024, at Kansas City, Kansas.**

                              **s/ Daniel D. Crabtree_____**
                              **Daniel D. Crabtree**
                              **United States District Judge**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| STATE OF ALASKA, *et al.*, |  |
| Plaintiffs, |  |
| v. | Case No. 24-1057-DDC-ADM |
| MIGUEL A. CARDONA, in his official capacity as Secretary of Education, *et al.*, |  |
| Defendants. |  |

## <u>NOTICE OF APPEAL</u>

PLEASE TAKE NOTICE that all Defendants in this case hereby appeal to the United States Court of Appeals for the Tenth Circuit from this Court's June 24, 2024 Memorandum and Order (ECF No. 76) and Preliminary Injunction (ECF No. 77).

Dated: June 27, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Stephen M. Pezzi*
STEPHEN M. PEZZI (D.C. Bar No. 995500)
 Senior Trial Counsel
SIMON G. JEROME (D.C. Bar No. 1779245)
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION**

| | | |
|---|---|---|
| STATE OF ALASKA, et al., | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| DEPARTMENT OF EDUCATION, et al.; | § | Civil Action No. 6:24-cv-01057-DDC-ADM |
| | § | |
| *Defendants*. | § | |
| | § | |

<u>AMENDED NOTICE OF CROSS-APPEAL</u>

The States of Alaska, South Carolina, and Texas appeal from the district court's June 24, 2024, judgment (Dkt. 76) under 28 U.S.C. § 1292(a). This is a cross-appeal to Defendants notice of appeal filed June 27, 2024 (Dkt. 78).

Respectfully submitted,

<u>/s/ Abhishek S. Kambli</u>
Abhishek S. Kambli, Kan. SC No. 29788
*Deputy Attorney General*
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Email: abhishek.kambli@ag.ks.gov

*Counsel for the States of Alaska, South Carolina, and Texas*

CERTIFICATE OF SERVICE

I certify that on the eighth day of July 2024, a copy of the foregoing document was electronically filed on the CM/ECF system, which will automatically serve a Notice of Electronic Filing on all attorneys in this case.

/s/ *Abhishek S. Kambli*
Abhishek S. Kambli
Deputy Attorney General