# In the United States Court of Appeals for the Tenth Circuit

### STATES OF ALASKA, SOUTH CAROLINA, AND TEXAS,
Plaintiffs-Appellees / Cross-Appellants,

*v.*

### MIGUEL CARDONA, SECRETARY OF EDUCATION, ET AL.,
Defendants-Appellants / Cross-Appellees.

On Appeal from the United States District Court
for the District of Kansas
District Court Case No. 6:24-CV-01057-DDC-ADM (Judge Daniel D. Crabtree)

## PLAINTIFF STATES' RESPONSE AND OPENING CROSS-APPEAL BRIEF

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General
Aaron.Nielson@oag.texas.gov

LANORA PETTIT
Principal Deputy Solicitor General

JACOB C. BEACH
Assistant Solicitor General

Counsel for Texas

**ADDITIONAL COUNSEL IN SIGNATURE BLOCK**

**ORAL ARGUMENT NOT REQUESTED**

# Table of Contents

Page

Table of Authorities ............................................................................. iii

Statement of Related Appeals Pursuant to  Circuit Rule 28.2(C)(3) ...................... ix

Glossary ......................................................................................... x

Introduction ..................................................................................... 1

Statement of Jurisdiction ....................................................................... 3

Issues Presented ................................................................................. 4

Statement of the Case ........................................................................... 4

    I.   The Higher Education Act ................................................................ 4

    II.  The Administration's Plans to Cancel Student Debt ................................. 6

        A.  The HEROES Act Plan ............................................................. 6

        B.  The SAVE Plan ..................................................................... 7

    III. Procedural History .................................................................... 9

        A.  District Court ...................................................................... 9

        B.  Stay Proceedings .................................................................. 10

        C.  *Missouri v. Biden* ................................................................ 11

Summary of the Argument ...................................................................... 11

Standard of Review ............................................................................. 14

Argument ........................................................................................ 14

    I.   The States have Standing. ............................................................. 14

        A.  Defendants Misunderstand the Scope of the Injunction .................... 15

        B.  The States Enjoy Standing Based on Their Instrumentalities' Losses of Interest Income ................................................................. 17

        C.  South Carolina Has Standing Due to Lost Income Tax Revenue ................................................................................... 23

        D.  The States Also Enjoy Standing Because the SAVE Plan Injures Their Ability to Recruit and Retain Employees ..................... 24

    II.  The States are Likely to Succeed on the Merits. .................................... 26

        A.  The SAVE Plan Exceeds Defendants' Authority. ........................... 27

            1.   The Major Questions Doctrine Plainly Applies .......................... 27

i

       2.    HEA Does Not Supply Clear Congressional Authorization.........31

   B.   The Save Plan Also Violates the APA.................................................. 40

       1.    The Rule is Arbitrary and Capricious.......................................... 40

       2.    The Rule's 30-Day Notice Period Violated the APA .................. 43

III.  The District Court Properly Considered the Remaining Factors. ............ 45

   A.   The State Established Irreparable Harm............................................. 45

   B.   The District Court Properly Balanced the Equities. .......................... 46

   C.   The Scope of the Injunction is Far From Overbroad. ....................... 49

IV.  The District Court Erred in Not Enjoining the SAVE Plan in Its
Entirety...................................................................................................51

   A.   The District Court Should Have Enjoined the Redefinition of
Discretionary Income Prospectively. ...................................................51

   B.   The District Court Should Have Ordered Defendants to Stop
Applying the SAVE Plan to Borrowers Receiving Benefits
Before July 1, 2024. ............................................................................ 54

Conclusion .................................................................................................... 56

Statement Regarding Oral Argument................................................................ 57

Certificate of Compliance ................................................................................ 58

Certificate of Service....................................................................................... 58

# Table of Authorities

Page(s)

**Cases:**

*Adray v. Adry-Mart, Inc.*,
  76 F.3d 984 (9th Cir. 1995) .............................................. 47

*AICPA v. IRS*,
  804 F.3d 1193 (2015) ...............................................19, 20, 25

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
  594 U.S. 758 (2021)....................................................2, 16

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
  458 U.S. 592 (1982) ...................................................... 26

*AMG Cap. Mgmt., LLC v. FTC*,
  141 S.Ct. 1341 (2021)...................................................... 37

*Biden v. Nebraska*,
  143 S.Ct. 477 (2022)................................................... 38, 42

*Biden v. Nebraska*,
  600 U.S. 482 (2023).................................................*passim*

*Bradford v. Dep't of Labor*,
  101 F.4th 707 (10th Cir. 2024) ..........................................31

*Branch v. Smith*,
  538 U.S. 254 (2003) ...................................................... 35

*Burlington N. & Santa Fe Ry. Co. v. White*,
  548 U.S. 53 (2006) ...................................................... 35

*California v. Texas*,
  593 U.S. 659 (2021) ...................................................... 21

*Celli v. Shoell*,
  40 F.3d 324 (10th Cir. 1994) ............................................ 22

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
  601 U.S. 416 (2024) ...................................................... 38

*CFPB v. Gordon*,
  819 F.3d 1179 (9th Cir. 2016) .......................................... 50

*Citizens for Const. Integrity v. United States*,
  70 F.4th 1289 (10th Cir. 2023) ......................................... 41

*City of Portland v. EPA*,
  507 F.3d 706 (D.C. Cir. 2007) .......................................... 43

*Concrete Pipe & Prods. v. Constr. Laborers Pension Tr.*,
    508 U.S. 602 (1993) .................................................... 17, 18, 19

*Copar Pumice Co. v. Tidwell*,
    603 F.3d 780 (10th Cir. 2010) ........................................ 40

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
    144 S.Ct. 2440 (2024) ................................................... 46

*Dep't of Commerce v. New York*,
    588 U.S. 752 (2019) ............................................... *passim*

*DHS v. Regents of the Univ. of Calif.*,
    591 U.S. 1 (2020) .......................................................... 42

*Does 1-11 v. Bd. of Regents*,
    100 F.4th 1251 (10th Cir. 2024) ................................... 14

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) .................................................. 2, 46

*FEC v. Cruz*,
    596 U.S. 289 (2022) ...................................................... 24

*Fischer v. United States*,
    144 S.Ct. 2176 (2024) ................................................... 13

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010) ...................................................... 38

*Free the Nipple-Fort Collins v. City of Fort Collins*,
    916 F.3d 792 (10th Cir. 2019) ...................................... 46

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) ........................................................ 2

*Gundy v. United States*,
    139 S.Ct. 2116 (2019) ................................................... 39

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006) ...................................................... 35

*Ill. Republican Party v. Pritzker*,
    973 F.3d 760 Cir. 2020 ................................................. 23

*Jones v. United States*,
    526 U.S. 227 (1999) ...................................................... 36

*Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.*,
    31 F.3d 1536 (10th Cir. 1994) ...................................... 45

*King v. Burwell*,
    576 U.S. 473 (2015) ...................................................... 31

*La. Energy & Power Auth. v. FERC*,
141 F.3d 364 (D.C. Cir. 1998) ............................................... 25

*Labrador v. Poe*,
144 S.Ct. at 921 .................................................................... 47

*Larson v. Valente*,
456 U.S. 228 (1982) ............................................................. 22

*Loper Bright Enters. v. Raimondo*,
144 S.Ct. 2244 (2024) ........................................................... 1

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ............................................................. 22

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ....................................................... 22, 26

*Michigan v. EPA*,
576 U.S. 743 (2015) ............................................................. 43

*Mistretta v. United States*,
488 U.S. 361 (1989) ............................................................. 39

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................... 43

*Murthy v. Missouri*,
144 S.Ct. 1972 (2024) ............................................................ 3

*Nat'l Lifeline Ass'n v. FCC*,
921 F.3d 1102 (D.C. Cir. 2019) ........................................... 44

*Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*,
414 U.S. 453 (1974) ......................................................... 33-34

*NCAA v. Governor of N.J.*,
730 F.3d 208 (3d Cir. 2013) ........................................... 12, 18

*Nebraska v. Biden*,
52 F.4th 1044 (8th Cir. 2022) ......................................... 42, 49

*New York v. DHS*,
969 F.3d 42 (2d Cir. 2020) ................................................... 18

*New York v. Yellen*,
15 F.4th 569 (2d Cir. 2021) ................................................. 25

*NFIB v. OSHA*,
595 U.S. 109 (2022) .............................. 46, 47, 48, 49, 50

*NRDC v. Perry*,
940 F.3d 1072 (9th Cir. 2019) ...................................... 13, 41

v

*Ohio v. EPA*,
   144 S.Ct. 2040 (2024) ....................................................... 13, 42, 43, 56

*Par Pharm., Inc. v. QuVa Pharma, Inc.*,
   764 F.App'x. 273 (3d Cir. 2019) ........................................ 23

*Petry v. Block*,
   737 F.2d 1193 (D.C. Cir. 1984) ........................................ 43

*Prometheus Radio Project v. FCC*,
   652 F.3d 431 (3d Cir. 2011) ............................................ 43, 44

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) ........................................................ 35

*Rimbert v. Eli Lilly and Co.*,
   647 F.3d 1247 (10th Cir. 2012) ........................................ 40

*Shays v. FEC*,
   414 F.3d 76 (D.C. Cir. 2005) ........................................... 25

*Sprint Commc'ns Co. v. APCC Servs., Inc.*,
   554 U.S. 269 (2008) ........................................................ 18

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
   289 F.3d 89 (D.C. Cir. 2002) ........................................... 50

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) ..................................... 12, 18, 24

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ........................................................ 18

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*,
   413 U.S. 548 (1973) ........................................................ 47

*United States v. Legro*,
   284 F.App'x 143 (5th Cir. 2008) ...................................... 23

*United States v. Oakland Cannabis Buyers' Co-op.*,
   532 U.S. 483 (2001) ........................................................ 49

*United States v. Sineneng-Smith*,
   590 U.S. 371 (2020) ........................................................ 18

*United States v. Texas*,
   579 U.S. 547 (2016) ........................................................ 12

*United States v. X-Citement Video, Inc.*,
   513 U.S. 64 (1994) .......................................................... 38

*United States v. Yellowhorse*,
   86 F.4th 1304 (10th Cir. 2023) ........................................ 18

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ............................................................. 2, 29, 31

*West Virginia v. EPA*,
597 U.S. 697 (2022) ..............................1, 2, 11, 27, 28, 30, 31

*Wyoming v. Oklahoma*,
502 U.S. 437 (1992) ............................................................. 23, 24

**Constitutional Provisions and Statutes:**

U.S. Const., art. I, §9 ............................................................. 38

5 U.S.C.:
§706(2) ............................................................. 39
§706(2)(A) ............................................................. 39
§706(2)(D) ............................................................. 40

20 U.S.C.:
§1070 ............................................................. 34
§1070a(b)(7)(C)(i)(III) ............................................................. 34
§1087 ............................................................. 6
§1087-4 ............................................................. 34
§1087e(d) ............................................................. 33, 35, 36
§1087e(d)(1)(D) ............................................. 4, 31, 32, 33, 36, 38
§1087e(e)(4) ............................................................. 4, 39
§1087e(e)(7)(B) ............................................................. 5
§1087e(m) ............................................................. 32
§1098bb(a)(1) ............................................................. 6
§1098e ............................................................. 5
§1098e(a)(3) ............................................................. 5
§1098e(a)(3)(B) ............................................................. 33
§1098e(b)(1) ............................................................. 33
§1098e(b)(7) ............................................................. 5
§1098e(e) ............................................................. 5

28 U.S.C. §2401(a) ............................................................. 45

31 U.S.C. §3711(a) ............................................................. 35

**Other Authorities:**

31 C.F.R. §901.1(a) ............................................................. 36

34 C.F.R. §685.219(a) ............................................................. 5

59 Fed. Reg. 66,132 (Dec. 22, 1994) ............................................................. 5

77 Fed. Reg. 66,088 (Nov. 1, 2012) ............................................................. 5

80 Fed. Reg. 67,204 (Oct. 30, 2015)............................................................ 5

88 Fed. Reg. 1,894 (Jan. 11, 2023) (*Proposed Rule*) ............................. 7, 8

88 Fed. Reg. 43,820 (July 10, 2023) (*Final Rule*) ............................... *passim*

89 Fed. Reg. 27,564 (Apr. 17, 2024)........................................................... 44

13A Fed. Prac. & Procedure Juris. 3d §3531.4, 147 (3d ed. 2008) ......... 18

*Certainty equivalent*, NASDAQ,
    https://www.nasdaq.com/glossary/c/certainty-equivalent .............................19

