Nos. 24-3089, 24-3094

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

---

STATES OF ALASKA, SOUTH CAROLINA, AND TEXAS,
*Plaintiffs-Appellees / Cross-Appellants*,
v.
DEPARTMENT OF EDUCATION, ET AL.,
*Defendants-Appellants / Cross-Appellees*.

---

On Appeal from the United States District Court for the District of Kansas
Case No. 6:24-CV-01057-DDC-ADM (Judge Daniel D. Crabtree)

---

*Amici Curiae* Brief of the New Civil Liberties Alliance, the Cato Institute, and the Mackinac Center for Public Policy in Support of Plaintiffs-Appellees/Cross-Appellants Alaska, South Carolina, and Texas

---

Sheng Li
*Counsel of Record*
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
Sheng.li@ncla.legal

July 30, 2024                *Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici* certifies that none of the *amici* has any parent corporations, and no publicly held company holds 10% or more of the stock or ownership interest in any of the *amici*.

*/s/ Sheng Li*
Sheng Li
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS .......................................................................... ii

TABLE OF AUTHORITIES ..................................................................... iii

INTERESTS OF THE AMICI CURIAE ............................................................ 1

STATEMENT OF ISSUES PRESENTED .......................................................... 3

STATEMENT OF THE CASE .................................................................... 3

ARGUMENT .................................................................................. 5

   I.  STATES HAVE STANDING IN THEIR CAPACITY AS PSLF-QUALIFYING EMPLOYERS .................................................................................. 5

     A.   SAVE Undermines Competitive Benefits that PSLF Confers on State Employers ....................................................................... 6

     B.   The District Court's Contrary Conclusion Was Wrong ........................... 12

   II.  THE 1993 HEA AMENDMENTS DO NOT AUTHORIZE SAVE .......................... 18

     A.   The 1993 HEA Amendments Require Repayment Rather than Cancellation of Student-Loan Debt ......................................................... 18

     B.   The Department's Contrary Interpretation Results in an Unconstitutional Delegation of Legislative Power ................................. 23

CONCLUSION ............................................................................... 27

CERTIFICATE OF COMPLIANCE ............................................................... 28

CERTIFICATE OF SERVICE .................................................................. 29

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*ABA v. U.S. Dep't of Educ.*,
  370 F. Supp. 3d 1 (D.D.C. 2019) ..................................................8, 14

*Adams v. Watson*,
  10 F.3d 915 (1st Cir. 1993).............................................. passim

*Am. Power & Light Co. v. SEC*,
  329 U.S. 90 (1946).............................................................24

*Biden v. Nebraska*,
  143 S.Ct. 2355 (2023) .......................................................3

*California v. Texas*,
  141 S. Ct. 2104 (2021) .................................................. 15, 16

*Can. Lumber Trade All. v. United States*,
  517 F.3d 1319 (Fed. Cir. 2008) ........................................ 6, 7, 12, 13

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
  601 U.S. 416 (2024).........................................................19

*Clinton v. City of New York*,
  524 U.S. 417 (1998).........................................................6

*Consumers' Research v. FCC*,
  No. 22-60008, 2024 WL 3517592 (5th Cir. July 24, 2024) ....................... 26, 27

*Dep't of Com. v. New York*,
  139 S. Ct. 2551 (2019).................................................. 15, 16

*Dep't of Transp. v. Ass'n of Am. RRs*,
  575 U.S. 43 (2015).........................................................24

*Dismas Charities, Inc. v. DOJ*,
  401 F.3d 666 (6th Cir. 2005) ..............................................13

*Gundy v. United States*,
  588 U.S. 128 (2019).........................................................23

*Int'l Union v. OSHA*,
  938 F.2d 1310 (D.C. Cir. 1991)........................................... 24, 25

*Jarkesy v. SEC*,
    34 F.4th 446 (5th Cir. 2022) ..................................................... 24, 26

*Mackinac Ctr. for Pub. Pol'y v. Cardona*,
    102 F.4th 343 (6th Cir. 2024) ................................................. 12

*Mistretta v. United States*,
    488 U.S. 361 (1989) ............................................................. 23, 27

*NFIB v. Sebelius*,
    567 U.S. 529 (2012) ............................................................. 16

*North Mill St., LLC v. City of Aspen*,
    6 F.4th 1216 (10th Cir. 2021) ............................................... 6, 7

*SEC v. Jarkesy*,
    144 S. Ct. 2117 (2024) .......................................................... 24

*Sherley v. Sebelius*,
    610 F.3d 69 (D.C. Cir. 2010) ......................................... passim

*Sw. Penn. Growth All. v. Browner*,
    144 F.3d 984 (6th Cir. 1998) ................................................. 7

*U.S. Telecom Ass'n v. FCC*,
    295 F.3d 1326 (D.C. Cir. 2002) ............................................ 17

*United Transp. Union v. ICC*,
    891 F.2d 908 (D.C. Cir. 1989) .............................................. 7

*Wayman v. Southard*,
    23 U.S. (10 Wheat.) 1 (1825) ............................................... 23

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ............................................................. 23

*Yakus v. United States*,
    321 U.S. 414 (1944) ............................................................. 24

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 1 ................................................................ 23