Christopher J. Walker, *Against Remedial Restraint in Administrative*
    *Law*, 117 COLUM. L. REV. ONLINE 106, 117 (2017) ........................... 50

Dep't of Education, *Secretary Cardona Statement on Supreme Court*
    *Ruling on Biden Administration's One Time Student Debt Relief Plan*
    (June 30, 2023) https://tinyurl.com/2jeyaapa................................... 41

Exec. Order 12,866 (Sept. 30, 1993)........................................................... 43

Exec. Order 13,563 (Jan. 21, 2011).............................................................. 43

*Grant* and *Loan*, Black's Law Dictionary (12th ed. 2024) ....................... 34

Heitor Almeida, *The Cash Flow Sensitivity of Cash*, 59 J. of Fin. 1777
    (Aug. 2004).............................................................................................19

Holly Johnson, *How Credit Card Companies Make Money*, TIME (Jan. 8,
    2024), https://perma.cc/U9VA-TNA4 ................................................19

Ingrid Jacques, *Courts Keep Telling Biden His Student Loan Scam Is*
    *Illegal. Will It Stop Him? Nah!*, USA Today (Jul. 1, 2024) .............................1, 34

Michael Stratford, *Education Dept. Freezes Loan Payments For 3M*
    *Student Borrowers After Court Rulings*, POLITICOPRO (June 28,
    2024), https://bit.ly/4bRf2Af ......................................................... 48

Monroe Harless, *Education Department Attacks Republicans, Touts*
    *Biden's Agenda in Official Letter*, The Federalist (Jul. 15, 2024),
    https://perma.cc/4T26-A3X5 ........................................................... 3

Repay, *American Heritage Dictionary* (34th ed. 2001)............................. 32

Repay, *American Heritage Dictionary* (New College ed. 1976)................. 32

U.S. Dep't of Transportation, *How Grants Differ from Other Federal*
    *Funding and Financing*, https://perma.cc/6UPZ-2UKD ................... 34

The White House, *President Joe Biden Outlines New Plans to Deliver*
    *Student Debt Relief to Over 30 Million Americans Under the Biden-*
    *Harris Administration* (Apr. 8, 2024), https://bit.ly/4cvvkzE .......... 37

## Statement of Related Appeals Pursuant to Circuit Rule 28.2(c)(3)

Counsel for appellees is aware of the following related proceedings:

*Kansas et al. v. Biden et al.*, No. 24-3093 (10th Cir.)

*Alaska et al. v. Cardona et al.*, No. 24A11 (U.S.)

# GLOSSARY

| Abbreviation | Description |
|---|---|
| APA | Administrative Procedure Act |
| HEA | Higher Education Act of 1965 |
| HEROES Act | Health and Economic Recovery Omnibus Emergency Solutions Act |
| IBR Plan | Income-Based Repayment Plan |
| ICR Plan | Income-Contingent Repayment Plan |
| PAYE Program | Pay As You Earn Program |
| PSLF | Public Service Loan Forgiveness |
| REPAYE Program | Revised Pay As You Earn Program |
| SAVE Plan | Saving on a Valuable Education Plan |
| The Rule | Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program/ SAVE Plan |
| Proposed Rule | 88 Fed. Reg. 1,894 (Jan. 11, 2023) |
| Final Rule | 88 Fed. Reg. 43,820 (July 10, 2023) |

# Introduction

"The Supreme Court tried to block me from relieving student debt. But they didn't stop me." Ingrid Jacques, *Courts Keep Telling Biden His Student Loan Scam Is Illegal. Will It Stop Him? Nah!*, USA Today (Jul. 1, 2024), https://bit.ly/46fPThb. Such words could have come from Andrew Jackson, but instead are what President Biden said about *Biden v. Nebraska*, 600 U.S. 482 (2023). Bragging that "I've relieved student debt for over 5 million Americans," he insisted "I'm going to keep going." Jacques, *supra*. And keep going is what Defendants did: The SAVE Plan now before the Court cancels $475 billion in student debt. Applying the Supreme Court's analysis from *Nebraska*, the district court unsurprisingly entered a nationwide preliminary injunction, halting parts of the SAVE Plan.[1]

In *Nebraska*, the Supreme Court held that "'the basic and consequential tradeoffs' inherent in a mass debt cancellation program 'are [questions] that Congress would likely have intended for itself.'" 600 U.S. at 506 (quoting *West Virginia v. EPA*, 597 U.S. 697, 730 (2022)). That should have been the end of it. Agencies cannot act without authority from Congress and must respect court decisions. *See Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244, 2257 (2024).

Unfortunately, Defendants did not abide by Supreme Court's decision in *Nebraska*. Indeed, Defendants' brief is perhaps most remarkable for what it lacks—a

---

[1] As noted in the States' Statement Regarding Oral Argument, *infra*, in addition to enjoining the Administration's original "mass debt cancellation program" under the HEROES Act, *Nebraska*, 600 U.S. at 506, the Eighth Circuit last week issued an administrative stay halting the *entire* SAVE Plan.

limiting principle of the sort *Nebraska* requires. In fact, Defendants do not mention *Nebraska* until page 26 of their brief. True, the debt plan that led to *Nebraska* was predicated on the HEROES Act, whereas here Defendants rely on the Higher Education Act. But nothing in *Nebraska* suggests the Supreme Court's ruling would have been different had Defendants used a different statute to effectuate a "mass debt cancellation program." 600 U.S. at 506. To the contrary, *Nebraska* is just the latest in a series of cases forbidding agencies from repurposing statutes for sweeping new policies that Congress refused to enact.[2]

As *Nebraska* demonstrates, canceling hundreds of billions of dollars' worth of student loans is precisely the type of question that should give courts "reason to hesitate before concluding that Congress meant to confer [the] authority" to answer it to an executive agency. 600 U.S. at 501. And the issues at stake are not merely financial. Barely a year ago, the Supreme Court noted that *both* "the economic *and* political significance" of "mass debt cancellation" is "staggering by any measure." *Id.* at 502 (emphasis added). Neither has not become less staggering as the election approaches. Just a week ago, the Secretary sent a campaign ad masquerading as an official email to student-loan borrowers across the nation blasting "federal courts" for "block[ing] Americans from accessing all the benefits of the most affordable student loan repayment plan in history" and promising that "the Biden-Harris

---

[2] *See, e.g.*, *West Virginia*, 597 U.S. at 729-30; *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021); *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014); *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

Administration" will continue to battle "Republican elected officials" through this suit. Monroe Harless, *Education Department Attacks Republicans, Touts Biden's Agenda in Official Letter*, The Federalist (Jul. 15, 2024), https://perma.cc/4T26-A3X5. The major questions doctrine plainly applies.

Unable to evade *Nebraska*—or the Administrative Procedure Act—Defendants attack the States' standing. But the States presented sufficient evidence of pocket-book injuries and Defendants chose not to offer any counterevidence. In the face of that one-sided showing, the district court correctly found that the States "have established" standing by a preponderance of the evidence. App. Vol. II, at 500.[3] Such findings can be displaced only if they are "clearly erroneous," *Murthy v. Missouri*, 144 S.Ct. 1972, 1988 n.4 (2024)—a hurdle Defendants cannot meet.

Finally, the equities and public interest here overwhelmingly support injunctive relief broader than that awarded below. The Supreme Court already weighed such factors in *Nebraska* and left a nationwide injunction in place. The same analysis applies here. The States accordingly cross appeal to prevent Defendants from doing what the Supreme Court did not allow them to do in *Nebraska*—unilaterally cancel more than $400 billion in student loans.

## Statement of Jurisdiction

The States agree with Defendants' statement of jurisdiction but observe that the States timely cross-appealed on July 8, 2024. App. Vol. II, at 546.

---

[3] Citations in this format refer to Appellants' appendix.

3

# ISSUES PRESENTED

1. Whether Defendants have shown the district court clearly erred in finding that the States have standing.

2. Whether the SAVE Plan (a) exceeds Defendants' authority, particularly given the major questions doctrine or (b) violates the APA by ignoring *Nebraska*, disregarding costs, and not allowing for meaningful public comment.

3. Whether the district court abused its discretion in fashioning the preliminary injunction by (a) issuing nationwide relief or (b) enjoining all applications of the Rule implemented after July 1, 2024.

4. Whether the district court should have granted a broader injunction.

# STATEMENT OF THE CASE

## I. The Higher Education Act

In 1965, Congress enacted the Higher Education Act (HEA), creating a student-loan program backed by the federal government. Congress amended the HEA in 1993 to authorize direct federal loans to students. Congress also gave the Department authority to create "income-contingent repayment" (ICR) plans that base repayment terms on the income of the borrower. Relevant here, Congress provided that the Department may create an ICR plan "with varying annual *repayment* amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years ...." 20 U.S.C. §1087e(d)(1)(D) (emphasis added); *see also id.* §1087e(e)(4) ("[ICR] schedules shall be established by regulations ... and *shall require payments* that vary in relation to the appropriate portion of the annual income of the borrower ... as determined by the Secretary." (emphasis added)).

Two years later, the Department implemented the ICR plan, which limited annual repayment to 20% of a borrower's income that exceeds the federal poverty line. 59 Fed. Reg. 66,132 (Dec. 22, 1994).

In 2007, Congress amended the HEA again, this time creating "income-based repayment" (IBR) plans for borrowers with "partial financial hardship." 20 U.S.C. §1098e. Congress defined "partial financial hardship" relief as applying to borrowers whose annual total payment "based on a 10-year repayment period; exceeds ... 15 percent of ... the amount by which … the borrower's … adjusted gross income … exceeds ... 150 percent of the [applicable] poverty line." *Id.* §1098e(a)(3). Congress authorized the Department to "repay or cancel any outstanding balance of principal and interest due" under certain conditions and after "a period of time prescribed by the Secretary, not to exceed 25 years." *Id.* §1098e(b)(7). "[T]o encourage individuals to enter and continue in full-time public service employment," 34 C.F.R. §685.219(a), Congress also established the Public Service Loan Forgiveness (PSLF) program, which allows those who enter public service to have their loans canceled after ten years, 20 U.S.C. §1087e(e)(7)(B).

In 2010, Congress changed the cap on payments for IBR Plans to 10% of income exceeding 150% of the poverty line for loans made after 2014 and decreased the maximum repayment period to twenty years. 20 U.S.C. §1098e(e). After that, the Department established first the PAYE Program, and then the REPAYE program, extending the 2010 amendments to all borrowers. *See* 77 Fed. Reg. 66,088 (Nov. 1, 2012); 80 Fed. Reg. 67,204, 67,236-42 (Oct. 30, 2015). None of these programs went outside the text of what Congress authorized for (1) the percentage of the poverty

line threshold to determine discretionary income, (2) the cap for repayment of one's discretionary income, and (3) the time limit to pay back loans.

Furthermore, Congress has authorized the Department to cancel loans in only four circumstances, namely when a borrower: (1) has "died or been permanently and totally disabled"; (2) becomes bankrupt; (3) is falsely certified by their schools or the schools closed down or failed to pay owed loan proceeds, or (4) meets the requirements for public-service loan forgiveness. *Nebraska*, 600 U.S. at 484-85 (quotes omitted) (citing 20 U.S.C. §1087).

## II. The Administration's Plans to Cancel Student Debt

In 2020, the Biden Administration campaigned on a promise to cancel student debt. Congress, however, refused to enact such legislation. Unsatisfied, the Administration has repeatedly attempted to unilaterally erase hundreds of billions of dollars of student debt. This lawsuit challenges the second attempt.

### A. The HEROES Act Plan

In 2022, the Administration announced its first attempt, invoking the HEROES Act, a statute Congress passed in the wake of 9/11 that allowed Defendants to "modify" student loans in the event of a national emergency. *Nebraska*, 600 U.S. at 485 (quoting 20 U.S.C. §1098bb(a)(1)). Without regard to the circumstances of individual borrowers, Defendants in the HEROES Act Plan claimed across the board for millions of borrowers that the COVID-19 pandemic was such an emergency.