**STATUTES**

20 U.S.C. § 1078-10 ................................................................. 19

20 U.S.C. § 1087e ............................................................. passim

20 U.S.C. § 1098e ........................................................................... 19, 21, 22

26 U.S.C. § 30D ........................................................................................16

31 U.S.C. § 1301 ......................................................................................19

College Cost Reduction and Access Act of 2007,
   Pub. L. 110-84, 121 Stat. 784 (2007) ..................................................21

Health Care and Education Reconciliation Act of 2010,
   Pub. L. No. 111-152, 124 Stat. 1029 (2010)........................................22

Omnibus Budget Reconciliation Act of 1993,
   Pub. L. 103-66, 107 Stat. 312 (1993) ................................................3, 4

Principles of Economics,
   Chap. 12-2: The Supply of Labor (Univ. of Minn. Librs. ed. 2016) (2012) ........14

## REGULATIONS

34 C.F.R. § 685.219 ................................................................................8, 17

*Improving Income Driven Repayment for the William D. Ford Federal Direct
   Loan Program and the Federal Family Education Loan (FFEL) Program*,
   88 Fed. Reg. 43,820 (July 10, 2023).................................... 3, 18, 22, 25

## OTHER AUTHORITIES

Adam Looney,
   *Biden's Income-Driven Repayment plan would turn student loans into
   untargeted grants*,
   Brookings, September 15, 2022..............................................................20

Barack Obama,
   *Remarks by the President in State of the Union Address*,
   Speech given before Congress, Jan. 27, 2010 ......................................22

Cong. Rsch. Serv.,
   *The Federal Direct Student Loan Program* (1995).............................21

Department of Education,
   Secretary Cardona Statement on Supreme Court Ruling on Biden
   Administration's One Time Student Debt Relief Plan (June 30, 2023).................3

*Hearing of the Senate Committee on Labor and Human Resources to Amend the
   Higher Education Act of 1965*,
   103d Cong. (1993) ........................................................................... 20, 25

v

Matthew Chingos, et al.,
   *Few College Students Will Repay Student Loans under the Biden
   Administration's Proposal*,
   Urban Institute, January 19, 2023 ........................................................................20

Steven A. Greenlaw & David Shapiro,
   Principles of Economics (2d ed. 2017) ................................................................14

## INTERESTS OF THE AMICI CURIAE[1]

The New Civil Liberties Alliance ("NCLA") is a nonpartisan, nonprofit civil rights organization devoted to defending constitutional freedoms from the administrative state's depredations. The "civil liberties" of the organization's name include rights at least as old as the U.S. Constitution itself, such as jury trial, due process of law, and the right to have laws made by the nation's elected lawmakers through constitutionally prescribed channels (*i.e.*, the right to self-government). NCLA is keenly interested in this case because it involves a profoundly troubling assertion of administrative power and raises critically important issues of constitutional and administrative law. NCLA was one of many commenters that objected to the proposed Department of Education ("Department") rule that ultimately established the Saving on a Valuable Education ("SAVE") student-loan plan, which is the central focus of this case.

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Toward that end, Cato's Robert A. Levy Center for Constitutional Studies publishes books and studies about legal issues, conducts

---

[1] Counsel for *amici* states that all parties have consented to the filing of this brief. No party's counsel authored any part of this brief and no person other than *amici* made a monetary contribution to fund its preparation or submission.

conferences, produces the annual *Cato Supreme Court Review*, and files *amicus* briefs in federal courts across the country, including in *Biden v. Nebraska*.

The Mackinac Center for Public Policy is a Michigan-based, nonpartisan research and educational institute advancing policies fostering free markets, limited government, personal responsibility, and respect for private property. The Center is a § 501(c)(3) organization founded in 1987.

## STATEMENT OF ISSUES PRESENTED

1. Whether Defendants have shown the district court clearly erred in finding that the States have standing.

2. Whether the SAVE plan exceeds Defendants' statutory authority.

## STATEMENT OF THE CASE

On June 30, 2023, before the ink dried on the Supreme Court's decision in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), which invalidated the Department's plan to cancel $430 billion in federal student loans by unlawfully rewriting the HEROES Act of 2003, the Secretary of Education announced a new and equally unlawful debt-cancellation scheme.[2] Ten days later, the Department published a final rule establishing the so-called SAVE repayment plan, entitled *Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program*, 88 Fed. Reg. 43,820 (July 10, 2023). SAVE rewrites 1993 amendments to the Higher Education Act, Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, 107 Stat. 312, 348-49 (1993) ("1993 HEA Amendments"), to transform loan-*repayment* plans that Congress authorized into loan-*cancellation* plans that Congress did not authorize and that would wipe out $475 billion of debt owed to the U.S. Treasury.

---

[2] *See* Department of Education, Secretary Cardona Statement on Supreme Court Ruling on Biden Administration's One Time Student Debt Relief Plan (June 30, 2023).

The Court should affirm and expand the district court's preliminary injunction to halt SAVE in its entirety because the 1993 HEA Amendments do not authorize SAVE. That law merely allows the Department to establish repayment plans over a longer period so individual monthly payments could be smaller for lower-income borrowers. *See* 107 Stat. at 349. Nothing in the 1993 HEA Amendments' text nor legislative history suggests Congress granted the Department discretion to design plans like SAVE that prioritize the cancellation of loans instead of their repayment. Indeed, if the 1993 law granted such power, it would be unconstitutional because it contains no intelligible principle to guide the Department's discretion regarding how generous it can make repayment plans. Otherwise, the Department could design a plan that resulted in virtually all federal student loans being cancelled, none at all, or anything in between. Such unfettered discretion violates the Constitution's vesting of all legislative powers in Congress—or at the very least the Major Questions Doctrine, as the Court articulated in *Biden v. Nebraska* 143 S. Ct. 2355.