Six States challenged that plan in *Nebraska*. Granting certiorari before judgment, the Supreme Court held that Defendants exceeded their authority. 600 U.S. at 489,

494-98. Applying the major questions doctrine, the Supreme Court held that Defendants cannot cancel $430 billion in debt without clear authorization from Congress. *Id.* at 505-06. Because Congress never provided such clear authorization, Defendants could not "modify" loans by canceling them. *Id.*

## B.  The SAVE Plan

While the *Nebraska* challenge to the HEROES Act Plan was ongoing, the Administration announced its second attempt at debt forgiveness: the SAVE Plan. 88 Fed. Reg. 1,894 (Jan. 11, 2023) (*Proposed Rule*). Under this plan, Defendants proposed to revise the 2015 REPAYE Plan in at least three significant ways:

1. The plan caps the repayment of undergraduate loans at 5% of a borrower's discretionary income. *Id.* at 1895.

2. The plan redefines what is considered "discretionary income" at 225% of the poverty line. *Id.*

3. The plan cancels loans for everyone with a principal at or below $12,000 after ten years of payments. *Id.* at 4903. And for balances above $12,000, it adds a year to the period for each $1,000. *Id.* at 1900.

When Defendants announced the Proposed Rule, they estimated the SAVE Plan would cost $137.9 billion over ten years. *Id.* at 1895. Yet that price tag, already staggering, would have been even significantly higher but for an accounting trick: Defendants omitted hundreds of billions of dollars of loans they assumed would already be partially or completely forgiven under the HEROES Act Plan. 88 Fed. Reg. at 43,820, 43,889 (July 10, 2023) (*Final Rule*). The actual cost of the SAVE Plan is thus $475 billion. App. Vol. II, at 522.

Despite the SAVE Plan's astronomical costs (and dubious legality), Defendants provided only thirty days for comments. *Proposed Rule* at 1,930. As far as the States are aware, no agency has ever provided such a short comment period for a rule of such political and economic significance.

During the comment period, commenters urged Defendants to account for the possibility that courts could vacate the HEROES Act Plan, as *Nebraska* was already pending in the Supreme Court. *See Final Rule* at 43,875. Defendants, however, brushed aside such concerns and refused to update cost estimates as they were "confident in [their] authority to pursue debt relief," and said that they were "awaiting the Supreme Court's ruling on the issue." *Id.* Yet Defendants published that refusal to consider the effect of *Nebraska* in the Federal Register ten days *after* the Supreme Court's decision in *Nebraska*. *Compare Nebraska*, 600 U.S. 477 (issued June 30, 2023), *with Final Rule* at 43,820, 44,875 (issued July 10, 2023).

The Rule says the SAVE Plan would go into effect on July 1, 2024. *Final Rule* at 43,820. Under the Department's ordinary practice, that means that Defendants will begin to modify student loans beginning on August 1, 2024. (Accordingly, for the reasons explained in their motion to expedite briefing in this appeal, the States respectfully urge the Court to resolve this appeal as promptly as possible.)

## III. Procedural History

### A. District Court

On March 28, 2024, eleven States challenged the SAVE Plan in the District of Kansas, and moved for a preliminary injunction. App. Vol. I, at 027; App. Vol. II, at 415. Defendants filed a combined motion to dismiss and a response to the States' motion. App. Vol. II, at 284. Defendants argued that all eleven States lacked standing, *Nebraska* is irrelevant, and the SAVE Plan is otherwise lawful. *Id.*

On June 7, the district court granted in part that motion to dismiss. App. Vol. II, at 456. It determined, however, that the Alaska Student Loan Corporation, South Carolina State Education Assistance Authority, and Texas Higher Education Coordinating Board will lose interest income because of the SAVE Plan. App. Vol. II, at 469-80. Specifically, the court found that the SAVE Plan provides benefits that are not available to borrowers who deal with state loan instrumentalities and that Defendants allowed (and actively advertised and encouraged) those borrowers to consolidate their loans with new loans issued by the federal government. This means that although these entities will receive their principal back, they will lose *future* interest income—a classic pocketbook injury. *Id.* at 479-80.[4]

On June 24, the district court granted a preliminary injunction. Following the Supreme Court's lead in *Nebraska*, the court concluded that the SAVE Plan was invalid under the major questions doctrine because Congress never clearly authorized Defendants to spend $475 billion on loan cancelation and forgiveness. App. Vol. II,

---

[4] The district court dismissed the other States which based their standing on lost tax revenue. They plan to appeal but their standing is not at issue here.

at 511-14. The district court also found that Alaska, South Carolina, and Texas will suffer irreparable harm due to lost interest income that is "irrecoverable" due to sovereign immunity, *id.* at 525-26, and that it was unnecessary to balance the equities anew given precedent, *id.* at 532.

The district court, however, declined to "enjoin the entire SAVE Plan" because to do so "would require defendants to unwind" certain actions done before July 1. *Id.* at 539. The court agreed with Defendants that it would not be "workable" to reinstate forgiven loans or unwind loans for "153,000 borrowers" whose loans had already been addressed when Defendants began early implementation of the Rule. *Id.* at 530 n.9. The court instead enjoined cancelations beginning after July 1, 2024. *See id.* at 530, 541 & n.9.

## B. Stay Proceedings

On June 27, Defendants moved for a stay pending appeal in the district court, asserting for the first time that the injunction would impose administrative costs. App. Vol. I, at 019. The district court denied that motion, explaining that the Department has "known for some time about the Supreme Court's ruling in *Biden v. Nebraska* and, likewise, [has] known that it fueled a fulsome challenge to the SAVE Plan," but "nonetheless elected to adhere to the July 1 implementation date despite these risks." *Id.* at 19-20.

On June 28, Defendants sought a stay pending appeal from this Court. On Sunday, July 1, 2024, this Court granted Defendants' motion in an unreasoned order over the dissent of Judge Tymkovich. The States have applied to the Supreme Court

vacate the stay and grant certiorari in advance of judgment. *See Alaska v. Cardona*, No. 24A11 (U.S.). That application remains pending.

### C. *Missouri v. Biden*

Seven additional States pursued similar challenges in the Eastern District of Missouri. On June 24, 2024, that court applied *Nebraska* to enjoin a different portion of the SAVE Plan concerning loan forgiveness. *See Missouri v. Biden*, No. 4:24-cv-00520, 2024 WL 3104514, at *1 (E.D. Mo. Jun. 24, 2024). On July 18, 2024, the Eighth Circuit administratively stayed implementation of the *entire* SAVE Plan on a nationwide basis. *See* Order, *Missouri v. Biden*, No. 24-2332 (8th Cir. Jul. 18, 2024).

### Summary of the Argument

The Court will rarely see a starker abuse of "pen-and-phone regulations as substitutes for laws passed by the people's representatives." *West Virginia*, 597 U.S. at 753 (Gorsuch, J., concurring). In *Nebraska*, the Supreme Court held that Congress alone may authorize the federal government to issue student loans, and that Congress alone may choose to forgive them en masse. *Nebraska*, 600 U.S. at 489. As Congress has done nothing in the intervening months to write off nearly half a trillion dollars, the same result should follow here—all the more so given the Rule's separate APA violations. None of Defendants' arguments undermine these points.

**I.** The States have standing. In *Nebraska*, the Supreme Court held that Missouri had standing because its instrumentality would lose revenues from servicing the loans the Administration sought to wipe off the books. 600 U.S. at 490, 506. Similar analysis applies here. Each State before the Court has an instrumentality that owns

a portfolio of loans. Such instrumentalities make money based on a stream of interest payments. Under the SAVE Plan, however, borrowers are heavily incentivized to convert those loans into federal loans (which alone are eligible for SAVE Plan benefits). The States offered unrefuted evidence that this would harm them.

Defendants try to muddy these waters by misstating the scope of the injunction and speculating about offsetting benefits. But they are wrong about the injunction's scope and standing "is not an accounting exercise." *Texas v. United States*, 809 F.3d 134, 156 (5th Cir. 2015), *aff'd by an equally divided Court*, *United States v. Texas*, 579 U.S. 547 (2016) (quoting *NCAA v. Governor of N.J.*, 730 F.3d 208, 223 (3d Cir. 2013)). Regardless, the States have other bases for standing—including lost tax revenue and competitive injury to their ability to recruit and retain employees.

**II.** On the merits, this Court's analysis can begin and end with *Nebraska*. There, the Supreme Court applied the major questions because "'[t]he basic and consequential tradeoffs' inherent in a mass debt cancellation program 'are ones that Congress would likely have intended for itself.'" *Nebraska*, 600 U.S. at 506. As the district court explained, the same analysis applies here because the Rule's price tag of $475 billion places the SAVE Plan well within major-questions territory. App. Vol. II, at 522. That astonishing sum is even greater than the costs of the HEROES Act Plan that the Supreme Court rejected in *Nebraska* and is nearly ten times more than the costs of the Biden Administration's "eviction moratorium" that the Supreme Court also rejected on major questions grounds.

Congress also has not authorized the Rule, let alone clearly. Congress has specified the terms under which Defendants may forgive or cancel loans, and the SAVE

Plan "represent[s] the first time the Secretary has gone beyond the number set by Congress." *Id.* at 523. Doing so renders Congress's reticulated system superfluous, contrary to law. *E.g.*, *Fischer v. United States*, 144 S.Ct. 2176, 2187 (2024). Furthermore, Defendants' reading of the HEA violates a host of other interpretative principles and raises significant constitutional concerns.

**B.** The Rule is also unlawful under the APA. Despite clear warnings, the Defendants did not even acknowledge the Supreme Court's decision in *Nebraska*, even though the Court issued its opinion *before* they finalized the Rule and certainly before the Rule went into effect. *See, e.g.*, *NRDC v. Perry*, 940 F.3d 1072 (9th Cir. 2019). Defendants also failed to consider the costs of this gargantuan giveaway and only provided 30-days for public comment. Defendants have not identified another rulemaking of comparable scope and significance with such a short comment period. None of this is consistent with reasoned decisionmaking under cases like *Ohio v. EPA*, 144 S.Ct. 2040 (2024).

**III.** Defendants are also wrong that the district court abused its discretion by enjoining the Rule nationwide. The district court could not have abused its discretion by doing the same thing the Eighth Circuit did in *Nebraska*. Defendants' arguments about the scope of the district court's injunction, moreover, are both are wrong and irrelevant. And if such arguments had merit, that would be additional reason for this Court to order the district court to enlarge the injunction.

**IV.** The only error the district court committed was issuing a preliminary injunction that stopped short of halting the full harm it *found* the States would suffer. The parties disagree about the scope of the injunction, but if Defendants are right,

this Court should correct the district court's error in light of the district court's own analysis. For similar reasons, the district court abused its discretion by refusing to enjoin the Rule as applied to the Departments' other actions before July 1, 2024.

## Standard of Review

This Court reviews for abuse of discretion an order granting a preliminary injunction. *Does 1-11 v. Bd. of Regents*, 100 F.4th 1251, 1261 (10th Cir. 2024). The district court's legal conclusions are reviewed de novo and its factual findings are reviewed for clear error. *Id.*

## Argument

### I. The States have Standing.

Consistent with *Nebraska*, the district court properly held that the lost interest income to the state instrumentalities here confers standing. Indeed, Defendants' arguments to the contrary—as well as their rest of their brief—are premised on an unduly narrow view of what the district court did. Even on their own terms, however, Defendants' arguments fail because they cannot show that the district court's factual findings are clearly erroneous—particularly because they submitted *no evidence* to rebut the State's evidence. Moreover, if the Court were to reweigh the evidence on appeal, it must reweigh *all* the evidence, which demonstrates not only that the States have standing because of the harm to their entities, but also based on their separate income-tax and competitive injuries.

## A. Defendants Misunderstand the Scope of the Injunction

A theme running through Defendants' brief is that the district court—after documenting the $475 billion economic impact of the SAVE Plan—enjoined only one of three "key" provisions: the one decreasing the percentage of discretionary income required to be paid from 10% to 5%. Defendants thus contend (at 27-28) that "the only challenged provision of the rule at issue here does not directly address forgiveness at all." The Department's reasoning is incorrect at three levels.

*First*, the district court did not limit its injunction to the SAVE Plan's cap on discretionary income. Instead, it agreed with Defendants that it would not be "workable" to reinstate forgiven loans or unwind loans for "153,000 borrowers" whose loans were involved in early implemented rules. App Vol. II, at 530 n. 9. The district court thus declined to "enjoin the *entire* SAVE Plan" because to do so "would require defendants to unwind those actions, modifying the status quo." *Id*. at 539 (emphasis added). The district court thus equated "irreversible, forgiven loans" with "loan forgiveness already in effect." Indeed, as in *Nebraska*, the district court concluded that the entire Rule is unlawful under the major questions doctrine, and it enjoined cancelations beginning after July 1, 2024. *Id*. at 530 n.9, 541.