Moreover, the States indisputably suffer concrete and irreparable injuries because of the Department's unlawful conduct. In addition to the States' loss of revenue from their loan-servicing activities as forth in their brief, SAVE further injures the States by undermining the competitive advantages Congress bestowed on them as employers through the Public Service Loan Forgiveness ("PSLF") program, which incentivized student-loan borrowers to seek and maintain employment with

state government agencies. *See* 20 U.S.C. § 1087e(m)(3)(B)(i) (creating PSLF incentives for workers in "public service" jobs). Loss of that competitive advantage would inflict a concrete injury against the States in their capacity as employers needing to recruit and retain college-educated employees. This competitive injury, which the States raised below, confers subject-matter jurisdiction that allows the Court to halt the Department's unconstitutional attempt to rewrite laws and cancel debt owed to the Treasury.

## ARGUMENT

## I. STATES HAVE STANDING IN THEIR CAPACITY AS PSLF-QUALIFYING EMPLOYERS

*Amici* agree with the district court that the States have standing because SAVE injures their state instrumentalities that service federal loans. App. Vol. II. at 469-80. But even if that were not so, the States would still have standing in their capacity as public-service employers. The States compete in the labor market against for-profit companies to hire college-educated workers who have outstanding student loans. PSLF deliberately gives the States an advantage in that competition by offering the promise of loan forgiveness to incentivize borrower employees to take public-service jobs. SAVE injures the States by undermining that statutory recruitment advantage, shrinking the PSLF-subsidized labor pool, and increasing labor costs. *See* States Br. at 24-25; *see also* App. Vol. II, at 434-36. The district court's contrary conclusion on this alternative basis for standing was based on an

unpersuasive out-of-circuit case and failed to apply the economic logic that undergirds the competitor-standing doctrine. *See id.* at 492-99.

## A. SAVE Undermines Competitive Benefits that PSLF Confers on State Employers

"The Supreme Court has routinely recognized that a likelihood of economic injury resulting from governmental action that changes market conditions is sufficient to satisfy Article III justiciability requirements." *North Mill St., LLC v. City of Aspen*, 6 F.4th 1216, 1229 (10th Cir. 2021) (citing *Clinton v. City of New York*, 524 U.S. 417, 432-3 (1998)). Under the doctrine of competitor standing, an injury-in-fact occurs when a party's "position in the relevant marketplace would be affected adversely by the challenged governmental action." *Adams v. Watson*, 10 F.3d 915, 922 (1st Cir. 1993); *accord Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010); *Can. Lumber Trade All. v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008).

The competitor-standing doctrine explicitly obviates the need for "analysis linking [the challenged conduct] to specific, demonstrated economic harms." *Can. Lumber*, 517 F.3d at 1332. Rather, plaintiffs need establish only that it is more likely than not they will be injured by the challenged government action, and they may "fairly employ economic logic toward that end." *Id.* at 1333. "Indeed, most 'competitor standing' cases depend on … core economic postulates," such as "standard principles of 'supply and demand.'" *Adams*, 10 F.3d at 923 (citations

omitted). Competitive injury can be—and routinely is—established by predicting the conduct of third parties "based on the laws of economics." *Id.*; *see also United Transp. Union v. ICC*, 891 F.2d 908, 912 n.7 (D.C. Cir. 1989) (noting that in "garden-variety competitor standing cases," courts routinely credit causal connections "firmly rooted in the basic laws of economics" or "basic economic logic").

Thus, manufacturers that compete to sell goods, for example, need not show "lost sales, decreased market share[,]" and the like. *Can. Lumber*, 517 F.3d at 1332. By the same logic, employers that compete in the labor market need not show lost workers who quit or who could not be hired due to government action. Rather, it is enough to use economic logic to show that government action placed them "at a disadvantage compared" to competitors. *North Mill*, 6 F.4th at 1229; *accord Sw. Penn. Growth All. v. Browner*, 144 F.3d 984, 988 (6th Cir. 1998) (finding competitor standing where government action caused "economic disadvantage").

Here, the Court "must accept as true" the States' allegation that they compete against for-profit employers in the labor market for college-educated employees. *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1152 (10th Cir. 2013) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). The States receive a statutorily created advantage in that labor-market competition through PSLF, which Congress established in 2007 to encourage individuals who owe outstanding student-loan debt

to seek and maintain employment with public-service employers, including state-government agencies. 20 U.S.C. § 1087e(m)(3)(B)(i). PSLF does this by promising borrowers that their outstanding loan balances will be completely cancelled after 120 monthly payments (10 years) while working at qualifying employers. *Id.* (m)(1)(A); *see also* 34 C.F.R. § 685.219. Because of PSLF, all else being equal, working for a qualifying employer is more financially advantageous to student-loan borrowers than working at the same pay (or even higher pay) at a nonqualifying employer.