Defendants say (at 22) that the district court was not distinguishing between loan modifications occurring before and after July 1, but instead was distinguishing between the "implemented parts" (*i.e.*, the modification of discretionary income exempt from payment obligations and the reduced timeline) from the "entire plan." But that clashes with the district court's findings and analysis that emphasize the staggering cost of the SAVE Plan, which—the district court repeatedly explained—

is a question for Congress under *Nebraska*. App. Vol. II, at 513-14. To say that the district court nonetheless allowed most of the Rule's key provisions to go into effect regardless of whether borrowers' loans were modified sets the injunction at war with itself. That is not a reasonable interpretation.

*Second*, even if the district court's order could be read in the narrow way Defendants suggest, that would not solve the federal government's problem. For one thing, even if the injunction were limited to Defendants' unprecedented decision to decrease repayment obligations from 10% to 5% of discretionary income, even Defendants admit (at 26) that it would cost $59 billion *before* accounting for *Nebraska*. Yet their failure to account for *Nebraska* itself invalidates the entire rule. *Infra* pp. 40-41. Even if it did not, $59 billion is itself more than enough to trigger the major questions doctrine. *See Ala. Ass'n of Realtors*, 594 U.S. at 764. Moreover, because money is fungible, it makes not a dime's worth of difference under any of the State' arguments *how* Defendants unlawfully cancel loans—only that Congress has never authorized (much less clearly) a "mass debt cancellation program." *Nebraska*, 600 U.S. at 506. Every provision of the Rule, moreover, fails because of Defendants' APA violations. After all, by definition, an agency's failure to allow a meaningful period for public comment necessarily taints an entire rule, and that is only one of the Defendants' violations of the APA. *Infra* Part II.B.2.

*Third*, even if there were some ambiguity about the scope of the injunction, it should be resolved in the States' favor as part of their cross-appeal. *Infra* Part IV. Accordingly, whatever the scope of the district court's injunction, Defendants cannot escape the district court's analysis and the States' statutory arguments.

## B. The States Enjoy Standing Based on Their Instrumentalities' Losses of Interest Income

The district court properly found that the States have Article III standing based on pocketbook injury, namely their instrumentalities' lost interest income resulting from consolidation of loans held by those instrumentalities into direct federal loans by borrowers seeking to take advantage of the SAVE Plan. App. Vol. II, at 479-80. Defendants do not dispute that, under *Nebraska*, those harms to state instrumentalities are harms to the States themselves for purposes of Article III. *Nebraska*, 600 U.S. at 489. But they do contend that those lost-interest harms—whose factual existence is not denied—are insufficient. None of their arguments work.

**1.** At the outset, Defendants confront two insurmountable obstacles: (1) the clear-error standard of review, and (2) their choice to leave the States' standing evidence uncontroverted. As the district court explained, "without any contradictory evidence, defendants have given [the court] no facts to reach a different conclusion" than that the SAVE Plan harms the States. App. Vol. II, at 478. And Defendants do not meaningfully contest the district court's factual finding that "the states' public instrumentalities—and therefore the states—will suffer harm in the form of reduced interest income." *Id.* at 479. For good reason: Alaska, for example, offered unrebutted testimony estimating that loss at $100,000 over the next two years and ample reasoning behind how that number was formulated. *Id.* at 480. Without any evidence supporting Defendants' position, this Court cannot reach the necessary "'definite and firm conviction that a mistake has been committed'" to find clear error. *Concrete*

17

*Pipe & Prods. V. Constr. Laborers Pension Tr.*, 508 U.S. 602, 622 (1993); *accord United States v. Yellowhorse*, 86 F.4th 1304, 1310 (10th Cir. 2023).

At most, Defendants attack (at 21) Alaska's estimate of $100,000 in losses as overstated. But even a "a dollar or two" of injury suffices to establish Article III standing. *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008). So even if Alaska overestimated its harms—it did not—the existence of any harm would be sufficient to establish standing.

**2.** Unable to rebut the States' evidence, Defendants contend (at 15-18) that the States' lost income is not cognizable because it *might* be offset by investments that the state instrumentalities could theoretically make with money they receive. But "standing analysis is not an accounting exercise." *Texas*, 809 F.3d at 156 (quoting *NCAA*, 730 F.3d at 223). Instead, "once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant." *Id.* at 155-56; *see also, e.g.*, *New York v. DHS*, 969 F.3d 42, 60 (2d Cir. 2020); 13A Fed. Prac. & Procedure Juris. 3d §3531.4, 147 (3d ed. 2008). And this makes sense: Justiciability doctrines exist to ensure that "federal courts exercise their proper function in a limited and separated government," namely, to "resolve only a real controversy with real impact on real persons," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021) (quotation omitted)—not to entangle the Court in a litigant's choice about what is "best for them," *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020).

Regardless, the district court made specific factual findings rejecting Defendants' theory. App. Vol. II, at 482-83. As it explained: "The problem with

defendants' rejoinder [concerning offsetting benefits] is a basic one: they haven't adduced any evidence to support their theory. More problematic yet, plaintiffs have marshaled evidence nullifying the theory." *Id.* at 482. Because Defendants did not proffer *any* evidence to rebut the States' evidence, this Court has no basis to form a "definite and firm conviction that a mistake has been committed." *Concrete Pipe*, 508 U.S. at 622.

Indeed, rather than offering evidence of offsetting benefits, Defendants resort to speculation. They contend (at 17) that the district "court did not explain how that theory of injury can be squared with a fundamental economic concept: the time value of money." Given that Defendants never mentioned "time value of money" in their briefing below, however, the district court can hardly be faulted for failing address it. If they had, the district court could have explained that Defendants' armchair economics ignores concepts like a "certainty equivalent," *Certainty equivalent*, NASDAQ, https://www.nasdaq.com/glossary/c/certainty-equivalent, or time sensitivity in payment flows, Heitor Almeida, *The Cash Flow Sensitivity of Cash*, 59 J. of Fin. 1777 (Aug. 2004). Defendants' "lottery" argument (at 17) also ignores that the business model of entire industries depends on receiving interest payments over a period of years rather than recouping the principal all at once. *See, e.g.*, Holly Johnson, *How Credit Card Companies Make Money*, Time (Jan. 8, 2024), https://perma.cc/U9VA-TNA4. Such industries persist because not everyone wins the lottery.

**3.** Defendants also ignore that if "the complainant [can] show an actual or imminent increase in competition," that "will almost certainly cause an injury in fact."

*AICPA v. IRS*, 804 F.3d 1193, 1197 (2015). Unlike Defendants' position—which misunderstands how lenders makes money—that doctrine is premised on "'basic economic logic.'" *Id.* at 1198. And it amply supports the States' standing.

Here the federal government essentially operates as a competitor for offering student loans to these state instrumentalizes. And the SAVE Plan makes direct federal loans *far* more competitively attractive—to the tune of hundreds of billions of dollars. It thus causes the sort of increased competition that establishes Article III standing. As the district court explained, "Alaska's ASLC declaration … explains the SAVE Plan's incentives for borrowers to consolidate and testifies that the SAVE Plan already is causing borrowers to consolidate. And defendants haven't rebutted this evidence with any evidence of their own." App. Vol. II, at 479.

Thus, this "increase in competition … will almost certainly cause an injury in fact," which establishes standing. *AICPA*, 804 F.3d at 1197. In fact, the States need not have offered any such evidence at all: competitive standing exists even where the plaintiff submitted "no evidence that the competitive harm has yet occurred" and D.C. Circuit "precedent imposes no such requirement." *Id.* at 1198. But here the (1) the States have submitted such evidence, (2) Defendants have submitted *no* countervailing evidence, and (3) the district court made findings that the Rule will increase the competitive pressure on state instrumentalities.

**4.** Defendants are also wrong that the States failed to establish traceability. "Article III 'requires no more than *de facto* causality.'" *Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019) (citation omitted), which the district court found as a factual matter the States have shown. App. Vol. II, at 480. And Defendants have again

failed to establish clear error in those findings—or even acknowledge the evidence submitted by Texas. *See* Op.Br.19-21. That should end this Court's analysis.

As the Supreme Court explained in *Department of Commerce*, there is a critical distinction between a "theory of standing" that "rest[s] on mere speculation about the decisions of third parties" and one that "relies … on the predictable effect of Government action[s] … on third parties." 588 U.S. at 768. One such predictable effect—indeed, one the most predictable effects of all—is that people will act in their economic self-interest when it comes to decisions whether to "enroll in valuable benefit programs." *California v. Texas*, 593 U.S. 659, 678 (2021).

Though Defendants do address Alaska's declaration (at 20-21), they do so only in part. That declaration not only explains "the SAVE Plan's incentives for borrowers to consolidate," but further attests "the SAVE Plan already is causing borrowers to consolidate." App. Vol. II, at 479. And once again "defendants haven't rebutted this evidence with any evidence of their own." *Id.* That is because they can't. While a party can rely (as the States do) on common-sense notions that most people act in their own economic self-interest, it requires "stronger evidence" for a party "to support [a] counterintuitive theory" that private individuals will voluntarily "forgo" government largesse. *California*, 593 U.S. at 678. Yet that "counterintuitive theory" is precisely what Defendants urge—without any evidence.

Here, such evidence would have to be truly remarkable to show that borrowers would *not* take advantage of the incentives created by the SAVE Plan, which makes half a trillion dollars of debt relief available but only to those with direct federal loans. Because borrowers with loans held by state instrumentalities are left out, there are

enormous incentives to turn to the federal government and consolidate. Based on common sense, and confirmed by uncontroverted evidence, "plaintiffs have shouldered their burden to show 'that third parties [here, borrowers] will likely react in predictable ways to' the SAVE Plan." App. Vol. II, at 479 (quoting *Dep't of Com.*, 588 U.S. at 768). That borrowers might also consolidate loans for *other* reasons does not deprive States of standing to sue over this injury. *Cf. Larson v. Valente*, 456 U.S. 228, 242-43 (1982) (finding standing to challenge a "discrete injury of which appellees now complain" despite confounding causes).

And this is all before the Court considers that the traceability requirement is doubly relaxed. That requirement is relaxed a first time because the States are asserting "procedural right[s] to protect [their] concrete interests." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992). The States can thus assert their procedural rights under the APA "'without meeting all the normal standards for redressability and immediacy.'" *Massachusetts v. EPA*, 549 U.S. 497, 517-18 (2007). The traceability requirement is relaxed a second time because the States are "entitled to special solicitude" in standing analysis. *Id.* at 520. Either with or without that solicitude, the district court did not clearly err in finding that—in the absence of controverting evidence—the States have shown injury from a loss of interest income.

Finally, although Defendants make much (*e.g.*, 22) of the district court's statement that the States "just barely" met their burden, they elide what that burden *was*. Because "jurisdiction [was] challenged," the district court placed the burden on the States as "the party claiming jurisdiction to show it by a preponderance of the evidence." App. Vol. II, at 462 (citing *Celli v. Shoell*, 40 F.3d 324, 327 (10th Cir. 1994)).

The better view is that the preponderance standard that the States supposedly "just barely" met is *higher* than the standard for preliminary injunctions. *See, e.g.*, *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020); *Par Pharm., Inc. v. QuVa Pharma, Inc.*, 764 F.App'x. 273, 277 (3d Cir. 2019). But it is certainly not *lower*. *See, e.g.*, *United States v. Legro*, 284 F.App'x 143, 145 (5th Cir. 2008).

## C. South Carolina Has Standing Due to Lost Income Tax Revenue

South Carolina also has standing because the SAVE Plan will cost it income-tax revenue. As the district court recognized, the plan's effect is to accelerate debt forgiveness from a period when it is taxable under federal law (*i.e.*, 2026-on) into a period when it is not (*i.e.*, 2023-25). App. Vol. II, at 486-87. Because South Carolina conforms to the federal definition of income, it will suffer lost income tax revenue as a result of this inevitable acceleration. App. Vol. II, at 491. And lost state tax revenue establishes Article III standing. *See*, *e.g.*, *Wyoming v. Oklahoma*, 502 U.S. 437, 448, 454 (1992). The district court never doubted that South Carolina would suffer such losses as a factual matter. But it held that such losses were not cognizable for two reasons, both of which are wrong as a matter of law.