By offering these incentives to student-loan borrowers in the job market, Congress purposefully gave qualifying public-service employers a valuable advantage over nonqualifying employers in competing to recruit and retain college-educated talent. PSLF benefits public-service employers "by providing significant financial subsidies to the borrowers they hire," thereby "increasing recruitment and lowering labor costs." *ABA v. Dep't of Educ.*, 370 F. Supp. 3d 1, 19 (D.D.C. 2019). The Department's own regulations acknowledge that PSLF was expressly created for the benefit of public-service employers. 34 C.F.R. § 685.219(a). So, government action that eliminates or reduces state employers' PSLF competitive advantage inflicts an economic injury that confers standing.

State agencies rely on the ability to offer loan forgiveness under PSLF to attract employees who would otherwise take higher-paying, private-sector jobs. *See, e.g.*, Dkt. 24-5 at 2 (declaration stating that Kansas agencies advertise PSLF to

recruit employees).[3] SAVE undermines PSLF benefits by cancelling all debt for borrowers with student loans of $12,000 or less after they make 10 years of monthly payments. 88 Fed. Reg. 43,820. Because eligible borrowers get their entire loan balance forgiven after 10 years regardless of where they work (or whether they work at all), they no longer have any incentive under PSLF to seek or continue employment with public-service employers like state agencies.

Consider a recent graduate who stands to earn $10,000 in PSLF forgiveness on top of his normal salary after working 10 years at a state agency, which averages out to $1,000 in extra compensation per year. This extra, PSLF-deferred compensation means it costs the state agency, for example, only $59,000 annually in salary and benefits to offer $60,000 in effective annual compensation, as compared to for-profit employers that are not PSLF-eligible. But SAVE cancels the same graduate's $10,000 loan balance after 10 years of monthly payments, even if he never holds a public-service job. So, the state agency no longer benefits from PSLF's $1,000 per year wage subsidy in its competition against for-profit employers to recruit that graduate. To remain equally competitive as an employer, the agency's labor cost must increase by $1,000 per year to match the effective compensation it provided the employee before SAVE. While the magnitude of this increase is

---

[3] Federal courts likewise rely on "[s]tudent loan forgiveness for qualified individuals, pursuant to the terms of the PSLF program," to attract college-educated workers. Dkt. 24-3 at 3.

different—and more complex to calculate—if present value, tax effects, inflation, and the like were considered, the direction of the effect remains the same: state agencies' labor costs rise (and even if they rise a little, that confers standing to sue).

Put another way, borrowers who are now eligible for accelerated forgiveness under SAVE may work for for-profit employers while getting their loan balances forgiven after 10 years. The Department thus gives for-profit competitors the same effective wage subsidy that Congress purposefully intended only for public-service employers like state agencies to give them a leg up in recruiting and retaining college-educated talent. This unauthorized expansion of the wage subsidy to for-profit employers threatens an actual and imminent increase in competition in the labor market, which courts "recognize will almost certainly cause an injury in fact." *Sherley*, 610 F.3d at 73.

In *Sherley*, two researchers who were eligible to apply for certain government grants sued the relevant agency for expanding eligibility to other applicants, claiming such expansion would "injure [their] ability to successfully compete for … [stem cell] research funds." *Id.* at 71 (cleaned up). The D.C. Circuit held that the researchers had competitor standing, even though they neither estimated the number of new applicants nor identified the subset of grants that would be affected or denied because of additional competition. There would be competitive injury even if the researchers were successful in all their future applications because the need to

"invest more time and resources to craft a successful grant application[]" in response to the expanded eligibility, by itself, "is an actual, here-and-now injury." *Id.* at 74. Even a "trifle" amount of additional effort or expense is enough for standing. *Adams*, 10 F.3d at 924 (citation omitted).

Just like the researchers in *Sherley*, public-service employers like State agencies were eligible for a specific competitive advantage in the labor market: a wage subsidy from the promise of ten-year debt forgiveness for workers whom they employ. SAVE extends that advantage to for-profit employers that compete with State agencies to recruit college-educated workers. This increase in labor-market competition requires State to "invest more time and resources" to successfully recruit employees, which is an "actual, here-and-now injury" just as in *Sherley*, 610 F.3d at 74.

Such injury extends to the retention of employees after they are hired. Consider next a current state agency employee who had an original loan balance of $10,000 and has been making monthly payments while working for the agency for the past eight years. Without SAVE, she would have a financial incentive to stay in public service for at least two more years so she could get the remaining balance of her loans forgiven under PSLF. However, because of SAVE, she would get her debt canceled after two more years of monthly payments regardless of where she works. She can thus switch to a higher-paying, for-profit job without any negative

11

repercussions on her eligibility for debt cancellation. Again, state agencies must invest time and resources to counterbalance the elimination of that incentive.

SAVE thus completely negates recruitment and retention benefits that PSLF confers on state employers with respect to borrowers eligible for PSLF's ten-year forgiveness provision. The loss of this competitive advantage in the labor market inflicts direct and immediate competitive harm on the States as employers, which satisfies the injury-in-fact requirement for Article III standing.

**B. The District Court's Contrary Conclusion Was Wrong**

Relying on an out-of-circuit decision, the district court rejected the States' standing based on their status as PSLF-qualifying employers for two reasons. App. Vol. II, at 496 (citing *Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343 (6th Cir. 2024)). Both are wrong.