*First*, the district court rejected standing on this ground because "[t]he SAVE Plan doesn't target plaintiffs or their tax policies," so rather than being "fairly direct" the harm results from the "federal policy creat[ing] incentives, [and] borrowers react[ing] to those incentives." App. Vol. II, at 489. This reasoning, however, fails under *Wyoming*: There, the challenged policy was *not* a tax but a mandate that Oklahoma power generators burn at least 10% coal mined in Oklahoma. 502 U.S. at 440. Nevertheless, the Supreme Court found standing on a tax-based theory because

the law predictably caused third parties to react to the resulting incentives by buying less Wyoming coal, and thus paying less Wyoming tax. *Id.* at 447-54. Here, the causal chain is even more straightforward: borrowers will avail themselves of the free money that the Save Plan confers at their earliest opportunity, thereby taking advantage of debt forgiveness in a window where South Carolina cannot tax it. The district court's analysis also runs afoul of *Department of Commerce*, where the causal chain was far more attenuated. *See* 588 U.S. at 767-68.

*Second*, the district court also erred by holding that South Carolina's injuries are "self-inflicted" because South Carolina chose to conform to the federal definition of income. App. Vol. II, at 490-91. Leaving aside that most States use federal adjusted gross income or federal taxable income to calculate state income tax liability, the only choice South Carolina has is between two injuries: It either must lose tax revenue, *Wyoming*, 502 U.S. at 448, or change its laws, *Texas*, 809 F.3d at 153. A victim who has chosen between two poisons has still been poisoned, and the Court still has jurisdiction to hold the poisoner accountable. There is nothing "voluntary" about South Carolina's injury. *Cf. FEC v. Cruz*, 596 U.S. 289, 296-97 (2022).

### D. The States Also Enjoy Standing Because the SAVE Plan Injures Their Ability to Recruit and Retain Employees

Finally, the SAVE Plan harms the States' ability to recruit and retain employees by removing an incentive for employees to work for the Staes: *i.e.*, taking advantage of Congress's public-interest loan forgiveness. *Final Rule* at 43,903. By reducing or eliminating student debt under its own auspices, the SAVE Plan reduces the

attractiveness of working for States and thereby obtaining debt relief under the PSLF Program.

The district court held that the States failed to demonstrate standing under this theory because they did not show imminent injury or identify specific employees who would leave public service because of the SAVE Plan. App. Vol. II, at 492-99. This again ignores that if the government, through unlawful regulation, exposes a plaintiff to increased competition, that by itself confers standing. *See, e.g.*, *La. Energy & Power Auth. v. FERC,* 141 F.3d 364, 367 (D.C. Cir. 1998); *supra* pp. 19-20. There is no requirement that a plaintiff show the competitive harm occurred before seeking relief. *See AICPA*, 804 F.3d at 1198. Nor is this theory of standing—which allows plaintiffs to rely on "[b]asic economic logic" to establish standing, *id.*—limited to purely business contexts. For instance, in *Shays v. FEC*, the D.C. Circuit applied the doctrine when a new FEC regulation provided a benefit to rival political campaigns. 414 F.3d 76, 86-87 (D.C. Cir. 2005). Here, "basic economic logic"—especially combined with the States' uncontroverted declarations—readily supports the State's competitive standing theory of harms. *See New York v. Yellen*, 15 F.4th 569, 577 (2d Cir. 2021).

The district court was also wrong to conclude that the States have a "traceability" problem, primarily because their theory relies on actions of third parties. App. Vol. II, at 493-97. Leaving aside that competition injuries inherently involve third parties, the States were permitted to rely on the "predictable effect of Government action on the decisions of third parties." *Dep't of Com.*, 588 U.S. at 768. And here the actions of current and prospective employees are entirely predictable: Take, for

example, an employee who has 8 years of public service and had an original loan balance of $12,000. Prior to the SAVE plan, he would likely stay in public service an additional two years. But under the SAVE plan, he receives that forgiveness even if leaves to work in the private sector now. This is at least as predictable as the *illegal* actions of census respondents in *Department of Commerce*, and it inherently makes it more difficult for the States to recruit and retain talent.

This is particularly clear because of the special solicitude to which the States are entitled. *Supra* p. 22. The district refused to apply such solicitude, reasoning that States' "ability to hire and retain an undefined number of employees doesn't qualify as the kind of quasi-sovereign interest that this caselaw imagines." App. Vol. II, at 499. But States have "quasi-sovereign interest[s] in the health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982). To serve those interests, States must hire employees. Harms to the States' ability to recruit and retain employees thus necessarily harms the States' quasi-sovereign interests in the well-being of their citizens, thus triggering special solicitude standing. *Massachusetts*, 549 U.S. at 520.

## II.  The States are Likely to Succeed on the Merits.

In addition to failing to rebut the district court's findings regarding standing, Defendants also have failed to rebut the district court's conclusion that the States are likely to succeed on the merits of their substantive statutory claim. Even putting that aside, the States plainly will prevail with respect to their APA claims.

## A. The SAVE Plan Exceeds Defendants' Authority.

The district court correctly held that the SAVE Plan exceeded Defendants' authority under the major questions doctrine. The Supreme Court in *Nebraska* held that a "mass debt cancellation program" triggers the doctrine. *Nebraska*, 600 U.S. at 506; *accord* App. Vol. II, at 467-68 (applying *Nebraska*). Yet Congress has never authorized—let alone clearly—Defendants to do any such thing, and certainly has not done so in the short period since the Supreme Court decided *Nebraska*.

### 1. The Major Questions Doctrine Plainly Applies

Defendants argue for the first time on appeal that the major questions doctrine does not apply to the SAVE Plan. They were right to forfeit this position in the district court. In *Nebraska*, the Supreme Court held that " '[t]he basic and consequential tradeoffs' inherent in a mass debt cancellation program 'are ones that Congress would likely have intended for itself.' " *Nebraska*, 600 U.S. at 506 (quoting *West Virginia*, 597 U.S. at 730). Because the SAVE Plan is "mass debt cancellation program"—cancelling *at least* $156 billion in debt in Defendants' underestimate, and likely around $475 billion, App. Vol. II, at 522, 524—the same principle applies here.

Rather than meaningfully reconciling their newly discovered arguments that the major questions doctrine does not apply with the Supreme Court's analysis in *Nebraska*, Defendants try (at 27) to portray *Nebraska*'s holding as limited to the HEROES Act. Even if that were so (and it is not), that would go only to whether a given statute *satisfies* the clear statement rule the doctrine imposes. Whether the doctrine applies in the first interest is "*inherent*" to the question and adheres to *any* "mass debt cancellation program." 600 U.S. at 506 (emphasis added).

Even apart from *Nebraska*'s holding with respect to debt forgiveness programs in particular, the SAVE Plan satisfies each factor that the Supreme Court has found relevant for whether a question is so major as to be presumptively reserved to Congress—(1) "economic" significance; (2) "political" significance; (3) "histor[ical]" precedent; and (4) "the breadth of the authority that [the agency] has asserted." *West Virginia*, 597 U.S. at 721.

*First*, the SAVE Plan's economic significance is self-evident. Defendants' $156 billion estimate is three times the cost of the $50 billion sufficient to trigger the doctrine in *Alabama Association of Realtors*, 594 U.S. at 764, which concerned the Administration's unlawful eviction moratorium. App. Vol. II, at 514. And the SAVE Plan's true cost of approximately $475 billion is nearly ten times that amount and even larger than the $430 billion at issue in *Nebraska*. *See* 600 U.S. at 505; App. Vol. II, at 522.

Defendants' attempt (at 26-27) to downplay the economic significance here proves the point: Due to the size of the debt portfolio ($1.6 trillion), "many potential agency actions could [indeed] have many billions of dollars in economic impact." That is why *Nebraska* said the question was "inherent[ly]" one for Congress. 600 U.S. at 506. That Congress has not acted in the way Defendants prefer does not change the fact that "[t]here is no serious dispute that the Secretary claims the authority to exercise control over 'a significant portion of the American economy.'" *Id.* at 503 (citation omitted).

*Second*, Defendants are wrong to suggest (at 27) that the SAVE Plan has "different political … significance" than *Nebraska*. As in *Nebraska*, the political significance

of the SAVE Plan is underscored by the fact that "the Secretary's assertion of administrative authority has 'conveniently enabled him to enact a program' that Congress has chosen not to enact itself." *Nebraska*, 600 U.S. at 503 (quoting *West Virginia*, 597 U.S. at 731). If anything, that the Secretary is using the SAVE Plan as a partisan tool (in a presidential election year) demonstrates that the SAVE Plan is *more* politically significant. *See supra* pp. 2-3. Judges "are not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce*, 588 U.S. at 785.

*Third*, in terms of history, Defendants protest (at 25) that the SAVE Plan "is hardly a 'transformative' expansion of the Department's authority," because it merely adjusts variables within the Secretary's control. Yet, as the district court noted, the SAVE Plan "represent[s] the first time the Secretary has gone beyond the number set by Congress" to rewrite the material financial terms of the loans Congress authorized. App. Vol. II, at 523. Of course, "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,'" courts "typically greet its announcement with a measure of skepticism." *UARG*, 573 U.S. at 324 (quotation omitted).

Defendants cannot overcome that skepticism by claiming the SAVE Plan "incrementally" changed aspects of prior agency practice: By their own figures the plan costs *30 times* as much as the prior highwater mark. *Compare* App. Vol. II, at 522 (previous highwater mark under this statute cost only $15 billion), *with* Rule at 43,886 (admitting the SAVE Plan will cost $156 billion, even before accounting for the Supreme Court's decision in *Nebraska*), *with* App. Vol. II, at 522 (real cost of SAVE Plan is $475 billion). Indeed, the Secretary boasts—and offers as a reason to

condemn "Republicans"—that the SAVE Plan is "the most affordable student loan repayment plan *in history*." *Supra* p. 2 (emphasis added). This is precisely the repurposing of old statutes that the Supreme Court rejects generally, *supra* n. 2, and rejected specifically in this context in *Nebraska*.

The SAVE Plan is similarly transformative in the way it turns putative "loans" into partial grants from the federal government. As the Rule explains, for undergraduate debt "expected payments per $10,000 borrowed drop from $11,844 … to $6,121." *Final Rule* at 43,880. In other words, what had been an actual loan with repayment of principal and interest is transformed into a roughly 40% outright gift and 60% interest-free loan. For many borrowers, the transformation is even starker: "Borrowers with only undergraduate debt who have lifetime income in the bottom quintile are projected to repay *$873 per $10,000* [under the SAVE Plan] compared to $8,724 per $10,000 in the current REPAYE plan." *Id.* at 43,881 (emphasis added). This is plainly transformative. It was meant to be.

Defendants' response to this analysis is essentially "it's just 5%." Yet the effect of that 5% change is approximately $180 billion following *Nebraska*. After all, Defendants concede (at 26 n.7) that without *Nebraska*, this provision alone would account for $59 of the Rule's $156 billion cost; thus, assuming the same ratio after *Nebraska*, this provision is worth nearly $180 billion.

*Fourth*, "the breadth of the authority that the agency has asserted" is also relevant. *West Virginia*, 597 U.S. at 721. Here, Defendants all but admit that their interpretation of the HEA has no limiting principle, *infra* at pp. 37-38, and would permit them to abolish *all* $1.6 trillion in student debt in the Department's portfolio.

Defendants' brief offers no limit on what the Secretary can supposedly do because their theory is all but limitless. Defendants' claim to a general forgiveness authority is again the sort of repurposing of old statutes that the Supreme Court rejects.

Finally, this Court also considers whether the agency has "expertise." *Bradford v. Dep't of Labor*, 101 F.4th 707, 728 (10th Cir. 2024) (citing *King v. Burwell*, 576 U.S. 473, 486 (2015)). That consideration comes from *King*'s discussion of whether *Chevron* applies—a question no longer relevant. Regardless, the Department has never *successfully* promulgated a rule like this one. The closest is the HEROES Act Plan, which was smaller and the Supreme Court still rejected it. Defendants thus have no relevant "expertise" here and certainly do not have more expertise than the EPA did in *West Virginia* and *UARG*, yet the EPA still lost. Regardless, the district court was correct that at least "one of the touchstones favors plaintiffs so compelling that it overpowers the others." App. Vol. II, at 524. That is enough.

### 2. HEA Does Not Supply Clear Congressional Authorization

Because the major questions doctrine applies, the relevant question is whether the HEA supplies the requisite "'*clear* congressional authorization' for the power [the government] claims." *West Virginia*, 597 U.S. at 723 (citation omitted) (emphasis added). But the statute Defendants rely on does not authorize mass cancelation at all, let alone give "clear … authorization" for it. Even without the major questions doctrine, the SAVE Plan would be unlawful.