*First*, the district court faulted States for relying on "elementary economics" instead of identifying current or prospective employees who received relief under SAVE and whose employment decisions were altered because of SAVE. *Id*. But competitor standing explicitly disavows any need to link government action to specific economic loss such as "lost sales," *Can. Lumber*, 517 F.3d at 1332, or in this case, lost employees. Indeed, if that were required, competitor standing would be a dead letter because it would be impossible to trace specific economic decisions—*e.g.*, buying a product or taking a job—to a government's illegal

12

extension or withdrawal of a subsidy. *See Dismas Charities, Inc. v. DOJ*, 401 F.3d 666, 677 (6th Cir. 2005) (noting that "the absence of competitor standing may render [unlawful] agency actions effectively immune from judicial review" and that a prior agency "violation would presumably have continued unabated in the absence of competitor standing"). Rather, the whole point of competitor standing is to allow a party to rely on "core economic postulates," *Adams*, 10 F.3d at 923, and "economic logic," *Can. Lumber*, 517 F.3d at 1332.

Similarly, it is of no moment that the State did not identify specific future employees whose PSLF incentives are extinguished by SAVE. *Sherley*, for instance, held that researchers have competitor standing because of increased competition from unknown future grant applicants for unknown future stem-cell grant applications that the agency had not yet announced. 610 F.3d at 73-74. Just as it was predictable in *Sherley* that there would be future (but unknown) applicants that the researchers would need to compete with to win, it is predictable here that state agencies face increased competition when seeking to hiring future (but unknown) PSLF-eligible employees. Hence, the States may rely on "standard principles of 'supply and demand'" to link SAVE to a negative impact on debt-laden employees' incentives to take and stay in public-service jobs. *Adams*, 10 F.3d at 923.

"Markets for labor have demand and supply curves, just like markets for goods." Steven A. Greenlaw & David Shapiro, Principles of Economics ch. 4.1—

13

Demand and Supply at Work in Labor Markets (2d ed. 2017).[4] "As wages in one industry rise relative to wages in other industries, workers shift their labor to the relatively high-wage one[,]" and vice versa. Principles of Economics, Chap. 12-2: The Supply of Labor (Univ. of Minn. Librs. ed. 2016).[5] The promise of loan forgiveness after 10 years under PSLF is a wage subsidy that causes workers to shift labor toward public-service jobs, which reduces labor costs for public-service employers. *See ABA*, 370 F. Supp. 3d at 19. Because SAVE provides the same ten-year forgiveness to eligible borrowers who take for-profit jobs, it negates PSLF and causes some eligible workers to shift away from public-service jobs, which increases labor costs for public-service employers like state agencies. The district court was wrong to dismiss such reasoning as "elementary economics."

That thousands of other public-service employers share the States' competitive injury does not reduce it. *Adams*, 10 F.3d at 924 ("[T]he Commissioner cannot carry the day on the claim that appellants' injury-in-fact is shared with so large a class (all out-of-state producers selling to Massachusetts dealers) that their respective shares of the aggregate injury will be minimal."). The two researchers in *Sherley* shared their competitive injury with all other pre-existing stem-cell

---

[4] *See* available at: https://openstax.org/books/principles-economics-2e/pages/4-1-demand-and-supply-at-work-in-labor-markets (last visited October 10, 2023).
[5] Available at: https://open.lib.umn.edu/principleseconomics/chapter/12-2-the-supply-of-labor/ (last visited July 21, 2023).

researchers, but that did not prevent the court from finding Article III standing.  610 F.3d at 74

*Second*, the district court incorrectly held that the States "have a third party problem" because they could not show that third-party borrowers who receive ten-year debt forgiveness under SAVE—and thus have no incentive to seek ten-year debt forgiveness under PSLF—are less likely to take public-service jobs. App. Vol. II, at 496-97. The district court again misses the point of competitor standing, which is based on using economic logic to predict the effects of illegal government action on third-party consumers or workers. The Supreme Court recognizes that standing may be based on "the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). Such predictions are not speculative when they are based on economic incentives that the government creates.

The district court's reliance on *California v. Texas*, 141 S. Ct. 2104, 2117 (2021), cited at App. Vol. II, at 496, is misplaced because that case actually *supports* incentive-based standing. *California* concerned a statute that initially incentivized the purchase of health insurance with tax penalties for those who did not purchase insurance, but later Congress "effectively nullified the penalty." *Id.* at 2112. The Court agreed that standing based on third-party purchases existed when "the penalty provision was still in effect." *Id.* at 2114 (citing among other cases *NFIB v. Sebelius*,

15

567 U.S. 529 (2012)). But standing could not be sustained after the penalty was withdrawn because, with no penalty to incentivize purchases, third-party purchases were no longer fairly traceable to the challenged statute. *Id*. In other words, *California* recognized that financial incentives predict third-party behavior for standing purposes. When monetary incentives are withdrawn—whether a tax penalty or wage subsidy—third parties predictably will engage less in the previously incentivized activity. Fewer workers taking public-service jobs when the Department eliminates their PSLF incentives is "the predictable effect of Government action on the decisions of third parties." *Dep't of Com.*, 139 S. Ct. at 2566.