**1.** Defendants' asserted authority for the SAVE Plan is a statute that does not mention loan forgiveness. Instead, it allows the Department to create "an income contingent repayment plan, with varying annual repayment amounts based on the

income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." 20 U.S.C. §1087e(d)(1)(D). Despite that modest language, the Rule claims that the Secretary has "discretion as to how much a borrower must pay," with no floor—only a ceiling that the repayment period "cannot exceed 25 years," and the amount repaid "must be set based upon the borrower's annual adjusted gross income and that the payment calculation must account for the spouse's income if the borrower is married and files a joint tax return." *Final Rule* at 43,826-27.

Defendants' interpretation ignores the crucial word "repayment"—which, rather than supplying the requisite "clear congressional authorization" to abolish debt, *precludes* massive debt forgiveness. "Repayment" is the noun form of "repay," which means "to pay back," with a fitting example being "repaid a debt." Repay, *American Heritage Dictionary* (34th ed. 2001) (definition 1). It similarly means "to pay back (money)." Repay, *American Heritage Dictionary* (New College ed. 1976). The plain meaning of "loan" underscores this view: The word "loan" has a well-understood meaning: "A sum of money lent at interest," which must be repaid. Loan, *New College Edition* (definition 1); *accord* Loan, *American Heritage* (definition 2: "A sum of money lent at interest."). Although the HEA allows for loan forgiveness in certain specific circumstances, the required "repayment" under 20 U.S.C. §1087e(d)(1)(D)—is not one of them. *Nebraska*, 600 U.S. at 484; *see also* 20 U.S.C. §1087e(m) (authorizing "cancel[lation]" and "forgiveness" of loans under the PSLF).

Under §1087e(d)(1)(D)'s plain text, then, Defendants can devise only plans that provide *repayment* of the loan amounts—*not* ones that forgive some borrowed amounts entirely. Congress authorized the Secretary to create a "plan" in which the "loan, *including principal and interest*" is "paid over an extended period of time prescribed by the Secretary[.]" 20 U.S.C. §1087e(d) (emphasis added). Congress thus specifically insisted that "repayment" "includ[e] *principal and interest* on the loan," which demonstrates Congress' unequivocal intent that borrowers repay the principal of the loan and at least some amount of interest. *Id.* (emphasis added).

Perhaps Defendants could take actions such as varying the payment amounts that are due if a requisite reduction in a borrower's income occurs—*i.e.*, creating plans for "repayment" that are "income contingent." *Id.* §1087e(d). Or perhaps they could defer the timing of repayment, contingent on a borrower's income falling below a threshold. But where, as here, the Secretary (1) abolishes or forgives the debt or (2) transforms the debt into a partial grant/gift, the borrower repays neither the principal nor interest, contrary to §1087e(d)'s explicit mandate. *Id.*

**2.** Two aspects of the larger statutory context underscore that §1087e(d)(1)(D) does not provide sweeping authority to forgive or cancel the principal of student debt and abolish interest payments.

*First*, Congress requires a showing of "partial financial hardship" before the Secretary can extend terms similar terms to the SAVE Plan (*i.e.*, low payments followed by forgiveness). To qualify, the borrower must show that the "annual amount due" on the loan exceeds "15 percent" of their income exceeding "150 percent of the poverty line." 20 U.S.C. §1098e(a)(3)(B), (b)(1). By creating a forgiveness

program and identifying the specific qualifications, Congress denied Defendants authority to create exceptions to the plans requiring repayment. At a minimum, Defendants cannot make forgiveness *easier* than the scheme in which Congress requires a hardship showing. *See, e.g.*, *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974) ("When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.") (quotation omitted).

*Second*, Defendants' interpretation elides the difference between a loan and a grant—concepts which are distinctly different under the same statutory scheme. *Compare* 20 U.S.C. §1070, *with id.* §1087-4. To "grant" is to "give or confer (something), with or without compensation." *Grant*, Black's Law Dictionary (12th ed. 2024) . By contrast, a "loan" is "[a] thing lent for the borrower's temporary use; esp[ecially] a sum of money lent at interest." *Loan*, *id.* As grants carry with them a notion of permanence, they are inherently more expensive than loans—as the United States has emphasized in other contexts. *See, e.g.*, U.S. Dep't of Transportation, *How Grants Differ from Other Federal Funding and Financing*, https://perma.cc/6UPZ-2UKD ("In contrast with grants, **loans need to be paid back** to the government (reimbursement or repayment)." (emphasis in original)).

Congress thus frequently places limits on such grants, establishes conditions on their receipt, or both. Here, for example, Congress has provided a specific formula for determining a student's eligibility for a Pell Grant in a given award year, which "round[s] to the nearest $5" and is capped at $4,860 or $5,500, depending on the circumstances. 20 U.S.C. §1070a(b)(7)(C)(i)(III). The SAVE Plan, by contrast,

nullifies the distinction between loans and grants. Yet "it is a commonplace of statutory construction that the specific governs the general. That is particularly true where … Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (cleaned up).

**3.** Interpretative canons confirm what the plain text says. As alluded to above, e*xpressio unius* is "[a] familiar principle of statutory construction" providing that "a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute." *Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006). Similarly, courts "normally presume that, where words differ … 'Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). By explicitly providing for debt forgiveness elsewhere in the HEA, Congress's decision to exclude it from §1087e(d) means this narrow statute cannot be the basis for loan forgiveness or cancellation, let alone en masse for millions of borrowers.

Defendants' reading also violates the *in pari materia* canon, which provides "that courts do not interpret statutes in isolation, but in the context of the corpus juris of which they are a part." *Branch v. Smith*, 538 U.S. 254, 281 (2003). Other statutes governing debts and obligations owed to the federal government make clear that federal agencies are required to pursue debts owed to the federal government diligently and cannot simply discharge or cancel those debts for policy (or political) reasons. For example, the Federal Claims Collection Act mandates that federal agencies "try to collect a claim of the United States Government for money … arising out

of the activities of, or referred to, the agency," and further severely restricts the authority of such agencies to compromise or otherwise settle such debts. 31 U.S.C. §3711(a). Implementing regulations also require that agencies "aggressively collect all debts." 31 C.F.R. §901.1(a). Against that backdrop, an agency having the power to cancel hundreds of billions of dollars in debt would be an enormous aberration.

**4.** The Rule justified this departure from the ordinary meaning of "repay" by contending that "[n]othing in the HEA requires ICR plans or Department regulations to be cost neutral." *Final Rule* at 43,829. That is a non sequitur. A cost deficient interpretation of §1087e(d)(1)(D) that includes "repayment" plan may comport with the Secretary's authority, depending (of course) on what it says. A plan that merely excuses *any* repayment for millions of borrowers, however, never complies with what the provision mandates explicitly: *i.e.*, a "repayment" plan that requires repayment "including principal and interest on the loan." §1087e(d).

"Congress is unlikely to intend any radical departures from past practice without making a point of saying so." *Jones v. United States*, 526 U.S. 227, 234 (1999). Earlier rules establishing income-contingent repayment plans under §1087e(d)(1)(D) were consistent with the repayment mandate. Under those earlier approaches, "borrowers with only undergraduate debt" would on average pay "per $10,000 borrowed … $11,844 under the standard 10-year plan and $10,956 under … REPAYE." *Final Rule* at 43,880. In other words, borrowers on average repaid their loan principals with at least some interest. The numbers are similar for student debt overall (including graduate-school debt): for every $10,000 in debt taken out, the

amount repaid under the standard 10-year plan is $11,880, and $11,844 under the current REPAYE plan. *Id.*

The SAVE Plan obliterates that requirement. Under Defendants' own estimates for undergraduate-only debt, "expected payments per $10,000 borrowed drop from $11,844 under the standard 10-year plan and $10,956 under the current REPAYE plan to $6,121 under the new REPAYE plan." *Id.* The numbers are similar where overall student debt (not just undergraduate) is considered. For every $10,000 in debt taken out, the amount repaid drops to just $7,069. *Id.* In other words, the Rule not only eliminates the concept of paying interest, it also severely impairs the obligation to repay principal. Indeed, it effectively transforms more than one-third of all federal dollars "loaned" into outright gifts.

For many subgroups, Defendants' vitiation of Congress's requirement of "repayment … including principal and interest" is even starker. As noted above, for "[b]orrowers with only undergraduate debt who have lifetime income in the bottom quintile," the Rule reduces repayment of principle by 90%. *Final Rule* at 43,881. Initial estimates that "more than 1 million borrowers … could" even "see their payments go to $0 based upon the parameters of the plan in this final rule," *id.* at 43,870, immediately proved an undercount as nearly half of the initial 8 million enrollees have $0 payments.[5] This statute is entirely too small a "mousehole" for Defendants

---

[5] The White House, *President Joe Biden Outlines New Plans to Deliver Student Debt Relief to Over 30 Million Americans Under the Biden-Harris Administration* (Apr. 8, 2024), https://bit.ly/4cvvkzE.

to find authority to wipe out the debt of *millions* of borrowers totaling hundreds of *billions* of dollars. *AMG Cap. Mgmt., LLC v. FTC*, 141 S.Ct. 1341, 1349 (2021).

**5.** Perhaps more concerning is that Defendants' view (at 24) of the Secretary's ability to "fill up the details" about what constitutes "appropriate portion … for calculating payments," has no limiting principle. Their interpretation would permit a federal agency to forgive 100% of every loan at the stroke of a pen merely by setting payments at 0.1% of discretionary income, defined as 3000% federal poverty, for two months. Such a reading must be rejected not just as absurd, but also under the Court's obligation to construe statutes to avoid constitutional doubts. *See*, *e.g.*, *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994). That is true for two reasons.

*First*, Defendants' asserted authority likely violates Article I's allocation of spending power to Congress—not the Executive. U.S. Const., art. I, §9. Indeed, "control of the purse" is "[a]mong Congress's most important authorities." *Nebraska*, 600 U.S. at 505. Yet Defendants claim that §1087e(d)(1)(D) grants an executive agency the power to unilaterally abolish over $1.6 trillion in student debt—roughly equivalent to "the [federal] Government's $1.7 trillion in annual discretionary spending." *Id.* at 503. That is not permissible under "[o]ur Constitution," which "gives Congress control over the public fisc." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 420 (2024). Indeed, the States are aware of *no* precedent for an agency expending over $100 billion dollars without congressional authorization, itself a "telling indication of [a] severe constitutional problem." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010) (quotation omitted).

*Second*, if §1087e(d)(1)(D) truly gives the Department power to cancel hundreds of billions of dollars of debt merely because the Secretary believes it to be "appropriate," then it supplies no intelligible principle to guide how that power should be exercised, raising serious questions under the nondelegation doctrine. Under Defendants' reading, the Secretary enjoys near-absolute discretion to cancel as much or as little student debt as he wants because (1) by definition, such cancellation ensures that repayment plans do not exceed 25 years in length, and (2) such plans can easily set repayment "based upon the borrower's annual adjusted gross income." *Final Rule* at 43,827. The constitutional-doubt canon requires this Court to interpret the Rule to avoid these severe constitutional problems. As the Supreme Court has explained, its "application of the nondelegation doctrine principally has been limited to the interpretation of statutory texts, and, more particularly, to giving narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional." *Mistretta v. United States*, 488 U.S. 361, 373, n.7 (1989). The Supreme Court thus reads statutes with this principle in mind, *see, e.g.*, *Gundy v. United States*, 588 U.S. 128 (2019), and this Court should do the same.

**6.**    Against the foregoing, Defendants' rest their argument on essentially a single word: "appropriate" in §1087e(e)(4). Yet courts read words in context. *See, e.g.*, *Nebraska*, 600 U.S. at 511 (Barrett, J., concurring). Here, it is untenable to read "appropriate" as a license to ignore the HSA's specific provisions, statutory history, historical usage, and constitutional requirements—all of which forbid the Department from giving hundreds of billions of dollars away. Even without the major questions doctrine, that is no way to read a statute.

## B.  The Save Plan Also Violates the APA.

Even if Defendants had statutory authority to authorize mass debt cancellation, the SAVE Plan would violate the APA because: (1) it is arbitrary and capricious, 5 U.S.C. §706(2)(A), and (2) its bare 30-day comment period was too short, *id.* §706(2)(D). Although the district court did not reach these grounds, and Defendants did not address them in their opening brief here, this Court can affirm on any basis in the record. *Rimbert v. Eli Lilly and Co.*, 647 F.3d 1247, 1256 (10th Cir. 2012).