The district court's refusal to consider how changes in financial incentives affect third parties would improperly eviscerate the competitor-standing doctrine. For instance, while federal statutory tax credits for purchasing electric vehicles ("EVs") go to third-party consumers rather than manufacturers, *see* 26 U.S.C. § 30D, they clearly benefit EV manufacturers by making their products more attractive relative to non-electric vehicles. If the government acted unlawfully to extend that tax credit to subsidize purchases of *non*-electric vehicles too, EV manufacturers would plainly suffer competitive disadvantage and yet somehow would lack standing to sue under the district court's reasoning. There are many reasons why third-party consumers may purchase one company's product or service over

another's. But price is certainly an important factor. Thus, when a government subsidy allows a company to "offer lower prices for the same … services," the competitor-standing doctrine predicts that consumers will purchase the lower cost service at its competitor's expense. *See U.S. Telecom Ass'n v. FCC*, 295 F.3d 1326, 1331 (D.C. Cir. 2002).

The same logic applies in the labor market. While there are many reasons why workers might take a job in public service versus the for-profit sector, it is hardly speculative to say that financial compensation is important. Thus, a wage subsidy will drive workers toward the subsidized sector, which in turn lowers labor costs for employers in that sector. Indeed, the whole point of PSLF's promise of ten-year debt forgiveness is to provide a subsidy that allows public-service employers like state agencies to attract third-party, college-educated workers with lower wages than they would otherwise need to offer. 34 C.F.R. § 685.219. Conversely, when that public-service subsidy is negated—because SAVE extends the same debt forgiveness to all sectors for eligible borrowers—fewer borrowers will be incentivized by PSLF to take public-service jobs, which in turn reduces the labor-cost benefits provided by PSLF.

In short, the competitor-standing doctrine allows the States to establish economic injury by using basic economic logic to predict the negative economic

impact of the Department's elimination of a wage subsidy for borrowers who would otherwise be incentivized to work for state agencies.

## II. THE 1993 HEA AMENDMENTS DO NOT AUTHORIZE SAVE

### A. The 1993 HEA Amendments Require Repayment Rather than Cancellation of Student-Loan Debt

The Department claims SAVE is authorized by the 1993 HEA Amendments, which provided in relevant part that "income contingent repayment shall be based on the [borrower's] adjusted gross income," and should "not … exceed 25 years." 20 U.S.C. §§ 1087e(d)(1)(D), 1087e(e)(2). According to the Department, this language allows it to design an income-contingent repayment plan with low monthly payments so that very little debt will have been repaid by the end of the repayment period, at which point the substantial remaining balance is cancelled. Dep't Br. at 28-29; *see also* 88 Fed. Reg. at 43,827 (statute requires "only that payments must be set based upon the borrower's annual adjusted gross income[.]"). There is no limiting principle. If the Department's position were accepted, it could, for instance, set the monthly payment cap at 1 percent of income over $1 million, so that nearly all loans would be cancelled rather than repaid at the end of the repayment term.

This boundless interpretation runs afoul of the 1993 law's plain text, which calls for "repayment" of debt with no mention of any authorization to cancel debt owed to the Treasury. *See* 20 U.S.C. § 1087e. Any cancellation of federal student-loan debt gives away "money otherwise destined for the general fund of the

18

Treasury" and thus involves an appropriation of funds. *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024). Congress made clear that a "law may be construed to make an appropriation out of the Treasury … only if the law specifically states that an appropriation is made[.]" 31 U.S.C. § 1301(d). Hence, when Congress authorizes debt forgiveness, it uses explicit language. *See, e.g.*, 20 U.S.C. § 1078-10(b) ("The Secretary shall … assume[] the obligation to repay a qualified loan" for qualifying teachers); § 1087e(m)(1) ("The Secretary shall cancel the balance of interest and principal due …" for borrowers who satisfy PSLF); § 1098e(b)(7) ("the Secretary shall repay or cancel any outstanding balance …" of eligible borrowers).

The lack of similarly explicit language in the 1993 income-contingent repayment provisions confirms that Congress did not authorize the Department to establish repayment plans that are designed to *cancel* debt.[6]  Rather, the 1993 law requires the Department to establish plans that provide for *repayment* of debt, albeit along a longer time horizon, "not to exceed 25 years," 20 U.S.C. § 1087e(d)(1)(D), so that monthly payments can be smaller for borrowers with lower income.

---

[6] The States rely on the Major Questions Doctrine to make a similar argument that a clear statement is needed to authorize the mass cancellation of student loans. States Br. at 27-31. *Amici* agree but note that it is not necessary to invoke the Major Questions Doctrine because 31 U.S.C. § 1301(d) already provides that a clear statutory statement is needed to authorize the expenditure of funds from the Treasury to pay for student-loan debt cancellation.

Then-Deputy Secretary of Education Madeline Kunin explained to Congress in 1993 that income-contingent repayment would be cost-neutral in the long run: "As to what the cost of [these plans] would be, we see it as a wash" because the government "would eventually get paid" and "[t]here would be interest charged on that, so it isn't like [borrowers] are getting a free ride." *Hearing of the Senate Committee on Labor and Human Resources to Amend the Higher Education Act of 1965*, 103d Cong. 48 (1993) ("Kunin Testimony").[7] Cost neutrality is obviously incompatible with granting the Department authority to design a repayment plan that ends up forgiving most loans.[8] To be sure, Deputy Secretary Kunin acknowledged that some small portion of loans might become uncollectable at the end of the payment period and "the Secretary will make some designation as to when you call it quits and [borrowers] are forgiven." *Id*. As any participant in the loan industry knows, writing off *some* bad loans as uncollectable is an unavoidable part of the business. But write-offs are not the goal—repayment is.