### 1.  The Rule is Arbitrary and Capricious

As the States explained below, the Rule violates the APA because the agency "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency." *Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 793 (10th Cir. 2010) (citation omitted).

Here the Rule runs afoul of that standard because it rests on a foundation that was false when the rule was published: that Defendants need not account for the possibility that the Department might lose in *Nebraska*. *Final Rule* at 43,875. But the Department had already lost—*before* the Rule was published.

To estimate that the SAVE Plan would cost 'only' $137.9 billion, the Proposed Rule excluded the HEROES Act Plan's debt cancellation. *See supra* p. 7. Unsurprisingly, a commenter asked the Department to consider the SAVE Plan's cost if the Supreme Court were to vacate that the HEROES Act Plan—as seemed likely at the time that comment was submitted, given that the Supreme Court had already granted certiorari before judgment and left the Eighth Circuit's nationwide freeze in

place. App. Vol. II, at 530. This issue is material: Without the HEROES Act cancellation, the Rule's cost would triple. *Id.* at 521-22.

Defendants, however, refused to update their cost estimates. They responded to the comment by asserting that they were "confident in [thei]r authority to pursue debt relief" under the HEROES Act even though they were "awaiting the Supreme Court's ruling on the issue." Rule at 44,875. This reasoning was incontestably false when the Rule was published. Instead, the Supreme Court had *ten days earlier* held that Defendants lacked authority under the HEROES Act to cancel student debt. It is hard to imagine what could be more arbitrary and capricious.

Defendants have elsewhere defended their refusal to engage with *Nebraska* on the ground that they had already sent the Rule to the General Printing Office before the case was decided. But Secretary Cardona himself announced that he approved the Rule *after* the Supreme Court's decision. Indeed, he declared in a June 30 press release—which was specifically responding to the *Nebraska* decision—that the Department "*today* … finalized our new [Rule]."[6] He was clear that the Rule was "finalized" only *after Nebraska* was issued at open of business that morning.

Regardless, even if Defendants' apparent rush to publish the Rule before the Supreme Court decided *Nebraska* had succeeded, they had ample authority to amend the Rule pre-publication to correct its known error. *See Perry*, 940 F.3d 1071 ("[A]gencies are free to withdraw a proposed rule before it has been published in the

---

[6] Dep't of Education, *Secretary Cardona Statement on Supreme Court Ruling on Biden Administration's One Time Student Debt Relief Plan* (June 30, 2023) (emphasis added) available at https://tinyurl.com/2jeyaapa.

Federal Register, even if the rule has received final agency approval."); *accord Citizens for Const. Integrity v. United States*, 70 F.4th 1289, 1306–07 (10th Cir. 2023) (approvingly citing *Perry*). Defendants have cited no authority that a Rule that is irreparably flawed when published can nonetheless be upheld.

In any event, the Department's "confiden[ce]" that it would prevail in *Nebraska* was hardly a reasonable justification even when the Rule was sent to the printers. After all, the Eighth Circuit had already entered a nationwide injunction against the HEROES Act Plan, which the Supreme Court had declined to stay. *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (granting nationwide injunction pending appeal); *Biden v. Nebraska*, 143 S.Ct. 477 (2022) (granting certiorari but declining to stay injunction). That refusal was a clear indication that the Supreme Court considered it likely that Defendants would lose *Nebraska*—as indeed they did.

If anything, Defendants' violation of the APA has become even clearer since the district court's injunction issued. In *Ohio*, the Supreme Court held that EPA's refusal to update its cost projections was arbitrary and capricious in the light of its "acknowledge[ment] that it could not represent with certainty whether the cost-effectiveness analysis it performed" before litigation "would yield the same results" after "two circuits [had already] issued stays" of other EPA orders preventing it from going into effect in "four States" before the Rule issued. *Ohio*, 144 S.Ct. at 2051, 2054. If EPA acted arbitrarily in *Ohio* by failing to account for *preliminary* litigation in intermediate courts of appeals, then the Department did so here by failing to account for a final adverse judgment from the nation's court of last resort.

Defendants argue that none of this matters because they need not consider costs at all. That argument is waived because it was never offered in the Rule as a basis for rejecting the commenter's request. *Final Rule* at 43,875. The "*post hoc* rationalizations of the agency … cannot serve as a sufficient predicate for agency action." *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 23 (2020).

The argument also fails on the merits: Absent a specific statutory provision to the contrary, costs are an "'important aspect of the problem'" for agencies to consider. *Michigan v. EPA*, 576 U.S. 743, 752 (2015) (quotation omitted). "Agencies have long treated cost as a centrally relevant factor when deciding whether to regulate." *Id.* at 752-53; *see also City of Portland v. EPA*, 507 F.3d 706, 713 (D.C. Cir. 2007). Even if that were not the case, Defendants' admission that they would have proceeded with the Rule even though they were clueless as to how much debt the SAVE Plan would cancel is the antithesis of the "reasoned decisionmaking" that the APA demands. *See*, *e.g.*, *Michigan*, 576 U.S. at 750 (citation omitted). Defendants can hardly claim that the Rule cancels the "right" amount of student debt when it lacks even a ballpark estimate as to how much debt cancellation that might be. *Ohio* confirms that Defendants' duty of reasoned decisionmaking does not permit the Department to ignore such an "'important aspect of the problem' before it." *Ohio*, 144 S.Ct. at 2053 (quoting *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

### 2. The Rule's 30-Day Notice Period Violated the APA

The Rule also violates the APA because its truncated 30-day notice period flunks the APA's requirement that commenters must be given a "meaningful opportunity"

to comment on proposed rules. *Prometheus Radio Project v. FCC*, 652 F.3d 431, 453 (3d Cir. 2011). As the Administrative Conference of the United States has explained, "a thirty-day period is … an inadequate time to allow people to respond to proposals that are complex or based on scientific or technical data." *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) (cleaned up).

Presidents thus typically require at least 60 days of comments for major rules. *See, e.g.*, Exec. Order No. 13,563 §2(b), 76 Fed. Reg. 3821 (Jan. 21, 2011); Exec. Order No. 12,866 §6(a)(2), 58 Fed. Reg. 51735(Sept. 30, 1993) (emphasis added). Although such executive orders are not binding on courts, they remain in force and provide crucial benchmarks for what constitutes adequate notice—which Defendants flouted. *See Final Rule* at 43,821 (acknowledging these orders).

Although agency deviations from the consensus view of at least 60-day notice periods are exceedingly rare, courts have not hesitated to call agencies to account when they attempt to short-circuit public comment. For example, the Third Circuit vacated an FCC rule where the agency "gave only 28 days" to submit comments, holding that such a short period failed to provide the "public have a meaningful opportunity to submit data and written analysis regarding a proposed rulemaking." *Prometheus Radio Project*, 652 F.3d at 453. Similarly, the D.C. Circuit invalidated an FCC rule holding that the "two-week period [for commenting] … was not an adequate period for eliciting meaningful comments." *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1103, 1117 (D.C. Cir. 2019).

Defendants here similarly violated the APA. Tellingly, in their briefing below Defendants never identified any rule with equivalent scope, complexity, and cost for

which only a 30-day comment period was provided—let alone where an agency did so and was *upheld* by a federal court. There is no reason for this Court to become the first. And the dangers of turning a blind eye to Defendants' actions are already apparent: Defendants again provided only a 30-day comment period for *another* rule effectuating yet more mass student debt cancellation exceeding $100 billion *See* 89 Fed. Reg. 27,564 (Apr. 17, 2024). None of this is consistent with the APA.

## III. The District Court Properly Considered the Remaining Factors.

Defendants' disregard of the APA—not to mention the Supreme Court's holding in *Nebraska* and the text of its own organic statute—belie their objections to the preliminary injunction's equities and scope. Indeed, the Supreme Court rejected many of the same arguments in *Nebraska* itself. And Defendants' ongoing conduct hardly makes their equitable arguments stronger.

### A. The State Established Irreparable Harm.

The district court properly held that the States established irreparable harm. App. Vol. II, at 530-31. As the district court explained, following the Eighth Circuit's analysis in *Nebraska*, because "loan forgiveness" creates "irreparable harm," it follows here that "plaintiffs have shown an irreparable harm if the SAVE Plan is allowed to take full effect on July 1, 2024." *Id.* at 530-31.

Notably, Defendants never dispute that because damages are not available here, any financial losses that the States will suffer are irremediable—and hence irreparable—harms. *See*, *e.g.*, *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab.*

*Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994). Similarly, the harms to the States' ability to recruit and retain employees constitute irreparable injury. *Id.*

Defendants' irreparable harm arguments rely (at 32-34) almost entirely on putative delay. But the statute of limitations for this challenge is *six years*. *See* 28 U.S.C. §2401(a). Here, the States filed suit on March 28, 2024—only months into that period; soon after Defendants began early implementation of the Rule; and three months *before* the Rule's stated July 1, 2024 effective date. Respectfully, it is not the States' fault that Defendants plowed ahead with a rule that ignores *Nebraska*, and Defendants do not cite a single instance in which a court has found irreparable harm was eliminated—or even undermined—by purported delay when the suit was brought *before* a rule's stated effective date. To the contrary, challenges to rules can potentially be brought even decades after the rule's effective date so long as the relevant injury occurred within the last six years. *See Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 144 S.Ct. 2440, 2460 (2024).

Finally, Defendants' assertion (at 33) that the Court can ignore this injury as "relatively meager" is borderline frivolous. Leaving aside that almost anything will look "meager" compared to this almost-half-trillion-dollar plan, the injury in *Nebraska* was not greater in any *material* sense given the $430 billion price tag for the "mass debt cancellation plan" there. 600 U.S. at 494, 506.

### B. The District Court Properly Balanced the Equities.

**1.** The district court also did not abuse its discretion in concluding that the final two *Winter* factors supported issuance of a preliminary injunction. App. Vol. II, at 531-32. On one hand, the district court found by a preponderance of the evidence

that the Rule will directly harm the States, *supra* pp. 17. On the other hand, it is never equitable nor in the public interest for federal agencies to exceed their statutory authority—let alone do so in a way that costs the United States hundreds of billions of dollars that citizens not yet born will be forced to repay for decades to come. *Cf. Brown & Williamson*, 529 U.S. at 161; *accord Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019).

Indeed, where agencies lack authority to take their challenged actions, "the equities do not justify withholding interim relief." *Nat'l Fed. Indep. Bus. v. OSHA*, 595 U.S. 109, 120 (2022). And the Eighth Circuit and Supreme Court applied that principle specifically to the mass debt cancellation in *Nebraska*, concluding that nationwide injunctive relief was warranted. The district court could not have abused its discretion in striking the same balance.

If more were needed (and it is not), the Court may look to Defendants' inequitable actions during this litigation. As set forth above, *supra* at pp. 2-3, Secretary Cardona has used this case for partisan advantage, leveraging the federal government's official channels of communication in a manner inconsistent with the Hatch Act. *See, e.g.*, *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 565 (1973). Such "unclean hands weigh[] in the equitable balance that underlies the design of a remedy." *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 991 (9th Cir. 1995).

**2.** Defendants' counterarguments are unavailing. Their reliance (at 34-35) on Justice Gorsuch's statement that the government "is irreparably injured when it 'is enjoined by a court from effectuating statutes enacted by representatives of its people'" is misplaced because—as quoted by Defendants themselves—that rule applies

to injunctions against "*statutes*" that were enacted by "*enacted by representatives of its people.*" *Labrador v. Poe*, 144 S.Ct. 921, 929 (2024) (Gorsuch, J., concurring) (emphasis added). But here, the non-statutory SAVE Plan was promulgated by a federal agency in defiance of Congress. The Supreme Court in *Nebraska* thus left in place a nationwide injunction.

Defendants are also wrong to rely (at 35-36) on disruption to their preparations and operations. Such disruptions are inherent whenever an illegal rule is enjoined. For example, though OSHA had undoubtedly made extensive preparations to carry out its mandate to compel the vaccination of roughly 84 million Americans, that did not prevent the Supreme Court from enjoining the vaccine mandate. *NFIB*, 595 U.S. 109. And here the equities that Defendants point to are far less compelling than the potential to "save over 6,500 lives," as was the case in *NFIB*. *Id.* Regardless, Defendants told reporters just one day after the district court's purportedly unimplementable injunction that it "would freeze the student loans of borrowers who are enrolled in the program—known as the SAVE plan—and required to make payments in July." Michael Stratford, *Education Dept. Freezes Loan Payments For 3M Student Borrowers After Court Rulings*, Politico Pro (June 28, 2024), https://bit.ly/4bRf2Af. And following the Eighth Circuit's administrative stay, the Department presumably immediately halted the SAVE Plan's implementation. The Department knows how to quickly to turn this program off.