An income-contingent repayment plan contains two essential variables: the monthly payment cap; and the repayment term. If the term is short, then monthly

---

[7] *Available at*: https://files.eric.ed.gov/fulltext/ED363187.pdf.

[8] Analysts at the Brookings Institution and the Urban Institute estimate that SAVE would cancel 50 percent or more of participants' student-loan debt. Adam Looney, *Biden's Income-Driven Repayment plan would turn student loans into untargeted grants*, Brookings, September 15, 2022. Matthew Chingos, et al., *Few College Students Will Repay Student Loans under the Biden Administration's Proposal*, Urban Institute, January 19, 2023.

payments must be higher to ensure repayment. And if the term is long, then monthly payments may be lowered. By limiting the maximum term to 25 years, Congress also limited the extent to which the Department could lower monthly payments— they cannot be so low that repayment is not feasible within the 25-year term. Consistent with this understanding, the Department's original income-contingent plan allowed a borrower's monthly payment to be capped at 20 percent of income above the federal poverty line. Cong. Rsch. Serv., *The Federal Direct Student Loan Program* 10 (1995).[9] A lower cap, like the one offered under SAVE, would result in a plan that is not designed to achieve repayment within the maximum 25-year terms. It would impermissibly prioritize debt cancellation over the statutory text requiring the Department to ensure debt "repayment."

Subsequent legislation reinforces this conclusion. Because the original income-contingent repayment plan based on the 1993 HEA Amendments was seen as insufficiently generous, Congress enacted the College Cost Reduction and Access Act of 2007 ("CCRA"), Pub. L. 110-84, 121 Stat. 784 (2007), which authorized income-based repayment plans that reduce monthly payments to 15 percent of income above 150 percent of the poverty line. 20 U.S.C. § 1098e(a). Unlike the 1993 law, CCRA contained explicit language authorizing loan cancellation after 25 years of payments. *Id.* at § 1098e(b)(7). Believing even more generosity was needed,

---

[9] *Available at*: https://files.eric.ed.gov/fulltext/ED378875.pdf.

President Obama urged Congress in his 2010 State of the Union address to lower the payment cap to "only 10 percent of their income [above 150 percent of the poverty line]" and to shorten the payment period so "all of their debt will be forgiven after 20 years." Barack Obama, *Remarks by the President in State of the Union Address*, Speech given before Congress, at 5, Jan. 27, 2010.[10] Congress obliged and enacted these 10-percent and 20-year proposals in the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029, § 2213 (2010) ("HCERA"), codified at 20 U.S.C. § 1098e(e).

The 2007 CCRA and 2010 HCERA make no sense if the 1993 HEA Amendments already authorized the Department to unilaterally design an even more generous repayment plan like SAVE. SAVE reduces monthly payments to only five percent of income in excess of 225 percent of the poverty line, 88 Fed. Reg. at 43,820, resulting in far more debt being cancelled instead of being repaid at the end of the 20-year repayment period as compared to HCERA. It also reduces the payment period to only 10 years for certain borrowers, *id*., which further increases the amount of debt cancelled rather than repaid. If the Department could have promulgated this plan at any point since 1993, as it now claims, then why did President Obama need to press Congress to enact HCERA in 2010 to authorize *less*

---

[10]    *Available    at*:    https://www.govinfo.gov/content/pkg/DCPD-201000055/pdf/DCPD-201000055.pdf.

generous income-based repayment? The obvious answer is that the 1993 law was never before understood to allow the Department to establish a repayment plan that is more generous than what Congress explicitly authorized in HCERA.

## B. The Department's Contrary Interpretation Results in an Unconstitutional Delegation of Legislative Power

The Department's contrary interpretation of the 1993 HEA Amendments to authorize SAVE must be rejected as an unconstitutional delegation of legislative power. "Article I, § 1, of the Constitution vests all legislative powers herein granted … in a Congress of the United States. U.S. Const. art. I, § 1. This text permits no delegation of those powers." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (cleaned up). Accordingly, "Congress … may not transfer to another branch 'powers which are strictly and exclusively legislative.'" *Gundy v. United States*, 588 U.S. 128, 135 (2019) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825)). The Supreme Court's formulation of that longstanding rule states that Congress may grant regulatory power to an agency only if it provides an "intelligible principle" by which the agency must exercise it. *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (quoting *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928)).

While the intelligible-principle test has been criticized as too lax,[11] it still demands the articulation of objective principles that allow courts to test whether the agency has faithfully executed Congress' command. *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946); *Yakus v. United States*, 321 U.S. 414, 426 (1944) (delegation would be unconstitutional if "it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed"). Thus, a statute that delegates to an agency "unfettered discretion" to make policy choices is unconstitutional. *Jarkesy v. SEC*, 34 F.4th 446, 460–61 (5th Cir. 2022), *affirmed on other grounds sub nom.*, *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024); *see also Int'l Union v. OSHA*, 938 F.2d 1310, 1317 (D.C. Cir. 1991).