To the extent that borrowers will be "confuse[d]," Op.Br.35, when the Department is forced to tell them the truth about their loan obligations, that is unfortunate. But it is not an injury cognizable in a court of equity—all the more so because there

is no basis to believe it is true. Not only have borrowers seen this same on-again-off-again process play out in the *Nebraska* litigation, but the Secretary's email last week, *supra* p. 2, confirms that Defendants can and already have been promptly communicating with borrowers about this litigation.

## C. The Scope of the Injunction is Far From Overbroad.

Although Defendants argue that the district court's injunction is improper because it provided nationwide relief and failed to sever putatively lawful aspects of the rule, they fail to demonstrate any abuse of discretion. To the contrary, as the States explain in their cross appeal, the district court abused its discretion by not following the Supreme Court's lead and going further to enjoin the entire Rule.

To start, Defendants' objections to the scope of the injunction again elide the standard of review. "For 'several hundred years,' courts of equity have enjoyed 'sound discretion' to consider the 'necessities of the public interest' when fashioning injunctive relief"—including in determining the scope of that relief. *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 496 (2001). For at least two reasons Defendants fail to overcome that deferential standard.

*First*, it is difficult to see how the district court could have exceeded the scope of its discretion by doing the same thing the Eighth Circuit did in *Nebraska*. *See* 52 F.4th at 1048. After all, the U.S. Solicitor General made similar objections to the "sweeping nationwide relief" afforded in seeking the Supreme Court's intervention. Application at 3, *Biden v. Nebraska*, 600 U.S. 482 (Nov. 18, 2022) (No. 22A444). Yet the Supreme Court neither stayed nor reversed that injunction.

*Second*, even apart from *Nebraska*, the district court provided ample explanation for the scope of its injunction. It explained, for example, that "[a] broad rule, like the SAVE Plan, requires a broad injunction, given the compelling need for nationwide uniformity in the Department's administration of student loan programs." App. Vol. II, at 538. And the Department's APA violations—including its decision to ignore *Nebraska*—infect every provision and application of the Rule, more than justifying a nationwide injunction. *See NFIB*, 595 U.S. at 120.

Defendants are also wrong (at 39-40) that the district court should have conducted a severability analysis. That argument also fails twice over.

*First*, the district court properly held this argument waived. As the district court explained, this argument "surface[d] in this Kansas case just now, for the first time" in Defendants' request for a stay pending appeal. App. Vol. I, at 19-20. Defendants "never provided any kind of roadmap for which portions should make the cut. They didn't, that is, until last night's late-night filing, when defendants peeled the SAVE Plan apart in a fashion never before furnished to the court." *Id.* Defendants do not acknowledge this holding, let alone attempt to show an abuse of discretion in it. *See*, *e.g.*, *CFPB v. Gordon*, 819 F.3d 1179, 1187 (9th Cir. 2016).

*Second*, the States' APA arguments necessarily implicate the entire rule. Failure to allow an adequate comment period—let alone failure to consider a relevant decision from the Supreme Court—means the rule is flawed from the outset due to "structural error." Christopher J. Walker, *Against Remedial Restraint in Administrative Law*, 117 COLUM. L. REV. ONLINE 106, 117 (2017). Failure to comply with the APA's notice-and-comment requirements thus "cannot be considered harmless if

there is any uncertainty at all as to the effect of that failure." *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002). The same analysis applies with respect to the major questions doctrine; because Defendants never had authority to promulgate this rule to begin with, severability is irrelevant.

## IV. The District Court Erred in Not Enjoining the SAVE Plan in Its Entirety.

The district court's injunction is flawed in at least one respect—thus prompting the States' cross-appeal. In particular, the injunction is not broad enough to remedy the legal violations the district court identified, and certainly not to remedy Defendants' separate APA violations that the district court did not address. The district court's factual findings and legal analysis emphasize the staggering cost of the SAVE Plan and thus logically support a injunction of all aspects of the plan beginning July 1, 2024. App. Vol. II, at 541. As explained above, however, the parties disagree about the scope of the district court's injunction. *See supra* p. 15-16. To the extent necessary, any uncertainty about the scope of the injunction is covered by the States' cross-appeal. Additionally, the district court also did not apply its preliminary injunction to Defendants' pre-July 1st actions with respect to certain borrowers. That was plainly erroneous, and this Court should remedy that error.

### A. The District Court Should Have Enjoined the Redefinition of Discretionary Income Prospectively.

If Defendants are right about the scope of the injunction, *but see supra* pp. 15-16, the district court's refusal to enjoin the SAVE Plan's redefinition of discretionary income going forward is at war with the remainder of the district court's reasoning.

The court therefore would have abused its discretion in declining to enjoin that aspect of the Rule prospectively. Indeed, because of Defendants' APA violations, the district court should have enjoined any and all applications of the Rule.

Under the district court's statutory ruling, there is no doubt that Defendants lacked authority to effectuate that redefinition of income under the major questions doctrine. *See* App. Vol. II, at 510-25. That change is extraordinarily expensive: an estimated $71.59 billion of Defendants' $156 billion estimate, *see Final Rule* at 43,890 (Table 5.4)—and thus likely more like $218 billion when the true $475 billion cost is considered. There is no doubt that this aspect of the Rule is invalid under the district court's merits analysis.

Nonetheless, the district court suggested that "plaintiffs have failed to show an irreparable injury from the parts of the SAVE Plan already in effect that a preliminary injunction could forestall." *Id.* at 540. As explained above, the States understand this statement to mean that the district court declined to apply its injunction to borrowers whose loans Defendants began to modify before July 1, 2024. *See supra* p. 15. By contrast, Defendants contend (at 22) that this statement means that the district court's nationwide injunction categorically does not apply to the SAVE Plan's redefinition of discretionary income, which Defendants began implementing for some (not all) borrowers before July 1.

Defendants' interpretation is manifestly inconsistent with other parts of the district court's opinions: This aspect of the Rule will continue to provide a massive incentive for borrowers going forward to continue converting loans to direct federal loans to take advantage of the hundreds of billions of dollars of debt relief the Rule

will offer going forward—as the district court recognized in its standing holding, App. Vol. II, at 478, and for its injunction of the 5% provision, *id.* at 530-31. Moreover, it will continue to harm the States by increasing competition from private firms given the relative decrease in attractiveness of PSLF relief. *See supra* pp. 19-20. It thus makes no sense to interpret the injunction as Defendants do—and if Defendants are right, the preliminary injunction's scope should be broader on its own terms.

To be sure, the district court faulted the States for "fail[ing] to present a workable injunction" regarding the "entire" SAVE Plan. App. Vol. II, at 540. But that supposed failing—even if true—would not suggest that plainly unlawful aspects of the SAVE Plan should continue to be implemented, even for borrowers whose loans had not yet been modified pursuant to the SAVE Plan's redefinition. If that is what the district court wanted, it would have said so clearly and reconciled the various pieces of its analysis. Regardless, that language must be read in context. The district court never identified *any* workability issues, and instead referred to some unspecified "pointless uncertainty." *Id.* Yet reading the district court's injunction as the Defendants do would *perpetuate* uncertainty by ambiguously forbidding or entirely leaving that illegal action in place. Once again, if Defendants read the district court's order correctly, this Court should correct its error.

After all, such nonspecific "uncertainty" hardly is a reason to permit more than $200 billion to be spent lawlessly. For perspective, that is nearly *three times* the Department's annual $68 billion budget. Such workability concerns could at most have justified a short delay for Defendants to adjust their payment systems—not the district court's supposed *de facto* indefinite blessing to continue with hundreds of

billions of dollars in unlawful spending. Nor is a workable solution hard to envision—simply revert to the REPAYE parameters in place for nearly a decade.

In short, Defendants' argument sets the district court's injunction at war with itself. But their argument also suffers from a separate flaw. If Defendants are right about the scope of the district court's injunction, then the district court necessarily erred by failing to address the States' APA claims. As explained above, Defendants' failure to analyze the SAVE Plan's true costs or even to provide an adequate comment period renders the entire Rule invalid as a matter of law. *See supra* pp. 40-41. Thus, if the district court did not grant the States' injunctive relief for *every* application of the SAVE Act after July 1, then the district court necessarily abused its discretion by cutting its legal analysis short because that additional legal analysis would have provided even more reason for broad relief.

## B. The District Court Should Have Ordered Defendants to Stop Applying the SAVE Plan to Borrowers Receiving Benefits Before July 1, 2024.

Finally, for similar reasons, the district court should have ordered Defendants to address the prior unlawful reductions in payments for certain borrowers, at least prospectively. As explained above, Defendants seek to expend hundreds of billions of dollars apparently for partisan aims. *Supra* at pp. 2-3. That is hardly equitable. Even if Defendants—in decisions before July 1—did not require certain borrowers to satisfy their monthly loan obligations for a few months, that would not be a reason to excuse Defendants from following key parts of federal law with respect to those borrowers now that a court has determined Defendants acted unlawfully.

Courts of equity should not tolerate such conduct with public money—especially because borrowers know after *Nebraska* that "mass debt cancellation" is legally barred. 600 U.S. at 506. Thus, any borrower who received any monthly benefit from the SAVE Plan before July 1 could not be surprised by a court order requiring Defendants to resume payment obligations consistent with the pre-SAVE Plan status quo. The Supreme Court in *Nebraska* did not allow *any* of the HEROES Act Plan to go into effect. The district court abused its discretion by not doing the same.

# Conclusion

The Court should affirm the district court's preliminary injunction in large part but order the district court to expand it to cover all aspects and applications of the SAVE Plan.

Respectfully submitted,

**ALAN WILSON**
Attorney General of South Carolina

/s/ Abhishek S. Kambli

ABHISHEK S. KAMBLI
Special Counsel
*Counsel of Record*


JOSEPH D. SPATE
Assistant Deputy Solicitor General


South Carolina Attorney General's Office
Robert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
Tel: (803) 734-3711


*Attorneys for the State of South Carolina*

**KEN PAXTON**
Attorney General of Texas


BRENT WEBSTER
First Assistant Attorney General


/s/ Aaron L. Nielson

AARON L. NIELSON
Solicitor General
*Counsel of Record*

Texas Attorney General's Office
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697


Drew C. Ensign
Holtzman Vogel Baran Torchinsky & Josefiak, PLLC
2575 E Camelback Road
Suite 860
Phoenix, AZ 85381
Phone: (540) 341-8808
Fax: (540) 341-8809


*Attorneys for the State of Texas*

**TREG TAYLOR**
Attorney General of Alaska


/s/ William E. Milks

WILLIAM E. MILKS
Chief Assistant Attorney General
*Counsel of Record*


JESSICA M. ALLOWAY
Solicitor General


Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
Tel.: (907) 465-4739
Fax: (515) 281-4209


*Attorneys for the State of Alaska*

## Statement Regarding Oral Argument

As the States of Alaska, South Carolina, and Texas (the States) explained in their motion to expedite this appeal filed on July 5, 2024, the States do not believe that oral argument is necessary for their challenge to the Department of Education's latest attempt at mass debt cancellation program given *Biden v. Nebraska*, 600 U.S. 482 (2023), and *Ohio v. EPA*, 144 S.Ct. 2040 (2024). Furthermore, for the reasons stated in that motion, the States urge the Court resolve this appeal before August 1, 2024, or as soon as reasonably possible thereafter. If oral argument would aid the Court's decisional process, however, the States would be pleased to participate.

In connection with any potential scheduling of oral argument, the States inform the Court that last week the U.S. Court of Appeals for the Eighth Circuit administratively stayed nationwide any implementation of the Final Rule that is the subject of this litigation. *See* Order, *Missouri v. Biden*, No. 24-2332 (8th Cir. Jul. 18, 2024). The States have applied to the U.S. Supreme Court to vacate this Court's order staying the district court's preliminary injunction pending appeal and have urged the Court to grant certiorari before judgment. *See Alaska v. Cardona*, No. 24A11 (U.S.). Because the Eighth Circuit has only entered an administrative stay, however, the States respectfully re-urge the Court to promptly resolve this appeal.

## Certificate of Compliance

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 15,023 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Aaron L. Nielson
Aaron L. Nielson

## Certificate of Service

On July 24, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with applicable rules; (2) the electronic submission is an exact copy of the paper document in compliance with; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Aaron L. Nielson
Aaron L. Nielson