Here, the Department claims that the 1993 HEA Amendments conferred unfettered discretion on the Secretary to invent whatever student-loan repayment plans he wishes. The Department says the explicit minimum-payment provisions that Congress enacted in 2007 and updated in 2010 do not bind it. Instead, the Department can design a repayment plan with even lower monthly payments and a shorter repayment period such that very little debt will have been repaid by the end

---

[11] *Dep't of Transp. v. Ass'n of Am. RRs*, 575 U.S. 43, 77 (2015) (Thomas, J., concurring) (Explaining that the intelligible-principle "test [that courts] have applied to distinguish legislative from executive power largely abdicates [the judiciary's] duty to enforce that prohibition [against legislative delegation].").

of the repayment period, at which point the substantial remaining balance is cancelled.

In the Department's view, "[t]he statute … gives the Secretary discretion as to how much a borrower must pay, specifying only that payments must be set based upon the borrower's annual adjusted gross income[.]" 88 Fed. Reg. at 43,827. Its brief confirms that it believes the Secretary has unlimited discretion to set payments to whatever amount he personally deems to be an "appropriate portion" of the borrower's income. Dep't Br. at 29 (quoting 20 U.S.C. § 1087e(e)(4)). Under this view, the same 1993 text authorizes both the original income-contingent plan that was expected to be cost neutral in the long-run[12] *and* the $475 billion SAVE plan, and presumably anything in between. Such unfettered discretion would plainly amount to an unconstitutional delegation of legislative power. *Int'l Union*, 938 F.2d at 1317 (rejecting on nondelegation ground agency's assertion of authority "to require precautions that take the industry to the verge of economic ruin … or to do nothing at all.").

SAVE's exorbitant price tag is not even the upper limit. If the only requirement is for payments to be based on income, as the Department claims, then it could lower the payment cap to just one percent of income above $1 million, which would result in zero payments from the vast majority of borrowers. Nearly all

---

[12] *See supra* Kunin Testimony.

student-loan debt would remain unpaid and then cancelled after 20 years. The Department's capacious view of its power would also allow it to reduce the payment period to 10 years or even shorter to further maximize debt cancellation. Perhaps the Department would object to this extreme option as not "appropriate" under the 1993 statute. *See* Dep't Br. at 29. But it also claims that appropriateness is "determined by the Secretary," *id.*, so he has unfettered discretion, *Jarkesy*, 34 F.4th at 460–61.

In any event, "appropriateness" is no more concrete than the "sufficient" and "affordable" principles that the Fifth Circuit recently held were unintelligible in *Consumers' Research v. FCC*, No. 22-60008, 2024 WL 3517592, at *11 (5th Cir. July 24, 2024). There, the statute authorized an agency's levying of contributions to ensure a fund is "sufficient … to preserve and advance universal [telecommunication] service," which "should be available at … affordable rates." *Id.* at *10 (quoting 47 U.S.C. § 254). The Court held these "contentless" principles were unintelligible because they provide no "*no guidance* whatsoever" regarding how the agency determines what is "sufficient" or "affordable." *Id.* at *11-12 (quoting *Jarkesy*, 34 F.4th at 462). Here too, nothing in the 1993 statute guides the Secretary's discretion to reduce student-loan payments to what he determines to be an "appropriate portion" of income, with the remainder cancelled after a period he sets. The intelligible-principle test cannot support the Department's attempt to invoke "appropriate portion" as a limiting principle because it would be impossible

to "ascertain whether the will of Congress has been obeyed." *Id.* at \*12 (quoting *Mistretta*, 488 U.S. at 379).

This nondelegation problem is easily avoided if the Court properly construes the 1993 HEA Amendments not to authorize the cancellation of debt at the end of the repayment period—an easy task since the text contains no such authorization to expend taxpayer funds. *Supra* at 18-19. Then, the phrase "appropriate portion" becomes intelligible and would mean an amount that would allow the borrower to fully repay the debt within the repayment period set by the Secretary, which may not exceed 25 years.

## CONCLUSION

For the foregoing reasons, the States have standing to sue, are likely to succeed on the merits, and the Court should affirm the district court's preliminary injunction and order the district court to expand it to cover all applications of SAVE.

July 30, 2024                                  Respectfully submitted,

                                               */s/ Sheng Li*_____

                                               Sheng Li
                                                    *Counsel of Record*
                                               NEW CIVIL LIBERTIES ALLIANCE
                                               1225 19th St. NW, Suite 450
                                               Washington, DC 20036
                                               (202) 869-5210
                                               Sheng.li@ncla.legal

                                               *Counsel for Amici Curiae*

27

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 5,785 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 14-point Times New Roman font.

In accordance with this Circuit's CM/ECF Procedures, I also certify that this document: (1) contains no information subject to the privacy redaction requirements of Circuit Rule 25.5; (2) the hard copies to be submitted to the Clerk of the Court are exact copies of the version submitted electronically, and (3) the electronic submission was scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Sheng Li*
Sheng Li
*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 30, 2024, I electronically filed the foregoing brief with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties represented by counsel who are registered CM/ECF users.

*/s/ Sheng Li*_____
Sheng Li
*Counsel for Amici Curiae*